**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| **TPC GROUP INC.**, *et al.*, | Case No. 22-10493 (___) |
| Debtors.[1] | Joint Administration Requested |

**MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, REIMBURSABLE EXPENSES, AND OTHER OBLIGATIONS ON ACCOUNT OF COMPENSATION AND BENEFITS PROGRAMS AND (B) CONTINUE COMPENSATION AND BENEFITS PROGRAMS AND (II) GRANTING RELATED RELIEF**

TPC Group Inc. and its affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully represent as follows in support of this motion (this "**Motion**"):

<u>Background</u>

1.      On the date hereof (the "<u>Petition Date</u>"), the Debtors commenced these chapter 11 cases by filing voluntary petitions with this Court under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

2.      The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee has been appointed in these cases.  The Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: TPC Group Inc. (3618); TPC Holdings, Inc. (7380); TPC Group LLC (8313); Texas Butylene Chemical Corporation (7440); Texas Olefins Domestic International Sales Corporation (4241); TPC Phoenix Fuels LLC (9133); Port Neches Fuels, LLC (1641); and TP Capital Corp. (6248). Each Debtor's corporate headquarters and mailing address is 500 Dallas St., Suite 2000, Houston, Texas 77002.

Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**").

3.     The Debtors are the leading North American producer and processor of intermediate and specialty chemicals and fuel derivatives.  Their products are critical to a wide range of end-markets and applications, including synthetic rubber, fuels, lubricants, plastics, and surfactants.  Additional information regarding the Debtors' businesses, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Robert A. Del Genio in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "**First Day Declaration**"), filed contemporaneously herewith and incorporated herein by reference.[2]

## Jurisdiction and Venue

4.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

5.     Pursuant to Local Rule 9013–1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

---

[2]     Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the First Day Declaration.

6.      The statutory predicates for the relief requested herein are sections 105(a), 362(d), 363(b), 364 and 503(b) of the Bankruptcy Code, Bankruptcy 4001, 6003 and 6004, and Bankruptcy Local Rule 9013-1(m).

### Relief Requested

7.      Pursuant to sections 105(a), 363(b), 507(a), and 541 of the Bankruptcy Code, as supplemented by Bankruptcy Rules 6003 and 6004(h) and Local Rule 9013-1(m), the Debtors request entry of interim and final orders, substantially in the forms attached as **Exhibit A** and **Exhibit B**, granting the Debtors (i) authority to (a) pay Employee Compensation Obligations and Employee Benefit Obligations (each as defined below), related expenses, and fees and costs incident to the foregoing, including amounts owed to third-party service providers, administrators, and taxing authorities and (b) maintain, continue to honor, and pay amounts with respect to the Debtors' business practices, programs, and policies for their employees as such were in effect as of the Petition Date and as such may be modified or supplemented from time to time in the ordinary course of business and (ii) related relief.

8.      The total amount of prepetition obligations the Debtors request authority to pay by this Motion, as discussed in further detail below, is summarized as follows:

| Relief Sought[3] | Approximate Amount as of Petition Date | Total Amount due in Interim Period |
|---|---|---|
| **Compensation and Withholding Obligations** | | |
| Unpaid Wages and Salaries | **$1,072,886** | **$1,072,886** |
| Withholdings and Deduction Obligations | **$312,741** | **$312,741** |
| Payroll Administration Fees | **$45,046** | **$45,046** |

---

[3]      Capitalized terms in this chart have the meanings ascribed to them in the Motion.

| Relief Sought[3] | Approximate Amount as of Petition Date | Total Amount due in Interim Period |
|---|---|---|
| **Medical Benefits** | | |
| Medical and Dental Drug Plans | $417,335 | $417,335 |
| Prescription Drug Plan | $68,725 | $68,725 |
| Vision Plan | $0 | $0 |
| Flexible Spending Account Program | $4,539 | $4,539 |
| Health Savings Account Program | $6,358 | $6,358 |
| Represented Employee Medical Program | $156,050 | $156,050 |
| **Insurance Programs** | | |
| Basic Life, AD&D, Long-Term Disability and Critical Care Insurance Plans | $66,478 | $66,478 |
| Supplemental Life Insurance Plan | $10,320 | $10,320 |
| Supplemental AD&D Insurance Plan | $4,800 | $4,800 |
| **Retirement Plans** | | |
| 401(k) Savings Plan | $88,073 | $88,073 |
| 401(k) Employee Loan Payments | $16,566 | $16,556 |
| Cash Balance Plan | $687,600 | $0 |
| **Other Benefits** | | |
| Reimbursement Obligations | $50,000 | $50,000 |
| Charitable Program | $7,053 | $7,053 |
| Miscellaneous Benefits | $65,180 | $62,290 |
| **Additional Obligations** | | |
| Supplemental Workforce Obligations | $3,344,758 | $3,344,758 |
| **Total** | **$6,424,507** | **$5,734,016** |

### Debtors' Workforce

9.       As of the Petition Date, the Debtors employ 470 individuals (each, an "**Employee**," and collectively, the "**Employees**") across the Debtors' Houston facility, production terminals, and corporate headquarters.  Of the Employees, (i) 270 are paid a salary and 200 are

paid on an hourly basis, and (ii) 467 are employed by TPC Group Inc. and three are employed by Texas Butylene Corporation.

10.     The Employees perform a wide variety of critical services to the Debtors. Employees at the Debtors' Houston facility and production terminals include engineers, maintenance personnel, quality and safety personnel, and chemists.  Employees at the Debtors' corporate headquarters perform management and operational service functions, including finance, legal, information technology, and human resources services.   The Employees' skills and specialized knowledge of the Debtors' equipment, infrastructure, customers, and business operations—much of which is highly technical and requires substantial education and training— are essential to the continued operation of the Debtors' businesses.   Without the Employees' continued, uninterrupted services, an effective reorganization of the Debtors will not be possible.

11.     Of the Debtors' Employees, 51 (the "**Represented Employees**") are members of unions and are employed pursuant to five collective bargaining agreements (each a "**CBA**").  The CBAs generally establish compensation and benefit standards with respect to the Represented Employees.   The Represented Employees are represented by one or more of the following: the United Steel Workers, the International Brotherhood of Electrical Workers, the International Brotherhood of Boilermakers, the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, and the United Brotherhood of Carpenters (each, a "**Union**").  The restructuring transaction set forth in the RSA does not involve modification or abrogation of Debtors' CBAs and Debtors currently have no plans to seek such relief.

## Employee Compensation Obligations

12.     The Debtors believe that, as of the Petition Date, their aggregate outstanding prepetition obligations related to compensation of Employees (collectively, the "**Employee**

**Compensation Obligations**") is approximately, $1,430,673.  The aggregate amounts of each
Employee Compensation Obligation, including the amounts that will become due within the first
21 days of these chapter 11 cases (the "**Interim Period**"), are summarized in the following chart
and described in further detail below:

| Prepetition Obligation | Total Relief Requested | Total Amount Due in Interim Period |
|---|---|---|
| **Unpaid Wages and Salaries** | $1,072,886 | $1,072,886 |
| **Withholdings and Deduction Obligations** | $312,741 | $312,741 |
| **Payroll Administration Fees** | $45,046 | $45,046 |
| **Total** | $1,430,673 | $1,430,673 |

### A.     Wages, Salaries, and Other Compensation

13.     In the ordinary course of business, the Debtors incur and pay obligations
relating to Employees' salaries and wages.  Employees are paid on one of two cycles: biweekly or
semimonthly.  Hourly Employees receive their wages in biweekly payments every other Thursday
or Friday depending on site location, with the applicable pay period beginning at 5:00 a.m. on
Monday of week 1 through Sunday of week 2.  Depending on site location, employees are paid
four or five days in arrears.  Hourly Employees therefore have 26 pay periods per year.  Salaried
Employees are paid semimonthly on the 15th and last day of each month.  Overtime for salaried
non-exempt employees is paid one pay period in arrears.

14.     Historically, the Debtors' average payroll is approximately $1.09 million
per pay period for hourly employees and approximately $1.75 million per pay period for salaried
employees. As of the Petition Date, the Debtors owe approximately $1,072,886 in unpaid wages
and salaries to Employees, $1,072,886 of which will become due within the Interim Period.  The
Debtors request authority to pay prepetition unpaid wages and salaries to Employees and to

continue to honor such obligations on a postpetition basis in the ordinary course of business and consistent with past practices. The Debtors do not believe that any individual is owed payment on account of Employee Compensation Obligations in an amount exceeding the $15,150 cap under section 507(a)(4) of the Bankruptcy Code.

**B.      Gross Pay Deductions, Governmental Withholdings, and Payroll Taxes**

15.     The Debtors are required by law to withhold from Employees' gross pay certain amounts related to federal, state, and local income taxes, social security taxes, Medicare taxes, and other taxes imposed by the law and to remit any such withheld amounts to the appropriate taxing authorities ("**Withholding Taxes**"). The Debtors' average monthly Withholding Taxes liability is approximately $1.13 million. The Debtors estimate that, as of the Petition Date, they hold approximately $182,726 in Withholding Taxes for remittance on their Employees' behalf, $182,726 of which the Debtors must remit within the Interim Period.

16.     The Debtors are required to make certain additional payments from their own funds in connection with the Withholding Taxes. These payments include matching payments on account of social security and Medicare taxes and, subject to certain limitations, additional amounts based on a percentage of gross payroll for, among other things, state and federal unemployment insurance (collectively, the "**Employer Payroll Taxes**"). On account of the Employer Payroll Taxes, the Debtors on average withhold and contribute approximately $400,000 per month. The Debtors estimate that, as of the Petition Date, they owe approximately $48,166 in Employer Payroll Taxes, $48,166 of which the Debtors must withhold and remit within the Interim Period.

17.     The Debtors also routinely deduct certain amounts from Employees' gross pay as required under applicable law, including garnishments (such as tax levies, child support, and other court-ordered garnishments), 401(k) contributions, Union dues, and other pre- and after-

tax deductions payable pursuant to certain of the employee benefit plans discussed herein (collectively, the "**Deductions**," and together with the Withholding Taxes and the Employer Payroll Taxes, the "**Withholding and Deduction Obligations**").  Each pay cycle, the Debtors deduct such amounts from applicable Employees' paychecks and remit them to the appropriate authorities or entities.  On average, the Debtors withhold and remit approximately $940,000 per month on account of Withholding and Deductions.  As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unremitted Deductions is approximately $66,923, of which $66,923 the Debtors must withhold and remit within the Interim Period.

18.      The Debtors request authority to continue to withhold and remit Withholding and Deduction Obligations incurred prepetition in the ordinary course of business and to continue to honor such obligations on a postpetition basis in the ordinary course of business and consistent with past practice.

### C.      Incentive Programs

19.      In addition to paying their wages and salaries, the Debtors maintain two incentive programs for their Employees (the "**Incentive Programs**"): (i) the Annual Incentive Plan (the "**AIP**"), which provides eligible Employees with an annual grant of cash compensation based on the Company's overall performance and (ii) the High-Performer Pool (the "**HPP**"), an annual cash bonus program for high performers.  The AIP is an incentive plan based on the Company's overall performance for each year.  All non-represented Employees participate in the AIP.  The HPP consists of performance-based cash bonuses to eligible Employees in recognition of the Debtors' view that high performers make significantly disproportionate contributions.  The HPP rewards such high performers and incentivizes other Employees to become high performers. The Debtors are not seeking approval of the Incentive Programs at this time and the Debtors reserve the right to seek approval of its Incentive Programs by separate motion at a later date.

### D.      Wage and Benefit Service Providers

20.      The Debtors generally manage the processing and payment of the various obligations described above internally but rely on third-party firms to perform certain related administrative functions, including withholding, remittance, and reporting of payroll taxes for Employees (the "**Wage and Benefit Service Providers**," and obligations related thereto, the "**Payroll Administration Fees**").  In particular, the Debtors engage UKG, which provides payroll services including garnishing and transmitting funds as required by judicial orders.

21.      As a result of the Debtors' retention of the Wage and Benefit Service Providers, the Debtors are able to employ fewer human resources professionals to administer payroll and benefit programs and thereby save substantial costs associated with administration of their payroll and benefits programs.  These relationships with the Wage and Benefit Service Providers also allow the Debtors to offer better and broader benefits to their Employees for less than those benefits would otherwise cost.  The Debtors pay the Wage and Benefit Service Providers approximately $49,291 per quarter for their services.  As of the Petition Date, the Debtors owe approximately $45,046 on account of Payroll Administration Fees, $45,046 of which becomes due within the Interim Period.  The Debtors request authority to pay all outstanding and future Payroll Administration Fees in the ordinary course of business, whether arising pre- or postpetition.

### Employee Benefit Obligations

22.      In the ordinary course of business, the Debtors make various benefit plans available to their Employees.  These benefit plans fall within the following categories: (i) medical, prescription drug, dental, and vision benefits ("**Medical Benefits**"); (ii) life insurance, accidental death and dismemberment ("**AD&D**") insurance, supplemental life and AD&D insurance, and long-term disability (the "**Insurance Benefits**," and together with the Medical Benefits, the "**Health and Welfare Benefits**"); (iii) 401(k) plan benefits ("**Retirement Benefits**"); (iv) paid

time off, including vacation and other leave (collectively, the "**Leave Benefits**"); and (v) certain other miscellaneous benefits (the "**Other Benefits**") (each of the foregoing (i)–(v), an "**Employee Benefit Program**," and the Debtors' corresponding obligations, the "**Employee Benefit Obligations**"). Although many Employees do participate in the Employee Benefit Programs (such Employees with respect to each such plan, the "**Plan Participants**"), in certain cases, Employees may elect to opt out of a particular program.

23. The Debtors believe that, as of the Petition Date, their aggregate outstanding Employee Benefit Obligations is approximately $1,649,076, of which $958,585 will become due during the Interim Period. The aggregate amounts of each Employee Benefit Obligation, including the amounts that will become due within the Interim Period, are summarized in the following chart and described in further detail below:

| Prepetition Obligation | Total Relief Requested | Total Amount Due in Interim Period |
|---|---|---|
| Medical Benefits | $653,006 | $653,006 |
| Insurance Benefits | $81,598 | $81,598 |
| Retirement Plans | $792,238 | $104,638 |
| Other Benefits | $122,233 | $119,342 |
| **Total** | $1,649,076 | $958,585 |

A. **Health and Welfare Benefits**

24. The Debtors maintain the Health and Welfare Benefits plans discussed below for their eligible Employees. The monthly average cost of the Health and Welfare Benefits is approximately $850,000, including amounts that are deducted from Plan Participants' paychecks as such Employees' contributions. Failure to maintain the Health and Welfare Benefits could

cause Employees to experience severe personal hardship and hinder the Debtors' ability to retain their workforce.

25.     The Debtors believe they are authorized to continue the Health and Welfare Benefits in the ordinary course of business; however, out of an abundance of caution, the Debtors request authority to continue the Health and Welfare Benefits on a postpetition basis in the ordinary course of business and consistent with past practice, as well as to pay any related prepetition Employee Benefit Obligations that are outstanding. The Debtors believe that, as of the Petition Date, their aggregate outstanding amounts for Health and Welfare Benefits is approximately $734,604, of which $734,604 will become due during the Interim Period.

### i.      *Non-Represented Employee Medical Benefits*

26.     The Debtors administer the following Medical Benefits plans through various insurers to Employees and their families:

| Medical Benefits Plan | Benefits Plan Provider |
|---|---|
| Medical | Blue Cross and Blue Shield of Texas (BCBSTX) |
| Prescription Drug | CVS/Caremark |
| Dental | Blue Cross and Blue Shield of Texas (BCBSTX) |
| Vision | UnitedHealthcare (UHC) Vision Network - Spectera |
| Flexible Spending Accounts | WEX |
| Health Savings Accounts | WEX |

27.     The Medical, Prescription Drug, and Dental Medical Benefits Plans are self-funded by the Debtors and administered by the respective benefits providers listed above (each, a "**Health Benefits Provider**").  The Health Benefits Providers are preferred provider organizations under which improved benefits are available when using a doctor, dentist, or other healthcare provider within a network of preferred providers.  Participating Employees pay the Company for

any costs associated with enrollment through payroll deductions.  The Health Benefits Providers pay the covered Employee's healthcare costs directly to the applicable healthcare provider (other than any required deductible or similar payment) and then seek reimbursement from the Debtors (the "**Health Benefit Claims**").  The Debtors pay the Health Benefit Claims upon submission to them by the Health Benefit Providers.  In addition, the Debtors pay fees for the administrative services provided by the Health Benefits Providers.

28.    <u>Medical and Dental Plans</u>.  The Debtors offer eligible Employees medical and dental care through Blue Cross and Blue Shield of Texas (BCBSTX) (the "**Medical and Dental Drug Plans**").  Medical and Dental Health Benefit Claims vary but have historically averaged approximately $459,573 per month.  As of the Petition Date, the Debtors estimate that they owe Blue Cross Blue Shield (i) up to approximately $275,245 on account of the Medical and Dental Health Benefit Claims, $275,245 of which will become due during the Interim Period, and (ii) approximately $142,090 on account of administrative fees, $142,090 of which will become due during the Interim Period.

29.    <u>Prescription Drug Plan</u>.  The Debtors offer eligible Employees prescription drug coverage (the "**Prescription Drug Plan**") through CVS/Caremark.  Prescription Health Benefit Claims vary but have historically averaged approximately $175,710 per month.  As of the Petition Date, the Debtors estimate that they owe CVS/Caremark (i) up to approximately $68,725 on account of the Prescription Health Benefit Claims, $68,725 of which will become due during the Interim Period, and (ii) approximately $0 on account of administrative fees.

30.    <u>Flexible Spending Accounts</u>.  The Debtors offer eligible Employees the ability to use their pre-tax compensation to pay for certain healthcare expenses or dependent care expenses through a flexible spending account program (the "**Flexible Spending Account**

**Program**") managed by WEX.  As of the Petition Date, the Flexible Spending Account Program has approximately 85 Plan Participants.  The Debtors estimate that they deduct approximately $13,368 per month from Plan Participants' compensation to fund such Plan Participants' flexible spending accounts.  As of the Petition Date, the Debtors owe approximately $4,539 on account of the Flexible Spending Account Program (exclusive of amounts to be funded through deductions from Plan Participants' compensation), $4,539 of which will become due during the Interim Period.

31.     <u>Health Savings Accounts</u>.  The Debtors offer eligible Employees the ability to deposit a portion of their pre-tax compensation into health savings accounts through a program (the "**Health Savings Account Program**") managed by WEX.  The Debtors contribute $500/year for eligible individuals, and $1,000/year for eligible families.  As of the Petition Date, the Health Savings Account Program has approximately 85 Plan Participants.  The Debtors estimate that they deduct approximately $19,197 per month from Plan Participants' compensation to fund such Plan Participants' health savings accounts.  As of the Petition Date, the Debtors owe approximately $6,358 on account of the Health Savings Account Program (exclusive of amounts to be funded through deductions from Plan Participants' compensation), $6,358 of which will become due during the Interim Period.

### ii.     *Employee Vision Benefits*

32.     <u>Vision Plan</u>.  The Debtors offer eligible Employees vision coverage (the "**Vision Plan**") through UnitedHealthcare (UHC) Vision Network, Spectera, which includes enhanced lens and frame benefit. Vision Plan Claims vary but have historically averaged approximately $6,527 per month.  The Debtors estimate that, as of the Petition Date, they owe approximately $0 to UnitedHealthcare (UHC) Vision Network, Spectera on account of the Vision Plan.

### iii. *Represented Employee Medical Benefits*

33.     Pursuant to the CBAs, the Debtors provide the following Insurance Benefits to the Debtors' Represented Employees.  The Debtors offer eligible Represented Employees medical, dental, and vision coverage through USW Healthcare Coverage ("**Represented Employee Medical Benefits**").  As of the Petition Date, the Represented Employee Medical Benefits have approximately 57 Plan Participants.  Premiums vary based on the number of Plan Participants but have historically averaged approximately $125,292 per month.  The Debtors pay 80% of such Plan Participants' premiums, and the remaining 20% is deducted from such Plan Participants' paychecks and remitted to USW Healthcare Coverage on such Plan Participants' behalf.  The Debtors estimate that they owe approximately $156,050 on account of Represented Employee Medical Benefits (exclusive of Plan Participants' portion of premium obligations) as of the Petition Date, $156,050 of which will become due during the Interim Period.

### iv. *Employee Insurance Benefits*

34.     The Debtors administer the following Insurance Benefits plans through various insurers to Non-represented Employees and their families:

| Insurance Benefits Plan | Benefits Plan Provider |
|---|---|
| Basic Life Insurance | Sun Life |
| Basic AD&D Insurance | Sun Life |
| Basic Long-Term Disability | Sun Life |
| Supplemental Life Insurance | Sun Life |
| Supplemental AD&D | Zurich and Unum |

35.     <u>Basic Life Insurance Plans</u>.  The Debtors offer eligible Non-represented Employees basic life insurance coverage (the "**Basic Life Insurance Program**") through Sun Life. As of the Petition Date, the Basic Life Insurance Program had 469 Plan Participants.  Premiums

vary based on the number of Plan Participants but have historically averaged approximately $20,300 per month.  The Debtors pay 100% of premiums.

36.     Basic AD&D Insurance Plans.  The Debtors offer eligible Employees basic AD&D insurance coverage (the "**Basic AD&D Insurance Program**") through Sun Life.  As of the Petition Date, the Basic AD&D Insurance Program had 469 Plan Participants.  Premiums vary based on the number of Plan Participants but have historically averaged approximately $5,500 per month.  The Debtors pay 100% of premiums.

37.     Basic Long-Term Disability Plan.  The Debtors provide eligible Employees with long-term disability coverage (the "**Long-Term Disability Plan**") through Sun Life.  As of the Petition Date, the Long-Term Disability Plan had 469 Plan Participants.  Premiums vary based on the number of Plan Participants but have historically averaged approximately $115,625 per month.  The Debtors pay 100% of premiums.

38.     In addition to the above, Debtors previously offered critical care insurance benefits through Aflac Group Insurance.  Although Debtors continue to provide critical illness insurance through Aflac for legacy subscribers, it is no longer part of the benefits offering.

39.     The Debtors estimate that, as of the Petition Date, they owe approximately $66,478 to on account of Basic Life Insurance, Basic AD&D Insurance Plans, Basic Long-Term Disability Plan, and the legacy critical care insurance (exclusive of Plan Participants' portion of premium obligations), $66,478 of which will become due during the Interim Period.

40.     Supplemental Life Insurance Plans.  Eligible Employees can elect to purchase additional life insurance ("**Supplemental Life Insurance Plan**") at their own expense.  The Supplemental Insurance Plan is provided by Sun Life.  The Debtors currently deduct approximately $8,300 per month from Plan Participants' compensation and remit such amount to

Sun Life on account of the Supplemental Insurance Plans. As of the Petition Date, the Debtors hold approximately $10,320 in deducted Plan Participant premiums on account of the Supplemental Insurance Plans, $10,320 of which will become due during the Interim Period.

41.     *Supplemental AD&D Insurance Plans*. Eligible Employees can elect to purchase additional AD&D insurance (the "**Supplemental AD&D Insurance Plan**") at their own expense. The Supplemental AD&D Insurance Plan is provided by Zurich and Unum. The Debtors currently deduct approximately $3,800 per month from Plan Participants' compensation and remit such amount to Zurich and Unum on account of the Supplemental Insurance Plans. As of the Petition Date, the Debtors hold approximately $4,800 in deducted Plan Participant premiums on account of the Supplemental Insurance Plans, $4,800 of which will become due during the Interim Period.

### v.     *Summary of Health and Welfare Benefits*

42.     The Debtors estimate that, as of the Petition Date, they owe (or hold on behalf of Plan Participants) approximately $734,604 on account of the Health and Welfare Benefits of the types and in the approximate amounts described above, $734,604 of which will become due during the Interim Period. The Debtors request authority to pay or remit, as applicable, such amounts and to continue providing Health and Welfare Benefits postpetition in the ordinary course of business.

### B.     Retirement Benefits

43.     The Debtors maintain for the benefit of eligible Employees a defined contribution plan meeting the requirements of sections 401(a) and 401(k) of the Internal Revenue Code (the "**401(k) Savings Plan**"). The 401(k) Savings Plan is managed by Fidelity. All full-time Employees are eligible to elect to participate in the 401(k) Savings Plan. Each month, the

Debtors deduct approximately $575,000 in the aggregate from such Employees' paychecks and remit such amounts to Fidelity to be used to fund the 401(k) Savings Plan for such Employees.

44.     The Debtors also maintain a contribution-matching program pursuant to which the Debtors match up to 5% of Plan Participants' 401(k) Savings Plan contributions on a dollar-for-dollar basis (but not in excess of the lesser of the Internal Revenue Service contribution limits and 60% of Employees' before tax eligible salary).  The Debtors contribute an additional annual discretionary contribution of up to 6% of Plan Participants' 401(k) Savings accounts for Non-represented Employees.

45.     Finally, under the 401(k) Plan, the Debtors also make disbursements on account of payroll deductions for repayment of loans that Employees previously drew from their individual 401(k) accounts (the "**401(k) Plan Loan Payments**").

46.     The Debtors estimate that, as of the Petition Date, they owe approximately $88,073 to Fidelity with respect to the 401(k) Savings Plan, $88,073 of which will become due during the Interim Period, and approximately $16,566 to Fidelity with respect to the 401(k) Plan Loan Payments, $16,566 of which will become due during the Interim Period.  The Debtors request authority to pay such amounts and to continue to honor their commitments under the 401(k) Savings Plan and the 401(k) Plan Loan Payments in the ordinary course of business and consistent with past practice.

47.     In addition to the above, the Debtors' Represented Employees are eligible to participate in a Cash Balance Plan (the "**Cash Balance Plan**"), which is a tax-qualified retirement plan under Section 401(a) of the Internal Revenue Code.  Under the Cash Balance Plan, the Debtors make contributions to a Cash Balance Account (the "Cash Balance Account") in the eligible Represented Employees' name and Represented Employees are eligible to receive their

vested account balance upon termination of service. The Cash Balance Plan is managed by Fidelity. Contributions on behalf of Represented Employees are based upon participating Employees' hire date and age. The Debtors estimate that, as of the Petition Date, they owe approximately $687,600 to Fidelity with respect to the Cash Balance Plan, none of which will become due during the Interim Period. The Debtors request authority to pay such amounts and to continue to honor their commitments under the Cash Balance Plan in the ordinary course of business and consistent with past practice.

C.    **Leave Benefits**

48.    Eligible Employees receive paid time off ("**PTO**") in the form of vacation days, paid sick leave, paid holiday leave on each annual holiday observed by the Debtors, paid parental leave, paid bereavement leave, paid jury duty leave, and military leave consistent with the requirements of the Uniformed Services Employment and Reemployment Rights Act of 1994. The Debtors generally do not provide for payments in lieu of leave, except in the case of vacation leave, and then only upon termination of employment.

49.    Non-represented Employees may carry over up to 40 hours of accrued vacation into the next calendar year. Employees with more than 40 hours of accrued vacation as of January 1 of the following year forfeit the number of hours in excess of the number the Employee earned during the year. Non-represented Employees who are terminated or resign and provide a minimum of two weeks' notice and work the notice period are entitled to a cash payment in lieu of up to 80 hours of accrued but unused vacation time.

50.    The Debtors estimate that, as of the Petition Date, the aggregate monetary value of accrued but unused PTO is approximately $1.32 million. This amount, however, is not a current cash payment obligation except to the extent Employees leave the Debtors' employment.

51. In addition, the Debtors provide certain other forms of paid leave and unpaid leave, including:

- nine designated holidays and three floating holidays during which Employees are not required to work but are paid their base rate of pay;

- paid sick leave depending on the Employees' years of service with the Company;

- unpaid leave under the FMLA for: (a) birth, adoption, or foster care, (b) family care, (c) medical emergencies, (d) military exigencies, and (e) military caregiving needs; and

- other paid and unpaid leaves of absence for personal reasons, many of which are required by law, including missed work time in the ordinary course of business for bereavement leave, jury or court attendance, or time spent voting and unpaid leaves of absence for family medical leaves and military leaves.

These other forms of paid and unpaid leave do not involve incremental cash outlays beyond standard payroll obligations.

52. The Debtors request authority to continue providing Leave Benefits on a postpetition basis in the ordinary course of business and consistent with past practice.

**D.    Other Benefits**

53. The Debtors provide eligible Employees with a variety of Other Benefits, as described below.

54. <u>Expense Reimbursements</u>.  In the ordinary course of business, the Debtors reimburse eligible Employees for reasonable and customary expenses incurred in the scope of their employment (collectively, the "**Reimbursable Expenses**," and the Debtors' obligations with respect thereto, the "**Reimbursement Obligations**").  Those obligations include, among other things, conference fees, car rentals, steel-toe work boots, and meals.  As of the Petition Date, the Debtors owe Employees approximately $50,000 in Reimbursement Obligations, $50,000 of which will become due during the Interim Period.  Yet the Debtors also believe that Reimbursable

Expenses incurred by Employees prior to the Petition Date may not all have been submitted to the Debtors for approval and reimbursement.  Based on historical practice, the Debtors do not believe that such amounts are material.  The Debtors request authority to pay all Reimbursement Obligations and to continue reimbursing Reimbursable Expenses in the ordinary course of business during these chapter 11 cases, whether arising prepetition or postpetition.

55.     Relocation Expenses.  In the ordinary course of business, the Debtors pay certain expenses of Employees that are transferred in connection with their jobs (the "**Relocation Expenses**").  The Relocation Expenses include costs associated with the transportation of household goods, eligible home sale and purchase closing cost expenses, temporary living accommodation costs, home finding trips, and other covered expenses.  The Debtors estimate that, as of the Petition Date, they owe approximately $0 in prepetition Relocation Expenses.  The Debtors request authority to continue paying Relocation Expenses in the ordinary course of business and consistent with past practice.

56.     Charitable Programs.  In the ordinary course of business, the Debtors participate in certain charitable programs (the "**Charitable Programs**") such as making relatively small donations to the TPC All for One Foundation, a 501(c)(3) nonprofit organized under Texas law for the benefit of making assistance grants to Employees of the Debtors experiencing financial hardship; hosting an annual charity golf tournament (for which all proceeds are donated to the designated charity); and fundraising for the United Way.  The Charitable Programs are important to the Debtors' corporate culture, and the Debtors believe that the relatively small costs associated with the Charitable Programs is far outweighed by the benefits of their impact on Employee morale and the Debtors' corporate citizenship.  The Debtors estimate that, as of the Petition Date approximately $7,053 is outstanding on account of the Charitable Programs, $7,053 of which will

become due during the Interim Period.  The Debtors request authority to continue the Charitable Programs postpetition in the ordinary course of business and consistent with past practice.

57.    <u>Miscellaneous Benefits</u>.  In the ordinary course of business, the Debtors provide a variety of additional benefits to their Employees (the "**Miscellaneous Benefits Programs**").  The Voluntary Benefits Programs include such programs as, among other things, certain legal services, an employee assistance program, tuition reimbursement, scholarship program, and a call center for benefits administration. The Debtors estimate that as of the Petition Date approximately $65,180 is outstanding on account of the Miscellaneous Benefits Programs, $65,180 of which will become due during the Interim Period.  The Debtors request authority to pay any unpaid prepetition obligations associated with providing the Miscellaneous Benefits Programs and to continue providing the Miscellaneous Benefits Programs in the ordinary course of business during these chapter 11 cases.

**E.    Non-Insider Severance Programs.**

58.    In the ordinary course of business, the Debtors provide severance benefits to Employees in the event of a termination by the Debtors that is not for "cause," if the Employee voluntarily resigns, or by reason of disability or death (the "**Non-Insider Severance Programs**"). Under the Non-Insider Severance Programs, Employees receive, upon termination, a lump sum payment determined by a combination of factors, including the Employee's organizational level, tenure, and whether the Employee is an hourly or salaried employee.[4]  This Motion is not seeking approval of severance benefits at this time and the Debtors reserve the right to seek approval of its severance programs by separate motion at a later date.

---

[4]    Certain of the Debtors' severance programs also apply to insiders.  This Motion is not seeking approval of any such severance benefits for insiders at this time and the Debtors reserve the right to seek approval of its severance programs with respect to Insiders by separate motion at a later date.

## Supplemental Workforce Obligations

59.    In the ordinary course of business, the Debtors utilize the services of temporary staff to perform a variety of roles including IT, human relations, craft, QC Lab testing, maintenance, and engineering (the "**Supplemental Workforce**").  The Debtors retain their Supplemental Workforce through a number of third-party staffing agencies (the "**Staffing Agencies**") such as, among others, Burrow Global Services, LLC, NES Global LLC, Dagen Personnel, Labtopia Inc., and Talent Nabbers LLC.  The number of Supplemental Workforce utilized by Debtors varies greatly depending on the Debtors' operations.  For example, among other roles, Debtors utilize Supplemental Workforce to increase the workforce to perform turnarounds as necessary at Debtors' facilities.  The Supplemental Workforce members have developed detailed understandings of the Debtors' operations such that needing to replace any significant number of Supplemental Workforce personnel at once would be disruptive to the Debtors' operations and would risk increasing the Debtors' overall costs due to retaining and training new temporary personnel to operate at the same level of efficiency.

60.    The Debtors generally engage the Staffing Agencies through agreements that set forth the terms of engagement, including remuneration.  The Debtors remit compensation for the Supplemental Workforce on a regular basis through their accounts payable system (the "**Supplemental Workforce Obligations**", and together with the Employee Compensation Obligations and Employee Benefit Obligations, the "**Employee Obligations**").  The Debtors request authority to pay, in their sole discretion, any unpaid obligations associated with Supplemental Workforce incurred prepetition and to continue utilizing Supplemental Workforce in the ordinary course of business during these chapter 11 cases. The Debtors estimate that, as of the Petition Date, they owe approximately $3,344,758 in total for prepetition services provided by the Supplemental Workforce, all of which will become due during the Interim Period. To the best

of the Debtors' knowledge, no member of the Supplemental Workforce is owed more than $15,150 in Supplemental Workforce Obligations.

### Relief Requested Should Be Granted

**A.      Payment of Employee Obligations is Warranted under Sections 363(b), 1107(a) and 105(a) of the Bankruptcy Code.**

61.      The Court may grant the relief requested herein pursuant to section 363 of the Bankruptcy Code, which provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  To approve the use of assets outside the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code, courts require only that the debtor "show that a sound business purpose justifies such actions." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (internal citations omitted); *see also In re Phoenix Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987); *In re Adelphia Commc'ns Corp.*, Ch. 11 Case No. 02-41729, 2003 WL 22316543, at *31 (Bankr. S.D.N.Y. Mar. 4, 2003).  Moreover, where the debtor "articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task.").

62.      In addition, under section 1107(a) of the Bankruptcy Code, a debtor has, among other things, the "implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business' going-concern value.'" *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)).  Under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order,

process, or judgment that is necessary or appropriate to carry out the provisions of this title."

Pursuant to section 105(a) of the Bankruptcy Code, the Court may exercise its broad grant of equitable powers to permit the payment of prepetition obligations when such payment is essential to the continued operation of the debtor's business. *See, e.g.*, *In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code provides a statutory basis for the payment of prepetition claims under the doctrine of necessity and noting that "[t]he Supreme Court, the Third Circuit and the District of Delaware all recognize the court's power to authorize payment of pre-petition claims when such payment is necessary for the debtor's survival during chapter 11"); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (holding that a court may authorize the payment of prepetition claims prior to the confirmation of a reorganization plan pursuant to the doctrine of necessity).

63.     Moreover, Bankruptcy Rule 6003 itself implies that the payment of prepetition obligations may be permissible within the first 21 days of a case where doing so is "necessary to avoid immediate and irreparable harm."   Accordingly, the Bankruptcy Code authorizes the postpetition payment of prepetition claims where, as here, such payments are critical to preserving the going-concern value of a debtor's estate. *See* 10 Collier on Bankruptcy ¶ 6003.01[2][b] n.8 (16th ed. 2020) ("Because good employee morale of the debtor's work force is almost always essential to the continuation of a debtor's business, and the inability of employees to pay home mortgages and other bills would result in their extreme hardship and distraction, almost all debtors with a continuing business should be able to demonstrate that immediate and irreparable harm would result if the debtor is not permitted to immediately pay employees' prepetition wages at the first day hearing.").

64.     The Employees and the Supplemental Workforce are crucial to the Debtors' businesses.  Any delay in paying, or failure to pay, the Employee Obligations could irreparably impair the morale of the Debtors' workforce at a time when their dedication, confidence, retention, and cooperation are most crucial.  It could also inflict a significant financial hardship on their families.  The Debtors cannot risk such a substantial disruption to their business operations, and it is inequitable to put Employees and the Supplemental Workforce at risk of such hardship.

65.     Payment of these obligations in the ordinary course of business will enable the Debtors to focus on completing a successful reorganization, which would benefit all parties-in-interest.  Recognizing how essential their Employees are to their continued operations, the Debtors have been proactive in taking steps to ensure current Employees remain at the Company. Without this relief, the Debtors may face an increased risk that otherwise-loyal Employees will seek other work opportunities, thereby further jeopardizing the Debtors' continued operations and reorganization efforts.

66.     Payment of these obligations will also permit the Debtors to continue to operate their businesses in an economic and efficient manner without disruption.  Moreover, the total amount sought to be paid by this Motion is modest compared to the magnitude of the Debtors' overall business.  Furthermore, failure to timely pay certain Employee Obligations may place the Debtors in violation of applicable law.

67.     In addition, payment of Reimbursable Obligations is also necessary because any other treatment of Employees would be highly inequitable.  Employees who have incurred Reimbursable Expenses should not be forced personally to bear the cost of the Reimbursable Expenses, especially because the Employees incurred the Reimbursable Expenses for the Debtors'

benefit, in the course of their employment by the Debtors, and with the understanding that they would be reimbursed for doing so.

68.     Payment of administrative fees to the administrators and providers of the Employee Benefit Plans are also necessary. Without the continued service of these administrators and providers, the Debtors will be unable to continue to honor their obligations to Employees under the Employee Benefit Plans in an efficient and cost-effective manner.  The Debtors do not seek to alter any of the Employee Benefit Plans.  This Motion requests permission only for the Debtors, in their discretion, to (i) make payments consistent with existing policies to the extent that such payments could otherwise be inconsistent with the provisions of the Bankruptcy Code and (ii) continue to honor practices, programs, and policies with respect to Employees as such were in effect before the Petition Date.

69.     With respect to the Supplemental Workforce Obligations, the Debtors require the services provided by the Supplemental Workforce engaged through the Staffing Agencies.  As discussed more fully below, the Supplemental Workforce possesses highly marketable skills in the Debtors' industry such that, if the Debtors were unable to pay the Supplemental Workforce Obligations, it would (i) be very difficult and burdensome to attempt to replace the Supplemental Workforce, and (ii) significantly delay operations, potentially affecting the Debtors' production.

70.     As an initial matter, the broad knowledge base (e.g., engineering, technical, and maintenance) of the Supplemental Workforce is critical to running the Debtors' operations efficiently, competently, and in an economically advantageous manner.  For example, as described above, Debtors utilize the Supplemental Workforce to perform various functions at its facilities.

71.     The Debtors have long-standing institutional relationships with the Staffing Agencies and have expended significant resources training the Supplemental Workforce to be knowledgeable service providers with specialized skills to support the Debtors' operations. The Debtors would likely be unable to replace the Supplemental Workforce in a timely manner if the Staffing Agencies no longer provided such personnel due to lack of payment. The Debtors would likely be unable to find replacement Staffing Agencies that could provide personnel for the Supplemental Workforce in numbers sufficient for the Debtors' operations. In addition, given the Supplemental Workforce's specialized skillsets, it would take time to effectively train new personnel to perform the work provided by the current Supplemental Workforce personnel. Thus, even if the Debtors are able to contract with alternative Staffing Agencies in lieu of payment to existing Staffing Agencies, the Debtors would be forced to cease, or substantially curtail, certain or most of their operations while they attempt to locate replacement Staffing Agencies that could supply sufficient numbers of personnel for a Supplemental Workforce.

72.     Moreover, if the Staffing Agencies went unpaid, it would likely cause detrimental reputational harm to the Debtors' working relationships with the various Staffing Agencies, which could impact the Debtors' ability to hire personnel in similar positions in the future. Accordingly, the Debtors submit that it is appropriate for the Court to authorize the Debtors to satisfy the Supplemental Workforce Obligations as set forth herein. *See, e.g.*, *In re Knotel, Inc.*, Case No. 21-10146 (MFW) (Bankr. D. Del. Feb. 25, 2021) (D.I. 282) (authorizing payment of independent contractors provided by staffing agencies); *In re THG Holdings LLC*, Case No. 19-11689 (Bankr. D. Del. Aug. 22, 2019) (authorizing payment of unpaid independent contractor wages); *In re Fred's, Inc.*, Case No. 19-11984 (CSS) (Bankr. D. Del. Sept. 29, 2019) (authorizing

payment of independent contractors); and *In re Hobbico, Inc.*, Case No. 18-10055 (KG) (Bankr. D. Del. Jan. 20, 2018) (same).

73.    The Debtors do not seek to alter their compensation, vacation, or other benefit policies at this time.  This Motion is intended only to permit the Debtors, in their discretion, to (i) make payments consistent with the Debtors' existing policies to the extent that, without the benefit of an order approving this Motion, such payments may be inconsistent with the relevant provisions of the Bankruptcy Code, and (ii) honor their practices, programs, and policies with respect to their Employees, as such practices, programs, and policies were in effect as of the Petition Date.[5]

74.    For the foregoing reasons, payment of the Employee Obligations as requested herein and in accordance with the Debtors' prepetition business practice, is necessary, appropriate, and in the best interests of the Debtors, their estates, and all other parties in interest in these cases, and will enable the Debtors to continue to operate their businesses in an economic and efficient manner, without disruption. Courts in this jurisdiction and others generally acknowledge that, under appropriate circumstances, they may authorize a debtor to pay (or provide special treatment for) certain prepetition obligations.  *See, e.g.*, *In re Quiksilver, Inc.*, No. 15-11880 (BLS) (Bankr. D. Del. Sept. 9, 2015) (authorizing Debtors to pay prepetition employee wages, benefits, and granting related relief.); *In re Samson Resources Corporation, et al.*, No. 15-11934 (CSS) (Bankr. D. Del. Sept. 16, 2015) (same); *see also In re Just for Feet, Inc.*, 242 B.R. 821, 825 (D. Del. 1999) ("The Supreme Court, the Third Circuit and the District of Delaware all recognize the

---

[5]    Although the Debtors believe continuation of the Employee Benefit Obligations in a manner consistent with their prepetition practices and policies is within the ordinary course of their business, out of an abundance of caution, the Debtors have sought Court authorization for the same pursuant to sections 363(b) and 105(a) of the Bankruptcy Code.

court's power to authorize payment of prepetition claims when such payment is necessary for the debtor's survival during chapter 11."); *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 939 (Bankr. D. Del. 1992) (citing *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (recognizing that "[i]f payment of a prepetition claim 'is essential to the continued operation of [the debtor], payment may be authorized'")); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (finding sound business justification for payment of certain prepetition claims). Such relief is also appropriate here. Accordingly, the Court should authorize the Debtors to continue to pay the Employee Obligations in the ordinary course of business.

> **B.    Certain of the Employee Obligations Are Entitled to Priority Treatment Under Section 507 of the Bankruptcy Code**

75.    The Debtors believe that many of the prepetition Employee Obligations constitute priority claims under sections 507(a)(4) and (5) of the Bankruptcy Code. Under section 507(a)(4)(A) of the Bankruptcy Code, claims of employees against a debtor for "wages, salaries, or commissions, including vacation, severance, and sick leave pay," that are "earned within 180 days before" the petition date are afforded priority unsecured status up to $15,150 per individual. 11 U.S.C. § 507(a)(4)(A). Similarly, under section 507(a)(5) of the Bankruptcy Code, employees' claims for contributions to certain employee benefit plans are also afforded priority unsecured status to the extent of $15,150 per employee covered by such plans, less any amount paid pursuant to section 507(a)(4) of the Bankruptcy Code. *Id.* at § 507(a)(5). As priority claims, the Employee Obligations are entitled to payment in full before any general unsecured claims asserted against the Debtors can be satisfied. Thus, the relief requested largely affects only the timing of payment of the priority prepetition Employee Obligations and should not prejudice the rights of general unsecured creditors and other parties in interest.

### C.     Payment of Certain Employee Obligations Is Required by Law

76.     The Debtors also seek authority to remit the Withholding Obligations to the appropriate entities.  These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from Employees' paychecks. Indeed, certain Deductions, including contributions to the Employee Benefit Obligations and child support and alimony payments, are not property of the Debtors' estates because they have been withheld from Employees' paychecks on another party's behalf.  *See* 11 U.S.C. § 541(b).

77.     Further, federal and state laws require the Debtors and their officers to make certain tax payments that have been withheld from their Employees' paychecks.  *See* 26 U.S.C. §§ 6672 and 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95-97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *DuCharmes & Co., Inc. v. State of Mich.* (*In re DuCharmes & Co.*), 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes).  Because certain Deductions and Employer Payroll Taxes are not property of the Debtors' estates, the Debtors request that the Court authorize them to transmit the Deductions, Withholdings, and Employer Payroll Taxes to the proper parties in the ordinary course of business.

78.     For the foregoing reasons, payment of the prepetition Employee Obligations and continuation of the Employee Benefit Programs is necessary, appropriate, and in the best interests of the Debtors, their estates, and all other parties in interest in these cases.  Accordingly, the Court should authorize the relief requested herein.

**Applicable Financial Institutions Should Be
Authorized and Directed to Receive, Process, Honor, and
<u>Pay Checks Issued and Transfers Requested to Pay Employee Obligations</u>**

79.     The Debtors further request that the Court authorize and direct applicable financial institutions (the "**Banks**") to receive, process, honor, and pay any and all checks issued, or to be issued, and electronic funds transfers requested, or to be requested, by the Debtors relating to the prepetition Employee Obligations, to the extent that sufficient funds are on deposit in available funds in the applicable bank accounts to cover such payment.  The Debtors also seek authority to issue new postpetition checks or effect new postpetition electronic funds transfers in replacement of any checks or funds transfer requests on account of prepetition Employee Obligations dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases.

**<u>Bankruptcy Rule 6003 Is Satisfied</u>**

80.     The Debtors request entry of the Interim Order pursuant to Local Rule 9013-1 and Bankruptcy Rule 6003.  Bankruptcy Rule 6003 provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" before 21 days after the filing of the petition.

81.     As described herein and in the First Day Declaration, the relief requested herein is necessary for the Debtors to operate their businesses in the ordinary course and to maximize the value of their estates for the benefit of all stakeholders.  Accordingly, the relief requested herein is necessary to avoid immediate and irreparable harm, and the requirements of Bankruptcy Rule 6003 are satisfied.

**Compliance with Bankruptcy Rule 6004(a) and Waiver of Bankruptcy Rule 6004(h)**

82.     To implement the foregoing successfully, the Debtors request that the Court find that notice of this Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances and waive the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h) to the extent applicable.  As explained above and in the First Day Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Thus, ample cause exists to justify finding that the notice requirements of Bankruptcy Rule 6004(a) have been satisfied and to waive the 14-day stay imposed by Bankruptcy Rule 6004(h) to the extent such notice requirements and stay apply.

**Reservation of Rights**

83.     Nothing contained herein is intended to be or shall be deemed (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the rights of the Debtors or any appropriate party in interest to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the rights of the Debtors or any appropriate party in interest under the Bankruptcy Code or any other applicable non-bankruptcy law, or (iv) an approval, adoption, assumption, or rejection of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief requested herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission of the validity of any claim or a waiver of the rights of the Debtors or any other party in interest subsequently to dispute such claim.

**Notice**

84.     Notice of this Motion will be provided to (i) the Office of the United States Trustee for the District of Delaware; (ii) the holders of the 30 largest unsecured claims against the Debtors on a consolidated basis; (iii) counsel to the ABL Agent, (x) Haynes and Boone, LLP, 1221

McKinney Street, Suite 4000, Houston, TX 77010, Attn: Charles A Beckham, Jr. (charles.beckham@haynesboone.com), and (y) Haynes and Boone, LLP, 2323 Victory Avenue, Suite 700, Dallas, TX 75219, Attn: J. Frasher Murphy (frasher.murphy@haynesboone.com); (iv) counsel to the Ad Hoc Noteholder Group, Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 (Attn: Kristopher M. Hansen, Jonathan D. Canfield and Gabriel Sasson), and Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, DE 19801 (Attn: Matthew B. Lunn, Sean M. Beach and Robert F. Poppiti, Jr.); (v) counsel to the Supporting Sponsors, Latham & Watkins LLP, 1271 Avenue of the Americas, New York, New York 10020 (Attn: George A. Davis and David A. Hammerman); (vi) the Internal Revenue Service; (vii) the United States Attorney's Office for the District of Delaware; (viii) the Securities and Exchange Commission; (ix) any other party entitled to notice pursuant to Bankruptcy Rule 2002; and (x) any other party entitled to notice pursuant to Local Rule 9013-1(m) (collectively, the "**Notice Parties**").

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: June 1, 2022
          Wilmington, Delaware

/s/ Robert J. Dehney

**BAKER BOTTS L.L.P.**
James R. Prince (*pro hac vice* admission pending)
Kevin Chiu (*pro hac vice* admission pending)
2001 Ross Avenue, Suite 900
Dallas, Texas 75201-2980
Telephone:     (214) 953-6500
Facsimile:     (214) 953-6503
Email: jim.prince@bakerbotts.com
          kevin.chiu@bakerbotts.com

-and-

BAKER BOTTS L.L.P.
Scott R. Bowling (*pro hac vice* admission pending)
30 Rockefeller Plaza
New York, New York 10112
Telephone:     (212) 408-2500
Facsimile:     (212) 259-2501
Email: scott.bowling@bakerbotts.com

-and-

BAKER BOTTS L.L.P.
David R. Eastlake (*pro hac vice* admission pending)
Lauren N. Randle (*pro hac vice* admission pending)
910 Louisiana Street
Houston, Texas 77002
Telephone:     (713) 229-1234
Facsimile:     (713) 229-1522
Email: david.eastlake@bakerbotts.com
          lauren.randle@bakerbotts.com

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Robert J. Dehney (No. 3578)
Curtis S. Miller (No. 4583)
Daniel B. Butz (No. 4227)
Matthew O. Talmo (No. 6333)
Brian Loughnane (No. 6853)
1201 N. Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email:    rdehney@morrisnichols.com
          cmiller@ morrisnichols.com
          dbutz@ morrisnichols.com
          mtalmo@ morrisnichols.com
          bloughnane@ morrisnichols.com

*Proposed Attorneys for Debtors
and Debtors in Possession*