## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| **TPC GROUP INC.**, *et al.*, | Case No. 22-10493 (___) |
| Debtors.[1] | Joint Administration Requested |

### MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) CONTINUE INSURANCE PROGRAMS AND SURETY BOND PROGRAM, (B) PAY ALL OBLIGATIONS WITH RESPECT THERETO, AND (C) PERFORM UNDER, RENEW, REPLACE, AND/OR ENTER INTO NEW PREMIUM FINANCE AGREEMENTS; AND (II) GRANTING RELATED RELIEF

TPC Group Inc. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully represent as follows in support of this motion (this "**Motion**"):

### Background

1.      On the date hereof (the "**Petition Date**"), the Debtors commenced these chapter 11 cases by filing voluntary petitions with this Court under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

2.      The Debtors are authorized to continue operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee has been appointed in these cases. The Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant

---

[1]The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: TPC Group Inc. (3618); TPC Holdings, Inc. (7380); TPC Group LLC (8313); Texas Butylene Chemical Corporation (7440); Texas Olefins Domestic International Sales Corporation (4241); TPC Phoenix Fuels LLC (9133); Port Neches Fuels, LLC (1641); and TP Capital Corp. (6248). Each Debtor's corporate headquarters and mailing address is 500 Dallas St., Suite 2000, Houston, Texas 77002.

to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1015-1 of the Bankruptcy Local Rules of the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Local Rules**").

3.      The Debtors are a leading North American producer and processor of intermediate and specialty chemicals and fuel derivatives.  Their products are critical to a wide range of end-markets and applications, including synthetic rubber, fuels, lubricants, plastics, and surfactants.  Additional information regarding the Debtors' businesses, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Robert Del Genio in Support of Debtors' Chapter 11 Petitions and Related Requests for Relief* (the "**First Day Declaration**"), filed contemporaneously herewith and incorporated herein by reference. [2]

### Jurisdiction and Venue

4.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      Pursuant to Bankruptcy Local Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the First Day Declaration.

6.      The statutory predicates for the relief requested herein are sections 105(a), 362(d), 363(b), 363(c), 364 and 503(b) of the Bankruptcy Code, Bankruptcy Rules 4001, 6003 and 6004, and Bankruptcy Local Rule 9013-1(m).

## Relief Requested

7.      By this Motion, the Debtors respectfully request entry of interim and final orders (i) authorizing the Debtors to: (a) continue their Insurance Programs and Surety Bond Program (each as defined herein); (b) honor their Insurance Obligations and Surety Bond Obligations (each as defined herein) in the ordinary course of business during the administration of these chapter 11 cases, including paying any prepetition Insurance Obligations, including amounts owed to the Insurance Service Providers (as defined herein), and (c) modify the automatic stay if necessary to permit the Debtors' employees to proceed with any claims they may have under the Workers' Compensation Program (as defined herein), and (ii) granting related relief.  The Debtors also request authority to purchase, continue, increase, renew, or extend their insurance coverage if they determine in their reasonable business judgment that such action is necessary or appropriate.

8.      A proposed form of order granting the relief requested herein on an interim basis is annexed hereto as **Exhibit A** (the "**Proposed Interim Order**").  A proposed form of order granting the relief requested herein on a final basis is annexed hereto as **Exhibit B** (the "**Proposed Final Order**", and together with the Proposed Interim Order, the "**Proposed Orders**").

## The Insurance Programs

9.      In the ordinary course of business, the Debtors maintain workers' compensation insurance and third-party liability, property, and other insurance programs (collectively, the "**Insurance Programs**") and incur certain obligations to pay premiums, deductibles, self-insured retentions, and other obligations related thereto, including, but not limited

to, broker or advisor fees, Insurance Service Provider fees (as defined herein), taxes, and other fees (collectively, the "**Insurance Obligations**"), in accordance with or relating to their respective insurance policies and any related agreements (each, an "**Insurance Policy**") through several different insurance carriers (the "**Carriers**"), including, but not limited to, those Insurance Programs and Carriers listed on **Exhibit C** annexed hereto (the "**Insurance Schedule**").[3]

10.     The Debtors maintain their various Insurance Policies to help manage and limit the various risks associated with operating their businesses, which is essential to the preservation of the value of the Debtors' businesses and assets, as well as to comply with regulations, laws, and contracts that govern the Debtors' commercial activities.  The Bankruptcy Code reinforces such requirements, as section 1112(b)(4)(C) of the Bankruptcy Code provides that "failure to maintain appropriate insurance that poses a risk to the estate or to the public," is "cause" for conversion or dismissal of a chapter 11 case.

11.     The Insurance Programs[4] include, but are not limited to, coverage for (a) workers' compensation and employer's liability (the "**Workers' Compensation Program**"); (b) legal or contractual liability or other damages to third parties arising from, or incurred by third parties in connection with, the Debtors' business operations (the "**General Commercial and Umbrella Liability Program**"); (c) the Debtors' vehicles (the "**Automobile Liability Program**"); (d) potential liability in connection with the Debtors' operation of marine terminals (the "**Marine Terminal Operator Liability Program**"); (e) potential liability in connection with

---

[3] Due to the size and complexity of the Debtors' businesses, it is possible that certain of the Debtors' Insurance Programs may have been inadvertently omitted from the list of Insurance Programs set forth on Exhibit C hereto. Accordingly, Exhibit C includes a non-exhaustive list of the Debtors' Insurance Programs.  Furthermore, the Debtors may, in the future, enter new Insurance Programs not listed on Exhibit C.  For the avoidance of doubt, the term "Insurance Programs" shall include all insurance policies for any line of coverage issued to or providing coverage to the Debtors, whether prospective, current or expired, and any agreements related thereto.

[4] For the avoidance of doubt, each specifically defined insurance "Program" shall include all insurance policies for that specific line of coverage issued to or providing coverage to the Debtors, whether prospective, current or expired.

the Debtors shipping and handling of marine cargo (the "**Marine Cargo Liability Program**"); (f) physical loss or damage to property owned, used, leased or rented by the Debtors or in which in the Debtors have an insurable interest and business interruption losses suffered by the Debtors (the "**Property/Business Interruption Insurance Program**"); (g) potential liability in connection with the Debtors' employment practices (the "**Employment Practices Liability Program**"); (h) potential environmental and pollution liability (the "**Pollution Legal Liability Program**"); (i) directors' and officers' liability, management liability, fiduciary liability, and professional liability (the "**D&O Liability Program**"); (j) loss or damage in connection with illegal or dishonest acts of an employee or group of employees (the "**Fiduciary and Crime Liability Program**"); and (k) loss or damage in connection with acts of terrorism (the "**Terrorism Liability Program**").  The Debtors also retain the services of the Insurance Service Providers (described herein) in connection with maintaining the Insurance Programs.

12.    Pursuant to the Insurance Policies, the Debtors pay premiums based upon a fixed rate established and billed by each Carrier (collectively, the "**Insurance Premiums**").  The Debtors' Insurance Policies for each of the Workers' Compensation Program, General Commercial and Umbrella Liability Program, and Auto Liability Program renewed on the Petition Date (the "**Renewed Insurance Policies**").  The annual premiums and other normal applicable taxes and fees for the Renewed Insurance Policies have not yet been invoiced by the Carriers. Accordingly, the Debtors estimate that as of the Petition Date they owe approximately $12.0 million in prepetition Insurance Obligations for the Renewed Insurance Policies (including normal applicable taxes and fees).  The outstanding prepetition Insurance Obligations for the Renewed Insurance Policies are expected to be financed under the 2022 Premium Finance Agreement (as defined below).  In the event that the 2022 Premium Finance Agreement is not agreed to in the

following weeks, approximately $12.0 million will come due during the first 21 days of these chapter 11 cases and the Debtors request authority to pay all such Insurance Obligations when due in respect of the Renewed Insurance Policies. The Insurance Programs are discussed below.

## A.    Workers' Compensation Program

13.    In the ordinary course of business, the Debtors maintain workers' compensation insurance as required by statute in the jurisdictions in which they operate for claims arising from or related to employment by the Debtors under the Workers' Compensation Program. The Workers' Compensation Program covers, among other things, statutory workers' compensation and employer liability claims generally arising from accidents, disability, death, or disease sustained by employees in the course of their employment by the Debtors.

14.    Arch Insurance Company (the "**Workers' Compensation Carrier**") currently provides coverage on a guaranteed cost basis in a policy that provides the Debtors' fully-insured coverage of statutory workers' compensation claims, up to $1 million of coverage for each accident for employer's liability arising from or in connection with bodily injury by accident, and up to $1 million in the aggregate of coverage for employer's liability arising from or in connection with bodily injury by disease (the "**Worker's Compensation Policy**").  Under the Workers' Compensation Policy, the Workers' Compensation Carrier is obligated to pay all or part of a covered worker's compensation claim directly to an employee, the employee's medical providers, or the employee's heirs or legal representatives.  The coverage period under the Worker's Compensation Policy is June 1, 2022 through June 1, 2023.  The annual premium of approximately $220,000[5] (including de minimis normal applicable taxes and fees) is currently outstanding and is

---

[5] The 2022-2023 period annual premium for the Workers' Compensation Policy has not yet been invoiced by the Workers' Compensation Carrier.  Accordingly, the annual premium amount for the 2021-2022 period is provided, as it is expected to be substantially similar to the 2022-2023 period annual premium.

expected to be paid under the terms of the 2022 Premium Finance Agreement.  The Debtors do not believe that they owe any amounts, other than the annual premium and related normal applicable taxes and fees, on account of the Workers' Compensation Program as of the Petition Date, including amounts on account of open or potential workers' compensation claims.

15.     Although unlikely, it is possible that an event giving rise to an obligation of the Worker's Compensation Carrier to make a payment on account of a workers' compensation claim—for example, for injury or disease of an employee—could have occurred prepetition without the Debtors' knowledge.   Out of an abundance of caution, the Debtors request modification of the automatic stay (i) to permit the Debtors' employees to proceed against the Worker's Compensation Carrier with any claims they may have under the Workers' Compensation Program and (ii) to allow the Worker's Compensation Carrier to pay such workers' compensation claims.

**B.     General Commercial and Umbrella Liability Program**

16.     The General Commercial and Umbrella Liability Program provides up to $100 million of coverage for each occurrence and in the aggregate for general commercial liability in excess of a $5 million per occurrence retained limit.  Such policy limits are shared with excess coverage for three other programs, the liabilities under which have historically been *de minimis*: (i) liability in excess of the Automobile Liability Program's $1 million coverage limit, (ii) liability in excess of the Marine Terminal Operator Liability Program's $40 million coverage limit, and (iii) liability in excess of the Workers' Compensation Program's $1 million coverage limit solely with respect to the employer's liability coverage provided under the program.  The General Commercial and Umbrella Liability Program has no deductible (other than the $5 million retained limit) and consists of multiple excess policies that, in aggregate, provide up to $100 million of coverage.

17.     The current Carriers under the General Commercial and Umbrella Liability Program are Westchester Surplus Lines Insurance Company, Illinois Union Insurance Company, Lloyd's Syndicate 1225, Ascot Underwriting Bermuda, Allianz Global Corporate & Specialty SE, National Fire & Marine Insurance Company, Market Insurance SE, Starr Surplus Lines Insurance Company, Lloyd's Syndicate 5555, Convex Insurance UK Limited., Endurance American Specialty Insurance Company, Hamilton Re Limited, Ascot Bermuda Limited, XL Bermuda Limited and Ironshore Specialty Insurance Company.  The coverage period is June 1, 2022 through June 1, 2023. The annual premiums of approximately $2.4 million ($2.5 million including normal applicable taxes and fees) for the first two layers of coverage have been paid in full as of the Petition Date.  The annual premiums of approximately $11.2 million[6] ($11.6 million including normal applicable taxes and fees) for the remaining layers of coverage are outstanding as of the Petition Date and are expected to be paid under the terms of the 2022 Premium Finance Agreement. Accordingly, the Debtors do not believe that they owe any amounts, other than the annual premium and related normal applicable taxes and fees, on account of the General Commercial and Umbrella Liability Program as of the Petition Date.

## C.     Automobile Liability Program

18.     The Automobile Liability Program provides coverage up to $1 million on a combined single-limit basis for liability to third parties arising from or in connection with the Debtors' operation, use, or maintenance of vehicles.  The Automobile Liability Program also provides the Debtors up to the statutory amount required for personal injury protection, up to $5,000 for medical payments, up to $1 million for claims involving underinsured or uninsured

---

[6] The 2022-2023 period annual premiums for these layers of coverage have not yet been invoiced by the Carriers. Accordingly, the annual premium amounts for the 2021-2022 period are provided, as they are expected to be substantially similar to the 2022-2023 period annual premiums.

motorists, and up to the actual cash value for coverage of comprehensive and collision claims.  The

Debtors' deductibles for comprehensive coverage and collision coverage are $2,000 each.  The

current Carrier for the Automobile Liability Program is Arch Insurance Company.  The coverage

period is June 1, 2022 through June 1, 2023, and the annual premium of approximately $74,000[7]

is expected to be paid under the terms of the 2022 Premium Finance Agreement.  The Debtors do

not believe that they owe any amounts other than the annual premium and related normal

applicable taxes and fees, on account of the Automobile Liability Program as of the Petition Date.

**D.     Marine Terminal Operator Liability Program**

19.     The Marine Terminal Operator Liability Program provides coverage for

liability up to $40 million for each occurrence and in the aggregate arising from or in connection

with the Debtors' operation of marine terminals in Houston, Texas, Port Neches, Texas, and

Westlake, Louisiana.  The Marine Terminal Operator Liability Program covers liability for damage

to third party property, bodily injury, defense cost and expenses resulting from insured operation

within the marine terminals.  The Marine Terminal Operator Liability Program has a deductible of

$25,000 for each occurrence except for a deductible of $50,000 for claims covering cargo legal

liability.  The current primary Carrier under the Marine Terminal Operator Liability Program is

Liberty Mutual Insurance Company.  The Debtors also maintain related excess liability policies

with Navigators Insurance Company.

20.     The Debtors incur approximately $148,000 annually in premiums on

account of the Marine Terminal Operator Liability Program.  The coverage period for the existing

policies under the Marine Terminal Operator Liability Program is August 1, 2021 through August

---

[7] The 2022-2023 period annual premium for the Automobile Liability Program has not yet been invoiced by the Carrier.  Accordingly, the annual premium amount for the 2021-2022 period is provided, as it is expected to be substantially similar to the 2022-2023 period annual premium.

1, 2022 and the annual premiums were paid in full prior to the Petition Date.  The Debtors do not believe that they owe any amounts on account of the Marine Terminal Operator Liability Program as of the Petition Date.

### E.    Marine Cargo Liability Program

21.    The Marine Cargo Liability Program provides coverage up to $20 million for each occurrence and in the aggregate to the Debtors for liability arising from or in connection with damages by natural disaster or other perils to goods shipped by water or conveyed on land. The Marine Cargo Liability Program also insures goods stored with limits ranging from $50,000 to $36 million for each storage facility depending on the storage facility and an aggregate limit of $36 million for coverage of all storage facilities.  The Marine Cargo Liability Program has a $1 million deductible for damages caused by natural disaster and all other perils.  The current Carrier under the Marine Cargo Liability Program is Southern Marine & Aviation.  The coverage period is August 1, 2021 through August 1, 2022, and the annual premium of approximately $715,000 ($751,000 including normal applicable taxes and fees) was paid in full prior to the Petition Date. The Debtors do not believe that they owe any amounts on account of the Marine Cargo Liability Program as of the Petition Date.

### F.    Property/Business Interruption Insurance Program

22.    The Property/Business Interruption Insurance Program provides coverage up to $850 million for each occurrence and in the aggregate for the Debtors to cover liability relating to, among other things, physical loss or damage, including earthquake and flooding damage, incurred with respect to the covered properties, and business interruption losses suffered by the Debtors.  The Property/Business Interruption Insurance Program has a $20 million deductible for each occurrence and a waiting period deductible of 60 days.

23.     The Carriers under the Property/Business Interruption Insurance Program are Starr Surplus Lines Insurance Co., Berkshire Hathaway Specialty Insurance Co., Lloyds Syndicate 1183, Great Lakes Insurance SE, National Union Fire Insurance Co., National Fire & Marine Insurance Co., ACE American Insurance Co., Indian Harbor Insurance Co, and Oil Casualty Insurance, Ltd.  The coverage period for the Property/Business Interruption Insurance Program is July 1, 2021 through July 1, 2022 and the aggregate annual premium of approximately $28.3 million ($29.5 million including normal applicable taxes and fees) was paid in full prior to the Petition Date.  The Debtors do not believe that they owe any amounts on account of the Property/Business Interruption Insurance Program as of the Petition Date.

**G.      Employment Practices Liability Program**

24.     The Employment Practices Liability Program provides coverage up to $5 million for each occurrence and in the aggregate for liability of the Debtors arising from or in connection with various employment-related claims including allegations of wrongful termination, discrimination, workplace harassment and retaliation.   The Employment Practices Liability Program has a deductible of $100,000 for each claim.

25.     The current Carrier under the Employment Practices Liability Program is Twin City Fire Insurance Company.  The coverage period is February 1, 2022 through February 1, 2023 and the annual premium of approximately $50,000 was paid in full prior to the Petition Date.  The Debtors do not believe that they owe any amounts on account of the Employment Practices Liability Program as of the Petition Date.

**H.      Pollution Legal Liability Program**

26.     The Pollution Legal Liability Program provides coverage of up to $25 million per incident and in the aggregate for liability arising from or in connection with illicit abandonment, indoor environmental conditions (such as the presence of fungi or *legionella*

*pneumophila* in a building or structure), and the discharge, dispersal, release, escape, migration, or seepage of any solid, liquid, gaseous or thermal irritant, contaminant, or pollutant.  The Pollution Legal Liability Program has a deductible of $100,000 for each incident.

27.    The current Carrier under the Pollution Legal Liability Program is Ironshore Specialty Insurance Company.  The coverage period is August 1, 2021 through August 1, 2022, and the annual premium of approximately $373,000 ($391,000 including normal applicable taxes and fees) was paid in full prior to the Petition Date.  The Debtors do not believe that they owe any amounts on account of the Pollution Legal Liability Program as of the Petition Date.

**I.      Fiduciary and Crime Liability Program**

28.    The Fiduciary and Crime Liability Program provides the Debtors coverage of up to $5 million for each occurrence and in the aggregate for liability arising from or in connection with any illegal or dishonest acts of an employee or group of employees such as theft or embezzlement.  The Fiduciary and Crime Liability Program has no deductible for fiduciary-based claims but has a deductible of $50,000 for each loss for crime-based claims.

29.    The current Carrier under the Fiduciary and Crime Liability Program is National Union Fire Insurance Company of Pittsburgh.  The coverage period is February 1, 2022 through February 1, 2023 and the annual premium of approximately $33,000 was paid in full prior to the Petition Date.  The Debtors do not believe that they owe any amounts on account of the Fiduciary and Crime Liability Program as of the Petition Date.

**J.      D&O Liability Program**

30.    The D&O Liability Program provides coverage of up to $50 million for each occurrence and in the aggregate for liability arising from or in connection with the decisions and actions taken by the Debtors' directors and officers within the scope of their duties.  The D&O Liability Program has a retention of $250,000 for each claim for D&O acts.

31.     The current Carriers under the D&O Liability Program are U.S. Specialty Insurance Company, Endurance American Insurance Company, Starr Indemnity & Liability Company, Great Midwest Insurance Company, Twin City Fire Insurance Company, ACE American Insurance Company, Zurich American Insurance Company, Old Republic Insurance Company, and XL Specialty Insurance Company.  The coverage period is February 1, 2022 through February 1, 2023 and the D&O Liability Program's annual premiums of approximately $2.2 million (including tail coverage) in the aggregate were paid in full prior to the Petition Date.[8] The Debtors do not believe that they owe any amounts on account of the D&O Liability Program as of the Petition Date.

**K.      Terrorism Liability Program**

32.     The Terrorism Liability Program provides coverage of up to $600 million in the aggregate for damages arising from or in connection with acts of terrorism.  The Terrorism Liability Program categorizes its coverage by offering up to $500 million per occurrence and in the aggregate for terrorism or sabotage claims and up to $100 million per occurrence and in the aggregate for cybersecurity claims.  The Terrorism Liability Program has no deductible.

33.     The current Carrier under the Terrorism Liability Program is Lloyd's Syndicate 33.  The coverage period is July 1, 2021 through July 1, 2022, and the annual premium of approximately $171,000 ($180,000 including normal applicable taxes and fees) was paid in full prior to the Petition Date.  The Debtors do not believe that they owe any amounts on account of the Terrorism Liability Program as of the Petition Date.

---

[8] Prior to the Petition Date, the Debtors also funded the premiums for tail coverage under the D&O Liability Program.

### Insurance Service Providers

34.     In connection with the Insurance Programs, in the ordinary course of business, the Debtors engage certain insurance service providers to help them procure, negotiate, and evaluate the Insurance Programs and process claims related thereto.

35.     The Debtors utilize Aon Risk Services Southwest Inc. as their insurance broker (the "**Insurance Broker**") to assist with the procurement and negotiation of certain Insurance Policies and, in certain circumstances, to remit payment to the Carriers on behalf of the Debtors.  The Insurance Broker is essential to the Debtors' ability to secure insurance coverage, as the Insurance Broker obtains and manages their Insurance Policies in a reasonable and prudent manner and enables the Debtors to realize considerable savings in the procurement of the Insurance Policies.  The Debtors do not have access to certain key markets unless represented by the Insurance Broker.

36.     For broker-related services, the Debtors pay the Insurance Broker a consulting fee for advising the Debtors on optimizing their portfolio of Insurance Policies (the "**Consulting Fee**").  The Consulting Fee for the current period from June 26, 2021 to June 26, 2022 is $400,000.  In addition to the Consulting Fee, the Debtors utilize additional services of the Insurance Broker for work associated with claims related to the November 27, 2019 PNO incident (described in the First Day Declaration).  The additional services require a supplemental fee (the "**Supplemental Fee**", and together with the Consulting Fee, the "**Broker Fees**").  The Supplemental Fee for the current period from June 26, 2021 to June 26, 2022 is $300,000.  The Supplemental Fee is subject to pro-rata adjustment promptly following final resolution of the Debtors' claims related to the PNO event should such final resolution occur prior to June 26, 2022. The Broker Fees, totaling $700,000, have been paid in full prior to the Petition Date.

37.     In addition to the Insurance Broker, the Debtors engage BDO Insurance Brokers, Inc. ("**BDOI**") as an advisor to assist the Company with preparing and submitting claims under its Property Insurance Program.  The Company compensates BDOI at an hourly rate.  In addition, the Company retains  Broadspire Insurance Company ("**Broadspire**") as the third-party administrator to process claims arising under the General Commercial & Umbrella Liability Program (BDOI and Broadspire, together and with any other third-party administrators, the "**Third-Party Administrators**", and together with the Insurance Broker, the "**Insurance Service Providers**").  The Company currently pays Broadspire a $3,500 annual retainer.  In addition, the Company would have to pay Broadspire additional fees on a per claim basis should a claim arise under its General Commercial & Umbrella Liability Program.  The Debtors use BDOI as an advisor with respect to claims relating to the PNO incident and the A-Dock incident specifically. The Debtors estimate they pay the Third-Party Administrators approximately $1.3 million per year for their advisory and claims-processing services before taking into account any BDOI fees recoverable under their Property Insurance Program.  The Debtors believe that, as of the Petition Date, not more than $100,000 in prepetition amounts are owed to the Third-Party Administrators.

38.     The Debtors request to continue honoring their obligations to the Insurance Service Providers in the ordinary course of business, including the authority to pay any fees that may be due and owing or that come due and owing to the Insurance Service Providers.

## L.     Insurance Premium Financing

39.     Generally, the Debtors' Insurance Policies require that the Debtors pay the Insurance Premiums in full at the beginning of the applicable policy period.  To manage their cash outflows and avoid paying certain premiums in annual lump sums, the Debtors financed certain of their premiums pursuant to the following premium finance agreements: (i) that certain Commercial Insurance Premium Finance and Security Agreement, dated as of August 9, 2021 (the "**August**

Premium Finance Agreement"), by and between the Debtors and Aon Premium Finance, LLC (the "**Premium Financier**") and (ii) that certain Commercial Insurance Premium Finance and Security Agreement, dated as of September 3, 2021 (the "**September Premium Finance Agreement**", and together with the August Premium Finance Agreement, the "**Premium Finance Agreements**"), by and between the Debtors and the Premium Financier.

40.     Pursuant to the Premium Finance Agreements, the Debtors granted the Premium Financier a security interest in, among other things, any and all unearned premiums and dividends which may become payable for any reason under the financed Insurance Policies.  If the Debtors do not fulfill their obligations under the Premium Finance Agreements, the Premium Financier has the contractual right, subject to the automatic stay, to, among other things, terminate any covered Insurance Policies.

41.     In renewal of the Renewed Insurance Policies for the 2022-2023 period, the Debtors expect the Premium Financier to develop a premium finance agreement (the "**2022 Premium Finance Agreement**") to finance the outstanding annual premiums.  The 2022 Premium Finance Agreement is expected to be executed upon receipt of invoices for the annual premiums from the applicable Carriers in the weeks following this Motion.

42.     The Debtors do not believe that they owe any amounts on account of the Premium Finance Agreements as of the Petition Date.  By this Motion, the Debtors request authority to renew the Premium Finance Agreements and/or to enter into new premium finance arrangements, including the 2022 Premium Finance Agreement, as needed in the ordinary course of business, and to continue honoring their obligations to the Premium Financier in the ordinary course of business, including authority to pay any amounts that may be due and owing or that

become due and owing, including those that become due and owing under the 2022 Premium Finance Agreement.

## Debtors' Surety Bond Program

43.     Pursuant to their surety bond program (the "**Surety Bond Program**"), in the ordinary course of business, the Debtors are required to provide surety bonds to certain third parties (the "**Obligees**"), including governmental units and other public agencies, to secure the Debtors' payment or performance of certain obligations in connection with utility deposits, tax permits, and various business licenses (the "**Surety Bonds**").  The Debtors currently have one Surety Bond outstanding.  The Obligee under the Surety Bond is the U.S. Customs and Border Protection agency.  The Surety Bond was issued by American Alternative Insurance Corp. (the "**Surety**").  The principal amount of the Surety Bond is $50,000 and the Surety Premium (as defined herein) of $375 was paid in full prior to the Petition Date.

44.     Pursuant to the Surety Bond Program, the Debtors pay premiums based upon a fixed rate established and billed by each Obligee (collectively, the "**Surety Premiums**", along with related taxes and other fees, the "**Surety Bond Obligations**").  The Debtors believe that no Surety Premiums are outstanding as of the Petition Date.  By this Motion, the Debtors seek authority to pay any Surety Bond Obligations that may become due and owing during these chapter 11 cases.

## Relief Requested Should Be Granted

45.     The Debtors believe that continued participation in the Insurance Programs and the Surety Bond Program and the payment of any Insurance Obligations and Surety Bond Obligations are in the ordinary course of business and are, therefore, authorized pursuant to section 363(c)(1) of the Bankruptcy Code.  Specifically, section 363(c)(1) of the Bankruptcy Code provides that a debtor may use property of the estate in the ordinary course of business without notice or a hearing.  11 U.S.C. § 363(c)(1).  The maintenance of the Insurance Programs and the

Surety Bond Program, and honoring of the obligations arising thereunder, including undertaking renewals of the Insurance Programs , Premium Financing Agreements, and Surety Bonds as they expire or entering into new insurance arrangements or Surety Bonds, are each the type of ordinary course transaction contemplated by the foregoing provision.

46.     To the extent that the Court believes that any such actions are not transactions in the ordinary course of the Debtors' business, including the payment of any prepetition Insurance Obligations and Surety Bond Obligations, the Debtors respectfully request that the Court authorize the Debtors to take such actions pursuant to sections 105(a), 363(b), and 503(b) of the Bankruptcy Code.

**A. Sections 105(a), 363(b), and 503(b) of the Bankruptcy Code Support the Maintenance of the Insurance Programs and the Surety Bond Program and the Payment of All Related Obligations**

47.     Section 503(b)(1) of the Bankruptcy Code provides that, "[a]fter notice and a hearing, there shall be allowed, administrative expenses [ ], including –. . . the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A).  The Court, therefore, can authorize the Debtors to use estate funds to pay any Insurance Obligations arising or relating to the period after the Petition Date.

48.     Additionally, pursuant to section 363(b) of the Bankruptcy Code, a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  Under this section, a court may authorize a debtor to pay certain claims as long as a sound business purposes exists for the transaction.  *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (finding that the debtor sustained its burden of articulating sound business reasons for its decision to pay pre-petition wages).  To evaluate whether a sound business purpose justifies the use, sale, or lease of property under section 363(b) of the Bankruptcy Code, "courts consider a variety of factors, which essentially represent

a business judgment test." *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999).  Once a debtor articulates a reasonable basis for its business decisions, "courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

49.     Furthermore, pursuant to section 105(a) of the Bankruptcy Code, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Under section 105(a) and the doctrine of necessity, the bankruptcy court may exercise its broad grant of equitable powers to permit the payment of prepetition obligations when such payment is essential to the continued operation of a debtor's business.  *See, e.g.*, *In re Just for Feet, Inc.*, 242 B.R. 821, 824-25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code provides a statutory basis for the payment of prepetition claims under the doctrine of necessity and noting that "[t]he Supreme Court, the Third Circuit and the District of Delaware all recognize the court's power to authorize payment of pre-petition claims when such payment is necessary for the debtor's survival during chapter 11"); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (confirming that the doctrine of necessity is the standard in the Third Circuit for enabling a court to authorize the payment of prepetition claims prior to the confirmation of a reorganization plan).

50.     Bankruptcy courts regularly rely on their authority under section 105(a) and the doctrine of necessity to grant debtors the discretionary authority to pay certain prepetition claims "where the payment is necessary to permit the effectuation of the rehabilitative purposes of the Bankruptcy Code." *Pension Benefit Guar. Corp. v. Sharon Steep Corp. (In re Sharon Steel Corp.)*, 159 B.R. 730, 736 (Bankr. W.D. Penn. 1993); *see also In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court may authorize payment of prepetition claims if such payment is essential to continued operation of the debtor); *In re Ionosphere Clubs, Inc.*, 98 B.R. at 175 ("The ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept.").

51.     The rationale for making payments to prepetition creditors under the doctrine of necessity is consistent with the paramount goal of chapter 11: the continued operation and rehabilitation of the debtor.  *See In re Ionosphere Clubs, Inc.*, 98 B.R. at 176 ("[F]acilitating the continued operation and rehabilitation of the debtor . . . is also a paramount goal of Chapter 11.").  To that end, approval of such payments benefits, rather than harms, the Debtors' other creditors.  *See, e.g.*, *In re Sharon Steel*, 159 B.R. at 737 (approving payments of certain prepetition wages under the doctrine of necessity where doing so would maximize the value of the Debtors' assets and noting that payments made pursuant to the doctrine of necessity "must not only be in the best interest of the debtor but also in the best interest of its other creditors").  Moreover, Bankruptcy Rule 6003 itself implies that the payment of prepetition obligations may be permissible within the first twenty-one (21) days of a case where doing so is "necessary to avoid immediate and irreparable harm."

52. The nature of the Debtors' businesses and the extent of their operations make it essential for the Debtors to maintain the Insurance Programs and the Surety Bond Program and pay all Insurance Obligations and Surety Bond Obligations on an ongoing and uninterrupted basis. Without authority to maintain and pay amounts owing in connection with the Insurance Programs and the Surety Bond Program, the ability of the Debtors to conduct operations in many locations would come to a halt to the detriment and prejudice of all parties in interest. Additionally, based on the Debtors' current circumstances, it is not likely that the Debtors will be able to renew or replace their existing Insurance Programs or Surety Bond Program on terms more favorable than those currently offered by the Insurance Carriers and Sureties nor can the Debtors be sure they will be able to renew the Insurance Programs with the current Insurance Carriers. At the same time, the Debtors will, together with their Insurance Broker, endeavor to renew their Insurance Programs on more favorable terms, which may include replacing certain current Insurance Carriers. The process of establishing new programs would also be burdensome and costly to the Debtors. Failure to pay the Insurance Obligations and the Surety Bond Obligations could result in the cancellation of the Insurance Programs or the Surety Bond Program, which would expose the Debtors to significant liability and fines under various applicable federal and state laws and regulations, including state laws mandating that the Debtors maintain workers' compensation coverage for their employees. Such exposure would have a materially adverse impact on the Debtors' ability to continue to operate as they work to consummate a sale of substantially all of their assets and, thus, would jeopardize the success of these of these chapter 11 cases. Furthermore, the Debtors are required to maintain most of the Insurance Programs to comply with the guidelines established by the Office of the United States Trustee for Region 3. Therefore, the continuation of the Insurance Programs and the Surety Bond Program and the payment of all Insurance

Obligations and the Surety Bond Obligations are essential to preserve value for the Debtors' estates and all parties in interest.

53.    Based on the foregoing, the Debtors respectfully submit that the maintenance and continuation of the Insurance Programs and the Surety Bond Program and the payment of any prepetition obligations arising therefrom should be authorized under sections 105(a), 363(b), and 503(b) of the Bankruptcy Code to the extent such actions are deemed outside the ordinary course of the Debtors' business.

**B.    The Automatic Stay, if Applicable, Should be Modified for Workers' Compensation Claims**

54.    Section 362(d)(1) of the Bankruptcy Code operates to stay:

> the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . .

11 U.S.C. § 362(d)(1).  Section 362(d)(1), however, permits a debtor or other party in interest to request a modification or termination of the automatic stay for "cause."

55.    To the extent the Debtors' employees hold valid claims under the Workers' Compensation Program, the Debtors seek authority, but not direction, under section 362(d) of the Bankruptcy Code to permit, in the Debtors' discretion, those employees to proceed with their workers' compensation claims, each in the appropriate judicial or administrative forum.  There is cause to modify the automatic stay, if applicable, because staying the workers' compensation claims could cause employee departures or otherwise harm employee morale, which would severely disrupt the Debtors' business and prevent a successful reorganization.  Accordingly, the Court should (i) modify the automatic stay as it relates to valid workers' compensation claims, if applicable, to allow, in the Debtors' sole discretion, any such claims to proceed to resolution and

(ii) waive corresponding notice requirements under Bankruptcy Rule 4001(d).  The Court should also grant the Debtors authority, to the extent required by law or under the Workers' Compensation Program, to pay all or part of a claim related thereto directly to an employee, any of his or her medical providers, or any of his or her heirs or legal representatives, as set forth in the applicable law or policy.

**Applicable Financial Institutions Should Be Authorized and Directed to<br>Receive, Process, Honor, and Pay Checks Issued and Transfers Requested to Pay<br>Insurance Obligations, Surety Bond Obligations, and Workers' Compensation Claims**

56.     The Debtors further request that the Court authorize and direct applicable financial institutions (the "**Banks**") to receive, process, honor, and pay any and all checks issued or to be issued, and electronic funds transfers requested or to be requested, by the Debtors relating to the Insurance Obligations, Surety Bond Obligations, workers' compensation claims, and Premium Finance Agreements, to the extent that sufficient funds are on deposit in applicable bank accounts to cover such payments.  The Debtors also request authority to issue new postpetition checks or effect new postpetition electronic funds transfers in replacement of any checks or fund transfer requests on account of prepetition Insurance Obligations, Surety Bond Obligations, workers' compensation claims, and the Premium Finance Agreements, that were dishonored or rejected as a result of the Debtors' commencement of these chapter 11 cases.

**Bankruptcy Rule 6003 Is Satisfied**

57.     Bankruptcy Rule 6003 provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" before twenty-one (21) days after the filing of the petition.

58.     As described herein and in the First Day Declaration, the relief requested herein is necessary for the Debtors to operate their businesses in the ordinary course and to maximize the value of their estates for the benefit of all stakeholders.  Accordingly, the relief requested herein is necessary to avoid immediate and irreparable harm, and the requirements of Bankruptcy Rule 6003 are satisfied.

### Request for Bankruptcy Rule 6004 Waivers

59.     The Debtors request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h).  As explained above and in the First Day Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and stay apply.

### Reservation of Rights

60.     Nothing contained herein is intended or shall be construed as (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors; (c) a waiver of any claims or causes of action which may exist against any creditor or interest holder; or (d) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

**Notice**

61.     Notice of this Motion will be provided to (i) the Office of the United States Trustee for the District of Delaware (the **"U.S. Trustee"**); (ii) the holders of the 30 largest unsecured claims against the Debtors on a consolidated basis; (iii) counsel to the ABL Agent, (x) Haynes and Boone, LLP, 1221 McKinney Street, Suite 4000, Houston, TX 77010, Attn: Charles A Beckham, Jr. (charles.beckham@haynesboone.com) and (y) Haynes and Boone, LLP, 2323 Victory Avenue, Suite 700, Dallas, TX 75219, Attn: J. Frasher Murphy (frasher.murphy@haynesboone.com); (iv) counsel to the Ad Hoc Noteholder Group, Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 (Attn: Kristopher M. Hansen, Jonathan D. Canfield and Gabriel Sasson), and Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, DE 19801 (Attn: Matthew B. Lunn, Sean M. Beach and Robert F. Poppiti, Jr.); (v) counsel to the Supporting Sponsors, Latham & Watkins LLP, 1271 Avenue of the Americas, New York, New York 10020 (Attn: George A. Davis and David A. Hammerman); (vi) the Internal Revenue Service; (vii) the United States Attorney's Office for the District of Delaware; (viii) the Securities and Exchange Commission; (ix) any other party entitled to notice pursuant to Bankruptcy Rule 2002; and (x) any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(m) (collectively, the "**Notice Parties**").

WHEREFORE the Debtors respectfully request entry of the Proposed Orders granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: June 1, 2022
      Wilmington, Delaware

/s/ Robert J. Dehney

**BAKER BOTTS L.L.P.**

James R. Prince (*pro hac vice* admission pending)
Kevin Chiu (*pro hac vice* admission pending)
2001 Ross Avenue, Suite 900
Dallas, Texas 75201-2980
Telephone:    (214) 953-6500
Facsimile:     (214) 953-6503
Email: jim.prince@bakerbotts.com
       kevin.chiu@bakerbotts.com

-and-

BAKER BOTTS L.L.P.

Scott R. Bowling (*pro hac vice* admission pending)
30 Rockefeller Plaza
New York, New York 10112
Telephone:    (212) 408-2500
Facsimile:     (212) 259-2501
Email: scott.bowling@bakerbotts.com

-and-

BAKER BOTTS L.L.P.

David R. Eastlake (*pro hac vice* admission pending)
Lauren N. Randle (*pro hac vice* admission pending)
910 Louisiana Street
Houston, Texas 77002
Telephone:    (713) 229-1234
Facsimile:     (713) 229-1522
Email: david.eastlake@bakerbotts.com
       lauren.randle@bakerbotts.com

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

Robert J. Dehney (No. 3578)
Curtis S. Miller (No. 4583)
Daniel B. Butz (No. 4227)
Matthew O. Talmo (No. 6333)
Brian Loughnane (No. 6853)
1201 N. Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email:    rdehney@morrisnichols.com
        cmiller@ morrisnichols.com
        dbutz@ morrisnichols.com
        mtalmo@ morrisnichols.com
        bloughnane@ morrisnichols.com

*Proposed Attorneys for Debtors
and Debtors in Possession*