## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| **TPC GROUP INC.**, *et al.*, | Case No. 22-10493 (___) |
| Debtors.[1] | Joint Administration Requested |

**MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) CONTINUE THEIR EXISTING CASH MANAGEMENT SYSTEM, (B) MAINTAIN EXISTING BUSINESS FORMS, (C) CONTINUE INTERCOMPANY ARRANGEMENTS, (D) CONTINUE USING P-CARDS; AND (E) PAY BANK FEES (II) GRANTING AN EXTENSION OF TIME TO COMPLY WITH 11 U.S.C. § 345(b); AND (III) GRANTING RELATED RELIEF**

TPC Group Inc. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully represent as follows in support of this motion (this "**Motion**"):

### Background

1.    On the date hereof (the "**Petition Date**"), the Debtors commenced these chapter 11 cases by filing voluntary petitions with this Court under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

2.    The Debtors are authorized to continue operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee has been appointed in these cases.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: TPC Group Inc. (3618); TPC Holdings, Inc. (7380); TPC Group LLC (8313); Texas Butylene Chemical Corporation (7440); Texas Olefins Domestic International Sales Corporation (4241); TPC Phoenix Fuels LLC (9133); Port Neches Fuels, LLC (1641); and TP Capital Corp. (6248).  Each Debtor's corporate headquarters and mailing address is 500 Dallas St., Suite 2000, Houston, Texas 77002.

The Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

3.      The Debtors are the leading North American producer and processor of intermediate and specialty chemicals and fuel derivatives.  Their products are critical to a wide range of end-markets and applications, including synthetic rubber, fuels, lubricants, plastics, and surfactants.  Additional information regarding the Debtors' businesses, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Robert A. Del Genio in Support of Debtors' Chapter 11 Petitions and Related Requests for Relief* (the "**First Day Declaration**"), filed contemporaneously herewith and incorporated herein by reference.[2]

## Jurisdiction and Venue

4.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The Debtors consent pursuant to Rule 9013-1(f) of the Bankruptcy Local Rules to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the First Day Declaration.

## Relief Requested

6.      Pursuant to sections 105(a), 345(b), 363(b), 363(c), and 364(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, the Debtors request authority, but not direction, to:

a.      Continue their existing cash management system (the "**Cash Management System**"), including, without limitation, to maintain their existing bank accounts and business forms;

b.      Implement changes to the Cash Management System in the ordinary course of business and consistent with prepetition practice insofar as such changes relate to the Debtors' participation in or control of the Cash Management System, including, without limitation, opening new or closing existing bank accounts owned or operated by the Debtors;

c.      Continue to perform under and honor intercompany transactions in the ordinary course of business and consistent with prepetition practice and make transfers to and certain payments on behalf of Non-Debtor Affiliates (as defined below);

d.      Provide administrative expense priority for postpetition intercompany claims against the Debtors; and

e.      Honor and pay all prepetition and postpetition Bank Fees (as defined below) that are payable by the Debtors.

7.      The Debtors further request, out of an abundance of caution, that the Court extend the Debtors' time to come into compliance with section 345(b) of the Bankruptcy Code to the extent that such provision applies and is not already satisfied.

8.      A proposed form of order granting the relief requested herein on an interim basis is annexed hereto as **Exhibit A** (the "**Proposed Interim Order**").  A proposed form of order granting the relief requested herein on a final basis is annexed hereto as **Exhibit B** (the "**Proposed Final Order**," and together with the Proposed Interim Order, the "**Proposed Orders**").

## Cash Management System

9.      To facilitate the efficient operation of their businesses, the Debtors utilize in the ordinary course of business the Cash Management System: a centralized system used to

collect, transfer, and disburse funds generated by the Debtors' operations. Both Debtors and certain non-Debtors participate in the Cash Management System as described herein. The Cash Management System facilitates cash monitoring, forecasting, and reporting and enables the Debtors to maintain control over the administration of their cash and intercompany transactions. The Cash Management System involves nine deposit accounts maintained by Debtors, two escrow accounts maintained by a Debtor, and one deposit account maintained by non-Debtor TPC All for One Foundation, a 501(c)(3) charitable organization, which utilizes the Debtors' banking platform at Bank of America, N.A. ("**BOA**"; all 12 such accounts described herein, together with any other such accounts the Debtors may open pursuant to the Proposed Orders, the "**Bank Accounts**").[3] The Bank Accounts as of the Petition Date are identified on **Schedule 1** to each of the Proposed Orders and are reflected on the diagram of the Cash Management System attached hereto as **Exhibit C**. The Debtors' treasury department, located in Houston, Texas, maintains daily oversight of the Cash Management System and implements cash management controls for entering, processing, and releasing funds. As discussed below, the Cash Management System is integral to the Debtors' business operations.

A.    **Bank Accounts and Flow of Funds**

10.    As of the Petition Date, the Debtors hold approximately $25,455,785 in cash in the Bank Accounts. Substantially all of the Debtors' cash on hand consists of proceeds from the Debtors' first-lien asset-based revolving credit facility (the "**ABL Revolver**"), proceeds from

---

[3] Debtors' BOA banking platform includes an additional bank account maintained by a Non-Debtor Affiliate, Sawgrass Holdings LP. Historically, the Debtors have disbursed funds from the Funding Account to a bank account ending in x8767 maintained by the Non-Debtor Affiliate (the "Sawgrass Holdings Account") to fund repurchases of departing employees' equity interests. Over the last five years, there have been six disbursements averaging about $24,500 in equity repurchases. The Debtors are not seeking relief in this Motion relating to the Sawgrass Holdings Account. The Debtors will not be repurchasing equity interests or transferring funds to or from the Sawgrass Holdings Account during these chapter 11 cases absent the consent of the Ad Hoc Noteholder Group and separate relief from the Court. The Sawgrass Holdings Account has a cash balance of $89,728 as of the Petition Date.

the collection of Debtors' accounts receivable, and insurance proceeds.  All of the Bank Accounts

are maintained with BOA.  The Bank Accounts' ownership and purposes are summarized as

follows:

| Applicable Entity | Account Number | Account Purpose |
|---|---|---|
| **Main Operating Accounts** | | |
| TPC Group LLC | x2999 | Collections account |
| TPC Group LLC | x5528 | Funding account |
| TPC Group LLC | x5252 | Accounts payable account |
| TPC Group LLC | x5544 | Payroll account |
| **Counterparty Escrow Accounts** | | |
| TPC Group LLC | x555.1 | Escrow account established pursuant to processing agreement with BASF TOTAL Petrochemicals LLC to fund capital expenses |
| TPC Group LLC | x556.1 | Escrow account established pursuant to processing agreement with BASF TOTAL Petrochemicals LLC to fund capital expenses |
| **Other Accounts** | | |
| TPC Group LLC | x1525 | Investment account with BOA |
| TP Capital Corp. | x2957 | Dormant account with zero balance |
| Port Neches Fuels, LLC | x6917 | Dormant account with zero balance |
| TPC All for One Foundation (*Non-Debtor*) | x9526 | Deposit account owned by non-Debtor 501(c)(3) non-profit charity but operated using the Debtors' existing banking platform with BOA |
| **Accounts Opened to Facilitate Chapter 11 Cases** | | |
| TPC Group LLC | x2199 | Utility deposit account |
| TPC Group LLC | x2212 | Dormant account with zero balance |

Each of these Bank Accounts, together with its sources and uses of cash, is described in further detail below.

     *1.*     ***Main Operating Accounts***

     11.     <u>Cash Collection and Concentration</u>.  The Debtors' cash receipts are derived principally from draws on the ABL Revolver, revenue from the Debtors' ongoing business operations, and insurance proceeds.  The Debtors' receipts enter the Cash Management System via check, wire transfer, or automated clearing house ("**ACH**") transfer.  All receipts other than ABL Revolver borrowings and Investment Account (as defined below) redemptions are collected into the Bank Account ending in x2999 (the "**Collections Account**").  Customer payments made by paper check are mailed to a lockbox, and the checks are cashed and then deposited by BOA into the Collections Account.  Currently, the Debtors' cash is concentrated in the Collections Account.  Each day, cash needed to meet payment obligations—such as debt service payments, payroll payments, funding the escrow accounts, and supplier and vendor payments—are automatically swept from the Collections Account into the Bank Account ending in x5528 (the "**Funding Account**").  ABL Revolver borrowings are, and Investment Account (as defined below) redemptions have historically been, received directly into the Funding Account.  As of the commencement of these cases, the Collections Account had a cash balance of approximately $22,862,146, and the Funding Account had a cash balance of approximately $0.

     12.     After the initial funding under the ABL DIP Facility (in the event such facility is approved by the Court), the Debtors will need to make certain changes to the Cash Management System to comply with the requirements of the ABL DIP Facility.  Each day, cash will be transferred from the Collections Account into a deposit account (the "**EBC Deposit Account**") maintained by ABL DIP Agent Eclipse Business Capital LLC ("**EBC**" or the "**ABL**

**DIP Agent"**).    The purpose of the EBC Deposit Account is to facilitate EBC's portfolio monitoring.    Each day, cash will be swept from the EBC Deposit Account into the Funding Account.    Debtors' cash will then be concentrated in the Funding Account instead of the Collections Account.  Based on the Debtors' available liquidity during the Chapter 11 Cases in the event the ABL DIP Facility is approved, the Debtors believe that such arrangements will not impact their business operations and are appropriate under the circumstances.

13.    <u>Cash Disbursements</u>.  The Debtors' cash disbursements have historically consisted principally of debt service payments, supplier and vendor payments, payroll payments, and pre-funding of two escrow accounts pursuant to a crude C4 processing agreement (as discussed below).  Wire payments on account of debt service obligations and supplier and vendor payment obligations are made from the Funding Account.  Payments made to third parties via check are made from the Bank Account ending in x5252 (the "**A/P Account**").    On a biweekly or semimonthly basis, as applicable, cash is automatically swept from the Funding Account into the Bank Account ending in x5544 (the "**Payroll Account**"), which is used exclusively to fund payroll.  The Debtors have also historically disbursed cash from the Funding Account to the Bank Account ending in x1525 (the "**Investment Account**") under certain circumstances described more fully below.  Debtor TPC Group LLC is the sole payor entity among the Debtors and the Non-Debtor Affiliates, making all payments to third parties on behalf of itself and its affiliates and recording intercompany balances by book entry (with quarterly accounting adjustments to affiliates' equity accounts).  As of the Petition Date, the A/P Account had a cash balance of approximately $0, and the Payroll Account had a cash balance of approximately $0.

### 2.  *Crude C4 Processing Escrow Accounts*

14.    The escrow account ending in x555.1 and the escrow account ending in x556.1 (each an **"Escrow Account"**) were opened in April 2021 pursuant to a Crude C4 processing agreement entered into with BASF TOTAL Petrochemicals LLC dated January 26, 2021 (the **"Processing Agreement"**).  The Debtors entered into the Processing Agreement to expand their crude C4 processing capacity following the November 2019 incident at, and resulting shutdown of, their Port Neches facility.  Pursuant to the Processing Agreement, each month, the Debtors pre-fund capital expenditures expected to be incurred by their counterparties (based on a forecast of capital expenditures updated monthly) into the Escrow Account to facilitate such counterparties' processing of the Debtors' crude C4.  Following each month end, any amounts underfunded or overfunded are trued up in the Debtors' next pre-funding of the Escrow Accounts.  As of the Petition Date, the Escrow Account ending in x555.1 had a cash balance of approximately $2,520,237, and the Escrow Account ending in x556.1 had a cash balance of approximately $0.

### 3.  *Other Accounts*

15.    <u>Investment Account</u>.  Historically, the Debtors have disbursed cash from the Funding Account to the Bank Account ending in x1525 (the **"Investment Account"**) to improve returns on excess cash on hand when no ABL Revolver borrowings were outstanding.  Funds in the Investment Account were invested in a money market fund.   Investment Account redemptions have historically been a *de minimis* source of cash receipts, and the Debtors do not currently utilize the Investment Account and do not intend to do so during these chapter 11 cases.  As of the Petition Date, the ABL Revolver had amounts outstanding (thereby prohibiting the Debtors from depositing funds into the Investment Account), and the Investment Account had a cash balance of $0.

16.     Utility Deposit Account.  In January 2022, the Debtors established a Bank Account ending in x2199 (the "**Utility Deposit Account**") to serve as a segregated account for adequate assurance deposits for utility companies should the need to seek chapter 11 relief arise. As of the Petition Date, and in furtherance of the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a) and 366 and Fed. Bankr. P. 6003 and 6004 for Entry of Interim and Final Orders (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies, (II) Establishing Procedures for Resolving Objections by Utility Companies, (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service, and (IV) Granting Related Relief* filed contemporaneously herewith, the Utility Deposit Account had a cash balance of approximately $0.

17.     Dormant Accounts.   The Debtors have three Bank Accounts that are dormant and are not currently used in their ordinary-course operations: a Bank Account maintained by Debtor TPC Group LLC ending in x2212, a Bank Account maintained by Debtor TP Capital Corp. ending in x2957, and a Bank Account maintained by Debtor Port Neches Fuels, LLC ending in x6917 (the "**Dormant Accounts**").  Each of these accounts has a balance of less than $1,000.00, and the Debtors currently do not intend to use the Dormant Accounts during these cases.  If the Debtors require the use of the Dormant Accounts, such accounts will be treated as if they were newly opened accounts with advance notice to the United States Trustee, counsel to the Ad Hoc Noteholder Group, and any statutory committee appointed in these cases.

18.     Foundation Account.   Non-Debtor TPC All for One Foundation (the "**Foundation**"), a 501(c)(3) nonprofit organized under Texas law and governed and operated by certain employees of the Debtors who are the Foundation's directors and officers, maintains the deposit account ending in x9526 (the "**Foundation Account**").   The Foundation, as a Texas

nonprofit organization, is not an affiliate of the Debtors, and the Foundation Account is not part of the Debtors' for-profit business but is maintained on the Debtors' existing banking platform at BOA at nominal cost to the Debtors and is disclosed here out of an abundance of caution.[4]  The Foundation was established in August 2017 to collect charitable donations from the Debtors and their employees and use such donations to make assistance grants to employees of the Debtors experiencing financial hardship as a result of Hurricane Harvey.  The Debtors initially made a $100,000 contribution to the Foundation when it was established and have since made relatively small, infrequent donations, principally to match employee donations solicited as part of fundraising campaigns for the Foundation.  The Foundation is governed by a board of directors who are also members of the Debtors' management team.  Other Debtor personnel serve as the Foundation's management, legal advisor, and treasury servicer.  The Debtors do not have discretion over the Foundation Account; only the Foundation does, subject to its organizational requirements and charitable mission.  Moreover, the Debtors do not receive transfers from the Foundation Account and make transfers to the Foundation Account only as donations to the Foundation to further its charitable purpose.  By this Motion, the Debtors request authority to continue permitting the Foundation Account to utilize the Debtors' existing banking platform at BOA and, to the extent necessary, to permit the Debtors' personnel who provide operational services to the Foundation to continue to do so in the ordinary course.

### B.    Intercompany Transactions

19.    In the ordinary course of business, the Debtors engage in only a very limited number of intercompany cash transactions.  Most intercompany transactions occur by book entry, being funded in cash by Debtor TPC Group LLC and trued up once each quarter in affiliates'

---

[4] Further, although the Foundation, as a 501(c)(3) entity, is not an affiliate of the Debtors, it is mentioned herein in the interest of full disclosure.

equity accounts.  The Debtors maintain records of all intercompany transactions that are processed through the Cash Management System.  During these chapter 11 cases, the Debtors will continue to keep records of any postpetition intercompany transactions and implement any additional accounting procedures required to identify and distinguish between prepetition and postpetition intercompany transactions so that claims arising from postpetition intercompany transactions are afforded administrative expense priority.[5]

### P-Card Program

20.    In the ordinary course of business, the Debtors maintain company-paid purchasing cards (the "**P-Cards**") that are primarily used by certain employees for time-sensitive, as-needed purchases, such as purchasing urgent part replacements at local hardware stores.  All of the P-Cards are issued by BOA, and amounts due to BOA on account of the P-Cards are paid out of the Funding Account.  The Debtors' aggregate credit limit for all thirty-five (35) P-Cards currently issued to employees is $200,000.  The Debtors believe that, as of the Petition Date, the P-Cards have an aggregate balance of approximately $187,295 relating to prepetition purchases. Following good-faith, arms' length negotiations between the Debtors and BOA prior to the Petition Date, BOA has consented to the Debtors' continued use of the P-Cards on a postpetition basis on the terms set forth in the Proposed Orders.  In connection therewith, the Debtors request authority to continue to make all payments of P-Card expenses on a postpetition basis in the ordinary course of business and consistent with the Debtors' prepetition practice, regardless of whether such amounts are on account of prepetition or postpetition purchases.

---

[5] Although the Foundation is not an affiliate of the Debtors, any transfers made by the Debtors to the Foundation (whether on behalf of the Debtors or their employees) are made in cash.

## Bank Fees

21.    In the ordinary course of business, the Debtors incur and pay, honor, or permit to be deducted from the appropriate Bank Accounts certain service charges and other fees, costs, and expenses charged by BOA (collectively, the "**Bank Fees**").  The Bank Fees are *de minimis*.  To maintain the integrity of the Cash Management System, the Debtors request authority to pay the full amount of the Bank Fees during the interim period, including fees for prepetition transactions that are charged postpetition, and to continue to pay the Bank Fees in the ordinary course of business and consistent with prepetition practice during these cases.  The Debtors also request that BOA be authorized to charge-back returned items to the Bank Accounts, whether such items are dated before, on, or after the Petition Date, in the ordinary course of business and consistent with prepetition practice.

## Existing Business Forms

22.    In the ordinary course of business, the Debtors utilize numerous preprinted business forms, including check stock.  To minimize expenses to their estates and avoid confusion on the part of vendors, employees, customers, and other parties during the pendency of these chapter 11 cases, the Debtors request that the Court authorize the Debtors to continue to use all existing preprinted checks, correspondence, and other business forms (collectively, the "**Business Forms**"), including, without limitation, business cards, letterhead, envelopes, expense reports, purchase orders, and invoices, as such forms were in existence immediately prior to the commencement of these cases and without reference to the Debtors' status as "debtors in possession."  Such relief would enable the Debtors, for the benefit of their estates, to avoid incurring the expense and delay of ordering entirely new Business Forms as would otherwise be required under the Operating Guidelines and Reporting Requirements for Debtors in Possession

and Trustees (the "**UST Operating Guidelines**") published by the Office of the United States

Trustee for Region 3 (the "**U.S. Trustee**").

**Relief Requested Should Be Granted**

**A.      The Court Should Approve the Debtors' Continued Use of the Cash Management
System as Essential to the Debtors' Operations and Restructuring Efforts.**

23.      The efficient and economical operation of the Debtors' businesses requires

that the Cash Management System continue during the pendency of these chapter 11 cases.  As a

practical matter, it would be inefficient and create unnecessary administrative burdens to require

that each Debtor establish and maintain a separate cash management system.  Further, requiring

the Debtors to adopt new, segmented cash management systems at this early and critical stage of

these cases would be extraordinarily disruptive to the Debtors' business operations.  Any such

disruption would have a severe and adverse impact on the Debtors' reorganization efforts.

Accordingly, the Debtors request authority to continue using the Cash Management System in the

same manner as the Cash Management System was used prior to the Petition Date and to

implement ordinary-course changes thereto.  The Bankruptcy Code provides for such relief.

24.      Section 363(c)(1) of the Bankruptcy Code authorizes the debtor in

possession to "use property of the estate in the ordinary course of business without notice or a

hearing."  11 U.S.C. § 363(c)(1). The purpose of section 363(c)(1) is to provide a debtor in

possession with the flexibility to engage in the ordinary transactions required to operate its

business without unneeded oversight by its creditors or the court.  *See In re Roth Am., Inc.*, 975

F.2d 949, 952 (3d Cir. 1992) ("Section 363 is designed to strike [a] balance, allowing a business

to continue its daily operations without excessive court or creditor oversight and protecting secured

creditors and others from dissipation of the estate's assets.") (citations omitted); *In re Vision

Metals, Inc.*, 325 B.R. 138, 145 (Bankr. D. Del. 2005) (same).  Included within the purview of

section 363(c) is a debtor's ability to continue the "routine transactions" necessitated by its cash management system. *See In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 796 (Bankr. D. Del. 2007) (noting that courts have shown a reluctance to interfere in a debtor's making of routine, day-to-day business decisions) (citations omitted); *In re Vision Metals*, 325 B.R. at 142 ("[W]hen a chapter 11 debtor in possession continues to operate its business, as permitted by section 1108, no court authorization is necessary for the debtor to enter transactions that fall within the ordinary course of its business.").

25.    The Third Circuit has recognized that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *aff'd in part and rev'd in part*, 997 F.2d 1039 (3d Cir. 1993). Indeed, requiring a debtor to maintain separate bank accounts "would be a huge administrative burden and economically inefficient." *Id.* at 1061. Accordingly, the Debtors seek authority pursuant to section 363(c)(1) of the Bankruptcy Code to continue operation of the Cash Management System as it operated prepetition as described above.

26.    Even if operation of the Cash Management System were outside of the ordinary course of business, the Court may authorize such relief pursuant to section 363(b) of the Bankruptcy Code. Section 363(b)(1) provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts have granted a debtors' request to use property of the estate pursuant to section 363(b)(1) upon finding that such use was supported by sound business reasons. *See In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) ("[T]he bankruptcy court has considerable discretion" in granting motions pursuant to section 363(b)); *In re*

*Ionosphere Clubs*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (stating that courts have "broad flexibility" under section 363(b) of the Bankruptcy Code to permit a debtor to expend funds outside the ordinary course so long as the debtor articulates a business justification to do so, including making preplan payments).

27. In addition, the Court may exercise its equitable powers to grant the relief requested herein. Specifically, section 105(a) of the Bankruptcy Code authorizes the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a) and the doctrine of necessity, the Court may exercise its broad grant of equitable powers to approve this Motion, including the payment of prepetition obligations, when such payment is essential to the continued operation of a debtor's business. *See In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code provides a statutory basis for the payment of prepetition claims under the doctrine of necessity and noting that "[t]he Supreme Court, the Third Circuit and the District of Delaware all recognize the court's power to authorize payment of pre-petition claims when such payment is necessary for the debtor's survival during chapter 11"). Therefore, it is within the Court's equitable power under section 105(a) to approve the continued use of the Cash Management System. Moreover, Bankruptcy Rule 6003 itself implies that the payment of prepetition obligations may be permitted within the first 21 days of a case where doing so is "necessary to avoid immediate and irreparable harm." Accordingly, the Bankruptcy Code authorizes the postpetition payment of prepetition claims where, as here, such payments are critical to preserving the going-concern value of debtors' estates.

28. Here, continuation of the Cash Management System is in the best interests of the Debtors, their estates, and all other parties in interest and should be approved. If the Debtors

were required to alter the way in which they collect and disburse cash throughout their business enterprise, their operations would be substantially disrupted, exposing the Debtors to the risk of value deterioration and potentially impacting their ability to achieve a successful reorganization. Moreover, the Cash Management System provides significant benefits to the Debtors, such as the abilities to (a) control their corporate funds, (b) ensure the maximum availability of funds when and where necessary, and (c) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate information regarding their cash.

29.     Bankruptcy courts in this jurisdiction have routinely granted chapter 11 debtors authority to continue using their existing cash management systems. *See, e.g.*, *In re Secure Home Holdings LLC*, Case No. 21-10745 (JKS) (Bankr. D. Del. Apr. 27, 2021) [Docket No. 56] (granting interim relief); *In re Nine Point Energy Holdings, Inc.*, Case No. 21-10570 (MFW) (Bankr. D. Del. Mar. 17, 2021) [Docket No. 95] (granting interim relief); *In re CMC II, LLC*, Case No. 21-10461 (JTD) (Bankr. D. Del. Mar 3, 2021 and Apr. 1, 2021) [Docket Nos. 28 and 137] (granting interim and final relief); *In re Knotel, Inc.*, Case No. 21-10146 (MFW) (Bankr. D. Del. Feb. 3, 2021 and Feb. 25, 2021) [Docket Nos. 63 and 281] (same); *In re Pennsylvania Real Estate Investment Trust*, Case No. 20-12737 (KBO) (Bankr. D. Del. Nov. 3, 2020 and Nov. 23, 2020) [Docket Nos. 79 and 188] (same); *In re Mallinckrodt PLC*, Case No. 20-12522 (JTD) (Bankr. D. Del. Oct. 14, 2020 and Nov. 19, 2020) [Docket Nos. 212 and 552] (same); *In re YouFit Health Clubs, LLC*, Case No. 20-12841 (MFW) (Bankr. D. Del. Nov. 10, 2020 and Dec. 3, 2020) [Docket Nos. 47 and 193] (same); *In re AAC Holdings, Inc.*, Case No. 20-11648 (CTG) (Bankr. D. Del. June 23, 2020 and July 15, 2020) [Docket Nos. 58 and 148] (same); *In re The Hertz Corp.*, Case No. 20-11218 (MFW) (Bankr. D. Del. May 27, 2020 and June 25, 2020) [Docket Nos. 210 and 586] (same).

B.    **The Court Should Authorize the Debtors to Continue Conducting Intercompany Transactions and Grant Administrative Expense Priority Status to Postpetition Intercompany Claims.**

30.    Intercompany transactions are necessary to the efficient operation of the Debtors' businesses, and the Debtors should be authorized to continue entering into and performing under them.  As stated above, under section 363(c)(1) of the Bankruptcy Code, a debtor in possession "may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business . . . and may use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1).  Further, under section 503(b)(1)(A) of the Bankruptcy Code, "[a]fter notice and a hearing, there shall be allowed, administrative expenses . . . including the actual, necessary costs and expenses of preserving the estate . . . ." 11 U.S.C. § 503(b)(1)(A).

31.    Administrative expenses treatment for postpetition intercompany claims has been granted in other similarly large chapter 11 cases in this and other districts.  *See, e.g.*, *In re Paragon Offshore PLC*, Case No. 16-10386 (CSS) (Bankr. D. Del. Feb. 17, 2016) [Docket No. 73] (granting interim relief); *In re Offshore Group Investment Limited*, Case No. 15-12422 (BLS) (Bankr. D. Del. Dec. 4, 2015) [Docket No. 45] (same); *In re Quiksilver, Inc.*, Case No. 15-11880 (BLS) (Bankr. D. Del. Sept. 10, 2015) [Docket No. 74] (granting relief); *In re Endeavour Operating Corp.*, Case No. 14-12308 (KJC) (Bankr. D. Del. Oct. 15, 2014) [Docket No. 60] (granting interim relief); *In re Physiotherapy Holdings, Inc.*, Case No. 13-12965 (KG) (Bankr. D. Del. Nov. 14, 2013) [Docket No. 47] (granting relief); *In re Southern Air Holdings, Inc.*, Case No. 12-12690 (CSS) (Bankr. D. Del. Sept. 28, 2012) [Docket No. 46] (granting interim relief); *In re General Growth Properties, Inc.*, Case No. 09-11977 (ALG) (Bankr. S.D.N.Y. May 14, 2009) [Docket No. 518] (granting final relief); *In re Lehman Bros. Holdings, Inc.*, Case No. 08-13555

(JMP) (Bankr. S.D.N.Y. Nov. 6, 2008) [Docket No. 1416] (granting final relief). The Debtors submit that similar relief is warranted in these Chapter 11 Cases.

32.     The Debtors believe that the Court's approval is not required for their continued entry into and performance under intercompany transactions. Intercompany transactions are "in the ordinary course of business" under section 363(c)(1) and are typical of business enterprises that operate through multiple affiliated entities. Out of an abundance of caution, however, the Debtors request express authority to enter into and perform under such transactions postpetition. The Debtors will maintain accurate records of all intercompany transactions so that all postpetition transfers are adequately and timely documented in, and readily ascertainable from, their books and records to the same extent that the Debtors maintained such records prior to the commencement of these cases.

33.     The Debtors further request that the Court grant administrative expense status to all intercompany claims against a Debtor by another Debtor that arise postpetition as a result of an intercompany transaction. Granting intercompany claims administrative expense status would cause each entity using cash that flows through the Cash Management System to bear ultimate responsibility for its own funding requirements.

**C.    The Court Should Authorize the Debtors to Continue Using the P-Card Program and Pay Prepetition Obligations Thereunder.**

34.     As stated above, under section 363(c)(1) of the Bankruptcy Code, a debtor in possession "may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business . . . and may use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). In addition, section 364(a) of the Bankruptcy Code permits a debtor in possession to "obtain unsecured credit and incur unsecured debt in the ordinary course of business" without court approval. *Id*. at § 364(a). Further, the Court

may exercise its equitable powers to grant the relief requested herein pursuant to section 105(a) of the Bankruptcy Code, which authorizes the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." *Id.* at § 105(a).

35.     Purchases made using the P-Cards are within the Debtors' ordinary course of business and are therefore permitted by section 363(c)(1).  Moreover, the use of P-Cards and similar payment methods is widespread among business enterprises in the Debtors' industry and across the United States as a means of facilitating day-to-day business activities.  As a result, the Debtors believe that they do not require the Court's approval to continue using the P-Cards on a postpetition basis.  However, the Debtors request authority to pay any prepetition obligations related to the P-Cards pursuant to sections 363(c)(1) and 105(a) of the Bankruptcy Code.

36.     Continued use of the P-Cards is integral to the success and stability of the Debtors' business and ability to perform timely maintenance of their equipment.  The Debtors rely on the ability of their employees to use the P-Cards to pay for expenses incurred in the ordinary course and to make other reasonable work-related purchases necessary to fulfill their day-to-day professional obligations.  Permitting the Debtors to continue using the P-Cards will ensure that the Debtors' employees are able to fulfill their daily professional obligations and, in turn, prevent significant disruption to the Debtors' business operations.  If the Debtors do not pay outstanding amounts owed on account of the P-Cards, there is a significant risk that the Debtors could incur interest and late fees on their P-Card balance and that BOA could offset amounts owing against cash collateral and restrict the Debtors' access to the P-Cards.  If the Debtors do not pay prepetition obligations owing to BOA under the P-Cards, BOA likely will not continue to permit the Debtors to use the P-Cards during these chapter 11 cases.  Such an occurrence would be costly and disruptive to the Debtors' operations.  It would be time-consuming for the Debtors to establish

new a P-Card program (to the extent such an alternative program is even available), and it would force the Debtors' employees to advance the costs of necessary parts and supplies to maintain the Debtors' equipment. Accordingly, the Debtors should be authorized to pay any outstanding amounts owing to BOA on account of the P-Cards.

**D.**   **The Court Should Authorize the Debtors to Pay Bank Fees.**

37.    The Court should authorize the Debtors to pay Bank Fees and any similar service charges incurred prior to the commencement of these chapter 11 cases. Here, payment of the prepetition Bank Fees is in the best interests of the Debtors, their estates, and all other parties in interest because it will prevent any disruption to the Cash Management System and ensure that the Debtors' receipt of and access to funds is not delayed. Further, because BOA likely has setoff rights with respect to Bank Fees, payment of prepetition Bank Fees should not alter the rights of unsecured creditors in these cases. Accordingly, the Court should authorize the Debtors to pay any outstanding prepetition Bank Fees and similar service charges to maintain the Cash Management System.

**E.**   **The Court Should Authorize the Debtors to Continue Using the Existing Bank Accounts and Business Forms.**

38.    Absent relief from the Court, the UST Operating Guidelines published by the U.S. Trustee would require that a chapter 11 debtor, among other things: (a) open new bank accounts at a depository approved by the U.S. Trustee; (b) establish one debtor-in-possession account for all estate monies required for the payment of taxes (including payroll taxes); (c) close all existing bank accounts and open new debtor-in-possession accounts; (d) maintain a separate debtor-in-possession account for cash collateral; (e) obtain new checks that bear the designation "Debtor In Possession"; and (f) reference the debtor's bankruptcy case number and type of account on each such check. *See* UST Operating Guidelines § 2. Moreover, Local Rule 2015-2(a)

generally requires that, upon exhausting its existing check stock, a chapter 11 debtor order new checks labeled "Debtor-in-Possession" with the corresponding chapter 11 case number.

39.     The Debtors request that the Court waive the requirements of the UST Operating Guidelines and Local Rule 2015-2(a).   Strict enforcement of the UST Operating Guidelines and Local Rule 2015-2(a) with respect to the Cash Management System would severely disrupt the Debtors' ordinary financial operations by reducing efficiencies, increasing administrative burdens, and creating unnecessary expenses, all for little or no benefit in the context of these chapter 11 cases.  These cases will be more orderly if the Debtors are permitted to maintain all Bank Accounts with the same account numbers as existed prepetition and to continue using their existing Business Forms without incurring the administrative burden or expense of obtaining new Business Forms solely for use during these cases.  In addition, to the extent necessary, the Debtors request authority to make ordinary-course changes to the Cash Management System, such as opening or closing their accounts, in accordance with their prepetition practices.

40.     Courts in this district and others have frequently granted the relief requested herein in similarly large and complex chapter 11 cases.  *See, e.g.*, *In re Golfsmith Intl Holdings, Inc.*, Case No. 16-12033 (CSS) (Bankr. D. Del. Oct. 13, 2016) [Docket No. 258] (granting final relief); *In re Sports Authority Holdings, Inc.*, Case No. 16-10527 (MFW) (Bankr. D. Del. Mar. 24, 2016) [Docket No. 811] (same); *In re Fresh & Easy, LLC*, Case No. 15-12220 (BLS) (Bankr. D. Del. Nov. 5, 2015) [Docket No. 56] (granting relief); *In re Radioshack Corp.*, Case No. 15-10197 (BLS) (Bankr. D. Del. Mar. 9, 2015) [Docket No. 880] (granting final relief); *In re Quiksilver Inc.*, Case No. 15-11880 (BLS) (Bankr. D. Del. Sept. 14, 2015) [Docket No. 94] (amended order granting relief); *In re CWC Liquidation Inc.*, Case No. 14-10867 (BLS) (Bankr. D. Del. May 5, 2014) [Docket No. 336] (granting final relief); *In re Filene's Basement, LLC*, Case No. 11-13511

(KJC) (Bankr. D. Del. Dec. 28, 2011) [Docket No. 501] (amended order granting relief); *In re New Page Corp.*, Case No. 11-12804 (KG) (Bankr. D. Del. Sept. 8, 2011) [Docket No. 57] (granting relief); *In re Aeropostale, Inc.*, Case No. 16-11275 (SHL) (Bankr. S.D.N.Y. June 3, 2016) [Docket No. 238] (granting final relief).  Such relief is appropriate in these cases as well.  Accordingly, the Court should authorize the Debtors' continued use of the Bank Accounts and Business Forms as set forth in the Proposed Orders.

**F.      An Extension of Time to Comply with the Requirements of Section 345(b) of the Bankruptcy Code Is Warranted, to the Extent They Apply to the Bank Accounts.**

41.      Section 345 of the Bankruptcy Code governs a debtor's deposit and investment of cash during a chapter 11 case and authorizes deposits or investments of money as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment."  11 U.S.C. § 345(a).

42.      For deposits or investments that are not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) of the Bankruptcy Code requires that the estate obtain from the entity with which money is deposited or invested a bond in favor of the United States and secured by the undertaking of an adequate corporate surety, unless the Court, for cause, orders otherwise.  11 U.S.C. § 345(b).

43.      Here, each of the Bank Accounts are held at BOA.  BOA is an authorized bank depository under the UST Operating Guidelines (an **"Authorized Depository"**).  Moreover, each Bank Account is insured by the Federal Deposit Insurance Corporation within such Authorized Depository.  Accordingly, the Debtors submit that all of their deposits of funds in the Bank Accounts comply with sections 345(a) and (b) of the Bankruptcy Code.

44.     Nevertheless, out of an abundance of caution, the Debtors request a 45-day (or such longer period as the U.S. Trustee may agree) extension of time to address any questions that the U.S. Trustee may have regarding the Cash Management System and, should the U.S. Trustee have concerns regarding the Bank Accounts, to make such arrangements as are acceptable to the U.S. Trustee (without prejudice to the Debtors' right to request further extensions of time by motion in this Court).

### Bankruptcy Rule 6003 Is Satisfied

45.     Bankruptcy Rule 6003 provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" before 21 days after the filing of the petition.  As described herein and in the First Day Declaration, the relief requested herein is necessary for the Debtors to operate their businesses in the ordinary course and to maximize the value of their estates for the benefit of all stakeholders.  Accordingly, the relief requested herein is necessary to avoid immediate and irreparable harm, and the requirements of Bankruptcy Rule 6003 are satisfied.

### Compliance with Bankruptcy Rule 6004(a) and Waiver of Bankruptcy Rule 6004(h)

46.     To implement the foregoing successfully, the Debtors request that the Court find that notice of this Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances and waive the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h) to the extent applicable.  As explained above and in the First Day Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Thus, ample cause exists to justify finding that the notice requirements of Bankruptcy

Rule 6004(a) have been satisfied and to waive the 14-day stay imposed by Bankruptcy Rule 6004(h) to the extent such notice requirements and stay apply.

## Reservation of Rights

47.     Nothing contained herein is intended to be or shall be deemed (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the rights of the Debtors or any appropriate party in interest to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the rights of the Debtors or any appropriate party in interest under the Bankruptcy Code or any other applicable non-bankruptcy law, or (iv) an approval, adoption, assumption, or rejection of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief requested herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission of the validity of any claim or a waiver of the rights of the Debtors or any other party in interest subsequently to dispute such claim.

## Notice

48.     Notice of this Motion will be provided to (i) the Office of the United States Trustee for the District of Delaware; (ii) the holders of the 30 largest unsecured claims against the Debtors on a consolidated basis; (iii) counsel to the ABL Agent, Haynes & Boone, LLP, 1221 McKinney Street, Suite 4000, Houston, TX 77010 (Attn: Charles A. Beckham, Jr., J. Frasher Murphy, and Timothy Johnston); (iv) counsel to the Ad Hoc Noteholder Group, Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 (Attn: Kristopher M. Hansen, Jonathan D. Canfield, and Gabriel Sasson), and Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, DE 19801 (Attn: Matthew B. Lunn, Sean M. Beach, and Robert F. Poppiti, Jr.); (v) counsel to the Supporting Sponsors, Latham & Watkins LLP, 1271 Avenue of the Americas, New

York, New York 10020 (Attn: George A. Davis and David A. Hammerman); (vi) the Internal Revenue Service; (vii) the United States Attorney's Office for the District of Delaware; (viii) the Securities and Exchange Commission; (ix) any other party entitled to notice pursuant to Bankruptcy Rule 2002; and (x) any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(m) (collectively, the "**Notice Parties**").

WHEREFORE the Debtors respectfully request entry of the Proposed Orders granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

[*Remainder of page intentionally left blank.*]

Dated: June 1, 2022
       Wilmington, Delaware

/s/ Robert J. Dehney
_____

**BAKER BOTTS L.L.P.**

James R. Prince (*pro hac vice* admission pending)
Kevin Chiu (*pro hac vice* admission pending)
2001 Ross Avenue, Suite 900
Dallas, Texas 75201-2980
Telephone:    (214) 953-6500
Facsimile:    (214) 953-6503
Email: jim.prince@bakerbotts.com
       kevin.chiu@bakerbotts.com

-and-

BAKER BOTTS L.L.P.
Scott R. Bowling (*pro hac vice* admission pending)
30 Rockefeller Plaza
New York, New York 10112
Telephone:    (212) 408-2500
Facsimile:    (212) 259-2501
Email: scott.bowling@bakerbotts.com

-and-

BAKER BOTTS L.L.P.
David R. Eastlake (*pro hac vice* admission pending)
Lauren N. Randle (*pro hac vice* admission pending)
910 Louisiana Street
Houston, Texas 77002
Telephone:    (713) 229-1234
Facsimile:    (713) 229-1522
Email: david.eastlake@bakerbotts.com
       lauren.randle@bakerbotts.com

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

Robert J. Dehney (No. 3578)
Curtis S. Miller (No. 4583)
Daniel B. Butz (No. 4227)
Matthew O. Talmo (No. 6333)
Brian Loughnane (No. 6853)
1201 N. Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email:    rdehney@morrisnichols.com
       cmiller@ morrisnichols.com
       dbutz@ morrisnichols.com
       mtalmo@ morrisnichols.com
       bloughnane@ morrisnichols.com

*Proposed Attorneys for Debtors*
*and Debtors in Possession*