## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| **TPC GROUP INC.**, *et al.*, | Case No. 22-10493 (___) |
| Debtors.[1] | Joint Administration Requested |

### MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS
### (I) AUTHORIZING DEBTORS TO PAY PREPETITION OBLIGATIONS TO
### (A) CRITICAL VENDORS, (B) CERTAIN SUPPLIERS, (C) LIEN CLAIMANTS,
### AND (D) 503(B)(9) CLAIMANTS; AND (II) GRANTING RELATED RELIEF

TPC Group Inc. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully represent as follows in support of this motion (this "**Motion**"):

### Background

1.     On the date hereof (the "**Petition Date**"), the Debtors commenced these chapter 11 cases by filing voluntary petitions with this Court under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

2.     The Debtors are authorized to continue operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee has been appointed in these cases. The Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: TPC Group Inc. (3618); TPC Holdings, Inc. (7380); TPC Group LLC (8313); Texas Butylene Chemical Corporation (7440); Texas Olefins Domestic International Sales Corporation (4241); TPC Phoenix Fuels LLC (9133); Port Neches Fuels, LLC (1641); and TP Capital Corp. (6248).  Each Debtor's corporate headquarters and mailing address is 500 Dallas St., Suite 2000, Houston, Texas 77002.

Rule 1015-1 of the Bankruptcy Local Rules of the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Local Rules**").

3.      The Debtors are a leading North American producer and processor of intermediate and specialty chemicals and fuel derivatives.  Their products are critical to a wide range of end-markets and applications, including synthetic rubber, fuels, lubricants, plastics, and surfactants.  Additional information regarding the Debtors' businesses, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Robert Del Genio in Support of Debtors' Chapter 11 Petitions and Related Requests for Relief* (the "**First Day Declaration**"), filed contemporaneously herewith and incorporated herein by reference.[2]

### Jurisdiction and Venue

4.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The Debtors consent pursuant to Rule 9013-1(f) of the Bankruptcy Local Rules to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

6.      The statutory and legal predicates for the relief requested herein are sections 105(a), 363(b) and 503(b)(9) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004.

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the First Day Declaration.

## Relief Requested

7.     Pursuant to sections 105(a), 363(b), and 503(b)(9) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, the Debtors hereby request: (i) authority, but not direction, to pay, in the ordinary course of business, certain prepetition claims held by (a) shippers, warehouseman, and other lien claimants (the "**Lien Claimants**"), (b) vendors whose claims may be entitled to administrative expense priority status under section 503(b)(9) of the Bankruptcy Code (the "**503(b)(9) Claimants**"), (c) certain suppliers whose contracts with the Debtors may be affected by the Bankruptcy Code "safe harbor" provisions (the "**Supplier Claimants**"); and (d) certain essential vendors and service providers (the "**Critical Vendors**" and, together with the Lien Claimants, the 503(b)(9) Claimants, and the Supplier Claimants, the "**Vendor Claimants**" and their prepetition claims, the "**Vendor Claims**"); and (ii) related relief.

8.     A proposed form of order granting the relief requested herein on an interim basis is annexed hereto as **Exhibit A** (the "**Proposed Interim Order**"), and a proposed form of order granting the relief requested herein on a final basis is annexed hereto as **Exhibit B** (the "**Proposed Final Order**" and together with the Proposed Interim Order, the "**Proposed Orders**").

## The Debtors' Vendors

9.     As a leading producer of products derived from petrochemical raw materials such as crude C4 and isobutylene, the Debtors rely on continual access to a voluminous supply of raw materials, as well as their relationships with their vendors.  A disruption in the Debtors' supply chain would adversely impact not only the Debtors' business but also those of their customers and their customer relationships.

10.     The Debtors estimate that they owe the Vendor Claimants approximately $90.24 million, in the aggregate, as of the Petition Date on account of the Vendor Claims, including

claims totaling up to approximately $33.88 million that may be entitled to administrative expense priority status pursuant to section 503(b)(9) of the Bankruptcy Code (the "**503(b)(9) Claims**").  By this Motion, the Debtors seek authority to pay prepetition Vendor Claims in an aggregate amount not to exceed $75,961,660 on an interim basis and $90,242,999 on a final basis (inclusive of the interim amount), the majority of which comprise 503(b)(9) Claims and claims held by Supplier Claimants with contract rights that may entitle them to relief under the "safe harbor" provisions of the Bankruptcy Code.[3]    The following chart summarizes the relief requested in this Motion with respect to prepetition Vendor Claim amounts:

| Vendor Claim Category | Description of Claims | Estimated Amount Due as of Petition Date | Estimated Amount Due Within Interim Period |
|---|---|---|---|
| Lien Claimants | Claimants that may assert shippers, warehouseman, mechanics, or other liens against the Debtors' property if unpaid | $32,164,881 | $28,000,000 |
| Critical Vendors | Vendors that supply goods or services that the Debtors rely upon to continue day-to-day operations, or which are sole or limited-source providers of the goods and services necessary for the uninterrupted operations of the Debtors' business | $12,000,000 | $10,000,000 |
| Supplier Claimants | Suppliers of raw materials that may be able to terminate executory contracts under the "safe harbor" provisions of the Bankruptcy Code | $46,078,118 | $37,961,660 |
| **Total Claims[4]** | | **$90,242,999** | **$75,961,660** |

[3] The Debtors reserve all rights with respect to safe harbor matters, including, without limitation, whether such counterparties constitute "forward contract merchants" and whether such contracts constitute "forward contracts" for the purchase or sale of "commodities," within the meanings of such terms in the Bankruptcy Code.

[4] Includes 503(b)(9) Claim amounts.

| 503(b)(9) Claimants | Suppliers of goods that may be entitled to statutory priority under section 503(b)(9) of the Bankruptcy Code | $33,879,134 | $28,235,598 |
|---|---|---|---|

11.    The Debtors intend to apply their business judgment and discretion on a case-by-case basis and pay only those Vendor Claims that are held by Critical Vendors or determined to be secured by a statutory lien, protected by the Bankruptcy Code "safe harbor" provisions, and/or afforded administrative expense priority status under section 503(b)(9) of the Bankruptcy Code, as applicable.  Moreover, the Debtors intend to use commercially reasonable efforts to require the Vendor Claimants holding such Vendor Claims to enter into trade agreements with the Debtors that provide trade terms in line with historical practice between the parties ("**Customary Trade Terms**") for the postpetition delivery of goods and/or services for the duration of these chapter 11 cases (the "**Trade Agreements**").

A.    **Lien Claimants**

12.    The Debtors routinely engage a number of third parties, including equipment manufacturers, contractors, repair technicians, and other service providers, that may be able to assert and perfect liens, including mechanic's liens, artisan's liens, shipper's or common carrier's liens, warehouseman's liens, construction liens, and other similar liens,[5] against the Debtors' property if the Debtors fail to pay for the goods or services rendered.

13.    These Lien Claimants perform a number of services for the Debtors, including construction and servicing of equipment and facilities and transporting and storing raw

---

[5] Pursuant to section 362(b)(3) of the Bankruptcy Code, the act of perfecting such liens, to the extent consistent with section 546(b) of the Bankruptcy Code, might be excluded from the automatic stay.  Under section 546(b) of the Bankruptcy Code, a debtor's lien avoidance powers "are subject to any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection." 11 U.S.C. § 546(b)(1)(A).

materials and other products that are essential to the Debtors' enterprise. Among other things, the Debtors regularly make improvements and repairs to their properties and equipment used in the operation of their businesses. The Debtors engage third-party contractors to provide, among other things, turnaround services and maintenance on the Debtors' facilities—essential practices to maintain the Debtors' ongoing businesses and commitment to safety. The Debtors also rely in the ordinary course of business on numerous vendors to provide transportation and storage services involving warehouse facilities, railcars, barges, trucks, and pipelines. As such, the Debtors request the services and labor of the Lien Claimants to make regular improvements and repairs and provide storage and transportation of the Debtors' materials, goods, and equipment. With the Debtors' required ongoing service, repair, and maintenance obligations of their facilities, the Debtors depend on continuing business relationships with and services provided by the Lien Claimants.

14. If the Debtors are unable to timely pay the claims of Lien Claimants (the "**Lien Claims**"), the Debtors risk being unable to fully operate their business, which would prevent them from maximizing recoveries for all stakeholders in these chapter 11 cases. Moreover, various state laws would permit such claimants to assert statutory liens against the Debtors' materials or equipment in their possession (collectively, the "**Materials**") that are the subject of any delinquent charges, which may not only give rise to secured claims in respect of such delinquent charges but also potentially block the Debtors' access to such Materials. Accordingly, the Debtors seek authority, but not direction, to pay the Lien Claims that the Debtors believe have given rise to, or could give rise to, a lien against the Debtors' property, regardless of whether the applicable Lien Claimants have already perfected any such liens, in an aggregate amount not to exceed $28,000,000 on an interim basis and $32,164,881 on a final basis (inclusive of the interim amount).

**B.      Supplier Claimants**

15.      Most of the Debtors' suppliers of raw materials—the feedstocks that the Debtors process into their products—are parties to contracts with the Debtors that provide for the delivery of hydrocarbons that may constitute "forward contracts" within the meaning of the Bankruptcy Code. *See* 11 U.S.C. §§ 101(25), 761(8); 7 U.S.C. § 1a(9).[6] Moreover, such suppliers may constitute "forward contract merchants" under section 101(26) of the Bankruptcy Code. Were these Supplier Claimants to terminate their contracts or otherwise exercise "safe harbored" rights, the potential adverse impact on the Debtors' business operations and customer relationships could be substantial. Even were the Debtors to contest purported exercises of "safe harbored" rights by these Supplier Claimants (a process that would likely entail both fact discovery and legal uncertainty), they would lose access to raw materials for the duration of such dispute, putting their operations and liquidity at risk during (and potentially after) that period.

16.      To avoid the liquidity and operational risks associated with such potential "safe harbored" rights or demands by counterparties for derivatives-style protections—both of which could precipitate immediate and irreparable harm to the Debtors' business and going-concern value—the Debtors request authority, but not direction, to pay such Supplier Claimants' prepetition claims (the "**Supplier Claims**") in the ordinary course of business in an aggregate amount not to exceed $37,961,660 on an interim basis and $46,078,118 on a final basis (inclusive of the interim amount). As with other Vendor Claimants for which the Debtors seek authority to

---

[6] Under section 1a of the Commodity Exchange Act, "commodity" means "wheat, cotton, rice, corn, oats, barley, rye, flaxseed, grain sorghums, mill feeds, butter, eggs, Solanum tuberosum (Irish potatoes), wool, wool tops, fats and oils (including lard, tallow, cottonseed oil, peanut oil, soybean oil, and all other fats and oils), cottonseed meal, cottonseed, peanuts, soybeans, soybean meal, livestock, livestock products, and frozen concentrated orange juice, and all other goods and articles, except onions (as provided by section 13–1 of this title) and motion picture box office receipts (or any index, measure, value, or data related to such receipts), and all services, rights, and interests (except motion picture box office receipts, or any index, measure, value or data related to such receipts) in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9).

make payments by this Motion, the Debtors will use commercially reasonable efforts to require such parties to enter into Trade Agreements and, further, will use commercially reasonable efforts to require such Supplier Claimants to certify that they constitute "forward contract merchants" and are parties to "forward contracts" for the sale of "commodities" to the Debtors, within the meanings of such terms under the Bankruptcy Code.

## C.    503(b)(9) Claimants

17.    Within the 20-day period before the Petition Date, the Debtors received, in the ordinary course of business, goods from certain of their vendors and suppliers, including suppliers of petrochemical raw materials and others.  Failure to pay the 503(b)(9) Claimants on account of their 503(b)(9) Claims at the outset of these chapter 11 cases—which, because of their administrative expense priority status, must be paid in full pursuant to a chapter 11 plan in any event—could result in the 503(b)(9) Claimants refusing to do business with the Debtors during or after these chapter 11 cases.  Further, certain 503(b)(9) Claimants may also impose stricter payment terms on the Debtors, negatively impacting their liquidity position.

18.    In the months leading up to the commencement of these chapter 11 cases, the Debtors have been making every effort to avoid interruptions to their supply chain and the adverse consequences that even a temporary disruption could have on their business.  Accordingly, the Debtors seek authority, but not direction, to pay the 503(b)(9) Claims in the ordinary course of business in an aggregate amount not to exceed $28,235,598 on an interim basis and $33,879,134 on a final basis (inclusive of the interim amount).

## D.    Critical Vendors

19.    In narrowing the Debtors' list of other vendors to only those that are critical, the Debtors and their advisors have engaged in a comprehensive process reviewing and analyzing the Debtors' books and records, consulting with the Debtors' management and personnel

responsible for operations, reviewing contracts and supply agreements, and analyzing applicable laws, regulations, and past practices to (a) identify those vendors, suppliers, and/or service providers that may be "critical" to the Debtors' businesses (which, if lost, would materially impair the going-concern viability of the Debtors' businesses) and (b) quantify the relief necessary to avoid immediate and irreparable harm to the Debtors at the outset of these chapter 11 cases.  The Debtors and their advisors assessed a variety of factors, including:

- the goods or services provided by a vendor or supplier;

- whether goods or services are provided pursuant to a contract or on a purchase order basis;

- whether failure to pay all or part of a particular vendor's claim could cause the vendor to refuse to ship inventory or provide services on a postpetition basis;

- whether the vendor is bound by an agreement pursuant to which the Debtors could compel such vendor to continue performing on prepetition terms;

- whether the failure to pay a particular vendor could result in the negotiated trade terms being altered as a matter of applicable non-bankruptcy commercial law or regulations;

- whether the vendor is a sole- or limited-source or high-volume supplier for goods and services;

- whether alternative vendors are available that could provide the requisite volume of similar goods or services on equal or better terms, and, if so, whether the Debtors would be able to continue operating without significant disruption to their postpetition operations while transitioning business thereto;

- whether certain specifications or contract requirements and conditions prevent, directly or indirectly, the Debtors from obtaining the goods and services from alternative sources; and

- whether the failure to pay a particular vendor could jeopardize the Debtors' valuable interest in goods or materials.

20.     As a result of this analysis, the Debtors identified the universe of Critical Vendors whose support remains essential to the Debtors' own ability to preserve and enhance their value as they proceed with a seamless transition into chapter 11.

21.     In some instances, the Critical Vendors are the only available source for goods and services, due to the highly specialized nature of such goods and services.  In other instances, the Critical Vendors are the most preferred source from which the Debtors can procure goods and services within a timeframe and at a price that will permit the Debtors to continue to operate their business smoothly, safely, and effectively.  Replacing such Critical Vendors, even in the infrequent instances where possible, could result in substantially higher costs for the Debtors and their estates and risk delays that could harm the Debtors' businesses.

22.     By this Motion, the Debtors seek authority to pay prepetition claims held by the Critical Vendors (the "**Critical Vendor Claims**") in the ordinary course of business in an aggregate amount not to exceed $10,000,000 on an interim basis and $12,000,000 on a final basis (inclusive of the interim amount).

## Relief Requested Should Be Granted

### A.    Payment of Critical Vendor Claims Is Warranted Under Sections 363(b)(1) and 105(a) of the Bankruptcy Code

23.     Courts may authorize debtors to pay certain prepetition obligations pursuant to section 363(b) of the Bankruptcy Code.  *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989).  Specifically, section 363(b)(1) of the Bankruptcy Code authorizes courts, after notice and a hearing, to permit a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  To approve the use of assets outside the ordinary course of business, courts require only that a debtor "show that a sound business purpose justifies such actions." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *see also In re Phoenix Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987).  If a debtor articulates a reasonable basis for its business decisions, "courts will generally not entertain

objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005).

24.     Courts have properly relied on section 363(b) of the Bankruptcy Code to authorize debtors to pay prepetition claims of critical vendors in circumstances where, as here, the estate will obtain more value for all creditors by making the prepetition payments.  *See, e.g., In re Tropical Sportswear Int'l Corp.*, 320 B.R. 15, 20 (Bankr. M.D. Fla. 2005) (authorizing debtor to pay, pursuant to 363(b), certain vendors' prepetition claims where the payments were "necessary" and "appropriate" to debtor's reorganization).

25.     Additionally, the Court may authorize the Debtors to pay any prepetition amounts that may be owed to the Critical Vendors pursuant to section 105(a) of the Bankruptcy Code, which provides that a "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 105(a).  Pursuant to section 105(a) of the Bankruptcy Code, a bankruptcy court may exercise its broad grant of equitable powers to permit the payment of prepetition obligations when such payment is essential to the continued operation of a debtor's business.  *See, e.g.*, *In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code provides a statutory basis for the payment of prepetition claims under the doctrine of necessity and noting that "[t]he Supreme Court, the Third Circuit and the District of Delaware all recognize the court's power to authorize payment of pre-petition claims when such payment is necessary for the debtor's survival during chapter 11"); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (holding that a court may authorize the payment of prepetition claims prior to the confirmation of a reorganization plan pursuant to the doctrine of necessity).  Courts have consistently permitted the postpetition payment of prepetition obligations "where the payment is necessary to permit the

effectuation of the rehabilitative purposes of the Bankruptcy Code." *In re Sharon Steel Corp.*, 159 B.R. 730, 736 (Bankr. W.D. Penn. 1993); *see also In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court may authorize payment of prepetition claims if such payment is essential to continued operation of the debtor); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (authorizing the payment of prepetition claims and explaining that the "ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept").  The rationale for making payments to prepetition creditors under the doctrine of necessity is consistent with chapter 11's paramount rehabilitative goals.  *Ionosphere Clubs*, 98 B.R. at 176.

26.     Moreover, Bankruptcy Rule 6003 implies that the payment of prepetition obligations may be permissible within the first 21 days of a case where doing so is "necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003.  Accordingly, the Bankruptcy Rules authorize the postpetition payment of prepetition claims where, as here, such payments are critical to preserving the going-concern value of a debtor's estate.

27.     As described above, payment of Critical Vendor Claims is necessary for the Debtors to maintain operations and consequently preserve the value of their business and ensure safety.  Accordingly, maintaining favorable trade terms and credit is in the best interests of all creditors and other parties in interest.

28.     Furthermore, in a long line of well-established decisions, courts consistently have permitted payment of prepetition obligations that are necessary to preserve or enhance the value of a debtor's estate. *See, e.g.*, *Miltenberger v. Logansport, C&S W.R. Co.*, 106 U.S. 286, 312 (1882) (payment of pre-receivership claim before reorganization permitted to prevent "stoppage of the continuance of [crucial] business relations"); *In re Lehigh & New Eng. Ry. Co.*, 657 F.2d

570, 581 (3d Cir. 1981) (holding that "if payment of a claim which arose prior to reorganization is essential to the continued operation of the . . . [business] during reorganization, payment may be authorized even if it is made out of [the] corpus"); *Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (extending doctrine for payment of prepetition claims beyond railroad reorganization cases), cert. denied 325 U.S. 873 (1945); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 285–86 (S.D.N.Y. 1987) (approving lower court order authorizing payment of prepetition wages, salaries, expenses, and benefits).

29.    The relief requested by this Motion represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is justified under sections 105(a) and 363(b) of the Bankruptcy Code.  During this critical time, customers may seek business from the Debtors' competitors, which threaten to derail the Debtors' entire chapter 11 efforts.  Authorizing the Debtors to pay Critical Vendor Claims in the amounts set forth herein is in the best interests of the Debtors, their estates, and their economic stakeholders.  As set forth herein and in the First Day Declaration, payment of the Critical Vendor Claims is necessary for the Debtors to maintain operations in the ordinary course, comply with brand standards under the Debtors' franchise agreements and other contracts, and preserve the value of the Debtors' businesses.

30.    The Critical Vendors provide goods and services that are necessary to maintain the Debtors' facilities and preserve the value of their business lines.  As discussed, many of the Critical Vendors are providers of specialized goods and services that cannot be replaced in a feasible manner, if at all, due to their specialized qualifications or commitments pursuant to the Debtors' customer contracts.  Failure to pay these vendors' prepetition claims could result in significant disruption to the Company's operations.  As stated in the First Day Declaration, the

Debtors have concluded that if they do not pay the Critical Vendor Claims in the amounts set forth herein, the value of the Debtors' business lines will be reduced by amounts well in excess of amounts that the Debtors seek authorization to pay.

31.     For the foregoing reasons, payment of the Critical Vendor Claims as set forth herein is necessary, appropriate, and in the best interests of the Debtors, their estates, and all other parties in interest in these cases.  Accordingly, the Court should authorize the Debtors to pay the Critical Vendor Claims on the terms and conditions set forth herein and in the Proposed Orders.

**B.     Payment of Lien Claims Is Necessary to Ensure Continuation of the Debtors' Operations**

32.     The Debtors have a strong business purpose for paying the Lien Claims. Absent payment of the Lien Claims, the Lien Claimants could be unwilling to release the Materials (including any equipment that may belong to the Debtors' estates) in their possession on which they may assert liens, as releasing such goods could result in the conversion of their claims against the Debtors from secured to unsecured status.  Absent authorization to pay outstanding Lien Claims as set forth herein, the Debtors could be denied access to Materials critical to their business operations.  If the Lien Claimants possess lien rights with respect to Materials in their possession and/or have the ability to exercise "self-help" remedies to secure payment of Lien Claims, failure to satisfy such claims could have a materially adverse effect on the Debtors' businesses, which would be to the detriment of the Debtors' estates and their economic stakeholders.  Similar to the Critical Vendors, Lien Claimants can significantly impact the Debtors' operations—any interruption in the essential services provided by such Lien Claimants to the Debtors would impair the Debtors' ability to operate.

33.     Reflecting the recognition that payment of prepetition claims of certain essential suppliers and vendors can be critical to a debtor's ability to preserve going-concern value,

courts in this district and in other jurisdictions regularly authorize chapter 11 debtors to pay

prepetition claims held by lien claimants and critical vendors, including foreign entities outside

the reach of the bankruptcy court's jurisdiction where it would be unduly time consuming and

expensive to seek to enforce an order of the bankruptcy court in such foreign jurisdiction, and

where the payments are essential to such debtor's continued operations. *See, e.g., In re Z Gallerie,

LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019) (authorizing payment of prepetition

foreign vendor claims); *In re Things Remembered, Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb.

26, 2019) (same); *In re ATD Corp.*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 24, 2018) (same);

*In re VER Technologies Holdco LLC*, No. 18-10834 (KG) (Bankr. D. Del. May 4, 2018) (same);

*In re GST AutoLeather, Inc.*, No. 17-12100 (LSS) (Bankr. D. Del. Nov. 13, 2017) (same).

C.    **Payment of the Supplier Claims Is Necessary to Mitigate Forward Contract Merchant Termination Risks for Key Supplier Contracts**

34.    Without continued performance by the Supplier Claimants, the Debtors

cannot effectively continue their business operations. The Debtors believe there is a meaningful

potential that Suppliers' contracts include "safe harbored" termination rights following the

commencement of these chapter 11 cases. Section 556 of the Bankruptcy Code provides, in

relevant part:

> The contractual right of a . . . forward contract merchant to cause the liquidation, termination, or acceleration of a commodity contract . . . or forward contract because of a condition of the kind specified in section 365(e)(1) of this title . . . shall not be stayed, avoided or otherwise limited by operation of any provision of this title or by the order of a court in any proceeding under this title.

11 U.S.C. § 556. The term "commodity contract" is defined to include "any other contract, option,

agreement, or transaction that is similar to a contract, option, agreement, or transaction referred to

in" section 761(4) of the Bankruptcy Code. 11 U.S.C. § 761(4)(F)(i). A "forward contract" means:

> (A) a contract . . . for the purchase, sale, or transfer of a commodity, as defined in section 761(8) of this title, or any similar good, article, service, right, or interest

which is presently or in the future becomes the subject of dealing in the **forward contract** trade, or product or byproduct thereof, with a maturity date more than two days after the date the contract is entered into, **including**, but not limited to, a repurchase or reverse repurchase transaction (whether or not such repurchase or reverse repurchase transaction is a "**repurchase agreement**", as defined in this section) consignment, lease, swap, hedge transaction, deposit, loan, option, allocated transaction, unallocated transaction, or any other similar agreement;

(B) any combination of agreements or transactions referred to in subparagraphs (A) and (C);

(C) any option to enter into an agreement or transaction referred to in subparagraph (A) or (B);

(D) a master agreement that provides for an agreement or transaction referred to in subparagraph (A), (B), or (C), together with all supplements to any such master agreement, without regard to whether such master agreement provides for an agreement or transaction that is not a forward contract under this paragraph, except that such master agreement shall be considered to be a forward contract under this paragraph only with respect to each agreement or transaction under such master agreement that is referred to in subparagraph (A), (B), or (C); or

(E) any security agreement or arrangement, or other credit enhancement related to any agreement or transaction referred to in subparagraph (A), (B), (C), or (D), including any guarantee or reimbursement obligation by or to a forward contract merchant or financial participant in connection with any agreement or transaction referred to in any such subparagraph, but not to exceed the damages in connection with any such agreement or transaction, measured in accordance with section 562.

11 U.S.C. § 101(25).

Under section 101(26) of the Bankruptcy Code, a "forward contract merchant" includes:

. . . an entity the business of which consists in whole or in part of entering into forward contracts as or with merchants in a commodity (as defined in section 761) or any similar good, article, service, right, or interest which is presently or in the future becomes subject of dealing in the forward contract trade.

11 U.S.C. § 101(26).

35.     Delaware bankruptcy courts have interpreted the definition of "forward contract merchant" broadly, in line with the discussion in *Collier* that explains that "any person that is in need of protection with respect to a forward contract in a business setting should be covered." *BCP Liquidating LLC v. Bridgeline Gas Marketing, LLC (In re Borden Chemicals and*

*Plastics Operating L.P.)*, 336 B.R. 214, 225 (Bankr. D. Del. 2006) (citing 5 *Collier On Bankruptcy* § 556.03[2] at 556–6 (15th ed. rev.2001)).

36.     As noted above, the Supplier Claimants are parties to contracts that provide for the delivery of goods/materials that may constitute "commodities" under the Bankruptcy Code and which are to be delivered to the Debtors more than two days after the date of each such contract.  Under certain precedent, and depending on certain facts that are unique to the Supplier Claimants' knowledge, some or all of the Supplier Claimants may constitute forward contract merchants and be entitled to exercise safe harbored contract termination rights.  Even if the Debtors were to contest a Supplier Claimant's assertion of its "forward contract merchant" status, the disruption to the Debtors' business, not to mention the factual and legal uncertainty in such a dispute, would pose unacceptable risk to the Debtors' ability to fulfill their obligations to their customers and maintain their operations in the ordinary course.

37.     To prevent any Supplier Claimant from unfairly obtaining the benefits of early payment, the Debtors intend to require each Supplier Claimant receiving payment under the Proposed Orders to certify to the Debtors, as condition to receiving such payment, that such Supplier Claimant constitutes a "forward contract merchant" under section 101(26) of the Bankruptcy Code as interpreted by applicable case law.  The Debtors submit that such a certification requirement appropriately balances the factual and legal uncertainty associated with a party's "forward contract merchant" status and the Debtors' practical need to avoid operational disruption with the liquidity and equal-treatment risks associated with receiving payment under the Proposed Orders.

38.     For the foregoing reasons, paying the Supplier Claims as set forth herein is of critical importance to the Debtors' business, and it is appropriate and in the best interests of the

Debtors, their estates, and all other parties in interest in these cases. Accordingly, the Court should authorize the Debtors to pay the Supplier Claims on the terms and conditions set forth herein and in the Proposed Orders.

**D.    Relief Requested Is Supported by Section 503(b)(9) of the Bankruptcy Code**

39.    Section 503(b)(9) of the Bankruptcy Code provides that the 503(b)(9) Claims are administrative expense claims against the Debtors' estates. The Debtors, therefore, are required to pay such 503(b)(9) Claims in full in order to confirm a chapter 11 plan. See 11 U.S.C. § 1129(a)(9)(A) (requiring payment in full of claims entitled to administrative expense priority under a chapter 11 plan). Instead of paying the 503(b)(9) Claims on the effective date of a chapter 11 plan, the Debtors seek authority to pay such 503(b)(9) Claims during the pendency of this chapter 11 case as they become due. Thus, payment of the 503(b)(9) Claims entitled to priority under section 503(b)(9) of the Bankruptcy Code on the terms and conditions set forth herein and in the Proposed Orders will effect only a change in the timing of such payments, but not the amounts or priority thereof that the 503(b)(9) Claimants will be entitled to from the Debtors, and so no other creditor or party in interest in this chapter 11 case will be unfairly prejudiced.

40.    The Debtors' ongoing ability to obtain the goods as provided herein is essential to its ability to preserve and enhance value for all parties in interest in this chapter 11 case. Absent the authority to pay the 503(b)(9) Claims at the outset of this chapter 11 case—which merely accelerates the timing of such payments and not the ultimate treatment of such 503(b)(9) Claims—the Debtors could be denied access to the goods necessary to maintain the Debtors' business operations. Failure to honor the 503(b)(9) Claims may also cause the 503(b)(9) Claimants to withhold their support for the Debtors during this chapter 11 process. Such 503(b)(9) Claimants could accelerate or eliminate the favorable customary trade terms. Needless to say, such costs and

18

distractions would likely impair the Debtors' ability to stabilize their operations at this critical juncture of these chapter 11 cases to the detriment of all parties in interest.

41.     Courts in this district and in other jurisdictions regularly authorize chapter 11 debtors to pay administrative expense claims as they come due during the course of a chapter 11 case.  *See, e.g., In re Global Home Prods., LLC*, Case No. 06-10340 (KG), 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006) ("[T]he timing of the payment of that administrative expense claim is left to the discretion of the Court."); *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC) (Bankr. D. Del. Oct. 31, 2006) Hr'g Tr. 49:21-23 ("I think arguable the debtor could pay its 503(b)(9) claimants without court approval.").  *See also, e.g., In re Forever 21, Inc.*, No. 19-12122 (KG) (Bankr. D. Del. Oct. 28, 2019) (authorizing debtors to pay claims arising under section 503(b)(9) of the Bankruptcy Code); *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. April 9, 2019) (same); *In re ATD Corp.*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 24, 2018) (same); *In re Gibson Brands, Inc.*, No. 18-11025 (CSS) (Bankr. D. Del. May 23, 2018) (same); *In re VER Techs. HoldCo LLC*, No. 18-10834 (KG) (Bankr. D. Del. May 4, 2018) (same).

42.     For the foregoing reasons, paying the 503(b)(9) Claims as set forth herein is necessary, appropriate, and in the best interests of the Debtors, their estates, and all other parties in interest in this chapter 11 case.  Courts in this district and others have approved the payment of administrative expense claims as a routine matter in similar cases.  The same relief is also appropriate here.  Accordingly, the Court should authorize the Debtors to pay the 503(b)(9) Claims on the terms and conditions set forth herein and in the Proposed Orders.

**E.     Applicable Banks Should Be Authorized to Receive, Process, Honor, and Pay Checks Issued and Transfers Requested to Pay the Critical Vendor Claims**

43.     The Debtors further request that the Court authorize, but not direct, applicable banks and financial institutions (the "**Banks**") to receive, process, honor, and pay, to

the extent of funds on deposit, any and all checks issued or to be issued and electronic fund transfers requested or to be requested by the Debtors relating to the Critical Vendor Claims.  The Debtors also seek authority, but not direction, to issue new postpetition checks or effect new postpetition electronic fund transfers in replacement of any checks or transfer requests on account of any prepetition Critical Vendor Claims dishonored or rejected as a result of these Chapter 11 Cases.

### Bankruptcy Rule 6003 Is Satisfied

44.    Pursuant to Bankruptcy Local Rule 9013-1, the Debtors request emergency consideration of this Motion under Bankruptcy Rule 6003.  Bankruptcy Rule 6003 provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" before 21 days after the filing of the petition.  FED. R. BANKR. P. 6003.  As described herein and in the First Day Declaration, the relief requested herein is necessary for the Debtors to operate their businesses in the ordinary course and to maximize the value of their estates for the benefit of all stakeholders.  Accordingly, the relief requested herein is necessary to avoid immediate and irreparable harm, and the requirements of Bankruptcy Rule 6003 are satisfied.

### Request for Bankruptcy Rule 6004 Waivers

45.    The Debtors request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h).  As explained above and in the First Day Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the

fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and stay apply.

### **Reservation of Rights**

46.    Nothing contained herein is intended or shall be construed as (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors; (c) a waiver of any claims or causes of action which may exist against any creditor or interest holder; or (d) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

### **Notice**

47.    Notice of this Motion will be provided to (i) the Office of the United States Trustee for the District of Delaware (the **"U.S. Trustee"**); (ii) the holders of the 30 largest unsecured claims against the Debtors on a consolidated basis; (iii) counsel to the ABL Agent, (x) Haynes and Boone, LLP, 1221 McKinney Street, Suite 4000, Houston, TX 77010, Attn: Charles A Beckham, Jr. (charles.beckham@haynesboone.com), and (y) Haynes and Boone, LLP, 2323 Victory Avenue, Suite 700, Dallas, TX 75219, Attn: J. Frasher Murphy (frasher.murphy@haynesboone.com); (iv) counsel to the Ad Hoc Noteholder Group, Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 (Attn: Kristopher M. Hansen, Jonathan D. Canfield and Gabriel Sasson), and Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, DE 19801 (Attn: Matthew B. Lunn, Sean M. Beach and Robert F. Poppiti,

Jr.); (v) the Internal Revenue Service; (vi) the United States Attorney's Office for the District of Delaware; (vii) the Securities and Exchange Commission; (viii) any other party entitled to notice pursuant to Bankruptcy Rule 2002; and (ix) any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(m) (collectively, the "**Notice Parties**").

WHEREFORE the Debtors respectfully request entry of the Proposed Orders granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

*[Remainder of page intentionally left blank.]*

Dated: June 1, 2022
       Wilmington, Delaware

/s/ Robert J. Dehney

**BAKER BOTTS L.L.P.**

James R. Prince (*pro hac vice* admission pending)
Kevin Chiu (*pro hac vice* admission pending)
2001 Ross Avenue, Suite 900
Dallas, Texas 75201-2980
Telephone:    (214) 953-6500
Facsimile:    (214) 953-6503
Email: jim.prince@bakerbotts.com
      kevin.chiu@bakerbotts.com

-and-

BAKER BOTTS L.L.P.

Scott R. Bowling (*pro hac vice* admission pending)
30 Rockefeller Plaza
New York, New York 10112
Telephone:    (212) 408-2500
Facsimile:    (212) 259-2501
Email: scott.bowling@bakerbotts.com

-and-

BAKER BOTTS L.L.P.

David R. Eastlake (*pro hac vice* admission pending)
Lauren N. Randle (*pro hac vice* admission pending)
910 Louisiana Street
Houston, Texas 77002
Telephone:    (713) 229-1234
Facsimile:    (713) 229-1522
Email: david.eastlake@bakerbotts.com
      lauren.randle@bakerbotts.com

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

Robert J. Dehney (No. 3578)
Curtis S. Miller (No. 4583)
Daniel B. Butz (No. 4227)
Matthew O. Talmo (No. 6333)
Brian Loughnane (No. 6853)
1201 N. Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email:    rdehney@morrisnichols.com
      cmiller@ morrisnichols.com
      dbutz@ morrisnichols.com
      mtalmo@ morrisnichols.com
      bloughnane@ morrisnichols.com

*Proposed Attorneys for Debtors
and Debtors in Possession*