# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>**TPC GROUP INC.**, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 22-10493 (CTG)<br><br>Joint Administration Requested<br><br>Re: D.I. 36, 56 |

**DECLARATION OF ROBERT A. DEL GENIO IN SUPPORT DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (IV) MODIFYING THE AUTOMATIC STAY, AND <u>(V) GRANTING RELATED RELIEF</u>**

I, Robert A. Del Genio, hereby declare that the following is true to the best of my knowledge, information, and belief:

1. I am a Senior Managing Director and the co-leader of the New York Metro Region for Corporate Finance and Restructuring at FTI Consulting, Inc. ("**FTI**"), which has its principal office located at 1166 Avenue of Americas 15th Floor New York, New York 10036. I am a resident of FTI's New York City office. Since November 1, 2021, FTI has been serving as the Debtors' financial advisor, which is an engagement I lead. I submit this declaration ("**Declaration**") in support of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (a) Obtain Senior Secured Priming Superpriority Postpetition Financing and (b) Use Cash Collateral, (II) Granting Liens and Providing Claims with*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: TPC Group Inc. (3618); TPC Holdings, Inc. (7380); TPC Group LLC (8313); Texas Butylene Chemical Corporation (7440); Texas Olefins Domestic International Sales Corporation (4241); TPC Phoenix Fuels LLC (9133); Port Neches Fuels, LLC (1641); and TP Capital Corp. (6248). Each Debtor's corporate headquarters and mailing address is 500 Dallas St., Suite 2000, Houston, Texas 77002.

1

*Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket Nos. 36, 56] (the "**DIP Motion**").[2]

2. Based on my work with the Debtors, I am generally familiar with the Debtors' businesses, financial condition, day-to-day operations and books and records. Except as otherwise noted herein, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from my review of the Debtors' business records and from the Debtors' employees and retained advisors (including members of my team that report to me) in the ordinary course of my responsibilities. The Debtors have authorized me to submit this Declaration on their behalf. If called upon to testify, I would testify competently as to the facts set forth in this Declaration.

### I. Professional Background and Qualifications

3. I joined FTI when it acquired CDG Group, a financial advisory firm I co-founded. Before that, I was a corporate finance partner and a national director at Ernst & Young. I have more than 35 years of experience in restructuring and mergers and acquisitions and have advised companies, lenders, creditors, corporate boards, and equity sponsors across a diverse range of industries both domestically and internationally. I hold a B.B.A. with high honors from the University of Notre Dame and a Master of Management from the Kellogg Graduate School of Management at Northwestern University.

4. I have advised companies, lenders, and investors both in and outside of chapter 11 in a variety of complex restructuring engagements. I acted as the financial advisor to GNC Holdings Inc., Catalina Marketing Corporation, Frontier Communications Corporation,

---

[2] Terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Motion.

ESSAR Steel, Algoma Steel Inc., Reichhold Holdings US, Inc., Milacron, Inc., Caraustar Industries, Inc., MicroAge, Inc., CST Industries, Dan River, Inc., Wheeling-Pittsburgh Steel Corp., Waypoint, US Internetworking, Factory Card Outlet, Malden Mills, and Metal Forming Technologies during their chapter 11 cases. I also served as the Strategic Planning Officer of RHI Entertainment, Inc., the Chief Restructuring Officer of The Weinstein Company Holdings LLC during its chapter 11 proceedings, the Chief Restructuring Officer of CHC Group Ltd. during its chapter 11 proceedings, the Chief Restructuring Officer of PHI, Inc during its chapter 11 proceedings, and the Co-Chief Restructuring Officer of F&W Media during its chapter 11 proceedings. I served as the Chief Strategic Officer of Production Resources Group, currently serve on the board of directors of Panavision, Inc. after having served as an interim Chief Executive Officer, and have previously served on the boards of Washington Group International, Inc., CHC Group Ltd., Lazare Kaplan International, Inc., and Buffets, Inc. As relevant to my testimony today, my 35 years of restructuring experience includes liquidity review and cash forecasting, working capital management, chapter 11 planning and administration and assisting companies with first day and other matters necessary to avoid any unnecessary disruption of their businesses and to protect value as companies transition into their roles as chapter 11 debtors-in-possession.[3]

## II.     Need to Use Cash Collateral

5.     As part of my work with the Debtors, I have developed an understanding of the Debtors' cash flows and liquidity needs. The Debtors have an urgent need to continue using Cash Collateral and to obtain postpetition financing at the outset of these chapter 11 cases.

6.     Events in the months leading up to the commencement of these chapter 11 cases have underscored the Debtors' need to access the proceeds of the DIP Facilities and continue

---

[3] Further information on my professional background is available on FTI's website at:
http://www.fticonsulting.com/our-people/robert-del-genio.

use of Cash Collateral. Those events include, among other things, (a) a rapid and significant decline in world-wide factory output and transportation demand which directly reduced overall demand for oil due to the COVID-19 pandemic; (b) commodity price volatility; (c) extended disruptions at the Debtors' facilities in Texas and Louisiana due to Winter Storm Uri; and (d) trade creditors' demands for more restrictive trade terms from the Debtors. As of the Petition Date, the Debtors have no unencumbered cash. The Debtors have approximately $23 million in total cash on hand. All of the Debtors' cash is on deposit in accounts with Bank of America, the Prepetition ABL Agent. I understand such accounts are subject to, among other things, security interests and deposit account control agreements ("**DACA**") with the Prepetition ABL Agent, for the benefit of the Prepetition ABL Lenders. I further understand that cash in accounts subject to security interests and possessed by the Prepetition ABL Agent constitutes Cash Collateral. Simply put, the Debtors cannot continue to operate their businesses without the use of Cash Collateral.

### III. Need for Postpetition Financing

7. Not only is continued use of Cash Collateral important for the Debtors' business, but so, too, is immediate access to the funds available from the DIP Facilities. The Debtors operate cash-intensive businesses with accounts payable and accounts receivables that can vary widely depending, at least in part, on commodity pricing. Weekly disbursements to raw material suppliers can range from $10 million to over $50 million. The continued cooperation of key business partners including raw material suppliers and vendors is critical at the early stage of these chapter 11 cases. Otherwise, the Debtors risk facing a value-destructive interruption to their businesses and, simultaneously, eliminate their best chance for negotiating and consummating a comprehensive and orderly restructuring, to the detriment of the Debtors, their estates, and all stakeholders. As such, and due to their current limited liquidity, the Debtors require immediate

access to the DIP Facilities and use of Cash Collateral to operate their businesses, preserve value, and avoid irreparable harm pending the Final Hearing.

8. *ABL DIP Loan Facility*. The Debtors have historically maintained a secured asset-based revolving loan facility to ensure the availability of liquidity despite monthly swings in their cash on hand. For the same reason, the Debtors seek approval of the ABL DIP Loan Facility in these chapter 11 cases. In addition, I understand that the Debtors' Prepetition ABL Lenders have the right to consent to the Debtors' use of Cash Collateral, and that (i) the Prepetition ABL Agent has consented to the use of Cash Collateral for a limited period to facilitate the repayment of the Prepetition ABL Facility by the ABL DIP Loan Facility and (ii) the ABL DIP Agent has consented to the Debtors' use of Cash Collateral otherwise in these chapter 11 cases. As a result, the Debtors have an urgent need to obtain approval of the ABL DIP Facility and related consents to their use of Cash Collateral.

9. *Term DIP Loan Facility*. The Debtors require access to the Term DIP Loan Facility because (i) they fall below minimum liquidity this week and (ii) it is important to the Debtors' ability to reassure their suppliers, customers, vendors, employees, and other stakeholders that the Debtors have adequate liquidity to fund these chapter 11 cases and have the support, backed by new money, of their largest financial constituency, the Ad Hoc Group.

10. The Debtors' current liquidity needs are illustrated in the Initial DIP Budget (the "**Budget**"), a true and correct copy of which is attached to the Interim Order as **Exhibit 1**, showing the operating cash flow and working capital needs of the Debtors over the next 13 weeks. The Budget includes anticipated cash receipts and disbursements during the projected period and considers several factors, including, but not limited to, the effect of the chapter 11 filing on the

Debtors' businesses, professional fees, customer and vendor relationships, and required operational payments.

11. Given the business's substantial cash needs, the Debtors' management team operates the Debtors with a minimum liquidity threshold of $50 million. That figure, established months prior to the commencement of these cases, already reflects a reduction from the Debtors' historical minimum liquidity threshold of between $75 and $100 million, as part of an effort to extend the Debtors' prepetition runway to negotiate a transaction with their economic stakeholders. As the Budget shows, the Debtors now expect to fall below their $50 million minimum liquidity threshold in the first week of these chapter 11 cases absent the ABL DIP Loan Facility and Term DIP Loan Facility, even if they obtain access to Cash Collateral. The goal of the Debtors is to return to the historical minimum liquidity threshold of between $75 and $100 million as operations normalize.

12. The Budget was developed by the Debtors, with the assistance of their advisors and through negotiations with the Term DIP Lenders. The Budget contains line items for the primary categories of cash flows anticipated to be received or disbursed during the period for which the Budget is prepared. I believe that the Budget includes all reasonable, necessary, and foreseeable expenses to be incurred in connection with the operation of the Debtors' businesses for the period set forth in the Budget. I also believe that the Budget demonstrates that the Debtors will have adequate liquidity during the 13-week period if allowed to access and use the Cash Collateral and proceeds of the DIP Facilities.

### IV. Proposed DIP Facilities Provide Crucial Access to Liquidity

13. The Term DIP Loan Facility will enable the Debtors to strengthen their cash position in the aggregate principal amount of $43 million to fund working capital, general

6

corporate purposes, the expenses of administering the chapter 11 cases.[4] The ABL DIP Loan Facility will provide the Debtors with a functioning revolving credit facility of up to the lesser of $200 million and the amount of the borrowing base that will enable the Debtors to prudently manage their liquidity as they did prior to the Petition Date, subject to the Budget.

14. These facilities, including access to significant incremental liquidity, will send a positive and credible message to the Debtors' workforce and commercial counterparties that the Debtors will have appropriate liquidity and creditor support to maintain ordinary-course operations and meet their financial commitments throughout these chapter 11 cases. Further, the additional liquidity provided by the DIP Facilities will facilitate the Debtors' comprehensive restructuring and successful emergence from chapter 11, which will inure to the benefit of all the Debtors' stakeholders.

15. Without immediate access to the proceeds of the DIP Facilities and continued use of Cash Collateral, the Debtors will be unable to continue to operate their businesses as a going concern and preserve and maximize the value of their assets for the benefit of all stakeholders. The Debtors, as a leading producer of products derived from petrochemical raw materials such as crude C4 and isobutylene, have important supplier and customer relationships across the petrochemical industry. The lack of adequate funding will cause a disruption in the Debtors' supply chain which would adversely impact not only the Debtors' businesses but also those of their customers and suppliers.

---

[4] The Term DIP Loan Facility provides that (i) $32 million in "new money" term loans will be made available under the Term DIP Loan Facility on the date of the Interim Order; (ii) $53 million in "new money" term loans under the Term DIP Loan Facility will be made available following entry of the Final Order and satisfaction of all conditions precedent under the Term DIP Loan Facility; and (iii) $28 million will be made available on June 30, 2022, subject to certain liquidity requirements set forth in the DIP Credit Agreement.

16. Any failure to secure postpetition financing will cause immediate and irreparable harm to the Debtors and their stakeholders and will diminish the value of the Debtors' estates to the detriment of their creditors. Moreover, the Debtors' inability to access the proceeds of the DIP Facilities and continue using Cash Collateral would severely impede the Debtors' ability to pay employees, insurance, suppliers, lessors, taxes, or other operating expenses. This would cause substantial long-term harm to revenues and business relationships.

### V.  Conclusion

17. A significant cash infusion, in the form of the DIP Facilities and proceeds is critically necessary to the continued operation of the Debtors' businesses, the preservation of going concern value, and the maintenance of the Debtors' valuable business relationships. Therefore, I believe that the Court should approve the DIP Facilities as requested by the Debtors and authorize the use of Cash Collateral.

*   *   *

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: June 1, 2022
      New York, New York

*/s/ Robert A. Del Genio*
Robert A. Del Genio
Senior Managing Director
FTI Consulting, Inc.