# Exhibit B

**to the Ad Hoc Group of Non-Consenting Noteholders' Letter to The Honorable
Craig T. Goldblatt from Aaron L. Renenger regarding Discovery Disputes**

1               UNITED STATES BANKRUPTCY COURT
                    DISTRICT OF DELAWARE
2

3  IN RE:                          )  Case No. 15-11357 (CSS)
                                   )  Chapter 11
4  MOLYCORP, INC, *et al.,*        )
                                   )
5               Debtors.           )  Courtroom No. 6
                                   )  824 Market Street
6                                  )  Wilmington, Delaware 19801
                                   )
7                                  )  August 17, 2015
                                   )  1:00 P.M.
8
                        TRANSCRIPT OF HEARING
9          BEFORE HONORABLE CHRISTOPHER S. SONTCHI
                 UNITED STATES BANKRUPTCY JUDGE
10
   APPEARANCES:
11

12 For the Debtors:          Young Conaway Stargatt & Taylor
                             By:  EDMON MORTON, ESQUIRE
13                           1000 North King Street
                             Wilmington, Delaware 19801
14
                             Jones Day
15                           By:  RYAN ROUTH, ESQUIRE
                             222 East 41st Street
16                           New York, New York 10017

17 ECRO:                     Leslie Murin

18 Transcription Service:    Reliable
                             1007 N. Orange Street
19                           Wilmington, Delaware 19801
                             Telephone:  (302) 654-8080
20                           E-Mail:  gmatthews@reliable-co.com

21
   Proceedings recorded by electronic sound recording:
22 transcript produced by transcription service.

23

24

25

```
 1   For OCM MLY Co Ltd:        Milbank Tweed
                                By:  DENNIS DUNNE, ESQUIRE
 2                                   ANDREW LEBLANC, ESQUIRE
                                28 Liberty Street
 3                              New York, New York 10005

 4   For U.S. Trustee:          Office of the United States Trustee
                                By:  DAVID BUCHBINDER, ESQUIRE
 5                              844 N. King Street
                                Wilmington, Delaware 19801
 6
     For Creditors Committee: Paul Hastings
 7                              By:  LUC DESPINS, ESQUIRE
                                     JAMES WORTHINGTON, ESQUIRE
 8                              75 East 55th Street
                                New York, New York 10022
 9
     For Miller Buckfire:       Debevoise & Plimpton
10                              By:  ERICA WEISGERBER, ESQUIRE
                                919 Third Avenue
11                              New York, New York 10022

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                                    INDEX

2                                                                    <u>Page</u>

3
<u>NOTICE OF AGENDA MATTERS:</u>
4   For the Debtors, by Mr. Morton                              4,15
    For Creditors Committee, by Mr. Despins                        5
5   For U.S. Trustee, by Mr. Buchbinder                        6,12
    For Miller Buckfire, by Ms. Weisgerber                       86
6   For the Debtors, by Mr. Routh                                76
    For Creditors Committee, by Mr. Worthington                 130
7   For OCM MLYCO, CTB Ltd., by Mr. Leblanc                     127

8                                                            Further
WITNESS FOR MILLER       <u>Direct</u> <u>Cross</u> <u>Redirect</u> <u>Recross</u> <u>Redirect</u>
9   <u>BUCKFIRE:</u>
    Alexander Tracy           21    44      73

10
<u>EXHIBITS:</u>                                   <u>Marked</u>    <u>Received</u>
11  Miller Buckfire Exhibit #1 Engagement Ltr.      22         23
    Miller Buckfire Exhibit #2 Summary              26         29
12  Miller Buckfire Exhibit #3 Committee's
    Comparable Chart                                40
13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE CLERK:  All rise.

2          THE COURT:  Please be seated.

3          MR. MORTON:  Good afternoon, Your Honor.

4          THE COURT:  Good afternoon.

5          MR. MORTON:  For the record, Edmon Morton from

6    Young Conaway Stargatt & Taylor on behalf of the Debtors and

7    Debtors in possession.  Turning to the second amended agenda

8    that was filed late morning or early afternoon; and the

9    purpose of that was to present a revised exhibit that the

10   Committee filed with respect to Miller Buckfire retention

11   application.  I don't know if that's made its way to Your

12   Honor.

13          THE COURT:  Yeah I have it.

14          MR. MORTON:  Thank you, Your Honor.  Item number

15   one on the agenda has been adjourned on consent.  Items

16   numbers two through seven have already been disposed of by

17   Your Honor, so that takes us to the matters going forward

18   section at item eight.

19          Your Honor, items eight through 11 have a common

20   initial theme as they were subject to an omnibus objection by

21   the U.S. Trustee.  Our thought was that perhaps we could go

22   ahead and dispense with that argument up front and then

23   switch to some of the more specific comments on the Miller

24   Buckfire retention if that's acceptable.

25          THE COURT:  Fine.

1          MR. MORTON:  Your Honor, again, --

2          THE COURT:  Mr. Despins?

3          MR. DESPINS:  Two seconds, Your Honor; I

4   apologize.  But we had discussed with counsel from Jones Day

5   making a broad representation applying to all estate

6   professionals.  And I am going to miss some, but it certainly

7   includes Jones Day, Paul Hastings, Ashby & Geddes, Young

8   Conaway, I apologize; at least, to cover what we call the

9   Baker BOPS issue.

10          And I'm sure you're aware of this, but that

11  Supreme Court decision ruled, you know, I forget, a couple

12  months ago regarding the reimbursement fees by the estate

13  when there's a challenge.  Since then the issue addressing

14  that is percolating I'm not sure in your Court yet, but it's

15  certainly in front of Judge Carey and Judge Walrath.  And

16  what we've discussed with the U.S. Trustee is just putting on

17  the record a placeholder so we don't spend estate resources

18  debating the issue.  We'll let the others essentially knock

19  themselves out on that issue.

20          And then if it's ever resolved in the favor of

21  professionals we would come back to Your Honor and, of

22  course, you would decide what you want to do with it.  But

23  estate professionals would not be faced with an argument that

24  you waited or you didn't raise that earlier.  So that's the

25  only reason why I'm speaking at this time; discussed this

1  with counsel for the U.S. Trustee.  He was agreeable to that.

2  And also, I believe, Jones Day was agreeable to that.  That's

3  the sole purpose of my intervention at this time.

4          THE COURT:  Obviously, that will be completely

5  without prejudice to my decision on the merits regardless of

6  how my colleagues play out.

7          MR. DESPINS:  Absolutely, Your Honor.

8          THE COURT:  Yes.

9          MR. BUCHBINDER:  Good afternoon, Your Honor, Dave

10 Buchbinder on behalf of the United States Trustee.  Just to

11 clarify the record a little bit on a claim made by Mr.

12 Despins.  We have agreed that the issue is not before the

13 Court today and shouldn't be raised at a later date in the

14 cases without prejudice to the parties to raise the various

15 issues.  No one is in agreeing to be bound by the decision of

16 any other Court.  And I will confirm that the matter is being

17 held by Judge Walrath right now.  There were arguments that

18 were made before Judge Carey this morning in the Baha Mar

19 case and he sent a briefing schedule for additional briefs on

20 that matter.

21         THE COURT:  The only Court I'm going to take issue

22 with you saying I'm not bound by it is the Supreme Court.

23         MR. BUCHBINDER:  Yes, Your Honor.

24         THE COURT:  I'm going to follow their direction.

25         MR. BUCHBINDER:  You're not bound by the decisions

1    of the other Judges in this District.

2              THE COURT:  Correct.

3              MR. MORTON:  Everyone seems to have a boss, Your

4    Honor.  Well turning then from that and I certainly

5    appreciate Mr. Despins' clarification on that point.  Turning

6    from that and we'll try to dispense with this in fairly short

7    order, but I'm going to address the omnibus objection that

8    was filed by the U.S. Trustee on behalf of the four

9    pertaining to state professionals with respect to the

10   evergreen retainer request.

11             I know this is subject matter that Your Honor is

12   more than familiar with so I'm not going to delay or spend

13   any time on the background of it.  But suffice it to say the

14   objection that was filed by the U.S. Trustee doesn't actually

15   take issue with the first four of the in Silco factors, so I

16   won't spend a ton of time on those except to say that I think

17   our reply sets out they are common in the marketplace. We

18   cited a string of orders where they've been approved fairly

19   recently by all of the Judges in this jurisdiction.

20   Certainly, the relationship between the parties is an item

21   that's not in legitimate contest.  This is a multibillion

22   dollar company whose very capable of negotiating on its own

23   behalf with respect to its professionals.

24             With respect to whether is in the best interest, I

25   think it's important to note for the record that all

1 professionals have been performing at a fair expedited level

2 to serve the estate and no party in interest has raised any

3 issue with the appropriateness of retaining of the

4 professionals that are subject to the evergreen retainer

5 request.  And, indeed, that bleeds into the fourth factor

6 which is the lack of creditor opposition.

7          There is a complete lack of creditor opposition to

8 this feature of the retentions at issue.  And, Your Honor, I

9 would actually state before I move onto the factor that was

10 taken issue with by the U.S. Trustee that actually if you

11 agree to give any of these factors fairly enhanced weight, I

12 would submit that perhaps creditor opposition is the

13 paramount factor.

14          And the reason would be that if there are issues

15 buried beneath the surface on some of these other points, it

16 is either the secured creditors or the unsecured creditors

17 who would be the parties to actually know and bring those to

18 Your Honor's attention; for instance if by holding the

19 retainers you were somehow inappropriately constricting the

20 Debtors' liquidity or if there had been some kind of

21 inappropriate and undue exertion of forced prior petition

22 date by some of the professionals.  That's something that

23 creditors would be in a position to know and bring to Your

24 Honor's attention.

25          But turning to the fifth factor that was cited by

1  the U.S. Trustee as the one that they believed was the most

2  informative; we're certainly not going to hide the ball.

3  Clearly, Your Honor has entered an interim compensation order

4  in this case as you do in almost every case.  And there is a

5  carve out here that is for the benefit of all the state

6  professionals.  And it is one that was heavily negotiated

7  with the Creditors Committee and with the Debtors'

8  professionals and the lenders.

9          And so I'm certainly not going to stand here and

10 say that we believe we negotiated an inappropriate carve out.

11 At the same time, the U.S. Trustee, as we said in our reply,

12 the U.S. Trustee seems to think that that's the end of the

13 inquiry.  And I believe that really this factor has more

14 weight when those are absent, because they further justify

15 those.  But the mere fact that you have a carve out in a cash

16 collateral or a DIP order and the mere fact that you have an

17 interim compensation procedures order in place is something

18 that's true in every case.

19         So if that were going to be the factor that you

20 could use to disregard evergreen retainers then they would

21 cease to exist if that sole factor alone was going to be what

22 would push them aside.  And, Your Honor, I think the reason

23 that they're appropriate, notwithstanding these risk

24 minimization factors, is that as several other Judges have

25 observed as well these actually enhance the disinterestedness

1  of the professional.  The further removed they are from

2  having direct economic skin in various strategy decisions,

3  the better equipped they are to deliver dispatchment advice.

4         And so as a result it is a little bit curious

5  sometimes when the U.S. Trustee pushes back on this because

6  if the creditors aren't saying that it's somehow an

7  inappropriate economic arrangement, it seems that the

8  existence of these types of retainers would only serve to

9  further enhance our disinterestedness.  And I'll address just

10 very briefly, Your Honor, one final point and then obviously

11 if there's a need for rebuttal, I'll stand back up.

12        But one final point that I want to make clear, it

13 wasn't argued expressly in the reply that was filed by the

14 U.S. Trustee, but it was what the U.S. Trustee argued in

15 Silco.  And that is that somehow the reason that these are

16 something to be, at least, moderately disfavored is because

17 it puts retained professionals on a different footing than

18 other administrative creditors.  And I would just submit very

19 briefly that that is incorrect for two reasons.

20        The first is I'm unaware of any motion that was

21 filed in this case or any other case that requires

22 prepetition administrative creditors to burn off any security

23 deposits that they have.  Whatever they have, they have, and

24 they'll continue to submit invoices in the ordinary course.

25 Obviously, they need relief from the Court before they can do

1  things like set off prepetition debts against those security

2  deposits.  And that's and certainly we would have the same

3  restriction.  But with respect to purely the fact that a

4  security retainer or a deposit, as the analogy would be for a

5  general admin creditor to exist, is nothing remarkable.  And

6  it either exists or it doesn't based upon the prepetition

7  negotiations among the parties, as it does here.

8          The second is and, again I don't want anyone to

9  start you know getting out violins for the retained

10  professionals.  It's tried and true practice that has been

11  out there for years, but we are in a different footing.  And

12  it's actually at this advantageous footing relative to other

13  admin creditors as far as the procedures and manners by which

14  we can get paid and [indiscernible] by which we can withdraw.

15  And that is that you know I have to go through, as do all the

16  other retained professionals, a full blown fee process.  Your

17  Honor has to review the fees.  A fee examiner will review the

18  fees.  It has to go out on notice to other parties.  I can't

19  simply submit an invoice and have it paid according to

20  whatever the terms were that existed prior to the petition

21  date.

22          And, again, as I said I'm not asking for the Court

23  to have sympathy for the professionals in that regard.

24  That's a product of the Bankruptcy Code and, frankly, the

25  interim compensation procedures order makes it even less

1  onerous than it would be if the Bankruptcy Court would just

2  operate it proper.  But all that's a long way of saying that

3  I do believe there is a disparate position relative to

4  retained professionals and other admin creditors and that's

5  one of the negatives.

6          So the idea that we have a very common prepetition

7  negotiated evergreen retainer as a further way to buttress

8  the potential downside of these cases, we respectfully submit

9  is appropriate.  Unless Your Honor has any questions for me I

10  will yield the podium and then reserve my right for a brief

11  rebuttal.

12          THE COURT:  I don't have any questions.

13          MR. BUCHBINDER:  Good afternoon, Your Honor, Dave

14  Buchbinder on behalf of the United States Trustee.  It is not

15  contrary to counsel's assertions.  It is not the common

16  practice in this District for counsel to obtain approval of

17  evergreen retainers.  It may be a somewhat common practice to

18  request them but in many cases the request is withdrawn.  In

19  some cases where it's opposed it's not approved.

20          Where the Courts have generally approved evergreen

21  retainers are in cases like Silco that can be referred to as

22  melting ice cubes where the Debtor comes into Court in tough

23  situation either a retail case that intermediate going out of

24  business sale or something similar where the Debtor is

25  falling apart.  But in a case where there are ample

1  protections for the payment of professional fees evergreen

2  retainers are disfavored.  In fact, counsel in Delaware often

3  forget how lucky they are to be in Delaware, because in most

4  other Districts there is no such thing as an interim

5  compensation order and counsel and all of those places get to

6  follow the Bankruptcy Code and can apply for their fees not

7  more than once every four months; not every month to receive

8  80% of the fees and full reimbursement of costs.

9        That aside, the most important factor in Silco

10 because the first four are generally easy to apply in any

11 case, it's what protections do the professionals need to

12 protect their payment of fees.  And that's what Judge Carey

13 described in Silco as risk minimizing devices and how many do

14 we have present in a particular case.

15        In this case, the collective retainers reported by

16 counsel in the various retention applications exceed a little

17 over $2 million dollars.  Granting the evergreen retainer

18 request would tie up for the course of this case $2 million

19 dollars on an ongoing basis.  And we've heard lots of

20 testimony in connection with the DIP dispute that the Debtor

21 could be on a thin margin at times in this case, so we have a

22 reason to not want to tie up $2 million dollars in evergreen

23 retainers.

24        But what other risk minimizing devices exist here

25 besides the substantial prepetition retainers.  We have an

1  interim compensation order as I noted which generally pays

2  80% of all the fees incurred on a monthly basis and a 100% of

3  all the costs. We have in connection with the significant DIP

4  financing dispute the Committee was able to negotiate a carve

5  out of $4 million dollars in the event of a default that

6  would apply to all professionals.

7          And we have a unique factor in this case where

8  unlike and in Silco or a retailer that needs to have

9  immediate gov sales we have the relatively rare occurrence of

10  a fight not about the terms of the DIP loan but about who

11  even gets to make the DIP loan.  We had a fight about who the

12  lender gets to be.  So we have ample risk minimizing devices

13  present in this case to satisfy the professionals.  We have

14  no objection to them drawing down upon their retainers until

15  they're used up, but we do have issue with $2 million dollars

16  being tied up in this case indefinitely because there appear

17  to be plenty of other protections to protect the

18  professionals in this case not the least of which was the

19  testimony that seems to clearly establish that all

20  administrative expenses will be paid in this case and that

21  the secured lenders will be paid in full in this case.  Thank

22  you, Your Honor.

23          THE COURT:  Thank you.  Mr. Morton.

24          MR. MORTON:  Thank you, Your Honor, if I could

25  just respond with two points.  The first is just a note as is

1   outlined in paragraph two of our reply.  The number is not $2

2   million dollars in the aggregate for professionals.  Most of

3   those retainers were burned off in some form or fashion right

4   at the time of filing as is common in the practice.  So we

5   actually have about an $810,000 in the aggregate left.  And

6   simply so that the record is clear that would equate to

7   $400,000.00 for Jones Day, roughly $100,000 for Jones

8   Conaway, $10,000 for Miller Buckfire, and then AlixPartners

9   has a substantial remaining retainer which they have agreed

10  to reduce from I believe the balance is approximately $900

11  now and they've agreed to reduce that to $300,000.00 through

12  the course of the process so that their retainer will be more

13  in line with the size of the other professionals in the case.

14  So you are talking about a relatively insubstantial number on

15  the retainer size relative to the potential fees to be

16  incurred by the professionals on any given monthly basis.

17          The second is we certainly were in the position

18  where we had two different lender groups going back and forth

19  and trying to get the Court to approve their proposals as the

20  DIP proposals for the case, but that was then.  I don't think

21  there's any retainers you know security retainers, carve

22  outs, etcetera are designed for what happens when the

23  financing breaks apart not what is happening the front end of

24  the case when everyone has grand plans for where it's going

25  to go.  And certainly it's I'm not going to stand here and

1  try to argue from the podium if there's anything tenuous

2  about the posture of our cases right now.  We're off and

3  running and trying to put together a reorganization that will

4  be maximizing for all.  But merely because we've had two

5  groups trying to put in financing in front of the case does

6  not mean that we can count on either of those groups at the

7  time that we had the territory printed under default.  So we

8  still maintain that the retainers particularly in reduced

9  amounts are appropriate; notwithstanding the protections that

10  are fairly standard in our industry as a whole.

11          And just to clarify one last point I always feel

12  lucky to be in Delaware.

13          THE COURT:  Thank you.  Well maybe not because I'm

14  going to sustain the objection.

15          MR. MORTON:  Well thankfully everyone has made me

16  feel better about the other protections.

17          THE COURT:  I am going to sustain the objection.

18  I believe that Mr. Buchbinder's correct that in connection

19  with the state professionals in a bankruptcy while evergreen

20  retainers are approved, they are not favored, and it is

21  decided on a case by case basis.  And the overwhelming factor

22  is whether any additional sort of risk mitigation is required

23  to protect those professionals.

24          I don't give a lot of credence to the no creditor

25  opposition point on these types of issues.  I think this is

1  particularly the purview of the office of the United States

2  Trustee and their input on retention issues, compensation

3  issues hold a lot of weight, perhaps more than they do in

4  other matters where you know the economics of a

5  reorganization plan are in place.  And we're really talking

6  about creditor money.  But I think it's important that the

7  Court give full weight to the Office of the U.S. Trustee on

8  these types of issues.

9         I also don't sort of really buy this carefully

10  were a good argument that estate professionals are somehow at

11  a disadvantage compared to other administrative expense

12  claimant.  First of all, they're professionals so they have

13  professional duties that may put them in a disadvantage but

14  no different from any disadvantage that they would have in a

15  private instance.  They're also in a unique position to

16  influence and monitor a case unlike other administrative

17  expense creditors.  And they do have protections and the

18  protections really bleed into the fifth factor the risk

19  mitigation factor in this case.

20         They are specifically protected by the interim

21  compensation order which allows for the timely payment of

22  their fees and expenses even without Court approval on a

23  month to month basis subject, of course, to the interims and

24  final issues or, excuse me, final approvals by the Court.

25  But also the carve out which is in place and that is a unique

1  protection that other administrative expense creditors don't

2  have.

3          In addition in this case, there is a fully funded

4  budget that was not hardly negotiated, was negotiated

5  vigorously by the parties.  And I think is more than adequate

6  to handle the [indiscernible] administrative expenses of

7  professionals.  So even though it's "only $810,000.00," I

8  still think it's a significant amount of money that is more

9  properly in the [indiscernible] of the estate.  The

10  professionals here are protected by the carve out, the

11  interim compensation order, adequate and vigorous DIP

12  financing in place with an adequate budget, so I am going to

13  sustain the objection.

14          MR. MORTON:  Thank you, Your Honor.  I note that

15  this issue was specifically carved out of the order that you

16  previously entered on behalf of AlixPartners and Young

17  Conaway. So we'll work with the U.S. Trustee on an order that

18  puts this issue to bed for those two.  I suspect unless Your

19  Honor has other questions about the Jones Day order that we

20  filed, this was the only issue that was hanging out there, so

21  we can probably interlineate something during the Miller

22  Buckfire portion of the hearing.

23          THE COURT:  However you want to proceed is fine.

24          MR. MORTON:  That's a fair point, Your Honor.

25  Maybe what we can do is we'll go ahead and enter the orders

1  today and then we'll work with the U.S. Trustee on an omnibus

2  order that denies this piece as to everybody if that's

3  acceptable.

4           THE COURT:  That seems backwards.

5           MR. MORTON:  Okay.  We'll --

6           THE COURT:  Let's do this because we're going to

7  have to deal with Miller Buckfire as well and we'll see what

8  happens with that.  But let's just submit the orders under

9  certification of counsel; run them by Mr. Buchbinder and make

10 sure he's okay with them.  I'm sure it won't be problematic

11 and that way you can submit them and get them approved in

12 short order.  I'm sure you can have something to me by

13 tomorrow and I'll get them entered.  Obviously, the

14 professionals want to know that they're retained so they can

15 work on more important things on behalf of the estate.

16          MR. MORTON:  Certainly.

17          UNIDENTIFIED SPEAKER:  Your Honor, does that mean

18 you don't want to hear anything further regarding the Jones

19 Day application.  You're satisfied with what's been

20 submitted?

21          THE COURT:  Yes I'm satisfied with all the

22 applications.  The only open application at this point I

23 think is Miller Buckfire; the issue of the fee fee; excuse me

24 the financing fee.

25          MR. MORTON:  Your Honor, and so what I would, what

1  we would propose to do there we know that you have another

2  hearing as well.

3        THE COURT:  It's a status conference, so don't

4  worry about it.

5        MR. MORTON:  Terrific.  I think that since we do

6  have one witness to present as well certainly we're happy to

7  just proceed right to evidence and then do argument

8  thereafter.  So if that's acceptable to Your Honor, the only

9  small hanging chat is if I may approach with the order

10 granting us leave to file our reply.

11       THE COURT:  Oh yes.  The objection is just

12 proceeding or do you want to make openings?

13       UNIDENTIFIED SPEAKER:  Your Honor, the Debtors

14 would be happy proceeding directly to evidence without

15 openings.

16       MR. DESPINS:  That's fine, Your Honor.

17       THE COURT:  Okay.

18       MS. WEISGERBER:  Your Honor, Erica Weisgerber on

19 behalf of Miller Buckfire from Debevoise & Plimpton.  If Your

20 Honor has no further questions we'd like to call Alexander

21 Tracy to the stand.

22       ALEXANDER TRACY, MILLER BUCKFIRE WITNESS, SWORN

23       THE CLERK:  Please state and spell your name for

24 the record.

25       MR. TRACY:  Alexander Tracy; T-r-a-c-y.

1              THE CLERK:  Thank you.

2                         DIRECT EXAMINATION

3    BY MS. WEISGERBER:

4    Q.  Good afternoon, Mr. Tracy.

5    A.  Good afternoon.

6    Q.  Would you please state your name for the record?

7    A.  Alexander Tracy.

8    Q.  And where are you currently employed?

9    A.  Miller Buckfire.

10   Q.  What is Miller Buckfire?

11   A.  Miller Buckfire is a restructuring focused investment

12   banking.

13   Q.  And what is your position at Miller Buckfire?

14   A.  I'm a managing director.

15   Q.  Just generally as I know the Court has a lot of

16   background on your work on Miller Buckfire, can you generally

17   explain the nature of your work at the firm?

18   A.  Sure. We advise corporate clients on restructuring,

19   financings, and mergers and acquisitions.

20   Q.  And how long have you been employed at Miller Buckfire?

21   A.  Since early 2006.

22   Q.  Did you have any prior experience in the areas of

23   restructuring or reorganization prior to joining Miller

24   Buckfire?

25   A.  Yes I worked at Channig Capital Partners from 2002 to

 1  2006.

 2  Q.  Mr. Tracy, was Miller Buckfire engaged by the Debtors in

 3  this matter?

 4  A.  Yes, we were.

 5  Q.  Did Miller Buckfire and the Debtors enter into an

 6  engagement letter in connection with Miller Buckfire's

 7  engagement?

 8  A.  Yes, we did.

 9          MS. WEISGERBER:  Your Honor, I'd like to mark

10  Exhibit 1 for identification.

11          THE COURT:  Yes.  No clerk today.  I'm sorry what

12  did we identify this as?

13          MS. WEISGERBER:  Miller Buckfire Exhibit 1.

14          THE COURT:  Miller Buckfire 1.

15      [Exhibit 1 Engagement Letter marked for identification]

16  BY MS. WEISGERBER:

17  Q.  Mr. Tracy, do you recognize this document?

18  A.  Yes, I do.

19  Q.  Is this a copy of the engagement letter entered into

20  between Miller Buckfire and Molycorp in May 2015?

21  A.  Yes, it is.

22          MS. WEISGERBER:  Your Honor, I'd like to move this

23  document Exhibit 1 Miller Buckfire into evidence.

24          THE COURT:  Any objection?

25          MR. DESPINS:  Two seconds, Your Honor.  No

1  objections, Your Honor.

2           THE COURT:  All right it's admitted without

3  objection.

4      [Exhibit 1 Engagement Letter received into evidence]

5  BY MS. WEISGERBERG:

6  Q.  Mr. Tracy, were there negotiations between Miller

7  Buckfire and the Debtors over the terms of this engagement?

8  A.  Yes, there were.

9  Q.  Were you involved in the negotiation of this engagement?

10 A.  Yes, I was.

11 Q.  With whom was Miller Buckfire primarily negotiating?

12 A.  Primarily Kevin Johnson, the company's general counsel.

13 Q.  Did the negotiations with Molycorp result in any material

14 reductions to the fees initially sought by Miller Buckfire?

15 A.  Yes, it did.  It resulted in significant crediting of the

16 monthly fees against the restructuring fee.  It resulted in a

17 reduction of the restructuring fee from 62½ basis points to

18 50 basis points as well as a $7 million dollar cap on the

19 restructuring fee.  It also resulted in a $7 million dollar

20 cap on a relevant sale fee, and it resulted in a $10 million

21 dollar cap in any financing fees.

22 Q.  Did you enter into a signed engagement letter with

23 Molycorp after completing the negotiations?

24 A.  Yes, we did.

25 Q.  Mr. Tracy, have you been involved in negotiations for

1   other representations in the past?

2   A.  Yes, I have.

3   Q.  How would you characterize these negotiations with

4   Molycorp as compared to those prior negotiations, other

5   firms?

6   A.  The negotiations on this assignment were extensive.  From

7   a time standpoint I'd say it was comparable to negotiations

8   on other engagement letters.  But the company certainly had

9   specific areas where they were they particularly rigid

10  predominately focused on placing caps in order to contain any

11  potential fees, and they were particularly resistant on

12  anything other than 100% crediting on the monthlies.

13  Q.  Mr. Tracy, can you give us an overview of the fee

14  structure that Miller Buckfire and the Debtors ultimately

15  agreed upon?

16  A.  Sure, the fee structure in this letter is a $175,000 per

17  month, 100% credited against restructuring fees, 50 basis

18  points on debt restructure up to a $7 million dollar cap, 1%

19  of any sale fees up to a $7 million dollar cap and then 1%,

20  3%, and 5% respectively for senior debts, subordinated debt,

21  and equity subject to a $10 million dollar cap.

22  Q.  Was each of those components critical to Miller

23  Buckfire's acceptance of this engagement?

24  A.  Yes, they were.

25  Q.  Can you provide a brief description of the types of

1  consideration that go into determining the type and amount of

2  fees that Miller Buckfire will agree to in any given

3  engagement?

4  A.  Well we typically look at it as a percentage of debt,

5  prepetition debt.  We also consider the complexity of the

6  case, the amount of work that would likely be required, the

7  potential for various services such as M&A or financing

8  services.

9  Q.  Are you generally familiar with the fee practices of

10 other investment banks that do restructuring work?

11 A.  Yes, I am.

12 Q.  How are you familiar with the fee practices of other

13 banks?

14 A.  From negotiating with other banks on assignments such as

15 these from reviewing fee comps and from other negotiations

16 and discussions.

17 Q.  Mr. Tracy, do you typically look at data regarding fees

18 charged by similar advisors in other cases when you are

19 negotiating a new engagement for Miller Buckfire?

20 A.  Yes, we do.

21 Q.  Did you look at that sort of market fee information prior

22 to negotiating with Molycorp?

23 A.  Yes, we did.

24 Q.  Did you also examine market base fee information while

25 preparing Miller Buckfire's response to the limited

1  objections of the Committee in this matter?

2  A.  Yes we did.

3  Q.  Did Miller Buckfire prepare an analysis of fee

4  comparables in connection with its response to the limited

5  objections of the Committee?

6  A.  Yes, we did.

7         MS. WEISGERBER:  Your Honor, I'd like to mark

8  Miller Buckfire Exhibit 2 for identification please.

9  BY MR. WEISGERBER:

10 Q.  Mr. Tracy, are you familiar with this document?

11 A.  Yes, I am.

12 Q.  Was this document prepared by Miller Buckfire?

13 A.  Yes, it t was.

14 Q.  Was this document prepared under your supervision?

15 A.  Yes, it was.

16 Q.  What does this document represent in general terms?

17 A.  This is a set of fee comps that are applicable to

18 Molycorp.

19 Q.  Can you explain how these comps were selected?

20 A.  Sure.  We keep a data base of fee comps and transactions

21 that we're aware of in the market.  We actually have an

22 analyst, an associate responsible for preparing that and

23 maintaining all that public information.  We then query that

24 data base to find a set of comps in this case that had a

25 billion to $2.5 billion of debt ranging back to the beginning

1    of 2012 that were approved in Court.

2    Q.  Mr. Tracy, what was Miller Buckfire's basis for selecting

3    the $1 billion to $2.5 billion bringing for prepetition debt

4    for this analysis?

5    A.  We selected a range around the amount of Molycorp

6    prepetition debt of $1.7 billion that weighted equally on

7    either side.

8    Q.  And how did Miller Buckfire define prepetition debt for

9    purposes of determining the amount of prepetition debt in

10   each of these other cases?

11   A.  It's funded debt to exclude trade, environmental, pension

12   and OPEB basically funded debt.

13   Q.  And why were items like trade debt, and pension and OPEB

14   obligations excluded?

15   A.  Well trade, for instance, accounts payable we don't view

16   that as appropriate for including in the amount of

17   prepetition debt; same with environmental and pension and

18   OPEB.  We're focused on the amount of debt that was actually

19   lent to the company.

20   Q.  And what was Miller Buckfire's basis for examining cases

21   from the last three and a half years back to January 1, 2012?

22   A.  Well we focused on the most recent data set that's

23   available as the market moves over time.  So going back to

24   the beginning of 2012 gave us sufficient data points that we

25   believed it was sufficiently relevant.

1 Q.  Once you had compiled that set of cases back through

2 January 1, 2012 within the $1 billion to $2.5 billion dollar

3 prepetition debt range did you remove any cases from that set

4 based on outliers that might have distinguishing

5 characteristics or the like?

6 A.  No, we did not.

7 Q.  Mr. Tracy, can you please provide a very brief

8 description walking us through each of the columns contained

9 in this chart?

10 A.  Sure.  Starting on the left hand side --

11         MR. DESPINS:  Your Honor, sorry to interrupt you.

12 I don't think this exhibit has been admitted to evidence or

13 there's been a motion to admit into evidence and I don't know

14 if there's an intention to do that.

15         MS. WEISGERBER:  Yes.

16         MR. DESPINS:  Later or?

17         MS. WEISGERBER:  Your Honor, I'd like to move

18 Exhibit 2 into evidence.

19         THE COURT:  Okay.

20         MR. DESPINS:  And our point on that, Your Honor,

21 is that there are source documents of this which are Court

22 documents, the Court orders.  We provided all of those to the

23 Court so that I don't, you know, there's no expertise that

24 attaches to this in a sense that this is just reading

25 documents the same way that other people can.  What I'm

1  really addressing here is that we have our chart as well

2  which is based on similar orders.  And so I have no

3  objections to this chart, but it's with the understanding

4  that there's no expertise that attaches to this chart other

5  than at the end where there's an effort made to try to

6  compare to their fees and using a median and etcetera.  But

7  other than that, this is just the --

8            THE COURT:  Summary.

9            MR. DESPINS:  Summary.

10           MS. WEISGERBER:  And, Your Honor, I believe we'd

11  submit this as a summary that's admissible under Rule 1006.

12  It's based on publicly available information.  We made those

13  materials available prior to this hearing.  No one requested

14  the underlying materials but they are all items that the

15  Court can take judicial notice of.

16           MR. DESPINS:  That's fine, Your Honor, on that

17  basis.

18           THE COURT:  All right, it's admitted.

19      [Miller Buckfire Exhibit #2 received into evidence]

20  BY MS. WEISGERBER:

21  Q.  Mr. Tracy, can you please walk us through each of the

22  columns very briefly explaining what each column represents

23  in this chart?

24  A.  Sure.  On the left hand side is the company's name as

25  well as the date of filing and their advisor.  The next

1  column over lists the prepetition debt as described.  The

2  third column is the monthly fee in dollar terms.  Fourth

3  column monthly crediting on a percentage basis over a 12

4  month period.  The next column is the restructuring fee on a

5  percentage basis that being a restructuring fee as a percent

6  or prepetition debt.  The column after that includes monthly

7  fees in addition to the restructuring fees that captures

8  potential crediting.  The next section includes the financing

9  fees per DIP senior liens subordinate and equity.  And then

10  the last section includes any limitations around those

11  financing fees which include caps and crediting.

12  Q.  Mr. Tracy, I'd like to focus for a moment on the monthly

13  crediting column. The notes to the chart for this column

14  which is note four on page 3 of Miller Buckfire Exhibit 2

15  states that this column represents effective crediting

16  percentage assuming an illustrative 12-month retention for

17  comparison purposes. Can you explain what that means?

18  A.  Sure.  Any time we do these fee comps we look at the

19  monthly crediting and look at these fees on a 12-month basis

20  in order to make the comparison across different comps,

21  apples to apples, so that's the primary reason why we have

22  done this here.

23  Q.  And can you explain for the Court why a 12-month

24  retention was selected specifically here?

25  A.  Well it was specifically it was selected because this is

1  the way that we have always done it in terms of looking at

2  comps and looking at monthly crediting related to them.  And

3  it also is reflective of the fact that companies or banks

4  don't actually know how long the case will actually take when

5  they're negotiating these letters.  But we've done it to make

6  them comparable to one another, as well as our proposed fee

7  structure here.  And in this case it is also relevant in that

8  you know the likely time from when we were initially engaged

9  based upon the maturity date of the DIP would be 12 to 13

10 months.

11 Q.  Turning to the restructuring fee column, I note that the

12 restructuring fee in each comparable case is expressed as a

13 percentage rather than an absolute number.  Can you explain

14 why?

15 A.  Again, also to make it comparable across the set such

16 that you can look at the restructuring fee relative to

17 prepetition debt instead of looking at the absolute dollar

18 which doesn't give you as good of a sense in the context.

19 Q.  Mr. Tracy, what sources of information were used to

20 obtain the numbers that are represented in this chart?

21 A.  As I mentioned we used our fee data base which we keep

22 current and that information comes from you know publicly

23 available filings, news releases, press reports, other

24 information that we then include in our data base when we

25 update it.

1  Q.   Is this information maintained by Miller Buckfire in the

2  regular course of is business?

3  A.   Yes, it is.

4  Q.   And I believe you've mentioned this, does Miller Buckfire

5  update its data base when new information becomes available?

6  A.   Yes, we do.

7  Q.   Next, Mr. Tracy, I'd like to direct your attention to the

8  bottom of page 2 of Miller Buckfire Exhibit 2.  Can you

9  describe in general terms what the information in the

10  outlined box titled Summary Statistics represents?

11 A.   Sure, it highlights the mean and median, as well as the

12 high and low out of the data set in the material above for

13 monthly fee amounts, credit percentages, restructuring fee

14 percentages, restructuring and monthly as a percent of total

15 prepetition debt, as well as financing fee percentages.

16 Q.   Below that the bottom row of the chart on page 2 says

17 Molycorp, what does that row of the chart represents?

18 A.   That represents the engagement letter that you provided

19 as of May 4th and the economics of that letter.

20 Q.   Do these two sets of information allow one to compare the

21 engagement terms in Molycorp to the engagement terms of

22 advisors and various other comparable cases?

23 A.   Yes, they do.

24 Q.   Is any particular column in this chart the most

25 appropriate for comparing prior restructurings with the terms

1  in the Molycorp matter?

2  A.  No I wouldn't pick out one.  I think they're all relevant

3  and applicable.

4  Q.  So no one column is more important than the others?

5  A.  No.

6  Q.  Now I'd like to specifically discuss financing, Mr.

7  Tracy.  Can you explain generally what a financing fee is?

8  A.  Sure.  It's a fee charged by a bank for raising capital

9  set as a percentage of the amount that's raised.

10  Q.  In your experience do fee structures or investment

11  bankers ever include limitations on financing fees?

12  A.  Yes, they do.

13  Q.  Can you explain what types of limitations might be

14  included?

15  A.  In some cases there could be a fee cap as we have here in

16  Molycorp.  In other cases there are crediting either for

17  existing creditors or for parties generally.  And other cases

18  there's no creditors.

19  Q.  I'd like to discuss each of those types of limitations in

20  a bit more detail.  What is a financing fee cap?

21  A.  A financing fee cap sets a ceiling on the amount that a

22  bank could earn in connection with a capital raised such that

23  if the amount of debt and/or equity raised multiplied by the

24  percentage fee exceeds a certain level it will be capped at

25  that level and won't exceed it.

1  Q.  And does the Miller Buckfire engagement here have a

2  financing fee cap?

3  A.  Yes, it does.

4  Q.  What is that cap?

5  A.  $10 million.

6  Q.  Turning back to Exhibit 2 the comparables chart prepared

7  by Miller Buckfire. Does the chart include information

8  regarding whether there is a financing fee cap in comparable

9  cases?

10 A.  Yes, it does.

11 Q.  How many of the engagements that Miller Buckfire examined

12 in this chart have financing fee caps?

13 A.  In this case there are two out of the nine.

14 Q.  To your knowledge, Mr. Tracy, without a financing fee cap

15 how high can financing fees be?

16 A.  Well without a cap they can be unlimited.  They can be

17 unlimited to the extent that there's no cap.  It depends on

18 the amount of capital that's raised.

19 Q.  Are you aware of any cases with particularly high

20 financing fees resulting from not having a financing fee cap?

21 A.  There were two so Visteon was cited in the Committee's

22 objection.  That was one where there was a crediting but no

23 cap and I believe that was $68 or $69 million that was then

24 settled for 52.  And then in our data base there's

25 LightSquared which, again, I believe that there was no cap

1  but a crediting mechanism.  That fee resulted in I think it

2  was north of $60 million and then it was settled for $32.5

3  million.

4  Q.  The second type of financing fee limitation that I

5  believe you spoke about was fee reductions for financing from

6  existing creditors or stakeholders.  Can you explain how that

7  type of limitation works?

8  A.  Sure.  If existing creditors or equity holders or other

9  participants in the capital structures are the ones providing

10  financing then there would be a credit against the

11  restructuring transaction fee for the amount that they have

12  provided.

13  Q.  In your experience are fee reductions for financing from

14  existing stakeholders common in investment banker retention

15  agreements?

16  A.  I would say in some cases they are present and in some

17  cases they're not.

18  Q.  Does the Miller Buckfire engagement letter contain a fee

19  reduction for financing from existing stakeholders?

20  A.  No, it does not.

21  Q.  Mr. Tracy, on this note I'd like to ask you a bit about

22  the financing process to date in the Molycorp matter.  Was

23  Miller Buckfire involved in the process by which the Debtors

24  secured financing for these cases?

25  A.  Yes, we were.

1  Q.  And did the Debtors, in fact, secure DIP financing?

2  A.  Yes, they did.

3  Q.  Was the DIP financing secured from existing creditors?

4  A.  Yes, it was ultimately provided by Oak Tree.

5  Q.  Can you explain Miller Buckfire's involvement in that

6  process?

7  A.  Sure. We were involved from the beginning in preparing

8  materials to begin to market the DIP financing.  We helped

9  the company structure the financing in terms of what it would

10 look like. We put together a list of third parties to go out

11 to.  We ultimately went out to 35 parties; 29 outside of the

12 capital structure.  We ran a wholesome third party process

13 including management presentations.  We received indications

14 of interest, provision of due diligence, and negotiations

15 with various parties.

16      We also from April/May timeframe began negotiating with

17 the secured noteholders on a DIP that they would be willing

18 to provide.  We negotiated over many months with them.  And

19 then when Oak Tree ultimately provided us a proposal which we

20 had requested on multiple occasions, shortly prior to filing

21 we ran a process over that weekend negotiating between the

22 secured noteholders and Oak Tree, updating the management

23 team, restructuring committee and the board.  Helped them

24 evaluate what decisions to make with regard to that.  And

25 subsequent to the initial first day hearing and prior to the

1    second hearing, we also ran another process between the tens

2    and Oak Tree to obtain the best possible financing.

3        And then we did that a third time between the second

4    hearing and the final DIP hearing which we spent significant

5    time negotiating between the parties to optimize the terms

6    both from an economic standpoint, from a case flexibility

7    standpoint, from a structural standpoint.

8    Q.  Was Miller Buckfire involved in any Court proceedings

9    relating to the financing?

10   A.  Yes, we were.  We were involved in, we were present at

11   all three, helped the company prepare for all three and we

12   provided testimony on two occasions.

13   Q.  Mr. Tracy, the third type of financing fee limitation I

14   believe that you mentioned was crediting financing fees

15   generally against other fees, is that correct?

16   A.  Yes that's correct.

17   Q.  And can you explain what you mean by that type of

18   arrangement?

19   A.  The same crediting mechanism as described for existing

20   capital structure investors except its provided generally.

21   So in other words, if we raised financing some portion of

22   that financing would be credited against a restructuring fee.

23   Q.  Does the Miller Buckfire engagement letter in this matter

24   involve a general crediting provision?

25   A.  No, it does not.

1  Q.  Why not?

2  A.  Well as part of the negotiations with the company as I

3  mentioned they were insistent upon 100% crediting of the

4  monthlies and they were also very focused on having caps on

5  all of the fees.  And as part of that negotiation when we

6  signed the original letter, we agreed to the 100% monthly

7  crediting against the restructuring fee with the agreement

8  that the company would agree, which they did in that letter,

9  that we would not be crediting our financing fees against the

10  restructuring fees as well.

11  Q.  Mr. Tracy, in your experience what types of consideration

12  might go into determining whether Miller Buckfire would agree

13  to a provision generally crediting financing fees against

14  other fees in a retention?

15  A.  Well I think it depends on the overall economics that are

16  being negotiated. We try and be flexible.  Many of our

17  clients have different views as to things that are important

18  to them and we try and accommodate them accordingly.  From

19  our perspective the amount of debt is used as a benchmark in

20  the standard across the industry.  We also try and evaluate

21  the complexity of the assignment, the amount of work that

22  will be required and the services that will be required.

23  Q.  Turning away from the financing fee focus I believe you

24  mentioned earlier that there is crediting of Miller

25  Buckfire's monthly fees in the engagement fee structure, is

1  that correct?

2  A.  Yes, that's correct.

3  Q.  Can you explain how that works?

4  A.  Sure, the monthly fees that are earned will reduce a

5  100%, will reduce the restructuring fee that we earn by a

6  100% of the amount paid under the monthlies.

7  Q.  In your experience, Mr. Tracy, is 100% crediting of

8  monthly fees against restructuring or sale transaction fees

9  common in investment bank of retention agreements?

10 A.  No.  That level of crediting is uncommon and, in fact, I

11 had not seen another letter where there's been a 100%

12 crediting of all monthly fees.

13 Q.  And turning back to Miller Buckfire Exhibit 2 the

14 comparables chart that Miller Buckfire prepared, do any of

15 those engagements involve 100% crediting of monthly fees

16 against any other fees?

17 A.  No, they do not.

18 Q.  Turning next to the restructuring fee in this matter for

19 Miller Buckfire.  How does Miller Buckfire's restructuring in

20 the Molycorp matter compare to the other cases that Miller

21 Buckfire looked at in Exhibit 2?

22 A.  So if you look at the monthly and restructuring fee

23 column Miller Buckfire's engagement letter represents 42

24 basis points relative to the mean and median; I'm sorry the

25 median of .46 and the mean of .47.

1          MS. WEISGERBER:  I'd like to mark Miller Buckfire

2    Exhibit 3, Your Honor.

3          THE COURT:  All right.

4        [Miller Buckfire Exhibit 3 marked for identification]

5    BY MS. WEISGERBER:

6    Q.  Mr. Tracy, do you recognize this document?

7    A.  Yes, I do.

8    Q.  Is this a copy of the Committee's comparables chart that

9    was submitted in support of its limited objection?

10   A.  Yes, it is.

11   Q.  Is this the original chart that was submitted with the

12   Committee's objection?

13   A.  No, it's not.  I believe this is the second version.

14   Q.  And was this submitted this morning in this matter, Mr.

15   Tracy?

16   A.  Yes.

17   Q.  Now focusing on the chart contained in this submission

18   which I believe begins at the fourth page of the document.

19          THE COURT:  Which page; I'm sorry?

20          MS. WEISGERBER:  The fourth page of the document.

21   The fourth stapled page.  It's the beginning of the chart

22   that states revised Exhibit A.

23          THE COURT:  Okay.

24   BY MS. WEISGERBER:

25   Q.  Mr. Tracy, does this chart contain --

1    THE COURT:  I'm sorry it says page 2 of 16 on top?

2         MS. WEISGERBER:  Yes, correct.

3         THE COURT:  Thank you.

4  BY MR. WEISGERBER:

5  Q.  Mr. Tracy, does this chart contain cases that the

6  Committee has submitted the terms of as part of their

7  objection?

8  A.  Yes, it does.

9  Q.  Mr. Tracy, do you have any understanding of how the

10 engagement listed here were selected by the Committee?

11 A.  I do not.

12 Q.  Do you have any understanding of why these engagements

13 were listed as comparable to Miller Buckfire's retention in

14 this matter?

15 A.  I don't.

16 Q.  Mr. Tracy, are you generally familiar with any of the

17 engagements involved here?

18 A.  Yes, I'm generally familiar with some of them.

19 Q.  In your opinion are the engagements listed on the

20 Committee's chart with which you are familiar comparable to

21 Miller Buckfire's engagement in this matter?

22 A.  I'm not sure.  There are many of them on here. I would

23 have to pick certain ones out to look at them and understand.

24 But I know that they range from approximately $375 million of

25 debt to $29 billion of debt and that they also go back, I

1  believe, ten years.  So I think it's a range that some may be

2  comparable and some are likely not.

3  Q.  In your opinion, Mr. Tracy, is it important to use cases

4  with similar size for sufficient debt for purposes of

5  comparison?

6  A.  Yes, I believe it is.

7  Q.  Why?

8  A.  Because that's a typical benchmark that's used.  And the

9  reason it's used is because people tend to look at the amount

10  of prepetition debt relative to the complexity of the case.

11  And I recognized that there can be smaller cases that can be

12  just as complicated as some of the larger cases.  But that's

13  a typical benchmark that's used in the industry.

14  Q.  And you mentioned that the Committee's chart contains

15  engagements that go back about 10 years.  You testified

16  earlier that Miller Buckfire's chart, Miller Buckfire Exhibit

17  2 goes back to only January 1st, 2012, is that right?

18  A.  That's correct.

19  Q.  In your opinion is it important to use recent cases when

20  conducting a market comparison?

21  A.  Yes, I think it's helpful to use as recent data as

22  possible.  I think if we had extended our data set back

23  further it probably based on the 2008/2009 timeframe would

24  provide even more positive data as it relates to the market

25  [indiscernible] of our fees.

1  Q.  Mr. Tracy, in your opinion is Miller Buckfire's fee

2  structure in this matter comparable to those fees generally

3  charged by investment bankers similar to Miller Buckfire for

4  comparable engagements?

5  A.  Yes, it is.

6           MR. DESPINS:  Objection, Your Honor; I don't think

7  he's been qualified as an expert.  He can testify about the

8  engagements, but he's not an expert on, as far as I know, he

9  hasn't been qualified as an expert on fee for investment

10  bankers in Chapter 11 cases.

11           MS. WEISGERBER:  Your Honor, this is an opinion by

12  a lay witness which he's well qualified to give based on his

13  prior involvement in fee negotiations and his knowledge of

14  other fee structures and comparable arrangements that is

15  admissible under Rule 701.

16           MR. DESPINS:  His opinion is that, Your Honor, we

17  have on problems.

18           THE COURT:  Okay.

19  BY MS. WEISGERBER:

20  A.  Yes, it is.

21           MS. WEISGERBER:  No further questions.

22           THE COURT:  Okay thank you. Take a quick moment.

23  Is counsel for Furniture Brands here?

24           UNIDENTIFIED SPEAKER:  They're outside, Your

25  Honor.

1        THE COURT:  All right they can wait then.  If they

2   were chaffing at the bit I was going to give them a moment.

3   That's all right.  I assume there's cross.

4        MR. DESPINS:  Yes, Your Honor.

5                    CROSS EXAMINATION

6   BY MR. DESPINS:

7   Q.  Good afternoon, Mr. Tracy.

8   A.  Good afternoon.

9   Q.  Just want to clarify something.  You are the lead Miller

10  Buckfire person on this engagement?

11  A.  Yes on a day to day basis, that's true.

12  Q.  Yes.  And maybe I'm confused by it I was under the

13  impression that a prior engagement letter had been signed by

14  Miller Buckfire prior to Exhibit 1, Miller Buckfire Exhibit

15  1.  Wasn't there a letter signed before this engagement

16  letter?

17  A.  Yes, there was a letter signed on December 22nd.

18  Q.  And that letter did not contain the financing fee, is

19  that correct?

20  A.  No that letter included an agree to agree on financing

21  fees.  So it said to the extent company requested financing

22  services of Miller Buckfire that we would agree to market

23  terms at that time; however, those financing fees would not

24  be credited against a restructuring fee.

25  Q.  So when you described the negotiation went back and forth

1  did that take place in December or in May, because I think

2  you described it in the context of a May letter?  Did that

3  appear twice?

4  A.  It did.  It occurred in December in the context of

5  negotiating the monthlies and whether or not a financing fee

6  would be credited.  It then came up again in May when we

7  modified the letter to include the market financing fees.

8  And at that point in negotiations with the company's general

9  counsel they insisted on a cap of those fees.

10 Q.  But the 100% crediting was already in place before you

11 agreed to the cap on the financing fee, correct?

12 A.  Before we agreed to the cap yes, but not before we agreed

13 that they would not be credited against a restructuring fee.

14 Q.  Restructuring fee or financing fee?

15 A.  The DIP financing fee would not be credited against a

16 restructuring fee.

17 Q.  I see.  By the way Miller Buckfire represents Oak Tree

18 on matters, does it not?

19 A.  I suspect that we have in the past.  I'm not aware of any

20 representations that we have with Oak Tree at the moment.

21 Q.  And you didn't disclose that in your application?

22 A.  I believe that we did.

23 Q.  You did disclose that in your application that you

24 represented Oak Tree on --

25 A.  I believe that we disclosed in our application that we

1  represented creditors involved in this case from time to

2  time.  I don't think there's a specific name referenced.

3  Q.  Okay.  Why is there no specific disclosure of the Oak

4  Tree representation?

5  A.  Well we represent creditors and other groups all the

6  times.  There could be numerous creditors in this capital

7  structure that we represented in the past and/or currently

8  and I think the general disclosure was what our counsel felt

9  comfortable with.

10  Q.  But in the Excel case; you familiar with the Excel case

11  in front of Judge Drain?

12  A.  Yes I am.

13  Q.  In that case you made a specific representation that you

14  represented Oak Tree, right?  You spell that out in that

15  case, correct?

16  A.  I don't recall that specific retention application.

17  Q.  It was your own declaration.  You don't recall

18  specifically?

19  A.  I don't recall that.

20  Q.  Going back to the issue of the lead --

21          THE COURT:  I'm sorry I didn't understand that

22  there were issues about disclosing in connection with your

23  objection.

24          MR. DESPINS:  And there were none until this

25  weekend where we actually did a bit of background work,

1  realized that Mr. Tracy submitted the declaration in support

2  of his retention in the Excel case disclosing in a separate

3  paragraph that they represent Oak Tree which was news to us

4  until this weekend.

5          MS. WEISGERBER:  Your Honor, I'm going to object

6  to this questioning.  It's not an issue that's before the

7  Court.  It was not part of their objection.

8          MR. DESPINS:  Your Honor, it's a separate core of

9  our -- but again we just learned of this, this weekend.

10         THE COURT:  Well no I'm not trying to limit what

11 I'm allowing you to discuss with the witness.  I just was

12 curious because I read the papers and I didn't see this, so

13 I'm wondering where you were going.

14         MR. DESPINS:  You're absolutely correct that it

15 was not in our papers.  Your Honor, as I said we just figured

16 this out this weekend when we saw this declaration from Mr.

17 Tracy and the Excel case.

18         THE COURT:  Well I'll allow this.  I mean I'll

19 allow you to examine him on this issue if you wish.  I'm just

20 trying to figure out if I missed something which happens all

21 the time.

22         MR. DESPINS:  Okay.  We'll come back to that.

23 BY MR. DESPINS:

24 Q.   Going back to the issue of the lead partner -- not

25 partner but of the lead person at Miller Buckfire on this

1  engagement.  Have you ever been the lead in a Chapter 11 case

2  prior to this one?

3  A.  Excel Maritime.

4  Q.  Okay so you're the lead in Excel Maritime.  And what's

5  the size of that case?

6  A.  It's approximately a billion dollars of debt.

7  Q.  And was that on your series of comps?

8  A.  I believe it was.

9  Q.  It was?

10  A.  Yes it is.

11  Q.  Okay Other than the Excel Maritime have you ever been the

12  lead on any Chapter 11 case?

13  A.  I've worked on several, but to be the lead, no.

14  Q.  No.  Okay you've been the managing director for four

15  years?

16  A.  I believe five years, I believe.

17  Q.  2011?

18  A.  2011 correct.

19  Q.  Okay so we're in 2015, so four years and some.  Have you

20  been qualified as an expert on valuation in any case?

21  A.  On valuation no.  I was called by as an expert providing

22  testimony in Delaware in front of Judge Carey related to

23  breakup fees and also to purchase price adjustment.

24  Q.  Okay and is there a provision in the engagement letter

25  that contractually obligates to have Miller Buckfire make

1  yourself available as the person working on this case?

2  A.   There is not.

3  Q.   Is there any other provision in that engagement letter

4  that provides that somebody else needs to work on this case,

5  be personally involved in the case, or something along those

6  lines?

7  A.   I suspect that you're referring to a paragraph in there

8  that requires that Ken Buckfire will be involved in the case.

9  Q.   Correct.   So there is a contractual provision to that

10  effect, correct?

11  A.   Yes, that is there.

12  Q.   Has Mr. Buckfire been in Court in this case so far?

13  A.   He has not been in Court, no.

14  Q.   Okay remember you testified about the 17 board meetings

15  you've had or board calls you've had.   Mr. Buckfire was on

16  these calls?

17  A.   He's been on some; not all.   He was actually in Toronto

18  with me last week at a board meeting.

19  Q.   No but I'm talking about prior to last week, was he

20  involved in these board meetings deciding which DIP lender to

21  choose?

22  A.   He's been on some, not all.

23  Q.   Okay out of 17 how many would he have been on?

24  A.   I don't know exactly.

25  Q.   Okay.   More than two?

1  A.  Yes.

2           MR. DESPINS:  Your Honor, if I can explain that.

3  I mean they want us to adopt a holistic approach with all due

4  respect to the witness he's been the managing director for

5  four years; never been qualified as an expert on valuation.

6  He wants to charge or they're charging Ken Buckfire fees and

7  the company insisted contractually for Mr. Buckfire to be

8  involved personally in the deal.  And as far as we know Mr.

9  Tracy is the lead actually.  He testified that he is the

10  lead.  So I'm not saying that's dispositive in itself, Your

11  Honor, but I think it goes to the issue of you want to review

12  the fees in the context of fees I think that this is an issue

13  that goes to the holistic approach on fees.

14           MS. WEISGERBER:  Your Honor, we would submit that

15  this is far field from the holistic approach to fees.  They

16  market comparison an exercise that is part of the 328

17  inquiries.  It's one of reasons regarding the fees.  It's not

18  regarding individuals who may or may not be working on the

19  representations.

20           THE COURT:  Well you can't.  There's perhaps

21  nothing more personal to a professional than what fee that

22  professional merits and can change.  If you had a first year

23  associate in here charging $850 an hour we'd be having a

24  discussion not just that $850 an hour is a market fee for a

25  bankruptcy professional in New York; it is.  But it's not a

1  market fee for a first year associate; yet, in New York.

2  Maybe I'm misstating that.  I don't think it is.  So I think

3  it is relevant so I'll allow this testimony.

4  BY MR. DESPINS:

5  Q.  Let's go to your chart for a second.

6          MR. DESPINS:  And I apologize to the Court.  I'm

7  going to take some of this a little bit out of order.

8  BY MR. DESPINS:

9  Q.  But let's look -- and you understand what I mean by your

10  chart; the chart that you prepared. Do you have it handy?  Do

11  you have it in front of you?

12  A.  I do.

13  Q.  Okay great.  The spectrum that you used or the filter you

14  used is $1.2 billion or $1 billion to $2.5 billion?

15  A.  $1 billion.

16  Q.  $1 billion okay.  And you mentioned that the debt size is

17  typical, so how did you determine that whether it's typical?

18  Is there some kind of reference point that you have that

19  people build on that basis?

20  A.  I'm not sure I understand your question that the debt

21  size is typical.

22  Q.  This whole analysis is based on one fact, right, which is

23  that [indiscernible] cases that are in the spectrum of $1

24  billion to $2.5 are relevant to the Court's analysis today of

25  whether your fee is market or not, correct?

1  A.  You're referring to prepetition debt as being used as a

2  benchmark for calculating fees as a percent of the amount of

3  debt.  Yes it's a benchmark.  It is a useful benchmark.  I

4  don't think it is the only information that's available.  I

5  think it also depends upon the complexities of the case and

6  the likely work and effort that would be required.

7  Q.  Okay so let's take this in pieces.  Let's assume that you

8  have two deals with a $7 million dollar restructuring fee, so

9  yours is $7 million here, correct?

10  A.  Correct and then have prior to crediting yes.

11  Q.  Okay.  So let's assume there's some other deal that's

12  also $7 million dollars.  But the debt in that case is $850

13  million dollars.  Not relevant to the Court what happened

14  with the crediting in that case?

15  A.  Sure the crediting is relevant in any case.  I think the

16  relevance between those two scenarios are things that you

17  know we're unaware which are what are the other complexities

18  of the case and what are the difficulties or risks of getting

19  restructuring completed and/or the other services provided.

20  Q.  Well that's true but we don't know that by this case

21  either.  When assigned this you had no idea how complex this

22  case would be and you didn't know that you had three DIP

23  hearings, did you?

24  A.  We didn't know that we would have three DIP hearings.  We

25  did expect this case to be particularly complex.

1  Q.  Okay.  The complexity has nothing to do with the size of

2  the debt, wouldn't you agree with that?

3  A.  In some cases it can be related.  And I think people

4  generally view that larger cases with more constituents, with

5  more complexity in the capital structure usually requires

6  more work and more skill in terms of negotiating a successful

7  outcome.

8  Q.  Well the amount of the debt doesn't mean more

9  constituents in a sense that for example this case.

10  A.  Not necessarily.  In many cases it turns out that way but

11  it doesn't necessarily mean that.

12  Q.  In this case there are actually very few constituents,

13  right?

14  A.  I don't know that I would say there are very few

15  constituents.  There are some concentration certainly amongst

16  the tens and Oak Tree has you know its position as well.  But

17  I don't know that I would say there are very few constituents

18  here.

19  Q.  Well are you saying that every holder of convertible debt

20  is a constituent or you look at the convertible debt as one

21  constituent?

22  A.  We look at that as a constituent.

23  Q.  Okay so there are three constituents in this case,

24  correct?

25  A.  The way you're describing it yes.

1  Q.  Okay.

2            THE COURT:  Don't forget yourself.

3            MR. DESPINS:  I was going to say perhaps some of

4  these people that I just listed are also constituents.  Time

5  will tell.  And I'm not taking a position on that today

6  that's for sure.

7  BY MR. DESPINS:

8  Q.  So let's go through, continue with your chart.  Is it

9  fair to say that out of 15 cases that you picked you only

10 have two in 2015?

11 A.  Between $1 billion and $2.5 billion approved by the

12 Court, yes.

13 Q.  I was talking about your chart.

14 A.  I'm referring to my chart as well.

15 Q.  So only two, correct?

16 A.  Yes.

17 Q.  Okay and six for 2014 out of 15?

18 A.  That's my count.

19 Q.  Okay you said, however, that the term of the amount

20 changes over time, fair?

21 A.  Fair.

22 Q.  Okay and therefore the more recent the case is the more

23 it's indicative of recent trends in terms of?

24 A.  Generally speaking yes.

25 Q.  Okay let's go back to the chart.  Look at this box you

1  have at the bottom there which is your summary statistics.

2              MR. DESPINS:  It's in summary statistics, Your

3  Honor.

4              THE COURT:  Yep.

5  BY MR. DESPINS:

6  Q.  So let's go to the right hand side of this chart.  You

7  see if you follow the header it says equity on top.  And then

8  you go all the way down in your box you say high 6%, medium

9  5%, etcetera.  You see that?

10 A.  Yes, I see it.

11 Q.  I want to be clear about this when you did this meeting

12 in May you did not factor in at all the fact that there were

13 50% credit mechanism in some cases and in some cases zero

14 percent financing fees for existing creditors, did you?

15 A.  No we didn't try and capture the crediting mechanism in

16 those numbers. We were trying to illustrate the percentage

17 amounts and then related to that we captured the limitations

18 including caps and crediting to the right of that.

19 Q.  Okay so what that means practically such as since I'm not

20 very good at math but I think I understood this.  That your

21 numbers because there's no crediting are way off the charts

22 on the equity side, were they not?

23 A.  Well it depends.  You don't know in each of the comps

24 that are listed here there's a different crediting mechanism

25 and you don't know who the capital would be provided for.  So

1  in a case for instance CEDC, Central European Distribution

2  Corp. there's a crediting mechanism for the equity sponsor

3  but not for third parties.  So we wouldn't have a way to

4  accurately reflect that on a percentage basis. So we tried to

5  highlight the fact where there was crediting how it

6  functioned, but there's no practical way to then factor that

7  into the financing fee percentage.

8  Q.  Look at Altegrity, there's a 50% crediting right off the

9  box, correct?

10 A.  Yes, there is.

11 Q.  Okay so when you listed them at 5% in your analysis the

12 practical effect of that on the restructuring fee is much

13 lower, isn't it, because crediting at 50%?

14 A.  In that case you don't know whether or not there would be

15 any of this capital raised and whether it would be provided

16 in Altegrity, for instance, by the existing sponsor,

17 providence equity or some third party. So, again, we didn't

18 try and capture any of the limitations in those percentages.

19 But we did try and make clear what those limitations were.

20 Q.  Okay but, in fact, there is financing in these cases

21 where there's a check and your numbers because you have none

22 of these features other than the cap would be way off the

23 chart, would they not?

24 A.  So if taking CEDC, for example, if there were equity

25 provided by the sponsor then there would not be an equity

1  fee.  If there were equity provided by a third party there

2  would be an equity fee.

3  Q.  Let me go back to; I know you love that case, but let's

4  go back to Altegrity.  Fifty percent crediting if there's

5  financing there your numbers are completely skewed by that

6  financing, correct, because there's a 50% credit?

7  A.  So in Altegrity, just to be clear, if the sponsor

8  Providence were to provide the equity that would reduce the

9  equity percentage entirely.  If a third party were to provide

10  it, it would reduce it by 50% so 2.5%.  But I would also

11  point out in Altegrity, you know there's monthly crediting

12  that is significantly below our 100% crediting.

13  Q.  We'll get to the monthly crediting in a minute.  That

14  doesn't mean to dial the same way that the -- we'll come back

15  to that in a second.  Okay so by the way it's not only

16  Altegrity, but you have, even on your chart you have others.

17  Endeavor existing creditors; so there if I look at your chart

18  you know if I read it correctly there would be no financing

19  fee if existing creditors provide the financing.

20  A.  So on Endeavor, for instance, there's zero monthly

21  crediting.  There are one, three, five financings and then if

22  existing creditors provided the equity financing I believe

23  that's correct.  It would not be a financing fee; although,

24  my understanding is that that case is likely to result in a

25  mid to high teens total fee for the advisors there which is

1  similar to where our caps are if applied across all of the

2  restructuring sale and financing fees.

3  Q.  Okay.  Putting aside the issue of the, you said the

4  amount of prepetition debt is a useful tool fine, but would

5  you agree with the following that a restructuring fee in the

6  zone of $4 to $7 million dollars can be looked at the Court

7  as a comp in this case?

8  A.  I'm not sure I understand your question.

9  Q.  None of these as comparables as the determining factor in

10  comparables or they need the size of the prepetition debt.

11  And shouldn't that $1 billion dollars of prepetition debt not

12  on your list, agreed?

13  A.  Agreed.

14  Q.  Okay.  And you've also established that that's a useful

15  tool but by no means the exclusive tool.  And sometimes you

16  have fees in cases that are less than a billion dollars of

17  debt where the fee is $5, $6, $7 million dollars, agreed?

18  A.  I'm sorry.

19  Q.  In cases where the amount of prepetition debt is less

20  than a billion dollars there are cases and such category

21  where the restructuring fee is in the $4 to $7 million dollar

22  range?

23  A.  That's possible.

24  Q.  And do you believe that these cases can be used by the

25  Court as a comparable to our case when determining the issue

1  of crediting?

2  A.  I think you're asking if we searched our data base by fee

3  amount as opposed to prepetition debt, is that your question?

4  I've never contemplated it in that fashion.  I'm not aware of

5  others who have.

6  Q.  Well actually let me ask you this.  Does your data base

7  go below a billion dollars of prepetition debt?

8  A.  No specifically it does not.  Oh I'm sorry this concept;

9  the data base does.  This concept does not.

10  Q.  So did you look, did you peek below one billion just to

11  see what it says?

12  A.  No, I did not.

13  Q.  Let's talk about the cap.  In your declaration you talk

14  about the fact and I think I want to read from it because

15  page 9, sorry page 5, paragraph 9.  Let me find it.  I

16  apologize it's here somewhere.  --

17              THE COURT:  Which --

18              MR. DESPINS:  I'm sorry declaration of Mr. Tracy

19  it's --

20              THE COURT:  The supplemental one?

21              MR. DESPINS:  Yes it is the supplemental one.

22              THE COURT:  10(a) on the agenda, I think.

23              MR. DESPINS:  Yes.

24              THE COURT:  Docket item 188:

25              MR. DESPINS:  No I believe it's 377.  Sorry it's

1  attached to the joint reply of the Debtors and Miller

2  Buckfire which is docket number 377.  It's an exhibit to that

3  joint reply.

4              THE COURT:  Okay.

5  BY MR. DESPINS:

6  Q.  There's a sentence at the end of this that I'll read it

7  very precisely.  The Miller Buckfire chart, that's the chart

8  we've just been discussing, shows that a combination of

9  financing fee caps and, you underline the word and, financing

10 fee crediting is not market norm.  Okay that statement is

11 based only on your chart, correct?

12 A.  That's correct.

13 Q.  And let's talk about the cap here.  What's and so in your

14 words the fact that you've agreed to a cap on your financing

15 fee sort of motors these other arguments regarding crediting

16 or elimination of financing fees for existing creditors,

17 would that be a fair statement?

18 A.  No I don't think so.  We view the cap like any other term

19 is part of the whole.

20 Q.  Let's assume for a second that you and [indiscernible]

21 for me a second that the cap was not $10 million dollars but

22 it was a billion dollars, would you think the Court could

23 attribute any value to that cap?

24 A.  At a billion dollars, no.

25 Q.  Thank you.  So then let's focus on the $10 million dollar

1  cap. Tell me how it's possible for you to reach that cap in

2  this case?

3  A.  Well the simple illustration would be $200 million of

4  equity.

5  Q.  Okay.  You think it's possible in this case to have

6  somebody invest $200 million dollars of equity without also

7  becoming the owner of the company, more than 50% owner of the

8  company?

9  A.  Is it possible for someone to invest $200 million in this

10  circumstance I think absolutely.  Is it possible for or is it

11  likely than someone will invest $200 million and not own the

12  company?

13  Q.  Yes.

14  A.  I think that's probably unlikely.

15  Q.  Okay so now we've established that $200 million construct

16  would involve a sale of the company practically, right?  I

17  mean if you're going to own more than 50% of the company

18  through an equity infusion you're buying control of the

19  company, are you not?

20  A.  Well it depends on how you're defining it.  It would not

21  have been a sale process it would be in the construct that

22  we're discussing, it would be an equity investment, but the

23  investor would own likely more than 50% of the company.

24  Q.  So in your view that's not a sale?  So I'm giving you

25  $200 million dollars and I now own 100% of the equity of the

1  company.  The company was just not sold right now under that

2  construct?

3  A.  Well you were referring to someone investing $200 million

4  for more than 50% of the equity.  I will tell you it's

5  certainly a gray area as to whether that's an investment or a

6  sale, but it would depend upon how it's structured.

7  Q.  Let's take the 10% holders.  Remember they made a

8  proposal regarding the DIP financing.

9  A.  Yes.

10  Q.  They were going to convert their DIP financing into what

11  percentage of the company?

12  A.  Well they're ultimately converting it into either amended

13  tens or preferred equity but it was for the majority of the

14  equity of the company.

15  Q.  So under that context would there be a financing fee?

16  A.  Under the context of converting the DIP into preferred

17  equity?

18  Q.  Yes.

19  A.  No.

20  Q.  Okay let's assume a third party comes in here and says I

21  will invest $200 million dollars in this company but I want

22  to control a 100% of the equity. Are you entitled to

23  financing fee in that context or is that a sale?

24  A.  Again I think it becomes down to the particulars as to

25  how it's structured, but it would either be a financing or a

1  sale.

2  Q.  Okay but well let's talk about this case and your

3  engagement letter. Are you entitled to the financing fee and

4  a sale fee at the same time?

5  A.  No in that construct we're not entitled to both a

6  financing fee and a sale fee.

7  Q.  Okay and which one would you have?

8  A.  I think it depends on how it's structured.

9  Q.  Okay so in that context the $200 million, assuming for a

10 second nobody's going to invest $200 million in this company

11 without also pending control what's the usefulness of the cap

12 of $10 million dollars?

13 A.  Well if someone were to invest $200 million plus and

14 there were to be a fee due on the financing as part of that

15 then it would be capped at $10 million dollars.  Anything in

16 excess of that would not be paid.

17 Q.  Can you conceive that the scenario in this case or

18 somebody would actually put that money in the company without

19 obtaining more than 50% of the voting stock of the company?

20 A.  No as I said previously I don't expect that to be the

21 case.

22 Q.  And let's move on from the cap.  The sentence in your

23 retention says it's not market to have a fee crediting and a

24 cap so would you agree that the reverse is true.  That if

25 there's no cap so, for example, or the terms that there will

1  be no cap on the financing that it becomes market to have the

2  crediting mechanism?

3  A.   In some cases that would be there and in some cases it

4  would not.

5  Q.   No I'm talking about this case, sir.

6  A.   Well I don't know what's going to be approved in this

7  case so I can't tell you.

8  Q.   Well you've made a sort of proposal to the Court,

9  correct, a [indiscernible] proposal.  In your joint reply

10  that Miller Buckfire filed for the Debtor you made a proposed

11  for lack of a better term, a proposal to the Court to modify

12  your engagement letter, do you recall that?

13  A.   Yes.  And we are flexible in trying to resolve this issue

14  and happy to make modifications that if it gets the Courts

15  approval and gets the Creditors Committee on board to modify

16  the crediting in exchange of the financing fee in exchange

17  for modifying the crediting of the monthly fees I think as

18  outlined in our reply.

19  Q.   So your proposal to be clear and you just stated so I

20  don't misstate it what is the proposal exactly?

21  A.   It was crediting after five months -- well I'm sorry;

22  step back.  On the financing fees it would be crediting 50%

23  of the financing fees subject to the $10 million cap.  On the

24  monthly side, it would be zero crediting of the monthlies for

25  the first four months and then 50% crediting thereafter.

1  Q.  Okay but didn't you forget one part of it which is that

2  you don't want the financing fee to apply to the deal that

3  the Court just approved on the DIP financing?  You want to

4  have that full fee of $1.53 million dollars not creditable

5  meaning that you get that and there's no offsets of any kind?

6  A.  Yes that's correct.

7  Q.  So let's talk about that for a second.  If I'm

8  understanding correctly your approach on that is that we'll

9  work really hard and therefore there should be no crediting.

10 Have you ever seen an engagement letter that actually allows

11 for this type of dual reading that you can go back to Court;

12 you're approved under 328 and you go back to Court and say

13 gee golly we've worked really hard on this deal, we don't

14 want a crediting mechanism to apply.  Have you ever seen that

15 in your career?

16 A.  We aren't proposing any sort of a do over.  And we are

17 happy to try and make accommodations if that gets the support

18 of the Court and of the Debtors other constituents, but we're

19 not trying to do anything over.

20 Q.  Well okay.  Assuming just for a second it's stipulated

21 that you're not agreeing with that as a fundamental

22 proposition.  But assuming for a second that is market to

23 have a 50% credit of the financing fee against the

24 restructuring fees, what, have you ever seen an engagement

25 letter that allows the investment banker to somehow get an

1  exemption of that on a basis that they work harder than they

2  thought they would?

3  A.  I'm still not sure I understand the question.  We're not

4  looking to try and re-write our engagement letter based upon

5  what's happened today.  We're happy with our engagement

6  letter as it is if it gets approved by the Court.  We're

7  simply offering to make accommodations to garner the

8  Creditors Committee support.

9  Q.  Okay.  By the way if the Court approved the engagement

10  letter today unchanged you could earn $15 million dollars in

11  this case, correct?

12  A.  I believe that's correct.

13  Q.  And do you think that $15 million is 15 is market for a

14  case of this size?

15  A.  Yes, I do.

16  Q.  You have precedence where I want to make sure is there a

17  $15 million dollar total fee?

18  A.  I haven't looked at the total fees on this chart.

19  Actually I can tell you that I do know that Kodak was, I

20  believe, $27 or $28 million.  I think the expectation as I

21  mentioned in [indiscernible] would be mid to high teens.  But

22  other than that I haven't looked at any of the others;

23  although I will say LightSquared largely due to a financing

24  fee was 32.5.

25  Q.  Okay now let's switch and talk about our chart, the

1   Committee's chart.  Do you have any, do you disagree with any

2   of the what is reflected there, I mean in a sense of, I

3   understand you don't think they have the necessarily good

4   comps, but putting that aside.  Do you disagree with anything

5   contained in that chart?

6   A.   That's a very generally question.  I can only say that

7   I'm not, it's no clear to me exactly how that information was

8   queried in terms of selecting a criteria for which those fee

9   comps would be comparable to Molycorp.

10            MR. DESPINS:  Your Honor, would it be possible to

11  have like a 10 minute break to just to because that would be

12  more efficient if I can just wrap up quickly after that.

13            THE COURT:  Yeah let's do this then because we are

14  running past when my other hearing was.  We'll take a recess

15  to allow you to get organized, not organized, but --

16            MR. DESPINS:  Well organized, that's fine; that's

17  fine.

18            THE COURT:  I didn't mean it that way.  And  in

19  the interim I'll take my FBI hearing and that should not take

20  long.  We just have to schedule something but it's also a

21  status conference so I'm not quite sure how long it will

22  time.  In the interim, sir, you may not discuss your

23  testimony with any person.  You're still under cross.

24            If you can just clear the tables that would be

25  great.  No need to worry about the boxes or the bags.  If

1  you're going to chat, if you want to chat whatever, please go

2  out in the hallway so that you don't interrupt the hearing,

3  that's all.  And if you need to use one of the rooms they

4  should be open to use that.  All right so take a little

5  recess.  We'll take the FBI case as soon as everybody can

6  sign in and we'll reconvene after that.

7        [Recess 2:37:59 - 3:02:15]

8            THE CLERK:  All rise.

9            THE COURT:  Please be seated.

10           MR. DESPINS:  Your Honor, very limited number of

11  questions.  It should go fairly fast.

12  BY MR. DESPINS:

13  Q.  In your I believe it's your supplemental declaration you

14  disclosed the fact that this was heavily negotiated with the

15  company and that, in fact, Miller Buckfire gave the company

16  some comps.

17  A.  Yes.

18  Q.  So what are those comps that you gave the company?

19  A.  Well I don't have them right here but they were a set of

20  comps that we looked at to evaluate fees?

21  Q.  And did you give them your own comps on other deals?

22  A.  I don't recall what was in the comp set but I would

23  expect that it probably had some of other deals in it.

24  Q.  And, for example, would you have given them the Dura case

25  you would know because you worked on the Dura case, correct?

1  A.  I did work on Dura case.

2  Q.  So do you remember giving them the Dura case as one of

3  the comps?

4  A.  I don't recall.  We looked at a spread of comps similar

5  to the one that we have here.  I don't remember specifically

6  whether Dura was in that or not.

7  Q.  Was there ever any discussion of not having a fee,

8  financing fee I should say with respect to financing raised

9  from existing creditors?  Creditors are parties already in

10 the capital structure.

11 A.  In this case?

12 Q.  Yes. We're referring to the negotiations with management

13 or whoever you're negotiating with. Was there ever a

14 discussion of not having a financing fee or having a reduced

15 financing fee for financing raised from people already in the

16 capital structure?

17 A.  Yes, I believe it was raised as existing creditors and/or

18 external creditors. And, again, as part of the December

19 engagement letter we agreed with the company that financing

20 fees would not be credited.

21 Q.  Okay you also testified that if we're referring to your

22 study, your analysis and if we're focusing on the box at the

23 bottom that I think your testimony was that all these bullet

24 points are important, something along those lines, do you

25 recall saying that?

1  A.  I don't recall saying that but I do recall saying that

2  all of the data is reflected in the summary statistics.

3  Q.  What I mean by, maybe I wasn't precise enough, that the

4  prepetition; forget the prepetition debt.  The monthly fee,

5  the monthly crediting, the restructuring fee and the

6  combination of monthly and restructuring fee and the

7  financing fee were all important elements of this deal?

8  A.  Yes so the overall construct we certainly believe is

9  important and think that's important in any engagement that

10  we have and, frankly, we think other banks look at the same

11  way.

12  Q.  Did you say and this is where I'm not sure that they were

13  equally important that each of these components were equally

14  important?

15  A.  Well I wouldn't assign a specific weighting to any of

16  them.  I think it's an overall holistic negotiation as it

17  relates to the economics.

18  Q.  Okay so let's talk about one of these data points which

19  is the 100% crediting of monthly fees against restructuring

20  fees.  What value do you attribute to that concession, if you

21  will?

22  A.  I don't attribute any specific value to it.

23  Q.  Well you said that it's not common to credit a 100%,

24  correct?

25  A.  That's correct.

1  Q.  And therefore if it's not common there must be something

2  else that's more common.

3  A.  A more common construct would be crediting of some

4  percentage for example 50% after a certain period of time

5  would be more common.

6  Q.  And would it be fair to say that based on cases you've

7  reviewed that on average it is no less than 50%?

8  A.  Well in these cases on average it is 41%.

9  Q.  Okay and based on your chart?

10 A.  Yes.

11 Q.  And in terms of when does that crediting start would it

12 surprise you to learn that more than 50% of the cases have a

13 beginning crediting date of four months after the beginning

14 of the engagements?

15 A.  I'd have to go back and look through.  I can tell you

16 that some of them start later than and some of them probably

17 start around that time and some probably start sooner.

18 Q.  Okay.  So assuming for a second that you have a structure

19 where, actually it's a structure you're proposing on your

20 joint reply, you recall that structure?

21 A.  I do.

22 Q.  And it's 50% crediting correct of the monthly against the

23 restructuring fee instead of the 100%?

24 A.  It's a 50% crediting of the monthly after four months

25 starting with the fifth month.

1  Q.  Okay so compare that to the current structure you have

2  right now.  Right now it's a 100% starting from day one

3  you're proposing as part of a compromise on the crediting

4  mechanism that you would credit only 50% and only starting

5  the beginning of the fifth month, correct?

6  A.  Correct.  You're asking me the dollar differential?

7  Q.  Yeah that should be fairly easy to determine.

8  A.  Approximately $1.3 million.

9  Q.  Okay $1.3 million dollars.  Let's talk about the size of

10 your monthly fee which is $175 correct?

11 A.  Correct.

12 Q.  Do I read your chart correctly that the million is $156 a

13 month?

14 A.  The median is $156 yes.

15 Q.  And the mean is $152?

16 A.  Yes.

17 Q.  Okay thank you.  Miller Buckfire has given the 50% credit

18 of the financing fee against restructuring fee on several

19 prior occasions, correct?

20 A.  Unrelated to this case [indiscernible] other cases.

21 Q.  Yes other --

22 A.  Yes in some cases we have and in some cases we haven't.

23 Q.  Okay and you've also have given not only the 50% credit

24 but also the no financing fee for existing parties in the

25 capital structure on several other occasions, have you not?

1  A.  That's correct and none of those instances did we credit

2  a 100% of our monthlies against the restructuring fee.

3  Q.  Okay so that's the same factor in your case 100%?

4  A.  No but it's one of the factors.

5  Q.  What are the other factors?

6  A.  Well I think all of the economics in the engagement

7  letter are relevant when we're negotiating these.

8          MR. DESPINS:  I believe that's all I have, Your

9  Honor, at this time.  Thank you.

10          THE COURT:  Any questions from any other parties

11  before redirect?  No, okay.

12                      REDIRECT EXAMINATION

13  BY MS. WEISGERBER:

14  Q.  Good afternoon again, Mr. Tracy.

15  A.  Good afternoon.

16  Q.  First I just want to ask you a couple of quick questions

17  about the earlier engagement letter that was referred to

18  during your cross.  Was there an initial engagement letter

19  between Molycorp and Miller Buckfire?

20  A.  Yes, there was.

21  Q.  And what was the date of that?

22  A.  December 22.

23  Q.  2014?

24  A.  2014 yes.

25  Q.  And did that engagement letter specifically provide for

1  the 100% monthly fee crediting against the restructuring fee?

2  A.  Yes, it did.

3  Q.  Did it also specifically provide that although the

4  precise terms of the financing fee were yet to be negotiated

5  explicitly the financing fee would not be credited against

6  the restructuring fee or the sales transaction fee?

7  A.  Yes, it did.

8  Q.  And to the extent that a financing fee cap ended up being

9  negotiated in the next realm of negotiations that's

10 memorialized in the May 2015 engagement letter, correct?

11 A.  That's correct.

12 Q.  And that cap is favorable to the Debtors, correct?

13 A.  Yes, it is.

14 Q.  I also want to talk briefly about Kenneth Buckfire's

15 involvement in the Molycorp matter.  Can you describe

16 briefly, Mr. Buckfire's involvement in the Molycorp's

17 representation to date?

18 A.  Sure.  Ken has been actively involved from the beginning

19 of the case.  As I said earlier, I'm responsible day to day

20 for the case and the lead on it.  But Ken is available to

21 join for conference calls particularly as it relates to

22 strategy discussions.  He's attended many of the board

23 meetings.  And he's been available to me anytime to me when I

24 want to bounce ideas off him or get different input.  He's

25 also met with certain of the constituents on multiple

1   occasions, both the tens and Oak Tree specifically about

2   Molycorp so he has been involved.

3   Q.   Did he also accompany the CEO of Molycorp to a meeting

4   with the Department of Defense?

5   A.   Yes, he did.

6   Q.   You also touched briefly during cross on the use of

7   prepetition debt as a metric for Exhibit 2 the Miller

8   Buckfire chart.  Is prepetition debt typically used as a

9   metric for determining comparables in a market comparable

10  analysis?

11  A.   Yes, it is.

12  Q.   And to the extent there may be other factors such as the

13  complexity or difficulties of the case is that something that

14  Miller Buckfire would be able to readily calculate with

15  respect to other cases that it was not involved in?

16  A.   Not from a numerical standpoint, no.

17  Q.   I believe there was also mention of a representation of

18  Oak Tree that was mentioned in a declaration of yours in

19  Excel Maritime.  Is it your understanding that that

20  representation concluded in 2013?

21  A.   I don't recall when that concluded, no, but that may very

22  well be the case.

23  Q.   Mr. Tracy, does Miller Buckfire Exhibit 2 the comp chart

24  prepared by Miller Buckfire represent Miller Buckfire's

25  attempt to prepare a list of comparable cases using a

1  measured and consistent standard of determining comparables

2  as determining metrics for comparability?

3  A.  Yes, it does.  We set out a criteria and we follow

4  through with that in bringing an analysis and are presented

5  as such.

6          MS. WEISGERBER:  I have no further questions, Your

7  Honor.

8          THE COURT:  All right thank you.  Is there any

9  other evidence?  All right, I hear none.  I'll hear argument.

10          MR. ROUTH:  Thank you, Your Honor, Ryan Routh with

11  Jones Day for the Debtors and Debtors in possession.  This is

12  an application of the Debtors and so I thought it appropriate

13  for the Debtors to explain to the Court their position on

14  Miller Buckfire's retention and the fee and expense

15  structure.

16          Your Honor, there's no dispute that the Debtors

17  need an investment banker.  There's no dispute of whether

18  Miller Buckfire is qualified.  The UCC and the number of

19  clarifications that they sought to the Miller Buckfire

20  retention order and there was some modifications to the order

21  and we filed a revised form of order last week that addressed

22  most of those concerns.  So what we have left is a single

23  dispute regarding fee and expense issues.  There could be

24  additional objections that Mr. Despins will be raising.  We

25  haven't heard some of the issues that he raised in the cross

1  examination.  To the extent that he raises those in his

2  statements, I reserve my right to respond to those.

3          What I have at issue is the reasonableness of the

4  fee and expense structure.  And I don't believe we dispute

5  what the legal standard is here.  Section 328 of the

6  Bankruptcy Code allows a Court to approve a fee and expense

7  structure on "any reasonable terms."  The case law explains

8  that any reasonable terms normally involves an inquiry into

9  the market and that the Court can take into account market,

10 what the Court has seen in the market and can also take into

11 account the facts of a particular case in connection with the

12 market base terms.

13         So the question becomes how should a Court

14 determine reasonableness.  As with many things in bankruptcy

15 law the concept of reasonableness almost implicitly requires

16 that the Court think of it as a range of possible outcomes.

17 In all of the cases in the chart that you saw from Miller

18 Buckfire and in the chart from the Committee a Bankruptcy

19 Court has -- excuse me.  A Debtor has entered into an

20 engagement letter, it's been subjected to creditor's

21 scrutiny, and the Bankruptcy Court has approved it.

22         So every single case in the chart comprises the

23 range.  [indiscernible] some of the fringes a Court might

24 determine that the engagement is unreasonable.  But my

25 reasonableness does not mean that the retention has to be

1  above average or ideal or the best it possibly could have

2  been gotten in a particular circumstance.  The Debtors submit

3  that there's really two ways in which the Miller Buckfire

4  retention application can be thought to be unreasonable here.

5        The first way would be to show that a particular

6  single term of the engagement is perhaps egregious or outside

7  the normal range with respect to that single term.  Maybe

8  it's a new term that isn't standard in an engagement letter.

9  Maybe it's a percentage that's really stretching the range.

10  Another way to show a lack of reasonableness we think is if

11  there's an accumulation of factors that start to add up where

12  this factor is weighted in favor of the professionals and

13  this favor is weighted in favor of the professional.  And you

14  build a tower and eventually get to the point where the

15  entire engagement letter is unreasonable and out of balance.

16        So looking at those two concepts, Your Honor, the

17  first is let's look at the individual portions of the

18  financing fee that the Committee is complaining about.

19  First, the Committee is arguing that no financing fee should

20  be payable when the financing comes from a party within the

21  existing capital structure.  And so we have some evidence on

22  this from Mr. Tracy and we have the chart of the Committee as

23  well.

24        With respect to those two potential forces that

25  the Court has available to it, I think the evidence is that

 1  the Miller Buckfire data base was compiled in a comprehensive

 2  manner.  It attempts to be more recent.  It doesn't

 3  selectively pull some cases or push some cases out.  And an

 4  attempt was made to include those cases in a size range

 5  comparable to the Debtors' case.  You know the Committee

 6  could argue well you could have done it another way.  You

 7  could have done it this way.  What Miller Buckfire has done

 8  is typical and it's reasonable.  And so I think looking at

 9  their particular precedent chart is a reasonable place for

10  the Court to start.

11          I think we don't have any evidence of how the

12  Committee compiled their chart and so we don't necessarily

13  believe from the Debtors' perspective that it's more reliable

14  than what we've gotten from Miller Buckfire.  If you look at

15  the Miller Buckfire chart and this was Miller Buckfire

16  Exhibit 2 what you'll find is that there are nine cases in

17  which there is a percentage base financing fee.  And there's

18  nine of those.  Of those nine, four of them have no

19  restriction on financing fees if obtained from a party in the

20  capital structure.  So just taken alone if four out of nine

21  Courts and four out of nine Debtors have agreed to this

22  structure just taken alone it can't be unreasonable on its

23  own.

24          If you look at the UCC's precedent and

25  unfortunately I didn't have a chance to look at what they

1  filed mid-morning today.  But their chart last week at 24

2  cases and eight of those had no restriction on financing fees

3  if the financing fee was obtained from a party in the capital

4  structure.  Now the UCC could argue that those eight Debtors

5  and those eight Courts got it wrong, but I think at a minimum

6  it shows that having no restriction; excuse me.  The absence

7  of a restriction on a financing fee when it comes from a

8  party in the existing capital structure is not so far out of

9  bounds that it makes the entire letter unreasonable.

10         In fact, Your Honor, if you look at their chart of

11  the 24 cases and this is Miller Buckfire Exhibit 3 which is

12  the pleading that we saw this morning.  Of the 24 cases that

13  they brought to the Court's attention as I indicated 16 of

14  those had some sort of restriction on financing fees if they

15  were from a party in the capital structure.  But if you look

16  closer five of those 16 are only restrictions for financing

17  provided by an equity holder.

18         So, for example, the Met case which is number 21

19  on their chart states, and this is just taking it at face

20  value, no financing fee provided by existing shareholders or

21  their controlled affiliates; the same thing with

22  Physiotherapy, the same thing with two or three others on the

23  chart.  So out of their 16 they only have 11 or 12 where if

24  financing is completed with an existing creditor that means

25  there should be no financing fee.  And that means conversely

1  that 12 or 13 go the other way.  That if there is a financing

2  from an existing creditor then a financing fee can be paid.

3  And that's what we have here, Your Honor.  We're not talking

4  about financing from a shareholder.  We're talking about

5  financing from creditors.

6          So just taken on its face, you know, we think that

7  the argument that there can be no financing fee from

8  somebody; excuse me there should be no financing fee payable

9  when the financing comes from existing capital structure.  So

10  we're looking at the market data.  We don't believe that that

11  is an argument that's supported by the market data.  So then

12  the question becomes well do we have facts here that suggest

13  that that's something that would be appropriate.

14          You know in my experience when these types of

15  restrictions get into engagement letters it's commonly in a

16  situation where the investment bankers come to the

17  transaction late.  Maybe restructuring negotiations have

18  already stated.  In many cases it's where there's an equity

19  sponsor that has a troubled subsidiary and may be saying gee

20  we need to hire counsel. Counsel gets involved.  The equity

21  sponsor says sure I'll provide a DIP but I'd like you to find

22  a DIP somewhere else maybe.  And counsel goes out, hires an

23  investment banker and at that point with a party potentially

24  already saying that they'll provide a DIP it might make sense

25  to have a carve out from an engagement letter.  And certainly

1  that's an experience probably many of us in the room have

2  had.  But that's not the facts here.

3          Miller Buckfire was engaged all the way back in

4  December of 2014.  They were involved six months prepetition.

5  And ultimately there was a significant back and forth with

6  respect to who the DIP financing would be provided by.  Mr.

7  Despins suggest that Miller Buckfire somehow may be trying to

8  get a do over by asking the Court to take into account the

9  facts that have actually occurred.  Well there's nothing

10 inappropriate about the Court taking into account the facts

11 that the Court's aware of and that Mr. Tracy has testified to

12 both in this declaration and in past hearings.

13          In a vacuum what the Committee is saying could

14 make some sense.  In a vacuum you can believe well maybe it's

15 easier to get financing from someone in the existing capital

16 structure.  But an investment isn't just paid to find and

17 locate the financing party.  The investment banker is paid to

18 negotiate terms.  An investment banker is paid to help with

19 due diligence, the advice the Board of Directors, to provide

20 litigation support and testimony, to be a chief negotiator

21 and all sorts of other things that are detailed in the Miller

22 Buckfire engagement letter.

23          Now in this case all of those other roles were

24 material and significant. The Court was here and knows what

25 happened post-petition.  You heard some testimony today, I

1  won't belabor that point.  Mr. Tracy has previously testified

2  that a full third party DIP financing process was run

3  prepetition as well.  We went so far as having a number of

4  five different lender interviews with management.  So the

5  record in this case is obtaining the financing did take a lot

6  of work and there's no reason for the Court to put on

7  blinders and ignore that fact.  And, frankly, in light of the

8  dynamic in this case there's no reason to believe that we

9  won't potentially have the same type of case dynamic when we

10  are looking at confirmation or future financings.

11        So, Your Honor, that's the point on getting a

12  financing from someone in the existing capital structure.

13  The second argument is, is it unreasonable to have no

14  crediting of a financing fee against a restructuring fee.

15  So, again, I look at Miller Buckfire Exhibit 2 and I look at

16  the nine cases that have a percentage base financing fee.

17  And what I found when you did our review is that four of the

18  nine cases with percentage base financing fees have no

19  creditors.  So, again, it's not quite 50%, but certainly it's

20  within the realm of normal market practices to not have this

21  kind of crediting.  Even the UCC's chart has a number of

22  instances where there hasn't been crediting of this type.

23        But I think of the two arguments that the

24  Committee is pressing this is probably the better of the two.

25  You know there is more support for some sort of crediting

1  than there is regarding the existing capital structure

2  argument that they're making.  So I think at that point the

3  Debtors then really say well let's look at this overall and

4  let's take a more holistic approach.  And I think this is

5  really maybe the Committee's main contention that it's maybe

6  not long or the other but it's the combination of both.

7  Frankly, when you read their objection it's a little bit

8  unclear which one they're seeking or if they're saying the

9  Court must order both.  It's up in the air right now.

10        But the Debtors think that if you look at this a

11  whole the entire fee structure as a whole is balanced and

12  there's two primary reasons for that.  The first is the

13  overall cap on the financing fee.  This was important for the

14  Debtors.  This was a key negotiating point for the Debtors.

15  The Debtors fought for this to ensure that there would be a

16  hard ceiling on the fees that would be payable.  This type of

17  hard cap is somewhat rare.  We heard testimony from Mr. Tracy

18  to that effect.  Miller Buckfire Exhibit 2 shows that it only

19  shows up and I believe two of the comparables that they

20  reviewed.

21        And the reason that this was important to the

22  Debtors is because of the types of situations that you saw in

23  Visteon and LightSquared that are cited in the papers.  While

24  there was crediting of the type that the Committee suggests

25  is appropriate here there wasn't a cap.  And those fees

1  exploded to some extent.  So the Debtors think that may be

2  there's an argument that if you have no cap and no crediting

3  and no existing stakeholder limitation maybe from all three

4  of those things you start to build the unreasonableness tower

5  I was talking about. But we believe that the cap certainly

6  brings the financing fee even considered alone into the realm

7  of reasonableness.

8           And then, Your Honor, we think it's important to

9  look at the entire fee structure.  And I think on balance

10  outside of the financing fee even if you believe that that is

11  slightly in favor of Miller Buckfire we would submit that the

12  restructuring fee and the other components of the fee

13  structure are favorable to the Debtors.  The 100% crediting

14  of the monthlies from day one is extremely favorable to the

15  Debtors.  If you look at the percentage calculations on Mr.

16  Tracy and Miller Buckfire's chart you'll see that assuming a

17  12 month case the mean and the median, monthly plus

18  restructuring fee is commonly .46 to .47% of debt.  The

19  Molycorp percentage is .42% of debt, but expressed in dollar

20  terms that's merely a million dollars.

21           And so the benefits of the crediting and the size

22  of the restructuring fee we think on balance favor the

23  Debtors.  So we think from the Debtors' point of view the

24  restructuring fee and the monthlies are slightly in their

25  favor.  The financing is maybe market, maybe slightly on the

1   high side within the range of market.  But we think taken

2   together it's a reasonable combination.  But if the Court

3   disagrees, if the Court thinks gee the financing fee is too

4   high you know we really need to bring that down, I think

5   Miller Buckfire has explained where to go with this.

6          On paragraph 17 of the reply they say okay if

7   crediting on the financing fee at 50% is what's required to

8   bring that into the market we'll go ahead and do that but

9   then we want the elements of the structure that were maybe

10  too favorable to the Debtor to be brought up to market and

11  then we'll be market on both sides and that would be an

12  appropriate compromise.  The Debtors, frankly, prefer the

13  deal that they originally struck or, excuse me would be fine

14  with the deal they originally struck and that's what we're

15  proposing.  But the Debtors have reviewed the alternative

16  proposal and they would also find that acceptable.

17         Your Honor, with that, I would suggest that under

18  Section 328 of the Bankruptcy Code the terms upon which the

19  Debtors are proposing to retain Miller Buckfire are any

20  reasonable terms and we would ask that the retention be

21  approved.

22         MS. WEISGERBER:  Erica Weisgerber on behalf of

23  Miller Buckfire and, Your Honor, first I'd like to address

24  the Oak Tree issue which was raised for the first time here

25  today during this hearing.  In the Excel Maritime case in

1  mid-2013 Mr. Tracy submitted supplemental declarations

2  disclosing a then new engagement with Oak Tree Opportunities

3  Fund 9 LP in an unrelated matter in connection with the

4  shipping industry.  We will verify and supplement, if

5  appropriate, but my understanding as I stand here today is

6  that no fees were earned in connection with that Oak Tree

7  engagement and it ended in 2013.

8         It is Miller Buckfire's practice to disclose all

9  existing connections consistent with the statements

10 concerning disclosures in the first Tracy declaration

11 relating to the application, plus in an abundance of caution

12 Miller Buckfire disclosed its engagement and other

13 connections in both this and the prior calendar year.  So

14 with respect to this engagement, it was 2014.  And, again, we

15 will supplement if appropriate, but since this issue was

16 raised for the first time here today we were not able to

17 address that in our papers previously.

18        Otherwise, Your Honor, addressing really the crux

19 of the objection that was raised to the application the

20 evidence demonstrates the reasonableness of Miller Buckfire's

21 proposed fees here.  The negotiations over Miller Buckfire's

22 fees were extensive resulting in significant concessions by

23 Miller Buckfire as Mr. Tracy testified.  The market

24 comparables analysis that Miller Buckfire submitted to the

25 Court demonstrates that the resulting fees are well within

1  market and are reasonable.

2          As Mr. Tracy testified today the two types of

3  financing fee accommodations sought by the Committee are

4  sometimes present in engagement and sometimes not.  And just

5  as financing fee caps which are present here are sometimes

6  present and sometimes are not.  The engagement letter between

7  Miller Buckfire and Molycorp represents the result of

8  tradeoffs during the negotiation process.  Further, Miller

9  Buckfire's fee structure for this case includes several other

10 Debtor friendly provision in addition to the financing fee

11 cap that we discussed.

12          The engagement letter provides for a 100%

13 crediting of Miller Buckfire's monthly advisory fees against

14 any restructuring or sale transaction fees.  Application of

15 this monthly crediting results in a net restructuring fee

16 that is below what the mean and the median of the market

17 range of approved fee structures on Miller Buckfire's Exhibit

18 2 comparables chart.

19          Now the Committee also argues that limitations on

20 Miller Buckfire's financing fees are warranted because when

21 capital is raised from existing stakeholders there's

22 typically significantly reduced effort involved on behalf of

23 the investment bankers in raising such a financing.  However,

24 the Court must consider the reasonableness of the proposed

25 engagement in light of the specifics of this case.  And we

1 know that here in this case that perhaps sometimes true

2 proposition is certainly not true of the efforts involved by

3 Miller Buckfire in raising financing from existing

4 stakeholders relating to the DIP financing.

5          Here, there was a highly contentious dispute

6 between two existing stakeholders regarding which would

7 provide financing the Debtor in possession and it required

8 the Debtors to rely heavily on Miller Buckfire's time,

9 effort, knowledge and skills throughout the entire DIP

10 financing process.  The resulting fee structure represents

11 tradeoffs that are the results of arm's length negotiations

12 and that are typical in an investment banker retention

13 agreements.  It results in an overall balance fee structure

14 that is reasonable.

15          Finally, as Mr. Tracy noted Miller Buckfire has

16 shown a willingness to rebalance the fee structure to

17 accommodate the concerns that are expressed by the Committee.

18 And we believe that the alternative fee structure proposed by

19 Miller Buckfire and the Debtors in the reply totally address

20 the [indiscernible] concerns and still results in a balance

21 and reasonable fee.

22          THE COURT:  I'm sorry, before you sit down.  I'm

23 not quite sure what the point is in connection with this

24 proposal.  It's in the reply.  Whether it's a proposal to me,

25 proposal to Committee, I am not sure what it is, but could

1  you explain it because the way I understand it on a net, net

2  it doesn't reduce the fee being sought at all.

3  　　　　　MS. WEISGERBER:  The way that the proposal works

4  is that the Creditors Committee has raised a specific concern

5  about the absence of two types of limitations on the

6  financing fee in this engagement.  They have not raised

7  concerns, really, but the overall fee and, I think Mr. Routh

8  noted, it's hard to understand what request, what relief,

9  specifically, they are seeking.  But to the extent that they

10  are concerned about the absence of those provisions, we are

11  willing to insert those types of provisions, which provide

12  the specific relief that they appear to be seeking, which is

13  having limitations on financing from existing stakeholders or

14  crediting of financing fees against the restructuring fee;

15  however, there also is a recognition that this 100 percent

16  monthly fee crediting is a very unusual provision and that if

17  we were to implement this additional limitation on the

18  financing fee, recognizing that the entire engagement is a

19  balanced piece that results from numerous tradeoffs, the 100

20  percent monthly crediting should come down as a result of

21  that.

22  　　　　　THE COURT:  All right.  So the net, net is the

23  gross amount being paid doesn't change, it just changes what

24  piece of it comes from the financing fee/credit to, which

25  decreases, but then also increases on the monthly fee credit,

1  on the restructuring fee.

2        MR. ROUTH:  Your Honor, could I address this point

3  because --

4        THE COURT:  Well, I think Miller Buckfire's

5  counsel should be able to explain to me Miller Buckfire's

6  proposal.

7        MS. WEISGERBER:  Well, Your Honor, I haven't don't

8  the specific math on it, but I think it would depend on the

9  specifics of the financing that was present, where the source

10  of a financing and subsequent; I'm sorry, I think it would

11  depend on the amount of the financing, ultimately provided.

12        THE COURT:  Well, we know the amount of the

13  financing, right?  Your mean the amount of the restructuring?

14        MS. WEISGERBER:  Subsequent financing, Your Honor.

15        THE COURT:  Like exit financing?

16        MS. WEISGERBER:  Yes, but if Mr. Routh would like

17  to supplement, I would defer to him as well.

18        MR. ROUTH:  Your Honor that is the primary point.

19  The exit financing fee, for example, if there was an equity

20  raise in exit of $100 million dollars, right now that fee

21  would be 5 percent of that.  If there is the 50 percent

22  crediting, then 5 percent of the $100 million, 50 percent of

23  that or $2.5 million is then credited against the

24  restructuring fee.  So the revised proposal gives Miller

25  Buckfire some cash up front; I believe the testimony was $1.3

1   million dollars, but it, potentially, reduces the amount they

2   would get in a backend financing fee or if there were interim

3   financing's during the case, in addition to the DIP

4   financing.

5           THE COURT:  Okay.

6           MS. WEISGERBER:  Any further questions, Your

7   Honor?

8           THE COURT:  Yeah, help me out with negotiations in

9   December vs. negotiations in May?  The deal in September

10  included the cap on the restructuring fee?

11          MS. WEISGERBER:  The deal in December, December

12  2014 was the initial engagement letter.

13          THE COURT:  Right.

14          MS. WEISGERBER:  And that provided for all of the

15  terms of the proposed engagement except for the specific cap

16  relating to the financing fee and the specific 1.35

17  arrangement of the financing fee.  Those were to be

18  negotiated later; however, the December 2014 engagement

19  letter was very clear that there would not be any crediting

20  of the financing fee against the restructuring or the sale

21  fee.  Subsequently, the May 2015 engagement letter provided

22  for the specifics of the financing fee, including the 1.35

23  structure and the cap.

24          THE COURT:  All right, so if I want to look at

25  this, as you suggest, holistically, it's fair to say that in

1 negotiating the Debtor friendly provisions such as the 100

2 percent credit, which is unusual, that was done at a time

3 when we knew there was going to be a financing fee, we didn't

4 know what it would be, but we knew that it wouldn't credit

5 against the restructuring fee?

6          MS. WEISGERBER:  That's correct, Your Honor.

7          THE COURT:  So what happened later, it really

8 wasn't subject to the back and forth that had already

9 occurred with the details of the financing fee other than

10 the, you know, the fact that there be no credit on the

11 restructuring fee.  So, for example, the limit.

12          MS. WEISGERBER:  Right, of the financing fee

13 against the restructuring.

14          THE COURT:  The percentages and the limit were

15 negotiated later?

16          MS. WEISGERBER:  Correct.

17          THE COURT:  Okay.  Was there any give and take on

18 other provisions in May, now we're going forward to May or

19 whenever you negotiated what was, ultimately, decided in May.

20 Were there any other give and takes in other terms of the

21 retention at that time, in negotiation, or was it simply

22 getting down to the nitty gritty of actually negotiating the

23 financing fee within the structure that had been previously

24 been agreed to in December?

25          MS. WEISGERBER:  I believe it was primarily the

1  latter, but I would have to defer to Mr. Tracy on the

2  specifics of the negotiations.

3              MR. ROUTH:  Your Honor, if I may.

4              THE COURT:  Yes.

5              MR. ROUTH:  The 1.35 percentage was determined in

6  May and the other component that was determined in May would

7  be the $10 million dollar cap.

8              THE COURT:  Those were the only two things in

9  discussion in May?

10             MR. ROUTH:  Those were the primary items that I

11 recall.

12             THE COURT:  At that time the DIP financing and

13 restructuring support agreement with the tens was the path

14 forward?

15             MR. ROUTH:  There were certainly discussions going

16 on with the tens.  I don't know that we were at the point

17 where we would say that we had a fully baked restructuring

18 support agreement or anything at that time.  When we talk

19 about the May engagement letter, a lot of these negotiations

20 actually occurred in April.

21             THE COURT:  Right, because May 4th, I think, is the

22 engagement letter?

23             MR. ROUTH:  Yes.

24             THE COURT:  All right, but until late May, Oak

25 Tree had refused to be a DIP lender.  It was only when they

1  found out that there had been this change in what was going

2  to happen at the Neo side of the business that they ever

3  said, hey, wait a minute, we might want to get involved as a

4  lender.  That is my memory from the three DIP hearings.

5           MR. ROUTH:  The ten percent noteholders proposal

6  at the time, it was maybe more favorable to Oak Tree with

7  respect to some of the priority issues that Your Honor has

8  that's how I am being treated, I don't need to provide the

9  DIP. I would also note that that time period was the time in

10  which Miller Buckfire was going out to the market and looking

11  for the third party DIP financing.

12           THE COURT:  Okay.  Thank you.  Very helpful.

13           MS. WEISGERBER:  Thank you, Your Honor.

14           THE COURT:  Mr. Despins.

15           MR. DESPINS:  Yes, briefly, Your Honor.  The first

16  point, which I raised, it was not in our papers, but, you

17  know, given that they insisted on this holistic approach was

18  the fact that, not to cast aspersions in any way, but, you

19  know, Ms. Tracy has been a managing director for four years,

20  never been qualified as an expert on valuation ever; only an

21  expert witness once, never lead a case other than one other

22  case.  So that is not determinative, but certainly something

23  that should be in the mix when we look at the size of these

24  fees.  The fact also that the company in the engagement

25  letter, I've never seen this before, where it says, you know,

1  this is Exhibit 1, "Miller Buckfire agrees that Mr. Buckfire

2  will be committed personally to this engagement, shall

3  actively perform services for the company," etc., etc.

4        As I said, you know, I don't how we reconcile that

5  with reality.  The testimony was very clear, "are you the

6  lead?"  "Yes, I am the lead."  How many meetings have you

7  attended?"  "Many, can't recall how many."  Is that the

8  controlling point?  No, it's a data point that I think is

9  important when we look at the size of these fees, especially

10  when we look at the potential fees here for $15 million

11  dollars.  That is huge considering that fact.

12        Now, let's go to the details of the transaction.

13  It's clear that Miller Buckfire has done, on several

14  occasions, a 50 percent crediting and on several other

15  occasions, in some occasions both, but in several other

16  occasions in exclusion, complete exclusion on a financing fee

17  for parties involved in a capital structure.  That is a huge,

18  so that is why we will talk about the benefit of the 100

19  percent crediting.  There is no comparison that that is huge.

20  It's not only Miller Buckfire.  I will come back to the cases

21  in a second, but that is a huge thing.

22        I want the Court to focus on this.  The testimony

23  was the savings on the 100 percent crediting vs. what market

24  is, is $1.3 million dollars.  So you might look at that and

25  say, well, that's a lot of money.  It is a lot of money, Your

1  Honor, but when you compare that to the absence of crediting

2  or to put it in the reverse, to the fact that a crediting

3  mechanism could save $5 million dollars in fees, $10 million

4  divided by half equals $5 million dollars.  That is a huge,

5  you know, game changer in that context.  So, therefore, the

6  $1.3 doesn't really, you know, compare to that.

7           Now, it was very clear, and I will come back to

8  that later, that they never looked at below a billion

9  dollars.  I think the testimony was very clear that the

10 amount of prepetition debt is useful, but it's not

11 determinative or binding in any way.  So when you have a $700

12 million dollar case in terms of debt, you can have as much

13 complexity and, in fact, the fees that are listed in our

14 chart support that that there are a lot of $5, $6, $7 million

15 dollar fees in transactions that are smaller in terms of the

16 prepetition debt.  So that cannot be determinative.

17 Actually, the testimony was very helpful.  I think, no pun

18 intended, that the only thing he said is that that is a

19 helpful data point or useful data point.

20           The next thing is the cap.  Their argument is

21 that, and I cannot emphasize that enough, Your Honor, this is

22 like the 100 percent crediting.  You might think wow that is

23 great.  I think a lot of these things are designed to, you

24 know, look this way, and don't look at the other pocket.  So

25 the cap, I think the testimony was very clear that, by the

1  way it's great to have a cap.  I can't negate that, but as I

2  said, you know, a billion dollar cap would be a joke.  The

3  question is, is a $10 million dollar cap real here given the

4  facts of this case.

5          THE COURT:  Your point there was that any kind of

6  financing that would bump up against the cap would really be

7  a restructuring or a sale?

8          MR. DESPINS:  That's exactly the point.

9          THE COURT:  In which it's got a smaller cap.

10          MR. DESPINS:  Correct, because remember, the way

11  the structure works for the financing fee is 1 percent for

12  real debt or DIP financing and it goes to 5 percent for

13  equity.  Nobody is putting $200 million of equity in this

14  company without owning the company.  So, therefore, the cap

15  is, again, it's cosmetically very interesting, but I am not

16  sure --

17          THE COURT:  And you don't get paid both.  So it's

18  either a restructuring or a financing fee?  It's either a

19  sale or a financing fee?

20          MR. DESPINS:  I think that that was the testimony,

21  is that if it's an acquisition, you don't get a financing fee

22  in that context.  So, therefore, that's why I am saying that

23  it's possible that there would be a $200 million dollar

24  financing, equity financing, that's possible, but such an

25  equity financing where the company would not be sold in that

1  process, by the way, I would love to be wrong on that.  I

2  would like it to be $200 million, you get 10 percent of the

3  company, but that's not this case.  Okay.  That's not

4  happening.  So that is another fact.

5         Let's talk about, briefly, the recent cases in our

6  chart.  By the way, the chart, we said is just a sampling.

7  We never professed that it would be all the cases.  The fact

8  is if you found five cases, you would say, but there is

9  something like 17 cases that all have some of these features.

10 By the way, these are not cases, some of them are just next

11 door or upstairs, but they are in Delaware.  The numbers on

12 our chart, by the way, the chart, we apologize for the

13 amended chart, but basically one of the things it did, it

14 added numbers so I could actually give you the numbers.

15        Number 1, 8, 9, 10, 13, 14, 16, 17, 22, 24, 26 all

16 have, are there the 50 percent and/or, meaning sometimes they

17 have the 50 percent in zero financing fee for people in the

18 existing capital structure.  So, and by the way, most of

19 these cases are 2014 and 2015.  The witness was very clear

20 that the market, you know, we have to follow the market and,

21 therefore, Your Honor, we believe that its clearly market and

22 it doesn't make any difference, on a crediting issue, whether

23 the case has prepetition debt or $700 million or a billion

24 two.

25        Let's talk about the chart for a second.  I don't

1  want to belabor the point, but it is very clear, when you

2  look at the bottom, that that box was skewed.  Why?  Because

3  they didn't factor in the 50 percent or, okay, I'm not going

4  to belabor that point.  Therefore, when you use that, they

5  are way off the chart in terms of whether their financing fee

6  combined with the restructuring fee is market or not.  Again,

7  only two cases in 2015, six in 2014, the rest are the 15 or

8  all older than that.  The witness was very candid, did you

9  peek before at less than a billion?  No.  I wonder why.  I

10  know why.  Look at our chart.  It will tell you why.

11          THE COURT:  Well, I mean that can go both ways.

12  One of the criticisms of charts like this or any kind of

13  analysis is that whenever people come look at comps,

14  additions and subtractions magically seem to support the

15  approach or the conclusion it ultimately had.  So to say I

16  took everything between $1 and $2.5 million period, didn't

17  add anything, didn't take anything off, you can argue well

18  that's a skew because, you know, you knew that was where you

19  wanted to be or that was the sweet spot or you could argue

20  that's actually ideal because its objective.  I took a sample

21  set and I didn't mess with it.  He would say, with some

22  force, that the sample said it's reasonable because it's

23  skewed, I think, $500 million dollars either way on what the

24  funded debt is.  So it's designed to capture, roughly,

25  equivalent cases based on the amount of funded debt without

1   any other adjustment.

2            MR. DESPINS:  But when the sampling is so limited,

3   15 cases, two in 2015 only, six in 2014, I think that that

4   sampling is not where the market is.  When you compare it to

5   the other cases, and we are not making those numbers up.  If

6   you look at the 2015 cases we have, most of them in Delaware,

7   they all have these features.  I think that that speaks for

8   itself.  Now, let's look at their proposal for a second.

9            THE COURT:  Yeah.

10           MR. DESPINS:  There are two or three things.  One,

11  the proposal says we will give you the 50 percent crediting

12  we want, but by the way we will not give you any credit for

13  the Oak Tree financing.  That is why I am asking the

14  question, do you know of any engagement letters where, in

15  fact, you can pick and choose the financing that you are

16  going to get a haircut on.  The answer is no, there is no

17  such thing; therefore, the fact that they work hard, that's

18  the whole point with the investment banker structure.  They

19  don't want the Court or anybody else to say, hey, in March

20  you were kind of slow that month or maybe in April you were

21  so, therefore, give back some money.  It doesn't work that

22  way.  They keep the money when they are slower and they don't

23  get more money when they are busier.  That is the

24  fundamental, Your Honor, is that you never have engagement

25  letters or somehow the investment banker can say this one I

1 will keep and the other one I won't, based on the amount of

2 work done.

3          They continue with the holistic approach, Your

4 Honor.  Their fees $175 a month.  Their own chart shows $156

5 as a mean.  Again, I explain the effect of the financing, how

6 it would really skew the chart if the crediting mechanisms

7 were added.  Now, let me address the issue of the tradeoffs

8 because I think that is very important.  The argument is,

9 basically, we really bargained really hard on this back and

10 forth, therefore, approve it; that's essentially the message.

11 To a certain extent I am sympathetic to that, but that cannot

12 be a substitute for market; otherwise, everyone would say we

13 bargain really hard.

14          The fact is when they locked in to the 100 percent

15 credit, there was no agreement on the financing fee, the size

16 of it or the cap; therefore, they can't say I bartered, which

17 is the implication, I bartered the 100 percent credit against

18 a cap on the financing fee.  That argument doesn't hold,

19 therefore, Your Honor, that's why we believe that that

20 argument about the tradeoffs and the negotiations cannot

21 control.

22          So, Your Honor, I would say this in closing, we

23 don't believe, I want to be clear about this because I think

24 that counsel for the Debtor raised that issue, we don't

25 believe that they should get zero fee for a financing with

1  people involved in a capital structure.  We believe there

2  should be a reduction and I think the chart supports a 25

3  basis point reduction in a financing fee in those instances.

4  We don't believe it should be zero because we want them to be

5  motivated, all things being equal, we want them to be

6  motivated to do a good job regardless of whether it's people

7  from within or without the capital structure; otherwise, if

8  they are not incentivized, you know, they won't be motivated.

9       Our position is that there needs to be, and merely

10 it is market to have a 50 percent crediting mechanism.  Two,

11 that it's okay, I will concede that, to not have the

12 crediting start immediately and it's okay to have it at 50

13 percent.  I think that the chart would show, our chart would

14 show that it's between fourth and fifth month, but there are

15 two things that we believe that this does not address.  One

16 is that, well, your Judge, you will do whatever you want, but

17 I don't think it would be appropriate to exclude, from what

18 they are proposing, the Oak Tree financing that just

19 happened.  That should be subject to 50 percent credit,

20 without a doubt.

21       The last point, Your Honor, is that there should

22 be some form of a reduction for people involved in the

23 capital structure, especially for future financing, Your

24 Honor.  Their argument has been, look, you know, we worked

25 really hard, Oak Tree had to be educated.  Well, Oak Tree

1  just made a loan in 2014.  So, presumably, they knew the

2  company, but let's assume they didn't.  So we worked really

3  hard.  That argument cannot apply anymore to the supporting

4  ten percent holders and it cannot apply to Oak Tree.  So,

5  certainly, for future financings, there should be a discount

6  of some kind in addition to the 50 percent crediting for

7  people in the capital structure, Your Honor.  Thank you.

8           THE COURT:  You're welcome.

9           MR. ROUTH:  Your Honor, just a few points.  I

10 disagree with Committee counsel on what the evidence was with

11 respect to Mr. Buckfire's personal involvement.  The

12 testimony was that he has been involved, that he's been at

13 meetings, he's been at board meetings, that he has been

14 involved in the process.  At any pitch meeting, Your Honor, a

15 Debtors' management might think that a particular individual

16 can be very beneficial to its case, so the Debtors, in this

17 case, put in a provision that required his involvement.  That

18 is no knock on Mr. Tracy, that's just what the Debtors felt,

19 in this particular case, would be gained from Mr. Buckfire's

20 personal involvement.  He has given us that involvement, thus

21 far, in these cases.

22           With respect to some of the contentions that were

23 made, you know, we heard that half; excuse me, we heard most

24 of the cases in their chart are from 2014 or 2015.  That is

25 not true.  If you go through and count them, less than half

1  are from 2014 or 2015.  We heard a number of, I was having

2  trouble keeping track of the numbers that Committee counsel

3  was going through with respect to the ones on his chart that

4  he thought the Court should focus on.  What we didn't hear is

5  how many of the items on his chart, you know, have both types

6  of reductions and an overall financing fee cap like the

7  structure here. I think if you look for all three of those

8  elements, you would find very, very few engagement letters.

9  In fact, I would go so far as to suggest that that would

10 likely take it out of market.

11        Your Honor, one final point.  With respect to the

12 alternative proposal, which we believe cures any infirmity,

13 would cure any infirmity in the financing fee, we don't think

14 there is one, but it would cure any alleged infirmity.  In

15 exchange, it would increase the amount of monthlies and the

16 amount of the restructuring fee.  Mr. Despins notes that the

17 benefit that the Debtors are getting right now is in the

18 neighborhood of about $1.3 million dollars on the

19 restructuring fee and on that half of the equation.

20        Then he says, well, you might save a lot of more

21 if you have the 50 percent crediting on the financing fee,

22 but that really depends on what happens in these cases.  The

23 amount that could be saved could be up to $5 million dollars,

24 but because of the $10 million dollar cap, it will never be

25 above that.  So the Debtors have the question of all right,

1   we could be saving somewhere between zero and $5 million

2   dollars.  Basically, we can pay $1.3 million dollars today to

3   save a question mark between zero and $5 million dollars.  I

4   can tell, Your Honor, that that is a close call.  The Debtors

5   have some idea of how some of the restructuring proposals

6   are, you know, the Debtors are involved in the restructuring

7   proposals that are going on in these cases.  I think the

8   Debtors' belief is that its, frankly, unclear which of those

9   two scenarios would be more favorable to it.

10          So, Your Honor, with that I will sit down. I do

11  believe that the proposal that we put before the Court,

12  today, is reasonable.  If the Court has concerns about the

13  financing fee, the alternative structure offered by Miller

14  Buckfire is reasonable as well and the Debtors would accept

15  that.

16          MS. WEISGERBER:  I will be very brief, Your Honor.

17  I would just join in Mr. Routh's comments.  I think the

18  testimony about why the amount of prepetition debt was used

19  for the chart explains that there are numerous complexities

20  in determining a set of comparables, but prepetition debt is

21  the common metric that is used.  It was used in Miller

22  Buckfire's chart, which attempts to provide an objection and

23  principal approach to the process.

24          We do not believe that the Committees' chart

25  presented such an approach.  We do not believe it really is a

1  comparables chart, but rather a sampling that goes back 10

2  years, using amounts of prepetition debt all over the place,

3  and there has not been any evidence put on to explain why

4  those cases are comparable and should be used as a metric to

5  compare for a market comparison analysis for this case.

6  Thank you, Your Honor.

7         THE COURT:  Thank you.  All right, well I am going

8  to sustain the objection.  I am not going to pick the

9  modified proposal.  It's a little bizarre.  One of the good

10 things about this job is I don't get involved in negotiations

11 or the back and forth.  I can only decide what is proposed to

12 me and brought forward in the relief that is being sought.

13 So I am a little uncomfortable, frankly, with the idea, well,

14 I don't like menu A, column A, so I will take column B as an

15 approach.

16         Having said all that, Mr. Despins offered column

17 C, really, in the context of his objection saying, you know,

18 these are problems we have with what has been proposed and

19 these are the types of things that might fix it.  Looking at

20 what has been presented to me, based on what market under the

21 reasonable facts and circumstances of this case, and I think

22 that's important.  The Court just doesn't look at, you know,

23 what people are getting generally speaking.  The Court has to

24 look at what the market is, it has to apply it to the facts

25 and circumstances of the case before it.  Some factors here

1  go into that.

2          One factor is that pricing on fees has to reflect

3  staffing.  Now, this is no knock on Mr. Tracy, we all had to

4  start somewhere and he has been very good on the stand.  He

5  appears to be eminently qualified.  Certainly, was involved

6  in heated negotiations over the DIP financing that ended up

7  with a good result for the Debtors, but he is not Mr.

8  Buckfire and he's not somebody with 20 years' experience.

9  That is a small factor, but I think it does factor into it.

10          More importantly, under the facts and

11  circumstances of this case, is the fact that the most likely

12  people to be involved in financing this company were already

13  at the table.  It was the tens and Oak Tree, and that goes

14  way back.  I think it is proper, appropriate under the facts

15  and circumstances of this case, and I think the market

16  generally reflects this, that some sort of discount is

17  appropriate when you are getting financing from people who

18  are already in the deal, who already have skin in the game,

19  that have already been educated, they already know the case

20  and they are more likely than someone who you bring in from

21  the outside to be willing to continue on with the Debtor, not

22  always, of course, but often.

23          On how much work had to get done on a post-

24  petition basis on financing, the fact that we had three DIP

25  hearings; I really don't count that into my equation.  I

1  think Mr. Despins raises a good point, you know, the fee

2  would have been the same if everything had gone smoothly on

3  the petition date.  I have my thoughts about why things went

4  sideways on the petition date for what was, initially,

5  proposed in front of the Court and why they didn't.  I think

6  that had things been done differently on the petition date,

7  we wouldn't have had to have two more financing hearings, but

8  we did.  It is what it is.

9        I am not throwing aspersions at anybody, but I

10  can't really put that into my analysis of whether this

11  specific fee is reasonable. I think I need to look at the

12  facts and circumstances of the case, but I really need to

13  take a snap shot, if you will, as of the petition date

14  because that's the *nunc pro tunc* nature of the retention.

15  That is when the documents were filed and that's when the

16  Court, sort of, looks at, hey, what was put in front of the

17  Court under the facts and circumstances of the case at that

18  time, was that reasonable.

19        So what would be reasonable?  This is where I pick

20  a column B or column C, which I said I wasn't going to do,

21  but I think it's helpful because it guides the party's

22  negotiations. I don't think that the proposal by Miller

23  Buckfire is reasonable.  I think something along the lines of

24  what Mr. Despins has mentioned, which would be a credit or

25  deduction of fee for doing financing both the DIP and future

1  financing with parties that are already in place, i.e., the

2  tens or Oak Tree would be appropriate.

3          I do think that a financing fee for the DIP is

4  appropriate.  I am not saying zero on the financing fee.  I

5  am just saying that as proposed, both in the initial

6  retention, by that I mean May, and the proposal Miller

7  Buckfire put forward, neither of those would be reasonable.

8  Something along the lines of what Mr. Despins has offered or

9  argued would be reasonable, as I understand it.

10         So I am going to sustain the objection, deny

11 without prejudice the motion.  If the parties are able to

12 negotiate a resolution, they can submit it under

13 certification of counsel.  We have to, sort of, start over

14 with a contested hearing on a revised Miller Buckfire

15 retention.  We can do that at a future date.  You can contact

16 chambers about where you want to go with that.  Okay.

17         I think that leaves three matters, bar date,

18 executory contract rejection and 2004 discovery.  Can you

19 give me, sort of an outline of how you want to proceed, we'll

20 take a brief recess and then we'll get to it.

21         MR. ROUTH:  Your Honor, we have a minor dispute

22 with the Creditors Committee over the bar date.  I would

23 think, from the Debtors' perspective, we would have a couple

24 of minutes of argument.  I don't know if the Committee would

25 have more than that.

1          MR. DESPINS:  Less than one minute, Your Honor.

2          THE COURT:  This is the non-Debtor affiliate,

3  right?

4          MR. ROUTH:  yes.

5          THE COURT:  Let's deal with it.  Go ahead.

6          MR. ROUTH:  Okay.  Your Honor, a few updates

7  regarding the bar date and a few proposed changes from the

8  version that we originally filed with the motion.  We had

9  originally anticipated that we would be filing our schedules

10  and statements of financial affairs prior to the hearing this

11  morning.  We were reviewing them over the weekend and we

12  believe we need a few more business days to file those.  The

13  Court ordered deadline from the petition date is August 24th.

14  We are not asking for that to be removed; however, we did

15  represent in our bar date motion that we expected that the

16  schedules and statements would be filed prior to this

17  hearing.  So I felt I needed to update the Court in that

18  regard.

19          In response to some of the comments of the United

20  States Trustee, we had already moved the bar date out from

21  its original proposed September 30th, out to October 13th.  We

22  expect that the schedules and statements will be filed by

23  this Thursday.  We are willing to change the order to

24  indicate that we need to serve the bar date package out by

25  August 16th, which is next Wednesday.

1          THE COURT:  That was yesterday.

2          MR. ROUTH:  I'm sorry, August 26th.

3          THE COURT:  Okay.

4          MR. ROUTH:  I have conferred with both the U.S.

5    Trustee and the Creditors Committee and they have no

6    objection to those changes.  These dates would mean that

7    parties in interest have 54 days from the filing of the

8    schedules and 49 days from the mailing of the bar date in

9    order to file their proofs of claim.  If Your Honor finds

10   that acceptable, that would leave the one objection of the

11   Creditors Committee.

12         The Debtors really have two issues with this.  The

13   first is simply the information question.  The Creditors

14   Committee objection is basically we need non-Debtor

15   affiliates to file proofs of claim for informational reasons.

16   The reality is, Your Honor, with respect to the cash

17   management order at the last hearing, the Creditors Committee

18   negotiated a number of provisions that were inserted into the

19   orders that expressly provide that the Debtors have to

20   provide them with all sorts of information regarding

21   intercompany transactions. We have to provide them weekly

22   reporting of the outstanding amounts owed by each non-Debtor

23   affiliate to any of the Debtors.

24         In addition, we have to maintain current records

25   with respect to all transfers of cash so that all

1   transactions, including inter-Debtor transactions and

2   intercompany transactions may be readily ascertained, traced

3   and recorded properly on applicable intercompany accounts.

4   The Debtors shall provide reasonable access to such records

5   and procedures to the Committee.  That is paragraph 9 of the

6   cash management order.

7           From that perspective, Your Honor, we expect, we

8   already have been addressing some questions the Committee has

9   had about intercompany.  We have some extensive document

10  requests that ask for more information that we expect to be

11  providing to them with respect to the intercompany

12  transactions.  So from a simple information gathering

13  standpoint, we don't see the point in requiring this in the

14  bar date order, when essentially we have to provide them with

15  the information anyway.  If there is no real purpose to it,

16  the issue just becomes cost.

17          Many of these foreign affiliates don't have their

18  own in-house counsel.  They commonly will look to general

19  counsel of the company in the United States for advice.  The

20  question will then become, well, gee, do we need to have

21  these foreign companies hire Delaware counsel or U.S.

22  Bankruptcy counsel to advise them on this point.  We will get

23  into a number of issues like that, Your Honor, and at the end

24  of the day what most counsel would advise is, well, file a

25  proof of claim, include everything you know about it, but

1  also include a number of paragraphs of things that may be

2  unliquidated.

3        So, I think at the end of the day if the

4  Committees' desiring certainty, simply requiring a bar date

5  process isn't going to fully liquidate every dime.  There

6  will be some reservation of rights and other things you

7  commonly see in proof of claims forms.  At the end of the

8  day, we will spend a lot of money and to really be that much

9  further along.  So, Your Honor, we are willing to live with

10  Your Honor's decision, whichever way.  We think it would be

11  more beneficial to the estates if we did not have to

12  undertake this exercise.

13        THE COURT:  Thank you for expressing willingness

14  to live with my decision. This is the only place in my life

15  where people express that.  Mr. Despins.

16        MR. DESPINS:  We know there are millions of

17  dollars of transactions or we're learning that there still

18  are millions of dollars of transactions almost on a weekly

19  basis between these non-Debtor affiliates and the Debtors.  A

20  lot of them are foreign entities and we also have a basis

21  issue, forget the information issue, how do we bond these

22  people?  We have to have a plan of reorganization.  How are

23  we going to discharge their claim if we tell them you don't

24  have to file a claim?  How do we deal with them?  They might

25  say, well, we control them.  If they are going to give me

1  releases from all these folks, that's great, but I'm not sure

2  you can.  These foreign companies are not going to give us

3  releases.  So the bottom line is, it's not the end of the

4  day, I leave it to Your Honor, but I don't understand from a

5  bankruptcy point of view how we are going to leave these

6  people hanging out there just because they are affiliates.

7              THE COURT:  I agree.  Mr. Buchbinder.

8              MR. BUCHBINDER:  Your Honor, Dave Buchbinder for

9  the U.S. Trustee.  I will be very, very brief.  We resolved a

10  number of issues with the Debtor in the bar date order, but

11  there was one thing that Mr. Routh said a moment ago that

12  requires clarification.  The reporting in the cash management

13  order and the monthly operating reports only concerns itself

14  with post-petition activity, including their claims in the

15  schedules documents what they are owed prepetition and we

16  heard a lot of evidence at the various DIP hearings about the

17  Mountain Pass side of the estate being not profitable and the

18  other side of the estate, which includes many or all of the

19  non-Debtor affiliates, is profitable.  I just want to make

20  the observation that the cash management order does not

21  substitute for prepetition schedules.

22              THE COURT:  Thank you.  Well, I agree with Mr.

23  Despins.  I think that this is an instance where requiring

24  non-Debtor affiliates to file proofs of claim makes a lot of

25  sense and should be required if we are going to have a bar

1  date.  It's not simply informational.  I think that's

2  important.  I think it's also important, though, to establish

3  legally binded amounts of what may be owed to these non-

4  Debtor affiliates.  Certainly, proofs of claim may contain

5  reservations, but that's true for many, many claims filed and

6  that doesn't mean bar dates don't make sense because people

7  simply put reservations attached to their proofs of claim.

8          I think it makes sense in this instance.  I echo

9  what Mr. Buchbinder says, while there might be post-petition

10 reconciliations going on, the purpose of the bar date is to

11 liquidate the prepetition amounts owed.  Given the fact that

12 these are non-Debtors, given that some of them, if not all of

13 them are foreign corporations or businesses, and given the

14 issues that have sort of percolated through the case relating

15 to the non-Debtor affiliates, I think it makes a lot of sense

16 to require the filing of a proof of claim.  If it costs

17 money, it costs money.  I am not cavalier about that, but I

18 can only, you know, I have to make decisions based on, sort

19 of, a rough cost benefit analysis that I do up here.  In my

20 mind, the benefits of having legal certainty in connection

21 with what the claims are outweighs whatever cost might be

22 associated with appropriately putting in place the mechanisms

23 needed to have those claims filed.

24          MR. ROUTH:  Your Honor, perhaps proving that we

25 were ready to proceed whichever way Your Honor ordered, I

1   have a form of order that includes the language that the

2   Committee wanted inserted, if I may approach.

3           THE COURT:  Yes.  Thank you.  This is acceptable,

4   Mr. Despins?

5           MR. DESPINS:  Yes, Your Honor.

6           MR. ROUTH:  Your Honor, there were a number of

7   changes with respect to informal comments of the PBGC, with

8   respect to Oak Tree, with respect to some other parties.  We

9   did file, with the Court, a blacklined form of order that

10   showed all of those changes.  So I believe parties in

11   interest have had the opportunity to review the various

12   changes to the bar date order and so I don't intend to go

13   over those with Your Honor today.

14           THE COURT:  No, that's not necessary.  All right,

15   I have signed the order just submitted.

16           MR. ROUTH:  Your Honor, I believe that brings us

17   to the omnibus contract rejection motion.

18           THE COURT:  Is there anyone present on the phone

19   or in the Court on behalf of Core-Rosion?  All right, I don't

20   hear anyone.  I have read their objection.  It's an executory

21   contract that can be rejected, and they will have a claim,

22   but it will be a general unsecured claim.  The fact that it

23   was, it may be difficult for that creditor to survive

24   financially based on the fact it's not getting paid for work

25   it did, is an unfortunate economic reality of the business.

 1 | So, unless you have got anything to add on that.

 2 |         MR. ROUTH:  Your Honor, we resolved one other

 3 | objection and I advised opposing counsel I would read a

 4 | sentence into the record.

 5 |         THE COURT:  I will overrule the Core-Rosion

 6 | objection.

 7 |         MR. ROUTH:  Thank you, Your Honor.  With respect

 8 | to Royal Wholesale, they objected to the motion with respect

 9 | to certain goods that they have title to that are in

10 | possession of the Debtors.  The Debtors and the objecting

11 | party have agreed that this week they would arrange a time in

12 | which those goods would be returned to the objecting party

13 | and with that, Royal Wholesale is willing to withdrawal their

14 | objection.

15 |         THE COURT:  Okay.  Please approach with an order.

16 | Thank you.

17 |         MR. ROUTH:  With that, Your Honor, I believe that

18 | takes us to the 2004 motions.

19 |         THE COURT:  Is that still contested?

20 |         MR. DESPINS:  Yes, Your Honor.

21 |         THE COURT:  All right, we're going to take a

22 | recess then.

23 |    [Recess 4:19:04 to 4:39:22]

24 |         THE CLERK:  All rise.

25 |         THE COURT:  Please be seated.

1        MR. DESPINS:  Yes, I'm sure you're excited on

2   Monday afternoon with a fee dispute and now a 2004 discovery

3   dispute.  Very exciting, but we will try to keep it simple,

4   Your Honor.  So this is the 2004 motion by the Committee

5   regarding various parties, but we are going to start with Oak

6   Tree.  Just to set the stage, as you know, we are under a

7   very, very tight deadline, October 6th we need to have a

8   motion or some other pleading asserting claims or we  need to

9   ask for an extension, therefore, and when you look at that

10  date and backtrack from there, there is really no time.  That

11  is why, you know, I think there was a mention in Oak Tree's

12  paper that we jumped the gun.  In this context there is no

13  such thing as jumping the gun.  We have no choice but to

14  proceed as quickly as we can.

15        By the way, on October 6th, they are getting very

16  broad releases, unless there is a challenge or an extension,

17  they are getting very, very broad releases under the order.

18  So put this in context, Your Honor, they have $118 or so

19  million term loan and a purported lease of $146 million

20  dollars.  So that totals about $260 million or so, maybe a

21  little bit more than that.  Out of that, they are going to

22  seek to have allowed, the Debtors have stipulated that they

23  are owed more than $100 million dollars as a penalty and/or a

24  stipulated loss value.  So a huge amount of money.

25        Your Honor, there is plenty of smoke here.

1  Usually I show up in these cases and I say, Your Honor, five

2  years and a half ago and, you know, the Judge looks at me

3  with a certain degree of skepticism.  This transaction was

4  done nine months before the filing and it's not like there

5  was a fire after the transaction so, therefore, there is a

6  lot of smoke in terms of the company's financial condition at

7  that time.  So we have no choice but to go deep and to go

8  fast.  Not surprisingly, that is causing some friction and we

9  are going to try to deal with this today.

10        Let me just address what should be easy issues.

11  The first one is the issue of the [indiscernible] because you

12  dealt with this in a bunch of contexts, but it's the issue of

13  us wanting discovery of their valuation, projections,

14  internal recovery models, etc.  I know what the law is,

15  generally, which is that in the confirmation context, if you

16  don't stick your neck out and say the valuation is X, you are

17  generally off the hook on that type of discovery.  But this

18  is not what we are dealing with.

19        What we are dealing with is whether the company

20  was insolvent, or undercapitalized or whatever other

21  financial tests are appropriate at the time of the 2014

22  transaction.  Clearly, on that, for example, let's take

23  undercapitalization.  You know, we know that

24  undercapitalization deals with the projections, a company's

25  projections.  We know from, you know, a bunch of sources, but

1  including Judge Gross in the Placom International case that

2  you sited in the [indiscernible] decision that the banks

3  reports or analysis at the time of the transaction are

4  certainly very relevant information.  So this information is

5  relevant in more than one respect on terms of

6  undercapitalization, but also the value of the company.

7  Insolvency, we all know that one of the standard issues is

8  discounted cash flow.

9       One of the issues with discounted cash flow is

10  what is the discount rate you are going to apply to that?

11  That depends on your assessment of whether the company is

12  likely or not to make it.  What if, I'm not saying there is,

13  but what if there is evidence, as there was in Placom with

14  the bank there, Fleet, that they said, basically in Placom,

15  these guys will never meet their projections, etc., etc.

16  That would be highly relevant to this issue and, therefore,

17  these cases that they site, regarding the non-discoverability

18  of business models or valuation models in the context of

19  valuation when you are not participating in the valuation

20  hearing, I don't believe are opposite in any way.  They are

21  in-opposite.

22       The second issue, Your Honor, is the trading

23  records.  We have asked for Oak Tree's trading records in the

24  company's securities.  Why did we ask for that?  Because they

25  told us that they traded in the company security.  So, first

1  thing, we are not making that up.  They did tell us.  We also

2  know that they had, for a very long period of time, inside

3  information on the company.  They say well, you know, I guess

4  they can't see the difference between being polite because we

5  said we have no evidence that there was insider trading,

6  which was being polite, and the fact that, well, add these

7  two factors together, they had inside information and they

8  were trading, that clearly investigations are appropriate

9  because, and we are not saying that we have a claim at this

10  stage, but clearly that needs to be looked at, clearly;

11  therefore, the fact that we are polite in our pleadings

12  should not be equal to us saying that we think we have no

13  claims .  Clearly, and we know, by the way, they will say

14  they have all that, but we will address that if we need to.

15  Your Honor, clearly, that is a claim that the estate would

16  have against Oak Tree and it needs to be investigated at this

17  time.

18        It's relevant, also, for other reasons.  For

19  example, if they fold securities the day before their

20  transaction closed, and by the way we know that's the case in

21  the sense they sold to the Debtors their securities.  They

22  had securities of this Debtor and some of the proceeds of

23  this transaction were used to re-purchase, at par, securities

24  that they had.  So we know, that is part of the mindset,

25  which is interesting, but if they had other securities that

1  they sold in the open market the day before the, by the way,

2  I'm not saying that is the case, but if that were the case,

3  it would be highly relevant.

4           The issue of burden.  What is the burden on them?

5  These securities, Your Honor, they all have codes.  They had

6  CUSIP.  So the ten percent notes had a certain CUSIP and the

7  convertible notes had another CUSIP.  I guarantee you that it

8  takes up an assistant at Oak Tree about half an hour to punch

9  in the code, put a frame in terms of date and off it comes.

10  So in terms of burden, there is none or practically none in

11  the context of discovery.

12          Now, next issue is the issue of, what I call, the

13  game of battleship, it's the issue of the unlimited discovery

14  of two Oak Tree people for a very short period of time.  Let

15  me explain what I mean by the game of battleship.  We all

16  played this game when we were kids and basically,  you know,

17  your brother is sitting on the other side and he's hiding his

18  destroyer and, you know, you're saying B4 or B6 and he says

19  no you missed.  Discovery, even in modern discovery, with the

20  use of search terms should not be a game of battleship.

21  Essentially, the fact is that we don't know how they describe

22  these transactions.  What code names they used.  They will

23  say they didn't use code names.  We have no clue.

24          In order to really assure ourselves that we are

25  not missing the battleship or the aircraft carrier, we want

1  to do a very narrow targeted search, and it is for two

2  employees of Oak Tree.  There are two different periods, 40

3  days before the filing and also 15 days before and 15 days

4  after the September 2014 transaction.  On top of that, Your

5  Honor, it's not all their e-mails, it's their e-mails with

6  three or four, maybe five entities, Moelis, McKenzie, Duff &

7  Phelps and Miller Buckfire.  So that is four, actually, four

8  entities.  So that is very narrow.

9          The way I would put this and, you know, I know

10  litigators, laws, these search terms, by the way, when I was

11  doing that stuff, we didn't use that, we actually went to the

12  client and looked through documents, but now they don't do

13  that.  That is a compelling argument when you have millions

14  of documents of potentially responsive documents.  But here,

15  on this issue, they are not telling you oh my God, there

16  would be thousands of e-mails, they are just saying we are

17  not doing it for two reasons.  One, it would be intrusive of

18  Oak Tree for reasons that I don't know and two, they raise

19  this privilege issue, which this one I give them a lot of

20  credit for in terms of creativity, which is if Milbank

21  reviewed e-mails from these two folks and they contain

22  privileged information about other deals, because the

23  argument is maybe, you know, Oak Tree number one, Oak Tree

24  number two communicated with Miller Buckfire on other deals.

25  If Milbank saw this, that would constitute a waiver of the

1  privilege.

2         The way, for example, when you produce to a

3  governmental agency like the SEC, when you open the door,

4  then the privilege is waived.  They site no case for that

5  proposition.  I want to be very precise, they site cases

6  involving governmental agencies and all that, but there is no

7  case saying that when your own counsel reviews documents, in

8  the context of document production, even though it is not

9  your counsel on this transaction that a privilege is waived.

10  Actually, frankly, if that concept works, we have just

11  invented the greatest way never to produce documents.  So if

12  you are talking to Miller Buckfire on two deals, always talk

13  to them at the same time, meaning the e-mail should cover

14  both because that way nobody can review it because it could

15  be a waiver of the privilege.  That cannot be the law.  I

16  give them a lot of kudos for creativity, but that cannot be

17  the case.

18         This is so narrow, Your Honor, this request for

19  the two Oak Tree folks for a very limited period of time.

20  It's so narrow that there cannot be any burden.  It's not

21  like as if they come back and say there will be 10,000;

22  they're not even trying to go and look because they know, for

23  30 days, what could it be.  It could never be, and that is

24  why the resort to the privilege issue.  So that is the third

25  point.

1          The final point is there is a search.  I have to

2 tell you, I was talking to my partner, Jay Worthington the

3 litigator, I said, you know, I need to understand this.  It's

4 counterintuitive because they call this the all document

5 request.  It's true that initially it looks like that because

6 it talks about all Molycorp documents, but time out.  It's

7 directed at only eight custodians and, on that, its limited

8 by the search terms that we agreed upon.  So, therefore, it

9 sounds like a lot, but it's really not a lot, Your Honor.

10 So, in a nutshell, these are the four issues, I think, we are

11 dealing with here today. So I will respond to whatever

12 arguments that counsel makes, but I think that concludes my

13 presentation.

14          THE COURT:  I thought, well, maybe I will hear

15 from others, but I thought on this last point they were

16 saying that their point was that it wasn't limited by the

17 search terms, that you were asking for everything that had to

18 do with Molycorp and it wasn't in any way being limited by

19 the search terms.

20          MR. DESPINS:  This is where I need a life line

21 since we are talking about games like battleship.  I need a

22 life line from Mr. Worthington, maybe he can explain it to

23 the Court.

24          MR. WORTHINGTON:  Your Honor, my understanding

25 from, and I have been listening in on the meet and confers,

1   is that the discussion related to all Molycorp documents that

2   satisfied the search criteria, which included custodians and

3   search term limitations.  So it is not calling for a search

4   in addition to the key word filter search.

5           THE COURT:  Okay.  So it's a, sort of catch all

6   bucket at the bottom of the discovery list, you know, not

7   item 34 of 34 in the sense, you know, all Molycorp documents.

8   Their point was, well, wait a minute, we just went through 33

9   items.  Since I am not limited, why did you even ask for the

10  first 33, you have asked for 34 and now you have asked for

11  everything.  Your point is, well, that might be the case, but

12  it's limited by the custodians and the search terms.

13          MR. WORTHINGTON:  Right.  In practice, Your Honor,

14  as we understand it, it's a document will belong to a

15  custodian, hit the search filter, and then a reviewer will

16  have to determine if that document is responsive.  We are

17  saying if it relate to Molycorp, after it has satisfied the

18  custodian and the search filter criteria, it should be

19  treated as responsive.

20          THE COURT:  All right, I understand.  Thank you.

21          MR. LEBLANC:  Good afternoon, Your Honor, Andrew

22  Leblanc of Milbank Tweed on behalf of Oak Tree.  Let me,

23  actually, take them in reverse order, that sort of starting

24  from the broadest down to the narrowest.  Just to deal with

25  that, if I understand correctly, I'm not sure we have a

1  dispute on the all documents relating to Molycorp.  In fact,

2  it was the first request.  So we said to them, the first time

3  we got the request over, why do you need 2 through 33 if you

4  have 1.  They said, let's focus on 2 through 33, we will come

5  up with search terms.

6         So just to level set where we sit, Your Honor,

7  this is not a 2004 where we are saying we are not going to

8  produce documents.  This is a motion to compel a subset of

9  documents.  Just to give this Court a sense of what we have

10  done, since the first time we first got the discovery

11  request, we have met and conferred with them many times.  At

12  their request, they gave us 51 search terms that we have, in

13  fact, run through Oak Tree's servers on the eight custodians

14  that were identified and we have collected those documents,

15  and today, on the deadline that they asked for production, we

16  are producing, substantially, all of the documents that are

17  responsive.  We have called out, obviously, privileged and

18  then the false positives.

19         Let me give you a sense because, Your Honor, I

20  have, actually, never seen this in any case; the search terms

21  that we proposed to them in response to their request are the

22  typical search terms one would expect, which would be

23  Molycorp, or Moly, or MCP or Neo, any of those names,

24  generally, with another word like financial condition, or

25  finance or projections or something like that.  They said,

1  no, no, we don't want that.  We want these 51 words run

2  without any connection to anything else.  So, for example,

3  the first word in the search is Molycorp.  So any document

4  that has the word Molycorp in it would be captured by our

5  search.  The list, and I have the list here if Your Honor

6  wants to see it, I think it might be useful.  If Your Honor

7  would like to see it, I will hand it up.

8            THE COURT:  Sure.

9            MR. LEBLANC:  May I approach, Your Honor?

10           THE COURT:  Yeah.

11           MR. LEBLANC:  So, Your Honor, this is the list of

12  search terms that was provided to us by the Committee.  So

13  running those search terms through the custodians yielded

14  22,000 documents.  When we reviewed for both privileged and

15  responsiveness, we are going to produce over 3,000 documents

16  today, which we think, substantially, completes the

17  production.  There is, obviously, we are going back through

18  second level review of documents that were identified for

19  privilege.  Those are not the issues that we are here for

20  today.

21           I will talk about the two categories of documents

22  where we have said we are not going to produce them, but

23  before I get to that, to be clear, if all they are asking for

24  now, which is different then what we had understood, if all

25  they are asking for now is for us to run these search terms

1   and to produce the documents that are yielded from it,

2   subject to whatever disputes we have on these couple of

3   categories, then we are fine.

4          What it looked like to us, Your Honor, is that

5   they wanted to press a request for all documents concerning

6   Molycorp so that if in the future a document arose because it

7   was forwarded on to somebody and it was produced to them from

8   some third party, and it didn't use one of these search

9   terms, then we would be the ones responsible for that not

10  being captured as opposed to their responsible for it not

11  being captured because we used their search terms.  If that

12  is not the issue, all request number 1 for all Molycorp

13  documents is asking for is actually these documents yielded

14  from this, then we are fine.  We don't have an issue with

15  that. I think we can leave that issue to the side.

16          THE COURT:  All right, let's narrow this.  Let's

17  see if that is the case.

18          MR. WORTHINGTON:  I think we are in agreement with

19  the caveat that should we become aware of additional

20  references, means of referring the Molycorp code words for

21  Molycorp or that might arise in the future, we would have to

22  reserve the right to request additional searches to identify

23  those additional Molycorp documents that might have been

24  missed entirely by the search protocol thus far.

25          MR. LEBLANC:  We have no issue with that.  In

1  fact, Your Honor, we put that into our response that we are

2  happy to run, if they have other search terms they want us to

3  run later, we are happy to run them.  This list is there were

4  six terms added at the bottom.  We are happy to do that.

5          THE COURT:  I think we have an agreement, all

6  right.

7          MR. LEBLANC:  Good.  The second issue, Your Honor,

8  which Mr. Despins described as very narrow, I am actually not

9  sure because their objection says one thing about the time

10 limits, but just to be clear about what they are asking for

11 is for two individuals at Oak Tree, they are saying every

12 communication with anybody at any of these four financial

13 institutions, whether its McKenzie or financial institutions

14 or consultants, on any topic you need to pull and look at,

15 specifically.

16          Now, importantly, Your Honor, the only documents

17 that would be yielded from that, that are not yielded from

18 the list of 51 search terms are documents that, by their

19 nature, have none of these words on them.  We suggest, and to

20 be clear, while its two people at Oak Tree, it is an

21 unlimited universe of people at each one of those financial

22 institutions.  So Moelis, McKenzie, Miller Buckfire and Duff

23 & Phelps. So to the extent that Mr. Lang, who is one of the

24 people that they have asked for the search for, we identified

25 him in our paper, who is the head of restructuring for Oak

1  Tree, engages in communication with Miller Buckfire on four

2  different deals.  This additional search, what Mr. Despins

3  describes as very narrow, by our calculation it looked like

4  120 day period we would have to search Mr. Lang's e-mails,

5  would yield, the only documents that would not be duplicative

6  of the first request and the search terms, would be documents

7  that have nothing to do with, they don't even say Molycorp,

8  MCP or any of these other 50 terms on them.

9          Now, what we suggest, Your Honor, is that that is

10  a search that by its nature is designed to yield documents

11  that are unrelated to Moly and to Molycorp and are instead

12  documents related to other transactions that are going on in

13  the market place.  We think it is entirely inappropriate in

14  this context to have a list as extensive of this.  It's not a

15  list of limited search terms within 50 words of something

16  else, but a virtually unlimited search term list that they

17  came up with to say then, look also for these other ones that

18  have none of these words in them over this 120 day period

19  with this entire set of financial firms.

20          Your Honor, we think it's unprecedented.  I have

21  never seen that in any case I have been involved in and it's

22  completely inappropriate in this context because the person

23  at Oak Tree; we had a list of several of the matters that Oak

24  Tree is involved in, Your Honor, and there is dozens and

25  dozens of more, obviously.  These people at Oak Tree are

1  engaged with these financial firms and these consultants in a

2  number of different things.  It is designed to yield other

3  cases, not this case.  Then, we are asked, and I will just

4  give an easy example because it's one that's public.  We just

5  confirmed in front of Judge Wiles, around the Fourth of July,

6  it was July 2nd, we confirmed a case, In Re Chassix.  We

7  represented Platinum Equity, which was the equity sponsor in

8  that case and one of the largest lenders was Oak Tree.  So

9  they were, in effect, on the other side.

10        Now, to the extent that, and I don't think any of

11  those four firms, although, I think McKenzie was, McKenzie

12  was involved in that case.  So if McKenzie's name comes up in

13  the 60 days or 120 days for which this review is sought, then

14  we are going to get every document that Mr. Lange engaged in,

15  every communication he had with McKenzie regarding Chassix.

16  We are going to now review it.  That case is confirmed, so

17  it's not as big an issue for us, but what's unusual about

18  this is it's designed to elicit or to return documents that

19  when you de-duplicate them, the only new set of documents or

20  documents that are almost assuredly unrelated to Oak Tree,

21  particularly in light of, or to Molycorp.

22        THE COURT:  I mean, that's what we used to do,

23  right.  Let's go back to pre-email when we were both young

24  lawyers, and you were sent on site, and you were said to look

25  through the CFO's correspondence file, we got to CFO's

1  correspondence file.  There was no preliminary cut, you know,

2  we looked at all the letters he had sent in the last 60 days

3  and we went through the documents or we went through the

4  boxes of the controller.  I mean that is how discovery used

5  to happen.  If you came across a communication between the

6  CFO and the lawyer on another deal that didn't have anything

7  to do, that didn't waive privilege, that was just not

8  responsive or not responsive and privileged, you know, not

9  necessarily privileged with you, privileged with somebody

10 because it's the client's privilege that mattered.

11         MR. LEBLANC:  Your Honor.

12         THE COURT:  That is what we used to do.  So e-

13 discovery is great because we don't have to do that anymore,

14 generally speaking and, particularly, great because the

15 volume of communication has exploded, exponentially.  I mean,

16 we all send a ton more e-mails then we ever sent letters

17 back.  Again, you know, when I started I didn't have a

18 computer on my desk, and that's how old I am.  So I

19 understand why we have the power of e-discovery, the

20 necessity of e-discovery, but it's not necessarily the end of

21 the world to have to do it the old fashioned way, even if you

22 are looking at e-mails.

23         MR. LEBLANC:  Well, Your Honor, and I don't

24 disagree with all of that.  I do disagree with some it.  What

25 you have here, you have the power of e-discovery in this

1 circumstance to know that if it's on this list, these 51

2 terms, we are already going to get it.

3       THE COURT:  Right.

4       MR. LEBLANC:  This is just everything else.  What

5 we do know, what we are certain of is the everything else is

6 a universe that is, likely, quite large.  It's not 15 days

7 plus or minus.  By our calculations, it's some 120 days total

8 of these two individuals with anyone in these different

9 firms.  In that circumstance, Your Honor, we think that the

10 burden of that alone is unreasonable.

11       I can honestly say, Your Honor, and I have only

12 done discovery through the e-discovery world, but I have

13 never seen anyone ask for these documents.  I have never seen

14 another Court order this type of review in the e-discovery

15 world because as Your Honor just noted, when you have a

16 correspondence file, you might have sent, you know, a handful

17 of letters a day.  Today, my inbox, and I'm sure many people

18 in this Courtroom are the same, I get more than 400 e-mails a

19 day that I am either copied on, or directed to me, I'm cc'd

20 or I'm bcc'd; it's an entirely different world that we are

21 dealing with in these circumstances.

22       In light of that, Your Honor, its wholly

23 unprecedented in our view and we think it's completely

24 inappropriate in this context because the prospect that they

25 are going to miss something with this search list is so

1  remote, Your Honor, and, again, with the understanding as we

2  have already put in the record and we put in our paper that

3  if there is something that comes up, if somebody uses another

4  project name, and I will give you just an example; at the

5  bottom handful, Your Honor, there is a Project REM and a

6  Project REE, those were added to the list because we

7  understand those are the project names that McKenzie used for

8  its work in this case.

9         So we added it to the list, at the Committees'

10 request, and they are going to get those documents.  If

11 another one of those comes up, we will do that search.  What

12 we are objecting to in this element, Your Honor, is just this

13 wide open period of time, and not a very narrow period of

14 time, with all these financial firms that are involved and

15 many different things in the marketplace.

16         THE COURT:  Okay.

17         MR. LEBLANC:  And now I am going, again,

18 backwards.  Now, the other two are discreet issues, so let me

19 take them in the order that Mr. Despins presented them.

20 Internal valuations.  Your Honor, when Your Honor just over a

21 year ago wrote the Energy Futures Holdings decision, you said

22 "it's uncommon to ask for internal valuations in the context

23 of a bankruptcy case."  That's what you had said at the time.

24 Now, little did we know, yours was, and I guess you had

25 already referenced them because they had happened only in the

1  proceeding couple of months, but over a three month period of

2  time, three Courts in New York and Delaware had cause to deal

3  with this question and to decide whether or not the

4  proprietary internal valuations that were done by creditors

5  in a case were subject to discovery.

6         I think, Your Honor, the notion that that arose,

7  certainly, in the Dolan case and, certainly, in the Genco

8  case in the context of plan confirmation, the idea that,

9  well, you couldn't get it as plan confirmation discovery,

10  but, instead, you could just serve a Rule 2004 to get the

11  same information; I don't think that works, Your Honor.  The

12  point, the issue here is this is not probative. The internal

13  thinking about valuation is not probative of anything.

14         Now, the Committee has a stable of financial

15  advisors at this point in time.  They have Blackstone and

16  they have Berkeley Capital.  If they believe, based upon the

17  Debtors financial information that there is a basis to assert

18  a claim against Oak Tree, and that claims then gives rise or

19  makes relevant Oak Tree's internal valuations, which it's

20  difficult to see because, obvious, if it's an actual

21  fraudulent transfer claim, then Oak Tree's views don't

22  matter; it's the Debtors' views.  If its constructive

23  fraudulent transfer claim, then, what is at issue is the

24  facts, which are from the Debtors' financial records.  They

25  have everything they need to make whatever arguments they

1  want to make.

2          I don't think there is any distinction.  I think

3  the notion, Your Honor, that given your decision, Judge

4  Shannon's decision, Judge Lane's decision that you would turn

5  around and say, well, you can't get it as plan discovery, but

6  its fair discovery as Rule 2004 discovery.  All you would see

7  is you would see an awful lot more requests for valuation

8  information as part of Rule 2004 instead of plan discovery

9  because that's where you can get it.

10          Your Honor, a couple things that are important.

11  Mr. Despins suggested, well, this is just about the

12  transaction 2014.  Well, that is not how the request is

13  actually framed.  It is every document from some, I think its

14  January 2013 forward relating to valuation.  So, we don't

15  think it's not limited to any period around the time of the

16  transaction.  We think even that, however, would be

17  inappropriate unless and until it becomes relevant to

18  something in this case, which the Committee can make relevant

19  or not based upon information they can get entirely from

20  other sources.  So we think Your Honor's decision in the EFH

21  is entirely appropriate, the same ruling that Judge Lane and

22  Judge Shannon entered.  To the extent that it becomes an

23  issue at some point in the future, which we are here, we

24  don't even know what a plan may look like, we can cross that

25  bridge when we come to it, Your Honor, but it's just not

1  appropriate now.

2           The last information, and just to be clear about

3  the valuation information, so, Your Honor, when I say that we

4  searched the 51 search terms, what we have excluded from our

5  production, really, is just to categories of things.  There

6  is the privileged documents and the false positives.  Those

7  are the only things that come out of that $22,000.00 that

8  bring it down to $3,000.00.  On top of that, we have also

9  taken out the internal valuations that Oak Tree has; that is

10  the only category.  I will talk about the trading issue in a

11  second, but I just want to be clear about that.  So there is,

12  obviously, given the nature of the transaction with the

13  Canadian company and a bunch of foreign subs where perfection

14  issues had to be dealt with, there is a lot of privilege

15  issues with local counsel in various jurisdictions.  So there

16  is a lot of privileged documents.  There is also a lot of

17  false positives because if you look further down the list,

18  Your Honor, there is a name like Bedford where every state in

19  New England has a Bedford as a city or a town, so there is a

20  lot of false positives there.  Doolan is not an uncommon

21  name, so those get a lot of false positives.

22           The only thing we have actually take out is issues

23  related to valuation.  The reason I say that, Your Honor, is

24  because trading information.  This is the last category that

25  Mr. Despins talked about.  The trading information, we have

1  agreed, Your Honor, to provide any and all trading

2  information from the books of the people at Oak Tree who were

3  involved in any of these transactions.  So the custodians at

4  Oak Tree who were involved in these transactions, to the

5  extent that they traded, the Committee will have all of that

6  information.  So we have not excluded anything based upon

7  trading information that is possessed, or within the

8  knowledge, or sent to or received by those eight custodians

9  of Oak Tree who are actually involved in this transaction.

10         What we expressed to the Committee we are

11  unwilling to do is to go look at the rest of Oak Tree, which

12  is a large organization, has a bunch of different trading

13  books and go through those books and see if there is any

14  trades in the securities of the Debtor.  We don't think it's

15  appropriate.  We don't think it's necessary.  So that is the

16  limitation that we have drawn because if any of them were

17  trading, they were not trading as part of the finance team or

18  the deal team here.  So that is the distinction that we have

19  drawn, Your Honor. The trading books of anybody involved in

20  these transactions that the Committee is investigating, they

21  will have and they will get.

22         So, Your Honor, we have tried very hard because we

23  understand there is, I wouldn't say it's a very short period

24  of time, it's sort of a common period of time to conduct this

25  investigation, so we got on it immediately when the Committee

1  sent us requests.  This isn't a 2004 in the sense that you

2  need to authorize them to come take discovery, we didn't

3  object to that.  We said, immediately, we will do that.  This

4  is really a motion to compel a very narrow set of documents.

5            THE COURT:  Okay.

6            MR. LEBLANC:  Your Honor, we think for the reasons

7  I have discussed, that it's inappropriate and unnecessary for

8  you to compel the production.  Thank you, Your Honor.

9            THE COURT:  Thank you.

10           MR. DESPINS:  So very briefly, Your Honor, again,

11 starting from the last point, which is the trading, I don't

12 care whether people were trading that were involved in

13 Molycorp or not.  However, I know this from other funds, not

14 from Oak Tree, but I know this, they have walls that people

15 of the wall report to the same person who has one brain and

16 who is told, hey, we want to invest.  By the way, I want to

17 be clear, I'm not saying that this happened here, but I have

18 seen this happen where they say I want to invest or sell

19 Molycorp, I want to buy Molycorp and that same person has

20 somebody else reporting to him on the other side of the wall.

21           So the point is, the words that Mr. Leblanc used

22 are it's not appropriate or necessary.  What are those words,

23 appropriate according to who?  If there is insider trading,

24 we absolutely need to investigate that.  As I said, the

25 burden, he's not even arguing with that.  If you push a

1  button, you put the code in and it spits out the

2  transactions.  If their problem is they want to redact

3  amounts, things like that or discuss that, but the concept

4  that we would have access to that is fundamental.  There is

5  just no way around that.

6          Then, the issue of internal valuations, I mean if

7  you are lending, let's say, $250 million dollars to someone

8  and it has a, I'm making round numbers now, and there is a

9  prepayment premium of $100 million dollars and you have

10 projections or models that show that these guys are not going

11 to make for the next three months, that clearly could have a

12 bearing on that transaction both from a fraudulent transfer

13 point of view, but also from whether these claims should be

14 allowed at all.  So, clearly, these other cases about

15 valuation and plan confirmation have no bearing on that.  We

16 are talking about the time of the transaction and that's

17 relevant from an under capitalization point of view.

18         Again, it's like Judge Gross in Placom, he

19 basically said the notes and the comments on the lender at

20 the time of the transaction are highly relevant.  Onto the

21 other point about, again, same words, its burdensome, it's

22 inappropriate, never seen that before.  The point being look

23 at all these names, look at all these terms.  I will give you

24 three.  This is, again, the search of two individuals for a

25 limited period of time, 30 days before the filing, 15 days

1  before and 15 after the 2014 transaction.  They are saying,

2  you don't need to do that.  By the way, the reason we are

3  doing that is a control test to make sure that the search

4  terms actually work.  Everything in there, there are so many

5  names, but I will give you five different, for example, they

6  are at a meeting, somebody sends an e-mail to somebody else,

7  I can't believe your CFO said.  How would that be picked up

8  by any of the search terms?  It would not be picked up.

9       You're a CFO and never made a projection in the

10  last five years or Gene made up these numbers.  By the way,

11  these are not real names, to the protect the innocents here,

12  but you get the point, Judge, is that it's the point you are

13  making.  Yes, search terms are wonderful, but given that we

14  have narrowed it so much, there is no burden on them to

15  actually go and look.  Mr. Leblanc said I get 400 e-mails a

16  day, but 400 e-mails from four sources, I don't think so.  If

17  you are getting 400 e-mails from these four sources, that is

18  possible, but I don't think it's likely.  By the way, they

19  are not saying that.  They have made no argument that there

20  is going to be thousands of e-mails.

21       The key point they are saying is this is designed

22  to catch other transactions.  Let's follow that.  So let's

23  assume that actually these e-mails talk about another

24  transaction.  I will never see this e-mail ever.  So how is

25  it designed to do that?  For what purpose, to have them incur

1  fees.  I mean, please that is kind of insulting.  The point

2  is there can be plenty of, I know this because when I send e-

3  mails there is not always a title that says Molycorp, there

4  is not always this and that; therefore, it's very easy to go

5  beyond or past these search terms.  That is why, Your Honor,

6  given the very limited scope here, its two people, and its 30

7  days before the filing, 15 days before the transaction and 15

8  days after for the unlimited search.  The trading records,

9  that's kind of, it's basic.  Again, on the projections, their

10  recovery models, that is highly relevant to the issue of

11  allowance of those claims, any claims that the estate may

12  have against Oak Tree.

13           THE COURT:  Okay.  Yes.

14           MR. LEBLANC:  Could I just respond to two points,

15  Your Honor?

16           THE COURT:  Yes.

17           MR. LEBLANC:  The first is, again, to level set.

18  This is a very large financial institution, a very large fund

19  dealing with a bunch of different financial advisors,

20  consultants, those types of things.  The e-mails Mr. Despins

21  just referred to, your CFO has never hit a projection.  I

22  don't know how we would ever deem them to be responsive

23  because they wouldn't have had any of the terms.  We are not

24  just going to hand that stuff over to them.  We would have to

25  them review it for responsiveness.  We have no way of seeing

 1  whether that is responsive.  It is just not a workable

 2  solution here.  It really isn't, Your Honor.  For that reason

 3  I don't think anybody has ever tried it before or done it

 4  before.  It's just not workable.  It has to have none of

 5  those terms.

 6          If they want to add other terms, if Gene is

 7  important to them, then let's add Gene to the list. I don't

 8  know who that might be, but let's add it to the list.  The

 9  only other point is, Your Honor, Mr. Despins keeps referring

10  to cases that have decided valuation is not relevant in the

11  context of confirmation.  Your Honor's decision in Energy

12  Futures was not in the context of confirmation.  It was a

13  declaratory judgment action where you said whether or not the

14  Debtor is solvent is relevant to how you determine the legal

15  question, whether it's an equitable standard that you would

16  apply or a legal standard that would apply depending on

17  whether they are solvent or insolvent.  Even in that context,

18  you said it's not appropriate to have this information

19  discovery.

20          I think that context is important, Your Honor.  I

21  think Mr. Despins just brushes it over saying that's a

22  different context, you shouldn't apply those rules to 2004

23  because it's a fishing expedition.  This is, as we say in our

24  pleadings, Your Honor, the hook ain't baited here.

25          THE COURT:  Okay.

1           MR. LEBLANC:  Thank you, Your Honor.

2           THE COURT:  All right.

3           MR. DESPINS:  Your Honor, two seconds.  Your case

4   on EHF was the issue of whether the company is insolvent

5   today.  These people have nothing to do with entering in a

6   transaction while the company was insolvent or not

7   undercapitalized or not; two totally different issues.  On

8   the issue of discovery being too broad, I am going back to

9   the first thing I mentioned, you know, they know where the

10  destroyer is.  They have all their hot documents and they

11  want search terms because we are going to go past the

12  destroyer or the aircraft carrier and that's not the way this

13  should proceed.  Thank you.

14          THE COURT:  All right, well, again, there were

15  four issues identified.  One was resolved by, sort of,

16  talking it out in Court, which is this all Molycorp documents

17  issue and, obviously, what the parties agreed to on the

18  record will resolve that.  With regard to the Oak Tree

19  trading records and the company securities, I think that is

20  appropriate.  I don't think that needs to be limited to these

21  eight custodians.  If anyone affiliated with Oak Tree, in

22  their various capacities, was trading in any of the company

23  securities, I think that's relevant and should be

24  discoverable.  I don't think the burden is high.

25          I am not going to require the production of

1 valuation projections or internal valuation at this time.  I

2 don't think enough has been put in front of the Court that

3 would deem it to be relevant or likely to lead to the

4 discovery of relevant information.  As I stand by, my

5 comments a year ago or so in EFH about internal valuation,

6 generally, being unavailable and not favored, there are

7 certainly circumstances in which it could arise and be

8 relevant.  I don't see them having been identified at this

9 time, so denying it now without prejudice as to what may

10 occur in the future or what might come to light in the future

11 or become relevant in the future.

12        It may be, you know, if the Committee does its

13 investigation and institutes some sort of action, you know,

14 in the context of that action it may become an issue that is

15 right for discovery.  I don't know.  I don't know what that

16 might be, but I don't think they need that information, as we

17 sit here today, to get between now and October 6th.  Those are

18 the easy ones.

19        The hardest one for me is this concept of

20 unlimited discovery of these two identified persons without

21 the limited search terms for, I guess, it's a total of 120

22 days; its 60 days for each person.  I am torn, frankly, on

23 how to proceed because I'm concerned with opening up this

24 giant morass of information instead of using the search

25 terms, but I am going to allow it because its limited to the

1  communication with the four entities identified, Moelis,

2  Miller Buckfire and two others that I don't remember.

3          So we are not talking about all e-mails received

4  or sent by these people.  We are not talking about every ECF

5  notice that an attorney has gotten with every *pro hac vice*

6  motion.  We are talking about specific people, two specific

7  people communicating with four specific firms and if it

8  identifies a bunch of communications in other cases,

9  obviously, that is not responsive.  It's going to be a pain.

10  We are going to have to pay $550.00 an hour or more for

11  somebody to go through and make that determination.  That is,

12  you know, one of the reasons it's important we use search

13  terms and that we limit the e-discovery because of the

14  explosion of information and the expense associated of going

15  through it without it, but, I think, given the narrowing

16  which has been done here, which is really, you know, more

17  narrowing would have been appropriate, less narrowing

18  wouldn't have been.

19          This is, sort of, on the cusp.  This is, you know,

20  I can pay.  If you have been asked for 60 days before the

21  filing or, you know, if you have been talking about any

22  communication with any other people.  I think it is just

23  sufficiently narrowly tailored that I will allow this

24  exception to the general rule about e-discovery.  So I will

25  allow items 2 and 3 on Mr. Despins list, not allow number 1

1   and number 4 as becoming irrelevant or moot.

2           MR. LEBLANC:  And, Your Honor, the one thing I

3   will note is that if this yields hundreds of thousands of

4   documents, we will work with the Committee to try to do

5   something to narrow it, but we will see what we can do to

6   comply with this.  Obviously, their response date was today,

7   so we need that, but we will work with the Committee to do

8   this as quickly as possible.

9           THE COURT:  All right.

10          MR. LEBLANC:  Your Honor, just so it's clear on

11  the record, we reserved with interrogatories on Friday, if we

12  have to deal with those issues before the Court we will, but

13  one of the documents they put before the Court was the

14  deposition notice.  So we have not met and conferred on the

15  deposition notice yet.  So I just don't want a motion to

16  compel the granted with respect to the motion, the deposition

17  notice at this time.

18          THE COURT:  I'm just dealing with the four issues

19  that were identified.

20          MR. LEBLANC:  Thank you, Your Honor.

21          MR. DESPINS:  Your Honor, I sort of hesitate to

22  ask this, but I, sort of, need to; clarification of what is

23  the valuation analysis.  I mean, there are also some things

24  in there, projections that, for example, show that the

25  company is not going to be able to --

1          THE COURT:  If they are internal projections, no,

2   I am not requiring that.

3          MR. DESPINS:  Okay.  Thank you, Your Honor.

4          THE COURT:  Anything else?

5          MR. WORTHINGTON:  Yes, Your Honor, we had the two

6   remaining pieces of the Rule 2004 motion with respect to Duff

7   & Phelps and Moelis.

8          THE COURT:  Okay.

9          MR. WORTHINGTON:  This will be very quick.  With

10  respect to Duff & Phelps, the Committee and Duff & Phelps

11  have reached an agreement and we are withdrawing the motion.

12  With respect to Moelis, we have not yet reached agreement.

13  There may be counsel for Moelis on the phone, I don't know.

14          UNIDENTIFIED SPEAKER: Yes, I'm sorry, Your Honor,

15  this is [indiscernible], I am the general counsel for Moelis.

16  We have not yet engaged counsel.

17          THE COURT:  Okay.

18          MR. WORTHINGTON:  The current situation with

19  respect to Moelis is or the Committees' position is there can

20  be no real dispute as to the relevance of Moelis, of

21  documents and information in Moelis's possession.  Moelis

22  advised Molycorp, prior to 2014, with respect, at least to,

23  certain equity offerings.  It also advised the company

24  throughout 2014 with respect to starting early in the year,

25  analysis and advise provided concerning the company's capital

1  structure, potential refinancing's.  It advised the company

2  and, as we understand it, negotiated on the company's behalf

3  in connection with the 2014 Oak Tree transaction.  It also

4  negotiated on the company's behalf with respect to potential

5  alternatives to the transaction.

6          After the 2014 Oak Tree transaction, we had seen,

7  although we do not yet have a complete set of Moelis

8  presentations, we have seen board minutes and documents

9  indicating that Moelis continued to provide analysis and

10  advise to the company regarding its capital structure post

11  the Oak Tree transaction and engaged in negotiations on the

12  company's behalf with respect to other lenders and other

13  interested parties.  Our understanding is that continued, at

14  least, until the end of 2014 or perhaps January of 2015 when

15  Miller Buckfire had done the same.

16          As we understand it, Moelis's objection is,

17  principally, as to burden.  We have made a series of detailed

18  request to Moelis in which we have taken the same Molycorp

19  search filter, which is designed to capture references to

20  Molycorp.  We have made one fairly significant concession in

21  that the term MCP, which is the company's, used to be the

22  company's publicly traded ticker, is also a reference to

23  Moelis Capital Partners.  So we have agreed to take that out

24  of the search filter, in an attempt to address Moelis's

25  concerns, but, otherwise we have developed a search filer to

1  tightly capture Molycorp references.

2            We have offered to narrow Moelis's production to

3  just four custodians.  We have reviewed Molycorp's board

4  minutes and there are four Moelis executives who attended

5  board meetings, regularly attended board meetings, provided

6  advise to the company, also provided advice to company

7  management and we believe that Moelis, the narrowest

8  production that would be appropriate for Moelis involves

9  those four Moelis executives who attended Molycorp board

10 meetings starting with some margin for safety.  We basically

11 had gone back to them a month prior, to the beginning of the

12 month prior to the first board meeting we see a Moelis

13 executive attending and we said Moelis should search through

14 the documents of those four custodians for the periods of

15 time when the Molycorp minutes and board minutes indicate

16 those executives were advising the company.

17            Moelis's response, thus far, has been to say that

18 any review of internal communications for a period greater

19 than one to two weeks were be unduly burdensome and we simply

20 don't believe that this discovery exercise, given the

21 centrality of Moelis's involvement here, through the key

22 negotiations in 2014 and subsequently, that this discovery

23 can be limited to a one or two week period.  That is, as we

24 understand it, that is the core of the dispute that we are

25 seeking from Your Honor an order directing that Moelis

1  conduct discovery with respect to internal and external

2  communications relating to Molycorp for each of these four

3  custodians beginning from the time period when the Molycorp

4  board minutes indicate that that custodian was involved in

5  advising the company.

6          THE COURT:  For those search terms.

7          MR. WORTHINGTON:  For the Molycorp search times.

8          THE COURT:  Without MCP?

9          MR. WORTHINGTON:  Correct and reserving the right

10 if additional search terms for reviewing documents or become

11 aware of additional searches that might be necessary to

12 identify relevant documents, we would have to re-open the

13 discussion.

14         THE COURT:  Okay.

15         MR. WORTHINGTON:  So with that I will reserve for

16 rebuttal.

17         THE COURT:  Okay.

18         MR. WORTHINGTON:  So with that, I will reserve for

19 rebuttal.

20         THE COURT:  Okay.

21         UNIDENTIFIED SPEAKER:  This is [indiscernible],

22 general counsel for Moelis.  We have talking with UCC counsel

23 and agreed upon certain things to produce.  I think he is

24 correct that the main concern we have was producing internal

25 e-mails and one of the main reasons for that is cost, but in

1  addition to that we are not sure that it's relevant as to

2  what our internal e-mails were.  On the transaction, they are

3  significantly more numerous than our external e-mails.

4          In addition to that, the custodians that they

5  pick, well, let me start with the timeframe that they have

6  chosen.  They selected a timeframe, effectively, for the two

7  main custodians from the beginning of 2014 through today,

8  which is almost two years.  We think it's more appropriate to

9  be searching the period from when the Oak Tree proposal was

10  first made sometime in June through the closing of the Oak

11  Tree transaction in December.  We actually were not the

12  company that advised their post-closing.  They hired, I

13  think, Miller Buckfire at some point. I don't know if that

14  was late 2014 or early 2015.  We actually pitched to become

15  that advisor, but were not selected.

16          So it's hard to imagine how our correspondence, we

17  can check e-mails for, you know, most of 2015 effectively.

18  The four custodians they picked, we agreed upon two of them,

19  Michael Sempt [*phonetic*] and Carl Deglamo [*phonetic*], who are

20  the two main people who work day to day on the transaction.  The

21  two additional custodians they selected, one that did not attend

22  any board meetings until after the Oak Tree proposal was closed,

23  the Oak Tree transaction was closed.  I was really, largely

24  involved in trying to pitch to win a restructuring assignment at

25  some point.

1   Then, the other individual, I think, attended two board meetings,

2   perhaps, in August of 2014, but was not central in the transaction.

3   So that goes to both the timeframe and the people selected.

4           Then, with regard to the main, I think, e-mails that

5   the UCC are looking for, are e-mails to Molycorp, which we have

6   agreed to produce and to Oak Tree to eight designated Oak Tree

7   people, which we would, hopefully, seek to try to narrow with UCC

8   counsel just for the reasons that Oak Tree counsel mentioned.  Oak

9   Tree is a very active player in our business and it would be

10  expected that a number of our people would have correspondence with

11  a number of Oak Tree people on various other matters.  I don't know

12  if that's the case with Mr. Sempt and Mr. Deglamo, but it certainly

13  would be with regard to Mr. Demont and Mr. Kline.  So we are hoping

14  that of those eight, I think there were two that were very much day

15  to day and, maybe, there are two senior people, but there are a

16  number of junior people who seem less relevant.

17          Then, with regard to other external e-mails, I think it

18  would be burdensome on us to have to review, we have to review each

19  of these e-mails to determine whether or not, you know, even if it

20  refers to Molycorp, it is related to another confidential client

21  matter and cannot be produced, given our confidentiality

22  obligations who are the clients.  So it is quite burdensome to

23  review these e-mails at our own cost.  So, we would respectfully

24  request that with regard to other external e-mails, they be limited

25  to a senior person or two senior people at the other four bidders

1  that were involved, that submitted proposals, I think there are

2  four other bidders that submitted proposals, as opposed to just a

3  blanket search of e-mails referring to the list of search terms.

4          THE COURT:  Okay.

5          MR. WORTHINGTON:  If I could briefly respond to a few

6  of those points, Your Honor.

7          THE COURT:  Yes.

8          MR. WORTHINGTON:  With respect to external parties

9  beyond Molycorp and Oak Tree, we know from the board minutes and

10 from Moelis presentations that Moelis was reaching out to other

11 company creditors, it was reaching out to other market participants

12 concerning possible alternatives to the financing transactions

13 that, ultimately, went forward in 2014.  We are not in a position,

14 right now, to know the universe of relevant external communications

15 that this Moelis team engaged in, certainly in 2014.  Are

16 expectation is that there would be considerable relevant external

17 communication with alternate sources of funding and other lenders

18 to the company throughout the course of 2014, not simply

19 concentrated on the Oak Tree transaction

20         In addition, we see from the custodians who we have

21 asked for, we see them continuing to participate in board meetings

22 through October, November, December.  January of 2015 is when we

23 first see Miller Buckfire here.  As far as we can tell, and the

24 picture we have is very limited, we have asked for a full set of

25 the Moelis presentations to the company and the board, but have not

1  yet received them, but as far as we can tell, it appears that

2  Moelis, immediately after the Oak Tree transaction, continued to be

3  involved in advising the company a to its post-transaction capital

4  structure.

5       The adequacy of the company's capitalization, the

6  adequacy of its capital structure before and after the Oak Tree

7  transaction are all highly relevant to the Committees'

8  investigation.  It would be overly narrow to say that Moelis's

9  relevant involvement here only focused on the negotiation of the

10  Oak Tree transaction.  What is relevant about Moelis's role is its

11  role as an advisor to the company throughout this period in 2014.

12  With respect to internal communications, again, the internal views

13  of the Moelis bankers advising the company as to how realistic the

14  company's business plans were, how realistic its finance plans

15  were, all of that could be highly relevant and, in fact, would be

16  highly relevant.

17       THE COURT:  Okay.  Anything further, sir?

18       UNIDENTIFIED SPEAKER:  No, Your Honor.

19       THE COURT:  Okay.  I will require production by Moelis,

20  subject to the following limitations.  First, the time period will

21  be calendar year 2014.  Second, the custodians will be the two

22  agreed to previously by Moelis.  Third, it will apply to internal

23  and external communications without limitation, other than the

24  search terms limitation.  So those two custodians for 2014, any

25  internal or external communications that give rise that get a hit

1    on any of the identified search terms will be producible.

2            MR. WORTHINGTON:  Thank you, Your Honor.

3            THE COURT:  Anything else?  Do we need formal orders on

4    my rulings?  I would hope not, but if so, if you would consult and

5    submit whatever you think you need under certification of counsel

6    that would be fine.  Mr. Bowden, good evening.

7            MR. BOWDEN:  Sorry, Your Honor, good evening.  We will

8    consult and consider whether we need formal orders or not.  Thank

9    you very much.

10           THE COURT:  You're welcome.  Anything else for today?

11   All right, thank you very much.  We're adjourned.  Have a pleasant

12   evening.

13   (Court Adjourned)

14

15                           CERTIFICATE

16

17   I certify that the foregoing is a correct transcript from the

18   electronic sound recording of the proceedings in the above-

19   entitled matter.

20

     /s/Mary Zajaczkowski                  August 18, 2015
21   Mary Zajaczkowski, CET**D-531                 Date

22

23

24

25