# Exhibit D

**to the Ad Hoc Group of Non-Consenting Noteholders' Letter to The Honorable
Craig T. Goldblatt from Aaron L. Renenger regarding Discovery Disputes**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE

                                    .   Chapter 11
IN RE:                              .
                                    .   Case No. 20-10766 (KBO)
QUORUM HEALTH CORPORATION           .
et al.,                             .
                                    .   Courtroom No. 1
                                    .   824 North Market Street
                                    .   Wilmington, Delaware 19801
                                    .
                      Debtors.      .   May 11, 2020
. . . . . . . . . . . . . . . . .   .   4:00 P.M.

  TRANSCRIPT OF TELEPHONIC HEARING REGARDING DISCOVERY DIPUTES
                 BEFORE THE HONORABLE KAREN OWENS
                 UNITED STATES BANKRUPTCY JUDGE

TELEPHONIC APPEARANCES:

For the Debtors:          David Hurst, Esquire
                          Emily Keil, Esquire
                          MCDERMOTT WILL & EMERY LLP
                          1007 North King Street
                          Wilmington, Delaware 19801

                          - and -

                          Bradley Giordano, Esquire
                          444 West Lake Street
                          Chicago, Illinois 60606

                          - and -

                          Timothy Hoeffner, Esquire
                          Peter Haveles, Esquire
                          340 Madison Avenue
                          New York, New York 10173

Audio Operator:           Al Lugano

Transcription Company:    Reliable
                          1007 N. Orange Street
                          Wilmington, Delaware 19801
                          (302)654-8080
                          Email: gmatthews@reliable-co.com
```

1   Proceedings recorded by electronic sound recording, transcript
    produced by transcription service.
2
    TELEPHONIC APPEARANCES (Continued):
3

4   For Mudrick Capital:      David S. Rosner, Esquire
                              Matthew B. Stein, Esquire
5                             Shai Schmidt, Esquire
                              Howard W. Schub, Esquire
6                             Kim Conroy, Esquire
                              KASOWITZ BENSON & TORRES LLP
7                             1633 Broadway
                              New York, New York 10019
8
                              - and -
9
                              Robert J. Dehney, Esquire
10                            Joseph C. Barsalona, II, Esquire
                              Brett S. Turlington, Esquire
11                            Andrew Remming, Esquire
                              Megan Cascio, Esquire
12                            MORRIS NICHOLS ARSHT & TUNNELL LLP
                              1201 N. Market Street, 16th Floor
13                            P.O. Box 1347
                              Wilmington, Delaware 19899
14

15  For the Ad Hoc           William Arnault, Esquire
    Committee:               KIRKLAND & ELLIS LLP
16                           300 North LaSalle
                             Chicago, Illinois 60654
17

18

19

20

21

22

23

24

25

1       (Telephonic proceedings commenced at 4:03 p.m.)

2           THE COURT:  Counsel, this is Judge Owens.  We're

3 here today to discuss the discovery issue that has been put

4 forth in a series of letters with the initial one filed by

5 Mudrick.

6           So, why don't I turn it over for counsel to

7 Mudrick to makes its presentation.

8           MR. REMMING:  Good afternoon, Your Honor.  For the

9 record Andrew Remming from Morris Nichols Arsht & Tunnell on

10 behalf of Mudrick Capital Management.  On the phone with me

11 are my colleagues from Kasowitz, Howard Schub, Kim Conroy and

12 Matthew Stein, as well as my colleagues from Morris Nichols,

13 Megan Cascio who will handle today's hearing, and Joe

14 Barsalona.

15           THE COURT:  Okay.  Thank you, Mr. Remming.

16           MS. CASCIO:  Good afternoon, Your Honor.  Megan

17 Cascio from Morris Nichols.  As Mr. Remming said, I'm going

18 to handle most of Mudrick's presentation; although, my

19 colleague at Kasowitz, Kim Conroy, is going to address some

20 KKR specific issues.

21           THE COURT:  Okay.

22           MS. CASCIO:  I appreciate your time.  We know how

23 difficult this is in the current circumstances to get

24 everyone together on a phone call.  So, we do appreciate Your

25 Honor's prompt attention to this issue.  And I'm going to try

1  to keep my remarks brief.

2          I think as just to refresh, as the disclosures

3  note the noteholders have been intimately involved in the

4  company for, at least, several months to a year.  I believe

5  the disclosure first mentioned that the noteholders were

6  given access to the company, to its documents, updates on

7  strategic alternative, opportunities for input and into the

8  negotiations of those alternatives going back, at least,

9  until last May 2019.  Ultimately, of course, the noteholders

10  were involved in negotiating a plan and the RSA.

11          So, I don't think that anyone can deny that the

12  noteholders have been informed about this company or well

13  informed about the debtors and have it involved in the

14  strategic process and alternatives for quite some time.

15  Therefore, we believe the noteholders are uniquely positioned

16  to have valued the company and that their valuations are

17  substantive, and have meaning, and have probative value in

18  the discovery of this case.

19          The noteholders -- well, if the plan is approved

20  the noteholders will walk away with the company's equity and

21  in some cases with respect to certain noteholders they're

22  putting in new money presumably because they believe they are

23  getting a fair, if not, great deal with that new equity

24  infusion.

25          With respect to the cases that the noteholders

1  counsel attached to its letter to Your Honor and with all due

2  respect to the judges in those cases I think that either the

3  issues weren't presented in the way that we looked at them or

4  as, I think, Judge Lane noted in the Genco case in New York

5  that he takes the cases as they're presented to him.

6        (Phone interference)

7        MS. CASCIO:  I'm sorry, either someone commented

8  or I got some reverb and I didn't want to talk over Your

9  Honor if you were commenting on something.

10        THE COURT:  No.  That must have been feedback on

11  the line.  So, please continue.

12        MS. CASCIO:  Oh, okay.  So, as I was saying, the

13  judges take the cases as they are presented.  That did appear

14  that perhaps the issues weren't addressed the way, as I said,

15  we look at them.  It seems that the judges in the other cases

16  were looking at what concerns with many trials, many

17  appraisals, extending the length of the trials and not so

18  much looking at the relevant issues.

19        I -- quite frankly, it seemed that there was an

20  arbitrary line drawn that communications between noteholders

21  and debtors would be produced whether or not noteholders were

22  going to present evidence in support of the plan, but

23  internal valuations of noteholders would not be produced.  I

24  think that really bears out that the issues -- we look at the

25  issues a little bit differently.

 1          Whether or not the noteholders present evidence in

 2    support of the plan, their views on the valuation issues are

 3    relevant.  In this case we are likely to be looking at, I

 4    think it's very likely we're going to be looking at a battle

 5    of experts between the debtor's experts and Mudrick's experts

 6    with respect to what valuation is.  We expect that the

 7    debtor's expert will have critiques and criticisms of

 8    Mudrick's expert's valuation.  For example, they may say -- I

 9    think some of the documents they said they don't think the

10    DCF, the discounted cash-flow analysis, is really appropriate

11    or the debtors.

12          For example, if we were to learn that the

13    noteholders did think that that was an appropriate method of

14    valuation when they were doing their valuations of the

15    debtors in connection with the strategic alternatives or

16    planning for the bankruptcy I think that would be probative,

17    at least, with respect to any criticism that the debtors may

18    have of (indiscernible) analysis.

19          The same would be true with respect to inputs that

20    are used in the valuations, whether it be, you know,

21    disagreements about discounts rates, or weighted average cost

22    of capital, et cetera; you know, what the noteholders used as

23    their inputs could be probative for those same reasons.  The

24    same is true with respect to comparable companies, comparable

25    transactions, others who were very involved with this

1 company, involved in the strategic process, involved in

2 planning for the bankruptcy thought were appropriate methods

3 and ways to value the debtors would be probative of any

4 challenge the debtors themselves may have to Protiviti's

5 valuation that is going to be presented to Your Honor in

6 connection with the confirmation hearing.

7       Internal valuations, you know, as opposed to what

8 parties may share across the table in negotiations, the

9 internal valuations are really what we  know are candid, what

10 parties really believe are more representative of the

11 appropriate considerations when you're valuing a company.

12 That is why the internal valuations of the noteholders are

13 important to us in this case.

14       Also, you know, I know the noteholders have said

15 that they're not putting on evidence at the confirmation

16 hearing, but they've already interjected in this case in the

17 past, whether it's specifically  putting on evidence of

18 valuation they have raised their position with respect to the

19 valuation including at the first day hearing when they made

20 comments which we cited in our letter to Your Honor about

21 what they think the value is of what they're going to be

22 walking away with if the plan is confirmed.

23       Moreover, you know, Mudrick is challenging that

24 the -- or its position is that the noteholders are getting

25 more than 100 cents on the dollar if the plan were to be

1  confirmed.  So, we can foresee the possibility that the

2  noteholders will inject themselves and they have a response

3  to that again.  We can't wait to find out that they are going

4  to have response to something that we present at the time of

5  the hearing.  The time for discovery is now.

6          There's also the possibility, as we note in our

7  letter, that the debtors will interject the noteholders views

8  on values as this case moves forward. They have already done

9  so with respect to the letter that we attached to our letter

10 to Your Honor that the debtors sent to the U.S. Trustee where

11 they argued that Mudrick's concerns of valuation being low

12 were "belied by the objective realities in these cases"

13 including, they pointed out, some of the noteholders had

14 decided not to put in new value which they said,

15         "Independently refutes Mudrick's theory that the

16 restructuring is a coy to take ownership of Q-HC at too low

17 of a value."

18         So, they have already raised issues with respect

19 to what the noteholders think the appropriate value is.  And,

20 you know, it could continue and, as I said, the time for

21 discovery is now.  The time is not to find out at the

22 confirmation hearing that the noteholders views are going to

23 seep into the process.

24         So, as I said, the judges have noted that you take

25 the case as you receive it.  I think here the noteholders

1  valuations and opinions have already been seeping into this

2  case.  And, moreover, where the confirmation hearing is

3  likely to have involved disagreements of experts as to

4  appropriate methods of valuation, inputs, considerations and

5  the like, and we expect the debtor's expert to challenge

6  Protiviti's input and assumptions (indiscernible), valuations

7  that the noteholders prepared for themselves, these parties

8  who are uniquely positioned, very knowledgeable about the

9  company, sophisticated and have been involved in this process

10  for, at least, a year what they thought about valuation and

11  what the appropriate elements they thought and the inputs

12  they thought as to the valuation would be probative to the

13  ultimate issues that Your Honor is going to have to decide.

14          That's all I have.  If Your Honor has any specific

15  questions for me, otherwise, I will turn it over to Ms.

16  Conroy to address some additional issues.

17          THE COURT:  Thank you.  I have no questions.  We

18  can hear from Ms. Conroy.

19          MS. CONROY:  Thank you, Your Honor.  Kim Conroy,

20  Kasowitz Benson & Torres, on behalf of Mudrick.

21          My co-counsel, Ms. Cascio, stated it very

22  succinctly.  So, I will just add in a few points with respect

23  to KKR of the noteholder specifically.  As Ms. Cascio noted,

24  the debtors and the noteholders for that matter have at times

25  injected themselves in this hearing while at the same time

1  claiming that they're not going to take any position.

2          As Ms. Cascio noted, during the first day hearing

3  counsel for the noteholders specifically made representations

4  to the court in so far as eluding to the value of the plan.

5  In particular, Ms. Greenblatt for the noteholders noted that

6  they thought it was really remarkable that everyone was fine

7  even though they were potentially getting "single digit"

8  recoveries in the sum of equity and speculative rights.  They

9  did interject themselves on the record as to the value

10 presumably of the plan.

11         Similarly, as Ms. Cascio noted, given the letter

12 to the trustee the debtors are using (indiscernible). They're

13 stating that certain of the noteholders, in particular KKR,

14 which they specifically note is not taking equity is somehow

15 proof of the value and that there's not enough value in

16 particular for Mudrick without having insight into what

17 exactly the values are.   We note that the debtors can use

18 these arguments at will.

19         Finally, with regard to that, Your Honor, in the

20 disclosure statement it should not be missed that in the

21 disclosure statement the debtors also make representations

22 relating to the take private action of potential transactions

23 that was opposed by KKR in December 2019, Your Honor.  The

24 debtors specifically state that ultimately the discussions

25 regarding that potential transaction (indiscernible)

1 | company's financial performance.  That was eluding to that
2 | that was the reason why in March KKR backed out of the
3 | transaction.
4 | Your Honor, statements they think can simply be
5 | made without Mudrick having any insight to test those
6 | (indiscernible), in essence the debtors -- the noteholders
7 | can make their argument through the debtors and we would have
8 | no insight into it. So, separate and apart from that we think
9 | that the valuation, and particularly with regard to KKR, is
10 | probative and should be produced.
11 | Unless Your Honor has any questions I rest.
12 | THE COURT:  I have no questions.
13 | Why don't I hear from counsel to one or more of
14 | the noteholders.
15 | MR. ARNAULT:  Good afternoon, Your Honor.  This is
16 | Bill Arnault from Kirkland & Ellis on behalf of the ad hoc
17 | group of noteholders.
18 | THE COURT:  Good afternoon.
19 | MR. ARNAULT:  Good afternoon.  Thank you very much
20 | for your time this afternoon.  We really appreciate you
21 | hopping on the phone in response to this urgent request.
22 | I too, like counsel for Mudrick, can be relatively
23 | brief here.  I think that I am able to do that because as we
24 | note in our letter, attached to our letter, there are
25 | actually two cases that are directly on point here.  And as

1  those cases demonstrate its very clear that where a creditor

2  does not intend to put on evidence relating to valuation at

3  the confirmation hearing a creditors own internal valuation

4  are not relevant and courts do not require that they be

5  produced.  Even if, whereas here, the creditor is a party to

6  an RSA and puts in pleadings, or other information in support

7  of the plan.  Again, where that creditor is not putting on

8  evidence that relates to valuation or any other witnesses the

9  courts have held that those internal valuations are simply

10  not relevant and should not be produced.

11         That is exactly the situation here because as we

12  have informed counsel for Mudrick, the noteholders will not

13  be putting on any evidence at the confirmation hearing, they

14  will not be putting on any witnesses relating to valuation,

15  and as a result, under these cases, the inquiry ends right

16  there.  This, Your Honor, makes sense as the judges in the

17  case have explained because those internal valuations are

18  simply not probative and they aren't relevant for a number of

19  reasons.

20         I would say, first of all and most importantly, it

21  is the debtor's burden here around valuation and as such they

22  will be the only one presenting evidence on that issue.  Most

23  importantly, Mudrick has already received emails and

24  documents relating to the debtor's valuation.  I think this

25  is important too from our perspective, Mudrick has already

1  received emails between the noteholders and the debtors.  So,

2  to the extent that there are valuations that the noteholders

3  have created that were shared outside of -- that no longer

4  remains internal, those would have been produced as part of

5  any document production.

6          So, to the extent that Mudrick is planning that it

7  doesn't have the documents to test with the debtor is now

8  saying they do, in fact, have those documents.  It's only the

9  internal valuation that the noteholders have refused to

10 produce here.

11         Secondly, the internal valuations are of no

12 probative value because, again, by definition the debtors

13 could not have relied on it.  And as a practical matter they

14 are of no probative value because as Your Honor might be able

15 to imagine they would have been performed at various points

16 in time under different scenarios with different assumptions;

17 some may have been completed, some may have not.  So, to have

18 to go out and produce a number of internal valuations that

19 were performed under a variety of scenarios has no relevant

20 or bearing on the valuation that the debtors are putting

21 forth.

22         This actually fits into the fact that there will

23 be no witnesses from the noteholders during confirmation.

24 So, as a result such valuations likely aren't admissible in

25 the first instance.  And let's say that even if you put them

1  in front of the debtor's valuation expert he's going to say

2  things like, or I can imagine he's going to say things like,

3  well, I've never seen this before, I don't know how it was

4  prepared, don't know who prepared it, don't know when it was

5  prepared, I don't know what the inputs were, I don't know the

6  purpose for which this was prepared.

7          This is actually Judge Lane's point in the <u>Genco</u>

8  case that you are going to open the flood gates to days of

9  mini trials on every iteration scenario valuation that was

10  performed over the past several months by all of the

11  individual noteholders.  That is just not probative nor is it

12  relevant.

13          This -- I make the point that this exercise is

14  particularly unnecessary here given that Mudrick's primary

15  objection to valuation rests on the fact that the debtors

16  have failed to update their valuation and account for the

17  CARES Act funds in a valuation.

18          So, on the one hand you have Mudrick objecting to

19  confirmation because the debtor's valuation is purportedly

20  (indiscernible), but has now taken the position, for purposes

21  of this dispute, that internal valuations performed at the

22  beginning of the RSA negotiations are directly relevant.  So,

23  putting to the side the fact that these internal valuations

24  are not relevant under well-established case law the group's

25  internal valuations are also not relevant to Mudrick's entire

1  theory of the case.

2          With that, Your Honor, I would state just a few

3  more points.

4          I think it's interesting to note that Mudrick

5  cites to just two cases in its letter, which are

6  (indiscernible) and Iridium.  And it's interesting that

7  Mudrick would cite to these two cases because they're

8  actually the new cases that are cited in the research that

9  they asked me to provide for them.  So, rather than going out

10  and finding independently any cases what they did is,

11  instead, relied on the two cases and the cases that I had

12  sent where the judges actually said that those cases do not

13  support the production of these internal valuations.

14          So, for example, in Iridium Judge Sontchi noted

15  that that case did not deal with a request for internal

16  valuations from a creditor or a party to a restructuring

17  support agreement.  In fact, those cases dealt with

18  fraudulent transfer issues which are certainly much different

19  than the cases here.

20          If you just compare that to the cases that we

21  cited in our letter, particularly the Dolan case and Genco

22  which are directly on point and actually contain parties to

23  an RSA.  There both courts held that internal valuations are

24  simply not relevant.  I actually think that these cases are

25  helpful and particularly on point here because they also

1  address Mudrick's point that the noteholders should be

2  treated differently because they were signatories to the RSA

3  to the plan.  I think it's actually much like the incorrect

4  entire fairness argument that Mudrick asserted during the DIP

5  hearing that this argument proves too much and is simply not

6  the case that you can then rope in other parties into

7  discovery simply because they were involved and signed the

8  RSA.

9          Relatedly, as Judge Lane notes, its not enough to

10  advance legal argument to then make internal valuations

11  relevant and subject to discovery.  Instead, for internal

12  valuation to be relevant the party must actually introduce

13  evidence on value.  That is not what has happened here

14  previously and that is not what is going to happen at the

15  confirmation hearing.

16          So, for these reasons, Your Honor, the noteholders

17  ask the court to deny Mudrick's request to compel them to

18  produce internal valuations.  Thank you, Your Honor.

19          THE COURT:  Thank you, Mr. Arnault.

20          Does Mudrick want any quick reply?

21          MS. CASCIO:  Your Honor, this is Ms. Cascio.  I

22  think I can respond very quickly and pointedly to some of the

23  arguments that we just heard.

24          What mister -- I don't believe I heard from Mr.

25  Arnault that we are going to be able to discern and prevent

1  the noteholders views from coming in through the debtors

2  without giving Mudrick the ability to test whether those

3  views are actually consistent with that the views of the

4  noteholders had in the past several months with respect to

5  the value.

6         I didn't hear Mr. Arnault address what we believe

7  are examples of why valuations will be relevant other than

8  for him to say that Mudrick's primary objection has to do

9  with the CARES Act money.  I'd have to note that that was our

10 -- we put in preliminary objections.  We have not completed

11 discovery.  We have not finalized our objections.  To say

12 that any valuations that the noteholders did months ago were

13 stale.  That ignores that there could be, for example, a

14 dispute about what are appropriate comparable transactions.

15        Those are historical and if the debtor's expert

16 says there's only one, which is, I believe, the positon that

17 they are currently taking, but the noteholders thought that

18 there were a bunch of comparable transactions.  That would be

19 probative and potentially support what Protiviti, Mudrick's

20 expert, may be prepared to opine on.

21        I think its artificial, again, to say you can have

22 the -- its appropriate to provide the documents that would be

23 the emails that went between the noteholders and debtors with

24 respect to value which, again, as I said previously, ignores

25 that there's also very different views that are not shared,

1   but are still, given the noteholders intimate knowledge about

2   the company relevant as to what are appropriate methods and

3   considerations for valuations.

4           Lastly, Your Honor, we're asking for a very

5   limited time period, which I think is in our letter, but I

6   forgot to mention in my opening remarks.  We're only asking

7   for valuations from November through March, November 2019

8   through March of this year.  So, I don't think they made a

9   burden argument, but just so that we close the loop on that.

10  We don't see this as a burdensome request.

11          Thank you, Your Honor.

12          THE COURT:  Okay.  Thank you very much.

13          I'm going to deny the request of Mudrick to compel

14  the internal valuation documents.  I reviewed the case law

15  and although I don't have copious amounts of valuation trial

16  experience I recently was involved in one.  So, I do know,

17  you know, obviously, it's the debtor's burden to satisfy the

18  plan confirmation standard.  And as acknowledged by the

19  parties the valuation is going to be proved through a battle

20  of experts.

21          I do agree with the decisions of the other courts

22  including Judge Sontchi in EFH and Judge Shannon in Dolan

23  that the lender's opinion of value is irrelevant.  And even

24  if there was even a modicum of relevancy I view, in my

25  experience, the probative value of those internal valuation

1   documents will be or is substantially outweighed by the

2   danger of issue confusion on the risk of the creation of a

3   side show with respect to the propriety of those valuations

4   or the assumptions that led to those valuation conclusions

5   when I think the proper focus should be on the expert's

6   opinions and my judgments with respect to those opinions.

7          What does give me pause is the acknowledgement or

8   the argument that the debtors had made certain statements in

9   their letters to the United States Trustee regarding reasons

10  why or why not a noteholder may have chosen not to

11  participate in the equity raised and why the decision to

12  participate or to not participate in the equity raise is

13  probative to value.

14         It seems to me that this type of argument would be

15  irrelevant to valuation, but I will warn the debtors that if

16  this is the type of information that is going to be proffered

17  at the valuation trial then I will reserve Mudrick's right to

18  remove its request to make a specific and maybe narrowly

19  tailored request for internal valuation documents that is

20  probative to whatever argument is proffered by the debtors on

21  those lines.

22         So, right now I am not going to compel the

23  internal valuation documents.  We can make judgement calls

24  depending on what arguments are raised by the debtors at the

25  valuation trial.

1           Is there anything else that we --

2           UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

3           MR. SCHUB:  Thank you, Your Honor.

4           MR. SCHUB:  Howard Schub from Kasowitz Benson on

5  behalf of Mudrick.

6           There is a question that I'd like to address to

7  you. Its not directly raised by the correspondence that you

8  saw earlier, but I think it may have come up somewhat in Mr.

9  Arnault's comments with respect to internal valuations.

10          We received documents from Credit Suisse with

11  certain presentations that were exchanged with the

12  noteholders that reflect, among other things, certain

13  valuations.  To the extent that those documents have been

14  shared my understanding is that while we're still working

15  through the documents that if anything has been shared

16  externally by the noteholders that we would receive those

17  documents and that the ruling today is simply with respect to

18  internal valuations.

19          THE COURT:  Yes.  That is correct.

20          MR. SCHUB:  Okay.  Fine.  I just want to make sure

21  that was clear so we don't have any confusion going forward.

22          Thank you, Your Honor.

23          THE COURT:  Thank you.  Thank you for that

24  question.  I'm glad I could make that clarification.

25          So, I understand we're going to be together on

1  Friday, but is there anything else that we should be

2  discussing today?

3        MS. CONROY:  No, Your Honor.  Kim Conroy from

4  Kasowitz.

5        THE COURT:  Okay.  Well then thank you all for

6  hopping on the call today.  I'm glad that all the parties

7  were able to get on so we could address the issue quickly and

8  get it resolved for the parties.  Let's adjourn the hearing

9  and I'll see you all on -- not see you all, but I will hear

10 you all on Friday.  I wish you well.  Take care.

11        COUNSEL:  Thank you, Your Honor.

12     (Telephonic proceedings concluded at 4:32 p.m.)

13

14

15

16                        CERTIFICATE

17

18    I, MARY ZAJACZKOWSKI, certify that the foregoing is a

19 correct transcript from the electronic sound recording of the

20 proceedings in the above-entitled matter.

21 /s/Mary Zajaczkowski_____        May 12, 2020

22 Mary Zajaczkowski, CET**D-531

23

24

25