```
 1                    UNITED STATES BANKRUPTCY COURT
                           DISTRICT OF DELAWARE
 2

 3   IN RE:                       .   Chapter 11
                                  .
 4   TPC GROUP INC., et al.,      .   Case No. 22-10493 (CTG)
                                  .
 5              Debtors.          .   Jointly Administered
     . . . . . . . . . . . . . . .
 6   BAYSIDE CAPITAL, INC., AND   .
     CERBERUS CAPITAL MANAGEMENT,.
 7   L.P.,                        .
                                  .
 8              Plaintiffs.       .
                                  .
 9      v.                        .   Adv. Pro. No. 22-50372 (CTG)
                                  .
10   TPC GROUP INC.,              .
                                  .
11              Defendant.        .
                                  .
12   - and -                      .   Courtroom No. 7
                                  .   824 North Market Street
13   THE AD HOC NOTEHOLDER GROUP,.    Wilmington, Delaware 19801
                                  .
14      Intervenor Defendant.     .   Thursday, June 29, 2022
     . . . . . . . . . . . . . . .    1:00 p.m.
15

16            TRANSCRIPT OF SUMMARY JUDGMENT HEARING
            BEFORE THE HONORABLE CRAIG T. GOLDBLATT
17               UNITED STATES BANKRUPTCY JUDGE

18

     APPEARANCES:
19
     For the Debtors:         James Prince, Esquire
20                            BAKER BOTTS LLP
                              2001 Ross Avenue, Suite 900
21                            Dallas, Texas 75201

22                            Kevin Jacobs, Esquire
                              BAKER BOTTS LLP
23                            910 Louisiana Street
                              Houston, Texas 77002

24

25   Audio Operator:          Brandon J. McCarthy
```

```
 1   Transcription Company:    Reliable
                               The Nemours Building
 2                             1007 N. Orange Street, Suite 110
                               Wilmington, Delaware 19801
 3                             Telephone: (302)654-8080
                               Email:  gmatthews@reliable-co.com
 4
     Proceedings recorded by electronic sound recording,
 5   transcript produced by transcription service.

 6   ─────────────────────────────────

 7   APPEARANCES (CONTINUED):

 8   For the Committee:        Marty Brimmage, Esquire
                               AKIN GUMP STRAUSS HAUER & FELD LLP
 9                             2300 N. Field Street, Suite 1800
                               Dallas, Texas 75201
10
     For Bayside Capital,
11   Cerberus Capital
     Management:               Jennifer Selendy, Esquire
12                             SELENDY GAY ELSBERG PLLC
                               1290 Avenue of the Americas
13                             New York, New York 10104

14   For the Intervenors:      Kris Hansen, Esquire
                               PAUL HASTINGS LLP
15                             200 Park Avenue
                               New York, New York 10166
16

17

18

19

20

21

22

23

24

25
```

1                                    INDEX

2
    PRELIMINARY MATTERS:                                       PAGE
3
        By Mr. Prince                                            8
4
        By Mr. Brimmage                                         13
5

6
    ADVERSARY PROCEEDING:                                      PAGE
7
    *Bayside Capital Inc.,* et al. *v. TPC Group Inc.*,
8   Adv. Pro. No. 22-50372

9   Agenda
    Item 20:   [SEALED] Ad Hoc Group of Non-Consenting          28
10             Noteholders' Motion for Summary Judgment
               (A.D.I. 4, filed 06/02/22)
11
    Agenda
12  Item 21:   Motion for Summary Judgment                      28
               (A.D.I. 16, filed 06/09/22)
13

14  Agenda
    Item 22:   Motion to Dismiss the Complaint for              28
15             Declaratory Judgment
               (A.D.I. 18, filed 06/09/22)
16
    Agenda
17  Item 23:   The Ad Hoc Noteholder Group's Cross-Motion       28
               for Summary Judgment and Opposition to
18             Plaintiffs' Motion for Summary Judgment
               (A.D.I. 43, filed 06/17/22)
19
    Agenda
20  Item 24:   Plaintiff-Counterclaim Defendants' Motion        28
               to Strike or Dismiss Defendant-
21             Counterclaimant's Initial Counterclaim
               (A.D.I. 48, filed 06/22/22)
22
    Agenda
23  Item 25:   Plaintiff-Counterclaim Defendants' Motion        28
               to Dismiss Defendant-Counterclaimant's New
24             Counterclaim
               (A.D.I. 49, filed 06/22/22)
25

ADVERSARY PROCEEDING:                                                    PAGE

Agenda
Item 26:   Motion to File Under Seal Portions of              28
           (I) TPC Group Inc.'s Brief in Opposition
           to Plaintiffs' Motion for Summary Judgment
           and (II) Declaration of Patrick Hurt
           (A.D.I. 53, filed 06/23/22)

Agenda
Item 27:   Motion to Strike Declaration of Oscar Shine        28
           in Support of Plaintiffs-Counterclaim
           Defendants' Consolidated Memorandum of Law
           in Further Support of their Motion for
           Summary Judgment and in Opposition to
           Intervenor-Defendants' Motion for Summary
           Judgment (A.D.I. 60, filed 06/28/22)

           Court's Ruling:                                    112

1   (Proceedings commence at 1:00 p.m.)

2        THE CLERK:  All rise.

3        THE COURT:  Please be seated.

4        Good morning.

5        MR. PRINCE:  Good afternoon, Your Honor.  James

6   Prince of --

7        THE COURT:  Oh, good afternoon.  That's it.  Thank

8   you.  Good afternoon.

9   (Laughter)

10        THE COURT:  You can proceed.

11        MR. PRINCE:  Okay.

12        THE COURT:  Well, actually, why don't I say the

13   following since we are having this hybrid hearing.  For those

14   of you who are here on zoom this is Judge Goldblatt.  We're

15   on the record in In Re TPC Group which is Case No. 22-10493.

16        To the extent that anyone who is participating by

17   zoom would like to participate I ask that, obviously, folks

18   should leave their microphones muted, that if you do

19   participate by zoom that you introduce yourself for the

20   record whenever you do and that, otherwise, folks on zoom

21   leave their cameras off so that if there is someone on zoom

22   who would like to be heard if you turn your camera on I will

23   then be able to recognize you.

24        So with that, Mr. Prince, let me pass the baton to

25   you to take us through the agenda.

1        MR. PRINCE:  Thank you, Your Honor.

2        We have filed an amended agenda, Docket No. 333.

3  Do you, by chance, have that or would you like a hard copy?

4        THE COURT:  No, I do have that.  Thank you very

5  much.

6        MR. PRINCE:  Okay.

7        THE COURT:  So this is the second amended agenda,

8  right?

9        MR. PRINCE:  Yes, sir.

10        THE COURT:  Okay.

11        MR. PRINCE:  Happy to report that in the main case,

12  Your Honor, everything is fully resolved consensually.  We do

13  have some matters that we're adjourning; one of those, of

14  course, is going to be the DIP, the final DIP hearing.  That

15  is being adjourned to Friday the 15th.  It's currently set

16  for one, I think, in the afternoon or 1:30. If we could get -

17  - if something frees up in the a.m. we would gladly take it.

18        THE COURT:  So here's what I can tell you, Mr.

19  Prince, that I do have a hearing that is set for 10 o'clock

20  that morning in AH Liquidations where debtor's counsel is

21  here in court with us.  My understanding is that that is a

22  claims objection where, I believe, there have been no

23  responses to the objection in which case I would expect a

24  certification to be filed in that to come off the calendar.

25  If that happens we will let you know and you can reset this

1 | for 10 o'clock.  If for some reason that doesn't happen then
2 | we will have to stay at one, but I expect that that would
3 | likely come off and we'd be able to set this for 10.

4 |       MR. PRINCE:  Okay. For my own education, is it fair
5 | to say that unless everyone that might have something to say
6 | about the matter set forth the 15th are consenting to in-
7 | person that it would be via zoom?

8 |       THE COURT:  So here's where I am for now: for now -
9 | - whatever -- if everyone consents to either one or the
10 | either then I will do what everyone agrees to.  If -- and I -
11 | - look, I hope and expect the default rule changes in the
12 | coming, you know, not too long and we default to being in-
13 | person.  I think that would be better, but I am not there
14 | yet.

15 |       Let me say the following: if there is a very
16 | substantial majority that would like to come in-person and a
17 | small number who object to it you should let me know and we
18 | will find a way to sort that out.  If there are substantial
19 | numbers of people who have a concern about being in-person I
20 | probably wouldn't require in-person -- I don't require in-
21 | person attendance for anyone, but in terms of whether we will
22 | proceed in person if everyone agrees I'm happy to do it, if a
23 | substantial majority agrees to reach out, and if there's a
24 | substantial minority that is opposed then presumably we'll
25 | proceed by zoom.

1    Is that clear enough?

2    MR. PRINCE:  It is.

3    THE COURT:  Okay.

4    MR. PRINCE:  I'm sure the debtor and, of course,

5  other major constituents the goal would be that we really

6  don't have a contested hearing, but at the moment certainly

7  with the discovery that the debtor has on its plate right now

8  we can't say that at this moment, but if it gets to a

9  consensual spot then, you know, we will alert the court, and

10 if it makes sense to save money to do via zoom we would love

11 to accommodate and save money.

12    THE COURT:  Okay.

13    MR. PRINCE:  Okay.  I guess we last talked on June

14 2nd.  We had like a discovery (indiscernible).  I had tech

15 problems so I didn't actually talk.  Sorry about making my

16 hand signals and stuff, but it didn't actually work out for

17 me.  So I am going back to June 2nd, which was the first day

18 hearing.

19    Since that time the debtors made substantial

20 progress in the case.  We filed a plan, initial version of a

21 plan, disclosure statement, backstop commitment agreement all

22 on the 15th of June.  So they have been on file for a couple

23 of weeks now.  We've spent a lot of time and we've had a lot

24 of help from the U.S. Trustee and our creditor constituents

25 resolving informal comments and objections to our first day

1  orders; those are now behind us and we've submitted those
2  under certificate of counsel or certificate of no objection,
3  but they are available for Your Honor for signing.

4        We are filing our schedules and our statement of
5  financial affairs today, heavy lift as they always are, but
6  we ultimately did not seek and we do not need an extension
7  beyond what the Delaware local rules, which I think that --
8  you know, kudos to FTI and the management team for getting
9  that done because we think that's helpful to have as much
10  information for our creditors as part of the process.

11        We have a committee, they are represented by Akin
12  Gump as their council, and Dundon Advisors as their financial
13  advisor.  Dundon Advisors, you may recall, that they were on
14  the zoom hearing and they were financial advisors to, what
15  I'd call, the NDL plaintiff leadership group represented by
16  Mr. Esserman.  And the debtor has worked with Dundon Advisors
17  and Mr. Dundon, and Mr. Esserman prior to the bankruptcy
18  filing.

19        So we have a committee, it consists of seven
20  creditors.  Two are what I would call crude C4 suppliers.
21  Five are NDL plaintiffs' and were part of Mr. Esserman's
22  client group and still are to our knowledge.

23        The two suppliers, one is Chevron Phillips Chemical
24  and another is a company called Sasol, Sasol Chemical North
25  America I believe.  We filed recently a motion to assume

1   Chevron Phillips Chemical's C4 contract as amended.  So we're

2   getting some concessions and better terms.  So we think it's

3   kind of similar to the first one we had at the beginning of

4   the case.

5           This is like the next one or the third one that we

6   have had.  So when that contract gets assumed and ultimately

7   cured and paid then we're going to have an issue of the U.S.

8   Trustee either getting a replacement member for Chevron

9   Phillips or the committee is going to shrink down in size.

10          Same story for Sasol, a little bit behind Chevron

11  Phillips, but same story; amending, getting better terms,

12  better pricing, all those kind of good things.

13          With respect to the committee we understand that an

14  informed committed is a good committee.  A functioning

15  informed committee is helpful to the process, so let's talk

16  about what we've been doing to get the committee up to speed

17  and, basically, its advisors up to speed.

18          The committee was formed on the 14th.  They

19  selected advisors on the 16th.  We had an initial background

20  conference with them on the 17th of June.  On Sunday, June

21  19th we received a total of 93 diligence and discovery

22  requests as well as 17 30(b)(6) deposition topics and a

23  request to produce two witnesses in their personal capacity,

24  basically Bob Del Genio who is our FA that testified at the

25  first day hearing, and then Zul Jamal who is our mezz loan at

1   Moelis who also testified.  So we are working to schedule

2   those between today and the final DIP hearing on the 15th.

3        As far as the documents go we produced, on a

4   rolling basis, and we still have more work to do, but on a

5   rolling basis we produced 38,000 pages of documents to the

6   committee's advisors; more documents will come.

7        We have also granted the committee's advisors

8   access to three data rooms:

9        One is the data room that we basically used to

10  attract capital and a lot of business information.

11  Everything if you wanting to put money into this business

12  what you would want to see they have access to.  Another one

13  is a prepetition data base that basically was setup for Mr.

14  Esserman's benefit and documents that Mr. Esserman and his

15  clients requested, so they have access to that.  Then a third

16  is documents that were produced in the litigation in the

17  Texas State Court.

18        So it's a lot of information.  We understand

19  they're working on it.  It's going to take some time, but our

20  goal is, like I said, a good committee is one that is fully

21  informed and so we need to get them there.  That is what we

22  intend to do.

23        With that, Your Honor, unless the court has any

24  questions with respect to the matters that we have submitted,

25  the orders, if you can enter them we would greatly appreciate

1  it.

2         THE COURT:  So I don't. I confess, I have spent

3  this morning focusing on the terms of the credit agreements

4  and not studying the orders.

5         MR. PRINCE:  Understood.

6         THE COURT:  But to the extent they're submitted

7  under certification and they're standard I expect to be able

8  to address it this afternoon.

9         MR. PRINCE:  One other thing I would like to say,

10 one of our independent directors got -- put his hand on the

11 plow and jumped in to try and resolve the controversy between

12 the noteholder groups between the last time we talked and

13 today.  You know, progress was made, but, you know,

14 ultimately we couldn't get there.

15         With respect to the plaintiffs I think I told you

16 that we had done some work pre-bankruptcy and may have more

17 work to do.  Since that time we have had a discussion with

18 Mr. Esserman and we're trying to get that dialog up and

19 running again.  So, you know, some issues that are kind of

20 first and foremost on our agenda because ideally we would

21 like to move this case with pace.

22         Obviously, litigation can slow pace and so if we

23 can resolve issues as best we can that's what we intend to

24 do.  Where we can't we're going to have to come to Your Honor

25 and Your Honor will do his job, but we're hopeful to resolve

1   issues at this hearing.

2            THE COURT:  Okay.  I appreciate everyone's efforts.

3            MR. PRINCE:  Counsel for the committee would like

4   to say a few words.

5            THE COURT:  Okay.

6            MR. BRIMMAGE:  Good afternoon, Your Honor.  Marty

7   Brimmage with Akin Gump Strauss Hauer & Feld. I am joined

8   here today by my colleagues, Naomi Moss and Edan Lisovicz.

9            I appreciate Mr. Prince.  He did a lot of the work

10  that I was going to do in telling you about a few things, but

11  I would still like to bring the court up to date from the

12  committee's perspective.

13           We were appointed on -- the committee was appointed

14  on June the 14th by the Office of the U.S. Trustee and two

15  days later it did select Akin Gump and Dundon Advisors as its

16  professional advisors in this case.  It also selected Cole

17  Schotz as its local and efficiency counsel advisor.

18           In an effort to conserve costs and see if we can

19  reach an agreement, a more global agreement in the very near

20  future we have deferred a decision on engaging an investment

21  banker.  So we will see where that goes.  We're not saying we

22  won't, but we're saying we're not going to do it right now.

23           Today, Your Honor, at Docket No. 331, we filed a

24  2019 statement describing the committee members claims.  I

25  think you find a little more detail in that then what is

1 | typically filed in there --

2 | THE COURT:  Including photos.

3 | MR. BRIMMAGE:  Including photos.  So you saw it?

4 | THE COURT:  Yes, I did.

5 | MR. BRIMMAGE:  Good.  That's very good.

6 | As Mr. Prince described to you there's five, what

7 | we will call, plaintiff claim creditors and then two trade

8 | creditors.  He talked to you about that.  Normally I would

9 | start by describing creditors and I will get to that in a

10 | minute, but before I do that I think it's appropriate, Your

11 | Honor, to address a little bit in a little more detail then I

12 | think what the court has heard the November 2019 explosion.

13 | The incident that without which five of the creditors in this

14 | committee would not be here and I dare say maybe the case

15 | wouldn't even be here.  We refer to those as the Port Neches

16 | explosions and I say that plural, Your Honor.

17 | Let's start with November 27th, 2019 at about 1

18 | a.m. in the morning.  There was a significant explosion at

19 | the TPC facility in Port Neches, Texas which was at the time

20 | used to manufacture butadiene and other chemicals.  The blast

21 | shattered windows of local houses.  They could be felt up to

22 | 30 miles and resulted in toxic plumes that could be seen for

23 | miles.

24 | At least two additional explosions occurred

25 | thereafter within the next 24 hours releasing chemicals into

1  the environment and resulting in fires that went on to burn

2  for over a month.  Due to the explosions local officials

3  imposed a mandatory four mile radius evacuation order forcing

4  some 60,000 people during the thanksgiving holiday to leave

5  their homes.

6          Five days after the explosion the City of Port

7  Neches issued a shelter in place order.  After measuring

8  elevated butadiene levels in the air the Port Neches schools

9  didn't fully reopen until December the 9th when they could

10  officially and finally determine that the air quality had

11  been resolved.

12         I could go on much longer and much further

13  describing the terrible impacts of the explosions, but I will

14  stop there because this is not something that the court is

15  hearing today, but I did want the court to get a little bit

16  of flavor for what really happened and a little bit more of

17  the detail.  I think it's important to keep those events in

18  mind, Your Honor, as these cases go forward.  So that is why

19  I provided that kind of detail.

20         What we have come to the conclusion is that many of

21  the unsecured creditors in this case did not choose to be

22  creditors of the debtors.  It was put upon them by the events

23  of the explosion.  We hope to continue to work constructively

24  with the debtors and the other RSA parties in the coming

25  months to achieve a restructuring that is in the best

1  interest of the estate and of all parties, but that includes

2  the unsecured creditors.

3       With that I will turn to just a quick introduction

4  of the committee members.  Your Honor, Mr. Prince talked to

5  you about Chevron, so I won't go into that.  He also talked

6  to you about Sasol, and so I won't go into that.

7       Let me focus a little bit on the five, what I call,

8  plaintiff claim creditors.  We have got Amber Harms, she has

9  an unliquidated property damage claim on behalf of herself,

10  her family members and family owned entities of at least $4.1

11  million based on losses to some 78 properties caused by the

12  explosions.

13       Chris Johnson, his wife Pamela, and their eight

14  year old grandson were asleep in their home in Port Neches

15  when the initial explosion occurred.  After being awoken by

16  the extremely loud explosion the Johnsons found all the

17  windows in the back of their house shattered and the living

18  room littered with glass.  The Johnsons could see the

19  facility burning as they jumped into their truck and fled

20  their home and were forced to spend Thanksgiving holiday away

21  from there and were not allowed to come back until the

22  mandatory evacuation order was lifted by the local officials.

23  The Johnsons have property damage claims in the amount of

24  approximately $860,000 for damages to their home, their

25  rental properties and a commercial building that they use for

1  a local business.  Most of these damages, Your Honor, were

2  not covered by insurance.

3          Third, we've got Emily Teesley [phonetic] who was

4  working as a contractor within a few hundred feet of the

5  initial explosion.  Ms. Teesley was blown into the wall in

6  her office trailer by the force of the explosion and incurred

7  brain damage, injuries to her back, injuries to her spine

8  that required surgery.  She also incurred two ruptured ear

9  drums, tendinitis injuries, wrist, hand and shoulder

10 injuries, bruising and cuts all over her body.

11         Ms. Teesley now suffers from nerve damage as a

12 result of the incident and has also suffered mental,

13 emotional and cognitive damage.  Ms. Teesley has unliquidated

14 claims in the amount of, at least, $5 million based on

15 personal injury, medical costs and loss of earning capacity.

16         Next we've got Farmers Insurance, Your Honor.  It's

17 a national insurance company.  I'm sure you're familiar with

18 it. It's got an unliquidated claim of, at least, $4 million

19 based on subrogation interest acquired in connection with the

20 insurance payments that it's paid to date for the Port Neches

21 explosions.

22         Last, but certainly not least, Your Honor, we have

23 Suzanne Williamson and her family.  They resided less than

24 one mile from the Port Neches facility and were in their home

25 at the time of the explosion.  Ms. Williamson's son attended

1  Port Neches Grove High School located within walking distance

2  to the facility.  Ms. Williamson's has testified before State

3  and Local Government agencies regarding the explosions

4  including the Texas Commission on Environmental Quality, and

5  has been contacted by the Office of the Attorney General and

6  the EPA in connection with their investigations into TPC.

7         Ms. Williamson's personal injury claims are, at

8  least, $503,000. Property damage claims of, at least,

9  $165,000 and other economic damages, at least, $13,000 all of

10  which, of course, are unliquidated.

11         If the court has any questions about those I will

12  answer them; otherwise, I will go on.

13         THE COURT:  Look, I mentioned at the first day,

14  obviously, before you were involved, but, you know, I'm

15  sensitive to the ways in which the bankruptcy code intersects

16  quite imperfectly with the world of mass torts and the

17  challenges from the perspective of a mass tort victim whom,

18  as you say, is an involuntary creditor; the ways in which the

19  bankruptcy process may upset what they had expected they

20  would receive in compensation for their claims.

21         What I can tell you is, you know, the code does

22  what it does. The capital structure here is what it is.  I

23  appreciate the human impact of what we're doing here and

24  hearing this is helpful.  All I can say is that I'm sensitive

25  to the concerns that you are raising and we will do our best

1 | to call balls and strikes and address the matters

2 | appropriately.

3 |           MR. BRIMMAGE:  I appreciate that, Your Honor.

4 |           Let me talk briefly about the committee's efforts

5 | today and what has been accomplished.  Mr. Prince talked

6 | about it a little bit.  In the approximately two weeks since

7 | the committee's advisors have been engaged we have literally

8 | worked around the clock to get up to speed on the cases

9 | which, in a sense, the other parties have been negotiating

10 | with the tort claimants or working on restructuring issues

11 | for maybe two years or certainly shortly after the explosion

12 | in 2019.

13 |           We have held multiple committee calls, we

14 | communicated with the committee by email or, otherwise, on a

15 | daily basis. We reviewed all the first day relief that is

16 | before Your Honor today for approval on a final basis.  And

17 | as you know, we have come to significant agreements on most

18 | of those.

19 |           There are two issues that are outstanding.  One is

20 | the DIP motion, and I will talk about that in a minute, and

21 | the other one, Your Honor, is the cash management motion

22 | which has been put off to the 15th.  We do not have final

23 | resolution on that, but I'm optimistic that if the parties

24 | keep working we can get there.

25 |           Let me briefly talk about the DIP motion, if I

1   could.   Your Honor is aware, and I read the first day

2   transcript, and so I heard some of the court's comments,

3   there is a variety of complex issues that will be critical to

4   the future trajectory of this case, Your Honor.  While I will

5   not get into the details because it's not really before you,

6   I think there's a number of things I would like to say.

7          Primarily, whether the debtors even need the DIP

8   facility, at least, at this point in time in the case, I

9   think, is a big question.  As you know, Your Honor, it's

10  conditioned on a significant roll-up of prepetition debt

11  relative to the amount of new money that is actually being

12  provided.

13          As with anything else, the committee's goal is

14  going to be to resolve those issues without requiring the

15  court's involvement; however, we recognize that we may need

16  to be prepared to litigate and those issues, to the extent

17  necessary, and come before the court, as Mr. Prince eluded,

18  and have a contested hearing over the DIP.

19          To provide the time for those discussions and to

20  have them heard in an orderly fashion the committee, the

21  debtors, and the DIP parties all agree to move this to July

22  15th which we think is a positive step.  We will, obviously,

23  Your Honor, conduct discovery as appropriate.  We've got it

24  staged, and I will talk about that in a minute, to happen a

25  little bit later if we can't get resolution.

1          So I think we have got an agreement on a briefing

2     schedule, and depositions and discovery.  Is that right?

3          UNIDENTIFIED SPEAKER:  Yes, that's right.

4          MR. BRIMMAGE:  Okay.  I just wanted to make sure.

5     So it goes something like this, Your Honor: we will have --

6     we will provide a non-binding issues list to the debtors of

7     our issues with the DIP by this Friday.  The committee's

8     deadline to file an objection to the DIP will be Friday, July

9     the 8th at 4 p.m.  The deadline to file replies will be July

10    the 12th.  The committee will conduct depositions of the

11    debtor's witnesses and other witnesses on July the 12th and

12    13th in advance of the hearing if we need to by then.  So, as

13    you know, Your Honor, the hearing will be on the 15th.

14         Your Honor, let me just conclude by saying this: we

15    appreciate the opportunity to be before you today.  We look

16    forward to appearing before you again as much as possible.

17    We look forward to working with all the parties in inters;

18    the DIP lenders, the debtor, and everybody else to work

19    constructively to try to get to a consensual situation where

20    everybody is treated appropriately, but including and

21    certainly not without the plaintiff claim committee members.

22         With that, Your Honor, I'm happy to address any

23    questions the court would have.

24         THE COURT:  No questions at this time. I appreciate

25    everyone's efforts to do what they can to address matters

1  consensually, to the extent you do.  As I often say, to the

2  extent an issue is resolved and I don't have to make a

3  decision I am much less likely to get it wrong.  So I

4  encourage you to stay at it.  And to the extent you're unable

5  and you need me to make a decision that is my job and I'm

6  happy to do that.

7         MR. BRIMMAGE:  Thank you, Your Honor.

8         THE COURT:  Thank you.

9         MR. PRINCE:  Your Honor, I think that's it for the

10 main case.  The other kind of announcement that I would make

11 is that the committee advisors have asked for a plant visit,

12 a tour of the facilities.  They understand operations and

13 that is going to take place on the 12th which, I guess, Mr.

14 Brimmage will not be part of that because he may have to

15 reserve for a deposition, but that is with the advisors for

16 the committee on the 12th.

17        THE COURT:  Okay.

18        MR. PRINCE:  Turning to -- unless there are any

19 other comments, Your Honor, with any luck I will be there.

20        THE COURT:  Best of luck.

21        MR. PRINCE:  Unless anybody has any other

22 statements to make in the main case we would like to turn to

23 the adversary proceeding if Your Honor is ready.

24        THE COURT:  To the extent I'm going to be ready I

25 am.

1          MR. PRINCE:  With respect to the other competing

2    motions I would think that perhaps the plaintiff would go

3    first on their papers.

4          THE COURT:  So can I -- look, to the extent the

5    parties have worked out how they want to proceed I am happy

6    to accept that, but if you haven't I have got a few thoughts,

7    so let me throw out there.

8          First of all, I've read a lot, some of which is in

9    my head as we sit here and some of which isn't. So I

10   appreciate everyone's patience as we work our way through

11   these issues.  It seems to me -- what I would like to do, if

12   I can, is focus primarily on the principal merits issues. It

13   seems to me the two issues that I find challenging are the

14   application of the no action clause and the, sort of, merits

15   question of whether the 2021 transaction was permissible

16   under the 2019 credit agreement.

17         There is also a fair amount of procedural, what

18   I'll call, noise that if I can find a way to sweep away I

19   would like to.  If there's something procedural I want to be

20   respectful of people's rights.  So if there's something

21   procedural that interferes with considering those two merits

22   issues I want to treat it fairly, but let me throw out some

23   preliminary thoughts to make sure that I am understanding it

24   correctly.

25         As I understand the procedural questions on the

1    agenda motions, what are -- well, there are two motions on an

2    earlier form of agenda they were 24 and 25.  What they

3    essentially were, were motions to either dismiss or strike

4    counterclaims.  As I understand it, and tell me if I have

5    this right, the counterclaims were counterclaims by TPC in

6    which TPC seeks a declaration regarding the application of

7    the no action clause. Am I right so far?

8            MR. JACOBS:  That's correct.

9            THE COURT:  Now it seems to me the application of

10   the no action clause is also before me as a defense to the

11   merits of the claim brought by Bayside and Cerberus in the

12   first instance so that I resolve the merits of the no action

13   clause without worrying about the counterclaims.  Am I right

14   so far?

15           MR. JACOBS:  I think there are multiple ways to get

16   at the no action.

17           THE COURT:  Okay.  So my question is does it -- is

18   to go to the merits, resolve what I resolve. It seems to me

19   likely that one way or the other that will moot out the

20   procedural concerns about the counterclaims.  If there is an

21   issue with respect to the counterclaims that I need to

22   consider that will remain ripe after resolution of the merits

23   of the no action clause I want to make sure I understand what

24   that is because of now I don't understand it.

25           MS. SELENDY:  Your Honor, Jennifer Selendy for

1  Bayside and Cerberus.

2         I agree with everything you have said. Honestly, I

3  think you can ignore those procedural issues for today.  The

4  purpose for raising them, and we think they're meritorious,

5  was simply to put an end to a proliferation of duplicative

6  motions.  We did not -- we failed at that.  So I am very

7  happy for you to just focus on the merits issues.

8         THE COURT:  All right. So what I propose to do is

9  hold that aside for now, if after I resolve the merits -- let

10  me be -- let me tell everyone what I expect: what I would

11  like to do today, while we're this afternoon, is hear merits

12  argument on the principal issues.

13         I don't anticipate ruling from the bench today. I

14  appreciate that with the final DIP hearing coming up on the

15  15th and the resolution of this bearing importantly on the

16  DIP what I expect to do is spend my July 4th weekend working

17  on this and get something out the door as promptly as I can,

18  you know, presumably if I can the early part of next week so

19  that everyone has the answer to this question before your

20  scrambling to get ready for the DIP hearing.

21         My thought is that I can do that and then we can

22  address, to the extent there are procedural issues that I

23  haven't tied up with a bow, come back and do appropriate

24  orders and tie it up with a bow appropriately after we

25  resolve the merits.  I really only raise that to make sure

1  that proceeding that way makes sense to folks.

2         From the debtor's perspective any concern there?

3         MR. JACOBS:  No concerns.  I think we proceed that

4  way and if there's an issue we need to resolve, in terms of

5  the form of whatever decision we can hopefully reach

6  agreement on that and if we can't then we can come back

7  before Your Honor and source through it that way.

8         THE COURT:  Okay.  The other procedural issue that

9  I saw floating around in the papers is there was, sort of, a

10 motion to strike a declaration.  As I understood that issue

11 that declaration wasn't actually evidence to begin with.  The

12 declaration bore on the circumstances around a case that

13 cited as precedent.

14        So to the extent something is about a precedent

15 that, to me, is legal material and not evidence; therefore, I

16 am happy to deny the motion to strike -- it's not -- I don't

17 view it as being submitted as evidentiary.  So whether that

18 moots or is the basis to deny the motion or what have you

19 that is where I am on that. If someone wants to spend more

20 time on a topic I will give you that chance, but that doesn't

21 seem to me to be a matter that has to be a big focus today.

22        MR. JACOBS:  Your Honor, Kevin Jacobs for TPC.

23 Agree with that.  We filed the objection because, frankly, it

24 wasn't clear to us what the purpose of those declarations and

25 those materials were.  We just thought it was the safe thing

1  to do and go ahead and object to those.

2           THE COURT:  All right.

3           MR. JACOBS:  In the event somebody wanted to later

4  on argue it was evidence we didn't want to be seen as

5  waiving.

6           THE COURT:  All right.  So as long as no one is

7  moving it into evidence I don't think I have anything before

8  me that I have to act on.  So I will leave it be.  Again, if

9  there are I's to be dotted after we address the merits I'm

10 happy to do that, but I just wanted to sweep away, to the

11 extent I could, as much as what I viewed as noise here and

12 focus on the signal of getting to the bottom of the merits of

13 a complex issue.

14          MR. JACOBS:  Understood.

15          THE COURT:  Okay.  So in terms of the merits, you

16 know, there are cross motions, it doesn't matter to me who

17 goes first.  I am happy to give everyone a chance to be

18 heard.  So why don't I -- if you would like to proceed you're

19 welcome to.

20          MS. SELENDY:  I have just a suggestion.  I haven't

21 had a chance to discuss with Mr. Jacobs, and I'm sorry for

22 putting you on the spot on it, but if it would be helpful to

23 the court I think the no action issue is a, sort of,

24 threshold issue.  It's been asserted in a couple different

25 forms that if we could argue that first, have both sides

1   address that --

2          THE COURT:  If that is agreeable to the parties

3   that is fine with me.  To be honest, I've gone back and forth

4   about the logical sequence and whether one is logically

5   antecedent or not.  You could think of that, I think, in

6   either direction, but if you want to separate the issues and

7   each present argument and, obviously, include the intervenors

8   who are a party in terms of those who are arguing if you want

9   to do the no action issue first and then come back to address

10  the merits issue afterwards that's fine.  Really either way.

11         MR. HANSEN:  Your Honor, Kris Hansen with Paul

12  Hastings on behalf of the intervenors.

13         That's fine with us, Your Honor.  We didn't

14  intervene and take a positon with respect to no action

15  clauses between the debtor and the plaintiffs.  They can,

16  obviously, argue that and then we will come in and argue the

17  other argument to the extent that you find it necessary.

18         THE COURT:  Okay.  I will.  I promise not to rule

19  on no action after this argument.  So we will get to the

20  merits certainly.  However folks want to arrange themselves

21  is fine with me.

22         MR. JACOBS:  May I please the court?

23         THE COURT:  Yes.

24         MR. JACOBS:  Your Honor, Kevin Jacobs for TPC

25  Group.

1    We're here, as we just discussed -- I will start

2 today's discussion on the no action clause, whether its

3 styled as a defense, whether its styled as an affirmative

4 declaration and claim, whether it's a motion to dismiss,

5 however we put it, it's the no action clause, which can be

6 found at 6.06 of the indenture.

7    Nothing unusual about this particular clause, Your

8 Honor. It is a threshold issue in this case as we see it

9 because it effects Cerberus's and Bayside's ability to

10 maintain their suit. If they can't then the adversary

11 proceeding is over and we all get to move along and work on

12 all the other things that are important with respect to this

13 restructuring.

14    A few important things with respect to this

15 provision 6.06.  It was in the agreement, the indenture

16 agreement, in August of 2019. It was not inserted in there as

17 part of the 2021 transaction. It had been there from the get

18 go.  That is, obviously, very different then some of the

19 cases that are cited by Cerberus and Bayside where they

20 claim, you know, in other cases that it gets crammed down in

21 some later transaction.

22    THE COURT:  Right. So I appreciate the no action

23 law language was added as part of the transaction at issue

24 and that this is a no action clause that was there from the

25 beginning. So I appreciate that.  So let me let you continue.

1  I do have some questions, but let me get to them in a logical

2  way.

3          MR. JACOBS:  Look, my working assumption coming out

4  of this, Your Honor, was these are all motions for summary

5  judgments on the paper.  You had read all the papers and were

6  familiar with them.  We're here to answer your questions.

7          THE COURT:  Let me start with this question just to

8  make sure that we're all rowing together.  In reading the

9  papers I don't see anyone saying anything other than that

10 this is a dispute that is resolvable by reading the words of

11 the relevant documents.  So I don't think anyone is saying to

12 me you need to understand commercial norms or you need to

13 understand parole evidence of negotiating history or any of

14 the other background factors that courts will sometimes look

15 to in construing agreements.  It seems to me everyone is

16 saying, Judge, why don't you just read this and tell us what

17 it means.

18          Do I have that wrong from your perspective?

19          MR. JACOBS:  You do not, Your Honor. You are

20 correct.

21          THE COURT:  Okay. If anyone does think I'm wrong

22 about that when you get to the podium please tell me.

23          MR. JACOBS:  Okay.

24          THE COURT:  Okay.  You should continue.

25          MR. JACOBS:  Thank you, Your Honor.

1            Again, Cerberus and Bayside, I think we have said

2   this in the papers, and they never disputed it, were not

3   holders of the notes in February of 2021 when this

4   transaction occurred, the challenge transaction.  They

5   acquired their interest after the fact.  While they have not

6   articulated how, they, after the fact, acquire that they can

7   now assert the rights of their predecessors --

8            THE COURT:  Well, isn't that right?  I mean I see

9   there is lots of discussion about how they bought the notes

10  afterwards.  We have a secondary market in distressed debt

11  and if the buyers didn't stand in the shoes of the seller and

12  had different rights then the seller had, particularly on a

13  matter of pure contract, this isn't an equitable claim, it's

14  a contract claim.

15           So why does the fact that they bought later, which

16  you say over again in your briefs, why does that make any

17  difference?

18           MR. JACOBS:  You know why I think it matters, Your

19  Honor, is when we received briefing from the other side that

20  talks about the things like victims and victimization of --

21           THE COURT:  Imagine I don't care about that at all

22  --

23           MR. JACOBS: Okay.

24           THE COURT:  -- imagine I think this is a contract

25  dispute and it's not about who is a good guy or a bad guy, or

1 who I like or don't like, or who is wearing the white hat or

2 the black hat, it's about construing a document that has a

3 meaning.  If that's the case do I care whether they were

4 original holders or bought the debt on the secondary market

5 later.

6          MR. JACOBS:  I think that for the rulings that are

7 asked for on these papers you do not.

8          THE COURT:  Okay.

9          MR. JACOBS:  I think if we go further, for whatever

10 reason, and there become issues of what's the right remedy,

11 are there additional defenses to their claims such as

12 ratification, or waiver, or estoppel, etc., it does become a

13 --

14          THE COURT:  I understand that, but I don't think

15 I've got an equitable issue in front of me.  I think I've got

16 a pure legal question about construing an agreement.

17          MR. JACOBS:  I agree with all that, Your Honor.  We

18 still believe that it was important to put out there in a

19 world where the other side is claiming to us to the entire

20 world that somehow they have been victimized by our conduct

21 which, honestly, we fully disagree with and we need to

22 disagree with.

23          THE COURT:  I understand.  I don't mean to be

24 critical of what you said, it just seems to me that I can

25 resolve this question without --

1          MR. JACOBS:  I agree with that.

2          THE COURT:  Okay.

3          MR. JACOBS:  Its undisputed, Your Honor, that, you

4   know, 6.06 has several requirements.  Cerberus did not comply

5   with them.  Bayside did not meet those requirements, that's

6   undisputed.  The sole argument, I think, that we really have

7   here and, again, it kind of dovetails back into, I think, the

8   main event in some respects is their argument that they are

9   exempt from 6.06 because the February 2021 transaction

10  somehow violated an individual right.

11         THE COURT:  So that is the issue --

12         MR. JACOBS:  That's the issue.

13         THE COURT:  -- that I'm interested in hearing

14  about.  So the cases say that no action clauses should be,

15  sort of, strictly and mostly narrowly construed and there's a

16  question about how you make sense of a no action clause when

17  it is applied to an individual right that is given to every

18  individual holder.

19         I am interested in your views on how to make sense

20  both of the case law and, sort of, common sense of applying -

21  - my basic question is this: the argument goes if you give a

22  right to every individual holder, including if they hold a

23  fraction of one percent, how do you make sense of a provision

24  of the agreement that grants such a right if the no action

25  clause operates to prevent its being enforced.  That is what

1  I think the case is about individual rights are saying.

2        They're saying, look, you know, you read this

3  document as a whole and why would someone -- why would you

4  negotiate for getting a right that would be granted to an

5  individual holder if it's rendered, essentially, meaningless

6  in the absence of 25 percent of the holders enforcing it.

7        MR. JACOBS:  So I think that the way -- I think of

8  it in this case is it comes back, in a lot of ways, to the

9  merits of the fundamental dispute on the indenture itself. Is

10 there, in fact, a violation of (d)(10), as they claim, or

11 not.  If there is such a violation, which, obviously, we

12 disagree with, then the no action clause would not bar it.

13 If we're right --

14       THE COURT:  So if that's the case the no action

15 clause isn't a defense at all, right?

16       MR. JACOBS:  I don't believe that, Your Honor,

17 because I think you get to -- because we're here on multiple

18 different ways, we got a summary judgment, the competing

19 summary judgments, we have, obviously, our claim against them

20 and the motion to dismiss, and I think the court is allowed

21 to look beyond the pleading itself to the merits of the

22 issues.

23       THE COURT:  Mr. Jacobs, let me make sure I

24 understand what you just told me. If I concluded that

25 902(d)(10) prohibited the 2021 transaction because it granted

1  an individual right -- it made -- you know, if it turned out

2  that one were to conclude that this transaction made changes

3  that dealt with the application of the proceeds of collateral

4  and, therefore, was a sacred right that required unanimous

5  consent, if I concluded that then would Bayside and Cerberus

6  be permitted to enforce it even though they hold less than 25

7  percent notwithstanding the no action clause.

8          MR. JACOBS:  Under that case law, yes.

9          THE COURT:  Okay.  So I understand your position.

10 So, basically, what you're saying is at the end of the day

11 your argument boils down to a merits argument that it didn't

12 violate the provisions of the indenture.

13         MR. JACOBS:  Yes, Your Honor. I think we have said

14 that in our papers.

15         THE COURT:  Okay.

16         MR. JACOBS:  I think that's -- I mean I'm happy to

17 get into the merits of the argument, but I know that you

18 wanted me, in terms of the (d)(10) issue that you wanted me

19 to talk about the no action clause issues first.

20         THE COURT:  I hear you, but to the extent it's not

21 an independent argument, but the argument depends on your

22 prevailing on the merits then I am not sure we need to spend

23 more time talking about it.

24         Ms. Selendy, do you have a different view of that?

25         MS. SELENDY:  Not from his perspective.

1          THE COURT:  So, look, I hear you.  Why don't we

2   pause there.

3          Ms. Selendy, do you want to address the no action

4   clause separately?

5          MS. SELENDY:  That's fine.

6          THE COURT:  Okay.

7          MS. SELENDY:  Good afternoon, Your Honor.  Jennifer

8   Selendy of Selendy Gay Elsberg for the non-consenting

9   noteholders Bayside and Cerberus.

10          This was a very helpful exchange and I'm going to

11   take issue with what Mr. Jacobs said to the following extent:

12   the issue of -- this threshold issue of whether or not we

13   have contractual standing to bring a suit, notwithstanding

14   the no action clause, I do not think that it makes sense

15   logically to say that you have to get to the merits and

16   decide the whole merits before you decide whether a party can

17   vindicate its rights.

18          THE COURT:  Ms. Selendy, in light of Mr. Jacobs

19   acknowledgement that if you are right on the merits the no

20   action clause isn't a problem I am not sure why you don't

21   say, yeah, that's fine because on that understanding the no

22   action clause isn't a bar to your lawsuit. It only bars your

23   lawsuit if it's a lawsuit that loses in which case it doesn't

24   really make -- it's not -- it doesn't incrementally do any

25   harm to you.

1          MS. SELENDY:  I agree with you.  It's a major

2    concession that's very helpful, but I mean just as a matter

3    of how we think about the issue legally that you can construe

4    -- we are purportedly -- we are invoking a section that

5    creates individual consent rights.  Whether we win or lose on

6    the merits you can decide that there are individual consent

7    rights that are there and that those are as a matter of law

8    and --

9          THE COURT:  Okay.  So I hear that --

10          MS. SELENDY:  So that is my only point.

11          THE COURT:  -- analytically.  It seems to me in

12    substance what we've got are basically two defenses to your

13    lawsuit.  One defense is that 902(d)(10) isn't triggered

14    because this isn't that.  Second is no action clause.  I

15    don't think analytically -- you can call the standing clause

16    standing if you want, but it's a merits defense, it's not

17    constitutional standing.

18          MS. SELENDY:  No, it's contractual.

19          THE COURT:  so I don't have to address -- if it --

20    it seems to me that I can and probably should turn directly

21    to the merits issue and figure out whether the transaction

22    was permissible or not under the contract.  If it is not then

23    they acknowledge that the no action clause permits your

24    lawsuit and if it is permissible then you are welcome to have

25    brought the lawsuit, but you've lost.  So I am not really

1  sure we need to burn more brain cells on this unless I'm

2  missing something.

3          MS. SELENDY:  No, no. I totally agree with that. I

4  just wanted to, I think, analytically it should proceed

5  differently.

6          THE COURT:  Okay.

7          MS. SELENDY:  So we can then turn to the merits

8  issues in our motion for summary judgment.

9          THE COURT:  Okay.

10          MS. SELENDY:  There are a lot of issues that I am

11 going to try to unpack with your indulgence, Your Honor.  So

12 TPC borrowed nearly a billion dollars from noteholders and in

13 the indenture they were promised first priority access to

14 certain of the company's collateral.  That promise was

15 guarded by a sacred right requiring the noteholders consent

16 in order to alter the order of the application of proceeds

17 from that collateral and displace them from their first

18 priority position.

19          THE COURT:  Ms. Selendy, can I ask you the question

20 that is most nagging at me?

21          MS. SELENDY:  Absolutely.

22          THE COURT:  This is in the brief, so it's not going

23 to surprise you, sometimes you see indentures that require

24 unanimous consent for the release of collateral and sometimes

25 you see express prohibitions on subordination.  What we have

1    here, we have 902(e) that allows the release of collateral

2    with two-thirds consent.

3              So the question to me that strikes me as

4    challenging to your position is figuring out what is meant by

5    the -- dealing with the application of proceeds of

6    collateral. I understand that TriMark reads that reasonably

7    broadly to say anything that has to do with how the

8    collateral gets distributed.

9              What I am struggling with is why that reading would

10   make sense in an agreement that also has 902(e) that says

11   two-thirds can release the collateral entirely. So it would

12   seem to me that you wouldn't have -- if there is something

13   that requires two-thirds and something that requires

14   unanimity you would think just as a matter of logic that the

15   actions that require unanimity would be more extreme rather

16   than less extreme then the ones that could be done with two-

17   thirds.

18             Your reading seems not to do that. So the question

19   I guess I have is why doesn't that make your reading a less

20   natural reading of the document?

21             MS. SELENDY:  Thank you for this question.

22             So, first of all, the provision of 902(e) that

23   talks about the release of the collateral, the

24   characterization of that as more extreme, we think, is not

25   looking at it the right way.

1           THE COURT:  Okay.

2           MS. SELENDY:  And here's why, when there is a

3   supermajority vote that releases the collateral, that affects

4   all of the noteholders.  It affects all of -- if they're --

5   they're all affected by that, okay.

6           THE COURT:  I understand.

7           MS. SELENDY:  The sacred rights, and we have seen

8   credit agreements, indentures.  Subordination is not a magic

9   word, okay.  The application of collateral proceeds, right,

10  is about subordination, changing that application that is set

11  up in the inter -- the intercreditor agreement is where the

12  waterfall is.  That's where it says who's first, who's

13  second, and who's third.

14          So, we think that the -- we think this is

15  absolutely one flavor of an antisubaordination.

16          THE COURT:  So, but what would have stopped?

17          Just thinking this through -- and, look, I confess

18  that back in practice when I did cases like these, I spent a

19  lot of time annoying the finance people with my annoying

20  questions and, unfortunately, they don't have to take my

21  calls anymore, but you have to answer my questions -- but,

22  what -- in substance, if the two-thirds majority had decided

23  in 2021 to release, say, $153 million worth of collateral, it

24  made a new loan secured by that $153 million worth of

25  collateral, wouldn't that have been entirely permissible

1  under this agreement?

2        MS. SELENDY:  Your Honor, I believe it would have

3  been.

4        THE COURT:  And why isn't that, in economic

5  substance, any different than what's happened here?

6        MS. SELENDY:  Well, because there's a lot of --

7  there's absolutely a lot of risk and different considerations

8  in having a majority group enter into a transaction where the

9  first step that they take is to release all their rights to

10  the collateral, as well, right.

11        The sacred rights provision is about the

12  oppression of a minority group, okay?

13        THE COURT:  Uh-huh.

14        MS. SELENDY:  That's why those are the sacred

15  rights and that's why that is much more precious, right,

16  because you are talking about in that list of sacred rights,

17  right, your proximity to the collateral.  You are talking

18  about your *pari passu* payment rights.  You are talking about

19  the key things in the bargain, right.

20        Now, if a two-thirds -- again, when the two-thirds

21  group decides to release all the collateral, it affects them,

22  too, and whatever transaction they plan to do next; great, if

23  it works out, but that is a much -- that's a different

24  proposition, okay.  And it is not a more extreme, in our

25  view, situation, than having lenders turn on lenders and be

1  able to take your first lien position and subordinate it.

2         And that is why -- and, again, if you look at the

3  structure of the whole Section 902, you have 902(a) that says

4  unless anything -- unless another provision of 902 applies,

5  it's majority, okay.  But then, when you get to 902(d),

6  you're saying each affected holder, so you're creating

7  individual rights there, and those sacred rights go to their

8  first lien position, the fact that they get to be first in

9  line and say, Whatever you do, if you're going to change a

10  provision that deals with our proximity to that collateral,

11  each one of us gets to vote on it.  So, the majority can't

12  get together and subordinate a minority, in order to get some

13  better goodies from the debtor.  That's what that protects

14  against.

15         The release (e) says, Okay, there's a whole bunch

16  of other changes that could be made that also would adversely

17  affect the noteholders, but they're not sacred rights, so

18  that group of adverse, including the release of all the

19  collateral, that can be done by a supermajority.

20         If they wanted to change the information rights,

21  right -- so, the noteholders get information rights from the

22  ABL lenders about what's going on with their collateral --

23  the majority could get together and say, Well, this group

24  doesn't get those information rights anymore.  We're going to

25  get those information rights, but not them, okay.  That could

1  be done with a two-thirds vote.  There are many things that

2  are adverse to some holders that wouldn't implicate those

3  sacred rights and that's the bucket that 902(e) covers.

4            And I can understand why, economically, you could

5  say, Well, they could do a deal where they released all the

6  collateral, but once that collateral is released, it's

7  released for everyone.

8            THE COURT:  Right.  But you don't have to release

9  all the collateral.  You could release only as much of the

10  collateral -- 902(e) doesn't require two-thirds to release

11  all.  It could also release some.

12            MS. SELENDY:  It could release some, exactly.

13            THE COURT:  And you could take a new lien in the

14  part you released and, therefore, harm the minority in

15  exactly the same way that was done here.

16            MS. SELENDY:  But there is certainly -- there are

17  certainly other provisions, other things, other risks, and

18  other considerations involved in a transaction like that --

19            THE COURT:  Okay.

20            MS. SELENDY:  -- that that don't implicate the

21  sacred rights, right, and it's all or substantially all of

22  the collateral, right.

23            THE COURT:  Can I ask this other question that --

24            MS. SELENDY:  So, it's not a small amount of the

25  collateral, right.

1           THE COURT:  I agree.  Can I -- yes, I see that.

2   That's a fair point.

3           In -- and I should know this, and despite spending

4   a lot of time with the document, I don't -- in 902(d)(10),

5   when it talks about any -- requiring unanimous consent to

6   make any change in the provisions that deal with the

7   application of proceeds of collateral, are there specific,

8   actual specific provisions of the credit agreement that you

9   think are those provisions that deal with the application of

10  the proceeds of collateral?

11          MS. SELENDY:  So, yes.  But let me -- I want to

12  correct something that --

13          THE COURT:  Okay.

14          MS. SELENDY:  -- it seems to be implicit in what

15  you're saying.  902(d)(10) or 902(d), generally, doesn't

16  require unanimous consent in all cases.  It requires the

17  consent of each adversely affected.

18          THE COURT:  Okay.

19          MS. SELENDY:  So, I don't think that's necessarily

20  unanimity.

21          THE COURT:  Fair enough.  But all I need to say is

22  that every holder would have a veto, to the extent they were

23  harmed by it.

24          MS. SELENDY:  Exactly.  They would have to be

25  harmed by it and then (indiscernible) which case, that's

 1  right.

 2           THE COURT:  Okay.

 3           MS. SELENDY:  So, I cannot give you a

 4  comprehensive list.  What I can say is the following, that

 5  there are many instances throughout the agreement where

 6  rights and obligations, and particularly when it comes to

 7  liens and security, rights and obligations are subject to

 8  that 2019 -- that original intercreditor agreement.  That

 9  makes them subject to the waterfall that is in that

10  intercreditor agreement.

11           And we think whenever there is a change that takes

12  away the application of the 2019 intercreditor agreement and

13  its waterfall, that is necessarily affecting the application

14  of proceeds because that's where it's set out.  That's where

15  it's required to be.

16           So, you know, our position is that "dealing with"

17  is a much broader phrasal verb than our adversaries hold it

18  to be, but it definitely is broad enough to cover every

19  instance where you are suggesting the rights and obligations

20  of the parties to this indenture to that waterfall, okay.

21  And changes, right, including when you change a definition

22  that's incorporated in the lien provision, right.  So, that's

23  a perfectly good example.  The lien provision in 410 tells

24  you that you cannot add any additional debt secured by liens

25  unless they're permitted liens, and permitted liens, both in

1  the definition and in the security documents, are subject to

2  that intercreditor agreement.  So, when you make the change

3  to that definition, you are definitely changing a provision

4  that deals with the application of proceeds.

5        And everything in this priming transaction, Your

6  Honor, everything they did was geared towards permitting the

7  subordination of those first priority noteholders to the

8  usurping noteholders, thereby changing the order in which any

9  collateral was going to be applied, right.  So, those

10  provisions that -- certainly, the provisions, also, that

11  mention "order of application of proceeds," rights, so that's

12  410 of the intercreditor, 610 of the indenture, when you

13  supplement those provisions, right -- supplements are covered

14  by 902(d) -- when you supplement those provisions with a new

15  intercreditor that interposes a new waterfall, you are

16  necessarily, again, changing the application of proceeds.

17        We think it's very important to understanding the

18  dispute to look at the argument that Section 407(b)(1) of the

19  indenture permitted the company to add the debt that was

20  senior to the senior secured notes, because it most clearly

21  did not Section 410 of the indenture, including its

22  definition of permitted liens, as well as the associated

23  security agreement, make it crystal clear that no new liens

24  could alter the order of application of collateral proceeds

25  that were set forth in that 2019 intercreditor.

1           THE COURT:  All right.  So, slow down,

2    Ms. Selendy, because I've got the document in front of me.

3    So, you're now talking about Section 4. -- I'm sorry, what

4    section of the indenture are you referring to?

5           MS. SELENDY:  So, if you look at 407(b) --

6           THE COURT:  4.07(b).  Hold on.

7           MS. SELENDY:  -- (b)(1), their argument -- and I

8    don't think it's disputed that that's the provision under

9    which they classified the usurping notes, right.  So, there's

10   a basket in (b)(1) for up to $300 million of new indebtedness

11   or the amount of the borrowing base, whichever is greater.

12          So, there's no dispute that additional

13   indebtedness, capital I, indebtedness, was permitted, Your

14   Honor, but -- and this is the crucial part -- that does not

15   say, it does not tell you that the indebtedness could be

16   secured indebtedness and it definitely doesn't allow it to be

17   senior secured indebtedness.  To look at, can it be secured,

18   can it be senior, we have to go to 410, which governs liens.

19          THE COURT:  Okay.  Let's go to 410.

20          MS. SELENDY:  Okay.  So, indebtedness, under 407

21   and its various (indiscernible), they say there are 19 ways

22   they could borrow more money.  Correct, but that doesn't

23   answer the question.

24          You have to look at whether it could be secured

25   and whether it could be senior.  They studiously avoided 410,

1 which in 410(a), the gist of what's going on there, quote:

2       The issuer will not incur any lien, other than

3 permitted liens, on any asset or property of the issuer that

4 secures an indebtedness.

5       Indebtedness does include our 10.5 percent notes.

6 And so, when we then turn to the definition of permit liens

7 in the original indenture, which is -- remember, what they're

8 amendment did to permitted liens, they specifically exempt

9 the new notes from the requirement in this definition, that

10 it be subject to the 2019 intercreditor agreement and its

11 waterfall.

12       THE COURT:  Right.  So, unless I'm missing

13 something, right, no one believes that you could have done

14 this transaction without amending the indenture, right.  So,

15 it's -- clearly, the transaction was not permitted by the

16 terms pre-amendment, and the point of the amendments -- the

17 trick here is that this agreement says it can be amended,

18 presumably, by majority with certain exceptions that require

19 supermajority or the sacred rights.

20       MS. SELENDY:  Right.

21       THE COURT:  And so, I understand that this

22 required an amendment.  And I don't believe you're saying the

23 amendments, other than the issue around whether the

24 registered-holder issue, you're not otherwise saying, the

25 amendments didn't suffice.  You're not saying they did the

1  amendments wrong, so that it's forbidden under the document,
2  as amended.

3          What you're saying is the amendments, themselves,
4  violate your sacred rights and are unauthorized, right?

5          MS. SELENDY:  That's right.  But the parties don't
6  agree, I think they argue pretty vociferously that they had
7  the right to put senior secured debt in here.  And I'm just
8  walking you through why that was absolutely not the default
9  before the amendments and that's why we get to the focus
10 on 902(d)(10).

11         THE COURT:  Got it.  Okay.

12         MS. SELENDY:  That's our position, right, that if
13 you look at the security documents, again, for example, there
14 is something called "permitted, additional *pari passu*
15 obligations" that could be attached to the notes' security
16 collateral, to our collateral, okay.  But that's not what
17 they did.  That's *pari passu*.

18         THE COURT:  I understand.

19         MS. SELENDY:  Okay.  So, baseline, it's very
20 important from our perspective that you start with that we
21 had a first lien position and that there was no senior debt
22 allowed unless there was an amendment.  So, we think by its
23 plain text, Section 902(d)(10) is clear and broad and it
24 applies to any change to any provision in the original
25 indenture or its related security documents dealing with the

1  application of proceeds, right, if it adversely affects.

2           And "dealing with" does not mean mentioning or

3  dealing exclusively with or referencing.  It's a broader verb

4  and it's commonly understood to mean "concerning" or "having

5  to do with"; thus, if a change to a provision has the effect

6  of altering the manner in which collateral proceeds are going

7  to be applied, that's a very big deal, that's a sacred right.

8           And we believe it is an antisubordination

9  provision and antisubordination provisions don't have to use

10  a magic word:  subordination.

11          THE COURT:  So, let me ask my original question

12  this way.  Using your definition of the language dealing with

13  the application of proceeds of collateral, would you agree

14  that releasing the lien would be an action that deals with

15  the application of the proceeds of collateral?

16          MS. SELENDY:  Releasing the lien deals with --

17  yes.

18          THE COURT:  So, that's why I stuck on your

19  reading --

20          MS. SELENDY:  Right.

21          THE COURT:  -- because it seems weird to me that

22  you would say that two-thirds could do that, but a majority

23  would be -- right.  How do I make sense of the fact that two-

24  thirds could release the liens if the language application

25  of -- I'm sorry -- dealing with the application of the

1   proceeds is so broad, that it actually requires -- it

2   requires -- it essentially gives rise to a veto in every

3   affected holder?

4            MS. SELENDY:  So, our position is that the release

5   of the collateral, again, all, or substantially all of the

6   collateral in (e), is something that affects all the parties

7   equally.  It doesn't -- it's not something that they can do

8   to the minority --

9            THE COURT:  Right.  But haven't you rendered the

10  language that says two-thirds can do that effectively

11  meaningless?

12           MS. SELENDY:  No, because it specifically uses the

13  term "release of collateral."  It's carved out that into the

14  two-thirds majority bucket and not in --

15           THE COURT:  Let me ask you a hypothetical.

16  Imagine that what the debtor was doing was releasing the

17  collateral and two-thirds of the creditors supported it and

18  there was affecting holder that objected to it and the debtor

19  said, I can do it because 9.02(e) says I can do it with two-

20  thirds --

21           MS. SELENDY:  Yes.

22           THE COURT:  -- and the other holder says, No, but

23  that is a transaction that deals with the application of the

24  proceeds and I don't consent.

25               Who wins that case?

1        MS. SELENDY:  That's -- I think the canons of

2   construction would tell us very easily that the specific

3   rules over the general and it would be permitted.

4        But your -- the premise of your hypothetical, I

5   think, is that they could simply reattach to the collateral

6   in the new deal, but once they've released the collateral,

7   they are subject, again, to the lien provision of --

8        THE COURT:  No, I understand the economics of

9   releasing collateral.  There are different incentives around

10  doing a lien release than there are here, and that maybe

11  those incentives -- you're saying -- what you're saying is

12  that those incentives, those different incentives

13  sufficiently police it, that it makes sense for someone,

14  commercially, to sign on this those.

15       MS. SELENDY:  I'm saying more than that, Your

16  Honor.

17       THE COURT:  Okay.

18       MS. SELENDY:  Because, yes, that is what I've

19  said, but I'm also saying there are other provisions of the

20  contract that would prevent this economically equivalent deal

21  that you're talking about from happening.

22       THE COURT:  Okay.

23       MS. SELENDY:  That's all.

24       So, I think the specific would prevail over the

25  general in that case and 902(e) definitely calls out release

1  of all, or substantially all, of the collateral and that is,

2  to our mind, does not in any way diminish the fact

3  that 902(d)(10) was meant to be an antisubordination

4  provision, okay, that broadly dealt with amendments that

5  could affect that waterfall, right.  And that each and every

6  one of the amendments that they made affected provisions that

7  took the waterfall in the original intercreditor and replaced

8  it with the subsequent one.

9         THE COURT:  So, they, I think, take issue with

10  that and make, you know, what you might call a technical

11  argument that says, look, the waterfall, as it applies to

12  collateral that comes in under this credit agreement, right,

13  is -- obviously, there's the whole set of issues around the

14  ABL loan and with respect to that collateral they get paid

15  first and so forth, but otherwise, to the extent the agent

16  gets its hands on money that are the proceeds of the

17  collateral, that gets distributed *pro rata* to the holders.

18         And they're saying, That's still true.  It now

19  turns out there's someone else ahead of us before it comes

20  in, but that the application of the collateral that this

21  agent gets in connection with this indenture is still

22  distributed *pro rata* to all holders -- you're one of them --

23  and we haven't done anything that affects the application of

24  the proceeds of collateral.

25         So, what's the response to that argument?

1          MS. SELENDY:  So, I mean, so TriMark is an

2    example.  That's the applicability of TriMark where it was

3    acknowledged that, you know, it doesn't make any sense.  It's

4    not a commercially reasonable interpretation here to say that

5    you can do, indirectly, essentially, what is barred directly

6    here.

7          And that's really -- there's nothing in the

8    language, also, of these provisions that they're pointing to,

9    and particularly of the 902(d)(10), that suggests that the

10   only provisions, right, that would be impacted here are the

11   rights are, as between the two.  I mean, they could have said

12   that, right, that what's being governed here is the --

13         THE COURT:  Yeah, whenever you've got a

14   complicated contract dispute, both sides can say, You could

15   have said that you win and you didn't, so therefore, I win.

16   I'm not sure those arguments are --

17         MS. SELENDY:  But the language is very broad and

18   construed their way, okay.  If you look at the intercreditor

19   agreement, okay, it doesn't say, you know, the real goal here

20   is to make sure that as between the parties here, we don't

21   get rearranged.  It says the goal here is that the

22   noteholders will have first priority access to the noteholder

23   collateral and second priority access to the ABL collateral,

24   right.

25         THE COURT:  Uh-huh.

1           MS. SELENDY:  So, to read out of this set of

2    documents, the importance of that first lien position by

3    saying, Oh, no, it's just relative to your ABL lenders that

4    you really cared about, that's what was sacred, that undoes

5    so much of the language and the terms of the whole agreement,

6    which, number one, did not allow senior debt without an

7    amendment, and two, specifically says this is about ensuring

8    first access to the notes priority collateral, second access

9    to the ABL collateral.

10          So, I think their argument really ignores the

11   whole structure here.  That ABL agreement is not just about

12   relative rights; it is about first priority access for those

13   noteholders and first priority access for the ABL lenders to

14   their collateral, right.

15          THE COURT:  Uh-huh.

16          MS. SELENDY:  And the security documents said very

17   clearly, if you want it to attach to that notes collateral,

18   it needed to be *pari* debt.  That's the implication of the

19   security document.  It's in the definition.

20          And another argument that they make that I'll

21   address before I move on is, of course, that these provision

22   don't, unless they mention and reference collateral proceeds,

23   that it doesn't deal with collateral proceeds.  And I think

24   that's a "form over substance" argument that is really,

25   really, again, not supported by the fact that the whole

1  agreement, itself, set up first lien protection, couldn't be

2  changed without an amendment and an intercreditor agreement

3  and a waterfall that says the purpose of this is to make sure

4  that we have first priority right to that collateral.

5          THE COURT:  Okay.

6          MS. SELENDY:  I want to make sure that I've

7  answered all of your questions, Your Honor.

8          THE COURT:  So, this is helpful.  Look, the issues

9  that I'm stuck -- I try to be reasonably transparent about

10 what I'm thinking --

11         MS. SELENDY:  Yeah.

12         THE COURT:  -- and I'm stuck here.  And what I'm

13 stuck on is the relationship between 902(e) and 902(d)(10),

14 which I find the interaction to be complicated.

15         I've heard your answer.  I get it.

16         MS. SELENDY:  Yeah.  Let me come at it from a

17 little different perspective, because I think that the

18 language in 902(e) that says that you need at least a

19 supermajority --

20         THE COURT:  Uh-huh.

21         MS. SELENDY:  -- is instructive, as well, because

22 it clearly contemplates that there are this other category of

23 sacred rights that came before it that would require more

24 than supermajority.  So, it's setting a floor, right, and it

25 expressly is acknowledging, in our view, the sacred rights

1  that come before that require, that then may require even

2  more than a supermajority.  It may be unanimity that is

3  required.

4          THE COURT:  Isn't that the opposite of what you

5  just told me?

6          You just said the specific would control over the

7  general, so that if it's covered by 902(e), then you don't

8  need -- it's not "at least."  It just means -- you know, I

9  mean, it says, "at least," but I think that means, you know,

10 it has to be 66 and two-thirds percent or more.

11         MS. SELENDY:  Yeah.  Thank you for that.

12         THE COURT:  Right.  But do I have that wrong?

13         MS. SELENDY:  No, no, I think that's right.

14         If I'm -- I'm just trying to -- I'm thinking about

15 the language, which I don't have right in front of me, but I

16 think what we've put forth in our papers very clearly is that

17 the "at least" language for a change that is adversely

18 affecting noteholders, right, is an acknowledgment in (e)

19 that there are sacred rights that require more than that.

20         It is not -- it -- were -- our interpretation

21 harmonizes 902(d) and 902(e), whereas, I feel that if you

22 listen to what the debtor is arguing, they're basically

23 saying, As long as it's adverse to the noteholders, you can

24 have -- you can do the amendments with the supermajority.

25         THE COURT:  So, Ms. Selendy, to me, it seems like

1  you haven't harmonized.  I mean, tell me if I've got this

2  wrong.

3          I think you actually haven't harmonized them.

4  You've reconciled them by a canon of construction that makes

5  imminent sense, which is the specific prevails over the

6  general.

7          But if -- so, if you had a transaction that was

8  within the heartland of 902(e) and it was the release of

9  substantially all and let's say 71.5 percent of the holders

10  supported it, but you had a dissenting, affected holder,

11  where you told me before that by virtue of the canon of the

12  specific controlling over the general, you wouldn't treat

13  that as subject to a sacred right under 902(d)(10), but you

14  would instead, say, this is controlled by 902(e).  And so,

15  that seems, to me, in some tension with the position that the

16  "at least" language of 902(e) operates to harmonize the

17  provisions.

18          Am I missing something?

19          MS. SELENDY:  No, I'm just saying, I'm not going

20  to stand before you and say, You read out of 902(e) the idea

21  of releasing all, or substantially all, of the --

22          THE COURT:  Right.  And the problem that I have

23  with that --

24          MS. SELENDY:  Right.

25          THE COURT:  -- is that in order -- the candidly --

1  let me just -- you know, I don't know how I'm resolving this,
2  but it seems to me the way to harmonize 902(e)
3  and 902(d)(10), if that's one wanted to, was -- it would be
4  to give a narrower reading of dealing with the application of
5  the proceeds of collateral so that it didn't cover a release
6  of the collateral.
7          MS. SELENDY:  I'm getting lots of notes here.
8          THE COURT:  Take your time.  Look, my only job
9  here is to get this right, so I'm not going anywhere.
10      (Pause)
11         MS. SELENDY:  I think this is a little --  I want
12 to give you a direct answer to your question, but the point
13 that my colleagues have made, which I've made already here,
14 and I think it's important, is it appears in your
15 hypothetical.  You were imagining a release of collateral
16 that would involve, you know, later reattaching in a new loan
17 or whatever.
18         THE COURT:  Forget that.  Forget -- I'm just
19 talking -- that was a hypothetical that -- that was going
20 down a path that, look, I think you fairly addressed, which
21 is, I was asking the question, could you do the same thing
22 another way, and if you could do it another way, wouldn't
23 that suggest you could do it this way?
24         Your answer to that, you know, I find to be
25 perfectly plausible, which is, Look, there are other risks

1  involved in doing it that way and there may well be other

2  provisions that would raise questions.

3          And so, forget the "do it another way."  What I'm

4  struggling with is a purely linguistic concern, which is I've

5  got those two provisions --

6          MS. SELENDY:  Yes.

7          THE COURT:  -- and the question is how narrow --

8  to me, the question is how narrowly or broadly to read the

9  language in 902(d)(10).

10          MS. SELENDY:  I understand.  I do.

11          THE COURT:  And it seems to me, just as a matter

12  of, you know, ordinary construction, that because 902(e)

13  requires two-thirds and 902(d)(10) requires -- you know,

14  again, would give rise to individual veto rights --

15          MS. SELENDY:  Yes.

16          THE COURT:  -- by affected holders, it would make

17  sense to read 902(d)(10) in a way that is narrower

18  than 902(e), and that if they cover the same material, you

19  would be left either, to say what you did, which is a

20  plausible thing, but it wouldn't reconcile it.

21          MS. SELENDY:  No, it doesn't reconcile them.

22          And I agree with you, and I do think that what's

23  more important is the exact language in 902(d)(10) that talks

24  about "at least" a supermajority, because then the way that

25  you harmonize them is to say if it creates -- if it does

1  affect a minority group who's -- are having the application

2  of proceeds impacted, then you would need more than the

3  supermajority.  I think that's very clearly contemplated and

4  set forth in (e), that it is at least a supermajority, so

5  it's contemplating that depending on the transaction, and

6  depending on if there's a minority, right, whose access to

7  collateral proceeds are being impacted, that you would need

8  more than that supermajority.

9          THE COURT:  All right.  Let me ask this question

10  one more time and try to be clearer about it.

11          Imagine you have a transaction that, according to

12  your reading of the language dealing with the application of

13  the proceeds, does both.  So, it releases the collateral and,

14  therefore, it deals with the application of the proceeds.

15  And you have more than two-thirds, but less than all --

16          MS. SELENDY:  Right.

17          THE COURT:  -- who support it.

18          Is that permitted or not permitted?

19          MS. SELENDY:  If the individual -- in your

20  hypothetical, there's one person --

21          THE COURT:  Yes.

22          MS. SELENDY:  Okay.

23          THE COURT:  He's objecting.

24          MS. SELENDY:  And it's not just that they're

25  objecting --

1           THE COURT:  He's adversely affected.

2           MS. SELENDY:  -- he has to be adversely affected.

3           THE COURT:  Yeah, he is.

4           MS. SELENDY:  Then, you would need the

5    supermajority, plus that one.

6           THE COURT:  I see.  So, I see.  So, you're not

7    saying specific controls over the general.  You're saying you

8    need to satisfy both?

9           MS. SELENDY:  Right.  Yes, that's right.

10          THE COURT:  Okay.  Now, I understand that.

11          MS. SELENDY:  Yes.  I think -- I do think that

12   our -- the way we've set this forth in our brief does

13   harmonize it in a way that you give full effect to (e) and to

14   (d) and that, otherwise, you really are taking something that

15   is a sacred right and called a "sacred right" for a very

16   important purpose, right, and you're gutting it.  Because it

17   is not -- it is absolutely clear in that intercreditor

18   agreement that the parties were concerned with far more than

19   just the relative relationship between those classes.  They

20   were concerned with who had first dibs on what collateral and

21   changing that is violating a sacred right.

22          THE COURT:  Okay.

23          MS. SELENDY:  So, I don't know if you have any

24   questions.  We think that there's a real issue with the

25   consents here, under the contract; again, a technical

1  argument, we acknowledge.  But one where it's -- it is not

2  the case that as far as I read the consents, that they were

3  delegated authority by the holder, right, the registered

4  holder to give these consents, right; in fact, it's just the

5  beneficial holders that are giving the consent, and that that

6  is a -- that is not permitted under the contract.

7           I don't know if you have any questions about that,

8  but we think that all of their cases --

9           THE COURT:  Well, they respond to that by saying

10  on that reading, then even your action is not permitted

11  because you claim only to be beneficial, not registered

12  holders.

13          MS. SELENDY:  But Cerberus, in contrast to them,

14  got a delegation from the registered holders, so an approval

15  to bring, and so, I think that puts us in a different

16  position.

17          THE COURT:  And --

18          MS. SELENDY:  And the cases, all of the cases that

19  are cited are really about, you know, the right to sue, not a

20  consent that's required under a contract to make an

21  amendment.

22          THE COURT:  Okay.

23          MS. SELENDY:  Thank you.

24          THE COURT:  Okay.  Thank you this is very helpful.

25  I appreciate it.

1          Mr. Hansen?

2          MR. HANSEN:  Yes, Your Honor.  Kris Hansen with

3  Paul Hastings, on behalf of the ad hoc committee of

4  noteholders.

5          Your Honor, we've been at this for a while.  Did

6  you want to take a small break or do you just want to go?

7          THE COURT:  Let's keep going before I forget

8  everything that I just think I learned.

9          MR. HANSEN:  Perfect.  Thank you, Your Honor.

10          Your Honor, I'm going to start with my opening,

11  which is actually where you started.  There's only one way

12  that you can read this document in harmony from a provision

13  perspective and you vectored right in on the provisions,

14  which is 902(e) and 902(d)(10).

15          Basically, the way those work is that you have an

16  increasing scale of consents that are necessary for

17  increasingly harmful actions to the 10-and-a-half-percent

18  noteholders.  A majority is necessary to subordinate the

19  lien.  Two-thirds is necessary to release the lien.  And a

20  hundred percent is necessary to change the ratable

21  distribution of collateral proceeds among the noteholders,

22  right.

23          Like, when we talk about a sacred right, a sacred

24  right is something that is personal to the noteholders.  And

25  Ms. Selendy was saying that a sacred right is actually

1   something that's more broad.  It's more applicable to the

2   class, as opposed to the holder.  But I think that most

3   indentures would be specific that the sacred right is sacred

4   with respect to the individual and so, a *pro rata* provision,

5   like we have here, right.

6            So, if you go to Section 610 of the indenture,

7   Section 610 is the ratable distribution of proceeds received

8   by the trustee among all the noteholders.  So, (d)(10)

9   clearly gets at that, because the ratable distribution of the

10  proceeds of collateral among the holders is the application

11  of proceeds.

12           THE COURT:  So, you would agree that if you were

13  to amend the 610 to say, We're going to distribute the

14  proceeds to holders alphabetically, rather than *pro rata*,

15  right, that would require unanimous -- that would give rise

16  to an individual veto right by any affected holder?

17           MR. HANSEN:  That's correct, Judge.

18           Exactly.  It's the change to that ratable

19  treatment, right.  That section says ratable treatment.  If

20  you go to (d)(10), (d)(10) says "deals with the application

21  of proceeds."  610 clearly deals with the application of

22  proceeds.

23           Were you to change that to your hypothetical and

24  order them alphabetically instead of by the fact *pro rata*,

25  meaning how much they hold, *vis-a-vis*, the total, then that

1   would be something that would require their consent.

2        But when you go to 902(e), like you said, Your

3   Honor, and you look at 902(e), the Plaintiffs are arguing

4   that the release of collateral is somehow a less-Draconian

5   remedy than the subordination of the lien with respect to

6   that collateral.  That's nonsensical.

7        If there is -- if you don't have any collateral at

8   all, you can never recover a dollar from the proceeds of that

9   collateral.  If you have lien on it, whether it's junior or

10  not, you always have an opportunity to receive a proceed of

11  that collateral, because you come after the lien that's ahead

12  of you.

13       So, clearly, from a 902(e) perspective, if it's

14  specific, which it is, and it says that two-thirds or more of

15  the holders can release the liens, then the way that

16  Ms. Selendy got there at the end when you asked her the

17  question, which was under (d)(10), right -- let's step back,

18  use your hypothetical -- you have a transaction where the

19  liens are released, the release of those liens will require

20  an amendment to the indenture.

21       There are basically three provisions.  There are

22  plenty of others, but there are three provisions that you'd

23  have to amend out.  You'd have to amend out 414, 418, and 12.

24  414 and 418 are basically continuing guarantors and after-

25  acquired property provisions within the indenture, right.  If

1  you have a lien, and, obviously, as property is after-

2  acquired, you get to attach your liens to that property as it

3  comes in.  That's how the indenture is written.

4         Section 12 refers to the collateral and security

5  documents that acknowledges their existence and binds the

6  parties to them.

7         So, clearly, if you're releasing the collateral,

8  you have to amend the indenture in order to get rid of those

9  provisions because there's no collateral left anymore.  It

10  doesn't make sense.  And leaving them in as a vestige would

11  confuse people who might buy this in a secondary market.  So,

12  you'd amend that.

13         That amendment would be a change -- let's go to

14  (d)(10) -- that amendment would be a change to the indenture

15  dealing with the application of proceeds of collateral, as

16  would the release.  So, if that was true, you'd need 100

17  percent consent to release the liens on collateral,

18  but 902(e) says you only need two-thirds.

19         So, reading it the way that the plaintiffs want

20  you to read it, 902(e) is no longer applicable, and so 902(e)

21  has no --

22         THE COURT:  I'm sorry, I apologize, I just want to

23  make sure I'm following.

24         MR. HANSEN:  Yes.

25         THE COURT:  So, what you're saying is you can --

1  everyone agrees you can release with two-thirds, but in order

2  to release the other provisions that, as a matter of logic,

3  you would need to amend, you said there are four --

4           MR. HANSEN:  414, 418, and 12.

5           THE COURT:  418 and 12.

6           And what you're saying is that those provisions

7  are clearly provisions that, read broadly, you would say deal

8  with the proceeds of collateral and, therefore --

9           MR. HANSEN:  No, Your Honor.  They don't deal with

10  the proceeds of collateral.  They just talk about the need to

11  secure collateral as it comes in.

12           So, my only point is that if you were releasing

13  all the liens, you would amend the document to get rid of the

14  provisions --

15           THE COURT:  Right.

16           MR. HANSEN:  -- that talk about if you got

17  property later, that gets pulled in and subject to liens.

18  I'm not (indiscernible) the application of proceeds.

19           THE COURT:  Okay.

20           MR. HANSEN:  The application of proceeds is

21  exactly what you asked.

22           THE COURT:  It's just 610.  And so, what you're

23  saying is if you read application of the proceeds as broadly

24  as your opponents do, it would then pick up these things in a

25  way that would render the document incoherent.

1          MR. HANSEN:  You read 902 -- yeah.

2          If (d)(10) says that you -- if (d)(10) says that

3  releasing a lien is dealing with collateral and you make a

4  change to the document, and obviously it's adverse if you

5  don't have a lien, it's a change that's adverse to you --

6          THE COURT:  Right.

7          MR. HANSEN:  -- then 902(e) can never apply, and

8  you can't read the document that way.  I mean, we know our

9  canons of construction say we have to harmonize the document.

10 We have to read the provisions together.  The specific

11 controls over the general.  902(e) is specific.  (D)(10) is

12 more general.  We believe that it's pretty easy to determine

13 which provisions deal with the application of proceeds of

14 collateral.  I'll get to that in a second.

15         THE COURT:  Okay.

16         MR. HANSEN:  But yeah, going straight to your

17 hypothetical -- that's where I was going to start from an

18 opening, Your Honor -- is that you can't read 902(e) out of

19 the document.  Read the debtors' way and read the

20 intervenor's way, you give meaning to all the provisions of

21 the contract.

22         And, again, they make sense at a practical level,

23 because there's no doubt that a release of a lien is worse

24 for a lien-holding party than the subordination of its lien.

25 If the lien is gone, they never get the chance to say, I have

1  a right to the proceeds of it, right.

2           But, obviously, if they're junior, then they say,

3  Well, I may have a right to the proceeds of it; it just has

4  to get through the senior debt first.

5           THE COURT:  All I can say, Mr. Hansen, is if this

6  is an indenture in which all of the pieces make perfect sense

7  together and you can give effect to every meaning and all the

8  words make perfect sense and it all reflects the intent of

9  the parties perfectly, it would be the first indenture I've

10  come across that accomplishes that.

11           MR. HANSEN:  No.  Understood, Your Honor.

12           But, again, we're focusing in on a couple of

13  provisions, not the entirety of the document.

14           THE COURT:  I'm just being playful, so ...

15           MR. HANSEN:  No.  Understood, Your Honor.

16           There's another point that the Plaintiffs just

17  brought up in their argument that we have to address, because

18  they say it seven times in their reply brief and it's not

19  true, which is "up-tiering transaction."  There's no up-tier

20  here.

21           What an up-tier transaction means is that exactly

22  where we went before.  Certain holders are preferred over

23  other holders, with respect to the existing indenture, the

24  existing document, an up-tier, right.

25           Let's take TriMark, for example.  An up-tier was,

1  there, certain lenders moved up into a new tranche of debt.

2  They were senior to the old tranche.

3         The consenting noteholders here, who put their

4  consents in and went ahead and did the transaction, they

5  remained 10-and-a-half-percent noteholders with the

6  Plaintiffs.  Today, they still remain.  Some of them may have

7  sold; others may have bought.  I don't know who bought from

8  whom.  But the point being that those parties remain 10-and-

9  a-half-percent noteholders today.

10        THE COURT:  So, it's the roll-up that is the up-

11  tiering transaction?

12     (Laughter)

13        MR. HANSEN:  No, the roll-up is applicable to the

14  10.875 percent notes, not the 10-and-a-halfs.  So, that's

15  wrong.  That's actually not correct, Your Honor.

16        THE COURT:  Okay.  So, look, it seems to me that

17  this fight is a definitional one, right.  You could view up-

18  tiering to mean there's existing debt that becomes senior or

19  you could say it's any transaction in which, with respect to

20  collateral that someone had a lien on, someone takes a

21  prior -- a senior lien in the same collateral, right.

22        And then you could argue about what is meant by

23  the word "up-tier," and it's not a legal term, but it seems

24  to me they're using it to mean the latter, and you're saying,

25  No, it means the former, and I'm not sure it matters.

1          MR. HANSEN:  They go to great lengths to talk

2   about the oppression of the minority by the majority.  They

3   go to great lengths to talk about the majority receiving some

4   type of preferential treatment to the minority and they

5   didn't.

6          THE COURT:  Well, look, to me, what I have here is

7   a technical, you know, dispute about the meaning of the

8   contract.  But it is the case, right, that they weren't

9   invited into this -- "they," I understand -- the -- whoever

10  it was who sold the original -- this transaction wasn't

11  offered to the entire issuance, right?

12         MR. HANSEN:  Yeah, but, Your Honor, let's just

13  step back.  Any bank could have handed them the financing in

14  the same structure that was done here.  If the noteholders

15  voted for it, it would have been done.

16         The company -- think about where the company was

17  at the time that they came and asked its noteholders for

18  this, right.  We heard a lot from Mr. Brimmage (phonetic) at

19  the start of this about the explosions, right.  Go there for

20  a second, right.

21         We have a company that has two plants:  one in

22  Port Neches and one in Houston, right.  It has a capital

23  structure that was built around having two plants, right.

24         The Port Neches facility blows up.  The company is

25  trying to obtain insurance proceeds to continue to actually

1  run its business, invest in capex in Houston, try to increase

2  capacity there, because it's got to service debt that was put

3  in place for two facilities.  And it's out paying victims'

4  claims.  It's resolving victims' claims.  It's paying

5  victims' claims.  It's dealing with environmental-response

6  costs and regulatory issues, and it has near-term maturing

7  debt.

8          So, what does the debtor do?

9          The debtor goes to the largest holders of its debt

10  and says, I need some money, okay, because the insurance

11  proceeds and the revenues from Houston are not enough to be

12  able to handle every obligation that we have.  So, they ask

13  the holders for money.

14          One of the holders with the Plaintiffs' prior

15  counsel puts in a proposal that says, Listen, here's a

16  transaction you could do --

17          THE COURT:  No, look, I understand that.  And I

18  understand there may well be good reason why a secured

19  creditor that has a lien on all the collateral would say, If

20  I foreclose today, there's nothing here for me --

21          MR. HANSEN:  Uh-huh.

22          THE COURT:  -- and so, it makes sense for me to

23  volunteer -- voluntarily allow my lien to be subordinated so

24  new money comes in to preserve the value of what I've got.  I

25  get why the company would ask for that and I understand why a

1  secured creditor might very well agree to that because it's

2  in their own best interests.

3         There's also something to their point that says, I

4  didn't, myself, agree to be so-subordinated and I find myself

5  having a lien on much less than I did before, and it's

6  surprising to me that my documents so-permit, and I don't

7  read them to so-permit them.

8         I mean, I think that's what we're dealing with,

9  right?

10         MR. HANSEN:  We are, except that the Plaintiffs go

11  to great lengths to try to talk about some type of

12  differential treatment with respect to the 10-and-a-half-

13  percent noteholders, between them and everybody else.

14         It didn't happen.  They're all still 10-and-a-

15  half-percent noteholders.

16         THE COURT:  All the 10-and-a-half-percents are all

17  in the same boat --

18         MR. HANSEN:  They were and they are.

19         THE COURT:  -- it's just that some of the 10-and-

20  a-halfs also hold the 10-and-seven-eighths, correct?

21         MR. HANSEN:  Yes, some of them hold the 10-and-

22  seven-eighths and there's nothing in this document that says

23  I had the right to participate in some other financing.

24         THE COURT:  Right.

25         MR. HANSEN:  And, remember, these Plaintiffs

1  bought after that financing was done.

2         THE COURT:  Right.  Which I consider to be besides

3  the point, but ...

4         MR. HANSEN:  Okay.  But, well --

5         THE COURT:  Right.

6         MR. HANSEN:  -- partly, because they're coming in

7  and they're complaining from an equitable perspective,

8  they're saying, You couldn't layer me, but, of course, they

9  bought debt that was already layered, so -- knowing that it

10 was already layered.  And, I don't know, maybe they thought

11 they would bring a lawsuit as a result of having, you know,

12 bought that and see what happened.  Who knows?

13        THE COURT:  And if the original lender could have

14 brought such a lawsuit, my view is that so can they.

15        MR. HANSEN:  Understood, Your Honor.

16        I'm just saying, like, we have to understand who

17 they are, right.  And so, the point being that they're saying

18 your hypothetical is, well, couldn't they say, well, I was

19 mistreated, because I didn't get the right to participate in

20 the financing.

21        They could have offered the financing.

22        THE COURT:  No.  I hear you.  And I'm not --

23        MR. HANSEN:  And they could have offered -- and,

24 Your Honor, they could have offered it on better terms.

25 Let's take for a second, these Plaintiffs have come to the

1  debtor twice to offer them DIP financing, right; granted,

2  they would rely on your approval, but clearly, if they're

3  right, they need 100 percent consent to be able to have that

4  DIP financing put in place, which couldn't happen and then

5  you'd have to rule over everyone's rights that it was

6  nonconsensual.

7          Now, granted, you have the power to do that,

8  right, because the Bankruptcy Court over here in 364 gives

9  you that authorization, but that's the point.  Who are they?

10 What are they doing?  And what was the opportunity?

11         All I'm saying is that there was no mistreatment

12 of anybody here in terms of they were all treated the same,

13 10-and-a-half-percent holder *qua* 10-and-a-half-percent

14 noteholders.  So, that's another point that is incredibly

15 important.

16         We also have to -- I take a little bit of issue

17 that subordination is not a magic word when it comes to an

18 indenture.  There are plenty of indentures -- and, obviously,

19 this is me just arguing, it's not in the record -- but there

20 are plenty of indentures that talk specifically about not

21 subordinating debt.  I believe they, even in the TriMark

22 situation, there was a (indiscernible) antisubordination

23 provision that was edited out.

24         But the point being that the specific, to the

25 earlier comment, has to rule over the general, but we can

1 │ also divine what the general means by looking at the

2 │ provision, itself.  So, the Plaintiffs are now offering up a

3 │ definition that is broader than the dictionary definition

4 │ that they told us to go look to in their brief.

5 │         Merriam-Webster's online dictionary says that

6 │ "dealing with" or "deal with" is to have as a subject or to

7 │ be about.  It's not concerning to.  It's not relating.  It's

8 │ not affecting.  It's to have as its subject.  Let's use that

9 │ one.

10 │         So, (d)(10) says, right, provisions that deal

11 │ with, so provisions that have as their subject, the

12 │ application of proceeds of collateral, you asked Ms. Selendy,

13 │ can you tell me what provisions of the indenture have as

14 │ their subject, the application of proceeds of collateral?

15 │         And she said, I can't tell you all of them because

16 │ there were so many of them.

17 │         In the indenture, there's one.  In the

18 │ intercreditor agreement, there's one that have, as their

19 │ subject, the application of the proceeds of collateral.

20 │         THE COURT:  And so, in the indenture, you think

21 │ it's 6.10(a)(2), essentially?

22 │         MR. HANSEN:  Correct.

23 │         THE COURT:  And of course that's sort of funny.  I

24 │ mean, it may be, but that's not about collateral, *per se*;

25 │ that's about any monies, right?

1           So, it's about if the debtor pays principal and

2    interest when it's due, it applies.  So, it's not really

3    about the application of proceeds of collateral, *per se*, at

4    least --

5           MR. HANSEN:  Well, it's about that and --

6           THE COURT:  And other things, right.

7           MR. HANSEN:  -- lots of other things that it might

8    receive, principal, interest, et cetera, but --

9           THE COURT:  Okay.  And what provision of the

10   inter-creditor, just so I have -- so I'm --

11          MR. HANSEN:  4.1(a).

12          THE COURT:  4.1(a) of the 2019 inter-creditor?

13          MR. HANSEN:  Correct.  And that provision is

14   really important as well, Your Honor, because the 2019 inter-

15   creditor agreement is crystal clear that, even by its use of

16   the terms senior and junior party, they're interchangeable.

17   It's the notes where they're senior, it's the ABL where

18   they're senior with respect to their respective collateral,

19   and the 2019 inter-creditor agreement puts the notes first on

20   notes collateral, the ABL first on ABL collateral, but

21   there's nothing in the 2019 inter-creditor agreement that

22   says the notes shall always be first on notes collateral with

23   respect to any other debt that's incurred, it's just first

24   with respect to the ABL.

25          And, interestingly, Your Honor, if you go to the

1  2019 inter-creditor agreement --

2          THE COURT:  Yeah, so it's -- is it 4.1 or 4.19?

3          MR. HANSEN:  No, it's 4.1.

4          THE COURT:  Okay.

5          MR. HANSEN:  So if you go to notes agreement, Your

6  Honor -- so go to the 2019 inter-creditor agreement, go to

7  the definition of notes agreement --

8          THE COURT:  Okay, hold on.

9      (Pause)

10         THE COURT:  Notes agreement, yep.

11         MR. HANSEN:  And if you read into the back half of

12 the definition that starts "provided," what you'll see is

13 that the 2019 inter-creditor agreement specifically

14 contemplates the incurrence of additional indebtedness, which

15 would be secured by notes collateral, and it actually

16 expressly dictates that another inter-creditor agreement

17 would have to be entered into.

18         THE COURT:  But wouldn't Ms. Selendy say that the

19 credit agreement clearly contemplated the possibility of

20 additional *pari passu* debt, right?  It's just that it's the

21 incurrence of additional debt that becomes senior that gives

22 rise to a different set of problems?

23         MR. HANSEN:  Well, the incurrence of additional

24 *pari passu* indebtedness was a specific provision within the

25 indenture that was subject to a leverage test that the

1  company couldn't meet at the time that it came looking for

2  additional indebtedness, but it was a provision of the

3  indenture that was specific to, you hit this leverage test,

4  you can incur this additional *pari passu* indebtedness.  But,

5  again, there's no anti-subordination provision within the ten

6  and a half percent indenture.

7         Now, obviously, if the plaintiffs are correct and

8  (d)(2) is read to be a blanket anti-subordination provision,

9  right, then the argument would be, well, the 2019 inter-

10  creditor agreement doesn't override that, we would agree with

11  that.  I'm only pointing out to you that it was -- the

12  plaintiffs make the argument that the 2019 inter-creditor

13  agreement never contemplated the incurrence, right, of debt

14  on a senior basis, potentially, that could wind up

15  subordinating the ten and a half percent notes with respect

16  to the notes' collateral.

17         So what I'm pointing out to you is the document is

18  actually express in talking about the potential entry into an

19  additional inter-creditor agreement.  If you were coming in

20  on a *pari* basis, if you were going to share the lien, then,

21  in theory, you don't have to have a separate inter-creditor

22  agreement.  If you're coming in as a senior party, then, yes,

23  you would need a separate inter-creditor agreement.

24         So I'm just pointing out, Your Honor, that the

25  2019 inter-creditor agreement obviously contemplated how this

1  transaction was constructed, and that's an important point

2  because the transaction was reviewed by the company and its

3  counsel, both Baker Botts and Simpson Thacher; it was

4  reviewed by the noteholders and its counsel when I was

5  previously at Stroock & Stroock & Lavan; and it was reviewed

6  by the indenture trustee, slash, collateral agent and its

7  counsel.

8          THE COURT:  Okay, none of that is in the summary

9  judgment record.

10         MR. HANSEN:  Understood, Your Honor, but what I'm

11 saying -- well, it is because -- it is because the debt was

12 issued and every party here, the debtors and the interveners

13 and the trustee have all said this works.  The trustee,

14 what's in the record is the trustee took the consents, right,

15 and actually said, yes, this works for me, I'm going to sign

16 the 2021 inter-creditor agreement, I'm going to join the 2019

17 inter-creditor agreement, and that's how the transaction got

18 constructed.  So all the parties did that and they moved

19 forward.  Simpson Thacher issued an opinion with respect to

20 it, it's how it works.

21         So the transaction was put together and the reason

22 people didn't think there was anything wrong with the

23 transaction is because when they looked at 902(d)(10) they

24 said, oh, majority for subordination; 902(e), super majority

25 for lien release; and, if I want to effect a sacred right,

1   truly sacred ratable distribution, we need a hundred percent

2   and we're not doing that here.  All we're doing is taking all

3   ten and a half percent noteholders and making them junior to

4   the new debt that's coming in.

5           So there's really nothing surprising or concerning

6   about how the transaction was constructed or put together,

7   Your Honor.

8           And, again, when you get -- I want to make a sum

9   of my notes here, Your Honor -- when we move into -- this is

10  a really, really important point -- the plaintiffs are trying

11  to say that the definitional change in permitted liens, all

12  right, was somehow evidence that the permitted liens

13  definition didn't allow the senior lien to be put in place,

14  so now maybe there's a new anti-subordination provision which

15  is somehow secretly hiding within the permitted liens

16  definition.  And so, in order to, you know, read through that

17  invisible ink and make this thin applicable to have senior

18  lien, you needed to inject the language that you did.  That

19  is not at all what happened.

20          So, as part of that, the plaintiffs also say and

21  the language that was put in the permitted liens definition

22  was designed to exempt the 10.875 notes from the 2019 inter-

23  creditor, that's not true at all.  The 2021 notes actually

24  joined the 2019 inter-creditor, so they are a party to it.

25          And if you go to the definitional change in

1  permitted liens, which we should move to, the definitional

2  change of permitted liens -- so I have the redline in front

3  of me, Your Honor --

4           THE COURT:  Is it the redline to the --

5           MR. HANSEN:  Supplemental indenture to original

6  indenture, ten and a half percent indenture.

7           THE COURT:  Yeah.

8           MR. HANSEN:  It's just easier to see with the

9  redline.

10          THE COURT:  Right.  So I also have that.

11          MR. HANSEN:  You'll see that those definitional

12  changes, all they did was to ensure that any future incurred

13  debt that was covered by a permitted lien went to the ABL

14  collateral, and that's because the basket was exhausted,

15  right?

16          This permitted lien 1, lien securing indebtedness,

17  Section 4.07(b)(1), that's the debt facilities basket; if you

18  go to 407(b)(1) from an incurrence perspective, it's debt

19  facilities basket.  That debt facility basket was exhausted

20  and so, as a result of that, this change says future incurred

21  debt needs to go over to the ABL collateral, at least under

22  that basket, right?  Under the (b)(1) basket.  And for the

23  notes that were issued, the 10.875 notes, they also were

24  covered by 407(b)(15), and (b)(15) was the general debt

25  basket.

1          So when we talked earlier about what was utilized,

2   it was exactly what the debtor had bargained for, right?  And

3   that's like a critically important point here is that we all

4   know that the issuer is in a bargained-for exchange in

5   connection with the receipt of proceeds from a note issuance

6   and the issuer would like some flexibility associated with

7   how it can live in the future.  So it negotiates for a broad

8   number of categories of debt that it can incur, and it also

9   negotiates for the permitted liens definition, which

10  corresponds with the debt that it can incur so it can put

11  liens on that.

12         It also, by the way, negotiates for investment

13  capacity, negotiates for the ability to make restricted

14  payments.  Like there's plenty of covenants that are in the

15  document which govern their relationship and they put

16  restrictions on the issuer, but they also give the issuer the

17  flexibility to be able to do things in the future.

18         If the issuer is in a situation where it wants to

19  go or it needs to go and incur additional indebtedness, it

20  had many ways to do it, right?  Again, one of which, if you

21  go to that other transaction that was proposed, was to create

22  a non -- and this is really instructive because it goes to

23  your hypothetical -- so non-wholly-owned foreign guarantors,

24  okay?  Effectively, those parties are exempt from having to

25  have the liens that are associated with this indenture.  You

1  know how these provisions work.

2          So, if you were to take investment capacity and

3  you were to take your assets and move them into a foreign

4  non-guarantor subsidiary, number one, and then finance at

5  that subsidiary, you would put yourself in a structurally

6  senior position and you would cause the release of the liens

7  with respect to the prior indebtedness.  And so not only

8  would you be in a structurally senior position, you would be

9  in a lien senior position and the ten and a half percent

10  notes would no longer have the benefit of their liens.

11          That transaction was proposed by prior counsel to

12  the plaintiffs and the reality of that is it was permissible

13  under the documents.  The debtors' response to that was, I'd

14  rather do something a little more straightforward here --

15          THE COURT:  Yes, so --

16          MR. HANSEN:  -- I'd rather come through the

17  central (indiscernible) lien of the document where everybody

18  came through.  We have debt capacity, we have the ability to

19  put a lien on it, and the 2019 inter-creditor agreement says,

20  as long as we respect the priority between the ABL on the one

21  side and the notes on the other, we can go ahead and make it

22  senior.

23          So that --

24          THE COURT:  Right, so --

25          MR. HANSEN:  -- that's the reality.

1          THE COURT:  Look, I understand it.  Just so that

2  we're all speaking the same language, for what it's worth,

3  I'm not inclined to hold against the debtor a proposal made

4  by present or former counsel --

5          MR. HANSEN:  Of course.

6          THE COURT:  -- when it was representing a

7  different client.  So I understand that that proposal was

8  made and that, you know, is worth what it's worth.  I mean,

9  to me, you know, this rises or falls with comparing this

10  transaction to the words of these agreements, not what

11  someone else might have proposed, you know, a different time,

12  but just to be clear, I'm not -- you know, in a world in

13  which law firms represent lots of different clients, I'm not

14  inclined to hold against any client a position taken by its

15  lawyer in representing another client.

16          MR. HANSEN:  Of course, Your Honor, of course.

17  And I'm not holding it against them, I'm using it as a

18  hypothetical example of the multitude of transactions that

19  could take place under this indenture that would not run

20  afoul of 902(d)(10).  There are a myriad number of them that

21  could occur, you've suggested some yourself, and --

22          THE COURT:  That shows how easy it is.

23      (Laughter)

24          MR. HANSEN:  And the point being, Your Honor, that

25  if those transactions could occur, then 10(d) cannot mean --

1          THE COURT:  Right.

2          MR. HANSEN:  -- what the plaintiffs are alleging

3   that it means.  And, once again, you go back to where we

4   started.  If you can release a lien, which is a more

5   Draconian action to a lien-holding party, right, with two

6   thirds, how is it that you can only subordinate with a

7   hundred percent?  It doesn't make any sense and it reads the

8   provisions out of the document.

9          Your Honor, I just want to look at my notes for a

10  moment to make sure that I cover everything that I intended

11  to cover with you.

12       (Pause)

13          MR. HANSEN:  Yeah, Your Honor, there -- so the

14  plaintiffs argue that Section 12.01 of the indenture is a

15  specific provision dealing with the application of proceeds

16  of collateral to try to bolster their argument that the

17  (d)(10) would actually expansively cover this and require the

18  consent.  Section 12.01 of the indenture is an acknowledgment

19  section, it talks about the existence of the collateral and

20  security documents and the inter-creditor agreements and it

21  binds the parties to them.  It is not an application-of-

22  proceeds section.

23          So what the plaintiffs say is, yeah, but you added

24  the 2021 inter-creditor agreement to that section and, by

25  doing that, that was the subordinating event and, as a result

1  of that you've effected the application of proceeds of

2  collateral.

3          So this is a really important point too, Judge.

4  What they're saying is you've effected the application of

5  proceeds of collateral by having referenced the 2021 inter-

6  creditor in Section 12 and, therefore, we can look at Section

7  12 as a provision that deals with -- they would like to read,

8  deals with as has the effect of the application of proceeds.

9          So we've already covered the ground in terms of we

10  don't believe deals with incorporates, have the effect of,

11  but we actually can look in the indenture and be instructed

12  by this.  So let's go to 902(e) again.  902(e) actually -- we

13  should turn to it together, Your Honor -- 902(e) says, "Any

14  amendment to or waiver of the provisions of this indenture,

15  any security document, or any other indenture governing

16  permitted additional *pari passu* obligations that has the

17  effect of," the drafters of this document knew how to use the

18  phrase "that has the effect of," they didn't use that in

19  (d)(10).  They used in (d)(10) "dealing with."

20          And, again, we go to Merriam Webster, the

21  definition of "dealing with" is to have as a subject --

22          THE COURT:  Right.

23          MR. HANSEN:  -- the definition of "have the effect

24  of" is much broader.

25          So Section 12, right, the argument of the

1  plaintiffs is Section 12 has the effect of subordinating, it

2  has the effect of dealing with the application of proceeds

3  and, therefore, you should find that (d)(10) covers it.  That

4  doesn't make any sense.  Section 12 is an acknowledgment

5  provision and then also we have to go very broad on the

6  language, which it is not broad language.

7  THE COURT:  So, Mr. Hansen, can I ask you what is

8  -- well, let me ask you this question.  We agree this is

9  governed by New York law, right?

10  MR. HANSEN:  Yes.

11  THE COURT:  And, presumably, the TriMark court is

12  more expert in New York law than I am.  And it did read a

13  provision that -- it's not exactly the same as the provision

14  here, but it's awfully similar to it, and it read it

15  basically as in effect an anti-subordination provision.

16  And I understand the answer that says, well,

17  that's different because the TriMark court, as far as we

18  know, didn't have an E in it, whereas that context makes it

19  different.  I understand that answer.  Is there anything more

20  to the answer than that?

21  MR. HANSEN:  Yeah, there is, Your Honor.  So --

22  THE COURT:  Okay.

23  MR. HANSEN:  -- a couple things that are

24  different.  So the first thing is the facts.  And then,

25  again, like courts have to apply not only the contract

1  provisions that are in front of them, but they have to apply

2  the facts to the circumstances that are in the document to

3  determine if they believe there was a transgression.  And of

4  course, you know, that was a motion to dismiss and the court

5  didn't dismiss.  We don't know -- obviously, the matter was

6  settled after that --

7          THE COURT:  I understand.

8          MR. HANSEN:  -- we don't know what happened, but

9  so going there, we have the facts that are different.  That

10  was an up-tiering transaction, so you did have lenders who

11  left the tranche of debt to move to a new tranche, and they

12  left behind the old lenders.  So that's one.

13          Two -- so the subordination, what the plaintiffs

14  talk about in their reply brief, you know, the injury, the

15  victimization of the subordinate party, right?  There the

16  argument is, well, the lenders moved themselves up, right?

17  They not only loaned new money in a first lien position, they

18  moved themselves up into a second lien position and they left

19  the other lenders behind.  So that factual difference is very

20  important.

21          I don't know what was in the mind of the TriMark

22  judge when reviewing that.  There were changes, obviously, to

23  the credit agreement that were also put in place by those

24  lenders, which included, you know, making an obstacle to

25  being able to bring the lawsuit in the first place.

1          THE COURT:  Right, they amended the no-action

2   clause, right?

3          MR. HANSEN:  Yeah.  And also, Your Honor, let's

4   remember, they didn't have the capacity in those documents to

5   be able to incur the indebtedness in the first place on the

6   senior basis and, as we read the decision, they didn't have

7   -- they actually had an express anti-subordination provision.

8          So the argument was all of those were amendable by

9   50 percent.  They deleted the anti-subordination provision,

10  they created the capacity for the loans, and they moved up.

11  And then, in order to put themselves in a second lien

12  position, they essentially sold their loans to the debtor,

13  who paid for those loans with new loans.

14          So it's a varied -- I mean, the factual

15  circumstances are just -- they're not what we have.  What we

16  have is a pretty simple transaction, all the ten-and-a-half

17  stayed in their seat and somebody came in above them, which

18  happened to be some of the ten-and-a-half holders, but they

19  just provided financing.  So it's a completely different

20  circumstance; no amendment of the no-action clause, no

21  creation of capacity for the debt, no elimination of

22  subordination provisions, none of that.  So, factually, it's

23  incredibly different.

24          From a contractual perspective, as we understand

25  it, there's also a distinction, and the court actually cited

1  this in its decision, which was the lower-case use of

2  agreement or agreements --

3          THE COURT:  Right.

4          MR. HANSEN:  -- as opposed to this indenture or

5  this inter-creditor agreement, right?  The court said

6  specifically, the use of the lower case A agreement or

7  agreements allows us to look at the transaction as a whole.

8  So that's a critical distinction between TriMark and here

9  from a contract perspective.  And then it obviously points --

10  you know, the provision points more specifically to the pro

11  rata provisions where here it just talks about those

12  provisions that would have application to proceeds.  So it's

13  a little weird.  It's more general and both more specific,

14  whereas here you are more specific with respect to the

15  agreements, but more general with respect to the provisions

16  that it's talking about.  But I think that creates an

17  unbelievable distinction for this Court.  And I believe, Your

18  Honor, that with respect to that decision and the

19  circumstance that we have here when you ultimately look at

20  the document, they didn't have 902(e), at least as far as we

21  know; the court didn't reference it, it's not included in any

22  of its decision.  And so there was no discussion about

23  harmonization of provisions within the document that might

24  have permitted an alternative transaction that, if you read

25  the provision one way, would result in the elimination of

1   another provision from the indenture.

2          So I guess that's the best I could do for Your

3   Honor to say --

4          THE COURT:  No, that's helpful.

5          MR. HANSEN:  -- that TriMark is inapplicable and

6   it's not binding on you in any event.  And so I think that

7   TriMark is of absolutely no use in the moment here.

8          I just want to look quickly to make sure that I

9   cover anything else.

10          So, with respect to the holders' argument, Your

11   Honor, 902(b) of the ten and a half percent indenture

12   authorizes the trustee to decide what evidence of consents

13   are satisfactory to it, and it obviously determined that the

14   certificate of consents that were given to it were

15   satisfactory because it went ahead and entered into the

16   transaction.

17          So I think that ends the inquiry.  I mean, you

18   know, we have this issue of whether or not SedingCo (ph)

19   needs to be -- you know, as the global noteholder, needs to

20   be the party that actually provides a consent --

21          THE COURT:  I'm sorry, Mr. Hansen, what provision

22   did you just point to that --

23          MR. HANSEN:  902(b), Your Honor.

24          THE COURT:  902(b).

25          MR. HANSEN:  Yeah, so if we go -- why don't we

1  turn together to that provision?

2      (Pause)

3          THE COURT:  Okay, I see that.

4          MR. HANSEN:  Yep, yeah.  "Upon the written request

5  of the issuer, accompanied by a resolution of its board,"

6  check, check, "authorizing the execution of any such amended

7  or supplemental indenture," check, "and upon the filing with

8  the trustee of evidence satisfactory to the trustee of the

9  consent of the holders as aforesaid," check, "and upon

10  receipt of the trustee of the documents described in 906,"

11  check, "the trustee will join with the issuing guarantors in

12  the execution of such amended or supplemental indenture,"

13  check.

14          So we check all the boxes and, obviously, the

15  holder argument is of no moment.  And the point before,

16  right, the case law, there's no case law on this.  Like to

17  come back to the point where the plaintiffs say, well, you

18  know, there's -- the cases cited authorize, you know, he

19  suit, but they don't deal with the consent.  They're going to

20  hold as a holder and -- right?  We've all been doing

21  transactions for decades and, the way these transactions get

22  done is -- and we all understand how the market works, right?

23  There are broker/dealers, broker/dealers have people who are

24  basically a prime booker for noteholders, the noteholders

25  transact through them, right?  They solicit votes and

1  consents.  They go back to the beneficial interest holder;

2  they ask them whether they can consent or not, they do, they

3  pass the law on that consent.  That's exactly what happened

4  here, there's nothing unique about it.

5          And to go to the ultimate point again, which, you

6  know, you raised before, which is -- and we have to talk

7  about back in time.  Ms. Selendy said, well, Cerberus, you

8  know, obtained an authorization from SedingCo to be able to

9  bring this lawsuit.  That's not the point.  The point is you

10 have to go back in time.  You were talking about, like,

11 forget about who the current owner is, it's the party at the

12 time that the transaction had occurred, what was the injury

13 suffered by them and what was the complaint, and they inherit

14 the rights that they had at the time, right?

15         So, if we're talking about a beneficial holder who

16 had sold its interests to Cerberus, and Cerberus and Bayside

17 now hold those, right, we go back in time to those parties at

18 that point in time, that's what we're talking about here.

19 Did they suffer the injury that is alleged and do they have

20 the standing and the right to be able to bring the claim?  If

21 they're not a holder, then they don't, and you take the

22 holders' rights.

23         And so, ultimately, though, Your Honor, that's not

24 what this is about, right?  It goes back to the other

25 question.  This is about evidence satisfactory to the trustee

1  to be able to consummate the transaction, which the

2  transaction was consummated and there's nothing nefarious

3  about it.

4          So, Your Honor, unless you have any other

5  questions for me, we would obviously request the Court to

6  enter summary judgment on our motion from an intervention

7  perspective, and we would ask that you deny the plaintiffs'

8  summary judgment motion.  I was going to defer the podium to

9  my co-counsel Mr. Lunn at Young Conaway to be able to deal

10 with the TriMark situation, but we dealt with that ourselves,

11 so we no longer have to go there, and I would yield the

12 podium to Mr. Jacobs, Your Honor.

13          THE COURT:  Okay.  Thank you.

14          Mr. Jacobs?

15          MR. JACOBS:  Your Honor, I've been paying very

16 close attention and feverishly crossing off points I was

17 going to make because they've already been made, but I do ant

18 to bring up a few things from TPC's perspective on the

19 documents, the transactions, and kind of the history here.

20          Cerberus and Bayside brought this adversary

21 proceeding and they have the burden of proof as to their

22 claims.  No such claim got brought against TPC, the trustee,

23 anyone, back in February of 2021 when this transaction

24 occurred; nothing was brought in the balance of 2021.

25 Nothing was arisen by anyone with respect to any of this

1  until Cerberus and Bayside started making noise this year.

2          THE COURT:  So what exactly follows from that?

3          MR. JACOBS:  I think what follows --

4          THE COURT:  I mean, is there a laches argument?

5          MR. JACOBS:  I think there potentially could be a

6  delay argument, Your Honor.

7          THE COURT:  Do you make that in your brief?

8          MR. JACOBS:  No, we do not because I believe it's

9  an affirmative defense that obviously we haven't gotten to

10 yet.

11         THE COURT:  Okay.

12         MR. JACOBS:  But I do think that it is important

13 to note, Your Honor, the context of all of this, including

14 the fact, Your Honor, that when this transaction occurred --

15 and we've put this in the summary judgment evidence and this

16 brings us to a big difference from, you know, their

17 talismanic case of TriMark, there was really no impact at all

18 on the note-pressing, it didn't budget, which is a big

19 difference than what we see in the TriMark case.

20         THE COURT:  So I understand that, but -- and I

21 apologize, I'm kind of old fashioned about this.  I've got a

22 summary judgment --

23         MR. JACOBS:  I understand.

24         THE COURT:  -- case and I don't think there's

25 anything in the summary judgment record about the -- I see

1  it's in the briefs and I can look it up, but I don't think

2  there's anything in the summary judgment record about the

3  pricing of the debt, is there?

4         MR. JACOBS:  I think we did put that in our

5  summary judgment record, Your Honor.

6         THE COURT:  Okay.

7         MR. JACOBS:  I know we've bombed you with a lot of

8  papers.

9         THE COURT:  Okay, all right.  And I understand

10  that the TriMark court did point to the pricing as sort of

11  evidence that what happened was inconsistent with market

12  expectations.

13         MR. JACOBS:  Well, that and the action was brought

14  almost immediately after the transaction occurred.  So it was

15  --

16         THE COURT:  Right.

17         MR. JACOBS:  -- so I had a reason for this, Your

18  Honor --

19         THE COURT:  Okay.

20         MR. JACOBS:  -- because they keep bringing up

21  TriMark and --

22         THE COURT:  And I understand that's different.  I

23  do think that -- and this is why I asked the question in the

24  beginning -- look, it seems to me that what I've got in front

25  of me, it's a dispute that I ought to resolve, to the extent

1  possible, by reading the documents and asking is what

2  happened in 2021 permissible -- and no one disputes what

3  actually happened in 2021 and is that permissible within the

4  four corners of the 2019 documents.

5          And, look, I understand everyone has clients and

6  wants to talk about who's the good guy and bad guy and, you

7  know, why is this happening to me, but just so that I'm

8  clear, it doesn't seem to me that the outcome of the dispute

9  before me now really turns on any of that.

10          MR. JACOBS:  I agree with that, Your Honor, and

11  that's why I'm -- I was just about to get right back to --

12          THE COURT:  Okay.

13          MR. JACOBS:  -- the 2019 documents, which my

14  client TPC views it gave us the flexibility to pursue the

15  transaction that we did in February 2021.  And there's

16  business reasons for that, Your Honor.

17          I mean, we've already heard and I think it's

18  already in the record before the Court, TPC's business is a

19  capital-intensive one and it can be somewhat unpredictable

20  with commodity pricing and external events, and it was

21  important to my client that, even though he was getting this

22  $930 million of debt financing, that it had to be in a

23  position to be able to access capital if unexpected events

24  occurred in the future, and that's what it bargained for as

25  part of this transaction.

1         And to not belabor the obvious, it wasn't long

2    after the August 2019 notes were placed that we started to

3    have some unexpected events.  First, obviously, the November

4    2019 P&O incidents, right?  Where we lost one of our two

5    production facilities, which had a substantial hit to our

6    revenue, and also resulted in significant external costs,

7    right?  Incident response, remediation, setting up a

8    voluntary claims program that we've paid over $100 million

9    into, less money coming in and a lot more money going out,

10   and then 2020 happened.  Obviously, COVID hit, crash in the

11   oil and gas and commodity markets.

12        And then, as we all know, because we were, like

13   me, working from my back porch at my house, I wasn't driving

14   much and neither was anybody else, and butadiene, our primary

15   product, goes towards tires.  If people aren't driving and

16   they're not buying cars, there's less tires being made,

17   there's less need for our product.  Demand was down, pricing

18   was down, massive impact, on top of the P&O incident, to our

19   financial situation, which is why then the baskets in

20   4.07(b), (b)(1) and (b)(15) specifically, became so important

21   as we moved into 2021, right?  And those are silent on

22   whether the new debt was going to be pari junior, nothing

23   prohibited it from being senior.  And that's how we proceeded

24   in February 2021 with respect to this transaction.

25        We don't read (d)(10) as this sort of nuclear

 1   weapon against subordination.  There's an easy path to

 2   preventing subordination.  The term subordinated occurs in

 3   the document a handful of times.  These were sophisticated

 4   parties back in 2019, there are ways to put in anti-

 5   subordination provisions; in fact, when the 2021 transaction

 6   occurred, we saw one put in, in 9.02(f), I believe.  So --

 7            THE COURT:  9.02(f) of the --

 8            MR. JACOBS:  Of the supplemental indenture.  And

 9   it shows, Your Honor, there are ways to prevent more senior

10   debt or subordination, and there simply was not such a

11   preclusion on our doing so in the agreements that we

12   negotiated for and bargained for in August of 2019.

13            I will not belabor the point about the (d)(10)(E)

14   analysis, we've put it in our papers.  You and the other

15   lawyers have been making those points.  Obviously, we stand

16   by our papers and the point that it makes.

17            If I could just summarize briefly, Your Honor -- I

18   mean, I can talk about TriMark, but I don' need to.  We think

19   it's totally different for all the reasons that he -- that

20   Mr. Hansen has said and the reasons that I've said.  We agree

21   with him on the consent issue, 9.02(b) was satisfied.  The

22   transaction occurred over 15, 16 months ago now; the money

23   was provided, everything went forward.

24            And I guess I just want to end on this, Your

25   Honor.  Our view is we fully and completely stand by the

1  transaction that occurred in February 2021.  It followed

2  exactly what we bargained for in the August 2019 documents

3  and provided us a lifeline to get through a very difficult

4  time for the company in the hopes that we could get to the

5  other side.

6         Obviously, we then -- soon after this transaction

7  closed, we had some unfortunate events that made life even

8  more difficult for us as 2021 went forward.

9         We have real work to do in this bankruptcy, Your

10 Honor, to get through with our plan and to get to

11 confirmation and to do it on a timeline that makes sense in

12 this case.  We believe this adversary proceeding needs to be

13 put behind us so that we can move forward with that real work

14 that needs to be done.  You know, we ask that Cerberus and

15 Bayside's claims be rejected, that the judgment be entered in

16 our favor, and that we can get on with the real work that

17 needs to be done.

18         THE COURT:  Okay.  Thank you.

19         MR. JACOBS:  Thank you.

20         MS. SELENDY:  May I be heard?

21         THE COURT:  Certainly.

22         MS. SELENDY:  Thank you, Your Honor.  And I do

23 appreciate that the Court views this as the contract dispute

24 that it is, that that's what's relevant and that's what is

25 before you to decide.

1          I wanted to return to your hypothetical because,

2   number one, it caught me off guard, but, two -- or I hadn't

3   thought through that particular issue and, going back to the

4   language of the indenture, I think that it is not correct, as

5   I stated before, to view a release of all or substantially

6   all of the collateral as a subset or as an example of

7   something that deals with the release of collateral proceeds

8   because, in many respects, right, if you're talking about the

9   change of the application of proceeds of collateral, you

10  still have collateral, and a release of collateral is a

11  different species, and I think they are dealt with separately

12  in (d) and (e).

13          And, therefore, I don't see that in your

14  hypothetical, right, we're not disputing that they could

15  release all the collateral and we don't think that it's a

16  legitimate argument to say that (d) covers a release of

17  collateral as some subset of the category of changes in the

18  application of collateral proceeds.  And, therefore, again,

19  you harmonize these provisions by not -- I mean, we're just

20  -- the release of collateral is not an issue in this

21  transaction and in fact the notion, which I would like to

22  dispute again, that it is necessarily a more Draconian action

23  to release collateral, which they said many, many times and I

24  know Your Honor had that instinct, right?  It's not

25  necessarily a more extreme result than subordination.  If a

1  majority subordinates one holder or minority, that could

2  certainly be more extreme to that holder, that minority

3  holder, that individual, and their consent right would be

4  affected under 9.02(d)(10).

5          THE COURT:  So, hold on.  So you're saying --

6  you're now taking the view -- I want to make sure I'm

7  following it and doing it justice -- that releasing the

8  provisions -- releasing the collateral entirely is not a

9  provision that deals with the application of the proceeds of

10 collateral because, if you release it, there are no proceeds,

11 so there's nothing to be dealt with.

12         MS. SELENDY:  Right.  That's not about the

13 waterfall and the application -- the application of proceeds

14 is what happens when there are proceeds from the collateral

15 and they're paid out under the particular waterfall.

16         So we are not viewing -- I don't think it's right

17 to view a total release of collateral in that sense, that

18 would be our position.

19         THE COURT:  Can we just talk about that as a

20 matter of ordinary English?  I mean, if the magician waved

21 his wand and made the rabbit disappear, wouldn't you say he

22 dealt with the rabbit?

23         MS. SELENDY:  No, he's no -- he's dealt with the

24 rabbit, but he's not dealing -- so that's not -- that's --

25         THE COURT:  He's dealing with the proceeds of the

1    rabbit.

2         (Laughter)

3              MS. SELENDY:  The proceeds of the rabbit and the

4    application of the proceeds --

5              THE COURT:  Okay, I hear you, I heard you.

6              MS. SELENDY:  -- which can only happen --

7              THE COURT:  If there's an antecedent --

8              MS. SELENDY:  If there's -- right.

9              THE COURT:  -- rabbit to begin with.

10             MS. SELENDY:  Exactly.

11             THE COURT:  Okay.

12             MS. SELENDY:  So that's -- you know, we're getting

13   into --

14             THE COURT:  I follow, okay.

15             MS. SELENDY:  -- the specific, very detailed

16   interpretation of the two things and, therefore, they can be

17   harmonized.

18             Again, the -- at some level, the argument about

19   the various provisions that do deal with -- that we say deal

20   with the application of proceeds of collateral, right, that

21   they say is -- it's just -- that subordination is a magic

22   word and there's only one way to create an anti-subordination

23   provision.  And they, of course, in self-serving way, point

24   out to the way they did it, right?  But there are other --

25   there is certainly other indentures and credit agreements out

1  there that use this language and your ruling is going to

2  affect those -- the interpretation of those other agreements.

3          Their argument at the end boils down to that it's

4  not -- it doesn't relate to this concept of application of

5  proceedings, but it really has to, Your Honor, because if

6  there are proceeds from the collateral and there's a

7  waterfall, right, and you subordinate a party, it changes

8  that waterfall, it changes the application of proceeds.

9  Those two concepts are not, you know, separate and

10 independent of each other.  And there is -- there are other

11 ways, as we see, there are many ways they could have

12 effectuated this transaction, any different amendments that

13 they could have made, the way this particular indenture does

14 it was very similar to the language, the sacred right that

15 existed in TriMark.

16          And I'll jump to that because, yes, it's true that

17 there were some other facts in TriMark, there was some up-

18 tiering, there was some other language, but there was a

19 virtually identical issue there because there was a new tier

20 of debt, a new tier of debt that was put in place, and the

21 question was did the change in the definition of inter-

22 creditor agreement to become inter-creditor agreements change

23 the order of application of proceeds to the collateral, and

24 that is the part of TriMark that we're relying on.

25          So the up-tiering portion of the transaction or --

1   and the point about the agreement or agreements, yes, that

2   was part of the amendment provision, but the plaintiffs in

3   that case were arguing that it was a single, integrated

4   agreement and the focus was on the same sacred right as we

5   have here.  So all of the other different facts that were

6   pointed to, yeah, those were different facts, but they're not

7   material to our request that you look at this as a precedent

8   that, if not binding on Court, is very influential because it

9   is New York law interpreting a very, very similar provision.

10          The intervener made the -- pointed out that the

11  agreements here actually contemplate new inter-creditor

12  agreements being added, right?  But, of course, if there's

13  pari debt, if there's junior debt, which is permitted, there

14  is a different class created that certainly could require a

15  new inter-creditor agreement.

16          So that fact alone, again, does not really address

17  head-on the argument that I think each of the provisions that

18  we have pointed to with respect to the lien section, the

19  definition of permitted liens, the security documents, do not

20  permit senior debt without an amendment.  That's where we

21  started and the contemplation of a new inter-creditor

22  agreement doesn't really tell us that all these documents all

23  along contemplated this transaction, the same way that we do

24  not dispute that there were baskets of additional debt.  The

25  baskets talk about all kinds of additional indebtedness that

1  they could incur, but it does -- that provision, whether

2  you're looking at 407(b)(1) or you're looking at

3  407(b)(15),that does not answer the question of whether that

4  debt could be secured, how it could be secured, and whether

5  it could be senior.  That's the important point that we make.

6  And there's very clear language that shows that they

7  contemplated pari notes that could be attached to the same

8  collateral that were pari.

9          THE COURT:  So it does seem like, commercially,

10  when you want an anti-subordination provision, that is a

11  reasonably -- there's reasonably common language commercially

12  that says, you know, to the extent there's new indebtedness

13  issued, none of it shall be senior too -- or not -- you know,

14  that you may not subordinate this to anything else without,

15  you know, what have you.  And it's actually not an uncommon

16  sacred right to have an anti-subordination provision

17  expressly as one of the sacred rights that requires the

18  consent of every affected holder.

19          You're saying that -- your position is that I

20  should read (d)(10) as effectively doing that and, therefore,

21  make nothing of the absence of the language you sometimes

22  see?

23          MS. SELENDY:  Yes, absolutely.

24          THE COURT:  Okay.

25          MS. SELENDY:  And in fact because (d)(10) is a

1   little bit broader.  It's not just saying you can't

2   subordinate these first, you know, senior secured notes, it's

3   saying you can't change the relationship as between them and

4   the ABLs and there are two classes of collateral.  It's just

5   a different way of addressing more than one issue there in

6   terms of subordination.

7           THE COURT:  Okay.

8           MS. SELENDY:  I'm just absolutely saying that you

9   can't -- because they didn't use the word subordination or

10  they didn't do it the common way, right?

11          THE COURT:  No, look, you give the words a natural

12  reading and there's no requirement that use any particular

13  form of words, but the question I'm struggling with is, you

14  know, at some point where there's a customary formulation and

15  it's not used, you might think that that has some import as

16  an ordinary matter of construction, that's what I'm

17  struggling with here.

18          MS. SELENDY:  I don't want to spend a lot of time

19  on this, but it was incumbent upon us to show that we were

20  harmed by this transaction, it was adversely affected as this

21  was not a good transaction for us, and it is some of -- many

22  of the same 10.5 percent lenders that are now in this senior

23  tranche.

24          And, yes, we acquired the debt subsequently, but

25  we acquired the rights to pursue the cause of action that

1  exists here and it's not, you know, to harm the debtor in its

2  righteous cause here, Your Honor.  I think that it's

3  important that we have a burden to show that we're adversely

4  affected and we're asserting rights that our client -- that

5  the clients have under the indenture.

6          And the -- going back again to the way that the

7  9.02 as a whole is set up, there was a statement that what it

8  does is create sort of ever-escalating levels of consent.

9  And I don't think that's a fair reading of it, right?

10 Because it starts with the majority in (a) and when you get

11 to (d) into the sacred rights provision, as I pointed out,

12 that could be a provision that requires unanimous consent or

13 it could be a provision for the sacred rights that requires

14 something less than unanimous consent because what it really

15 relates to is the consent of the adversely-affected parties

16 -- we don't know how many there might be in any time -- and

17 then, ultimately, in (e) you get to, you know, the super

18 majority for -- I read it more as a sort of catchall for the

19 adverse amendments that aren't otherwise captured in the

20 sacred rights provision, right?  Because it also requires

21 adversely-affected holders to get you to that higher

22 threshold.

23         So we think that's how you read them together and

24 it isn't necessarily an escalating level of consent that is

25 set forth there.

1         I can't say -- and Mr. Hansen stood up here and

2   it's clear to me that he sees these agreements every single

3   day, right?  But we've seen a fair amount ourselves and I

4   think that 9.02(d)(10), in our experience, is customary

5   formulation and it's -- we've seen it in a number of credit

6   agreements, if not indentures, and it covers -- there are

7   broader protections in there than the anti-subordination, and

8   we have to give 9.02(d)(10) its plain reading.  It has a

9   number of sacred rights in there that relate to things that

10  are extremely important to our clients and, on a plain

11  reading of that, the change -- the implementation of a new

12  inter-creditor agreement that changed the waterfall, right?

13        If you recall, we talked a little bit about fact

14  that they believe that there are just these two provisions,

15  6.10 of the inter-creditor and 4 point -- no, sorry, 6.10 of

16  the indenture and 4.10 of the inter-creditor, that actually

17  deal with the application of proceeds.  But of course they

18  did supplement and amend those provisions through the

19  implementation of the new inter-creditor agreement, and that

20  is definitely something that is covered by 9.02(d) and

21  9.02(d)(10).

22        So you've heard a lot of argument.  If you don't

23  have any further questions, I ask that you grant Cerberus'

24  motion for summary judgment and deny the debtor and

25  intervener motions.

1          THE COURT:  Thank you, Ms. Selendy.

2          Is there anyone else that would like to be heard

3   with respect to the motion?

4          MR. HANSEN:  Nothing further from --

5          THE COURT:  Mr. Hansen?

6          MR. HANSEN:  -- the interveners, Your Honor.

7          THE COURT:  Mr. Jacobs?

8          MR. JACOBS:  Nothing further from the debtor, Your

9   Honor.

10          THE COURT:  Okay.  So, look, this has been very

11  helpful, really extremely helpful, and I've got some work to

12  do.  I appreciate that time is of the essence here and this

13  is not going to be leisurely exercise on my part, and

14  apologies in advance if as a result -- well, no matter how

15  long it took, what you got from me wouldn't be perfect, but

16  if it's even less perfect than usual, but I'm going to

17  endeavor to process this, to write something that is

18  understandable, and get something to folks as quickly as I

19  can.

20          So, with that, unless -- I take it -- anyone on

21  Zoom, anything that any party wants to be heard?

22          If not, let me thank all of you for this.  This

23  has been very helpful, I appreciate it.  And, with that, we

24  stand adjourned.

25          Thank you.

1          COUNSEL:  Thank you, Your Honor.

2       (Proceedings concluded at 3:24 p.m.)

3

4

5                     CERTIFICATION

6          We certify that the foregoing is a correct

7    transcript from the electronic sound recording of the

8    proceedings in the above-entitled matter to the best of our

9    knowledge and ability.

10

11   /s/ William J. Garling                    June 30, 2022

12   William J. Garling, CET-543

13   Certified Court Transcriptionist

14   For Reliable

15

16   /s/ Tracey J. Williams                    June 30, 2022

17   Tracey J. Williams, CET-914

18   Certified Court Transcriptionist

19   For Reliable

20

21   /s/ Mary Zajaczkowski                     June 30, 2022

22   Mary Zajaczkowski, CET-531

23   Certified Court Transcriptionist

24   For Reliable

25