## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| **TPC GROUP INC.**, *et al.*, | Case No. 22-10493 (CTG) |
| Debtors.[1] | Jointly Administered |
| | **Re: D.I. 36** |

### DEBTORS' OMNIBUS REPLY TO OBJECTIONS TO DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (IV) MODIFYING THE AUTOMATIC STAY, AND (V) GRANTING RELATED RELIEF

TPC Group Inc. and its debtor affiliates, as debtors and debtors in possession in the above-captioned Chapter 11 Cases (collectively, the "**Debtors**") file this reply (this "**Reply**") in support of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: TPC Group Inc. (3618); TPC Holdings, Inc. (7380); TPC Group LLC (8313); Texas Butylene Chemical Corporation (7440); Texas Olefins Domestic International Sales Corporation (4241); TPC Phoenix Fuels LLC (9133); Port Neches Fuels, LLC (1641); and TP Capital Corp. (6248). Each Debtor's corporate headquarters and mailing address is 500 Dallas St., Suite 2000, Houston, Texas 77002.

*Automatic Stay, and (V) Granting Related Relief* (D.I. 65) (the "**Motion**")[2] and respond to

objections[3] to the Motion (the "**Objections**") and respectfully represent as follows:

## PRELIMINARY STATEMENT

1.    The Objectors fail to rebut the Debtors' business judgment in obtaining the

DIP Facilities, offer no viable alternative financing, and would have the Court destabilize the

Debtors' business operations and reorganization process for their own parochial benefit.    The

Objections should be overruled.

2.    As the Court is aware, the Debtors were able to stabilize (and even improve)

their business operations following the commencement of these cases, in large part due to their

prepetition entry into the Restructuring Support Agreement (the "**RSA**") and having committed

postpetition financing from both the ad hoc group of secured noteholders (the "**Ad Hoc Group**")

and Eclipse Business Capital, LLC ("**Eclipse**").    In particular, the Debtors' ability to access both

the Term DIP Loan Facility and the ABL DIP Loan Facility has reassured suppliers and customers

that the Debtors are creditworthy and paves the way forward for the Debtors to operate during and

emerge from chapter 11.

---

[2]    Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Motion.

[3]    The Debtors received objections to the Motion from (i) the Official Committee of Unsecured Creditors (the "**Committee**") [D.I. 390] (the "**Committee Objection**") and (ii) the Co-Lead Counsel for the plaintiffs in the Multi-District Litigation matter of In re: TPC Group Litigation, Cause No. A2020-0236-MDL, pending in the District Court of Orange County, Texas, 128th Judicial District [D.I. 391] (the "**MDL Joinder**"), (iii) the objection filed by Mockingbird Credit Opportunities Company LLC (the "**Mockingbird Objection**"), [D.I. 391], and (iv) the supplemental objection filed by Cerberus Capital Management, L.P. and Bayside Capital, Inc. ("**Cerberus/Bayside Objection**") (collectively, the "**Objections**" and the parties that brought such Objections, the "**Objectors**").    Reference herein is made to the *Declaration of Zul Jamal in Support of Debtors and Intervenor Defendant's Consolidated Response to Plaintiffs' Emergency Motion for Stay of Effectiveness and Enforcement of Order and Judgment Pending Appeal and Suspension of Other Proceedings* [A.D.I. 84] (the "**Jamal Supplemental Declaration**") and the *Declaration of Robert Del Genio in Support of Debtors and Intervenor Defendant's Consolidated Response to Plaintiffs' Emergency Motion for Stay of Effectiveness and Enforcement of Order and Judgment Pending Appeal and Suspension of Other Proceedings* [A.D.I. 85] (the "**Del Genio Supplemental Declaration**").

3.        The Objectors, however, take a cavalier approach to the Debtors' funding for their business operations and this reorganization process.  They ask the Court to substitute their own business judgment for that of the Debtors as to whether postpetition financing is necessary.  They would have the Court throw these cases into crisis by denying approval of the Term DIP Loan Facility and exposing the Debtors to the risk of losing the ABL DIP Loan Facility.  With no alternative source of financing and their ability to conduct business and reorganize at stake, the Debtors cannot take the kinds of risks proposed by the Objectors.  The Objections should be overruled.

4.        First, the evidence will show that Eclipse has not committed to providing the ABL DIP Loan Facility if the Term DIP Loan Facility is not approved on a final basis.  (*See* Jamal Suppl. Decl. ¶ 14.)  All of the Objectors fail to note the ABL DIP Loan Facility event of default that would occur under such circumstances.  All similarly fail to connect the lack of covenants in the ABL DIP Loan Facility to the substantial indirect protections that Eclipse receives from the covenants in the Term DIP Loan Facility and the junior financing provided under the Term DIP Loan Facility.  All of the Objectors fail to note the substantial discretion that Eclipse has to limit the Debtors' borrowings under the ABL DIP Loan Facility.  Yet all of the Objectors ask the Court to deny approval of the Term DIP Loan Facility, apparently unaware of the risks their request would create for the Debtors' access to their ABL DIP Loan Facility while of course assuming that the ABL DIP Loan Facility will be fully available.  The Debtors will not take such risks.

5.        Second, the evidence will show that the Debtors have no viable alternative postpetition financing available, despite having conducted a robust marketing process.  With their ABL DIP Loan Facility dependent on the existence of a postpetition term loan facility, and no

other actionable term loan facility available, the Objectors cannot demonstrate that entry into the Term DIP Loan Facility was anything other than a reasonable exercise of the Debtors' business judgment.

6.      Third, the evidence will show that the Roll Up is reasonable because it does not harm any constituency in these cases because it is vastly oversecured and remains subject to a Challenge, and because it is a negotiated term of the Debtors' only actionable postpetition financing.  Under such circumstances, the ratio (which is 2.8:1) is irrelevant.  And the actual implications the Roll Up has for confirmation of a plan—which do not rise above the purely theoretical—are appropriate in view of the certainty and stability that the Term DIP Loan Facility, the ABL DIP Loan Facility, and the RSA bring to the Debtors' businesses and these cases.

7.      Finally, the Objectors (particularly the Committee's) desire that the Term DIP Lenders improve the terms of the Term DIP Loan Facility for the Debtors, in exchange for no consideration, are meritless in the face of no actionable alternative financing.  Yet the Term DIP Lenders nevertheless did make certain improvements, including direct concessions to the Committee.  The Objections should be overruled.

8.      For the reasons set forth below and as the evidence will show, the DIP Facilities are appropriate, comply with the Bankruptcy Code, and are the best and only actionable sources of financing for the Debtors' business operations and these Chapter 11 Cases.  The Court should reject the Objectors' efforts to gamble with the DIP Facilities in view of the extreme risks that the Objectors ask the Court to overlook.  The DIP Facilities should be approved.

## **REPLY**

**I.      Term DIP Loan Facility Is a Reasonable Exercise of Debtors' Business Judgment**

9.      The Objectors fail to demonstrate any basis to reject the Debtors' business judgement with respect to the Term DIP Loan Facility.  The unrebutted evidence will show that

(i) failure to approve the Term DIP Loan Facility would risk creating a near-term liquidity crisis that is needless and unjustifiable (including because the ABL DIP Lender declined to commit to extend credit if the Term DIP Loan Facility is not approved on a final basis) and (ii) the Debtors have no viable alternative to the Term DIP Loan Facility.

10.    ***Unrebutted evidence will support Debtors' business judgment***.    The unrebutted evidence will show that the Debtors have a critical need for the Court to approve the Term DIP Loan Facility on a final basis.  As Mr. Del Genio has testified, the Term DIP Loan Facility provides liquidity that has enabled the Debtors to stabilize their businesses and their supplier and customer relationships, has stopped trade credit contraction, has enabled the Debtors to negotiate significantly beneficial amendment-and-assumption arrangements with certain of its suppliers (with more expected in the future), and has served as a prudent contingency planning measure in the face of ongoing commodity price volatility.  (*See* Del Genio Decl. ¶ 14.)[4]

11.    Mr. Del Genio has described the Debtors' need for the liquidity that the DIP Facilities provide:

> It's a very cash intensive business in terms of it being a large petrochemical company.  They buy significant quantities of raw materials over like a four week period could be as much as $160 million.  It is such a just in time business where they have chemicals that it comes in, they process and they send out.  So the working capital movements here are relatively fluid and it's a commodity business. So the commodity that you buy could cost today could be very different tomorrow . . . .

(Jun. 2 Hrg. Tr. at 124:23-25, 125:1–6 [D.I. 148].)  He further testified:

> When we were structuring this [financing], working with management, and Mr. Jamal, and the Moelis team, you know, we were thinking about the appropriate liquidity for this company and we felt that we had three buckets: cash that the company generates, an ABL facility, and term loan DIP.  One of the reasons why we thought of it that way is because you have your ABL facility which if there is movement in commodity prices you could see there's availability on this, but then

---

[4] Here, refer to Bob's DIP declaration and docket number.

cash and the term loan DIP will give you greater availability. We felt, management particularly felt very strongly about, is get very large vendors and customers, and they expect to see a company like this capitalize. A number of their customers they'll sell a source to and they're important in the supply-chain. So we felt it was very important to have my term, a bullet-proof balance sheet with liquidity on it so that customers and suppliers do not have to worry about . . . .

(*Id.* at 132:8-25.) Mr. Del Genio also stated that:

It's a working capital perspective that as the price of the commodity goes up there is a need for more working capital now. The flipside to that is they would sell their products at a higher price, but you also have the interim period where prices are rising and you pay more for inventory. Then it takes a while to collect the receivables. So what happens is where you have working capital slings and when we were working with management to design the right financing structure is not only what you need for the business, but also what is needed to account for working capital swings in the business.

(*Id.* at 126:21-25, 127:1–6.) The Objectors offer no evidence to the contrary, nor can they.

12.     ***Avoidance of liquidity crisis***. The Objectors similarly fail to address the consequences of the relief that they seek. If the Court were not to approve the Term DIP Loan Facility, an Event of Default under both the ABL DIP Loan Facility and the Term DIP Loan Facility would occur, resulting in the acceleration and need for immediate repayment of approximately $88.789 million in cash. (*See* Term DIP Credit Agreement § 7.01(k)(iii)(c); ABL DIP Credit Agreement § 7.01(k)(iii)(c).) As Mr. Del Genio has testified, the Debtors would be left with approximately $20,407,000 in total liquidity. (*See* Del Genio Suppl. Decl. ¶ 6.) That is without taking into account trade credit contraction that would likely result from such a dramatic drop in the Debtors' liquidity. *Id.* Yet the Objectors fail to acknowledge such consequences or propose any solutions.

13.     ***Continued availability of ABL DIP Loan Facility***. The Objectors uniformly and incorrectly assume that the Debtors' ABL DIP Loan Facility will continue to be fully available to the Debtors even if the Term DIP Loan Facility is not approved. (*See* Comm. Obj. ¶¶ 6, 27.) Yet, as Mr. Jamal has testified, the ABL DIP Lender was asked specifically about

this scenario and has not committed to providing the ABL DIP Loan Facility under such circumstances. (*See* Jun. 2 Hrg. Tr. at 173:16–24.) The current ABL DIP Loan Facility assumes the existence of the Term DIP Loan Facility.

14.     The Debtors cannot responsibly put the existence of the ABL DIP Loan Facility at risk, particularly given that the Debtors' extensive marketing process for postpetition ABL financing yielded only the ABL DIP Loan Facility. As Mr. Jamal has testified:

> We ultimately got a committed proposal from the Eclipse and then a number of alternative lenders got very far down the path, but ultimately only Eclipse was able to get to the stage of a fully committed proposal.

(Jun. 2 Hr'g. Tr. at 171:13–16.) The Objections fail even to controvert this evidence and should be overruled.

15.     ***No viable alternative***.   The Objectors fail to propose any actionable alternative form of postpetition financing to the Debtors. As stated, the Debtors are unable to obtain a DIP facility that primes the Prepetition Senior Priority Notes or the Prepetition Junior Priority Notes due to the fact that such noteholders maintain a blanket lien on substantially all assets of the Debtors, and the Debtors would otherwise be unable to provide such holders with the necessary adequate protection. In any event, such an effort would require significant litigation, at significant cost, disruption and delay to the Debtors' chapter 11 cases. Despite the Debtors' extensive prepetition marketing efforts, the Debtors obtained no proposal for postpetition financing that does not involve the nonconsensual priming of secured 10.5% Notes Claims. As Mr. Jamal testified:

> the ad hoc group proposal provided the only viable path, and that was primarily, well it was primarily due to the fact that based on the work that we have done, we, you  know, we believe that 10 1/2 present notes are effectively the fulcrum. And, you know, counsel's advice is that, you know, we can't prime them without their consent given those facts. And although we repeatedly asked both their principals and advisors, they were not willing to provide that consent. And so we were faced with either taking their proposal and negotiating it as hard as we could or moving

> forward with the proposal on a non-consensual basis which, you know, given what
> we believed about the company's value and the parts of the notes and other factors,
> would lead to a lot of challenges in securing that financing.

(Jun. 2 Hr'g Tr. at 177:11–25.)  As stated in the Jamal Declaration, the Debtors, through Moelis,

conducted a robust marketing process for their postpetition financing, pursuant to which Moelis

contacted (i) six traditional banks and twenty-three alternative lenders as prospective financing

sources for both priming and non-priming term loan postpetition financing and (ii) ten traditional

banks and five alternative lenders as prospective financing sources for a postpetition ABL facility,

in addition to the Debtors' existing ABL lenders and known noteholders, all of which Moelis

believed would be interested in providing the Debtors postpetition financing.  (*See* Jamal Decl.

¶ 14.)  The Debtors negotiated the DIP Facilities in good faith and at arm's length and believe that

the terms of the DIP Facilities are the best and only actionable option under the circumstances.

(*Id.* at ¶¶ 19–21, 24.)  Among other things, negotiations with the DIP Lenders lasted for months,

and the Debtors and their advisors were successful in lowering interest rates, reducing fees, and

ensuring sufficient timing in the Milestones to effectuate the necessary restructuring.  (*Id.* at ¶¶ 21,

34.)  Under such circumstances, the Debtors' entry the Term DIP Loan Facility is appropriate.

16.    ***Continued implementation of RSA***.  Although the Objectors assert that the

Term DIP Loan Facility should be "decoupled" from the RSA, the Objectors propose no alternative

path forward in these cases.  Absent an actionable alternative path to emergence from chapter 11,

and subject to their fiduciary duties, the Debtors have determined that the RSA maximizes value,

is the most beneficial alternative for all parties in interest, and is the best and only viable set of

restructuring transactions available to the Debtors.  As Mr. Jamal testified, "the ad hoc group's

proposal was part of a negotiated RSA that Mr. [Prince] previously talked about which provided

the company with a foundation to navigate in a bankruptcy case, the bankruptcy case and get to an

exit."  (Jun. 2 Hr'g Tr. at 178:1–5.)

17.     In view of the unrebutted evidence demonstrating the substantial benefits of the Term DIP Loan Facility, the lack of any actionable alternative, and the significant risk to the Debtors' business operations and restructuring that would result from denial of the Term DIP Loan Facility, the Court should find that the Term DIP Loan Facility constitutes a reasonable exercise of the Debtors' business judgment.  *See, e.g.*, *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility "reflect[ed] sound and prudent business judgement"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender.").  In determining whether the Debtors have exercised valid business judgment in selecting the DIP Facilities, a court need only "examine whether a reasonable businessperson would make a similar decision under similar circumstances."  *In re AbitibiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009).  "[A court's] normal function in reviewing requests for postpetition financing is to defer to a debtor's own business judgment so long as a request for financing does not leverage the bankruptcy process and unfairly cede control of the reorganization to one party in interest."  *In re Barbara K Enters., Inc.*, No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (Glenn, J.); *see also In re YL W. 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) (Gropper, J.) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing.").  The Objections should be overruled.

## II.     Objections to Roll Up Are Meritless

18.     The Objectors fail to identify any harm that results from the Roll Up, and there is none.  The Roll Up is a roll up of prepetition debt that is vastly oversecured and will remain subject to the Challenge.  In the context of the Debtors' particular capital structure, and in view of

the benefits of the Term DIP Loan Facility described above, the Roll Up is appropriate and the Objections should be overruled.

19.     ***No Dispute that Prepetition Senior Priority Notes are oversecured***.  The Objectors do not dispute the most important fact supporting the Roll Up: that the Prepetition Senior Priority Notes are oversecured.  Mr. Jamal testified: "I believe the Prepetition Senior Priority Notes are oversecured under any plausible view of the Debtors' value and that converting such claims into postpetition DIP claims will not adversely impact the Debtors' ability to confirm a chapter 11 plan in these cases."  (Jamal Decl. ¶ 30.)  The Court has correctly noted the impact of rolling up such debt in the context of these cases:

> rolling up that debt (and thereby granting it administrative claim status in the bankruptcy case) has relatively little effect on other creditors.  If the value of the collateral would, in any event, go first to pay the 10.875% Notes, then as long as the value of the collateral exceeds the outstanding amount under those notes, granting those holders administrative claim status should operate only as "belt-and-suspenders" assurance that the holders of that debt are entitled to be paid in full under a plan.

*Bayside Capital Inc. v. TPC Group Inc*., Adv. Pro. No. 22-50372 (CTG), 2022 WL 2498751, at *11 (Bankr. D. Del. July 7, 2022).  Any theoretical optionality the Debtors may be yielding by way of the Roll Up—namely, the ability to cram a plan down on the Debtors' senior most secured debt or to unimpair such debt and reinstate its 2024 maturity (at a 10.875% interest rate)—is purely academic: 90% of the Prepetition Senior Priority Notes are held by the same Restructuring Support Parties that hold 85% of the 10.5% Notes, the fulcrum security in these cases.  (*See* First Day Decl. ¶ 71.)[5]  Moreover, the Debtors determined, in their business judgment, that conceding such theoretical optionality was appropriate to obtain the stability that the Term DIP Loan Facility and

---

[5]     In particular, the Committee's suggestion that the Roll Up somehow "pervert[s] the reorganizational process," *In re Tenney Vill. Co.*, 104 B.R. 562, 567–70 (Bankr. D.N.H. 1989), is unfounded.

ABL DIP Loan Facility provide and the path forward that the RSA provides.  The Objectors cannot show otherwise.

20.    ***The Prepetition Senior Priority Notes remain subject to a Challenge***.  As the proposed Final Order (the "**Proposed Final Order**") provides:

> Notwithstanding anything contained in this Final Order or the DIP Loan Documents to the contrary, (A) ***the Roll Up is approved without prejudice to any and all rights of any party in interest with requisite standing to seek to Challenge***, in accordance with and subject to paragraph 25 of this Final Order, the validity, enforceability or perfection of the Prepetition Liens and the Prepetition Secured Obligations that are the subject of the Roll Up (the "*Roll Up Challenge*"), ***it being understood that all rights, claims, counterclaims, cross-claims, defenses and remedies (contractual, equitable or otherwise) of each of the Debtors, the DIP Secured Parties and the Prepetition Secured Parties in connection with any such Roll Up Challenge are hereby expressly preserved*** . . . .

(Proposed Final Order ¶ 2(d) (emphasis added).)  The Committee's ability to investigate and, if appropriate, commence a Challenge with respect to the rolled-up Prepetition Senior Priority Notes leaves unsecured creditors no worse off as a result of the Roll Up.  The Committee has identified no other harm that is occasioned thereby, and certainly none that outweighs the benefits of the DIP Facilities and the continued pursuit of the RSA transactions.

21.    The Committee's assertion that unsecured creditors are prejudiced unless, in the event of a successful Challenge, the Roll Up is automatically and entirely unwound, is inconsistent with precedent or any sense of proportion.  The Proposed Final Order provides that "in the event the Court sustains a Roll Up Challenge, nothing herein shall (i) affect or limit the authority of the Court to fashion any remedy the Court deems appropriate." *Id*.  This language, which has been used in at least one other recent complex chapter 11 case in this District, fully preserves the Committee's rights and reflects the Court's inherent flexibility to grant appropriate and proportional relief.  *See In re Southland Royalty Company LLC*, Case No. 20-101586 (KBO) (Bankr. D. Del. Feb. 26, 2020) (providing that "in the event that there is a timely Successful

Challenge, this Court may fashion an appropriate remedy, including, without limitation, unwinding the Roll Up"). The Proposed Final Order here goes even further, providing that the Roll Up does not "increase the burden of proof of any plaintiff whose Roll Up Challenge is sustained by the Court with respect to any such remedy, and all rights and remedies of the Debtors, the DIP Secured Parties and the Prepetition Secured Parties with respect to any such remedy and this Final Order are hereby expressly preserved" (Proposed Final Order ¶ 2(d).) The Committee fails to provide applicable precedent or reasoned basis for an automatic unwinding of the entire Roll Up (in the event of, for example, the avoidance of a lien on an immaterial asset), nor is there any.

22.     The Committee's reliance on *In re VeraSun* is inapposite. In *VeraSun*, Judge Shannon commented that "$15 million of prepetition liability being rolled up and another [$1.5 million] of new money coming in . . . that's, I think, the kind of circumstance that the proposed rules speak to and that I find to be an abuse of the system . . . ." *In re VeraSun*, No. 08-12606 (BLS) (Bankr. D. Del. Dec. 3, 2008), Hr'g Tr. at 34:4–8. Yet, far from being an "abuse of the system," the Roll Up here inflicts no harm on any party in these cases. It does not predetermine the outcome of a plan or cause the Debtors to forego any meaningful harm. To the contrary, the amount of committed new money ($85 million, $32 million is already drawn) is far from nominal, and the other benefits of the DIP Facilities and the RSA have been stated above. *VeraSun* has no bearing on the Roll Up.[6]

23.     ***Terms of Roll Up are appropriate***. The Objectors' assertions that the terms of the Roll Up are unreasonable are meritless and should be rejected. First, the Objectors' use of a variety of methodologies to recalculate the Roll Up ratio is misplaced. And the reality is much

---

[6] The Committee fails to mention that Judge Shannon overruled the objection to VeraSun's roll up of approximately $103 million in connection with $93 million of new money financing. *In re VeraSun*, No. 08-12606 (BLS) (Bankr. D. Del. Dec. 2, 2008), Hr'g Tr. at 95:12–19.

simpler: **$238 million** of **oversecured** Prepetition Senior Priority Notes are being rolled up in connection with a commitment of **$85 million** of new money. (*See* Motion ¶ 1(a)(i)–(ii).) The ratio is 2.8:1. Such a ratio fits squarely within historical precedent, regardless of the oversecured nature of the Prepetition Senior Priority Notes. *See, e.g.*, *In re True Religion Apparel, Inc*., Case No. 20-10941 (CSS) (Bankr. D. Del. Aug. 1, 2017) [D.I. 278] (approving roll up with a ratio of 5.79:1 on term loan facility); *Nine Point Energy Holdings*, Case No. 21-10570 (MFW) (Bankr. D. Del. Apr. 12, 2021) [D.I. 240] (approving roll up with a ratio of 3.83:1); *In re Alamo Drafthouse Cinemas Holdings, LLC*, Case No. 2110474 (MFW) (Bankr. D. Del. Apr. 1, 2021) [D.I. 249] (approving roll up of $40 million of prepetition debt on $20 million of new money financing). The Objectors' assertions otherwise are unsupportable.

24.     The Objectors' assertion that the Term DIP Lenders have committed only approximately $32 million of new money is unsupported by evidence and contrary to the facts of these Chapter 11 Cases. The Term DIP Loan Agreement provides for $85 million in new money commitment in three draws, with certain draws potentially reduced by the amount of insurance proceeds received up to approximately $46 million. The Term DIP Loan Agreement also contains customary liquidity threshold for borrowing and mandatory prepayment requirement under certain circumstances. *See* ABL DIP Loan Agreement §§ 2.01(b), 2.08, 2.11(d), 4.04. Such provisions are not only a negotiated term of the Term DIP Loan Facility but also customary and appropriate, especially given the Debtors' lack of alternative term financing. (Jamal Decl. ¶ 32.) Moreover, the Debtors' potential receipt of approximately $46.9 million in insurance proceeds is not the forgone conclusion that the Objectors would have the Court believe. (*See, e.g.*, Comm. Obj. ¶¶ 4, 27, 29.) To date, the Debtors' insurers have not been willing to advance any additional funds absent further relief from the Court, the terms of which the Debtors have been negotiating with the Ad Hoc Group

(and will soon be negotiating with the DIP Lenders and the Committee).  The Objections with respect to the Roll Up ratio are unsupported.[7]

25.    The Committee's assertion that the Roll Up should be secured only by Prepetition Collateral fails to identify any harm to unsecured creditors and should be rejected.  To the extent the Committee suggests that unencumbered assets (to the extent there are any) should be segregated for the exclusive benefit of unsecured claims, such a view is inconsistent with sections 361 and 364 of the Bankruptcy Code.

26.    Finally, the Committee's assertion that "[a]ll $237.8 million of Roll Up obligations will accrue interest during the Chapter 11 Cases at a higher interest rate than the Prepetition Senior Priority Notes" is inaccurate.  It fails to account for the default-rate interest of two percent (2%) above the non-default rate of 10.875% that began accruing on the Prepetition Senior Priority Notes on March 2, 2022 due to the Debtors' missed interest payment.  *See* Prepetition Senior Priority Notes Indenture § 2.12; Prepetition Senior Priority Notes ¶ 1.  Moreover, the Committee advances no evidence to rebut Mr. Jamal's testimony that "the interest rates and fees for the proposed DIP Facilities are reasonable under the circumstances, particularly in light of the credit profile of the Debtors, the nature and extent of the collateral, and the relevant risks associated with lending in the postpetition financing context."  (Jamal Decl. ¶ 32.)

27.    For the foregoing reasons, the Objections to the Roll Up should be overruled.

---

[7] The Debtors understand that the Committee's fixation on seeking to obtain rights to cash insurance proceeds—prepetition collateral—for the exclusive benefit of unsecured creditors, described at length in the Committee Objection, is a contributing factor in the carriers' reluctance to advance such proceeds to the Debtors without further relief from the Court.

### III.      Objections to Particular Terms of the Term DIP Loan Facility Are Meritless

28.      Though the Committee asserts that it is "troubled" by a litany of provisions of the Term DIP Loan Facility, the Committee does not suggest that superior, actionable postpetition financing is available.  Further, the provisions identified as "troubling" to the Committee are customary for postpetition financings of this nature and were in any event negotiated at arms' length with the DIP Lenders.  The Committee's Objection should be overruled.

29.      ***Adequate protection terms are appropriate***.  The Committee's assertion that the postpetition interest on the Debtors' prepetition notes should be "subject to recharacterization (as payment in principal) or automatic disgorgement, as applicable, in the event it is determined that the Prepetition Senior Priority Noteholders or the Prepetition Junior Priority Noteholders were undersecured or fully unsecured based on the value of the Prepetition Collateral or upon a successful Challenge" is meritless.  (Comm. Obj. ¶ 38.)  First, such postpetition interest accrues only to the amount of Diminution in Value.  (Proposed Final Order ¶ 11(c)(i).)  Second, ***pay-in-kind*** postpetition interest that accrues only to the maximum extent permitted by law (including by section 361 of the Bankruptcy Code) is inherently capped; recharacterization and disgorgement do not make sense and are unnecessary.  But nevertheless, the proposed Final Order provides that adequate protection payments of principal or interest are subject to recharacterization, as, to the extent, and in the amount required under section 506(b) of the Bankruptcy Code, upon notice and a hearing, if the Prepetition Senior Priority Notes are determined by a final non-appealable order of the Court to be undersecured.

30.      ***Assets of TPC Holdings, Inc. are appropriately available to satisfy DIP claims and adequate protection claims***.  The Committee appears to suggest that the assets of TPC Holdings, Inc. ("**Holdings**") should be ringfenced for the exclusive benefit of unsecured creditors

is unfounded.  (Comm. Obj. ¶ 7.)  Holdings is an obligor under the Debtors' prepetition secured notes and the ABL DIP Loan Facility.  It is a debtor in these cases, and to the extent it has unencumbered assets, those assets are appropriately available to satisfy DIP claims and adequate protection claims consistent with section 364 of the Bankruptcy Code.  Moreover, as Holdings is a holding company that has no operations of its own, (i) it is unclear what valid unsecured claims could exist at Holdings and (ii) what distributable value the Committee believes Holdings has. Tax attributes, being nontransferable and having value only to the reorganized Debtors and indirectly to the reorganized Debtors' equity interest holders (to the extent not fully consumed by the effectiveness of a chapter 11 plan), have no distributable value to unsecured creditors.  The Committee's objection with respect to Holdings should be overruled.[8]

31.    ***Milestones and Events of Default are appropriate***.  The Committee's assertions that the Term DIP Loan Facility contains inappropriate Events of Default and remedies are meritless and should be rejected.  (*See* Comm. Obj. ¶ 54.)  The milestones are reasonable, provide a clear path to emerge from chapter 11 (which promotes certainty for the Debtors' suppliers and customers) and help ensure that the Debtors do not languish in chapter 11, with its associated incurrence of administrative expense claims (including professional fees).  The evidence will show that the terms of the Term DIP Loan Facility are the product of arms' length negotiations and that the Debtors have no superior, actionable alternative financing available.  The Committee's purported dissatisfaction with particular terms of the agreement, in the face of no alternative, does not warrant rejection of the Term DIP Loan Facility. *See In re Pinnacle Airlines,*

---

[8] Likewise, the Committee's assertions regarding pipelines, easements, rights of way, and leasehold interests, referred to as "certain infrastructure and real property interests," are irrelevant to the Motion. (Comm. Obj. ¶ 7.) To the extent such assets are unencumbered by prepetition liens, they are properly encumbered by DIP liens and adequate protection liens pursuant to section 364 of the Bankruptcy Code and are properly available to satisfy DIP claims and adequate protection claims pursuant to section 361 of the Bankruptcy Code.

*Corp.*, 483 B.R. 381, 397 (Bankr. S.D.N.Y. 2012), as corrected (Nov. 29, 2012) (explaining that "[t]he onerous milestones, financial covenants and other provisions in the DIP Financing Agreement and the associated DIP Financing Order had to be approved for lack of viable alternatives"). But in any event the Committee cannot demonstrate that such terms are "onerous" or unreasonable. *Id.*

32.    ***Avoidance Action terms are appropriate***. The Committee's assertions that the Court should not grant DIP Liens or Adequate Protection Liens on Avoidance Actions or the proceeds thereof should likewise be rejected. (*See* Comm. Obj. ¶¶ 43–47.) Proceeds of Avoidance Actions are customary adequate protection and DIP collateral. *E.g.*, *Trans World Airlines*, 163 B.R. at 972 ("Section 550(a) requires a benefit to the "estate," not to creditors. "Estate" is a broader term than "creditors." There is no requirement that an avoidance action recovery be distributed (or "committed") in whole or in part to creditors."); *In re AppliedTheory Corp.*, No. 02-11868, 2008 WL 1869770, at *1 (Bankr. S.D.N.Y. Apr. 24, 2008) ("Of course [proceeds from avoidance actions] started out unencumbered. But those assets can thereafter be encumbered (or made available to satisfy superpriority claims), if necessary to provide adequate protection."); *In re Fleming Packaging Corp.*, No. 03-82408, 2007 WL 4556985, at *6 (Bankr. C.D. Ill. Dec. 20, 2007) ("This Court does not consider Section 550(a)'s 'for the benefit of the estate' phraseology as a statutory requirement that the unsecured creditors benefit directly from the recovery of an avoided transfer, i.e., that the recovered funds end up in the pockets of the unsecured creditors."); *Mellon Bank, N.A. v. Dick Corp.*, 351 F.3d 290, 293 (7th Cir. 2003) ("Section 550(a) speaks of benefit to the estate—which in bankruptcy parlance denotes the set of all potentially interested parties—rather than to any particular class of creditors."). The evidence will show that adequate protection liens on Avoidance Actions are a negotiated term of the Term DIP Loan Facility and

consent to use cash collateral and were similarly negotiated at arms' length and in the face of no actionable alternative financing.

33.     ***Waivers of marshaling, the "equities of the case" doctrine, and section 506(c) surcharge rights are appropriate***.  The Committee's assertions regarding the waivers in the Proposed Final Order of the marshaling doctrine, the "equities of the case" doctrine under section 552(b) of the Bankruptcy Code, and surcharge rights under section 506(c) of the Bankruptcy Code should be rejected.  These waivers are common quid pro quo for DIP financings and cash collateral use.

34.     <u>Marshaling waiver is appropriate</u>.  As a threshold matter, "unsecured creditors cannot invoke the equitable doctrine of marshaling."  *In re Advanced Mktg. Servs., Inc.*, 360 B.R. 421, 427 (Bankr. D. Del. 2007).  The Committee fails to demonstrate any basis for standing to object to this provision.  Even if it had standing, marshaling waivers are a customary term of postpetition financing, *see In re MD Helicopters, Inc.*, Case No. 22-10263 (KBO) (Apr. 26, 2022) [D.I. 205]; *In re Teligent, Inc.*, Case No. 21-11332 (BLS) (Nov. 15, 2021) [D.I. 174 ]; *In re Jab Energy Sols. II, LLC*, Case No. 21-11226 (CTG) (Oct. 26, 2021) [D.I. 92 ]; *In re BL Santa Fe, LLC*, Case No. 21-11190 (MFW) (Oct. 21, 2021) [D.I. 163]; *In re Sequential Brands Grp., Inc.*, Case No. 21-11194 (JTD) (Sept. 21, 2021) [D.I. 110]; *In re Alpha Latam Mgmt., LLC*, Case No. 21-11109 (JKS) (Sept. 13, 2021) [D.I. 177]; *In re Hosp. Invs. Trust, Inc.*, Case No. 21-10831 (CTG) (June 10, 2021) [D.I. 97], and the Committee fails to rebut Mr. Jamal's testimony that the Term DIP Loan Facility was negotiated in good faith and at arms' length.  (Jamal Decl. ¶ 34.)  The Committee's assertions should be rejected.

35.     <u>"Equities of the case" waiver is appropriate</u>.  The Committee's assertion that the "equities of the case" waiver should be rejected because on the basis that the Committee

"should be afforded every tool offered" to recover for unsecured creditors is meritless.  (Comm. Obj. ¶ 41.)  The Term DIP Loan Facility is the only viable term financing available to the Debtors. As Mr. Del Genio has testified, the Term DIP Loan Facility is critical to the Debtors' ability to preserve their business operations and reorganize.  (*See* Del Genio Decl. ¶ 14.)  The Committee should not be permitted to benefit from the going-concern value preserved by the Debtors' reorganization while seeking to undermine the negotiated financing that makes value preservation possible.  And the Debtors cannot force their prepetition noteholders to take unknown risk on their prepetition collateral package while permitting the Debtors to use their cash collateral and extending new money postpetition.  A waiver of the "equities of the case" doctrine is a customary term of both new-money postpetition financing and consensual cash collateral use and should be approved here as it is in so many other, similarly complex chapter 11 cases.  *See*, *e.g., In re Fuhu, Inc.*, Case No. 15-12465 (CSS) (Bankr. D. Del. Jan. 21, 2016) [D.I. 336] (approving waiver of 506(c) and 552(b)); *In re Golden County Foods, Inc.*, Case No. 15-11062 (KG) (Bankr. D. Del. June 22, 2015) [D.I. 175] (same); *In re Cal Dive Int'l, Inc.*, Case No. 15-10458 (CSS) (Bankr. D. Del. Apr. 20, 2015) [D.I. 282] (same); *In re Windsor Petroleum Transp. Corp.*, Case No. 14-11708 (PJW) (Bankr. D. Del. Aug. 12, 2014) [D.I. 52] (same); *In re Source Home Entm't, LLC*, Case No. 14-11553 (KG) (Bankr. D. Del. July 22, 2014) [D.I. 162] (same); *In re Brookstone Holdings Corp.*, Case No. 14-10752 (BLS) (Bankr. D. Del. Apr. 25, 2014) [D.I. 245] (same); *In re Noble Logistics, Inc.*, Case No. 14-10442 (CSS) (Bankr. D. Del. Apr. 2, 2014) [D.I. 117] (same).

36.    <u>Surcharge waiver is appropriate.</u>  The Committee's assertions regarding the section 506(c) surcharge waiver are similarly unfounded.  For the same reasons as set forth above, and also because the DIP Lenders Prepetition Senior Priority Noteholders, and Prepetition Junior Priority Noteholders have all agreed to subordinate their liens to the Carve-Out, a waiver of

surcharge rights under section 506(c) is appropriate. *See In re Towne, Inc.*, 536 F. App'x 265, 268 (3d Cir. 2013) (noting surcharge should apply only in "sharply limited" circumstances); *In re Delta Towers, Ltd.,* 924 F.2d 74, 76 (5th Cir. 1991) (noting that section 506(c) surcharges are "an exception to the general rule"). Waivers of surcharge rights under 506(c) are routinely approved in similar complex cases. *See*, *e.g., In re Fuhu, Inc.*, Case No. 15-12465 (CSS) (Bankr. D. Del. Jan. 21, 2016) [D.I. 336] (approving waiver of 506(c) and 552(b)); *In re Golden County Foods, Inc.*, Case No. 15-11062 (KG) (Bankr. D. Del. June 22, 2015) [D.I. 175] (same); *In re Cal Dive Int'l, Inc.*, Case No. 15-10458 (CSS) (Bankr. D. Del. Apr. 20, 2015) [D.I. 282] (same); *In re Windsor Petroleum Transp. Corp.*, Case No. 14-11708 (PJW) (Bankr. D. Del. Aug. 12, 2014) [D.I. 52] (same); *In re Source Home Entm't, LLC*, Case No. 14-11553 (KG) (Bankr. D. Del. July 22, 2014) [D.I. 162] (same); *In re Brookstone Holdings Corp.*, Case No. 14-10752 (BLS) (Bankr. D. Del. Apr. 25, 2014) [D.I. 245] (same); *In re Noble Logistics, Inc.*, Case No. 14-10442 (CSS) (Bankr. D. Del. Apr. 2, 2014) [D.I. 117] (sane).

37. ***Fee provisions are appropriate***. The Committee's contentions regarding purported limitations on its professional fees in these cases should be rejected. The Proposed Final Order does not limit (or even purport to limit) the Committee's ability to incur professional fees in these cases, with administrative expense priority for any reasonable and documented fees and out-of-pocket expenses, and the cap on the Committee's profession fees was removed. It limits only the amount of DIP Collateral that must be used to fund an investigation of prepetition liens and claims. (*See* Proposed Final Order ¶ 24(a) ("the foregoing clause (a) shall not constitute a cap on the amount of allowed fees, expenses and disbursements of Professional Persons that may be asserted as administrative expense claims against the Debtors").) Yet, the DIP Lenders are substantially the same parties as are sponsoring the Debtors' chapter 11 plan and receiving the

majority of the reorganized equity in the Debtors: if those parties want to consummate a chapter 11 plan, administrative expenses must be paid in full. *See* 11 U.S.C. §§ 726(a)(2), 507(a)(2). The Committee's concerned are unfounded. Moreover, the Term DIP Lenders have increased the amount of the Investigation Budget to $150,000 in response to the Committee's request. (Proposed Final Order ¶ 26.) No further concessions are necessary.

38. ***Other terms are appropriate***. The Committee's remaining assertions regarding purportedly improper terms of the Term DIP Loan Facility should be rejected.

39. <u>Challenge</u>. The Proposed Final Order expressly does not limit the Committee's ability to contest valuation in these cases. Proposed Final Order ¶ 26(a) ("*provided, that this clause (a) shall not apply to valuation or the quantification of any Diminution in Value*"); ¶ 10 (preserving rights of parties with standing for seek to Challenge.) The Committee's assertions otherwise are unsupported by the plain language of the proposed Final Order and should be rejected.

40. <u>Releases</u>. The DIP Facilities and the Proposed Final Order provide for releases by the Debtors of claims against the DIP Lenders. Such releases are customary, supported by precedent, were negotiated in good faith and at arms' length, and an appropriate concession by the Debtors in exchange for the significant benefits of the DIP Facilities. *See, e.g.*, *In re Event Rentals, Inc.*, 2014 WL 1724188, at *5, 17 (Bankr. D. Del. Apr. 1, 2014) (PJW) (providing release of claims by debtor against lender but allowing official committee of unsecured creditors limited time to contest lender's liens and claims); *In re Mach Gen, LLC*, 2014 WL 1884109, at *6, 18 (Bankr. D. Del. Mar. 27, 2014) (MFW); *In re EdgeNet, Inc.*, 2014 WL 1244155, at *4, 10 (Bankr. D. Del. Feb. 19, 2014) (BLS); *In re VeraSun Energy Corp.*, 2008 WL 8178096, at *23 (Bankr. D.

Del. Dec. 4, 2008) (BLS).  Moreover, the releases do not bind the Committee and do not restrict its Challenge rights.  The Court should reject the Committee's assertions.

**IV.**    **Cerberus/Bayside's Objection Should Be Overruled**

41.    The Cerberus/Bayside Objection is a continuation of the crusade of Cerberus Capital Management, L.P. and Bayside Capital, Inc. (collectively, "**Cerberus and Bayside**") against the Prepetition Senior Priority Notes, including on grounds already addressed in the now-resolved adversary proceeding.

42.    Cerberus and Bayside's contention that the Court should reject the DIP Facility as unnecessary is meritless.  (Cerberus/Bayside Obj. ¶ 15.)  There is no basis for the Court to substitute Cerberus and Bayside's business judgment for that of the Debtors.  Cerberus and Bayside's assertion that the Debtors "do not need a single additional dollar of New Money Term DIP Loans" (*id.* ¶ 15) is unsupportable and contrary to the testimony of Mr. Del Genio, particularly given the substantial impact of commodity markets on the Debtors' cash flows and business operations.  It should be rejected.

43.    Cerberus and Bayside's assertion that the Roll Up is excessive also ignores economic reality.  (*Id.* ¶ 17.)  As discussed above, the assertion incorrectly presumes that the Debtors face no risk with respect to their ability to obtain the full $85 million of committed funding under the Term DIP Loan Facility.  (*See* Del Genio Suppl. Decl. ¶ 13.)  Nor do Cerberus or Bayside identify any harm to them that results from the Roll Up (other than, contrary to these cases, in a scenario where they have prevailed in the Adversary Proceeding).  There is no such harm.  *See In re Vaso Active Pharms., Inc.*, 500 B.R. 384, 399 (Bankr. D. Del. 2013) (even while appeal is pending, "the law of the case doctrine also precludes relitigation of issues in which parties have already had a full and fair opportunity to litigate"); *In re DBSI, Inc.,* No. 08-12687 JW, 2012 WL

2501090, at *11 (Bankr. D. Del. 2012) ("The prevailing party may treat the judgment of the lower court as final notwithstanding that an appeal is pending.") (internal citations omitted).

44.     Finally, Cerberus and Bayside's assertion that the 10.5% Notes Trustee failed to consent to priming by the Term DIP Loan Facility because of purportedly insufficient documentation is meritless.  This assertion is a reworking of a baseless contention in the Adversary Proceeding that the 10.5% Notes Trustee failed to properly document 10.5% Noteholders' consent to priming by the Prepetition Senior Priority Notes that "elevates form over substance."  (*See* Final Judgment [A.D.I. 72].)  It is not grounds to deny the DIP Motion.

**V.      Summary Table and Reservation of Rights**

45.     Attached as **Exhibit A** hereto is a table summarizing the points raised in the Objections and the Debtors' responses thereto.  The Debtors reserve all rights to respond as necessary to any objections raised after the filing of this Reply.

**CONCLUSION**

46.     For the foregoing reasons and the reasons set forth in the Motion, the Debtors respectfully request that the Court overrule the Objections on the merits, enter the proposed Final Order, and grant such other and further relief as the Court deems just and proper.

Dated:  July 12, 2022
          Wilmington, Delaware

**BAKER BOTTS L.L.P.**

James R. Prince (*pro hac vice* admission pending)
Kevin Chiu (*pro hac vice* admission pending)
2001 Ross Avenue, Suite 900
Dallas, Texas 75201-2980
Telephone:      (214) 953-6500
Facsimile:      (214) 953-6503
Email: jim.prince@bakerbotts.com
          kevin.chiu@bakerbotts.com

-and-

BAKER BOTTS L.L.P.
Scott R. Bowling (*pro hac vice* admission pending)
30 Rockefeller Plaza
New York, New York 10112
Telephone:      (212) 408-2500
Facsimile:      (212) 259-2501
Email:  scott.bowling@bakerbotts.com

-and-

BAKER BOTTS L.L.P.
David R. Eastlake (*pro hac vice* admission pending)
Lauren N. Randle (*pro hac vice* admission pending)
910 Louisiana Street
Houston, Texas 77002
Telephone:      (713) 229-1234
Facsimile:      (713) 229-1522
Email:  david.eastlake@bakerbotts.com
          lauren.randle@bakerbotts.com

*/s/ Brian Loughnane*

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Robert J. Dehney (No. 3578)
Curtis S. Miller (No. 4583)
Daniel B. Butz (No. 4227)
Matthew O. Talmo (No. 6333)
Brian Loughnane (No. 6853)
1201 N. Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email:    rdehney@morrisnichols.com
          cmiller@ morrisnichols.com
          dbutz@ morrisnichols.com
          mtalmo@ morrisnichols.com
          bloughnane@ morrisnichols.com

*Proposed Attorneys for Debtors
and Debtors in Possession*