## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| TPC GROUP INC., *et al.*,[1] | § | Case No. 22-10493 (CTG) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**SUPPLEMENTAL OBJECTION OF CERBERUS CAPITAL MANAGEMENT, L.P. AND BAYSIDE CAPITAL, INC. TO "DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (IV) MODIFYING THE AUTOMATIC STAY, AND (V) GRANTING RELATED RELIEF"**

Cerberus Capital Management, L.P. and Bayside Capital, Inc. (together, the "Non-Consenting Noteholders") supplement their *Objection of the Ad Hoc Group of Non-Consenting Noteholders to Debtors' Motion for Entry of Interim and Final Orders Approving DIP Financing* [ECF No. 76] (the "Initial Objection") with this supplemental objection (this "Supplemental Objection") to the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties,*

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: TPC Group Inc. (3618); TPC Holdings, Inc. (7380); TPC Group LLC (8313); Texas Butylene Chemical Corporation (7440); Texas Olefins Domestic International Sales Corporation (4241); TPC Phoenix Fuels LLC (9133); Port Neches Fuels, LLC (1641); and TP Capital Corp. (6248). Each Debtor's corporate headquarters and mailing address is 500 Dallas St., Suite 2000, Houston, Texas 77042.

*(IV) Modifying the Automatic Stay, and (V) Granting Related Relief* (the "<u>DIP Motion</u>") [ECF No. 36], and respectfully represent as follows:

<h2 style="text-align:center"><u>SUPPLEMENTAL OBJECTION</u>[2]</h2>

1.     The Court has held that the lien securing the Debtors' obligations under the Usurping Notes ranks senior in priority to the lien securing its obligations under the so-called "Prepetition Junior Priority Notes Indenture" (the "<u>10.5% Notes</u>"). *See* A.D.I. 72 (the "<u>Lien Priority Order</u>") at 30.  The Non-Consenting Noteholders have appealed that decision and have sought to stay its efficacy.  Armed with the Lien Priority Order and the DIP financing-related waivers in the 2021 Intercreditor Agreement (the "<u>Disputed ICA</u>"), the Debtors now seek final approval of a priming lien to secure (a) the New Money Term DIP Loans (up to $85 million) and (b) a roll-up of the Usurping Notes (in the amount of roughly $238 million).  If approved, the Court will authorize the Debtors to permanently and irrevocably strip up to $323 million of value from the holders of the 10.5% Notes (including the Non-Consenting Noteholders) and destroy the Non-Consenting Noteholders' appellate recourse with respect to the Lien Priority Order based on statutory mootness set forth in 11 U.S.C. § 364(e).

2.     Such a drastic result—one with constitutional implications—can, and should, be avoided by simply adjourning the Final DIP Hearing, which would allow the Non-Consenting Noteholders time to pursue an expedited appeal.  In many cases, this "kick the can" approach might be outweighed by a debtor's urgent need for additional DIP financing to maintain and preserve its business.  But, that is not the case here.  On the contrary, the Debtors have no need for any further New Money Term DIP Loans and the proposed roll-up of the Usurping Notes provides no liquidity.

---

[2]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the DIP Motion or the Initial Objection, as applicable.

In fact, as explained below, the Debtors' current and projected future cash position and liquidity far exceed the high end of their stated liquidity targets. Thus, the Non-Consenting Noteholders request that the Court adjourn the hearing to consider entry of a final order approving the DIP Motion until their expedited appeal can be heard and decided.

3.     To the extent the Court decides to consider the merits of the DIP Motion, the Non-Consenting Noteholders supplement their Initial Objection with three arguments. <u>First</u>, the Debtors' request for a priming lien under 11 U.S.C. § 364(d)(1) to secure the New Money Term DIP Loans and the Roll-Up DIP Loans should be denied because the Debtors (a) admit that there is no basis for adequate protection and (b) have failed to demonstrate a valid waiver of the right to adequate protection. <u>Second</u>, the Debtors' request for authority to borrow additional New Money DIP Term Loans should be denied because their current and forecasted cash and liquidity far exceeds the high end of even their aspirational liquidity needs. <u>Third</u>, the Debtors' request to roll-up the Usurping Notes should be denied because the ratio of proposed rolled-up of pre-petition debt relative to the New Money DIP Term Loans actually advanced is more than 7:1, which is facially unreasonable and significantly exceeds the roll-up ratios approved in other comparable cases in the Debtors' own market survey.

## A.     <u>NO ADEQUATE PROTECTION WAIVER</u>

4.     The Debtors seek approval of the (a) New Money Term DIP Loans in the aggregate amount of $85 million and (b) Roll-Up DIP Loans in the amount of roughly $238 million, both of which would be secured by a lien pursuant to section 364(d)(1) of the Bankruptcy Code that would rank senior in priority to the existing lien securing the Debtors' prepetition obligations under the 10.5% Notes. If approved, the priming DIP lien would strip up to $323 million of value from the holders of the 10.5% Notes (including value from the Non-Consenting Noteholders) and reallocate

3

it to the Term DIP Lenders.

5.      The Debtors concede that they cannot provide adequate protection to the primed 10.5% Notes.[3]  But they maintain that value reallocation is nevertheless authorized by the Bankruptcy Code because the collateral trustee for the 10.5% Notes waived the right to seek adequate protection and consented to being primed by the proposed DIP Liens securing the New Money DIP Term Loans.  The Debtors, however, have a problem:  that assertion is not accurate.

6.      Section 364(d)(1) of the Bankruptcy Code authorizes post-petition financing secured by a senior lien on property that is already encumbered "only if … there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior . . . lien is proposed to be granted."  A priming lien constitutes extraordinary relief with constitutional implications.  When authorized, it usurps an otherwise constitutionally-protected property interest, shifting value away from a secured creditor to another creditor.[4]  As a result, the Debtors "ha[ve] the burden of proof on the issue of adequate protection," by making a "strong

---

[3]      The Debtors' investment banker, Zul Jamal of Moelis & Company ("Moelis"), testified that: "the Debtors would be unable to prime the [10.5% Noteholders'] liens without the consent of the [10.5% Noteholders] because such prepetition claims are … undersecured and no equity cushion exists with respect thereto…. The recent trading prices of the [10.5% Notes], and a valuation analysis that Moelis conducted in connection with the Debtors' consideration of, among other things, the DIP Facilities each indicate that the prepetition claims of the [10.5% Noteholders] are undersecured.  Consequently, the Debtors are unable to provide adequate protection to the [10.5% Noteholders] such as would be necessary to incur debt secured by a priming lien without their consent."  *See Declaration of Zul Jamal in Support of [DIP Motion]*, dated June 1, 2022 [ECF 68-1] (the "Jamal Decl.") ¶ 26.

[4]      "The concept of adequate protection is derived from the Fifth Amendment protection of property interests."  S. REP. 95-989, 49, 1978 U.S.C.C.A.N. 5787, 5835.  The Supreme Court has long recognized that the Bankruptcy Code's powers are subject to the Fifth Amendment.  *See, e.g.*, *Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 166–67 (1974) (elimination of secured creditors' rights in their collateral by bankruptcy statute in exchange for securities in new company of uncertain value constituted a taking of property requiring just compensation under the Fifth Amendment); *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 589–90 (1935) ("The bankruptcy power, like the other great substantive powers of Congress, is subject to the Fifth Amendment" and cannot be used to effectuate "the taking of substantive rights in specific property").  Indeed, a "secured creditor has a constitutional right to have the value of its secured claim on the petition date preserved."  *In re Keystone Camera Prods. Corp.*, 126 B.R. 177, 183–84 (Bankr. D.N.J. 1991) (citing *Wright v. Union Cent. Life Ins. Co.*, 311 U.S. 273 (1940)).

showing" or "tangible demonstration" of adequate protection and the Court must be "cautious" in approving the "extraordinary relief" of a priming debtor-in-possession financing. *See* 11 U.S.C. § 364(d)(2); *In re LTAP US, LLLP*, 2011 Bankr. LEXIS 667, at *9 (Bankr. D. Del. Feb. 18, 2011); *Resolution Trust Corp. v. Swedeland Dev. Grp. (In re Swedeland Dev. Grp.)*, 16 F.3d 552, 567 (3rd Cir. 1994).

7.      Here, the DIP Motion is predicated on the premise that the collateral trustee for the 10.5% Notes expressly and validly waived the statutory obligation of the Debtors to provide adequate protection and consented to the proposed priming DIP lien and resulting reallocation of collateral value.   Specifically, the Debtors' investment banker, Mr. Jamal, testified that he "understands that the Ad Hoc [Noteholder] Group has directed both the [10.875%] Notes Trustee and the [10.5%] Notes Trustee to consent to the priming liens securing the Term DIP Loan Facility and that the trustees under such Indentures have so consented."  Jamal Decl. ¶ 25.

8.      Contrary to the clear import of Mr. Jamal's testimony, however, the collateral trustee for the 10.5% Notes did not receive any direction letter from the Ad Hoc Noteholder Group requesting that it so consent, nor did the trustee did consent to the priming lien securing the Term DIP Facility in response to any such direction.  *See* Ex. 1 (email from Mark Radtke of Foley & Lardner LLP, attorney for the collateral trustee for the 10.5% Notes, dated June 22, 2022).  The Debtors confirmed that they also "do not possess any direction letters or similar correspondence" from the Ad Hoc Noteholder Group.  *See* Ex. 2 (email from Kevin Jacobs of Baker Botts L.L.P., attorney for the Debtors, dated June 22, 2022).

9.      Mr. Jamal may try to repair his testimony by arguing what he meant to say was that the collateral trustee for the 10.5% Notes implicitly consented to the priming liens securing the Term DIP Facility when it executed the Disputed ICA, which includes purported waivers in section

6.1(a) with respect to adequate protection and to the subordination of liens in the event of a priming DIP facility agreed to or provided by the holders of the 10.875% Notes. But that is not how Mr. Jamal chose to testify and not what the DIP Motion states in the section asserting the Debtors' request for priming liens should be granted. *See* DIP Motion ¶¶ 43–49.[5]

10.    In any case, reliance on the Disputed ICA would not change the outcome. Simply put, the Disputed ICA cannot credibly be the source of a clear and unambiguous waiver of a constitutionally protected property interest when the very validity of the Disputed ICA is the subject of a *bona fide* dispute upon appeal.[6]

11.    It is well-settled under New York law[7] that the "party seeking to enforce a contract bears the burden to establish that a binding agreement was made." *Allied Sheet Metal Works, Inc. v. Kerby Saunders, Inc.*, 206 A.D.2d 166, 169 (1st Dept. 1994); *Paz v. Singer Co.*, 151 A.D.2d 234, 235 (1st Dept. 1989) ("It is black letter law that the burden of proving the existence, terms and validity of a contract rests on the party seeking to enforce it"); *In re Motors Liquidation Co.*, 580 B.R. 319, 343 (Bankr. S.D.N.Y. 2018) ("[t]he party seeking to enforce a purported settlement agreement bears the burden of proving that such a binding and enforceable agreement exists.") (citation omitted); *see also In re Landon Estate*, 2017 WL 2492044, *3 (Del. Ch. Court June 8, 2017) ("As the parties seeking to enforce an alleged agreement, the Executors bear the burden of proving the existence of a contract…"). This should be especially so when dealing with

---

[5]    The DIP Motion makes reference to the Disputed ICA provisions in a single sentence in the description of the Debtors' capital structure. *See* DIP Motion ¶ 26.

[6]    On July 6, 2022, this Court ruled that the Disputed ICA and the 2021 supplemental indenture for the 10.5% Notes "did not violate the rights of the objecting noteholders under the 2019 [i]ndenture [for the 10.5% Notes.]" Lien Priority Order at 30. On July 8, 2022, the Non-Consenting Noteholders filed a notice of appeal and a motion to stay enforcement of that order and to adjourn the scheduled final hearing on the DIP Motion pending resolution of the Non-Consenting Noteholders' expedited appeal of this Court's Lien Priority Order. *See* Adv. Proc. No. 22-50372 [ECF Nos. 76, 78].

[7]    The Disputed ICA is governed by New York law. *See* Disputed ICA, § 8.10.

6

extraordinarily prejudicial relief where the party seeking to enforce the contract is held to an exacting standard to carry its burden. Here, the Debtors are relying on the claimed contractual waiver in lieu of adequate protection because, far from being able to prove adequate protection with a "strong showing" or "tangible demonstration," they admit they cannot provide it at all.[8] As a matter of basic logic and equity, parties should not be allowed to enforce an agreement while its validity is subject to a genuine dispute, particularly when enforcement would have constitutional implications.

12. Courts in other contexts have refused to enforce a contract purporting to waive substantial rights when, as here, its validity is challenged. For example, the Supreme Court has repeatedly held that where the validity of an arbitration provision or agreement to arbitrate is challenged, a court should order arbitration of a dispute only *after* the court has determined that the arbitration provision (which waives the right to proceed in court) is valid and enforceable. *See Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 300 (2010) (stating that the Supreme Court's prior holdings "compelled arbitration of a dispute only after the [Supreme] Court was persuaded that the parties' arbitration agreement was validly formed and that it covered the dispute in question and was legally enforceable"); *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 71 (2010) ("If a party challenges the validity under [the Federal Arbitration Act] of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that agreement under § 4."). *See also Dedon GmbH v. Janus et Cie*, 411 F. App'x 361, 363 (2d Cir. 2011) (collecting cases upholding "well-established precedent that where a party

---

[8]     The party asserting waiver (here, the Debtors) "bears the weighty burden of establishing that a clear and unmistakable waiver has occurred." *In re Miami Metals I, Inc.*, 625 B.R. 593, 598 (Bankr. S.D.N.Y. 2021). "Federal common law and New York common law both define waiver as an intentional relinquishment and abandonment of a known right or privilege. A waiver cannot be lightly presumed." *In re Best Payphones, Inc.*, 523 B.R. 54, 70 (Bankr. S.D.N.Y. 2015) (internal citations omitted).

7

challenges the very existence of the contract containing an arbitration clause, a court cannot compel arbitration without first resolving the issue of the contract's existence").

13.     Similarly, a court must first determine whether a valid forum selection clause exists before entering a decision enforcing it.  *See, e.g.*, *Evolution Online Sys v. Koninklijke PTT Nederland N.V.*, 145 F.3d 505, 509 (2d Cir. 1998) ("In the absence of a clear finding of a contract, the district court's determination that the parties reached agreement on a forum-selection clause was premature. . . .  On remand, the district court must conduct a proper [] analysis to determine whether [the parties] entered into a contract.") (citations omitted).  Simply put, "[b]efore this Court can look within a contract, there must be a valid contract."  *Koger, Inc. v. Klco*, 2009 U.S. Dist. LEXIS 27146, at *4–5 (D.N.J. Mar. 9, 2009) (court must first determine if there is valid contract before enforcing choice of law provision in disputed contract).

14.     Accordingly, the validity of the Disputed ICA must be finally resolved before allowing the Debtors to use a claimed waiver in that document as a sword to deprive the Non-Consenting Noteholders of the value that they would otherwise recover in the absence of a priming lien.  Given the pendency of the appeal and the motion to stay the effectiveness of the Lien Priority Order pending that appeal, the Court should reject any effort by the Debtors to justify the priming DIP lien to secure the Roll-Up DIP Loans on the basis that the lien securing the Usurping Notes is senior the lien securing 10.5% Notes based on the Lien Priority Order.  For these reasons, the Court should deny the Debtors' request to grant a priming lien to secure the New Money Term DIP Loans and the Roll-Up DIP Loans.

## B.    <u>ADDITIONAL NEW MONEY TERM DIP LOANS IS UNNECESSARY</u>

15.     The Debtors have the burden of proving that the terms of the proposed Term DIP Facility are fair and reasonable.  *See*, *e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 312–13 (Bankr.

8

D. Del. 2011).  They must also show that "the relief requested is an appropriate exercise of the debtor's business judgment."  *U.S. Bank Trust N.A. v. Am. Airlines, Inc. (In re AMR Corp.)*, 485 B.R. 279, 287 (Bankr. S.D.N.Y.), *aff'd*, 730 F.3d 88 (2d Cir. 2013).  The Debtors cannot satisfy this admittedly deferential standard because, as explained below, they do not need a single additional dollar of New Money Term DIP Loans.

16.     Robert A. Del Genio, the Debtors' financial advisor, testified that the Debtors have "a minimum liquidity threshold of $50 million" and a "goal … to return to the historical minimum liquidity threshold of between $75 and $100 million as operations normalize."  *Declaration of Robert A. Del Genio in Support [of DIP Motion]* [ECF No. 66], ¶ 11.  With this testimony serving as the baseline to assess reasonableness, the Debtors' request should be denied because they do not need any further New Money Term DIP Loans to meet the high end of their liquidity goal ($100 million).  In fact, the Debtors' own cash flow reports and forecasts demonstrate that, at all times during the forecast period, they will have (a) a cash balance of no less than $122 million and (b) liquidity, which includes availability under the ABL DIP Facility (but <u>excludes</u> any additional draws under the Term DIP Facility) of no less than $159 million.  *See* Ex. 3 ¶¶ 9–10.  For this reason, the Court should deny the Debtors' request for incremental access to priming New Money DIP Term Loans.[9]

---

[9]     The New Money Term DIP Loans are available in three draws: (1) $32 million upon entry of the Interim Order, (2) $25 million upon entry of the Final Order and (3) $28 million if the Liquidity Condition is satisfied.  "Liquidity Condition" is defined in the Term DIP Loan Credit Agreement, attached as Exhibit 2 of the Interim DIP Order, means "that (1) Liquidity of the Loan Parties on the date of the Borrowing Request is less than $75 million in the aggregate, and (2) the Borrower reasonably estimates that Liquidity of the Loan Parties shall be less than $50 million in the aggregate within the two (2) week period following the date of such Borrowing Request (assuming no borrowing shall otherwise be made under this DIP Facility during such two-week period); <u>provided</u>, that the Borrower shall certify satisfaction of clauses (1) and (2) in good faith to the Agents and Lenders in writing, which may be included in the Borrowing Request."

### C.    PROPOSED ROLL-UP IS EXCESSIVE

17.    The Debtors seek authority to roll-up approximately of $238 million of the 10.875% Notes without regard as to whether they borrow a single additional dollar.  The Court should evaluate the reasonableness of the roll-up based on the amount of New Money Term DIP Loans actually funded ($32 million) as opposed to the commitment amount ($85 million) because, as just discussed, the Debtors are forecasting that they do not need any incremental New Money Term DIP Loans beyond the $32 million they already drew upon entry of the Interim Order.

18.    This being the case, the Debtors' roll-up request should be evaluated by comparing the ratio of rolled-up debt to the amount of actual new money DIP financing.  Here, that ratio is a whopping 7.4:1.  In other words, for every dollar of New Money Term DIP Loans funded, the Debtors ask to roll-up 7.4 dollars of 10.875% Notes.

19.    The Debtors' investment banker, Mr. Jamal, offered 25 cases of "comparable" DIP facilities.  *See* Jamal Decl. ¶ 32 and Appendix I.  None of the other DIP facilities he identified included a roll-up measured against the DIP commitment amount (as opposed to actually funded DIP loans) with a ratio even approaching the proposed 7.4:1.  Moreover, the maximum roll-up ratio in the cases he identified compared to new money provided was 3:1.  A ratio of 7.4:1 far exceeds the highest roll-up ratio in every comparable case cited by the Debtors.  *See* Ex. 3 ¶¶ 15–16.  In short, the roll-up requested here is demonstrably unreasonable and should be denied.

### RESERVATION OF RIGHTS

20.    The Non-Consenting Noteholders hereby fully reserve their right to (a) raise issues in the Final Hearing as otherwise set forth in the Initial Objection, (b) raise additional arguments at the Final Hearing in respect of the approval of the Term DIP Facility and the terms of any proposed form of final order approving the DIP Motion, (c) join in any other objections from any

10

other party to the Term DIP Facility and the relief sought in the DIP Motion, and (d) seek any other

relief that is just and proper.


Dated:  July 8, 2022
   Wilmington, Delaware                    By: */s/ Laura Davis Jones*                    .

                                           **PACHULSKI, STANG, ZIEHL & JONES LLP**
                                           Laura Davis Jones (DE Bar No. 2436)
                                           Timothy P. Cairns (DE Bar No. 4228)
                                           919 North Market Street, 17th Floor
                                           P.O. Box 8705
                                           Wilmington, Delaware 19899 (Courier 19801)
                                           Telephone:  (302) 652-4100
                                           Facsimile:   (302) 652-4400
                                           ljones@pszjlaw.com
                                           tcairns@pszjlaw.com

                                           - and -

                                           **PROSKAUER ROSE LLP**
                                           David M. Hillman (*pro hac vice*)
                                           Michael T. Mervis (*pro hac vice*)
                                           Joshua A. Esses (*pro hac vice*)
                                           Eleven Times Square
                                           New York, New York 10036
                                           Telephone: (212) 969-3000
                                           Facsimile: (212) 969-2900
                                           Email: DHillman@proskauer.com
                                                   MMervis@proskauer.com
                                                   JEsses@proskauer.com

                                           Peter J. Young (*pro hac vice*)
                                           2029 Century Park East, Suite 2400
                                           Los Angeles, CA 90067-3010
                                           Telephone: (310) 284-4542
                                           Facsimile: (310) 557-2193
                                           Email: PYoung@proskauer.com

                                           *Counsel for the Ad Hoc Group of Non-Consenting*
                                           *Noteholders*

DOCS_DE:239786.1 13563/001