<pre>
 1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
 2

 3   IN RE:                      .  Chapter 11
                                 .
 4   TPC GROUP INC., et al.,     .  Case No. 22-10493 (CTG)
                                 .
 5                               .  Jointly Administered
                                 .
 6                               .  Courtroom No. 7
                                 .  824 Market Street
 7                               .  Wilmington, Delaware 19801
                                 .
 8            Debtors.           .  Friday, July 29, 2022
     . . . . . . . . . . . . . . .  10:00 a.m.
 9

10                        TRANSCRIPT OF HEARING
                BEFORE THE HONORABLE CRAIG T. GOLDBLATT
11                 UNITED STATES BANKRUPTCY JUDGE

12
     APPEARANCES:
13

14   For the Debtors:         Scott Bowling, Esquire
                               BAKER BOTTS LLP
                               30 Rockefeller Plaza
15                             New York, New York 10112

16                             James Prince, Esquire
                               BAKER BOTTS LLP
17                             2001 Ross Avenue, Suite 900
                               Dallas, Texas 75201
18

19   Audio Operator:          Sean Moran

20   Transcription Company:   Reliable
                               The Nemours Building
21                             1007 N. Orange Street, Suite 110
                               Wilmington, Delaware 19801
22                             Telephone: (302)654-8080
                               Email:  gmatthews@reliable-co.com
23

24   Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.
25
</pre>

1  APPEARANCES (CONTINUED):

2  For the Debtors:            Kevin Jacobs, Esquire
                                BAKER BOTTS LLP
3                               910 Louisiana Street
                                Houston, Texas 77002
4
    For the Ad Hoc
5   Noteholder Group:           Kristopher Hansen, Esquire
                                Erez Gilad, Esquire
6                               PAUL HASTINGS LLP
                                200 Park Avenue
7                               New York, New York 10166

8   For the Ad Hoc Group
9   of Non-Consenting
    Noteholders:                David Hillman, Esquire
10                              Michael Mervis, Esquire
                                PROSKAUER ROSE LLP
11                              Eleven Times Square
                                Eighth Avenue & 41st Street
12                              New York, New York 10036

13
    For Mockingbird Credit
14  Opportunities:              Charles Persons, Esquire
                                SIDLEY AUSTIN LLP
15                              2021 McKinney Avenue, Suite 2000
                                Dallas, Texas 75201
16
17  For MDL Plaintiffs:         Sander Esserman, Esquire
                                STUTZMAN BROMBERG ESSERMAN & PLIFKA
                                2323 Bryan Street, Suite 2200
18                              Dallas, Texas 75201

19
    For the Committee:          Naomi Moss, Esquire
20                              AKIN GUMP STRAUSS HAUER & FELD LLP
                                One Bryant Park
21                              Bank of America Tower
                                New York, New York 10036

22

23

24

25

1                            INDEX

2    MATTERS GOING FORWARD AS A STATUS CONFERENCE:        PAGE

3    Agenda
     Item 1:   Debtors' Motion for Entry of Interim and    10
4              Final Orders (I) Authorizing the Debtors
               to (A) Obtain Senior Secured Priming
5              Superpriority Postpetition Financing and
               (B) Use Cash Collateral, (II) Granting Liens
6              and Providing Claims with Superpriority
               Administrative Expense Status, (III)
7              Granting Adequate Protection to Prepetition
               Secured Parties; (IV) Modifying the Automatic
8              Stay; and (V) Granting Related Relief
               [Docket No. 36 – filed June 1, 2022]
9

10             Court's Ruling:                              178

11

12   WITNESSES CALLED
     BY THE DEBTORS:                                       PAGE

13        ZUL JAMAL
          Direct examination by Mr. Jacobs                 42
14        Cross-examination by Mr. Hillman                 51
          Cross-examination by Mr. Persons                 66
15        Cross-examination by Mr. Hansen                  72

16
          ROBERT DEL GENIO
17        Direct Examination by Mr. Jacobs                 74
          Cross-examination by Mr. Mervis                  100
18        Cross-examination by Mr. Persons                 112

19

20   EXHIBITS:                                             PAGE

21   D-47  Jamal Declaration                               43

22   D-52                                                  45

23   D-45  Del Genio first day declaration                75

24   D-46  Del Genio declaration in support of interim     76
           and final order of the DIP
25

EXHIBITS:                                               PAGE

D-53  Cash-flow chart                                    85

D-54  Forecast                                           86

UCC-6  Partial proof of loss document                   105

UCC-7  Partial proof of loss document                   107

Debtor Exhibits 2 through 8                             121

Non-Consenting Noteholder Exhibits 2 through 4          124

Non-Consenting Noteholder Exhibits 6 through 12         124

1        (Proceedings commence at 10:00 a.m.)

2        THE COURT:  Good morning, everyone.  This is Judge

3   Goldblatt.  We are on the record in In Re TPC Group, Inc.,

4   which is Case Number 22-10493.

5        We are proceeding this morning by Zoom.  As a

6   result, I ask that folks leave your microphones muted, unless

7   you're addressing the Court; that, when you do address the

8   Court, you introduce yourselves for the record each time; and

9   as I see folks already are, to have folks leave their cameras

10  off, unless you're either addressing the Court or wish to be

11  recognized.

12       So, with that, why don't I pass the baton to Mr.

13  Prince to take us through the agenda.

14       MR. PRINCE:  Good morning, Your Honor.  Jim Prince

15  of Baker Botts here on behalf of the debtors.  With me are my

16  partners Scott Bowling and Kevin Jacobs.  Mr. Bowling is

17  going to handle Item Number 1, which is the DIP motion.  And

18  of course, Mr. Jacobs, he handles our evidence and he will be

19  doing that function again today.  We also have our co-counsel

20  Morris Nichols on the line, our -- as part of the hearing.

21       Turning to the agenda, Your Honor, we have the DIP

22  motion.  That's the big game or the big show.  We have some

23  miscellaneous sealing motions, which are Items 2 through 6.

24  I'm pleased to report that those are all either resolved or

25  moot.  So, really, we just have one item, which is the --

1  which is the DIP motion.

2          In that regard, I believe we filed at Docket 539, a

3  blackline of a DIP order.  What that order reflects is a

4  highly negotiated settlement with the creditors' committee

5  that resolves all of the committee's objections, as well as

6  the joinder by Mr. Esserman, who represents the MDL

7  plaintiffs.  That is a material favorable outcome for the

8  debtors and these estates.

9          Your Honor, if you would have asked me at the

10  beginning of the week, perhaps even as recently as Wednesday,

11  the odds of settling the committee's objections, I would have

12  said remote, doubtful, not likely, perhaps even impossible.

13  However, thankfully, the parties have worked very hard.

14  There have been many negotiating sessions, all of them

15  professional, most of them spirited, and ultimately, a deal

16  was cut late last night.  And that's reflected in Docket 539.

17  And Mr. Bowling will walk through all the various changes.

18  So that's a very good outcome for this debtor, for these

19  debtors, and ultimately, we're hopeful that it's going to

20  reduce the length of this hearing, which otherwise was going

21  to be hotly contested.

22          We still have the objections of Cerberus, as well

23  as Trive (phonetic) and we'll have to work through those, and

24  we are prepared to move forward with our motion.

25          All right.  Let me --

1          THE COURT:  Mr. Prince --

2          MR. PRINCE:  -- give the Court --

3          THE COURT:  -- can I stop --

4          MR. PRINCE:  -- a little --

5          THE COURT:  -- you for -- can I stop you for a

6   second --

7          MR. PRINCE:  You bet.

8          THE COURT:  -- just to make sure I understand the

9   different moving parts here?

10          So the second amended agenda also lists an

11   objection by taxing authorities, that's at DI 280.  Has that

12   been resolved or is that going forward?

13          MR. PRINCE:  That's been resolved with language,

14   Your Honor.

15          THE COURT:  Okay.  And so I just want to make sure

16   I understand the objections that are in front of me that are

17   live issues.  Obviously, I appreciate the Cerberus/Bayside

18   objection, and there's an objection/reservation by

19   Mockingbird Credit.  Are those the two matters that are live

20   today?

21          MR. PRINCE:  That is it.

22          THE COURT:  Okay.

23          MR. PRINCE:  Those two are the only two live

24   objections.

25          THE COURT:  Got it.  Okay.  That's helpful.  I

1   appreciate it.  Apologies for the interruption.

2           MR. PRINCE:  No, no problem.

3           I also have -- I'm going to give just a brief

4   update on where we are.

5           Your Honor has seen a number of motions to assume

6   contracts as amended.  What those motions are doing are

7   basically providing critical raw materials, but

8   (indiscernible) enterprising (indiscernible) a longer

9   duration and in some cases higher volumes.  So we're getting

10  discounts sooner, and we're also de-risking our long-term

11  plan because we're getting extensions.

12          I'll say the renegotiations of our supplier

13  contracts, we are 80 to 85 percent done.  We still have a few

14  more to do and those will be coming forward in the next few

15  days.  Perhaps it may take a little bit longer, but our goal

16  is to get all of them done before our disclosure statement

17  hearing, which is the 16th of August.

18          All right.  Turning to our committee, as well as

19  efforts to ultimately negotiate (indiscernible) plan

20  treatment with our unsecured creditors.  Our committee

21  started with seven members.  Five of those members are MDL

22  plaintiffs, involuntary creditors, and two were suppliers.

23  The two suppliers have now been assumed and paid, so we now

24  have a five-person committee consisting of all MDL

25  plaintiffs.  Those MDL plaintiffs are a subset of a larger

1   group of MDL plaintiffs represented by Mr. Esserman.

2         All right.  Since the committee was formed,

3   obviously, they need to get up to speed.  And they have

4   provided a large number of diligence requests.  We have

5   provided to date -- I think, when I last gave an update, we

6   were at 38,000 pages.  Today we are at 100,000 pages.

7         We also, last week, completed a site visit with the

8   two advisors to the committee, both legal and financial.

9   That included a management presentation and an update

10  regarding the business, as well as a Q-and-A session with the

11  management team.  We're hopeful we're going to be in a

12  position very soon that the committee will feel that they are

13  fully informed and, thus, can engage in earnest in what we

14  hope will be resolution of the unsecured treatment under a

15  plan.

16        Turning to the calendar, as we look forward into

17  the future, we have a general claims bar date of August 5.

18  That also is the deadline to object to the debtors'

19  disclosure statement, as well as a backstop motion.

20        A hearing to consider the debtors' disclosure

21  statement, as well as the debtors' backstop motion, is the

22  16th of August.

23        The Court has given us some time and we're -- it

24  looks like it's going to work with our overall schedule, the

25  week of October 24 for confirmation hearing, starting at the

1  beginning of that week.  Obviously, that gives some time in

2  September, in the event there's any shifting that needs to be

3  done to the disclosure statement.  But at the moment, we're

4  pressing forward on the 16th of August on the disclosure

5  statement and on the backstop motion.

6          Any questions, Your Honor, on kind of where we are

7  or where we're going?

8          THE COURT:  No.  I think I -- I think I understand

9  the time line and where things are, so I think we're good

10 there.

11         MR. PRINCE:  Okay.  I will now turn it over to Mr.

12 Bowing, who will go through the settlement with the

13 committee, as well as other matters, before we get to the

14 evidence.

15         THE COURT:  Okay.  Very well.  Thank you.

16         Mr. Bowling.

17         MR. BOWLING:  Thank you, Your Honor.  Can you hear

18 me?

19         THE COURT:  I can.

20         MR. BOWLING:  Excellent.  For the record, Your

21 Honor, Scott Bowling, Baker Botts, for the debtors.

22         As Mr. Prince noted, the only item on today's

23 agenda is the motion -- on today's agenda is the debtors'

24 motion for DIP financing, Docket Number 36.  And the most

25 recent proposed order was filed under certification of

1  counsel this morning at Docket Number 539.  And we are

2  pleased to say that this is the product of a lot of hard work

3  by the parties and their professionals and resolves many of

4  the issues that would otherwise have been on for today.

5         I'd like to just hit the highlights of the changes

6  to the order.  And of course, if you have any questions, feel

7  free to stop me.  And then I think, after that, we would

8  propose to probably talk process for today's argument and

9  evidence.

10        THE COURT:  Okay.  And I should say I did receive

11 the submission of the final order and the redline this

12 morning.  I've skimmed through the redline changes, so I

13 have, in very broad strokes, a general understanding.  But

14 you will not do any harm by taking your time to point out how

15 the committee's issues were resolved.

16        MR. BOWLING:  Of course.

17        So the highlights of that order -- and I won't go

18 through all 93 plus pages of it -- are as follows:

19        First, the roll-up of priming those claims does not

20 extend to TPC Holdings, Inc., meaning that roll-up

21 obligations sit only at the other debtors.

22        In addition, provisions that -- it contains

23 provisions that the DIP roll-up collateral will not include

24 assets determined to be unencumbered by way of a successful

25 avoidance action.

1          It includes a clarification that any post-petition

2    interest accrual on the ten and a half percent notes claims

3    as adequate protection, which would be paid in kind, is

4    subject to recharacterization or aligning, if appropriate.

5          It includes a provision that a successful challenge

6    by the committee does not constitute an event of default

7    under the term DIP facility.

8          It includes clarifications to the carveout.

9          It includes clarifications that valuation arguments

10   are not part of the challenge and are not limited by the

11   requirements applicable to the committee's challenge rights.

12         It increases the committee's investigation budget

13   to $200,000.

14         It includes language requested by the committee

15   regarding remedies in the event of a successful challenge to

16   roll-up priming notes.

17         The order clarifies that the committee's challenge

18   rights are not impacted by the roll-up.

19         It provides that the adequate protection rights are

20   now clearly limited to what is expressly permitted under

21   Section 361 of the Bankruptcy Code.

22         It includes a clarification that the rolled-up

23   priming notes will not receive adequate protection in

24   addition to their DIP treatment.

25         It adds a provision that the DIP lenders and the

1   pre-petition secured parties must use commercially reasonable

2   efforts to recover DIP claims and adequate protection claims

3   out of what we would consider hard assets that are not the

4   subject of a successful challenge before recovering out of

5   avoidance action proceeds.

6          And it includes a number of technical corrections

7   and conforming changes.

8          And on balance, especially given the length of this

9   order and all of the work that went into it, we think that is

10  tremendous progress.

11         THE COURT:  Okay.  Thank you.  That is helpful.

12         Ms. Moss, do you want to be heard with respect to

13  the -- these issues.

14         MS. MOSS:  Yes, Your Honor.  Good morning.  Can you

15  hear me?

16         THE COURT:  I can.

17         MS. MOSS:  For the record, Naomi Moss, Akin, Gump,

18  Strauss, Hauer & Feld, proposed counsel for the official

19  creditors' committee.

20         Recognizing that it's Friday, I will aim to keep it

21  brief, but I did want to make some short remarks on behalf of

22  the committee, if that's okay with Your Honor, with respect

23  to the proposed modifications to the final DIP order.

24         THE COURT:  Certainly.  You can proceed, Ms. Moss.

25         MS. MOSS:  Great.

1          So the committee filed this sealed objection -- a
2   sealed version of its objection to the DIP motion on July 8th
3   at Docket Number 390.

4          On July 10th, we filed a redacted version of the
5   committee's objection at Docket Number 399 and a related
6   motion to seal at Docket Number 400.

7          I wanted to echo the sentiment expressed by the
8   debtors.  The committee is, likewise, pleased to report that
9   we were able to resolve the committee's objection to the DIP
10  motion through the modifications reflected in the revised
11  version of the order that was filed with the Court this
12  morning.  And if you'll indulge me, I want to touch on some
13  of the modifications that Mr. Bowling also referenced.

14         But before I get into the specifics, as we laid out
15  in our objection, the committee took issue with the original
16  version of the proposed final DIP order because it sought to
17  limit the tools provided by the Bankruptcy Code to creditors'
18  committee and for the protection of unsecured creditors.  And
19  as reflected in the revised form of order, we were able to
20  get some significant changes that we believe are fair,
21  reasonable, and more in line with the (indiscernible) and the
22  Bankruptcy Code.

23         So, turning first to the roll-up.  As we raised in
24  our objection, perhaps the most troubling aspects of the
25  roll-up and just one of the ways in which the roll-up, as

1  originally proposed, advantaged the priming noteholders was

2  the proposed granting of liens on collateral that was

3  undisputedly not part of the noteholders' pre-petition

4  collateral package.  This includes, among other things, TPC

5  Holdings' assets, various leasehold interests, and the like.

6          So the final DIP order has been revised to limit

7  the roll-up to pre-petition collateral.  And notably, as Mr.

8  Bowling mentioned, the roll-up is subject to challenge by the

9  committee and expressly provides that the Court may fashion a

10 remedy that it deems appropriate, including, but not limited

11 to unwinding or otherwise modifying the roll-up in the event

12 that the pre-petition senior priority notes, the priming

13 notes, are deemed unsecured as a result of a successful

14 challenge.  And we believe that, as modified, the roll-up

15 will not prejudice unsecured creditors.

16          So just to highlight a few additional provisions

17 that we wanted to touch on:

18          As originally proposed, the debtors had agreed to

19 include avoidance actions and the proceeds thereof as DIP

20 collateral.  We believe that granting liens on avoidance

21 actions themselves is fundamentally at odds with the

22 Bankruptcy Code, in the context of these cases.  And as a

23 result of our negotiations, no liens are being granted on

24 avoidance actions themselves.

25          And with respect to the roll-up, it will not be

1   able to look to the proceeds of avoidance actions that are

2   the result of a successful challenge against the pre-petition

3   secured parties.

4        Relatedly, while the DIP lenders did not agree to

5   marshal, they did agree to look to avoidance action proceeds

6   last.

7        Turning to adequate protection, as Mr. Bowling

8   mentioned, we were able to narrow the scope of the adequate

9   protection package.  And throughout the order, changes were

10  made limiting the ability to reach certain unencumbered

11  assets, ensure that the burden of proof on the definition of

12  "diminution in value" tracks what is provided in the

13  Bankruptcy Code.

14       And the last thing I wanted to draw the Court's

15  attention to, although the changes to the order, as you can

16  see, are not limited to the buckets that I went through

17  today, importantly, the DIP lenders agreed to limit the

18  circumstances whereby certain actions would trigger events of

19  default under the DIP; so that, for example, if a successful

20  roll-up challenge is granted, that will not trigger an event

21  of default.

22       So, just to wrap it up, we do think that the

23  modified proposed form of final DIP order reflects a number

24  of modifications that dial back certain provisions in the

25  order that were designed for the unwarranted benefit of the

1  pre-petition noteholders and did prejudice the estates and

2  the debtors' unsecured creditors.  And we think that the

3  changes that were made to the proposed final DIP order are

4  significant.  They weren't easy to come by, but we're pleased

5  to be here before you today having achieved them.

6           So, unless Your Honor has any questions for me or

7  would like me to address any of the specific provisions in

8  the order, I'll turn it back to the debtor.

9           THE COURT:  Okay.  Thank you, Ms. Moss.  I don't

10  have questions about the changes themselves.  I'm pleased,

11  obviously, that  the parties were able to work out the

12  disputes that gave rise to these changes and think that these

13  changes are appropriate.  So nothing about these changes, of

14  course, gives me any independent concern.

15           Mr. Gilad, let me -- you're turning your camera on.

16  Let me give you a chance to be heard.

17           MR. GILAD:  Thank you, Your Honor.  Erez Gilad,

18  Paul Hastings, on behalf of the ad hoc group and the DIP

19  lenders.

20           First, good morning, Your Honor.  It's great to

21  appear before you.

22           (Indiscernible) we echo the sentiments made by the

23  other professionals.  It was definitely a hard-fought and

24  spirited negotiation, as Mr. Prince suggested.  We felt that

25  the terms of the DIP financing and the use of cash collateral

1  that were being presented to the Court were fair and

2  reasonable.  We don't believe that they prejudiced the

3  parties.  We thought that they were balanced.  But our goal

4  all along was to try and foster consensus, so that was our

5  goal, which we're happy to have achieved very late last

6  night.  So we do think that this should put the company now

7  in a position where it can begin to start moving forward past

8  the initial phase of these cases of stabilizing operations

9  and then focusing on their plan efforts.

10          I don't want to offer our own perspective of all

11  the various points that were negotiated.  I think that folks,

12  so far, got it mostly right, I would say 98, 99 percent

13  right.  We'll defer to the terms of the order themselves.

14          There is, however, one part of clarification that I

15  want to make, which I'm not sure is quite reflected in the

16  DIP order.  It occurred to us literally as the hearing was

17  progressing, so this is not a point that we've addressed with

18  the other parties-in-interest, and apologies in advance to

19  all the professionals.

20          But just to lay out the pre-petition capital

21  structure, Your Honor, the ten-and-a-halfs and the ten-eight-

22  seven-fives have a pre-petition unsecured claim at TPCH,

23  that's TPC Holdings.  So the committee's concern was that, in

24  the roll-up, in implementing the roll-up, that the roll-up

25  lenders would not then be stepping into collateral that they

1  didn't have pre-petition.  So we agreed that the roll-up

2  would not take a lien in TPC Holdings.

3          But it occurred to us, though -- and this is a bit

4  of an incongruity -- that we don't want to be in a worse

5  position than we were in relative to the pre-petition status

6  of our claim.  We just need to make sure that, although the

7  pre-petition increments are rolling up, the DIP order doesn't

8  quite contemplate that we will have a pre-petition general

9  unsecured claim that remains extant at the Holdings level.

10         I don't think that that's controversial, I don't

11  think that was the intent, it certainly wasn't our intent.

12  But I wanted to make that clarification and invite all the

13  professionals (indiscernible) if they have a concern.

14         THE COURT:  Let me give folks the opportunity to --

15  I understand your point, but I don't think I ought to inject

16  myself into your negotiations.

17         Let me ask Mr. Esserman if he'd like to be heard,

18  either on that or anything else.

19         MR. ESSERMAN:  Yes, Your Honor, just as --

20  generally.  We did file an objection and a joinder to the

21  committee's objection to the DIP.  And we feel comfortable

22  that the resolution is a resolution of our issues, also.  So

23  I just wanted to note for the record, subject to any

24  modifications to be continued to be negiogated by the parties

25  -- by the parties, that we would withdraw our objection.

1  Thank you.

2          THE COURT:  Okay.  Thank you, Mr. Esserman.

3          Mr. Gilad, I under -- look, I understand what

4  you're saying.  And I appreciate that, in a situation like

5  this, folks are working hard and there are a lot of moving

6  parts and everyone is doing their best.  I'm happy to hear

7  from the debtor or the committee in response to your point.

8  But I have -- I suspect there will be opportunities along the

9  way today to break and give folks the opportunity to discuss

10  those points offline and see if there might not be clarifying

11  language that the -- that folks might be able to work out

12  that would address that point, unless folks feel like they

13  want to engage more directly now.

14          Mr. Bowling.

15          MR. BOWLING:  Your Honor, that approach is

16  sensible.  We think there will be some time during today's

17  hearing, particularly the evidentiary portion, where the

18  parties can have a sidebar and work in the background on

19  this.

20          THE COURT:  Okay.  Mr. Gilad, is that agreeable

21  from your perspective?

22          MR. GILAD:  Absolutely.  And apologies to all.  You

23  know, as was indicated, the deal was cut very late last

24  night, and we were rapidly trying to keep the documents

25  apace.  So thank you to Your Honor and to the parties.

1          THE COURT:  Okay.  Totally understand and

2   appreciate that, you know, this kind of glitch is just in the

3   nature of what we do, so -- okay.

4          So, Mr. Bowling -- well, let me ask this:  Is there

5   any other party-in-interest that wants to be heard in

6   response to the points Mr. Bowling made before?  If not, Mr.

7   Bowling, I'll turn it back to you to continue marching

8   forward.

9          MR. BOWLING:  Thank you, Your Honor.

10         So, as Mr. Prince mentioned, that leaves the --

11  really three objections to the DIP motion that are

12  outstanding for today's hearing, and those are the objection

13  and supplemental objection of Cerberus and Bayside and the

14  objection of Mockingbird Credit Opportunities.  Those are

15  essentially our agenda for today.

16         I thought it might make sense to spend just a

17  moment on the process before we get started.

18         Cerberus and Bayside have requested the opportunity

19  to make an opening argument.  We have no issue with that and

20  we understand that Mockingbird also has no issue with that,

21  although I believe Mr. Persons is present at today's hearing

22  and I don't want to speak on his behalf if I'm wrong.  And

23  we're, of course, prepared to do a brief opening, but we will

24  take the Court's guidance on what process would be most

25  helpful today.

1              THE COURT:  Mr. Persons --

2              MR. PERSONS:  And Your Honor, if I may?

3              THE COURT:  Yeah, let me --

4              MR. PERSONS:  Just --

5              THE COURT:  Go ahead, Mr. Persons.

6              MR. PERSONS:  What I was going to say -- and

7    perhaps I didn't relay this properly to Mr. Bowling --

8    Mockingbird would also -- also has an opening we would like

9    to make, as well (indiscernible) so -- and no concerns with

10   anybody else (indiscernible)

11             THE COURT:  Okay.  Does anybody -- is there any

12   party-in-interest that has an objection to giving all parties

13   who would like to be heard with respect to the DIP motion the

14   opportunity to give a brief opening statement that I would --

15   well, leave it at that.  Is there any objection to giving

16   folks that opportunity?

17        (No verbal response)

18             THE COURT:  Okay.  So that doesn't offend me at

19   all.  I'm happy to proceed that way.  So why don't we do

20   that?

21             I guess, since it's the debtors' burden, it makes

22   sense for them to go first, followed by those who are the

23   objectors.  And after we've heard openings from everyone, we

24   can then turn to the evidence.  And I do -- I propose that,

25   following the evidence, we plan on having argument.  And so,

1  during the openings, you know, I'm happy to hear from folks

2  about legal issues, if necessary, but don't -- no one should

3  feel like they've got to make a full-on legal argument in the

4  opening.  You'll have that chance at -- after the evidence.

5          Is proceeding that way inconsistent with anyone's

6  expectations?

7      (No verbal response)

8          THE COURT:  Okay.  Hearing no one, why don't we do

9  that?

10          So, Mr. Bowling, let me pass it to you.

11          MR. BOWLING:  Thank you, Your Honor.

12          As I mentioned, there are three objections to the

13  DIP motion which remain, and all three of the objecting

14  parties challenged the debtors' business judgment in

15  obtaining the DIP facilities.  They ask this Court to

16  essentially upend the debtors' restructuring and impose

17  substantial risk on the businesses that the debtors operate,

18  including their customer and supplier relationships and their

19  employee relationships, on the basis that the debtors

20  purportedly do not need the DIP facilities or that certain

21  provisions of the term DIP facility; namely, the roll-up,

22  should not be approved.

23          You will hear today, as you've heard before, from

24  Mr. Jamal and Mr. Del Genio, whose testimony will show that

25  the DIP facilities are a reasonable exercise of business

1   judgment, were negotiated in good faith, and are the best

2   actionable financing terms available to the debtors.

3          I'd like to spend just one moment on the

4   jurisdictional argument raised in Cerberus and Bayside's

5   supplemental objection.  The argument Cerberus and Bayside

6   make is, essentially, that, regardless of this Court's denial

7   of the stay pending appeal and regardless of the District

8   Court's denial of the stay pending appeal and regardless of

9   the District Court's denial for their motion for expedited

10  briefing, this Court cannot approve the term DIP facility

11  because Cerberus and Bayside have filed an appeal.  If this

12  were true, Chapter 11 cases around the country would grind to

13  a halt because any party with an ax to grind could divest the

14  Bankruptcy Court of jurisdiction on any issue that

15  tangentially affects an issue on appeal.

16         But more importantly, if Cerberus and Bayside's

17  supplemental objection is right, then their motions for a

18  stay pending appeal in this Court and the District Court

19  didn't matter, and it would have been a big waste of time and

20  resources for all the parties involved because this Court

21  wouldn't have been able to adjudicate the DIP motion

22  regardless of the stay pending appeal.  This simply is not

23  how the divestiture rule, which is the principle that applies

24  here, works.

25         As we stated in our papers, under the divestiture

1   rule, so long as this Court is not altering its order

2   adjudicating the adversary proceeding, this Court retains

3   jurisdiction to enforce it.  The rule's purpose is to avoid a

4   scenario where two courts at different levels are ruling on

5   the same issue at the same time.  Cerberus and Bayside's

6   argument clearly, on its face, does not implicate the

7   divestiture rule.

8          This Court's summary judgment in the adversary

9   proceeding expressly acknowledged the implications for DIP

10  financing and was entered at Cerberus and Bayside's own

11  request that their summary judgment motion be resolved prior

12  to the DIP hearing.  Cerberus and Bayside got the process

13  they wanted.  This Court adjudicated the adversary proceeding

14  before considering the DIP on a final basis.  Cerberus and

15  Bayside are just, frankly, unhappy with the outcome, but that

16  doesn't impact this Court's jurisdiction.

17         I would note that -- excuse me.  I would note that

18  the cases cited in Cerberus and Bayside's supplemental

19  objection are addressed at length in the debtors' reply filed

20  yesterday and in the reply of the ad hoc noteholder group.

21  And we're, of course, happy to answer any questions the Court

22  may have, but I wasn't otherwise planning to go into those.

23         THE COURT:  Okay.  I don't think we need -- you

24  need to do that.  I've seen the papers and we can address

25  that when the time comes.

1        MR. BOWLING:  Okay.  Thank you.

2        With respect to the substantive objections to the

3  DIP motion, as the Court is aware from the testimony at the

4  first-day hearing of these cases, the debtors made a

5  determination in their business judgment to enter into the

6  DIP facilities.  There are two facilities:

7        An ABL DIP from Eclipse Business Capital, which

8  refinanced Bank of America's pre-petition ABL several weeks

9  ago and has been a critical piece of the debtors' post-

10 petition capital structure;

11       And the term DIP facility, which has already

12 brought the debtors $30 million of new money liquidity and

13 has demonstrated to the debtors' suppliers, customers, and

14 other stakeholders that:

15       One, the debtors' have appropriate liquidity, which

16 is a significant factor that customers and suppliers consider

17 when evaluating their business relationships with TPC;

18       And two, the overwhelming majority of the debtors'

19 secured noteholders support the debtors and this

20 restructuring and are willing to put even more of their own

21 money behind this Chapter 11 process.

22       Mr. Del Genio's testimony at the first-day hearing,

23 in his declarations and which you'll hear today, all support

24 the reasonableness of the debtors' business judgment in

25 entering into the DIP facilities.

1              But let's break down business judgment even

2      further.  As both Mr. Jamal and Mr. Del Genio have testified,

3      Eclipse has not considered the underwriting on its ABL DIP

4      facility in a scenario where there is no DIP term facility

5      that is effectively (indiscernible) money standing behind it.

6              And the evidence shows that we don't know if

7      Eclipse would be willing to consider providing an ABL if the

8      DIP term loan is not approved or on what terms an ABL might

9      be available.

10             What we do know is that the debtors marketed a DIP

11     ABL facility extensively pre-petition and had multiple

12     potential ABL providers fall away.  And while Cerberus,

13     Bayside, and Mockingbird all object to the term DIP facility,

14     none of them objects to the ABL DIP facility, and each of

15     them asks the Court to overlook this risk that, if the Court

16     denies the DIP motion, we may find ourselves without an ABL

17     DIP facility or with a much more restrictive or expensive

18     ABL.  And so, to put it in terms of business judgment, what

19     the objectors are saying is that the debtors board should

20     have determined to put the company at risk of losing its ABL

21     facility, plain and simple.

22             They also implied that the debtors' board should

23     have chosen to have less liquidity, rather than more

24     (indiscernible) volatile commodity markets, which Mr. Del

25     Genio has testified are a significant driver of the debtors'

1  need for liquidity.  You will see that there is no evidence

2  from the objectors showing that these would be prudent risks

3  to take, and certainly none to overturn the business judgment

4  as to those risks.

5         Cerberus, Bayside, and Mockingbird also overlook

6  the fact that they have not proposed actual financing of

7  their own.  They don't have a solution for an ABL facility if

8  the term DIP is not approved and Eclipse decides to walk

9  away.  They haven't been willing to put in a non-priming DIP

10 facility themselves.  They have no way to mitigate the risks

11 associated with commodity market volatility.  And most

12 importantly, as you'll hear, they cannot present any evidence

13 that rebuts or even casts doubt on the debtors' business

14 judgment in these cases.

15        The evidence will clearly show that the DIP motion

16 should be approved.  We look forward to the evidentiary

17 portion of today's hearing and to presenting a brief closing

18 afterward.  Thank you.

19        THE COURT:  Thank you, Mr. Bowling.

20        Let me -- Mr. Hansen, I guess, if you're -- you're

21 in support, obviously, of the debtors' position, so I think

22 it does make sense to give you a chance to be heard next.

23        MR. HANSEN:  Yes.  Thank you, Your Honor.  Can you

24 hear me okay?

25        THE COURT:  I can, Mr. Hansen.  You can proceed.

1          MR. HANSEN:  Okay.  Great.  Kris Hansen with Paul

2    Hastings on behalf of the ad hoc group and the DIP lenders.

3    Your Honor, I'll be very brief.

4          The terms of the ABL and term loan DIP are

5    reasonable.  They were negotiated in good faith and there's

6    nothing extraordinary about them.  The ABL and the term loan

7    DIP are also critical to preserving value of these estates,

8    which benefits all parties-in-interest and not just the

9    interests of the objectors by getting rid of them.

10         When you think about who all those parties-in-

11   interest are, that includes employees, customers, vendors,

12   secured and unsecured creditors, many governmental entities

13   including taxing authorities and others.  And this case is

14   about all of those constituencies, it's not just about the

15   objectors.

16         When it comes to the question of the divestiture

17   rule, we think it's crystal-clear that it does not apply even

18   remotely, and that bringing it on in a supplemental objection

19   to the Court is a demonstration of the lengths that the

20   objecting parties are prepared to go to, to try to sabotage

21   these cases for their benefits.

22         So, Your Honor, the creditors' committee, who also

23   had submitted a pretty lengthy objection, recognized the

24   value of the DIP to these estates and to the continuing

25   preservation of value.  They worked hard with us and the

 1  debtors to arrive at a reasonable conclusion.  And I think

 2  that that says an awful lot about where we are today.

 3         And so, Your Honor, we would ask -- obviously, we

 4  will come back and talk more in closing arguments and you'll

 5  hear all the evidence, which we believe supports everything

 6  that the debtors say and that we said.  But of course, we ask

 7  that the DIP order be entered today on a final basis.  Thank

 8  you, Your Honor.

 9         THE COURT:  Thank you, Mr. Hansen.

10         Mr. Hillman, let me give you a chance to have an

11  opening.

12         MR. HILLMAN:  Good morning, Your Honor.  Can you

13  hear me okay?

14         THE COURT:  I can, Mr. Hillman.  You can proceed.

15         MR. HILLMAN:  Great.  David Hillman, Proskauer

16  Rose, counsel for Cerberus and Bayside.  I'm joined by my

17  partner Michael Mervis.

18         So what do we want today?  We're hyper-focused on a

19  singular issue:  The roll-up.  The debtors want the roll-up

20  to be ironclad, at least *vis-a-vis* Cerberus and Bayside,

21  irrevocable and unreviewable.  If it's approved, our

22  appellate recourse is destroyed.

23         There won't be any more ten and seven-eighth notes

24  because the Court will have converted those notes into DIP

25  obligations.  There won't be any more pre-petition lien

1  because the Court will have replaced that lien with a DIP

2  lien.

3         The request here is far more than merely enforcing

4  the lien priority order.  The DIP proponents argue that we

5  want to -- I think Mr. Hansen's words were "sabotage" the

6  company or we want to hold up entry of the final order.

7  That's not true.  We want the Court to avoid destroying our

8  appellate rights and we have suggested there's a -- that

9  there's a simple fix, one sentence to the order that could

10 permit the Court to fashion a remedy.  It's similar to the

11 concept that you required at the interim hearing.  We asked

12 for the single sentence to be included in the final order and

13 our request was rejected.

14        So what is the basis for why we come here before

15 you, asking for the relief?  Well, first, we believe that the

16 fix, the conditionality of the roll-up is justified and

17 required by the appellate divestiture rule.  I'll deal with

18 that at closing, it's legal argument.

19        But we also believe that Your Honor has the ability

20 to cut back the roll-up based upon the quantum that they

21 seek.  It's excessive when you look at the roll-up, compared

22 to the funds that will actually be advanced, as opposed to

23 the commitment about.

24        The evidence will show -- and it's undisputed --

25 that the debtors, based on their own projections, are never

1  going to draw more than $38 million of the eighty-five-

2  million-dollar commitment amount.  That yields a roll-up

3  ratio of more than six-to-one.  That is, for every dollar of

4  new money actually advanced, the debtors seek the authority

5  to roll up $6 of ten-and-seven-eighths.  The evidence will

6  show that that type of ratio is simply outside of the range

7  of reasonableness, based on market comps.  And the question

8  for this Court is:  Is this really the case that warrants a

9  record-shattering roll-up.

10          The fix here is also very easy:  Require the roll-

11 up to be based, not on the commitment amount, but on the new

12 money actually advanced.  And Your Honor can set it at a

13 ratio or you could insist that it be set at a ratio that's

14 consistent with market comps.

15          So the debtors -- or the DIP proponents are going

16 to argue that, if you tweak the order any way that you see

17 fit, in any manner, that the DIP lenders might not fund and

18 this is going to lead to a death spiral and to liquidation.

19 You will hear evidence today that that threat, simply put, is

20 not credible.

21          The DIP lenders have already invested almost a

22 billion dollars of capital here.  They stand to reap hundreds

23 of millions more if their plan is confirmed.  It defies logic

24 and commercial sense to believe that the roll-up, an

25 irrevocable, ironclad roll-up is mission-critical here.  We

1  know what it is.  It's a downfield blocker to make it harder

2  for the company to pivot for an alternative plan.  It's an

3  anecdote against a hostile cram-down plan.  Your Honor, it's

4  plainly obvious that it's nice to have, but it's not a must

5  have.  And therefore, if there is a decision by the Court to

6  modify the order, the threats that you have heard are not

7  coming to fruition.  Let's hear the evidence.

8          The non-consenting -- the consenting noteholders

9  have also raised issues about the intercreditor agreement.

10  Those are all legal, we'll address those in closing.

11          So let me hit why we're objecting to the roll-up.

12  Again, this isn't sabotage.  Cerberus and Bayside have made

13  several constructive proposals for DIP and exit financing.

14  We're motivated to protect our economic interests from what

15  we see as a class-skipping gift and massive dilution lurking

16  around the corner.

17          So, as you know, we believe the roll-up debt is

18  secured by a lien that's junior to the ten-and-a-halfs.

19  Admittedly, we lost on summary judgment.  We lost a stay

20  pending appeal.  But we still have appellate rights in the

21  District Court and beyond.  We might be the underdog, based

22  on the District Court's stay decision, but that decision is

23  not on the merits and it's not final.

24          What are the consequences to us if we're right

25  about lien priority?  Well, the ten-and-seven-eighths are

1   wiped out, they get a zero recovery.  And if we're right and

2   this roll-up, this ironclad roll-up is approved, it goes from

3   zero percent recovery to a hundred percent recovery.  And

4   that value transfer, that's just a class-skipping gift

5   disguised in a roll-up.

6        And the debtors say in their papers don't worry,

7   there's no harm to anybody because the roll-up remains

8   subject to the challenge.  And you've just heard the

9   committee settlement with the company.  And when they say

10  don't worry, it remains subject to challenge, what they

11  really mean, it remains subject to challenge by the

12  creditors' committee, but not as it relates to Cerberus and

13  Bayside.  Our rights will be eviscerated.

14       You can see this with one word.  When you get a

15  chance, look at -- and I'll point this to you in closing --

16  Docket 429, Exhibit 1.  It's a redline of the DIP order.

17       "The roll-up remains subject to a challenge only

18  with respect to validity, enforceability, and perfection."

19       They struck one word, "priority."  And as a result,

20  that massive, class-skipping gift will evade any appellate

21  review.

22       So one more point to make.  Our concern here today

23  is compounded by a battle that's looming around the corner:

24  The rights offering.  And we're not litigating the rights

25  offering today, but that's coming.  And I want to just at

1   least highlight a concern, so you can see the fuller picture

2   of what's truly at stake here.

3          The debtors intend to raise $450 million in a

4   rights offering.  And that deal is structured for the

5   consenting noteholders to fund a distribution to themselves.

6   This is simple.  Left pocket funds the cash, right pocket

7   receives the cash.  And for the round-tripping, the debtors

8   have to pay $100 million in fees and discounts just for the

9   consenting noteholders to pay themselves in cash.

10         And there's more.  The rights offering is massively

11  oversized to account for the round-tripping.  And as a

12  result, rights offering participants stand to recovery 99

13  percent of the reorg equity, while the ten and a half class

14  only gets .1 percent, and Cerberus and Bayside get a tiny

15  fraction of that amount.

16         So who's watching out for our interests here?  The

17  debtors and its board appear to have their hands tied.  You

18  can see this with the roll-up, the DIP, the backstop.  And

19  there's a trend here that the debtors are -- they don't have

20  an option.  They're being forced to yield.  And so I ask the

21  Court:  How much is too much?

22         I'll reserve the rest of my remarks for closing,

23  and I appreciate the Court's time.  Thank you.

24         THE COURT:  Thank you, Mr. Hillman.

25         Mr. Persons.

1        MR. PERSONS:  Good morning, Your Honor.  Charles

2   Persons of Sidley Austin on behalf of Mockingbird Credit

3   Opportunities, holder of 10 million of the ten and a half

4   percent secured notes.

5        We echo many of Mr. Hillman's concerns and agree

6   that Your Honor has the ability to fashion a remedy that's

7   more appropriate for this DIP, for these cases, and for the

8   facts before Your Honor.

9        The consequences of this DIP, if approved, are

10  clear.  Entering the DIP order today without further

11  modifications effectively predetermines the outcome of these

12  Chapter 11 cases and forecloses any opportunity for the

13  debtors to find a better result, to the detriment of every

14  creditor not fortunate enough to be part of the ad hoc group.

15       Mockingbird's concerns are narrow, but significant:

16       First, the ad hoc group wants to roll up its

17  roughly $240 million of 10.875 percent notes.  As Mr. Hillman

18  stated, that (indiscernible) the amount that's being actually

19  leant over the course of these cases under the current state

20  of the DIP budget looks like a six-to-one roll-up ratio, far

21  in excess of what is typical or normal in these -- in the

22  district -- in Delaware.

23       Second, the ad hoc group wants to coercively tie

24  the debtors to this, their preferred plan, which provides

25  outsized economics to only them at all other parties'

1  expense.  Let's make no mistake.  This may be styled as the

2  debtors' motion, but there's no question as to who benefitted

3  from the DIP proposal on the table and who's driving the bus

4  today.

5          Of course, this kind of situation is familiar to

6  any experienced restructuring lawyer in our courtroom today.

7  We've all seen secured lenders push through a DIP that

8  secured outsized rights for certain lenders and forced an

9  ultimate outcome.  Debtors in these positions are faced with

10 two choices:  Either fight like crazy and use leverage to try

11 to reach more favorable terms or accept the secured lenders

12 are in a position to dictate the terms of the plan and

13 facilitate those lenders' preferred outcome.

14         To be clear, there are circumstances where option

15 two, while neither preferable and, in fact, sometimes barely

16 (indiscernible) is more appropriate, especially when

17 reluctantly accepting that preferred choice of the secured

18 lenders is the only option.  Debtors and their professionals

19 need to fulfill their fiduciary duty to maximize value for

20 all creditors.  And without alternatives, appeasing a lender

21 group may, indeed, be the only viable path.

22         But that is not the situation before this Court

23 right now.  As discussed in the pleadings, there are parties

24 willing to fund an alternative DIP.  There are parties like

25 Mockingbird that have offered hundreds of millions of dollars

1  of equity commitments to the debtors.  That path, if pursued,

2  would result in equal or better recoveries for all creditors,

3  and a vastly superior capital structure for the reorganized

4  debtors upon emergence.  These alternatives are not

5  fantasies, Your Honor.  They are options that actively sit on

6  the table today.

7       To be clear, we do not ask the Court to substitute

8  its business judgment for that of the debtors today.  But we

9  do ask the Court to, first and foremost, recognize the

10  approval of the DIP order as currently drafted forecloses

11  further consideration of the alternative paths, even if the

12  nominal changes that were achieved by the UCC.

13       If approved as drafted, the DIP order would

14  effectively close all alternative doors to the debtors, real

15  money on the table, real (indiscernible) alternatives, actual

16  improved economics to creditors effectively gone, all gone if

17  the Court approves this DIP order today as currently drafted.

18       Mockingbird's objection to the DIP centers around:

19       One, the roll-up, which creates an unnecessary and

20  inappropriate administrative burden should the debtors want

21  to pursue alternative DIP proposals;

22       And two, the various milestones and covenants in

23  the DIP that tie the debtors irrevocably to the RSA and the

24  plan.  These provisions exist only because the ad hoc group

25  exhibits outsized control over these debtors, not because the

1  related provisions represent necessary precautions that

2  protect DIP lenders' interests or because they provide any

3  benefit to the debtors.

4        Paragraph 3 of the new DIP order makes this

5  apparent, by which I mean the DIP order filed this morning.

6  Previously, the term DIP lenders were only covered for costs,

7  expenses, and disbursements incurred pursuant to items around

8  the DIP facilities.  That paragraph now covers costs,

9  expenses, and disbursements incurred by the DIP lenders in

10 any capacity, for anything in connection with these Chapter

11 11 cases.  Somehow, despite the UCC pushing back and reaching

12 a compromise, somehow the debtors are now liable for more ad

13 hoc group expenses.

14        To be clear, Your Honor, Mockingbird reached out to

15 professionals for the debtors and the ad hoc group in an

16 effort to address these issues in advance of this DIP

17 hearing, in the hope that a compromise could be reached.

18 Those parties showed absolutely no interest in even picking

19 up the phone to talk, a situation I imagine is familiar to

20 other parties-in-interest in this courtroom today.

21        Simply put, the ad hoc group positioned itself as

22 the only game in town and forced the debtors to accept its

23 onerous financing terms, both pre-petition and in connection

24 with this DIP.  This lopsided power dynamic was apparent when

25 the debtors agreed to a five-million-dollar make-whole

1  provision in their bridge financing.  The nearly ten percent

2  fee was certain to be paid because the ad hoc group could and

3  ultimately did force the debtors into Chapter 11,

4  specifically three months later.

5          What value is derived by the debtors from agreeing

6  to this ten percent fee, Your Honor, remains unclear.  But it

7  certainly comes at the detriment of the debtors and all of

8  the non ad hoc group creditors in these cases.  And the same

9  can be said about the main issues in the DIP that we contest

10 today.  As such, we ask that the Court consider the evidence

11 today and the appropriateness of the roll-up and the various

12 milestones and provisions that forcibly tie the DIP financing

13 to the RSA and plan today.

14          And with that, I'll reserve the remainder of time

15 for closing.

16          THE COURT:  Okay.  Thank you, Mr. Persons.

17          Is there any other party-in-interest that would

18 like to be heard by way of opening statement?

19     (No verbal response)

20          THE COURT:  Okay.  If not -- so, Mr. Jacobs, I take

21 it you will lead the debtors' evidentiary presentation.  And

22 as I understand it, you've got two witnesses.  Is that right?

23          MR. JACOBS:  Your Honor, Kevin Jacobs for the

24 debtors.

25          That is correct.  We will call Mr. Jamal first and

1  then Mr. Del Genio.

2          THE COURT:  Okay.  Why don't I pass the baton to

3  you to call your first witness?

4          MR. JACOBS:  Very good, Your Honor.  Thank you.

5          Am I showing up on your screen?

6          THE COURT:  You are, Mr. Jacobs, and so is Mr.

7  Jamal.

8          MR. JACOBS:  Very good.

9          If we could, we will call Mr. Zul Jamal, please.

10          THE COURT:  Okay.  Ms. Barksdale, if you could

11  swear the witness, please.

12          THE COURT OFFICER:  Raise your right hand.

13  ZUL JAMAL, WITNESS FOR THE DEBTORS, AFFIRMED

14          THE COURT OFFICER:  Please state your full name and

15  spell your last name for the record.

16          THE WITNESS:  Yes, it's Zul Jamal, that's J-a-m-a-

17  l.

18          THE COURT OFFICER:  Thank you.

19          MR. JACOBS:  May I --

20          THE COURT:  Okay.  Mister --

21          MR. JACOBS:  -- proceed, Your Honor.

22          THE COURT:  Yeah, you -- yes, you may, Mr. Jacobs.

23          THE WITNESS:  And Your Honor, can you hear me okay?

24          THE COURT:  I can, Mr. Jamal.

25          So, Mr. Jacobs, you can proceed.

1              THE WITNESS:  Thank you.

2              MR. JACOBS:  Thank you.

3                        DIRECT EXAMINATION

4  BY MR. JACOBS:

5  Q    Just so we're all clear, would you tell us your name

6  again, please?

7  A    Yes.  It's Zul Jamal.

8  Q    And Mr. Jamal, are you the same Zul Jamal that testified

9  at the first-day hearing, sir?

10 A    I am.

11 Q    Okay.  Mr. Jamal, we have two declarations that you have

12 executed.  The first is Exhibit 47, which was the declaration

13 dated June 1st, that we used at the first-day hearing.  Do

14 you remember that, sir?

15 A    I do.

16 Q    Okay.  And that declaration, if I were to ask you those

17 same questions today, would your answers be the same, sir?

18 A    They would.

19             MR. JACOBS:  Okay.  Your Honor, we would like to

20 offer into evidence Exhibit 47, which is the declaration of

21 Mr. Jamal that is dated June 1st.

22             THE COURT:  Okay.  One second.  I just want to make

23 sure I've got the right documents in front of me.  My

24 apologies.

25      (Pause in proceedings)

1           THE COURT:  Okay.  I now have that.  So it's

2  Exhibit 47, I think it's DI 68.

3           Is there any party-in-interest that objects to the

4  introduction into evidence of Mr. Jamal's declaration, which

5  is Exhibit Number 47?  Okay.  Hearing none -- oh, I'm sorry.

6  Mr. Hillman.

7           MR. HILLMAN:  Sorry.  No objection.

8           THE COURT:  Okay.  So, here, obviously, it's

9  subject to cross-examination, but the declaration will be

10  admitted.

11      (Debtors' Exhibit 47 received in evidence)

12           MR. JACOBS:  Thank you, Your Honor.

13  BY MR. JACOBS:

14  Q    Mr. Jamal, there is a second declaration that we have

15  marked as Exhibit 52, that is actually DI 84, and it is dated

16  July the 11th.  Do you recall that, sir?

17  A    I do.

18  Q    Okay.  If I were to ask you the same questions that are

19  in Exhibit 52, your July 11th declaration, would your answers

20  be the same, sir?

21  A    They would.

22           MR. JACOBS:  Your Honor, we would like to offer

23  into evidence Exhibit 52, which is DI 84.

24           THE COURT:  Okay.  Any objections to the admission

25  into evidence of that declaration?  Mr. Hillman?

1          MR. HILLMAN:  Your Honor, a narrow objection.  On

2  this exhibit, Exhibit 52, specifically Paragraph 14,

3  specifically within Paragraph 14, the last three sentences,

4  they all appear to be hearsay.  And so I would ask that you

5  not admit this portion of Exhibit 52, and simply have it

6  stricken.  Otherwise, I have no objection to the admission of

7  the balance of the exhibit.

8          THE COURT:  Okay.  Mr. Jacobs, what's your response

9  to the hearsay objection?

10          MR. JACOBS:  My response to that, Your Honor, is a

11  couple-fold:

12          Number one, I think it falls within an exception

13  under the hearsay rules under 803, in that it reflects the

14  intent and motive of Eclipse as expressed by them in their

15  discussions.

16          The other thing that is important, Your Honor, is

17  that whether it goes to the truth of the matter or not, the

18  fact that they have stated that to us impacts our business

19  judgment.  And so it is, in fact, not hearsay because a

20  significant part of its relevance is the mere fact that it

21  was stated to us and how it impacts our business judgment.

22          THE COURT:  Okay.  So, Mr. Hillman, is there any

23  objection if I limit its admission, so that it's not admitted

24  for the truth, but just for the impression it left on the

25  debtor, regardless of whether the statements were true or

1  false?

2          MR. HILLMAN:  No objection, Your Honor.

3          THE COURT:  Okay.  So it will be admitted subject

4  to that condition.

5          MR. JACOBS:  Thank you, Your Honor.

6          THE COURT:  And someone else turned on their camera

7  to object, it sounds like -- is there any further objection

8  to the admission of Exhibit Number 52?  Mr. Persons?

9          MR. PERSONS:  Yeah, that was me, Your Honor.

10  Nothing further.  Thank you.

11          THE COURT:  Okay.  So Exhibit Number 52 will be

12  admitted subject to the limitations with respect to the last

13  three sentences of Paragraph 14.

14      (Debtors' Exhibit 52 received in evidence)

15          THE COURT:  And with that, Mr. Jacobs, you can

16  proceed.

17          MR. JACOBS:  Okay.  I have a handful of questions,

18  Your Honor, and then I will tender him for cross.

19  BY MR. JACOBS:

20  Q    Mr. Jamal, I want to talk about the DIP term

21  negotiations.  How long, Mr. Jamal, in terms of weeks,

22  months, did the negotiations for the DIP term loan take?

23  A    They took months.

24  Q    And in the course of that negotiation, were there give

25  and takes --

1          THE COURT:  I'm --

2  Q    -- by each side --

3          THE COURT:  I'm sorry, mister --

4  Q    -- (indiscernible)

5          THE COURT:  I apologize.  Mr. Hillman turned his

6  camera on briefly, but it looks like that may have been

7  inadvertent, so my apologies for interruptions.

8          Mr. Jacobs, why don't you start that question

9  again, beginning -- after you had gotten the answer that the

10  negotiations took months, why don't you pick up from there?

11          MR. JACOBS:  Happy to, Your Honor.  Thank you.

12  BY MR. JACOBS:

13  Q    Mr. Jamal, in your testimony, you stated that there were

14  give-and-takes in that negotiation.

15          If I were to ask you a memory test on the histories of

16  the bids and the asks and the gives and the takes, could you

17  do that from memory, sir?

18  A    I could not.  It was such a long, complicated

19  negotiation that, beyond the general evolution of it that

20  I've described in my declaration, I think I would have to get

21  all the documents to go through the specifics for you.

22  Q    Okay.  One of the things that has come up and we've

23  already heard it this morning is the notion of ratios between

24  the amount of either paid money, new money, committed money,

25  and then a roll-up.  You've heard that before, right, sir?

1  A     I have.

2  Q     Okay.  In the course of the negotiations and the

3  analysis of these discussions in leading up to the term DIP

4  loan, did you or your team do a, quote, "ratio analysis"?

5  A     We did not.

6  Q     And why not, sir?

7  A     So, first, I'd say that we would often do a ratio

8  analysis, and it's a pretty common analysis that one does

9  when looking at roll-ups because, often, the party seeking

10 the roll-up is getting a very tangible economic benefit that,

11 you know, negatively impacts other parties.  Here, our

12 analysis was the following:

13      That, number one, there weren't really any unencumbered

14 assets, so they weren't getting the benefit of incremental

15 collateral.

16      Number two, the ten-eight-seven-fives were senior to all

17 of the other debt in the capital structure.

18      And number three, under any view of value that we looked

19 at, the ten-eight-seven-fives were fully covered.

20      So, from our perspective, the impact on the debtors of

21 the roll-up was not significant because they weren't getting

22 additional assets, they weren't leapfrogging any creditors,

23 and there was no scenario that we saw where they were not

24 going to be paid in full.  So, given those circumstances, we

25 didn't think a ratio analysis was a relevant thing to look at

1    in this particular case.

2    Q    I want to look at the roll-up amount.  And on the amount

3    that gets rolled up, Mr. Jamal, is the interest rate higher

4    or lower if it had remained as a 10.875 percent note or under

5    the roll-up terms?

6    A    It's actually lower because the 10.875 percent notes

7    have a 2 percent default rate.  So the interest rate we pay

8    on the ten-eight-seven-fives would actually have been higher

9    if you include the default rate.

10        I suppose there's a scenario where they could be

11   ultimately (indiscernible) on the DIP, the (indiscernible)

12   rate, you know, dramatically increase form here.  But you

13   know, hopefully, that won't matter in the context of the

14   length of these cases.

15   Q    I want to turn to the ABL part next, please.  It's in

16   your declaration, the first one, Exhibit 47.  But let's just

17   remind ourselves.

18        Approximately how may potential ABL lenders did you or

19   your team approach in this process?

20   A    So we approached ten bank -- banks, traditional banks,

21   and then five non-bank financial institutions, in addition to

22   the existing ABL, the existing pre-petition ABL agent, I

23   should say.

24   Q    And of those over 15 potential lenders, who actually

25   came forward and committed to providing an ABL to TPC?

1  A     Only the Eclipse Group, so Eclipse Business Capital.

2  Q     And Eclipse's commitment, was that commitment based on

3  or premised on a DIP term loan being in place?

4  A     It was.  When they -- when we went out for DIP

5  proposals, we showed the market that we would have both an

6  ABL and a term DIP coming in.  All of the diligence and work

7  that Eclipse did was predicated and premised upon the term

8  DIP -- or a term DIP, I should say, coming in to the debtors.

9  Q     From an economic perspective, why is it important to --

10  for an ABL lender, such as Eclipse, for there to be a DIP

11  term loan in place?

12  A     There's a handful of reasons:

13        Firstly, the term loan provides incremental cash and

14  liquidity to the -- to debtors.  The ABL is really there to

15  help fund working capital, it's not there to fund the

16  entirety of these cases.  And so it was important to them

17  that the term DIP came in to provide incremental liquidity to

18  the estates.

19        In addition, that term DIP is effectively junior to

20  Eclipse because the Eclipse loan has a first lien on the

21  company's working capital, assets, and cash, which are the

22  sort of most readily used collateral and then the term DIP is

23  secured by the fixed assets.  So I think, in the ABL lender's

24  mind, it's effectively junior money.

25        And then, thirdly, because Eclipse was not an incumbent

1   lender here and they were a new lender, it was important to

2   them that other parties also had, you know, sin in the game

3   here, and they weren't the only party stepping up to provide

4   financing to the company during the Chapter 11.

5   Q    Covenants.  What about from a covenant perspective?  Why

6   is it important that Eclipse have the DIP term loan in place

7   from that perspective?

8   A    So Eclipse did something quite unusual, which is they

9   provided their financing without really any independent

10  covenants that were negotiated.  All of the covenants that

11  they are relying upon were the covenants that were negotiated

12  as part of the term DIP.  So, if the term DIP disappeared,

13  Eclipse would either have to lend without any covenants or

14  they'd have to renegotiate a full covenenant package, to the

15  extent they were willing to remain a lender.

16  Q    Did anyone, any of these potential lenders, including

17  Eclipse, ever make a commitment to fund an ABL for TPC

18  without a DIP term loan being in place?

19  A    They did not.

20          MR. JACOBS:  I'll pass the witness, Your Honor.

21          THE COURT:  Okay.  Just give me a second to finish

22  my notes.

23      (Pause in proceedings)

24          THE COURT:  Okay.  Mr. Hillman, you can proceed.

25          MR. HILLMAN:  Thank you, Your Honor.

1                         CROSS-EXAMINATION

2  BY MR. HILLMAN:

3  Q    Good morning, Mr. Jamal.

4  A    Hey, good morning.

5  Q    Do you have --

6  A    Mr. Hillman, before you proceed, it's a little hard to

7  hear you.  I don't know if that's just me or -- I apologize.

8  Q    Any better?

9  A    Yeah, it's a letter better.  Thank you.

10 Q    If, at any point, you can't hear me, just let me know.

11      You testified that the DIP terms are reasonable, right?

12 A    I did, yes.

13 Q    And generally consistent with market comps for DIPs?

14 A    Generally, yes.

15 Q    And to support your testimony about reasonableness and

16 consistent with market comps, you reviewed some comparable

17 DIPs, right?

18 A    We did.

19 Q    And those comps, they're in a chart, right?

20 A    They are.

21 Q    And that chart is attached to your declaration, right?

22 A    It is.

23 Q    And that's Appendix 1 to your declaration, which has

24 already been admitted, and I think it was Exhibit 47, Docket

25 Number 68, right?

1  A     That's right.

2  Q     Okay.  And when you put together the chart, there's

3  about 25 DIPs in that chart, right?

4  A     There are.

5  Q     And when you put together -- and you beleived they were

6  compaarable to the term loan DIP here, right?

7  A     Yes, similar.  I mean, I think, as we always say, I

8  mean, nothing is identical, so you look at the best --

9  Q     All right.

10  A     -- data that you have.

11  Q     And you thought that was the best data available, right?

12  A     That's right.

13  Q     And when you put together that chart, you didn't look at

14  all at whether the comps had roll-ups, right?

15  A     As I just stated, we weren't focused on the roll-up

16  because of our view that, in this particular case, in this

17  particular circumstance, the roll-up impact was not

18  significant.  And so we were focused, when looking at these

19  comps, at interest rate, fees, maturity, and those types of

20  terms.

21  Q     Thank you, Mr. Jamal, but I wasn't asking about your

22  focus.

23       I was asking whether or not you looked as to whether or

24  not the comps had any roll-ups and you didn't.  Isn't that

25  right?

1   A    Well, as I said, we weren't focused on roll-up ratios

2   and we didn't -- we never looked at that analysis, no.

3   Q    Right.  So -- but you remember you were deposed, right?

4   A    I do.

5   Q    Not that long ago.

6   A    Not that long ago, no.

7   Q    And you were asked:

8          "So you didn't verify whether or not" --

9       Excuse me.  And you were asked:

10         "You agree with me that you didn't direct your

11   team, nor, to your knowledge, did they look at whether or not

12   any of the comps had roll-ups in them at the time."

13      And you said:

14         "That wasn't the criteria under which these comps

15   were developed.

16         "And so they didn't verify whether or not they had

17   comps?

18      And you said:

19          "They didn't."

20      Is that consistent with your testimony today?

21   A    It is.

22           MR. JACOBS:  Your Honor, I'm going to object.  This

23   is improper impeachment and it's, frankly, entirely

24   consistent with his testimony.

25           THE COURT:  I'll overrule the objection.  I think

1  that it's fair impeachment.

2          So I think, Mr. Jamal, you test -- just testified

3  that that was, in fact, your testimony at the deposition?

4          THE WITNESS:  Yeah.  I never -- we never looked at

5  roll-up ratios when we evaluated the DIP.  That's correct.

6          MR. HILLMAN:  Thank you.

7          THE COURT:  Okay.

8          MR. HILLMAN:  Thank you, Mr. Jamal.

9  BY MR. HILLMAN:

10 Q    And so, when you created the exhibit to your

11 declaration, you don't know how many of the 25 DIPs that you

12 looked at as comps had roll-ups, right?

13 A    That's right.  We didn't focus on -- as I said, we

14 didn't focus on roll-up as a criteria when evaluating the

15 economics of the new money.

16 Q    And you've been in the restructuring business for what,

17 22 years?

18 A    Yes, something --

19 Q    Negotiated --

20 A    -- like that.

21 Q    Negotiated many DIPs over the course of your 22 years,

22 right?

23 A    Yeah.  Well, I have --

24 Q    And --

25 A    -- (indiscernible) --

1  Q    And --

2  A    -- (indiscernible)

3  Q    And yet, at your deposition, you couldn't name a single

4  case, other than this one, where you didn't calculate the

5  roll-up ratio.  Isn't that right?

6  A    Well, I don't think that that's exactly what I said.  In

7  the context of -- yes, some DIPs have roll-ups; some DIPs

8  don't.  When we -- when I look at DIPs, we'll look at them

9  based on whatever the appropriate economic criteria are.  In

10 every other case where I have had DIPs that have roll-ups,

11 the roll-up has had an economic impact because, oftentimes,

12 you're rolling up debt that, you know, may or may not be

13 fully secured, there may be unencumbered assets, there may be

14 other factors where the ratio will make it -- makes it, you

15 know, very relevant.  Here --

16 Q    Mister --

17 A    -- (indiscernible)

18 Q    Mr. Jamal, I'm sorry.  I want to be very clear and make

19 sure you understand my question, so let me ask it again

20 because it's framed as a yes or a no.

21      So, at your deposition, isn't it true that you couldn't

22 name a single case, other than this one, where you didn't

23 calculate a roll-up ratio?  Isn't that a true statement?

24 A    Well, again, in a -- in a case where --

25 Q    Is it a true statement?

1  A    -- there's a roll-up --

2  Q    Is it a true statement?

3  A    That's correct, in the context of where --

4  Q    Thank --

5  A    -- there was no --

6  Q    Thank you.

7  A    -- there was no roll-up, yes.

8  Q    Now I asked -- you were asked at your deposition:

9            "Can you name" --

10       This is at Page 146 of your deposition:

11           "Can you name one other case that you've worked on

12  a term loan DIP roll-up, where you didn't calculate the

13  ratio?"

14       And you answered:

15           "I can't."

16       Is that your testimony from your deposition?

17  A    It is.

18  Q    Thank you.

19       The only DIPs listed in your comparable DIP survey,

20  Appendix 1, that have roll-ups are actually on Exhibit D to

21  Mr. Alexander Tracy's declaration.  Isn't that right?

22  A    I don't remember exactly.  I -- I remember looking at

23  Mr. Tracy's --

24  Q    Okay.

25  A    -- declaration, but I don't have it in front of me, so

1  you'd have to refresh --

2  Q    Well --

3  A    -- my recollection on that.

4  Q    Of course, of course.

5         MR. HILLMAN:  Your Honor, can we give privileges to

6  share the screen to Josh Esses, who's on the call?

7         THE COURT:  We can do that.

8         MR. HILLMAN:  You can take off your ... can you

9  just share (indiscernible) so that we can get to -- get the

10  right document here -- the declaration of Alex Tracy?

11      (Pause in proceedings)

12         MR. HILLMAN:  Sorry, Your Honor.  We'd beg just the

13  Court's indulgence for just one second.  There we go.

14  BY MR. HILLMAN:

15  Q    (Indiscernible) Mr. Jamal?

16  A    Yes.

17  Q    All right.  And you know what this is, right?

18  A    Yes, it looks like an exhibit in Mr. Tracy's

19  declaration.

20  Q    And you've reviewed this exhibit, right?

21  A    I have.

22  Q    And this exhibit, Exhibit D to Mr. Tracy's declaration,

23  goes through your 25 DIPs and identifies which one of your

24  comp sets have roll-ups, right?

25  A    That's what it appears to do.

1  Q     And you confirm that, right?

2  A     Yeah, although I -- I would not agree with the way he's

3  characterized the TPC roll-up.  But yes, I -- we looked at

4  the other cases.

5  Q     Thank you.

6        And so you and your team have checked Exhibit D for

7  accuracy, as it relates to the roll-up ratios for all of the

8  DIPs, other than the TPC DIP, right?

9  A     Yeah, that's right.

10 Q     And the math is right, there's no inaccuracies, right?

11 A     Not that I recall.

12          MR. HILLMAN:  Can you -- Mr. Esses, can you put up

13 the declaration and to get to Paragraph 17 of Mr. Tracy's

14 declaration and just blow that up on the screen?

15 BY MR. HILLMAN:

16 Q    Mr. Jamal, can you take a moment and just look at

17 Paragraph 17, which is up on the screen, of Mr. Tracy's

18 declaration?

19     (Participants confer)

20 A     Okay.

21 Q     Thank you.

22          MR. HILLMAN:  And just for the record, I'm

23 referring to a document that's in our binders as Cerberus

24 Exhibit 1.

25 BY MR. HILLMAN:

1  Q     And you understand Mr. Tracy's testimony, right?

2  A     I do.

3  Q     And you and your team checked Paragraph 17 for accuracy,

4  right?

5  A     In the context of that statement, yes.

6  Q     And you and your team didn't find any inaccuracies in

7  Paragraph 17, right?

8  A     We did not.

9  Q     Isn't it true that you told us in your deposition you

10 couldn't name a single roll-up that you've been involved with

11 that had a ratio of greater than three-to-one?

12       MR. JACOBS:  Your Honor, I'm just going to have to

13 object here.  I mean, this really is improper examination,

14 asking him about his deposition.  Just have -- I mean, if Mr.

15 Hillman would just ask him the question; and then, if he gets

16 a different answer, there's a way to properly impeach a

17 witness with their deposition, where you actually call out

18 the page and the line and show the witness the testimony.  I

19 think this will go a lot better.

20       THE COURT:  Mr. Hillman, do you have a response to

21 that?

22       MR. HILLMAN:  I'll move on.  I'll re-frame the

23 question.

24 BY MR. HILLMAN:

25 Q     Mr. Jamal, you can't name a single roll-up that you've

1  been involved with that had a ratio of higher than three-to-

2  one, right?

3  A    Not that I recall.

4  Q    Thank you.

5      You agree with me that there is a possibility that the

6  Bankruptcy Court won't approve the roll-up, right?

7  A    Yeah.  I think there's a possibility the Bankruptcy

8  Court doesn't approve the DIP.

9  Q    Okay.  And you agree with me that there's a possibility

10  that the Bankruptcy Court can insist that the roll-up be

11  modified, right?

12  A    I mean, again, I'm not going to speculate as to what the

13  Court will or won't do.  That's not -- I don't know how I

14  could do that.

15  Q    Okay.  And I'm only asking if it's possible.  It's

16  possible, right?

17  A    Yeah, I indicated it's possible.

18  Q    And if that happens it's also possible the DIP term

19  loan lenders could still elect to move forward with the new

20  money DIP term loans, right?

21  A    I have no basis to believe that.

22  Q    It's possible, right?  Based on your experience is it

23  possible?

24  A    Again, anything is possible.

25

1  Q      I'm talking to somebody with 22 years of experience and

2  I'm just asking you if it's possible that if the roll-up is

3  modified, tinkered, adjusted, that the term loan DIP lenders

4  could still move forward with the new money term loan. It's

5  possible, right?

6  A      I don't -- again, anything is possible.  I have no idea

7  what their reaction is going to be.  I have no idea what

8  other changes may be required.

9  Q      Okay.  And if the new money term loan is approved the

10  ABL lender is not going anywhere, right?

11  A      If the new money term loan is approved my understanding

12  is the ABL lenders (indiscernible).

13  Q      Thank you.

14         Now the term loan lenders, through the various hats

15  they wear as holders of ten and seventh eights, as holders as

16  ten and a half's, they hold close to a billion dollars of

17  funded debt in TPC, right?

18  A      I think that is about right, yes.

19  Q      And the term loan lenders, sometimes in the case and in

20  the affidavit they're referred to as the ad hoc group of

21  consenting noteholders, right?

22  A      That's right.

23  Q      That group is also party to the restructuring support

24  agreement, right?

25  A      They are.

1  Q     And that group is also the backstop parties for the

2  proposed rights offering, correct?

3  A     They are.

4  Q     There's a disclosure statement on file, right?

5  A     There is a plan on file.  That is my understanding.

6  Q     And there's a backstop motion on file too, right?

7  A     There is.

8  Q     And the debtor's plan contemplates payment in full of

9  the DIP in cash, right?

10 A     It does.

11 Q     And you're one of the architects of the rights

12 offering, right?

13 A     I don't know architect, I help negotiate the terms of

14 the rights offering on behalf of the debtors.

15 Q     Thank you.

16       So let's just briefly, very briefly just talk about the

17 equity rights offering.  The equity rights offering

18 contemplates the company raising $300 million in common

19 equity, right?

20 A     That's right.

21 Q     And that's backstopped by the consenting noteholders?

22 A     It is.

23 Q     And the consenting noteholders get $135 million of that

24 $300 as a direct allocation for common equity, right?

25

1  A     I have to go back and look at the exact numbers.  I

2  don't have it in front of me.

3  Q     Well it's in your affidavit in support of the backstop

4  motion.  That's a pretty solid source to attribute to you.

5  A     Again, I --

6          MR. JACOBS:  Objection, Your Honor.  If he wants

7  to show the man his affidavit or declaration he ought to do

8  it properly.  I would just ask that if he's going to use it

9  let's use the document, please.

10          MR. HILLMAN:  Your Honor, I'm trying to get us

11  through this portion of the cross. It's going to be just a

12  few more minutes. I am just trying to go rapid fire.  I don't

13  think it's necessary for each document to go and to show this

14  witness what he has in his affidavit.  So I will ask a few

15  more questions and we will move on.

16          I'm just asking the witness to agree that if he

17  described the direct allocation as $135 million that that is

18  a fair place to look for the source of the dollar amount of

19  the direct allocation.

20          THE COURT:  So I think that that as phrased is a

21  fair question and the witness can answer it.

22          THE WITNESS:  Yes.  If that's what it says in my

23  affidavit I won't don't disagree with that statement

24  (indiscernible).

25  BY MR. HILLMAN:

1  Q     The equity in the direct allocation is that a 35

2  percent discount to plan value, right?

3  A     I believe that is correct.  Again, I refer back to --

4  Q     And the --

5  A     -- the affidavit, if that's what it says then, yes,

6  that is accurate.

7  Q     -- consenting noteholders also receive an equity put

8  option premium, right?

9  A     They do.

10  Q     And that is for $36 million, right?

11  A     Again, I would have to go back and look at my affidavit

12  to the exact calculation, but, again, assuming that is

13  consistent with what it says in the affidavit then I have no

14  reason to disagree with it.

15  Q     And the put option payment is also payable in equity,

16  right?

17  A     It is.

18  Q     And that is also at a 35 percent discount, right?

19  A     That's right.

20  Q     Let's quickly pivot to the debt rights offering.  There

21  is also an intention to raise an additional $150 of liquidity

22  in debt, right?

23  A     Yes, in holding company debt.

24  Q     That is also backstopped by the consenting noteholders,

25  right?

1   A      It is.

2   Q      And the consenting noteholders get roughly $67 and a

3   half million of the $150 as a direct allocation, right?

4   A      Again, if that is what it says in my affidavit.  I

5   don't have the exact numbers in front of me, but, again, if

6   that is what it says in the affidavit then I have no reason

7   to disagree.

8   Q      The consenting noteholders also receive a debt put

9   option premium, right?

10  A      They do.

11  Q      That is roughly for $18 million, right?

12  A      Again, I refer back to the affidavit, but if that is

13  the math then no reason to disagree.

14  Q      Payable in equity, right?

15  A      That's right.

16  Q      At a discount to plan value of 35 percent, right?

17  A      That is correct.

18  Q      And under the proposed rights offering isn't true that

19  the rights offering participants will receive roughly 90 plus

20  percent of the reorg equity could be as high as 99 percent?

21  A      Yes.  In aggregate the end result of the rights

22  offering is it ends up acquiring 99 percent -- up to 99

23  percent of the equity of the company between all the new

24  money that comes in.

25            MR. HILLMAN:  Thank you, Mr. Jamal.

1          No further questions, Your Honor.

2          THE COURT:  Okay.  Thank you, Mr. Hillman.

3          Is there any other party in interest that would

4  like to cross-examine Mr. Jamal?

5          Mr. Persons?

6          MR. PERSON:  Thank you, Your Honor.

7                    CROSS-EXAMINATION

8  BY MR. PERSONS:

9  Q    Good morning, Mr. Jamal.

10 A    Good morning.

11 Q    A question about something you just testified to Mr.

12 Hillman about.  You said that you have no idea what the term

13 loan lender's reaction would be if they are not granted the

14 full roll-up, is that right?

15 A    That's right.

16 Q    Are you saying that you never discussed that

17 possibility with the term loan lenders?

18 A    Well I -- when we negotiated the DIP the roll-up -- the

19 requirement for a roll-up was a key component of the term

20 loan lenders ask.  As I think I testified previously, because

21 we didn't view the roll-up as having really a significant

22 economic impact on the estates when we were negotiating it

23 was not an area that we pushed on as hard as we did on other

24 areas like pricing, covenants, maturity and the like.  I

25

1   haven't talked to them about what they would do if the terms

2   of the DIP, as we're putting forward today, change.

3   Q      You were aware, Mr. Jamal, that there were objections

4   on file to DIP as currently proposed, right?

5   A      Yes.

6   Q      And one of those was from Mockingbird, one was from

7   Bayside, Cerberus and until this point one was from the UCC,

8   correct?

9   A      Yes.

10  Q      And each of those objections objected or spoke to the

11  propriety of the roll-up.  Is that right?

12  A      That's right.

13  Q      And did the debtors, over the past few weeks, engage

14  with either Bayside, Cerberus or Mockingbird about their DIP

15  objections or making any changes to the DIP?

16  A      I don't know because I think counsel -- most of those

17  negotiations were taking place between counsel, so I don't

18  know what conversations occurred between counsel.  I was

19  focused on negotiations around other aspects of the case.

20  A      So did you have any reason to believe -- let me ask it

21  a different way: did you have any reason to believe that all

22  of the DIP objections would be resolved before today's

23  hearing?

24  A      No.

25

1  Q     So despite the fact that you knew three parties had

2  objected to this roll-up concept you have not since the

3  initial DIP negotiations discussed whether or not the lenders

4  would be okay if the DIP was reduced -- excuse me, the roll-

5  up was reduced.

6  A     I don't know whether we have had that conversation or I

7  have been party to that conversation since the initial DIP

8  objection.  We have had so many conversations with so many

9  different parties.  I don't recall all of them.  I do know

10 that in every conversation I have had with the ad hoc group

11 or its advisors about the roll-up they have not shown any

12 willingness to change the roll-up, but I couldn't tell you,

13 you know, all the times when we have discussed it, you know,

14 in the context of all the discussions that we have had.

15 Q     So if I understand correctly you can't testify to the

16 court that you know the DIP lenders -- the term DIP lenders

17 would walk away if they did not get a full roll-up.

18 A     Well I think the term DIP lenders have made it clear

19 that the roll-up, as set forth here, is a critical element of

20 them providing the new money DIP.  As I testified before, I

21 have no idea what it will do if the roll-up is not approved

22 other then they have given me no indication that they would

23 continue to be there to provide the DIP.

24 Q     You are not certain that they would away either, is

25 that right?

1  A      Again, I'm not certain of anything.

2  Q      One other issue, Mr. Jamal, and you brought this up

3  both with Mr. Hillman and also speaking to me.  You said that

4  part of the reason you weren't focused on the roll-up is

5  because it didn't have "significant economic impact on the

6  debtors."  Is that right?

7  A      That's right.

8  Q      That accurately states your view of why the roll-up

9  wasn't important to you?

10 A      Yes, that's right.

11 Q      And you do -- again, you have 22 years of experience in

12 restructuring and restructuring finance, is that right?

13 A      Yeah, that's right.

14 Q      You do understand that a DIP expense is administrative

15 -- the amounts that are paid for the total size of the DIP is

16 an administrative expense.  Is that right?

17 A      Yeah, I understand that.

18 Q      And you understand that the 10.875's, unless they are

19 rolled up, are not an administrative expense.  Is that right?

20 A      Yeah, I understand that.

21 Q      And as the administrative expense the roll-up piece

22 would need to be paid in full in cash, is that right?

23 A      That's right.

24 Q      And if the debtors were to seek alternative financing

25 today, Mr. Jamal, based on the amounts that are outstanding

1   on the interim DIP and the current amount that has been

2   rolled up how much would it cost -- how much money would

3   another DIP provider need to provide to buy-out the DIP?

4   A    So I think it's approximately -- I would have to go

5   back and look, but it's something like $85 or $90 million.

6   Q    and if the roll-up is approved in full today how much

7   would an alternative DIP provider need to pay to get the

8   debtors out of the DIP and provide a different DIP?

9   A    So to take out the full amount would be, I think, $320

10  million.  It will depend in part on, you know, where we land

11  with the insurance because some of that new money may or may

12  not end up being funded.

13  Q    So is that fair to say that that's roughly $240 million

14  if my lawyer math is correct?

15  A    Incremental, yeah.  But, again, it could be a little

16  lower because some of the commitment may not end up being

17  funded given that we may or may not ultimately receive the

18  insurance funds.  That is accurate.

19  Q    And how much additional -- according to the current 13

20  week cash-flow, Mr. Jamal, how much additional amounts under

21  the term DIP loan are the debtors anticipating to borrow in

22  the coming 13 weeks?

23  A    I don't have that in front of me. I would defer to Mr.

24  Del Genio on the specifics of the 13 week cash-flow.  Again,

25  if you put it up I'm sure I could get you the answer, but I

1 just don't have it sitting here in front of me because I

2 don't have the cash-flow.

3 Q    We can address it with Mr. Del Genio when he gets on

4 the stand if that's the more appropriate party.

5      To be clear, incrementally if this is approved there

6 will be an additional $240 million worth of administrative

7 expenses on the debtor's books approximately. Is that your

8 testimony?

9 A    I think that sounds about right, yes.

10          MR. PERSONS:  Nothing further, Your Honor.

11          THE COURT:  Okay.  Thank you, Mr. Persons.

12          Is there any other party in interest that wants to

13 cross-examine Mr. Jamal?

14          Mr. Hansen, I am happy to hear you in the form of

15 cross/redirect.

16          MR. HANSEN:  It's a cross-judgment.  May I request

17 just two minutes to confer with my colleagues before I ask a

18 question, Your Honor?  Given the virtual nature I don't have

19 the ability to --

20          THE COURT:  Yes.  That's a fair ask, Mr. Hansen.

21 We can recess for two minutes.

22          MR. HANSEN:  Thank you.

23          THE COURT:  So we stand in recess.  We will be

24 back at 7:33 -- I'm sorry, 11:33.

25      (Recess taken at 11:29 a.m.)

1           (Proceedings resumed at 11:33 a.m.)

2                THE COURT:  We are back on the record.

3                Mr. Hansen?

4                MR. HANSEN:  Thank you, Your Honor.

5                          CROSS-EXAMINATION

6    BY MR. HANSEN:

7    Q    Mr. Jamal, are you aware of restructuring proposals

8    having been received by the company from Cerberus, Bayside

9    and separately from Tribe?

10   A    I am.

11   Q    Under the Cerberus and Bayside restructuring proposal

12   if the 10.875 percent notes were determined to be senior

13   their proposal provides for the repayment in full, in cash on

14   the effective date of those notes, does it not?

15   A    It does.

16   Q    And under the Tribe proposal it also provides for the

17   repayment in full, in cash of the 10.875 percent notes, does

18   it not?

19   A    It does.

20                MR. HANSEN:  Thank you, Your Honor.  I have no

21   further questions.

22                THE COURT:  Okay.  Thank you, Mr. Hansen.

23                Any other party in interest interested in

24   examining Mr. Jamal?

25           (No verbal response)

1          THE COURT:  Any redirect?

2          Mr. Jacobs?

3          MR. JACOBS:  No redirect, Your Honor.  Thank you.

4          THE COURT:  Okay.  So, Mr. Jamal, you can step

5   down.  Thank you for your testimony today.

6          MR. JAMAL:  Your Honor, am I excused for the day

7   or is there a chance I will be called again?  I just want to

8   --

9          THE COURT:  That's a fair ask.  Is there any party

10  in interest that has any objection to our excusing Mr. Jamal

11  for the day?

12         Mr. Persons?

13         MR. PERSONS:  I do not, Your Honor.

14         THE COURT:  Okay.  Is there anyone who does?

15      (No verbal response)

16         THE COURT:  Okay. If not then, Mr. Jamal, you may

17  be excused.  Thank you for your attendance today.

18         MR. JAMAL:  Thank you, Your Honor.

19      (Witness excused)

20         THE COURT:  Mr. Jacobs, you can call your next

21  witness.

22         MR. JACOBS:  Thank you, Your Honor.

23         We call Robert Del Genio.

24         THE COURT:  Ms. Barksdale, can you swear-in Mr.

25  Del Genio please?

1          ROBERT DEL GENIO, DEBTOR WITNESS, SWORN

2          THE CLERK:  Please state your full name and spell

3  your last name for the record.

4          THE WITNESS:  Robert Anthony Del Genio, D-E-L, G-

5  E-N-I-O.

6          THE CLERK:  Thank you.

7          THE WITNESS:  You're welcome.

8          THE COURT:  Mr. Jacobs, you can proceed.

9          MR. JACOBS:  Thank you, Your Honor.

10                    DIRECT EXAMINATION

11  BY MR. JACOBS:

12  Q     Remind us of your name, sir?

13  A     Robert Anthony Del Genio.

14  Q     And are you the same Robert Anthony Del Genio that

15  appeared on June -- in early June, June 3rd for the first day

16  hearing?

17  A     I am.

18  Q     Mr. Del Genio, I want to refer you to your three

19  declarations and we will take them in order.

20          The first is Exhibit 45.  It is, what we refer to as,

21  your first day declaration, Mr. Del Genio.  Do you remember

22  that, sir?

23  A     I do.

24          MR. JACOBS:  It can be found, Your Honor, at DI-

25  27.

1  BY MR. JACOBS:

2  Q    Mr. Del Genio, if I were to ask you the same questions

3  that are in Exhibit 45 today would your answers be the same,

4  sir?

5  A    Yes.

6        MR. JACOBS:  Your Honor, we would offer Exhibit

7  45.

8        THE COURT:  Is there any party in interest that

9  objects to the introduction into evidence of Exhibit 45?

10     (No verbal response)

11        THE COURT:  Okay.  Hearing none that will be

12  admitted.

13     (Debtor's Exhibit 45 received into evidence)

14        MR. JACOBS:  Thank you.

15  BY MR. JACOBS:

16  Q    I now want to turn to Exhibit 46 which is your

17  declaration in support for the interim and final order of the

18  DIP. It can be found at DI-66.  Do you remember that

19  declaration, Mr. Del Genio?

20  A    I do.

21  Q    If I were to ask you questions relating to the

22  information in Exhibit 46 would your answers be the same

23  today, sir?

24  A    They would assuming the time period that I referred to

25  in that declaration is the same.

1     MR. JACOBS:  Your Honor, we would offer Exhibit

2  46.

3     THE COURT:  Is there any party in interest that

4  has an objection to the admission into evidence of Exhibit

5  46?

6     (No verbal response)

7     THE COURT:  If not that will be admitted.

8     (Debtor's Exhibit 46 received into evidence)

9  BY MR. JACOBS:

10 Q    The third declaration, Mr. Del Genio, is your

11 declaration from July 11th that was in support of our

12 response to the emergency motions for the stay.  Do you

13 remember that declaration, Mr. Del Genio?

14 A    I do.

15 Q    And as to Exhibit 51 if I were to ask you question

16 related to that information would your answers be the same

17 today, sir?

18 A    Yes.  Again, with the caveat that the questions about

19 specific timeframes are the same.

20     MR. JACOBS:  Your Honor, we will offer Exhibit 51.

21     THE COURT:  Any objection to the admission into

22 evidence of Exhibit 51?

23     Mr. Hillman?

24     MR. MERVIS:  Well, Your Honor, its Michael Mervis

25 from Proskauer Rose.

1         I was afraid that would happen.  I am not Mr.

2  Hillman, not that there would be anything wrong with it if I

3  were, but there's only one Mr. Hillman.

4         Yes, we do have some discreet objections must like

5  what Mr. Hillman took the court through with respect to Mr.

6  Jamal's declaration.  Some of them I think are solvable by

7  the agreement to not offer hearsay.

8         THE COURT:  Okay.  If you could just hold on one

9  second, Mr. Mervis.  I have to pull-up the password, which I

10 have, in order to access the exhibits so that I can see the

11 language as we go through it.  So just give me a minute.  My

12 apologies.

13         MR. MERVIS:  Not at all, Your Honor.

14      (Pause)

15         THE COURT:  This is Exhibit No. 51.  So,

16 apologies.  You can proceed to point out the portions to

17 which you have an objection.

18         MR. MERVIS:  Thank you, Your Honor.

19         I will go paragraph by paragraph.  I think that

20 makes the most sense.

21         Let me just say, at the outset, very quickly we're

22 not doing this to be difficult or obstructionist, but the

23 objections fall into two categories.  One is hearsay, which I

24 think we can deal with potentially.  The other is there's a

25 lot of legal argument in this declaration.  We don't have any

1  problem with the legal argument coming from the lawyers.  We

2  think we need to have a clean record and Mr. Del Genio should

3  not be, you know, the lawyer in the case.

4          So with that as background the first paragraph

5  that we object to is 11.  Its double hearsay, Your Honor.  It

6  also states a legal conclusion.

7          THE COURT:  Mr. Jacobs?

8          MR. JACOBS:  Your Honor, I'm not sure what his

9  double hearsay part of this is.  You know, he references Mr.

10 Jamal's declaration which is actually in evidence.  So I

11 don't think that that is hearsay.

12         Then he has a second statement of delay in the

13 entry of a final DIP order granting relief for cause of

14 default of the term loan.  I think that he has testified to

15 that previously already in front of this court including at

16 the first day hearing.  So the court has already been made

17 aware of it.  It's been part of the court's record and I

18 don't see how that is a legal conclusion.

19         THE COURT:  So what counts as an event of default

20 one could arguably say is a legal conclusion.  Obviously, the

21 document is, itself, before the court and that's something

22 the court can figure out.

23         Any objection to my reading this as a statement of

24 the witness's understanding?

25         MR. MERVIS:  No, Your Honor.

1            THE COURT:  Okay.

2            MR. MERVIS:  I think that would probably go to the

3  balance of the objections.

4            Paragraph 12, again, that is a legal conclusion,

5  but if it's just his understanding that's fine.

6            THE COURT:  Mr. Jacobs, any problem with resolving

7  the objection that way?

8            MR. JACOBS:  No, Your Honor.

9            THE COURT:  Mr. Mervis, you can continue.

10            MR. MERVIS:  13, again, Your Honor, is double

11  hearsay, but if it's offered only to inform or as evidence

12  that informs the debtor's business judgment then that's fine.

13            THE COURT:  Mr. Jacobs, any objection to that

14  limitation?

15            MR. JACOBS:  I'm assuming he's referring to the

16  first sentence, Your Honor.  I am fine with that.

17            MR. MERVIS:  Paragraph 14 -- actually, I won't

18  press that one, Your Honor.

19            Paragraph 15, again, if it's offered only for his

20  understanding that is fine, but it is a series of legal

21  conclusions on that basis.

22            THE COURT:  Mr. Jacobs, any objection to limiting

23  the admission to the witness's understanding?

24            MR. JACOBS:  Well, I'm not sure I understand which

25  parts of 15 he is objecting to.  The first sentence is a

1  factual statement.  It is corroborating what he stated in his

2  first day declaration that is already in evidence without

3  objection.  The second sentence, understanding is fine.

4          THE COURT:  Okay.  Hold on a second, Mr. Jacobs.

5          MR. JACOBS:  And then the --

6          THE COURT:  Oh, go ahead, I'm sorry.

7          MR. JACOBS:  -- the third sentence, I think, is

8  right within his wheelhouse and his expertise so that if they

9  lose $59.3 million and have to repay it that's going to have

10  a significant impact on the liquidity profile.

11          THE COURT:  All right.  Let's take them one at a

12  time.

13          Mr. Mervis, is there any objection to admitting

14  the first sentence without limitation as just a fact of which

15  the witness has firsthand knowledge?

16          MR. MERVIS:  No.  And there's no objection to the

17  third sentence either, Your Honor.

18          THE COURT:  Okay.

19          MR. MERVIS:  I think Mr. Jacobs made a valid

20  point.

21          THE COURT:  So the second sentence will be

22  admitted as limited to the witness's understanding, and the

23  first and third sentence will be admitted without limitation.

24          What is next, Mr. Mervis?

25

1    MR. MERVIS:  Just two more, Your Honor.  Paragraph

2  28 on page 11, the very first sentence is legal conclusion

3  and actually the ultimate issue.  Again, if it's offered for

4  his understanding I'm not concerned, but I do think it's

5  objectionable.

6    THE COURT:  Any concern, Mr. Jacobs with limiting

7  the first sentence of Paragraph 28 to the witness's

8  understanding or belief?

9    MR. JACOBS:  None, Your Honor.  Thank you.

10    THE COURT:  Okay.

11    MR. MERVIS:  Thank you, Your Honor.

12    Finally, Paragraph 29 the second and third

13  sentences, Your Honor -- well, the first sentence is hearsay.

14  So we -- I'm sorry, the second sentence is hearsay, so we

15  object to it on that ground.  The third sentence is

16  predicated on that hearsay, so we object to it on that ground

17  as well.

18    MR. JACOBS:  Which one, Your Honor?  The second

19  one?

20    THE COURT:  So we're in Paragraph 29 and we're

21  talking about the second sentence, the sentence that says

22  "Since entry into the bankruptcy case the debtor's

23  discussions with critical customer vendor stakeholders have

24  been highly positive and resulted in significant benefits."

25

1          Mr. Mervis, I don't think that sentence states the

2    substance of the discussions with customers, but just the

3    effect thereof.  So I am not sure why that is hearsay.

4          MR. MERVIS:  Well, I think, Your Honor, it's

5    because the conclusion could only have been reached through -

6    - I mean its -- in other words, its, sort of, an implied

7    statement offering for the statement of facts for the truth.

8    Again, if it's only offered for his understanding then I

9    don't have a concern.

10          THE COURT:  Mr. Jacobs, you're response?

11          MR. JACOBS:  Your Honor, I don't think its hearsay

12    and I also think we've had numerous motions in front of this

13    court, as were referenced already today, but we had critical

14    vendor motions and others that have been presented to the

15    court that have provided substantial benefits to the debtors

16    and all stakeholders, and have been approved by the court.  I

17    think 80 to 85 percent of them are done without objection by

18    any parties including Cerberus and Bayside.

19          THE COURT:  Right, but the -- that hearsay

20    statement might be true doesn't mean it isn't hearsay.  I'm

21    trying to figure out if it is hearsay.  I don't believe it

22    is.

23          Mr. Mervis, I'm going to overrule that --

24          MR. JACOBS:  Your Honor --

25

1          THE COURT:  Go ahead, Mr. Jacobs.  I didn't mean

2   to interrupt.

3          MR. JACOBS:  Yes, Your Honor. I mean it doesn't

4   reflect the substance of the discussions.  It talks about the

5   consequences that the company has felt.

6          THE COURT:  Yeah.  I'm persuaded by that, so I

7   will overrule the objection.

8          Mr. Mervis, anything else in this paragraph?

9          MR. MERVIS:  None, Your Honor.  And nothing else

10  in the declaration.

11         THE COURT:  Okay.  So, is there any other party in

12  interest that has an objection, subject to the limitations

13  we've just discussed to the admission into evidence of

14  Debtors' Exhibit 51?

15      (No verbal response)

16         THE COURT:  Okay.  Hearing nothing further,

17  Exhibit 51 will be admitted, subject to those limitations.

18         MR. JACOBS:  Thank you, Your Honor.

19  Your Honor, before we proceed, could I ask that Mr. Nish

20  Bhan, my colleague, be given accommodation privileges,

21  sharing privileges?

22         THE COURT:  Certainly.  We'll work on that here.

23         Mr. Bhan, let us know if you have any trouble.

24         MR. BHAN:  I'll do so, Your Honor.  Thank you.

25         THE COURT:  Okay.

1  BY MR. JACOBS:

2  Q     All right.  Mr. Del Genio, the last declaration that we

3  did reference was dated July 11th.

4       That was a few weeks ago, wasn't it?

5  A     Yes, it was.

6  Q     Okay.  In that interim period, has the company

7  continued to operate?

8  A     Yes, it has.

9  Q     And as part of the work that you've been doing, have

10  you and your team been reviewing and preparing 13-week

11  forecasts on a weekly basis?

12  A     Yes, we prepare them every week working at the company.

13  Q     Okay.  And when you do that, do you share those with

14  the other stakeholders in this proceeding, sir?

15  A     Yes, all the financial advisors receive copies of that

16  Friday night at five o'clock or just before five o'clock.

17            MR. JACOBS:  Mr. Bhan, if you could help me with

18  Exhibit 53, please.

19  BY MR. JACOBS:

20  Q     We have up in front of us, Exhibit 53.

21       Mr. Del Genio, could you please tell us what this is.

22  A     Yes, that was the 13-week cash flow that we sent out a

23  couple of weeks ago, which is, obviously, actuals as of

24  July 8th.

25  Q     Okay.  And if it reflects the actuals as of July 8th,

1  2022, when did the -- you or your team actually have it

2  prepared and sent out to other stakeholders?

3  A    We effectively sent it out on the Friday following.

4  So, we -- basically, the week's closed out.  The company does

5  their work.  Based on this information, we talk to them,

6  generally, on Thursday, and then we wait until Friday to

7  finalize the report just so we get the full week's activity

8  for our forecast going forward.

9  Q    So, if I'm hearing you right, even though it has a date

10  with the actuals as of July 8th, 2022, it is published on

11  July 15th, in fact?

12  A    Correct.  There's always a week lag, right.  The

13  actuals are a week behind and then the forecast

14  (indiscernible).

15  Q    Okay.

16          MR. JACOBS:  Your Honor, I'd like to offer into

17  evidence Exhibit 53.

18          THE COURT:  Is there any objection to the

19  introduction into evidence of Exhibit 53?

20      (No verbal response)

21          THE COURT:  Okay.  Hearing none, that'll be

22  admitted.

23      (Exhibit 53 received into evidence)

24          MR. JACOBS:  Mr. Bhan, can you bring up 54,

25  please, Exhibit 54.

1  BY MR. JACOBS:

2  Q    Mr. Del Genio, I have Exhibit 54 in front of you.

3       Would you please identify this for us.

4  A    Yes, that was last week's forecast that we sent out for

5  last Friday.

6  Q    And last Friday would have been July 22nd?

7  A    That's correct.

8       MR. JACOBS:  Your Honor, we'd like to move in

9  Exhibit 54, please.

10      THE COURT:  Is there any party in interest that

11 objects to the introduction into evidence of Exhibit 54?

12      (No verbal response)

13      THE COURT:  Okay.  Hearing none, that will be

14 admitted.

15      (Exhibit 54 received into evidence)

16 BY MR. JACOBS:

17 Q    All right.  Let's focus on this Exhibit 54, the most

18 current forecast that's been published.

19      Just stepping back for a second, Mr. Del Genio, since

20 your July 11th declaration a few weeks ago, what happened

21 with the company's liquidity forecast in that interim period

22 between then and the publication of Exhibit 54 in front of

23 you?

24 A    It's become tighter than the forecast that was before

25 my declaration.

1  Q      Okay.

2            MR. JACOBS:  Mr. Bhan, let's go to the next page,

3  please, and one more forward.  So, we're on page 3.

4  BY MR. JACOBS:

5  Q     And let's make sure we can all remember how we work

6  this document.

7        Mr. Del Genio, can you explain, starting at the top of

8  page 3 of Exhibit 54, how we're supposed to read this

9  document.

10 A      In the top of the document is a forecast.  Obviously,

11 the first column is actuals for the week of 7/15.  So, when

12 you're doing this forecast, you always want to root the

13 forecast in actuals.  And then going forward, those are the

14 receipts, trade collections, or any other collections the

15 company would receive.  And out of the company's forecast

16 proposals, they look at near-term receivables and expected

17 collection for those receivables, and then as they go to the

18 back end of the forecast, some of that is influenced, also,

19 by not only receivables, but what their expectation is in

20 their business plan forecast.  The next grouping is

21 "Operating disbursements."  Well, first is the "Raw

22 materials."  Those are the, like, chemicals that they're

23 purchasing -- (indiscernible).  It could be isobutylene.  The

24 different types of raw materials they use to produce their

25 products.  "AP non-raw materials" is what it sounds like.

1  It's really everything else besides raw material purchases.

2  That would be supplies.  That could be payments to

3  contractors that are doing turnarounds, for example.  It

4  could be anything that's really involved in the running of

5  the plant that, besides labor, that would be used that's not

6  a raw material.  And then the next one is "Payroll and

7  benefits."  Obviously, it's the employees of the company of

8  both, at the plants and at the corporate office.  "Insurance

9  premiums" are the premiums they pay for all their insurance.

10  And then "Taxes" are the various taxes the company pays.

11  Those are operating disbursements.

12      You then have a line "Operating cash flow before

13  insurance."  Because what we're trying to show is what the

14  cash flow is from the basic operations of the business.

15  "Insurance" would be any estimated insurance recovery from

16  their business interruption (indiscernible) the property

17  casualty insurance.

18      And then you have operating cash flow after,

19  effectively, any type of insurance recoveries.  And you have

20  your debt service, ABL, and that's for the interest and fees.

21  And then the restructuring-related costs.  We have a line

22  here, "AP catch-up."  That was really before -- a vestige

23  before the filing.  And then you have professional fees.

24  Those are the professional fees that relate to the

25  restructuring.  Ordinary course professional fees would be an

1   operating disbursement.  And then you have your DIP fees and

2   interest.  That would give you your net cash flow.  And then

3   you have, basically, the flow through of beginning cash, net

4   cash flow, any borrowings that you would have under the

5   facility.

6       In this case, you could see in the week of 8/5, the

7   estimate was that we would have the DIP approved and we could

8   borrow on our 6 million there, the ending cash.

9       Then, we'd show the DIP ABL balance.  And similar to

10  what Mr. Jamal just talked about, you could see in that

11  number that the actual borrowings are staying flat because

12  the company looks at that as that's availability for RT

13  capital variations and different types of unexpected types of

14  borrowings.  And then you have your net borrowing capacity or

15  the borrowing capacity (indiscernible) any type of, like, are

16  allowed, and different types of a block you'd have on the

17  borrowing days to get the net borrowing capacity.

18      And then at the bottom is the DIP, which is the term

19  loan DIP.  Thirty-two has been borrowed on that.  The

20  assumption at this time is that it would have the DIP

21  approved and that we'd be able to borrow next week; again,

22  that was the assumption.  The Court hasn't approved it yet.

23  So, there's $6 million of additional borrowing that we're

24  showing under that DIP.

25      And then, lastly, we have the availability.  What you

1  see here is the availability still reflects the fact that the

2  insurance proceeds have not been received.  If the insurance

3  proceeds were received, then, obviously, the availability

4  would drop.  When you look at the week of 9/16, we're

5  assuming the -- under this case, insurance proceeds are

6  received, subject to receiving a Court order that's been the

7  condition the insurance companies have specified.  If that

8  occurs under this time frame, then the DIP, if we borrowed

9  $6 million next week, would be $38 million and we wouldn't

10 have any other availability, but, obviously, the cash would

11 reflect the fact that we borrowed $38 million.  And that's

12 why we show the total liquidity on the bottom, excluding DIP

13 availability because once we're showing what it looks like

14 and then once it's borrowed it ends up as cash.

15       So, sorry for the long-winded answer, but that's the

16 way the forecast flows.

17 Q    Okay.

18            MR. JACOBS:  I want to focus in on a couple of

19 weeks here, and maybe Mr. Bhan can help us maybe by

20 highlighting let's say, the weeks of August 19th through

21 September 2nd.

22            Can you help us with that, Mr. Bhan.

23            MR. BHAN:  I might have to make this searchable,

24 so with Your Honor's indulgence, can I do that --

25            THE COURT:  Sure.

1           MR. BHAN:  -- so I can highlight?

2           Thank you.

3           THE WITNESS:  And, Mr. Bhan, when you're done

4  doing that, if you could put it back in the format you had it

5  before, that was easier for me to read, once you're done with

6  what you're doing.

7           MR. BHAN:  Okay.  Absolutely.

8           THE WITNESS:  Thank you.

9  BY MR. JACOBS:

10 Q    While Mr. Bhan is working on that, let me continue with

11 some questions.  What in -- under the latest forecast, when

12 do we have the lowest total liquidity for the company per

13 day?

14 A    Yeah, it would be easier if I saw the bottom of the

15 forecast.

16          MR. JACOBS:  Just scroll down, please, Mr. Bhan.

17          MR. BHAN:  I can't do that at this exact moment.

18 I think in just about 10 seconds, I'll be able to.

19          MR. JACOBS:  Okay.

20          THE WITNESS:  I mean, Mr. Jacobs, I do have a hard

21 copy of this.  If I could refer to that, that might speed

22 things up.  And it's the same one I used in my deposition.

23 BY MR. JACOBS:

24 Q    I will tell you I have a hard copy in front of me, as

25 well, because, frankly, it's easier on my eyes.  So, if

1  that's easier for you and with the Court's permission, I'm

2  fine with it.

3          THE COURT:  So, if I could just pull up my

4  electronic version -- give me two seconds -- this is Debtors'

5  Exhibit 54?

6          MR. JACOBS:  Yes, sir.

7          THE WITNESS:  Okay.  Mr. Jacobs, I do have a hard

8  copy in front of me, so whenever Your Honor's ready, let me

9  know.

10          THE COURT:  Just give me a second.  I'm almost

11  there.  And this is on the third page of this exhibit.

12          Okay.  So, I have that in front of me also, so you

13  can proceed.

14          THE WITNESS:  Thank you.

15  BY MR. JACOBS:

16  Q    Mr. Del Genio, when does the company experience the

17  lowest forecasted liquidity for this year?

18  A    If you look at the bottom, the total liquidity,

19  excluding DIP availability, it is the week of 8/19 --

20  August 19th.

21  Q    And what is the -- what is that forecast there?

22  A    $72.7 million.

23  Q    And is it also forecasted to be below a hundred million

24  dollars for the two weeks after that, the weeks of

25  August 26th and September the 2nd?

1  A      Yes.  And that's assuming that we receive the first two

2  interest payments that we have in the forecast -- I'm

3  sorry -- the insurance recoveries that we have in the

4  forecast.

5  Q      Got it.

6         What has happened with the company since we forecasted

7  some lower liquidity levels in this time period, starting on

8  August 19th?

9  A      Well, there's been a variety of changes.  And because

10  this is an operating business, first of all, there was

11  receipt fines because some of their customers, the pricing of

12  the product they bought has declined.  And as a commodity

13  business, as these prices come down, the receipts move with

14  that.

15        Also, several of their customers cut back the terms of

16  their purchasing that was not expected and there's still some

17  discussion with the company regarding that.

18  The company processes crude C4.  That is provided by vendors.

19  A      number of the customers -- vendors -- and I'm being

20  very sensitive here because I'm not going to use names -- had

21  had the crackers, which are ones that, basically -- ethylene

22  crackers provide crude C4 -- they had outages at their

23  plants.  Some of them could be it affects, like, a boiler or

24  a pipe or maybe they didn't get the supply they needed.

25  Well, because they had outages, they weren't able to produce

1  as much polyethylene and, therefore, the byproduct is crude

2  C4.

3       So, the company received less crude C4 than was

4  anticipated, which is not unusual because these are

5  operational businesses and sometimes that happens.  And then

6  besides supply shortages, when they process the crude 4, the

7  crude C4, like, one of the things they process into is

8  butadiene priced on -- there's also some reduction in some of

9  the price where they sell the product.  So, that was one of

10 the changes to this forecast that impacted that.

11      There was also a change in the borrowing dates which

12 affected availability and that change was due to the fact

13 that the June borrowing base came into existence as

14 (indiscernible) of each month.  And as of the negotiations

15 that were going on with number of the contract counterparties

16 and the filing of the company, we had a large pre-petition

17 amount that wasn't paid.  Some of those have subsequently

18 been paid because these contracts have been assumed and that

19 was part of the contract negotiation.

20      That created a large contra account in the borrowing

21 base.  The reason there was a large contra account is some of

22 the C4 vendors are also customers and what happens in an

23 asset-based facility, if you have a customer and a supplier,

24 they put it in an ineligible in the receivables because they

25 effectively can offset.

1    The other change is the block or the carve-out in the

2  ABL facility increased because professional fees increased

3  primarily because of the process we're involved with now.

4  There was a litigation, so we had higher fee estimates

5  because the forecast wasn't predicated on, I would say, the

6  heavy litigations that occurred over the recent period and

7  they went back to the professionals and asked them what

8  they're accrued unpaids were and what their estimated was on

9  run rate, because we have to show kind of the fees

10 outstanding to the carve-out and then a forecast of the next

11 month, and because those were higher, the carve-out was

12 lower.

13    Those were the primary factors.  I would say other

14 ones, if you look on the week of 8/19, you have a very large

15 raw material purchase that week -- payments.  And,

16 effectively, raw materials, the terms are 15 or 20 days, end

17 of month.  They're there, C4 vendors.  Well, it just happens

18 the week of 8/19 kind of lines up where most of those

19 payments are due.  So, you can see there's $73 million in

20 that week.

21    Also that week, there's a large insurance premium and

22 most of the insurance is front-end loaded, even though

23 it's -- you have terms, there's -- you can't finance

24 everything.  So, that is an insurance premium payment that

25 gets (indiscernible).  Obviously, it's not the same every

1  week, but that was another factor, which contributed to the

2  low point in the forecast.

3  Q    One other topic -- I'm sure you'll get questions about

4  this -- involves the potential receipt of insurance payments

5  related to the P&O incident.

6       You see that's on your forecast here on Exhibit 54,

7  right, Mr. Del Genio?

8  A    Yes.  And one other thing I just want to add,

9  Mr. Jacobs, is also a number of the contracts were assumed

10 during this period and the assumption of those contracts we

11 paid out, we anticipated the payment of those, but the timing

12 might have shifted from week-to-week, depending on when those

13 contracts were assumed.  I just wanted to add that, too.

14 Q    Right.  And just so we finish that topic, when a

15 contract gets assumed, what, then, triggers for the company

16 in terms of an obligation, with respect to past payments or

17 past invoices?

18 A    They were negotiated pending those, I guess, that

19 normal vernacular is a cure payment, but these were actually

20 negotiated payments because they negotiated all the aspects

21 of the contract.

22 Q    Okay.  Let's turn back to the question I had about the

23 insurance amounts and recoveries.

24      In this forecast in Exhibit 54, what did you do in

25 terms of the timing of the insurance recoveries?

1  A     There was still a negotiation going on in terms of the

2  insurance recoveries.  The traditional pattern is a proof of

3  loss is signed, then the company goes to their -- the ad hoc

4  group, which is secured against the insurance proceeds and

5  the ABL lender in this case, Eclipse.  And then they get,

6  effectively, their consent on they can go to the insurance

7  companies and basically say, now, we've had signed proof of

8  loss.  We have the consent of Eclipse and the ad hoc group.

9       Well, during this process, when the company filed,

10 counsel to the insurance companies advised them that they

11 weren't -- they weren't advising them to make any other

12 payments until there was a court order they received

13 regarding these payments.  So, because there hasn't been a

14 hearing yet on it, there is still a stipulation being

15 negotiated between the company and the various parties, we

16 and the company, said, well, it's unlikely that this is going

17 to be approved this week, so we pushed those off.

18      Because the pattern is once everything is approved,

19 then it takes a little time for the insurance companies to

20 make payments.  That's why in the normal course, there's

21 about a 30-day -- well, it's a 30-day period where they're

22 supposed to make payments.  So, the company and we decided,

23 based on what was going on, and the fact that there hasn't

24 been a signed order yet that it was more likely that these

25 proceeds would come in later in August, so they were shifted

1  to the week of August 26th.

2  Q    Just a few more questions, Mr. Del Genio.

3       Has it been suggested by some other parties, maybe

4  financial advisors, that maybe the company should, TPC should

5  slow-pay its vendors or suppliers in mid-August to try to

6  ease this, you know, low points of liquidity that we start

7  seeing the week of August 19th?

8  A    There were questions regarding that from certain

9  advisors and we said that that would be inappropriate.  It

10 would essential damage the business and we felt, and

11 management, as well, very strongly that that wasn't a good

12 business practice, considering what's going on with this

13 company right now.

14 Q    Going back, we have the first page hearing and the

15 interim DIP was approved.

16      You remember that, right?

17 A    Yes, I do.

18 Q    Was getting the interim DIP approved helpful to the

19 company?

20 A    Yes.

21 Q    Can you explain why, please.

22 A    Well, first of all, it gave suppliers and customers

23 comfort that the company was able to pay their bills when due

24 and, also, customers know that they would get a product that

25 TPC had provided.  It also allowed the company to have

1  negotiations with contract counterparties and (indiscernible)

2  or they weren't worried that they were going to get paid

3  post-petition.  And from my perspective, we were able to hold

4  significant trade credit.  There'll be an MOR filed either

5  today or Monday and you'll see that the post-petition AP is

6  $121 million.

7       So, one of the reasons why we're getting post-petition

8  trade credit is people know that we have the cash and ABL --

9  and, hopefully, (indiscernible) ABL and the term loan DIP,

10 there's plenty of liquidity to pay them.

11 Q    And what would happen if we couldn't (indiscernible)

12 the trade credit?

13 A    That's -- you take 121 million or some percentage of

14 that, if that goes away, that would put significant strain on

15 the company.

16 Q    And Mr. Del Genio, if your professional opinion or

17 judgment, would getting the final DIP order entered be

18 helpful to the company?

19 A    Yes.  It would provide stability and let the -- the

20 company has talked to their customers and suppliers about how

21 their financing worked.  That there's cash.  There's a term

22 ABL.  And there is a term DIP and, effectively, an ABL DIP.

23      So, they have three sources of financing which they

24 could say there's plenty of liquidity and vendors and

25 customers shouldn't have to worry about the company's

1  financial wherewithal during this process.

2  Q     Thank you, Mr. Del Genio.

3             MR. JACOBS:  I'll pass the witness.

4             THE COURT:  One second.  Okay.

5             Cross, Mr. Mervis, you can proceed.

6             MR. MERVIS:  Yes, Your Honor.  Thank you.

7                         CROSS-EXAMINATION

8  BY MR. MERVIS:

9  Q     Mr. Del Genio, just picking up on that last question or

10 two that you were asked about customers and vendors taking

11 comfort from a final DIP order, and the reason for that is

12 because it would communicate to them that the company has

13 adequate liquidity; is that right?

14 A     Yes.

15 Q     And in all your -- you've been doing this 40 years,

16 this restructuring thing?

17 A     Yes.

18 Q     Okay.  And in your experience, vendors, when a DIP

19 order is approved, they don't care how much pre-petition debt

20 was rolled up into the DIP, do they?

21            MR. JACOBS:  Objection; calls for speculation.

22            MR. MERVIS:  Well --

23            THE COURT:  I'll overrule that objection and ask

24 if the witness knows the answer to the question, he can

25 answer it.

1       THE WITNESS:  And roll-ups are generally not

2   topics you talk about with vendors, but some vendors are more

3   sophisticated than others and they would look at the impact

4   on the -- impact on (indiscernible) how much more interest

5   you have to pay in that.  But they're usually most concerned

6   about the company's overall liquidity that they have (audio

7   interference).

8   BY MR. MERVIS:

9   Q    Now, the commitment amount for the term DIP is

10  $85 million; is that right?

11  A    That's correct.

12  Q    Okay.  And your -- the 13-week forecast that we've

13  looked at just a few minutes ago, I think it was Debtors'

14  Exhibit 54, shows only 38 of that 85 being drawn; is that

15  correct?

16  A    That's assuming the insurance proceeds are received;

17  that is correct.

18  Q    Right.  But that assumption is in your forecast, right?

19  A    Yes.  Yes.  We, as I just described, we made the

20  assumption that insurance proceeds would be received;

21  however, we need to make sure that the Court approves that.

22       So, those -- it's not certain; it's our best estimate

23  at this time.

24  Q    Now, if and when those insurance proceeds come in,

25  they, according to -- to your understanding, according to the

1  terms of the DIP facility, the term DIP facility, every

2  dollar of insurance proceeds that comes in reduces the amount

3  of the DIP term loan, correct?

4  A     That's correct; that's the way it works.

5  Q     Okay.  And the DIP -- the term DIP loan is in three

6  tranches, right?

7  A     Yes.

8  Q     The first tranche was a $32 million draw that's already

9  been made; right?  That was under the interim order?

10  A     That's correct.

11  Q     And the second draw, at least that you're showing in

12  your 13-week cash flow forecast is -- sorry, the second

13  tranche, the draw that is projected in your 13-week cash flow

14  forecast is $6 million; right?

15  A     Again, assuming the insurance proceeds are received.

16  The way it works is, we have an ability to draw 25, but if

17  the insurance proceeds are received, then it would come down

18  to 38 and there would only be six left.  If the insurance

19  proceeds weren't received, we could draw 25.

20  Q     And if in fact, for some reason, you receive more

21  insurance proceeds than you're expecting, it's possible that

22  if the company drew on the $6 million amount the company

23  might have to pay it back; right?

24  A     Well, yes, if we received more insurance proceeds

25  during this time period, but right now this is what -- this

1  is the only proof of loss that has been executed.

2  Q    And, with respect to the third tranche, your 13-week

3  forecast shows no draw on the third tranche; right?

4  A    Again, because the assumption is we're going to receive

5  the remaining insurance proceeds.  So the way the -- as we

6  just described, the way that works is there would only be $6

7  million of availability left.

8  Q    Right.  And, just to be clear, which would mean there

9  would be zero available in the third tranche, right, if you

10 got the insurance proceeds?

11 A    Yes, because we'd be topped out at 38 million.

12 Q    And, even if the insurance proceeds for whatever reason

13 don't come in in the foreseeable future, there is a liquidity

14 condition to drawing on the third tranche; isn't there?

15 A    Yes, the third tranche; the second one doesn't have a

16 liquidity issue, but the third one does, correct.

17 Q    And you understand, at least as a general matter, how

18 that liquidity condition works; right?

19 A    Yes, I do.

20 Q    It has to be -- liquidity has to be less than $75

21 million and then forecasted to be less than 50 million in the

22 following two weeks; fair summary?

23 A    You've read the document correctly.

24 Q    Thank you.

25           MR. MERVIS:  Could I -- I'm sorry, Your Honor, can

1  I ask Mr. Esses to take control of the screen again?

2           THE COURT:  I believe we can do that.

3           MR. MERVIS:  Thank you, Your Honor.

4           And if Mr. Esses could pull up from -- this is off

5  of the committee's exhibit list, Committee Exhibit 6, please.

6        (Pause)

7           MR. MERVIS:  I'm not seeing it, Mr. Esses, but I

8  don't know if anybody -- Your Honor, do you see Exhibit 6?

9           THE COURT:  No, I've got the list of exhibits.

10          MR. MERVIS:  Yeah, I just -- Exhibit 6, Mr. Esses.

11       (Pause)

12          MR. MERVIS:  Apologies, Your Honor.

13          THE COURT:  No worries.  We'll get there.

14          MR. MERVIS:  There we go.  And, Mr. Esses, you may

15  or may not need to scroll down for Mr. Del Genio --

16  BY MR. MERVIS:

17  Q     -- but, Mr. Del Genio, you know what Exhibit 6 is --

18  I'm sorry, UCC Exhibit 6 is; correct?

19  A     Yes.

20  Q     This is a so-called partial proof of loss; right?

21  A     Yes.

22  Q     And this one, I think, is number 11; is that right?

23  A     Yeah, I can't see it all the way down with the amount,

24  but maybe he can scroll down for me.

25  Q     Oh, let's scroll down --

1   A      Yes, yes.

2   Q      -- we can see -- then we can see the amount.

3   A      I know the -- I know the amount.  So, yes, that's

4   partial proof of loss number 11 (indiscernible) --

5   Q      So it's a little under 42 million; right?

6   A      Yes, that's correct.

7   Q      And --

8            MR. MERVIS:  -- well, actually, let me do this,

9   Your Honor, I'd offer UCC Exhibit 6 in evidence.

10           THE COURT:  Is there any objection to the

11  introduction into evidence of UCC Exhibit 6?

12           MR. JACOBS:  None, Your Honor.

13           THE COURT:  Okay.  Hearing none, it will be

14  admitted.

15        (UCC Exhibit 6 received in evidence)

16           MR. MERVIS:  Thank you.

17  BY MR. MERVIS:

18  Q      And when Mr. Jacobs was asking you questions before, he

19  asked you about the whole approval process, you know, parties

20  that needed to approve and consent; do you recall that?

21  A      Yes.

22  Q      And, at least with respect to the historical practices,

23  proof of loss 11, UCC Exhibit 6, has received all those

24  approvals; right?

25  A      Yes, all the -- all the prior proof of loss has been

1  received.

2  Q     All right.

3              MR. MERVIS:  And, Mr. Esses, if you could pull up

4  UCC Exhibit 7, please?

5       (Pause)

6  BY MR. MERVIS:

7  Q     And, again, Mr. Del Genio, let Mr. Esses or let us know

8  if you need some help scrolling, but you know what UCC

9  Exhibit 7 is; right?

10 A     Yes, this is what we refer to as proof of loss 11-A; I

11 don't know if that's a technical term, but that's how we

12 describe it.

13 Q     11-A.  And the amount here is a little over five

14 million?

15 A     Yes, that's correct, because some of the insurance

16 companies weren't in a position to sign the first proof of

17 loss, but then, subsequently, they were part -- there's an

18 insurance group, not just one insurance company, so these

19 were some of the remaining insurance companies that signed up

20 to proof of loss, which was 11, we call it 11-A because it

21 was a second document that was sent around and signed.

22             MR. MERVIS:  And, Your Honor, I'll offer UCC

23 Exhibit 7 into evidence.

24             THE COURT:  Any objection to the admission into

25 evidence of UCC Exhibit 7?  Hearing none --

1    MR. JACOBS:  None here, Your Honor.

2    THE COURT:  Okay, it will be admitted.

3    (UCC Exhibit 7 received in evidence)

4    MR. MERVIS:  Thank you, Your Honor.

5  BY MR. MERVIS:

6  Q    And, like UCC Exhibit 6, this UCC Exhibit 7 has also

7  received all the necessary approvals and it has been

8  submitted to the insurers; correct?

9  A    That's correct.

10  Q    Now, you talked about a wrinkle in the form of a -- I

11  guess a condition that you understand is being imposed about

12  a court order.  Let me ask you, that's something that you

13  were told by the company's treasurer; right?

14  A    I heard that from the company's treasurer, I've also

15  heard that from the company's counsel.

16  Q    Okay.  And they were telling you what the insurers'

17  counsel told them; isn't that right?

18  A    Well, the treasurer talks to the adjuster and I believe

19  he does have some conversation with the insurance companies,

20  but I'm not sure on, you know, his communication.

21  Q    All right.  In any event, during the entire time that

22  you and the company have been putting out this weekly 13-week

23  cash flow forecasts -- sorry, let me say it differently.

24    Since the time that proof of loss 11 and proof of loss

25  11-A were submitted to the insurers, since that point in

1  time, every single 13-week cash flow forecast that you and

2  the company have put out shows the receipt of the money

3  that's covered by these two proofs of loss; correct?

4  A     Yes.  The timing has changed, but every forecast we've

5  had the insurance proceeds in there -- well, let me just say.

6  I've been doing these since November, so there might have

7  been forecasts where there was no proof of loss, but since

8  proof of loss 11 has been identified and the paperwork has

9  been signed, clearly we've -- during that period we've had it

10 in the forecast.

11 Q     Fair enough.  And in fact about $7 million that are

12 covered by proof of loss 11 have actually come in since June

13 1st of this year; isn't that right?

14 A     That's correct.

15 Q     Mr. Del Genio, in a couple of your declarations you

16 made reference to the debtors' historical minimum liquidity

17 threshold; is that right?

18 A     Yes, I did.

19 Q     And you've reported that that historical minimum is

20 between 75 million and 100 million?

21 A     Well, I said two things.  I said in the historical, not

22 in a constrained environment, 75 to 100.  I also said, in a

23 constrained environment in (indiscernible) during this

24 process that we were working off of 50 million, but the

25 historic level was 75 to 100.

1  Q      Yeah, to be clear, the constrained environment is, in

2  effect, the restructuring environment that you've been

3  involved in since November of last year, right --

4  A      Yeah, and a lot --

5  Q      -- at least that long?

6  A      I'm sorry to interrupt.  A lot of that was, you know,

7  obviously, (indiscernible) where we had even more limited

8  funds.  Now, obviously, with hopefully what gets approved

9  today, the company has more liquidity.

10 Q      And that 75 to $100 million range, that came from the

11 company's CEO and CFO; isn't that right?

12 A      That's correct.

13 Q      You were at a meeting with the two of them when you

14 asked them a question about historical liquidity; correct?

15 A      Meetings and phone calls, yes.

16 Q      Okay, but there was a particular meeting where you

17 asked them to give you a sense of what the minimum liquidity

18 -- level of liquidity to run the business in normal times had

19 been; isn't that right?

20 A      That's correct.

21 Q      And one said a hundred million and one said 75?

22 A      That's correct.

23         MR. MERVIS:  Just a moment, Your Honor.

24     (Pause)

25 BY MR. MERVIS:

1   Q      In your declaration that was submitted most recently

2   that we've had admitted, I think it's -- I think it's Exhibit

3   -- we just had it admitted, but it's the one that you

4   submitted in connection with the stay motion; do you recall

5   that?

6   A      I do, yes.

7   Q      And you talk about, among other things, the validity of

8   the commodities markets; right?

9   A      The validity?

10  Q      I'm sorry, not the validity, the volatility of the

11  commodities markets; correct?

12  A      Yes, I do, yes.

13  Q      And commodities markets have been volatile all

14  throughout history; isn't that right?

15  A      Yes, they have.

16  Q      Including during the time that the debtors were running

17  their business with a minimum liquidity threshold of 75 to

18  $100 million?

19  A      Yeah.  The only thing I would say, they weren't running

20  it through a Chapter 11.

21           MR. MERVIS:  Your Honor, just one second to review

22  my notes.

23           THE COURT:  Certainly.

24      (Pause)

25           MR. MERVIS:  I have nothing further, Your Honor.

1           THE COURT:  Okay.  Thank you, Mr. Mervis.

2           Is there any other party in interest that wishes

3  to cross-examine Mr. Del Genio?

4      (No verbal response)

5           THE COURT:  Okay.  Seeing none, is there any

6  redirect?

7           MR. JACOBS:  No redirect, Your Honor.

8           MR. PERSONS:  Apologies, Your Honor, I had a bit

9  of a Zoom malfunction.  If I could have the opportunity to

10 cross Mr. Del Genio?

11          THE COURT:  You may, Mr. Persons.  You can

12 proceed.

13          MR. PERSONS:  Thank you, Your Honor.  Could we

14 give control of the presentation to Ms. Megan Kahata (ph)?

15          THE COURT:  I believe we can do that.

16          MR. PERSONS:  Ms. Kahata, when you have that, can

17 you please pull up what was Debtors' Exhibit 54?

18                    CROSS-EXAMINATION

19 BY MR. PERSONS:

20 Q    Mr. Del Genio, that's the 13-week cash flow you've been

21 working off and feel free, obviously, to use your hard copy.

22 I certainly don't want to try to read this off a screen

23 myself either.

24 A    Thank you.

25      (Pause)

1          MR. PERSONS:  And if we can go to, I think it's

2   page 3, Ms. Kahata.

3          (Pause)

4          MR. PERSONS:  Why don't we zoom in one notch, if

5   we can, just -- but appreciating everyone is probably working

6   off the hard copy.

7   BY MR. PERSONS:

8   Q     Mr. Del Genio, you testified, I believe, that there

9   were certain C-4 outages with certain vendors that affected

10  the cash flow; is that correct?

11  A     It affected the near term cash flow, that correct.

12  Q     And is that -- are those problems with outages still

13  ongoing?

14  A     My understanding is that some of them have been

15  resolved, but the company is still concerned about getting

16  supplies.  So I can't tell you of all the plants, but based

17  on my last conversation it hasn't been fully resolved in

18  terms of the availability of C-4.

19  Q     And you also testified that there were a number -- in

20  association with the assumed contracts that the debtors have

21  had before the Court, that the debtors had to pay a number of

22  what we'll call in our parlance the cure payments?

23  A     Yes.

24  Q     And are those reflected in the budget at Exhibit 54?

25  A     Yes.  If you go to page 4, please, if you look at

1  footnote number 1 on the bottom -- it's very small, but if

2  everyone has a hard copy -- we call out the weeks where we

3  have expected payments to be in.

4  Q    Those payments are built into this forecast; is that

5  right?

6  A    Yes.

7  Q    And, to be clear, those are one-time events; is that

8  correct?

9  A    Yes.

10  Q    The debtors won't continue to make cure payments;

11  right?

12  A    No, once the contract negotiations are done, those will

13  be current -- they could move, some of these could move week

14  to week, as you can see, because some of them haven't been

15  entered into (indiscernible) and negotiated yet, but those

16  are our best estimates at that time.

17          MR. PERSONS:  Let's go back to page 3, if we

18  could, Ms. Kahata.

19  BY MR. PERSONS:

20  Q    And, Mr. Del Genio, I believe you testified that right

21  now the debtors have pulled $32 million from the term loan

22  DIP piece under the interim DIP order; is that correct?

23  A    Yeah, that was the initial draw, that is correct.

24  Q    And appreciating the insurance proceeds, as you've

25  mentioned, needing to come in, the debtors foresee --

1   according to your budget, foresee borrowing another $6

2   million under the DIP; is that correct?

3   A      Assuming all the insurance proceeds come in, that is

4   correct.

5   Q      And so is there anywhere on this budget, this 13-week

6   cash flow, where the debtors are expected to withdraw or have

7   a total outstanding balance of a term DIP greater than 38

8   million?

9   A      No, as long as they receive those insurance proceeds,

10   it will be capped at 38 million.

11   Q      You would say that, upon entry of the final DIP order,

12   the expectation is that the debtors will borrow an additional

13   $6 million; is that right, Mr. Del Genio, according to your

14   budget?

15   A      According to the budget.  I mean, obviously, it's going

16   to be up to the company.  My view is, we paid for it, so we

17   should borrow it.

18   Q      So the company could do less than $6 million, is that

19   what you're saying?

20   A      Well, the company will make a decision.  I don't run

21   the company, they'll make a decision on what they'll borrow

22   or not.  The forecast and which the company has participated

23   in shows it will borrow the additional six million, but

24   that's not my decision.

25   Q      And were you present in the virtual courtroom when Mr.

1    Jamal testified earlier, Mr. Del Genio?

2    A      Today you're talking about?

3    Q      Yes, today.

4    A      Yes, I've been on the hearing since the beginning.

5    Q      And do you recall that I asked Mr. Jamal about the

6    incremental administrative expense based on a full draw --

7    or, excuse me, based on the final DIP order?

8    A      Yes, I remember your question.

9    Q      And do you recall that Mr. Jamal testified that, by

10   virtue of the full roll-up, the debtors would incur an

11   additional incremental $240 million worth of administrative

12   expenses; is that correct?

13   A      Yes, to the extent approximately, I heard him respond,

14   yes.

15   Q      Okay, so approximately.

16   A      Approximately is what he said.

17   Q      Does that additional $240 million of administrative

18   expenses provide any additional cash to the company?

19   A      Let me answer it this way.  It's part of the package,

20   right?  So as what was negotiated is that was part of the DIP

21   term loan.  So you're asking me, if you remove that, does it

22   provide any incremental liquidity, I have to be very careful

23   here because right now, the way this DIP is structured, it's

24   part of the DIP.

25   Q      Well, let me phrase that question then a little bit

1  differently, Mr. Del Genio.  Does that $240 million of

2  incremental expense provide you or provide the company with

3  any additional money to use -- any additional liquidity?

4  A    You're talking about the roll-up piece of it, is that

5  what your -- I'm just trying to understand your question --

6  Q    Yes, yes.

7  A    -- can borrow six million, so --

8  Q    Yes, Mr. Del Genio.

9  A    The roll-up piece doesn't, but, again, it's part of the

10  entire (indiscernible).

11  Q    So would it be your testimony then that the debtors

12  will be borrowing an additional -- under budget, under your

13  proposed budget right before you, the debtors are expected to

14  borrow an additional $6 million, but in exchange for that

15  incur two hundred -- approximately $240 million worth of

16  additional administrative expenses, is that what your

17  testimony would be?

18  A    Here's the way I would describe it is we negotiated --

19  I mean, maybe it would be helpful to take a step back and get

20  the history here.  We negotiated for --

21  Q    Well, Mr. Del Genio, without going into negotiations, I

22  really just want to talk about what your budget says.  So --

23  A    Well, I'm trying to answer your question.

24          MR. JACOBS:  Your Honor, can we let the witness

25  answer the question, please --

1          THE COURT:  Yeah, Mr. Persons --

2          MR. JACOBS:  -- and if he has a follow-up --

3          THE COURT:  -- I believe Mr. Del Genio is entitled

4  to give an answer to your question.  I do think that what he

5  was saying was responsive, so I'm going to permit him to

6  finish his answer.

7          MR. PERSONS:  Understood, Your Honor, and

8  apologies, Mr. Del Genio.

9          THE WITNESS:  No problem.  There was an $85

10  million facility that was negotiated.  At the time that

11  facility was negotiated, proof of loss 11 -- or 11-A, both of

12  them were unknown, and then it became -- that's when we sized

13  this DIP -- then it became known that there would be this

14  proof of loss and, even at that time, we weren't sure exactly

15  the amount, but then it kind of crystalized.  So what was

16  negotiated was that when proceeds came in that the DIP would

17  be less because dollars are fungible, so that -- but we had

18  different draw conditions because in case for some reason

19  they didn't come in, we wanted to understand how the DIP

20  worked.

21          So, in answer to your question, there was an $85

22  million DIP, there was a roll-up piece attached to it.  The

23  initial draw was 32 and, if these proceeds come in, the 85

24  reduces dollar for dollar.  So it was -- that was a short

25  summary of a very elaborate negotiation.  So the mechanics as

1  I just described were, if for some reason the insurance

2  proceeds don't come in, we can borrow another 25, and then if

3  -- after that, the third draw has a liquidity condition to

4  it.

5          So I don't think it's just six million and you get

6  all this, I think it's the -- it was 85 with this function

7  coming down; if the insurance comes in, it's 38 that we have,

8  and then there's a roll-up that's attached to it.  That's the

9  way I would answer your question.

10  BY MR. PERSONS:

11  Q    Mr. Del Genio, you testified that you believe the final

12  DIP order, entry of the final DIP order will be helpful; is

13  that correct?

14  A    Yes.

15  Q    And is that based on providing the company with

16  incremental additional liquidity?

17  A    Yes.  The way I look at it is -- and I testified on

18  this before -- that I think this company, the more liquidity

19  it has, the better because it's a large company, large

20  vendors and suppliers and customers and they want to know

21  there's enough liquidity.  So, when we were structuring this

22  -- and I know the company has talked to their customers and

23  vendors -- there's three components:  term loan DIP, DIP ABL,

24  and cash, and we feel that that is important for this company

25  to have that funding.

1  Q     But do these vendors that you've spoken to, are they

2  concerned at all about whether or not a roll-up is achieved?

3  A     I haven't spoke to all the vendors, I've had

4  conversations with basically one, the company is really the

5  front end of the discussions.  I don't know if they're

6  talking about roll-ups or not because -- I just don't know.

7           MR. PERSONS:  If I may just have a moment to check

8  my notes as well.

9           THE COURT:  Certainly.

10       (Pause)

11          MR. PERSONS:  Nothing further.

12          THE COURT:  Okay.

13          MR. PERSONS:  Thank you, Your Honor.

14          THE COURT:  Thank you, Mr. Persons.

15          Is there any other party in interest interested in

16 cross-examining Mr. Del Genio?

17      (No verbal response)

18          THE COURT:  Any redirect?

19          MR. JACOBS:  No direct, Your Honor.

20          THE COURT:  Okay.  So, Mr. Del Genio, you may step

21 down.

22          THE WITNESS:  Thank you, Your Honor.

23      (Witness excused)

24          THE COURT:  Mr. Jacobs, your thoughts on where to

25 from here?

1    MR. JACOBS:  Your Honor, my thoughts are, I

2 probably just need to move a couple of documents into

3 evidence where there is no objection, they are Debtors'

4 Exhibits 2 through 8, and I'm happy to walk the Court through

5 those.  And I think, once I move those into evidence, our

6 presentation of the evidence is completed.

7    THE COURT:  Okay.  Let me -- well, let me first

8 ask -- you say there's no objection, let me just get a record

9 on this.  Is there any party in interest that objects to the

10 introduction into evidence of Debtors' Exhibits 2 through 8?

11 Mr. Mervis?

12    MR. MERVIS:  We don't object, Your Honor, but just

13 so that the Court has context, Mr. Jacobs and I exchanged

14 emails last night and identified a set of exhibits that we

15 both agreed would come in without objection.

16    So I have no objection to the admission of those,

17 assuming he doesn't change his mind about the ones that I

18 want to have admitted --

19    THE COURT:  Okay.  Well, if he does --

20    MR. MERVIS:  -- so that's the only issue.

21    THE COURT:  If he does, Mr. Mervis, you should let

22 me know --

23    MR. MERVIS:  Okay.

24    THE COURT:  -- but it looks like Exhibits 2

25 through 8 are certain of the underlying documents in terms of

1  the loan agreements and the like, is that -- do I have that

2  right, Mr. Jacobs?

3        MR. JACOBS:  That is correct, Your Honor, it's the

4  underlying indentures and the inter-creditor agreements,

5  which I think we're all pretty familiar with at this point.

6        THE COURT:  Right.  Okay, all right.  So, in the

7  absence of any objection, those will be admitted.

8      (Debtors' Exhibits 2 through 8 received in evidence)

9        MR. JACOBS:  And with that, Your Honor, we rest --

10        THE COURT:  Okay.

11        MR. JACOBS:  -- (indiscernible) --

12        THE COURT:  Okay.  So, it being 12:40, is this a

13  logical time to break for lunch and to come back following to

14  hear the objecting party's evidentiary case?  Mr. Persons,

15  does that make sense to you?

16        MR. PERSONS:  I believe it does, Your Honor.

17        THE COURT:  Okay.  Mr. Mervis?

18        MR. MERVIS:  It does, Your Honor, but just so --

19  for the Court's planning purposes, our case -- and I can't,

20  obviously, speak for Mockingbird -- our case will just be for

21  moving the admission of the exhibits I referred to a few

22  moments ago.  We had identified Mr. Tracey as a potential

23  witness, but we will not be calling him.  I still think it's

24  a good time for a break, but I wanted the Court to know what

25  lied ahead.

1           THE COURT:  Okay.  And, Mr. Persons, in terms of

2    Mockingbird's case, do you have an evidentiary submission?

3           MR. PERSONS:  No, Your Honor, I think what we have

4    on the record is sufficient at this point.  So we will -- and

5    I believe our exhibits have been moved into evidence by one

6    party or another, so we will be good as well.

7           THE COURT:  Okay.  So I propose that we break and

8    then come back, we address the exhibits by the objecting

9    parties, and then go into closing argument.  Is there anyone

10   who has an objection to proceeding that way?

11        (No verbal response)

12          THE COURT:  Okay, it's now 12:45 here on the East

13   Coast, does returning at -- I'm pretty flexible, but I want

14   to be sensitive to others -- how does returning at 1:30 sound

15   to folks?

16          MR. JACOBS:  Yes, Your Honor, that's acceptable.

17   Thank you.

18          THE COURT:  Mr. Persons?

19          MR. PERSONS:  That's good, Your Honor.  Thank you.

20          THE COURT:  Okay.  So, with that, why don't we go

21   into recess.  We'll be back on the record at 1:30.

22          Thanks to all.

23        (Recess taken at 12:42 p.m.)

24        (Proceedings resumed at 1:30 p.m.)

25

1          THE COURT:  Good afternoon, everyone.  This is

2  Judge Goldblatt.  We are now back on the record.

3          I think where we are is that the objecting parties

4  have some documentary evidence to move into evidence if I've

5  got that right.

6          MR. MERVIS:  Yes, Your Honor.  So, Your Honor, we

7  would like to move, and these are all our exhibits, I think

8  they're labeled ad hoc group which probably they shouldn't

9  have been given that there's two groups.  That is what it

10  says.  Exhibits 2 through 4.

11          THE COURT:  Hold on one second.  Let me make sure

12  I've got your folder open in front of me.

13          MR. MERVIS:  Sure.

14          THE COURT:  So Exhibits 2 through 4 those are

15  cash-flows.  Is that right?

16          MR. MERVIS:  Yes, Your Honor.  I think that is

17  right.

18          THE COURT:  Okay.  Let me pause there.  Is there

19  any objection to the admission into evidence of the ad hoc

20  committee group's Exhibits 2 through 4?

21          MR. JACOBS:  Kevin Jacobs, Your Honor.  No

22  objections to 2 through 4.

23          THE COURT:  Okay.  Those will be admitted.

24      (Non-Consenting Noteholders Exhibits 2 through 4

25  received into evidence)

1          MR. MERVIS:  Your Honor, the next is a bit of a

2     spread, but its 6 through 12.

3          THE COURT:  Okay.  Any objection to any -- let me

4     first ask this: is there any objection by any party in

5     interest to the introduction into evidence of any of the

6     exhibits that are ad hoc group Exhibits 6 through 12?

7          That looks like a no, Mr. Jacobs?

8          MR. JACOBS:  That is a no, Your Honor.

9          THE COURT:  Okay.  Then those will be admitted as

10    well.

11        (Non-Consenting Noteholders Exhibits 6 through 12

12    received into evidence)

13         MR. MERVIS:  The last piece, Your Honor, Exhibits

14    13 through 25 we have marked with Exhibit numbers.  We are

15    not offering them in evidence.  They are the various DIP

16    orders from other cases that was the subject of Mr. Jamal's

17    testimony in that Exhibit D from Mr. Tracey's declaration

18    that was on the screen we will simply ask the court to take

19    judicial notice of those orders, but they're not offered for

20    evidence.

21         THE COURT:  Okay.  Any objection to the court's

22    taking notice of the existence of those orders?

23        (No verbal response)

24         THE COURT:  Seeing none --

25         MR. JACOBS:  None here, Your Honor.

1          THE COURT:  Okay.  The court will take judicial

2   notice of the fact of those orders, but not admit the order

3   themselves into evidence.

4          Anything further, Mr. Mervis?

5          MR. MERVIS:  No, Your Honor.  Cerberus and Bayside

6   rest.

7          THE COURT:  Okay.  My understanding was that

8   Mockingbird did not intend to present an evidentiary case.

9   Do I hae that right, Mr. Persons?

10         MR. PERSONS:  That's correct, Your Honor.

11         THE COURT:  Okay.  So is there any other party in

12  interest that would like the opportunity to present evidence

13  in connection with the court's consideration of approval of

14  the DIP loan?

15     (No verbal response)

16         THE COURT:  Okay.  Seeing nothing further I guess

17  we can turn to argument and if the parties have worked

18  something out I'm happy to adhere to whatever that agreement

19  is and absent that, I guess, it's the debtor's burden and I'd

20  let them kick-off.

21         Mr. Bowling?

22         MR. BOWLING:  Thank you, Your Honor.  Can you hear

23  me?

24         THE COURT:  I can.

25

1        MR. BOWLING:  Great.  Thank you very much.  Your

2   Honor, I will not reiterate the points we raised in our

3   opening this morning.  What I would like to do is focus on

4   the substantive arguments that Cerberus, Bayside and

5   Mockingbird raised in their objections to the DIP motion.

6   There are five of those as well as a few new arguments raised

7   here today.  I will take each of those briefly in turn.  And

8   just for the record this is Scott Bowling of Baker Botts on

9   behalf of the debtors.

10       First, Cerberus and Bayside contend that the

11   debtors do not need to term DIP facility because the debtor's

12   cash-flow forecast shows, in their view, sufficient cash to

13   operate the business.  That, of course, is not a legal

14   standard for whether a DIP facility is appropriate.

15       The bankruptcy code does not force debtors to wait

16   until they run out of cash to borrow money.  You heard Mr.

17   Del Genio testify back at the first day hearing and again

18   today that the DIP facilities are an important part of the

19   debtor's restructuring and that they are critical to the

20   debtor's ability to maintain successful relationships with

21   their counterparties and suppliers.

22       Moreover, Mr. Del Genio has testified that the

23   liquidity provided by the DIP facilities is an important

24   protection against volatility in the commodity markets.  That

25

1    is reflected in the debtor's cash-flow forecast which are not

2    static and which go from week to week.

3         Notably, you have heard no evidence to cast doubt

4    on Mr. Del Genio's testimony or call into question the

5    debtor's business judgment.  To use Mr. Del Genio's words

6    "this is an operating business," his words.  Mr. Del Genio

7    was clear, we are not here to reorganize a financial model.

8    We're here to reorganize and operate a company with all of

9    its uncertainties, counterparties and employees.

10        Because this is an operating company it's effected

11   by unforeseeable events, not only in the debtors own

12   business, but also in the businesses of the debtor's

13   suppliers and customers.  The debtors, in their business

14   judgment, determined that the liquidity provided by the DIP

15   facilities was appropriate protection against the

16   uncertainties that face their operating business.  We have

17   demonstrated extensively why that business judgment was

18   appropriate and no one has shown by that judgment was

19   anything but reasonable.

20        Second, Cerberus and Bayside challenge the roll-up

21   as inappropriate both because it allegedly impairs their

22   appellate rights and based on their calculation of its ratio.

23   As we have cited in our papers and as we believe the court

24   also recognizes.  The roll-up is a roll-up of debt that is

25   over-secured and needs to be paid in full to confirm a plan

1  in any event.  This is not a roll-up of under-secured debt

2  which might implicate concerns about the ratio.

3          When the debt is over-secured the roll-up doesn't

4  harm anyone.  That view is reflected in Mr. Jamal's testimony

5  that the roll-up of the priming notes, which is subject to

6  the challenge, was not one of the debtor's greatest concerns

7  in negotiating this DIP facility.  Any theoretical ability to

8  cram-down the priming notes here or to un-impair them at

9  their nearly 11 percent interest rate with a reinstated

10 maturity in 2024 is simply academic.  At most it's an

11 appropriate concession that the debtors made in exchange for

12 the new money under the DIP facility and the certainty of

13 having an ABL DIP facility and the incremental liquidity

14 provided by the term DIP facility.

15          As Mr. Jamal testified, and nobody has disputed,

16 the proposal submitted by these very same objecting parties

17 involved repaying the priming notes in full.  So the

18 suggestion that we are giving a valuable optionality to

19 pursue some kind of a secured claim cram-down plan is belied

20 by the objector's proposals themselves.  This decision too is

21 governed by the debtor's business judgment.

22          To the extent Cerberus and Bayside contend that

23 the roll-up should not be approved because it may affect

24 their appeal that is a restatement of their facially

25

1  incorrect jurisdictional argument on the divestiture rule and

2  a continued attempt to re-litigate the adversary proceeding.

3        The debtor's decision to seek approval of DIP

4  facility with a roll-up is also appropriate under Section 364

5  of the Bankruptcy Code.  As Mr. Jamal has testified the term

6  DIP facility is the only actionable new money term facility

7  that was available to the debtors. It was negotiated

8  extensively over a period of months, multiple back and

9  forth's between debtors and the ad hoc group.  There has been

10 no evidence to rebut this.  And it goes to both the debtor's

11 satisfaction of the requirements of Section 364(d) of the

12 Bankruptcy Code as well as to the DIP lender's satisfaction

13 of the good faith requirement of Section 364(d).

14        THE COURT:  So, Mr. Bowling, when you say it was

15 the only actionable offer can you just say a few more words?

16 I have, obviously, seen the pleadings, but I take it your

17 point there is that you contend you wouldn't be able to

18 provide adequate protection to the majority holders if you

19 had tried to do a DIP from one of the other potential

20 lenders.  Is that what you -- when you say its the only

21 actionable one is that the work the word "actionable" is

22 doing?

23        MR. BOWLING:  That's correct, Your Honor.  And as

24 you will recall from the first day hearing, Mr. Jamal

25 testified that there was, at least, one DIP facility proposal

1  that had better economic terms in isolation, but was not

2  actionable for that reason.

3           THE COURT:  Okay.  I don't -- I want to hear your

4  five or however many points you want to make.  I am

5  interested though in understanding -- so there is testimony

6  in the form of the various declarations that elude to the

7  fact that the DIP that you have gone with comes with an RSA

8  that provides a path out whereas the alternatives did not.

9           We haven't heard much discussion of that in court

10  today, but it is in the record in the declarations that have

11  been admitted.  I guess I am interested in hearing your

12  thoughts on how that concern should weigh in the balance as I

13  think about the debtor's business judgment.

14           MR. BOWLING:  Yes, Your Honor.  A few things.

15           One, the debtors appropriately decided that that

16  was one of the benefits of this particular DIP facility.  It

17  may or may not have been -- I don't know that there is any

18  basis to say it was the primary benefit, but it was certainly

19  a benefit that it provides a clear path to the emergence from

20  Chapter 11 and it's the kind of messaging that the debtors

21  need to be able to show their suppliers and customers there

22  is certainty here and this is not a, call it, free-fall

23  Chapter 11 case.

24           THE COURT:  So I just want to make sure that I

25  have fully wrapped my brain around what you are saying here.

1  I take it the flip-side of what you're saying is, look, this

2  group of creditors, you know, essentially, has a blocking

3  position with respect to any plan and so choosing a different

4  route would, you know, be running into a world of trouble and

5  we'd be in a Chapter 11 case without a vision of how we get

6  out.

7              I am asking these questions because as I think

8  about the question of the debtor's business judgment I, at

9  least, start thinking about that question from the

10 perspective of did the debtor reasonably exercise their

11 business judgment, sort of, in light of the leverage they

12 actually had, not against some abstract measure of terms that

13 I think would be fair against a blank slate, but, instead,

14 you know, viewing the reasonableness of the judgment as

15 informed by the circumstance in which the debtor found

16 itself.

17             I just want to make sure I'm -- it seems to me you

18 are saying something in that direction, I just want to make

19 sure I'm understanding your argument correctly.

20             MR. BOWLING:  Your exactly right, Your Honor.  I

21 would like to be unequivocal about that.  You know, here in

22 exercising its business judgment the company looked at all of

23 the available circumstances including that it's got secured -

24 - including that it's got two tranches of secured debt in its

25 capital structure, including who the holders are and that I

1  think its approximately 90 percent of the priming notes are

2  held by the same group that holds approximately 85 percent of

3  the ten and a half percent notes.

4           The availability of other alternatives here, as

5  Mr. Jamal testified in his -- and the first day hearing and

6  also in his declarations that we would need consent, of

7  course, from our secured creditors to prime their facilities

8  their existing prepetition debts.  That was not something

9  that we were able to obtain despite our efforts.

10           So under all of those circumstances, as well as

11  the company's need for incremental liquidity, which Mr. Del

12  Genio has testified to, and, frankly, the lack of

13  availability of other DIP facilities.  I think all of those

14  weigh in favor of a reasonable exercise of business judgment

15  and we too look at it as being what's available under the

16  circumstances.  Obviously, no deal is perfect.

17           THE COURT:  Okay.

18           MR. BOWLING:  This is the best deal we have.

19           THE COURT:  Okay.  Let me let you continue.  I

20  think you were in the middle of two of five or more points

21  when I jumped in.  So let me let you go back to your plan.

22           MR. BOWLING:  Thank you, Your Honor.

23           I'd just like to note that the unrebutted evidence

24  here shows that the debtor's negotiated the terms of the DIP

25  facility over a period of months and were unable to obtain

1   financing on better terms.  The roll-up, like the rest of the

2   package of terms that comprised the term DIP facility, is

3   appropriate and it's the best -- the terms are the best terms

4   that are available and the facility should be approved.

5   Cerberus and Bayside have adduced no evidence to dispute

6   these facts.

7           I would note that you have heard concerns about

8   the fees in the term DIP facility.  There is no evidence in

9   the record to controvert Mr. Jamal's testimony that the fees

10  for the DIP are reasonable.  The same argument applies to the

11  rate.

12          The third argument raised in the objections to the

13  DIP motion, again from Cerberus and Bayside, Cerberus and

14  Bayside assert in their original objection that the ten and a

15  half percent notes did not consent to priming by the DIP

16  facility because the consent was not sufficiently backed by

17  paperwork.  This argument ignores the economic reality of the

18  transaction, the fact that the ad hoc group holds nearly 85

19  percent of the ten and a half percent notes and is here

20  consenting to a priming DIP, and the fact that US Bank, the

21  ten and a half percent notes trustee, has been involved

22  throughout this process as, in fact, consented to the priming

23  DIP facility.

24          This court rejected a nearly identical argument

25  that Cerberus and Bayside raised in the adversary proceeding

1   on very similar facts.  We believe that the outcome should be

2   the same here in this instance.

3          THE COURT:  So, Mr. Bowling, let me -- I want to

4   make sure I've got this right.  So just as I understand the

5   record, if I understand what I think the debtors are arguing

6   it's that the consent to the priming was actually given in

7   the inter-creditor agreement, is that right?

8          MR. BOWLING:  That is one argument, Your Honor.

9   The other is that the consent is actually given for this

10  particular facility because --

11         THE COURT:  And -- I'm sorry, go ahead.

12         MR. BOWLING:  -- we have a group here represented

13  by Mr. Hansen and his colleagues who have affirmatively

14  consented to priming.

15         THE COURT:  Okay.  If one works through the

16  document, right, the consent has to be given, essentially, by

17  the trustee, not by the holders, right?

18         MR. BOWLING:  That's correct.

19         THE COURT:  And the -- so if one were to look to

20  evidence of consent by the trustee what I've got is the

21  inter-creditor agreement, is that right?

22         MR. BOWLING:  That is correct, Yoru Honor;

23  although, I think it's also clear I think you could fairly

24  consider the papers that the ad hoc group, based on their

25  verified 2019 statement, holds a majority -- holds more than

1  enough of the ten and a half percent notes to consent to

2  priming, and his here on the record saying that they do, in

3  fact, consent to priming and have directed the Trustee to do

4  so.

5          THE COURT:  Okay.  It's that last part that I want

6  to make sure I -- I just don't gloss over.  When you say that

7  there is evidence in the record that they have directed the

8  trustee what evidence in the record is there of that?

9          MR. BOWLING:  Your Honor, I believe you could

10 infer from the papers that the ad hoc group consents to the

11 priming.  I think its, essentially, an admission.

12         THE COURT:  Okay.  I think I understand your

13 position.   Let me let you continue.

14         MR. BOWLING:  Thank you.

15         The fourth argument, with respect to Mockingbird's

16 objection, Mockingbird raises two arguments.  The first is

17 that Mockingbird asserts that the roll-up is unnecessary.

18 For the reasons we have discussed, specifically the lack of

19 harm to Mockingbird from rolling up over-secured debt and the

20 fact that the roll-up is a singular term of the DIP facility

21 which is a proper exercise of business judgment that was

22 negotiated extensively this assertion should be rejected.

23 Mockingbird has not adduced any evidence that a better viable

24 DIP facility -- by viable I mean actionable as we discussed

25 earlier was available to the debtors.

1       Fifth, Mockingbird asserts that the DIP facility

2  pre-determines the outcome of these Chapter 11 cases.

3  Cerberus and Bayside today suggested something similar which

4  is that the roll-up constitutes a class skipping gift.  This

5  is, of course, not plan confirmation and the term DIP

6  facility does not provide for plan distributions and is not a

7  sub rosa plan.  It's able to be refinanced. If an offer comes

8  along that the debtors find more attractive and actionable,

9  and worth terminating the RSA to pursue.

10       Today, the RSA and the DIP facilities are the best

11  deal that the debtors have available to them and they simply

12  don't predetermine any outcomes here.

13       THE COURT:  Well can I ask you about that because

14  the approval of the DIP, right, assuming I enter an order

15  today that approves the DIP loan on a final basis, I am,

16  essentially approving that with milestones that provided if

17  the plan isn't confirmed that is an event of default and the

18  DIP lenders can foreclose on everything, right?

19       MR. BOWLING:  That's correct, Your Honor.  There

20  are milestones in the DIP facilities. I am not sure it

21  permits them upfront if we close on everything, but there

22  are, in fact, milestones.

23       THE COURT:  So that if the plan that you filed

24  isn't confirmed by a certain time that is an event of

25  default.  I mean where I'm going is it does seem that the

1   decision to go with this DIP is a decision to put a lot of

2   your eggs in the basket that this plan is a confirmable plan.

3   Am I misunderstanding that aspect of your judgement?

4          MR. BOWLING:  No.  You are understanding it

5   correctly, Your Honor.  And I would say that that's --

6   frankly, we actually view that as one of the benefits of this

7   facility and certainly the debtor's customers and suppliers,

8   we believe, see it as a sort of reassurance that there is a

9   path to emergence here.

10          THE COURT:  Okay.  Here is what I want to be clear

11  about and I want to be sure that we're not seeing this a

12  different way.  I wouldn't expect, if I conclude that this

13  DIP loan should be approved, to the extent folks have

14  objections to the plan that anything in approving the DIP

15  would prejudice in any way anyone's plan objections on the

16  merits.  Do you see that differently?

17          MR. BOWLING:  We do not.  We see that the same

18  way.

19          THE COURT:  Okay.  Let me let you continue.

20          MR. BOWLING:  Thank you.

21          I would just add that the assertion of the roll-up

22  debt that has already been held as a matter of law to be

23  over-secured somehow constitutes a class skipping gift

24  assumes that Cerberus and Bayside won summary judgment in the

25

1  adversary proceeding.  We don't need to spend more time on

2  those arguments.

3       The last thing I would mention, Your Honor, is

4  that today Cerberus and Bayside have raised arguments about

5  the inter-creditor agreement. I think we, essentially,

6  addressed these, but we view them as, at best, irrelevant to

7  the DIP motion or a rehashing of the arguments that lost in

8  the adversary proceeding and failed to persuade either this

9  court or the District Court to grant a stay pending appeal

10  with the caveat that to the extent we are relying on the

11  inter-creditor agreement over one of the forms of consensual

12  priming we believe its relevant to that limited respect, but

13  that would be it.

14       So in short, Your Honor, the DIP facilities here

15  are appropriate.  For all the reasons stated in our papers,

16  and elicited in testimony before you today, and at the first

17  day hearing, and in Mr. Jamal and Mr. Del Genio's

18  declarations the DIP facility should be approved.

19       THE COURT:  Thank you.

20       MR. BOWLING:  Of course.  That concludes -- we

21  just would appreciate an opportunity to respond to any

22  arguments that might be raised in other parties closings that

23  we haven't already addressed.

24       THE COURT:  Fair enough.  Thank you, Mr. Bowling.

25

1        Mr. Hansen, I do think it's a matter of logic

2   you're probably next on the agenda.

3        MR. HANSEN:   Thank you, Your Honor.   Always just a

4   sound check before I start.

5        THE COURT:   I can hear you.

6        MR. HANSEN:   Kris Hansen with Paul Hastings on

7   behalf of the ad hoc group and the DIP lenders, Your Honor.

8        Your Honor, I'd like to start by saying in closing

9   all the divestiture cases, effectively, say the same thing;

10  the order on appeal can be enforced, but not modified or

11  altered.   Here the court found that the priority of the

12  10.875 percent notes and what the parties intended, right, is

13  that they are senior to the 10 and a half's and you, thus,

14  preserve the status quo, right.   You entered a summary

15  judgment preserving the status quo of the transaction that

16  had been undertaken by the debtors.

17       So providing a roll-up treatment to those senior

18  claims doesn't modify or alter the summary judgement ruling

19  in any way.   The problem that the objectors have is that

20  their remedy, right, and what they really needed to get was a

21  stay.   To avoid the statutory mootness argument they needed

22  to obtain a stay.   They tried twice, they didn't get one.   So

23  as a result of not getting the stay they resorted to the

24  divestiture rule.   What they say is, listen, Judge, you're

25  actually -- you know, you're expanding your ruling by going

1  over and saying that these notes are senior and ultimately if

2  rolled up into a DIP you have now made them an admin claim,

3  so you've given them something extra, right.

4          Now, obviously, their action didn't have anything

5  to do with the DIP.  Their action, out of the box, was these

6  notes aren't senior.  You decided that they were.  The

7  Appellate Court has that appeal.  But, again, the remedy to

8  avoid the statutory mootness is the stay, it's not the

9  divestiture rule.  So having lost that twice they're now

10 trying to torture the divestiture rule to put themselves in a

11 position to basically get a third shot.  In terms of the

12 third shot I guess they could go to the Third Circuit.  They

13 seem to have chosen not to do that and so they're here

14 arguing that.

15         So, as a threshold, Your Honor, you know, Mr.

16 Hillman went into this in depth in his opening and I just

17 wanted to make sure that I addressed it.  From a closing

18 perspective we don't think the rule applies here.  You're not

19 modifying or altering your decision.  And what you're doing

20 is you're actually enforcing it in the context of the roll-

21 up.

22         THE COURT:  Mr. Hansen, I take it another

23 alternative that Bayside and Cerberus would have would be

24 seek a stay of an order approving the DIP as well, right?

25         MR. HANSEN:  Yes.  I agree with that.

1               THE COURT:  Okay.

2               MR. HANSEN:  We actually -- when we were thinking

3    through, obviously, the strategic steps that they could take,

4    of course, if you enter,  you know, the DIP order they can

5    seek emergency stay with that as well.  Obviously, they can

6    appeal your decision to have entered that order, right.  You

7    know, we would start that again.  It seems like they might be

8    unsuccessful because this is your court's decision on the

9    stay, it was pretty robust but, of course, that is another

10   option that they have.

11              So, you know, Your Honor, I also would point out

12   in the context of this divestiture point Mr. Hillman said it

13   straight-up in his opening, their fight isn't with the DIP

14   and the fight isn't with the roll-up.  Mr. Hillman made some

15   reference in his opening to having the opportunity to propose

16   a cram-down plan, but as Mr. Jamal testified both Cerberus,

17   and Bayside, and Tribe each provided proposals to the debtor

18   that repay the 10.875 percent notes.

19              So that doesn't mean that they're bound to do that

20   forever and, obviously, they can seek to terminate

21   exclusivity in the future and, perhaps, you know, they could

22   try a cram-down plan to the extent that these claims weren't

23   rolled up.  But I think, at least, as we sit here today from

24   a record perspective they recognize -- as Mr. Bowling said,

25   their concern here is with not being a backstop party and not

1  being party to the economics that are provided to the

2  backstop parties.  So they intend to object to the approval

3  of the backstop, they intend to object to the plan.  Those

4  are both part of that process.  They are not part of the DIP.

5         THE COURT:  Let me just make sure we're all on the

6  same page here.  Do you agree with Mr. Bowling that all of

7  those objections are fully preserved if I enter an order

8  approving the DIP today?

9         MR. HANSEN:  I do, Your Honor.  You saved me the

10  words on the argument.  I was about to go there next which

11  was approving the DIP today and rolling up these claims.  It

12  doesn't do anything to their right to be able to challenge

13  the backstop or their right to be able to challenge the plan.

14  Maybe what it does do, again, if they were successful in

15  attempting to pursue their own plan or in attempting to

16  persuade the debtor to abandon this plan and propose an

17  alternative plan is that they lose the right to attempt a

18  cram-up of the 10.875 notes.

19         I mean let's face reality, if the value of the

20  collateral of the 10.875 notes doesn't exceed the $238

21  million associated with the roll-up then we have got a lot

22  bigger problems in this case and this case should probably be

23  moving in a pretty different direction.

24         THE COURT:  Right, but it is also the case that if

25  your plan, essentially, or something substantially like it

1  isn't confirmed after the DIP is approved then we're in a

2  situation where we're in a default under the DIP, right.  So

3  it makes it awfully hard to confirm another plan if you

4  exercise default remedies, right?

5           MR. HANSEN:  If you allow us to exercise default

6  remedies at that point.  If the debtor is unable to find

7  alternative financing that you would approve over our

8  objection to the extent we object, of course.

9           THE COURT:  Okay.  So do you agree that even after

10  I approve the DIP you don't get to enforce default remedies

11  without further approval?

12           MR. HANSEN:  I mean, you know, the DIP order

13  allows us to come back in front of you on a very short period

14  of notice --

15           THE COURT:  Right.

16           MR. HANSEN:  -- without challenging the existence

17  of the default, but, yeah, I don't get to automatically just

18  go and start exercising remedies.

19           THE COURT:  Okay.  I just wanted to make sure that

20  I was reading it correctly in that regard.

21           MR. HANSEN:  We're reading it the same way, Your

22  Honor.

23           Your Honor, when we get to the DIP itself, again,

24  you have got uncontroverted testimony, right, that the -- I

25  appreciate everybody's opportunity to take, you know, time to

1  put in cross-examinations, and ask questions, and try to

2  elicit testimony, but the reality is the cross-examinations

3  didn't do anything except enhance the direct testimony which

4  was the demonstration that the debtors have negotiated this

5  DIP in good faith over a long period of time while evaluating

6  alternatives.

7         Their business judgment is that they have arrived

8  at promoting this DIP and they believe that this DIP is the

9  best DIP for where they are at this time in this case trying

10 to get the debtor in and out of the bankruptcy case.  You

11 know, our group represents in excess of that now in excess of

12 84 percent of the ten and a half percent notes, and in excess

13 of that of the 10.875 percent notes.  That is an important

14 thing to a debtor's board when evaluating whose financing to

15 take in order to move the process forward especially when

16 there really isn't any injury that results to any party from

17 taking the DIP.

18        I mean the creditors committee had a very robust

19 objection, we negotiated with them to get to a conclusion.

20 You can, obviously, imply from that that the committee

21 believes the DIP is necessary to preserve and value this

22 estate as well.  And they recognize that, you know.  They

23 started -- as you saw, they objected to the roll-up as well,

24 but they abandoned that objection in the context of a

25 reasonable negotiation over the order where everybody's

1  rights were preserved and we move forward.  What we're doing

2  is we're preserving the value of the estate.  That is what is

3  most important.

4        What's not important is what piece of the DIP is

5  objectionable or not because candidly, Your Honor, when you

6  look at it as an overall package it's a good DIP.  You have

7  heard Mr. Del Genio's testimony that the DIP is important to

8  keeping the ABL in place.  The ABL plus the term loan DIP are

9  really important to keeping all customer relationships in

10  place and the vendor relationships in place.  And without

11  either one of those, you know, the company's liquidity is

12  really going to be in jeopardy.  It is not a good position to

13  put the debtor in.

14        So when you look at the reasonableness of the term

15  you have uncontroverted testimony there as well. As I just

16  said, the importance of the DIP to the process is really --

17  that box has been checked as well.  And, you know, in the

18  end, Your Honor, I do want to make it clear because Mr.

19  Hillman made a lot of this in his opening statement which is

20  I will bet if you deny the roll-up these DIP lenders will

21  still provide credit to the company.  The answer to that is

22  no, we will not.

23        Where I sit here today, Your Honor, obviously, we

24  proposed a DIP, we negotiated it with the creditor's

25  committee and the debtor.  We have arrived at an order that

1  we would like you to enter.  And, by the way, during the

2  break we had the opportunity to speak with the other parties

3  and everybody agrees that with respect to the roll-up

4  component we continue to maintain our claim at TPC Holdings

5  which we had as a result of the gaurantee that was afforded

6  to the 10.875's.  So there is no controversy there.

7          What I really have to be clear on this point which

8  is that the ad hoc group/the DIP lenders who are already in

9  here for $32 million as interim DIP lenders we're not

10 prepared to continue to offer that financing on those terms

11 at all if you say, well, I'm going to pull the roll-up

12 component out, how's it going.  The answer is not well.

13         THE COURT:  So, Mr. Hansen, let me make sure I'm

14 understanding the state of play here.  So, look, let me --

15 just to put my cards on the table I am by temperament not of

16 the view that it's the job of the bankruptcy judge to play

17 chicken with the lender to try to, essentially, give the

18 debtor leverage the debtor didn't have in order to -- I

19 understand there are some bankruptcy judges that might take

20 the view that that is the role of the court.  Just as a

21 matter of philosophy that's not where I am.

22         I think what I have got in front of me is the

23 question whether based on the evidence in the record the

24 agreement is or isn't a reasonable exercise of the debtor's

25 business judgment and that just is what it is.  Figuring out

1  what would happen if I rule one way or the other, sort of, is

2  what it is, but I'm not here to predict that.

3         I also don't think, tell me if I'm wrong about

4  this, I have any evidence in the record one way or the other

5  about what would happen if I didn't approve the DIP.  Do I

6  have that wrong about what is in the record?

7         MR. HANSEN:  Well, Your Honor, I think Mr. Del

8  Genio was asked questions about what the consequence of the

9  debtor would be if it didn't have the DIP.

10         THE COURT:  Yeah, I understand that, right.  We

11  certainly don't have anything from your clients that's

12  evidentiary that says this is what I would do.  Again, I'm

13  not sure I would admit it into evidence and I'm not sure it

14  matters to the debtor's exercise of their business judgment.

15  That is the question in front of me, but I also don't think

16  that I've -- I understand I've got -- what I do have is the

17  debtor's perspective on why they agreed to this.  And,

18  obviously, that was informed by what they were hearing across

19  the negotiating table.

20         There is nothing more than that, is there?

21         MR. HANSEN:  No.  That is why I was providing it

22  to Your Honor. I don't really think it's a matter of evidence

23  in the sense that I'm the representative of the DIP lenders

24  and I'm telling you that I have had a conversation with them

25  about whether or not they would continue -- whether or not

1  they would call a default under the interim DIP for the

2  failure to meet the milestones for entry of a final DIP in

3  the event that you didn't approve it.  The answer to that is

4  they would.  And whether or not they would be prepared to

5  offer their DIP financing on different terms.  The answer is

6  no.  Obviously, if you said we weren't I would have to go

7  back and talk to them again, but sitting here today as their

8  representative I want that to be clear.

9         THE COURT:  Okay.  I certainly understand that as

10 a position taken by counsel, but not as evidence.  You can

11 proceed.

12        MR. HANSEN:  Thank you, Your Honor.

13        The other point about the need for the DIP here,

14 obviously, Cerberus and Bayside recognize the need for the

15 DIP too. They have made, I believe, two proposals to the

16 debtor to provide the DIP themselves.  It's not a question of

17 do they need a DIP even though they have morphed to that by

18 saying the company has plenty of cash and don't worry about

19 it.  I think we can all say that that is really not the issue

20 that is before the court.

21        We go back to the debtor's business judgment and

22 reasonable exercise of it.  I think everything that you do

23 have in front of you from a record perspective demonstrates

24 that the exercise of that business judgment was absolutely

25 reasonable and was absolutely appropriate.

1          Your Honor, I really don't have anything else to

2  say.  If you have any questions for me with respect to

3  consent; otherwise, I'm happy to answer those.  I would,

4  otherwise, cede the podium to the other parties.

5          THE COURT:  Okay.  This is helpful, Mr. Hansen.

6  Again, if after we hear from the other side if there are

7  points you haven't made that require airing I will, at least,

8  let you tell me that I should listen to you further.

9          I guess I should hear from the objectors unless, I

10 should say, there is any other -- let me ask this question:

11 is there any other party in interest that supports approval

12 of the DIP that wants the opportunity to be heard?

13     (No verbal response)

14          THE COURT:  Okay. Mr. Hillman?

15          MR. HILLMAN:  Good afternoon, Your Honor.  David

16 Hillman for the record, Proskauer Rose, counsel for Cerberus

17 and Bayside.

18          I had some prepared remarks, but I think I need to

19 pivot a bit and speak directly to the concerns that you just

20 articulated.  I am going to put aside Mr. Hansen's testimony

21 or attempted testimony about what his clients will or won't

22 do.

23          You said it very clearly at the first day hearing

24 and you just said it again now.  At the first day hearing you

25 talked about picking up the blue pencil.  Today you talked

1  about your judicial temperament of not wanting to play

2  chicken.

3          So I own the burden to stand before you today to

4  tell you that this is the case for you to bluntly take out

5  the blue pencil for one issue, the roll-up.  I will arm you

6  with everything you need to make that determination and I

7  know I have an uphill claim based upon, I think, the

8  questions that you have asked Mr. Bowling and Mr. Hansen. I

9  would like that opportunity to --

10          THE COURT:  I will give you every opportunity to

11  be heard, but let me just be clear about where I am.  To me

12  what you can persuade me of, if you can, is that the debtor's

13  decision to enter into this DIP on these terms was

14  unreasonable and if they are I don't approve it and people

15  are back to the drawing board.  Maybe if I were to reach that

16  conclusion maybe I would or maybe I wouldn't offer thoughts

17  on what would be reasonable.

18          I think in the first instance what I have is a

19  binary choice.  I have got a motion in front of me and

20  there's a legal standard, and my job is to call balls and

21  strikes and ask whether if when I look at the evidence the

22  standard is met or not met.  I don't think you're going to

23  persuade me that my job is to ask is this really the term

24  that I wish the debtor had and can I think of terms that I

25  would prefer myself.

1          So I will let you be heard, but just to be clear

2    that is how I think about the job that I've got here.

3          MR. HILLMAN:  I understand that, Your Honor, very,

4    very clearly.  What makes our current circumstances unique

5    is, first, I would like to start with the appellate

6    divestiture rule.

7          THE COURT:  Okay.  We can start there.

8          MR. HILLMAN:  What we have heard from the plan

9    proponents is that we have adopted a tortured interpretation

10   that would send the bankruptcy regime into a frenzy if every

11   appeal resulted in a stay of bankruptcy proceedings. I am not

12   advocating for that.

13         THE COURT:  So, Mr. Hillman let's -- can we -- I

14   just want to apologize for the interruption, but I want to

15   make sure I understand what the rule is as you articulate it.

16         And I think your articulation is --

17         MR. HILLMAN:  Yes.

18         THE COURT:  -- any action the judge -- a trial

19   judge might take that would have the effect of mooting a

20   pending appeal from that judge's prior order is prohibited by

21   the appellate divestiture rule.

22         Is that a correct statement of the rule that you

23   would -- that you think exists?

24         MR. HILLMAN:  No.

25         THE COURT:  Okay.  Then what is?

1          MR. HILLMAN:   I think Judge Sontchi's description

2   of the rule in <u>Youngman v Yucaipa</u>, which was citing the

3   <u>Scopac</u> case, Fifth Circuit, which was citing a Third Circuit

4   BAP (phonetic), <u>Whispering Pines</u> says it the best, so the

5   articulation is once an appeal is pending, it's imperative

6   that a lower court not exercise jurisdiction over those

7   issues, which although themselves are not expressly on

8   appeal, nevertheless impact the appeal so as to interfere or

9   effectively circumvent the appeal process.

10          But the appellant's point -- excuse me -- the DIP

11  proponent's point to you to a, I would say, a more narrow

12  interpretation that has support for it in Judge Walrath's

13  decision in <u>WaMu</u>.  And if you were to adopt a, I would call

14  it a more narrow -- narrow interpretation, you're free to

15  enforce the order, so long as you don't alter it or enlarge

16  it.

17          So, let's use that interpretation, what the

18  debtors and the plan -- and the ad hoc group of consenting

19  lenders tell you is the standard, that you can enforce, so

20  long as you're not altering.  I'll accept for purposes of the

21  argument that standard.

22          The question that is posed here is a simple one:

23  Are you being asked to merely enforce the lien priority

24  order?

25          If we look at the proposed order and the mechanics

1  of a roll-up, which are set forth in paragraphs 2(c) and (e)

2  there, it's simple.  There's two things that are being asked

3  of you.  You are being asked to convert the pre-petition 10-

4  and-seven-eighths claim into a DIP claim.  So, there will no

5  longer be a 10-and-seven-eighths pre-petition claim.  And you

6  are being asked to replace the existing lien with a DIP loan

7  under 364(d)(1).

8          Doing those things, converting and replacing,

9  isn't enforcing.  A roll-up is more than enforcement.  So --

10          THE COURT:  So, Mr. Hillman, can I back up a

11  second here.  So, your client came in, in front of me and in

12  front of the District Court and you told us unless we granted

13  a stay pending appeal of the previous declaratory judgment

14  order, your client would suffer irreparable harm.  And I

15  agreed with that; nevertheless, ruled against you, but I

16  agreed with that assertion.  And, Judge Andrews agreed with

17  that assertion and granted an administrative stay.

18          Was that statement true or false?

19          MR. HILLMAN:  That statement is true.

20          THE COURT:  But if you're right now, how could

21  that have been true, which is to say if the appellate

22  divestiture rule is going to prevent me from approving the

23  DIP, how could it have been that you needed a stay from the

24  previous order to avoid irreparable injury?

25          MR. HILLMAN:  Okay.  So, there's mootness.

1  Rolling -- you asked me if mootness alone can trigger the

2  absolute divestiture rule.  And there are two cases that

3  stand for that proposition in our papers:  Norris Green and

4  (indiscernible).  It is clear that if we didn't seek a stay,

5  we would be criticized for not doing so.  The 10-and-seven-

6  eighths would be rolled-up.

7            As Your Honor noted, as Judge Andrews noted, as

8  the debtors noted, that creates mootness under 364(e).  I

9  accept all that and that's what we argued for irreparable

10 harm.

11           The question now is not, are we getting a third

12 bite at the apple?  The question is much more narrow:  Are

13 you enforcing your order?  Are you enforcing the lien

14 priority order?

15           I know that one of the things I anticipated that

16 you would ask me is, Well, what does it mean to enforce the

17 lien priority order?

18           I recognize that the fact that you have determined

19 that the 10-and-seven-eighths are senior sets the stage for

20 where we are now, but it doesn't mean that you're merely

21 enforcing the priority.  The clearest example of enforcement

22 in my mind would be, let's assume there were collateral

23 proceeds and there was a time to make a distribution on those

24 proceeds and the 10-and-seven-eighths stepped up and said,

25 Look, we're next in line ahead of the 10.5s.  That's

1  enforcement of the order.  They are today, without a stay,

2  10-and-seven-eighths are senior, but by converting and

3  replacing, that's not enforcing the order.

4          THE COURT:  So, Mr. Hillman, can I ask you this

5  question -- I apologize for interrupting -- if there weren't

6  a statutory mootness provision of 364, which is to say if it

7  turned out that this ruling -- if I were to approve the DIP

8  and it could be fully considered in due course by the

9  appellate court and there wasn't a risk that you'd face

10  statutory mootness, would your argument on divestiture be the

11  same or does your argument depend on the statutory mootness

12  provision?

13          MR. HILLMAN:  It does not depend on statutory

14  mootness.  The question for --

15          THE COURT:  So, even if you could bring this fully

16  to -- even if after I were to rule today, and now, if I were

17  to approve the DIP, you'd still have the ability to

18  essentially unwind the DIP.  If you were to succeed on a

19  subsequent appeal, I still couldn't consider the approval of

20  the DIP because my jurisdiction would have been divested.

21          That's your position?

22          MR. HILLMAN:  I think we have to roll back just

23  for a second.  This is -- I admit that we're addressing

24  something very fine here.

25          You are not divest -- you are -- the lower court,

1  the Bankruptcy Court is permitted to enforce.  If we -- if

2  you are enforcing, I can't cite the appellate divestiture

3  rule.  So, the question is, are you enforcing?

4          When you add in the notation of whether or not I

5  can appeal another order, if you've converted and replaced --

6  converted the debt and replaced the lien, the existing order

7  -- the existing appeal is a nullity.  There is no longer

8  something to fight about --

9          THE COURT:  All right.  So let me ask you --

10          MR. HILLMAN:  -- because of the actions today.

11          THE COURT:  Let me ask you another hypothetical,

12  okay.  Some litigant challenges, let's just call it a federal

13  program, right, someone says the Federal Government's program

14  that requires vaccine mandates isn't authorized by statute

15  and they file a complaint and they file a motion for a

16  preliminary injunction.  And the District Court grants a

17  preliminary injunction or denies a preliminary injunction,

18  and there's an appeal from the PI ruling.

19          And while that appeal is pending before -- yeah,

20  while that appeal is pending, the parties proceed to the

21  merits.  And now we've reached the merits and the Trial Court

22  has had summary judgment or had a trial and it's ready to

23  decide.  If they decide that will moot the appeal on the

24  preliminary injunction, on your theory of appellate

25  divestiture, why wouldn't that be impermissible?

1          It's not enforcing a previous ruling and it will

2     destroy jurisdiction of the appeal.  So, why isn't that

3     impermissible?  And I'll tell you, that happens in Federal

4     Court every single day, so if you can't distinguish it, then

5     you're wrong.

6          MR. HILLMAN:  So, in your hypothetical, has the

7     District Court granted or denied an injunction?

8          THE COURT:  Either way.  Let's say -- either

9     way -- and let's say granted the injunction and that is on

10    appeal or denied.  In either event, final judgment on the

11    merits will moot the preliminary injunction appeal.

12         MR. HILLMAN:  I am not advancing an argument to

13    you that mootness alone, although there are two cases in our

14    brief that stand for that proposition, is enough to trigger

15    the appellate divestiture rule.  I believe in the bankruptcy

16    context, for the rule that all the parties today are willing

17    to live by -- I am willing to live by the rule, not Judge

18    Sontchi's articulation, which I think certainly supports our

19    position -- but even the more narrow interpretation, the

20    question is:  Is enforcing your lien priority order, is that

21    what you're doing when you approve a roll-up?

22         And I would submit is answer is no.  There's a lot

23    more -- when you look at each mechanic of what you or the

24    Court is approving, it's more than merely approving the

25    seniority of an instrument.

1              THE COURT:  So --

2              MR. HILLMAN:  That's not what's happening here.

3              THE COURT:  -- explain to me how the decision

4  operates to interfere with the appellate court's authority to

5  resolve your appeal, other than through mootness.

6              MR. HILLMAN:  Okay.  There will no longer be --

7              THE COURT:  Because assuming -- there will no

8  longer be, but if you could appeal -- here's where I'm stuck,

9  Mr. Hillman.  I believe that absent statutory mootness, if an

10  order is reversed, then it's incumbent on the trial court to

11  go fashion an appropriate remedy.

12              And, therefore, if it were to turn out that you

13  were to prevail on the merit -- if I were to approve the DIP

14  on a final basis and you were to prevail on your declaratory

15  judgment ruling, that would require the reconsideration of

16  the DIP order and then you'd get a remedy.

17              And so, I don't think I'm interfering.  I'm not --

18  I don't -- I'm not saying I'm enforcing the DIP order.  I

19  don't think it -- I'm sorry -- enforce -- I don't think I'm

20  enforcing the declaratory judgment ruling, but I don't think

21  I'm doing anything that interferes with full consideration of

22  that.  To the extent there's anything that interferes with

23  it, it's the provision of 364 that renders appeals from a

24  financing order statutorily moot, but that sort of is what it

25  is.  So, I don't think I have to call it enforcement.  I

1  think that we're not even in the world of appellate

2  divestiture.  That's how I think about it.

3          So, tell me why that's wrong.

4          MR. HILLMAN:  Well, if the thing that's on appeal,

5  there's two pieces to it, a claim and a lien.  That's what's

6  on appeal, right:  the 10-and-seven-eighths claim and

7  priority of a pre-petition lien.

8          THE COURT:  Uh-huh.

9          MR. HILLMAN:  Those are the items that are on

10  appeal.  That's the subject matter, the corpus.

11          Today, if you approve the order, this Court will

12  be eliminating the corpus before the appeal.  The claim and

13  the lien, it's gone.  If that's -- your actions today take

14  away the claim and the lien; the very thing that is the

15  subject of litigation and that's why I am trying to convince

16  you that the appellate divestiture rule permits you to

17  enforce, but not to do more, and this is more.

18          And it's not that you're doing it.  I'm sorry that

19  I personalized it by saying, "you."

20          THE COURT:  No.

21          MR. HILLMAN:  Of course, it's not you; it's the

22  debtors who are asking for relief that goes beyond.  It puts

23  the Court in a position to do something more than merely

24  enforce.  That's the central thrust.  And I believe,

25  respectfully, entirely consistent with the debtors' cases and

1  with cases, with Judge Walrath and Judge Sontchi, of what it

2  does and it doesn't.

3         But I'm cognizant and want to address the

4  slippery-slope argument.  No one is saying you can't approve

5  DIP financing, right.  That's not what this is about.  No one

6  is saying the case can't continue.  It's not an indefinite

7  stay.  You can approve DIP financing.

8         This one aspect that they're asking you to do,

9  they ran into a problem with the appellate divestiture rule,

10  which is why I say there is a reason in this case for you to

11  push back.  But I think I've exhausted the appellate

12  divestiture rule.

13         THE COURT:  Okay.

14         MR. HILLMAN:  Another -- and, by the way, I'm not

15  giving up on this, so if you have more questions for me, of

16  course, I want to be responsive, but I'm trying to be mindful

17  of the time.

18         THE COURT:  No, I appreciate it.

19         MR. HILLMAN:  So, another reason to surgically

20  push back on a feature, the roll-up -- and, Your Honor, you

21  hit -- Your Honor hit this directly.  You said, look, you've

22  got to evaluate the leverage that they have and it's about

23  the roll-up and the quantum of the roll-up.

24         And here, the evidence is pretty simple and

25  compelling.  It's a 6:1 roll-up if you measure the roll-up

1  based on the amount that the debtors intend to borrow.

2          THE COURT:  Okay.  But, Mr. Hillman, what's your

3  response to the testimony that said, yeah, I understand that

4  when the roll-up operates effectively to encumber otherwise

5  unencumbered assets, the ratio matters, but that in the

6  circumstances of this case where the -- what we're rolling up

7  is already going to be paid in full in any scenario and were

8  not subjecting to a lien, assets that were otherwise going to

9  be available to any other creditor, the ratio doesn't --

10  isn't of any economic importance.

11          What's your response to that argument?

12          MR. HILLMAN:  There are two responses.  One, that

13  assumes that we obviously never get to our day in court to

14  challenge --

15          THE COURT:  Sure.

16          MR. HILLMAN:  -- the 10-and-seven-eighths, okay.

17  So, that's one piece.

18          Second, there are limits to roll-ups.  As far as I

19  am aware, no case has been cited to Your Honor.  I am not

20  aware of any examples where roll-ups can be unlimited in

21  dollar amount.

22          In all of the cases that the debtors' investment

23  banker has brought forth to the Court as comparable

24  situations, the highest roll-up is 3:1.  The debtors'

25  investment banker says in his 22 years of experience, he

1  hasn't seen more than a 3:1.  So, this is 6:1, and so the

2  question -- and I put this in the opening -- you know, how

3  much is too much, because that's a theme here.

4          And I would submit to you that there is an outer

5  limit, all right.  Your hypothetical to me would suggest that

6  in that scenario for a commitment which may never be drawn --

7  and I think Mr. Del Genio's testimony was he's

8  extraordinarily credible.  You know this company, it's nice

9  to have the commitment.  They're not anticipating in all the

10 cash flow projections, they're not anticipating to draw more

11 than the $38 million.  It is not unreasonable to say, Measure

12 the roll-up based upon the new money extended, when and if

13 it's extended, and so, to me, I would submit that there is an

14 outer limit.

15         And your hypothetical to me, which suggests

16 there's none, you can roll up an infinite amount of pre-

17 petition, so long as it meets the criteria that you laid out

18 in your hypothetical.  And I would say I'm not aware of those

19 cases.  None have been cited to you.  And that would be,

20 respectfully, unreasonable and inconsistent with the evidence

21 before the Court today.

22         So, then we move on.  We should just talk about

23 the threat of what happens of default.  I mean, we heard Mr.

24 Hansen and I appreciate the Court's response that that's just

25 lawyer argument.

1          Mr. Jamal never looked at the roll-up.  What I

2   found interesting in his cross-examination, when he was

3   asked, What happens if Your Honor -- if the Court strikes the

4   roll-up, modifies the roll-up?

5          There were objections.  No one was able to

6   anticipate what you would or won't do.  You know, were they

7   thinking about plan B?  Did they have any conversations?

8          And quite surprisingly, and I'm not sure how

9   credibly, you said they have no conversations about plan B.

10  You know, what I think what we can deduce from the evidence

11  is that common sense indicates that when you have DIP lenders

12  with over a billion dollars invested in the company, poised,

13  if this DIP is approved, to be on their way to a highly

14  diluted rights offering, which will deliver the rights

15  offering participants 99 percent of the reorganized equity,

16  is it really something that commercial parties would do to be

17  immunized from, in my opening, I called it an anti-cramdown

18  protection.

19         This isn't a cram-down.  You know, Mr. Hansen

20  said, you know, that's what we were angling for.

21         This is about trying to preserve, you know, I

22  called it a class skip-and-dip, because if we ultimately

23  prevail, that's it, right.  The debt goes from a zero percent

24  recovery to a hundred-percent recovery.

25         So, when you think about --

1          THE COURT:  Can I ask you about that,

2  Mr. Hillman -- and I apologize for being dense here -- when

3  you say the debt goes from zero percent to a hundred percent,

4  are you talking about your client's holding?

5          If -- oh, I see what you're saying.  You're saying

6  if the 10-and-seven-eighths are, in fact, at the bottom of

7  the stack, then moving them up brings them from zero to a

8  hundred.  It's not that there's some alternative that would

9  bring your clients from zero to a hundred, right?

10          MR. HILLMAN:  No.

11          THE COURT:  Your clients are in a slice of $930

12  million face amount of debt.

13          MR. HILLMAN:  A hundred percent, Your Honor.

14          THE COURT:  I see.  I understand what you're

15  saying.

16          MR. HILLMAN:  I'm not advocating valuation.

17          I'm only saying, based on the debtors' valuation,

18  it's either below the fulcrum or above the fulcrum.

19          THE COURT:  Right.  Right.  Okay.

20          MR. HILLMAN:  And today, entering this order,

21  makes that a *fait accompli*, right; ironclad, forever.

22          THE COURT:  It's also the result of an unstayed

23  judgment that's been entered.

24          MR. HILLMAN:  Do you mind if I just look at my

25  notes for a second, Your Honor?

1              THE COURT:  Certainly, Mr. Hillman.

2              And I didn't mean it cut you off.  I'm, as you can

3   tell, I'm sort of puzzling through all this in real time.

4              MR. HILLMAN:  During the debtors' argument, you

5   asked a very pointed question:  Show me consent for priming.

6   Show me the document where the indenture trustee consented to

7   priming.

8              And I heard arguments about implied consent.  Mr.

9   Jamal in his declaration -- I'm just pulling it up here --

10  one second.  It was the one filed at Docket 65.  I'm sorry, I

11  don't have the exhibit reference number.  I think it's

12  Number 2.  He testified at paragraph 25:

13             I further understand the ad hoc group has

14  directed -- and I'm paraphrasing now -- the 10-and-seven-

15  eighths trustee to consent to the priming liens and that the

16  trustee under such indentures have so consented direction and

17  consent.

18             Can I have our binder of the exhibits?

19             There's a letter, an email -- I just want to make

20  sure you have it, Your Honor.

21             THE COURT:  Yes.  So, I know the document

22  you're -- the one that says there is not written instruction.

23             But I can ask --

24             MR. HILLMAN:  That's on the indenture -- sorry.

25             THE COURT:  Can I ask you another question about

1  this issue, though, as I've thought about it, and maybe I've

2  been thinking about it wrong.

3          MR. HILLMAN:  And it's Exhibit 6.

4          THE COURT:  Got it.

5          So, the DIP loan will prime the 10-and-a-half-

6  percent notes.  The party that has the authority to come to

7  court and enforce the 10-and-a-half-percent notes is the

8  indenture trustee, U.S. Bank.  U.S. Bank hasn't come in and

9  objected to the priming.

10          So, why isn't that all I need to know?

11          MR. HILLMAN:  Well, the debtors have the burden to

12  demonstrate adequate protection or a waiver, and so what

13  happens here is the debtors' knowledge, there's no adequate

14  protection because there's no equity cushion.  So, they base

15  their entire case on consent.

16          And you're asking me is the failure to object

17  consent?

18          I would posit, no.  That means that the debtors

19  haven't carried their burden.

20          THE COURT:  Isn't that what we do when we enter

21  third-party releases every day in bankruptcy court?  The

22  third -- the party affected by it hasn't shown up.  We treat

23  that as their consent.

24          The debtors got the burden of establishing that

25  the elements of the plan are met, but we say, look, someone's

1   got to show up.  If they don't show up, that's a forfeiture

2   of their rights.

3           MR. HILLMAN:  Now, I would submit when dealing

4   with a constitutionally protected property interest, the

5   higher standard than a failure to object --

6           THE COURT:  I don't know.  My claim that I have

7   against a third party is a property interest that's as

8   protected by the Fifth Amendment as your lien.

9           MR. HILLMAN:  Your Honor, you asked where the

10  consent is.  The debtor didn't tell you where the consent is.

11          You come up with a theory.  I've tried my best to

12  counter it.

13          THE COURT:  And I hear you.  I'm, again, just

14  trying to figure out the right answer here.  I'm puzzling

15  through this, so I appreciate your humoring me --

16          MR. HILLMAN:  Sure.

17          THE COURT:  -- as I think out loud.

18          MR. HILLMAN:  No, my job is to be responsive to

19  your questions.  And I know I have an uphill battle here, but

20  again, I'm trying to lay all of the cases and legal arguments

21  so that you can reach this decision, which again, you've made

22  very clear it's not your judicial temperament to take out

23  that blue pen.  This is the one.

24          You asked questions about predetermining the

25  flight path.

1          THE COURT:  Uh-huh.

2          MR. HILLMAN:  I mean, the flight path is

3  predetermined, right.  You entered -- if this DIP order is

4  entered, the flight path is predetermined, because when we

5  show up on August -- I think it's 16th -- objecting to the

6  rights offering, the debtor will say, and I guarantee, even

7  though this is a heavily diluted rights offering, we have no

8  other alternative.  We have to do this, and if we don't, our

9  DIP will be in default.

10          And we have these milestones and we're trying

11  desperately to be constructive behind the scenes.  We're not

12  just out here as litigants.  We're trying to negotiate with

13  the company to give this high-class problem, imagine this,

14  cheaper exit financing, cheaper paths, cheaper alternatives,

15  and we are trying to be constructive in this path, but you

16  know when we get to the 16th -- and I appreciate that you

17  have elicited from the debtor and from Mr. Hansen a very

18  helpful statement that the rights to object are fully

19  preserved, that's probably nominal that our rights are fully

20  preserved, that we can stand up, but it's a *fait accompli*.

21  So that's another reason to at least consider what we're

22  asking for here and it's not to throw the entire DIP out.

23          Just one more moment.

24          THE COURT:  Certainly.

25      (Pause)

1         MR. HILLMAN:  Unless Your Honor has questions for

2    me, I think I've given you my best arguments as to why this

3    case deserves a much closer look on one aspect and I tried to

4    arm you with everything you need to reach that conclusion.

5         THE COURT:  Okay.  Thank you, Mr. Hillman.  I

6    appreciate it.

7         MR. HILLMAN:  I appreciate the Court's time.

8         THE COURT:  I appreciate your good humor with my

9    peppering you with annoying questions, so thank you for that.

10   This has been very helpful.

11        Mr. Persons?

12        MR. PERSONS:  Thank you, Your Honor.

13        There are advantages and disadvantages to going

14   forward, I suppose.  You get to hear everybody else, but

15   sometimes everyone else takes some of your arguments away.

16        But nonetheless, Your Honor, but Mockingbird, for

17   its part, notwithstanding what Mr. Hansen might have

18   asserted, does not contest the appropriateness of 8010

19   (phonetic) here.  It contests certain Draconian provisions in

20   terms (indiscernible) and, specifically, we're talking about

21   the roll-up and the events of default that we believe tie

22   this DIP to, basically, as pointed out, exit a *fait accompli*,

23   where our plan is going.

24        You're focused, obviously, on the correct

25   question, which is, was this a proper exercise of the

1  debtors' business judgment?

2         Well, on this line, I want to go back to something

3  that Mr. Bowling argued in his close.  First, that there's a

4  lack of harm associated with the roll-up to my client or, I

5  believe, also to Bayside Cerberus parties.

6         Your Honor, everyone here assumes that the

7  10.875s, if they are not to be subordinated under, obviously,

8  the issues that Cerberus and Bayside raised, but that they're

9  oversecured.  Testimony on direct from Mr. Jamal indicated

10 that even the proposals put forward by Mockingbird and others

11 contemplate paying the 10.875 percent notes in full, with

12 that in mind, Your Honor, I then question why it is so

13 valuable and important for the ad hoc group to get this roll-

14 up, to increase the administrative burden, and to force the

15 debtors to take another $240 million of administrative burden

16 on in exchange for what's going to be an additional $6

17 million worth of borrowing; $6 million, by the way, that Mr.

18 Del Genio testified the company may or may not even need.  He

19 thought it was appropriate to take it because it was there.

20 Not an unusual statement from (indiscernible), but it

21 certainly does indicate how important the $6 million is.

22        There is a difference to my client and to Bayside

23 Cerberus' client.  We, as I think you heard, are trying to

24 offer the debtors an opportunity to maintain some optionality

25 here, to keep the playbook open, because there are parties

1  that are prepared, and have made offers and will continue to

2  make offers and refine those offers, to open up their wallets

3  and find a better result for all parties, as they were trying

4  to do.

5          And when you change a piece of secured debt above

6  you into an administrative -- into a claim that must be taken

7  out if you're going to take out the DIP and try to go in a

8  different direction, it does change the game.

9          THE COURT:  But, so Mr. Persons, why isn't that

10 just an example of the majority -- the ad hoc group basically

11 saying, We've got leverage here because we've got 80 percent

12 of your debt and we want to lock in our position, and so, you

13 know, here's your choice, debtor.  You can go with one of

14 those other loans and good luck to you -- you'll be in

15 bankruptcy forever -- or if you want a path out, here's what

16 it is, but we're locking in our control.

17         I get that that's not palatable, but I don't think

18 the question is, do I like it?  I think the question is,

19 would a reasonable debtor in that situation cry uncle and

20 choose door number one?

21         And you're persuading me that someone's twisted

22 the debtors' arm -- I get it -- but you haven't persuaded me

23 that a reasonable debtor wouldn't cry uncle when their arm is

24 being twisted.

25         Am I thinking about this question the wrong way?

1        MR. PERSONS:  I don't think you're thinking about

2   it the wrong way, Your Honor.  And certainly having

3   represented debtors many, many times in the past, I

4   understand the situation that debtors find themselves in pre-

5   petition as they're looking at their options for DIP

6   financing.  It certainly is a difficult position.

7        What I believe you heard is that the parties that

8   surround this particular transaction have tried to provide

9   the debtors with additional leverage.  What I also think the

10  testimony today showed, and Mr. Hillman hit on it briefly,

11  and I think Your Honor really asked questions about it

12  especially earlier, is, is the process by which the debtors

13  considered this particular DIP, and whether, again, this goes

14  back to was this an appropriate exercise of business judgment

15  at the very least, with respect to the roll-up that stands

16  before the Court, that we very much, like Mr. Hillman, would

17  invite Your Honor, notwithstanding your temperament, to pull

18  the blue pen out and think about whether or not, or in the

19  alternative, push back.

20       And I appreciate that Mr. Hansen has indicated

21  that he talked to his clients and that they would not be

22  willing to fund on this DIP.  But the truth is -- and, again,

23  speaking -- following up on what Mr. Hillman said -- the

24  testimony that you heard today was that Mr. Jamal does not

25  know if the debtors -- what would happen if the lenders

1  didn't get every bit of the roll-up they're seeking.

2          And further on that, what is -- and I agree this

3  is somewhat remarkable -- facing multiple objections from

4  multiple parties all around the proposed roll-up, the debtors

5  apparently, at no point in time, according to Mr. Jamal,

6  chose to even make an ask of the ad hoc group.  That's why

7  there is no evidence on the record before you today as to

8  whether or not the ad hoc group would go forward and fund

9  this, nonetheless.  The debtors don't know.  They never

10 asked.  That, to me, is remarkable.

11         The debtors have also not shown that they

12 considered the appropriateness of the roll-up.  As you heard

13 in his testimony, Mr. Jamal said that the roll-up wasn't

14 considered when they were continue -- when they were

15 originally negotiating the DIP.

16         It's hard for me to understand, Your Honor, how

17 Mr. Jamal, who is accurate as banker for these debtors and

18 the advisor to, obviously, the Board as it thinks through

19 these situations, could have not contemplated the

20 appropriateness or not considered, and one would presume, not

21 presented any evidence of the appropriateness of that roll-

22 up, whether or not it should have been taken up by the

23 company.  And I think that demonstrates --

24         THE COURT:  So, Mr. Persons, what's your response

25 to the testimony -- what he basically said, and I'm

1  paraphrasing and putting it in my own words -- but he

2  basically said, Look, I don't know why this was so -- well,

3  he didn't say "I don't know why" -- and maybe one could

4  speculate as to the reasons why the ad hoc group cared about

5  it, but what he said was from the estate's perspective, this

6  wasn't goring anybody's ox.  So, I thought I should use my

7  limited leverage on matters that would make a difference to

8  the estate, not to this.

9          Why is that unreasonable?

10          MR. PERSONS:  And, Your Honor, that may well have

11  been true at the time the DIP negotiations started.  You

12  heard testimony that it took a long, long period of time to

13  get the DIP done.  But in the time intervening, at least

14  after that, you know, those negotiations began, other parties

15  did show up and offer alternatives.

16          And the question at that point was, did the

17  debtors -- did the debtors' management or Board, under the

18  advice of its professionals, did it consider whether or not,

19  given the other potential deals on the table, whether or not

20  this was appropriate.  Did they even push back?

21          There simply isn't any testimony on the record

22  today that indicates that they did.  Well, I understand.  I

23  think none of us are -- again, none of us are new to this

24  game.  We understand that debtors have a difficult time

25  obtaining leverage, but just because it's difficult to

1  negotiate doesn't automatically mean that you've exercised

2  your business judgment appropriately.

3        And, Your Honor, I don't think, at least with

4  respect to the roll-up terms, especially in light of the

5  facts that we've heard, that an additional $6 million worth

6  of liquidity that may not be needed, will result in $240

7  million worth of administrative claims, which shuts down or

8  largely takes away the ability for anybody to come in and

9  refinance that DIP, that's an enormous burden that the

10  debtors are taking on, apparently in the face of Mr. Jamal

11  and perhaps the other professionals, not really providing the

12  kind of information which would be necessary to exercise

13  business judgment appropriately.

14        So, I would take that, Your Honor, and I think I

15  believe Mr. Hillman said, want to arm you with the reasoning

16  or arm you with the opportunity to pull out your blue pen, or

17  in the alternative, say on the record, I think you all should

18  go back and think about whether this is the right amount of

19  money and whether the ad hoc group will really do this.  And

20  you can use that because we are not -- we have not seen at

21  any point in my mind today, evidence of how the debtors'

22  Board exercised their business judgment with respect to this

23  particular, very, very pointed, but very important aspect of

24  this DIP that does foreclose a lot of options to the debtors

25  without really giving the debtors much in return.

1    I'll take just a moment to look at my notes, as

2  well, again.  Going last sometimes means you -- everyone else

3  said some of your stuff first.

4         THE COURT:  Take your time.

5      (Pause)

6         MR. PERSONS:  I think that's all, Your Honor.

7  Thank you.

8         THE COURT:  Okay.  Thank you, Mr. Persons.

9         Let me ask if the debtor or the ad hoc group wants

10  to be heard briefly by way of response?

11         Mr. Bowling, unless you prefer Mr. Hansen go

12  first?  Whatever your preference.

13         MR. BOWLING:  Just very briefly, Your Honor.

14         The point I'd like to make is that we disagree

15  with Mr. Persons' characterization of the evidence regarding

16  the testimony -- regarding the negotiation history of the

17  DIP.  I think there's -- I think the record is replete with

18  Mr. Jamal's testimony regarding the negotiation history of

19  the DIP facility, that it took months.  That it involved

20  extensive back-and-forth.  And there is no evidence in the

21  record to the contrary on that point.

22         I would just also add that we have confirmed, to

23  address one of Mr. Hillman's points, we have confirmed on the

24  record that the arguments the parties wish to make at future

25  points in these cases are not being prejudiced by this DIP

1 | facility.  Mr. Hansen has already confirmed that as well on
2 | the record.

3 |      And I would close by saying, if there is a better
4 | alternative available to the debtors, we are, of course, open
5 | for business, because our job here is to maximize value.
6 | Currently, this is the best deal that's available to the
7 | debtors and at some point, we need to emerge from these
8 | Chapter 11 cases.  We believe this is the best way to do it.

9 |      That's all, Your Honor.

10 |      THE COURT:  Thank you, Mr. Bowling.

11 |      Mr. Hansen?

12 |      MR. HANSEN:  I was just going to say, I don't have
13 | anything else to add, Your Honor.  If you have any questions
14 | for me, I'm happy to answer them, but otherwise, nothing to
15 | add.

16 |      THE COURT:  Okay.  I don't.

17 |      So, here's where I am -- and no one's going to be
18 | happy with me -- but given that it is 10 minutes to 3:00 on a
19 | Friday in the summer, I'm going to take a little bit less
20 | than an hour to gather my thoughts and review the day's
21 | testimony and arguments and I propose to come back at -- I
22 | can do the math -- 3:45.  And I don't think I'm going to have
23 | a work of art, but I think I'll be able to make some findings
24 | and conclusions in support of my determination.

25 |      So, unless there's anything that folks -- let me

1  ask this question first:  Before we recess until then, is

2  there anything else that we should address by way of

3  housekeeping?

4          (No verbal response)

5          THE COURT:  Okay.  If not, then we're going to

6  recess and we will come back on at 3:45.  So, thanks to all.

7          (Recess taken at 2:49 p.m.)

8          (Proceedings resumed at 4:15 p.m.)

9          THE COURT:  Good afternoon, all.  This is Judge

10 Goldblatt.  We are back on the record.

11         Apologies to everyone after -- beginning by

12 apologizing for delaying everyone's -- the start of

13 everyone's weekend, I went and delayed it even more than I

14 had planned.  So my apologies for that and thanks for

15 everyone's patience.

16         Let me begin by thanking everyone for the terrific

17 presentation of evidence and the argument today.  I

18 appreciate that this is a matter in which the stakes are

19 high, that folks have worked very hard and it shows in the

20 terrific advocacy all around, I really do appreciate that.

21         So I'm not one who believes that a judicial

22 decision ought to be a murder mystery where the reader is

23 kept in suspense until the end, so I'll start with the punch

24 line.  I will approve the DIP loan on a final basis.  There

25 are some minor issues about language that we'll get to

1  towards the end of this discussion, but the substance of that

2  is that I'm persuaded that the debtor has met its burden

3  Section 364 of establishing the propriety of the proposed

4  post-petition financing.

5          After walking through the reasons that I came to

6  that conclusion, I also want to say a word or two about some

7  concerns I have about the path forward and why those concerns

8  do not stand in the way of approval of the loan.

9          I'm going to start with jurisdiction to consider

10  final approval of the DIP loan, and so I would start with the

11  argument that Cerberus and Bayside have made about the

12  appellate divestiture rule.

13          I don't believe that the appellate divestiture

14  rule has any application here.  At bottom, what that rule is

15  about is, it is a directive to trial courts that they should

16  not play Lucy-and-the-football with the appellate courts;

17  your decision may not be a moving target.  Once it is on

18  appeal, the trial court should keep its hands off the

19  decision that is the subject of the appeal.  Once Charlie

20  Brown starts to run, the football needs to stay where it is.

21          I alluded to that very rule earlier in this case

22  when, in connection with the motion for a stay pending

23  appeal, I declined to revise a passage in my declaratory

24  judgment ruling that I described as infelicitous because by

25  then a notice of appeal had been filed and the matter was

1  before the district court on appeal.  The point of the

2  doctrine, though, is that where the subsequent action by the

3  trial court would affect the foundation of the matter on

4  appeal, the appellate divestiture doctrine says you may not

5  do so.

6          Those are the circumstances of the cases as I read

7  them that are cited by Cerberus and Bayside in their pleading

8  that's directed to this issue, which is D.I. 508.  This just

9  isn't such a case.  It may be the case that the order

10  approving the DIP, if not stayed, will moot the appeal from

11  the declaratory judgment ruling, that's not a decision for me

12  to make.  But, despite what some of the non-binding authority

13  cited by Cerberus and Bayside might say, that cannot possibly

14  trigger the appellate divestiture rule or the commonplace

15  occurrence of a trial court proceeding to the merits while a

16  preliminary injunction ruling was on appeal would also

17  trigger the appellate divestiture doctrine.

18          The situation here is, at best, analogous to that

19  situation and I haven't heard any potential articulation of

20  the metes and bounds of the appellate divestiture rule that

21  would permit that everyday occurrence, but that would strip

22  this Court of authority to proceed to consider final approval

23  of the DIP loan.

24          I will add that, even if there were such an

25  articulation, the Court finds that principles of judicial

1   estoppel would nevertheless bar the application of that rule.

2           Here, Cerberus and Bayside represented to this

3   Court and to the district court that they would suffer

4   irreparable injury if the Court did not grant a stay pending

5   appeal.  Both this Court and the district court credited that

6   argument and, on account of that determination that Cerberus

7   and Bayside would suffer irreparable injury, the district

8   court granted an administrative stay.  Now, having obtained

9   whatever leverage or other benefit they might have received

10  as a result of having taken that position, principles of

11  equity bar Cerberus and Bayside from being heard to argue

12  that a stay was not necessary after all because the mere

13  pendency of the appeal operated to preclude this Court's

14  consideration of final approval of the DIP motion.

15          So, even if the argument were correct, and I don't

16  believe it is, Cerberus and Bayside would be judicially

17  estopped from advancing it.

18          Okay.  I'm going to turn next to the debtors'

19  showing with respect to its need for DIP financing.

20          Based on my consideration of the documents and the

21  declarations that were admitted into evidence today, and the

22  testimony of the two witnesses, Mr. Jamal and Mr. Del Genio,

23  I'm satisfied that the debtors have reasonably exercised

24  their business judgment in deciding to enter into the

25  proposed DIP.  I'm persuaded that one cannot cherry pick and

1  say that the debtors should have done the ABL loan without

2  the term loan since there is no suggestion that the ABL loan

3  would have been available in the absence of the term loan.

4         The question of how much liquidity is necessary

5  and appropriate is precisely the kind of business judgment

6  where this Court ought to defer to the debtors' exercise of

7  its business judgment.  And I am satisfied, based on the

8  evidence that was presented, that the debtor exercised its

9  business judgment prudently here.

10         This is a business that is subject to the

11  vicissitudes of the real world.  Being in a position to have

12  some measure of cushion in terms of cash and borrowing

13  availability seems eminently sensible in light of the

14  circumstances in which the debtors find themselves.  Indeed,

15  the objectors don't really take issue with the need for a DIP

16  loan, they mostly complain that the terms are unduly onerous

17  and ask that I revise those terms.

18         So, turning to the terms, I will decline the

19  invitation to blue pencil the agreements that were reached by

20  the parties at what I find, based on the evidence before me,

21  to have been arm's length-negotiated terms.  The evidence

22  there is extensive that negotiations took place, were

23  protracted, that there was extensive back-and-forth.

24         And, as I said during some of the colloquy with

25  counsel, I believe that the task before me is principally a

1   binary one.  I think my task is to find that the debtor

2   either did or did not exercise its business judgment

3   appropriately.

4           Most importantly, I think everyone agrees, based

5   on the discussions we've had, that I ought to make that

6   assessment against the backdrop of the leverage the debtor

7   actually had and, under the circumstances of this case, the

8   decision of the debtor to move forward with a loan made by

9   lenders who happen to hold the overwhelming majority of its

10  debt and whose support is likely necessary for their

11  successful reorganization cannot be said to be unreasonable.

12          To be sure, the record suggests that those lenders

13  exercised leverage they had and they did so by demanding a

14  roll-up, as well as milestones that collectively ensure that

15  they will have a very substantial voice in the future

16  direction of this bankruptcy case.  But I view the question

17  before me as whether the debtor made a reasonable decision in

18  light of the situation in which it found itself.  I do not

19  believe it to be an appropriate judicial task to insist on a

20  deal that is more favorable to the estate than the best that

21  the debtor, as a fiduciary, was able to bring back.

22          To be sure, the ratio of the amount of rolled-up

23  debt to the amount of new money is high and, depending on

24  whether you think the right denominator is the amount that

25  will actually be advanced or the availability under the loan,

1  it could be described, alternatively, as being very high or

2  being very, very high.  But I was persuaded by Mr. Jamal's

3  testimony that in the circumstances of this case that had

4  relatively little effect on the estate.

5           As long as the debt being rolled up is above the

6  fulcrum, the lender is not receiving more than it otherwise

7  would and, as long as the loan does not encumber assets that

8  were otherwise unencumbered, it does not come out of any

9  other party's recovery.  In those circumstances, which no one

10  really contests are the circumstances present here, the

11  result of the roll-up is mostly that the lender can't be

12  crammed up and that it is harder for a new lender to take out

13  a DIP as part of some kind of refinancing that would take

14  place during the bankruptcy case.  And, given the leverage

15  the DIP lenders have in these negotiations, I do not think

16  that the debtor acted unreasonably in acceding to that

17  demand.

18           Cerberus and Bayside also point out that the DIP

19  loan will prime the loan of the ten-and-a-half-percent

20  lenders, which can only be done with those lenders' consent,

21  but that consent was granted in Section 6.1 of the 2021

22  inter-creditor agreement, which was admitted into evidence as

23  Debtors' Exhibit 3.  And, contrary to the argument made by

24  Cerberus and Bayside, I do not believe that the pending

25  appeal precludes the Court from relying on that agreement.

1  And in any event, in the alternative, the Court would be

2  prepared to infer the consent of U.S. Bank from its failure

3  to file any objection after having been served with the DIP

4  motion and having appeared in the bankruptcy case.

5           So those are my principal findings and the reasons

6  why I'm prepared to enter the terms of the DIP loan.  There

7  are two caveats there.  One, all parties have agreed that the

8  entry of the DIP loan does not prejudice any party's rights

9  with respect to future arguments they might make regarding

10  plan confirmation.  And so I propose adding to the order -- I

11  can't blue line the agreement, but I can include language in

12  the order that says nothing herein shall prejudice the rights

13  of any party to advance any argument in favor of or in

14  opposition to confirmation of the debtors' proposed plan of

15  reorganization.

16           The other question I had that I wanted to talk

17  about is there's language that would stay -- that would

18  essentially terminate the stay that would otherwise apply by

19  virtue of the rules to the effectiveness of the order and my

20  usual practice is, to the extent a party is representing that

21  they intend to seek a stay from the district court of the

22  effectiveness of this order, that I would adjust the stay

23  that I am entering in order, essentially, not to unduly jam

24  the district court.

25           So let me ask, is there any party that intends to

1  seek stay of the order approving the DIP loan?  Mr. Hillman?

2         MR. HILLMAN:  Yes, I rise or, you know, activate

3  my video only to say I haven't had an opportunity to confer

4  with Cerberus and Bayside.  So I think that question is

5  directed to me and potentially to Mockingbird and the only

6  thing I can say is, I don't know the answer to the question

7  and would like the opportunity to confer with the clients

8  before, you know, that window is closed on us.

9         THE COURT:  Okay.  Why don't I give you a half an

10 hour and if by 5 o'clock you're in a position to represent

11 you intend to seek such a stay, I'll -- here's what I will

12 do.  The language that we're talking about is in paragraph 45

13 and -- well, actually, before we get into -- Mr. Persons, do

14 you have something different to say on this topic?

15        MR. PERSONS:  I don't have an answer right now.

16 I'm interested to hear what the Court's (indiscernible) --

17        THE COURT:  Okay.  So here's -- if by 5 o'clock

18 you are in a position to represent that you intend to seek a

19 stay, I'll require that paragraph 45 be revised to say,

20 rather than this order shall be immediately effective and

21 enforceable upon entry, to say this order may be effective

22 and enforceable upon its entry upon -- what I want to say is

23 at the end of the day Tuesday, to give essentially the

24 weekend and 48 hours for you to seek and obtain a further

25 stay.  So, basically, at the end of August 2nd it would

1  become effective and enforceable, but I'm going to insist on

2  that language be included only in the event one or more

3  objecting parties represents that it has an intent to

4  immediately seek such a stay.  In the absence of such a

5  representation, I'll allow the order to enter as written.

6           Does that give the parties enough guidance to work

7  through that issue?  And I understand you'll need to be

8  reaching out to your clients promptly.

9           MR. PERSONS:  Yes, I think so, Your Honor.  Thank

10  you.

11          THE COURT:  And I should say, to the extent anyone

12  were going to seek a stay from me, it wouldn't be granted.

13  So you're permitted, under the circumstances, to proceed

14  directly to the district court, if that's -- if you intend to

15  seek a stay, the idea here being I want to be as considerate

16  as possible to the district court and not put them in a

17  situation that creates more of an emergency than necessary.

18          MR. HILLMAN:  Your Honor, may I be heard on one

19  question?

20          THE COURT:  Yes, you may.

21          MR. HILLMAN:  I don't know if there's a liquidity

22  need that is justifying the entry of the order to have effect

23  without the language that you've proposed in the next 30

24  minutes, I just don't know if it's feasible to get feedback.

25  So, in the absence of a liquidity need, I don't want to do

1  anything to harm the company, but the only request that I

2  would make is, can that language exist or do you need us to

3  report back to you by 5 o'clock?

4       THE COURT:  So this language has been in this

5  draft order since the beginning of the case and, if you had

6  an objection to it, you could have raised it and haven't.

7  And I think, by giving you a half an hour, I'm giving you a

8  half an hour longer than I needed to.

9       MR. HILLMAN:  Thank you, Your Honor.

10      THE COURT:  Okay.  So I do have a few additional

11 points that I want to add.  Before that anyone here feels as

12 if the wind is now at their sails, I thought I should say a

13 word about a lingering concern that I have.

14      So, as discussed, this DIP loan incorporates the

15 RSA milestones and, as a result, the failure to meet those

16 milestones becomes an event of default.  So, to the extent

17 there are concerns about the plan, they are at least a

18 relevant consideration of the approval of the DIP loan.  And

19 there's a concern that I have, without prejudging any issue,

20 that I thought it appropriate to highlight in view of the

21 evidence that I heard today.

22      During the cross-examination of Mr. Jamal, there

23 was evidence that the members of the ad hoc group would under

24 the plan receive substantial value that is not described as a

25 payment on account of their prepetition secured claim or

1  payment under the DIP, but is instead essentially described

2  as fees for backstopping the rights offering and the exit

3  facility.  And on hearing that testimony, it really jumped

4  out and underscored that this question of whether that value

5  is on account of the prepetition debt or on account of those

6  plan transactions will be important to whether the plan

7  comports with the requirement of the Bankruptcy Code that

8  similarly-situated creditors be treated alike.

9         And at some level it does seem as if, for example,

10  the Supreme Court's decision in 203 North LaSalle is highly

11  relevant to that question and that, when you're asked is the

12  reason a party, a creditor or interest holder receiving

13  certain treatment on account of their claim or interest, on

14  the one hand, or on account of a plan transaction on the

15  other, that the way that's answered is by market testing.

16  And I've got some concerns that these transactions here

17  aren't market tested, which, if right, would counsel in favor

18  of the view that it's actually consideration being given on

19  account of the claims, which would give rise to claims of

20  discriminatory treatment.

21         Now, I say that not to answer any of these

22  questions today, but because I had concerns about approving

23  the DIP that, if that turns out to be a problem, the case

24  could be in trouble, I ended up satisfying myself that no one

25  can exercise default remedies without approval from the Court

1  and that, with the quality of the parties here, there may be

2  an opportunity to work through those issues between here and

3  there.  But I did want -- and, again, nothing I've said, you

4  know, is intended to prejudge anything and everything I said

5  on this topic could well be entirely mistaken.  And so no one

6  should take this as I've decided anything, it's just that, as

7  I heard the evidence, I became concerned about it and thought

8  it only appropriate to share the concern, so that the parties

9  can all proceed appropriately.

10         So, with that, let me ask this question.  Are

11 there any questions about what I just said that I can help

12 address?

13      (No verbal response)

14         THE COURT:  Okay.  If not, what I would propose

15 then is that the objectors reach out to the debtor -- well,

16 let me ask the question this way.  Can we -- I just want to

17 puzzle through the question of timing of the entry of this

18 order and how -- we are obviously happy to enter an

19 appropriate order, you know, in the evening, over the

20 weekend, whenever it's -- whenever we're in a position to

21 enter it, but I would be interested in hearing from the

22 parties about how much time sensitivity there is from an

23 operational business perspective as to when the order is

24 entered.

25      (Pause)

1          THE COURT:  Mr. Bowling?

2          MR. BOWLING:  Thank you, Your Honor.  For the

3   record, Scott Bowling, Baker Botts, for the debtors.

4          I think it would be -- I mean, look, we would

5   prefer that the order be entered as soon as possible, of

6   course, and that would certainly be operationally helpful for

7   the debtors in terms of messaging their counterparties and,

8   you know, maintaining confidence.  That said, I don't know

9   that it makes a tremendous difference whether the order is

10  entered today versus sometime early next week, we're only

11  talking about one or two business days.

12         THE COURT:  I see.  All right.  So if that's the

13  case, why don't we do the following then.  Why don't I ask --

14  I can then maybe be less unreasonable to Mr. Hillman than I

15  proposed to be and ask that they get to you at some point

16  before noon on Monday and that, on Monday, you submit a form

17  of order on certification, is that -- is proceeding that way

18  appropriate?

19         MR. BOWLING:  That's okay for the debtors, Your

20  Honor.  We of course have DIP lenders.

21         THE COURT:  I understand.  Mr. Hansen?

22         MR. HANSEN:  (Indiscernible) --

23         THE COURT:  So, Mr. Hansen, you're breaking up,

24  I'm not sure why.  We heard you perfectly well before.

25         MR. HANSEN:  Okay.  Can you hear me okay now?

1           THE COURT:  I can, yes.

2           MR. HANSEN:  Sorry, I was too far away from the

3  microphone.  Your Honor, I was just saying that we have a

4  milestone for entry of the final DIP order; I think it's on

5  the 3rd.  So, obviously, if the objectors are going to seek a

6  stay, they've got to get that stay prior to that point.  We

7  don't want to extend that milestone, we've been waiting long

8  enough.

9           So, yeah, I'll have to speak to the clients.  I

10  don't really have personally any objection to giving them

11  time to make that decision.  I understand the difficulty of

12  maybe reaching a client at 5 o'clock on a Friday, but I just

13  want to make the Court aware of that milestone.

14           THE COURT:  So, Mr. Hansen, let me be clear.  The

15  milestone, as I understand it, is about the entry of the DIP

16  order, not the effectiveness of the order, right?

17           MR. HANSEN:  Yeah, that's true, Your Honor, but,

18  obviously, if you're entering it without the language that

19  we've asked for, which of course delays --

20           THE COURT:  Right.

21           MR. HANSEN:  -- the potential --

22           THE COURT:  Okay.

23           MR. HANSEN:  -- (indiscernible) --

24           THE COURT:  But what I'm proposing, essentially,

25  is that the order become effective at the end of the day on

1   the 3rd, unless it is -- that if there is -- if someone will

2   represent that they intend to -- here's what I'm proposing, I

3   just want to be really clear and I probably wasn't.  If no

4   one is willing to represent by noon on Monday that they

5   intend to seek a stay, the order would be entered on Monday

6   with the language that makes it effective immediately.

7           If someone will represent that they do intend to

8   seek a stay, then the order will provide that it will become

9   effective at the end of the day on the 3rd unless stayed.

10  And so, in any event, I'll have done what I can do to have it

11  become effective by the 3rd.  If someone else stays it,

12  that's out of my hands and you have whatever rights you have.

13          MR. HANSEN:  That's acceptable -- yeah, that's

14  acceptable to us, Your Honor.

15          And the other thing I would say too is, I just

16  want to be clear here, the record on everything before you is

17  closed, so I -- and I don't really need to say that, you've

18  obviously ruled, you've taken into account everything that

19  was presented today, all the parties said that the record was

20  closed, but I just want to make sure, given the circumstances

21  that we're under, that no one is going to attempt to return

22  to Your Honor with some type of new evidence, new proposal,

23  or whatever it is.

24          THE COURT:  Well, anyone can seek reconsideration

25  at any time, but they will have an uphill battle.  They'll be

1  subject to all the standards about why I didn't hear about

2  it, you know, when they were required to present it.  So I

3  don't -- it would surprise me if someone were able to

4  persuade me that I should hear new arguments or evidence.

5          MR. HANSEN:  Thank you, Your Honor.

6          THE COURT:  Okay.  Does that give the parties the

7  guidance they need to proceed or does anyone -- Mr. Miller,

8  let me give you a chance to be heard.

9          MR. MILLER:  Good afternoon, Your Honor, Curtis

10 Miller of Morris, Nichols, Arsht & Tunnell on behalf of the

11 debtors.

12          The one thing I just wanted to raise is in your

13 initial comments you had mentioned that this stay that you --

14 the temporary stay that you would impose to allow Cerberus,

15 Bayside, or Mockingbird to go to the district court was until

16 Tuesday, and in your comments you just made you said the 3rd.

17 We would obviously --

18          THE COURT:  You're right.

19          MR. MILLER:  -- prefer it be the 2nd.

20          THE COURT:  No, thank you, Mr. Miller, I

21 appreciate that clarification.  That was just a mistake on my

22 fault.  So I mean Tuesday.  And so --

23          MR. MILLER:  So the 2nd then?

24          THE COURT:  Yeah, exactly.  So, look, I'm happy to

25 let the parties work through the language.  The concept would

1  be that, as I see it, if they're making a representation that

2  they intend to seek a stay, then it would -- the order would

3  not become effective until the end of the day on the 2nd, so

4  long as a stay was sought by the end of the day on the 1st.

5  And I'm sure there's a better --

6              MR. MILLER:  Understood, Your Honor.

7              THE COURT:  -- and clearer way to say that, but

8  that's essentially the gist of what I intend to do.

9  Basically, if someone wants to seek a stay, I want to not put

10 the district court in a position where they have 15 minutes

11 to rule.  I understand giving the short 24 hours isn't that

12 helpful, but it's better than nothing.

13             MR. MILLER:  Understood, Your Honor.

14             THE COURT:  Ms. Jones?

15             MS. JONES:  Good afternoon, Your Honor.  Sorry to

16 bother you, but this is the danger of multi-tasking.  I am

17 looking at the docket while I talk to Your Honor and our

18 motion for stay just popped up on the docket as just being

19 filed now.  That is the motion that was filed at the

20 beginning of July, I'm not sure why it has just came up on

21 the docket again, Your Honor, just literally, freshly ten

22 minutes ago or five minutes ago.  And I wanted to let Your

23 Honor know before parties saw that because it's dated at the

24 top the 29th, but if you scroll down and look at my signature

25 page, that's from the 8th of July.

1          So I just wanted to let Your Honor know that we

2   didn't put some stay motion in while Your Honor was talking.

3          THE COURT:  Okay.  So I take it that was

4   inadvertently filed, essentially?

5          MS. JONES:  I'm not sure what happened there, Your

6   Honor.  I frankly just don't know.

7          THE COURT:  Okay.

8          MS. JONES:  It literally -- I've been in this

9   hearing and I saw it happening.

10          THE COURT:  But what it is is it's a motion for a

11   stay of the previous order, not a stay of anything I've done

12   so far?

13          MS. JONES:  It's the motion from before, Your

14   Honor, and I think maybe it's being put on because it has the

15   unredacted material now --

16          THE COURT:  Got it.

17          MS. JONES:  -- and I think the parties agreed to

18   it and I think they got just a little ahead of Your Honor's

19   comments.  And the reason I raised it is I had four emails

20   come in while you were talking saying aren't you going to

21   tell the Court --

22          THE COURT:  Okay.

23          MS. JONES:  -- you're moving to stay, if you're

24   moving to stay.

25          THE COURT:  So I --

1            MS. JONES:  So I thought I better --

2            THE COURT:  -- thank you.

3            MS. JONES:  -- clarify the record, Your Honor.

4            THE COURT:  Thank you, Ms. Jones.  First of all,

5    thank you for raising it because I would have been confused.

6    I'm quite easily confused and that certainly would have

7    exceeded the threshold for confusing me, but that explanation

8    makes perfect sense.  So we'll -- that document is

9    inoperative for the purposes of what we've been discussing

10   and then otherwise the order should proceed as we've

11   discussed.

12           MS. JONES:  Thank you, Your Honor.

13           THE COURT:  Thank you, Ms. Jones.

14           Is there anything else that the Court can do to be

15   helpful to the parties at this point?  Mr. Gilad?  I'm sorry,

16   I think you may be muted.

17           MR. GILAD:  Apologies, Your Honor.  Erez Gilad,

18   Paul Hastings, for the DIP lender.

19           You'll recall at the beginning of the hearing I

20   mentioned that there was one change -- more of a

21   clarification that needed to be made to the DIP order.  And

22   we've had occasion to reach out to the parties offline, that

23   is the committee, the ABL agent, and they are on board with

24   that certain change, and counsel has asked that I simply

25   describe the change on the record so as to avoid the need to

1   further clog the docket with more paper, if that's okay with

2   Your Honor.

3          THE COURT:  That's certainly okay.  I actually was

4   curious about that myself.  So why don't you proceed.

5          MR. GILAD:  So the change is on -- it's paragraph

6   (indiscernible) --

7          THE COURT:  I'm sorry --

8          MR. GILAD:  -- page 30 --

9          THE COURT:  -- you broke up.  Which paragraph?

10          MR. GILAD:  2(c), as in Charlie, and it's page 30.

11   The paragraph begins with the title, "DIP roll-up loans."

12          THE COURT:  Okay, just give me a second.  I

13   apologize.  And I'm working off of the redline, I don't know

14   if you're working off a different version, but --

15          MR. GILAD:  Oh --

16          THE COURT:  -- I can find paragraph 2(c) in any

17   event.

18          MR. GILAD:  Okay.

19       (Pause)

20          THE COURT:  I'm almost there.

21       (Pause)

22          THE COURT:  Paragraph 2(c) is called "DIP roll-up

23   loans."  Yep, I'm there.

24          MR. GILAD:  So if Your Honor scrolls to the bottom

25   of the page, you'll see the first proviso, and it reads

1  (indiscernible) --

2           THE COURT:  I'm sorry, the provided, however, that

3  Holdings shall not be obligated?

4           MR. GILAD:  Yeah, that -- exactly, that phrase.

5  That phrase is proposed to be changed to the following:

6  "provided, however, that Holdings shall be obligated on any

7  payment obligations on account of the DIP roll-up loans only

8  on an unsecured basis."

9           So the word "not" will be deleted and the phrase

10  "only on an unsecured basis" will be added at the end of the

11  proviso.

12           THE COURT:  Got it.  I get that.  Okay.

13           So, again -- and I think everyone, every party in

14  interest is still on and has heard that, but presumably when

15  the form of order comes in under certification it will have

16  that language and everyone will have had a chance to look at

17  it.  I appreciate that.

18           MR. GILAD:  Thank you, Your Honor.

19           THE COURT:  Thank you, Mr. Gilad.

20           Is there any other party in interest that would

21  like the opportunity to be heard?

22      (No verbal response)

23           THE COURT:  Okay, if not, you know, it being 4:45

24  on a Friday in the summertime, let me thank everyone for your

25  patience with me, as it's taken me a little bit to work my

1    way through these issues, I appreciate that.

2            We will await a certification on Monday and we'll

3    promptly enter the order upon receipt of the certification.

4    If an issue arises, folks know how to reach our chambers and

5    we're happy to hop on the phone and resolve a dispute, if

6    that were to become necessary.

7            And otherwise, with everyone's wishes for a good

8    weekend and my thanks for the terrific arguments today, we're

9    adjourned.  Thank you.

10           COUNSEL:  Thank you, Your Honor.

11        (Proceedings concluded at 4:47 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       CERTIFICATION

2            We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                  July 30 2022

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                  July 30, 2022

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17   /s/ Mary Zajaczkowski                   July 30, 2022

18   Mary Zajaczkowski, CET-531

19   Certified Court Transcriptionist

20   For Reliable

21

22   /s/ Coleen Rand                         July 30, 2022

23   Coleen Rand, CET-341

24   Certified Court Transcriptionist

25   For Reliable