## <u>EXHIBIT 1</u>

**Second Amended Disclosure Statement**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TPC GROUP INC., *et al.*, | Case No. 22-10493 (CTG) |
| Debtors. [1] | (Jointly Administered) |

## DISCLOSURE STATEMENT FOR SECOND AMENDED JOINT
## CHAPTER 11 PLAN OF TPC GROUP INC. AND ITS DEBTOR AFFILIATES

**BAKER BOTTS L.L.P.**
James R. Prince (admitted *pro hac vice*)
Kevin Chiu (admitted *pro hac vice*)
2001 Ross Avenue, Suite 900
Dallas, Texas 75201-2980
Telephone:     (214) 953-6500
Facsimile:     (214) 953-6503
Email: jim.prince@bakerbotts.com
            kevin.chiu@bakerbotts.com

BAKER BOTTS L.L.P.
Scott R. Bowling (admitted *pro hac vice*)
30 Rockefeller Plaza
New York, New York 10112
Telephone:     (212) 408-2500
Facsimile:     (212) 259-2501
Email: scott.bowling@bakerbotts.com

BAKER BOTTS L.L.P.
David R. Eastlake (admitted *pro hac vice*)
Lauren N. Randle (admitted *pro hac vice*)
910 Louisiana Street
Houston, Texas 77002
Telephone:     (713) 229-1234
Facsimile:     (713) 229-1522
Email: david.eastlake@bakerbotts.com
            lauren.randle@bakerbotts.com

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Robert J. Dehney (No. 3578)
Curtis S. Miller (No. 4583)
Daniel B. Butz (No. 4227)
Matthew O. Talmo (No. 6333)
Brian Loughnane (No. 6853)
1201 N. Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email:     rdehney@morrisnichols.com
            cmiller@ morrisnichols.com
            dbutz@ morrisnichols.com
            mtalmo@ morrisnichols.com
            bloughnane@ morrisnichols.com

*Attorneys for Debtors*
*and Debtors in Possession*

Dated: September 22, 2022
Wilmington, Delaware

---

[1]    The Debtors in these chapter 11 cases (the "**Chapter 11 Cases**"), along with the last four digits of each Debtor's federal tax identification number, are: TPC Group Inc. (3618); TPC Holdings, Inc. (7380); TPC Group LLC (8313); Texas Butylene Chemical Corporation (7440); Texas Olefins Domestic International Sales Corporation (4241); TPC Phoenix Fuels LLC (9133); Port Neches Fuels, LLC (1641); and TP Capital Corp. (6248).  Each Debtor's corporate headquarters and mailing address is 500 Dallas St., Suite 2000, Houston, Texas 77002.

**<u>IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT</u>**

THE DEADLINE TO VOTE ON THE PLAN IS OCTOBER 28, 2022, AT 4:00 P.M. (PREVAILING EASTERN TIME), UNLESS EXTENDED BY THE DEBTORS.

FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT (OR A MASTER BALLOT CAST ON YOUR BEHALF, AS APPLICABLE) MUST BE ACTUALLY RECEIVED BY KROLL RESTRUCTURING ADMINISTRATION BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS ENTITLED TO VOTE FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE *SECOND AMENDED JOINT CHAPTER 11 PLAN OF TPC GROUP INC. AND ITS DEBTOR AFFILIATES*. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN (DEFINED BELOW), EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN <u>ARTICLE IX</u> HEREIN.

---

THE PLAN IS SUPPORTED BY (I) THE DEBTORS, (II) HOLDERS OF APPROXIMATELY 100 PERCENT OF TERM LOAN DIP CLAIMS AND 96.3 PERCENT OF CLASS 3 10.5% NOTES SECURED CLAIMS AND (III) HOLDERS OF APPROXIMATELY 99 PERCENT OF EXISTING HOLDINGS INTERESTS. THE DEBTORS BELIEVE THAT THE PLAN IS FAIR AND EQUITABLE, MAXIMIZES THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDES THE HIGHEST RECOVERIES TO STAKEHOLDERS. THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR ALL PARTIES IN THESE CHAPTER 11 CASES.

<u>THE DEBTORS URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO VOTE TO ACCEPT THE PLAN</u>.

---

ARTICLE X OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND SECTION 10.7 OF THE PLAN CONTAINS A THIRD-PARTY RELEASE BY HOLDERS OF CLAIMS AND INTERESTS. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MAY BE AFFECTED THEREUNDER. FOR MORE INFORMATION ABOUT THE THIRD-PARTY RELEASE BY HOLDERS OF CLAIMS AND INTERESTS, PLEASE REFER TO ARTICLE III.B.8 OF THIS DISCLOSURE STATEMENT.

---

THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST ENTITLED TO VOTE TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO

ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AND INTERESTS AFTER THE EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR INTERESTS OR OBJECTIONS TO CLAIMS OR INTERESTS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.

ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.

INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT.

THE DEBTORS HAVE NOT AUTHORIZED ANY PERSON OR ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN, OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE X OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT EACH IN THEIR ENTIRETY, INCLUDING ARTICLE IX HEREIN, ENTITLED "RISK FACTORS," BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN.   THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.  EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING VOTES FOR THE ACCEPTANCES AND CONFIRMATION OF THE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE.  IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN, THE RELEVANT PROVISIONS OF THE PLAN WILL GOVERN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.

UPON CONFIRMATION OF THE PLAN, CERTAIN OF THE SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT WILL BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, 15 U.S.C. §§ 77A–77AA, TOGETHER WITH THE RULES AND REGULATIONS PROMULGATED THEREUNDER (THE "SECURITIES ACT"), OR SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN LAWS, IN RELIANCE ON THE EXEMPTION SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE. OTHER SECURITIES DESCRIBED IN THE DISCLOSURE STATEMENT MAY BE ISSUED PURSUANT TO OTHER APPLICABLE EXEMPTIONS UNDER THE FEDERAL SECURITIES LAWS.  TO THE EXTENT EXEMPTIONS FROM REGISTRATION UNDER SECTION 1145 OF THE

**BANKRUPTCY CODE OR APPLICABLE FEDERAL SECURITIES LAW DO NOT APPLY, THE SECURITIES MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO A VALID EXEMPTION OR UPON REGISTRATION UNDER THE SECURITIES ACT.**

**THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS. THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS. FORWARD-LOOKING STATEMENTS MAY INCLUDE STATEMENTS ABOUT THE DEBTORS':**

- **BUSINESS STRATEGIES;**

- **OPERATING AND GROWTH INITIATIVES AND OPPORTUNITIES, INCLUDING PROPOSED CAPITAL PROJECTS;**

- **EXISTING AND EXPECTED COMPETITION AND COMPETITIVE POSITION;**

- **MARKET OUTLOOK AND TRENDS IN THE DEBTORS' INDUSTRY;**

- **EXPECTED FINANCIAL CONDITION;**

- **FUTURE CASH FLOWS, INCLUDING INSURANCE PROCEEDS;**

- **LIQUIDITY NEEDS, FINANCING SOURCES AND AVAILABILITY;**

- **EXPECTED RESULTS OF OPERATIONS;**

- **FUTURE CAPITAL AND OTHER EXPENDITURES;**

- **AVAILABILITY AND PRICE OF RAW MATERIALS AND INVENTORIES;**

- **THE BUSINESS CYCLICALITY OF THE PETROCHEMICALS INDUSTRY;**

- **EFFECTS OF SEASONALITY;**

- **PLANS AND OBJECTIVES OF MANAGEMENT OR THE SUPPORTING SPONSORS;**

- **FUTURE COMPLIANCE WITH ORDERS AND AGREEMENTS WITH REGULATORY AGENCIES;**

- **ENVIRONMENTAL MATTERS;**

- **THE IMPACT OF THE COVID-19 PANDEMIC ON THE GLOBAL ECONOMY;**

- **DIRECT OR INDIRECT EFFECTS ON OUR BUSINESS RESULTING FROM ACTUAL OR THREATENED TERRORIST INCIDENTS OR ACTS OF WAR,**

**INCLUDING THE ONGOING RUSSIAN INVASION OF UKRAINE, ITS ASSOCIATED IMPACTS ON GLOBAL COMMODITY MARKETS AND THE RESULTING POLITICAL AND ECONOMIC SANCTIONS ON RUSSIA;**

- **POTENTIAL OUTCOMES OF LEGAL, ENVIRONMENTAL OR REGULATORY PROCEEDINGS AND THEIR EXPECTED EFFECTS ON THE DEBTORS' RESULTS OF OPERATIONS;**

- **POTENTIAL OUTCOMES OF GEOPOLITICAL CHANGES AND THEIR RESULTING EFFECTS ON GLOBAL MARKETS AND THE EFFECTS ON THE DEBTORS' OPERATIONS;**

- **EXPECTATIONS, STRATEGIES AND PLANS FOR INDIVIDUAL ASSETS AND PRODUCTS (INCLUDING THE ABILITY TO MAINTAIN PLANT UTILIZATION RATES), BUSINESS SEGMENTS AND THE DEBTORS AS A WHOLE;**

- **ANTICIPATED RESTRUCTURING, DIVESTITURE AND CONSOLIDATION ACTIVITIES;**

- **COST REDUCTION AND CONTROL EFFORTS AND TARGETS;**

- **COMPLIANCE AND OTHER COSTS AND POTENTIAL DISRUPTION OR INTERRUPTION OF PRODUCTION OR OPERATION DUE TO ACCIDENT, FIRES, EXPLOSIONS, INTERRUPTIONS IN SOURCES OF RAW MATERIALS, CYBER SECURITY INCIDENTS, TERRORISM, POLITICAL UNREST, NATURAL DISASTERS OR OTHER UNFORESEEN EVENTS; AND**

- **ANY OTHER STATEMENTS REGARDING FUTURE GROWTH, FUTURE CASH NEEDS, FUTURE OPERATIONS, BUSINESS PLANS AND FUTURE FINANCIAL RESULTS.**

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE DEBTORS' OR REORGANIZED DEBTORS' FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE DEBTORS' OR REORGANIZED DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING: THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED; THE DEBTORS' ABILITY TO REDUCE THEIR OVERALL FINANCIAL LEVERAGE; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESSES DURING THE CHAPTER 11 CASES; CUSTOMER AND SUPPLIER RESPONSES TO THE CHAPTER 11 CASES; THE DEBTORS' INABILITY**

**TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; INTEREST RATE FLUCTUATIONS; PRICE INCREASES; EXPOSURE TO LITIGATION; A DECLINE IN THE DEBTORS' MARKET SHARE DUE TO COMPETITION OR PRICE PRESSURE BY CUSTOMERS; THE DEBTORS' ABILITY TO IMPLEMENT COST REDUCTION INITIATIVES IN A TIMELY MANNER; THE DEBTORS' ABILITY TO DIVEST EXISTING ASSETS OR BUSINESSES; FINANCIAL CONDITIONS OF THE DEBTORS' CUSTOMERS; ADVERSE TAX CHANGES; LIMITED ACCESS TO CAPITAL RESOURCES; CHANGES IN LAWS AND REGULATIONS; NATURAL DISASTERS; GEOPOLITICAL INSTABILITY; AND THE EFFECTS OF GOVERNMENTAL REGULATION ON THE DEBTORS' BUSINESSES.**

**TABLE OF CONTENTS**

Page

I.    **INTRODUCTION**.................................................................................................1

   A.    Overview of Restructuring...................................................................... 1
   B.    Inquiries ................................................................................................... 3

II.   **SUMMARY OF PLAN TREATMENT** ............................................................5

   A.    Summary and Description of Classes and Treatment ............................. 5
   B.    Illustrative Recoveries for Allowed Class 4 General Unsecured Claims ............ 11

III.  **THE DEBTORS' RESTRUCTURING SUPPORT AGREEMENT AND PLAN** .................13

   A.    The Restructuring Support Agreement ................................................. 13
   B.    The Terms of the Plan............................................................................ 14

IV.   **OVERVIEW OF THE COMPANY AND ITS BUSINESSES** ..................................23

   A.    The Company's Businesses ................................................................... 23
   B.    Equity Ownership .................................................................................. 28
   C.    Corporate Organization and Prepetition Indebtedness ......................... 28

V.    **EVENTS LEADING TO THE COMMENCEMENT OF THESE CHAPTER 11 CASES**.................................................................................................34

   A.    Current Market Conditions and Business Conditions............................ 34
   B.    The Dock Incident and the HNO Technical Center Fire ....................... 34
   C.    The Port Neches Incident; Company Response and Related Subsequent Events........................................................................................... 35
   D.    Other Events Leading to Commencement of Chapter 11 Cases............ 41
   E.    The Company's Prepetition Restructuring Efforts ............................... 42
   F.    Restructuring Support Agreement, Proposed DIP Financing, and Exit Financing................................................................................... 48

VI.   **MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES** .................................................................................52

   A.    Expected Timetable of the Chapter 11 Cases ...................................... 52
   B.    First Day Relief..................................................................................... 52
   C.    Other Procedural and Administrative Motions..................................... 53
   D.    Assumption of Contracts....................................................................... 53
   E.    The Debtors' DIP Financing.................................................................. 54
   F.    Appointment of Creditors' Committee ................................................. 56
   G.    Schedules and Statements..................................................................... 56
   H.    Establishment of a Claims Bar Date .................................................... 57
   I.    Adversary Proceeding ........................................................................... 57
   J.    Backstop Motion ................................................................................... 58
   K.    Litigation Matters.................................................................................. 59

|  | L. | Putative PNO Class Claimants' Omnibus Motion for Class Proofs of Claim and Certification of Classes | 59 |
|  | M. | Creditors' Committee Standing Motion | 60 |
|  | N. | Rejection of Lion Elastomers Storage and Handling Agreement and Adversary Proceeding | 60 |

**VII.   TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL LAW .... 61**

|  | A. | New Common Shares, HoldCo Notes and Exit Notes | 61 |
|  | B. | Equity Backstop Agreement, Debt Backstop Agreement and Exit Notes Backstop Agreement | 62 |
|  | C. | Equity Backstop Commitment Securities; Debt Backstop Commitment Securities; Equity Direct Allocation Securities; Debt Direct Allocation Securities; Equity Put Option Securities; Debt Put Option Securities; and Backstop Exit Notes | 63 |
|  | D. | Certain Securities Law Matters | 63 |

**VIII.   CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ............ 68**

|  | A. | Introduction | 68 |
|  | B. | Certain U.S. Federal Income Tax Consequences to the Debtors and Reorganized Debtors | 70 |
|  | C. | Certain U.S. Federal Income Tax Consequences to the U.S. Holders of 10.5% Secured Notes Claims and General Unsecured Claims | 75 |
|  | D. | Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of 10.5% Secured Notes Claims | 85 |
|  | E. | FATCA | 89 |
|  | F. | Information Reporting and Backup Withholding | 89 |
|  | G. | Transaction Reporting by Holders of Claims | 89 |

**IX.   RISK FACTORS ........................................................................................................ 91**

|  | A. | Certain Bankruptcy Law Considerations | 91 |
|  | B. | Risks Related to Recoveries under the Plan | 96 |
|  | C. | Risk Factors Relating to Ownership of New Common Shares and HoldCo Notes | 97 |
|  | D. | Risks Related to the Debtors' and the Reorganized Debtors' Businesses | 99 |

**X.   SOLICITATION AND VOTING PROCEDURES ................................................... 117**

|  | A. | Voting Record Date | 117 |
|  | B. | Voting Deadline | 117 |
|  | C. | Voting on the Plan | 118 |
|  | D. | Holders of Claims and Interests Entitled to Vote on the Plan | 118 |

**XI.   CONFIRMATION OF THE PLAN .......................................................................... 120**

|  | A. | Requirements for Confirmation of the Plan | 120 |
|  | B. | Objections to Confirmation | 120 |

C.      Requirements for Confirmation of the Plan..........................................................122

**XII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
PLAN.**..............................................................................................................................**127**

A.      Alternative Plan of Reorganization....................................................................127
B.      Sale under Section 363 of the Bankruptcy Code ................................................127
C.      Liquidation Under Chapter 7 of Bankruptcy Code.............................................127

**XIII.   RECOMMENDATION.**..........................................................................................**128**

**EXHIBITS**

EXHIBIT A    Joint Chapter 11 Plan

EXHIBIT B    Restructuring Support Agreement

EXHIBIT C    Organizational Chart

EXHIBIT D    Financial Projections

EXHIBIT E    Valuation Analysis

EXHIBIT F    Liquidation Analysis

EXHIBIT G    Release Provisions, Exculpation, and Related Injunctions

EXHIBIT H    Letter from Official Committee of Unsecured Creditors

## I.    <u>INTRODUCTION</u>

TPC Group Inc. and its debtor affiliates TPC Holdings, Inc. ("**Holdings**"), TPC Group LLC ("**TPC**"), Texas Butylene Chemical Corporation, Texas Olefins Domestic International Sales Corporation, TPC Phoenix Fuels LLC, Port Neches Fuels, LLC, and TP Capital Corp., as debtors and debtors in possession (each, a "**Debtor**," and collectively, the "**Debtors**," and collectively with their non-Debtor subsidiaries, the "**Company**"), submit this disclosure statement (as may be amended from time to time, this "**Disclosure Statement**") in connection with the solicitation of votes on the *Second Amended Joint Chapter 11 Plan of TPC Group Inc. and its Debtor Affiliates* [D.I. 793], dated September 20, 2022 filed contemporaneously herewith and attached hereto as **<u>Exhibit A</u>** (the "**Plan**").[2]  Although proposed jointly for administrative purposes in these Chapter 11 Cases, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding claims against and interests in each Debtor pursuant to the Bankruptcy Code.

The purpose of this Disclosure Statement is to provide information of a kind, and in sufficient detail, to enable creditors of the Debtors that are entitled to vote on the Plan to make an informed decision on whether to vote to accept or reject the Plan.  This Disclosure Statement contains summaries of the Plan, certain statutory provisions, and events contemplated in the chapter 11 cases that commenced (the "**Chapter 11 Cases**") on June 1, 2022 (the "**Petition Date**"), as well as certain documents related to the Plan.

### A.    <u>Overview of Restructuring</u>

The Plan is the result of extensive, good-faith negotiations overseen by the Debtors' independent Special Committee (as defined below) and approved by the Debtors' board of directors, among the Debtors and a number of their key economic stakeholders, including the ABL DIP Lender, the Supporting Noteholders, and the Supporting Sponsors.  The ABL DIP Lender has agreed to provide the Exit ABL Facility on the terms set forth in the Exit ABL Credit Agreement, a copy of which will be filed in the Chapter 11 Cases as part of the Plan Supplement.  The Supporting Noteholders (who collectively hold, in the aggregate, approximately 100% of the Term Loan DIP Claims and 96.3% of the Class 3 10.5% Notes Secured Claims)[3] and the Supporting Sponsors (who collectively hold, in the aggregate, approximately 99% of the Class 8 Existing Holdings Interests) support confirmation of the Plan. [4]  The Supporting Noteholders' and Supporting Sponsors' agreement to support confirmation of the Plan is set forth in, and subject to the terms of, the Restructuring Support Agreement, attached as **<u>Exhibit B</u>** hereto.

As described in more detail below, the Plan substantially deleverages the Debtors' balance sheet and establishes sufficient liquidity to operate the Debtors' business and execute on a business

---

[2]    Capitalized terms used in the Disclosure Statement but not defined herein have the meanings ascribed to such terms in the Plan.  To the extent any inconsistencies exist between the Disclosure Statement and the Plan, the Plan will govern.

[3]    Subject to execution of an applicable joinder to the RSA and other definitive documentation.

[4]    The holders of the Term Loan DIP Claims also hold approximately 90% of the Priming Notes which were rolled up (and are pending final cancelation or cash-out) pursuant to the Term Loan DIP.

plan that will provide for a sustainable and successful enterprise going forward. The key components of the Plan are as follows:

- Treatment of the **ABL DIP Claims** consisting of, at the Debtors' option (with the consent of the Required Supporting Noteholders), either (i) on a dollar-for-dollar basis, conversion of such ABL DIP Claims into loans and letter of credit participations under the Exit ABL Facility or (ii) payment in full in Cash from proceeds of the Exit ABL Facility;

- Payment in full in Cash of the **Term Loan DIP Claims**;

- Treatment of **10.5% Notes Secured Claims** consisting of the following:

    (a).    Cash in the amount of $350 million, plus all unrestricted Cash held by the Debtors on the Effective Date in excess of $50 million, with such excess cash to be reduced by (i) any amounts drawn and letters of credit issued (whether or not drawn) under the Exit ABL Facility, and (ii) any reserves and other cash distribution requirements expressly provided under the Plan;

    (b).    100% of the New Common Shares, subject to dilution by the Equity Rights Offering Securities, the Equity Direct Allocation Securities, the Equity Put Option Securities, the Debt Put Option Securities (together with the Equity Put Option Securities, the "**Put Option Premium Securities**"), and the Management Incentive Plan;

    (c).    100% of the Equity Subscription Rights (without oversubscription rights) to participate in a $165 million new money equity rights offering to purchase New Common Shares, which is backstopped by certain Supporting Noteholders;

    (d).    100% of the Debt Subscription Rights (without oversubscription rights) to participate in an $82.5 million debt rights offering to purchase HoldCo Notes, which is backstopped by certain Supporting Noteholders; and

    (e).    $80 million in principal amount of the HoldCo Notes (the "**Takeback HoldCo Notes**");

- Treatment of **General Unsecured Claims** in the form of:[5]

---

[5]    Class 4 consists of all General Unsecured Claims against the Debtors and does not structurally differentiate Class 4 General Unsecured Claims by Debtor. Because Holdings is expected to have no distributable value that would require a greater recovery on account of Allowed Class 4 Claims than that set forth in the Plan, the Plan consolidates Class 4 General Unsecured Claims of all the Debtors into one estate for purposes of distribution only. As such, the holder of an Allowed Class 4 General Unsecured Claim in any Debtor will only be entitled to receive its Pro Rata Share of the GUC Trust Interests, which in turn will entitle such holder to receive only its Pro Rata share of the GUC Trust Assets.

(a).    ***in the event that Class 4 votes to <u>accept</u> the Plan***:  100% of the GUC Trust Interests (which shall entitle the holders thereof to their Pro Rata share of (i) Cash in the aggregate amount of $5 million <u>plus</u> (ii) the right to receive an additional $5 million in Cash in the event that the Reorganized Debtors' 2024 Adjusted EBITDA exceeds $250 million); *provided*, that distributions on account of Allowed 10.5% Notes Deficiency Claims will be waived; or

(b).    ***in the event that Class 4 votes to <u>reject</u> the Plan***: no recovery and all General Unsecured Claims will be discharged without further notice to, approval of or action by any Person or Entity;

- Cancellation of all **<u>Existing Holdings Interests</u>**;

- Exit financing consisting of:

  i.    the Exit ABL Facility, with a maximum committed amount of $200 million, subject to a borrowing base;

  ii.    the Exit Notes in the principal amount of $350 million, which will be fully backstopped by certain Supporting Noteholders; and

  iii.    the new money HoldCo Notes in the aggregate principal amount of $150 million, which will be fully backstopped certain Supporting Noteholders; and

- $202.5 million in new capital, consisting of $135.0 million of Equity Direct Allocation Securities purchased pursuant the Equity Direct Allocation and $67.5 million of Debt Direct Allocation Securities purchased pursuant to the Debt Direct Allocation.

Entry into the Restructuring Support Agreement and the formulation of the Plan are significant achievements for the Debtors.  The level of consensus for this comprehensive reorganization reflects the efforts undertaken by the Debtors, the Supporting Noteholders, and the Supporting Sponsors, as well as such parties' belief in the Debtors' prospects as a reorganized enterprise.

The Debtors and the other parties to the Restructuring Support Agreement believe that the Plan is in the best interests of all stakeholders because it maximizes the value of the Debtors' estates for the benefit of all parties in interest in the Chapter 11 Cases.  Given the Debtors' core strengths, including their experienced management team and strategic business plan going forward, the Debtors are confident that they can implement the Plan's balance sheet restructuring to ensure the Debtors' long-term viability and success.  For these reasons, the Debtors strongly recommend that Holders of Claims entitled to vote accept the Plan.

## B.    <u>Inquiries</u>

If you have any questions about the packet of materials you have received, please contact Kroll Restructuring Administration, the Debtors' voting agent (the "**Voting Agent**"), via one of the following methods:

*By regular mail, hand delivery, or overnight mail at*:
TPC Ballot Processing
c/o Kroll Restructuring Administration,
850 3rd Avenue, Suite 412,
Brooklyn, NY 11232

*By electronic mail at*:
TPCGroupinfo@ra.kroll.com

*By telephone at*:
(844) 596-2260 (toll free for U.S. and Canada)
(646) 214-8808 (International toll)

Copies of this Disclosure Statement, which includes the Plan and the Plan Supplement (when filed), are also available on the Voting Agent's website, https://cases.ra.kroll.com/TPCGroup/.    PLEASE DO NOT DIRECT INQUIRIES TO THE BANKRUPTCY COURT.

## II.    <u>SUMMARY OF PLAN TREATMENT</u>

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are: (i) Impaired and Unimpaired under the Plan; (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; and (iii) presumed to accept or reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified.  The classification of Claims and Interests set forth herein shall apply separately to each Debtor.

### A.    <u>Summary and Description of Classes and Treatment</u>

The table below provides a summary of the classification, treatment and estimated recoveries of Allowed Claims and Interests under the Plan. This information is provided in summary form for illustrative purposes only, is subject to material change based on contingencies related to, among other things, the Claim reconciliation process, and is qualified in its entirety by reference to the full text of the Plan.  Any estimates of Allowed Claims or Interests in this Disclosure Statement may vary from the final amounts Allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan. The projected recoveries set forth in the table below are estimates only and therefore are subject to change, including based upon changes in the amount of Claims that are Allowed (as defined in the Plan) as well as other factors related to the Debtors' business operations and general economic conditions.  For a more detailed summary of the terms and provisions of the Plan, *see* Article III.B below.

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Projected Amount of Allowed Claims and Interests and Projected Recovery Under the Plan |
|---|---|---|---|
| 1 (Other Secured Claims) | Except to the extent that a holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the Debtors or the Reorganized Debtors, but with the consent of the Required Supporting Noteholders, each holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Other Secured Claim either:<br><br>(i)    payment in full in Cash; or<br><br>(ii)   such other treatment rendering such Other Secured Claim Unimpaired;<br><br>in each case, on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter. | Unimpaired<br><br>(Not entitled to vote because presumed to accept) | Projected Amount of Allowed Claims: N/A<br><br>Projected Recovery Under the Plan: N/A |

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Projected Amount of Allowed Claims and Interests and Projected Recovery Under the Plan |
|---|---|---|---|
| 2 (Other Priority Claims) | Except to the extent that a holder of an Allowed Other Priority Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Priority Claim, at the option of the Debtors or the Reorganized Debtors, but with the consent of the Required Supporting Noteholders, each holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Other Secured Claim either:<br><br>(i)　payment in full in Cash; or<br><br>(ii)　such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code,<br><br>in each case, on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, in each case, or as soon as reasonably practicable thereafter. | Unimpaired<br><br>(Not entitled to vote because presumed to accept) | Projected Amount of Allowed Claims: N/A<br><br>Projected Recovery Under the Plan: N/A |

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Projected Amount of Allowed Claims and Interests and Projected Recovery Under the Plan |
|---|---|---|---|
| 3 (10.5% Notes Secured Claims)[6] | As of the Effective Date, the 10.5% Notes Secured Claims shall be deemed Allowed in the aggregate amount of $479.2 million.[7] <br><br> Except to the extent that a holder of an Allowed 10.5% Notes Secured Claim agrees to less favorable treatment, on the Effective Date, each holder of an Allowed 10.5% Notes Secured Claim shall receive, in full and final satisfaction of such 10.5% Notes Secured Claim, its Pro Rata share of the following: <br><br> (i)  Cash in the amount of $350 million, plus all unrestricted Cash held by the Debtors on the Effective Date in excess of $50 million, with such excess cash to be reduced by (i) any amounts drawn and letters of credit issued (whether or not drawn) under the Exit ABL Facility, and (ii) any reserves and other cash distribution requirements expressly provided under the Plan; <br><br> (ii)  100% of the New Common Shares, subject to dilution by the Equity Rights Offering Securities, the Equity Direct Allocation Securities, the Equity Put Option Securities, the Debt Put Option Securities and the Management Incentive Plan; <br><br> (iii) the Takeback HoldCo Notes; <br><br> (iv) 100% of the Debt Subscription Rights; and <br><br> (v)  100% of the Equity Subscription Rights. | Impaired <br><br> (Entitled to vote) | Projected Amount Allowed of Claims: <br><br> $479.2 million <br><br> Projected Recovery Under the Plan: <br><br> 100% |

---

[6]     The 10.5% Notes Secured Claims amount of $479.2 million consists of the principal amount of the 10.5% Notes plus accrued and unpaid prepetition interest plus the applicable premium payable pursuant to the 10.5% Notes Indenture less the amount of the 10.5% Notes Deficiency Claim.  Such amount constitutes a 44.1% recovery on account of the aggregate 10.5% Notes Claims.

[7]     The Allowed 10.5% Notes Secured Claim amount of $479.2 million is based on the midpoint total distributable value per the valuation analysis, attached as Exhibit E hereto, and includes an estimated cash payment of $365

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Projected Amount of Allowed Claims and Interests and Projected Recovery Under the Plan |
|---|---|---|---|
| 4 (General Unsecured Claims (including 10.5% Notes Deficiency Claim))[8] | On the Effective Date, the 10.5% Notes Deficiency Claims shall be deemed Allowed in the aggregate amount of $607.2 million. [9]<br><br>Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, each holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Allowed General Unsecured Claim:<br><br>(i) *In the event that Class 4 votes to accept the Plan:* On the Effective Date, its Pro Rata share of the GUC Trust Interests (which, for the avoidance of doubt, shall entitle such holder to receive its Pro Rata share of the GUC Trust Assets in accordance with the GUC Trust Agreement); *provided,* that distributions on account of Allowed 10.5% Notes Deficiency Claims will be waived; or<br><br>(ii) *In the event that Class 4 votes to reject the Plan:* On the Effective Date, all General Unsecured Claims will be discharged without further notice to, approval of or action by any Person or Entity, and the holders of General Unsecured Claims shall not receive any distribution or retain any property on account of such General Unsecured Claims. | Impaired<br><br>(Entitled to vote) | Projected Amount of Allowed Claims:<br><br>$180 million - $946 million (excluding 10.5% Notes Deficiency Claims of $607.2 million)<br><br>*See* Section IV.C.4 for information<br><br>Projected Recovery Under the Plan:<br><br>0.00% - 5.00%<br><br>*See* Section II.B for more information |

---

million (based on estimated pre-emergence cash of approximately $65 million). In performing its valuation analysis of the Reorganized Debtors, Moelis performed an enterprise valuation and as such, did not conduct a valuation of the collateral securing the 10.5% Notes.

[8] For the avoidance of doubt, all holders of Allowed Class 4 General Unsecured Claims, including holders of 10.5% Notes Deficiency Claims, are entitled to vote on the Plan. Holders of Class 3 10.5% Notes Secured Claims that also hold 10.5% Notes Deficiency Claims must vote both such Claims in the same manner, and such Holders will receive only one ballot on account of both such Claims.

[9] The Plan represents a compromise with respect to the 10.5% Notes that provides for a secured and unsecured portion of the 10.5% Note Claims, with the unsecured portion based on the Plan value being classified as a

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Projected Amount of Allowed Claims and Interests and Projected Recovery Under the Plan |
|---|---|---|---|
| 5 (Intercompany Claims) | Allowed Intercompany Claims shall, at the option of the applicable Debtor(s) or Reorganized Debtor(s), as applicable, and the Required Supporting Noteholders, be (i) reinstated, (ii) adjusted, or (iii) discharged (or otherwise eliminated) and receive no distribution under the Plan. | Unimpaired (Not entitled to vote because presumed to accept) | Projected Amount of Allowed Claims: N/A Projected Recovery Under the Plan: N/A |
| 6 (Subordinated Claims) | All Subordinated Claims, if any, shall discharged, cancelled, released, and extinguished as of the Effective Date and will be of no further force or effect, and holders of Subordinated Claims will not receive any distribution on account of such Subordinated Claims. | Impaired (Not entitled to vote because deemed to reject) | Projected Amount of Allowed Claims: $0 Projected Recovery Under the Plan: 0% |

General Unsecured Claim in the amount of the full Claim less the remaining Plan value. However, the 10.5% Notes were issued by Debtor TPC Group Inc. and guaranteed by each of the other Debtors, and the holders of the 10.5% Notes have asserted a Claim for the full amount of the principal, make-whole and accrued prepetition interest on such notes at Debtor TPC Group Inc. and each of the other Debtors, and that no payment or allocable value from any of those entities on account of the 10.5% Notes results in the reduction of such claims so long as the 10.5% Notes are not paid in full, including postpetition interest and other fees, costs and charges payable under the indenture in the event that the 10.5% Notes are determined to be oversecured or the Debtors liable for such Claim are determined to be solvent. Accordingly, in the event that the Plan is not confirmed and the compromise with the 10.5% Notes is not approved, the holders of the 10.5% Notes will assert claims in the minimum amount of $1.098 billion against every Debtor entity.

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Projected Amount of Allowed Claims and Interests and Projected Recovery Under the Plan |
|---|---|---|---|
| 7 (Existing Holdings Interests) | All Existing Holdings Interests shall be cancelled, released, and extinguished and shall be of no further force or effect as of the Effective Date, whether surrendered for cancellation or otherwise. No holder of Existing Holdings Interests shall receive any distribution under the Plan on account of such Existing Holdings Interests. | Impaired (Not entitled to vote because deemed to reject) | Projected Amount of Allowed Claims: $0 Projected Recovery Under the Plan: 0% |
| 8 (Other Holdings Interests) | All Other Holdings Interests shall be cancelled, released, and extinguished and will be of no further force or effect as of the Effective Date, whether surrendered for cancellation or otherwise. No holder of Other Holdings Interests will receive any distribution under the Plan on account of such Other Holdings Interests. | Impaired (Not entitled to vote because deemed to reject) | Projected Amount of Allowed Claims: $0 Projected Recovery Under the Plan: 0% |
| 9 (Intercompany Interests) | Intercompany Interests are Unimpaired. On the Effective Date, all Intercompany Interests shall, at the option of the applicable Debtor(s) or Reorganized Debtor(s), as applicable, and the Required Supporting Noteholders, be (i) adjusted, (ii) reinstated or (iii) discharged (or otherwise eliminated) and receive no distribution under the Plan. | Unimpaired (Not entitled to vote because presumed to accept) | Projected Amount of Allowed Claims: N/A Projected Recovery Under the Plan: N/A |

## B.    Illustrative Recoveries for Allowed Class 4 General Unsecured Claims

Under the Plan, in the event that Class 4 votes to accept the Plan, holders of Allowed Class 4 Claims shall be entitled to their Pro Rata share of 100% of the GUC Trust Interests which shall entitle such holders to receive their Pro Rata share of the GUC Trust Assets in accordance with the GUC Trust Agreement; *provided*, that distributions on account of the Allowed 10.5% Notes Deficiency Claims will be waived. The GUC Trust Assets consist of (i) Cash in the aggregate

amount of $5 million plus (ii) the right to receive an additional $5 million in Cash in the event that the Reorganized Debtors' 2024 Adjusted EBITDA exceeds $250 million).

As further discussed below in Section IV.C.4, substantially all of the claims in Class 4, other than Allowed 10.5% Notes Deficiency Claims are contingent, disputed, and/or unliquidated. As such, the Debtors are unable to estimate with certainty the recovery amount for Allowed Class 4 Claims under the Plan.  The following illustrative chart sets forth a sensitivity analysis of the Debtors' estimated range of recoveries based on the low and high range of Allowed Class 4 Claims (including the waiver of distributions on account of the Allowed 10.5% Notes Deficiency Claims) as discussed in Section IV.C.4 and the potential range of Pro Rata recoveries on account of the GUC Trust Interests under the Plan, and assumes $1 million in GUC Trust Expenses to administer the GUC Trust, which are paid from the GUC Trust Interests prior to any distribution to Allowed Class 4 Claims.

| (in $millions) | **Illustrative Range of Allowed General Unsecured Claim Amounts** | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **GUC Trust Assets for Distribution**[10] | **$200** | **$300** | **$400** | **$500** | **$600** | **$700** | **$800** | **$900** |
| $0 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| $5 million | 2.00% | 1.33% | 1.00% | 0.80% | 0.67% | 0.57% | 0.50% | 0.44% |
| $10 million | 4.50% | 3.00% | 2.25% | 1.80% | 1.50% | 1.29% | 1.13% | 1.00% |

---

[10] This table is provided for illustration and summary purposes only.  The Debtors do not admit to the validity, priority and/or allowance of any claim or, lien or interest in property and reserve rights in relation to such issues related to Class 4 General Unsecured Claims.  Many of these estimated claim amounts incorporate litigation claims which are in their preliminary stages and can only be estimated by using broad ranges.  As such, these amounts could vary significantly. The resolution and/or estimation of these claims for distribution purposes could have a material effect on the estimated recoveries.

## III.    THE DEBTORS' RESTRUCTURING SUPPORT AGREEMENT AND PLAN

### A.    The Restructuring Support Agreement

The Debtors engaged with their stakeholders to secure the terms of a value-maximizing and consensual reorganization. Specifically, the Debtors, the members of the Ad Hoc Noteholder Group, and the Supporting Sponsors negotiated and formulated a restructuring support agreement (the "**Restructuring Support Agreement**" or "**RSA**") that would provide the Debtors with additional liquidity and exit funding, maximize recoveries to all of the Debtors' creditors, and allow the Debtors to quickly emerge from chapter 11 on a consensual basis. Furthermore, in parallel with its negotiation of the RSA with the Ad Hoc Noteholder Group and Supporting Sponsors, the Company has been engaged in negotiations with a group of law firms representing holders of PNO Claims (as defined below) (such holders, "**PNO Claimants**"), referred to herein as the "**PNO Claims Steering Committee**," which collectively represent a supermajority of PNO Claimants in the pending civil litigation arising from the PNO Incident (as defined below), and certain other stakeholders regarding a potential settlement that would consensually address the PNO Claims and obtain the PNO Claimants' support of the Plan, but these negotiations have not yet been successful. The Debtors also engaged in similar prepetition negotiations with Bayside Capital, Inc. ("**Bayside**") and Cerberus Capital Management, L.P., ("**Cerberus**"), holders of less than 10% of the outstanding principal amount of 10.5% Notes.

Following the Debtors' negotiation efforts, on May 9, 2022, with the support of the Special Committee (as defined below) and the Board (as defined below), the Company, the members of the Ad Hoc Noteholder Group, and the Supporting Sponsors entered into an initial restructuring support agreement with respect to a transaction that would be implemented, subject to the Company's obtaining a debtor-in-possession ABL facility either from its existing bank group or from a new ABL lending source. Over the following weeks, the Company successfully negotiated a postpetititon senior secured superpriority priming asset-based revolving loan facility with Eclipse Business Capital ("**Eclipse**"; such facility, the "**ABL DIP Facility**"), together with obtaining a commitment from Eclipse to provide an exit ABL facility at the conclusion of these chapter 11 cases. Thereafter, on May 31, 2022, the Company, the members of the Ad Hoc Noteholder Group, and the Supporting Sponsors entered into a superseding Restructuring Support Agreement, which is attached hereto as **Exhibit B**.

The restructuring transactions contemplated by the Restructuring Support Agreement provide for, among other things: (i) a restructuring pursuant to a chapter 11 plan funded by a $300 million equity rights offering, a $150 million debt rights offering for paid-in-kind holding company notes, a $350 million issuance of secured exit notes—all backstopped by certain members of the Ad Hoc Noteholder Group, subject to the terms and conditions set forth in the Restructuring Support Agreement and the Backstop Agreements—and an $80 million issuance of paid-in-kind holding company notes; (ii) the elimination of the vast majority of the Company's funded debt and other claims from the Company's balance sheet; and (iii) the financing of the Company's chapter 11 cases through a debtor-in-possession loan facility provided by certain members of the Ad Hoc Noteholder Group and the ABL DIP Facility. The Restructuring Support Agreement also contemplates a plan of reorganization that provides a distribution to holders of general unsecured claims, which would not otherwise be entitled to receive or retain value under a plan in these chapter 11 cases, consisting of $5 million in cash plus $5 million in future cash subject to the

Company's achieving projected 2024 Adjusted EBITDA in excess of $250 million (excluding any insurance proceeds that may be received by the Company), assuming the class of general unsecured claims votes to accept the Plan.

**B.    The Terms of the Plan**

The Plan contemplates the following key terms, among others described herein and therein:

**1.    Issuance and Distribution of New Common Shares**

On the Effective Date, all Existing Holdings Interests shall be cancelled and the applicable Reorganized Debtor shall be authorized to issue or cause to be issued and shall issue the New Common Shares for distribution in accordance with the terms of the Plan and the Plan Supplement without the need for any further board, shareholder or other corporate action. All of the New Common Shares, issuable under the Plan, when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable. The applicable New Corporate Governance Documents shall provide for sufficient authorized New Common Shares to effectuate the issuance of New Common Shares contemplated by and in connection with the Plan, including the Equity Direct Allocation Securities, the Equity Rights Offering Securities, the Equity Put Option Securities, the Debt Put Option Securities, the New Common Shares issuable under the Management Incentive Plan and the New Common Shares received by holders of Allowed 10.5% Secured Notes Claims pursuant to Section 5.8 of the Plan. The applicable Reorganized Debtor shall issue or reserve for issuance a sufficient number of shares of New Common Shares to effectuate all such issuances.

Each holder of New Common Shares shall, at the option of the Debtors, with the consent of the Required Supporting Noteholders, and as set forth in the Confirmation Order, be deemed, without further notice or action, to have agreed to be bound by the New Corporate Governance Documents, as the same may be amended from time to time following the Effective Date in accordance with their terms. The New Corporate Governance Documents shall be binding on all Entities receiving New Common Shares (and their respective successors and assigns), whether received pursuant to the Plan or otherwise and regardless of whether such Entity executes or delivers a signature page to the Shareholder Agreement or any other New Corporate Governance Document. Notwithstanding the foregoing, the Debtors or the Reorganized Debtors, as applicable, may condition the distribution of any New Common Shares issued pursuant to the Plan upon the recipient thereof duly executing and delivering to the Debtors or the Reorganized Debtors, as applicable, counter-signatures to the Shareholder Agreement.

**2.    Issuance and Distribution of HoldCo Notes and Exit Notes**

On the Effective Date, the applicable Reorganized Debtors shall be authorized to execute, deliver, and enter into the HoldCo Notes Indenture, the HoldCo Notes, the Exit ABL Credit Agreement, the Exit Notes Indenture and the Exit Notes, including any documents required in connection with the creation or perfection of Liens in connection therewith without further (i) notice to or order or other approval of the Bankruptcy Court, (ii) act or omission under applicable law, regulation, order, or rule, (iii) vote, consent, authorization, or approval of any Person, or (iv) action by the holders of Claims or Interests. The HoldCo Notes Indenture, the HoldCo Notes, the Exit ABL Credit Agreement, the Exit Notes Indenture and the Exit Notes shall

constitute legal, valid, binding and authorized joint and several obligations of the applicable Reorganized Debtors, enforceable in accordance with its terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, the Plan or the Confirmation Order.  The financial accommodations to be extended pursuant to the HoldCo Notes Indenture, the HoldCo Notes, the Exit ABL Credit Agreement, the Exit Notes Indenture and the Exit Notes are reasonable and are being extended, and shall be deemed to have been extended, in good faith and for legitimate business purposes.

On the Effective Date, (a) all Liens and security interests granted pursuant to or in connection with the Exit ABL Credit Agreement and the Exit Notes Indenture shall be deemed granted by the Reorganized Debtors, and (b) all Liens and security interests granted pursuant to, or in connection with, the Exit ABL Credit Agreement and the Exit Notes Indenture shall (i) be valid, binding, perfected, enforceable Liens and security interests in the property described in the Exit ABL Credit Agreement and the Exit Notes Indenture (and, in each case, any ancillary documents thereto), with the priorities established in respect thereof under applicable non-bankruptcy law and the applicable intercreditor agreements, and (ii) not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under any applicable law, the Plan, or the Confirmation Order.

The Reorganized Debtors and the Persons granted Liens and security interests under the Exit ABL Credit Agreement and the Exit Notes Indenture are authorized under the Plan to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order without the need for any filings or recordings) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### 3.    The Equity Rights Offering

The Plan provides that following approval by the Bankruptcy Court of the Equity Rights Offering Procedures, the Equity Rights Offering Amount will be raised pursuant to the Equity Rights Offering.  The Equity Rights Offering Amount is $165 million and shall be fully backstopped by the Equity Backstop Parties pursuant to the terms and conditions in the Equity Backstop Agreement.  The Debtors and the Reorganized Debtors, as applicable, shall distribute (or cause to be distributed, directly or indirectly), the Equity Subscription Rights for the Equity Rights Offering to holders of 10.5% Notes Secured Claims (the "**Rights Offering Participants**") as set forth in the Plan, the Plan Supplement and the Equity Rights Offering Documents.  Subject to the terms and conditions set forth in the Equity Rights Offering Procedures, the Equity Rights Offering shall be open to all Equity Rights Offering Participants, and the purchase price per share of the Equity Rights Offering Securities shall be $13.00.  The Equity Rights Offering Securities issued upon exercise of the Equity Subscription Rights pursuant to the terms of the Equity Backstop Agreement and the Rights Offering Procedures will dilute the distribution of New

Common Shares received by holders of Allowed 10.5% Secured Notes Claims pursuant to Section 4.3 of the Plan.

Subject to the terms and conditions set forth in the Equity Backstop Agreement, if, after following the procedures set forth in the Equity Rights Offering Procedures, there remains any unsubscribed Equity Rights Offering Securities, the Reorganized Debtors will have an option to sell to the Equity Backstop Parties, and, upon exercise of such option, the Equity Backstop Parties shall each, severally and not jointly, be required to purchase, their respective allocation of the unsubscribed Equity Rights Offering Securities. As consideration for certain of the commitments of the Equity Commitment Parties under the Equity Backstop Agreement, the applicable Equity Commitment Parties shall receive the Equity Put Option Premium, which shall be deemed fully earned as of the date of execution of the Equity Backstop Agreement.

On the Effective Date, all actions contemplated by the Plan and the Plan Supplement shall be deemed authorized and approved in all respects, including (i) the distribution of the New Common Shares (including New Common Shares representing the Equity Put Option Premium and Debt Put Option Premium) and (ii) the entry into the Shareholder Agreement by Reorganized Holdings and the holders of New Common Shares. Certain of the Debtors and Reorganized Debtors, as applicable, shall issue the Equity Rights Offering Securities pursuant to the Plan, the Plan Supplement, the Equity Rights Offering Documents. The Equity Rights Offering will be conducted in reliance upon one or more exemptions from registration under the Securities Act, which will include the exemption provided in section 1145 of the Bankruptcy Code to the fullest extent available and, to the extent such exemption is not available, the exemption from registration set forth in Section 4(a)(2) of the Securities Act or another available exemption from registration under the Securities Act.

On the Effective Date, the rights and obligations of Holdings under the Equity Backstop Agreement shall vest in the Reorganized Debtors. Notwithstanding anything to the contrary in the Plan, (a) Holdings' obligations under the Equity Backstop Agreement shall remain unaffected and shall survive following the Effective Date in accordance with the terms thereof, (b) any such obligations shall not be discharged under the Plan, and (c) none of the Reorganized Debtors shall terminate any such obligations.

### 4.    The Debt Rights Offering

The Plan provides that following approval by the Bankruptcy Court of the Debt Rights Offering Procedures, the Debt Rights Offering Amount will be raised pursuant to the Debt Rights Offering. The Debt Rights Offering Amount is $82.5 million and shall be fully backstopped by the Debt Backstop Parties pursuant to the terms and conditions in the Debt Backstop Agreement. The Debtors and Reorganized Debtors, as applicable, shall distribute (or cause to be distributed, directly or indirectly), the Debt Subscription Rights for the Debt Rights Offering to the Debt Rights Offering Participants as set forth in the Plan and the Debt Rights Offering Documents. Subject to the terms and conditions set forth in the Debt Rights Offering Procedures, the Debt Rights Offering shall be open to all Debt Rights Offering Participants.

Subject to the terms, conditions, and limitations set forth in the Debt Backstop Agreement, if, after following the procedures set forth in the Debt Rights Offering Procedures, there remains

any unsubscribed Debt Rights Offering Securities, the Reorganized Debtors will have an option to sell to the Debt Backstop Parties, and, upon exercise of such option, the Debt Backstop Parties shall each, severally and not jointly, be required to purchase, their respective allocation of the unsubscribed Debt Rights Offering Securities, in accordance with, and subject to, the terms and conditions of the Debt Backstop Agreement. As consideration for certain of the commitments of the Debt Commitment Parties under the Debt Backstop Agreement, the applicable Debt Commitment Parties shall receive the Debt Put Option Premium, which shall be deemed fully earned as of the date of execution of the Debt Backstop Agreement.

On the Effective Date, the Debtors and the Reorganized Debtors, as applicable, subject to the terms of the Plan and the Plan Supplement, shall issue (i) the Debt Rights Offering Securities pursuant to the Debt Rights Offering and the Debt Backstop Agreement and (ii) New Common Shares representing the Debt Put Option Premium to the applicable Debt Commitment Parties.  On the Effective Date, the rights and obligations of Holdings under the Debt Backstop Agreement shall vest in the Reorganized Debtors.  Notwithstanding anything to the contrary in the Plan or the Confirmation Order, (a) Holdings' obligations under the Debt Backstop Agreement shall remain unaffected and shall survive following the Effective Date in accordance with the terms thereof, (b) any such obligations shall not be discharged under the Plan, and (c) none of the Reorganized Debtors shall terminate any such obligations.

The Debt Rights Offering will be conducted in reliance upon one or more exemptions from registration under the Securities Act, which will include the exemption provided in section 1145 of the Bankruptcy Code and/or the exemption from registration set forth in Section 4(a)(2) of the Securities Act or another available exemption from registration under the Securities Act.

### 5.    Equity Direct Allocation

On the Effective Date, the Equity Direct Allocation Parties shall purchase, and the applicable Reorganized Debtor shall be authorized to issue to such parties, the Equity Direct Allocation Securities for the Equity Direct Allocation Amount.  All such Equity Direct Allocation Shares shall be duly authorized, validly issued, fully paid, and non-assessable.  The issuance of Equity Direct Allocation Shares to the Direct Allocation Parties shall be subject to the terms of the Plan, the Plan Supplement and the Equity Backstop Agreement.

### 6.    Debt Direct Allocation

On the Effective Date, the Debt Direct Allocation Parties shall purchase, and the applicable Reorganized Debtor shall be authorized to issue to such parties, the Debt Direct Allocation Securities for the Debt Direct Allocation Amount.  The issuance of the Debt Direct Allocation Securities to the Debt Direct Allocation Parties shall be subject to the terms of the Plan, the Plan Supplement and the Debt Backstop Agreement.

### 7.    The Exit ABL Credit Facility and Exit Notes

The Exit ABL Credit Facility:

On the Effective Date, the Reorganized Debtors shall enter into the Exit ABL Credit Agreement and the Exit Notes Indenture including any documents required in connection with the

creation or perfection of Liens in connection therewith.  The Confirmation Order shall include approval of the Exit ABL Credit Agreement and the Exit Notes Indenture all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Reorganized Debtors in connection therewith, authorization of the Reorganized Debtors to enter into, execute, and perform under the Exit ABL Credit Agreement and the Exit Notes Indenture and all related documents and agreements to the extent a party thereto, and authorization for the Reorganized Debtors to create or perfect the Liens in connection therewith.

The Exit ABL Credit Agreement and the Exit Notes Indenture shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms.  The financial accommodations to be extended pursuant to Exit ABL Credit Agreement and the Exit Notes Indenture are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to any Claims, Causes of Action, avoidance, reduction, recharacterization, subordination (whether contractual or otherwise), cross claim, disallowance, impairment, objection, or challenges under any applicable law or regulation by any Person for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent transfers, obligations, or conveyances, or other voidable transfers or obligations under the Bankruptcy Code or any other applicable non-bankruptcy law.

The lenders and noteholders under the Exit ABL Credit Agreement and the Exit Notes Indenture shall have valid, binding, and enforceable Liens on property identified as "Collateral" therein.  To the extent granted, the guarantees, mortgages, pledges, Liens and other security interests granted pursuant to either the Exit Facility Documents are granted in good faith as an inducement to the lenders and noteholders under either the Exit ABL Credit Agreement and the Exit Notes Indenture to extend credit thereunder and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, recharacterization, or subordination (whether contractual or otherwise) for any purposes whatsoever, and the priorities of any such Liens and security interests shall be as set forth in the relevant Exit Facility Documents. The Reorganized Debtors and the persons and entities granted such Liens are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order, and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens to third parties.

The Exit Notes:

The Company shall use commercially reasonable efforts to issue $350 million in aggregate principal amount of Exit Notes in a private placement not subject to registration under the Securities Act, pursuant to an Exit Notes Indenture on terms and conditions set forth herein and acceptable to the Debtors and the Required Supporting Noteholders.  The Exit Notes will be secured by a second priority security interest in and lien on the Reorganized Debtors' cash, accounts receivable, and inventory and a first priority security interest in and lien on substantially all of the Reorganized Debtors' other assets; *provided*, that the indenture governing the Exit Notes shall permit without condition the disposition of all property damage and business interruption insurance policies giving rise to claims by the Company for the November 2019 incident at the

PNO Facility (as defined below), and any proceeds thereof. The proceeds of the Exit Notes shall be used to fund the cash distribution to holders of the 10.5% Notes Secured Claims, as set forth below.

The terms and conditions of the Exit Notes and the Exit Notes Indenture will be set forth in the Plan Supplement. There will be no registration rights associated with the Exit Notes.

If the Company is unable to place some or all of the Exit Notes in the market, the Debtors are expected to have the right to cause the Exit Notes Backstop Parties, on a several (but not joint) basis, to purchase any such Exit Notes that are not placed in the market (the "**Exit Notes Backstop**") on terms and subject to conditions set forth in the Plan Supplement.

## 8.    Releases

The Plan contains releases of claims and causes of actions (as described more fully in Section 10.7 of the Plan), including mutual releases of claims and causes of action between the Debtors, the Reorganized Debtors and the Estates on the one hand, and: (i) the Supporting Noteholders, (ii) SK Second Reserve, L.P., a Delaware limited partnership;[11] (iii) the agents and lenders under the Exit ABL Facility, (iv) the holders of the Exit Notes and Holdco Notes and any agents or trustees thereunder, (v) the agents and lenders under the ABL DIP Facility, (vi) the agents and lenders under the Term Loan DIP Facility, (vii) the Backstop Parties, (viii) the Supporting Sponsors, (ix) the agents and lenders under the Prepetition ABL Credit Agreement, (x) the indenture trustees and collateral trustees in respect of the Priming Notes and the 10.5% Notes; and (xi) with respect to each of the foregoing Persons in clauses (i) through (x), each of their affiliates, predecessors, successors, assigns, subsidiaries, current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, employees of affiliates who worked on matters related to the Debtors or the Chapter 11 Cases and other professionals, affiliated investment funds or investment vehicles, managed accounts or funds, and such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such. None of the foregoing Entities, in each case, shall receive a release under the Plan if it: (a) elects to opt out of the releases contained in the Plan; or (b) timely files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation.

The Plan also contains releases of claims and causes of action, if any, held by the Debtors or their Estates against the Supporting Sponsors and the Debtors' directors and officers. The Debtors have evaluated the existence, colorability, and potential value of any such claims or causes of action against any of the Supporting Sponsors and the Debtors' directors and officers. Specifically, the Board (as defined below) established the Special Committee (as defined below), which directed an independent investigation into potential claims and causes of action of the

---

[11]    SK Second Reserve, L.P. is a party to the Restructuring Support Agreement and has agreed to be bound by its obligations thereunder, including to grant the releases set forth in Section 10.7(b) of the Plan. SK Second Reserve, L.P. is a named defendant in the prepetition litigation arising from the PNO Incident that has no involvement with the Debtors and is unrelated to the Debtors and the PNO Incident.

Company or that would become property of the Company's bankruptcy estate in a chapter 11 case against related parties and insiders, including the Supporting Sponsors and the Debtors' directors and officers. The Special Committee (as defined below) identified no colorable claims other than one non-material potential preference claim for a $389,581.19 payment to a former officer of the Company in connection with such former officer's severance agreement. The Special Committee (as defined below) determined that, even if valid, the Potential Preference Claim may be subject to valid defenses and that, in light of the amount at issue, the Potential Preference Claim was of *de minimis* net value to the Company. For more information on the Independent Investigation *see* Article III.E.4 below.

Under the Plan, Holders of Claims and Interests that either (i) vote to accept or are deemed to accept the Plan, (ii) are in voting Classes who abstain from voting on the Plan, or (iii) vote to reject or are deemed to reject the Plan, and do not opt out of the release provisions contained in Article X of the Plan, will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, from any and all Claims and Causes of action whatsoever (including any derivative claims, asserted or assertable on behalf of the debtors, the Reorganized Debtors, or their Estates), the Debtors and the Released Parties.

**As set forth in the ballot sent to Holders entitled to vote on the Plan, a Holder of a Claim is deemed to provide the release contained in Article 10.7(b) of the Plan (including releases of the Supporting Sponsors, Ad Hoc Noteholder Group, ABL DIP Lender, Term Loan DIP Lender, and PNO Claims asserted in the MDL if they (i) vote to accept the Plan, (ii) do not submit a ballot to accept or reject the Plan, or (iii) vote to reject the Plan and do not opt out of or object to the release provisions in the Plan.**

The Debtors believe that the releases, exculpations, and injunctions set forth in the Plan are appropriate because, among other things: (i) the releases, exculpations, and injunctions are specific; (ii) the releases provide closure with respect to prepetition claims and causes of action, which the Debtors determined is a valuable component of the overall restructuring under the circumstances and is integral to the Plan; (iii) the releases are a necessary part of the Plan; (iv) each of the Released Parties and Exculpated Parties has afforded value to the Debtors and aided in the reorganization process, which facilitated the Debtors' ability to propose and pursue confirmation of a value-maximizing restructuring and (v) and the other Supporting Sponsor-related matters described in Section V.F.1. Moreover, based on the conclusion of the Special Committee's Independent Investigation (both as defined below), there are no colorable claims or causes of action to be preserved against related parties and insiders. The releases, exculpations, and injunctions have the support of the vast majority of the Debtors' secured creditors by principal amount. The Debtors believe that each of the Released Parties and Exculpated Parties has played an integral role in formulating or enabling the Plan and has expended significant time and resources analyzing and negotiating the issues presented by the Debtors' prepetition capital structure. The Debtors will be prepared to meet their burden to establish the basis for the releases, exculpations, and injunctions for each Released Party and Exculpated Party as part of Confirmation of the Plan.

### 9.    Insurance Policies

Notwithstanding anything in the Plan to the contrary, all of the Debtors' insurance policies, in effect or purchased as of the Petition Date, and any agreements, documents, or instruments

relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, pursuant to section 365(a) of the Bankruptcy Code, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto, including all D&O Liability Insurance Policies (including tail coverage liability insurance). All members, managers, directors, and officers of the Company who served in such capacity at any time prior to the Effective Date and all other individuals covered by D&O Liability Insurance Policies will be entitled to the full benefits of each such policy for the full term of such policy, regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Effective Date.

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of all such insurance policies, including the D&O Liability Insurance Policies. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of any Debtor existing as of the Confirmation Date with respect to any Insurance Policy; and prior payments for premiums or other charges made prior to the Petition Date under or with respect to any Insurance Policy shall be indefeasible. Moreover, as of the Effective Date, all payments of premiums or other charges made by the Debtors on or after the Petition Date under or with respect to any insurance policy shall be deemed to have been authorized, approved, and ratified in all respects without any requirement of further action by the Bankruptcy Court. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of insurance policies, including the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim or Claim for Cure Costs need be Filed, and shall survive the Effective Date.

All members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Effective Date and all other individuals covered by such insurance policies will be entitled to the full benefits of each such policy for the full term of such policy, regardless of whether such members, managers directors, officers, or other individuals remain in such positions after the Effective Date.

### 10.     Proceeds from Insurance Recovery Efforts

Under the Plan, all proceeds of property damage/business interruption insurance arising from the PNO Incident constitute collateral securing the 10.5% Notes. If such insurance proceeds are received by the Debtors prior to the Effective Date, they will be distributed as excess cash to holders of Class 3 10.5% Notes Secured Claims pursuant to Section 4.3 of the Plan; otherwise, such proceeds will be retained as an asset of the Reorganized Debtors. No portion of such insurance proceeds will be distributed to holders of unsecured claims.

### 11.     Qualified Defined Benefit Plan

TPC Group LLC sponsors a defined benefit pension plan covered by Title IV of the Employee Retirement Security Act of 1974, as amended ("**ERISA**"), 29 U.S.C. §§ 1301-1461 (2018).

On the Effective Date, the Reorganized Debtors will assume and continue to maintain the TPC Group LLC Cash Balance Plan for Represented Employees (the "**Pension Plan**") in accordance with the terms of the Pension Plan (as such terms may be amended from time to time) and applicable non-bankruptcy law (and the Reorganized Debtors reserve all of their rights thereunder), and as may be required under ERISA or the Tax Code (as defined below) will pay any aggregate unpaid minimum funding contributions, with interest, for the Pension Plan.

After the Effective Date, the Reorganized Debtors will (i) satisfy the minimum funding requirements under 26 U.S.C. §§ 412 and 430 and 29 U.S.C. §§ 1082 and 1083 for the Pension Plan, (ii) pay all required Pension Benefit Guaranty Corporation ("**PBGC**") premiums in accordance with 29 U.S.C. §§ 1306 and 1307 for the Pension Plan, and (iii) administer the Pension Plan in accordance with the applicable provisions of ERISA and the Tax Code, and the Reorganized Debtors reserve all of their rights with respect to all such obligations.

## IV. OVERVIEW OF THE COMPANY AND ITS BUSINESSES

The Company, headquartered in Houston, Texas, is a leading producer of value-added products derived from petrochemical raw materials such as C4 hydrocarbons, and provider of critical infrastructure and logistics services along the U.S. Gulf Coast. With an operating history of 75 years, the Company has a manufacturing facility in the industrial corridor adjacent to the Houston Ship Channel and operates product terminals in Port Neches, Texas and Lake Charles, Louisiana. The Company is, among other things, the largest crude C4 processor by installed capacity in North America, and its customer and supplier relationships average more than 20 years old.

### A. The Company's Businesses

The Company operates as a value-added processor and marketer through the Debtors and their non-Debtor affiliates, linking raw material providers with its diverse customer base of chemical, refinery and fuels consumers. Its products are sold to producers in a wide range of performance, specialty and intermediate markets, including synthetic rubber, fuels, lubricant additives, plastics and surfactants. In North America, the Company is the leader across its major product lines, which include:

- Butadiene: largest producer by production capacity;

- Butene-1: largest producer by production capacity;

- Methyl Tertiary Butyl Ether ("**MTBE**"): second largest producer by production capacity;

- Isobutylene: third largest producer by production capacity; and

- Highly Reactive Polyisobutylene ("**HR-PIB**"): largest producer by production capacity.

The principal operating and reporting segments are C4 Processing and Performance Products.

In the C4 Processing segment, the Company processes the crude C4 stream from ethylene crackers into the following higher-value components:

- Butadiene: primarily used to produce synthetic rubber that is mainly used in tires and other automotive products;

- Butene-1: primarily used in the manufacture of plastic resins and synthetic alcohols; and

- Raffinates: primarily used in the manufacturing of alkylate, a high-octane gasoline blending component.

The Performance Products segment operates through two business units, Fuels and Isobutylene Derivatives, to produce the following higher-value derivative products:

- MTBE: primarily used as a gasoline blending stock;

- Conventional Poly-Isobutylenes ("**PIB**") and HR-PIB: primarily used in the production of fuel and lubricant additives, caulks, adhesives, sealants and packaging;

- Diisobutylene ("**DIB**"): primarily used in the manufacture of surfactants, plasticizers and resins; and

- High Purity Iso-Butylene ("**HPIB**"): primarily used in the production of synthetic rubber, lubricant additives, surfactants and coatings.[12]

The Company owns and operates (a) the HNO Facility; (b) approximately 230 miles of feedstock and product pipelines, including nine active pipelines spanning 113 miles along the Gulf Coast of Texas and Louisiana; and (c) certain shipping and maritime logistics assets such as storage and terminal assets in Houston and Port Neches, Texas and Lake Charles, Louisiana and two contract terminals used to support tank truck movements of PIB products to industrial customers of PIB. The Company also owns and formerly operated the PNO Facility until the PNO Facility was shut down following the PNO Incident, after which the PNO Facility was repurposed to function solely as a storage and shipping terminal. Both the HNO Facility and PNO Facility are serviced by rail, tank truck, barge and ocean-going vessel.

- HNO Facility: The HNO Facility is the Company's principal operating facility. It is built on a 257-acre parcel of land approximately one mile from the Houston Ship Channel and can process crude C4, PIB, DIB, HPIB and MTBE. The HNO Facility has an annual production capacity of 920 million pounds of butadiene; 300 million pounds of butene-1; 740 million pounds of raffinates; 120 million pounds of HR-PIB; 79 million pounds of DIB and 330 million pounds of PIB. It can also process 700 million pounds of purchased isobutylene annually and has a total MTBE production capacity of 1.4 billion pounds. The HNO Facility is also highly flexible with respect to the quality grades of C4 feedstocks that it can process. The facility is covered by an extensive logistics network which includes service by rail, tank truck, barge and ocean-going vessel. Its 20 million pounds of butadiene storage capability is one of the largest on the U.S. Gulf Coast.

---

[12] From time to time, the Company may reduce production at or idle a facility or a particular unit at a facility for an extended period of time or discontinue a product line because of an oversupply of a particular product and/or a lack of demand for that particular product, or high feedstock prices that make production uneconomical. In 2017, the Company significantly decreased production of HPIB at its Houston facility for the reasons described above and is currently not producing any HPIB. The Company expects to continue production when demand and market economics improve.

Figure 1: Aerial Photograph of HNO Facility



- <u>PNO Facility</u>: Prior to the PNO Incident, the PNO Terminal in Port Neches, Texas also housed the PNO Facility, which operated as the Company's second C4 processing facility.  On November 27, 2019, two explosions occurred at the TPC plant in Port Neches (the "**PNO Facility**") at approximately 1:00 a.m. and 11:45 a.m. (prevailing central time) (the "**PNO Incident**"). [13]  The explosions and subsequent fires resulted in the complete shutdown of all processing at the PNO Facility and production remains shut as of this date.  Following the PNO Incident, the PNO Facility was repurposed into a storage, shipping, and logistics terminal.

- <u>Gulf Coast Storage Logistics</u>: Texas Butylene Chemical Corporation, a wholly owned subsidiary of TPC Group LLC, owns storage and terminal assets in Lake Charles, Louisiana (the "**LCO Terminal**"). TPC Group LLC owns storage and terminal assets in Port Neches, Texas (the "**PNO Terminal**"), and a network of product and feedstock pipelines throughout the Gulf Coast region.

*LCO Terminal*

The LCO Terminal comprises two barge docks, two butadiene storage spheres and the ability to pump product via pipeline directly to the Company's customers. Texas Butylene Chemical Corporation leases the land on which the LCO Terminal is built through October 31, 2024, with an automatic ten-year extension and a purchase option at the end of the extension period. The ground lease covers 3.830

---

[13]    A document titled "Factual Update" dated October 29, 2020 and issued by the U.S. Chemical Safety and Hazard Investigation Board states, among other things, that explosions occurred on November 27, 2019 at 12:56 a.m., 2:40 a.m., and 1:48 p.m. (Central Time).  The document is available online at https://www.csb.gov/assets/1/17/tpc_factual_update_10-29-2020.pdf?16614.  A member of the Creditors' Committee asserts that four of the fifty instances of the term "PNO Incident" in this Disclosure Statement should read "PNO Explosions and Fire."  To maintain consistency of usage throughout this Disclosure Statement and across the other documents that the Debtors have filed in these Chapter 11 Cases, and to avoid confusion, the Debtors use the term "PNO Incident" throughout this Disclosure Statement.

acres in Lake Charles, Louisiana.  Texas Butylene Chemical Corporation is not a defendant in any litigation arising from the PNO Incident.  However, Texas Butylene Chemical Corporation is a guarantor of the 10.5% Notes, and has pledged machinery, equipment and all other personal property as collateral for such 10.5% Notes. In addition, TPC Group LLC has pledged its equity ownership in Texas Butylene Chemical Corporation as collateral securing the 10.5% Notes.

Figure 2: Aerial Photograph of Terminal and Logistics Assets at LCO Terminal



Figure 3: Alternate View of Terminal and Logistics Assets at LCO Terminal



*PNO Terminal*

The PNO Terminal, located on a 216-acre site in Jefferson County, Texas, is owned by the Company (except for the PNO Terminal dock and associated pipelines and

wastewater treatment facilities, which are co- owned with industrial neighbors). It provides access to many butadiene customers, suppliers and refineries via barge, ship, rail, truck and an approximate sixty-mile pipeline network. The PNO Terminal also has twenty-two active storage tanks, consisting of six butadiene tanks, nine raffinates tanks, and seven crude C4 tanks. In addition, the PNO Terminal has a load dock facility, consisting of both a vessel and barge dock, and significant rail assets, including four rail racks, twelve rail unloading spots, and ninety railcar storage spots.

Figure 4: Aerial Photograph of Select Storage Assets at PNO Terminal



In addition to its other logistics assets, the Company owns a proprietary pipeline for shipment of B-1 to Dow's Texas City plant. It also leases storage capacity and has terminal capabilities for PIB in Hammond, Indiana, which allows the Company to service northern U.S. customers. Raffinate customers are served through a network of Company-owned and third-party pipelines, including a salt-dome storage facility in Pierce Junction, Texas, which the Company leases.

The Company has a broad client base of chemical producers and refiners, primarily in the United States, who use the Company's products as raw materials primarily for production of tires, nylons, fuel and lubricant additives, gasoline, gasoline blend stocks and plastics. For the years ended December 31, 2021, 2020 and 2019, sales to non-U.S. customers accounted for 4.2%, 5.6% and 9.2%, respectively, of the Company's total revenue.

Finally, the Company employs approximately 470 individuals across its manufacturing facility, production terminals and corporate headquarters. Fifty-one (51) of the Employees are represented by five different unions, each with a collective bargaining agreement: the United Steelworkers, the International Brotherhood of Electrical Workers, the Boilermakers Union, the Pipefitters Union, and the Carpenters Union. The Debtors currently intend to assume such collective bargaining agreements and are not aware of any cure obligations or claims being asserted on account of such collective bargaining agreements. On April 30, 2020, the Company terminated

the employment of over sixty employees as part of a reduction in force initiative following the PNO Incident.

**B.    Equity Ownership**

Holdings is a privately-owned company that has, since December 20, 2012 (the "**2012 Acquisition**"), been indirectly, majority-owned by FR Sawgrass, L.P., SK Sawgrass, L.P., and certain affiliates of both entities, with certain current and former employees and members of the Company's senior leadership team indirectly holding approximately 1% of the Company's equity interests.

**C.    Corporate Organization and Prepetition Indebtedness**

Holdings, the parent company of TPC Group Inc. and the other Debtors, is a Delaware corporation and an unsecured guarantor of the 10.875% Senior Secured Notes and, in connection with the Debtors' entry into the February 2022 forbearance agreement, became an unsecured guarantor of the 10.5% Notes in February 2022. Each of the Debtors is a direct or indirect wholly owned subsidiary of Holdings. The Debtors' corporate organization is depicted on the chart attached hereto as **Exhibit C**.

The Debtors' capital structure is summarized by the following table and described in more detail below:

| CAPITAL STRUCTURE | | | | |
|---|---|---|---|---|
| **Secured Debt**<br><br>*( $ in millions)* | **Principal Amount** | **Accrued Interest** | **Applicable Premium** | **Total Claim Amount** |
| Secured ABL Facility | $108.5 | - | - | $108.5 |
| 10.875% Priming Secured Notes | $205.5 | $12.4 | $19.9 | $237.8 |
| 10.50% Senior Secured Notes | $930 | $83.1 | $73.2 | $1,086.3 |
| **Total Debt** | $1,241 | $95.5 | $93.1 | **$1,432.6** |

**1.    Funded Indebtedness**

(i)    **10.875% Senior Secured Notes due July 2024 – Priming Notes**

The Debtors are obligors under that certain *Indenture*, dated as of February 2, 2021, by and among TPC Group Inc., as issuer, the other Debtors, as guarantors, and U.S. Bank National Association ("**U.S. Bank**"), as trustee and collateral agent, for the issuance of $153 million in aggregate principal amount of 10.875% senior secured notes due 2024 (such notes, the "**Original Priming Notes**"; such indenture, as amended, modified, and supplemented, the "**Priming Notes Indenture**"). A portion of the net proceeds of the Original Priming Notes was used to repay and terminate a secured $70 million term loan that the Company borrowed from entities managed by or affiliated with Apollo Global Management, LLC, which term loan otherwise would have matured in August 2021.

(ii)      **10.875% Senior Secured Notes due July 2024 – Additional Priming Notes**

Each of the Debtors is party to a *Forbearance Agreement* (the "**Forbearance Agreement**") dated February 3, 2022, with an ad hoc group of holders of the Company's 10.50% Notes (described below) and the Company's 10.875% Priming Notes. The Ad Hoc Noteholder Group holds approximately 96.3% of the Company's 10.5% Notes.

Under the Forbearance Agreement, the Ad Hoc Noteholder Group agreed, among other things, to forbear from exercising rights and remedies arising from the Company's election to forego $53 million of interest payments due February 1, 2022, on the Company's secured notes. The Ad Hoc Noteholder Group also agreed to provide the Company with approximately $51.5 million of additional liquidity in the form of a commitment to purchase additional 10.875% senior secured priming notes due 2024 (the "**Bridge Priming Notes**," and together with the Original Priming Notes, the "**Priming Notes**").[14] The Company issued the Bridge Priming Notes in two tranches: approximately $25 million on March 2, 2022 and approximately $26.5 million on March 11, 2022. As of the Petition Date, approximately $205.5 million[15] in aggregate principal amount of Priming Notes were outstanding, in addition to accrued and unpaid interest, premiums, fees, and other charges.

The Debtors' obligations under the Priming Notes Indenture are secured by a first-priority security interest in and lien on the Notes Priority Collateral (including, among other things, real property, fixtures, and equipment) and a second-priority security interest in and lien on the ABL Priority Collateral, pursuant to, among other security documents, mortgages and a *Pledge and Security Agreement*, dated as of February 2, 2021, by and among TPC Group Inc., each of the other Debtors party to the Priming Notes Indenture, and U.S. Bank.

(iii)      **10.5% Senior Secured Notes due August 2024**

The Debtors are obligors under that certain *Indenture*, dated as of August 2, 2019, by and among TPC Group Inc., as issuer, the other Debtors, as guarantors, and U.S. Bank, as trustee and collateral agent, for the issuance of $930 million in aggregate principal amount of the 10.5% Notes (such indenture, as amended, modified, and supplemented, the "**10.5% Notes Indenture**").

---

[14]     In connection with the issuance of the Priming Notes, the Debtors entered into that certain Letter Agreement Providing for an Offer to Purchase Certain Existing Notes of TPC Group Inc. upon the terms and conditions set forth herein (the "**Side Letter**"). The Side Letter required the Debtors to offer to repurchase, under certain circumstances, 10.5% Notes held by the parties specified therein. As of the Petition Date, the Debtors had not been required to make, and had not made, such an offer, and the enforceability of the Side Letter was stayed by the automatic stay. Certain of the counterparties to the Side Letter have filed proofs of claim asserting claims arising under the Side Letter, but if the Plan is confirmed, the Debtors' obligations under the Side Letter would be discharged, and the Debtors do not currently anticipate being required to make any distributions on account of such Claims in these chapter 11 cases.

[15]     The total of approximately $205.5 million includes a 2% paid-in-kind fee on the issuance of the Bridge Priming Notes.

The Debtors' obligations under the 10.5% Notes Indenture are secured by a first-priority security interest in and lien on the Notes Priority Collateral (including, among other things, real property, fixtures, and equipment) and a second-priority security interest in and lien on the ABL Priority Collateral, pursuant to, among other security documents, mortgages and a *Pledge and Security Agreement*, dated as of August 2, 2019, by and among TPC Group Inc., each of the other Debtors party to the 10.5% Notes Indenture, and U.S. Bank.  As of the Petition Date, approximately $930 million in aggregate principal amount of 10.5% Notes were outstanding, in addition to accrued and unpaid interest, premiums, fees, and other charges.

## 2.    Debtor Credit Facilities

### (i)    ABL Revolving Credit Facility

As of the Petition Date, the Company maintained an asset-based revolving loan facility (the "**ABL Facility**") with Bank of America, N.A., as administrative agent and collateral agent for the lenders thereunder (in such capacity, the "**ABL Agent**"), pursuant to that certain *Amended and Restated Credit Agreement*, dated as of August 2, 2019 (as amended, modified, or otherwise supplemented from time to time, the "**ABL Credit Agreement**").  TPC Group Inc. is the borrower under the ABL Credit Agreement, and the other Debtors are guarantors thereunder.  The ABL Facility has a maximum committed amount of $200 million, consisting of a $192.5 million revolving loan tranche (less outstanding letters of credit) and a $7.5 million "first-in-last-out" loan tranche.  Availability under the ABL Facility is subject to a borrowing base.  The Debtors had borrowings under the ABL Facility of approximately $105.5 million as of the Petition Date, plus any accrued and unpaid prepetition interest, fees, and other charges.

The Debtors' obligations under the ABL Facility and guarantees are secured by a first-priority security interests in and lien on the assets more fully described in that certain *Amended and Restated Pledge and Security Agreement*, dated as of August 2, 2019 (such assets, the "**ABL Priority Collateral**").  The ABL Priority Collateral includes the Debtors' accounts receivable, inventory, general intangibles, intellectual property, deposit and investment accounts, and investment property, and a second-priority security interest in and lien on substantially all of the Debtors' other assets (such other assets, the "**Notes Priority Collateral**") other than real property.

## 3.    Intercreditor Agreements.

The rights of the agent and lenders under the ABL Credit Agreement (the "**ABL Secured Parties**"), the trustee, collateral agent, and holders of Priming Notes under the Priming Notes Indenture (the "**Priming Notes Secured Parties**"), and the trustee, collateral agent, and holders of notes under the 10.5% Notes Indenture (the "**10.5% Notes Secured Parties**," and together with the ABL Secured Parties and Priming Notes Secured Parties, the "**Prepetition Secured Parties**") with respect to collateral and the proceeds thereof are governed by two prepetition intercreditor agreements:

a.    The rights as between the ABL Secured Parties, on the one hand, and the Priming Notes Secured Parties and 10.5% Notes Secured Parties, on the other hand, are governed by that certain *Intercreditor Agreement*, dated as

of August 2, 2019 (as amended, modified, supplemented, or joined, the "**ABL Intercreditor Agreement**").    With respect to ABL Priority Collateral, the rights of the Priming Notes Secured Parties and the 10.5% Notes Secured Parties are subordinate to the rights of the ABL Secured Parties; and with respect to Notes Priority Collateral, the rights of the ABL Secured Parties are subordinate to the rights of the Priming Notes Secured Parties and the 10.5% Notes Secured Parties.

b.    The rights as between the Priming Notes Secured Parties and the 10.5% Notes Secured Parties are governed by that certain *Intercreditor Agreement*, dated as of February 2, 2021 (as amended, modified, or supplemented, the "**Notes Intercreditor Agreement**," and together with the ABL Intercreditor Agreement, the "**Intercreditor Agreements**").    With respect to common collateral under the Priming Notes Indenture and the 10.5% Notes Indenture, the rights of the 10.5% Secured Parties are subordinate to the rights of the Priming Notes Secured Parties.

The Intercreditor Agreements govern, among other things, the priority of distribution of collateral and proceeds thereof among the Prepetition Secured Parties.    A table summarizing some the controlling bankruptcy-specific provisions in the ABL Intercreditor Agreement is set forth below:

| Key Provisions of ABL Intercreditor Agreement[16] | |
|---|---|
| **Noteholders' Ability to Object to DIP Financing or Provision of Adequate Protection or Request Adequate Protection** | If the ABL Representative or the other ABL Secured Parties desire to consent to or not object to the use of ABL Facility Priority Collateral constituting cash collateral or provide or permit a third-party to provide ABL DIP Financing secured by all or a portion of the ABL Facility Priority Collateral, the noteholders agree to consent and not object to the use of such cash collateral or to the ABL DIP Financing on the grounds of failure to provide for adequate protection or any other grounds, except the Junior Representative may request adequate protection of its interest in the Junior Collateral in the form of an additional or replacement Lien thereon provided that (i) an adequate protection Lien shall also have been granted in favor of the Senior Secured Parties in respect of such Collateral and (ii) the Lien in favor of the Junior Secured Parties on such Collateral shall be subordinated to the Liens thereon securing and providing adequate protection for the Senior Obligations in accordance with the Lien Priority set forth in the Agreement.  *ABL Intercreditor Agreement*, §§5.2(a), 5.4. |

---

[16]    This summary is qualified in its entirety by reference to the applicable provisions of the ABL Intercreditor Agreement.  To the extent anything in this table is inconsistent with the ABL Intercreditor Agreement, the terms of the ABL Intercreditor Agreement shall control.  All capitalized terms listed in this table shall have the meanings ascribed to such terms in the ABL Intercreditor Agreement.

| Key Provisions of ABL Intercreditor Agreement[16] | |
|---|---|
| **Noteholders' Ability to Seek Relief from the Stay** | Each Notes Representative agrees, on behalf of itself and the applicable Notes Secured Parties, that none of them will seek or support any other Person in seeking relief from the automatic stay or from any other stay in any Insolvency Proceeding or take any action in derogation thereof, in each case in respect of any ABL Facility Priority Collateral, without the prior written consent of the ABL Representative. *ABL Intercreditor Agreement*, §5.3. |

### 4.    General Unsecured Creditors

The Debtors have general unsecured liabilities, which can be grouped into three main categories: (i) PNO Claims asserted by individuals and/or homeowners (including subrogation claims filed by insurance carriers), (ii) PNO Claims asserted by industrial claimants (including subrogation claims filed by insurance carriers), and (iii) other general unsecured claims that include, among other things, contract rejection claims, impaired trade claims and the 10.5% Notes Deficiency Claims.  As of the Petition Date, approximately 7,800 litigation claims have been asserted against one or more of the Debtors arising from the PNO Incident (the "**PNO Claims**").

The table below reflects a range of estimates of Class 4 General Unsecured Claims based upon, among other things, the proofs of claim submitted.  As set forth in the table below, the Debtors' range of estimates of Class 4 General Unsecured Claims that may receive a distribution under the Plan does not include the 10.5% Notes Deficiency Claims.  This information is provided in summary form for illustrative purposes only and is subject to material change based on contingencies related to, among other things, the Claim reconciliation and allowance process.  Further, the Debtors do not admit the validity and amount of any Claim and reserve all rights to object to any Claim, as appropriate.  Further, the Debtors contend that claims for future damages should be discounted to present value as of the Petition Date.  The estimates below do not reflect any such discounting to present value.  The estimates may and likely will vary from the final amounts allowed by the Bankruptcy Court.  The high end of the range for PNO Claims reflects amounts asserted in proofs of claim or, if filed in unliquidated amounts, such amounts were obtained by statements made by counsel to the PNO Claims Steering Committee in open court at the First Day Hearing.  The low end of the range reflects the Debtors' experience resolving and paying over 5,000 PNO Claims under the Voluntary Settlement Program (as defined below) prior to the Petition Date.[17]

---

[17]    This table does not include estimates for Claims on account of additional contract rejections that are either pending or anticipated by the Debtors.  The table also does not include any Claims asserted by governmental units.

| General Unsecured Claims (in $ million) | Low | High |
|---|---|---|
| 10.5% Notes Deficiency Claims | $ 607 | $ 607 |
| PNO Claims (Subrogation & Individual) | | |
|     Subrogation Claims | 20 | 20 |
|     Individual Property Damage Claims [18] | 72 | 250 |
|     Individual Personal Injury [19] | 60 | 250 |
| PNO Claims (Industrial) | | |
|     Indorama | Undetermined | 107 |
|     Lion | Undetermined | 52 |
|     Air Liquide | Undetermined | 9 |
| Contract Rejection Claims | | |
|     Direct Energy | 8 | 8 |
|     Lion | 0 | 12 |
|     Air Liquide | 10 | 210 |
|     Voluntary Settlement Program [20] | 0 | 13 |
| Trade Claims | 10 | 15 |
| **Total Class 4 General Unsecured Claims** | **$787** | **$1,553** |
|     Less: 10.5% Notes Deficiency Claims | (607) | (607) |
| **Total Class 4 General Unsecured Claims (with waiver of 10.5% Notes Deficiency Claim)** | **$180** | **$946** |

---

[18]    The low end estimate assumes 3,000 claimants with an average amount per claim of $24,000.

[19]    The low end estimate assumes 6,000 claimants with an average amount per claim of $10,000.

[20]    As set forth herein, the Debtors currently intend to reject the settlement agreements entered into in connection with the Voluntary Settlement Program prior to the Petition Date, provided that determinations regarding assumption and rejection of executory contracts and unexpired leases will be set forth in the Plan Supplement and governed by Section VIII of the Plan.

## V.    EVENTS LEADING TO THE COMMENCEMENT OF THESE CHAPTER 11 CASES

### A.    Current Market Conditions and Business Conditions

The primary drivers of the Company's businesses are general economic and industrial growth.  The Company's results are impacted by the effects of economic upturns or downturns on its customers and suppliers, and its ability to achieve on-stream time and production targets within operating units.  The Company's results are also dependent on its costs to produce, sell and deliver its products.  The Company's customers generally use its products in their own production processes; therefore, if its customers curtail production of their products, the Company's results could be materially affected.  In particular, feedstock costs and product prices are susceptible to volatility in pricing and availability of crude oil, natural gas, natural gas liquids such as isobutane and oil-related products such as unleaded regular gasoline.  Prices for these products tend to be volatile as well as cyclical, as a result of global and local economic factors, worldwide political events, weather patterns and the economics of oil and natural gas exploration and production, among other things.

In the past several years, the Debtors' businesses, results of operations and liquidity have been negatively impacted by several adverse Company-specific events, including damages to its facilities such as the Dock Incident, the HNO Technical Center Fire and the PNO Incident described below.  General economic conditions and regional disruptions have also combined to exacerbate these negative impacts, including the 2020 oil and gas market crash, the COVID-19 pandemic, and Winter Storm Uri (and lingering effects on equipment, including requiring a shutdown of parts of the HNO Facility for portions of September through November 2021 to repair boilers that supply steam to various part of the HNO Facility).  Finally, most recently, liquidity impacts by trade credit contraction as a result of the Company's financial difficulties have also negatively impacted the Company's operations.

### B.    The Dock Incident and the HNO Technical Center Fire

#### 1.    Dock Incident

On June 13, 2018, an ocean-going bulk carrier navigating in the Port of Houston Ship Channel veered off course and struck a barge stationed at the Debtors' primary Houston facility dock (the "**Dock Incident**").  The incident caused substantial damage to both the barge and the dock facilities.  There were no significant injuries and there was no environmental impact from the incident.

The damaged dock was returned to full barge and ship service in August 2018 after temporary repairs of approximately $5 million which, excluding a $0.25 million deductible, were reimbursed from insurance proceeds in September 2018.  The insurance proceeds were accounted for as an offset to the actual dock repair costs.  The total amount of the insurance deductible and uninsured logistics and legal expenses recognized in the Debtors' reported 2018 earnings was $1.5 million and the margin on estimated lost sales volume was approximately $6.0 million.  The revenue and cost of sales related to the lost sales volume for the C4 Processing segment were estimated to be $4 million and $2 million, respectively, and for the Performance Products segment were estimated to be $13 million and $9 million, respectively.

The Debtors are close to finalizing agreements with the Houston Port Authority and their insurance carriers around the rebuild of the dock and expect to commence the project in 2023.

### 2. HNO Technical Center Fire

Early on the morning of January 9, 2021, the TPC Houston operations team responded to a fire alarm in the Technical Center (the "**HNO Technical Center**").  The HNO Technical Center, located on the southwest side of the facility, which contains quality control and research and development activities, had a fire in the mechanical room.  TPC's Emergency Response Team responded to the incident with assistance from the Houston Fire Department.  The Company coordinated with local officials and emergency responders to quickly resolve the issue.  There were no injuries to TPC employees and no offsite or environmental impacts as a result of the event; however, one emergency responder sustained an ankle injury while responding to the event.  As a result of the fire, there was considerable damage to the facility and the housed equipment.  Fortunately, over 75% of the equipment was salvageable, but, in the absence of a functioning laboratory the Company had to secure short-term outsourcing solutions for its quality control testing needs.  Since late February 2021, however, the Company has replaced the majority of the outsourced testing with in-house testing in a combination of TPC and rental facilities, thereby substantially reducing the incremental costs.  In view of the Company's recent operational challenges and their impact on liquidity, the Company has decided to defer rebuilding the HNO Technical Center for the time being and cover its analytical and R&D needs through leased facilities.

### C. The Port Neches Incident; Company Response and Related Subsequent Events

### 1. The PNO Incident

On November 27, 2019, two explosions occurred at the PNO Facility at approximately 1:00 a.m. and 11:45 a.m. (prevailing central time).  The explosions and subsequent fires resulted in the complete shutdown of all production at the PNO Facility.  Production remains shut down to this day.  The PNO Incident directly resulted in the loss of approximately half of the Company's historical crude C4 processing capacity.  Following the PNO Incident, the PNO Facility was repurposed into a storage terminal.  The Company terminated the employment of over sixty employees as part of a reduction in force initiative following the PNO Incident.  The Company also incurred significant expenses related to legal and regulatory compliance, health and safety efforts, and restoration of storage and terminal capabilities at the facility.

### 2. Company's Response to the PNO Incident

In the aftermath of the PNO Incident, the Company worked through a unified command of federal, state, and local government entities (the "**Unified Command**") to secure the site and minimize the impact to the environment while preserving the safety of emergency responders and the community.  Among other things, the Company worked with the Unified Command to develop a response plan to the PNO Incident, to ensure compliance with any investigations and other regulatory matters and to perform critical water, air and other pollution tests for the incident site and surrounding area.  On January 30, 2020, the Unified Command was dissolved and command

of the PNO Incident site was relinquished to the Company, which continued to maintain and monitor operations at the site of the PNO Incident.

### 3.    Federal and State Agency Investigation and Related Matters

Following the PNO Incident, multiple federal, state, and local government agencies initiated full-scale investigations of the PNO Incident.  The Company has fully cooperated, and continues to do so, with each agency's respective investigations, assessments, and requests for information.

In December 2019, the Occupational Safety and Health Administration (OSHA) initiated its inspection of the PNO Incident.  OSHA completed its inspection and issued citations on May 26, 2020, including ten serious citations and three willful citations with total proposed penalties of approximately $0.5 million.  The Company has appealed these citations.  The Company strongly disagrees with the characterization of some of the alleged violations as "willful." Mandatory settlement conferences took place August 5-6, and 19-20, 2021.  The citations were not resolved, and OSHA filed its complaint on September 9, 2021.  The Company appealed certain of the OSHA citations and it is anticipated that a trial will take place in Q4 2022.

The Texas Attorney General has filed two state-court lawsuits in the District Courts of Travis County Texas against the Company. One lawsuit is for alleged violations of the Texas Clean Air Act and the Texas Water Code pertaining to the PNO Incident.  This lawsuit also includes claims arising from previously investigated emission events that occurred at the PNO Facility from January 2018 through September 2019.  Although these events had been the subject of administrative settlements with TCEQ, the agency withdrew those settlements in the wake of the PNO Incident. The second state-court lawsuit concerns the Company's Houston facility, and seeks injunctive relief, civil penalties, attorney's fees, and court costs for alleged violations of the Texas Clean Air Act, the Federal Clean Air Act, the Texas Water Code, and rules and permits issued thereunder. TPC, the OAG, and TCEQ continue to work together to insure that TPC rectifies current issues at the Houston facility.

The U.S. Chemical Safety and Hazard Board ("**CSB**"), United States Environmental Protection Agency ("**EPA**") and the United States Department of Justice ("**DOJ**") are separately investigating the Company as a result of the PNO Incident.  The EPA has served two separate information requests under Section 114 of the federal Clean Air Act to the Company.  These requests seek information about the incident as well as the Company's Risk Management compliance program at both the PNO Facility and HNO Facility.  Such requests are typically the first step in EPA enforcement.  In addition, a grand jury investigation has issued two subpoenas to the Company in relation to the PNO Incident.

The Company responded to the EPA's information requests and the parties are currently in ongoing discussions regarding potential civil liability.  The Company's response to the first grand jury subpoena is complete.  The response to the second subpoena is ongoing.

On August 23, 2022, the EPA and the Company entered into an Administrative Order on Consent ("AOC") related to the HNO Facility.  Under the AOC, the Company has agreed to specific timeframes to take corrective action related to fixed equipment (vessels and piping), rotating equipment (pumps and compressors), instrumentation and safety systems, water on

pumps, pressure gauges, idle or out-of-service equipment, dead legs, maintenance, and housekeeping at the HNO Facility.

The Company anticipates that there likely will be additional enforcement matters, claims for cost recovery, and/or claims for natural resource damages from these and other similar agencies.

TCEQ and EPA have requested that the following language be added to the Plan or Confirmation Order.

> "*Notwithstanding anything contained in the Plan, Plan Documents, or the Confirmation Order to the contrary, nothing in the Plan, the Plan Documents, or the Confirmation Order shall discharge, exculpate, release, impair, enjoin, or otherwise preclude: (a) any liability to any Governmental Unit that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (b) any liability to any Governmental Unit arising after the Confirmation Date; (c) any liability to a Governmental Unit under police or regulatory law to which any entity is subject as the owner or operator of property after the Plan Effective Date; (d) any criminal liability; or (e) any liability to any Governmental Unit of any non-debtor. Nothing in the Plan, Plan Documents, or Confirmation Order shall impair any setoff or recoupment rights of any Governmental Unit. Nor shall anything in the Plan, Plan Documents, or the Confirmation Order: (a) enjoin or otherwise bar any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability or obligation described in preceding sentence or (b) divest any court, commission, or tribunal of jurisdiction from resolving any matters relating to the liabilities and/or claims set forth in this section.*"

Without such language, TCEQ and EPA are likely to object to the Plan as unconfirmable under 11 USC 1129. TCEQ's and EPA's rights to object to the Plan are fully preserved, including without limitation with respect to any non-debtor release and regardless of whether TCEQ or EPA choose to vote for or against the Plan.

### 4.    PNO Settlements and Litigation

Promptly following the PNO Incident, the Company established a claims center to deal with and expedite community claims regarding evacuation expenses, damages to property and debris removal. Since that time, nearly 19,000 evacuation claims have been processed and paid to affected residents and over 5,700 property claims have been resolved under the Company's voluntary settlement program (the "**Voluntary Settlement Program**"). As of the Petition Date, the Company has paid settlements in the aggregate amount of approximately $134.6 million on account of PNO Claims and the Debtors have approximately $13.9 million in aggregate unpaid property damage settlement amounts that are owed under the terms of the settlement agreements. The Debtors currently intend to reject such settlement agreements, provided that determinations regarding assumption and rejection of executory contracts and unexpired leases will be set forth in the Plan Supplement and governed by Section VIII of the Plan. Separate from the aforementioned $13.9 million in PNO Claims with signed settlement agreements, there are approximately $12.9 million in PNO Claims that had begun being processed in the Voluntary Settlement Program, but did not have a have an executed settlement agreement as of the Petition Date. Such PNO Claims

without executed settlement agreements would be treated accordingly as Class 4 General Unsecured Claims.

In addition to the outstanding property claims, over 7,000 plaintiffs have filed petitions related to the PNO Incident are pending in Texas state court. The plaintiffs in those actions assert a variety of claims against certain of the Debtors, certain of the Supporting Sponsors, and certain other entities, such as Nalco Co., LLC, an industrial air and water solutions company, Suez WTS USA, Inc., an industrial air and water solutions company, and Ingenero, Inc., an engineering services provider. The causes of action include negligence, gross negligence, nuisance, and trespass. The claims against TPC Holdings, Inc. and the Supporting Sponsors are identical, while the claims against TPC Group LLC/TPC Group Inc. and the Supporting Sponsors have substantial overlap. To date, although some discovery has taken place, no claim has proceeded to trial. Given the voluminous nature of the claims at issue, the Company moved the State of Texas' Multi-District Litigation Panel (the "**MDL Panel**") to transfer civil cases to a single court for pretrial purposes to limit inconsistent rulings and excessive and duplicative discovery. The MDL Panel granted the Company's motion to transfer, designating the Honorable Judge Courtney Arkeen of the 128th Judicial District Court of Orange County (the "**MDL Court**") as the pretrial judge assigned to the cases. The actions emerging from the PNO Incident were assigned to Multidistrict Litigation under Case Number A-2020-0236-MDL (the "**MDL**"). Over 7,800 individual plaintiffs have claims pending in the MDL and approximately 322 individual plaintiffs have cases pending in Jefferson County and Harris County, Texas which have not yet been dismissed or abated. Additionally, more than 820 properties are the subject of litigation as a result of subrogation claims filed by insurance companies.

Since the MDL was empaneled, a number of dismissal arguments have been raised by certain of the Supporting Sponsors defendants. Specifically, some of the Supporting Sponsors defendants moved to the dismiss the claims against them for failure to state a claim. The MDL Court denied that motion, and certain Supporting Sponsors defendants sought relief by mandamus petition on that motion. The intermediate court of appeals rejected that petition, and the Supporting Sponsors defendants have sought mandamus relief from the Texas Supreme Court. On September 2, 2022, the Texas Supreme Court asked the parties to provide full merits briefing on the motion to dismiss. Some of the Supporting Sponsors defendants also challenged the exercise of personal jurisdiction over them, and the MDL Court denied those motions. The relevant Supporting Sponsors defendants have appealed that determination, and their appeal is currently pending in the Texas Court of Appeals for the Ninth District. The plaintiffs' responsive briefing in that appeal is due on September 23, 2022; submission of a reply brief and oral argument will follow.

On June 1, 2022, the Company and related entities filed the Chapter 11 Cases, jointly administered under Case No. 22-10493 (CTG). TPC then filed a suggestion of bankruptcy with the various Texas courts, which resulted in a stay of the litigation that remains ongoing. Since the stay went into effect, the Support Sponsors have filed letter briefs in the MDL Court requesting the court to clarify that all proceedings (including discovery and further amendments of pleadings) impacting the Debtors or property of the Debtors' estate are currently stayed by virtue of the automatic stay. The Supporting Sponsors have also argued that the Texas Rules of Civil Procedure do not permit the Debtor defendants to be severed out of the MDL, and explained that it would be more efficient and practical for the court to stay the entire MDL until the Debtors' bankruptcy proceedings have concluded. At a status conference on September 12, 2022, the MDL Trial Court

agreed with the Defendants that the MDL proceedings were to remain stayed because of the Debtors' bankruptcy proceedings and because of the on-going appellate and mandamus proceedings pursued by the Supporting Sponsors.

Since the time of the filing of these Chapter 11 Cases, no other material developments have occurred in the MDL.

### 5.      Insurance Recovery Efforts

Following the PNO Incident, the Company has engaged in a process to recover proceeds available under its applicable insurance policies, including $850 million in coverage under its property damage and business interruption insurance policies, $100 million in coverage under its liability insurance policies, $25 million in coverage under its environmental/pollution insurance policies and $35 million in coverage under its marine cargo/inventory policies.

The following table reflects the status of the Company's insurance recovery efforts as of the Petition Date:

## PNO Insurance Receipts & Remaining Coverage as of September 1, 2022
### (Contract Claims Only; Excludes Fees, Costs, Interest, Penalties and Expenses)

| KEY POLICY | POLICY LIMIT | RECEIVED TO DATE | PENDING AMOUNTS | EST. REMAINING COVERAGE |
|---|---|---|---|---|
| PROPERTY DAMAGE & BUSINESS INTERRUPTION | $850.0 million | $419.8 million[21] | $39.94[22] million | $430.2 million[23] |
| LIABILITY – CLAIMS | $100.0 million | $100.0 million | -- | -- |
| LIABILITY – DEFENSE | -- | $35.2 million | -- | -- |
| POLLUTION POLICY | $25.0 million | $25.0 million | -- | -- |
| INVENTORY POLICY | $35.0 million[24] | $2.5 million | $2.0 million | -- |
| **TOTAL** | **$1,010 million** | **$582.5 million** | **$41.94 million** | **$430.2 million** |

---

[21]   Includes $1.7 million direct payment to Pall Water. Pall Water is a leading water treatment company that was an additional insured under a TPC's Property policy which made a claim directly against TPC's insurers related to the PNO Incident. Pall Water and TPC's insurers eventually negotiated a settlement which included the $1.7 million direct payment.

[22]   As of the filing of this Disclosure Statement, the Debtors have only collected $7.059 million of insurance proceeds on account of POL 11 and 11a. The Company, its insurance carriers and DIP and collateral agents have negotiated a stipulation for the release of the remaining balance of $39.940 million on account of POL 11 and 11a.

[23]   Upon the Company's collection in full of the pending amounts reflected in the table, the estimated remaining coverage under the Company's property damage and business interruption policy will be $390.3 million and total estimated remaining coverage will be $392.3 million. Such amounts have not been collected and the Debtors' entitlement to such amounts is disputed by the Debtors' insurance carriers. The Debtors are unable to predict the outcome or timing of any negotiations, litigation, or potential resolution of disputes between the Debtors and their insurance carriers. As such, the certainty and timing of the Debtors' receipt of such insurance proceeds under these policies are highly unpredictable as well.

[24]   Policy limit for inventory at PNO Facility

[25]   The receipt by the Company of any amounts listed in the "Estimated Remaining Coverage" column of the table above is contingent on additional payment commitments from its Carriers; however, it is unclear whether and when any additional amounts will be paid to the Debtors pursuant to these insurance policies.

### D.    Other Events Leading to Commencement of Chapter 11 Cases

Over the past two years, the Debtors' business and liquidity has been impacted by several adverse events in addition to the PNO Incident.  These include the 2020 oil and gas market crash, the COVID-19 pandemic, Winter Storm Uri (and lingering effects on equipment), a shutdown of parts of the HNO Facility (for portions of September through November 2021) to repair boilers that supply steam to various part of the HNO Facility, and, most recently, the liquidity impact of trade credit contraction.  These are described in turn below.

### 1.    COVID-19 and Commodity Price Volatility

On March 11, 2020, the World Health Organization declared the ongoing coronavirus (COVID-19) outbreak a pandemic and recommended containment and mitigation measures worldwide.  The pandemic resulted in widespread adverse impacts on the global economy, on the petrochemical, transportation and energy industries as a whole, on world-wide factory output, and on the Company's customers, suppliers, and other parties with whom the Debtors have business relations.  The pandemic and related travel and operational restrictions, as well as business closures and curtailed consumer activity, resulted in a reduction in global demand for intermediate and specialty chemicals and petroleum byproducts, volatility in the market prices for crude oil, condensate, natural gas, and NGLs, and a significant reduction in the market price of crude oil during the first and second quarter of 2020.  Because of the demand destruction, reduced commodity prices, and an uncertain timeline for full recovery, many oil and natural gas producers, including the Company's customers and suppliers, curtailed their drilling and production activity and reduced or slowed down their plans for future drilling and production activity.

Like many other companies, the Company experienced significant disruptions throughout the pandemic and its impacts on the global economy spread, including materially reduced demand across many of the Company's flagship product lines.  For example, world-wide reductions in automotive production and tire manufacturing operations due to the pandemic resulted in historically low prices for, and a precipitous decline in the demand for and consumption of, butadiene, a key component in the manufacture of tires and the largest commodity supplied by the Company.  Likewise, the Company's MTBE business—a product primarily used in gasoline blending—reached a low point on volume and margins in 2020, as the Company's primary demand regions underwent a significant reduction in gasoline demand.  Similarly, the Company's PIB business segment reached a low point in 2020, due to the pandemic's historic impacts on miles driven and the attendant reduction in lubricant and fuel additive demand.

While the effects of COVID-19 on the Company's operating results have begun to dissipate and demand across most business segments (with exception of the fuels business) has begun to rise to pre-COVID-19 levels, the pandemic had an enormous negative impact on the Company's financials.  The Company's total revenue across 2020 decreased by nearly 50% from 2019 and over 50% from 2018 and 2017.  Like most businesses, the Company remains cautious due to the still evolving conditions of the pandemic and ongoing supply-chain delays and disruptions caused by the pandemic.

### 2.      Winter Storm Uri and Other Operational Issues

In February 2021, Winter Storm Uri swept across Texas and the southern United States, bringing in its wake extreme low temperatures of an unprecedented duration and causing millions of Americans to lose power to their homes.

The Company faced significant financial impacts from Winter Storm Uri due to extended disruptions at the Company's facilities in Texas and Louisiana, fluctuations and volatility in demand caused by disruptions to customers and suppliers, and lasting damage to critical equipment at the HNO Facility.  Following Winter Storm Uri, the Company experienced repeated outages with the HNO Facility's boilers that are critical to the fuels and butadiene business segments, ultimately resulting in a complete stoppage of all butadiene and fuels production for almost two months while the Company implemented necessary repairs and curative work to restore steam production.

Steam production was fully restored by November 2021, but the adverse financial impacts of the boiler-related outages and costs were material and further negatively impacted operating results and worsened the Company's already tight liquidity.

### 3.      Trade Credit

In the months leading up to the filing, the Company has faced liquidity pressure resulting from adequate assurance demands and the lowering of credit limits by its suppliers and other trade counterparties.  The Company's vendor communications plans, supported by the Company's issuance of the Bridge Priming Notes resulting in approximately $51.5 million of additional liquidity, have mitigated the impact on the Company, but were unable to offset it.  Among other things, suppliers' credit insurers refused to insure the Company's credit risk.  Certain vendors demanded adequate assurance, requiring cash in advance or deposits.  Others reduced credit limits, shortened due dates, refused to enter new contracts without credit support, or refused to ship or release goods without payment or other credit support.  The Debtors believe that their proposed DIP financing arrangements and requested first-day relief are appropriately designed to help stabilize their business and better position the Debtors' management team to procure goods and services in the ordinary course and on appropriate terms.

### E.      The Company's Prepetition Restructuring Efforts

In addition to continuing its ongoing negotiations with insurers to obtain further PNO Incident-related insurance proceeds—with which the Company has had some degree of success— the Company has explored certain transactions and other strategic and operational initiatives in a multi-year effort to avoid the need to commence these cases.  Unfortunately, no strategy or combination of strategies adequately addressed the Company's balance sheet and liquidity needs.

### 1.      Transactions and Other Strategic Alternatives

First, in Q2 2020, the Company signed a new MTBE offtake contract with one of the world's largest independent fuels and commodity trading firms.  Although this contract is market based (and thus subject to greater pricing volatility than the Company's prior offtake contracts), it

provides the Company with a consistent outlet for 100% of its MTBE production through the end of 2023.

Second, the Company has attempted to find new sales outlets for products. For example, in response to dwindling raffinates sales coupled with inventory build-up throughout 2021, the Company made sustained efforts to find new outlets for raffinates sales, ultimately reducing its overstocked raffinates inventory by the end of Q3 2021. Likewise, in reaction to increased isobutane and methanol pricing skewing the Company's MTBE margins throughout 2020–2021, the Company capitalized on its operational and logistical flexibility by moving feedstock normally used for MTBE production into the Company's raffinates business to benefit from the stronger demand and margins in alkylate.

Third, in response to the loss of crude C4 processing capacity caused by the PNO Incident, the Company has actively been pursuing opportunities with third-party processors within the industry. In Q1 2021, the Company signed a long-term contract with a third-party for crude C4 processing and began sending crude C4 to this processor through enhancements made to the PNO terminal following the PNO Incident. The Company has, in turn, begun receiving butadiene and raffinates back from this third-party processor. As this agreement grows in volume over time, the Debtors anticipate being able to bring butadiene volumes available for sale back to the levels from prior to the PNO Incident; however, profits are shared with the third-party processor.

Fourth, the Company has responded to market pressures by focusing on products that have remained consistently in demand. For example, throughout 2020, the Company took sustained efforts to optimize its hydrotreating and raffinate train operations to maximize the production of B-1, a product for which demand has been solid since the start of the COVID-19 pandemic and remained strong in 2021 and 2022. These strategic catalytic and operational changes are expected to increase B-1 production capabilities by approximately 10–15% by the end of the year.

Finally, from late 2020 and throughout 2021, the Company has proactively pursued multiple strategies to address its liquidity and capital structure, while maintaining safe and reliable operations and meeting the needs of its customers. As described above, in February 2021, the Company issued the Priming Notes to provide enhanced liquidity, extend its runway to realize on its sizeable insurance asset, and to refinance and extend a secured term loan that was maturing in August 2021. In addition, throughout the majority of 2021, the Company and its advisors endeavored to market and to sell or lease strategic pipeline, terminal, boiler, and other assets located across the Gulf Coast, with the ultimate goals of bridging liquidity gaps, extending the Company's liquidity runway to pursue its insurance recoveries, and deleveraging its balance sheet. The Debtors first marketed a package of separable logistics assets, including pipeline, terminal storage tanks, and other assets, but unfortunately, there was insufficient interest at acceptable values. The Debtors then made efforts to sell the pipelines, but the assets proved to have limited marketable value as the Debtors received no committed offers.

The Debtors intend for these Chapter 11 Cases to have no impact on the Company's operations. It is critical that the Company demonstrate its ability to continue to perform its obligations under its customer and supplier agreements, notwithstanding the filing. Thus, key to

the Company's prepetition negotiations with its creditors was ensuring that it could obtain the necessary prepetition liquidity to enable it to continue operating and that it had the necessary support of its creditors to provide for a consensual, non-disruptive restructuring.

## 2.    Engagement with Financial Stakeholders and Formation of Special Committee

The board of directors of TPC Holdings Inc. (the "**Board**") has met regularly and thoroughly evaluated an array of strategic alternatives, including potential financings, asset sales or leases, and out-of-court and in-court restructuring transactions, receiving presentations and analysis on such alternatives from the Company's management team and the Company Advisors. For example, in May 2020, the Company engaged Moelis & Company LLC ("**Moelis**") to assist the Company in evaluating an array of strategic alternatives, including potential financings, asset sales or leases, and out-of-court restructuring transactions.  Baker Botts L.L.P. ("**Baker Botts**") has also provided legal services to the Company, focusing primarily on assisting the Company with environmental, permitting and other regulatory matters.  Following the PNO Incident, Baker Botts was engaged as the Company's lead counsel in responding to regulatory and compliance matters, as well as claims arising from the PNO Incident and insurance recovery efforts.   After the retention of Moelis, the Company expanded Baker Botts' role to include corporate and restructuring advice to support the Company's evaluation of strategic alternatives and targeted strategies seeking a global resolution of contingent litigation claims arising from the PNO Incident. Starting in late 2020 and continuing through 2021, the Company and Baker Botts engaged with the MDL plaintiff leadership firms to provide diligence and responses.  However, the Company was ultimately unable to secure a source of funds sufficient to effectuate a global settlement of the PNO Claims and other events in 2021, for example, Winter Storm Uri, materially and negatively impacted the Company's liquidity and overall financial condition.

In November 2021, it became increasingly clear that the Company would require significant additional liquidity and a deleveraging transaction to preserve and maximize the value of the Company's business and to optimize the Company's capital structure for long-term success. The Company expanded Baker Botts and Moelis's roles to include an evaluation of a potential comprehensive restructuring through Chapter 11.  The Company also retained FTI Consulting as financial advisor.

In December 2021, the Board established a special committee of independent, disinterested directors, comprised of Paul Aronzon and Carol Flaton (the "**Special Committee**").  Ms. Flaton and Mr. Aronzon were appointed to the Board and Special Committee based on, among other things, their extensive restructuring and (respectively) financial and legal experience, as well as their reputations and proven track records for guiding distressed companies through transactions. The Board delegated to the Special Committee the authority to, among other things, direct the Company's negotiations with stakeholders and make recommendations to the Board regarding the implementation of one or more potential transactions or strategies, as well as to conduct an independent investigation of claims, if any, against related parties.  Since its formation, the Special Committee has met both formally and informally and communicated with the Company Advisors and the Company's management team multiple times each week and has provided substantial, thoughtful, and invaluable guidance to the Company, the Board, and the Company Advisors.  The

Special Committee also retained Weil, Gotshal & Manges LLP ("**Weil**") to advise on its independent investigation (as discussed in section E.4 below).

Beginning in late November and early December 2021, the Company began discussions in earnest with an ad hoc group of beneficial holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, a supermajority of both the Priming Notes and the 10.5% Notes (the "**Ad Hoc Noteholder Group**") regarding a potential deleveraging transaction. As of the Petition Date, the Ad Hoc Noteholder Group held in the aggregate approximately 88% of the Priming Notes and approximately 78% of the 10.5% Notes and is represented by Paul Hastings LLP ("**Paul Hastings**") and Evercore Group L.L.C. ("**Evercore**").[26] The Company also began regular discussions with ABL Agent.  In January 2022, the Company commenced a marketing process for a potential debtor-in-possession financing, the scope of which included a broad range of capital providers, including commercial banks, investment firms that specialize in debtor-in-possession financing and distressed investments, and certain holders of 10.5% Notes that are not members of the Ad Hoc Noteholder Group.  In furtherance of its stakeholder discussions, and to facilitate the Company's marketing for financing sources, the Company established a confidential virtual data room to facilitate the sharing of due diligence materials not only to its economic stakeholders' advisors but also to potential financing sources outside of the Company's existing capital structure.  The Company and the Company Advisors held numerous due diligence meetings in furtherance of such process.[27]

### 3.    Forbearance and Bridge Financing.

As the Company's process progressed, it became clear that a deal would not be reached prior to February 1, 2022, when approximately $53 million of cash interest on the Company's Priming Notes and 10.5% Notes would come due (the "**February Interest Payment**").  With the support of the Ad Hoc Noteholder Group, the Company determined to utilize its grace period under the Priming Notes and 10.5% Notes with respect to the February Interest Payment.  The PNO Claims Steering Committee also informally expressed its support for such determination.  For the benefit of the Company's ongoing relationships and negotiations with its suppliers and customers, and to obtain incremental bridge liquidity, the Company negotiated and, on February 3, 2022, entered into a forbearance agreement with the Ad Hoc Noteholder Group (the "**Forbearance Agreement**").  Under the Forbearance Agreement, the Ad Hoc Noteholder Group agreed, among other things, to cause U.S. Bank to forbear from exercising rights and remedies arising from the Company's failure timely to pay the February Interest Payment.  The Ad Hoc Noteholder Group also agreed to supplement the Original Priming Notes Indenture and the 10.5% Notes Indenture to

---

[26]    As of the date hereof, the members of the Ad Hoc Noteholder Group hold, in the aggregate, approximately 96.3% of the 10.5% Notes and 100% of the Term Loan DIP Claims. Pursuant to the Final DIP Order, approximately 90% of the Priming Notes were rolled up into the Term Loan DIP Claims and are pending final cancelation or cash-out, which amount represents the amount of Priming Notes held by the Ad Hoc Noteholder Group as of the date of the roll-up.

[27]    During this time period, the Company's negotiations with Carriers were somewhat productive, as on December 9, 2021, the Company received a $75 million partial proof of loss from its property insurers, providing a much needed, albeit temporary, liquidity bridge.  Another $35 million partial proof of loss was approved and paid in April 2022.  On May 26, 2022, another partial proof of loss for $41.947 million was approved and a check of $3.1 million representing the first payment has been issued to the Company as of June 10, 2022.

enable the Company to issue the Bridge Priming Notes, and to provide the Company with approximately $51.5 million of additional liquidity in the form of a commitment to purchase the Bridge Priming Notes. The Forbearance Agreement and Bridge Priming Notes enabled the Company to continue its restructuring discussions with its various stakeholders outside of a chapter 11 case, thereby, among other things, increasing the likelihood that the Company would be able to implement a transaction through more structured and orderly chapter 11 cases. This sent a strong signal to the market that the Company's economic stakeholders were supportive of the Company and committed to facilitating its restructuring in an orderly and efficient manner. The liquidity created by the Bridge Priming Notes was critical for the Company to manage and stabilize its key trade and supplier relationships and to complete a previously scheduled turnaround of the Company's butane dehydrogenation unit. To permit the Forbearance Agreement, the Company and the ABL Agent entered into a related amendment to the ABL Credit Agreement. The Forbearance Agreement was amended several times to facilitate continued out-of-court discussions and, most recently, to direct U.S. Bank to forbear from exercising rights or remedies with respect to the Company's nonpayment of interest on the Priming Notes and 10.5% Notes due May 1, 2022. The ABL Agent consented to such extensions.

### 4.    Independent Investigation

In December 2021, the Board delegated to the Special Committee the full power and authority of the Board to (i) direct the investigation and assessment of any actual and potential claims against affiliates and insiders of the Company or any of its subsidiaries that would be considered "property of the estate" if any or all such entities were to commence chapter 11 cases and whether any such actual and potential claims have value to any such entity, its creditors and/or its estate (the "**Independent Investigation**"); (ii) make all determinations and assessments regarding the disposition of any such actual and potential claims; and (iii) take or direct the Company to take any other necessary or appropriate actions in furtherance of the foregoing. In connection with carrying out its duties, the Special Committee retained Weil to assist in the Independent Investigation. The Independent Investigation took place over the course of approximately five months. Transactions falling within the scope of the Independent Investigation were diligenced and the following considerations were evaluated with respect to certain prepetition transactions and events: (i) the Board's corporate governance practices and oversight of the business; (ii) the Company's internal controls and reporting systems with respect to potential safety concerns; (iii) any potential breaches of fiduciary and implied duties or mismanagement; (iv) any potential claims that could implicate a piercing of the corporate veil or alter ego theory of recovery; and (v) any potential fraudulent or preferential avoidance claims relating to transfers of property or incurrence of obligations by the Company to certain related parties and insiders.

The Independent Investigation focused on analyzing the following prepetition transactions and events: (1) the November 2019 Port Neches incident; (2) entry into sales agreements between TPC and SI Group, Inc. ("**SI**"), an affiliate of SK Capital Partners, LP, which provides for the sale of certain products from TPC to SI, as amended; (3) 2021 master services agreement between TPC and TNT Crane & Rigging, Inc. ("**TNT**"), an affiliate of First Reserve Management, L.P. ("**First Reserve**"), pursuant to which TNT provides TPC with cranes, operators, and related services, as amended; (4) the master services agreement between TPC and USA DeBusk LLC ("**DeBusk**"), an affiliate of First Reserve, pursuant to which DeBusk provides TPC with dehydro catalyst removal and refiling, among other services, as amended; (5) three separation and release agreements

entered into between certain individuals and TPCI or TPC; and (6) TPC's reimbursement of travel, lodging, and other necessary business expenses incurred by the Company's D&Os in connection with their services paid pursuant to the Amended and Restated Limited Liability Company Agreement of Sawgrass Holdings GP LLC, dated December 20, 2012 and/or the Travel and Entertainment Policy  (collectively, the "**Transactions**").

The Independent Investigation involved an extensive factual and legal analysis, in which Weil conferred with and reported to the Special Committee throughout the investigation.  Potential claims and causes of action arising under Delaware, Texas and federal laws relating to the Transactions were analyzed, including: (1) actual fraudulent transfer, (2) constructive fraudulent transfer, (3) preference avoidance, (4) breach of fiduciary duty, (5) breach of good faith and fair dealing, (6) negligence, (7) gross negligence, and (8) piercing the corporate veil.  In connection with the Independent Investigation, Weil collected and reviewed more than 6,000 documents and conducted interviews with six individuals (including one by proxy through counsel), including certain employees within in-line management and senior management, certain Board members, and representatives from each of the Sponsors.

Based on the Independent Investigation, the Special Committee determined that there were no colorable claims belonging to the Company, other than one potential preference and/or fraudulent transfer avoidance claim for a $389,581.19 severance payment to a former officer of the Company (the "**Identified Preference Claim**") that, even if valid, could be subject to potential defenses and, when expected litigation costs were taken into account, the Identified Preference Claim could had a negative net value to the Company.  Further, based on the Independent Investigation, the Special Committee found, among other things, that: (i) the Board did not deny or delay safety or turnaround-related budget requests; and (ii) applicable statutes of limitations would bar the Company's pursuit of certain potential claims.  The Special Committee also found no evidence that, during all relevant times, (i) the Company failed to maintain corporate formalities, (ii) the Sponsors controlled the Company, or (iii) there was any misconduct that would support a claim for breach of fiduciary duties by the Board or piercing the Company's corporate veil to hold the Sponsors or other affiliates responsible for the claims of the Company's creditors.

Based on the Independent Investigation, the Special Committee concluded, and therefore recommended to the Board, that it would be appropriate for the Company to provide, in the context of a chapter 11 restructuring transaction, releases for officers, directors, and the Sponsors if such transaction were otherwise the best transaction available to the Company and were in the best interests of the Company and its stakeholders.

### 5.    Settlement Efforts with PNO Claims Steering Committee

Starting in late 2020, the Debtors began engaging with the PNO Claims Steering Committee to negotiate a global settlement of PNO Claims.  The PNO Claims Steering Committee retained counsel and a financial advisor to assist in those negotiations.  In the course of these discussions, pursuant to confidentiality agreements, the Debtors have been providing confidential information regarding the Debtors, their operations, and their financial condition to the PNO Claims Steering Committee throughout 2021 and 2022.  This has included, among other things, liquidity forecasts, the Debtors' long-range business plan, and a management presentation regarding the Debtors' business plan.  The above-described negotiations were ultimately

unsuccessful and failed to address the Company's deleveraging needs. Instead, a comprehensive restructuring of the Company's balance sheet was necessary, ultimately leading to the commencement of these Chapter 11 Cases.

**F.    Restructuring Support Agreement, Proposed DIP Financing, and Exit Financing.**

**1.    Restructuring Support Agreement and Plan.**

On May 9, 2022, with the support of the Special Committee and the Board, the Company, the members of the Ad Hoc Noteholder Group, and the Supporting Sponsors entered into an initial restructuring support agreement with respect to a transaction that would be implemented, subject to the Company's obtaining a debtor-in-possession ABL facility either from its existing bank group or from a new ABL lending source. Over the following weeks, the Company successfully negotiated the ABL DIP Facility and obtained a commitment from Eclipse to provide an exit ABL facility at the conclusion of these chapter 11 cases. In connection therewith, on May 31, 2022, the Company, the Ad Hoc Noteholder Group, and the Supporting Sponsors entered into a superseding Restructuring Support Agreement. The Restructuring Support Agreement provides for, among other things:

- *Agreed Use of Cash Collateral and ABL Refinancing*—use of encumbered cash, in accordance with the approved budget, for the duration of these cases. Together with the cash management order and proceeds of the DIP Facilities, the cash collateral order will allow the Company access to sufficient cash on hand to carry it through emergence. To date, the Debtors refinanced the Prepetition ABL Facility and have been using cash collateral as agreed.

- *Committed DIP Financing*—Financing of the Company's chapter 11 cases through a $323 million debtor-in-possession Term DIP Loan Facility provided by certain members of the Ad Hoc Noteholder Group. In addition, the Restructuring Support Agreement provides for the refinancing of the Company's existing ABL facility into a $200 million ABL DIP Facility, subject to a borrowing base, provided by Eclipse. The refinancing of the Company's existing ABL facility under an interim order was necessary so that the Company would have a functioning ABL facility to fund working capital at the beginning of and throughout these cases. To date, the Debtors have drawn $57 million under the Term DIP Facility and have been performing under the ABL DIP Facility as agreed.

- *Committed New Capital*— A $300 million equity rights offering, a $150 million debt rights offering for paid-in-kind holding company notes, a $350 million issuance of secured exit notes—all backstopped by certain members of the Ad Hoc Noteholder Group, subject to the terms and conditions set forth in the Restructuring Support Agreement and the Backstop Agreements—and an $80 million issuance of paid-in-kind holding company notes.[28] The new money provided by the capital

---

[28]    The Equity Rights Offering Securities and the Equity Direct Allocation Securities will be issued at a discount of 35% to plan equity value of $545 million (for the avoidance of doubt, plan equity value has been calculated by subtracting (x) the $350 million of Exit Notes and the $230 million of HoldCo Notes from (y) the plan value

infusion and the exit facilities will fund distributions under the Plan and provide the Company with liquidity to operate and invest in its business which should facilitate a prompt exit from chapter 11 with a less leveraged balance sheet. To date, these capital commitments have been memorialized in the Equity Backstop Agreement and the Debt Backstop Agreement, which were filed at Docket No. 491 and remain subject to Court approval.

- *Runway*—The comprehensive financing package—including the agreed final cash collateral order, the DIP Facilities, the Exit ABL Facility, the Exit Notes and the terms of the applicable Backstop Agreement—together with the support of the Supporting Noteholders under the Restructuring Support Agreement, provides ample runway and should minimize the execution risk of the Debtors' restructuring.[29]

- *Flexibility*—The Debtors' obligations under the Restructuring Support Agreement are entirely qualified by their fiduciary obligations to the estates.

- *Tax Attribute Preservation/Additional Supporting Sponsor Agreements*— As of the Petition Date, the Tax Group (as defined below) had approximately $337 million of estimated net operating loss carryforwards, $291 million of estimated business interest expense carryforwards under section 163(j) of the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), and $3 million of estimated research credit carryforwards. Future use of available tax attributes could result in substantial tax savings. On May 31, 2022, the Supporting Sponsors agreed, subject to the terms of the RSA, to refrain from taking a worthless stock deduction under section 165 of the Tax Code for any tax year ending prior to the Effective Date, and from transferring any equity, if doing so could result in an "ownership change" of Holdings under section 382 of the Tax Code. If the Supporting Sponsors had caused an ownership change by taking such actions, the Tax Group's ability to use such tax attributes could be subject to additional severe limitations. On June 2, 2022, the Bankruptcy Court entered an order establishing notification procedures and approving restrictions on certain transfers of equity interests in the Debtors, certain worthless stock deduction claims, and other procedures and relief relating to trading in claims against the Debtors (the "**NOL Order**"). In accordance with their obligations under the RSA, the Supporting Sponsors consented to entry of the NOL Order, which, among other things, affirmatively enjoins them from taking a worthless stock deduction under section 165 of the Tax Code with respect to the beneficial ownership of Existing Holdings Interests for any tax year ending before the Effective Date, and from transferring any equity interests, in contravention of

---

of $1.125 billion). As consideration for the substantial financial commitments being made by the applicable Commitment Parties, the Debtors are providing the Equity Put Option Premium under the Equity Backstop Agreement and the Debt Put Option Premium under the Debt Backstop Agreement of $36 million and $18 million, respectively.

[29] Professional fees are being paid by the Debtors' estates pursuant to the Final DIP Order. The Debtors have not assumed the RSA and are not paying any amounts pursuant to the RSA.

the NOL Order, in each case, in order to prevent an ownership change under section 382 of the Tax Code prior to the Effective Date.

The Restructuring Support Agreement, particularly the $350 million Exit Notes and $450 million combination of Direct Allocation Securities and the Rights Offerings contemplated thereby, plus the Debtors' cash on hand, are expected to ensure an efficient and prompt reorganization. The following illustrative chart shows the range of reorganized equity that will be owned by the Commitment Parties under the Plan and rights offerings.

| | Pre-Money | Post-Money | |
| --- | --- | --- | --- |
| | % | % | Amount |
| 10.5% Secured Noteholders | 100.0% | 0.1% | $0 |
| Rights Offering - Pro Rata | - | 46.6% | 254 |
| Rights Offering - Direct Allocation | - | 38.1% | 208 |
| Rights Offering - Backstop | - | 15.2% | 83 |
| Plan Equity Value for Rights Offering | 100.0% | 100.0% | $545 |

The restructuring contemplated therein is intended to minimize any potential adverse effects to the Debtors' business, customers, suppliers, vendors, and employees because of the restructuring, and to allow the Company to expediently emerge from bankruptcy with the entirety of its workforce intact and with a capital structure to allow the Company to be more competitive and positioned for long-term success. The Debtors fully anticipate these Chapter 11 Cases to be a narrow, de-levering of their balance sheet, with no material impact on their customers, employees or operations.

## 2.    DIP Financing.

To fund the Debtors' operations through the administration of these Chapter 11 Cases, the existing ABL Lenders and certain other third party lenders (collectively, the "**DIP Facility Lenders**"), have agreed to provide a $523 million (the "**Total DIP Commitment**") debtor-in-possession facility comprising of: (i) the ABL DIP Facility, a secured asset-based revolving credit facility in a maximum committed amount of up to $200 million (the "**ABL DIP Loan Facility**"), and (ii) a postpetition senior secured superiority priming term loan facility (as approved by the DIP Orders) in an aggregate amount of $323 million (the "**Term DIP Loan Facility**," and together with the ABL DIP Loan Facility, the "**DIP Facilities**"), in accordance with the terms and conditions of the ABL DIP Credit Agreement and the Term Loan DIP Credit Agreement, respectively. Under the Term Loan DIP Credit Agreement, the DIP Facility Lenders will (A) provide up to $85 million in new money term loans to fund working capital, general corporate purposes, the expenses of administering the Chapter 11 Cases and (B) permit a roll-up of the Prepetition Senior Priority 2022 Bridge Notes in the amount of approximately $237 million, $59.3 million (consisting of approximately $52.5 million of principal amount outstanding, $5.1 million in respect of the Redemption Premium (as defined in the Priming Notes Indenture) and $1.7 million of accrued but unpaid interest, in respect of the Prepetition Senior Priority 2022) of which will be rolled-up and converted into the Term Loan DIP Facility upon entry of the Interim DIP Order, and the remaining balance of which will be rolled-up and converted into the Term Loan DIP Facility

upon entry of the Final DIP Order, in each case, including all principal and accrued but unpaid interest through the date thereof, on a cashless dollar-for-dollar basis.

The ABL DIP Loan Facility and Term DIP Loan Facility have a split lien collateral structure like what existed before the filing. The ABL DIP Loan Facility will have a first lien on ABL Priority Collateral and a second lien on all other collateral, and the Term DIP Loan Facility will have a second lien on ABL Priority Collateral and a first lien on all other collateral. The Term DIP Loan Facility will prime the existing 10.5% Notes with the consent of the Ad Hoc Noteholder Group and the notes collateral agent, but not any other liens that are otherwise valid, unavoidable, and senior to the liens securing the Priming Notes and the 10.5% Notes as of the Petition Date.

The Debtors have agreed to pay certain fees in connection with the extension of credit under the DIP Facilities (collectively, the "**DIP Fees**"), which fees are included in the budget pertaining to the DIP Facility. The DIP Fees include a commitment fee of 4.50% (based on the aggregate amount of New Money Commitment of each lender), an exit fee equal to 2.25% of the aggregate principal amount of any amount repaid or prepaid or that remains outstanding upon maturity of the Term DIP, and a non-use fee equal to 5.0% of the undrawn New Money Commitments under the Term Loan DIP Facility.

The DIP Facility allows the Debtors to pay suppliers and other participants in the Debtors' supply chain in the ordinary course to ensure the continuing and uninterrupted flow of inputs to the Debtors' businesses.

### 3.    Exit Facility.

The Restructuring Support Agreement provides for the Reorganized Debtors' entry into a senior secured revolving credit facility and issuance of exit notes which will be used to fund the Debtors' operations upon emergence from these Chapter 11 Cases. Specifically, the Restructuring Support Agreement provides that, on the Effective Date, the Reorganized Debtors will enter into the Exit ABL Facility and will conduct a marketing process to issue an aggregate principal amount of $350 million Exit Notes which will be secured by a second priority security interest in and lien on the Reorganized Debtors' cash, accounts receivable, and inventory and a first priority security interest in and lien on substantially all of the Reorganized Debtors' other assets. If the Reorganized Debtors are unable to place some or all of the Exit Notes in the market, the Reorganized Debtors shall have the right to cause the Exit Notes Backstop Parties, on a several (but not joint) basis, to purchase any such Exit Notes that are not placed in the market on terms and subject to conditions set forth in the Plan Supplement.

The Debtors believe the Exit ABL Facility and the Exit Notes will allow them to operate with stability, and successfully fund a go-forward business plan that fully harnesses the benefits of the Plan.

## VI.   MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

### A.   Expected Timetable of the Chapter 11 Cases

As described therein, the Restructuring Support Agreement (as it may be amended) contains certain milestones for the Debtors to secure Confirmation of a chapter 11 plan and emerge from chapter 11.  Specifically, the Restructuring Support Agreement contemplates, among other things, (i) that an Interim DIP Order will be entered by the Bankruptcy Court within 3 calendar days after the Petition Date, (ii) that the Debtors will file initial versions of the Plan, the Disclosure Statement and a motion to approve the Disclosure Statement within 14 calendar days after the Petition Date, which motion seeks entry of an order granting relief within 5 business days after filing the motion, (iii) that a Final DIP Order will be entered by the Bankruptcy Court within 35 calendar days after the Petition Date, (iv) entry of a final order approving the Disclosure Statement within 75 calendar days after the Petition Date and Confirmation of the Plan within 120 days after the Petition Date and (v) substantial consummation of the Plan by September 29, 2022 (subject to extension under certain circumstances).  Thus, to ensure that the Debtors and their stakeholders will benefit from the Restructuring Support Agreement, the Debtors intend to move at a steady— but reasonable, prudent, and statutorily compliant—pace.  The Disclosure Statement Order scheduled certain dates and deadlines in connection with the approval of this Disclosure Statement and Confirmation of the Plan.  Should the Debtors' projected timelines prove accurate, the Debtors could emerge from chapter 11 within approximately 135 calendar days after the Petition Date.  **No assurances can be made, however, that the Bankruptcy Court will enter various orders on the timetable anticipated by the Debtors.**

### B.   First Day Relief

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "**Petitions**"), the Debtors filed several motions (collectively, the "**First Day Motions**") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases.  A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of Robert A. Del Genio in Support of Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 27] (the "**First Day Declaration**").  At a hearing on June 2, 2022, the Bankruptcy Court granted substantially all of the relief initially requested in the First Day Motions, including: authority to continue to pay employee wages and benefits; authority to pay certain taxes and assessments; authority to continue prepetition insurance coverage and renew or enter into new insurance policies; authority to provide adequate assurance for future utility services; notification and hearing procedures for certain transfers of and declarations of worthlessness with respect to stock of Holdings; authority to pay, in the ordinary course of business, certain prepetition claims held by suppliers, critical vendors, shippers, warehouseman, and other lien claimants; and authority to maintain the Company's existing cash management system.

The First Day Motions, the First Day Declaration, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at https://cases.ra.kroll.com/TPCGroup/.

### C.     Other Procedural and Administrative Motions

The Debtors filed several procedural and administrative motions subsequent to the Petition Date to facilitate the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

- OCP Motion.  On June 8, 2022, the Debtors filed the *Debtors' Motion for an Order Authorizing the Debtors to Employ and Compensate Professionals Utilized in the Ordinary Course of Business* [Docket No. 178] (the "**OCP Motion**").  The OCP Motion sought to establish procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course of their businesses

### D.     Assumption of Contracts

The Debtors have filed several motions to assume commercial agreements, as amended by postpetition amendments, to date, including the following:

- Debtors' Motion for Entry of an Order (I) Approving the Debtors Assumption of Commercial Contracts with **Dow**, as Amended, and (II) Granting Related Relief (filed June 1, 2022)

- Motion to Approve Debtors' Motion for Entry of an Order (I) Approving the Debtors Assumption of a Commercial Supply Contract with **Formosa**, as Amended, and (II) Granting Related Relief (filed June 13, 2022)

- Debtors' Motion for Entry of an Order (I) Approving the Debtors Assumption of Commercial Supply Contracts with **CPChem**, as Amended, and (II) Granting Related Relief (filed June 23, 2022)

- Debtors' Motion for Entry of an Order (I) Approving the Debtors Assumption of a Sales Contract with **Trafigura Trading, LLC** and (II) Granting Related Relief (filed June 27, 2022)

- Debtors' Motion for Entry of an Order (I) Approving the Debtors' Assumption of a Commercial Supply Contract with **Sasol**, as Amended, and (II) Granting Related Relief (filed July 1, 2022)

- Debtors' Motion for Entry of an Order (I) Approving the Debtors' Assumption of Commercial Contracts with **Nova**, as Amended, and (II) Granting Related Relief (filed July 1, 2022)

- Debtors' Motion for Entry of an Order (I) Approving the Debtors Assumption of a Commercial Supply Contract with **Shintech**, as Amended, and (II) Granting Related Relief (filed July 11, 2022)

- Debtors' Motion for Entry of an Order (I) Approving the Debtors Assumption of a Commercial Supply Contract with **LACC**, as Amended, and (II) Granting Related Relief (filed July 15, 2022);

- Debtors' Motion for Entry of an Order (I) Approving the Debtors' Assumption of a Commercial Agreement with **Pasadena Performance Products**, (II) Approving the Debtors' Use of Estate Property to Pay for Pipeline Connection Costs of Behalf of Non-Debtor Subsidiaries to Realize the Value of Debtors' Commercial Agreement with Pasadena Performance Products, And (II) Granting Related Relief (filed August 5, 2022); and

- Debtors' Motion for Entry of an Order (I) Approving the Debtors Assumption of a Commercial Supply Contract with **Linde**, as Amended, (II) Approving the Debtors' Entry into a Post-Petition Commercial Contract with Linde, and (III) Granting Related Relief (filed September 9, 2022).

The Company has negotiated amendments to approximately 85-88% of its Crude C4 agreements and the Debtors have filed motions to assume each of these agreements, as amended. Each of these motions can be found at: https://cases.ra.kroll.com/tpcgroup/Home-DocketInfo. The Court has entered orders approving each of these motions except for the Pasadena Performance Productions motion, which is still pending.

Regarding Debtors' pending motion to assume its commercial agreement with Pasadena Performance Products ("**PPP**"), a wholly owned subsidiary of Next Wave Energy Partners, LP, in addition to seeking an order approving assumption its contract to sell raffinate to PPP, Debtors seek Court approval of certain capital expenditures necessary to build infrastructure to facilitate the transportation of the raffinate product from TPC's facilities to PPP's facilities. A portion of these expenditures are made on behalf of TPC Pipeline Holding Company LLC ("TPC Pipeline Holding"), and its subsidiary, TPC Pipeline Company LLC ("**TPC Pipeline**" and together with TPC Pipeline Holding, the "**Pipeline Companies**"), which are wholly-owned non-Debtor subsidiaries of TPC Group LLC.[30] As of June 2022, TPC has incurred approximately $3 million in costs to ready the pipeline segments owned by TPC Pipeline for connection to PPP's plant facility and related infrastructure assets owned by PPP. TPC estimates that it must spend an additional approximately $700,000 to $800,000 to complete the pipeline segment connections on behalf of TPC Pipeline to realize the value of the commercial agreement sought to be assumed. The Court has entered an order authorizing expenditures on behalf of the Pipeline Companies to support and facilitate the commercial agreement up to a total of $4,000,000.

E.     **The Debtors' DIP Financing**

On June 1, 2022, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief*

---

[30]     Since filing each of their Schedules, the Debtors received an invoice from CT Corporation for registered agent services in respect of a dormant subsidiary of TPC Group, LLC named TPC IAHC LLC, a Texas limited liability company, which is an entity that was formed but never capitalized with assets. It also has no liabilities. The dormant subsidiary was slated for dissolution in 2020, but the Debtors have learned that the dissolution was not in fact fully effectuated as intended prior to the Petition Date.

[Docket No. 36] (the "**DIP Motion**"), together with the *Declaration of Zul Jamal in Support of Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 65], and the *Declaration of Robert A. Del Genio in Support [of] Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 66]. By the DIP Motion, the Debtors sought approval of: (i) a secured asset-based revolving credit facility in a maximum committed amount of up to $200 million, and (ii) a priming secured term loan facility in an aggregate amount of $323 million, in accordance with the terms and conditions of the ABL DIP Credit Agreement and the Term Loan DIP Credit Agreement, respectively. Under the Term Loan DIP Credit Agreement, the Term Loan DIP Lenders committed to (A) provide $85 million in new money term loans to fund working capital, general corporate purposes, the expenses of administering the Chapter 11 Cases and (B) roll up Prepetition Senior Priority Notes claims in the amount of approximately up to $237 million, $59 million of which was rolled-up and converted into the Term Loan DIP Facility upon entry of the Interim DIP Order, and the balance of which was deemed rolled-up and converted into the Term Loan DIP Facility upon entry of the Final DIP Order, in each case, including all principal and accrued but unpaid interest through the date thereof, on a cashless dollar-for-dollar basis (and subject to an exception for holders of Prepetition Senior Priority Notes unable to roll-up into the Term Loan DIP Facility, who are expected to be cashed out by way of a drawing of new DIP term loans made by other lenders under the Term Loan DIP Facility). The $85 million in new money term loan commitments include (i) $32 million of new money commitments for the first borrowing, (ii) $25 million of new money commitments for the second borrowing, and (iii) $28 million of new money commitments for the third borrowing. As of the date hereof, the first and second borrowings have occurred. The new money term loans require prepayment upon receipt by the Debtors of any insurance proceeds arising or related to the PNO Incident, subject to the Debtors' ability to terminate the new money term loan commitments in respect of the third borrowing in an amount equal to an equivalent amount of insurance proceeds received. So, for example, the Debtors currently have $57 million in principal amount of term loans outstanding under the Term Loan DIP Credit Agreement. To the extent the Debtors receive the approximately $47 million of insurance proceeds under proof of loss 11 and 11a, the Debtors anticipate they will first terminate $28 million of undrawn new money commitments (third borrowing) and then repay approximately $19 million of the outstanding amount under the Term Loan DIP Credit Agreement, leaving approximately $38 million outstanding. If the third borrowing occurs, any insurance proceeds that are received after the third borrowing would first be used to repay the outstanding amounts under the third borrowing and then remaining proceeds would be used to repay the second borrowing. For the avoidance of doubt, all proceeds of property damage/business interruption insurance arising from the PNO Incident constitute collateral securing the 10.5% Notes. If such insurance proceeds are received by the Debtors prior to the Effective Date, they will be distributed as excess cash to holders of Class 3 10.5% Notes Secured Claims pursuant to Section 4.3 of the Plan; otherwise, such proceeds will be retained as an asset of the Reorganized Debtors. No portion of

such insurance proceeds will be distributed to holders of unsecured claims.    The Debtors believe the DIP Facility will help ensure the Debtors have sufficient liquidity to enable them to proceed with the process of confirming the Plan, administer their Estates in an efficient manner, and ultimately achieve a successful reorganization.

On June 3, 2022, the Bankruptcy Court entered the *Interim Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* (ECF No. 147) (the "**Interim DIP Order**") granting the DIP Motion on an interim basis.

The DIP Motion was considered on a final basis at a hearing that took place on June 29, 2022.  Following the hearing, the Bankruptcy Court approved the DIP Facilities and overruled all objections filed or otherwise raised at the hearing. On August 2, 2022, the Bankruptcy Court entered the *Final Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 566] (the "Final DIP Order").

### F.    Appointment of Creditors' Committee

On June 14, 2022, the U.S. Trustee filed the *Notice of Appointment of Unsecured Creditors Committee* [Docket No. 207], notifying parties in interest that the U.S. Trustee appointed the Creditors' Committee in the Chapter 11 Cases.  The Creditors' Committee is currently composed of the following members: (a) Chevron Phillips Chemical Company LP, (b) Sasol Chemicals North America LLC, (c) Farmers Insurance, (d) Amber Harms, (e) Emily Teasley, (f) Suzanne Williamson and (g) Chris Johnson.

On July 22, 2022, following the assumption of their contracts and payment of their prepetition claims, Chevron Phillips Chemical Company LP and Sasol Chemicals North America LLC resigned from the Committee. The Committee currently comprises the following members: (i) Amber Harms; (ii) Chris Johnson; (iii) Emily Teasley; (iv) Farmers Insurance; and (v) Suzanne Williamson.

### G.    Schedules and Statements

On June 30, 2022, the Debtors originally filed their Schedules and Statements of Assets and Liabilities for each of the filed Debtors, detailing known claims against the Debtors. Further, as of the date hereof, over 36,000 proofs of Claim had been filed against the Debtors asserting in the aggregate approximately $11.3 billion, which aggregate includes claims filed by the indenture trustees.  The Debtors continue to review, analyze, and reconcile potential objections to the filed Claims.

H.    **Establishment of a Claims Bar Date**

On June 30, 2022, the Bankruptcy Court entered an order approving (i) August 5, 2022, as the deadline for all creditors or other parties in interest to file proofs of Claim (the "**Bar Date**"); and (ii) On November 30, 2022, 2022 as the deadline for all Governmental Entities to file a proof of Claim [Docket No.345].

The Debtors provided notice of the Bar Date, and published notice of the Bar Date (i) once in the *Houston Chronicle, La Voz de Houston, Lake Charles American Press* and *New York Times National Edition* and (ii) three times in *The Port Arthur News, Beaumont Enterprises, Beaumont Examiner* and *Orange Leader*.  Any party that is required, but that fails, to file a proof of claim in accordance with the procedures set forth in the Bar Date Motion and order shall be forever barred, estopped, and enjoined from asserting such claim against the Debtors, and the Debtors and their property shall be forever discharged from any indebtedness or liability with respect to or arising from such claim.  Such party will be prohibited from voting to accept or reject the Plan or any chapter 11 plan filed in these Chapter 11 Cases, participating in any distribution in the Chapter 11 Cases on account of such claim, or receiving further notices regarding such claim.

I.    **Adversary Proceeding**

On June 2, 2022, Bayside Capital, Inc. ("**Bayside**") and Cerberus Capital Management, L.P., ("**Cerberus**") commenced an adversary proceeding for declaratory judgment in the Chapter 11 Cases, captioned *Bayside Capital, Inc. and Cerberus Capital Management, L.P. v. TPC Group Inc.*, Adv. Proc. No. 22-50372 (the "**Notes Adversary Proceeding**").  Through the Notes Adversary Proceeding, Bayside and Cerberus allege that the Debtors' issuance of the 10.875% Priming Notes, the 10.875% Priming Notes Indenture, the Supplemental Indenture, and the 2021 Intercreditor Agreement violate the 10.5% Notes Indenture's provisions and that the consents obtained by TPC to the issuance of the Supplemental Indenture and 2021 Intercreditor Agreement were deficient.  [Adv. Dkt. Nos. 1, 3].  Bayside and Cerberus have requested a declaration from the Bankruptcy Court ordering that the 10.875% Priming Notes, the 10.875% Priming Notes Indenture, the Supplemental Indenture, and the 2021 Intercreditor Agreement are of no further force or effect with respect to the application of and priority of collateral to the 10.5% Notes and that the consents obtained with respect to such instruments are invalid.  On June 2, 2022, Bayside and Cerberus filed a motion for summary judgment on their claims [Adv. Dkt No. 4].

On June 9, 2022, the Debtors filed a counterclaim for declaratory judgment (the "**Notes Counterclaim**") in the Notes Adversary Proceeding against Bayside and Cerberus [Adv. Dkt.  No. 15], alleging that Bayside and Cerberus' commencement of the Notes Adversary Proceeding is invalid because it violates the 10.5% Notes Indenture.  Specifically, the Debtors allege that the Notes Adversary Proceeding violates Section 6.06(a), a "no-action" clause that places restrictions on when noteholders to the 10.5% Notes can seek remedies related to the 10.5% Notes, 10.5% Notes Indenture, or related documents, because Bayside and Cerberus had not satisfied its requirements, including establishing that 25% of the aggregate principal amount of the outstanding 10.5% Notes support the Notes Adversary Proceeding or providing proper notice. [Adv. Dkt. No. 15].  Simultaneous with the filing of the Notes Counterclaim, the Debtors filed a motion for summary judgment seeking a declaration from the Bankruptcy Court that the Notes Adversary Proceeding violated the terms of the 10.5% Notes Indenture and that the Notes Adversary

Proceeding be dismissed as improper under the 10.5% Notes Indenture [Adv. Dkt. Nos. 16, 17]. Simultaneous with filing of the Notes Counterclaim and summary judgment motion, the Debtors also filed a motion to dismiss the Notes Adversary Proceeding. [Adv. Dkt. Nos. 18, 19].

On June 10, 2022, the Ad Hoc Noteholder Group filed an emergency motion to intervene in the Notes Adversary Proceeding (the "**Intervention**"). [Adv. Dkt. No. 28]. Through the intervention, the Ad Hoc Noteholder Group seeks an order from the bankruptcy court authorizing the Ad Hoc Noteholder Group to intervene in the Notes Adversary Proceeding as a defendant to preserve and protect the interests of its members in the Notes Adversary Proceeding and to have the rights and obligations of a party to the Notes Adversary Proceeding, as if it had been initially named as a defendant.

The Debtors' response to the Notes Adversary Proceeding motion for summary judgment is due on June 17, 2022, with any reply brief in support due June 24, 2022. Bayside and Cerberus' response to the Notes Counterclaim is June 22, 2022, with any reply brief in support due June 28, 2022. The hearing on the cross-motions for summary judgment on the Notes Adversary Proceeding and Notes Counterclaim took place on June 29, 2022.

On July 8, 2022, the Bankruptcy Court issued entered judgment denying Bayside and Cerberus' summary judgment motion. That same day, Bayside and Cerberus filed an emergency motion to stay the Bankruptcy Court's order denying relief, pending appeal. On July 11, 2022, the Bankruptcy Court denied the emergency motion for stay of order pending appeal. On July 12, 2022, Bayside and Cerberus filed an appeal of the Bankruptcy Court's order to the District Court of Delaware and moved for an emergency motion to stay the Bankruptcy Court's order pending appeal. On July 26, 2022, the District Court issued an order denying Bayside and Cerberus's emergency motion for stay. On August 5, 2022, the Debtors and Bayside and Cerberus entered into an agreed stipulation dismissing Bayside and Cerberus's appeal with prejudice.

### J.    Backstop Motion

On July 22, 2022, the Debtors filed the *Motion of Debtors for Order (I) Authorizing Entry Into Backstop Agreements, (II) Approving Obligations Thereunder, (III) Approving Rights Offering Procedures and Related Forms, (IV) Authorizing Debtors to Conduct the Rights Offering Transactions, and (V) Granting Related Relief* [Docket No. 491] (the "**Backstop Motion**"). By way of the Backstop Motion, the Debtors are requesting authorization to enter into the Backstop Agreements, the Bankruptcy Court's approval of (i) the Commitment Obligations (as defined therein) in the Backstop Agreements and (ii) the Rights Offering Procedures, and authorization to conduct the Rights Offering Transactions (as defined therein).

On August 9, 2022, the U.S. Trustee filed an objection to the Backstop Motion [Docket No. 606]. On August 10, 2022, Bayside and Cerberus, the Creditors' Committee, and Mockingbird Credit Opportunities Company LLC ("**Mockingbird**") each filed their objections to the Backstop Motion [Docket Nos. 616, 620, and 624].

On September 13, 2022, the Debtors announced at a status conference that the Ad Hoc Noteholder Group, Cerberus and Bayside and Mockingbird had reached an agreement in principle to resolve their objections to the Backstop Motion and were working to document such agreement.

K.    **Litigation Matters**

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims. These matters primarily consist of claims for personal injury or exposure to certain chemical products or feedstocks, and to environmental matters. To the extent that Debtors are party to any such lawsuits, the Debtors defend such actions vigorously. Moreover, many of the personal injury or product exposure lawsuits to which the Debtors are party to are covered by the Debtors' insurance, subject to certain self-insured retention amounts.

The Debtors' complex contractual arrangements with their customers and suppliers have, from time to time, caused the Debtors to be involved in disputes with their customers and suppliers regarding the interpretation of these contracts. This includes litigation related to complex, index-based pricing formulas applicable to such contracts. These disputes, which are common to the industry and occur in the ordinary course of the Debtors' business, seldom result in actual formal litigation. To the contrary, they are typically resolved in the context of the broader commercial relationship that the Debtors maintain with the customer or supplier in question.

In addition to prepetition litigation related to the PNO Incident (described in greater detail in Section V.C.4, herein), the Texas Attorney General brought suit against TPC in February 2022 in state court in Austin alleging violations by the Debtors of the Texas Clean Air Act and the Texas Water Code, pertaining to certain emissions events in 2020 and 2021 at the HNO Facility.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. The Debtors reserve their right to remove such litigation under Bankruptcy Rule 9027. In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

L.    **Putative PNO Class Claimants' Omnibus Motion for Class Proofs of Claim and Certification of Classes**

On August 30, 2022, the PNO Claimants filed the *Port Neches Plant Explosion Class Claimants' Omnibus Motion for (I) Approval and Ratification of Filing of Class Proofs of Claim and (II) Certification of Classes* [Docket No. 687] (the "**Class Claimants' Omnibus Motion**") seeking, among other things, the Bankruptcy Court's (i) approval and ratification of the filing of class proofs of claim by the proposed class representatives and (ii) certification of the classes, approval of the class representatives and approval of counsel representing the class.

The objection deadline for the Class Claimants' Omnibus Motion has been extended for the Debtors to September 29, 2022 at 4:00 p.m. (prevailing eastern time) by agreement among the parties. The Debtors anticipate filing responsive pleadings opposing the Class Claimants' Omnibus Motion, which is scheduled to be heard at the Debtors' omnibus hearing on October 13, 2022 at 11:00 a.m. (prevailing eastern time).

### M.    Creditors' Committee Standing Motion

On August 31, 2022, the Creditors' Committee filed the *Motion of the Official Committee of Unsecured Creditors of TPC Group Inc., et al., for Entry of an Order Granting (I) Leave, Standing, and Authority to Commence and Prosecute Certain Claims on Behalf of the Debtors' Estates and (II) Exclusive Settlement Authority in Respect of Such Claims* [Docket No. 704] (the "**Standing Motion")**, including the proposed complaint attached thereto, to, among other things, (i) challenge the validity and enforceability of liens and security interests on the Debtors' insurance proceeds arising from the PNO Incident, purportedly unencumbered pipeline assets located in Galveston, Orange and Brazoria Counties in Texas and Calcasieu Parish in Louisiana, and a leasehold interest at the Lake Charles Terminal, (ii) seek avoidance of any unperfected liens with respect to the aforementioned assets, (iii) seek declaratory relief that certain make-whole provisions are unenforceable, and (iv) seek a finding that the New Holdings Guaranty (as defined therein) is avoidable as a constructive fraudulent transfer.  In the Standing Motion, the Creditors' Committee has asserted that noteholders' liens in the insurance proceeds are not properly perfected.  The Creditors' Committee believes that if its arguments are correct, the Plan will not be confirmable.  Moreover, the Creditors' Committee also believes that if its challenge to the validity and enforceability of the noteholders' liens is successful, the Plan will not be confirmable.

The Debtors, the Ad Hoc Noteholder Group and U.S. Bank dispute the Committee's allegations, and the Debtors anticipate filing responsive pleadings opposing the Standing Motion. Other than segments of pipeline assets in Galveston, Orange and Brazoria Counties in Texas and Calcasieu Parish in Louisiana and equity in the Pipeline Companies, the Debtors believe that all assets are encumbered.  A hearing on the Standing Motion has been scheduled for October 13, 2022 at 11:00 a.m. (prevailing eastern time).

### N.    Rejection of Lion Elastomers Storage and Handling Agreement and Adversary Proceeding

On September 7, 2022, the Debtors filed *Debtors' Motion for Entry of an Order Approving Rejection of Butadiene Storage and Handling Agreement with Lion Elastomers* [Docket No. 734] (the "**Lion Rejection Motion**").  By way of the Lion Rejection Motion, the Debtors request approval of their rejection of that certain Butadiene Storage and Handling Agreement between TPC, as successor-in-interest under the contract to Texaco Chemical Company, and Lion Elastomers, LLC ("**Lion**"), as successor-in-interest under the contract to Ameripol Synpol Company, dated December 17, 1992 (the "**Storage Agreement**").

On September 7, 2022, TPC also filed its *Complaint for Declaratory Judgment* [Adv. Docket No. 1], seeking a declaration that the Storage Agreement does not contain any covenants that run with the land.  Then, on September 16, 2022, TPC filed its *First Amended Complaint for Declaratory Judgment* [Adv. Docket No. 4] seeking (1) a declaration that the Storage Agreement does not contain any covenants that run with the land, and (2) a declaration that any and all purported conveyances of or interests in real property pursuant to the Butadiene Storage and Handling Agreement are avoidable by TPC pursuant to section 544(a)(3) of the Bankruptcy Code and may be recovered by TPC pursuant to section 550(a) for the benefit of the Debtors' estates. On September 16, 2022, TPC filed its *Plaintiff's Motion for Summary Judgment* and *Brief in*

*Support of Plaintiffs' Motion for Summary Judgment*, seeking judgment in its favor on both counts. [Adv. Docket Nos. 5 and 6.]

## VII.    TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL LAW

### A.    New Common Shares, HoldCo Notes and Exit Notes

As discussed herein, the Plan provides for the Debtors and the Reorganized Debtors, as applicable, subject to the terms of the Plan Supplement, to distribute: (1) New Common Shares and HoldCo Notes to Holders of 10.5% Notes Secured Claims on account of their respective Claims and/or in connection with the Equity Rights Offering and Debt Rights Offering; (2) New Common Shares under the Management Incentive Plan; (3) New Common Shares consisting of unsubscribed Equity Rights Offering Securities issued to the Equity Backstop Parties or their Affiliates pursuant to the Equity Backstop Agreement (the "**Equity Backstop Commitment Securities**"); (4) New Common Shares consisting of Equity Put Option Securities issued to the Equity Commitment Parties or their Affiliates pursuant to the Equity Backstop Agreement; (5) New Common Shares consisting of Equity Direct Allocation Securities issued to the Equity Direct Allocation Parties or their Affiliates pursuant to the Equity Backstop Agreement; (6) New Common Shares consisting of Debt Put Option Securities issued to the Debt Commitment Parties or their Affiliates pursuant to the Debt Backstop Agreement; (6)  HoldCo Notes consisting of Unsubscribed Debt Rights Offering Securities issued to the Debt Backstop Parties or their Affiliates pursuant to the Debt Backstop Agreement (the "**Debt Backstop Commitment Securities**"); and (7) HoldCo Notes consisting of Debt Direct Allocation Securities issued to the Debt Direct Allocation Parties or their Affiliates pursuant to the Debt Backstop Agreement.

The Plan also provides for the Debtors and the Reorganized Debtors, as applicable, to issue Exit Notes in a private placement not subject to registration under the Securities Act, and/or unsubscribed Exit Notes issued to the Exit Notes Commitment Parties pursuant to the Exit Notes Backstop Agreement (the "**Exit Notes Backstop Issue**") and, in each case, pursuant to the Exit Notes Indenture.

The Debtors believe that the New Common Shares, HoldCo Notes, and Exit Notes will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and any applicable state securities law (a "**Blue Sky Law**").  The Debtors further believe that the offer, issuance and distribution of the New Common Shares, HoldCo Notes, and the Exit Notes pursuant to the Plan is, and subsequent transfers of shares of the New Common Shares, HoldCo Notes or the Exit Notes by the holders thereof that are not "underwriters" (as defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code) will be, exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code, and any applicable state Blue Sky Law in each case, to the extent set forth below.

**RECIPIENTS OF NEW COMMON SHARES, HOLDCO NOTES OR EXIT NOTES ARE URGED TO CONSULT WITH THEIR OWN LEGAL ADVISORS AS TO THE AVAILABILITY OF ANY EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE BLUE SKY LAW.**

**B.**     **Equity Backstop Agreement, Debt Backstop Agreement and Exit Notes Backstop Agreement**

The applicable Commitment Parties and the Debtors have entered into (i) the Equity Backstop Agreement with respect to the Equity Rights Offering and (ii) the Debt Backstop Agreement with respect to the Debt Rights Offering, pursuant to which the Equity Backstop Parties and the Debt Backstop Parties, as applicable, severally and not jointly, will undertake to backstop the Equity Rights Offering and Debt Rights Offering, respectively, which Equity Rights Offering and Debt Rights Offering shall be conducted in accordance with the Plan, the Equity Rights Offering Documents and the Debt Rights Offering Documents, as applicable.

Under the Equity Backstop Agreement (i) the Equity Backstop Parties, severally and not jointly, will purchase the Equity Backstop Commitment Securities and (ii) the Equity Direct Allocation Parties will purchase the Equity Direct Allocation Securities for the aggregate Equity Direct Allocation Amount.  As consideration for certain of the commitments of the Equity Commitment Parties under the Equity Backstop Agreement, the applicable Equity Commitment Parties shall receive the Equity Put Option Premium, paid in Equity Put Option Securities, which shall be deemed fully earned as of the date of execution of the Equity Backstop Agreement.

Under the Debt Backstop Agreement, (i) the Debt Backstop Parties, severally and not jointly, will purchase the Debt Backstop Commitment Securities and (ii) the Debt Direct Allocation Parties will purchase the Debt Direct Allocation Securities for the aggregate Debt Direct Allocation Amount.  As consideration for certain of the commitments of the Debt Commitment Parties under the Debt Backstop Agreement, the applicable Debt Commitment Parties shall receive the Debt Put Option Premium, paid in Debt Put Option Securities, which shall be deemed fully earned as of the date of execution of the Debt Backstop Agreement.

In addition, the Exit Note Commitment Parties and the Company, on behalf of itself and each of the other Debtors, are expected to enter into an Exit Notes Backstop Agreement (the "**Exit Notes Backstop Agreement**"), pursuant to which the Exit Notes Backstop Parties, severally and not jointly, will backstop the private placement of Exit Notes to be conducted in accordance with the Plan.  Under the Exit Notes Backstop Agreement, if the Company is unable to place some or all of the Exit Notes in the market, the Debtors are expected to have the right to cause the Exit Notes Commitment Parties, severally but not jointly, to purchase any Exit Notes that are not placed in the market on terms and subject to conditions set forth in the Plan.

The Equity Commitment Parties, the Debt Commitment Parties and the Exit Notes Commitment Parties, as applicable, are sophisticated financial institutions that are familiar with the Debtors' operations and the petrochemicals industry and the entry into the Equity Backstop Agreement, the Debt Backstop Agreement and the Exit Notes Backstop Agreement by each of the Equity Commitment Parties, the Debt Commitment Parties and the Exit Notes Commitment Parties, as applicable was (or will be) the result of extensive negotiations among the Debtors and

the Equity Commitment Parties, the Debt Commitment Parties and the Exit Notes Commitment Parties, as applicable, in the months prior to the Petition Date and thereafter.

C. **Equity Backstop Commitment Securities; Debt Backstop Commitment Securities; Equity Direct Allocation Securities; Debt Direct Allocation Securities; Equity Put Option Securities; Debt Put Option Securities; and Backstop Exit Notes**

Issuance of the Equity Backstop Commitment Securities, the Debt Backstop Commitment Securities, the Equity Direct Allocation Securities, the Debt Direct Allocation Securities, the Equity Put Option Securities, the Debt Put Option Securities and the Backstop Exit Notes will be in reliance upon the exemption from registration under the Securities Act provided by Section 4(a)(2) thereof. Such issuances will not be exempt under section 1145 of the Bankruptcy Code because those securities are not being issued in exchange for an existing Claim against the Debtors.

D. **Certain Securities Law Matters**

1. **Section 1145 of the Bankruptcy Code**

Issuance of Securities:

Section 1145(a)(1) of the Bankruptcy Code exempts the offer or sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws if three principal requirements are satisfied: (a) the securities must be issued "under a plan" of reorganization by the debtor or its successor under a plan or by an affiliate participating in a joint plan of reorganization with the debtor; (b) the recipients of the securities must hold a claim against, an interest in, or a claim for administrative expenses in the case concerning the debtor; and (c) the securities must be issued in exchange for the recipient's claim against or interest in the debtor, or "principally" in such exchange and "partly" for cash or property. In reliance upon these exemptions, as well as Section 4(a)(2) under the Securities Act, the Debtors believe that the offer, issuance and distribution under the Plan of the New Common Shares to Holders of the 10.5% Notes Secured Claims pursuant to the Plan (such securities, the "**1145 Securities**" and such Holders, the "**1145 Security Holders**"), following the filing of the Chapter 11 Cases may be made without registration under the Securities Act or any applicable state securities laws. To the extent that the offer, issuance and distribution of the New Common Shares to the 1145 Security Holders following the filing of the Chapter 11 Cases is covered by section 1145 of the Bankruptcy Code, subject to compliance with the New Organizational Documents, such 1145 Securities may be resold without registration under the Securities Act or other federal securities laws, unless such Holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in section 1145(b)(1) of the Bankruptcy Code. In addition, such 1145 Securities are governed by section 1145 of the Bankruptcy Code generally and may be able to be resold without registration under applicable state securities laws pursuant to various exemptions provided by the applicable states; however, the availability of such exemptions cannot be known unless applicable individual state securities laws are examined.

<u>Subsequent Transfers</u>:

The 1145 Securities may be freely transferred by most recipients following the initial issuance under the Plan, subject to any restrictions in the New Corporate Governance Documents, and all resales and subsequent transfers of the 1145 Securities are exempt from registration under the Securities Act and state securities laws, unless the Holder is an "underwriter" with respect to such securities. Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of 1145 Securities by entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, Holders of 1145 Securities who are deemed to be "underwriters" may be entitled to resell their 1145 Securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such Person if the required holding period has been met and, under certain circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met. If the issuer is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, adequate current public information as specified under Rule 144 is available if certain company information is made publicly available,

as specified in Section (c)(2) of Rule 144. The Reorganized Debtors will not be subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act. Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the 1145 Securities, would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the 1145 Securities and, in turn, whether any Person may freely resell the 1145 Securities.

## 2.    Section 4(a)(2) under the Securities Act

Issuance of Securities:

Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving a public offering are exempt from registration under the Securities Act. Rule 506 of Regulation D is a nonexclusive safe harbor from registration promulgated by the SEC under section 4(a)(2) of the Securities Act.

Any New Common Shares (including the Equity Put Option Securities and Debt Put Option Securities), HoldCo Notes or Exit Notes distributed pursuant to Section 4(a)(2) under the Securities Act (collectively the "**4(a)(2) Securities**") will be offered, issued and distributed without registration under the Securities Act and applicable state securities laws and in reliance upon the exemption set forth therein. Such issuances will not be exempt under section 1145 of the Bankruptcy Code because those securities are not being issued in exchange for an existing Claim against the Debtors.

Subsequent Transfers:

The 4(a)(2) Securities will be considered "restricted securities" as defined by Rule 144 of the Securities Act and may not be resold under the Securities Act and applicable state securities laws absent an effective registration statement, or pursuant to an applicable exemption from registration, under the Securities Act and pursuant to applicable state securities laws. Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such person after a specified holding period if current information regarding the issuer is publicly available and certain other conditions are met, and, if such seller is an affiliate of the issuer (or was an affiliate during the three months preceding the sale), if volume limitations, manner of sale requirements and certain other conditions are met. The Debtors express no view as to whether any person may freely resell the 4(a)(2) Securities.

A non-affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act and who has not been an affiliate of the issuer during the 90 days preceding such sale may resell restricted securities after a one-year holding period whether or not current public information regarding the issuer is available and without compliance with the volume, manner of sale, and notice requirements described below.

An affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act may resell restricted securities after the one-year holding period if at the time of the sale certain current public information regarding the issuer is available. An affiliate must also comply with the volume, manner of sale, and notice requirements of Rule 144. First,

the rule limits the number of restricted securities (plus any unrestricted securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of 1% of the outstanding securities of the same class being sold, or, if the class is listed on a stock exchange, the average weekly reported volume of trading in such securities during the four weeks preceding the filing of a notice of proposed sale on Form 144 or if no notice is required, the date of receipt of the order to execute the transaction by the broker or the date of execution of the transaction directly with a market maker. (In the case of debt securities, the amount of debt securities sold for the account of an affiliate in any three-month period may not exceed the greater of the limitation set forth in the preceding sentence or 10% of the principal amount of the applicable tranche of debt securities.) Second, the manner of sale requirement provides that the restricted securities must be sold in a broker's transaction, directly with a market maker or in a riskless principal transaction (as defined in Rule 144). Third, if the amount of securities sold under Rule 144 in any three month period exceeds 5,000 shares or other units or has an aggregate sale price greater than $50,000, an affiliate must file or cause to be filed with the SEC three copies of a notice of proposed sale on Form 144 and provide a copy to any exchange on which the securities are traded.

The Debtors believe that the Rule 144 exemption will not be available with respect to any 4(a)(2) Securities (whether held by non-affiliates or affiliates) until at least one year after the Effective Date. Accordingly, unless transferred pursuant to an effective registration statement or another available exemption from the registration requirements of the Securities Act, non-affiliate Holders of 4(a)(2) Securities will be required to hold their 4(a)(2) Securities for at least one year and, thereafter, to sell them only in accordance with the applicable requirements of Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws. It is currently contemplated that the Reorganized Debtors will not be subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act.

Each certificate representing, or issued in exchange for or upon the transfer, sale or assignment of, any 4(a)(2) Security shall, upon issuance, be stamped or otherwise imprinted with a restrictive legend substantially consistent with the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

In addition to the foregoing restrictions, the applicable 4(a)(2) Securities will also be subject to any applicable transfer restrictions contained in the New Corporate Governance Documents.

Reorganized Holdings will reserve the right to require certification or other evidence of compliance with Rule 144 or another available exemption as a condition to the removal of such legend or to any resale of 4(a)(2) Securities or to stop the transfer of 4(a)(2) Securities is such transfer is not in compliance with Rule 144 or another available exemption.

THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES.  WE MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE SECURITIES OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT.

ANY PERSON WHO RECEIVES SECURITIES UNDER THE PLAN IS URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE FEDERAL OR STATE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS.  IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, WE ENCOURAGE EACH RECIPIENT OF SECURITIES AND PARTY IN INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS.

BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A SECURITY IS EXEMPT FROM THE REGISTRATION REQUIREMENTS UNDER THE FEDERAL OR STATE SECURITIES LAWS OR WHETHER A PARTICULAR RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER, WE MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE SECURITIES ISSUED UNDER THE PLAN.

### 3.      The Management Incentive Plan

The Confirmation Order shall authorize the Reorganized Holdings Board to adopt and enter into a market-based Management Incentive Plan reserving up to 7.0% of the New Common Shares, with amounts, structure, awards and terms of the Management Incentive Plan to be determined by the New Board.  The issuance of New Common Shares, if any, under the Management Incentive Plan would dilute all of the New Common Shares as applicable, issued pursuant to the Plan.  The New Common Shares, including New Common Shares issued under the Management Incentive Plan, may be subject to dilution in connection with the conversion of any other options, warrants, convertible securities, or other securities that may be issued post-emergence.

## VIII.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors, and certain Holders of Claims entitled to vote on the Plan, and it does not address the U.S. federal income tax consequences to Holders of Claims not entitled to vote on the Plan or to any Debtor that ceases to be a member of the Tax Group as a result of the Restructuring Transactions.  This summary is based on the Tax Code, the U.S. Treasury Regulations promulgated thereunder ("**Treasury Regulations**"), judicial decisions, revenue rulings and revenue procedures of the Internal Revenue Service (the "**IRS**"), and other published administrative rules and pronouncements of the IRS, all as in effect on the date hereof (collectively, "**Applicable Tax Law**").  Changes in the Applicable Tax Law or new interpretations of the Applicable Tax Law may have retroactive effect and could significantly affect the U.S. federal income tax consequences described herein.  The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority, or any legal opinion of counsel, with respect to the tax consequences discussed herein.  The discussion below is not binding upon the IRS or the courts, and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address state, local or non-U.S. tax consequences, or any U.S. federal tax consequences (such as consequences under the federal estate tax, the federal gift tax, or the "Medicare" tax on certain net investment income) other than U.S. federal income tax consequences, of the Plan (including such consequences with respect to the Debtors or the Reorganized Debtors).  This summary also does not purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances, nor does it discuss the U.S. federal income tax consequences to certain types of Holders that may be subject to special tax rules (such as persons who are related to the Debtors within the meaning of the Tax Code; persons liable for the alternative minimum tax or base erosion and anti-avoidance tax; U.S. Holders (as defined below) whose functional currency is not the U.S. dollar; U.S. expatriates; broker-dealers; banks; mutual funds; insurance companies; financial institutions; small business investment companies; regulated investment companies; tax-exempt organizations; controlled foreign corporations; passive foreign investment companies; partnerships or other pass-through entities for U.S. federal income tax purposes (and beneficial owners of such entities); persons who will hold Claims, New Common Shares, Takeback HoldCo Notes, Equity Subscription Rights, Debt Subscription Rights, Debt Rights Offering Securities or GUC Trust Interests as part of a straddle, hedge, conversion transaction, or other integrated investment; Holders of Claims with respect to damages on account of personal injury or sickness, punitive damages, or attorneys' fees; persons using a mark-to-market method of accounting; persons who are required to recognize income or gain no later than such income or gain is required to be reported on an applicable financial statement under section 451(b) of the Tax Code; Holders who have previously taken or will take a bad debt deduction (or otherwise take an ordinary loss) with respect to a Claim or the liability giving rise to a Claim; Holders of Existing Holdings Interests; Holders of Disputed Claims; former citizens and residents of the United States; Non-U.S. Holders (as defined below) of General Unsecured Claims; and persons who are themselves in bankruptcy).  This summary also does not address the U.S. federal income tax consequences to Holders of Claims other than 10.5% Secured Notes Claims or General Unsecured Claims.  Furthermore, this summary does not

address the U.S. federal income tax consequences of the Backstop Agreements and Restructuring Support Agreement (or to the parties thereto in respect of such agreements), or the Exit Notes or the Exit ABL Facility (or loans thereunder) or to the holders thereof, or any aspects thereof or of the DIP Facilities (including any adequate protection provisions).

This summary assumes that a Holder of a Claim, New Common Shares, Takeback HoldCo Notes, Equity Subscription Rights, Debt Subscription Rights, Debt Rights Offering Securities or a GUC Trust Interest holds only Claims in a single Class and holds such Claim, New Common Shares, Takeback HoldCo Notes, Equity Subscription Rights, Debt Subscription Rights, Debt Rights Offering Securities or GUC Trust Interest only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the Claims to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code, and that the Contingent Rights (as defined below) will not be treated in whole or in part as debt or a security for U.S. federal income tax purposes. In addition, this summary assumes that the receipt by a Holder of an Equity Subscription Right or Debt Subscription Right in exchange for a Claim will be treated as the receipt of an option pursuant to a step that is separately identifiable from any subsequent exercise or lapse of such Equity Subscription Right or Debt Subscription Right and that any exercise of an Equity Subscription Right or Debt Subscription Right will be respected as a transaction separate from the other Restructuring Transactions. However, such treatment is not free from doubt. If the IRS were to take a contrary position, and such position were upheld, the U.S. federal income tax consequences to a Holder of the receipt and exercise or lapse of an Equity Subscription Right or Debt Subscription Right (including the amount of gain or loss on such receipt) could be different than as described below. Holders should consult their tax advisors regarding the possibility and consequences of any such alternative treatment.

Furthermore, this summary assumes that the 10.5% Secured Notes are not contingent payment debt instruments and that the terms of the Takeback HoldCo Notes and the Debt Rights Offering Securities (collectively, the "**New Notes**") will not include contingent terms that would cause such New Notes to be subject to special rules governing certain contingent payment debt instruments. If the 10.5% Secured Notes Claims or the New Notes were treated as contingent payment debt instruments, the tax consequences related to the holders of 10.5% Secured Notes Claims and to the receipt and holding of the New Notes could vary significantly from that described below. If the 10.5% Secured Notes or the New Notes were so treated, among other things, holders of 10.5% Secured Notes Claims might be required to characterize any gain or loss upon the exchange pursuant to the Plan in a different manner than as described below, and holders of the New Notes might be required to accrue income at a different rate than described below, and any gain recognized on the sale or other disposition of a New Note would generally be treated as ordinary interest income rather than capital gain. Holders should consult their tax advisors regarding the possible application of the contingent payment debt instrument rules to the New Notes.

For purposes of this discussion, a "**U.S. Holder**" is a beneficial Holder of a Claim or New Common Shares, Takeback HoldCo Notes, Equity Subscription Rights, Debt Subscription Rights, Debt Rights Offering Securities or a GUC Trust Interest acquired pursuant to the Plan that in each case, for U.S. federal income tax purposes, is: (1) an individual citizen or resident of the United

States; (2) a corporation (or other entity treated as a corporation) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the Tax Code) have authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.  For purposes of this discussion, a "**Non-U.S. Holder**" is any beneficial Holder of a Claim or New Common Shares, Takeback HoldCo Notes, Equity Subscription Rights, Debt Subscription Rights, Debt Rights Offering Securities or a GUC Trust Interest acquired pursuant to the Plan that, in each case, is an individual, corporation, estate or trust and is not a U.S. Holder.

If a partnership (or other entity or arrangement treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, New Common Shares, Takeback HoldCo Notes, Equity Subscription Rights, Debt Subscription Rights, Debt Rights Offering Securities or a GUC Trust Interest, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the entity.  Partners (or other beneficial owners) of partnerships (or other entities treated as partnerships or other pass-through entities for U.S. federal income tax purposes) that are Holders of a Claim, New Common Shares, Takeback HoldCo Notes, Equity Subscription Rights, Debt Subscription Rights, Debt Rights Offering Securities or a GUC Trust Interest are urged to consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS INTENDED FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM, NEW COMMON SHARES, TAKEBACK HOLDCO NOTES, EQUITY SUBSCRIPTION RIGHTS, DEBT SUBSCRIPTION RIGHTS, DEBT RIGHTS OFFERING SECURITIES OR A GUC TRUST INTEREST.  ALL HOLDERS OF A CLAIM, NEW COMMON SHARES, TAKEBACK HOLDCO NOTES, EQUITY SUBSCRIPTION RIGHTS, DEBT SUBSCRIPTION RIGHTS, DEBT RIGHTS OFFERING SECURITIES OR A GUC TRUST INTEREST ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN BASED ON THEIR PARTICULAR CIRCUMSTANCES.**

B.    <u>Certain U.S. Federal Income Tax Consequences to the Debtors and Reorganized Debtors</u>

1.    **Effects of Restructuring on the Debtors**

(i)    **Cancellation of Debt and Reduction of Tax Attributes**

For U.S. federal income tax purposes, Holdings is the common parent of an affiliated group of companies that files a single consolidated U.S. federal income tax return (the "**Tax Group**"),

of which the other Debtors are members or are disregarded entities, directly or indirectly, wholly owned by a member of the Tax Group.  In general, absent an exception, the Tax Group will realize and recognize cancellation of indebtedness income ("**COD Income**") upon satisfaction of their outstanding indebtedness for total consideration less than the amount of such indebtedness.  In particular, the amount of COD Income realized by the Tax Group with respect to the satisfaction of the 10.5% Secured Notes Claims is expected to be the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of Cash, (ii) the issue price (or, depending on the particular manner in which the distributions are structured, as will be set forth in the Restructuring Transactions Memorandum, and treated for U.S. federal income tax purposes (the "**Transaction Structure**"), fair market value) of the Takeback HoldCo Notes (as discussed under Section C below), and (iii) the fair market value of the New Common Shares and other consideration (including Equity Subscription Rights and Debt Subscription Rights), in each case, given in satisfaction of such indebtedness at the time of the exchange.  In certain circumstances, the Tax Group also may realize and recognize COD Income upon a modification of a debt instrument if the modification is a "significant modification" for U.S. federal income tax purposes.

Under section 108 of the Tax Code, the Tax Group will not, however, be required to include any amount of COD Income in gross income if the Debtors are under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, the Tax Group must reduce certain tax attributes by the amount of COD Income that they excluded from gross income pursuant to section 108 of the Tax Code.  Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined.  In general, tax attributes will be reduced in the following order: (a) U.S. federal income tax net operating losses ("**NOLs**") and NOL carryforwards; (b) U.S. federal income tax general business credit carryovers; (c) U.S. federal income tax capital loss carryovers; (d) U.S. federal income tax basis in assets (but not below the amount of liabilities to which the Reorganized Debtors will remain subject immediately after the discharge); (e) U.S. federal income tax passive activity loss and credit carryovers; and (f) foreign tax credit carryovers for U.S. federal income tax purposes.  Alternatively, the Tax Group may elect first to reduce the basis of their depreciable assets pursuant to section 108(b)(5) of the Tax Code.  In the absence of contrary guidance, business interest expense carryforwards under section 163(j) of the Tax Code ("**163(j) Deductions**") should not be subject to reduction under these rules.  Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

In connection with the Restructuring Transactions, the Tax Group expects to realize COD Income; however, the exact amount of any COD Income that will be realized by the Tax Group will not be determinable until the consummation of the Plan.  In addition, depending on the Transaction Structure, it is possible that the Tax Group could be treated as recognizing (in addition to COD Income) gain with respect to the extinguishment of the 10.5% Secured Notes Claims or the Takeback HoldCo Notes and/or Debt Subscription Rights distributed pursuant to the Plan. Regardless of the Transaction Structure, however, the Debtors expect that the amount of such COD Income (and gain, if applicable) will reduce some of their Tax Attributes (as defined below) pursuant to section 108 of the Tax Code.  Depending on the amount of COD Income, some or all of the Debtors' tax basis in their assets may be reduced by COD Income that is not absorbed by the reduction of their Tax Attributes.

In the event that a Debtor ceases to be a member of the Tax Group as a result of the Restructuring Transactions, the Tax Attributes (as defined below) generally would be reallocated among members of the group.

<div align="center">(ii)    <strong>Limitation on NOLs, 163(j) Deductions, and Other Tax Attributes</strong></div>

As of the Petition Date, the Debtors estimate that the Tax Group had approximately $337 million of NOL carryforwards, $291 million of 163(j) Deductions and $3 million of research credit carryforwards (collectively, the "**Tax Attributes**").  The Debtors may generate additional tax attributes prior to the Effective Date.  Any NOLs remaining upon implementation of the Plan may be able to offset future taxable income for up to 20 years in the case of NOLs arising before 2018 and indefinitely for NOLs arising in taxable years starting in 2018, thereby reducing the Debtors' future aggregate tax obligations.  For taxable years beginning after 2020, NOLs arising in taxable years beginning before 2018 generally may offset 100% of taxable income in a given year, and NOLs arising in taxable years beginning after 2017 generally may be used to offset 80% of taxable income in a given year.    As discussed above, however, the Tax Attributes (other than the 163(j) Deductions) are expected to be reduced (or possibly eliminated) upon implementation of the Plan.  Moreover, the Tax Attributes are subject to audit and possible challenge by the IRS.  Accordingly, the amount of the Tax Attributes ultimately may vary from the amounts set forth above.

After giving effect to the reduction in Tax Attributes pursuant to excluded COD Income described above, the Reorganized Debtors' ability to use any Tax Attributes remaining after the Effective Date also are expected to be subject to certain limitations under sections 382 and 383 of the Tax Code.  Under sections 382 and 383 of the Tax Code, if a corporation undergoes an "ownership change," the amounts of any remaining NOL carryforwards, tax credit carryforwards, 163(j) Deductions, and possibly certain other attributes (potentially including losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change) of the corporation allocable to periods on or prior to the date of the ownership change (collectively, "**Pre-Change Losses**") that may be utilized to offset future taxable income generally are subject to an annual limitation.  For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation.  In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10 million, or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

The rules of section 382 of the Tax Code are complicated, but as a general matter, the Debtors anticipate that the issuance of New Common Shares pursuant to the Plan will result in an "ownership change" of the Debtors for these purposes, and that the Reorganized Debtors' use of any Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the Tax Code applies.

### (a)    General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments), and (ii) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the ownership change occurs, currently 2.54 percent for September 2022).  The annual limitation may be increased to the extent that the Reorganized Debtors have a net unrealized built-in gain at the time of the ownership change and recognize certain built-in gains in their assets during the five-year period following the ownership change or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65.  In general, a corporation's (or consolidated group's) net unrealized built-in gain will be deemed to be zero unless it is greater than the lesser of (a) $10 million, or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.  Should a corporation be in a net unrealized built-in gain position at the time of an ownership change, proposed Treasury Regulations issued on September 10, 2019, and on January 14, 2020, under section 382(h) of the Tax Code (the "**Proposed Regulations**") would, if finalized in their present form, change the currently existing rules and limit the potential increases to the annual limitation amount for certain built-in gains existing at the time of an ownership change (unless the transition relief provisions of the Proposed Regulations are applicable), thereby possibly reducing the ability to utilize tax attributes. Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits.  Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.  As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

### (b)    Special Bankruptcy Exceptions

Special rules may apply in the case of a corporation that experiences an "ownership change" as a result of a bankruptcy proceeding.  An exception to the foregoing annual limitation rules generally applies under section 382(l)(5) of the Tax Code when the shareholder and so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their shares or claims, at least 50 percent of the vote and value of the stock of the debtor corporation (or a controlling corporation if also in chapter 11) as reorganized pursuant to a confirmed chapter 11 plan (the "**382(l)(5) Exception**").  If the 382(l)(5) Exception applies, a debtor's Pre-Change Losses would not be limited on an annual basis, but NOL carryforwards and 163(j) Deductions would be reduced by the amount of any interest deductions allowable in respect of debt converted into stock pursuant to the chapter 11 plan of reorganization during the three taxable years preceding the effective date of the plan of reorganization and during the part of the taxable year prior to and including the effective date of the plan of reorganization.  If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses thereafter would be effectively eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor corporation does not qualify for it or the debtor corporation otherwise elects not to utilize the 382(l)(5) Exception), another exception will generally apply under section

382(l)(6) of the Tax Code (the "**382(l)(6) Exception**").  Under the 382(l)(6) Exception, the annual limitation generally should be calculated by reference to the lesser of (i) the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or (ii) the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change, although there is some uncertainty as to how to apply this rule in the context of a consolidated group.  The 382(l)(6) Exception differs from the 382(l)(5) Exception in that, under the 382(l)(6) Exception, a debtor corporation is not required to reduce its NOL carryforwards and 163(j) Deductions by the amount of certain interest deductions as described above, and a debtor corporation may undergo a subsequent change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses.  The limitation resulting from such subsequent change of ownership would be determined under the regular rules for ownership changes.

The Debtors have not determined whether the 382(l)(5) Exception will be available or, if it is available, whether the Reorganized Debtors will elect out of its application.  The Plan is not premised on the application of such exception.

### 2.        Treatment of the GUC Trust and GUC Trust Claims Reserve

Pursuant to the Plan, the GUC Trust will be established on behalf of and for the benefit of the Holders of the Allowed General Unsecured Claims.  While the treatment of the GUC Trust for U.S. federal income tax purposes is not entirely clear, the GUC Trust (other than assets set aside in escrow to fund the GUC Trust Claims Reserve) is intended to be treated as a liquidating trust within the meaning of Treasury Regulations section 301.7701-4(d), which is not a separate taxable entity, but rather is treated for U.S. federal income tax purposes as a "grantor trust" (*i.e.*, a pass-through entity).  *See* Section C.2. below for a discussion of the U.S. federal income tax consequences of the GUC Trust to Holders of Allowed General Unsecured Claims.

The Debtors intend to treat the transfer of assets by the Debtors to the GUC Trust (other than the assets contributed to the GUC Trust Claims Reserve) as (1) a transfer to the Holders of Allowed General Unsecured Claims receiving GUC Trust Interests of their proportionate interests in the GUC Trust's assets in full satisfaction of such Holder's Allowed General Unsecured Claim, followed by (2) the transfer by such Holders to the GUC Trust of such assets in exchange for their beneficial interests in the GUC Trust.

The GUC Trustee will file tax returns for the GUC Trust treating the GUC Trust as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations.  The GUC Trust also will annually send to each holder of GUC Trust Interests a separate statement regarding the receipts and expenditures of the GUC Trust as relevant for U.S. federal income tax purposes.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the GUC Trustee of a private letter ruling if the GUC Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the GUC Trustee), allocations of GUC Trust taxable income or loss shall be allocated by reference to the manner in which any economic gain or loss would be borne immediately after a hypothetical liquidating distribution of the remaining GUC Trust Assets.  The tax book value of the GUC Trust Assets for purpose of this

paragraph shall equal their fair market value on the date the GUC Trust Assets are transferred to the GUC Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including an adverse determination by the IRS upon audit if not contested by the GUC Trustee), the GUC Trustee intends to (A) timely elect to treat any GUC Trust Claims Reserve as a "disputed ownership fund" governed by Treasury Regulations section 1.468B-9 (which is generally subject to U.S. federal income taxes annually on a separate entity basis, including potentially with respect to payments pursuant to the Contingent Rights allocated to the GUC Trust Claims Reserve), and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. Any entity-level taxes incurred by the GUC Trust Claims Reserve are expected to be paid out of the GUC Trust Assets. All distributions from such GUC Trust Claims Reserve assets (which distributions will be net of the expenses, including taxes, relating to the retention or actual or deemed disposition of such assets) will be treated as received by Holders in respect of their General Unsecured Claims as if distributed directly by the Debtors on their Allowed Claims.

All parties (including the GUC Trustee, the Debtors, and the GUC Trust Beneficiaries) are intended to report for U.S. federal, state and local income tax purposes consistently with the foregoing.

If the treatment of the GUC Trust (including the GUC Trust Claims Reserve) as described above is not respected for U.S. federal income tax purposes, it is possible that the GUC Trust would be subject to U.S. federal income taxation at the entity level. The remainder of this discussion assumes that the treatment described above is respected.

### C. Certain U.S. Federal Income Tax Consequences to the U.S. Holders of 10.5% Secured Notes Claims and General Unsecured Claims

The following discussion of U.S. federal income tax consequences applies only to U.S. Holders of 10.5% Secured Notes Claims and General Unsecured Claims and assumes that the Debtors will undertake the Restructuring Transactions contemplated by the Plan (including the Plan Supplement). Holders of Claims are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

#### 1. U.S. Federal Income Tax Consequences to U.S. Holders of 10.5% Secured Notes Claims

(i) **Exchange of 10.5% Secured Notes Claim for Cash, New Common Shares, Takeback HoldCo Notes, Equity Subscription Rights and Debt Subscription Rights**

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of 10.5% Secured Notes Claims, each Holder thereof will receive (i) Cash in an amount equal to its Pro Rata share of $350 million *plus* all unrestricted Cash held by the Debtors on the Effective Date in excess of $50 million (subject to applicable adjustments), (ii)

New Common Shares, (iii) Takeback HoldCo Notes, (iii) Equity Subscription Rights and (iv) Debt Subscription Rights.

While not free from doubt, and subject to the Transaction Structure, the Company currently intends for the distributions under the Plan to U.S. Holders in satisfaction of their 10.5% Secured Notes Claims to be treated as a fully taxable exchange to such U.S. Holders for U.S. federal income tax purposes, and the remainder of this discussion assumes such treatment.  However, it is possible that the 10.5% Secured Notes Claims could be treated as having been contributed to the Reorganized Debtors pursuant to a generally nontaxable transaction (including, for instance, in a transaction to which section 351(a) of the Tax Code applies) in which the U.S. Holders would recognize gain only to the extent of the non-equity consideration received by them, and would not be entitled to claim any losses.  U.S. Holders are urged to consult their own tax advisors regarding the tax treatment of such exchange.

Other than with respect to any amounts received that are attributable to accrued interest (as described below), a U.S. Holder should recognize gain or loss on satisfaction of its 10.5% Secured Notes Claim in an amount equal to the difference, if any, between (a) the sum of (1) Cash, (2) the fair market value of the New Common Shares, Equity Subscription Rights and Debt Subscription Rights and (3) the issue price (or, depending on the Transaction Structure, fair market value)  of the Takeback HoldCo Notes, in each case received in satisfaction of such 10.5% Secured Notes Claim, and (b) the U.S. Holder's adjusted tax basis in its 10.5% Secured Notes Claim.  The character of such gain as capital gain or ordinary income will be determined by a number of factors including the tax status of the U.S. Holder and the rules regarding "market discount" (as discussed below) and accrued interest.  If recognized gain or loss is capital in nature, it generally would be long-term capital gain or loss if the U.S. Holder held its Claim for more than one year at the time of the exchange.  The holding period for the New Common Shares, Equity Subscription Rights, Debt Subscription Rights and Takeback HoldCo Notes received should begin on the day following the Effective Date.  The U.S. Holder generally should obtain a tax basis in the non-Cash consideration received equal to the fair market value of such property (or, depending on the Transaction Structure, issue price in the case of the Takeback HoldCo Notes).

In the event that, as a result of the ultimate Transaction Structure or a contrary position taken by the IRS, the exchange is generally a nontaxable transaction as described above, a U.S. Holder (1) should not recognize any loss on the satisfaction of its 10.5% Secured Notes Claim, (2) should recognize gain on the satisfaction of its 10.5% Secured Notes Claim to the extent of the Cash and the fair market value of the Equity Subscription Rights, Debt Subscription Rights and the Takeback HoldCo Notes received, (3) should have a tax basis in its New Common Shares equal to the adjusted tax basis in its 10.5% Secured Notes Claim exchanged decreased by the sum of the Cash and the fair market value of the Equity Subscription Rights, Debt Subscription Rights and Takeback HoldCo Notes received, and increased by the amount of gain recognized in the exchange, and (4) should have a holding period for the New Common Shares that includes its holding period for the 10.5% Secured Notes Claim exchanged.  The holding period for the Equity Subscription Rights, Debt Subscription Rights and Takeback HoldCo Notes received should begin on the day following the Effective Date, and such property generally should have a tax basis equal to the fair market value of the property.

(ii)    **The New Notes**

The discussion below is a general discussion of certain U.S. federal income tax consequences currently expected with respect to the holding and disposition of the New Notes. It is currently expected that the New Notes and the Debt Direct Allocation Securities will generally all be issued (to persons other than a bond house, broker, or similar person or organization acting in the capacity of an underwriter, placement agent, or wholesaler) within a period of thirteen days beginning on the Effective Date or otherwise be treated under applicable Treasury Regulations as part of the same issue, and, as a result, such New Notes and the Debt Direct Allocation Securities will have the same "issue price" (as described below) for U.S. federal income tax purposes. To the extent any New Notes or the Debt Direct Allocation Securities are not issued within a period of thirteen days beginning on the Effective Date and certain other conditions are not satisfied, then such New Notes and Debt Direct Allocation Securities may have a different issue price and may not all be fungible for U.S. federal income tax purposes with the New Notes and Debt Direct Allocation Securities issued as of the Effective Date. The discussion below is limited to New Notes (and, where explicitly indicated, Debt Direct Allocation Securities) issued (to persons other than a bond house, broker, or similar person or organization acting in the capacity of an underwriter, placement agent, or wholesaler) within a period of thirteen days beginning on the Effective Date.

*Issue Price*

The Debtors anticipate that a substantial amount of the New Notes and/or Debt Direct Allocation Securities will be issued (or deemed issued) for Cash (other than to bond houses, brokers, or similar persons or organizations acting in the capacity of underwriters, placement agents, or wholesalers) for purposes of the determination of issue price under applicable Treasury Regulations and therefore that the issue price of the New Notes and Debt Direct Allocation Securities would be the first price (including any applicable deemed payments) at which a substantial amount of the New Notes and/or Debt Direct Allocation Securities is sold (or deemed sold) for Cash (other than to bond houses, brokers, or similar persons or organizations acting in the capacity of underwriters, placement agents, or wholesalers).

*Original Issue Discount*

The New Notes will be treated as issued with original issue discount ("**OID**") for U.S. federal income tax purposes if the "stated redemption price at maturity" of the New Notes exceeds their "issue price" (*see "—Issue Price*" above) by an amount equal to or more than a statutorily defined de minimis amount (generally, 0.0025 multiplied by the product of the stated redemption price at maturity and the number of complete years to maturity). The "stated redemption price at maturity" of the New Notes is the total of all payments to be made under the New Notes other than "qualified stated interest" (generally, interest that is unconditionally payable in Cash or in property (other than debt instruments of the issuer), or that will be constructively received under certain specified rules, at least annually at a single fixed rate). Interest on the New Notes is payable in-kind by additional debt instruments bearing the same interest rate and maturity date as the original New Notes. Paid-in-kind interest is not considered a payment on the original debt instrument for these purposes and is instead aggregated with the original debt instrument. Therefore, the New Notes are currently expected to be issued with OID.

U.S. Holders are required to include OID in ordinary income on an annual basis under a constant yield accrual method regardless of such U.S. Holder's regular method of accounting for U.S. federal income tax purposes, subject to reduction in the case of any premium, as discussed below.  A U.S. Holder must include in income in each taxable year the sum of the daily portions of OID for each day on which it held a New Note during the taxable year.  To determine the daily portions of OID, the amount of OID allocable to an accrual period is determined, and a ratable portion of such OID is allocated to each day in the accrual period.  An accrual period may be of any length and the length of the accrual periods may vary over the life of the New Notes, provided that no accrual period may be longer than one year and each scheduled payment of interest or principal on the New Notes must occur on either the first day or last day of an accrual period.  The amount of OID allocable to an accrual period will equal (A) the product of (i) the New Notes' adjusted issue price at the beginning of the accrual period and (ii) the New Notes' yield to maturity (adjusted to reflect the length of the accrual period), less (B) any qualified stated interest allocable to the accrual period.  It is not currently expected that there will be any qualified stated interest on the New Notes.

A New Note's adjusted issue price at any time generally will be its original issue price, increased by the amount of OID on such New Note accrued for each prior accrual period and decreased by the amount of payments on such New Note other than payments of qualified stated interest.  A New Note's yield to maturity is the discount rate that, when used in computing the present value of all principal and interest payments to be made on the New Note, produces an amount equal to the New Note's original issue price.

*Market Discount*

A Takeback HoldCo Note received by a U.S. Holder in exchange for a 10.5% Secured Notes Claim or a Debt Rights Offering Security received by a U.S. Holder upon exercise of a Debt Subscription Right generally is expected to be considered to have been acquired with market discount if the issue price of such New Note exceeds the U.S. Holder's initial tax basis in the New Note immediately after its acquisition by the U.S. Holder by at least a statutory *de minimis* amount (generally equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).  Market discount will be considered to accrue ratably during the period from the date of the U.S. Holder's acquisition of the New Note to the maturity date of the New Note, unless the U.S. Holder has made an election to accrue market discount on a constant yield basis.

U.S. Holders should consult their tax advisors regarding the applicability and impact of market discount for U.S. federal income tax purposes.

*Amortizable Bond Premium and Acquisition Premium*

If a U.S. Holder's initial tax basis in a New Note exceeds such New Note's stated redemption price at maturity, the New Note will be treated as acquired by such U.S. Holder with amortizable bond premium.  In such case, the U.S. Holder will not be required to accrue any OID on such New Note.  Generally, a U.S. Holder may elect to amortize such bond premium (or, if it results in a smaller premium, an amount computed with reference to the amount payable on an earlier call date) as an offset to Cash interest income in respect of a New Note, using a constant

yield method as prescribed under the applicable Treasury Regulations, over the remaining term of the New Note. A U.S. Holder that elects or has elected to amortize bond premium must reduce its basis in a New Note by the amount of premium used to offset Cash interest. However, it is not currently expected that the New Notes will pay Cash interest until maturity. An election to amortize bond premium, once made, applies to all debt instruments held or subsequently acquired by the U.S. Holder on or after the first day of the first taxable year to which the election applied and may not be revoked without the consent of the IRS.

If a U.S. Holder's initial tax basis in a New Note exceeds the issue price of such New Note but is less than such New Note's stated redemption price at maturity ("**acquisition premium**"), the U.S. Holder may reduce the OID accrual on such New Note by a portion of such acquisition premium.

U.S. Holders should consult their tax advisors regarding the availability and impact of amortizable bond premium and acquisition premium for U.S. federal income tax purposes.

*Sale, Retirement or Other Taxable Disposition*

A U.S. Holder of a New Note will recognize gain or loss upon the sale, redemption, retirement or other taxable disposition of the New Note equal to the difference between the amount realized upon the disposition (less a portion allocable to any accrued interest that has not yet been included in income by the U.S. Holder, which generally will be taxable as ordinary income) and the U.S. Holder's adjusted tax basis in the New Note. In general, a U.S. Holder's adjusted tax basis in a New HoldCo Note will be its initial tax basis in the New Note, increased by any accrued OID previously included in the U.S. Holder's income with respect to the New Note and by market discount (discussed above), if any, previously included in the U.S. Holder's income with respect to the New Note (pursuant to an election to include market discount in income currently as it accrues), and reduced (but not below zero) by any amortizable bond premium with respect to the New Note that an electing U.S. Holder has previously amortized. Any gain or loss on the sale, redemption, retirement or other taxable disposition of the New Note generally will be capital gain or loss, and will be long-term capital gain or loss if the U.S. Holder has held the New Note for more than one year as of the date of disposition, except that any such gain will be treated as ordinary income to the extent of any accrued market discount carried over from the 10.5% Secured Notes and any market discount accrued on the 10.5% Secured Notes. The deductibility of capital losses is subject to limitations.

(iii)    **Equity Subscription Rights**

A U.S. Holder that exercises Equity Subscription Rights received pursuant to the Plan should be treated as receiving, in exchange for the value at issuance of such Equity Subscription Rights and the amount of Cash funded by the U.S. Holder to exercise such Equity Subscription Rights, the Equity Rights Offering Securities. Such a transaction should generally be treated as the exercise of an option under general tax principles, and accordingly such U.S. Holder should not recognize income, gain, or loss for U.S. federal income tax purposes upon such exercise. A U.S. Holder's aggregate tax basis in the Equity Rights Offering Securities should equal the sum of (1) the amount of Cash paid by the U.S. Holder to exercise its Equity Subscription Rights and (2) such U.S. Holder's tax basis in the Equity Subscription Rights immediately before exercise,

determined as set forth above. While not free from doubt, a U.S. Holder's holding period for the Equity Rights Offering Securities received should begin on the day following the exercise. U.S. Holders should consult their tax advisors regarding the tax consequences of exercising Equity Subscription Rights, including the appropriate holding period for the Equity Rights Offering Securities and alternative characterizations of the exercise of the Equity Subscription Rights.

A U.S. Holder that elects not to exercise its Equity Subscription Rights may be entitled to claim a capital loss equal to the amount of tax basis allocated to the Equity Subscription Rights. The deductibility of capital losses is subject to certain limitations.

(iv)    **Debt Subscription Rights**

A U.S. Holder that exercises Debt Subscription Rights received pursuant to the Plan should be treated as purchasing, in exchange for the value at issuance of such Debt Subscription Rights and the amount of Cash funded by the U.S. Holder to exercise such Debt Subscription Rights, the Debt Rights Offering Securities. Such a purchase should generally be treated as the exercise of an option under general tax principles, and accordingly such U.S. Holder should not recognize income, gain, or loss for U.S. federal income tax purposes upon such exercise. A U.S. Holder's aggregate tax basis in the Debt Rights Offering Securities should equal the sum of (1) the amount of Cash paid by the U.S. Holder to exercise its Debt Subscription Rights and (2) such U.S. Holder's tax basis in the Debt Subscription Rights immediately before exercise, determined as set forth above. While not free from doubt, a U.S. Holder's holding period for the Debt Rights Offering Securities received should begin on the day following the exercise. U.S. Holders should consult their tax advisors regarding the tax consequences of exercising Debt Subscription Rights, including the appropriate holding period for the Debt Rights Offering Securities and alternative characterizations of the exercise of the Debt Subscription Rights.

A U.S. Holder that elects not to exercise its Debt Subscription Rights may be entitled to claim a capital loss equal to the amount of tax basis allocated to the Debt Subscription Rights. The deductibility of capital losses is subject to certain limitations.

(v)    **New Common Shares**

*Distributions on New Common Shares*

Any distributions made on the New Common Shares will constitute dividends for U.S. federal income tax purposes to the extent of applicable current or accumulated earnings and profits as determined under U.S. federal income tax principles. To the extent that a U.S. Holder receives distributions on the New Common Shares that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares of the New Common Shares (but not below zero). Any such distributions in excess of the U.S. Holder's basis generally will be treated as capital gain. Any such dividend may be eligible for the dividends-received deduction if the U.S. Holder is an otherwise qualifying corporate U.S. Holder and certain conditions are met. Dividends received by non-corporate U.S. Holders may be subject to U.S. federal income tax at lower rates than other types of ordinary income if certain conditions are met. U.S. Holders should consult their own tax advisors regarding their qualification for the dividends-received deduction and the lower rates on dividends.

*Sale, Redemption, or Repurchase of New Common Shares*

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the New Common Shares. Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder held the New Common Shares for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates.  The deductibility of capital losses is subject to certain limitations.

## 2.    U.S. Federal Income Tax Consequences to U.S. Holders of General Unsecured Claims

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of General Unsecured Claims, in the event the Holders of such claims vote to accept the Plan, each Holder thereof will receive a GUC Trust Interest, which shall entitle each holder of an Allowed Unsecured Claim to receive its Pro Rata share of the GUC Trust Assets after the GUC Trust Expenses have been paid in full or otherwise reserved.  As described above, the GUC Trust is intended to be treated as a liquidating trust within the meaning of Treasury Regulations section 301.7701-4(d).  Therefore, each U.S. Holder of a General Unsecured Claim should be treated for U.S. federal income tax purposes as receiving pursuant to the Plan (i) its Pro Rata share of $5.0 million in Cash (such Holder's "**Closing Amount**") and (ii) its Pro Rata share of an additional $5.0 million in Cash, payable within a to-be-specified period of time after, and in the event that, the Reorganized Debtors' 2024 Adjusted EBITDA exceeds $250 million (any contingent right to payment under clause (i) or (ii) after the initial distribution of Cash, the "**Contingent Right**").  In addition, U.S. Holders of the GUC Trust Interests will be treated as owning an applicable portion of the GUC Trust Assets for U.S. federal income tax purposes and generally will be allocated any items of income, gain, loss or deduction attributable to such portion (other than to the extent allocable to Disputed General Unsecured Claims).  In the event the Holders of General Unsecured Claims vote to reject the Plan, each General Unsecured Claim will be extinguished and entitled to no recovery.

The U.S. federal income tax obligations of a holder with respect to its GUC Trust Interests are not dependent on the GUC Trust distributing any Cash or other proceeds.  Thus, a holder may incur a U.S. federal income tax liability with respect to its allocable share of GUC Trust income even if the GUC Trust does not make a concurrent distribution to the holder.  In general, other than in respect of Cash retained on account of Disputed General Unsecured Claims and distributions resulting from undeliverable distributions (the subsequent distribution of which still relates to a holder's Allowed Claim), a distribution of Cash by the GUC Trust will not be separately taxable to a holder of GUC Trust interests since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the Cash was earned or received by the GUC Trust).

Taxable income or loss allocated to a holder of GUC Trust Interests (other than with respect to the initial contribution of the GUC Trust Assets, distributions from the GUC Trust Claims Reserve, distributions resulting from undeliverable distributions, and any payments pursuant to the Contingent Right, the tax treatment of which is described in more detail below) generally will be treated as income or loss with respect to such holder's undivided interest in the underlying assets

of the trust, and not as income or loss with respect to its prior Allowed Claim.  The character of any income and the character and ability to use any loss will depend on the particular situation of the holder.

If the Holders of the General Unsecured Claims vote to reject the Plan, then, generally, a U.S. Holder may be entitled to claim a loss or deduction to the extent of its adjusted basis in the General Unsecured Claim.  Such loss may be subject to limitation, and U.S. Holders of General Unsecured Claims are urged to consult their own tax advisors regarding the consequences to them in the event that the General Unsecured Claims are extinguished and receive no recovery.  The remainder of this discussion assumes that the Holders of the General Unsecured Claims vote to accept the Plan.

The receipt of the Closing Amount and the Contingent Right by a U.S. Holder of a General Unsecured Claim pursuant to the Plan generally will be a taxable transaction for U.S. federal income tax purposes, except that such payments under the Plan to a U.S. Holder with respect to damages on account of personal physical injuries or physical sickness generally will not be includable in such U.S. Holder's gross income pursuant to section 104 of the Tax Code, and certain other exceptions may apply depending on the particular circumstances of the U.S. Holder and the nature of the General Unsecured Claim.  The amount of gain or loss a U.S. Holder recognizes, and the timing and potential character of a portion of such gain or loss, depends on the U.S. federal income tax treatment of the Contingent Right, which is subject to uncertainty, and whether a U.S. Holder is eligible to report any gain under the installment sale rules.  The availability of installment sale treatment with respect to any gain on the exchange of a General Unsecured Claim is also uncertain and may depend on the nature of the particular General Unsecured Claim.

In addition, in the event of the subsequent disallowance of any Disputed General Unsecured Claim, it is possible that a Holder of a previously Allowed General Unsecured Claim may receive additional distributions in respect of its Claim. Distributions from the GUC Trust Claims Reserve should generally be treated for U.S. federal income tax purposes as additional payments in satisfaction of applicable Allowed General Unsecured Claims, except that a portion of such distributions may be treated as interest income under the imputed interest provisions of the Tax Code.  Accordingly, it is possible that the recognition of any loss realized by a Holder with respect to an Allowed General Unsecured Claim may be deferred until all General Unsecured Claims are allowed or disallowed.  Alternatively, it is possible that a Holder will have additional gain in respect of any additional distributions received in respect of its Allowed General Unsecured Claim.  Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of any subsequent distributions of Cash originally retained by the GUC Trust on account of Disputed General Unsecured Claims.  See also Section B.2 above ("—Treatment of the GUC Trust and GUC Trust Claims Reserve").

Installment sale treatment with respect to the satisfaction of a General Unsecured Gain would generally result in the recognition of gain to a U.S. Holder as amounts (including the Closing Amount) are paid.  Special rules apply to installment sales in which the total amount to be realized is contingent and some of these rules may, in certain circumstances, provide for disadvantageous recovery of a Holder's basis.  A portion of amounts paid after one year generally will be treated as imputed interested, and additional interest charges could apply in certain circumstances.  If installment sale treatment were available to a U.S. Holder, such treatment would apply unless such

U.S. Holder affirmatively elected out of such treatment. The discussion below assumes that installment sale treatment is not applicable or a U.S. Holder affirmatively elects for installment sale treatment not to apply.

The receipt of the Contingent Right may be treated as a "closed transaction" (as described below) if the fair market value of the Contingent Right is reasonably ascertainable or as an "open transaction" (as described below) if the fair market value of the Contingent Right cannot be reasonably ascertained. It is possible that a trading value of an applicable Claim would be considered along with other factors in determining whether the value of the Contingent Right is reasonably ascertainable. Additionally, Treasury Regulations state that only in "rare and extraordinary" cases would the value of contingent payment obligations not be reasonably ascertainable. Because the Plan requires the GUC Trustee to determine the fair market value of the portion of the GUC Trust Assets that is treated for U.S. federal income tax purposes as having been transferred to each GUC Trust Beneficiary (and that all applicable parties utilize such fair market value for all U.S. federal income tax purposes), while not free from doubt, it is expected that the receipt of the Contingent Right will be treated as a closed transaction.

Each U.S. Holder should consult its tax advisor regarding the availability and application of the installment sale method, the ability to elect out of the installment method, whether the exchange of a General Unsecured Claim for the Closing Amount and the Contingent Right should be treated as an "open transaction" or "closed transaction," and the consequences of each such treatment.

*Treatment as Closed Transaction*

If the receipt of the Contingent Right is treated as part of a closed transaction for U.S. federal income tax purposes, other than with respect to any amounts received that are attributable to accrued interest (as described below), such U.S. Holder generally would recognize gain or loss from the satisfaction of a General Unsecured Claim in an amount equal to the difference between (1) the sum of the fair market value of the Contingent Right and the Closing Amount received for such General Unsecured Claim and (2) the U.S. Holder's basis in the General Unsecured Claim. A U.S. Holder's initial tax basis in the Contingent Right received pursuant to the Plan would equal the fair market value of such Contingent Right as determined for U.S. federal income tax purposes. The character of such gain as capital gain or ordinary income will be determined by a number of factors including the tax status of the U.S. Holder and the rules regarding "market discount" (as discussed below) and accrued interest. If recognized gain or loss is capital in nature, it generally would be long-term capital gain or loss if the U.S. Holder held its Claim for more than one year at the time of the disposition. The deductibility of capital losses is subject to certain limitations.

The amount, timing and character of any gain, income or loss with respect to payments of cash pursuant to the Contingent Right following the Effective Date would be uncertain. For example, amounts received in respect of the Contingent Right could be treated in whole or in part as payments with respect to a sale or exchange of a capital asset or as giving rise to ordinary income. In addition, it is unclear how a U.S. Holder would recover its adjusted tax basis with respect to the Contingent Right. It is also possible that, were a payment to be treated as being with respect to the sale of a capital asset, a portion of such payment would constitute imputed interest (as described below under "—*Treatment as Open Transaction*").

*Treatment as Open Transaction*

If the receipt of a Contingent Right is treated as an "open transaction" for U.S. federal income tax purposes, the Contingent Right would not result in additional gain to a U.S. Holder at the time the Contingent Right is received pursuant to the Plan, and the U.S. Holder would have no tax basis in the Contingent Right. Consequently, upon receipt of the Closing Amount and the Contingent Right in satisfaction of a General Unsecured Claim, other than with respect to any amounts received that are attributable to accrued interest (as described below), a U.S. Holder would generally recognize gain, but not loss, in an amount equal to the excess (if any) of (a) the Closing Amount for such General Unsecured Claim over (b) the U.S. Holder's adjusted tax basis in the General Unsecured Claim.

The U.S. Holder would then take payments pursuant to the Contingent Right into account when made or deemed made in accordance with the U.S. Holder's regular method of accounting for U.S. federal income tax purposes. A portion of any payments made more than one year after the Effective Date should be treated as interest income (as discussed below) and the balance, in general, as additional consideration for the disposition of the General Unsecured Claim.

Payments of cash pursuant to the Contingent Right that are not treated as imputed interest will generally result in gain to the U.S. Holder if, and to the extent, such amounts (plus the Closing Amount for such General Unsecured Claim) exceed the U.S. Holder's adjusted tax basis in the General Unsecured Claim. A U.S. Holder may recognize loss if the amounts received with respect to a General Unsecured Claim (including the Closing Amount) do not in the aggregate equal or exceed the U.S. Holder's adjusted basis in the General Unsecured Claim, although the U.S. Holder generally will not be able to recognize such loss until the resolution of all contingencies with respect to the Contingent Right or possibly until such U.S. Holder's abandonment of the Contingent Right.

The character of such gain as capital gain or ordinary income will be determined by a number of factors including the tax status of the U.S. Holder and the rules regarding "market discount" (as discussed below) and accrued interest. If recognized gain or loss is capital in nature, it generally would be long-term capital gain or loss if the U.S. Holder held its Claim for more than one year at the time of the disposition. The deductibility of capital losses is subject to certain limitations.

The portion of any payment made with respect to a Contingent Right treated as imputed interest generally will be determined at the time such payment is made and should equal the excess of (1) the amount of the Contingent Right over (2) the present value of such amount as of the Effective Date, calculated using the applicable federal rate as the discount rate. The applicable federal rate is published monthly by the IRS. Such imputed interest is taxable as ordinary interest income.

### 3.    <u>Accrued Interest</u>

A portion of the consideration received by U.S. Holders of Claims may be attributable to accrued interest on such Claims. Such amount should be taxable to that U.S. Holder as ordinary interest income if such accrued interest has not been previously included in the U.S. Holder's gross

income for U.S. federal income tax purposes.  Conversely, U.S. Holders of Claims may be able to recognize a deductible loss to the extent that any accrued interest on the Claims was previously included in the U.S. Holder's gross income but is not paid.  Such loss may be ordinary, but the tax law is unclear on this point.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued but unpaid interest is unclear.  Under Section 6.13 of the Plan, the aggregate consideration to be distributed to U.S. Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to interest that accrued on such Claims, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest.  The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than first to the principal amount of Allowed Claims as provided in the Plan.  Holders of Claims are urged to consult their respective tax advisors regarding the proper allocation of the consideration received by them under the Plan between principal and accrued interest.

### 4.    Market Discount

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of an Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest," or (b) in the case of a debt instrument issued with OID, its revised issue price (which is the sum of the issue price of the debt instrument and all OID includible in the income of holders with respect such debt instrument prior to the U.S. Holder's acquisition of the debt instrument), in each case, by at least a *de minimis* amount (generally equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of an Allowed Claim (as described above) that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

### D.    Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of 10.5% Secured Notes Claims

The following discussion of U.S. federal income tax consequences applies only to Non-U.S. Holders of 10.5% Secured Notes Claims and assumes that the Debtors will undertake the Restructuring Transactions contemplated by the Plan (including the Plan Supplement).  The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex.  Each Non-

U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S. income and other tax consequences of the consummation of the Plan to such Non-U.S. Holder and the ownership and disposition of Takeback HoldCo Notes, Equity Subscription Rights, Debt Subscription Rights, the New Common Shares and Debt Rights Offering Securities, as applicable.

1.    **Gain Recognition**

Subject to the discussion under Section F below regarding backup withholding, any gain realized by a Non-U.S. Holder on the exchange of its 10.5% Secured Notes Claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or, if applicable, a lower treaty rate) on the gain recognized, which may be offset by certain U.S. source capital losses.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder.  In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or, if applicable, a lower treaty rate) of its effectively connected earnings and profits (that, if required by an applicable income tax treaty, are attributable to a permanent establishment within the United States) for the taxable year, subject to certain adjustments.

2.    **Interest.**

Subject to the discussions below under Section E regarding FATCA and under Section F regarding backup withholding, payments made to a Non-U.S. Holder under the Plan that are attributable to accrued interest with respect to a 10.5% Secured Notes Claim or OID accruals on the Takeback HoldCo Notes and the Debt Rights Offering Securities generally will not be subject to U.S. federal income or withholding tax, provided that (a) such Non-U.S. Holder is not a bank, (b) such Non-U.S. Holder does not actually or constructively own 10 percent or more of the total combined voting power of all classes of the stock of any of the Debtors, (c) such Non-U.S. Holder is not a "controlled foreign corporation" with respect to which an applicable Debtor is a "related person," each within the meaning of the Tax Code, (d) such payment is not effectively connected with the conduct by such Non-U.S. Holder of a U.S. trade or business (or, if required by an applicable income tax treaty, is not attributable to a permanent establishment within the United States), and (e) the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E, as applicable) establishing that the Non-U.S. Holder is not a U.S. person.  If the interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (and, if required by an applicable income tax treaty, is attributable to a permanent establishment within the United States), (x) the payment of such interest generally will not be subject to U.S. federal withholding tax as long as the Non-U.S. Holder provides a properly completed and executed IRS Form W-8ECI (or successor form) to the withholding agent, but (y) the Non-U.S. Holder generally will be subject to

U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes also may be subject to a branch profits tax equal to 30 percent (or, if applicable, a lower treaty rate) of its effectively connected earnings and profits (that, if required by an applicable income tax treaty, are attributable to a permanent establishment within the United States) for the taxable year, subject to certain adjustments.

A Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to the payment of interest generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or, if applicable, a lower treaty rate) on such payment. For purposes of providing a properly completed and executed IRS Form W-8BEN or W-8BEN-E, as applicable, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

### 3. Exercise of Equity Subscription Rights or Debt Subscription Rights

A Non-U.S. Holder will generally not be subject to U.S. federal income tax upon the exercise of an Equity Subscription Right or Debt Subscription Right.

### 4. Distributions on New Common Shares

Any distributions made with respect to New Common Shares that constitute dividends for U.S. federal income tax purposes (*see* Section C above for a discussion of when distributions will result in dividends, a reduction in the Non-U.S. Holder's tax basis in the New Common Shares or gain from the sale or exchange of New Common Shares for U.S. federal income tax purposes) that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or, if an income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal withholding tax at a rate of 30 percent (or, if applicable, a lower treaty rate). In addition, the applicable withholding agent may generally withhold on the entire distribution (including any portion that is not treated as a dividend), in which case a Non-U.S. Holder generally would be entitled to a refund from the IRS by timely filing an appropriate claim for a refund, to the extent the withholding exceeds such Non-U.S. Holder's tax liability with respect to the distribution. A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E, as applicable (or an applicable successor form), upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to New Common Shares held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and, if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes also may be subject to a branch profits tax equal to 30 percent (or, if applicable, a lower treaty rate) of its effectively connected earnings and profits (that, if required by an applicable income tax treaty, are attributable to a permanent establishment within the United States) for the taxable year, subject to certain adjustments.

5. **Sale, Redemption, or Repurchase of Takeback HoldCo Notes, Equity Subscription Rights, Debt Subscription Rights, New Notes or New Common Shares**

Subject to the discussions below under Section E regarding FATCA and under Section F regarding backup withholding, a Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of New Notes, Equity Subscription, Debt Subscription Rights, or New Common Shares unless: (1) such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition and certain other conditions are met; (2) such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or (3) in the case of New Common Shares (and, potentially, the Equity Subscription Rights), Reorganized Holdings is or has been during a specified testing period a "U.S. real property holding corporation" ("**USRPHC**") for U.S. federal income tax purposes.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or, if applicable, a lower treaty rate) on the gain recognized, which may be offset by certain U.S. source capital losses. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes also may be subject to a branch profits tax equal to 30 percent (or, if applicable, a lower treaty rate) of its effectively connected earnings and profits (that, if required by an applicable income tax treaty, are attributable to a permanent establishment within the United States) for the taxable year, subject to certain adjustments.

If the third exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax on any gain recognized on the disposition of all or a portion of its New Common Shares (and, potentially, the Equity Subscription Rights) under the Foreign Investment in Real Property Tax Act ("**FIRPTA**"). Taxable gain from the disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and such Non-U.S. Holder's adjusted tax basis in such interest) will constitute effectively connected income. Further, the buyer of the New Common Shares (and, potentially, the Subscription Rights) may be required to withhold a tax equal to 15 percent of the amount realized on the sale. The amount of any such withholding would be allowed as a credit against the Non-U.S. Holder's federal income tax liability and may entitle the Non-U.S. Holder to a refund, provided that the Non-U.S. Holder properly and timely files a tax return with the IRS. In general, the FIRPTA provisions will not apply to the New Common Shares if (a) the Non-U.S. Holder does not directly or indirectly own more than 5 percent of the value of the New Common Shares during a specified testing period, and (b) the New Common Shares are regularly traded on an established securities market.

The Debtors do not believe that Holdings is a USRPHC and do not currently anticipate that Reorganized Holdings will become a USRPHC. However, there can be no assurance that Reorganized Holdings will not become a USRPHC in the future.

### E.    FATCA

Sections 1471 through 1474 of the Tax Code and the Treasury Regulations and administrative guidance issued thereunder (referred to as "**FATCA**") generally impose a 30% withholding tax on certain "withholdable payments" to certain foreign entities, unless such foreign entities satisfy specific information reporting or other compliance provisions or an exemption applies.  For this purpose, "withholdable payments" generally include U.S.-source payments of fixed or determinable, annual or periodical income (generally including dividends, if any, on shares of New Common Shares and interest (including any OID) paid in respect of debt instruments issued by the Debtors).  FATCA withholding tax will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax.

Prior to the issuance of proposed Treasury Regulations, withholding under FATCA would have also applied to payments of gross proceeds from the sale or other disposition of property of a type which can produce U.S. source interest or dividends on or after January 1, 2019.  However, the proposed Treasury Regulations generally eliminate FATCA withholding on payments of gross proceeds.  Taxpayers generally may rely on these proposed Treasury Regulations until final Treasury Regulations are issued.

**BOTH U.S. HOLDERS AND NON-U.S. HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS REGARDING THE POSSIBLE IMPACT OF THESE RULES ON SUCH HOLDERS' EXCHANGE OF ANY OF ITS CLAIMS PURSUANT TO THE PLAN OR ON THE OWNERSHIP OF TAKEBACK HOLDCO NOTES, EQUITY SUBSCRIPTION RIGHTS, DEBT SUBSCRIPTION RIGHTS, DEBT RIGHTS OFFERING SECURITIES, NEW COMMON SHARES OR CONTINGENT RIGHTS.**

### F.    Information Reporting and Backup Withholding

In general, information reporting requirements may apply to distributions or payments made (or deemed made) to a Holder of a Claim under the Plan or for or with respect to, or with respect to OID accruals (as applicable) on, Takeback HoldCo Notes, Equity Subscription Rights, Debt Subscription Rights, Debt Rights Offering Securities, New Common Shares or a Contingent Right.  Copies of these information returns may also be made available to the tax authorities in a country in which a Non-U.S. Holder resides under the provisions of an applicable income tax treaty.  Additionally, under the backup withholding rules, such payments or distributions may be subject to backup withholding unless, in the case of a U.S. Holder, such U.S. Holder provides a properly completed and executed IRS Form W-9 and, in the case of a Non-U.S. Holder, such Non-U.S. Holder provides a properly completed and executed applicable IRS Form W-8 (or otherwise establishes eligibility for an exemption).  The current backup withholding rate is 24 percent.  Backup withholding is not an additional tax.  The amount of any backup withholding will generally be allowed as a credit against the Holder's U.S. federal income tax liability and may entitle the Holder to a refund, provided that the Holder timely furnishes the required information to the IRS.

### G.    Transaction Reporting by Holders of Claims

The Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, for example, "reportable transactions," which include certain transactions that result in the taxpayer's

claiming a loss in excess of specified thresholds, and certain transactions in which gain or loss is not recognized in whole or in part. Each Holder is urged to consult its tax advisors regarding these Treasury Regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure by the Holder to the IRS.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM, NEW COMMON SHARE, TAKEBACK HOLDCO NOTE, EQUITY SUBSCRIPTION RIGHT, DEBT SUBSCRIPTION RIGHT, DEBT RIGHTS OFFERING SECURITY, OR GUC TRUST INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS, NEW COMMON SHARES, TAKEBACK HOLDCO NOTES, EQUITY SUBSCRIPTION RIGHTS, DEBT SUBSCRIPTION RIGHTS, DEBT RIGHTS OFFERING SECURITIES, AND GUC TRUST INTERESTS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM UNDER THE PLAN AND WITH RESPECT TO NEW COMMON SHARES, TAKEBACK HOLDCO NOTES, EQUITY SUBSCRIPTION RIGHTS, DEBT SUBSCRIPTION RIGHTS, DEBT RIGHTS OFFERING SECURITIES AND GUC TRUST INTERESTS, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL AND NON-U.S. INCOME OR OTHER TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## IX.    RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

**THE DEBTORS HAVE PROVIDED THE FOLLOWING RISK FACTOR DESCRIPTIONS TO SATISFY THE DISCLOSURE REQUIREMENTS OF SECTION 1125 OF THE BANKRUPTCY CODE.    DISCLOSURE AND DISCUSSION OF ADDITIONAL RISK FACTORS RELATED TO THE DEBTORS' BUSINESS MAY BE FOUND ON THE INVESTOR PORTAL OF THE DEBTORS' WEBSITE.**

### A.    Certain Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims or Allowed Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

#### 1.    Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 2.    The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent.  If such conditions precedent are not met or not waived, the Effective Date will not take place.

#### 3.    The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction.  There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Allowed Claims or Interests as those proposed in the Plan and the Debtors do not believe that any

such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

### 4.        The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim or Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Allowed Claims and Interests against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan and the Restructuring Support Agreement, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan.  Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 5.        Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased professional expenses.

### 6.    Continued Risk upon Confirmation

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for oil and natural gas (and thus demand for the services the Debtors provide), and increasing expenses.  *See* Article IX.D of this Disclosure Statement, entitled "Risks Related to the Debtors' and the Reorganized Debtors' Businesses." Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed.  As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization as reflected in the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan.  The Debtors will have retained the exclusive right to propose the Plan upon filing their Petitions.  If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve Confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases.  Adequate funds may not be available when needed or may not be available on favorable terms.

### 7.    The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, when commodities prices are volatile, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

8. **The Debtors May Object to the Amount or Classification of a Claim or Interest**

Except as otherwise provided in the Plan, and subject to the terms of the Restructuring Support Agreement, the Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim or Interest where such Claim or Interest is subject to an objection.  Any Holder of a Claim or Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.  Further, parties in interest may object to the amount or classification of any Claim or Interest under the Plan in accordance with the Bankruptcy Code.

9. **Risk of Non-Occurrence of the Effective Date**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

10. **Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan**

The distributions available to Holders of Allowed Claims or Existing Interests under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims or Existing Interests to be subordinated to other Allowed Claims or Existing Interests.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims and Interests may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims and Interests may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time the number or amount of Claims and Interests that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims and Interests under the Plan.

11. **Releases, Injunctions, and Exculpations Provisions May Not Be Approved**

Article X of the Plan provides for certain releases (including third-party releases), injunctions, and exculpation of claims and causes of action that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable, all as set forth more fully in the Plan.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties is necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts and have agreed to make further contributions, including by agreeing to massive reductions in the amounts of their Claims against the Debtors' estates and facilitating a critical source of post-emergence liquidity by backstopping the Rights Offering and the Exit Notes and committing to the Direct Allocation, but only if they receive the full benefit of the Plan's release and exculpation provisions. The Plan's release and exculpation provisions are an inextricable component of the Restructuring Support Agreement and Plan and the significant deleveraging and financial benefits that they embody.

## 12.    The Backstop Agreements May Not Be Approved

The Debtors and Commitment Parties have entered into the Equity Backstop Agreement and Debt Backstop Agreement in order to backstop the Equity Rights Offering and Debt Rights Offering that will be conducted in accordance with the Plan and have moved for Bankruptcy Court approval of such agreements by way of the Backstop Motion. While certain parties, including the Creditors' Committee, have objected to the approval of the Debtors' motion to approve the Backstop Agreements, the Debtors and the Ad Hoc Noteholder Group have continued to work diligently with the objecting parties and as a result, the Ad Hoc Noteholder Group, Bayside and Cerberus, and Mockingbird have reached an agreement in principle to resolve their objections, subject to definitive documentation. Accordingly, the Debtors are moving forward with a hearing on the Backstop Motion, which is scheduled for September 29, 2022 at 3:00 p.m. (prevailing eastern time).

While the Debtors believe that the Backstop Agreements are reasonable and necessary to effectuate the Restructuring Transactions, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Should the Bankruptcy Court deny the Debtors' Backstop Motion and approval of the Backstop Agreements, the decision may cause a default under the RSA or the Term DIP Facility. Additionally, should the objecting parties prevail, the Bankruptcy Court's decision not to approve the Backstop Agreement may render the Debtors unable to prove that the Plan is feasible or confirmable and the Bankruptcy Court may deny confirmation of the Plan.

## 13.    Ad Hoc Noteholder Group Reservation of Rights

The 10.5% Notes were issued by Debtor TPC Group Inc. and guaranteed by each of the other Debtors, and the holders of the 10.5% Notes have asserted a Claim for the full amount of the principal, make-whole and accrued prepetition interest on such notes against Debtor TPC Group Inc. and each of the other Debtors. In the event that the Plan is not confirmed, Holdings and each of the other Debtors may be liable for the full amount of at least approximately $1.098 billion of 10.5% Notes Claims pursuant to the 10.5% Notes Indenture and Holdings' guarantee of the 10.5% Notes.

### B.    Risks Related to Recoveries under the Plan

#### 1.    The Reorganized Debtors May Not Be Able to Achieve Their Projected Financial Results

The Reorganized Debtors may not be able to achieve their projected financial results.  The financial projections set forth in this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular (the "**Financial Projections**").  The Financial Projections are attached hereto as **Exhibit D**.  While the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized.  If the Debtors do not achieve their projected financial results, the value of the New Common Shares may be negatively affected and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date.  Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

#### 2.    The New Common Shares Are Subject to Dilution

The New Common Shares distributed on the Effective Date under the Plan, the Equity Rights Offering and the Backstop Agreements, as applicable, will be subject to dilution by any securities that may be issued post-emergence, including in connection with the Management Incentive Plan and any other future issuance of Securities (subject to the terms of the New Corporate Governance Documents).

#### 3.    Certain Tax Implications of the Plan

Holders of Allowed Claims and Interests should carefully review Article VIII of this Disclosure Statement, entitled "Certain U.S. Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan, the Plan Supplement and the Chapter 11 Cases and the ownership of any property received pursuant thereto (including the fact that the Takeback HoldCo Notes, Debt Rights Offering Securities and Debt Direct Allocation Securities are expected to be issued with more than a *de minimis* amount of OID for U.S. federal income tax purposes) may adversely affect the Reorganized Debtors and Holders of Claims and Interests entitled to vote on the Plan.

#### 4.    The Debtors May Not Be Able to Accurately Report Their Financial Results

The Debtors have established internal controls over financial reporting.  However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud.  Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements.  If the Debtors fail to maintain the adequacy of their internal

controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required for the Debtors' financial reporting under the terms of the agreements governing the Debtors' indebtedness. Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition. Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

C.    **Risk Factors Relating to Ownership of New Common Shares and HoldCo Notes**

1.    **Market for Securities**

There is currently no market for the New Common Shares or the HoldCo Notes, and there can be no assurance as to the development or liquidity of any market for any such securities.

Except as my be set forth in the New Corporate Governance Documents, the Reorganized Debtors are under no obligation to list the New Common Shares or the HoldCo Notes on any national securities exchange. Therefore, there can be no assurance that any of the foregoing securities will be tradable or liquid at any time after the Effective Date. If a trading market does not develop or is not maintained, holders of the foregoing securities may experience difficulty in reselling such securities or may be unable to sell them at all. Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in the Disclosure Statement depending upon many factors including prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for the Reorganized Debtors. Accordingly, holders of these securities may bear certain risks associated with holding securities for an indefinite period of time

2.    **The Valuation of New Common Shares Not Intended to Represent Trading Value of New Common Shares**

The valuation of the Reorganized Debtors is not intended to represent the trading value of New Common Shares in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things: (a) prevailing interest rates; (b) conditions in the financial markets; (c) the anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis; and (d) other factors that generally influence the prices of securities. The actual market price of the New Common Shares is likely to be volatile. Many factors, including factors unrelated to the Reorganized Debtors' actual operating performance and other factors not possible to predict, could cause the market price of the New Common Shares to rise and fall. Accordingly, the value, stated herein and in the Plan, of the securities to be issued does not necessarily reflect, and should not be construed as reflecting, values that will be attained for the New Common Shares in the public or private markets.

3.      **The New Common Shares Being Issued Pursuant to the Equity Rights Offering and the Equity Direct Allocation Are Being Issued at a Significant Discount**

Pursuant to the Equity Rights Offering and the Equity Direct Allocations, the Debtors are issuing New Common Shares that in the aggregate will constitute approximately 99.9% of the New Common Shares, at a price of $13.00 per share.  This purchase price reflects a 35% discount to the plan equity value of Reorganized Holdings.  Persons that do not purchase New Common Shares (other than the Equity Direct Allocation Securities) through the Equity Rights Offering will not receive the value associated with this discount.

4.      **The New Common Shares Issued Pursuant to the Equity Rights Offering and the Backstop Agreements, as Applicable, Will Be Restricted Securities**

The New Common Shares issued pursuant to the Equity Rights Offering, the Equity Backstop Agreement and the Debt Backstop Agreement (including the Equity Put Option Securities and Debt Put Option Securities) will be issued in reliance on Section 4(a)(2) of the Securities Act of 1933.  Because these securities will not have been registered under the Securities Act or applicable state securities laws, and will not benefit from the exemption from registration afforded by section 1145 of the Bankruptcy Code, the New Common Shares issuable in the Equity Rights Offering and pursuant to the Equity Backstop Agreement and the Debt Backstop Agreement will be subject to trading restrictions under applicable federal and, possibly state, securities laws.

5.      **HoldCo Notes Issued Pursuant to the Debt Rights Offering and the Debt Backstop Agreement Will Be Restricted Securities**

The HoldCo Notes issued pursuant to the Debt Rights Offering and the Debt Backstop Agreement will be issued only to Qualified Institutional Buyers or non-U.S. Persons in reliance on Section 4(a)(2) of the Securities Act of 1933.  Because these securities will not have been registered under the Securities Act or applicable state securities laws, the HoldCo Notes issuable in the Debt Rights Offering and pursuant to the Debt Backstop Agreement will be subject to trading and resale restrictions under Rule 144 and applicable federal and state securities laws

6.      **Holders of 10.5% Secured Notes Claims Must Tender Such Notes as Part of the Equity Rights Offering and the Debt Rights Offering**

All Holders of 10.5% Secured Notes Claims are required to tender their notes to the subscription agent to the extent they are subscribing for New Common Shares and/or Holdco Notes in the Equity Rights Offering and/or the Debt Rights Offering.  As explained in the Rights Offering Procedures, once the notes are tendered, they may not be withdrawn, unless the Equity Rights Offering and/or the Debt Rights Offering are terminated or, in limited circumstances, the Holders are permitted to revoke the exercise of their subscription rights as set forth in the Rights Offering Procedures.  While it is currently contemplated that the Effective Date (at which time the Equity Rights Offering and the Debt Rights Offering will be consummated) will occur within a short time following the end of the subscription period for the Equity Rights Offering and the Debt Rights Offering, there can be no assurance that this will be the case.  Accordingly, tendering holders of

notes may not have access to their notes, and may not be able to transfer or trade their notes, for a considerable period of time during which the Plan will not have been consummated.

**D.**    **Risks Related to the Debtors' and the Reorganized Debtors' Businesses**

**1.**    **The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness**

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control, including, without limitation, the continued impact of the COVID-19 pandemic. The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest on their indebtedness, including, without limitation, potential borrowings under the Exit Facility, upon emergence.

**2.**    **The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases**

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

3.   **Certain Significant Holders of Shares of New Common Shares May Have Substantial Influence Over the Reorganized Debtors Following the Effective Date**

Assuming that the Effective Date occurs, holders of Claims who receive distributions representing a substantial percentage of the outstanding shares of the New Common Shares may be in a position to influence matters requiring approval by the holders of shares of New Common Shares, including, among other things, the election of directors and the approval of a change of control of the Reorganized Debtors.  The holders may have interests that differ from those of the other holders of shares of New Common Shares and may vote in a manner adverse to the interests of other holders of shares of New Common Shares.  This concentration of ownership may facilitate or may delay, prevent, or deter a change of control of the Reorganized Debtors and consequently impact the value of the shares of New Common Shares.  A holder of a significant number of shares of New Common Shares may, on its own account, pursue acquisition opportunities that may be complementary to the Reorganized Debtors' business, and as a result, such acquisition opportunities may be unavailable to the Reorganized Debtors.  Such actions by holders of significant number of shares of New Common Shares may have a material adverse impact on the Reorganized Debtors' business, financial condition, and operating results.

4.   **Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses**

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization.  A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity.  So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations.  A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses.  In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization.  Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

5.      **Financial Results May Be Volatile and May Not Reflect Historical Trends**

The Financial Projections attached hereto as **<u>Exhibit D</u>** are based on assumptions that are an integral part of the projections, including Confirmation and Consummation of the Plan in accordance with its terms, the anticipated future performance of the Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors and some or all of which may not materialize.

In addition, unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Debtors' operations.  These variations may be material and may adversely affect the value of the New Common Shares and the ability of the Debtors to make payments with respect to their indebtedness.  Because the actual results achieved may vary from projected results, perhaps significantly, the Financial Projections should not be relied upon as a guarantee or other assurance of the actual results that will occur.

Further, during the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as restructuring activities and expenses, contract terminations and rejections, and/or claims assessments significantly impact the Debtors' consolidated financial statements.  As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization.  The Debtors also may be required to adopt "fresh start" accounting in accordance with Accounting Standards Codification 852 ("**Reorganizations**") in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets.  The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.  The Financial Projections contained in **<u>Exhibit D</u>** hereto do not currently reflect the impact of fresh start accounting, which may have a material impact on the Financial Projections.

Lastly, the business plan was developed by the Debtors with the assistance of their advisors.  There can be no assurances that the Debtors' business plan will not change, perhaps materially, as a result of decisions that the board of directors may make after fully evaluating the strategic direction of the Debtors and their business plan.  Any deviations from the Debtors' existing business plan would necessarily cause a change in financial results.

6.      **The Debtors' Operations Depend on a Limited Number of Key Facilities, and The Loss or Shutdown of Operations at One or More of These Facilities Would Have a Material Adverse Impact**

Until the PNO Facility was shut down following an explosion on November 27, 2019, the Debtors operated two significant processing facilities, which are located in Houston, Texas, and Port Neches, Texas.  Following the PNO Incident, the PNO Facility was repurposed to function

solely as a storage and shipping terminal.  The loss or shutdown of operations over an extended period of time at the Debtors' remaining processing facility would have a material adverse effect on its financial condition, results of operations and cash flows.  The Debtors' operations, and those of its customers and suppliers, are subject to the usual hazards associated with chemical manufacturing and the related storage and transportation of feedstocks, products and wastes, including explosions, fires, inclement or extreme weather, natural disasters (including hurricanes and flooding), mechanical failure, pipeline leaks and ruptures, unscheduled downtime, transportation interruptions (including due to third party actions or events such as those resulting from the Dock Incident and the chemical fire at the Intercontinental Terminals Company terminal in 2019), chemical spills, discharges or releases of toxic or hazardous substances or gases and other environmental risks. These hazards can cause personal injury and loss of life, severe damage to or destruction of property and equipment and environmental damage, and may result in suspension of the Debtors' operations and the imposition of civil or criminal penalties.

### 7.     The Debtors' Substantial Liquidity Needs May Impact Revenue

The Debtors operate in a capital-intensive industry.  The Debtors' principal sources of liquidity historically have been cash flow from operations, borrowings under various bank-funded facilities, issuances of bonds, and issuances of securities.  If the Debtors' cash flow from operations remains depressed or decreases as a result of lower commodity prices, decreased E&P sector capital expenditures, or otherwise, the Debtors may not have the ability to expend the capital necessary to improve or maintain their current operations, resulting in decreased revenues over time.

In addition to the cash requirements necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with preparing for and administering the Chapter 11 Cases and expect to continue to incur significant professional fees and costs through the conclusion of the Chapter 11 Cases.  The Debtors cannot guarantee that cash on hand and cash flow from operations will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things:  (a) their ability to comply with the terms and conditions of any cash collateral order entered by the Bankruptcy Court in connection with the Chapter 11 Cases; (b) their ability to maintain adequate cash on hand; (c) their ability to generate cash flow from operations; (d) their ability to develop, confirm, and consummate a chapter 11 plan or other alternative restructuring transaction; and (e) the cost, duration, and outcome of the Chapter 11 Cases.  The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control.  In the event that cash on hand and cash flow from operations are not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing. The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms.  The Debtors' access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all.  The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

8.     **The Debtors May Not Have Access to Capital in Future Due to Changes in General Economic Conditions or the Reduction in Value of Their Assets**

The Debtors may need new or additional financing in the future to conduct its operations, expand its business, make acquisitions or refinance existing indebtedness.  Longer term volatility and disruptions in the capital and credit markets as a result of uncertainty, changing or increased regulation of financial institutions, reduced alternatives or failure of significant financial institutions could adversely affect access to the liquidity needed for the Debtors in the longer term.  Such disruptions could require the Debtors to take measures to conserve cash until the markets stabilize or until alternative credit arrangements or other funding for its business needs can be arranged.  Inflation and other disruptions in the capital and credit markets could result in higher interest rates on debt securities and increased costs under credit facilities.  Any further disruptions could increase the Debtors' interest expense and capital costs and could adversely affect its results of operations and financial condition, including the Debtors' ability to grow its business through acquisitions.

Because the Exit ABL Facility is asset-based, the availability under the facility will decrease if the value of the Debtors' trade accounts receivable or inventories decrease.  Any sustained weakness in general economic conditions and/or financial markets in the United States or globally could adversely affect the Debtors ability to raise capital on favorable terms or at all.

Finally, in periods of low demand or decreased feedstock supply, the negative effect on the Debtors financial condition may cause the feedstock suppliers with whom the Debtors do business to require shorter payment terms or require letters of credit to secure payment.  Complying with shorter payment terms or providing letters of credit would reduce the Debtors cash and/or the availability under the Exit ABL Facility.  Either of these outcomes would impact the Debtors liquidity, and could cause the Debtors to decrease its feedstock purchases or other expenditures, or otherwise negatively affect its financial condition and results of operations.

9.     **Cyclicality, Seasonality and Changes in the Petrochemicals Industry May Result in Reduced Volumes or Operating Margins**

The petrochemicals industry is cyclical and has historically experienced periodic downturns.  Profitability is highly sensitive to supply and demand cycles and product prices, among other factors.  The cycles are generally characterized by periods of strong demand, leading to high operating rates and margins, followed by periods of oversupply relative to demand, primarily resulting from significant capacity additions or decreases in demand, leading to reduced operating rates and lower margins.  Any significant downturn in or developments affecting demand for the end uses for the Debtors' products or in general economic conditions could result in a material reduction in demand and margins for the Debtors' products and could harm the Debtors' business.  The Debtors are unable to predict with certainty supply and demand balances, industry conditions, regulations, product standards and other factors that may affect industry operating margins and demand in the future.  In addition, because the Debtors compete in limited segments of the petrochemicals industry and have less diversified operations than most of the Debtors' competitors, a downturn in one or more of those specific segments may affect the Debtors more severely than the Debtors competitors who compete more broadly in the industry as a whole.

The Debtors may reduce production at or idle a facility or a particular unit at a facility for an extended period of time or discontinue a product line because of an oversupply of a particular product and/or a lack of demand for that particular product, or high feedstock prices that make production uneconomical.  In 2017, the Debtors significantly decreased production of HPIB at the Houston facility for the reasons described above.  Temporary idling or shutdowns sometimes last for several quarters or, in certain cases, longer, and cause the Debtor to incur costs, including the expenses of maintaining and restarting these facilities.  Factors such as increases in feedstock costs or lower demand in the future may cause the Debtor to further reduce capacity, idle facilities or discontinue product lines.

Lastly, the pricing under the Debtors' supply contracts and sales contracts is usually tied to a commodity price index, such as indices based on the price of unleaded regular gasoline, butane, isobutane or methanol, or to the price at which we sell the finished product.  The price for unleaded regular gasoline, typically used in pricing for butene-1 and raffinates, and the market price of MTBE varies seasonally as a result of increased demand during the spring and summer months of the year and decreased demand during the fall and winter months of the year.  As a result, the Debtors generally have increased volumes and margins for these products during the spring and summer and decreased volumes and margins during the fall and winter.

> **10.     Commodity Prices Are Volatile, and Sustained Volatility in the Petrochemicals Industry Could Materially Adversely Affect the Debtors' Businesses, Results of Operations, and Financial Condition**

The Debtors' revenues, profitability and the value of the Debtors' assets depend on the prices of raw material feedstocks and demand for its finished products.  In particular, feedstock costs and customer demand are susceptible to volatility in pricing and availability of crude oil, natural gas and oil-related products such as unleaded regular gasoline.  Prices for these products tend to be volatile as well as cyclical, as a result of particular product market dynamics, the chemical nature of these products (and their ability to be stored economically), global and local economic factors, worldwide political events, weather patterns and the economics of oil and natural gas exploration and production, among other factors.  In addition, the Debtor's ability to process raw material feedstock is driven by the composition of feedstock delivered to it by producers.  Raw material feedstock composition is in turn influenced by the economics of producing lighter feedstocks like NGLs or heavier feedstocks like naphtha.  When light feedstocks are inexpensive relative to heavier feedstock, ethylene crackers conduct primarily light cracking, a practice in which producers process light feedstocks instead of heavy feedstocks, which results in lower volumes of crude C4 available in the market and occasionally the Debtors' inability to meet 100% of its contractual sales commitments.

The cost of raw material feedstock is usually determined by application of index-based formulas contained in many of the Debtors' raw material supply contracts.  Through these index-based formulas, raw material costs are linked to commodity market indices (such as the published contract price for butadiene and indices based on the price of unleaded regular gasoline, butane, isobutane or methanol) or to the selling price of the related finished product.  The selling prices for the Debtors' finished products are also typically determined from index-based formulas contained in many of its sales contracts and, in most cases, the indices used to determine finished

product selling prices are the same indices used to determine the cost of the corresponding raw material feedstock.

The linkage between the costs of raw material feedstocks and the selling prices of the Debtors' finished products to the same indices mitigates, to varying degrees, the Debtors exposure to volatility in average material margin per pound (which the Debtor defines as the difference between average revenue per pound and average raw material cost per pound).  But, despite the fact that these index-based pricing formulas provide relative stability in average material margin per pound over time, the material margin percentage (which the Debtor defines as the difference between average revenue per pound and average raw material cost per pound as a percentage of average revenue per pound) tends to decline during periods in which selling prices and raw material costs trend upward and tends to increase during periods when selling prices and raw material costs trend downward due to various factors, including those listed below.

- The Debtors may purchase raw material feedstocks in one period based on market indices for that period, and then sell the related finished products in a later period based on market indices for the later period.  Changes in selling prices of finished products, based on changes in the underlying market indices between the period the raw material feedstocks are purchased and the related finished products are sold, lessens the effect of the matching indices and causes variation in the Debtors' average material margin per pound.  For example, the Debtor may purchase crude C4 at pricing based on the January butadiene index but sell the finished butadiene at pricing based on the February butadiene index.  If the butadiene index for January and February are the same, the Debtor would expect to realize substantially the same unit margins regardless of the absolute value of the index.  However, if the index increases between January and February, the Debtor would realize a temporary margin expansion until pricing stabilizes; and conversely, if the index decreases, the Debtor would realize a temporary margin contraction.  The magnitude of the effect on the average material margin per pound and the material margin percentage depends on the magnitude of the change in the underlying indices between the period the raw material is purchased and the period the finished product is sold and the quantity of inventory impacted by the change.

- Although most of the Debtors supply and sales contracts contain index-based formulas, varying proportions of raw material purchases and finished product sales are done on a spot basis or otherwise negotiated terms.  In addition, while many of the index-based formulas in the Debtors contracts are simply based on a percentage of the relevant index, others apply adjustment factors to the market indices that do not fluctuate with changes in the underlying index.  Although non-fluctuating adjustment factors would not impact the material margin per pound, they can impact the material margin percentage.  During periods when market indices are high, the use of non-fluctuating adjustment factors tends to reduce the material margin percentage; and conversely, during periods when market indices are low the non-fluctuating adjustment factors tend to increase the material margin percentage.

- Under some of the Debtors' raw material purchase contracts the cost of the raw materials are based on a percentage of the relevant market index and under some of our sales contracts the selling price of the related finished product is based on a higher

percentage of the same market index. As a result, the average material margin per pound tends to increase during periods in which the market indices are trending upward and tends to decrease during periods in which the market indices are trending downward, although the material margin percentage tends to be relatively constant.

- Finished product selling price formulas under some of the Debtors sales contracts, primarily in the Performance Products segment, are based on commodity indices not for the period in which the sale occurs but for either a prior or subsequent period. The effect on profit margins of these selling price formulas is diminished during times of relatively stable market indices, but can have a substantial effect on both the average material margin per pound and the material margin percentage during times of rapidly increasing or decreasing market indices.

Because the Debtors' contractual arrangements do not insulate them from all changes in commodity prices, volatile petrochemicals and unleaded gasoline markets can materially and adversely affect its material margin percentage and results of operations. Further, since producers are reluctant to increase production activities in a high-volatility commodities pricing environment, the pricing and availability of feedstocks and demand for the Debtors' products is affected as much by oil and natural gas price expectations as actual pricing. Other factors that affect the overall levels of feedstock production and customer demand include:

- the supply of and demand for oil and gas and market expectations for such supply and demand;

- actions of the Organization of Petroleum Exporting Countries and other oil producing countries to control prices or change production levels;

- increased supply of oil and gas resulting from onshore hydraulic fracturing activity and shale development;

- general economic conditions, both worldwide and in particular regions;

- governmental regulation;

- the price and availability of alternative fuels;

- weather conditions, including the impact of hurricanes and other weather-related phenomena;

- advances in exploration, development and production technology;

- the policies of various governments regarding exploration and development of their oil and gas reserves; and

- the worldwide political environment, including uncertainty or instability resulting from an escalation or additional outbreak of armed hostilities or other crises in the Middle

East, Ukraine, Russia or other geographic areas, or global threats of terrorism targeting oil and gas installations.

Crude oil prices have fluctuated significantly over the past few years, often with drastic moves in relatively short periods of time. While the Debtors saw an increase in both the demand for and price of crude oil throughout 2021, and a significant increase in price in the first half of 2022, it is not without continued uncertainty. Current global geopolitical and economic instability, particularly as it relates to the ongoing Russian invasion of Ukraine, continues to contribute to future uncertainty, and potential volatility, in financial and commodity markets. One example of such global economic forces impacting crude oil prices was the stalemate among Organization of Petroleum Exporting Countries ("**OPEC**") members and co-operating non-OPEC resource holders (the "**OPEC+ alliance**"), which ultimately ended in mid-2021 and was resolved when the OPEC+ alliance agreed to phase out the COVID-19 production cuts from August 2021 to December 2022. The Debtors expect that the OPEC+ alliance decision will cause the crude oil market to remain relatively tight in the near and medium-term, as this increased production will likely align with the higher global demand. The ongoing Russian invasion of Ukraine and resulting sanctions imposed on Russia, Russian companies and non-Russian companies controlled by Russia (or sanctioned Russian companies) by the European Union, the United States and other countries have further tightened the crude oil market and elevated commodity prices. Although such sanctions do not directly impact the Debtors' business or their customers, the effects of these measures may indirectly affect their business by affecting the price of crude oil, natural gas, natural gas liquids such as isobutane and oil-related products such as unleaded regular gasoline. Additionally, in order to address high oil prices, in March 2022 President Biden announced a plan to release 1 million barrels of oil a day for a period of 6 months from the U.S. Strategic Petroleum Reserve. The release from the U.S. Strategic Petroleum Reserve was available in the market beginning in May 2022. While the scope of impact on commodity prices is somewhat unclear, the continued release could have a downward effect.

Global demand for refined products and chemicals could impact the Debtors' operations and refined products, as well as crude pipelines that feed U.S. manufacturing demand. Likewise, changes in the global market for crude oil could affect their operations and require expansion capital expenditures. Demand for crude oil, natural gas, natural gas liquids such as isobutane and oil-related products may decline in the areas the Debtors serve as a result of decreased production by their customers, depressed commodity prices, decreased third-party investment in the industry, increased competition and other adverse economic factors. Other global events, such as the lingering impacts of the COVID-19 pandemic, could also affect the exploration, production and refining industries generally, which, indirectly, may affect their business.

In short, the Debtors face exposure to oil and natural gas price swings despite mitigation provided, to varying degrees, by the linkage between the costs of raw material feedstocks and the selling prices of finished products. The Debtors expect such volatility to continue in the future, especially given current economic and geopolitical conditions, and to affect availability and cost of raw material feedstock and demand for the Debtors' final products.

11.     **Failure to Obtain Suitable Quantities and Mix of Feedstock Could Materially Adversely Affect the Debtors' Performance and Cash Flows**

The Debtors' operation is subject to risks associated with fluctuations in feedstock supply in both the C4 Processing and the Performance Products segments.  Most of the Debtors' contracts with its crude C4 suppliers obligate the Debtor to purchase a percentage of the output from a given facility, as opposed to a fixed volume.  The contracts contain volume estimates, but the actual amount purchased varies based on what is actually produced by the supplier.  Additionally, for supply contracts that specify a fixed volume of feedstocks, as is the case for some agreements in the Performance Products segment, the suppliers are not always able to meet the fixed volume.

The amounts of feedstock produced by the Debtors' suppliers are not tied to the amounts needed to support the Debtors' customers.  If customer demand drops without a corresponding drop in supplier production, inventories may dramatically increase and result in significantly increased exposure to commodity price volatility.  Similarly, if supplier production decreases without a corresponding drop in customer demand, inventories may dramatically decrease, forcing the Debtor to allocate its own production and putting the Debtor at risk of default under its customer contracts.  Moreover, to the extent that the Debtors are unable to obtain additional feedstock from suppliers or other sources, the Debtors' ability to grow the business could be constrained.

Even if the Debtor can obtain raw material feedstock at cost effective prices, the quantity and type of such feedstock may not be sufficient to meet the Debtors' production needs.  Composition of the raw material feedstock varies greatly by production source.  A disproportionate mixture of one sub-component over another in raw material feedstock can directly affect the types and quantities of products the Debtors can produce.  While the Debtor contractually obligates most of its suppliers to certain minimum amounts of carbon compounds in the raw material feedstocks, there is typically an allowed margin of variability.  This creates uncertainty as to whether the Debtor will have enough of a particular sub-component to meet its production needs.  Finally, there is no guarantee that new sources of raw material feedstocks will have the same sub-component makeup as existing sources.

The Debtor anticipates that the relatively high cost of crude oil compared to the cost of natural gas in recent years may continue, especially in light of the abundance of shale natural gas being discovered and developed in the United States, and will drive continuation of light cracking.

12.     **Failure to Adequately Protect the Debtors' Intellectual Property Rights or Critical Data and Technology Systems Could Materially Adversely Affect the Debtors' Operations**

The Debtors' success and ability to compete depends, in part, on proprietary processes for which the Debtors own or have sought to patent or registered intellectual property rights, including key patents related to HR-PIB and the catalyst mechanism for the polymerization of PIB and DIB that give certain products differentiated features.  However, not all of the Debtors' intellectual property can be protected by registration, and while a presumption of validity exits with respect to patents issued to the Debtors, such patents may be challenged, invalidated, circumvented or rendered unenforceable.  It is possible for others to copy, or otherwise obtain and use similar

technology without authorization of the Debtors.  Proceedings to enforce the Debtors' intellectual property rights may be costly and the Debtors may not prevail.  Furthermore, as patents expire, the products and processes described and claimed under those patents become generally available for use by competitors.  In addition, patent rights may not prevent the Debtors competitors from developing, using or selling products that are similar or functionally equivalent to its products and processes.  Any unauthorized use or misuse of the Debtors' intellectual property or disclosure of its proprietary information could have a material adverse effect on the Debtors' business, financial condition and results of operations.

In addition, data security and privacy breaches, including due to human error, breach of Debtors' systems through hacking or cyber-attack, leaks or other events, could damage the Debtors' reputation, cause interruptions in their operations, require significant amounts of the Debtors' time and resources to handle, expose the Debtors to a risk of loss or litigation and possible financial liability, subject them to investigations, adverse publicity, regulatory penalties and enforcement action, and could also cause clients and potential clients to lose confidence and trust in the security of the Debtors' transactions, which would have a negative effect on the demand for the Debtors' services and products, all of which may materially affect their results of operations, financial condition and cash flows. Breaches of security could require the Debtors to make further financial investment in technical controls.

While the Debtors have taken reasonable steps to mitigate these risks by implementing network security and internal control measures, there can be no assurance that a system failure or data security breach will not be occur.  Further any insurance coverage maintained by the Debtors to cover such losses may be subject to specific policy terms and conditions (including deductibles, coverage restrictions and monetary coverage caps) or may be unavailable or insufficient to cover all of the Debtors' losses.

> **13.    The Debtors' Operations Are Subject to Complex and Extensive Environmental, Health and Safety Regulations That Could Increase the Debtors' Legal Compliance Costs and Reduce the Debtors' Ability to Operate Successfully**

The Debtors' operations are subject to extensive international, federal, state and local laws, regulations, rules and ordinances relating to pollution and protection of the environment, including those relating to the generation, handling, transportation, treatment, storage, disposal and cleanup of hazardous substances and wastes, the discharges of waste water, the emission of air pollutants or contaminants and chemical safety regulation and product stewardship.  Statutes and regulations in these jurisdictions also subject the Debtors to various permitting, certification and reporting requirements, and inspections regarding safety, training and general regulatory compliance.  For example, the Debtors' production facilities require a number of environmental permits and authorizations that are subject to renewal, modification and, in certain circumstances, revocation. Actual or alleged violations of these regulations or permit requirements or the discovery of releases of hazardous substances at or from the Debtors' facilities could result in restrictions or prohibitions on, or require the Debtors to modify, its plant operations and product distribution/sales strategy. The Debtors may also incur significant remedial expenditures, substantial civil or criminal sanctions, as well as, under some environmental laws, the assessment of strict liability and/or joint and several liability, all of which could result in reduced revenue and profitability.

In addition, many of the Debtors' products and operations are subject to the chemical control laws of the jurisdictions in which they are located, including the regulation of chemical substances and inventories under the Toxic Substances Control Act ("**TSCA**") and the Emergency Planning and Community Right-to-Know Act ("**EPCRA**") that impose notification, reporting, record-keeping and testing  requirements, and restrictions relating to chemical substances and/or mixtures as well as certain reporting on the storage,  use and releases of hazardous chemicals to federal, state, and local governments; the federal Resource Conservation and Recovery Act ("**RCRA**") and comparable state laws that impose requirements for  the generation, handling, transportation, treatment, storage, disposal and cleanup of waste from the Debtors' facilities; the federal Comprehensive Environmental Response, Compensation, and Liability Act ("**CERCLA**") also known as  "Superfund," and comparable state laws that regulate the cleanup of hazardous substances that may have been released at properties currently or previously owned or operated by the Debtors or locations to which the Debtors have sent waste for disposal; the federal Clean Water Act ("**CWA**") and analogous state laws and regulations that impose detailed permit requirements  and strict controls on discharges of wastewater from the Debtors facilities; the federal Clean Air Act ("**CAA**") and comparable state laws and regulations that impose obligations related to air emissions, including federal and state laws and regulations that recently took effect or are currently under development to address greenhouse gas ("**GHG**") emissions and which provide for continuous reporting obligations; and the United States Department of Homeland Security's Marine Transportation Security Act ("**MTSA**") which establishes  standards for security at marine-based chemical facilities, among others.

New laws and regulations may also be enacted or adopted by various U.S and foreign regulatory agencies which may impact the Debtors' operations.  For example, in the U.S., the EPA finalized revisions to its Risk Management Program in January 2017.  The revisions included new requirements for certain facilities to perform hazard analyses, third-party auditing, incident investigations and root cause analyses, emergency response exercises, and to publicly share chemical and process information.  The EPA's Risk Management Program rule was challenged in court and subsequently the EPA published a reconsideration rule on November 20, 2019 that rescinded several of the 2017 revisions to the Risk Management Program rule.  The reconsideration rule was also challenged and that litigation is held in abeyance while the EPA reviews the 2019 reconsideration rule in response to an executive order issued by the Biden Administration. Separately, the U.S. Occupational Safety and Health Administration had announced in 2013 that it was considering changes to its Process Safety Management standards that parallel EPA's Risk Management Program, but no rule changes have been issued.  In June and July 2021, the EPA and OSHA held public listening sessions to solicit comments on the Risk Management Program rule and Process Safety Management standards.  In addition, TSCA reform legislation was enacted in June 2016, and the EPA has begun the process of issuing new chemical control regulations.  EPA issued several final rules in 2017 and 2018 under the revised TSCA related to existing chemicals, including the following: (i) a rule to establish EPA's process and criteria for identifying chemicals for risk evaluation; (ii) a rule to establish EPA's process for evaluating high priority chemicals and their uses to determine whether or not they present an unreasonable risk to health or the environment; and (iii) a rule to require industry reporting of chemicals manufactured or processed in the U.S. over the past 10 years. In April 2020, EPA finalized revisions to its Chemical Data Reporting rule under TSCA, which changes reporting requirements.  The EPA has also released its framework for approving new chemicals and new uses of existing chemicals.  Under the framework, a new chemical or use presents an unreasonable risk if it exceeds set standards.  Such

a finding could result in either the issuance of rules restricting the use of the chemical being evaluated or in the need for additional testing.

Furthermore, societal demands for increasing levels of product safety and environmental protection could result in increased pressure for more stringent regulatory control with respect to the petrochemical industry.  These concerns could influence public perceptions regarding the Debtors' products and operations, the viability of certain products, the Debtors' reputation, the cost to comply with regulations, and the ability to attract and retain employees.

The Debtors cannot predict the full impact of, or the compliance costs associated with, the application of new and proposed environmental laws and regulations on the Debtors' businesses or any future regulatory and societal developments which might affect the handling, manufacture, or use of the Debtors' products or the handling, use, emission, disposal and/or cleanup of other materials or hazardous and non-hazardous waste.  Because the operation of any chemical manufacturing plant entails risk of adverse environmental events, including exposure to chemical products and by-products and contamination associated with accidental spills, discharges or other releases of hazardous substances, the Debtors can provide no assurance that material costs or liabilities will not be incurred to remediate any such damage and the Debtors cannot predict with certainty the extent of any future liabilities and costs that may be imposed by governmental agencies or asserted by third parties under environmental, health and safety laws and regulations. Accordingly, the application of these laws and regulations to the Debtors' businesses may cause the Debtors' to incur significant unanticipated losses, costs or liabilities, which could have a material adverse effect on the Debtors' businesses, financial condition and results of operations.

### 14.    The Debtors Are Subject to Other Legal Risks

The Debtors are also subject to laws and regulations which relate to other aspects of the Debtors' businesses, including anti-bribery and anti-corruption laws, other illegal or unethical acts, import and export controls, sanctions against business dealings with certain countries and third parties, the payment of taxes, employment and labor relations, antitrust and fair competition, data privacy protections, securities regulation, and other regulatory requirements affecting trade and investment.  The application of these laws and regulations to the Debtors' businesses is often unclear and may sometimes conflict.  In addition, these laws are complex and often change with time as international relations and confrontations between and among nations evolve.  Compliance with these laws and regulations may involve significant costs or require changes in the Debtors' business practices that could result in reduced revenue and profitability.  Non-compliance could result in significant fines, damages, and other criminal sanctions against the Debtors, their officers or their employees, in addition to prohibitions and heightened regulatory requirements with respect to the conduct of the Debtors' businesses, which could damage their reputation.  Certain violations of law could also result in suspension or debarment from government contracts.

Although the Debtors implement policies and procedures designed to ensure compliance with these laws, there can be no assurance that all of their employees, contractors, agents, and business partners will not take action in violation with their internal policies.  Any such violation of the law or even internal policies could have a material adverse effect on the Debtors' businesses, financial condition and results of operations.

The issue of, and increasing political and social attention on, climate change has resulted in both existing and pending national, regional, and local legislation and regulatory measures, such as mandates for renewable energy and emissions reductions, targeted at limiting or reducing emissions of greenhouse gases. Changes in these laws or regulations may result in delays or restrictions in permitting and the development of projects, may result in increased costs and may impair the Debtors' ability to move forward with their construction, completions, waste handling, storage, transport, and remediation activities, any of which could have an adverse effect on the Debtors' financial results.

In addition, the upcoming Congressional elections in the United States and policies implemented by the current and former Presidential administration have resulted in significant changes in legislation, regulation, implementation of government policy. The 2022 midterm elections may significantly alter the current regulatory framework and impact the Debtors' business and the petrochemicals industry. The Debtors continually monitor these developments so they can respond to the changing regulatory environment impacting their business.

Lastly, the Debtors are, and may in future be, subject to other legal and regulatory actions and claims arising out of the ordinary conduct of their business including product liability claims brought against the Debtors customers.  Results of these proceedings cannot be predicted with certainty.  Irrespective of their merits, these proceedings may be both lengthy and disruptive to the Debtors operations and may cause significant expenditure and diversion of management attention. In particular, many of the Debtors products provide critical performance attributes to its customers' products that are in turn sold to consumers.  These consumers could potentially bring product liability suits in which the Debtors could be named as a defendants or which could cause the Debtors' customers to seek a contribution from the Debtors.  A successful claim or series of claims against the Debtors could have a material adverse effect on the Debtors financial condition, results of operations and cash flows.

### 15.    The Debtors' Industry Is Highly Competitive, with Intense Price Competition

The petrochemicals industry is, generally, highly competitive.  Due to the commodity nature of many of the Debtors' products, competition is based primarily on price and, to a lesser extent, the Debtors' professional reputation, client relationships, technology, reliability, product quality, product deliverability and product performance.  The Debtor is generally not able to protect its industry position by product differentiation.  In addition, competition for feedstocks among processors can have significant effects on the Debtors' input costs.  If the Debtors' input costs are higher than those of its competitors due to supply-side competition or other factors, the Debtor may have difficulty recovering those higher costs from customers due to the commodity nature of its products.

Many of the Debtors' competitors are larger and have greater financial resources than the Debtor, including some of the world's largest chemical companies and major integrated petroleum companies.  Some of these competitors have their own raw materials resources.  In addition, a significant portion of the Debtors' operations are based on widely available technology.  Therefore, barriers to entry, apart from capital availability, may be low in the commodity product section of the Debtors' business.  The entrance of new competitors may reduce the Debtors' ability to

maintain profit margins in circumstances where capacity utilization in the industry is diminishing. Certain petroleum-rich countries have also become more significant participants in the petrochemicals industry and may expand their petrochemicals operations significantly in the future.  Any significant increases in competition from existing or new industry participants could have a material adverse effect on the Debtors' financial condition, results of operations and cash flows.

16.    **Concentration Risk in the Debtors' Customer and Supplier Base Could Materially and Adversely Affect the Debtors' Profitability and Cash Flows**

A small number of the Debtors' customers account for a significant percentage of its total revenues.  For the years ended December 31, 2021, 2020 and 2019, the Debtor's top five customers accounted for an aggregate of 51.0%, 47.2% and 43.3%, respectively, of the Debtors' total revenue.  Sales to the Debtor's largest customer accounted for 17% and 15% of its revenue for the years ended December 31, 2021 and 2020, respectively.  Three customers accounted for 38% and 30% of the Debtors outstanding accounts receivables balances as of December 31, 2021 and 2020, respectively.  In addition, a small number of feedstock suppliers account for a significant percentage of the Debtors' feedstock purchases.  For the years ended December 31, 2021, 2020 and 2019, the Debtors' top five suppliers accounted for an aggregate of 62.5%, 65.6%, and 48.3%, respectively, of the Debtors' feedstock purchases.  Customers and suppliers are also increasingly pursuing arrangements with processors that can meet a larger portion of their needs and production streams on a more global basis.

A loss of one or more of the Debtors' key customers or suppliers, which may occur for a variety of reasons, including as a result of a merger, consolidation or bankruptcy, would have a material adverse impact on the Debtors' financial condition, results of operations and cash flows.

17.    **The Debtors' Operations Involve a Degree of Inherent Risk That May Not Be Covered by the Debtors' Insurance and May Increase the Debtors' Operating Costs**

The manufacturing and marketing of petrochemical and related products inherently involves a degree of risk.  Hazards such as chemical spills, pipeline leaks and ruptures, storage tank leaks, discharges or releases of toxic or hazardous substances or gases, mechanical failures, facility fires, pandemic outbreaks, harsh weather and marine conditions and other hazards incident to the manufacturing, processing, handling, transportation and storage of dangerous chemicals are inherent in the Debtors' businesses and that of its customers and suppliers.  These hazards could result in personal injury, loss of life, severe damage to property and equipment, suspension or reduction of operations, environmental contamination and monetary penalties.  On November 27, 2019, an explosion occurred at a butadiene processing unit at the PNO Facility.  The explosion and subsequent fires resulted in the complete shutdown of all processing at the PNO Facility and production remains shut as of this date.  The PNO Incident directly resulted in the loss of approximately half of the Company's historical crude C4 processing capacity.  The Company also incurred significant expenses related to legal and regulatory compliance, health and safety efforts, and restoring storage and terminal capabilities at the facility.

In addition to risks inherent in the day-to-day handling of petrochemical products, the Debtors' revenue, profitability and margins could be materially affected by asset damage. On June 13, 2018, an ocean-going bulk carrier navigating in the Port of Houston Ship Channel veered off course and struck a barge stationed at the Debtors' primary Houston facility dock. The incident caused substantial damage to both the barge and the dock facilities. On January 9, 2021, the HNO Technical Center which contains quality control and research and development equipment had a fire in the mechanical room. As a result of the fire, there was considerable damage to the facility and the housed equipment.

The Debtors attempt to protect themselves against financial losses and damage by carrying insurance, including general liability, workers' compensation, business interruption and property and casualty insurance which they believe are in accordance with customary industry practice. However, the Debtors do not carry insurance against all types of losses and even where losses or liability for damages is covered by insurance, the Debtors may incur deductibles, claims may be subject to maximum coverage limits, and recoveries may be denied, delayed or subject to prolonged litigation. Further, the Debtors' loss history with its insurers in connection with claims relating to events such as the PNO Incident, the Dock Incident and the HNO Technical Center Fire may limit the scope of insurance or coverage available to the Company on economic terms. The Debtors cannot assure you that their existing coverage will be sufficient to protect against losses, that they will be able to maintain their existing coverage in the future or that the premiums will not increase substantially. Certain insurance coverages may also become unavailable or available only for reduced amounts of coverage. For example, following the Debtor's petition for reorganization under Chapter 11, certain insurance providers have notified the Company that they will discontinue coverage or provide coverage at significantly higher costs. The loss of the Debtors' liability insurance coverage, inadequate coverage or substantial increases in premiums could have a material adverse effect on their businesses, financial condition and results of operations.

### 18. The Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases

In the future, the Reorganized Debtors may become parties to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims or Interests under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

### 19. The Loss of Key Personnel or Labor Disputes Could Adversely Affect the Debtors' Operations

The Debtors' operations are dependent on a relatively small group of key management personnel, mechanics and other highly-trained personnel. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. Because the market for these experienced and highly-trained employees is

competitive, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management and operating personnel could adversely affect the Debtors' ability to operate their businesses.  In addition, a loss of key personnel or material erosion of employee morale could adversely affect the Debtors' businesses and the results of operations.  The Debtors do not maintain "key person" life insurance on any of its key employees.

In addition, approximately fifty-one employees at the Debtors' PNO Facility are covered by collective bargaining agreements.  The Debtors consider current labor relations with the applicable unions to be generally satisfactory, but there can be no assurance that the Debtors will not experience work stoppages in the future as a result of labor disagreements.  A prolonged labor disturbance at one or more of the Debtors' facilities could have a material adverse effect on its operations, financial condition and results of operations.

### 20.    Certain Holders of New Common Shares May Be Restricted in Their Ability to Transfer or Sell Their Securities

To the extent that shares of the New Common Shares issued under the Plan are covered by section 1145(a)(1) of the Bankruptcy Code, such securities may be resold by the Holders thereof without registration under the Securities Act unless the Holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities.  Resales by Holders of Claims who receive New Common Shares pursuant to the Plan that are deemed to be "underwriters" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law.  Such Holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.

The New Common Shares will not initially be registered under the Securities Act or any state securities laws, and the Debtors make no representation regarding the right of any Holder of New Common Shares to freely resell such securities (including, as applicable, shares or notes issuable upon exercise of the Subscription Rights) (as applicable).  *See* Article VII to this Disclosure Statement, entitled "Transfer Restrictions And Consequences Under Federal Law."

### 21.    Restricted Securities Issued Under the Plan May Not Be Resold or Otherwise Transferred Unless They Are Registered Under the Securities Act or an Exemption from Registration Applies

To the extent that securities issued pursuant to the Plan are not covered by section 1145(a)(1) of the Bankruptcy Code, such securities shall be issued pursuant to section 4(a)(2) under the Securities Act and will be deemed "restricted securities" that may not be sold, exchanged, assigned or otherwise transferred unless they are registered, or an exemption from registration applies, under the Securities Act.  Holders of such restricted securities may not be entitled to have their restricted securities registered and will be required to agree not to resell them except in accordance with an available exemption from registration under the Securities Act.  Under Rule 144, the public resale of restricted securities is permitted if certain conditions are met, and these conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer, as defined in Rule 144.  A non-affiliate who has not been an affiliate of

the issuer during the preceding three months may resell restricted securities after a six-month holding period unless certain current public information regarding the issuer is not available at the time of sale, in which case the non-affiliate may resell after a one-year holding period.  An affiliate may resell restricted securities after the applicable holding period but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale and notice requirements of Rule 144.

Holders of New Common Shares who are deemed to be "underwriters" under Section 1145(b) of the Bankruptcy Code will also be subject to restrictions under the Securities Act on their ability to resell those securities.  Resale restrictions are discussed in more detail in Article VII to this Disclosure Statement, entitled "Transfer Restrictions And Consequences Under Federal Law."

22. **Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations**

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from, among other things, substantially all debts arising prior to confirmation.  With few exceptions, all Claims against the Debtors that arise prior to the Petition Date or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization.  Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations.

## X.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a ballot or ballots to be used for voting on the Plan, is being distributed to the Holders of Claims and Interests in those Classes that are entitled to vote to accept or reject the Plan.  The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order.

*The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement in formulating a decision to vote to accept or reject the Plan.*

### A.    Voting Record Date

**The Voting Record Date is September 22, 2022**.  The Voting Record Date is the date on which it will be determined which Holders of Claims and Interests in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims and Interests have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim or Interest.

### B.    Voting Deadline

All Eligible Holders have been sent a Ballot together with the Disclosure Statement.  Such holders should read the Ballot carefully and follow the instructions contained therein.  Please use only the Ballot that accompanies the Disclosure Statement to cast your vote.

The Debtors have engaged Kroll Restructuring Administration as their Solicitation Agent to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan.  **FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE SOLICITATION AGENT AT THE ADDRESS SET FORTH BELOW ON OR BEFORE THE VOTING DEADLINE OF 4:00 P.M. (PREVAILING EASTERN TIME) ON OCTOBER 28, 2022, UNLESS EXTENDED BY THE DEBTORS.**

IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE SOLICITATION AGENT AT THE NUMBER SET FORTH BELOW TO RECEIVE A REPLACEMENT BALLOT.  ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE A VOTE FOR ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.

IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE SOLICITATION AGENT AT:

*By regular mail, hand delivery, or overnight mail at*:
TPC Ballot Processing
c/o Kroll Restructuring Administration,
850 3rd Avenue, Suite 412,
Brooklyn, NY 11232

*By electronic mail at*:

TPCGroupinfo@ra.kroll.com

*By telephone at*:
(844) 596-2260 (toll free for U.S. and Canada)
(646) 214-8808 (International toll)

Additional copies of the Disclosure Statement are available upon request made to the Solicitation Agent, at the telephone numbers of e-mail address set forth immediately above.

### C.    Voting on the Plan

The Debtors are providing copies of the Disclosure Statement (including all exhibits and appendices), related materials, and a Ballot (collectively, a "**Solicitation Package**") to record holders in the Voting Classes.

Eligible Holders in the Voting Classes should provide all of the information requested by the Ballot, and should (a) complete and return all Ballots received in the enclosed, self-addressed, postage-paid envelope provided with each such Ballot to the Solicitation Agent, or (b) submit a Ballot electronically via the E-Ballot voting platform on the Solicitation Agent's website by visiting https://cases.ra.kroll.com/TPCGroup/, clicking on the "Submit E-Ballot" navigation panel, and following the instructions set forth on the website.

HOLDERS ARE STRONGLY ENCOURAGED TO SUBMIT THEIR BALLOTS VIA THE E-BALLOT PLATFORM.

### D.    Holders of Claims and Interests Entitled to Vote on the Plan

Under the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on a plan.  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless: (1) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof; or (2) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and interests do not actually vote on the plan.  If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan by a class of: (1) Claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more

than one-half (1/2) in number of the Claims that cast ballots for acceptance or rejection of the Plan; and (2) Interests as acceptance by interest holders in that class that hold at least two-thirds (2/3) in amount of the Interests that cast ballots for acceptance or rejection of the Plan.

The Claims and Interests in the following classes are impaired under the Plan and entitled to vote to accept or reject the Plan:

Class 3 – 10.5% Notes Secured Claims

Class 4 – General Unsecured Claims (including holders of 10.5% Notes Deficiency Claims)

An Eligible Holder should vote on the Plan by completing a Ballot in accordance with the instructions therein and as set forth above.  All Ballots must be signed by the Eligible Holder, or any person who has obtained a properly completed Ballot proxy from the Eligible Holder by the Record Date.

The Ballots provided to Eligible Holders will reflect the principal amount of such Eligible Holder's Claim; however, when tabulating votes, the Solicitation Agent may adjust the amount of such Eligible Holder's Claim by multiplying the principal amount by a factor that reflects all amounts accrued between the Record Date and the Petition Date including interest.

Under the Bankruptcy Code, for purposes of determining whether the requisite votes for acceptance have been received, only Eligible Holders who actually vote will be counted.  The failure of a holder to deliver a duly executed Ballot to the Voting Agent will be deemed to constitute an abstention by such holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan.

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE SOLICITATION AGENT AT (844) 596-2260 (toll-free for U.S. and Canada) or (646) 214-8808 (International toll).  ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL <u>NOT</u> BE COUNTED.**

## XI.    CONFIRMATION OF THE PLAN

### A.    Requirements for Confirmation of the Plan

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties.  Notice of the Confirmation Hearing will be provided to all known creditors and equity holders or their representatives.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing, at any subsequent continued Confirmation Hearing, or pursuant to a notice filed on the docket for the Chapter 11 Cases

### B.    Objections to Confirmation

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Rules, must set forth the name of the objector, the nature and amount of the Claims held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, with a copy to the chambers of the United States Bankruptcy Judge appointed to the Chapter 11 Cases, together with proof of service thereof, and served upon the following parties, including such other parties as the Bankruptcy Court may order:

    a)  **Debtors at**

        TPC Group Inc.
        One Allen Center
        500 Dallas Street, Suite 2000
        Houston, Texas 77002
        Attention: Marilyn Moore Basso, SVP and General Counsel
        (marilyn.moorebasso@tpcgrp.com)

    b)  **Counsel to Debtors at**

        Baker Botts L.L.P.
        30 Rockefeller Plaza
        New York, New York 10112
        Attention:  Scott R. Bowling (scott.bowling@bakerbotts.com)

        - and -

        Baker Botts L.L.P.
        2001 Ross Avenue, Suite 900
        Dallas, Texas 75201-2980
        Attention:  James R. Prince (jim.prince@bakerbotts.com)
                    Kevin Chiu (kevin.chiu@bakerbotts.com)

        - and -

Baker Botts L.L.P.
910 Louisiana Street
Houston, Texas 77002
Attention: David R. Eastlake (david.eastlake@bakerbotts.com)
           Lauren N. Randle (lauren.randle@bakerbotts.com)

- and -

Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Attention: Robert J. Dehney (rdehney@morrisnichols.com)
           Curtis S. Miller (cmiller@ morrisnichols.com)
           Daniel B. Butz (dbutz@ morrisnichols.com)
           Matthew O. Talmo (mtalmo@ morrisnichols.com
           Brian Loughnane (bloughnane@ morrisnichols.com)

### c) Counsel to the Ad Hoc Noteholder Group

Paul Hasting LLP
200 Park Avenue
New York, New York 10166
Attention: Kristopher M. Hansen, Esq. (krishansen@paulhastings.com)
           Kenneth Pasquale, Esq. (kenpasquale@paulhastings.com)
           Erez E. Gilad, Esq. (erezgilad@paulhastings.com)
           Jonathan D. Canfield, Esq. (joncanfield@paulhastings.com)
           Gabriel E. Sasson, Esq. (gabesasson@paulhastings.com)

- and -

Young Conaway Stargatt & Taylor, LLP
1000 North King Street
Wilmington, Delaware 19801
Attention: Matthew Lunn (mlunn@ycst.com)
           Robert Poppitti (rpoppitti@ycst.com)

### d) Counsel to the Creditors' Committee

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
Bank of America Tower
New York, New York 10036-6745

Attention:  Philip C. Dublin (pdublin@akingump.com)
　　　　　　Naomi Moss (nmoss@akingump.com)

- and -

Akin Gump Strauss Hauer & Feld LLP
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Attention:  Marty L. Brimmage, Jr. (mbrimmage@akingump.com)
　　　　　　Lacy M. Lawrence (llawrence@akingump.com)

- and -

Cole Schotz P.C.500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Attention:  Justin R. Alberto (jalberto@coleschotz.com)
　　　　　　Patrick J. Reilley (preilley@coleschotz.com)
　　　　　　Andrew J. Moore (aroth-moore@coleschotz.com)

### e)  Office of the U.S. Trustee

Office of the U.S. Trustee for the District of Delaware
844 King Street
Suite 2207, Lock Box 35
Wilmington, Delaware   19801
Attention:  Linda, Richenderfer (linda.richenderfer@usdoj.gov)
　　　　　　Rosa Sierra-Fox (rosa.sierra-fox@usdoj.gov)

## C.    Requirements for Confirmation of the Plan

The Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation are that the Plan is (1) accepted by all impaired Classes of Claims and Interests entitled to vote or, if rejected or deemed rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (2) in the "best interests" of the holders of Claims and Interests impaired under the Plan; and (3) feasible.  The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

### 1.    Acceptance of Plan

#### (a).    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a

plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[31]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan.  Thus, a Class of Claims will have voted to accept the Plan only if (i) two-thirds in amount and (ii) a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Pursuant to Section 3.7 of the Plan, if a Class contains Claims eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims in such Class shall be deemed to have accepted the Plan.

(b).    <u>Confirmation Without Acceptance by All Impaired Classes</u>

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; provided, that the plan has been accepted by at least one impaired class determined without including any acceptance of the plan by an insider holding a claim in that class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is Impaired under, and has not accepted, the plan.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan.  A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or interests receives more than it legally is entitled to receive for its claims or interests.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured; claims versus interests) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class.  As to the dissenting class, the test sets different standards that must be satisfied for the Plan to be confirmed, depending on the type of claims or interests in such class.  The following sets forth the "fair and equitable" test that must be satisfied as to each type of class for a plan to be confirmed if such class rejects the Plan:

- **Secured Creditors**. Each holder of an impaired secured claim either (a) retains its liens on the property, to the extent of the allowed amount of its secured claim, and receives

---

[31]    A class of claims or equity interests is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan:  (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such secured claim, (b) has the right to credit bid the amount of its claim if its property is sold and retains its lien on the proceeds of the sale, or (c) receives the "indubitable equivalent" of its allowed secured claim.

- **Unsecured Creditors**. Either (a) each holder of an impaired unsecured claim receives or retains under the plan, property of a value, as of the effective date of the plan, equal to the amount of its allowed claim or (b) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

- **Interests**. Either (a) each equity interest holder will receive or retain under the plan property of a value equal to the greater of (i) the fixed liquidation preference or redemption price, if any, of such equity interest and (ii) the value of the equity interest or (b) the holders of interests that are junior to the interests of the dissenting class will not receive or retain any property under the plan.

The Debtors believe the Plan satisfies the "fair and equitable" requirement with respect to any rejecting Class.

IF ALL OTHER CONFIRMATION REQUIREMENTS ARE SATISFIED AT THE CONFIRMATION HEARING, THE DEBTORS WILL ASK THE BANKRUPTCY COURT TO RULE THAT THE PLAN MAY BE CONFIRMED ON THE GROUNDS THAT THE SECTION 1129(b) REQUIREMENTS HAVE BEEN SATISFIED

### 1.     Best Interests of Creditors/Liquidation Analysis

As noted above, with respect to each impaired class of claims and equity interests, confirmation of a plan requires that each such holder either: (a) accept the plan; or (b) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such holder would receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code.  This requirement is referred to as the "best interests test."

This test requires a bankruptcy court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtors believe that under the Plan all holders of impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code.  The Debtors' belief is based primarily on: (a) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims and Interests; and (b) the Liquidation Analysis attached hereto as **Exhibit F** (the "**Liquidation Analysis**") prepared by the Debtors with the assistance of the Debtors' advisors.

The Debtors believe that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors. The Liquidation Analysis provided in **Exhibit F** is solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein. There can be no assurance as to values that would actually be realized in a chapter 7 liquidation, nor can there be any assurance that a bankruptcy court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

## 2.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared the consolidated financial projections for the Reorganized Debtors (collectively with the reserve information, development of schedules, and financial information, the "**Financial Projections**") for December 2022 through December 2027 (the "**Projection Period**"). The Financial Projections, and the assumptions on which they are based, are annexed hereto as **Exhibit D**. Based upon such Financial Projections, the Debtors believe they will have sufficient resources to make all payments required pursuant to the Plan and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their advisors, have analyzed their ability to meet their respective obligations under the Plan. The Debtors do not, as a matter of course, publish their business plans or strategies, projections or anticipated financial position. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or Financial Projections to parties in interest after the Confirmation Date, or otherwise make such information public, unless required to do so by a regulatory body. In connection with the planning and development of the Plan, the Financial Projections were prepared by the Debtors, with the assistance of their professionals, to present the anticipated impact of the Plan. The Financial Projections assume that the Plan will be implemented in accordance with its stated terms. The Financial Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, oil and natural gas prices, expectations regarding future commodity prices, competition in the petrochemicals industry, demand for the Debtors' products, changes in the political environment of the countries in which the Debtors and its suppliers and customers operate, regulatory changes, and a variety of other factors. Consequently, the estimates and assumptions underlying the Financial Projections are inherently uncertain and are subject to material business, economic, and other uncertainties. Therefore, such Financial Projections, estimates, and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein. Creditors and other interested parties should review Article IX of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code. The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement and the Plan in their entirety.

The Debtors submit that if the Debtors "cram down" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank or the best available under the circumstances. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100% of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan

## XII.  **ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN.**

The Debtors have evaluated several alternatives to the Plan.  After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan.  If the Plan is not confirmed and consummated, the alternatives to the Plan are: (A) the preparation and presentation of an alternative reorganization; (B) a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code; or (C) a liquidation under chapter 7 of the Bankruptcy Code.

### A.    **Alternative Plan of Reorganization**

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan.  Such a plan might involve either: (a) a reorganization and continuation of the Debtors' businesses or (b) an orderly liquidation of their assets.  The Debtors, however, believe that the Plan, as described herein, enables their creditors to realize the most value under the circumstances.

### B.    **Sale under Section 363 of the Bankruptcy Code**

If the Plan is not confirmed, the Debtors could seek from the Bankruptcy Court, after notice and hearing, authorization to sell their assets under section 363 of the Bankruptcy Code.  In liquidations under section 363, the Debtors' assets could be sold over a more extended period of time than in a liquidation under chapter 7.  Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs.  Upon analysis and consideration of this alternative, the Debtors do not believe a sale of its assets under section 363 of the Bankruptcy Code would yield a higher recovery for the holders of Claims under the Plan.

### C.    **Liquidation Under Chapter 7 of Bankruptcy Code**

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code.  The effect that a chapter 7 liquidation would have on the recovery of holders of Allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as **Exhibit F.**

The Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of, among other things, the delay resulting from the conversion of the Chapter 11 Cases, the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals who would be required to become familiar with the many legal and factual issues in the Chapter 11 Cases, and the loss in value attributable to an expeditious liquidation of the Debtors' assets as required by chapter 7.

## XIII.   RECOMMENDATION.

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario.  Accordingly, the Debtors recommend that Holders of Claims and Interests entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

*[Remainder of page intentionally left blank.]*

Dated:  September 22, 2022          TPC GROUP INC.
on behalf of itself and all other Debtors


*/s/ Bart de Jong*
Bart de Jong
Chief Financial Officer
TPC Group Inc.

# EXHIBIT A

**Joint Chapter 11 Plan**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TPC GROUP INC., *et al.*, | Case No. 22-10493 (CTG) |
| Debtors. [1] | (Jointly Administered) |

## SECOND AMENDED JOINT CHAPTER 11 PLAN OF
## TPC GROUP INC. AND ITS DEBTOR AFFILIATES

**BAKER BOTTS L.L.P.**
James R. Prince (admitted *pro hac vice*)
Kevin Chiu (admitted *pro hac vice*)
2001 Ross Avenue, Suite 900
Dallas, Texas 75201-2980
Telephone:     (214) 953-6500
Facsimile:     (214) 953-6503
Email:  jim.prince@bakerbotts.com
            kevin.chiu@bakerbotts.com

BAKER BOTTS L.L.P.
Scott R. Bowling (admitted *pro hac vice*)
30 Rockefeller Plaza
New York, New York 10112
Telephone:     (212) 408-2500
Facsimile:     (212) 259-2501
Email:  scott.bowling@bakerbotts.com

BAKER BOTTS L.L.P.
David R. Eastlake (admitted *pro hac vice*)
Lauren N. Randle (admitted *pro hac vice*)
910 Louisiana Street
Houston, Texas 77002
Telephone:     (713) 229-1234
Facsimile:     (713) 229-1522
Email:  david.eastlake@bakerbotts.com
            lauren.randle@bakerbotts.com

Dated: September 20, 2022
Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Robert J. Dehney (No. 3578)
Curtis S. Miller (No. 4583)
Daniel B. Butz (No. 4227)
Matthew O. Talmo (No. 6333)
Brian Loughnane (No. 6853)
1201 N. Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email:    rdehney@morrisnichols.com
            cmiller@ morrisnichols.com
            dbutz@ morrisnichols.com
            mtalmo@ morrisnichols.com
            bloughnane@ morrisnichols.com

*Attorneys for Debtors*
*and Debtors in Possession*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: TPC Group Inc. (3618); TPC Holdings, Inc. (7380); TPC Group LLC (8313); Texas Butylene Chemical Corporation (7440); Texas Olefins Domestic International Sales Corporation (4241); TPC Phoenix Fuels LLC (9133); Port Neches Fuels, LLC (1641); and TP Capital Corp. (6248).  Each Debtor's corporate headquarters and mailing address is 500 Dallas St., Suite 2000, Houston, Texas 77002.

# Table of Contents

**Page**

**ARTICLE I.    DEFINITIONS AND INTERPRETATION.** ................................................... 1

    1.1    Definitions. ............................................................................................. 1

    1.2    Interpretation; Application of Definitions; Rules of Construction. ............... 20

    1.3    Computation of Time. ............................................................................ 21

    1.4    Reference to Monetary Figures. ............................................................. 21

    1.5    Consent Rights. .................................................................................... 21

    1.6    Controlling Document. .......................................................................... 21

**ARTICLE II.    ADMINISTRATIVE EXPENSE CLAIMS, FEE CLAIMS, DIP CLAIMS, AND PRIORITY TAX CLAIMS.** .......................................... 22

    2.1    Treatment of Administrative Expense Claims. ......................................... 22

    2.2    Treatment of Fee Claims. ...................................................................... 22

    2.3    Treatment of DIP Claims and Commitments. ........................................... 23

    2.4    Payment of Fees and Expenses Under DIP Order. ................................... 23

    2.5    Treatment of Priority Tax Claims. .......................................................... 24

**ARTICLE III.    CLASSIFICATION OF CLAIMS AND INTERESTS.** ............................ 24

    3.1    Classification in General. ....................................................................... 24

    3.2    Formation of Debtor Groups for Convenience Only. ................................. 24

    3.3    Summary of Classification of Claims and Interests. .................................. 25

    3.4    Special Provision Governing Unimpaired Claims. ..................................... 25

    3.5    Separate Classification of Other Secured Claims. ..................................... 25

    3.6    Elimination of Vacant Classes. ............................................................... 25

    3.7    Voting Classes; Presumed Acceptance by Non-Voting Classes. ................. 26

    3.8    Voting; Presumptions; Solicitation. ......................................................... 26

    3.9    Cramdown. .......................................................................................... 26

| | | |
|---|---|---|
| 3.10 | No Waiver. | 26 |
| **ARTICLE IV.** | **TREATMENT OF CLAIMS AND INTERESTS.** | **26** |
| 4.1 | Class 1:  Other Secured Claims. | 26 |
| 4.2 | Class 2:  Other Priority Claims. | 27 |
| 4.3 | Class 3: 10.5% Notes Secured Claims. | 27 |
| 4.4 | Class 4:  General Unsecured Claims. | 28 |
| 4.5 | Class 5:  Intercompany Claims. | 29 |
| 4.6 | Class 6:  Subordinated Claims. | 29 |
| 4.7 | Class 7:  Existing Holdings Interests. | 29 |
| 4.8 | Class 8:  Other Holdings Interests. | 29 |
| 4.9 | Class 9:  Intercompany Interests. | 30 |
| 4.10 | Treatment of Vacant Classes. | 30 |
| **ARTICLE V.** | **MEANS FOR IMPLEMENTATION.** | **30** |
| 5.1 | Continued Corporate Existence; Effectuating Documents; Further Transactions. | 30 |
| 5.2 | Corporate Action. | 31 |
| 5.3 | Plan Funding. | 31 |
| 5.4 | Cancellation of Existing Securities and Agreements. | 32 |
| 5.5 | Cancellation of Certain Existing Security Interests. | 33 |
| 5.6 | Officers and Boards of Directors. | 34 |
| 5.7 | Management Incentive Plan. | 34 |
| 5.8 | Authorization, Issuance, and Delivery of New Common Shares. | 34 |
| 5.9 | Debt Documents. | 35 |
| 5.10 | Rights Offerings. | 36 |
| 5.11 | Intercompany Interests; Corporate Reorganization. | 38 |
| 5.12 | Restructuring Transactions. | 39 |

5.13    Restructuring Expenses. ..........................................................................39

5.14    Indenture Trustee Expenses. ...................................................................39

5.15    Private Company. ....................................................................................40

5.16    Employment Arrangements. ....................................................................40

5.17    GUC Trust. ...............................................................................................41

**ARTICLE VI.    DISTRIBUTIONS. .............................................................................. 44**

6.1    Distributions Generally. ..........................................................................44

6.2    No Postpetition Interest on Claims. ........................................................44

6.3    Date of Distributions. ..............................................................................44

6.4    Distribution Record Date. .......................................................................45

6.5    Distributions After Effective Date. .........................................................45

6.6    Disbursing Agent. ...................................................................................45

6.7    Delivery of Distributions. .......................................................................45

6.8    Unclaimed Property. ...............................................................................46

6.9    Satisfaction of Claims. ............................................................................46

6.10    Manner of Payment Under Plan. .............................................................47

6.11    Fractional Shares, Fractional HoldCo Notes, and De Minimis Cash
Distributions. ...........................................................................................47

6.12    No Distribution in Excess of Amount of Allowed Claim. .......................47

6.13    Allocation of Distributions Between Principal and Interest. ...................48

6.14    Exemption from Securities Laws. ...........................................................48

6.15    Setoffs and Recoupments. .......................................................................48

6.16    Rights and Powers of Disbursing Agent. ................................................49

6.17    Withholding and Reporting Requirements. .............................................49

**ARTICLE VII.    PROCEDURES FOR DISPUTED CLAIMS. .......................................... 50**

7.1    Allowance of Claims. ..............................................................................50

7.2        Claims Objections. .............................................................................. 50

7.3        Estimation of Claims. ........................................................................... 50

7.4        Adjustment to Claims Register Without Objection. ........................................ 51

7.5        Time to File Objections to Claims. ........................................................... 51

7.6        Disallowance of Claims. ........................................................................ 51

7.7        Amendments to Claims. ......................................................................... 51

7.8        No Distributions Pending Allowance. ........................................................ 52

7.9        Distributions After Allowance. ................................................................ 52

7.10       Claims Resolution Procedures Cumulative. .................................................. 52

**ARTICLE VIII.   EXECUTORY CONTRACTS AND UNEXPIRED LEASES. .................. 52**

8.1        General Treatment. .............................................................................. 52

8.2        Determination of Cure Amounts and Deemed Consent. ................................... 53

8.3        Payments Related to Assumption of Contracts and Leases. ............................... 54

8.4        Rejection Damages Claims. .................................................................... 54

8.5        Survival of the Debtors' Indemnification Obligations. .................................... 54

8.6        Compensation and Benefit Plans. ............................................................. 55

8.7        Insurance Policies. .............................................................................. 55

8.8        Modifications, Amendments, Supplements, Restatements, or Other
           Agreements. ...................................................................................... 57

8.9        Reservation of Rights. .......................................................................... 57

**ARTICLE IX.    CONDITIONS PRECEDENT TO OCCURRENCE OF EFFECTIVE
                 DATE. ............................................................................................ 57**

9.1        Conditions Precedent to Confirmation. ...................................................... 58

9.2        Conditions Precedent to Effective Date. ..................................................... 58

9.3        Waiver of Conditions Precedent. .............................................................. 60

9.4        Effect of Failure of a Condition. .............................................................. 60

**ARTICLE X.      EFFECT OF CONFIRMATION**.................................................................... 60

    10.1      Binding Effect. .......................................................................................... 60

    10.2      Vesting of Assets. ...................................................................................... 60

    10.3      Discharge of Claims Against and Interests in Debtors. ............................. 61

    10.4      Pre-Confirmation Injunctions and Stays. .................................................. 62

    10.5      Injunction against Interference with Plan. ................................................. 62

    10.6      Plan Injunction. ......................................................................................... 62

    10.7      Releases...................................................................................................... 63

    10.8      Exculpation. ............................................................................................... 65

    10.9      Injunction Related to Releases and Exculpation........................................ 66

    10.10    Release of Liens. ........................................................................................ 66

    10.11    Subordinated Claims. ................................................................................. 66

    10.12    Retention of Causes of Action and Reservation of Rights. ........................ 67

    10.13    Ipso Facto and Similar Provisions Ineffective. ......................................... 67

    10.14    Indemnification and Reimbursement Obligations. ..................................... 67

**ARTICLE XI.     RETENTION OF JURISDICTION.**........................................................... 68

    11.1      Retention of Jurisdiction. ........................................................................... 68

**ARTICLE XII.    MISCELLANEOUS PROVISIONS**............................................................ 70

    12.1      Exemption from Certain Transfer Taxes. ................................................... 70

    12.2      Request for Expedited Determination of Taxes........................................... 70

    12.3      Dates of Actions to Implement Plan. .......................................................... 70

    12.4      Amendments. .............................................................................................. 70

    12.5      Revocation or Withdrawal of Plan.............................................................. 71

    12.6      Severability. ............................................................................................... 71

    12.7      Governing Law. .......................................................................................... 72

12.8      Immediate Binding Effect. ............................................................. 72

12.9      Successors and Assigns. ................................................................ 72

12.10     Entire Agreement. ......................................................................... 72

12.11     Computing Time. ........................................................................... 73

12.12     Exhibits to Plan; Additional Documents. ...................................... 73

12.13     Notices. ......................................................................................... 73

12.14     Reservation of Rights. ................................................................... 74

12.15     Dissolution of Creditors' Committee. ............................................ 75

12.16     Closing of Chapter 11 Cases. ....................................................... 75

Each of TPC Group Inc., TPC Holdings, Inc., TPC Group LLC, Texas Butylene Chemical Corporation, Texas Olefins Domestic International Sales Corporation, TPC Phoenix Fuels LLC, Port Neches Fuels, LLC, and TP Capital Corp. (each, a "***Debtor***" and collectively, the "***Debtors***") proposes the following joint chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code.  Capitalized terms used herein shall have the meanings set forth in <u>Section 1.1</u> below.

## ARTICLE I.        DEFINITIONS AND INTERPRETATION.

### 1.1    *<u>Definitions.</u>*

The following terms shall have the respective meanings specified below:

***10.5% Notes*** means the senior secured notes due 2024 issued under the 10.5% Notes Indenture.

***10.5% Noteholder*** means a holder of the 10.5% Notes and/or the 10.5% Notes Claims, as applicable.

***10.5% Notes Claim*** means any Claim arising under or related to the 10.5% Notes or the 10.5% Notes Indenture; for the avoidance of doubt, the 10.5% Notes Claims shall include all principal, accrued and unpaid pre- and postpetition interest (including at the default rate (to the extent applicable)), fees, and other amounts arising thereunder or payable pursuant thereto, including the applicable make-whole amount.

***10.5% Notes Deficiency Claim*** means a 10.5% Notes Claim (or any portion thereof) that is not a Secured Claim in respect of the 10.5% Notes.

***10.5% Notes Indenture*** means that certain Indenture, dated as of August 2, 2019 (as amended, modified, or otherwise supplemented from time to time), by and among TPC Group Inc., each of the guarantors thereunder, and the 10.5% Notes Trustee.

***10.5% Notes Secured Claim*** means a 10.5% Notes Claim (or any portion thereof) that is a Secured Claim in respect of the 10.5% Notes.

***10.5% Notes Trustee*** means U.S. Bank National Association and any of its successors or assigns, and any indenture trustee, collateral trustee, or other trustee or similar entity under the 10.5% Notes Indenture, in its capacity as such.

***2024 Adjusted EBITDA*** means the Reorganized Debtors' EBITDA for fiscal year 2024 as calculated in the Reorganized Debtors' ordinary course of business and consistent with past practice following the Effective Date.

***ABL DIP Agent*** means Eclipse Business Capital LLC, as administrative agent and collateral agent under the ABL DIP Credit Agreement, together with its permitted successors and assigns.

1

***ABL DIP Agent Advisors*** means the advisors to the ABL DIP Agent, which include Goldberg Kohn Ltd. and Potter Anderson & Corroon LLP, and any other advisor retained by the ABL Agent from time to time with the Debtors' reasonable consent.

***ABL DIP Claim*** means any Claim held by the ABL DIP Agent or the ABL DIP Lenders arising under or relating to the ABL DIP Credit Agreement or the DIP Orders.

***ABL DIP Credit Agreement*** means the credit agreement governing the terms of the ABL DIP Facility, dated as of June 6, 2022, by and among the Debtors, the ABL DIP Agent and the ABL DIP Lenders, with any amendments, restatements, amendments and restatements, modifications or supplements thereto as permitted by the DIP Orders.

***ABL DIP Facility*** means the postpetition senior secured superpriority priming asset-based revolving loan facility approved by the DIP Orders.

***ABL DIP Lenders*** means the lenders under the ABL DIP Credit Agreement.

***Ad Hoc Noteholder Group*** means the ad hoc committee of certain beneficial owners (or nominees, investment managers, advisors, or subadvisors for the beneficial owners) of Priming Notes and 10.5% Notes represented by Paul Hastings LLP and Evercore Group L.L.C. and who were Supporting Noteholders under the Restructuring Support Agreement as of May 31, 2022.

***Administrative Expense Claim*** means any Claim constituting a cost or expense of administration incurred during the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code (including section 503(b)(9) of the Bankruptcy Code) and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries, or commissions for services and payments for goods and other services and leased premises) (ii) Fee Claims, and (iii) Restructuring Expenses.

***Allowed*** means, with respect to any Claim against or Interest in a Debtor, (a)(i) that is timely filed by the Bar Date or (ii) as to which there exists no requirement for the holder of a Claim to file such Claim under the Plan, the Bankruptcy Code, the Bankruptcy Rules or a Final Order, (b)(i) that is listed in the Schedules as not contingent, not unliquidated, and not disputed and (ii) for which no contrary proof of claim has been timely filed, or (c) allowed under the Plan or by a Final Order.  With respect to any Claim described in clause (a) above, such Claim will be considered allowed only if, and to the extent that, (A) no objection to the allowance of such Claim has been asserted, or may be asserted, on or before the time period set forth in the Plan, and no request for estimation or other challenge, including, without limitation, pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed and not withdrawn within the applicable period fixed by the Plan or applicable law, (B) an objection to such Claim is asserted and such Claim is subsequently allowed pursuant to a Final Order, (C) such Claim is settled pursuant to an order of the Bankruptcy Court, or (D) such Claim is allowed pursuant to the Plan or any agreements related thereto and such allowance is approved and authorized by the Bankruptcy Court; *provided, however*, that notwithstanding the foregoing, the Reorganized Debtors will retain all claims and

defenses with respect to Allowed Claims that are reinstated or otherwise unimpaired pursuant to the Plan.

*Antitrust Authorities* means the United States Federal Trade Commission, the Antitrust Division of the United States Department of Justice, the attorneys general of the several states of the United States, and any other Governmental Entity having jurisdiction pursuant to the Antitrust Laws.

*Antitrust Laws* mean the Sherman Act, the Clayton Act, the HSR Act, the Federal Trade Commission Act, and any other Law governing agreements in restraint of trade, monopolization, pre-merger notification, the lessening of competition through merger or acquisition or anti-competitive conduct, and any similar foreign Laws.

*Asset* means all of the rights, title, and interests of a Debtor in and to property of whatever type or nature (including real, personal, mixed, intellectual, tangible, and intangible property).

*Assumption Dispute* means an unresolved objection regarding assumption, Cure Amount, "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), or other issues relating to assumption of an executory contract or unexpired lease.

*Avoidance Actions* means all claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors arising under sections 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code and applicable nonbankruptcy law.

*Backstop Agreements* means, collectively, the Equity Backstop Agreement, the Debt Backstop Agreement and, to the extent reasonably required by the Debtors, with the consent of the Required Supporting Noteholders, the Exit Notes Backstop Agreement.

*Backstop Order* means one or more orders of the Bankruptcy Court approving the Debtors' entry into and performance under the Backstop Agreements, which are not subject to a stay.

*Bankruptcy Code* means title 11 of the United States Code, as amended from time to time, as applicable to these Chapter 11 Cases.

*Bankruptcy Court* means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code or the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

*Bankruptcy Rules* means the Federal Rules of Bankruptcy Procedure as promulgated by Supreme Court of the United States under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Cases, and any local rules of the Bankruptcy Court.

**Bayside** means Bayside Capital, Inc., as a Supporting Noteholder under the Restructuring Support Agreement.

**Business Day** means any day other than a Saturday, a Sunday or any other day on which banking institutions in New York, New York are authorized or required by law or executive order to close.

**Cash** means legal tender of the United States of America.

**Cause of Action** means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including under any state or federal securities laws). For the avoidance of doubt, Cause of Action also includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (ii) the right to object to Claims or Interests, (iii) any claim pursuant to section 362 of the Bankruptcy Code, (iv) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (v) any Avoidance Actions.

**Cerberus** means Cerberus Capital Management, L.P., as a Supporting Noteholder under the Restructuring Support Agreement.

**Cerberus/Bayside Advisor Fees** means Cash in the amount of up to $3.25 million payable to the professionals of Cerberus and Bayside on the Effective Date on account of professional fees and expenses incurred by Cerberus and Bayside in connection with the Chapter 11 Cases.

**Chapter 11 Cases** means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court.

**Claim** means a "claim," as defined in section 101(5) of the Bankruptcy Code, against any Debtor.

**Class** means any group of Claims or Interests classified under the Plan pursuant to section 1122(a) of the Bankruptcy Code.

**Collateral** means any Asset of an Estate that is subject to a Lien securing the payment or performance of a Claim, which Lien is not invalid, is properly perfected as of the Petition Date, and is not subject to avoidance under the Bankruptcy Code or applicable nonbankruptcy law.

*Commitment Parties* means the Equity Commitment Parties, the Debt Commitment Parties, and the Exit Notes Commitment Parties (if any).

*Confirmation Date* means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

*Confirmation Hearing* means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

*Confirmation Order* means the order of the Bankruptcy Court confirming this Plan in the Chapter 11 Cases, which is not subject to a stay.

*Creditors' Committee* means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code as it may be constituted from time to time.

*Cure Amount* means the payment of Cash or the distribution of other property (as the Debtors or the Reorganized Debtors, as applicable (subject to the consent of the Required Supporting Noteholders), and the counterparty to such executory contract or unexpired lease may agree or the Bankruptcy Court may order) as necessary to (i) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors and (ii) permit the Debtors to assume such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

*Cure Notice* means the notice of proposed Cure Amount to be paid in connection with an executory contract or unexpired lease that may be assumed or assumed and assigned under the Plan pursuant to section 365 of the Bankruptcy Code, which notice shall be reasonably acceptable to the Required Supporting Noteholders and shall include (i) procedures for objecting to proposed assumptions or assumptions and assignments of executory contracts and unexpired leases, (ii) any Cure Amount to be paid in connection therewith, and (iii) procedures for resolution by the Bankruptcy Court of any related disputes.

*D&O Policy* means any insurance policy, including tail insurance policies, for directors', members', trustees', and officers' liability maintained by the Debtors and in effect or purchased as of the Petition Date.

*Debt Backstop Agreement* means that certain Debt Backstop Purchase Agreement, to be entered into by and among Holdings, TPC Group Inc., the other direct and indirect subsidiaries of Holdings party thereto and the Debt Commitment Parties, as may be amended, supplemented, amended and restated, or otherwise modified from time to time.

*Debt Backstop Party* means a "Backstop Party" under and as defined in the Debt Backstop Agreement.

*Debt Commitment Parties* means the Supporting Noteholders that are signatories to the Debt Backstop Agreement as "Backstop Parties" and/or "Direct Allocation Parties"

thereunder, together with their successors and permitted assigns, and that provide each of the commitments set forth therein.

**Debt Direct Allocation** means the issuance of the Debt Direct Allocation Securities as further described <u>Section 5.10(e)</u>.

**Debt Direct Allocation Amount** means $67,500,000.

**Debt Direct Allocation Party** means a "Direct Allocation Party" under and as defined in the Debt Backstop Agreement.

**Debt Direct Allocation Securities** means the "Direct Allocation Securities" under and as defined in the Debt Backstop Agreement.

**Debt Put Option Premium** means the non-refundable put option premium payable to the Debt Commitment Parties in the form of Debt Put Option Securities, on the terms and conditions set forth in the Debt Backstop Agreement.

**Debt Put Option Securities** means New Common Shares issued in respect of the Debt Put Option Premium.

**Debt Rights Offering** means the debt rights offering pursuant to which eligible 10.5% Noteholders shall be offered the right to purchase, in Cash, HoldCo Notes, on the terms and conditions set forth in this Plan and the Debt Rights Offering Documents.

**Debt Rights Offering Amount** means $82,500,000.

**Debt Rights Offering Documents** means the Debt Backstop Agreement, the Debt Rights Offerings Procedures, the subscription forms delivered under the Debt Rights Offerings Procedures, and any and all other agreements, documents, and instruments delivered or entered into in connection with the Debt Rights Offering.

**Debt Rights Offering Procedures** means the procedures for Debt Rights Offering Participants to participate in the Debt Rights Offering.

**Debt Rights Offering Participant** means each holder of an Allowed 10.5% Secured Notes Claim that is a "qualified institutional buyer" as such term is defined in Rule 144A under the Securities Act or a "non U.S. Person" as such term is defined in Regulation S under the Securities Act.

**Debt Rights Offering Securities** means the HoldCo Notes offered to eligible 10.5% Noteholders pursuant to the Debt Rights Offering.

**Debt Subscription Rights** means the right to purchase Debt Rights Offering Securities pursuant to the Debt Rights Offering Procedures.

**Debtor(s)** has the meaning set forth in the introductory paragraph of the Plan.

**Debtor in Possession** means, with respect to a Debtor, that Debtor in its capacity as a debtor in possession pursuant to sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

**Definitive Documents** has the meaning given to such term in the Restructuring Support Agreement.

**DIP Claim** means any ABL DIP Claim, Priming Notes DIP Claim, or Term Loan DIP Claim.

**DIP Facilities** means, collectively, the ABL DIP Facility and the Term Loan DIP Facility.

**DIP Orders** means the Interim DIP Order and the Final DIP Order.

**Disbursing Agent** means (i) any Reorganized Debtor or any other Person(s) designated by (x) the Required Supporting Noteholders and (y) the Debtors or the Reorganized Debtors, as applicable, to serve as disbursing agent under Section 6.6 of the Plan and (ii) solely to the extent Class 4 votes to accept the Plan, the GUC Trustee with respect to distributions of GUC Trust Assets to the GUC Trust Beneficiaries as and when provided for in the GUC Trust Agreement.

**Disclosure Statement** means the disclosure statement for the Plan, and all exhibits, schedules, supplements, modifications, amendments, annexes, and attachments to such disclosure statement.

**Disputed** means, with respect to a Claim, (i) any Claim, which Claim is disputed under Article VII of the Plan or as to which the Debtors have interposed and not withdrawn an objection or request for estimation that has not been determined by a Final Order; (ii) any Claim, proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of claim was not timely or properly filed; (iii) any Claim that is listed in the Schedules, if any are filed, as unliquidated, contingent or disputed, and as to which no request for payment or proof of claim has been filed; or (iv) any Claim that is otherwise disputed by any of the Debtors, Reorganized Debtors, the GUC Trustee, or the Required Supporting Noteholders in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled by a Final Order.  To the extent any such party disputes only the amount of a Claim, such Claim shall be deemed Allowed in the amount such party does not dispute, if any, and Disputed as to the balance of such Claim.

**Distribution Record Date** means, except as otherwise provided in the Plan, the Voting Deadline (or such other date as mutually agreed between the Debtors and the Required Consenting Noteholders); *provided*, that the Distribution Record Date for any Claims held through the facilities of DTC shall be the Effective Date.

**DTC** means the Depository Trust Company, a limited-purpose trust company organized under the New York State Banking Law.

**Effective Date** means the date which is the first Business Day on which (i) all conditions to the effectiveness of the Plan set forth in Section 9.2 of the Plan have been satisfied

or waived in accordance with the terms of the Plan, (ii) no stay of the Confirmation Order is in effect, and (iii) the substantial consummation of the Plan occurs pursuant to 11 U.S.C. § 1101(2).

*Employment Arrangements* means all employment and severance arrangements, employment agreements, plans, programs, and policies, and all compensation and benefits plans, policies, and programs of the Debtors applicable to their respective employees, retirees, consultants, contractors, and non-employee directors, including all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans (including equity and equity-based plans), welfare benefits plans, and life and accidental death and dismemberment insurance plans.

*Entity* has the meaning set forth in section 101(15) of the Bankruptcy Code.

*Equity Backstop Agreement* means that certain Equity Backstop Purchase Agreement to be entered into by and among Holdings, TPC Group Inc., the other direct and indirect subsidiaries of Holdings party thereto and the Equity Commitment Parties, as may be amended, supplemented, amended and restated, or otherwise modified from time to time.

*Equity Backstop Party* means a "Backstop Party" under and as defined in the Equity Backstop Agreement.

*Equity Commitment Parties* means the Supporting Noteholders that are signatories to the Equity Backstop Agreement as "Backstop Parties" and/or "Direct Allocation Parties" thereunder, together with their successors and permitted assigns, and that provide each of the commitments set forth therein.

*Equity Direct Allocation* means the issuance of the Equity Direct Allocation Securities as further described Section 5.10(c) of the Plan.

*Equity Direct Allocation Amount* means $135,000,000.

*Equity Direct Allocation Party* means a "Direct Allocation Party" under and as defined in the Equity Backstop Agreement.

*Equity Direct Allocation Securities* means the New Common Shares purchased in the Equity Direct Allocation.

*Equity Put Option Premium* means the non-refundable put option premium payable to the Equity Commitment Parties in the form of Equity Put Option Securities, on the terms and conditions set forth in the Equity Backstop Agreement.

*Equity Put Option Securities* means New Common Shares issued in respect of the Equity Put Option Premium.

*Equity Rights Offering* means the common equity rights offering pursuant to which eligible 10.5% Noteholders shall be offered the right to purchase, in Cash, New Common Shares, on the terms and conditions set forth in this Plan and the Equity Rights Offering Documents.

*Equity Rights Offering Amount* means $165,000,000.

*Equity Rights Offering Documents* means collectively, the Equity Backstop Agreement, the Equity Rights Offerings Procedures, the subscription forms delivered under the Equity Rights Offerings Procedures, and any and all other agreements, documents, and instruments delivered or entered into in connection with the Equity Rights Offering.

*Equity Rights Offering Participant* means each holder of an Allowed 10.5% Secured Notes Claim that is an "accredited investor" as such term is defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

*Equity Rights Offering Procedures* means the procedures for Equity Rights Offering Participants to participate in the Equity Rights Offering.

*Equity Rights Offering Securities* means the New Common Shares offered to eligible 10.5% Noteholders pursuant to the Equity Rights Offering.

*Equity Subscription Rights* means the right to purchase Equity Rights Offering Securities pursuant to the Equity Rights Offering Procedures.

*Estate(s)* means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

*Exchange Act* means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

*Exculpated Parties* means, collectively, (i) the Debtors, (ii) the Reorganized Debtors, (iii) any statutory committee appointed in the Chapter 11 Cases, (iv) the Supporting Noteholders, (v) the Backstop Parties, (vi) the agents and lenders under the Exit ABL Facility, (vii) the agents and lenders under the Prepetition ABL Credit Agreement, (viii) the Supporting Sponsors, (ix) the agents and lenders under the DIP Facilities (x) the holders of the Exit Notes and HoldCo Notes and any agents or trustees thereunder and (xi) with respect to each of the foregoing Persons in clauses (i) through (x), such Persons' predecessors, successors, assigns, subsidiaries, affiliates, current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, affiliated investment funds or investment vehicles, managed accounts or funds, and such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such.

*Existing Holdings Interest* means the shares of Class A common stock of Holdings that existed immediately prior to the Effective Date, including any restricted stock of Holdings that vests prior to the Effective Date.

*Exit ABL Commitment Letter* means that certain Commitment Letter, dated May 31, 2022, provided to the Debtors by Eclipse Business Capital LLC, pursuant to which Eclipse Business Capital LLC has committed to provide the Exit ABL Facility on the terms and conditions set forth therein.

*Exit ABL Credit Agreement* means the credit agreement governing the Exit ABL Facility, which shall be on terms no less favorable to the Reorganized Debtors than those set forth in the Exit ABL Commitment Letter, as determined by the Debtors and the Required Supporting Noteholders.

*Exit ABL Facility* means the asset-based revolving loan facility that the Reorganized Debtors (other than Reorganized Holdings) will enter into on the Effective Date.

*Exit ABL Lenders* means the lenders under the Exit ABL Credit Agreement, in their capacities as such.

*Exit Facility Documents* means, collectively, the HoldCo Notes Indenture, the Exit ABL Credit Agreement, the Exit Notes Indenture and any and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, and each of which shall be subject to the consent rights of the Required Supporting Noteholders.

*Exit Notes* means $350,000,000 in aggregate principal amount of notes due on the date that is no more than five (5) years from the Effective Date, the obligations under which will be secured by a second priority security interest in and lien on the Reorganized Debtors' cash, accounts receivable, and inventory and a first priority security interest in and lien on substantially all of the Reorganized Debtors' other assets, and contain such other terms and conditions as set forth in the Exit Notes Indenture.

*Exit Notes Backstop Agreement* means that certain backstop agreement to be entered into by and among Holdings, TPC Group Inc., the other direct and indirect subsidiaries of Holdings party thereto and the Exit Notes Commitment Parties, solely to the extent reasonably required by the Debtors, and with the consent of the Required Supporting Noteholders, as such agreement may be amended, supplemented, amended and restated, or otherwise modified from time to time.

*Exit Notes Commitment Parties* means the Supporting Noteholders that become signatories to the Exit Notes Backstop Agreement, together with their successors and permitted assigns, and that provide the commitments set forth therein.

*Exit Notes Indenture* means that certain Indenture, to be dated as of the Effective Date, by and among Reorganized TPC, as issuer, the guarantors thereunder, and the trustee thereunder, for the issuance of the Exit Notes.

*Fee Claim* means a Claim for professional services rendered or costs incurred on or after the Petition Date through the Effective Date by Professional Persons retained by an order of the Bankruptcy Court pursuant to sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code in the Chapter 11 Cases.

*Fee Escrow Account* means an interest-bearing account established and funded pursuant to Section 2.2 of the Plan.

**Final DIP Order** means the *Final Order (I) Authorizing the Debtors to (a) Obtain Senior Secured Priming Superpriority Postpetition Financing and (b) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [D.I. 566].

**Final Order** means an order, ruling, or judgment of the Bankruptcy Court (or other court of competent jurisdiction) that:  (i) is in full force and effect; (ii) is not stayed; and (iii) is no longer subject to review, reversal, vacatur, modification, or amendment, whether by appeal or by writ of *certiorari; provided, however,* that the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in such other court of competent jurisdiction) may be filed relating to such order, ruling, or judgment shall not cause such order, ruling, or judgment not to be a Final Order.

**General Unsecured Claim** means any Claim that is not Secured and is not: (a) a DIP Claim (b) a Prepetition ABL Claim; (c) a Priming Notes Claim; (d) a 10.5% Notes Secured Claim; (e) an Intercompany Claim; or (f) a Claim that is secured, subordinated, or entitled to priority under the Bankruptcy Code.  For the avoidance of doubt, the 10.5% Notes Deficiency Claims shall constitute General Unsecured Claims.

**Governmental Entity** means U.S. or non-U.S. international, regional, federal, state, municipal or local governmental, judicial, administrative, legislative or regulatory authority, entity, instrumentality, agency, department, commission, court or tribunal of competent jurisdiction (including any branch, department or official thereof).

**GUC Trust** means that certain trust to be established on the Effective Date pursuant to Section 5.17 hereof and in accordance with the GUC Trust Agreement.

**GUC Trust Agreement** means that certain trust agreement to be entered into on the Effective Date by the Debtors and the Reorganized Debtors (as applicable) and the GUC Trustee, in consultation with the Creditors' Committee, that, among other things, shall establish and govern the GUC Trust, and which shall be in form and substance acceptable to the Debtors and the Required Supporting Noteholders.

**GUC Trust Assets** means the GUC Trust Initial Funding Amount and, if applicable, the GUC Trust Contingent Funding Amount.

**GUC Trust Beneficiaries** means holders of the GUC Trust Interests.

**GUC Trust Contingent Funding Amount** means the contingent right of the GUC Trust to receive, if applicable, Cash in the amount of $5,000,000 from the Reorganized Debtors solely in the event that the Reorganized Debtors' 2024 Adjusted EBITDA exceeds $250,000,000.

**GUC Trust Expenses** means all costs and expenses of the GUC Trust, including without limitation, reasonable and documented fees, expenses, and costs incurred by the GUC Trustee in connection with carrying out the obligations of the GUC Trust and otherwise in accordance with the GUC Trust Agreement, costs related to the maintenance or disposition of the

GUC Trust Assets as well as indemnity reserves, attorneys' fees, the fees of other professionals and other Persons retained by the GUC Trustee, any taxes imposed on the GUC Trust or in respect of the GUC Trust Assets or imposed on or withheld from distributions of GUC Trust Assets to GUC Trust Beneficiaries, and all costs and expenses as set forth in <u>Section 12.16(b)</u> of this Plan.

***GUC Trust Initial Funding Amount*** means Cash in the amount of $5 million to be transferred to the GUC Trust by the Debtors on the Effective Date.

***GUC Trust Interests*** means the non-certificated and non-transferable beneficial interests in the GUC Trust that shall entitle each respective holder thereof to its Pro Rata share of the GUC Trust Assets in accordance with the GUC Trust Agreement.

***GUC Trustee*** means the Person or Entity selected by the Debtors and the Required Supporting Noteholders, in consultation with the Creditors' Committee, to serve as the trustee of the GUC Trust, and any successor thereto, in accordance with the GUC Trust Agreement.

***HoldCo Notes*** means $230,000,000 in aggregate principal amount of notes due on the date that is five years and 182 days from the Effective Date and contain such other terms and conditions as set forth in the HoldCo Notes Indenture, the obligations under which will not be secured by a pledge of equity of any of the Reorganized Debtors and shall not be guaranteed by the Reorganized Debtors.

***HoldCo Notes Indenture*** means that certain Indenture, to be dated as of the Effective Date, by and among Reorganized Holdings (or such other entity as identified in the Restructuring Transaction Memorandum, which may be Reorganized TPC Group Inc.) and the trustee thereunder, for the issuance of the HoldCo Notes.

***Holdings*** means TPC Holdings, Inc.

***HSR Act*** means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

***Impaired*** means, with respect to a Claim, Interest, or a Class of Claims or Interests, "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

***Indemnification Obligation*** means any existing or future obligation of any Debtor to indemnify current and former officers, directors, agents, or employees of any of the Debtors who served in such capacity, with respect to all present and future actions, suits, and proceedings against any Debtor or such directors, officers, agents, or employees, based upon any act or omission for or on behalf of any Debtor, whether pursuant to corporate charters, bylaws, limited liability company agreements, or other organizational documents, excluding any obligation to indemnify any of the forgoing parties with respect to any act or omission for or on behalf of the Company directly and primarily arising out of any act or omission determined by a Final Order to constitute actual fraud, willful misconduct, or gross negligence.

***Indenture Trustees*** means, collectively, the Priming Notes Trustee and the 10.5% Notes Trustee.

*Indenture Trustee Charging Lien* means any Lien or other priority in payment in favor of the Indenture Trustees against distributions to be made to holders of Allowed Notes Claims for payment of any Indenture Trustee Fees and Expenses.

*Indenture Trustee Fees and Expenses* means the reasonable and documented compensation, fees, expenses, disbursements, and indemnity claims incurred by the Indenture Trustees, including without limitation, attorneys' and agents' fees, expenses and disbursements, incurred by the Indenture Trustees, whether prior to or after the Petition Date and whether prior to or after the Effective Date, in each case to the extent payable or reimbursable under the Indentures.

*Indentures* means, collectively, the Priming Notes Indenture and the 10.5% Notes Indenture.

*Interim DIP Order* means the *Interim Order (I) Authorizing the Debtors to (a) Obtain Senior Secured Priming Superpriority Postpetition Financing and (b) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [D.I. 147].

*Initial GUC Distribution Date* means a date after the Effective Date, as determined by the GUC Trustee, on which initial distributions of GUC Trust Assets shall be made to GUC Trust Beneficiaries.

*Intercompany Claim* means any Claim against a Debtor held by another Debtor.

*Intercompany Interest* means an Interest in a Debtor held by another Debtor (and excluding, for the avoidance of doubt, any Existing Holdings Interests or Other Holdings Interests).

*Intercreditor Agreements* means collectively, (i) that certain *Intercreditor Agreement*, dated as of August 2, 2019, by and among the ABL DIP Agent, as administrative agent and collateral agent pursuant to the ABL DIP Credit Agreement and U.S. Bank National Association, as trustee and collateral agent pursuant to the 10.5% Notes Indenture (as amended, modified, or supplemented from time to time, including as a result of that certain Collateral Agent Joinder Agreement dated as of June 6, 2022) and (ii) that certain *Intercreditor Agreement*, dated as of February 2, 2021, by and among U.S. Bank National Association, as trustee and collateral agent pursuant to the 10.5% Notes Indenture and U.S. Bank National Association, as trustee and collateral agent pursuant to the Priming Notes Indenture (as amended, modified, or supplemented from time to time).

*Interest* means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any of the Debtors, and any other security or equity interest in any of the Debtors, including all ordinary shares, units, common stock, preferred stock, membership interest, partnership interest or other instrument, evidencing any fixed or contingent ownership interest in any of the Debtors, whether or not transferable and whether fully vested or vesting in the future, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest in the Debtors, that existed immediately before the Effective Date, and including any equity interest issued to any of the Debtors' current or former employees and non-employee directors

various forms of long-term incentive compensation including stock options, stock appreciation rights, restricted stock, restricted stock units, performance shares/units, incentive awards, Cash awards, and other stock-based awards.

*Lien* has the meaning set forth in section 101(37) of the Bankruptcy Code.

*Management Incentive Plan* means the market-based management incentive plan to be implemented in accordance with Section 5.7 of the Plan.

*Mockingbird* means Mockingbird Credit Opportunities Company LLC, as a Supporting Noteholder under the Restructuring Support Agreement.

*Mockingbird Advisor Fees* means Cash in the amount of up to $150,000 payable to the professionals of Mockingbird on the Effective Date on account of professional fees and expenses incurred by Mockingbird in connection with the Chapter 11 Cases.

*New Board* means the initial board of directors of Reorganized Holdings appointed pursuant to Section 5.6 of the Plan.

*New Common Shares* means shares of common stock or other common equity interests of Reorganized Holdings or such other entity as identified in the Restructuring Transaction Memorandum, which may be Reorganized TPC Group Inc.

*New Corporate Governance Documents* means the organizational and governance documents for the Reorganized Debtors and its subsidiaries and affiliates, including, without limitation, certificates of incorporation, certificates of formation, bylaws, limited liability company agreements, shareholder agreements, operating agreements, registration rights agreements, or similar organization or formation documents, as applicable.

*Other Holdings Interests* means all other Interests in Holdings (including, without limitation, any phantom stock, tracking stock, and any options with respect to equity interest) other than Existing Holdings Interests.

*Other Priority Claim* means any Claim other than an Administrative Expense Claim or a Priority Tax Claim that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code.

*Other Secured Claim* means any Secured Claim other than a Priority Tax Claim, a DIP Claim, a Priming Notes Claim, or a 10.5% Notes Secured Claim.

*Other Supporting Noteholder Advisor Fees* means, collectively, (1) the Cerberus/Bayside Advisor Fees and (2) the Mockingbird Advisor Fees.

*Payoff Letter* means the payoff letter in respect of payment in full in Cash of the ABL DIP Claims and termination of all commitments under the ABL DIP Facility, including the customary survival of indemnification obligations under the ABL DIP Facility and related loan documents, to be agreed upon by the Debtors and the ABL DIP Agent prior to the Effective

Date, and which shall be in form and substance acceptable to the Debtors, the ABL DIP Agent and the Required Supporting Noteholders.

**Person** means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code), or other Entity.

**Petition Date** means, with respect to a Debtor, the date on which such Debtor commenced its Chapter 11 Case.

**Plan** means this joint chapter 11 plan (as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements (including the Plan Supplement), appendices, annexes and attachments hereto), as may be modified from time to time in accordance with the Bankruptcy Code, the terms hereof, and the terms of the Restructuring Support Agreement.

**Plan Distribution** means the payment or distribution of consideration to holders of Allowed Claims under the Plan.

**Plan Supplement** means a supplement or supplements to the Plan containing certain summaries of terms, documents and forms of documents, schedules, and exhibits, in each case subject to the terms and provisions of the Restructuring Support Agreement and this Plan and relevant to the implementation of the Plan, to be filed with the Bankruptcy Court, as amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Restructuring Support Agreement (including any consent rights in favor of the Required Supporting Noteholders, the Supporting Sponsors and/or solely to the extent affecting the rights or obligations of the ABL DIP Agent, the ABL DIP Lenders or the Exit ABL Lenders (including the Payoff Letter and Exit Facility Documents), the ABL DIP Agent, the ABL DIP Lenders and the Exit ABL Lenders), which shall include, but not be limited to (a) the New Corporate Governance Documents, (b) the number and slate of directors to be appointed to the New Board, (c) with respect to the members of the New Board, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code, (d) the Restructuring Transactions Memorandum, if any, (e) the Exit Facility Documents, (f) a schedule of retained Causes of Action, (g) the Schedule of Rejected Contracts, (h) GUC Trust Agreement, (i) the identity of the GUC Trustee, and (j) the Payoff Letter.

**Prepetition ABL Agent** means Bank of America, N.A., as administrative agent and collateral agent, solely in its capacity as administrative agent and collateral agent under the Prepetition ABL Credit Agreement.

**Prepetition ABL Credit Agreement** means that certain Credit Agreement, dated as of August 2, 2019 (as amended, restated, amended and restated, modified or otherwise supplemented from time to time), by and among TPC Group Inc., as lead borrower, Holdings, as holdings, the subsidiaries of TPC Group Inc. party thereto, each of the guarantors thereunder, the

Prepetition ABL Agent, as an administrative agent and collateral agent, as in effect immediately prior to the Effective Date.

*Prepetition ABL Facility* means the revolving asset-based credit facility arising under the Prepetition ABL Credit Agreement.

*Priming Notes* means the 10.875% senior secured notes due 2024 issued pursuant to the Priming Notes Indenture.

*Priming Notes Claim* means a Claim arising under or related to the Priming Notes or the Priming Notes Indenture; for the avoidance of doubt, the Priming Notes Claims shall include all principal, accrued and unpaid pre- and postpetition interest (including at the default rate (to the extent applicable)), fees, and other amounts arising thereunder or payable pursuant thereto, including the applicable make-whole amount.

*Priming Notes DIP Claim* means any Claim arising under, or related to the Priming Notes DIP Roll-Up.

*Priming Notes DIP Roll-Up* means the Priming Notes Claims rolled up into the Term Loan DIP Facility in the amount of approximately $237,000,000 million pursuant to the DIP Orders.

*Priming Notes Indenture* means that certain Indenture, dated as of February 2, 2021 (as amended, modified, or otherwise supplemented from time to time), by and among TPC Group Inc., each of the guarantors thereunder, and the Priming Notes Trustee.

*Priming Notes Trustee* means U.S. Bank National Association and any of its successors or assigns, and any indenture trustee, collateral trustee, or other trustee or similar entity under the Priming Notes Indenture, in its capacities as such.

*Priority Tax Claim* means any Secured Claim or unsecured Claim of a governmental unit (as defined in section 101(27) of the Bankruptcy Code) of the kind entitled to priority of payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

*Pro Rata* means the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of all Allowed Claims or Interests in that Class.

*Professional Person* means any Person retained by order of the Bankruptcy Court in connection with these Chapter 11 Cases pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code, excluding any ordinary course professional retained pursuant to an order of the Bankruptcy Court.

*Released Parties* means, collectively, (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Supporting Noteholders, (iv) SK Second Reserve, L.P., a Delaware limited partnership; (v) the agents and lenders under the Exit ABL Facility, (vi) the holders of the Exit Notes and Holdco Notes and any agents or trustees thereunder, (vii) the agents and lenders under the ABL DIP Facility, (viii) the agents and lenders under the Term Loan DIP Facility, (ix) the Backstop Parties, (x) the Supporting Sponsors, (xi) the agents and lenders under the Prepetition ABL Credit

Agreement, (xii) the indenture trustees and collateral trustees in respect of the Priming Notes and the 10.5% Notes; and (xiii) with respect to each of the foregoing Persons (i)–(xii), each of their affiliates, predecessors, successors, assigns, subsidiaries, current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, employees of affiliates who worked on matters related to the Debtors or the Chapter 11 Cases and other professionals, affiliated investment funds or investment vehicles, managed accounts or funds, and such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such; *provided*, that in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation; *provided*, *further*, that NALCO Co, LLC, Ingenero, Inc., and Suez WTS USA, Inc. shall not be Released Parties.

   ***Releasing Parties*** means, collectively, and in each case in its capacity as such: (a) the holders of all Claims that vote to or are deemed to accept the Plan, (b) the holders of all Claims whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan, (c) the holders of all Claims or Interests that vote, or are deemed, to reject the Plan but do not opt out of granting the releases set forth herein, (d) the holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth herein but did not opt out, and (e) the Released Parties other than the Debtors (*provided*, that with respect to Released Parties identified in clause (xiii) of the definition thereof, each such Person constitutes a Releasing Party under this clause (e) solely with respect to claims that such Person could have properly asserted on behalf of a Person identified in clauses (i) through (xii) of the definition of Released Parties).

   ***Reorganized*** means, with respect to any Debtor, on or after the Effective Date, such Debtor as reorganized under and pursuant to the Plan, or any successor thereto or assign thereof.

   ***Reorganized Holdings*** means, on or after the Effective Date, Holdings as reorganized under and pursuant to the Plan.

   ***Required Supporting Noteholders*** has the meaning ascribed to such term in the Restructuring Support Agreement.

   ***Requisite Debt Commitment Parties*** means the "Requisite Commitment Parties" under and as defined in the Debt Backstop Agreement.

   ***Requisite Equity Commitment Parties*** means the "Requisite Commitment Parties" under and as defined in the Equity Backstop Agreement.

   ***Restructuring*** means the financial restructuring of the Debtors, the principal terms of which are set forth in the Restructuring Support Agreement, the Plan and the Plan Supplement.

   ***Restructuring Expenses*** means all reasonable and documented fees, costs and out-of-pocket expenses of the Supporting Noteholders Advisors, in each case, in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and/or

enforcement of the Restructuring Support Agreement, this Plan and/or any of the other Definitive Documents, and/or the transactions contemplated hereby or thereby, and/or any amendments, waivers, consents, supplements or other modifications to any of the foregoing and, to the extent applicable, consistent with any engagement letters or fee reimbursement letters entered into between the applicable Debtors, on the one hand, and each Supporting Noteholder Advisor, on the other hand.

       **Restructuring Support Agreement** means that certain Restructuring Support Agreement, entered into and dated as of May 31, 2022, by and among the Debtors and the other parties signatory thereto, including all exhibits, schedules and other attachments thereto, as such agreement may be amended from time to time in accordance with the terms thereof, a copy of which is attached as Exhibit A to the *Declaration of Robert A. Del Genio in Support of Debtors' Chapter 11 Petitions and First Day Motions* [D.I. 27].

       **Restructuring Term Sheet** means the term sheet attached as Exhibit A to the Restructuring Support Agreement including all exhibits, schedules and other attachments thereto.

       **Restructuring Transactions** means one or more transactions pursuant to section 1123(a)(5) of the Bankruptcy Code to occur on the Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including (a) the consummation of the transactions provided for under or contemplated by the Restructuring Support Agreement; (b) the execution and delivery of appropriate agreements or other documents containing terms that are consistent with or reasonably necessary to implement the terms of the Plan and the Restructuring Support Agreement and that satisfy the requirements of applicable law; (c) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan and the Restructuring Support Agreement; and (d) all other actions that the Debtors (with the consent of the Required Supporting Noteholders) or the Reorganized Debtors (at the direction of the New Board), as applicable, determine are necessary or appropriate.

       **Restructuring Transactions Memorandum** means a document that includes a description of the Restructuring Transactions, including any changes to the corporate and/or capital structure of any of the Reorganized Debtors to be made on or prior to the Effective Date, and description of, or changes to, the tax structure of the Reorganized Debtors, in each case, as determined by the Debtors and the Required Supporting Noteholders.

       **Rights Offering Procedures** means the Equity Rights Offering Procedures and/or the Debt Rights Offering Procedures, as context may require; provided that the Equity Rights Offering Procedures and the Debt Rights Offering Procedures may, for purposes of administrative convenience, be contained in a single document.

       **Schedule of Rejected Contracts** means the schedule of executory contracts and unexpired leases to be rejected by the Debtors pursuant to the Plan, if any, as the same may be amended, modified, or supplemented from time to time.

**Schedules** means any schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code, which shall be reasonably acceptable to the Required Supporting Noteholders.

**Secured Claim** means a Claim to the extent (i) secured by a valid, perfected and enforceable Lien on property of a Debtor's Estate, the amount of which is equal to or less than the value of such property as (a) set forth in the Plan, (b) agreed to by the holder of such Claim, the Debtors and the Required Supporting Noteholders, or (c) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (ii) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code.

**Securities Act** means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, and the rules and regulations promulgated thereunder.

**Security** means any "security" as such term is defined in section 101(49) of the Bankruptcy Code.

**Shareholder Agreement** means the shareholder agreement to be entered into (or as may be deemed entered into, as applicable) by the Reorganized Debtors and the holders of New Common Shares on the Effective Date that will govern certain matters related to the governance of the Reorganized Debtors.

**Solicitation Materials** means collectively, Disclosure Statement and the related solicitation materials approved by the Bankruptcy Court for solicitation.

**Statutory Fees** means all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code.

**Subordinated Claim** means a Claim that is subject to subordination in accordance with sections 510(b)-(c) of the Bankruptcy Code or otherwise.

**Supporting Noteholders** means the beneficial owners (or nominees, investment managers, advisors, or subadvisors for the beneficial owners) of Priming Notes and/or 10.5% Notes that are signatories to the Restructuring Support Agreement, and any holders of Priming Notes and/or 10.5% Notes that subsequently becomes party thereto in accordance with the terms of the Restructuring Support Agreement.

**Supporting Noteholders Advisors** means the advisors to the Ad Hoc Noteholder Group, which include Evercore Group L.L.C., Paul Hastings LLP, Stroock & Stroock & Lavan LLP and Young Conaway Stargatt & Taylor, LLP and any other advisor retained by the Ad Hoc Noteholder Group from time to time with the Debtors' reasonable consent.

**Supporting Sponsors** means collectively (i) FR Sawgrass, L.P., a Delaware limited partnership; (ii) SK Sawgrass, L.P., a Delaware limited partnership; (iii) Sawgrass Holdings GP LLC, a Delaware limited liability company; and (iv) Sawgrass Holdings LP, a Delaware limited partnership; (v) First Reserve Corporation, L.L.C., a Delaware limited liability company; (vi) First Reserve Management, L.P., a Cayman Islands limited partnership; (vii) FR XII Alpha AIV, L.P.,

a Cayman Islands limited partnership; (viii) SK Capital Partners, L.P., a Delaware limited partnership; and (ix) FR XII-A Alpha AIV, L.P., a Cayman Islands limited partnership.

*Takeback HoldCo Notes* means $80,000,000 in principal amount of HoldCo Notes issued under the Plan on account of Allowed 10.5% Notes Secured Claims.

*Tax Code* means the Internal Revenue Code of 1986, as amended from time to time.

*Term Loan DIP Agents* means GLAS USA LLC, as administrative agent and GLAS Americas LLC, as collateral agent.

*Term Loan DIP Credit Agreement* means the credit agreement governing the terms of the Term Loan DIP Facility, dated as of June 6, 2022, by and among the Debtors, the Term Loan DIP Agents, and the Term Loan DIP Lenders, with any amendments, restatements, amendments and restatements, modifications or supplements thereto as permitted by the DIP Orders.

*Term Loan DIP Facility* means the postpetition senior secured superpriority priming term loan facility approved by the DIP Orders.

*Term Loan DIP Claim* means any Claim held by the Term Loan DIP Agents, or any Term Loan DIP Lender arising under or relating to the Term Loan DIP Credit Agreement or the DIP Orders.

*Term Loan DIP Lenders* means the lenders from time to time party to the Term Loan DIP Credit Agreement.

*Unimpaired* means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124(2) of the Bankruptcy Code.

*U.S. Trustee* means the United States Trustee for the District of Delaware.

*Voting Deadline* means the date and time to be set by the Bankruptcy Court as the deadline for holders of Impaired Claims to vote to accept or reject the Plan.

## 1.2    *Interpretation; Application of Definitions; Rules of Construction.*

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in or exhibit to the Plan, as the same may be amended, waived, or modified from time to time in accordance with the terms hereof and the Restructuring Support Agreement. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein and have the same meaning as "in the Plan," "of the Plan," "to the Plan," and "under the Plan," respectively. The words "includes" and "including" are not limiting. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or plural, shall include both the singular and plural, and pronouns stated in the masculine, feminine, or neuter

gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (d) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

### 1.3    *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to this Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

### 1.4    *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to the legal tender of the United States of America unless otherwise expressly provided.

### 1.5    *Consent Rights.*

Notwithstanding anything herein to the contrary, any and all consent rights of the parties to the Restructuring Support Agreement and the Commitment Parties set forth in the Restructuring Support Agreement and the  and the Backstop Agreements (as applicable) with respect to the form and substance of this Plan, the Plan Supplement and the other Definitive Documents (and the terms and conditions hereof and thereof), including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article 1.1 hereof) and be fully enforceable as if stated in full herein.

### 1.6    *Controlling Document.*

In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control unless otherwise specified in such Plan Supplement document.  In the event of an inconsistency between the Plan and any other instrument or document created or executed pursuant to the Plan, or between the Plan and the Disclosure Statement, the Plan shall control.  The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided*, that if there is determined to be any inconsistency between any provision of the Plan and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of the Plan.

**ARTICLE II.**      **ADMINISTRATIVE EXPENSE CLAIMS, FEE CLAIMS, DIP CLAIMS, AND PRIORITY TAX CLAIMS.**

### 2.1      *Treatment of Administrative Expense Claims.*

On (or as soon thereafter as is reasonably practicable) the later of (i) the Effective Date and (ii) the first Business Day after the date that is thirty (30) calendar days after the date each Administrative Expense Claim becomes an Allowed Administrative Expense Claim, each holder of an Allowed Administrative Expense Claim (other than a Fee Claim or Restructuring Expenses) shall receive in full and final satisfaction of such Claim, either (x) Cash in an amount equal to the Allowed amount of such Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code or (y) such other less favorable treatment as to which the Debtors or the Reorganized Debtors, as applicable, subject to the consent of the Required Supporting Noteholders, and the holder of such Allowed Administrative Expense Claim will have agreed upon in writing; *provided*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities.

### 2.2      *Treatment of Fee Claims.*

(a)      All Professional Persons seeking approval by the Bankruptcy Court of Fee Claims shall (i) file, on or before the date that is sixty (60) days after the Effective Date, their respective applications for final allowances of such Fee Claims and (ii) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) relating to or allowing any such Fee Claim. The Debtors are authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

(b)      No later than ten (10) Business Days before the proposed Effective Date, all Professional Persons shall deliver to the Debtors and the Supporting Noteholders Advisors a reasonable and good-faith estimate of their Fee Claims to be held in escrow on the terms and subject to the conditions set forth in this Plan and that certain escrow agreement (which agreement shall be reasonably acceptable to the Required Supporting Noteholders). On the Effective Date, the Debtors shall establish and fund the Fee Escrow Account. The Debtors shall fund the Fee Escrow Account with Cash equal to the Professional Persons' good faith estimates of the Fee Claims. Funds held in the Fee Escrow Account shall not be considered property of the Debtors' Estates or property of the Reorganized Debtors, but shall revert to the Reorganized Debtors only after all Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full. The Fee Escrow Account shall be held in trust for Professional Persons and for no other parties until all Fee Claims Allowed by the Bankruptcy Court have been paid in full. Allowed Fee Claims owing to the applicable Professional Persons shall be paid in full, in Cash, to such Professional Persons from funds held in the Fee Escrow Account when such Claims are Allowed by an order of the Bankruptcy Court or authorized to be paid under the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [D.I. 339]; *provided* that the

22

Reorganized Debtors' obligations with respect to Allowed Fee Claims shall not be limited by nor deemed limited to the balance of funds held in the Fee Escrow Account.  To the extent that funds held in the Fee Escrow Account are insufficient to satisfy the Allowed amount of accrued Fee Claims owing to the Professional Persons, such Professional Persons shall have an Allowed Administrative Expense Claim for any such deficiency, which shall be satisfied in accordance with Section 2.1 of the Plan.  No Liens, claims, or interests shall encumber the Professional Fee Escrow in any way.  For the avoidance of doubt, Restructuring Expenses shall not be paid into the Fee Escrow Account, and shall be payable on the Effective Date pursuant to Section 5.14 of the Plan.

(c)    Any objections to Fee Claims shall be served and filed (a) no later than twenty one (21) days after the filing of the final applications for compensation or reimbursement or (b) such later date as ordered by the Bankruptcy Court upon a motion of the Reorganized Debtors.

## 2.3    *Treatment of DIP Claims and Commitments.*

On the Effective Date and subject to the terms of the Payoff Letter, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed ABL DIP Claim, each holder of an Allowed ABL DIP Claim shall receive its Pro Rata share of, at the Debtors' option (with the consent of the Required Supporting Noteholders), either (i) on a dollar-for-dollar basis, first lien revolving loans and letter of credit participations under the Exit ABL Facility or (ii) payment in full in accordance with the Payoff Letter on account of its Allowed ABL DIP Claims from the proceeds of the Exit ABL Facility.  On the Effective Date, all Liens granted to secure the Allowed ABL DIP Claims shall be terminated and of no further force and effect, subject to the Payoff Letter.

On the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Term Loan DIP Claim, each holder of an Allowed Term Loan DIP Claim shall receive payment in full in Cash on account of its Allowed Term Loan DIP Claims.  Upon the indefeasible payment or satisfaction in Cash, on the Effective Date, all Liens granted to secure the Allowed Term Loan DIP Claims shall be terminated and of no further force and effect.

On the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priming Notes DIP Claim, each holder of an Allowed Priming Notes DIP Claim shall receive payment in full in Cash on account of its Allowed Priming Notes DIP Claims.  Upon the indefeasible payment or satisfaction in Cash, on the Effective Date, all Liens granted to secure the Allowed Priming Notes DIP Claims shall be terminated and of no further force and effect.

## 2.4    *Payment of Fees and Expenses Under DIP Order.*

On the later of (i) the Effective Date and (ii) the date on which such fees, expenses or disbursements would be required to be paid under the terms of the DIP Orders, the Debtors or Reorganized Debtors (as applicable) shall pay all fees, expenses and disbursements of the Term Loan DIP Agents and ABL DIP Agent otherwise required to be paid under or pursuant to the

applicable DIP Order.  All payments of fees, expenses, or disbursements pursuant to this Section 2.4 shall be subject in all respects to the terms of the applicable DIP Order.

### 2.5 *Treatment of Priority Tax Claims.*

On the Effective Date or as soon thereafter as is reasonably practicable, each holder of an Allowed Priority Tax Claim shall receive in full and final satisfaction of such Claim, either (i) Cash in an amount equal to the Allowed amount of such Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code or (ii) such other less favorable treatment as to which the Debtors or the Reorganized Debtors, as applicable, subject to the consent of the Required Supporting Noteholders, and the holder of such Allowed Administrative Expense claim will have agreed upon in writing; *provided*, that Allowed Priority Tax Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities.

## ARTICLE III.    CLASSIFICATION OF CLAIMS AND INTERESTS.

### 3.1 *Classification in General.*

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided*, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

Because Holdings is expected to have no distributable value that would require a greater recovery on account of Allowed Class 4 Claims than that set forth in the Plan, the Plan consolidates Class 4 General Unsecured Claims of all the Debtors into one estate for purposes of distribution only.

### 3.2 *Formation of Debtor Groups for Convenience Only.*

The Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, confirmation of the Plan, and making Plan Distributions in respect of Claims against and Interests in the Debtors under the Plan.  Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' businesses enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any Assets; and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities.

### 3.3    *Summary of Classification of Claims and Interests.*

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are: (i) Impaired and Unimpaired under the Plan; (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; and (iii) presumed to accept or reject the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified. The classification of Claims and Interests set forth herein shall apply separately to each Debtor.

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|-------|---------------------------|------------|------------------|
| Class 1 | Other Secured Claims | Unimpaired | No (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | No (Presumed to Accept) |
| Class 3 | 10.5% Notes Secured Claims | Impaired | Yes |
| Class 4 | General Unsecured Claims | Impaired | Yes |
| Class 5 | Intercompany Claims | Unimpaired | No (Presumed to Accept) |
| Class 6 | Subordinated Claims | Impaired | No (Deemed to Reject) |
| Class 7 | Existing Holdings Interests | Impaired | No (Deemed to Reject) |
| Class 8 | Other Holdings Interests | Impaired | No (Deemed to Reject) |
| Class 9 | Intercompany Interests | Unimpaired | No (Presumed to Accept) |

### 3.4    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### 3.5    *Separate Classification of Other Secured Claims.*

Although all Other Secured Claims have been placed in one Class for purposes of nomenclature within the Plan, each Other Secured Claim, to the extent secured by a Lien on Collateral different from the Collateral securing a different Other Secured Claim, shall be treated as being in a separate sub-Class for the purposes of voting to accept or reject the Plan and receiving Plan Distributions.

### 3.6    *Elimination of Vacant Classes.*

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes that votes on the Plan shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

### 3.7  *Voting Classes; Presumed Acceptance by Non-Voting Classes.*

With respect to each Debtor, if a Class contained Claims eligible to vote and no holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the holders of such Claims in such Class.

### 3.8  *Voting; Presumptions; Solicitation.*

(a)    **Acceptance by Certain Impaired Classes**.  Only holders of Allowed Claims in Classes 3 and 4 are entitled to vote to accept or reject the Plan.  An Impaired Class of Claims shall have accepted the Plan if (a) the holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.   Holders of Allowed Claims in Classes 3 and 4 shall receive ballots containing detailed voting instructions.

(b)    **Conclusive Presumption of Acceptance by Unimpaired Classes**. Holders of Claims and Interests in Classes 1, 2, 5, and 9 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject the Plan.

(c)    **Deemed Rejection by Certain Impaired Classes**.  Holders of Claims and Interests in Classes 6, 7, and 8 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject the Plan.

### 3.9  *Cramdown.*

If any Class is deemed to reject the Plan or is entitled to vote on the Plan and does not vote to accept the Plan, the Debtors may (i) seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify the Plan in accordance with the terms hereof and the Bankruptcy Code.  If a controversy arises as to whether any Claims or Interests, or any class of Claims or Interests, are impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### 3.10  *No Waiver.*

Nothing contained in the Plan shall be construed to waive any right of a Debtor, Reorganized Debtor, or the GUC Trustee, as applicable, to object on any basis to any Disputed Claim.

## ARTICLE IV.    TREATMENT OF CLAIMS AND INTERESTS.

### 4.1  *Class 1:  Other Secured Claims.*

(a)    **Treatment**: Except to the extent that a holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the Debtors or the Reorganized Debtors, but with the consent of

the Required Supporting Noteholders, each holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Other Secured Claim either:

      i.      payment in full in Cash; or

      ii.     such other treatment rendering such Other Secured Claim Unimpaired;

in each case, on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable **thereafter**.

      (b)    **Impairment and Voting**: Class 1 is Unimpaired. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Secured Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Secured Claims.

### 4.2    *Class 2:  Other Priority Claims.*

      (a)    **Treatment**: Except to the extent that a holder of an Allowed Other Priority Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Priority Claim, at the option of the Debtors or the Reorganized Debtors, but with the consent of the Required Supporting Noteholders, each holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Other Secured Claim either:

      i.      payment in full in Cash; or

      ii.     such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code,

in each case, on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, in each case, or as soon as reasonably practicable thereafter.

      (b)    **Impairment and Voting**: Class 2 is Unimpaired. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Priority Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Priority Claims.

### 4.3    *Class 3: 10.5% Notes Secured Claims.*

      (a)    **Allowance**: The 10.5% Notes Secured Claims shall be deemed Allowed in the aggregate amount of $479,200,000.

      (c)    **Treatment**: Except to the extent that a holder of an Allowed 10.5% Notes Secured Claim agrees to less favorable treatment, on the Effective Date, each holder of an Allowed

10.5% Notes Secured Claim shall receive, in full and final satisfaction of such 10.5% Notes Secured Claim, its Pro Rata share of the following:

> i. Cash in the amount of $350 million, *plus* all unrestricted Cash held by the Debtors on the Effective Date in excess of $50 million, with such excess cash to be reduced by (i) any amounts drawn and letters of credit issued (whether or not drawn) under the Exit ABL Facility, and (ii) any reserves and other cash distribution requirements expressly provided under the Plan;

> ii. 100% of the New Common Shares, subject to dilution by the Equity Rights Offering Securities, the Equity Direct Allocation Securities, the Equity Put Option Securities, the Debt Put Option Securities and the Management Incentive Plan;

> iii. the Takeback HoldCo Notes;

> iv. 100% of the Debt Subscription Rights; and

> v. 100% of the Equity Subscription Rights.

(d)    **Impairment and Voting**: Class 3 is Impaired.  Holders of Allowed 10.5% Notes Secured Claims in Class 3 are entitled to vote to accept or reject the Plan.

### 4.4    *Class 4:  General Unsecured Claims.*

(a)    **Treatment**:  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, each holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Allowed General Unsecured Claim:

> i. ***In the event that Class 4 votes to <u>accept</u> the Plan:*** On the Effective Date, its Pro Rata share of the GUC Trust Interests (which, for the avoidance of doubt, shall entitle such holder to receive its Pro Rata share of the GUC Trust Assets in accordance with the GUC Trust Agreement); *provided*, that distributions on account of Allowed 10.5% Notes Deficiency Claims will be waived; or

> ii. ***In the event that Class 4 votes to <u>reject</u> the Plan:*** On the Effective Date, all General Unsecured Claims will be discharged without further notice to, approval of or action by any Person or Entity, and the holders of General Unsecured Claims shall not receive any distribution or retain any property on account of such General Unsecured Claims.

(b)    **Impairment and Voting**: Class 4 is Impaired.  Holders of Allowed General Unsecured Claims in Class 4 are entitled to vote to accept or reject the Plan.

### 4.5    *Class 5:  Intercompany Claims.*

(a)    **Treatment**:  Allowed Intercompany Claims shall, at the option of the applicable Debtor(s) or Reorganized Debtor(s), as applicable, and   the Required Supporting Noteholders, be (i) reinstated, (ii) adjusted, or (iii) discharged (or otherwise eliminated) and receive no distribution under the Plan.

(b)    **Impairment and Voting**:  Class 5 is Unimpaired. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Intercompany Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Intercompany Claims.

### 4.6    *Class 6:  Subordinated Claims.*

(a)    **Treatment**:  All Subordinated Claims, if any, shall discharged, cancelled, released, and extinguished as of the Effective Date and will be of no further force or effect, and holders of Subordinated Claims will not receive any distribution on account of such Subordinated Claims.

(b)    **Impairment and Voting**:  Class 6 is Impaired.  In accordance with section 1126(g) of the Bankruptcy Code, holders of Subordinated Claims are deemed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Subordinated Claims.

### 4.7    *Class 7:  Existing Holdings Interests.*

(a)    **Treatment**:  All Existing Holdings Interests shall be cancelled, released, and extinguished and will be of no further force or effect as of the Effective Date, whether surrendered for cancellation or otherwise.  No holder of Existing Holdings Interests will receive any distribution under the Plan on account of such Existing Holdings Interests.

(b)    **Impairment and Voting**:  Class 7 is Impaired.  In accordance with section 1126(g) of the Bankruptcy Code, holders of Existing Holdings Interests are deemed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Existing Holdings Interests.

### 4.8    *Class 8:  Other Holdings Interests.*

(a)    **Treatment**:  All Other Holdings Interests shall be cancelled, released, and extinguished and will be of no further force or effect as of the Effective Date, whether surrendered for cancellation or otherwise.  No holder of Other Holdings Interests will receive any distribution under the Plan on account of such Other Holdings Interests.

(b)    **Impairment and Voting**:  Class 8 is Impaired.  In accordance with section 1126(g) of the Bankruptcy Code, holders of Other Holdings Interests are deemed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Other Holdings Interests.

**4.9**     *Class 9: Intercompany Interests.*

(a)     **Treatment**: Intercompany Interests are Unimpaired. On the Effective Date, all Intercompany Interests shall, at the option of the applicable Debtor(s) or Reorganized Debtor(s), as applicable, and the Required Supporting Noteholders, be (i) adjusted, (ii) reinstated or (iii) discharged (or otherwise eliminated) and receive no distribution under the Plan.

(b)     **Impairment and Voting**: Class 9 is Unimpaired. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Intercompany Interests are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Intercompany Interests Claims.

**4.10**     *Treatment of Vacant Classes.*

Any Claim or Interest in a Class that is considered vacant under Section 3.6 of the Plan shall receive no Plan Distribution.

## ARTICLE V.     MEANS FOR IMPLEMENTATION.

**5.1**     *Continued Corporate Existence; Effectuating Documents; Further Transactions.*

(a)     Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated into this Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, or other form, as the case may be, with all the powers of a corporation, limited liability company, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended, amended and restated, or replaced under this Plan or otherwise, including pursuant to the New Corporate Governance Documents, and to the extent such documents are amended in accordance therewith, such documents are deemed to be amended, amended and restated, or replaced pursuant to this Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

(b)     On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor, each Reorganized Debtor may, in its sole discretion, take such action as permitted by applicable law and the New Corporate Governance Documents or other applicable corporate governance documents, as such Reorganized Debtor may determine is reasonable and appropriate, including, subject to the consent of the Required Supporting Noteholders, causing: (i) a Reorganized Debtor to be merged into another Reorganized Debtor or an affiliate of a Reorganized Debtor; (ii) a Reorganized Debtor to be dissolved; (iii) the legal name of a Reorganized Debtor to be changed; (iv) a Reorganized Debtor to convert its form of entity; or (v) the closure of a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter, and such action and documents are deemed to require no

further action or approval (other than any requisite filings required under the applicable state, provincial and federal or foreign law).

(c)    On the Effective Date or as soon thereafter as is reasonably practicable, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate the Plan, including, subject to the consent of the Required Supporting Noteholders:  (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and the Plan Supplement and that satisfy the requirements of applicable law and any other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation or formation and amendments thereto, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable law; (iv) the Restructuring Transactions; and (v) all other actions that the applicable entities determine to be necessary or appropriate, including, making filings or recordings that may be required by applicable law.

## 5.2    *Corporate Action.*

(a)    Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (a) the assumption of executory contracts and unexpired leases as provided herein, (b) the selection of the managers, directors, or officers for the Reorganized Debtors, (c) the distribution of the New Common Shares and HoldCo Notes, (d) the entry into or execution of the Exit Facility Documents, (e) entry into the Shareholder Agreement by Reorganized Holdings and the holders of New Common Shares, (f) entry into the HoldCo Notes Indenture, and (g) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date), in each case in accordance with and subject to the terms hereof.  All matters provided for in the Plan involving the corporate or limited liability company structure of the Debtors or the Reorganized Debtors, and any corporate or limited liability company action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors.

(b)    On or (as applicable) before the Effective Date, the appropriate directors, officers, and managers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to, subject to the consent of the Required Supporting Noteholders, issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan).  The authorizations and approvals contemplated by this Section 5.2 shall be effective notwithstanding any requirements under non-bankruptcy law.

## 5.3    *Plan Funding.*

Plan Distributions of Cash (including, solely in the event that Class 4 votes to accept the Plan, the GUC Trust Initial Funding Amount), shall be funded from the Debtors' Cash

on hand as of the applicable date of such Plan Distributions and from the proceeds of the Debt Rights Offering, Equity Rights Offering, Holdco Notes, Exit ABL Facility, and the Exit Notes. If applicable, the GUC Trust Contingent Funding Amount shall be funded from the Reorganized Debtors' Cash on hand as of the applicable date of such funding in accordance with the GUC Trust Agreement.

### 5.4    *Cancellation of Existing Securities and Agreements.*

(a)     Except for the purpose of evidencing a right to and allowing holders of Claims to receive a distribution under the Plan, and except as otherwise set forth in the Plan or in the Plan Supplement or any related agreement, instrument, or document, on the Effective Date, all agreements, instruments, notes, certificates, indentures, mortgages, security documents, and other instruments or documents evidencing or creating any prepetition Claim or Interest (collectively, the "**Cancelled Agreements**") (except that the following shall not be Cancelled Agreements:  the agreements, instruments, notes, certificates, indentures, mortgages, security documents, and other instruments or documents governing, relating to and/or evidencing (i) certain Intercompany Interests not modified by the Plan, (ii) the Intercreditor Agreements (including the Intercreditor Agreements themselves) (iii) any security interests granted in connection with or with respect to the DIP Facilities and any rights of any holder in respect thereof and (iv) the Payoff Letter) shall be deemed cancelled and of no force or effect and the Debtors shall not have any continuing obligations thereunder; *provided*, *however*, that each of the Cancelled Agreements shall continue in effect solely for the purposes of, (a) allowing holders of Claims or Interests to receive distributions under the Plan on account of such Claims or Interests and (b) allowing and preserving the rights of the ABL DIP Agent, Term Loan DIP Agents, Priming Notes Trustee, and the 10.5% Notes Trustee, as applicable, to (i) make distributions on account of such Claims or Interests; (ii) maintain, enforce, and exercise their respective liens, including their Indenture Trustee Charging Liens, as applicable, under the terms of the applicable agreements, or any related or ancillary document, instrument, agreement, or principle of law, against any money or property distributed or allocable on account of such Claims, as applicable; (iii) seek compensation and reimbursement for any reasonable and documented fees and expenses incurred in connection with the implementation of the Plan; (iv) maintain, enforce, and exercise any right or obligation to compensation, indemnification, expense reimbursement, or contribution, or any other claim or entitlement that the, ABL DIP Agent, Term Loan DIP Agents, Priming Notes Trustee, and the 10.5% Notes Trustee may have under the Plan, the Payoff Letter, the applicable credit agreement, Indentures, collateral agreements, or pledge agreements; (v) appear and raise issues in these Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court after the Effective Date on matters relating to the Plan or the applicable credit agreements or Indentures; and (vi) execute documents pursuant to Section 5.6 of the Plan; *provided*, *further*, that the ABL DIP Agent, Term Loan DIP Agents, Priming Notes Trustee, and the 10.5% Notes Trustee may take such further action to implement the terms of this Plan, including the Restructuring Transactions, as agreed to with the Debtors or the Reorganized Debtors, as applicable, and the Required Supporting Noteholders to the extent not inconsistent with the Confirmation Order or the Plan.

(b)     On and after the Effective Date, all duties, responsibilities or obligations of the Prepetition ABL Agent, ABL DIP Agent, Term Loan DIP Agents, Priming Notes Trustee, and the 10.5% Notes Trustee, the holders of RBL Claims, the DIP Agent, in each case under (i) the

Prepetition ABL Credit Agreement and the other Credit Documents (as defined in the Prepetition ABL Credit Agreement), (ii) the ABL DIP Facility Credit Agreement and the other Credit Documents (as defined in the ABL DIP Facility Credit Agreement) (subject to the terms of the Payoff Letter), (iii) the Term Loan DIP Facility Credit Agreement and the other Credit Documents (as defined in the Term Loan DIP Facility Credit Agreement), (iv) the 10.5% Notes Indenture and the other Notes Documents (as defined in the applicable 10.5% Notes Indenture), and (v) the Priming Notes Indenture and the other Notes Documents (as defined in the applicable Priming Notes Indenture), shall, in each case, be fully discharged, and such Persons shall have no rights or obligations arising from or related to such agreements, instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan. For the avoidance of doubt, the Debtors and the Reorganized Debtors (in each case, subject to the reasonable consent of the Required Supporting Noteholders), the Prepetition ABL Agent, the ABL DIP Agent, Term Loan DIP Agents, Priming Notes Trustee, and the 10.5% Notes Trustee, and the Disbursing Agent may (i) make post-Effective Date Distributions or take such other action to exercise their rights and discharge their obligations relating to the interests of the holders of such Claims in accordance with the Plan, and (ii) may take any other action necessary to cause the Plan to become Effective, including by implementing the Restructuring Transactions set forth in this Plan.

(c)    If the record holder of any Priming Note or 10.5% Note is DTC or its nominee or another securities depository or custodian thereof, and such Priming Note or 10.5% Note is represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then each beneficial holder of such Priming Note or 10.5% Note shall be deemed to have surrendered such Note upon surrender of the applicable global security by DTC or such other securities depository or custodian thereof.

### 5.5   *Cancellation of Certain Existing Security Interests.*

(a)    Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Debtors or Reorganized Debtors, as applicable, any Collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or *lis pendens*, or similar interests or documents.

(b)    After the Effective Date, the distributions to holders on account of 10.5% Notes Claims, and the payment of the Indenture Trustee Fees and Expenses (including, without limitation, attorneys' fees and expenses), the Debtors or the Reorganized Debtors, at their expense, may, in their sole discretion, take any action necessary to terminate, cancel, extinguish, and/or evidence the release of any and all mortgages, deeds of trust, Liens, pledges, and other security interests with respect to the 10.5% Notes Claims, including, without limitation, the preparation and filing, in form, substance, and content reasonably acceptable to the Indenture Trustees, of any and all documents necessary to terminate, satisfy, or release any mortgages, deeds of trust, Liens, pledges, and other security interests held by the Indenture Trustees, including, without limitation, UCC-3 termination statements.

### 5.6 *Officers and Boards of Directors.*

(a)     On the Effective Date, the New Board shall initially consist of seven (7) individuals, consisting of (i) Reorganized Holdings' chief executive officer and (ii) six (6) individuals selected by the Required Supporting Noteholders in their sole discretion and on arrangements to be agreed to by, and in the sole discretion of, the Required Supporting Noteholders. The composition of the boards of directors or managers, as applicable, of each Reorganized Debtor (to the extent known) shall be identified no later than the Confirmation Hearing or otherwise in accordance with section 1129(a)(5) of the Bankruptcy Code.

(b)     Except as otherwise provided in the Plan Supplement, the officers of the respective Reorganized Debtors immediately before the Effective Date, as applicable, shall serve as the initial officers of each of the respective Reorganized Debtors on and after the Effective Date. After the Effective Date, the selection of officers of the Reorganized Debtors shall be as provided by their respective organizational documents.

(c)     Except to the extent that a member of the board of directors or managers, as applicable, of a Debtor continues to serve as a director or manager of such Reorganized Debtor on the Effective Date, the members of the board of directors or managers, as applicable, of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date and each such director or manager shall be deemed to have resigned or shall otherwise cease to be a director or manager of the applicable Debtor on the Effective Date. Commencing on the Effective Date, each of the directors or managers, as applicable, of each of the Reorganized Debtors shall serve pursuant to the terms of the applicable organizational documents of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents.

### 5.7 *Management Incentive Plan.*

Promptly after the Effective Date, the New Board shall adopt the Management Incentive Plan. Up to 7% of the New Common Shares shall be reserved for issuance under the Management Incentive Plan, with amounts, structure, awards and terms of the Management Incentive Plan to be determined by the New Board. All awards issued under the Management Incentive Plan will be dilutive of all other equity interests in Reorganized Holdings issued in connection with the Restructuring Transactions.

### 5.8 *Authorization, Issuance, and Delivery of New Common Shares.*

On the Effective Date, Reorganized Holdings is authorized to issue or cause to be issued and shall issue the New Common Shares for distribution in accordance with the terms of the Plan without the need for any further board, shareholder or other corporate action. All of the New Common Shares, issuable under the Plan, when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable. Reorganized Holdings' New Corporate Governance Documents shall have provided for sufficient authorized New Common Shares to effectuate the issuance of New Common Shares contemplated by and in connection with the Plan, including the Equity Direct Allocation Securities, the Equity Rights Offering Securities, the Equity Put Option Securities, the Debt Put Option Securities, the New Common Shares issuable under the

Management Incentive Plan and the New Common Shares received by holders of Allowed 10.5% Secured Notes Claims pursuant to Section 4.3 of the Plan. Reorganized Holdings shall issue or reserve for issuance a sufficient number of shares of New Common Shares to effectuate all such issuances. Each holder of New Common Shares may, at the option of the Debtors, with the consent of the Required Supporting Noteholders, and as set forth in the Confirmation Order, be deemed, without further notice or action, to have agreed to be bound by the New Corporate Governance Documents, as the same may be amended form time to time following the Effective Date in accordance with their terms. The New Corporate Governance Documents shall be binding on all Entities receiving New Common Shares (and their respective successors and assigns), whether received pursuant to the Plan or otherwise and regardless of whether such Entity executes or delivers a signature page to the Shareholder Agreement or any other New Corporate Governance Document. Notwithstanding the foregoing, the Debtors or the Reorganized Debtors, as applicable, may condition the distribution of any New Common Shares issued pursuant to the Plan upon the recipient thereof duly executing and delivering to the Debtors or the Reorganized Debtors, as applicable, counter-signatures to the Shareholder Agreement.

### 5.9    *Debt Documents.*

On the Effective Date, the applicable Reorganized Debtors shall be authorized to execute, deliver, and enter into the HoldCo Notes Indenture, the HoldCo Notes, the Exit ABL Credit Agreement, the Exit Notes Indenture and the Exit Notes (and all documents and agreements contemplated under each of the foregoing), including any documents required in connection with the creation or perfection of Liens in connection therewith without further (i) notice to or order or other approval of the Bankruptcy Court, (ii) act or omission under applicable law, regulation, order, or rule, (iii) vote, consent, authorization, or approval of any Person, or (iv) action by the holders of Claims or Interests. The HoldCo Notes Indenture, the HoldCo Notes, the Exit ABL Credit Agreement, the Exit Notes Indenture and the Exit Notes (and all documents and agreements contemplated under each of the foregoing)shall constitute legal, valid, binding and authorized joint and several obligations of the applicable Reorganized Debtors, enforceable in accordance with its terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, the Plan or the Confirmation Order. The financial accommodations to be extended pursuant to the HoldCo Notes Indenture, the HoldCo Notes, the Exit ABL Credit Agreement, the Exit ABL Facility, the Exit Notes Indenture and the Exit Notes are reasonable and are being extended, and shall be deemed to have been extended, in good faith and for legitimate business purposes.

On the Effective Date, (a) all Liens and security interests granted pursuant to or in connection with the Exit ABL Credit Agreement and the Exit Notes Indenture shall be deemed granted by the Reorganized Debtors, and (b) all Liens and security interests granted pursuant to, or in connection with, the Exit ABL Credit Agreement and the Exit Notes Indenture shall (i) be valid, binding, perfected, enforceable Liens and security interests in the property described in the Exit ABL Credit Agreement and the Exit Notes Indenture (and, in each case, any ancillary documents thereto), with the priorities established in respect thereof under applicable non-bankruptcy law and the applicable intercreditor agreements, and (ii) not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under any applicable law, the Plan, or the Confirmation Order.

The Reorganized Debtors and the Persons granted Liens and security interests under the Exit ABL Credit Agreement and the Exit Notes Indenture (and all documents and agreements contemplated under each of the foregoing) are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order without the need for any filings or recordings) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### 5.10   *Rights Offerings.*

(a)   General.

Following approval by the Bankruptcy Court of the Debt Rights Offering Procedures and the Equity Rights Offering Procedures in the Chapter 11 Cases, Holdings and Reorganized Holdings, as applicable, will commence the two separate rights offerings: (i) the Debt Rights Offering; and (ii) the Equity Rights Offering, in each case in accordance with the applicable Rights Offering Procedures.  On the Effective Date, Holdings and Reorganized Holdings, as applicable shall consummate the Debt Rights Offering and the Equity Rights Offering, in each case subject to the terms and conditions of the Plan, the applicable Rights Offering Procedures, the Equity Backstop Agreement and the Debt Backstop Agreement, and any consents or approvals required under each of the foregoing.

The Debt Rights Offering and the Equity Rights Offering are separate rights offerings, and eligible Persons may elect to participate in both, only one, or neither.  Participation in the Equity Rights Offering is not a condition to participation in the Debt Rights Offering and participation in the Debt Rights Offering is not a condition to participation in the Equity Rights Offering.

(b)   Equity Rights Offering.

The Plan provides that the Equity Rights Offering Amount will be raised through the Equity Rights Offering. Holdings and Reorganized Holdings, as applicable, will implement the Equity Rights Offering in accordance with the Equity Rights Offerings Procedures. The Equity Rights Offering Amount is fully backstopped by the Equity Backstop Parties pursuant to the terms and conditions set forth in the Equity Backstop Agreement.

The Debtors and Reorganized Debtors, as applicable, shall distribute (or cause to be distributed, directly or indirectly), the Equity Subscription Rights for the Equity Rights Offering as set forth in this Plan and the Equity Rights Offering Documents.  Subject to the terms and conditions set forth in the Equity Rights Offerings Procedures, the Equity Rights Offering shall be open to all Equity Rights Offering Participants, and the purchase price per share of the Equity Rights Offering Securities shall be $13.00. Upon exercise of the Equity Subscription Rights pursuant to the terms of the Equity Backstop Agreement and the Equity Rights Offerings Procedures, Reorganized Holdings shall be authorized to issue any issuable Equity Rights Offering Securities

pursuant to such exercise. The Equity Rights Offering Securities will dilute the distribution of New Common Shares received by holders of Allowed 10.5% Secured Notes Claims pursuant to <u>Section 4.3</u> of the Plan.

Subject to the terms and conditions set forth in the Equity Backstop Purchase Agreement, if, after following the procedures set forth in the Rights Offerings Procedures, there remains any unsubscribed Equity Rights Offering Securities, the Reorganized Debtors will have an option to sell to the Equity Backstop Parties, and, upon exercise of such option, the Equity Backstop Parties shall each, severally and not jointly, be required to purchase, their respective allocation of Backstop Commitment Securities (as defined in the Equity Backstop Agreement). Subject to, and in accordance with the Equity Backstop Agreement, as consideration for certain of the commitments of the Equity Commitment Parties under the Equity Backstop Agreement, the applicable Equity Commitment Parties shall receive the Equity Put Option Premium, which shall be deemed fully earned as of the date of execution of the Equity Backstop Agreement.

On the Effective Date, Holdings and Reorganized Holdings, as applicable, shall issue the Equity Rights Offering Securities pursuant to the Equity Rights Offering and the Equity Backstop Agreement. On the Effective Date, the rights and obligations of Holdings under the Equity Backstop Agreement shall vest in the Reorganized Debtors. Notwithstanding anything to the contrary in this Plan, (a) Holdings' obligations under the Equity Backstop Agreement shall remain unaffected and shall survive following the Effective Date in accordance with the terms thereof, (b) any such obligations shall not be discharged under this Plan, and (c) none of the Reorganized Debtors shall terminate any such obligations.

(c)     <u>Equity Direct Allocation</u>.

On the Effective Date, the Equity Direct Allocation Parties shall purchase, and Reorganized Holdings shall be authorized to issue to such parties, the Equity Direct Allocation Securities for the Equity Direct Allocation Amount. The issuance of the Equity Direct Allocation Securities to the Equity Direct Allocation Parties shall be subject to the terms of the Plan and the Equity Backstop Agreement. All such Equity Direct Allocation Securities shall be duly authorized, validly issued, fully paid, and non-assessable.

(d)     <u>Debt Rights Offering</u>.

The Plan provides that the Debt Rights Offering Amount will be raised through the Debt Rights Offering. Holdings and Reorganized Holdings, as applicable, will implement the Debt Rights Offering in accordance with the Debt Rights Offerings Procedures. The Debt Rights Offering Amount is fully backstopped by the Debt Backstop Parties pursuant to the terms and conditions set forth in the Debt Backstop Agreement.

The Debtors and Reorganized Debtors, as applicable, shall distribute (or cause to be distributed, directly or indirectly), the Debt Subscription Rights for the Debt Rights Offering as set forth in this Plan and the Debt Rights Offering Documents. Pursuant to the Debt Rights Offerings Procedures, the Debt Rights Offering shall be open to all Debt Rights Offering Participants, and the purchase price for each Debt Rights Offering Security shall be equal to the principal amount thereof. Upon exercise of the Debt Subscription Rights pursuant to the terms of

the Debt Backstop Agreement and the Debt Rights Offerings Procedures, Reorganized Holdings shall be authorized to issue any issuable Debt Rights Offering Securities pursuant to such exercise.

Subject to the terms, conditions, and limitations set forth in the Debt Backstop Agreement, if, after following the procedures set forth in the Debt Rights Offerings Procedures, there remains any unsubscribed Debt Rights Offering Securities, the Reorganized Debtors will have an option to sell to the Debt Commitment Parties, and, upon exercise of such option, the Debt Commitment Parties shall each, severally and not jointly, be required to purchase, their Backstop Commitment Securities (as defined in the Debt Backstop Agreement), in accordance with, and subject to, the terms and conditions of the Debt Backstop Agreement. Subject to, and in accordance with the Debt Backstop Agreement, as consideration for certain of the commitments of the Debt Commitment Parties under the Debt Backstop Agreement, the applicable Debt Commitment Parties shall receive the Debt Put Option Premium, which shall be deemed fully earned as of the date of execution of the Debt Backstop Agreement.

On the Effective Date, Reorganized Holdings, subject to the terms of this Plan, shall issue the Debt Rights Offering Securities pursuant to the Debt Rights Offering and the Debt Backstop Agreement. On the Effective Date, the rights and obligations of Holdings under the Debt Backstop Agreement shall vest in the Reorganized Debtors. Notwithstanding anything to the contrary in this Plan or the Confirmation Order, (a) Holdings' obligations under the Debt Backstop Agreement shall remain unaffected and shall survive following the Effective Date in accordance with the terms thereof, (b) any such obligations shall not be discharged under this Plan, and (c) none of the Reorganized Debtors shall terminate any such obligations.

(e)    Debt Direct Allocation.

On the Effective Date, the Debt Direct Allocation Parties shall purchase, and Reorganized Holdings shall be authorized to issue to such parties, the Debt Direct Allocation Securities for the Debt Direct Allocation Amount.

The issuance of the Debt Direct Allocation Securities to the Debt Direct Allocation Parties shall be subject to the terms of the Plan and the Debt Backstop Purchase Agreement.

(f)    Purpose.

On the Effective Date, the proceeds of the Equity Rights Offering and the Debt Rights Offering may be used: (i) to pay down a portion of the DIP Facilities; (ii) pay all reasonable and documented Restructuring Expenses; (iii) fund Plan Distributions, case administration expenses, and exit costs; and (iv) provide the Reorganized Debtors with additional liquidity for working capital and general corporate purposes.

### 5.11    *Intercompany Interests; Corporate Reorganization.*

On the Effective Date and without the need for any further corporate action or approval of any board of directors, board of managers, managers, management, or shareholders of any Debtor or Reorganized Debtor, as applicable, the certificates and all other documents representing the Intercompany Interests shall be deemed to be in full force and effect.

### 5.12    *Restructuring Transactions.*

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as applicable, may take all actions consistent with the Plan (including the Plan Settlement), the Confirmation Order and the Restructuring Support Agreement, including the consent of the Required Supporting Noteholders, as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with the Plan.

### 5.13    *Restructuring Expenses.*

The outstanding Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date (whether incurred prepetition or postpetition) shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of (x)(i) any engagement letters or fee reimbursement letters entered into (whether prior to, or after, the Petition Date) between the Debtors and the Supporting Noteholder Advisors, (ii) the Restructuring Support Agreement, (iii) the DIP Orders, or (iv) the Backstop Agreements, and/or (y) sections 503(b) and 1129(a)(4) of the Bankruptcy Code, and, in each case, and without the need to file any fee application or for any further notice or approval by the Bankruptcy Court or otherwise.  All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least three (three) Business Days before the anticipated Effective Date (or such shorter period as the Debtors may agree); *provided*, that such estimate shall not be considered an admission or limitation with respect to such Restructuring Expenses.  As promptly as practicable following the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.

### 5.14    *Other Supporting Noteholder Advisor Fees.*

On the Effective Date, and without any further notice to, or action, order, or approval of the Bankruptcy Court, the Debtors or Reorganized Debtors, as applicable, shall pay in full in Cash each of (i) the Cerberus/Bayside Advisor Fees and (ii) the Mockingbird Advisor Fees. For the avoidance of doubt, no other amounts shall be payable to the advisors of Bayside, Cerberus or Mockingbird other than the Cerberus/Bayside Advisor Fees and the Mockingbird Advisor Fees.

### 5.15    *Indenture Trustee Expenses.*

On the Effective Date, and without any further notice to, or action, order, or approval of the Bankruptcy Court, the Debtors or Reorganized Debtors, as applicable, shall distribute Cash to the Indenture Trustees in an amount equal to the Indenture Trustee Fees and Expenses without a reduction to recoveries to holders of the Priming Notes and 10.5% Notes; *provided* that the Indenture Trustees shall provide the Debtors with summary invoices for the Indenture Trustee Fees and Expenses (including, without limitation, attorneys' fees and expenses) for which they seek payment no later than fifteen (15) days prior to the Effective Date.  Such summary invoices may (but are not required to) include estimates for the Indenture Trustee Fees and Expenses anticipated through the Effective Date and the release of any Liens required under

the Plan.  If the Debtors dispute any Indenture Trustee Fees and Expenses, the Debtors or Reorganized Debtors, as applicable, shall (i) provide written notification, within ten (10) days after receipt of the summary invoices, to the Indenture Trustees (as applicable) specifying the disputed portion of the Indenture Trustee Fees and Expenses and the basis for such dispute, (ii) on the Effective Date, pay in Cash the undisputed portion of the Indenture Trustee Fees and Expenses, and (iii) escrow the amount of any disputed portion of the Indenture Trustee Fees and Expenses pending any consensual resolution or resolution by the Bankruptcy Court.  Upon receipt of such notification, the applicable Indenture Trustee may assert its Indenture Trustee Charging Lien to pay the disputed portion of its Indenture Trustee Fees and Expenses to the extent provided under the applicable Indenture or may submit such dispute for resolution by the Bankruptcy Court.  For the avoidance of doubt, nothing herein shall be deemed to impair, waive, discharge, or negatively impact or affect the Indenture Trustees' rights to exercise their respective Indenture Trustee Charging Liens pursuant to the terms of the applicable Indentures.

To the extent the Indenture Trustees provide services or incur costs or expenses, including professional fees, related to or in connection with the Plan, the Confirmation Order, or the Indentures (as applicable) from and after fifteen (15) days prior to the Effective Date, such Indenture Trustee shall be entitled to receive from the Reorganized Debtors, without further Bankruptcy Court approval, payment, in Cash, as reasonable compensation for such services and expenses (including, without limitation, attorneys' fees and expenses) incurred in connection with such services.  The payment of such compensation and expenses will be made as soon as reasonably practicable, but in any case within the earlier of (i) the date upon which the Indenture Trustee releases any Liens under the Plan or (ii) ten (10) days following the applicable Indenture Trustee's notification of the Debtors or Reorganized Debtors, as applicable, of the amount of such costs or expenses.

### 5.16    *Private Company.*

The Reorganized Debtors shall not have any class of equity securities listed on a national securities exchange and shall take the steps necessary to be a private company without Exchange Act reporting obligations upon emergence or as soon as possible thereafter in accordance with and to the extent permitted by the Exchange Act; *provided*, *however*, that in the event that the Reorganized Debtors have determined such necessary steps are not commercially reasonable the Reorganized Debtors shall not be required to take such steps.

### 5.17    *Employment Arrangements.*

All Employment Arrangements will be treated as executory contracts under the Plan and, on the Effective Date, will be assumed by the Debtors, as may be amended, pursuant to sections 365 and 1123 of the Bankruptcy Code.

Any Interests, stock options, restricted stock, restricted stock units, phantom stock, tracking stock, and other stock-based or equity-based awards granted prior to the Effective Date to a current or former employee, officer, director, or contractor under an Employment Arrangement or otherwise, and any stock-based or equity-based plans, will be deemed cancelled on the Effective Date.  For the avoidance of doubt, any provisions of an Employment Arrangement

that is assumed under the Plan relating to an award or potential award of Interests, stock options, restricted stock units or other stock-based awards in the Debtors shall not be enforceable.

The New Board shall, promptly following the Effective Date, implement an amendment to the assumed severance program for certain employees. Such amended severance program shall be market-based and shall be determined by the New Board (in consultation with the Reorganized Debtors' chief executive officer).

### 5.18 *GUC Trust.*

(a)    Establishment of GUC Trust. Solely in the event that Class 4 votes to accept the Plan, on the Effective Date, the GUC Trust Agreement shall be executed by the Debtors and the GUC Trustee, and all other necessary steps shall be taken to establish the GUC Trust in accordance with the Plan and the GUC Trust Agreement. This Section 5.18 summarizes certain of the rights, duties, and obligations of the GUC Trustee. In the event of any conflict between the terms of the Plan and the GUC Trust Agreement, the terms of the GUC Trust Agreement shall govern.

(b)    Purpose of GUC Trust. The GUC Trust shall be established for the purposes of holding and administering the GUC Trust Assets for the benefit of the GUC Trust Beneficiaries in accordance with the GUC Trust Agreement.

(c)    GUC Trust Assets. On the Effective Date, the Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the GUC Trust, on behalf of and for the benefit of the GUC Trust Beneficiaries, the GUC Trust Initial Funding Amount and a contingent right to receive the GUC Trust Contingent Funding Amount. If applicable, the Reorganized Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the GUC Trust, on behalf of and for the benefit of the GUC Trust Beneficiaries, the GUC Trust Contingent Funding Amount as and when provided for in the GUC Trust Agreement. Pursuant to section 1141 of the Bankruptcy Code, the GUC Trust Assets shall automatically vest in the GUC Trust free and clear of all Claims, Interests, Liens, other encumbrances or interests of any kind as of the applicable date of transfer of such GUC Trust Assets to the GUC Trust. Such transfer(s) shall be exempt from any stamp, real estate transfer, other transfer, mortgage reporting, sales, use, or other similar tax. Upon transfer by the Debtors and, if applicable, the Reorganized Debtors of the GUC Trust Assets to the GUC Trust, the Reorganized Debtors shall be released of all liability and shall have no further obligations with respect to the transfer of such GUC Trust Assets. All GUC Trust Expenses shall be paid solely from the GUC Trust Assets in accordance with the terms of the GUC Trust Agreement, and the Debtors and Reorganized Debtors shall have no liability or obligations with respect to GUC Trust Expenses or the administration of the GUC Trust Assets.

(d)    Appointment of GUC Trustee. The appointment of the GUC Trustee shall be approved in the Confirmation Order, and such appointment shall be effective as of the execution of the GUC Trust Agreement on the Effective Date.

(e)    Role of GUC Trustee. In furtherance of, and consistent with the purpose of the GUC Trust and the Plan, the GUC Trustee shall have the rights and powers set forth in the GUC Trust Agreement, including, among other things, the power and authority to (i) hold, manage

and distribute the GUC Trust Assets to the GUC Trust Beneficiaries, (ii) file, prosecute, settle, compromise, or withdraw objections to Disputed General Unsecured Claims, (iii) retain and reasonably compensate counsel and other professionals to assist the GUC Trustee in carrying out his/her/its duties on such terms as the GUC Trustee deems appropriate, subject to the terms of the GUC Trust Agreement, and (iv) perform such other functions as are provided for in the Plan and the GUC Trust Agreement.  The GUC Trustee shall be responsible for all decisions and duties with respect to the GUC Trust and the GUC Trust Assets.  In all circumstances, the GUC Trustee shall act in the best interests of all GUC Trust Beneficiaries, in furtherance of the purpose of the GUC Trust, and in accordance with the GUC Trust Agreement.  The GUC Trustee shall be entitled to reasonable compensation, subject to the terms of the GUC Trust Agreement.

(f)  <u>Transferability of GUC Trust Interests and Distribution Rights</u>.  The GUC Trust Interests, and any right to receive a distribution from the GUC Trust, shall not be evidenced by any certificate, security, receipt, or in any other form or manner whatsoever, except as maintained on the books and records of the GUC Trust by the GUC Trustee.   The GUC Trust Interests, and any rights to receive distributions from the GUC Trust, shall not constitute "securities" and shall not be registered pursuant to the Securities Act.  If it is determined that such GUC Trust Interests or rights constitute "securities," the exemption provisions of section 1145(a)(1) of the Bankruptcy Code would be satisfied and such securities would be exempt from registration.

(g)  <u>U.S. Federal Income Tax Treatment of GUC Trust</u>.  Internal Revenue Service ("**IRS**") Revenue Procedure 94-45 provides conditions under which the IRS will generally issue a ruling that an entity created pursuant to a bankruptcy plan under chapter 11 of the Bankruptcy Code qualifies as a liquidating trust.  The GUC Trust will be structured so as to comply with these conditions to the maximum extent possible, and the GUC Trustee will treat the GUC Trust as a liquidating trust within the meaning of Treasury Regulations section 301.7701-4(d).  However, the Debtors have not, and do not intend to, seek a ruling from the IRS or an opinion of counsel regarding the status of the GUC Trust as a liquidating trust.  Accordingly, there can be no assurance that the IRS will not take a contrary position.  In the event that the IRS determines that the GUC Trust does not qualify as a liquidating trust, the GUC Trust (other than any amounts set aside in escrow to fund remaining Disputed General Unsecured Claims (the "**GUC Trust Claims Reserve**")) shall be treated as a "partnership" for U.S. federal income tax purposes.

Solely for tax purposes, the GUC Trust Beneficiaries shall be treated as grantors and owners of the GUC Trust (other than the GUC Trust Claims Reserve) pursuant to section 671 *et seq.* of the Tax Code and the Treasury Regulations promulgated thereunder and any similar provision of state or local law.  For federal income tax purposes, the Debtors intend that all parties (including, without limitation, the GUC Trustee, the GUC Trust Beneficiaries, and the transferors, for tax purposes, of the GUC Trust Assets to the GUC Trust) shall take the position, subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, that the transfer of the GUC Trust Assets (including the contingent right to receive the GUC Trust Contingent Funding Amount) to the GUC Trust (other than the GUC Trust Claims Reserve) is a deemed transfer to the GUC Trust Beneficiaries (as of the Initial GUC Distribution Date), followed by a deemed transfer by such GUC Trust Beneficiaries to the GUC Trust, and all income and gain of the GUC Trust (other than income and gain in respect of the GUC Trust Claims Reserve) which is earned after such deemed transfer shall be taxed to the GUC Trust Beneficiaries on a current basis.  In addition,

the GUC Trust Agreement shall provide that the investment powers of the GUC Trustee with respect to GUC Trust Assets shall be strictly limited.

The fair market value of the portion of the GUC Trust Assets (including the contingent right to receive the GUC Trust Contingent Funding Amount) that is treated for federal income tax purposes as having been transferred to each GUC Trust Beneficiary as described in the preceding paragraph, and the fair market value of the portion of the GUC Trust Assets (including the contingent right to receive the GUC Trust Contingent Funding Amount) that is treated for federal income tax purposes as having been transferred to any GUC Trust Beneficiary as a result of the Allowance or disallowance of a Disputed General Claim, shall be determined by the GUC Trustee, and all parties (including, without limitation, the GUC Trustee, the GUC Trust Beneficiaries, and the transferors, for tax purposes, of GUC Trust Assets (including the contingent right to receive the GUC Trust Contingent Funding Amount) to the GUC Trust) shall utilize such fair market value determined by the GUC Trustee for all federal income tax purposes.

Any items of income, deduction, credit, or loss of the GUC Trust (other than any such item attributable to the GUC Trust Claims Reserve) shall be allocated by the GUC Trustee for federal income tax purposes among current or former GUC Trust Beneficiaries, such allocation shall be binding on all parties for all federal, state, local, and foreign income tax purposes, and such current or former GUC Trust Beneficiaries shall be responsible for the payment of any federal, state, local, and foreign income tax due on the income and gain so allocated to them.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including of an adverse determination by the IRS upon audit if not contested by the GUC Trustee), the GUC Trustee shall (A) timely elect to treat any GUC Trust Claims Reserve as a "disputed ownership fund" governed by Treasury Regulations section 1.468B-9, and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  All parties (including the GUC Trustee, the Debtors, and the GUC Trust Beneficiaries) shall report for U.S. federal, state and local income tax purposes consistently with the foregoing.

The GUC Trustee shall be responsible for payment, out of the GUC Trust Assets, of any taxes imposed on the GUC Trust or the GUC Trust Assets  (including the contingent right to receive the GUC Trust Contingent Funding Amount), including the GUC Trust Claims Reserve. In the event, and to the extent, any Cash retained on account of Disputed General Unsecured Claims in the GUC Trust Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed General Unsecured Claims (including any income that may arise upon the distribution of the assets of the GUC Trust Claims Reserve), such taxes may be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (ii) to the extent such Disputed General Unsecured Claims have subsequently been resolved, deducted from any amounts otherwise distributable by the GUC Trustee as a result of the resolution of such Disputed General Unsecured Claims.

The GUC Trustee may request an expedited determination of taxes of the GUC Trust, including the GUC Trust Claims Reserve, under section 505(b) of the Bankruptcy Code for

all tax returns filed for, or on behalf of, the GUC Trust for all taxable periods through the dissolution of the GUC Trust.

(h)    GUC Trust Distributions.  The GUC Trustee shall make distributions to GUC Trust Beneficiaries from the GUC Trust Assets in accordance with the terms of the GUC Trust Agreement and hold in the GUC Trust all payments of GUC Trust Assets to be made on account of Disputed General Unsecured Claims for the benefit of holders of Disputed General Unsecured Claims whose Claims are subsequently Allowed.

(i)    Dissolution.  The GUC Trust shall be dissolved and the GUC Trustee shall be discharged from his/her/its duties with respect to the GUC Trust upon completion of his/her/its duties as set forth in the GUC Trust Agreement.  In the event that all Allowed General Unsecured Claims and obligations of the GUC Trust have been satisfied in accordance with the GUC Trust Agreement, any remaining GUC Trust Assets shall revert to the Reorganized Debtors.

## ARTICLE VI.    DISTRIBUTIONS.

### 6.1    *Distributions Generally.*

The Disbursing Agent shall make all Plan Distributions to the appropriate holders of Allowed Claims and Allowed Interests in accordance with the terms of the Plan.

### 6.2    *No Postpetition Interest on Claims.*

Except as otherwise specifically provided for in this Plan, the Confirmation Order, or another order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

### 6.3    *Date of Distributions.*

Unless otherwise provided in this Plan (and, except with respect to the distributions of GUC Trust Assets to GUC Trust Beneficiaries, which will be governed by the GUC Trust Agreement), any distributions and deliveries to be made under the Plan shall be made on the Effective Date or as soon thereafter as is practicable.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII hereof.  Except as otherwise provided in this Plan, holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in this Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date

### 6.4    *Distribution Record Date.*

(a)    As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each Class, as maintained by the Debtors or their agents, shall be deemed closed, and there shall be no further changes in the record holders of any Claims after the Distribution Record Date.  Neither the Debtors nor the Disbursing Agent shall have any obligation to recognize any transfer of a Claim occurring after the close of business on the Distribution Record Date.  In addition, with respect to payment of any Cure Amounts or disputes over any Cure Amounts, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

(b)    Notwithstanding anything in this Plan to the contrary, in connection with any distribution under the Plan to be effected through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise), the Debtors and the Reorganized Debtors, as applicable, shall be entitled to recognize and deal for all purposes under the Plan with holders of Claims in each Class to the extent consistent with the customary practices of DTC used in connection with such distributions.  All New Common Shares to be distributed under the Plan shall be issued in the names of such holders on the books and records of Reorganized Holdings or a transfer agent.  For the avoidance of doubt, no New Common Shares shall be issued through the facilities of DTC.

### 6.5    *Distributions After Effective Date.*

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 6.6    *Disbursing Agent.*

All distributions under the Plan shall be made by the Disbursing Agent on and after the Effective Date as provided herein.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.  The Reorganized Debtors shall use all commercially reasonable efforts to provide the Disbursing Agent (if other than the Reorganized Debtors) with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors' or Reorganized Debtors' books and records.  The Reorganized Debtors shall cooperate in good faith with the applicable Disbursing Agent (if other than the Reorganized Debtors) to comply with the reporting and withholding requirements outlined in Section 6.17 of the Plan.

### 6.7    *Delivery of Distributions.*

Subject to Section 6.4(b) of the Plan, the Disbursing Agent shall issue or cause to be issued, the applicable consideration under the Plan and, subject to Bankruptcy Rule 9010, shall make all distributions to any holder of an Allowed Claim as and when required by the Plan at: (a) the address of such holder on the books and records of the Debtors or their agents; or (b) at the address in any written notice of address change delivered to the Debtors or the Disbursing Agent,

including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001. In the event that any distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the Disbursing Agent has been notified of the then-current address of such holder, at which time or as soon thereafter as reasonably practicable (subject to the limitations set forth in Section 6.8 of the Plan) such distribution shall be made to such holder without interest.

Distributions under the Plan of the HoldCo Notes, the Exit Notes and the New Common Shares will be made through the facilities of DTC in accordance with DTC's customary practices; *provided* that, to the extent that the HoldCo Notes, the Exit Notes and/or the New Common Shares are not eligible for distribution in accordance with DTC's customary practices, the manner of such distributions shall be jointly determined by the Debtors or Reorganized Debtors, as applicable, and the Required Supporting Noteholders, and the Debtors or Reorganized Debtors, as applicable, will take such reasonable actions as may be required to cause distributions of the HoldCo Notes, the Exit Notes and/or the New Common Shares as contemplated under the Plan. To the extent distributions are to be made through the facilities of DTC, any distribution that otherwise would be made to any holder eligible to receive a distribution who does not own or hold an account eligible to receive such a distribution through DTC on a relevant distribution date may be forfeited. For the avoidance of doubt, DTC shall be considered a single holder for purposes of distributions.

### 6.8    *Unclaimed Property.*

One year from the later of:  (a) the Effective Date and (b) the date that is ten Business Days after the date a Claim is first Allowed, all distributions payable on account of such Claim shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary) shall revert to the Reorganized Debtors or their successors or assigns, and all claims of any other Person (including the holder of a Claim in the same Class) to such distribution shall be discharged and forever barred. The Reorganized Debtors and the Disbursing Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

For the avoidance of doubt, a distribution shall be deemed unclaimed if a holder has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Disbursing Agent of an intent to accept a particular distribution; (c) responded to the Debtors', the Reorganized Debtors', or the Disbursing Agent's requests for information necessary to facilitate a particular distribution; or (d) taken all actions necessary to facilitate such distribution.

### 6.9    *Satisfaction of Claims.*

Unless otherwise provided herein, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

### 6.10    *Manner of Payment Under Plan.*

Except as specifically provided herein, at the option of the Debtors or the Reorganized Debtors, as applicable, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

### 6.11    *Fractional Shares, Fractional HoldCo Notes, and De Minimis Cash Distributions.*

No fractional New Common Shares shall be distributed.  When any issuance or distribution of New Common Shares would otherwise result in the issuance of a number of New Common Shares that is not a whole number, the New Common Shares subject to such distribution shall be rounded to the next higher or lower whole number as follows:  (a) fractions equal to or greater than 1/2 shall be rounded to the next higher whole number, and (b) fractions less than 1/2 shall be rounded to the next lower whole number.  The total number of New Common Shares to be issued or distributed on account of the Allowed 10.5% Notes Secured Claims, the Equity Rights Offering, the Equity Backstop Agreement, the Debt Backstop Agreement and the Management Incentive Plan shall be adjusted as necessary to account for the rounding provided for herein. For purposes of determining whether a Person would otherwise receive a fraction of a share of New Common Share, all shares of New Common Shares to be issued to such Person pursuant to the Equity Rights Offering, the Equity Backstop Agreement, the Debt Backstop Agreement and/or the Plan shall be aggregated.

Fractional HoldCo Notes (i.e., HoldCo Notes in a principal amount not equal to a whole dollar or a multiple thereof) shall be rounded down to the nearest whole number such that no fractional HoldCo Notes are issued.  The total number of HoldCo Notes to be issued or distributed on account of the Allowed 10.5% Notes Secured Claims, the Debt Rights Offering and the Debt Backstop Agreement shall be adjusted as necessary to account for the rounding provided for herein. For purposes of determining whether a Person would otherwise receive a fraction of a HoldCo Note, all HoldCo Notes to be issued to such Person pursuant to this Agreement, the Equity Backstop Agreement, the Debt Backstop Agreement and/or the Plan shall be aggregated.

The Debtors, the Requisite Equity Commitment Parties and the Requisite Debt Commitment Parties may determine to make such further adjustments as necessary so that the total amount of New Common Shares and the aggregate principal amount of HoldCo Notes is fixed. No consideration shall be provided in lieu of fractional New Common Shares or fractional HoldCo Notes that are rounded down.  None of the Reorganized Debtors or the Disbursing Agent shall have any obligation to make a distribution that is less than one (1) New Common Share or $50.00 in Cash.  Fractional New Common Shares that are not distributed in accordance with this Section 6.11 shall be returned to, and ownership thereof shall vest in, Reorganized Holdings.

### 6.12    *No Distribution in Excess of Amount of Allowed Claim.*

Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, Plan Distributions in excess of the

Allowed amount of such Claim (plus any postpetition interest on such Claim solely to the extent permitted by <u>Section 6.2</u> of the Plan).

### 6.13  <u>*Allocation of Distributions Between Principal and Interest.*</u>

Except as otherwise required by law, consideration received in respect of a Claim is allocable first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to the remainder of the Claim, including any Claim for accrued but unpaid interest.

### 6.14  <u>*Exemption from Securities Laws.*</u>

The issuance of and the distribution of the New Common Shares under <u>Section 4.3(c)(ii)</u> of the Plan shall be exempt, without further act or actions by any Entity, from registration under the Securities Act and any other applicable securities laws to the fullest extent permitted by section 1145 of the Bankruptcy Code.  These securities may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code.  In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

The offer, issuance, and distribution of (i) the Equity Subscription Rights, (ii) the Debt Subscription Rights, (iii) the Equity Direct Allocation Securities, (iv) the Debt Direct Allocation Securities, (v) the Equity Rights Offering Securities, (vi) the Debt Rights Offering Securities, (vii) the Equity Put Option Securities, (viii) the Debt Put Option Securities and (ix) the Takeback HoldCo Notes, in each case are being made in reliance on the exemption from registration set forth in Section 4(a)(2) of the Securities Act.  Such securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act, and subject to any applicable restrictions in the New Corporate Governance Documents.

### 6.15  <u>*Setoffs and Recoupments.*</u>

Each Reorganized Debtor, or such entity's designee as instructed by such Reorganized Debtor, may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, offset or recoup against any Allowed Claim, and the distributions to be made pursuant to the Plan on account of such Allowed Claim any and all claims, rights, and Causes of Action that a Reorganized Debtor or its successors may hold against the holder of such Allowed Claim after the Effective Date to the extent such setoff or recoupment is either (a) agreed in amount among the relevant Reorganized Debtor(s) and holder of the Allowed Claim or (b) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided*, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any claims, rights, or

Causes of Action that a Reorganized Debtor or its successor or assign may possess against such holder.

### 6.16    *Rights and Powers of Disbursing Agent.*

(a)    Powers of Disbursing Agent.  The Disbursing Agent shall be empowered to:  (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all applicable distributions or payments provided for under the Plan; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers (A) as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any Final Order issued after the Effective Date) or pursuant to the Plan or (B) as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

(b)    Expenses Incurred on or After the Effective Date.  Except as otherwise ordered by the Bankruptcy Court and subject to the written agreement of the Reorganized Debtors, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including for reasonable attorneys' and other professional fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors in the ordinary course of business; provided, that the payment of such fees and expenses shall not override the Reorganized Debtors' obligation to pay any fees and expenses incurred by the Indenture Trustees, if they act as the Disbursing Agent.

### 6.17    *Withholding and Reporting Requirements.*

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, but subject to the terms of the DIP Facilities and the Backstop Agreements, the Reorganized Debtors and any other Disbursing Agent (including, for avoidance of doubt, the GUC Trustee) shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all Plan Distributions (including, for avoidance of doubt, any distributions from the GUC Trust) shall be subject to any such withholding or reporting requirements.  In the case of a Plan Distribution that is subject to withholding, the distributing party may request a holder of an Allowed Claim or Interest to complete and return a Form W-8 or W-9, as applicable to each such holder, and any other applicable forms.  If such form is requested and not submitted to the distributing party within 10 days of the request, the distributing party may, in its discretion, either (a) withhold an appropriate portion of Cash or, in the case of a non-Cash Plan Distribution, other distributed property and sell any such withheld property to generate Cash necessary to pay over the withholding tax, or (b) require the intended recipient of such distribution to provide the withholding agent with an amount of Cash sufficient to satisfy such withholding tax as a condition to receiving such distribution.  If such form is requested and submitted to the distributing party within 10 days of the request, the distributing party may withhold an appropriate portion of Cash or, in the case of a non-Cash Plan Distribution, other distributed property and sell any such withheld property to generate Cash necessary to pay over the withholding tax; provided that, the distributing party shall first notify the intended recipient of any such contemplated sale and offer the intended recipient a reasonable opportunity to provide sufficient Cash to satisfy such withholding tax in lieu of such sale.  The distributing

party shall have the right, but not the obligation, not to make a Plan Distribution until its withholding obligation is satisfied pursuant to the preceding sentences. If an intended recipient of a non-Cash Plan Distribution has agreed to provide the withholding agent with the Cash necessary to satisfy the withholding tax pursuant to this <u>Section 6.17</u> and such person fails to comply before the date that is 180 days after the request is made, the amount of such Plan Distribution that was not distributed shall irrevocably revert to the applicable Reorganized Debtor and such Claim in respect of such Plan Distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property. Any amounts withheld pursuant to the Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. The distributing party may require a holder of an Allowed Claim or Interest to complete and return a Form W-8 or W-9, as applicable, to each such holder, and any other applicable forms.

Notwithstanding the above, each holder of an Allowed Claim or Interest that is to receive a Plan Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any governmental unit, including income, withholding, and other tax obligations, on account of such Plan Distribution.

## ARTICLE VII.     PROCEDURES FOR DISPUTED CLAIMS.

### 7.1     *Allowance of Claims.*

Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed pursuant to the Plan or a Final Order, including the Confirmation Order (when it becomes a Final Order), Allowing such Claim. On and after the Effective Date, each of the Debtors or the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim immediately before the Effective Date.

### 7.2     *Claims Objections.*

Except insofar as a Claim is Allowed under the Plan, the Debtors or the Reorganized Debtors, as applicable, shall be entitled to object to Claims. Except as otherwise expressly provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors shall have the authority (i) to file, withdraw, or litigate to judgment objections to Claims; (ii) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (iii) to administer and adjust the Debtors' claims register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court, in each case subject to the terms of the GUC Trust Agreement.

### 7.3     *Estimation of Claims.*

Before or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, and in the case of Disputed General Unsecured Claims after the Effective Date, the GUC Trustee, may at any time request that the Bankruptcy Court estimate any Disputed Claim or Disputed Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy

Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection, in each case subject to the terms of the GUC Trust Agreement.  In the event that the Bankruptcy Court estimates any Disputed, contingent, or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation of the amount of such Claim, the Debtors or the Reorganized Debtors, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated.

### 7.4    *Adjustment to Claims Register Without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the claims register by the Debtors or Reorganized Debtors upon stipulation between the parties in interest without a Claims objection having to be filed and without any further notice or action, order, or approval of the Bankruptcy Court.

### 7.5    *Time to File Objections to Claims.*

Any objections to a Claim shall be filed on or before the date that is the later of (i) 180 days after the Effective Date and (ii) such later date as may be fixed by the Bankruptcy Court, after notice and a hearing, upon a motion by the Reorganized Debtors, as such deadline may be extended from time to time.

### 7.6    *Disallowance of Claims.*

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors.

### 7.7    *Amendments to Claims.*

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court, and the Reorganized Debtors, subject to the terms of the GUC Trust Agreement, to the extent applicable.

**7.8**     *No Distributions Pending Allowance.*

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

**7.9**     *Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date on which the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order (but in no event later than the first Quarterly Distribution Date after such date), the Disbursing Agent shall provide to the holder of such Allowed Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required by the Bankruptcy Code.

**7.10**     *Claims Resolution Procedures Cumulative.*

All of the Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved in accordance with this Plan or any mechanism approved by the Bankruptcy Court, subject in each case to the terms of the Oversight Monitor Agreement.

**ARTICLE VIII.     EXECUTORY CONTRACTS AND UNEXPIRED LEASES.**

**8.1**     *General Treatment.*

As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed assumed, unless such contract or lease (i) was previously assumed, assumed and assigned, or rejected by the Debtors, pursuant to a Final Order of the Bankruptcy Court, (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (iii) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date, or (iv) is specifically designated as a contract or lease to be rejected on the Schedule of Rejected Contracts, which shall be acceptable to the Required Supporting Noteholders. The assumption of executory contracts and unexpired leases hereunder may include, subject to the consent of the Required Supporting Noteholders, the assignment of certain such contracts. Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease assumed pursuant to the Plan shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, any Final Order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

To the maximum extent permitted by law, to the extent any provision in any executory contract or unexpired lease assumed pursuant to the Plan restricts or prevents, or

purports to restrict or prevent, or is breached or deemed breached by, the assumption of such executory contract or unexpired lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such executory contract or unexpired lease or to exercise any other default-related rights with respect thereto.

The Debtors reserve the right, on or before 5:00 p.m. (prevailing Eastern Time) on the date that is seven (7) days before the Confirmation Hearing, or such other time as may be agreed in writing between the Debtors and the applicable counterparty, to amend the Schedule of Rejected Contracts, subject to the consent of the Required Supporting Noteholders, to add or remove any executory contract or unexpired lease; *provided* that if the Confirmation Hearing is adjourned or continued, such amendment right shall be extended to 5:00 p.m. (prevailing Eastern Time) on the date that is seven (7) days before the rescheduled or continued Confirmation Hearing, and this proviso shall apply in the case of any and all subsequent adjournments and continuances of the Confirmation Hearing; *provided*, *further* that the Debtors may amend the Schedule of Rejected Contracts to add or delete any executory contracts or unexpired leases after such date to the extent agreed with the relevant counterparties and subject to the consent of the Required Supporting Noteholders and entry of an order of the Bankruptcy Court.

### 8.2 *Determination of Cure Amounts and Deemed Consent.*

(a)     The Debtors shall file, as part of the Plan Supplement, the Schedule of Rejected Contracts, which shall be acceptable to the Required Supporting Noteholders.

(b)     The Debtors shall serve a Cure Notice, which shall be reasonably acceptable to the Required Supporting Noteholders, on parties to executory contracts and unexpired leases no later than fifteen (15) days prior to the Confirmation Hearing in accordance with the order approving the Disclosure Statement.  If a counterparty to any executory contract or unexpired lease that the Debtors or Reorganized Debtors, as applicable, intend to assume or assume and assign is not listed on the applicable Cure Notice, the proposed Cure Amount for such executory contract or unexpired lease shall be deemed to be zero dollars ($0).

(c)     Any counterparty to an executory contract or unexpired lease shall have the time prescribed by the order approving the Disclosure Statement to object to the proposed assumption, assumption and assignment, or related Cure Amount listed on the Cure Notice.

(d)     The Bankruptcy Court will determine any Assumption Dispute by entry of an order; *provided*, that the Debtors or the Reorganized Debtors, as applicable, may settle any Assumption Dispute with the consent of the Required Supporting Noteholders, and without any further notice to any other party or any action, order, or approval of the Bankruptcy Court; *provided, further*, that where an Assumption Dispute relates solely to the applicable Cure Amount, the Debtors may with the consent of the Required Supporting Noteholders assume and/or assume and assign the applicable executory contract or unexpired lease prior to the resolution of such Assumption Dispute.  If there is an Assumption Dispute, the Debtors reserve the right to reject or nullify the assumption or assignment of the applicable executory contract or unexpired lease no later than thirty (30) days after an order of the Bankruptcy Court resolving such Assumption Dispute becomes a Final Order.

**8.3**    *Payments Related to Assumption of Contracts and Leases.*

(a)    Any Cure Amounts shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code by payment of the Cure Amount as reflected in the applicable Cure Notice, in Cash on the Effective Date, subject to the limitations described in Section 8.2 of the Plan, or on such other terms as the parties to such executory contracts or unexpired leases and the Debtors may otherwise agree.  If no Cure Amount is reflected in the applicable Cure Notice, no Cure Amount shall be deemed to be owing, unless otherwise ordered by the Bankruptcy Court.

(b)    Assumption or assumption and assignment of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against any Debtor or defaults by any Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date that the Debtors assume or assume and assign such executory contract or unexpired lease.  Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, upon the assumption of such executory contract or unexpired lease.

**8.4**    *Rejection Damages Claims.*

Any counterparty to a contract or lease that is identified on the Schedule of Rejected Contracts or is otherwise rejected by the Debtors must file and serve a proof of Claim on the applicable Debtor that is party to the contract or lease to be rejected no later than thirty (30) days after the later of (a) the Effective Date or (b) the effective date of rejection of such executory contract or unexpired lease.

**8.5**    *Survival of the Debtors' Indemnification Obligations.*

Notwithstanding anything in the Plan (including Section 10.3 of the Plan), any Indemnification Obligation to indemnify current and former officers, directors, agents, or employees with respect to all present and future actions, suits, and proceedings against any Debtor or such directors, officers, agents, or employees, based upon any act or omission for or on behalf of such Debtor, will be discharged or impaired by confirmation of the Plan shall (i) remain in full force and effect, (ii) not be discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, or the Confirmation Order, (iii) not be limited, reduced or terminated after the Effective Date, and (iv) survive unimpaired and unaffected irrespective of whether such Indemnification Obligation is owed for an act or event occurring before, on or after the Petition Date.  All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized Debtors.  Any Claim based on such obligations of the Company will be an Allowed Claim; *provided*, that no cure payment will be required in connection with such assumption.  Without limiting an indemnified party's rights to indemnity, an indemnified party and the Reorganized Debtors will cooperate to pursue and make all claims under all applicable insurance policies.

**8.6** *Compensation and Benefit Plans.*

All employment and severance agreements and policies, and all compensation and benefits plans, policies, and programs of the Debtors applicable to their respective employees, retirees, consultants, contractors, and non-employee directors, including all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life and accidental death and dismemberment insurance plans, are deemed to be, and shall be treated as, executory contracts under the Plan and, on the Effective Date, shall be assumed pursuant to sections 365 and 1123 of the Bankruptcy Code.

**8.7** *Insurance Policies.*

(a)    All current and former insurance policies to which any Debtor is or was a party as of the Effective Date (regardless of whether such insurance policy has expired, and any claims or causes of action that might exist with respect thereto), including any D&O Policy and property or business interruption policy, shall be deemed to be and treated as executory contracts and shall be assumed by the applicable Debtors or Reorganized Debtors and shall continue in full force and effect thereafter in accordance with their respective terms (and the rights of the Debtors under all expired insurance policies shall be transferred to the Reorganized Debtors). All other insurance policies shall vest in the Reorganized Debtors. Coverage for defense and indemnity under the D&O Policy shall remain available to all individuals within the definition of "Insured" in any D&O Policy. Nothing in the Plan shall affect, impair or prejudice the rights of the insurance carriers, the insureds, or the Reorganized Debtors under the insurance policies in any manner, and such insurance carriers, the insureds, and Reorganized Debtors shall retain all rights and defenses under such insurance policies, and such insurance policies shall apply to, and be enforceable by and against, the insurance carriers, the insureds, and the Reorganized Debtors in the same manner and according to the same terms and practices applicable to the Debtors, as existed prior to the Effective Date.

(b)    In addition, after the Effective Date, all officers, directors, agents, or employees who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any D&O Policy (including any "tail" policy) for the full term of such policy regardless of whether such officers, directors, agents, and/or employees remain in such positions after the Effective Date, in each case, to the extent set forth in such policies.

(c)    In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any D&O Policy (including any "tail policy") in effect as of the Petition Date, and any current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such D&O Policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date to the extent set forth in such policies.

(d)    Notwithstanding anything to the contrary in the Disclosure Statement, the Plan (including sections 8.7, 8.9 and 10.13 thereof), the Plan Supplement, the Confirmation Order, any bar date notice or claim objection, any documents related to any of the foregoing or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to

be preemptory or supervening or grants an injunction, discharge or release, confers Bankruptcy Court jurisdiction or requires a party to opt out of any releases):

    i.    on the Effective Date, the Reorganized Debtors, jointly and severally, shall assume all insurance policies and any related agreements (collectively, the "**Chubb Insurance Program**") issued at any time by ACE American Insurance Company, Westchester Surplus Lines Insurance Company, Illinois Union Insurance Company, Indemnity Insurance Company of North America, Federal Insurance Company, Texas Pacific Indemnity Company, or any of their U.S.-based affiliates and successors (collectively, "**Chubb**") in their entirety pursuant to sections 105 and 365 of the Bankruptcy Code;

    ii.    the Chubb Insurance Program and all legal, equitable or contractual rights, obligations, and defenses of Chubb, the Debtors (or, after the Effective Date, the Reorganized Debtors), or any other individual or entity, as applicable, under the Chubb Insurance Program, whether arising before or after the Effective Date, shall survive and shall not be amended, modified, waived, released, discharged or impaired in any respect, and all such rights and obligations shall be determined under the Chubb Insurance Program and applicable non-bankruptcy law as if the Chapter 11 Cases had not occurred, and on the Effective Date the Reorganized Debtors shall become and remain liable in full for all of their and the Debtors' obligations under the Chubb Insurance Program, regardless of when they arise, without the need or requirement for Chubb to file or serve any objection to a proposed Cure Amount (including a Cure Notice) or a request, application, claim, proof of Claim or motion for payment or allowance of any Administrative Expense Claim, and Chubb shall not be subject to any bar date or similar deadline governing Cure Amounts, proofs of Claim or Administrative Expense Claims;

    iii.    nothing shall permit or otherwise effect a sale, assignment or any other transfer of the Chubb Insurance Program and/or any rights, benefits, claims, rights to payments, or recoveries under or relating thereto without the prior express written consent of Chubb; and

    iv.    the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Article X of the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Court, solely to permit: (I) claimants with direct action claims against Chubb under applicable non-bankruptcy law to proceed with their claims; (II) Chubb to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court, claims where a claimant asserts a direct claim against Chubb under applicable non-bankruptcy law, or an order has

been entered by this Court granting a claimant relief from the automatic stay or the injunctions set forth in Article X of the Plan to proceed with its claim, and all costs in relation to the foregoing; and (III) Chubb to cancel any policy issued under the Chubb Insurance Program, and take other actions relating to the Chubb Insurance Program (including effectuating a setoff), to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the Chubb Insurance Program.

**8.8** *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instruments, or other document is listed in any notices of assumed contracts.

**8.9** *Reservation of Rights.*

(a)    Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors or the Reorganized Debtors or their respective affiliates has any liability thereunder.

(b)    Except as explicitly provided in the Plan, nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors or the Reorganized Debtors under any executory or non-executory contract or unexpired or expired lease.

(c)    Nothing in the Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors, as applicable, under any executory or non-executory contract or unexpired or expired lease.

(d)    If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under the Plan, the Debtors or Reorganized Debtors, as applicable, shall, subject to the consent of the Required Supporting Noteholders, have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

**ARTICLE IX.**        **CONDITIONS PRECEDENT TO OCCURRENCE OF EFFECTIVE DATE.**

### 9.1    *Conditions Precedent to Confirmation.*

The confirmation of the Plan shall not occur unless all of the following conditions precedent have been satisfied or waived in accordance with Section 9.3 of this Plan:

(a)    the Plan and the Plan Supplement shall be consistent in all material respects with the Restructuring Support Agreement;

(b)    the Bankruptcy Court shall have entered the Confirmation Order, which shall be in form and substance acceptable in all respects to the Debtors and the Required Supporting Noteholders, and, solely in respect of provisions directly affecting them, the Supporting Sponsors and the ABL DIP Agent;

(c)    the DIP Facilities and the Restructuring Support Agreement shall be in full force and effect and shall not have been terminated; and

(d)    the Backstop Agreements shall remain in full force and effect.

### 9.2    *Conditions Precedent to Effective Date.*

The Effective Date shall not occur unless all of the following conditions precedent have been satisfied or waived in accordance with this Plan:

(a)    each of the Backstop Agreements and the Backstop Order shall remain in full force and effect and shall not have been terminated;

(b)    the Definitive Documents shall have been executed and/or effectuated, and shall contain terms and conditions consistent in all material respects with the Restructuring Term Sheet and the Restructuring Support Agreement, and any conditions precedent related thereto or contained therein shall have been satisfied prior to or contemporaneously with the occurrence of the Effective Date or otherwise waived by the party whose consent is required thereunder;

(c)    the Restructuring Support Agreement shall remain in full force and effect and shall not have been terminated;

(d)    the DIP Facilities shall remain in full force and effect and shall not have been terminated, subject to the proposed treatment of Allowed DIP Claims as set forth herein;

(e)    there shall not have been instituted or threatened or be pending any action, proceeding, application, claim, counterclaim, or investigation (whether formal or informal) by any Governmental Entity (i) making illegal, enjoining, or otherwise prohibiting the consummation of the restructuring transaction contemplated herein and in the Definitive Documents or (ii) imposing a material award, claim, injunction, fine or penalty that both (1) is not dischargeable, as determined by the Bankruptcy Court in the Confirmation Order, and (2) has a material adverse effect on the financial condition or operations of the Reorganized Debtors, taken as whole;

(f)        all material regulatory and governmental approvals and consents that are necessary to operate the businesses of the Reorganized Debtors in the ordinary course shall have been obtained;

(g)        all conditions precedent to the effectiveness of the Exit ABL Credit Agreement shall have been satisfied or duly waived by the party whose consent is required thereunder, and the Exit ABL Credit Agreement shall be in full force and effect;

(h)        all conditions precedent to the effectiveness of each of the Exit Notes Indenture and HoldCo Notes Indenture shall have been satisfied or duly waived, and each of the Exit Notes Indenture and HoldCo Notes Indenture shall be in full force and effect;

(i)        the Bankruptcy Court shall have entered the Confirmation Order and such order shall be a Final Order;

(j)        all waiting periods imposed by any Antitrust Authority with respect to the transactions contemplated by the Plan and the Backstop Agreements shall have terminated or expired and all authorizations, approvals, consents or clearances under the Antitrust Laws in connection with the transactions contemplated by the Plan and the Backstop Agreements shall have been obtained;

(k)        the (i) Equity Rights Offering and Debt Rights Offering shall have been conducted in accordance with the Plan, the Equity Rights Offering Procedures, Debt Rights Offering Procedures, the Equity Backstop Agreement and the Backstop Order (as applicable) and (ii) Debt Rights Offering shall have been conducted in accordance with the Plan, the Debt Rights Offering Procedures, the Debt Backstop Agreement and the Backstop Order (as applicable);

(l)        the New Corporate Governance Documents shall be in full force and effect;

(m)        (i) the Equity Put Option Premium shall have been paid to the Equity Commitment Parties and the Debt Put Option Premium shall have been paid to the Debt Commitment Parties, (ii) all amounts payable to the Exit Notes Backstop Parties in connection with the Exit Notes Backstop (as to be agreed by the Debtors and the Exit Notes Backstop Parties) shall have been paid in full by the Debtors, and (iii) all accrued and unpaid Restructuring Expenses shall have been paid in full by the Debtors;

(n)        to the extent not otherwise addressed herein, all material actions, documents, and agreements necessary to implement and consummate the Restructuring Transactions shall have been effected and executed, and shall be in form and substance consistent with the Restructuring Support Agreement or otherwise acceptable to the Debtors and the Required Supporting Noteholders;

(o)        all agreements set forth in the Plan Supplement shall have become effective and all steps necessary to substantially consummate the Restructuring Transactions shall have been taken; and

(p)        all Other Supporting Noteholder Advisor Fees shall have been paid in full by the Debtors.

### 9.3    *Waiver of Conditions Precedent.*

(a)    Each of the conditions precedent to the occurrence of the Effective Date may be waived in writing by the Debtors and the Required Supporting Noteholders and, solely to the extent such party is directly and adversely impacted by such waiver, the Backstop Parties and the Supporting Sponsors, the ABL DIP Agent, the ABL DIP Lenders, Term Loan DIP Agents, and Term Loan DIP Lenders (each in their capacities as such) which waiver shall be effective without leave of or order of the Bankruptcy Court.  If any such condition precedent is waived pursuant to this Section 9.3 and the Effective Date occurs, each party agreeing to waive such condition precedent shall be estopped from withdrawing such waiver after the Effective Date or otherwise challenging the occurrence of the Effective Date on the basis that such condition was not satisfied, the waiver of such condition precedent shall benefit from the "equitable mootness" doctrine, and the occurrence of the Effective Date shall foreclose any ability to challenge the Plan in any court. If the Plan is confirmed for fewer than all of the Debtors, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur.

(b)    The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

### 9.4    *Effect of Failure of a Condition.*

If the conditions listed in Section 9.2 of the Plan are not satisfied or waived in accordance with Section 9.3 of the Plan on or before the termination of the Restructuring Support Agreement, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (b) prejudice in any manner the rights of any Person, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, any of the other Supporting Noteholders or any other Person.

## ARTICLE X.    EFFECT OF CONFIRMATION.

### 10.1    *Binding Effect.*

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of the Plan shall bind every holder of a Claim against or Interest in any Debtor and inure to the benefit of and be binding on such holder's respective successors and assigns, regardless of whether the Claim or Interest of such holder is Impaired under the Plan and whether such holder has accepted the Plan.

### 10.2    *Vesting of Assets.*

Except as otherwise provided in the Plan, the Confirmation Order or any Plan Supplement, on and after the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all Assets of the Estates, including all claims, rights, and Causes of Action and any property acquired by the Debtors or the Reorganized Debtors during the Chapter 11 Cases or

under or in connection with the Plan shall vest in each respective Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances, and interests. Subject to the terms of the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Expense Claims) and Causes of Action without notice to, supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for Professional Persons' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

### 10.3 *Discharge of Claims Against and Interests in Debtors.*

Upon the Effective Date, except as otherwise expressly provided in the Plan or in the Confirmation Order, the distributions, rights and treatment to be made under the Plan, shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their Assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, Interests or Causes of Action, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims, Interests or Causes of Action relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a proof of claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

Each holder (as well as any trustee or agent on behalf of such holder) of a Claim or Interest, and any affiliate of such holder, shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date. Except as otherwise provided in the Plan, upon the Effective Date, all such holders of Claims and Interests and their affiliates shall be forever precluded and enjoined, pursuant to sections 105, 524, and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in any Debtor or any Reorganized Debtor

### 10.4    *Pre-Confirmation Injunctions and Stays.*

Unless otherwise provided in the Plan or a Final Order of the Bankruptcy Court, all injunctions and stays arising under or entered during the Chapter 11 Cases (including, for the avoidance of doubt, under the *Final Order (I) Establishing Notification Procedures and Approving Restrictions on (A) Certain Transfers of Interests in, and Claims Against, the Debtors and (B) Certain Worthless Stock Deduction Claims, (II) Setting Record Date for Sale-Down Notice Related to Trading in Claims Against the Debtors; and (III) Granting Related Relief* [D.I. 348]), whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the date of entry of the Confirmation Order, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

For the avoidance of doubt and in accordance with the terms of the Restructuring Support Agreement, from and after the Effective Date, each Supporting Sponsor shall be permanently enjoined from claiming (or permitting any person or entity under its control to claim) a worthlessness deduction under IRC Section 165 for the stock of Holdings, or for an interest in any other entity if doing so could result in an "ownership change" of Holdings under IRC Section 382(g)(4)(D), in either case with respect to any taxable year ending prior to the Effective Date.

### 10.5    *Injunction Against Interference with Plan.*

Except as otherwise provided in the Plan or in the Confirmation Order, upon the entry of the Confirmation Order, all holders of Claims and Interests and all other parties in interest, along with their respective present and former affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or the occurrence of the Effective Date.

### 10.6    *Plan Injunction.*

**Except as otherwise provided in the Plan or in the Confirmation Order, from and after the Effective Date, all Persons who have held, hold, or may hold Claims or Interests, and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, are, with respect to any such Claim or Interest, permanently enjoined after the entry of the Confirmation Order from:  (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a Debtor, a Reorganized Debtor, or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against a Debtor, a Reorganized Debtor, or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (ii) or any property of any such transferee or successor; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor, a**

Reorganized Debtor, or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this subsection (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; *provided*, that nothing contained in the Plan shall preclude such Persons who have held, hold, or may hold Claims against, or Interests in, a Debtor, a Reorganized Debtor, or an Estate from exercising their rights and remedies, or obtaining benefits, pursuant to and consistent with the terms of the Plan.

10.7    *Releases.*

(a)    **Releases by the Debtors.**  As of the Effective Date, except for the rights and remedies that remain in effect from and after the Effective Date to enforce the Plan and the obligations set forth in the Definitive Documents, including the documents in the Plan Supplement, except as provided for in the Schedule of Retained Claims and Causes of Actions, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by the Debtors, the Reorganized Debtors, and the Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all Claims and Causes of Action (including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirements or otherwise that the Debtors, the Reorganized Debtors, the Estates, or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Restructuring, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the ABL DIP Facility, the Term Loan DIP Facility, the Exit ABL Facility, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Plan, the Solicitation Materials, the Restructuring Support Agreement, the Definitive Documents (including the documents in the Plan Supplement) or related agreements, instruments, or other documents relating thereto, the solicitation of votes with respect to the Plan, and any contract, instrument, agreement or other document entered into in connection with any of the foregoing, or any preference, fraudulent transfer or other avoidance action related to the Debtors arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence

taking place on or before the Effective Date, other than Claims or Causes of Action arising out of or related to any act or omission of a Released Party that constitutes intentional fraud or willful misconduct as determined by a Final Order.  For the avoidance of doubt, Claims and Causes of Action retained in the Plan Supplement are not released and expressly preserved.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases in <u>Section 10.7(a)</u> of the Plan (the "<u>Debtor Releases</u>"), which includes, by reference, each of the related provisions and definitions under the Plan, and, furthermore, shall constitute the Bankruptcy Court's finding that the Debtor Releases are:  (i) in exchange for the good and valuable consideration provided by the Released Parties, (ii) a good faith settlement and compromise of the Claims released by the Debtors, the Reorganized Debtors and the Estates, (iii) in the best interests of the Debtors, the Estates and all Holders of Claims and Interests, (iv) fair, equitable and reasonable, (v) given and made after due notice and opportunity for hearing, and (vi) a bar to any of the Debtors, the Reorganized Debtors or the Estates asserting any Claim or Cause of Action released pursuant to the Debtor Releases.

(b)    <u>Releases by Holders of Claims and Interests</u>.  As of the Effective Date, except for the rights and remedies that remain in effect from and after the Effective Date to enforce the Plan and the obligations contemplated by the Definitive Documents (including the documents in the Plan Supplement) or as otherwise provided in any order of the Bankruptcy Court, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Releasing Parties, from any and all Claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort, or otherwise by statute, violations of federal or state securities laws or otherwise, that such holders or their estates, affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, or their Estates, the Chapter 11 Cases, the Restructuring, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party, the restructuring of any Claims or Interests before or during the

Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Plan, the Solicitation Materials, the Restructuring Support Agreement, the Definitive Documents (including the documents in the Plan Supplement) or related agreements, instruments, or other documents, relating thereto, or the solicitation of votes with respect to the Plan, and any contract, instrument, agreement or other document entered into in connection with any of the foregoing, or any preference, fraudulent transfer or other avoidance action related to the Debtors arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, in all cases based upon any act or omission, transaction, agreement, event, or other occurrences taking place on or before the Effective Date, other than Claims or Causes of Action arising out of or related to any act or omission of a Released Party that constitutes intentional fraud or willful misconduct as determined by a Final Order.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases in <u>Section 10.7(b)</u> of the Plan (the "<u>Third Party Release</u>"), which includes, by reference, each of the related provisions and definitions under the Plan, and, furthermore, shall constitute the Bankruptcy Court's finding that the Third Party Release is (i) consensual, (ii) essential to the confirmation of the Plan, (iii) given in exchange for the good and valuable consideration provided by the Released Parties, (iv) a good faith settlement and compromise of the Claims released by the Third Party Release, (v) in the best interests of the Debtors and their Estates, (vi) fair, equitable and reasonable, (vii) given and made after due notice and opportunity for hearing, and (viii) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third Party Release.

10.8    *Exculpation.*

To the fullest extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party will be released and exculpated from, any Claim or Cause of Action in connection with or arising out of the administration of the Chapter 11 Cases; the negotiation and pursuit of the ABL DIP Facility, the Priming Notes DIP Roll-Up, the Term Loan DIP Facility, the Exit ABL Facility, the Exit Notes, Holdco Notes, the Debt Rights Offering, the Equity Rights Offering, the Backstop Agreements, the Management Incentive Plan, the Disclosure Statement, the Restructuring Support Agreement, the Restructuring, and the Plan, the Solicitation Materials and any other Definitive Documents (including the documents in the Plan Supplement), or the solicitation of votes for, or confirmation of, the Plan; the funding of the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; the issuance of securities under or in connection with the Plan; the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors; or the transactions in furtherance of any of the foregoing; other than Claims or Causes of Action arising out of or related to any act or omission of an Exculpated Party that constitutes

**intentional fraud or willful misconduct as determined by a Final Order, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of securities pursuant to the Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of securities thereunder. The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.**

### 10.9    *Injunction Related to Releases and Exculpation.*

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released or exculpated pursuant to the Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in the Plan or the Confirmation Order.

**10.10    *Release of Liens.*  Except as otherwise specifically provided in the Plan or in any contract, instrument, release, or other agreement or document contemplated under or executed in connection with the Plan, including the Exit Facility Documents, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or filing being required to be made by the Debtors.**

### 10.11    *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments thereof under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a), 510(b), or 510(c) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### 10.12    *Retention of Causes of Action and Reservation of Rights.*

Except as otherwise provided in the Plan, including Sections 10.5, 10.6, 10.7, 10.8 and 10.9, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law.  The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

### 10.13    *Ipso Facto and Similar Provisions Ineffective.*

Any term of any prepetition policy, prepetition contract, or other prepetition obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor as a result of, or gives rise to a right of any entity based on any of the following:  (a) the insolvency or financial condition of a Debtor; (b) the commencement of the Chapter 11 Cases; (c) the confirmation or consummation of the Plan, including any change of control that shall occur as a result of such consummation; or (d) the Restructuring.

### 10.14    *Indemnification and Reimbursement Obligations.*

For purposes of the Plan, (a) Indemnification Obligations to current and former directors, officers, agents or employees of any of the Debtors who served in such capacity prior to, on or subsequent to the Petition Date shall be assumed by the Reorganized Debtors and (b) Indemnification Obligations of the Debtors arising from services as current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity during the period from and after the Petition Date shall be Administrative Expense Claims; *provided, however*, that the Reorganized Debtors shall not assume any obligation to indemnify any of the forgoing parties with respect to any act or omission for or on behalf of the Debtors directly and primarily arising out of any act or omission determined by a Final Order to constitute actual fraud, willful misconduct, or gross negligence..  Without limiting an indemnified party's rights to indemnity, an indemnified party and the Reorganized Debtors will cooperate to pursue and make all claims under all applicable insurance policies.  In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any current and former directors' and officers' insurance policies (including any "tail policy") in effect as of the Petition Date, and all current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date to the extent set forth in such policies.

For the avoidance of doubt, the Reorganized Debtors shall not assume any obligations to indemnify the Supporting Sponsors or any other holders of Existing Holdings Interests, with respect to all present and future actions, suits, and proceedings against the Debtors or such parties, based upon any act or omission for or on behalf of the Debtors; *provided*, that the foregoing clause shall not limit indemnification of any current or former director or officer of the Debtors by virtue of his or her affiliation with any of the Supporting Sponsors or by such Person's ownership of Existing Holdings Interests.

## ARTICLE XI.        RETENTION OF JURISDICTION.

### 11.1    *Retention of Jurisdiction.*

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in or related to the Chapter 11 Cases for, among other things, the following purposes:

(a)    to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases and any disputes over Cure Amounts resulting therefrom;

(b)    to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the entry of the Confirmation Order;

(c)    to hear and resolve any disputes arising from or related to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004 or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d)    to ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan and the Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under the Plan;

(e)    to consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claim;

(f)    to enter, implement, or enforce such orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)    to issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person or other Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)    to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code to remedy any defect or omission or reconcile any

inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)     to hear and determine all Fee Claims;

(j)     to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(k)     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments in furtherance of either, or any agreement, instrument, or other document governing or related to any of the foregoing;

(l)     to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, enforce, implement, execute, and consummate the Plan, including any release, exculpation, or injunction provisions set forth in the Plan, following the occurrence of the Effective Date;

(m)     to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(o)     to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

(p)     to resolve any disputes concerning whether a Person or entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose for determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(q)     to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory;

(r)     to recover all Assets of the Debtors and property of the Estates, wherever located;

(s)     to hear and determine matters related to the DIP Facilities and the Final DIP Order; and

(t)     to enter a final decree closing each of the Chapter 11 Cases.

## ARTICLE XII.    MISCELLANEOUS PROVISIONS.

### 12.1    *Exemption from Certain Transfer Taxes.*

Pursuant to and to the fullest extent permitted by section 1146 of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under this Plan or pursuant to (a) the issuance, reinstatement, distribution, transfer or exchange of any debt, interest, securities, instruments or documents, (b) the creation, modification, consolidation, termination, refinancing and/or recording of any Lien, mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such other means, (c) all sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including any transfers effectuated under the Plan, (d) any assumption, assignment, recordation or sale by the Debtors of their interests in unexpired leases of nonresidential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, (e) the grant of collateral under the credit documents governing the Exit Facility Documents (f) the Restructuring Transactions and (g) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

### 12.2    *Request for Expedited Determination of Taxes.*

The Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

### 12.3    *Dates of Actions to Implement Plan.*

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

### 12.4    *Amendments.*

(a)    Plan Modifications.    Subject to the terms and conditions of the Restructuring Support Agreement, the Backstop Agreements, the Payoff Letter, and any consents or approvals required under each of the foregoing, including the consent of the Required Supporting Noteholders, the Plan may be amended, modified, or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as

otherwise ordered by the Bankruptcy Court; *provided* that any amendments, modifications, or supplements shall be in form and substance acceptable in all respects to the Debtors and the Required Supporting Noteholders, and, solely in respect of provisions directly affecting them, the Supporting Sponsors, the ABL DIP Agent, the ABL DIP Lenders, Term Loan DIP Agents, and Term Loan DIP Lenders (each in their capacities as such).  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to the Plan, the Debtors, with the consent of the Required Supporting Noteholders (and, solely in respect of provisions directly affecting them, the ABL DIP Agent and the ABL DIP Lenders), may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of effects of the Plan, and any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.  The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement in accordance with the terms of this Plan and the Restructuring Support Agreement through the Effective Date.

(b)      <u>Certain Technical Amendments</u>.  Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court with the consent of the Required Supporting Noteholders (and, solely in respect of provisions directly affecting them, the ABL DIP Agent and the ABL DIP Lenders).

### 12.5 *Revocation or Withdrawal of Plan.*

The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date as to any or all of the Debtors.  If, with respect to a Debtor, the Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor:  (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Person; (ii) prejudice in any manner the rights of such Debtor or any other Person; or (iii) constitute an admission of any sort by any Debtor or any other Person.

### 12.6 *Severability.*

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, subject to the consent of the Required Supporting Noteholders, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of the Plan shall remain in full force and effect

and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with this Section 12.6, is (i) valid and enforceable pursuant to its terms, (ii) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Reorganized Debtors (as the case may be) and (iii) nonseverable and mutually dependent.

### 12.7    *Governing Law.*

Except to the extent that the Bankruptcy Code or other federal law is applicable or to the extent that a Plan Supplement document provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflicts of laws thereof; *provided* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the jurisdiction of incorporation or formation of the relevant Debtor or Reorganized Debtor, as applicable.

### 12.8    *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, the holders of Claims and Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), the Released Parties and all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in this Plan, each Entity acquiring property under this Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors, and each of their respective successors and assigns. All Claims against and Interests in the Debtors shall be as fixed, adjusted, or compromised, as applicable, pursuant to this Plan regardless of whether any holder of a Claim or Interest has voted on this Plan.

### 12.9    *Successors and Assigns.*

The rights, benefits, and obligations of any Person named or referred to in the Plan shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiary, or guardian, if any, of each such Person.

### 12.10    *Entire Agreement.*

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### 12.11   *Computing Time.*

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 12.12   *Exhibits to Plan; Additional Documents.*

All exhibits, schedules, supplements, and appendices to the Plan (including any other documents to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date) are incorporated into and are a part of the Plan as if set forth in full in the Plan.

On or before the Effective Date, and subject to and consistent in all respects with the terms of the Restructuring Support Agreement, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of this Plan and the Restructuring Support Agreement. The Debtors or the Reorganized Debtors, as applicable, and all holders of Claims or Interests receiving distributions pursuant to this Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

### 12.13   *Notices.*

All notices, requests, and demands hereunder shall be in writing (including by facsimile or email transmission) and, unless otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

if to the Debtors or Reorganized Debtors:

TPC Group Inc.
One Allen Center
500 Dallas Street, Suite 2000
Houston, Texas 77002
Attn: Marilyn Moore Basso, General Counsel
(marilyn.moorebasso@tpcgrp.com)

– and –

Baker Botts L.L.P.
2001 Ross Avenue
Suite 900
Dallas, Texas 75201-2980
Attn: Jim Prince, Scott R. Bowling, and David Eastlake
(jim.prince@bakerbotts.com; scott.bowling@bakerbotts.com;
david.eastlake@bakerbotts.com)

if to the Supporting Noteholders:

        Paul Hastings LLP
        200 Park Avenue
        New York, NY 10166
        Attn: Kris Hansen, Allison Miller,
        Jon Canfield and Gabriel Sasson
        (krishansen@paulhastings.com; allisonmiller@paulhastings;
        joncanfield@paulhastings.com; gabesasson@paulhastings.com)

if to the Supporting Sponsors:

        Latham & Watkins LLP
        1271 Avenue of the Americas
        New York, New York 10020
        Attn: George Davis and David Hammerman
        (george.davis@lw.com; david.hammerman@lw.com)

if to the Creditors' Committee:

        Akin Gump Strauss Hauer & Feld LLP
        One Bryant Park
        New York, NY 10036
        Attn: Philip C. Dublin, Naomi Moss, and Marty L. Brimmage, Jr.
        (pdublin@akingump.com; nmoss@akingump.com; mbrimmage@akingump.com)

A notice is deemed to be given and received (a) if sent by first-class mail, personal delivery, or courier, on the date of delivery if it is a Business Day and the delivery was made prior to 4:00 p.m. (local time in place of receipt) and otherwise on the next Business Day, or (b) if sent by electronic mail, when the sender receives an email from the recipient acknowledging receipt; *provided* that an automatic "read receipt" does not constitute acknowledgment of an email for purposes of this <u>Section 12.13</u>.  Any party may change its address for service from time to time by providing a notice in accordance with the foregoing.  Any element of a party's address that is not specifically changed in a notice will be assumed not to be changed.

        After the occurrence of the Effective Date, the Reorganized Debtors have authority to send a notice to entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002; *provided*, that the U.S. Trustee and the Required Supporting Noteholders need not file such a renewed request and shall continue to receive documents without any further action being necessary.  After the occurrence of the Effective Date, the Reorganized Debtors are authorized to limit the list of entities receiving documents pursuant to Bankruptcy Rule 2002 to the U.S. Trustee, the Required Supporting Noteholders, and those entities that have filed such renewed requests.

### 12.14  *<u>Reservation of Rights.</u>*

        Except as otherwise provided herein, the Plan shall be of no force or effect unless the Bankruptcy Court enters the Confirmation Order.  None of the filing of the Plan, any statement

or provision of the Plan, or the taking of any action by the Debtors with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of (a) the Debtors with respect to any Claims or Interests prior to the Effective Date or (b) any holder of a Claim or Interest or other entity prior to the Effective Date.

### 12.15   *Dissolution of Creditors' Committee.*

On the Effective Date, the Creditors' Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; *provided* that, after the Effective Date, the Creditors' Committee shall continue in existence and have standing and a right to be heard solely for the limited purpose of prosecuting applications, and any relief related thereto, for compensation by professional persons retained in the Chapter 11 Cases pursuant to sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code and requests for allowance of Administrative Expense Claims for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code.

### 12.16   *Closing of Chapter 11 Cases.*

(a)      The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case(s). As of the Effective Date, the Reorganized Debtors shall submit separate orders to the Bankruptcy Court under certification of counsel closing certain individual Chapter 11 Cases and changing the caption of the Chapter 11 Cases accordingly. Matters concerning Claims shall be heard and adjudicated in a Debtor's Chapter 11 Case that remains open regardless of whether the applicable Claim is against a Debtor in a Chapter 11 Case that is closed.

(b)      Beginning with the Statutory Fees due for the first quarter of 2023, any and all Statutory Fees shall be paid by the GUC Trust until any remaining Reorganized Debtor's case is closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code unless, within five (5) Business Days prior to the end of the fourth quarter 2022, the Debtors or the Reorganized Debtors, as applicable, inform the GUC Trustee that full administration of the Chapter 11 Case(s), other than reconciliation of General Unsecured Claims by the GUC Trust, is incomplete; *provided, however*, that the GUC Trust shall not be responsible for any Statutory Fees unless and until the full administration of the Chapter 11 Cases(s), other than reconciliation of General Unsecured Claims by the GUC Trust, is complete.

Dated:  September 20, 2022

TPC GROUP INC.
on behalf of itself and all other Debtors

*/s/ Bart de Jong*

Bart de Jong
Chief Financial Officer
TPC Group Inc.

# EXHIBIT B

**Restructuring Support Agreement**

**THIS AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF ANY CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION ONLY WILL BE MADE IN COMPLIANCE WITH ALL APPLICABLE SECURITIES LAWS AND PROVISIONS OF THE BANKRUPTCY CODE. ACCEPTANCES OR REJECTIONS OF A CHAPTER 11 PLAN WILL NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.**

## <u>RESTRUCTURING SUPPORT AGREEMENT</u>

This RESTRUCTURING SUPPORT AGREEMENT (as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, together with all exhibits, annexes and schedules attached hereto or incorporated herein, this "**Agreement**"), dated as of May 31, 2022, is made by and among:[1]

(a)    (i) TPC Group Inc., a Delaware corporation (the "**Issuer**"); (ii) TPC Holdings, Inc., a Delaware corporation ("**Holdings**"); (iii) TPC Group LLC, a Texas limited liability company; (iv) Texas Butylene Chemical Corporation, a Texas corporation; (v) Texas Olefins Domestic-International Sales Corporation, a Texas corporation; (vi) TPC Phoenix Fuels LLC, a Texas limited liability company; (vii) Port Neches Fuels, LLC, a Delaware limited liability company; (viii) TP Capital Corp., a Delaware corporation; (ix) TPC Pipeline Holding Company LLC, a Delaware limited liability company; and (x) TPC Pipeline Company LLC, a Delaware limited liability company. Each of the entities described in the foregoing clauses (i)-(x) is referred to herein individually as a "**TPC Party**" and collectively as the "**TPC Parties**", and each of the entities described in the foregoing clauses (i)-(viii) is referred to herein individually as a "**Debtor**" and collectively as the "**Debtors**";

(b)    the undersigned holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, (i) the 10.875% secured notes due 2024 (the "**Priming Notes**") issued pursuant to that certain indenture dated as of February 2, 2021, by and among the Issuer, the guarantors party thereto, and U.S. Bank National Association, as trustee and collateral agent (in such capacity, the "**Priming Notes Trustee**"; such indenture, as from time to time amended, modified, or otherwise supplemented, the "**Priming Notes Indenture**") (collectively, the "**Initial Supporting Priming Notes Noteholders**") and (ii) the 10.5% secured notes due 2024 (the "**10.5% Notes**"; together with the Priming Notes, the "**Notes**") issued pursuant to that certain indenture dated as of August 2, 2019, by and among the Issuer, the guarantors party thereto, and U.S. Bank National Association, as trustee and collateral agent (in such capacity, the "**10.5% Notes Trustee**"; such indenture, as from time to time amended, modified, or otherwise supplemented, the "**10.5% Notes Indenture**") (collectively, the "**Initial Supporting 10.5% Noteholders**," and together with the Initial Supporting Priming Notes Noteholders, the "**Initial Supporting Noteholders**");

---

[1] Capitalized terms used but not otherwise defined in the preamble and recitals to this Agreement have the meanings ascribed to them in <u>Section 1</u> hereof.

(c)    (i) FR Sawgrass, L.P., a Delaware limited partnership; (ii) SK Sawgrass, L.P., a Delaware limited partnership; (iii) Sawgrass Holdings GP LLC, a Delaware limited liability company; and (iv) Sawgrass Holdings LP, a Delaware limited partnership; (v) First Reserve Corporation, L.L.C., a Delaware limited liability company; (vi) First Reserve Management, L.P., a Cayman Islands limited partnership; (vii) FR XII Alpha AIV, L.P., a Cayman Islands limited partnership; (ix) SK Capital Partners, L.P., a Delaware limited partnership; and (ix) FR XII-A Alpha AIV, L.P., a Cayman Islands limited partnership (collectively, the "**Supporting Sponsors**");

(d)    SK Second Reserve, L.P., a Delaware limited partnership; and

(e)    each other holder of Notes and/or Claims that subsequently becomes a party hereto by executing and delivering a Joinder Agreement in accordance with the terms hereof, including any holder of DIP Claims required to execute and deliver a Joinder Agreement under the DIP Credit Agreement (the "**Additional Supporting Noteholders**" and, together with the Initial Supporting Noteholders, the "**Supporting Noteholders**").

Each of the TPC Parties, the Supporting Noteholders, and the Supporting Sponsors is referred to herein as a "**Party**" and, collectively, as the "**Parties**."

## RECITALS

**WHEREAS** the Parties have in good faith and at arms' length agreed to undertake a financial restructuring of the TPC Parties that is anticipated to be effected through (a) a pre-negotiated plan of reorganization (including any schedules, annexes and exhibits attached thereto) on terms and conditions set forth in the term sheet attached as **Exhibit A** hereto (including any schedules and exhibits attached thereto, the "**Restructuring Term Sheet**"); (b) the commencement by each Debtor of a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"; such cases collectively, the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the District of Delaware or, with the consent of the Required Supporting Noteholders (such consent not to be unreasonably withheld, conditioned, or delayed), any other jurisdiction that the TPC Parties choose (the "**Bankruptcy Court**"); and (c) the funding of the Chapter 11 Cases by a debtor-in-possession loan facility on terms and conditions set forth in the term sheet attached as **Exhibit B** hereto (including any schedules, annexes and exhibits attached thereto, the "**DIP Term Sheet**");

**WHEREAS**, as of the date hereof, the Supporting Priming Notes Noteholders collectively beneficially own in excess of 88% of the aggregate outstanding principal amount of the Priming Notes;

**WHEREAS**, as of the date hereof, the Supporting 10.5% Noteholders collectively beneficially own in excess of 78% of the aggregate outstanding principal amount of the 10.5% Notes;

**WHEREAS**, as of the date hereof, the Supporting Sponsor FR Sawgrass L.P. and Supporting Sponsor SK Sawgrass L.P. indirectly hold or control, 71.2% and 27.8%, respectively, of the aggregate issued and outstanding Existing Holdings Interests; and

**WHEREAS**, the TPC Parties and certain of their stakeholders entered into negotiations to settle and compromise extant and outstanding disputes to maximize the value of the TPC Parties' assets and to effect the Restructuring by means of the Plan in accordance with the terms of this Agreement; and

**WHEREAS**, the Parties and their respective representatives have engaged in arm's length, good-faith negotiations regarding a potential restructuring of the indebtedness and other obligations of and interests in the TPC Parties in accordance with the terms and conditions set forth in this Agreement;

**NOW, THEREFORE,** in consideration of the covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which each of the Parties hereby acknowledges, each Party, intending to be legally bound hereby, agrees as follows:

## AGREEMENT

1.    **Certain Definitions**.  Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Restructuring Term Sheet.  As used in this Agreement, the following terms have the following meanings:

"**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly controls, or is under common control with, or is controlled by, such Person.  As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean, with respect to any Person, the possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise) of such Person.  A Related Fund of any Person shall be deemed to be the Affiliate of such Person.

"**Alternative Restructuring Proposal**" means any plan, inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to: (a) any plan of reorganization or liquidation, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, debt or equity investment (including any debtor-in-possession financing or exit financing), use of cash collateral, tender offer, share issuance, recapitalization, sale of assets or equity interests or restructuring involving any of the TPC Parties or any material portion of their respective assets, properties, or businesses, in each case, outside of the ordinary course of business and other than as contemplated by this Agreement; or (b) any other transaction involving the TPC Parties that is an alternative to and/or materially inconsistent with the Restructuring.

"**Ballot**" means the ballot distributed with the Solicitation Materials for voting on the Plan.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

"**Existing Intercreditor Agreements**" means (i) that certain Intercreditor Agreement, dated as of August 2, 2019, among the ABL Representative (as defined therein), the Priming Notes Trustee and the 10.5% Notes Trustee and (ii) that certain Intercreditor Agreement, dated as of February 2, 2021, among the Priming Notes Trustee and the 10.5% Notes Trustee.

"**IRC**" means the Internal Revenue Code of 1986, as amended.

"**Material Adverse Effect**" means any event, change, effect, occurrence, development, circumstance, condition, result, state of fact or change of fact, the worsening of any of the foregoing or any other matter (each, an "**Event**") occurring after the RSA Effective Date, that, individually or together with all other Events, has had, or would reasonably be expected to have, a material adverse effect on either (i) the business, operations, finances, properties, condition (financial or otherwise), assets, or liabilities of Holdings and its subsidiaries, taken as a whole, or (ii) the ability of Holdings and its subsidiaries, taken as a whole, to consummate the transactions contemplated by this Agreement and the Restructuring; *provided, however*, that none of the following Events shall be deemed to constitute a "Material Adverse Effect" and shall not be taken into account, individually or in the aggregate, in determining whether a Material Adverse Effect has occurred: (A) the execution, announcement or pendency of this Agreement and compliance with the express provisions of this Agreement or the consummation of the transactions contemplated hereby (including the impact on the relationships, contractual or otherwise, of Holdings or any of its subsidiaries with its respective suppliers or partners or other business relationships as a result of the execution, announcement or pendency of this Agreement), including the filing of, and other transactions undertaken in furtherance of the Restructuring Transactions as contemplated by this Agreement in connection with, the Chapter 11 Cases as contemplated by this Agreement, (B) any actions or omissions taken or not taken by or on behalf of any Debtor with the express prior written consent of or upon the request of the Required Supporting Noteholders, (C) changes or prospective changes in applicable law or generally accepted accounting principles or other applicable accounting principles or standards in the United States or elsewhere, or changes or prospective changes in the interpretation or enforcement of any of the foregoing, or any changes or prospective changes in general legal, regulatory or political conditions; (D) epidemics, pandemics, disease, including additional waves of any contagious diseases (including influenza, COVID-19 or any variation thereof), (E) any action required to be taken under any law or order to which any Debtor is bound to the extent such action is not in contravention of any express term and does not otherwise frustrate the purpose of this Agreement, (F) general trends, events or conditions generally affecting the industry, markets or geographic areas in which the Debtors operate, including changes in supplier and customer behavior, changes in financial markets, general economic conditions (including changes in supply chains, prevailing interest rates, exchange rates, commodity prices and/or raw materials and other cost of goods sold), (G) local, regional, national or international political or social conditions or any national or international hostilities, acts of terror, cyberterrorism, police action, civil unrest, sabotage, war (whether or not declared) or any escalation or worsening of any such conditions, hostilities or acts, and (H) any failure, in and of itself, of Holdings or any of its subsidiaries to meet any published or internally prepared projections, budgets, plans or forecasts of revenues, earnings or other financial performance measures or operating statistics (it being understood that the facts and circumstances underlying any such failure that are not otherwise excluded from the definition of a "Material Adverse Effect" may be considered in determining whether there has been, or is reasonably expected to be, a Material Adverse Effect), except, in the case of the foregoing clauses (C), (D), (E), (F), and (G), to the extent such Events have a materially disproportionate adverse effect on the Debtors, taken as a whole, as compared to other businesses in the same industry, market, or geographic area in which the Debtors operate.

"**Notes Forbearance Agreement**" means that certain Forbearance Agreement, dated as of February 3, 2022, between Issuer, Holdings, the other TPC Parties party thereto, and certain holders of the Priming Notes and the 10.5% Notes described therein as the "Forbearance Holders" (as amended by that certain Amendment No. 1 to Forbearance Agreement, dated as of March 16, 2022, as amended by that certain Amendment No. 2 to Forbearance Agreement, dated as of April 10, 2022, as amended by that certain Amendment No. 3 to Forbearance Agreement, dated as of April 28, 2022, as amended by that certain Amendment No. 4 to Forbearance Agreement, dated as of May 11, 2022, and as may be further amended, supplemented, or otherwise modified from time to time).

"**Qualified Marketmaker**" means an entity that (i) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Notes and/or Claims (or enter with customers into long and short positions in Notes and/or Claims), in its capacity as a dealer or market maker in Notes and/or Claims and (ii) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities).

"**Related Fund**" means, with respect to any Person, any fund, account or investment vehicle that is controlled or managed by (i) such Person, (ii) an Affiliate of such Person or (iii) the same investment manager, advisor or subadvisor as such Person or an Affiliate of such investment manager, advisor or subadvisor.

"**Required Supporting Noteholders**" means, as of the relevant date, each of the following: (i) Supporting Noteholders that collectively own or control more than 50% in aggregate principal amount of the Priming Notes (or, as applicable, the Claims arising therefrom) then owned or controlled by all the Supporting Noteholders in the aggregate as of such date; and (ii) Supporting Noteholders that collectively own or control more than 50% in aggregate principal amount of the 10.5% Notes (or, as applicable, the Claims arising therefrom) then owned or controlled by all the Supporting Noteholders in the aggregate as of such date.

"**Restructuring Transactions Memorandum**" means the memorandum setting forth certain steps of the Restructuring.

"**RSA Effective Date**" means the date on which all of the conditions set forth in Section 12 hereof have been satisfied or waived, as applicable.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

2.    **Exhibits and Schedules Incorporated by Reference**.  The Restructuring Term Sheet, the DIP Term Sheet and the other exhibits, annexes or schedules attached hereto or thereto (collectively, the "**Exhibits and Schedules**") are expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall be deemed to include the Restructuring Term Sheet, the DIP Term Sheet and any other Exhibits and Schedules.  In the event of any inconsistency between this Agreement (without reference to the Exhibits and Schedules) and the Exhibits and Schedules, this Agreement (without reference to the Exhibits and Schedules) shall govern.

### 3. **Definitive Documents**.

(a)     The definitive documents and agreements governing the Restructuring (collectively, the "**Definitive Documents**") shall include this Agreement and each of the following: (i) the Plan (and all exhibits, schedules and annexes thereto); (ii) the Confirmation Order; (iii) the Disclosure Statement; (iv) the Disclosure Statement Order; (v) the Solicitation Materials other than, if applicable, Solicitation Materials authored by parties other than the TPC Parties; (vi) the Interim DIP Order, the Final DIP Order, the DIP Credit Agreement and all other documents, including security, collateral, guarantee and ancillary documents, executed in connection with the Term Loan DIP Facility and the ABL DIP Facility; (vii) any credit agreement and/or indenture and related security documents to be entered into by the Reorganized Debtors on the Effective Date, including with respect to the Exit ABL Facility, the HoldCo Notes and the Exit Notes; (viii) any and all motions filed on or after the Petition Date seeking to assume, reject or assume and assign an executory contract or unexpired nonresidential real property lease of the Debtors, and all orders relating thereto; (ix) any and all agreements and instruments delivered or entered into in connection with the Equity Rights Offering and the Debt Rights Offering, including the Equity Rights Offering Documents and the Debt Rights Offering Documents; (x) the New Corporate Governance Documents; (xi) the Restructuring Transactions Memorandum, if any; (xii) the Backstop Agreements and the Backstop Order; (xiii) the Interim Record Date Order, the Final Record Date Order, the Interim NOL Order and the Final NOL Order; (xiv) any and all "first day" and "second day" pleadings and all orders relating thereto, including any cash management orders; (xv) the Plan Supplement; and (xvi) any other material exhibits, schedules, amendments, modifications, supplements, appendices, pleadings, orders, forms, questionnaires, documents and/or agreements relating to any of the foregoing or utilized to implement or effectuate the Restructuring; *provided*, that declarations, affidavits, and other documents comprising testimony shall not constitute Definitive Documents.

(b)     The Definitive Documents not executed or in a form attached to this Agreement as of the date hereof remain subject to negotiation and completion, as applicable.  Upon completion, the Definitive Documents shall contain terms, conditions, representations, warranties, and covenants consistent in all material respects with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 13.  Further, except as otherwise indicated or set forth herein or in the Exhibits and Schedules, the Definitive Documents not executed or in a form attached to this Agreement as of the date hereof, (i) in the case of the Definitive Documents described in clauses (iii)-(v), (viii), (xi), (xiv) and (xvi), of Section 3(a) shall be in form and substance reasonably acceptable to the TPC Parties and the Required Supporting Noteholders, and, solely in respect of provisions directly affecting them, the Supporting Sponsors, and (ii) in the case of the Definitive Documents described in clauses (i), (ii), (vi), (vii), (ix), (x), (xii), (xiii) and (xv) of Section 3(a) shall be in form and substance acceptable in all respects to the TPC Parties and the Required Supporting Noteholders, and, solely in respect of provisions directly affecting them, the Supporting Sponsors.

(c)     Notwithstanding anything otherwise set forth herein, the Parties agree to take reasonable steps to amend the Plan to remedy any defect identified by the Bankruptcy Court with respect to confirmability in the event that the TPC Parties and the Required Supporting Noteholders reasonably determine that the Plan is not likely to be confirmed if such defect is not remedied.

**4.** <u>**Milestones**</u>.   As provided in <u>Section 8</u> hereof, the Restructuring shall be implemented on the following timeline (each deadline, a "**Milestone**"):

(a)    No later than 8:00 a.m. (prevailing Eastern Time) on June 1, 2022, the Petition Date shall have occurred;

(b)    No later than the date that is three (3) calendar days after the Petition Date (or, if such third day is not a Business Day, the first succeeding Business Day thereafter), the Bankruptcy Court shall have entered the Interim DIP Order;

(c)    No later than the date that is three (3) calendar days after the Petition Date (or, if such third day is not a Business Day, the first succeeding Business Day thereafter), the Bankruptcy Court shall have entered the Interim NOL Order;

(d)    No later than the date that is seven (7) calendar days after the Petition Date, the TPC Parties shall have filed initial versions of the Plan, the Disclosure Statement, a motion to approve the Disclosure Statement and other Solicitation Materials (the "**Disclosure Statement Motion**") and a motion to approve the Equity Rights Offering Documents and the Debt Rights Offering Documents (the "**Backstop Motion**");

(e)    No later than the date that is thirty-five (35) calendar days after the Petition Date (or, if such 35th day is not a Business Day, the first succeeding Business Day thereafter), the Bankruptcy Court shall have entered the Final DIP Order;

(f)    No later than the date that is three (3) Business Days after entry of an order approving a General Claims Bar Date (the "**Bar Date Order**"), which shall be no later than the date that is sixty-five (65) calendar days after the Petition Date, the TPC Parties shall have published notice of the Chapter 11 Cases as authorized under the Bar Date Order;

(g)    No later than the date that is sixty (60) calendar days after the Petition Date (or, if such 60th day is not a Business Day, the first succeeding Business Day thereafter), the Bankruptcy Court shall have entered the Final NOL Order;

(h)    No later than the date that is seventy-five (75) calendar days after the Petition Date (or, if such 75th day is not a Business Day, the first succeeding Business Day thereafter), the Bankruptcy Court shall have entered the Disclosure Statement Order and the Backstop Order;

(i)    No later than the date that is five (5) calendar days after entry of the Disclosure Statement Order, the TPC Parties shall have commenced solicitation of votes on the Plan;

(j)    No later than the date that is five (5) calendar days after entry of the Backstop Order, the TPC Parties shall have commenced the Equity Rights Offering and the Debt Rights Offering;

(k)    No later than the date that is seven (7) calendar days prior to the deadline to file the Plan Supplement (the "**Draft Deadline**"), the Supporting Noteholders shall provide then-

current drafts of the New Corporate Governance Documents for Reorganized Holdings to the TPC Parties through counsel; *provided*, that the Supporting Noteholders and the Supporting Sponsors agree that the TPC Parties shall receive an automatic one (1) calendar day extension of each of the Milestones set forth in Section 4(l) and Section 4(m) for each calendar day following the Draft Deadline for which the Supporting Noteholders have not delivered then-current drafts of the New Corporate Governance Documents to the TPC Parties; *provided*, *further*, that the Supporting Noteholders' failure to deliver such drafts by the Draft Deadline shall not, without more, give rise to a TPC Party Termination Event;

(l)     No later than one hundred and twenty (120) calendar days after the Petition Date (or, if such 125th day is not a Business Day, the first succeeding Business Day thereafter), the Bankruptcy Court shall have entered the Confirmation Order; and

(m)     No later than the date that is one hundred and thirty-five (135) calendar days after the Petition Date, the Effective Date shall have occurred (the "**Plan Outside Date Milestone**").

Each Milestone may be extended or waived with the express written consent of the Required Supporting Noteholders (which may be delivered by email from Paul Hastings LLP ("**Paul Hastings**") to Baker Botts L.L.P. ("**Baker Botts**") and which shall not be unreasonably withheld, conditioned, or delayed if an extension is necessary to accommodate the Bankruptcy Court's availability); *provided*, *however*, that except as provided in Section 4(k), the Milestones set forth in Section 4(l) and Section 4(m) may not be extended or waived without the express written consent of the Supporting Sponsors (which may be delivered by email from Latham & Watkins LLP ("**Latham & Watkins**") to Baker Botts and which shall not be unreasonably withheld, conditioned, or delayed if an extension is necessary to accommodate the Bankruptcy Court's availability). In the event that a Milestone occurs on a non-Business Day, such Milestone shall be automatically extended to the next Business Day without any action by the Parties.

5.     **Commitments of the Supporting Noteholders**.  Subject to the terms and conditions of this Agreement, each Supporting Noteholder shall (severally and not jointly), solely as it remains the legal owner, beneficial owner, and/or investment advisor or manager of or with power and/or authority to bind any Claims (as defined in the Bankruptcy Code) against the Debtors, from the RSA Effective Date until the occurrence of the RSA Termination Date (as defined below):

(a)     subject to the receipt by such Supporting Noteholder of the Disclosure Statement, as approved by the Bankruptcy Court as having adequate information in accordance with section 1125 of the Bankruptcy Code, and other Solicitation Materials, vote or cause to be voted all of its Claims against the Debtors to accept the Plan by timely delivering duly executed and completed Ballots accepting the Plan; *provided*, that no Supporting Noteholder shall be obligated to waive (solely as such conditions apply to the Supporting Noteholder) any condition to the consummation of any part of the Restructuring set forth in any Definitive Document, including the conditions precedent to the consummation of the Restructuring set forth in this Agreement and in the section of the Restructuring Term Sheet entitled "Conditions to Effectiveness";

(b)    not directly or indirectly withdraw, change, or revoke (or seek to directly or indirectly withdraw, change, or revoke) any tender, consent, or vote with respect to the Plan;

(c)    not object to, impede, or directly or indirectly take any other action, including, without limitation, initiating, supporting, and/or joining in any legal proceeding inconsistent with, or which could reasonably be expected to lead to a delay in the (and, upon reasonable request of the Debtors and subject to advice of counsel, take reasonable actions such as filing pleadings in the Chapter 11 Cases to support) confirmation, consummation, or implementation of the Plan or the transactions contemplated by the Plan or this Agreement;

(d)    act in good faith and take (and cause its agents, representatives, and employees to take) all actions that are reasonably necessary or appropriate, and all actions required by the Bankruptcy Court, to support and achieve confirmation and consummation of the Plan and consummation of all transactions and implementation steps provided for or contemplated by this Agreement and the Plan;

(e)    not directly or indirectly (i) solicit approval or acceptance of, encourage, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets, merger, workout, or plan of reorganization for the TPC Parties other than the Plan or (ii) otherwise take any action that could reasonably be expected to or would interfere with delay, impede, or postpone the solicitation of acceptances, confirmation, consummation, or implementation of the Plan or the transactions contemplated in the Plan and this Agreement;

(f)    provide prompt written notice to the TPC Parties and the Supporting Sponsors between the date hereof and the Effective Date, to the extent known by such Supporting Noteholder, of (i) the occurrence, or failure to occur, of any event of which the occurrence or failure to occur would be reasonably likely to cause (x) any representation or warranty of the Supporting Noteholders contained in this Agreement to be untrue or inaccurate in any material respect, (y) any covenant of the Supporting Noteholders contained in this Agreement not to be satisfied in any material respect, or (z) any condition precedent contained in the Plan or this Agreement not to occur or become impossible to satisfy or (ii) the receipt of written notice from any third party alleging that the consent of such party is or may be required as a condition precedent to consummation of the transactions contemplated by the Restructuring; and

(g)    negotiate in good faith the DIP Credit Agreement on terms and conditions consistent with the DIP Term Sheet.

Notwithstanding the foregoing, nothing in this Agreement shall (i) bar any Supporting Noteholder from filing a proof of claim or taking action to establish the amount, validity, or priority of such Supporting Noteholder's Claim (ii) be construed to limit the rights of a Supporting Noteholder under the Chapter 11 Cases, including appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as, such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and are not for the purposes of hindering, delaying, or preventing the consummation of the Restructuring; (iii) prevent any Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement; (iv) except as otherwise expressly provided in this Agreement, be construed to limit or waive any Supporting Noteholder's rights under any

applicable indenture, note, or other credit document, instrument, or applicable law, including the right to purchase, sell, or enter into any transactions regarding any Claim, subject to the terms hereof; (v) affect the rights of any Supporting Noteholder to consult with other Supporting Noteholders, the TPC Parties, the Priming Notes Trustee or the 10.5% Notes Trustee, or any other party-in-interest in the Chapter 11 Cases (including any official committee or the United States Trustee); (vi) impair or waive the rights of any Supporting Noteholder to assert any objection permitted under this Agreement in connection with any hearing before the Bankruptcy Court or other court of competent jurisdiction; (vii) prevent any Supporting Noteholder from taking any action that is required by applicable law (*provided*, that if any Supporting Noteholder proposes to take any action that is otherwise inconsistent with this Agreement in order to comply with applicable law, such Supporting Noteholder shall provide at least one (1) Business Day's advance written notice to the Debtors (by email from Paul Hastings to Baker Botts) to the extent the provision of notice is practicable under the circumstances); (viii) require any Supporting Noteholder to take any action that is prohibited by applicable law or to waive or forego the benefit of any applicable legal privilege; (ix) except and solely to the extent required to consummate the transactions contemplated hereunder as and when required, constitute a termination or release of any liens on, or security interests in, any of the assets or properties of the Debtors that secure the obligations under the Priming Notes Indenture or the 10.5% Indenture; (x) prohibit any Supporting Noteholder from taking any action that is not inconsistent with this Agreement or the Restructuring; (xi) except as and to the extent in pursuit of the transactions contemplated hereunder, require any Supporting Noteholder to incur, assume, become liable in respect of or suffer to exist any expenses, liabilities, or other obligations, or agree to or become bound by any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations to such Supporting Noteholder; or (xii) except as and to the extent explicitly set forth herein, limit the ability of any Supporting Noteholder to enforce the terms of the Existing Intercreditor Agreements (including exercising any rights or remedies available to the Supporting Noteholders).

**6.    Commitments of the Supporting Sponsors**.  Subject to the terms and conditions of this Agreement, each Supporting Sponsor shall, from the RSA Effective Date until the occurrence of the RSA Termination Date (except, in the case of clause (d)(iii) of this Section 6, to the extent described in Section 16):

(a)    support and take all steps reasonably necessary (and within its control) to consummate the Restructuring in accordance with this Agreement;

(b)    vote and exercise any powers or rights available to it (including in any meeting or process requiring voting or approval in which it is legally entitled to participate) in favor of any matter requiring approval to the extent necessary to implement the Restructuring;

(c)    use commercially reasonable efforts to assist (and/or cause their Affiliates to assist) the TPC Parties and the Supporting Noteholders in implementing the tax structure as determined by them for the Reorganized Debtors; and

(d)    not, without the prior written consent of the Required Supporting Noteholders, directly or indirectly (i) object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring, (ii) take any action that

is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation, and consummation of the Restructuring described in, this Agreement or the Plan or (iii)(A) claim (or permit any person or entity under its control to claim) a worthlessness deduction under IRC Section 165 for the stock of Holdings, or for an interest in any other entity if doing so could result in an "ownership change" of Holdings under IRC Section 382(g)(4)(D) (a "**WS Entity**"), in either case with respect to any taxable year ending prior to the Effective Date, or (B) transfer the equity of any entity in a manner that results in an "ownership change" of Holdings or Issuer for purposes of IRC Section 382.

Notwithstanding the foregoing, nothing in this Agreement shall (i) bar any Supporting Sponsor from filing a proof of claim or taking action to establish the amount, validity, or priority of such Supporting Sponsor's Claim; (ii) be construed to limit the rights of a Supporting Sponsor under the Chapter 11 Cases, including appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as, such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and are not for the purposes of hindering, delaying, or preventing the consummation of the Restructuring; (iii) prevent any Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement; (iv) except as otherwise expressly provided in this Agreement, be construed to limit any Supporting Sponsor's rights, directly or indirectly, with respect to any Claim or Existing Holdings Interest; (v) affect the rights of any Supporting Sponsor to consult with other Supporting Sponsors, the TPC Parties, or any other party-in-interest in the Chapter 11 Cases (including any official committee or the United States Trustee); (vi) impair or waive the rights of any Supporting Sponsor to assert any objection permitted under this Agreement in connection with any hearing in the Bankruptcy Court or other court of competent jurisdiction; (vii) based on advice of counsel, prevent any Supporting Sponsor from taking any action that is required by applicable law; or (viii) require any Supporting Sponsor to take any action that is prohibited by applicable law or to waive or forego the benefit of any applicable legal privilege (provided, that if any Supporting Sponsor proposes to take any action that is otherwise inconsistent with this Agreement in order to comply with applicable law, such Supporting Sponsor shall provide at least one (1) Business Days' advance written notice to the TPC Parties and the Ad Hoc Noteholder Group (by email from Latham & Watkins to Baker Botts and Paul Hastings) to the extent the provision of notice is practicable under the circumstances); (ix) prohibit any Supporting Sponsor from taking any action that is not inconsistent with this Agreement or the Restructuring; (x) except as and to the extent in pursuit of the transactions contemplated hereunder, require any Supporting Sponsor to incur, assume, become liable in respect of or suffer to exist any expenses, liabilities, or other obligations, or agree to or become bound by any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations to such Supporting Sponsor; or (xi) prohibit any Supporting Sponsor from claiming a worthlessness deduction under IRC Section 165 for the stock of Holdings or an interest in a WS Entity in either case with respect to any taxable year ending on or after the Effective Date.

7. **Commitments of the TPC Parties**.

(a) <u>Affirmative Covenants</u>. Subject to the terms and conditions hereof, and except as the Required Supporting Noteholders may expressly release the TPC Parties in writing from any of the following obligations, the TPC Parties agree to:

(i)      support, act in good faith, and take all reasonable actions necessary, or reasonably requested by the Required Supporting Noteholders, to implement and complete the Restructuring as set forth in the Plan and this Agreement, including by (v) negotiating in good faith and executing (as applicable) all Definitive Documents that are subject to negotiation as of the RSA Effective Date and taking any and all necessary and appropriate actions in furtherance of the Restructuring, the Plan, and this Agreement, (w) obtaining the Bankruptcy Court's approval of the applicable Definitive Documents, (x) taking, or causing Affiliates of the TPC Parties to take, such actions as may be reasonably requested by the Required Supporting Noteholders in foreign jurisdictions in order to implement and consummate the Restructuring, (y) soliciting votes to accept or reject the Plan by means of the Disclosure Statement and related Solicitation Materials, and (z) obtaining entry of the Confirmation Order and consummation of the Restructuring pursuant to the Plan, in each case in accordance with each Milestone set forth in Section 4 of this Agreement;

(ii)      to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring contemplated herein, take all steps reasonably necessary or requested by the Required Supporting Noteholders to address any such impediment;

(iii)      provide prompt written notice to the Supporting Noteholders and the Supporting Sponsors between the date hereof and the Effective Date of (A) the occurrence or failure to occur of any event of which the occurrence or failure to occur would be reasonably likely to cause (x) any representation or warranty of the TPC Parties contained in this Agreement to be untrue or inaccurate in any material respect, (y) any covenant of the TPC Parties contained in this Agreement not to be satisfied in any material respect or (z) any condition precedent contained in the Plan or this Agreement not to occur or become impossible to satisfy, (B) receipt of any written notice from any third party alleging that the consent of such party is or may be required as a condition precedent to consummation of the transactions contemplated by the Restructuring, (C) receipt of any written notice from any Governmental Entity that is material to the consummation of the transactions contemplated by the Restructuring, and (D) any material governmental or third-party complaints, litigations, investigations, or hearings (or communications threatening the same);

(iv)      use commercially reasonable efforts to obtain any and all permits, consents and/or any other third-party approvals that are necessary or advisable for the implementation or consummation of any material part of the Restructuring;

(v)      negotiate in good faith and use commercially reasonable efforts to execute, deliver, perform their obligations under, and consummate the transactions contemplated by, the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring as contemplated by this Agreement in all material respects;

(vi)      negotiate in good faith and execute, deliver, perform their obligations under, and consummate the transactions contemplated by, the DIP Term Sheet, including: (i) enter into the Term Loan DIP Facility upon the terms set forth in the DIP Term Sheet, and (ii) utilize best efforts to obtain an ABL DIP Facility and, in the event the Company is unable to obtain an ABL DIP Facility, obtain the consent of the lenders under the ABL Credit Agreement to the use of cash collateral, in each case upon the terms set forth in the DIP Term Sheet;

(vii)    use commercially reasonable efforts to seek additional support for the Restructuring from their other material stakeholders to the extent reasonably prudent;

(viii)    pay all reasonable and documented fees and out-of-pocket expenses of the Ad Hoc Noteholder Group, whether incurred before or after the Petition Date, including the reasonable and documented fees and out-of-pocket expenses of the Ad Hoc Noteholder Group Advisors, in each case, as and when they come due after receipt of applicable invoices and in accordance with the engagement letters of such professionals, the Bankruptcy Code, any DIP Order, and any other orders of the Bankruptcy Court;

(ix)    (A) complete the preparation, as soon as reasonably practicable after the RSA Effective Date, of the Disclosure Statement and any other Solicitation Materials in order to commence the solicitation of the Plan in accordance with the Milestones, (B) provide drafts of the Plan, the Disclosure Statement, any other Solicitation Materials, and each other Definitive Document to, and afford a reasonable opportunity for comment and review of such documents by, the Ad Hoc Noteholder Group Advisors and advisors to the Supporting Sponsors, which opportunity of comment and review shall, unless otherwise consented to by the Ad Hoc Noteholder Group Advisors (which may be by email), be not less than three (3) full Business Days in advance of any filing, execution, distribution, or use (as applicable) thereof (*provided*, that if delivery of such document at least three (3) full Business Days in advance is impossible or impracticable under the circumstances, such document shall be delivered as soon as otherwise practicable), (C) consult in good faith with the Ad Hoc Noteholder Group Advisors and, solely in respect of provisions directly affecting the Supporting Sponsors, the advisors to the Supporting Sponsors, regarding the form and substance of the Disclosure Statement and other Solicitation Materials, the Plan, and each other Definitive Document, sufficiently in advance of the filing, execution, distribution, or use (as applicable) thereof and not file, execute, distribute, or use (as applicable) the Disclosure Statement, other Solicitation Materials, the Plan, and each other Definitive Document unless such document is in form and substance acceptable or reasonably acceptable (as applicable) to the applicable Parties as required by the consent rights set forth in Section 3(b), and (D) negotiate in good faith, execute, perform their obligations under, and consummate the transactions contemplated by, the Definitive Documents to which the respective TPC Parties are (or will be) a party; *provided*, that the obligations of the Debtors under this Section 7(a)(ix) shall in no way alter or diminish any right expressly provided to any applicable Supporting Noteholder or Supporting Sponsor under this Agreement to review, comment on, and/or consent to the form and/or substance of any document in accordance with the terms hereof, including the consent rights set forth in Section 3(b);

(x)    promptly notify the Ad Hoc Noteholder Group Advisors and advisors to the Supporting Sponsors in writing (email being sufficient) (and in any event within two (2) Business Days after any officer or director of the TPC Parties obtains knowledge thereof) of (A) the initiation, institution, or commencement of any proceeding by a Governmental Entity (or communications indicating that the same may be contemplated or threatened) involving any of the TPC Parties (including any assets, permits, businesses, operations, or activities of any of the TPC Parties) or any of their respective current or former officers, employees, managers, directors, members, or equity holders (in their capacities as such), (B) the initiation, institution, or commencement by any Person of any proceeding involving any of the TPC Parties (or communications indicating that the same may be contemplated or threatened) that could result in

or is likely to have a material impact in any manner on any of the TPC Parties' businesses (including any assets, permits, businesses, operations, or activities of any of the TPC Parties) or any of their respective current or former officers, employees, managers, directors, members, or equity holders (in their capacities as such), (C) the initiation, institution, or commencement of any proceeding by a Governmental Entity or other Person challenging the validity of the transactions contemplated by this Agreement or any other Definitive Document or seeking to enjoin, restrain, or prohibit this Agreement or any other Definitive Document or the consummation of the transactions contemplated hereby or thereby, (D) any breach by any of the TPC Parties in any respect of any of their obligations, representations, warranties, or covenants set forth in this Agreement, (E) the happening or existence of any event that shall have made any of the conditions precedent to any Person's obligations set forth in (or to be set forth in) any of the Definitive Documents, including the section of the Restructuring Term Sheet entitled "Conditions Precedent", and the Disclosure Statement to the consummation of the Restructuring, incapable of being satisfied so as to permit consummation of the Restructuring on or before the Plan Outside Date Milestone, (F) the occurrence of a "TPC Party Termination Event" pursuant to Section 8, and/or (G) the receipt of notice from any Governmental Entity or other Person alleging that the consent of such Person is or may be required under any organizational or governance document, material contract, permit, law, or otherwise in connection with the consummation of any part of the Restructuring;

(xi)    maintain the good standing and legal existence of each TPC Party under the laws of the state or jurisdiction in which it is incorporated, organized, or formed, except to the extent that any failure to maintain such TPC Party's good standing or legal existence arises solely as a result of the filing of the Chapter 11 Cases;

(xii)    if any TPC Party receives an Alternative Restructuring Proposal, to the extent permitted by law, (A) promptly notify the Ad Hoc Noteholder Group Advisors and advisors to the Supporting Sponsors (in each case, no later than one (1) Business Days after the receipt of such Alternative Restructuring Proposal), with such notification to include the material terms thereof (but not the identity of the Person(s) involved), and (B) respond promptly to reasonable information requests and questions from the Ad Hoc Noteholder Group Advisors with respect to the impact of such Alternative Restructuring Proposal on the Restructuring and any action taken or proposed to be taken by the TPC Parties in response thereto, but not to include the identity of the Person(s) involved;

(xiii)    (A) operate their businesses in the ordinary course in a manner that is consistent in all material respects with this Agreement, and use commercially reasonable efforts to preserve intact their business organization and relationships with third parties and employees (which shall not prohibit the TPC Parties from taking actions outside of the ordinary course of business to the extent approved by the Bankruptcy Court and with the consent of the Required Supporting Noteholders (such consent not to be unreasonably withheld, conditioned, or delayed)), (B) subject to any applicable confidentiality restrictions, keep the Supporting Noteholders reasonably informed about the operations of the TPC Parties, and (C) subject to any applicable confidentiality restrictions, provide the Supporting Noteholders with any information reasonably requested regarding the TPC Parties in a timely manner; and

(xiv)    subject to professional responsibilities, object to any motion filed with the Bankruptcy Court by any Person seeking the entry of an order (A) directing the appointment of an examiner or a trustee, (B) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (C) dismissing any of the Chapter 11 Cases (other than with the consent of the Required Supporting Noteholders), or (D) modifying or terminating the TPC Parties' exclusive right to file and/or solicit acceptance of a plan of reorganization, as applicable.

(b)    Negative Covenants. Each of the TPC Parties shall not, without the prior written consent of the Required Supporting Noteholders, directly or indirectly:

(i)    object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring;

(ii)    take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation, and consummation of the Restructuring described in, this Agreement or the Plan;

(iii)    (A) execute, deliver, and/or file with the Bankruptcy Court any agreement, instrument, motion, pleading, or order that is not consistent with this Agreement in all material respects or otherwise in form and substance reasonably acceptable to the Required Supporting Noteholders, or if applicable, file any pleading with the Bankruptcy Court seeking authorization to accomplish or effect any of the foregoing; or (B) waive, amend, or modify any of the Definitive Documents, or, if applicable, file with the Bankruptcy Court a pleading seeking to waive, amend, or modify any term or condition of any of the Definitive Documents, which waiver, amendment, modification, or filing is not consistent in all material respects with this Agreement and the Restructuring Term Sheet, or otherwise reasonably acceptable to the Required Supporting Noteholders;

(iv)    (A) seek discovery in connection with, prepare, or commence any proceeding or other action that challenges (1) the amount, validity, allowance, character, enforceability, or priority of any Claim of any of the Supporting Noteholder, or (2) the validity, enforceability, or perfection of any lien or other encumbrance securing any Claim of any of the Supporting Noteholders; (B) otherwise seek to restrict any rights of any of the Supporting Noteholders; or (C) other than as may be required by law, support any Person in connection with any of the acts described in clause (A) or clause (B) of this Section 7(b)(iv);

(v)    except for the Term Loan DIP Facility, ABL DIP Facility, Exit ABL Facility, HoldCo Notes or the Exit Notes, or as otherwise contemplated by this Agreement, enter into any contract with respect to debtor-in-possession financing, cash collateral usage, exit financing, and/or other financing arrangements outside of the ordinary course of business without the advance written consent of the Required Supporting Noteholders;

(vi)    other than as may be required by law, assert, or file any document in the Bankruptcy Court in support of any assertion by any Person, that, in order to act on the provisions of Section 8, the Supporting Noteholders shall be required to obtain relief from the automatic stay from the Bankruptcy Court (and each of the TPC Parties hereby waives, to the

greatest extent possible, the applicability of the automatic stay to the giving of any notice of termination in accordance with Section 8);

(vii)    Unless otherwise agreed to in writing by the Required Supporting Noteholders, (A) pay any bonus or other incentive or retention payment greater than $150,000 (in one transaction or a series of related transactions) to any of its employees individually or together other than those bonus or other incentive or retention payments already approved by the board of TPC or provided for in any employment agreements, employee compensation plans, or other agreements entered into or effective prior to the RSA Effective Date; or (B)(1) enter into or make or implement any amendment, waiver, supplement, or other modification to any employment agreement or employee compensation plan or (2) pay or cause to be paid any amount contemplated by such agreements or plans before the date on which such amount becomes due and payable pursuant to the terms of the such agreements or plans, as applicable, in each case, unless in the ordinary course of business;

(viii)   unless otherwise ordered by the Bankruptcy Court, (A) compromise, settle, resolve, or make payments in respect of any claim, litigation and/or disputes arising from or related to the explosion of the TPC Parties' chemical plant in Port Neches, Texas in November 2019, including any insurance claims under any relevant business interruption or property insurance policies (the proceeds thereof, the "**Specified Insurance Proceeds**"), or (B) use, transfer, encumber or dispose of any Specified Insurance Proceeds received by any TPC Party, in each case, without the prior written consent of the Required Supporting Noteholders; *provided, however*, that the restriction on payments set forth in clause (A) shall not apply to (y) payments made prior to the filing of a chapter 11 petition to Dynamic Settlement Group as the claims processor pursuant to the TPC Group Voluntary Claims Program (the "**VCP**"), as and when due and solely to the extent such payments are required to be made in respect of the "Release" and annexed "Terms and Conditions of Payment" executed by a claimant prior to the date hereof pursuant to the VCP or (z) payment of administrative and legal fees, costs and expenses that are incurred in the ordinary course of business in respect of any governmental investigations, regulatory actions, litigation and/or disputes related to claims arising from or related to the explosion of the TPC Parties' chemical plant in Port Neches, Texas in November 2019 (including any insurance claims under any relevant business interruption or property insurance policies);

(ix)    other than as required by law, as agreed to by the Required Supporting Noteholders or as contemplated by the Definitive Documents, make or change any material tax election (including, with respect to any TPC Party that is treated as a partnership or disregarded entity for U.S. federal income tax purposes, an election to be treated as a corporation for U.S. federal income tax purposes) other than in the ordinary course of business, file any material amended tax return, enter into any closing agreement with respect to taxes for an amount greater than $50,000, consent to any extension or waiver of the limitations period applicable to any material tax claim or assessment other than in the ordinary course of business, adopt or change any material accounting methods, practices, or periods for tax purposes other than in the ordinary course of business, make or request any tax ruling, enter into any tax sharing or similar agreement or arrangement (other than agreements entered in the ordinary course of business the primary purpose of which are not taxes), or settle any tax claim or assessment for an amount greater than $50,000;

(x)    other than as required by law, as agreed to by the Required Supporting Noteholders or as contemplated by the Definitive Documents, take any action by the TPC Parties that would result in a disaffiliation of any TPC Party from the TPC Parties' consolidated U.S. federal income tax group under IRC Section 1502 if such TPC Party is a member of such consolidated federal income tax group as of the date hereof;

(xi)    commence the solicitation with respect to the Plan unless the Disclosure Statement and any other Solicitation Materials shall be in form and substance consistent with this Agreement, including the consent rights set forth in Section 3(b), or otherwise satisfactory to the Required Supporting Noteholders;

(xii)    consummate the Restructuring unless each of the applicable conditions to the consummation of any transaction set forth in this Agreement, the Restructuring Term Sheet, the Disclosure Statement, and the other applicable Definitive Documents has been satisfied (or waived by the Party or Parties entitled to waive such condition or conditions in their sole discretion); or

(xiii)    permit, as of the Petition Date or one (1) calendar day prior thereto, cash or cash equivalents to exist in any deposit account of the TPC Parties that is not subject to a control agreement in favor of the agent under the ABL Credit Agreement.

(c)    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require any TPC Party or the board of directors, board of managers, or similar governing body of a TPC Party, after consulting with outside counsel, to take any action or to refrain from taking any action with respect to the transactions contemplated by the Restructuring to the extent taking or failing to take such action would be inconsistent with applicable law or its fiduciary obligations under applicable law, and any such action or inaction pursuant to this Section 7(c) shall not be deemed to constitute a breach of this Agreement. The TPC Parties shall provide prompt written notice to the Supporting Noteholders and Supporting Sponsors in connection with the exercise of any of the TPC Parties' rights under this Section 7(c).

(d)    Notwithstanding anything to the contrary in this Agreement (but subject to Section 7(c)), each TPC Party and its respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to: (i) provide access to non-public information concerning any TPC Party to any Entity that provides an unsolicited Alternative Restructuring Proposal and executes and delivers a confidentiality agreement with the TPC Parties; (ii) respond to, facilitate inquiries with respect to, and maintain and continue discussions or negotiations with respect to an unsolicited Alternative Restructuring Proposal received by any of the TPC Parties if the board of directors, board of managers, or similar governing body of such TPC Party determines in good faith, upon the advice of outside counsel, that failure to take such action would be inconsistent with the fiduciary duties, if any, of the members of such board or governing body under applicable law; and (iii) enter into or continue discussions or negotiations with holders of Claims against or Interests in a TPC Party (including any Supporting Noteholder or Supporting Sponsor), any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the transactions contemplated by the Restructuring or unsolicited Alternative Restructuring Proposals. Prior to the date on which the TPC Parties enter

17

into a definitive agreement with respect to an Alternative Restructuring Proposal, the TPC Parties shall provide counsel to the Supporting Noteholders and Supporting Sponsors with all relevant information regarding (A) any discussions and/or negotiations relating to any such Alternative Restructuring Proposal and/or (B) any amendments, modifications, or other changes to, or any further developments of, any such Alternative Restructuring Proposal, in any such case as is necessary to keep such counsel contemporaneously informed as to the status and substance of such discussions, negotiations, amendments, modifications, changes, and/or developments. The TPC Parties shall provide prompt written notice to the Supporting Noteholders in connection with the exercise of any of the TPC Parties' rights under this <u>Section 7(d).</u>

(e)     Nothing in this Agreement shall: (i) impair or waive the rights of any TPC Party to assert or raise any objection permitted under this Agreement in connection with the transactions contemplated by the Restructuring; or (ii) prevent any TPC Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

8.     <u>**Termination**</u>.

(a)     <u>Noteholder Termination Events</u>.  The Required Supporting Noteholders shall have the right, but not the obligation, to terminate this Agreement as to all Parties upon delivery of written notice to the TPC Parties and Supporting Sponsors at any time after the occurrence of or during the continuation of any of the following events, unless waived in writing on a prospective or retroactive basis by the Required Supporting Noteholders (each, a "**Noteholder Termination Event**"):

(i)     the failure to meet any of the Milestones set forth in <u>Section 4</u> hereof unless (x) such failure is the result of any act, omission, or delay on the part of any of the Required Supporting Noteholders seeking termination or (y) such Milestone is waived or extended in accordance with <u>Section 4</u> hereof;

(ii)     the happening or existence of any event that shall have made any of the conditions precedent to the consummation of the Restructuring as set forth in this Agreement, the Plan, or the section of the Restructuring Term Sheet entitled "Conditions Precedent", if applicable, incapable of being satisfied on or before the Plan Outside Date Milestone; *provided*, that the right to terminate this Agreement under this <u>Section 8(a)(ii)</u> shall not be available to any Supporting Noteholder if the happening or existence of such event is caused by, or results from, the breach by such Supporting Noteholder of its covenants, agreements, or other obligations under this Agreement;

(iii)     the Bankruptcy Court enters an order, or the Debtors file any motion or any request for relief (other than with the consent of the Required Supporting Noteholders) that seeks, to (A) dismiss any of the Chapter 11 Cases, (B) convert any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (C) appoint a trustee or examiner with expanded powers beyond those set forth in section 1106 of the Bankruptcy Code; (D) terminate the Debtors' exclusive right to file a plan of reorganization pursuant to section 1121 of the Bankruptcy Code; or (E) reject this Agreement;

(iv)    the Debtors' withdrawal, waiver, amendment, or modification of, or the filing of a pleading seeking to withdraw, waive, amend, or modify, any of the Definitive Documents, that is both not consistent in all material respects with this Agreement and not done with the consent of the Required Supporting Noteholders;

(v)    the issuance by any Governmental Entity, including the Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction, of any ruling or order enjoining the substantial consummation of the Restructuring on the terms set forth in this Agreement or the Plan, *provided*, that the Debtors shall have fifteen (15) Business Days after issuance of such ruling or order to obtain relief that would allow consummation of the Restructuring in a manner that does not prevent or materially diminish the TPC Parties' compliance with the terms of this Agreement or the Plan;

(vi)    a breach by the TPC Parties or the Supporting Sponsors (other than an immaterial breach) of any representation, warranty, or covenant of the TPC Parties or the Supporting Sponsors set forth in this Agreement that remains uncured (if susceptible to cure) for a period of five (5) Business Days after the receipt by the TPC Parties or the Supporting Sponsors (as applicable) of written notice of such breach;

(vii)    any TPC Party or any of its directors, officers or managers (A) publicly announces, or communicates in writing to any other Party, its intention not to support or pursue the Restructuring, (B) provides notice to the Supporting Noteholders that it is exercising its rights pursuant to <u>Sections 7(c)</u>, <u>7(d)</u> and/or <u>8(c)(iii)</u>, or (C) publicly announces, or communicates in writing to any other Party, that it intends to enter into, or has entered into, definitive documentation with respect to, an Alternative Restructuring Proposal;

(viii)    the TPC Parties file, propose, or support any plan of liquidation, asset sale of all or any material portion of the TPC Parties' assets or plan of reorganization other than as contemplated by this Agreement or with the consent of the Required Supporting Noteholders;

(ix)    the Bankruptcy Court enters an order granting relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) authorizing any party to proceed against any material asset of the TPC Parties or that would materially and adversely affect the TPC Parties' ability to operate their businesses in the ordinary course;

(x)    after entry by the Bankruptcy Court of any DIP Order (including any adequate protection order), Disclosure Statement Order, or Confirmation Order, as applicable, such order is reversed, stayed, dismissed, vacated, reconsidered, modified or amended, in each case, in a manner materially inconsistent with this Agreement without the written consent of the Required Supporting Noteholders;

(xi)    except for the Term Loan DIP Facility, ABL DIP Facility, Exit ABL Facility, HoldCo Notes or the Exit Notes and except as otherwise set forth in the Restructuring Term Sheet or DIP Term Sheet, any Debtor obtains debtor-in-possession financing, cash collateral usage, exit financing and/or other financing arrangement outside of the ordinary course of business

19

that is in an amount, on terms and conditions, or otherwise in form and substance, that (in any such case) is/are not acceptable to the Required Supporting Noteholders;

(xii)    (A) the termination of the Notes Forbearance Agreement, other than any termination that directly results from the filing of the Chapter 11 Cases or the Restructuring, (B) the occurrence of a default or event of default under any forbearance agreement or similar agreement or arrangement entered into by any of the Debtors or any of their Affiliates in connection with the commencement of the Chapter 11 Cases by the Debtors and the implementation of the Restructuring, solely to the extent that such default or event of default has not been waived by the parties under such agreement or arrangement and does not directly result from the filing of the Chapter 11 Cases or the Restructuring, or (C) prior to the Petition Date, the occurrence of an Event of Default (each as defined in the 10.5% Notes Indenture or Priming Notes Indenture, as applicable), other than, in each case, a Default or Event of Default that directly results from the filing of the Chapter 11 Cases or the Restructuring or any Default arising from the failure to make any coupon payment due under the Notes on May 1, 2022;

(xiii)    (A) the occurrence of an Event of Default (as defined in the DIP Term Sheet), or (B) the modification of the Approved Budget (as defined in the DIP Term Sheet) in a manner not acceptable to the Required Supporting Noteholders in their sole and absolute discretion;

(xiv)    the imposition of any material award, claim, fine, penalty, or other monetary judgment by any Governmental Entity, including the Bankruptcy Court, that would not be dischargeable pursuant to the Bankruptcy Code, the Confirmation Order or any other order of the Bankruptcy Court;

(xv)    the failure of the Debtors to comply with the DIP Orders, including failure to make adequate protection payments when due, which remains uncured for a period of two (2) Business Days after the receipt of written notice of such event or is not otherwise waived in accordance with the terms thereof;

(xvi)    the imposition of any ruling, judgment or order issued by any Governmental Entity (a) making illegal, enjoining, or otherwise prohibiting the consummation of the Restructuring Transactions contemplated by the Restructuring Term Sheet and in the Definitive Documents;

(xvii)    the TPC Parties fail to pay the Restructuring Expenses as and when due pursuant to the terms of any applicable engagement letters, fee reimbursement letters, the Bankruptcy Code, any DIP Order, or any other orders of the Bankruptcy Court;

(xviii) the Bankruptcy Court enters a Final Order approving the assumption or rejection of any executory contract or unexpired lease other than in accordance with this Agreement or as otherwise approved in writing by the Required Supporting Noteholders;

(xix)    the Bankruptcy Court enters an order denying confirmation of the Plan;

(xx)    the termination of either of the Backstop Agreements;

(xxi)   (A) the commencement of an involuntary case against any TPC Party under the Bankruptcy Code that is not dismissed or withdrawn within five (5) Business Days, or (B) the entry of a ruling, judgment or order by any court of competent jurisdiction granting the winding up, dissolution, liquidation, administration, moratorium, reorganization, or other relief in respect of the TPC Parties or the TPC Parties' debts, or a substantial part of the TPC Parties' assets, under any federal, state, or foreign bankruptcy, insolvency, administrative, receivership, or similar law now or hereafter in effect (*provided*, that such involuntary proceeding is not dismissed or stayed within a period of thirty (30) days after the filing thereof);

(xxii)  the Bankruptcy Court enters an order invalidating, disallowing, subordinating, recharacterizing or limiting, as applicable, any of the Supporting Noteholders' Claims or any of the liens or encumbrances that secure (or purport to secure) the Supporting Noteholders' Claims;

(xxiii)  the occurrence of a Material Adverse Effect;

(xxiv)  any of the TPC Parties, without the consent of the Required Supporting Noteholders, (A) commences a voluntary case under the Bankruptcy Code other than the Chapter 11 Cases, (B) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described above, (C) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator, or similar official for the TPC Parties or for a substantial part of the TPC Parties' assets, (D) files an answer admitting the material allegations of a petition filed against it in any such proceeding, (E) seeks any arrangement, adjustment, protection, or relief of its debts other than the Chapter 11 Cases or (F) makes a general assignment or arrangement for the benefit of creditors; or

(xxv)  this Agreement has been terminated by the Supporting Sponsors as to themselves pursuant to Section 8(b), and the Interim NOL Order or the Final NOL Order is (A) stayed, (B) subject to review, reversal, vacatur, modification, or amendment, whether by appeal or by writ of certiorari or (C) not in full force and effect.

(b)   Supporting Sponsor Termination Event.  The Supporting Sponsors may terminate this Agreement solely as to themselves (which shall not affect the continuing effectiveness of this Agreement as between the TPC Parties and the Supporting Noteholders) upon delivery of written notice to the Supporting Noteholders and the TPC Parties at any time after the occurrence or during the continuation of any of the following events (each, a "**Supporting Sponsor Termination Event**"):

(i)   the breach by the TPC Parties or by the Supporting Noteholders of any of the covenants or other obligations or agreements of the TPC Parties or the Supporting Noteholders set forth in this Agreement in a manner that materially and adversely affects the treatment of the Supporting Sponsors under the Plan, including with respect to the provisions of the Plan's releases applicable to the Supporting Sponsors, and such breach remains uncured (if susceptible to cure) for five (5) Business Days after the Supporting Sponsors transmit a written notice to the TPC Parties and the Supporting Noteholders in accordance with Section 22 detailing any such breach; or

(ii)    the Bankruptcy Court grants relief that is inconsistent with the Restructuring Term Sheet and materially and adversely affects the treatment of the Supporting Sponsors;

(iii)    the failure to meet the Milestone set forth in either of <u>Section 4(l)</u> or <u>Section 4(m)</u> hereof unless such Milestone is waived or extended in accordance with <u>Section 4</u> hereof (including the automatic extension of such Milestones as provided in <u>Section 4(k)</u>, if applicable);

(iv)    the happening or existence of any event that shall have made any of the conditions precedent to the consummation of the Restructuring as set forth in this Agreement, the Plan, or the section of the Restructuring Term Sheet entitled "Conditions Precedent", if applicable, incapable of being satisfied on or before the Plan Outside Date Milestone; *provided*, that the right to terminate this Agreement under this <u>Section 8(b)(iv)</u> shall not be available to any Supporting Sponsor if the happening or existence of such event is caused by, or results from, the breach by such Supporting Sponsor of its covenants, agreements, or other obligations under this Agreement;

(v)    the Bankruptcy Court enters an order, or the Debtors file any motion or any request for relief (other than with the consent of the Supporting Sponsors) that seeks, to (A) dismiss any of the Chapter 11 Cases, (B) convert any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (C) appoint a trustee or examiner with expanded powers beyond those set forth in section 1106 of the Bankruptcy Code; (D) terminate the Debtors' exclusive right to file a plan of reorganization pursuant to section 1121 of the Bankruptcy Code; or (E) reject this Agreement;

(vi)    the Debtors' withdrawal, waiver, amendment, or modification, or the filing of a pleading seeking to withdraw, waive, amend, or modify, any of the Definitive Documents, that is both not consistent in all material respects with this Agreement and not done with the consent of the Supporting Sponsors;

(vii)    the issuance by any Governmental Entity, including the Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction, of  any ruling or order enjoining the substantial consummation of the Restructuring on the terms set forth in this Agreement or the Plan, *provided*, that the Debtors shall have fifteen (15) Business Days after issuance of such ruling or order to obtain relief that would allow consummation of the Restructuring in a manner that does not prevent or materially diminish the TPC Parties' compliance with the terms of this Agreement or the Plan;

(viii)    a breach by the TPC Parties (other than an immaterial breach) of any representation, warranty, or covenant of the TPC Parties set forth in this Agreement that remains uncured (if susceptible to cure) for a period of five (5) Business Days after the receipt by the TPC Parties of written notice of such breach;

(ix)    any TPC Party or any of its directors, officers or managers (A) publicly announces, or communicates in writing to any other Party, its intention not to support or pursue the Restructuring, (B) provides notice to the Supporting Sponsors that it is exercising its

22

rights pursuant to Sections 7(c), 7(d) and/or 8(c)(iii), or (C) publicly announces, or communicates in writing to any other Party, that it intends to enter into, or has entered into, definitive documentation with respect to, an Alternative Restructuring Proposal;

(x)     the TPC Parties file, propose, or support any plan of liquidation, asset sale of all or any material portion of the TPC Parties' assets or plan of reorganization other than as contemplated by this Agreement or with the consent of the Supporting Sponsors;

(xi)     the Bankruptcy Court enters an order denying confirmation of the Plan;

(xii)     the occurrence of a Material Adverse Effect;

(xiii)     (A) the commencement of an involuntary case against any TPC Party under the Bankruptcy Code that is not dismissed or withdrawn within five (5) Business Days, or (B) the entry of a ruling, judgment or order by any court of competent jurisdiction granting the winding up, dissolution, liquidation, administration, moratorium, reorganization, or other relief in respect of the TPC Parties or the TPC Parties' debts, or a substantial part of the TPC Parties' assets, under any federal, state, or foreign bankruptcy, insolvency, administrative, receivership, or similar law now or hereafter in effect (provided, that such involuntary proceeding is not dismissed or stayed within a period of thirty (30) days after the filing thereof); or

(xiv)     any of the TPC Parties, without the consent of the Supporting Sponsors, (A) commences a voluntary case under the Bankruptcy Code other than the Chapter 11 Cases, (B) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described above, (C) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator, or similar official for the TPC Parties or for a substantial part of the TPC Parties' assets, (D) files an answer admitting the material allegations of a petition filed against it in any such proceeding, (E) seeks any arrangement, adjustment, protection, or relief of its debts other than the Chapter 11 Cases or (F) makes a general assignment or arrangement for the benefit of creditors.

(c)     TPC Party Termination Events.  The TPC Parties may terminate this Agreement, in each case, upon delivery of written notice to the Supporting Noteholders upon the occurrence of any of the following events (each, a "**TPC Party Termination Event**"):

(i)     the material breach by one or more of the Supporting Noteholders of any representation, warranty, or covenant set forth in this Agreement that would reasonably be expected to have a material adverse impact on the Restructuring or the consummation of the Restructuring, such that the non-breaching Supporting Noteholders own or control less than two-thirds of the aggregate principal amount of all of the outstanding 10.5% Notes or less than two-thirds of the aggregate principal amount of all of the outstanding Priming Notes, and such breach (to the extent curable) remains uncured for a period of ten (10) Business Days after the TPC Parties transmit a written notice to the Supporting Noteholders in accordance with Section 22 detailing any such breach;

(ii)     the Bankruptcy Court enters an order (A) dismissing any of the Chapter 11 Cases (other than with the consent of the Debtors), (B) converting any of the

23

Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or (C) appointing a trustee or examiner with expanded powers beyond those set forth in section 1106 of the Bankruptcy Code;

(iii)    the board of directors or other applicable governing body of the Debtors determines in good faith and after consultation with outside counsel that proceeding with the Restructuring would be inconsistent with the exercise of its fiduciary duties; *provided*, that the Debtors transmit a written notice of such determination to the Supporting Noteholders in accordance with Section 22 at least five (5) days prior to the date of termination pursuant to this clause;

(iv)    the issuance by any Governmental Entity, including the Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction, of any ruling or order that (A) enjoins or renders impossible the substantial consummation of the Restructuring and (B) remains in effect for thirty (30) days after such terminating Debtor transmits a written notice to the other Parties in accordance with Section 22 detailing any such issuance; *provided*, that this termination right shall not apply to or be exercised by any Debtor that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement; or

(v)    the failure by any DIP Lender to fund its commitments to make loans in the aggregate amount of $5 million or more under the Term Loan DIP Facility in accordance with the terms of any DIP Order that remains uncured for a period of ten (10) calendar days after the TPC Parties transmit a notice of such funding default to the non-defaulting DIP Lenders.

(d)    Mutual Termination; Automatic Termination. This Agreement and the obligations of the Parties hereunder may be terminated at any time by mutual written agreement of the TPC Parties and the Required Supporting Noteholders.  Notwithstanding anything in this Agreement to the contrary, this Agreement shall terminate automatically upon the earlier of (i) the occurrence of the Effective Date and (ii) October 31, 2022, in each case (other than with respect to the TPC Parties' obligations (or the obligations of their successors in interest) to pay the Restructuring Expenses set forth in Section 23).

(e)    Termination Generally.  The earliest date on which termination of this Agreement as to a Party is effective in accordance with this Section 8 shall be referred to, with respect to such Party, as an "**RSA Termination Date**."  Upon the occurrence of an RSA Termination Date as to any Party, this Agreement shall be of no further force and effect with respect to such Party and such Party shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action; *provided*, *however*, that in no event shall any such termination relieve any Party from (i) liability for its breach or non-performance of its obligations under this Agreement prior to the RSA Termination Date or (ii) obligations under this Agreement which by their terms expressly survive termination of this Agreement; *provided*, *further*, that if this Agreement is terminated by any Party, such Party shall not be entitled to any rights under this Agreement other than as expressly

24

survives the termination of this Agreement pursuant to Section 16 hereof. Upon the occurrence of the RSA Termination Date and, if applicable, prior to the Confirmation Order being entered by the Bankruptcy Court, any and all consents or ballots tendered by the Parties before the RSA Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring, this Agreement or otherwise. If this Agreement is terminated in accordance with this Section 8 (other than a termination pursuant to Section 8(d)), each Supporting Noteholder shall have an opportunity to change or withdraw (or cause to change or withdraw) its vote to accept the Plan or its consent (regardless of whether any deadline for votes or consents, or for withdrawal thereof, set forth in the Disclosure Statement has passed) and no TPC Party shall oppose any attempt by a Supporting Noteholder to change or withdraw (or cause to change or withdraw) any vote or consent at such time; *provided*, that any such Supporting Noteholder that intends to change or withdraw its vote has not breached and is not otherwise in violation of the terms of this Agreement. Nothing in this Agreement shall be construed as prohibiting a TPC Party or any of the Supporting Noteholders or Supporting Sponsors from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a RSA Termination Date. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right or ability of any TPC Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Supporting Noteholder, (b) any right of any Supporting Noteholder, or the ability of any Supporting Noteholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any TPC Party or Supporting Sponsor; or (c) any right of any Supporting Sponsor, or the ability of any Supporting Sponsor, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any TPC Party or Supporting Noteholder. No purported termination of this Agreement shall be effective under this Section 8 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Section 8(c)(iii). Nothing in this Section 8 shall restrict any TPC Party's right to terminate this Agreement in accordance with Section 8(c)(iii).

9. **Transfers**.

(a) During the period beginning on the RSA Effective Date and ending on the RSA Termination Date and except as may be expressly required otherwise by an order of the Bankruptcy Court, each Supporting Noteholder, solely with respect to itself (as expressly identified and limited on its signature page to this Agreement or Joinder Agreement (as defined below), as applicable), shall not sell, transfer, assign, pledge, hypothecate, participate, donate, or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales, or other transactions in which any Person receives the right to own or acquire any current or future interest in) (each, a "**Transfer**"), or permit a Transfer of, directly or indirectly, in whole or in part, any of its Notes or Claims against the TPC Parties, unless the transferee thereof either (i) is a Supporting Noteholder and provides prompt notice of such Transfer (including the amount and type of Notes or Claims transferred) or (ii) before or contemporaneously with such Transfer, agrees in writing for the benefit of the Parties to become a Supporting Noteholder and to be bound by all of the terms of this Agreement applicable to Supporting Noteholders by executing a joinder agreement substantially in the form attached

hereto as **Exhibit C** (a "**Joinder Agreement**") and delivering an executed copy thereof within two (2) Business Days after such execution to (1) Baker Botts, as counsel to the TPC Parties, and (2) Paul Hastings, as counsel to the Ad Hoc Noteholder Group, in which event (x) the transferee shall be deemed to be a Supporting Noteholder to the extent of such transferred rights and obligations and (y) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred rights and obligations; *provided*, that failure to deliver such Joinder Agreement on a timely basis shall not by itself affect the applicable Supporting Noteholder's or transferee's obligations under this Agreement with respect to such Notes or Claims or render the Transfer void *ab initio* with respect to such Notes or Claims; *provided*, *further*, that the failure by a Supporting Noteholder to comply with the procedures set forth in this Section 9(a) with respect to a Transfer to any transferee entity that, as of the date of such Transfer, is an Affiliate of such transferring Supporting Noteholder shall not, without more, constitute a breach of this Agreement if (i) the transferring Supporting Noteholder or the transferee provides notice of such Transfer to Baker Botts (which may be delivered by email) and either (A) the transferring Supporting Noteholder or the transferee provides evidence that such transferee is at least as creditworthy as the applicable transferring Supporting Noteholder to Baker Botts (which may be delivered by email) promptly after such Transfer has occurred or (B) the transferring Supporting Noteholder confirms to Baker Botts (which may be by email) that such Transfer shall not relieve the transferring Supporting Noteholder of its obligations hereunder if such transferee fails to perform such obligations and (ii) the transferee shall be deemed to be a Supporting Noteholder and bound by all terms of this Agreement applicable to Supporting Noteholders.  To the extent that a Supporting Noteholder's Notes or Claims against the TPC Parties may be loaned (and consequently pledged, hypothecated, encumbered, or rehypothecated) as part of customary securities lending arrangements (each such arrangement, a "**Customary Securities Lending Arrangement**"), and such Customary Securities Lending Arrangement does not adversely affect such party's ability to timely satisfy any of its obligations under this Agreement, such Customary Securities Lending Arrangement shall not be deemed a Transfer hereunder.  Each Supporting Noteholder agrees that any Transfer of any Notes or Claims against the TPC Parties that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and the TPC Parties shall have the right to enforce the voiding of such Transfer.  This Agreement shall in no way be construed to preclude any Supporting Noteholder from acquiring additional Notes or Claims against the TPC Parties; *provided*, that (i) any such additional Notes and/or Claims automatically are subject to all of the terms of this Agreement and (ii) each such Supporting Noteholder agrees (A) that such additional Notes and/or Claims shall be subject to this Agreement (except as expressly provided below) and (B) to notify Baker Botts and Paul Hastings within two (2) Business Days following such acquisition of the aggregate amount and type of such Notes and/or Claims.

(b)    Notwithstanding this Section 9, any Supporting Noteholder may Transfer its Notes or Claims against the TPC Parties to an entity that is acting in its capacity as a Qualified Marketmaker without the requirement that such Qualified Marketmaker execute and deliver a Joinder Agreement in respect of such Notes or Claims or be a Supporting Noteholder; *provided*, that such Qualified Marketmaker (i) subsequently Transfers such Notes or Claims to a transferee that is or becomes (by executing and delivering a Joinder Agreement in accordance with this Section 9) a Supporting Noteholder at the time of such Transfer within the earlier of (A) ten (10) calendar days of its acquisition of such Notes or Claims and (B) if received prior to the deadline to vote on a chapter 11 plan and such Notes or Claims have not yet been and may yet be voted

with respect to the Restructuring, at least five (5) calendar days prior to such deadline, and (ii) if such Qualified Marketmaker fails to comply with its obligations in this <u>Section 9(b)</u>, such Qualified Marketmaker shall be required to become, and shall be deemed without further action to be, a Supporting Noteholder hereunder solely with respect to such Notes and/or Claims and shall be obligated to vote such Notes and/or Claims in favor of the Plan; *provided*, *further*, that the Qualified Marketmaker shall automatically, and without further notice or action, no longer be a Supporting Noteholder with respect to such Notes or Claims, as applicable, at such time that the transferee of such Notes and/or Claims becomes a Supporting Noteholder with respect to such Notes and/or Claims.  To the extent that any Supporting Noteholder is acting solely in its capacity as a Qualified Marketmaker, it may Transfer any Notes or Claims that it acquires from a holder of such Notes or Claims that is not a Supporting Noteholder without the requirement that the transferee be or become a Supporting Noteholder.  Notwithstanding anything to the contrary in this Agreement, the restrictions on Transfer in this <u>Section 9</u> shall not apply to the grant of any liens or encumbrances on any Claims in favor of a bank or broker-dealer holding custody of such Notes and/or Claims in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such Notes or Claims (which Transfer must comply with the requirements of this <u>Section 9</u>).

(c)     Notwithstanding the foregoing provisions of this <u>Section 9</u>, in no event shall any Supporting Sponsor directly or indirectly Transfer all or any of its Existing Holdings Interests.

**10.     <u>Definitive Documents; Good Faith Cooperation; Further Assurances</u>**.  Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and shall exercise commercially reasonable efforts with respect to, the pursuit, approval, implementation, and consummation of the transactions contemplated by this Agreement and the Plan, as well as the negotiation, drafting, execution, and delivery of the Definitive Documents. Furthermore, subject to the terms hereof, each of the Parties shall take such actions as may be reasonably necessary or reasonably requested by other Parties to carry out the purposes and intent of this Agreement and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement.

**11.     <u>Representations and Warranties</u>**.

(a)     Each of the Parties (severally, and not jointly and severally) represents and warrants to each other Party that the following statements are true, correct, and complete as of the date hereof (or, if later, the date that such Party first became or becomes a Party):

(i)     it is validly existing and in good standing under the laws of the state of its incorporation or organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other, similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(ii)     except as expressly provided in this Agreement or otherwise required by the Bankruptcy Code, no material consent or approval of, or any registration or filing with, any Governmental Entity is required for it to carry out and perform its obligations under this Agreement and the Plan;

(iii)    it has all requisite organizational power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its obligations under, this Agreement and the Plan;

(iv)    the execution and delivery by it of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary organizational action on its part;

(v)    it has been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement; and

(vi)    the execution, delivery, and performance by such Party of this Agreement does not and will not (A) violate any provision of law, rule, or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other, similar governing documents) or those of any of its subsidiaries, (B) conflict with, result in a breach of, or constitute (with or without notice or lapse of time or both) a default under any material debt for borrowed money to which it or any of its subsidiaries is a party, or (C) violate any order, writ, injunction, decree, statute, rule, or regulation.

(b)    Each Supporting Noteholder (severally, and not jointly and severally) represents and warrants to the TPC Parties that, as of the date hereof (or as of the date such Supporting Noteholder becomes a Party hereto), except as expressly set forth on its signature page to this Agreement (or its signature page to a Joinder Agreement for any Supporting Noteholder that becomes a Party hereto after the date hereof), such Supporting Noteholder (i) is or, after taking into account the settlement of any pending assignments to which such Supporting Noteholder is a party as of the date of this Agreement, will be the beneficial owner of the Notes and other Claims set forth below its name on the signature page hereto (or below its name on the signature page of a Joinder Agreement for any Supporting Noteholder that becomes a Party hereto after the date hereof) and/or (ii) has or, after taking into account the settlement of any pending assignments to which such Supporting Noteholder is a party as of the date of this Agreement, will have, with respect to the beneficial owner(s) of such Notes and other Claims, (A) investment or voting discretion with respect to such Notes and Claims, (B) full power and authority to vote on and consent to matters concerning such Notes and Claims and to exchange, assign, and Transfer such Claims, and (C) full power and authority to bind or act on the behalf of matters concerning such Notes and Claims, (iii) is an institutional "accredited investor" as defined in Rule 501(a) under the Securities Act, and (iv) except for such Notes and other Claims set forth on its signature page, such Supporting Noteholder does not own or, with respect to any beneficial owners thereof, have any voting, investment, or other power, with respect to any other Notes or Claims.

(c)    Each TPC Party (severally, and not jointly and severally) represents and warrants to the Supporting Noteholders that, as of the date hereof, such TPC Party has not received approval from the applicable insurers with respect to, or any payments in respect of, Proof of Loss No. 11 submitted pursuant to the TPC Parties' property damage and business interruption insurance policy for the period of July 1, 2019 through July 1, 2020.

**12.**    **Conditions to Agreement Effectiveness**.  This Agreement shall become effective and binding upon each of the parties that has executed and delivered counterpart signature pages

to this Agreement on the date on which all of the following conditions have been satisfied or waived by each of the TPC Parties and the Required Supporting Noteholders:

(a)     each of the TPC Parties shall have executed and delivered counterpart signature pages of this Agreement to Baker Botts and Paul Hastings;

(b)     the following shall have executed and delivered counterpart signature pages of this Agreement to Baker Botts and Paul Hastings:

(i)     holders of at least 75.01% of the aggregate outstanding principal amount of the Priming Notes;

(ii)     holders of at least 75.01% of the aggregate outstanding principal amount of the 10.5% Notes; and

(iii)     each of the Supporting Sponsors; and

(c)     all the Restructuring Expenses invoiced by the Ad Hoc Noteholder Group Advisors to the TPC Parties at least two (2) Business Days prior to the date of this Agreement shall have been paid in full.

### 13.  **Amendments**.

(a)     Except as otherwise expressly set forth herein, this Agreement (including any Exhibits and Schedules) may not be waived, modified, amended, or supplemented except in a writing signed (i) in the case of a waiver, by the Party against whom the waiver is to be effective (it being understood that the Required Supporting Noteholders may waive any conditions to the obligations of the Supporting Noteholders or any rights of the Supporting Noteholders under this Agreement), (ii) in the case of a modification, amendment, or supplement, by the TPC Parties and the Required Supporting Noteholders; *provided*, that (A) any modification or amendment to the definition of "Required Supporting Noteholders" or the definition of "Initial Supporting Noteholders" shall also require the written consent of each Initial Supporting Noteholder; (B) any modification or amendment to, or waiver of, this Section 13 shall require the consent of each Party; (C) if the proposed modification, amendment, supplement, or waiver will result in a material change from the terms provided in this Agreement that has a disproportionate and adverse effect on (x) a Supporting Priming Notes Noteholder, relative to all other of the Supporting Priming Notes Noteholders or (y) a Supporting 10.5% Noteholder, relative to all other of the Supporting 10.5% Noteholders, then the consent of such affected Party (solely in their affected capacity) shall also be required to effectuate such modification, amendment, supplement or waiver, and such affected Party shall be entitled to terminate the Agreement as to itself only for any breach of this provision; (D) any modification, amendment or supplement to the Plan Outside Date Milestone or the right to terminate this Agreement by the Required Supporting Noteholders if the Plan Outside Date Milestone is not achieved as set forth in Section 8(a)(i) shall also require the consent of the Supporting Sponsors solely to the extent expressly set forth in Section 4; and (E) any modification, amendment, or supplement that directly and adversely affects the Supporting Sponsors shall also require the consent of the Supporting Sponsors; *provided, further*, that nothing in the foregoing clauses (A), (B), (C), (D), or (E) shall waive any consent or approval required to be given by the

TPC Parties. Any consent required to be provided pursuant to this <u>Section 13</u> may be delivered by email from the applicable Party's counsel.

(b)    In determining whether any consent or approval has been given by the Required Supporting Noteholders, any Priming Notes or 10.5% Notes held by any then-existing Supporting Noteholder that is in material breach of its covenants, obligations, or representations under this Agreement shall be excluded from such determination, and the Priming Notes or 10.5% Notes, as applicable, held by such Supporting Noteholder shall be treated as if they were not outstanding.

(c)    Any proposed modification, amendment, waiver or supplement that does not comply with this <u>Section 13</u> shall be ineffective and void *ab initio*.

(d)    The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power, or remedy under this Agreement shall operate as a waiver of any such right, power, or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power, or remedy by such Party preclude any other or further exercise of such right, power, or remedy or the exercise of any other right, power, or remedy. All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by law.

**14.    <u>Governing Law; Jurisdiction; Waiver of Jury Trial</u>**.

(a)    This Agreement shall be construed and enforced in accordance with, and the rights of the Parties shall be governed by, the laws of the State of New York and applicable federal law, without giving effect to the conflicts-of-laws principles thereof.

(b)    Each Party irrevocably agrees that any legal action, suit, or proceeding arising out of or relating to this Agreement brought by any party or its successors or assigns shall be brought and determined in the Bankruptcy Court. Each Party hereby irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have (or declines to exercise) jurisdiction, courts of the State or New York sitting in the Borough of Manhattan and the United States District Court for the Southern District of New York, and any appellate court from any such court, for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement. Each Party further agrees that notice as provided herein shall constitute sufficient service of process, and the Parties further waive any argument that such service is insufficient. Each Party hereby irrevocably and unconditionally waives and agrees not to assert, by way of motion or as a defense, counterclaim, or otherwise, in any proceeding arising out of or relating to this Agreement, (i) any claims that it is not for any reason personally subject to the jurisdiction of the Bankruptcy Court or such other court described above, (ii) that it or its property is exempt or immune from jurisdiction of such court or from any legal process commenced in such court (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment, or otherwise), and (iii) that (A) the proceeding in such court is brought in an inconvenient forum, (B) the venue of such proceeding is improper, or (C) this Agreement or the subject matter hereof may not be enforced in or by such court.

(c)    **EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY).  EACH PARTY (i) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (ii) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

**15.    Specific Performance; Remedies**.  The Parties understand and agree that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorney's fees and costs) as a remedy for any such breach, without the necessity of proving the inadequacy of money damages as a remedy.  Each Party hereby waives any requirement for the security or posting of any bond in connection with such remedies.

**16.    Survival**.  Notwithstanding the termination of this Agreement pursuant to Section 8 hereof or any Transfer pursuant to Section 9, Section 8(d), Section 8(e), and Sections 14–32 of this Agreement shall survive such termination or Transfer and shall continue in full force and effect in accordance with the terms hereof; *provided*, that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.  Notwithstanding the termination of this Agreement in accordance with Section 8(d), the TPC Parties will comply with their obligations (or the obligations of their successors in interest) to pay the Restructuring Expenses set forth in Section 23.  Notwithstanding anything in this Agreement to the contrary, the obligations of the Supporting Sponsors pursuant to Section 6(d)(iii) (relating to the transfer of any equity interests or any claims for a worthlessness deduction under IRC Section 165) shall survive the termination of this Agreement, and shall continue indefinitely in full force and effect in accordance with the terms hereof and the applicable provisions of the Restructuring Term Sheet, if this Agreement is terminated (i) by the Supporting Sponsors pursuant to Section 8(b) (except to the extent the Supporting Sponsors were entitled to terminate under Section 8(b) at such time as a direct result of actions taken by, or a breach of this Agreement by, the TPC Parties or the Supporting Noteholders) or (ii) upon the occurrence of the Effective Date.

**17.    Headings**.  The headings of the sections, paragraphs, and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation of this Agreement or, for any purpose, be deemed a part of this Agreement.

**18.    Successors and Assigns; Third Parties**.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators, and representatives.  There are no third-party beneficiaries of this Agreement and, except as set forth in Section 9 hereof, the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other Person.

**19.**    **Relationships Among Parties**.  Notwithstanding anything herein to the contrary, the duties and obligations of the Supporting Noteholders and the Supporting Sponsors under this Agreement shall be several, not joint and several.  None of the Supporting Noteholders or Supporting Sponsors shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities to one another, the TPC Parties, or any of the TPC Parties' creditors, stockholders, or other stakeholders, and there are no commitments between or among any Supporting Noteholders or Supporting Sponsors.  It is understood and agreed that any Supporting Noteholder may trade in any debt or equity securities of the TPC Parties without the consent of the TPC Parties or any other Supporting Noteholder or Supporting Sponsor, subject to applicable securities laws and the terms of Section 9 of this Agreement.  The Parties have no agreement, arrangement, or understanding with respect to acting together for the purposes of acquiring, holding, voting, or disposing of any equity securities of the TPC Parties.  No Supporting Noteholder is a member of a "group" within the meaning of Rule 13d-5 under the Securities Act.  No Supporting Noteholder shall, nor shall any action taken by a Supporting Noteholder pursuant to this Agreement, be deemed to be acting in concert or as any group with any other Supporting Noteholder with respect to the obligations under this Agreement nor shall this Agreement create a presumption that the Supporting Noteholders are in any way acting in concert or as a group.  The decision to commit to enter into the transactions contemplated by this Agreement has been made independently by each Party hereto.  The Parties acknowledge that all representations, warranties, covenants, and other agreements made by or on behalf of any Supporting Noteholder that is a separately managed account of an investment manager signatory hereto (the "**Manager**") are being made only with respect to the assets managed by such Manager on behalf of such Supporting Noteholder, and shall not apply to (or be deemed to be made in relation to) any assets or interests that may be beneficially owned by such Supporting Noteholder that are not held through accounts managed by such Manager.

**20.**    **Prior Negotiations; Entire Agreement**.  This Agreement, including the Exhibits and Schedules (including the Restructuring Term Sheet), constitutes the entire agreement of the Parties and supersedes all other prior negotiations with respect to the subject matter hereof and thereof, other than any confidentiality agreement and, prior to the Petition Date, the Notes Forbearance Agreement.

**21.**    **Counterparts**.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement delivered by facsimile or PDF shall be deemed to be an original for the purposes of this paragraph.

**22.**    **Notices**.  Except as otherwise expressly provided in this Agreement, all notices under this Agreement shall be deemed given if in writing and delivered, if contemporaneously sent by email, courier, or registered or certified mail (return receipt requested) to the following addresses:

        (a)    If to the TPC Parties, to:

        TPC Group, Inc.
        One Allen Center
        500 Dallas Street, Suite 2000

Houston, Texas 77002
Attention: Marilyn Moore Basso, SVP and General Counsel
(marilyn.moorebasso@tpcgrp.com)

With a copy (which shall not constitute notice) to:

Baker Botts L.L.P.
2001 Ross Avenue
Suite 900
Dallas, Texas 75201-2980
Attention: Jim Prince, Scott R. Bowling, and David Eastlake
(jim.prince@bakerbotts.com; scott.bowling@bakerbotts.com;
david.eastlake@bakerbotts.com)

(b)     If to a Supporting Noteholder, to the address listed on the signature page for such Supporting Noteholder (or as directed by any transferee thereof), as the case may be, with copies (which shall not constitute notice) to:

Paul Hastings LLP
200 Park Avenue
New York, NY 10166

Attention: Kris Hansen, Allison Miller,
Jonathan Canfield and Gabriel Sasson
(krishansen@paulhastings.com; allisonmiller@paulhastings;
joncanfield@paulhastings.com; gabesasson@paulhastings.com)

(c)     If to a Supporting Sponsor, to the address listed on the signature page for such Supporting Sponsor, as the case may be, with copies (which shall not constitute notice) to:

Latham & Watkins LLP
1271 Avenue of the Americas
New York, New York 10020
Attention: George Davis and David Hammerman
(george.davis@lw.com; david.hammerman@lw.com)

Any notice given by delivery, mail, or courier shall be effective when received.  Any notice given by email shall be effective upon oral or email (as applicable) confirmation of transmission.

### 23.    <u>Restructuring Expenses</u>.

(a)     Whether or not the transactions contemplated by this Agreement are consummated and, in each case, if applicable, subject to the terms of the applicable engagement letter or fee reimbursement letter, the TPC Parties hereby agree, on a joint and several basis, to pay in cash the Restructuring Expenses as follows: (i) all accrued and unpaid Restructuring Expenses incurred up to (and including) the RSA Effective Date shall be paid in full in cash; (ii) prior to the Petition Date and after the RSA Effective Date, all accrued and unpaid Restructuring Expenses shall be paid in full in cash by the TPC Parties on a regular and continuing

basis promptly (but in any event within five (5) Business Days) and no later than the Business Day prior to the Petition Date following receipt of reasonably detailed invoices; (iii) after the Petition Date (to the extent permitted by order of the Bankruptcy Court) all accrued and unpaid Restructuring Expenses shall be paid in full in cash by the TPC Parties on a regular and continuing basis promptly (but in any event within five (5) Business Days) following receipt of reasonably detailed invoices; (iv) upon termination of this Agreement, all accrued and unpaid Restructuring Expenses incurred up to (and including) the RSA Termination Date shall be paid in full in cash promptly (but in any event within five (5) Business Days) following receipt of reasonably detailed invoices; (v) on the Effective Date, all accrued and unpaid Restructuring Expenses incurred up to (and including) the Effective Date, shall be paid in full in cash on the Effective Date, provided the TPC Parties receive reasonably detailed invoices by such date, in each case and to the extent applicable, without any requirement for Bankruptcy Court review or further Bankruptcy Court order; and (vi) after the Effective Date, all accrued and unpaid Restructuring Expenses incurred in connection with the implementation and consummation of the Plan shall be paid in full in cash by the TPC Parties (or their successors in interest, the Reorganized Debtors) on a regular and continuing basis promptly (but in any event within five (5) Business Days) following receipt of reasonably detailed invoices.  The Plan and any DIP Order shall contain appropriate provisions to give effect to the obligations under this Section 23.  With respect to invoices for Restructuring Expenses submitted to the TPC Parties by counsel to the Ad Hoc Noteholder Group, such invoices shall provide reasonable supporting detail in summary format (with such redactions as may be necessary to maintain attorney-client privilege), and such invoices shall not be required to provide the TPC Parties with attorney time entries.

(b)     The terms set forth in this Section 23 shall survive termination of this Agreement and shall remain in full force and effect regardless of whether the transactions contemplated by this Agreement are consummated.  Notwithstanding any other obligations of TPC Parties to reimburse or pay (as the case may be) the Restructuring Expenses as set forth herein, in the Definitive Documents, or in any engagement letters or fee reimbursement letters entered into between the TPC Parties and the Ad Hoc Noteholder Group Advisors, subject to the approval of the Bankruptcy Court, the TPC Parties shall reimburse or pay (as the case may be) all reasonable and documented Restructuring Expenses pursuant to sections 503(b), 507(a)(2) or 1129(a)(4) of the Bankruptcy Code or otherwise.

**24.     Publicity**.  The TPC Parties shall submit drafts to Paul Hastings, as counsel to the Ad Hoc Noteholder Group, or, if the Supporting Sponsors are named in any of the following disclosures, counsel to the Supporting Sponsors of any press releases or other public statement or public disclosure (excluding for this purpose, any posting on the TPC Parties password protected investor portal) of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least two (2) Business Days prior to making any such disclosure; *provided*, that if delivery of such document at least two Business Days in advance of such disclosure is impossible or impracticable under the circumstances, such document shall be delivered as soon as otherwise practicable, and shall afford them a reasonable opportunity under the circumstances to comment on such documents and disclosures and shall incorporate any such reasonable comments in good faith.  Except as required by law, no Party or its advisors shall (a) other than as necessary during live court proceedings and in filings in connection with the Chapter 11 Cases, use the name of any Supporting Noteholder or any Supporting Sponsor in any public manner (including in any press release) with respect to this Agreement, the Restructuring, or any of the Definitive

Documents, or (b) disclose to any Person (including, for the avoidance of doubt, any other Supporting Noteholder), other than advisors to the TPC Parties, the principal amount or percentage of any Claims held by any Supporting Noteholder without such Supporting Noteholder's prior written consent (it being understood and agreed that each Supporting Noteholder's signature page to this Agreement shall be redacted to remove the name of such Supporting Noteholder and the amount and/or percentage of Claims held by such Supporting Noteholder); *provided*, *however*, that (i) if such disclosure is required by law, the disclosing Party shall, to the extent practicable, afford the relevant Supporting Noteholder a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of Claims held by the Supporting Noteholders of the same class, collectively.  Notwithstanding the provisions in this <u>Section 24</u>, (x) any Party may disclose the identities of the other Parties in any action to enforce this Agreement or in any action for damages as a result of any breaches hereof, and (y) any Party may disclose, to the extent expressly consented to in writing by a Supporting Noteholder such Supporting Noteholder's identity and individual holdings.

**25.    No Recourse**.  This Agreement may only be enforced against the named parties hereto (and then only to the extent of the specific obligations undertaken by such parties in this Agreement).  All claims or causes of action (whether in contract, tort, equity, or any other theory) that may be based upon, arise out of, or relate to this Agreement, or the negotiation, execution, or performance of this Agreement, may be made only against the Persons that are expressly identified as parties hereto (and then only to the extent of the specific obligations undertaken by such parties herein) and no other Person shall have any liability with respect to this Agreement or with respect to any proceeding that may arise out of or relate to this Agreement, or the negotiation, execution, or performance of this Agreement.

**26.    No Solicitation; Adequate Information**.  This Agreement is not and shall not be deemed to be a solicitation of votes on the Plan or any other chapter 11 plan.  The votes of the holders of Notes and/or Claims, as applicable, will not be solicited until such holders that are entitled to vote on the Plan have received the Plan, the Disclosure Statement (or, if such solicitation occurs prior to the Petition Date, a disclosure statement that will be the proposed Disclosure Statement), and related ballots and other required Solicitation Materials.  In addition, this Agreement does not constitute an offer to issue or sell securities to any Person or the solicitation of an offer to acquire or buy securities in any jurisdiction where such offer or solicitation would be unlawful.

**27.    Severability**.  If any provision of this Agreement, or the application of any such provision to any Person or circumstance, is held to be invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof, and the remaining part of such provision and this Agreement shall continue in full force and effect so long as the essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

**28.    Interpretation; Rules of Construction; Representation by Counsel**.  When a reference is made in this Agreement to a Section, Exhibit, or Schedule, such reference shall be to a Section, Exhibit, or Schedule, respectively, of or attached to this Agreement unless otherwise

indicated.  Unless the context of this Agreement otherwise requires, (a) words using the singular or plural number also include the plural or singular number, respectively, (b) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Agreement, (c) the words "include," "includes," and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," and (d) the word "or" shall not be exclusive and shall be read to mean "and/or."  The Parties agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding, or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

29.    **Several, Not Joint, Claims**.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

30.    **Email Consents**.  Where a written consent, acceptance, approval, notice, or waiver is required pursuant to or contemplated by this Agreement, including a written approval by the TPC Parties, the Required Supporting Noteholders, or the Supporting Sponsors, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

31.    **Computation of Time**.  Bankruptcy Rule 9006(a) applies in computing any period of time prescribed or allowed herein.

32.    **Settlement Discussions**.  This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties.  Nothing in this Agreement shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408, any applicable state rules of evidence, and any other applicable foreign or domestic law, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than to prove the existence of this Agreement or in a proceeding to enforce the terms of this Agreement.

33.    **Electronic Signatures**.  The Parties acknowledge and agree that this Agreement may be executed by electronic signature, which shall be considered as an original signature for all purposes and shall have the same force and effect as an original signature.  Without limitation, "electronic signature" shall include faxed versions of an original signature or electronically scanned and transmitted versions (e.g., via pdf) of an original signature.

*[Signature pages follow.]*

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacities as officers of the undersigned and not in any other capacity, as of the date first set forth above.

TPC GROUP INC.

By: *Bart de Jong*
⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
Name:  Bart de Jong
Title:  Chief Financial Officer

TPC HOLDINGS, INC.

By: *Bart de Jong*
⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
Name:  Bart de Jong
Title:  Chief Financial Officer

TPC GROUP LLC

By: *Bart de Jong*
⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
Name:  Bart de Jong
Title:  Chief Financial Officer

TP CAPITAL CORP.

By: *Bart de Jong*
⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
Name:  Bart de Jong
Title:  Chief Financial Officer

TEXAS BUTYLENE CHEMICAL CORPORATION

By: *Bart de Jong*
⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
Name:  Bart de Jong
Title:  Chief Financial Officer

TEXAS OLEFINS DOMESTIC-INTERNATIONAL
SALES CORPORATION

By: _____
    Name:  Bart de Jong
    Title:  Chief Financial Officer

PORT NECHES FUELS, LLC

By: _____
    Name:  Bart de Jong
    Title:  Chief Financial Officer

TPC PHOENIX FUELS LLC

By: _____
    Name:  Bart de Jong
    Title:  Chief Financial Officer

*[Signature page to Restructuring Support Agreement]*

## SUPPORTING NOTEHOLDER

DRAWBRIDGE OSO SECURITIES LLC,

By: _____

Name: David N. Brooks

Title: Secretary

Address: 1345 Avenue of the Americas 46th Fl
New York, NY 10105



**SUPPORTING NOTEHOLDER**

FORTRESS CREDIT OPPORTUNITIES IX CLO LIMITED
By: FCOD CLO Management LLC, its collateral manager

By: _____

Name: David N. Brooks

Title: Secretary

Address: 1345 Avenue of the Americas 46th Fl
         New York, NY 10105



## SUPPORTING NOTEHOLDER

FDF V LIMITED
By: FDF V Management LLC, its collateral manager

By: 

Name: David N. Brooks

Title: Secretary

Address: 1345 Avenue of the Americas 46th Fl
        New York, NY 10105

**SUPPORTING NOTEHOLDER**

FDF IV LIMITED
By: FDF Management LLC Series IV, a designated series of
FDF Management LLC

By: _____

Name: _David N. Brooks_____

Title: __Secretary_____

Address: 1345 Avenue of the Americas 46th Fl
              New York, NY 10105



**SUPPORTING NOTEHOLDER**

FDF III LIMITED
By: FDF Management LLC Series III, a designated series of
FDF Management LLC



By: _____

Name: David N. Brooks

Title: Secretary

Address: 1345 Avenue of the Americas 46th Fl
         New York, NY 10105

**SUPPORTING NOTEHOLDER**

FCI HOLDINGS I LTD.

By: _____

Name:  David N. Brooks

Title:  Secretary

Address: 1345 Avenue of the Americas 46ᵗʰ Fl
          New York, NY 10105



**SUPPORTING NOTEHOLDER**

DRAWBRIDGE DSO SECURITIES LLC,

By: 

Name: David N. Brooks

Title: Secretary

Address: 1345 Avenue of the Americas 46th Fl
        New York, NY 10105

**SUPPORTING NOTEHOLDER**

Monarch Alternative Capital LP, on behalf of certain of its advisory clients

By: _____

Name

Title:

Michael Weinstock

Chief Executive Officer

**SUPPORTING NOTEHOLDER**

PGIM, Inc on behalf of one or more funds and/or accounts for which it serves as investment advisor

By: *Ryan Kelly*

Name: Ryan Kelly

Title: Vice President

Address:

PGIM, Inc
P.O. Box. 32339
Newark NJ 07102

**SUPPORTING NOTEHOLDER**

Corbin Opportunity Fund, LP

CORBIN OPPORTUNITY FUND, LP
By: REDWOOD CAPITAL MANAGEMENT, LLC, its Sub-Advisor

By: _____
Name: Ruben Kliksberg
Title: Chief Executive Officer

**SUPPORTING NOTEHOLDER**

Redwood Master Fund, Ltd.

REDWOOD MASTER FUND, LTD.
By: REDWOOD CAPITAL MANAGEMENT, LLC, its Investment Manager

By: _____
Name: Ruben Kliksberg
Title: Chief Executive Officer

**SUPPORTING NOTEHOLDER**

Redwood Opportunity Master Fund, Ltd.

REDWOOD OPPORTUNITY MASTER FUND, LTD.
By: REDWOOD CAPITAL MANAGEMENT, LLC, its Investment Manager

By: _____
Name: Ruben Kliksberg
Title: Chief Executive Officer

## SUPPORTING NOTEHOLDER

REDWOOD DRAWDOWN MASTER FUND II, L.P.
By: REDWOOD CAPITAL MANAGEMENT,
LLC, its Investment Manager

By: 
Name: Ruben Kliksberg
Title: Chief Executive Officer

**SUPPORTING NOTEHOLDER**

**Strategic Value Master Fund, Ltd.**

By: Strategic Value Partners, LLC, its Investment Manager

_____

Name: James Dougherty

Title: Chief Financial Officer

**Strategic Value Excelsior Fund L.P.**

By: SVP Excelsior Management, its Investment Manager

_____

Name: James Dougherty

Title: Chief Financial Officer

**Strategic Value Opportunities Fund, L.P.**
By: SVP Special Situations III-A LLC, its Investment Manager

Name: James Dougherty

Title: Chief Financial Officer

**Strategic Value Capital Solutions Master Fund, L.P.**
By: SVP Dislocation LLC, its Investment Manager

Name: James Dougherty

Title: Chief Financial Officer

**Strategic Value Special Situations Master Fund IV, L.P.**
By: SVP Special Situations IV LLC, its Investment Manager

_____

Name: James Dougherty

Title: Chief Financial Officer



**Strategic Value Special Situations Master Fund V, L.P.**
By: SVP Special Situations V LLC, its Investment Manager

_____

Name: James Dougherty

Title: Chief Financial Officer

**SUPPORTING SPONSOR**

**Sawgrass Holdings GP LLC**

By: _____

Name: Edward J. Dineen

Title:  Manager

*[Signature page to Restructuring Support Agreement]*

DocuSign Envelope ID: 15BF2D0B-5E6F-43F1-984E-8758380B8DB6

**SUPPORTING SPONSOR**

**Sawgrass Holdings LP**
By: Sawgrass Holdings GP LLC,
its general partner

By: _____
Name: Edward J. Dineen
Title:   Manager

*[Signature page to Restructuring Support Agreement]*

**SUPPORTING SPONSOR**

<div align="right">

**FR Sawgrass LP**
By: FR XII Alternative GP, Ltd.,
its general partner


By:  _/s/ Paul J. Steen_
Name: Paul J. Steen
Title:   Director

</div>

**SUPPORTING SPONSOR**

**First Reserve Corporation, L.L.C.**
By: First Reserve Management, L.P.,
its managing member

By: First Reserve Management Limited,
its general partner


By:      /s/ *Paul J. Steen*                    _
Name: Paul J. Steen
Title:   Director

*[Signature page to Restructuring Support Agreement]*

**SUPPORTING SPONSOR**

**First Reserve Management, L.P.**
By: First Reserve Management Limited,
its general partner


By: _____ /s/ *Paul J. Steen*
Name: Paul J. Steen
Title:    Director

*[Signature page to Restructuring Support Agreement]*

**SUPPORTING SPONSOR**

**FR XII Alpha AIV, L.P.**
By: First Reserve GP XII, L.P.,
its general partner

By: First Reserve GP XII Limited,
its general partner

By:    /s/ *Paul J. Steen*
                                                              
Name: Paul J. Steen
Title:   Director

*[Signature page to Restructuring Support Agreement]*

**SUPPORTING SPONSOR**

**FR XII-A Alpha AIV, L.P.**
By: First Reserve GP XII, L.P.,
its general partner

By: First Reserve GP XII Limited,
its general partner


By:     /s/ *Paul J. Steen*
Name: Paul J. Steen
Title:   Director

*[Signature page to Restructuring Support Agreement]*

**SUPPORTING SPONSOR**

**SK Sawgrass, L.P.**
By: SKCI III Glades AIV-GP, LP,
its general partner
By: SKCI III Glades GP Management Ltd.,
its general partner

By: ___/s/ Jamshid Kevneiad___
Name: Jamshid Keynejad
Title:  Director

**SUPPORTING SPONSOR**

<div style="margin-left:50%;">

**SK Capital Partners, L.P.**
By: SK Capital GP, LLC,
its general partner


By: _____ /s/ *Jamshid Kevneiad* _____
Name: Jamshid Keynejad
Title:  Director

</div>

**SK Second Reserve, L.P.**
By: SK Capital Investment, LLC,
its general partner


By: _/s/ Jamshid Keyneiad_

Name: Jamshid Keynejad
Title:   Chief Financial Officer

## **Exhibit A**

**Restructuring Term Sheet**

[Attached.]

## TPC GROUP INC. AND CERTAIN AFFILIATES

## RESTRUCTURING TERM SHEET

## MAY 31, 2022

This restructuring term sheet (this "**Term Sheet**") presents the principal terms of a proposed restructuring (the "**Restructuring**") of the existing capital structure of TPC Group Inc. ("**TPC**"), its direct parent company TPC Holdings, Inc. ("**Holdings**"), and certain of TPC's direct and indirect subsidiaries identified below (collectively with TPC and Holdings, the "**Company**" or the "**Debtors**"), which Restructuring will be consummated pursuant to a chapter 11 plan containing terms set forth herein to be confirmed in the cases commenced (the date of such commencement, the "**Petition Date**") in the United Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"; such cases, the "**Chapter 11 Cases**"). This is the Term Sheet referred to in, and attached as **Exhibit A** to, the Restructuring Support Agreement, dated as of May 31, 2022, by and among the Company and the other parties signatory thereto (as amended, supplemented, or otherwise modified from time to time, the "**RSA**").[1]

**THIS TERM SHEET DOES NOT CONSTITUTE (NOR WILL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH AN OFFER, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE LAWS.**

**THIS TERM SHEET DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN. THE CLOSING OF ANY TRANSACTION WILL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS.**

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the RSA.

| **OVERVIEW** | |
| --- | --- |
| **The Debtors:** | TPC; Holdings; TPC Group LLC; Texas Butylene Chemical Corporation; Texas Olefins Domestic-International Sales Corporation; TPC Phoenix Fuels LLC; Port Neches Fuels, LLC; and TP Capital Corp. |
| **Claims and Interests to Be Restructured:** | The Company's current capital structure consists of:<br><br>**ABL Revolver Claims**: consisting of approximately $106 million in aggregate principal obligations plus outstanding letters of credit under that certain Amended and Restated Credit Agreement, dated as of August 2, 2019, by and among Holdings, as holdings, TPC, the subsidiaries of TPC party thereto, the lenders party thereto, Bank of America, as administrative agent and collateral agent, and the other parties thereto (such credit agreement, as amended, modified, or supplemented from time to time, and including all related credit documents, the "**ABL Credit Agreement**"), plus all accrued and unpaid interest, fees, and other amounts arising thereunder or payable pursuant thereto and certain secured bank product obligations (the "**ABL Revolver Claims**").<br><br>**Priming Notes Claims**: consisting of $205.53 million in aggregate principal amount of the 10.875% senior secured notes due 2024, issued under that certain Indenture, dated as of February 2, 2021, by and among TPC, each of the guarantors thereunder, and U.S. Bank National Association, as trustee and collateral agent ("**U.S. Bank**"; such indenture, as amended, modified, or supplemented from time to time, the "**Priming Notes Indenture**"), including approximately $52.53 million in aggregate principal amount outstanding under the Prepetition Senior Priority 2022 Bridge Notes (as defined below), plus all accrued and unpaid interest at the default rate (to the extent applicable), fees, and other amounts arising thereunder or payable pursuant thereto, including the applicable make-whole amount (the "**Priming Notes Claims**").<br><br>**10.5% Notes Claims**: consisting of $930 million in aggregate principal amount of the 10.5% senior secured notes due 2024, issued under that certain Indenture, dated as of August 2, 2019, by and among TPC, each of the guarantors thereunder, and U.S. Bank, as trustee and collateral agent (such indenture, as amended, modified, or supplemented from time to time, the "**10.5% Notes Indenture**"), plus all accrued and unpaid interest at the default rate (to the extent applicable), fees, and other amounts arising |

thereunder or payable pursuant thereto, including the applicable make-whole amount (the "**10.5% Notes Claims**" and the secured portion of such claims, the "**10.5% Notes Secured Claims**").

**General Unsecured Claims**: consisting of any prepetition Claim against the Debtors that is not an ABL Revolver Claim, a Priming Notes Claim, a 10.5% Notes Secured Claim, an Intercompany Claim, a Subordinated Claim (as defined below) or a claim entitled to priority under the Bankruptcy Code (the "**General Unsecured Claims**"). For the avoidance of doubt, deficiency claims in respect of the 10.5% Notes Claims ("**10.5% Notes Deficiency Claims**") shall constitute General Unsecured Claims.

**Existing Holdings Interests**: consisting of the shares of Class A common stock of Holdings that existed immediately prior to the Effective Date, including any restricted stock of Holdings that vests prior to the Effective Date (collectively, the "**Existing Holdings Interests**").

**Other Holdings Interests**: consisting of all other Interests in Holdings (including, without limitation, any phantom stock, tracking stock, and any options with respect to equity interests) other than Existing Holdings Interests (collectively, the "**Other Holdings Interests**").

**Subordinated Claims**: consisting of any prepetition Claim that is subject to subordination pursuant to sections 510(b)–(c) of the Bankruptcy Code or otherwise (collectively, the "**Subordinated Claims**").

|  |  |
|---|---|
|  | **TRANSACTION SUMMARY** |
| **Overview of the Restructuring:** | A chapter 11 plan, incorporating the terms hereof and which shall be acceptable to the Company and the Required Supporting Noteholders and, where specifically provided herein, the Supporting Sponsors (including all appendices, exhibits, schedules, and supplements thereto, as may be modified from time to time in accordance with its terms and the RSA, the "**Plan**"), will be filed and prosecuted with the support of the Supporting Noteholders and Supporting Sponsors (each as defined in the RSA) on the terms and conditions set forth in the RSA.

The Chapter 11 Cases will be funded by the Term Loan DIP Facility (as defined below), the ABL DIP Facility (as defined |

|  | below) and the Debtors' use of cash collateral, each on the terms and conditions set forth below. |
|--|--|
|  | The Debtors' emergence from the Chapter 11 Cases will be funded by the proceeds of a combination of the Exit ABL Facility, the Exit Notes, the Equity Rights Offering, the Debt Rights Offering, the Equity Direct Allocation and the Debt Direct Allocation. |
|  | As of the Effective Date, each holder of a DIP Claim, an ABL Revolver Claim (to the extent not previously converted into ABL DIP Claims or discharged), a Priming Notes Claim (to the extent not previously converted into Priming Notes DIP Claims or discharged), a 10.5% Notes Claim, a General Unsecured Claim, an Existing Holdings Interest, and/or Other Holdings Interest shall, in each case, to the extent such Claim or Interest is Allowed, receive under the Plan the treatment described in this Term Sheet in full and final satisfaction, settlement, release, and discharge, and in exchange for such Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to among the Reorganized Debtors, the Required Supporting Noteholders, and the holder of such Allowed Claim or Allowed Interest. |
|  | The Plan will constitute a separate chapter 11 plan of reorganization for each Debtor. For the avoidance of doubt, any action required to be taken by the Debtors on the Effective Date pursuant to this Term Sheet may be taken either (a) on the Effective Date or (b) with the consent of the Required Supporting Noteholders (not to be unreasonably withheld), as soon as is reasonably practicable thereafter. |
| **DIP Financing and Use of Cash Collateral:** | The Chapter 11 Cases will be financed by (i) the Debtors' use of Cash collateral and (ii) a postpetition senior secured priming new money debtor-in-possession delayed-draw term loan facility (the "**Term Loan DIP Facility**") provided by certain Supporting Noteholders. |
|  | The Term Loan DIP Facility will be issued in the aggregate principal amount of $323 million (or such additional amount as determined by the DIP Lenders in their sole discretion), consisting of: (i) $85 million in new money to fund working capital, general corporate purposes, the expenses of administering the Chapter 11 Cases and, if necessary and solely with the consent of the DIP Lenders, repayment in full of the ABL Revolver Claims, and (ii) a roll-up of the Priming Notes Claims in respect of the Prepetition Senior Priority 2022 Bridge Notes (consisting of approximately $52.5 million of principal amount outstanding, $5.1 million in |

|  | respect of the Redemption Premium (as defined in the Priming Notes Indenture) and $1.7 million of accrued but unpaid interest, in respect of the Prepetition Senior Priority 2022 Bridge Notes) will be rolled up (on a cashless dollar-for-dollar basis) upon entry of the Interim DIP Order (the "**Initial DIP Roll-Up**"), and a roll-up of the remaining balance of Priming Notes Claims (including all remaining principal (including the balance of the Redemption Premium) and accrued but unpaid interest, in respect of the Priming Notes) pursuant to, and subject to the entry of, the Final DIP Order (the "**Final DIP Roll-Up**" and together with the Initial DIP Roll-Up, the "**Priming Notes DIP Roll-Up**").  The terms of the Term Loan DIP Facility are set forth in further detail in the DIP Term Sheet. Any debtor-in-possession financing facility that provides for the roll-up or refinancing of the ABL Revolver Claims (the "**ABL DIP Facility**"), whether provided by the incumbent holders of ABL Revolver Claims or third party lenders, shall be acceptable to the Required Supporting Noteholders.<br><br>The Required Supporting Noteholders shall consent to the use of Cash collateral on the terms and conditions set forth in the DIP Term Sheet (subject to definitive documentation and entry of the DIP Orders, in each case, acceptable to the Required Supporting Noteholders), which shall be consistent with the terms of this Term Sheet and the RSA and otherwise acceptable to the Required Supporting Noteholders.  Any DIP Order shall provide for the adequate protection of (a) the ABL Revolver Claims (to the extent the ABL Revolver Claims are not fully repaid or refinanced in connection with the Term Loan DIP Facility), including, without limitation, in the form of payment of interest at the non-default rate or other amounts due under the ABL Credit Agreement as such amounts come due, (b) the Priming Notes Claims (until rolled-up into Priming Notes DIP Claims), including, without limitation, in the form of payment of interest at the non-default rate (payable-in-kind) or other amounts due under the Priming Notes Indenture as such amounts become due and payable, and (c) the 10.5% Notes Claims, including, without limitation, in the form of payment of interest at the non-default rate (payable-in-kind), as such amounts become due and payable. |
| --- | --- |
| **Definitive Documents:** | Any documents contemplated by this Term Sheet, including any Definitive Documents, that are not executed or remain the subject of negotiation or completion as of the RSA Effective Date shall be subject to the rights and obligations set forth in the RSA. Failure to reference such rights and obligations as it relates to any |

| | |
|---|---|
| | document referenced in this Term Sheet shall not impair such rights and obligations. |
| **EXIT FUNDING** | |
| **Exit ABL Facility:** | On the Effective Date, the Reorganized Debtors will enter into a credit agreement for an asset-based revolving loan facility secured by a first priority security interest in and lien on the Reorganized Debtors' cash, accounts receivable, inventory, and other related categories of collateral substantially consistent with the scope of the ABL priority collateral applicable to the ABL Credit Agreement (except as otherwise explicitly set forth herein), and a second priority security interest in and lien on substantially all of the Reorganized Debtors' other assets to fund the Reorganized Debtors' working capital and general corporate purposes (such facility, the "**Exit ABL Facility**"); *provided*, that Company shall use commercially reasonable efforts to ensure that the documents governing the Exit ABL Facility shall permit, without condition, the disposition of all property damage and business interruption insurance policies giving rise to claims by the Company for the November 2019 incident at its Port Neches facility, and any proceeds thereof; *provided*, *further*, that the Exit ABL Facility shall not be guaranteed by Reorganized Holdings.  The Exit ABL Facility will be funded either by rolling the ABL DIP Facility into the Exit ABL Facility or by refinancing the ABL DIP Facility. The terms of the Exit ABL Facility will be negotiated prior to the Effective Date and must be mutually acceptable to the Debtors and the Required Supporting Noteholders. |
| **Exit Notes:** | The Company shall use commercially reasonable efforts to issue $350 million in aggregate principal amount of notes (the "**Exit Notes**") in a private placement not subject to registration under the Securities Act, pursuant to an indenture on terms and conditions set forth herein and acceptable to the Debtors and the Required Supporting Noteholders (such indenture, the "**Exit Notes Indenture**").  The Exit Notes will be secured by a second priority security interest in and lien on the Reorganized Debtors' cash, accounts receivable, and inventory and a first priority security interest in and lien on substantially all of the Reorganized Debtors' other assets; *provided*, that the indenture governing the Exit Notes shall permit without condition the disposition of all property damage and business interruption insurance policies giving rise to claims by the Company for the November 2019 incident at its Port Neches facility, and any proceeds thereof; *provided*, *further*, that the Exit Notes shall not be guaranteed by Reorganized Holdings.  The proceeds of the Exit Notes shall be |

| | |
|---|---|
| | used to fund the cash distribution to holders of the 10.5% Notes Secured Claims, as set forth below. |
| | The terms and conditions of the Exit Notes and the Exit Notes Indenture will be set forth in the Plan Supplement.  There will be no registration rights associated with the Exit Notes. |
| | If the Company is unable to place some or all of the Exit Notes in the market, the Debtors shall have the right to cause the Exit Notes Backstop Parties, on a several (but not joint) basis, to purchase any such Exit Notes that are not placed in the market (the "**Exit Notes Backstop**") on terms and subject to conditions set forth in the Plan Supplement. |
| **HoldCo Notes:** | Reorganized Holdings shall issue $230 million in aggregate principal amount of notes (the "**HoldCo Notes**") in a private placement not subject to registration under the Securities Act, pursuant to an indenture on terms and conditions set forth herein and acceptable to the Debtors, the Required Supporting Noteholders and the RO Backstop Parties (such indenture, the "**HoldCo Notes Indenture**"). |
| | The HoldCo Notes shall bear paid-in-kind interest at a rate of [•]%[2] compounded semi-annually and shall mature on the date that is 5 and 1/2 years after the Effective Date.  In addition, the HoldCo Notes shall not be secured by a pledge of equity of any of the Reorganized Debtors and shall not be guaranteed by the Reorganized Debtors, and, for the avoidance of doubt, Reorganized Holdings shall not guarantee any of the debt obligations to be issued or incurred by the other Reorganized Debtors on the Effective Date as contemplated herein.  Such other terms and conditions of the HoldCo Notes and the HoldCo Notes Indenture will be set forth in the Plan Supplement.  There will be no registration rights associated with the HoldCo Notes. |
| **Equity Rights Offering and Equity Direct Allocation:** | On the Effective Date, Reorganized Holdings shall consummate a common equity rights offering (the "**Equity Rights Offering**") pursuant to which eligible 10.5% Noteholders shall be offered the right to purchase, in Cash, New Common Shares for an aggregate purchase price of $165 million (the "**Equity Rights Offering Amount**" and such New Common Shares, the "**Rights Offering Shares**"). The subscription rights to participate in the Equity Rights Offering (the "**Equity Subscription Rights**") shall be allocated Pro Rata (based on such party's 10.5% Notes) to all |

---

[2] The interest rate applicable to the HoldCo Notes will be market-based, and with a spread no greater than 400 basis points wider than the interest rate applicable to the Exit Notes.

eligible 10.5% Noteholders who hold 10.5% Notes on the Record Date. There shall be no oversubscription rights as part of the Equity Rights Offering. The Equity Subscription Rights shall be transferable only with the underlying 10.5% Notes.

Discount: The Rights Offering Shares and the Direct Allocation Shares will be issued at a discount of 35% to plan equity value of $545 million (for the avoidance of doubt, plan equity value has been calculated by subtracting (x) the $350 million of Exit Notes and the $230 million of HoldCo Notes from (y) the plan value of $1.125 billion) (the "**Rights Offering Discount**").

Equity Rights Offering Backstop: If less than all of the Rights Offering Shares are subscribed for in the Equity Rights Offering, Reorganized Holdings shall have the right to cause the RO Backstop Parties, on a several (but not joint) basis, to purchase any such Rights Offering Shares that are not subscribed for in the Equity Rights Offering in accordance with the terms and subject to the conditions set forth in the RO Backstop Agreement (the "**Equity RO Backstop**"). Each RO Backstop Party shall be allowed to participate in the Equity RO Backstop on a *pro rata* basis based on the amount of 10.5% Notes such RO Backstop Party held on the Original NDA Date relative to the 10.5% Notes held by all RO Backstop Parties on the Original NDA Date or as otherwise agreed to by the RO Backstop Parties and as set forth in the RO Backstop Agreement.

Equity Direct Allocation: In connection with the Equity Rights Offering, the RO Backstop Parties shall purchase New Common Shares for an aggregate purchase price of $135 million (the "**Equity Direct Allocation Amount**", and together with the Equity Rights Offering Amount, the "**Total Equity Offering Amount**" and such New Common Shares, the "**Direct Allocation Shares**") in accordance with the terms and subject to the conditions set forth in the RO Backstop Agreement. Each RO Backstop Party, on a several (but not joint) basis, shall be allowed to purchase Direct Allocation Shares on a *pro rata* basis based on the amount of 10.5% Notes such RO Backstop Party held on the Original NDA Date relative to the 10.5% Notes held by all RO Backstop Parties on the Original NDA Date or as otherwise agreed to by the RO Backstop Parties and as set forth in the RO Backstop Agreement.

Equity Put Option Premium: In consideration for Reorganized Holdings' right to cause the RO Backstop Parties to purchase the Rights Offering Shares that are not subscribed for in the Equity Rights Offering and for the RO Backstop Parties' commitment to

| | |
|---|---|
| | make the "Equity Direct Allocation", Reorganized Holdings shall make a non-refundable put option payment (the "**Equity Put Option Payment**") equal to 12.0% of the Total Equity Offering Amount, which Equity Put Option Payment shall be issued at the Rights Offering Discount and paid in the form of additional New Common Shares (the "**Equity Put Option Premium Shares**"). The Equity Put Option Payment shall be deemed fully earned as of the execution of the RO Backstop Agreement and payable on the Effective Date.<br><br>The Equity Put Option Premium Shares shall be issued on a pro rata basis based on the RO Backstop Parties' commitments under the RO Backstop Agreement and on the terms and subject to the conditions set forth in the RO Backstop Agreement. |
| **Debt Rights Offering and Debt Direct Allocation:** | On the Effective Date, Reorganized Holdings shall consummate a debt rights offering (the "**Debt Rights Offering**") pursuant to which eligible 10.5% Noteholders shall be offered the right to purchase, in Cash $82.5 million in aggregate principal amount of HoldCo Notes (the "**Rights Offering HoldCo Notes**"). The subscription rights to participate in the Debt Rights Offering (the "**Debt Subscription Rights**") shall be allocated Pro Rata (based on such party's 10.5% Notes) to all eligible 10.5% Noteholders who hold 10.5% Notes on the Record Date. There shall be no oversubscription rights as part of the Debt Rights Offering. The Debt Subscription Rights shall be transferable only with the underlying 10.5% Notes. For the avoidance of doubt, participation in the Debt Rights Offering shall not be conditioned in any way on participation in the Equity Rights Offering, and vice versa.<br><br>Debt Rights Offering Backstop: If less than all of the Rights Offering HoldCo Notes are subscribed for in the Debt Rights Offering, Reorganized Holdings shall have the right to cause the RO Backstop Parties, on a several (but not joint) basis, to purchase any such Rights Offering HoldCo Notes that are not subscribed for in the Debt Rights Offering in accordance with the terms and subject to the conditions set forth in the RO Backstop Agreement (the "**Debt RO Backstop**"). Each RO Backstop Party shall be allowed to participate in the Debt RO Backstop on a *pro rata* basis based on the amount of 10.5% Notes such RO Backstop Party held on the Original NDA Date relative to the 10.5% Notes held by all RO Backstop Parties on the Original NDA Date or as otherwise agreed to by the RO Backstop Parties and as set forth in the RO Backstop Agreement. |

9

<u>Debt Direct Allocation</u>: In connection with the Debt Rights Offering, the RO Backstop Parties shall purchase $67.5 million in aggregate principal amount of HoldCo Notes (the "**Direct Allocation HoldCo Notes**") in accordance with the terms and subject to the conditions set forth in the RO Backstop Agreement. Each RO Backstop Party, on a several (but not joint) basis, shall be allowed to purchase Direct Allocation HoldCo Notes on a *pro rata* basis based on the amount of 10.5% Notes such RO Backstop Party held on the Original NDA Date relative to the 10.5% Notes held by all RO Backstop Parties on the Original NDA Date or as otherwise agreed to by the RO Backstop Parties and as set forth in the RO Backstop Agreement.

<u>Debt Put Option Premium</u>: In consideration for Reorganized Holdings' right to cause the RO Backstop Parties to purchase the Debt Rights Offering HoldCo Notes that are not subscribed for in the Debt Rights Offering and for the RO Backstop Parties' commitment to make the "Debt Direct Allocation", Reorganized Holdings shall make a non-refundable put option payment (the "**Debt Put Option Payment**") equal to 12.0% of the aggregate principal amount of the Rights Offering HoldCo Notes and the Direct Allocation HoldCo Notes, which Debt Put Option Payment shall be issued at the Rights Offering Discount and paid in the form of additional New Common Shares (the "**Debt Put Option Premium Shares**"). The Debt Put Option Payment shall be deemed fully earned as of the execution of the RO Backstop Agreement and payable on the Effective Date.

The Debt Put Option Premium Shares shall be issued on a *pro rata* basis based on the RO Backstop Parties' backstop commitments under the RO Backstop Agreement or as otherwise agreed by the RO Backstop Parties and as set forth in the RO Backstop Agreement and on the terms and subject to the conditions set forth in the RO Backstop Agreement.

| **TREATMENT OF CLAIMS AND INTERESTS** |
|---|

| | |
|---|---|
| **Administrative Expense Claims and Priority Tax Claims:** | Except to the extent that a holder of an Allowed Administrative Expense Claim or an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Administrative Expense Claim or Allowed Priority Tax Claim will receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Claim on the Effective Date or as soon as practicable thereafter or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |

| | |
|---|---|
| **ABL DIP Claims:** | On the Effective Date, each holder of an Allowed ABL DIP Claim will receive its Pro Rata share of (i) first lien revolving loans and letter of credit participations under the Exit ABL Facility, or (ii) payment in full in Cash on account of its Allowed ABL DIP Claims from the proceeds of the Exit ABL Facility. |
| **Priming Notes DIP Claims:** | On the Effective Date, each holder of an Allowed Priming Notes DIP Claim will receive payment in full in Cash on account of its Allowed Priming Notes DIP Claims. |
| **Term Loan DIP Claims:** | On the Effective Date, each holder of an Allowed Term Loan DIP Claim will receive payment in full in Cash on account of its Allowed Term Loan DIP Claims. |
| **Fee Claims:** | No later than ten (10) Business Days before the proposed Effective Date, the Professional Persons shall deliver to the Debtors and the Supporting Noteholders Advisors a reasonable and good-faith estimate of their Fee Claims to be held in escrow on the terms and subject to the conditions set forth in this Term Sheet and that certain escrow agreement (which agreement shall be reasonably acceptable to the Required Supporting Noteholders). On the Effective Date, the Debtors will fund the Fee Escrow Account with Cash equal to the Professional Persons' good-faith estimates of the Fee Claims. Funds held in the Fee Escrow Account will not be considered property of the Debtors' Estates or the Reorganized Debtors, but will revert to the Reorganized Debtors only after all Fee Claims allowed by the Bankruptcy Court have been paid in full. The Fee Escrow Account will be held in trust for Professional Persons and for no other parties until all Fee Claims Allowed by the Bankruptcy Court have been paid in full. Fee Claims owing to the applicable Professional Persons will be paid in full, in Cash, to such Professional Persons from funds held in the Fee Escrow Account when such Claims are Allowed by an order of the Bankruptcy Court or authorized to be paid under the Interim Compensation Procedures Order; *provided*, that to the extent that funds held in the Fee Escrow Account are insufficient to satisfy the amount of accrued Fee Claims owing to the Professional Persons, such Professional Persons will have, subject to an order of the Bankruptcy Court approving such Fee Claims, an Allowed Administrative Expense Claim for any such deficiency, which will be satisfied in full in Cash. No Liens, claims, or interests shall encumber the Fee Escrow Account in any way, other than customary liens in favor of the depository bank at which the Fee Escrow is maintained. When all such Allowed amounts owing to Professional Persons have been paid in full, any remaining amount in the Fee Escrow Account shall promptly be paid to the |

|  | Reorganized Debtors without any further action or order of the Bankruptcy Court.<br><br>All Professional Persons seeking approval by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 1103 of the Bankruptcy Code will (i) file, on or before the date that is sixty (60) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (ii) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) relating to or allowing any such Fee Claim. |
| --- | --- |
| **ABL Revolver Claims:** | To the extent the ABL Revolver Claims are not rolled up and/or repaid in full in Cash pursuant to the orders of the Bankruptcy Court approving the Term Loan DIP Facility, such claims shall be deemed Allowed, and on the Effective Date, such claims shall receive, in full and final satisfaction of such Allowed ABL Revolver Claims, payment in full, in Cash, and upon such payment shall be released and extinguished on the Effective Date. |
| **Priming Notes Claims:** | To the extent the Priming Notes Claims are not rolled up pursuant to the orders of the Bankruptcy Court approving the Term Loan DIP Facility, such claims shall be deemed Allowed, and on the Effective Date, such claims shall receive, in full and final satisfaction of such Allowed Priming Notes Claims, payment in full, in Cash and, accordingly, upon such payment shall be released and extinguished on the Effective Date. |
| **Class 1**<br><br>**Other Secured Claims:** | Except to the extent that a holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the Debtors (with the consent of the Required Supporting Noteholders) or the Reorganized Debtors, (i) such holder will receive payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter or (ii) such holder will receive such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired.<br><br>**Unimpaired – Presumed to accept.** |

| Class 2<br><br>**Other Priority Claims:** | Except to the extent that a holder of an Allowed Other Priority Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Priority Claim, each holder of an Allowed Other Priority Claim will, at the option of the Debtors (with the consent of the Required Supporting Noteholders) or the Reorganized Debtors, (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, in each case, or as soon as reasonably practicable thereafter.<br><br>**Unimpaired – Presumed to accept.** |
|---|---|
| Class 3<br><br>**10.5% Notes Secured Claims:** | The 10.5% Notes Secured Claims shall be deemed Allowed. Except to the extent that a holder of an Allowed 10.5% Notes Secured Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed 10.5% Notes Secured Claim, on the Effective Date or on another date acceptable to the Required Supporting Noteholders, all holders of Allowed 10.5% Notes Secured Claims will receive, in full and final satisfaction of their Allowed 10.5% Notes Secured Claims, their Pro Rata share of the following:<br><br>(i)  Cash in the amount of $350 million, *plus* all unrestricted Cash held by the Debtors on the Effective Date in excess of $50 million, with such excess Cash to be reduced by (i) any amounts drawn and letters of credit issued (whether or not drawn) under the Exit ABL Facility, and (ii) any reserves and other cash distribution requirements expressly provided under the Plan;<br><br>(ii)  100% of the New Common Shares, subject to dilution by the Rights Offering Shares, the Direct Allocation Shares, the Equity Put Option Premium Shares, the Debt Put Option Premium Shares and the MIP;<br><br>(iii)  $80 million in principal amount of HoldCo Notes (the "**Takeback HoldCo Notes**");<br><br>(iv)  100% of the Equity Subscription Rights; and<br><br>(v)  100% of the Debt Subscription Rights.<br><br>**Impaired – Entitled to vote.** |

| Class 4<br><br>**General Unsecured Claims:** | Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed General Unsecured Claim, on or as soon as practicable after the Effective Date, all holders of Allowed General Unsecured Claims will receive their Pro Rata share of the following:<br><br>   (i)   <u>In the event that Class 4 votes to accept the Plan</u>: (A) $5.0 million in Cash *plus* (B) rights to receive $5.0 million in Cash via a contingent value right, payable within a to-be-specified period of time after, and in the event that, the Reorganized Debtors' 2024 Adjusted EBITDA exceeds $250 million; *provided*, that distributions on account of the Allowed 10.5% Notes Deficiency Claims will be waived;[3] or<br><br>   (ii)   <u>In the event that Class 4 votes to reject the Plan</u>: no recovery.<br><br>**Impaired – All holders of Allowed General Unsecured Claims, including holders of 10.5% Notes Deficiency Claims, entitled to vote.** |
| --- | --- |
| Class 5<br><br>**Specified Trade Claims:** | All holders of Claims based on unpaid amounts under ordinary course, prepetition supplier or vendor agreements with the Debtors may elect to have their Claims treated as "**Specified Trade Claims**" by agreeing, in writing (the terms of such agreement shall be reasonably acceptable to the Required Supporting Noteholders), to provide, upon the occurrence of the Effective Date, goods or services to the Reorganized Debtors on the same ordinary trade terms that existed during calendar year 2021 or such later date when such holder first entered into a business relationship with the Debtors.[4]<br><br>Specified Trade Claims shall not include any Claim arising from or based upon rejection of any executory contract or unexpired lease, any Claim that is a Secured Claim, or any Claim resulting from litigation against one or more of the Debtors.<br><br>Except to the extent that a holder of a Specified Trade Claim agrees to receive different treatment, on and after the Effective |

---

[3] For the avoidance of doubt, such waiver shall only apply to the Plan on the terms and conditions set forth herein, and shall not apply to any other chapter 11 plan.

[4] Classification and treatment remain subject to ongoing diligence by, and consent of, the Required Supporting Noteholders and the Company.

| | Date, the Reorganized Debtors shall continue to pay or dispute each Specified Trade Claim in the ordinary course of business as if the Chapter 11 Cases had not been commenced.<br><br>**Unimpaired – Presumed to accept.** |
|---|---|
| **Class 6**<br><br>**Intercompany Claims:** | All Intercompany Claims will be adjusted, reinstated, or discharged in the Debtors' discretion, subject to the reasonable consent of the Required Supporting Noteholders, or in the Reorganized Debtors' discretion at the direction of the New Board.<br><br>**Unimpaired – Presumed to accept.** |
| **Class 7**<br><br>**Subordinated Claims:** | All Subordinated Claims, if any, will be discharged, cancelled, released, and extinguished as of the Effective Date and will be of no further force or effect, and Holders of Allowed Subordinated Claims will not receive any distribution on account of such Subordinated Claims.<br><br>**Impaired – Deemed to reject.** |
| **Class 8**<br><br>**Existing Holdings Interests:** | On the Effective Date, Existing Holdings Interests will be cancelled, released, and extinguished and will be of no further force or effect, whether surrendered for cancellation or otherwise. No holder of Existing Holdings Interests will receive a distribution under the Plan.<br><br>**Impaired – Deemed to reject** |
| **Class 9**<br><br>**Other Holdings Interests:** | On the Effective Date, Other Holdings Interests will be cancelled, released, and extinguished and will be of no further force or effect, whether surrendered for cancellation or otherwise. No holder of Other Holdings Interests will receive a distribution.<br><br>**Impaired – Deemed to reject.** |
| **Class 10**<br><br>**Intercompany Interests:** | All Allowed Intercompany Interests will be adjusted, reinstated, or discharged in the Debtors' discretion, subject to the reasonable consent of the Required Supporting Noteholders, or in the Reorganized Debtors' discretion at the direction of the New Board.<br><br>**Unimpaired – Presumed to Accept.** |

| **GENERAL PROVISIONS** | |
|---|---|
| **Executory Contracts and Unexpired Leases:** | As of and subject to the occurrence of the Effective Date and the payment of any applicable cure amount, all executory contracts and unexpired leases to which any of the Debtors is a party will be deemed assumed, unless such contract or lease (i) was previously assumed or rejected by the Debtors pursuant to a Final Order of the Bankruptcy Court, (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (iii) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date, or (iv) is specifically designated as a contract or lease to be rejected on the Schedule of Rejected Contracts; each decision by the Debtors described in the foregoing clauses (i) through (iv) shall be reasonably acceptable to the Required Supporting Noteholders. |
| **Board of Directors:** | The Reorganized Debtors shall be managed by a board of directors/managers (the "**New Board**") initially comprised of seven (7) individuals, consisting of (i) the Reorganized Debtors' chief executive officer and (ii) six (6) individuals selected by the Required Supporting Noteholders in their sole discretion and on arrangements to be agreed to by, and in the sole discretion of, the Required Supporting Noteholders.<br><br>Provisions regarding the removal, appointment, and replacement of members of the New Board will be set forth in the New Corporate Governance Documents. |
| **Private Company:** | The Reorganized Debtors will take the steps reasonably necessary to be a private company that is not listed on a national securities exchange and without Exchange Act reporting obligations upon emergence. |
| **Management Incentive Plan:** | The New Board shall, promptly following the Effective Date, adopt the terms of a new management incentive plan (the "**Management Incentive Plan**" or the "**MIP**"). The MIP shall be market-based and reserve up to 7% of the New Common Shares, with amounts, structure, awards and terms of the Management Incentive Plan to be determined by the New Board. All awards under the MIP will be dilutive of all other equity interests in Reorganized Holdings. |
| **Employment Arrangements:** | All Employment Arrangements will be treated as executory contracts under the Plan and, on the Effective Date, will be |

| | |
|---|---|
| | assumed by the Debtors, as may be amended, pursuant to sections 365 and 1123 of the Bankruptcy Code. |
| | Any Interests, stock options, restricted stock, restricted stock units, phantom stock, tracking stock, and other stock-based or equity-based awards granted prior to the Effective Date to a current or former employee, officer, director, or contractor under an Employment Arrangement or otherwise, and any stock-based or equity-based plans, will be deemed cancelled on the Effective Date.  For the avoidance of doubt, any provisions of an Employment Arrangement that is assumed under the Plan relating to an award or potential award of Interests, stock options, restricted stock units or other stock-based awards in the Debtors shall not be enforceable. |
| | The New Board shall, promptly following the Effective Date, implement an amended severance program for certain employees. The amended severance program shall be market-based and shall be determined by the New Board (in consultation with the Reorganized Debtors' chief executive officer). |
| **Cancellation of Notes, Instruments, Certificates, and Other Documents:** | On the Effective Date, except to the extent otherwise provided in this Term Sheet, the RSA or the Plan, all notes, instruments, or certificates evidencing Claims against the Company and Interests in Holdings will be cancelled and obligations of the Company thereunder will be discharged and of no further force or effect, except for the purpose of allowing the applicable agents and trustees to receive distributions from the Debtors under the Plan and to make further distributions to the applicable holders on account of their Claims. |
| **Vesting of Assets:** | On the Effective Date, pursuant to sections 1141(b)–(c) of the Bankruptcy Code, all assets of the Company will vest in the Reorganized Debtors free and clear of all liens, Claims, and encumbrances. |
| **Survival of Indemnification Obligations and D&O Insurance:** | No obligations of the Company pursuant to corporate charters, bylaws, limited liability company agreements, or other organizational documents to indemnify current and former officers, directors, agents, or employees (the "**Indemnified Individuals**") with respect to all present and future actions, suits, and proceedings against the Company or such directors, officers, agents, or employees, based upon any act or omission for or on behalf of the Company, will be discharged or impaired by confirmation of the Plan; *provided, however*, that the Reorganized Debtors shall not assume any obligation to indemnify any of the forgoing parties with respect to any act or omission for or on |

| | |
|---|---|
| | behalf of the Company directly and primarily arising out of any act or omission determined by a Final Order to constitute actual fraud, willful misconduct, or gross negligence. All such obligations will be deemed and treated as executory contracts to be assumed by the Company under the Plan and will continue as obligations of the Reorganized Debtors. Any Claim based on such obligations of the Company will be an Allowed Claim; *provided*, that no cure payment will be required in connection with such assumption.<br><br>Without limiting an indemnified party's rights to indemnity, an indemnified party and the Reorganized Debtors will cooperate to pursue and make all claims under all applicable insurance policies.<br><br>In addition, after the Effective Date, the Reorganized Debtors will not terminate or otherwise reduce the coverage under any directors' and officers' insurance policy (including any "tail policy") in effect or purchased as of the Petition Date, and all members, managers, directors, and officers of the Company who served in such capacity at any time prior to the Effective Date and all other individuals covered by such insurance policies will be entitled to the full benefits of each such policy for the full term of such policy, regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Effective Date.<br><br>For the avoidance of doubt, the Reorganized Debtors shall not assume any obligations to indemnify the Supporting Sponsors or any other holders of Existing Holdings Interests, with respect to all present and future actions, suits, and proceedings against the Company or such parties, based upon any act or omission for or on behalf of the Company; *provided*, that the foregoing clause shall not limit indemnification of any current or former director or officer of the Company by virtue of his or her affiliation with any of the Supporting Sponsors or by such Person's ownership of Existing Holdings Interests. |
| **Conditions to Effectiveness:** | The occurrence of the Effective Date will be subject to the satisfaction or waiver of the following conditions to confirmation of the Plan and effectiveness of the Plan, as applicable:<br><br>(i)    each of the Backstop Agreements shall remain in full force and effect and shall not have been terminated;<br><br>(ii)    the Definitive Documents shall have been executed and/or effectuated, and shall contain terms and conditions |

consistent in all material respects with this Term Sheet and the RSA, and any conditions precedent related thereto or contained therein shall have been satisfied prior to or contemporaneously with the occurrence of the Effective Date or otherwise waived by the party whose consent is required thereunder;

(iii) the Term Loan DIP Facility, the ABL DIP Facility and the RSA shall remain in full force and effect and shall not have been terminated;

(iv) there shall not have been instituted or threatened or be pending any action, proceeding, application, claim, counterclaim, or investigation (whether formal or informal) by any Governmental Entity (a) making illegal, enjoining, or otherwise prohibiting the consummation of the restructuring transaction contemplated herein and in the Definitive Documents or (b) imposing a material award, claim, injunction, fine or penalty that both (1) is not dischargeable, as determined by the Bankruptcy Court in the Confirmation Order, and (2) has a material adverse effect on the financial condition or operations of the Reorganized Debtors, taken as whole;

(v) all conditions precedent to the effectiveness of the Exit ABL Credit Agreement shall have been satisfied or duly waived by the party whose consent is required thereunder, and the Exit ABL Credit Agreement shall be in full force and effect;

(vi) all conditions precedent to the effectiveness of each of the Exit Notes Indenture and HoldCo Notes Indenture shall have been satisfied or duly waived, and each of the Exit Notes Indenture and the HoldCo Notes Indenture shall be in full force and effect;

(vii) all "Closing Conditions" in the Plan shall have been satisfied or waived by the party whose consent is required thereunder, or satisfied contemporaneously with the occurrence of the Effective Date;

(viii) the Bankruptcy Court shall have entered the Confirmation Order and such order shall not have been amended or modified (other than with the consent of the Company and the Required Supporting Noteholders), dismissed, or vacated or be subject to a stay;

| | |
|---|---|
| | (ix) all waiting periods imposed by any Antitrust Authority with respect to the transactions contemplated by the Plan and the Backstop Agreements shall have terminated or expired and all authorizations, approvals, consents or clearances under the Antitrust Laws in connection with the transactions contemplated by the Plan and the Backstop Agreements shall have been obtained; |
| | (x) the (a) Equity Rights Offering shall have been conducted in accordance with the Plan, the Equity Rights Offering Procedures, and the RO Backstop Agreement and (b) Debt Rights Offering shall have been conducted in accordance with the Plan, the Debt Rights Offering Procedures, and the RO Backstop Agreement; |
| | (xi) the New Corporate Governance Documents shall be in full force and effect; and |
| | (xii) (a) the Equity Put Option Premium shall have been paid to the RO Backstop Parties in New Common Shares and the Debt Put Option Premium shall have been paid to the RO Backstop Parties in New Common Shares, (b) all amounts payable to the Exit Notes Backstop Parties in connection with the Exit Notes Backstop (as to be agreed by the Debtors and the Exit Notes Backstop Parties) shall have been paid in full by the Debtors, and (c) all accrued and unpaid Restructuring Expenses shall have been paid in full by the Debtors. |
| | The conditions to effectiveness may be waived, in whole or in part, in writing (which may be via email) by the Debtors and the Required Supporting Noteholders and, solely to the extent such party is directly and adversely impacted by such waiver, the Backstop Parties and the Supporting Sponsors, which waiver shall be effective without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan. |
| **Releases by the Debtors:** | As of the Effective Date, except for the rights and remedies that remain in effect from and after the Effective Date to enforce the Plan and the obligations set forth in the Definitive Documents and the documents in the Plan Supplement, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by the Debtors, the Reorganized Debtors, and the Estates, in each case on behalf of themselves and |

their respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all Claims and Causes of Action (including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirements or otherwise that the Debtors, the Reorganized Debtors, the Estates, or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Restructuring, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Plan, the RSA, the Definitive Documents and the documents in the Plan Supplement or related agreements, instruments, or other documents relating thereto, the solicitation of votes with respect to the Plan, and any contract, instrument, agreement or other document entered into in connection with any of the foregoing, or any preference, fraudulent transfer or other avoidance claim related to the Debtors arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than Claims or Causes of Action arising out of or related to any act or omission of a Released Party that constitutes intentional fraud or willful misconduct as determined by a Final Order. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any Claim or obligation arising under the Plan.

| Releases by Third Parties: | As of the Effective Date, except for the rights and remedies that remain in effect from and after the Effective Date to enforce the Plan and the obligations contemplated by the Definitive Documents, and the documents in the Plan Supplement or as otherwise provided in any order of the Bankruptcy Court, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Releasing Parties, from any and all Claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort, or otherwise by statute, violations of federal or state securities laws or otherwise, that such holders or their estates, affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, or their Estates, the Chapter 11 Cases, the Restructuring, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party, the restructuring of any Claims or Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Plan, the RSA, the Definitive Documents and the documents in the Plan Supplement, or related agreements, instruments, or other documents, relating thereto, or the solicitation of votes with respect to the Plan, and any contract, instrument, agreement or other document entered into in connection with any of the foregoing, or any preference, fraudulent transfer or other avoidance claim related to the Debtors arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, in all cases based upon any act or omission, transaction, agreement, event, or other occurrences taking place on or before the Effective Date, other than Claims or Causes of Action arising out of or related to any act or omission of a Released Party that constitutes intentional fraud or willful misconduct as determined by a Final |
|---|---|

|  | Order. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any Claim or obligation arising under the Plan.<br><br>The Debtors shall use best efforts to obtain approval of the third party releases set forth herein. |
|---|---|
| **Exculpation:** | To the fullest extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party will be released and exculpated from, any Claim or Cause of Action in connection with or arising out of the administration of the Chapter 11 Cases; the negotiation and pursuit of the ABL DIP Facility, the Priming Notes DIP Roll-Up, the Term Loan DIP Facility, the Exit ABL Facility, the Exit Notes, the HoldCo Notes, the Equity Rights Offering, the Debt Rights Offering, the MIP, the Disclosure Statement, the Backstop Agreements, the RSA, the Restructuring, and the Plan (including the documents in the Plan Supplement) and the other Definitive Documents, or the solicitation of votes for, or confirmation of, the Plan; the funding of the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; the issuance of securities under or in connection with the Plan; the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors; or the transactions in furtherance of any of the foregoing; other than Claims or Causes of Action arising out of or related to any act or omission of an Exculpated Party that constitutes intentional fraud or willful misconduct as determined by a Final Order, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of securities pursuant to the Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of securities thereunder. The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability. |

| | The Debtors shall use best efforts to obtain approval of the exculpation set forth herein. |
|---|---|
| **Discharge and Injunction:** | The Plan will contain customary discharge and injunction provisions acceptable to the Company and the Required Supporting Noteholders. |
| **Tax Structure:** | To the extent practicable, the Restructuring contemplated by this Term Sheet (including, but not limited to, the issuance and treatment of the Exit Notes and the HoldCo Notes) will be structured so as to obtain the most beneficial tax structure for the Supporting Noteholders and, to the extent not inconsistent therewith, the Company, as determined by the Company and the Required Supporting Noteholders.<br><br>On the Petition Date or within three (3) calendar days thereafter (or, if such third day is not a Business Day, the first succeeding Business Day thereafter), the Bankruptcy Court shall have entered (i) an interim order (the "**Interim Record Date Order**"), and within sixty (60) days of the Petition Date, the Bankruptcy Court shall have entered a final order (the "**Final Record Date Order**") (each of which shall be acceptable to the Required Supporting Noteholders), which establishes a record date with respect to the impact of claims of the Company and, in the case of the Final Record Date Order, provides for procedures with respect to such claims, and (ii) an interim order (the "**Interim NOL Order**"), and within sixty (60) days of the Petition Date, the Bankruptcy Court shall have entered a final order (the "**Final NOL Order**" and, together with the Interim NOL Order, the "**NOL Orders**"), which establishes notice procedures and restrictions (A) on and preventing (without complying with any applicable notice or Bankruptcy Court approval requirements under the NOL Orders) direct or indirect trading with respect to stock of Holdings (within the meaning of IRC Section 382 and applicable Treasury regulations and IRS guidance with respect thereto), (B) on and preventing (without complying with any applicable notice or Bankruptcy Court approval requirements under the NOL Orders) the claiming of a worthlessness deduction directly or indirectly with respect to the stock of Holdings under IRC Section 165 with respect to any taxable year ending prior to the Effective Date, and (C) except as provided in the foregoing clauses (A) and (B), which are otherwise acceptable to the Required Supporting Noteholders and the Supporting Sponsors. The Confirmation Order for the Plan shall permanently enjoin the claiming of a worthlessness deduction directly or indirectly with respect to the stock of |

| | |
|---|---|
| | Holdings under IRC Section 165 with respect to any taxable year ending prior to the Effective Date. |
| **Retention of Jurisdiction:** | To the maximum extent allowable, the Plan will provide for a broad retention of jurisdiction by the Bankruptcy Court for (i) resolution of Claims, (ii) allowance of compensation and expenses for pre-Effective Date services, (iii) resolution of motions, adversary proceedings, or other contested matters, (iv) entry of such orders as necessary to implement or consummate the Plan and any related documents or agreements, and (v) other purposes. |
| **Restructuring Transactions:** | On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as applicable, may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with this Plan. |
| **Securities Exemption:** | The issuance and distribution under the Plan of the New Common Shares, the Exit Notes, the HoldCo Notes, the Rights Offering Shares, the Direct Allocation Shares, the Equity Put Option Premium Shares and the Debt Put Option Premium Shares will be exempt from registration under the Securities Act under section 1145(a) of the Bankruptcy Code and/or Section 4(a)(2) of the Securities Act. |

|  |
|:---:|
| **DEFINITIONS** |

| | |
|---|---|
| **"10.5% Noteholder"** | A holder of 10.5% Notes or 10.5% Notes Claims, as applicable. |
| **"2024 Adjusted EBITDA"** | The Reorganized Debtors' EBITDA for fiscal year 2024 as calculated in the Company's ordinary course of business and consistent with past practice following the Effective Date. |
| **"ABL DIP Claim"** | Any Claim resulting from the issuance of the ABL DIP Facility. |
| **"Ad Hoc Noteholder Group"** | The holders of Priming Notes and 10.5% Notes represented by Evercore and Paul Hastings LLP. |
| **"Ad Hoc Noteholder Group Advisors"** | Evercore, Paul Hastings LLP, Stroock & Stroock & Lavan LLP and Young Conaway Stargatt & Taylor, LLP and any other advisor retained by the Ad Hoc Noteholder Group from time to time with the Company's reasonable consent. |

| | |
|---|---|
| **"Administrative Expense Claim"** | Any right to payment constituting a cost or expense of administration incurred during the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries, or commissions for services and payments for goods and other services and leased premises), (ii) Fee Claims, and (iii) Restructuring Expenses. |
| **"Allowed"** | With reference to any Claim or Interest against a Debtor, (a)(i) that is timely filed by the Bar Date or (ii) as to which there exists no requirement for the holder of a Claim to file such Claim under the Plan, the Bankruptcy Code, the Bankruptcy Rules or a Final Order, (b)(i) that is listed in the Schedules as not contingent, not unliquidated, and not disputed and (ii) for which no contrary proof of claim has been timely filed, or (c) allowed under the Plan or by a Final Order. With respect to any Claim described in clause (a) above, such Claim will be considered allowed only if, and to the extent that, (A) no objection to the allowance of such Claim has been asserted, or may be asserted, on or before the time period set forth in the Plan, and no request for estimation or other challenge, including, without limitation, pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed and not withdrawn within the applicable period fixed by the Plan or applicable law, (B) an objection to such Claim is asserted and such Claim is subsequently allowed pursuant to a Final Order, (C) such Claim is settled pursuant to an order of the Bankruptcy Court, or (D) such Claim is allowed pursuant to the Plan or any agreements related thereto and such allowance is approved and authorized by the Bankruptcy Court; *provided, however*, that notwithstanding the foregoing, the Reorganized Debtors will retain all claims and defenses with respect to allowed Claims that are reinstated or otherwise unimpaired pursuant to the Plan. |
| **"Antitrust Authorities"** | The United States Federal Trade Commission, the Antitrust Division of the United States Department of Justice, the attorneys general of the several states of the United States, and any other Governmental Entity having jurisdiction pursuant to the Antitrust Laws. |
| **"Antitrust Laws"** | The Sherman Act, the Clayton Act, the HSR Act, the Federal Trade Commission Act, and any other Law governing agreements in restraint of trade, monopolization, pre-merger notification, the |

| | |
|---|---|
| | lessening of competition through merger or acquisition or anti-competitive conduct, and any similar foreign Laws. |
| **"Backstop Agreements"** | Collectively, the Exit Notes Backstop Agreement and the RO Backstop Agreement. |
| **"Backstop Order"** | One or more orders of the Bankruptcy Court, which shall be acceptable to the Debtors and the applicable Backstop Parties, approving the Debtors' entry into and performance under the Backstop Agreements, which are not subject to a stay. |
| **"Backstop Parties"** | Collectively, the Exit Notes Backstop Parties and the RO Backstop Parties. |
| **"Bar Date"** | The dates by which Proofs of Claim must be filed with respect to Claims against the Debtors, as ordered by the Bankruptcy Court pursuant to a bar date order or other applicable order, or pursuant to the Plan. |
| **"Business Day"** | Any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, NY are authorized or required by law or executive order to close. |
| **"Cash"** | Legal tender of the United States of America. |
| **"Cause of Action"** | Any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including under any state or federal securities laws). For the avoidance of doubt, Cause of Action also includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (ii) the right to object to Claims or Interests, (iii) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, (iv) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (v) any state law fraudulent transfer claim. |

| **"Chapter 11 Cases"** | The jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court. |
| **"Claim"** | A "claim," as defined in section 101(5) of the Bankruptcy Code, against any Debtor, including, without limitation, any claims arising under the Term Loan DIP Facility. |
| **"Confidentiality Agreement"** | An executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with the Restructuring. |
| **"Confirmation Date"** | The date on which the Bankruptcy Court enters the Confirmation Order. |
| **"Confirmation Order"** | The order of the Bankruptcy Court, which shall be acceptable to the Debtors and the Required Supporting Noteholders, and, solely in respect of provisions directly and adversely affecting them, the Supporting Sponsors, confirming the Plan in the Chapter 11 Cases, which is not subject to a stay. |
| **"Debt Rights Offering Documents"** | Collectively, the RO Backstop Agreement and the Debt Rights Offering Procedures. |
| **"Debt Rights Offering Procedures"** | The procedures for eligible 10.5% Noteholders to participate in the Debt Rights Offering, which shall be acceptable to the Debtors and the Required Supporting Noteholders. |
| **"DIP Agent"** | The agent under the DIP Credit Agreement to be designated by the DIP Lenders. |
| **"DIP Claim"** | Any ABL DIP Claim, Priming Notes DIP Claim, or Term Loan DIP Claim. |
| **"DIP Credit Agreement"** | The credit agreement governing the terms of the Term Loan DIP Facility. |
| **"DIP Lenders"** | The lenders party to the DIP Credit Agreement. |
| **"DIP Term Sheet"** | The term sheet setting forth the terms of the Term Loan DIP Facility, incorporated herein by reference and attached to the RSA as **Exhibit B**. |
| **"DIP Order"** | The Interim DIP Order or the Final DIP Order, as applicable. |
| **"Disclosure Statement"** | The disclosure statement in respect of the Plan, including all exhibits and schedules thereto, in each case, reasonably |

|  | acceptable to the Debtors and the Required Supporting Noteholders, and, solely in respect of provisions directly and adversely affecting them, the Supporting Sponsors, as approved or ratified by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code. |
|---|---|
| **"Disclosure Statement Order"** | The order of the Bankruptcy Court, which shall be reasonably acceptable to the Debtors, the Required Supporting Noteholders, and, solely in respect of provisions directly and adversely affecting them, the Supporting Sponsors, approving the Disclosure Statement in the Chapter 11 Cases, which is not subject to a stay. |
| **"Effective Date"** | The date upon which all conditions to the effectiveness of the Plan have been satisfied or waived in accordance with the terms thereof and the Plan becomes effective. |
| **"Employment Arrangements"** | All employment and severance arrangements, employment agreements, plans, programs, and policies, and all compensation and benefits plans, policies, and programs of the Debtors applicable to their respective employees, retirees, consultants, contractors, and non-employee directors, including all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans (including equity and equity-based plans), welfare benefits plans, and life and accidental death and dismemberment insurance plans. |
| **"Entity"** | An "entity," as defined in section 101(15) of the Bankruptcy Code. |
| **"Equity Rights Offering Documents"** | Collectively, the RO Backstop Agreement and the Equity Rights Offering Procedures. |
| **"Equity Rights Offering Procedures"** | The procedures for eligible 10.5% Noteholders to participate in the Equity Rights Offering, which shall be acceptable to the Debtors and the Required Supporting Noteholders. |
| **"Estate(s)"** | Individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code. |
| **"Exchange Act"** | The Securities Exchange Act of 1934. |
| **"Exculpated Parties"** | Collectively, (i) the Debtors, (ii) the Reorganized Debtors, (iii) any statutory committee appointed in the Chapter 11 Cases, (iv) the Supporting Noteholders, (v) the Backstop Parties, (vi) the agents and lenders under the Exit ABL Facility, (vii) the agents and lenders under the ABL Credit Agreement, (viii) the |

| | |
|---|---|
| | Supporting Sponsors, (ix) the agents and lenders under the Term Loan DIP Facility and ABL DIP Facility, (x) the holders of the Exit Notes and HoldCo Notes and any agents or trustees thereunder and (xi) with respect to each of the foregoing Persons in clauses (i) through (x), such Persons' predecessors, successors, assigns, subsidiaries, affiliates, current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, affiliated investment funds or investment vehicles, managed accounts or funds, and such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such. |
| **"Exit ABL Credit Agreement"** | Either the ABL Credit Agreement, as amended and restated on the Effective Date or a new credit agreement in respect of a secured asset-based revolving loan facility to be entered into on the Effective Date, in each case, acceptable to the Debtors and the Required Supporting Noteholders. |
| **"Exit Notes Backstop Agreement"** | The agreement setting forth the commitment of the Exit Notes Backstop Parties to backstop the Exit Notes, on the terms and subject to the conditions set forth therein and acceptable to the Debtors, the Required Supporting Noteholders and the Exit Notes Backstop Parties. |
| **"Exit Notes Backstop Parties"** | The members of the Ad Hoc Noteholder Group that are signatories to the Exit Notes Backstop Agreement and that provide commitments in respect of the Exit Notes Backstop. |
| **"Fee Claim"** | A Claim for professional services rendered or costs incurred on or after the Petition Date through the Effective Date by Professional Persons. |
| **"Fee Escrow Account"** | An interest-bearing account in an amount equal to the total estimated amount of Fee Claims and funded by the Debtors on or before the Effective Date. |
| **"Final DIP Order"** | The Final Order of the Bankruptcy Court, which shall be acceptable to the Debtors, the DIP Lenders and the DIP Agent, authorizing, among other things, the Debtors' entry into and borrowing under the Term Loan DIP Facility and granting certain rights, protections, and liens to and for the benefit of the DIP Lenders. |

| | |
|---|---|
| **"Final Order"** | An order, ruling, or judgment of the Bankruptcy Court (or other court of competent jurisdiction) that (i) is in full force and effect, (ii) is not stayed, and (iii) is no longer subject to review, reversal, vacatur, modification, or amendment, whether by appeal or by writ of certiorari; *provided, however*, that the possibility that a motion under Rules 50 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in such other court of competent jurisdiction) may be filed relating to such order, ruling, or judgment shall not cause such order, ruling, or judgment not to be a Final Order. |
| **"Governmental Entity"** | Any U.S. or non-U.S. international, regional, federal, state, municipal or local governmental, judicial, administrative, legislative or regulatory authority, entity, instrumentality, agency, department, commission, court or tribunal of competent jurisdiction (including any branch, department or official thereof). |
| **"HSR Act"** | The Hart-Scott-Rodino Antitrust Improvements Act of 1976. |
| **"Impaired"** | With respect to a Claim, Interest, or a class of Claims or Interests, "impaired" within the meaning of sections 1123(a)(3) and 1124 of the Bankruptcy Code. |
| **"Intercompany Claim"** | Any Claim against a Debtor held by another Debtor. |
| **"Intercompany Interest"** | An Interest in a Debtor held by another Debtor (and excluding, for the avoidance of doubt, any Existing Holdings Interests or Other Holdings Interests). |
| **"Interest"** | Any equity interest (as defined in section 101(16) of the Bankruptcy Code) in the Company, including all ordinary shares, units, common stock, preferred stock, membership interest, partnership interest or other instrument, evidencing any fixed or contingent ownership interest in the Company, whether or not transferable, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest in the Company, that existed immediately before the Effective Date, and including any equity interest issued to the Company's current or former employees and non-employee directors various forms of long-term incentive compensation including stock options, stock appreciation rights, restricted stock, restricted stock units, performance shares/units, incentive awards, Cash awards, and other stock-based awards. |
| **"Interim Compensation Procedures Order"** | An order of the Bankruptcy Court establishing procedures for compensation of Professional Persons prior to the Effective Date. |

| "Interim DIP Order" | The interim order of the Bankruptcy Court, which shall be acceptable to the Debtors, the DIP Lenders and the DIP Agent, authorizing, among other things, the Debtors' entry into and borrowing under the Term Loan DIP Facility and granting certain rights, protections, and liens to and for the benefit of the DIP Lenders. |
|---|---|
| "Lien" | Any "lien," as defined in section 101(37) of the Bankruptcy Code. |
| "New Common Shares" | Shares of common stock or other common equity interests of Reorganized Holdings. |
| "New Corporate Governance Documents" | The organizational and governance documents for the Reorganized Debtors and its subsidiaries and affiliates, including, without limitation, certificates of incorporation, certificates of formation, bylaws, limited liability company agreements, shareholder agreements, operating agreements, registration rights agreements, or similar organization or formation documents, as applicable, in each case acceptable to the Debtors and the Required Supporting Noteholders. |
| "Other Priority Claim" | Any Claim other than an Administrative Expense Claim or a Priority Tax Claim that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code. |
| "Other Secured Claim" | A Secured Claim other than a Priority Tax Claim, a DIP Claim, or a 10.5% Notes Secured Claim. |
| "Original NDA Date" | The date on which each of the members of the Ad Hoc Noteholder Group entered into a Confidentiality Agreement with any TPC Party, which is November 29, 2021. |
| "Person" | Any individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code), or other Entity. |
| "Plan Supplement" | A supplement or supplements to the Plan containing certain documents and forms of documents, schedules, and exhibits, in each case subject to the terms and provisions of the RSA (including any consent rights in favor of the Required Supporting Noteholders) relevant to the implementation of the Plan, to be filed with the Bankruptcy Court, as amended, modified or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the RSA (including any consent rights in |

| | favor of the Required Supporting Noteholders and/or Supporting Sponsors), which shall include, but not be limited to (i) the New Corporate Governance Documents, (ii) the number and slate of directors to be appointed to the New Board to the extent known and determined, (iii) with respect to the members of the New Board, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code, (iv) a form of the Management Incentive Plan, (v) forms of the Exit ABL documents, (vi) forms of the Exit Notes documents and HoldCo Notes documents, (vii) a schedule of retained Causes of Action, and (viii) the Schedule of Rejected Contracts. |
|---|---|
| **"Prepetition Senior Priority 2022 Bridge Notes"** | Those certain 10.875% senior secured notes due 2024 issued on March 2, 2022 and March 11, 2022, collectively, in an aggregate principal amount equal to approximately $52.53 million. |
| **"Priming Notes DIP Claim"** | Any Claim resulting from the Priming Notes DIP Roll-Up. |
| **"Priority Tax Claim"** | Any Secured Claim or unsecured Claim of a governmental unit of the kind entitled to priority of payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code. |
| **"Pro Rata"** | The proportion that an Allowed Claim or Interest in a particular class bears to the aggregate amount of Allowed Claims or Interests in that class. |
| **"Professional Person"** | Any Person retained by an order of the Bankruptcy Court pursuant to sections 327, 328, 329, 330, 331, 503(b), and/or 1103 of the Bankruptcy Code in the Chapter 11 Cases. |
| **"Record Date"** | The "Record Date" (if any) for participation in (A) the Equity Rights Offering as set forth and contemplated under the Equity Rights Offering Procedures and (B) the Debt Rights Offering as set forth and contemplated under the Debt Rights Offering Procedures. |
| **"Released Parties"** | Collectively, (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Supporting Noteholders, (iv) SK Second Reserve, L.P., a Delaware limited partnership; (v) the agents and lenders under the Exit ABL Facility, (vi) the holders of the Exit Notes and HoldCo Notes and any agents or trustees thereunder, (vii) the agents and lenders under the ABL DIP Facility, (viii) the agents and lenders under the Term Loan DIP Facility, (ix) the Backstop Parties, (x) the Supporting Sponsors, (xi) the agents and lenders under the ABL Credit Agreement, (xii) the indenture trustees and collateral trustees in respect of the Priming Notes and the 10.5% Notes, and (xiii) with respect to each of the foregoing Persons (i)–(xii), each |

| | of their affiliates, predecessors, successors, assigns, subsidiaries, current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, employees of affiliates who worked on matters related to the Debtors or the Chapter 11 Cases, and other professionals, affiliated investment funds or investment vehicles, managed accounts or funds, and such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such; *provided,* that in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation. |
|---|---|
| **"Releasing Parties"** | Collectively, (i) the holders of all Claims that vote to accept the Plan, (ii) the holders of all Claims whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan, (iii) the holders of all Claims or Interests that vote, or are deemed, to reject the Plan but do not opt out of granting the releases set forth herein, (iv) the holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth herein but did not opt out, and (v) the Released Parties. |
| **"Reorganized Debtors"** | The Debtors as reorganized on the Effective Date pursuant to and in accordance with the Restructuring Transactions and the Plan. |
| **"Reorganized Holdings"** | Holdings as reorganized on the Effective Date pursuant to and under the Restructuring Transactions and the Plan, including any successor thereto or any entity established to acquire, directly or indirectly, all or a portion of the assets of Holdings and/or its direct and indirect subsidiaries. |
| **"Required Supporting Noteholders"** | As of the relevant date, each of the following: (i) Supporting Priming Notes Noteholders that collectively own or control more than 50% in aggregate principal amount of the Priming Notes (or, as applicable, the Claims arising therefrom) then owned or controlled by all the Supporting Noteholders in the aggregate as of such date; and (ii) Supporting 10.5% Noteholders that collectively own or control more than 50% in aggregate principal amount of the 10.5% Notes (or, as applicable, the Claims arising therefrom) then owned or controlled by all the Supporting Noteholders in the aggregate as of such date. |

| | |
|---|---|
| **"Restructuring Expenses"** | All reasonable and documented fees, costs and out-of-pocket expenses of the Ad Hoc Noteholder Group Advisors in each case, in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and/or enforcement of the RSA and/or any of the other Definitive Documents, and/or the transactions contemplated hereby or thereby, and/or any amendments, waivers, consents, supplements or other modifications to any of the foregoing and the Chapter 11 Cases, in each case, to the extent applicable, pursuant to any engagement letters or fee reimbursement letters entered into between the applicable Debtors, on the one hand, and each Ad Hoc Noteholder Group Advisor, on the other hand. |
| **"Restructuring Transactions"** | One or more transactions pursuant to section 1123(a)(5)(D) of the Bankruptcy Code to occur on the Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including (a) the consummation of the transactions provided for under or contemplated by the RSA; (b) the execution and delivery of appropriate agreements or other documents containing terms that are consistent with or reasonably necessary to implement the terms of the Plan and the RSA and that satisfy the requirements of applicable law; (c) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan and the RSA; and (d) all other actions that the Debtors (with the consent of the Required Supporting Noteholders) or the Reorganized Debtors (at the direction of the New Board), as applicable, determine are necessary or appropriate. |
| **"RO Backstop Agreement"** | One or more agreements setting forth the commitment of the RO Backstop Parties to (a)(i) consummate the Equity Direct Allocation, (ii) backstop the Equity Rights Offering and (iii) purchase the Rights Offering Shares, and (b)(i) consummate the Debt Direct Allocation, (ii) backstop the Debt Rights Offering and (iii) purchase the Rights Offering HoldCo Notes, in each case on the terms and subject to the conditions set forth therein, which agreement shall be acceptable to the Debtors, the Required Supporting Noteholders and the RO Backstop Parties. |
| **"RO Backstop Parties"** | The members of the Ad Hoc Noteholder Group that are signatories to the RO Backstop Agreement and that provide each of the commitments set forth therein. |

| | |
|---|---|
| **"Schedule of Rejected Contracts"** | The schedule of executory contracts and unexpired leases to be rejected by the Debtors pursuant to the Plan, if any, as the same may be amended, modified, or supplemented from time to time. |
| **"Schedules"** | The schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code. |
| **"Secured Claim"** | A Claim (i) secured by a lien on collateral to the extent of the value of such collateral as (a) set forth in the Plan, (b) agreed to by the holder of such Claim and the Debtors, or (c) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (ii) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code. |
| **"Securities Act"** | Securities Act of 1933, as amended, 15 U.S.C. §§ 77a-77aa, and any rules and regulations promulgated thereby. |
| **"Solicitation Materials"** | Collectively, the Disclosure Statement and the related solicitation materials, which shall be reasonably acceptable to the Debtors and the Required Supporting Noteholders, and, solely in respect of provisions directly and adversely affecting them, the Supporting Sponsors. |
| **"Supporting Noteholders"** | The holders of Priming Notes and/or 10.5% Notes that are signatories to the RSA, and any subsequent holder of Priming Notes and/or 10.5% Notes that becomes party thereto in accordance with the terms of the RSA. |
| **"Term Loan DIP Claim"** | Any Claim resulting from the issuance of the Term Loan DIP Facility that is not a Priming Notes DIP Claim. |
| **"Unimpaired"** | With respect to a Claim, Interest, or a class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(3) and 1124 of the Bankruptcy Code. |
| **"Voting Deadline"** | The date and time to be set by the Bankruptcy Court as the deadline for holders of Impaired Claims to vote to accept or reject the Plan. |

## **Exhibit B**

**DIP Term Sheet**

[Attached.]

## TPC Group Inc.
## Term Loan DIP Facility Term Sheet

This term sheet (together with all annexes, exhibits and schedules attached hereto, this "**DIP Term Sheet**") sets forth certain material terms of the proposed Term Loan DIP Facility (as defined below). Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Restructuring Support Agreement, dated as of May 31, 2022 (together with all annexes, exhibits and schedules attached thereto, including the Restructuring Term Sheet (as defined therein) attached thereto, in each case, as amended supplemented or modified in accordance with its terms, the "**RSA**"), to which this DIP Term Sheet is attached.

This DIP Term Sheet does not address all terms that would be required in connection with the Term Loan DIP Facility or that will be set forth in the Term DIP Documents (as defined below), which are subject to negotiation and further subject to execution of definitive documents, pleadings and proposed forms of orders that are in form and substance acceptable to the Ad Hoc Noteholder Group (as defined below), in its discretion, and the Borrower.

THIS DIP TERM SHEET DOES NOT CONSTITUTE (NOR WILL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN, IT BEING UNDERSTOOD THAT SUCH AN OFFER, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE LAWS.

| | |
|---|---|
| **Borrower** | TPC Group Inc., a Delaware corporation (the "**Borrower**"), in its capacity as a debtor and debtor-in-possession in the case (the "**Borrower's Case**") to be filed under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), which shall be jointly administered with the Guarantors' Cases (as defined below). |
| **Guarantors** | TPC Holdings, Inc., a Delaware corporation ("**Holdings**"), in its capacity as a debtor and debtor-in-possession, and each of the Borrower's direct and indirect subsidiaries (other than the Pipeline Subsidiaries (as defined below)), each in their respective capacities as debtors and debtors-in-possession (collectively with Holdings, the "**Loan Guarantors**" and, together with the Borrower, the "**Loan Parties**") in the cases to be filed under the Bankruptcy Code with the Bankruptcy Court contemporaneously and jointly administered with the Borrower's Case (the "**Guarantors' Cases**" and, collectively with the Borrower's Case, the "**Chapter 11 Cases**"). The date of commencement of the Chapter 11 Cases is referred to herein as the "**Petition Date**". |
| | TPC Pipeline Holding Company LLC and TPC Pipeline Company LLC (collectively, the "**Pipeline Subsidiaries**") shall not guarantee the Term Loan DIP Facility or any ABL DIP Facility (as defined below), and shall be unrestricted subsidiaries on terms substantially consistent with the Senior Priority Notes Indenture; *provided*, that no investments may be made in the Pipeline Subsidiaries, subject to a basket acceptable to the Required DIP Lenders (as defined below) (and as expressly set forth in an Approved Budget (as defined below)). |
| **Administrative** | The administrative agent and the collateral agent for the Term DIP Lenders (as |

| | |
|---|---|
| **Agent and Collateral Agent** | defined below) with respect to the Term Loan DIP Facility (in such capacities, the "**Term DIP Agent**") shall be a financial institution selected by, and qualified to perform the duties customarily associated with such roles as determined by, the Required DIP Lenders, which shall be reasonably acceptable to the Borrower; _provided_, that GLAS USA LLC, as administrative agent, and GLAS Americas LLC, as collateral agent, shall be deemed reasonably acceptable. |
| **Term DIP Lenders** | One or more beneficial holders of Senior Priority Notes (as defined below) that are members of the _ad hoc_ group of holders of Senior Priority Notes represented by Paul Hastings LLP (the "**Ad Hoc Noteholder Group**") and/or one or more of their respective designated affiliates and/or related funds or accounts (each a "**Term DIP Lender**", and collectively, the "**Term DIP Lenders**"). |
| **Prepetition ABL Facility** | That certain Amended and Restated Credit Agreement, dated as of August 2, 2019, as amended by Amendment No. 1 to Amended and Restated Credit Agreement, dated as of February 2, 2021 and as amended by Amendment No. 2 to Amended and Restated Credit Agreement, dated as of March 2, 2022, among the Borrower, the other borrowers party thereto, Holdings, Bank of America, N.A., as administrative agent and collateral agent (in such capacity, the "**ABL Representative**") and the lenders party thereto (the "**ABL Lenders**", and together with the ABL Representative and the other secured parties under the ABL Credit Agreement and related loan documents, the "**Prepetition ABL Secured Parties**") (as amended, restated, supplemented or otherwise modified from time to time, the "**ABL Credit Agreement**"; the obligations thereunder and under the related loan documents, the "**Prepetition ABL Secured Obligations**"; and the liens and security interests granted in connection therewith, the "**Prepetition ABL Liens**") (the "**Existing ABL Facility**"). |
| **Existing ABL / Notes Intercreditor Agreement** | That certain Intercreditor Agreement, dated as of August 2, 2019, among the ABL Representative, the Senior Priority Notes Trustee (as defined below) and the Junior Priority Notes Trustee (as defined below) (the "**Existing ABL/Notes Intercreditor Agreement**"). |
| **Existing Notes Intercreditor Agreement** | That certain Intercreditor Agreement, dated as of February 2, 2021, among U.S. Bank National Association, as Senior Priority Notes Trustee and the Junior Priority Notes Trustee (the "**Existing Notes Intercreditor Agreement**"). |
| **Senior Priority Notes** | The 10.875% senior secured notes due 2024 (the "**Senior Priority Notes**" and, the holders of such notes, the "**Senior Priority Noteholders**") issued pursuant to the Indenture, dated as of February 2, 2021 (as supplemented from time to time, the "**Senior Priority Notes Indenture**"; the liens and security interests granted in connection therewith, the "**Prepetition Senior Priority Notes Liens**"; and the obligations arising thereunder, the "**Prepetition Senior Priority Notes Secured Obligations**") among the Borrower, U.S. Bank National Association, as trustee and collateral agent (in such capacities, the "**Senior Priority Notes Trustee**", and together with the Senior Priority Noteholders, the "**Prepetition Senior Notes Secured Parties**"), and the other parties party thereto.<br><br>"**Prepetition Senior Priority 2022 Bridge Notes**" means those certain Senior Priority Notes issued on March 2, 2022 and March 11, 2022, collectively, in an |

| | |
|---|---|
| | aggregate principal amount equal to approximately $52.53 million. |
| **Junior Priority Notes** | The 10.50% senior secured notes due 2024 (the "**Junior Priority Notes**" and, the holders of such notes, the "**Junior Priority Noteholders**") issued pursuant to the Indenture, dated as of August 2, 2019 (as supplemented from time to time, the "**Junior Priority Notes Indenture**"; the liens and security interests granted in connection therewith, the "**Prepetition Junior Priority Notes Liens**", and together with the Prepetition Senior Priority Notes Liens, the "**Prepetition Notes Liens**"; the obligations arising thereunder, the "**Prepetition Junior Priority Notes Secured Obligations**") among the Borrower, U.S. Bank National Association, as trustee and collateral agent (in such capacities, the "**Junior Priority Notes Trustee**", and together with the Junior Priority Noteholders, the "**Prepetition Junior Notes Secured Parties**"; and together with the Prepetition Senior Notes Secured Parties the "**Prepetition Notes Secured Parties**"), and the other parties party thereto. |
| **ABL DIP Facility** | The Loan Parties shall obtain a senior secured super priority debtor-in-possession asset-based revolving credit facility, in an amount and upon economic terms, relative payment and collateral rank and priorities, and other terms and conditions acceptable to the Term DIP Lenders ("**ABL DIP Facility**") to be provided either by the existing ABL Lenders or one or more third party lenders acceptable to the Required DIP Lenders (the "**ABL DIP Lenders**"; the credit agreement in respect of such ABL DIP Facility, the "**ABL DIP Credit Agreement**", and together with all security, collateral and other documents, agreements, certificates and instruments related thereto, the "**ABL DIP Documents**"; the administrative and collateral agent under such ABL DIP Credit Agreement, which shall be reasonably acceptable to the ABL DIP Lenders and the Required DIP Lenders, the "**ABL DIP Agent**", and together with the ABL DIP Lenders, the "**ABL DIP Secured Parties**" and the liens securing the ABL DIP Facility, the "**ABL DIP Liens**"). The ABL DIP Documents shall be in form and substance, and upon terms and conditions, acceptable to the Term DIP Lenders. |
| | Proceeds of loans under an ABL DIP Facility (the "**ABL DIP Loans**") will be used to repay and refinance the Prepetition ABL Facility and for working capital and general corporate purposes during the Chapter 11 Cases, in each case, in an amount and upon terms and conditions acceptable to the Required DIP Lenders. |
| | The Term DIP Agent and the ABL DIP Agent will either amend the Existing ABL Notes Intercreditor Agreement or enter into a new intercreditor arrangement (the "**DIP Intercreditor Agreement**"), including through provisions set forth in the DIP Orders, on terms acceptable to the Term DIP Agent and the Required DIP Lenders (in their reasonable discretion). |
| | In the event the Loan Parties are unable to obtain the ABL DIP Facility, the Loan Parties shall obtain the consent of the ABL Representative and the requisite Prepetition ABL Secured Parties to the use of the Prepetition ABL Secured Parties' cash collateral, and the terms of such cash collateral use, including adequate protection to be granted to the Prepetition ABL Secured Parties (as set forth herein), shall be acceptable to the Required DIP Lenders ("**ABL Cash Collateral Usage**"). The definitive documents, pleadings and orders governing the foregoing shall be in form and substance, and upon terms and conditions, |

| | |
|---|---|
| | acceptable to the Required DIP Lenders. |
| **Permitted Liens** | (A)    Any valid liens ("**Permitted Prior Liens**") that are (1) in existence on the Petition Date, (2) are either perfected as of the Petition Date or perfected subsequent to the Petition Date under section 546(b) of the Bankruptcy Code, (3) senior in priority to the Senior Priority Notes Liens and the Junior Priority Notes Liens, as applicable, and (4) are permitted to be incurred under the Senior Priority Notes Indenture and the Junior Priority Notes Indenture; and <br><br> (B)    liens permitted to have seniority over the Term DIP Liens (as defined below) securing the Term Loan DIP Facility as specified in the DIP Credit Agreement (as determined by the Required DIP Lenders) (the liens referenced in (A) and (B) above, collectively, the "**Permitted Liens**"). |
| **Interim and Final DIP Orders** | The order approving the Term Loan DIP Facility and any ABL DIP Facility (or ABL Cash Collateral Usage) on an interim basis, which shall be in form and substance, and upon terms and conditions, acceptable in all respects to the Loan Parties, the Term DIP Agent and the Required DIP Lenders (as defined below) (the "**Interim DIP Order**"), shall authorize and approve, among other matters, (i) the Loan Parties' entry into the Term DIP Documents and the ABL DIP Documents, as applicable, (ii) the making of the Term DIP Loans and the ABL DIP Loans (or ABL Cash Collateral Usage), (iii) the granting of the super-priority claims and liens against the Loan Parties and their assets in accordance with the Term DIP Documents, the ABL DIP Documents (as applicable) and the DIP Intercreditor Agreement, respectively, with respect to the DIP Collateral (as defined below), (iv) the use of cash collateral, and (v) the granting of adequate protection to the Prepetition Notes Secured Parties and the Prepetition ABL Secured Parties. The order approving the Term Loan DIP Facility and the ABL DIP Facility (or ABL Cash Collateral Usage) on a final basis shall be in form and substance, and upon terms and conditions, acceptable in all respects to the Loan Parties, the Term DIP Agent and the Required DIP Lenders (the "**Final DIP Order**" and, together with the Interim DIP Order, the "**DIP Orders**"). |
| **Adequate Protection** | As adequate protection against the risk of any diminution in the value of the respective Prepetition Notes Liens in all collateral securing the Prepetition Senior Priority Notes Secured Obligations and the Prepetition Junior Priority Notes Secured Obligations (collectively, the "**Prepetition Notes Collateral**") (as applicable) and the Prepetition ABL Liens in all collateral securing the Prepetition ABL Secured Obligations (the "**Prepetition ABL Collateral**"), including as a result of the imposition of the automatic stay, the Loan Parties' use, sale, or lease of such collateral, including Cash Collateral (as defined below), during the Chapter 11 Cases, the granting of priming liens and claims as set forth herein, and the imposition of the Carve-Out, the Prepetition Notes Secured Parties and the Prepetition ABL Secured Parties, as applicable, shall be granted the following adequate protection, subject in all cases to the Carve-Out: <br><br> (i)    The Prepetition Senior Notes Secured Parties shall be entitled to receive, subject in all cases to the Carve-Out and Permitted Prior Liens and only until the Prepetition Senior Priority Notes Secured Obligations are indefeasibly repaid and/or deemed repaid in full under the Term Loan |

DIP Facility, including any deemed roll-up and conversion of all amounts outstanding under the Senior Priority Notes into the Term Loan DIP Facility, the following as adequate protection: (A) to the extent of any diminution in value of the Prepetition Senior Priority Notes Liens in Prepetition Notes Collateral, validly perfected replacement liens on any security interests in all DIP Collateral (the "**Senior Priority Notes Adequate Protection Liens**"), which replacement liens shall have the priority set forth on **Annex II** attached hereto, as applicable; (B) to the extent of any diminution in value of the Prepetition Senior Priority Notes Liens in Prepetition Notes Collateral, a superpriority administrative expense claim as contemplated by section 507(b) of the Bankruptcy Code against each of the Debtors, on a joint and several basis, which claim shall have priority over all other claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 506(c), 507(a), 507(b), 546(c), 546(d), 726(b), 1113 and 1114 of the Bankruptcy Code or otherwise (other than the Carve-Out) (the "**Senior Notes Adequate Protection Claims**"), which claims shall be subject to the priorities set forth on **Annex II** attached hereto, as applicable; (C) payment of accrued but unpaid pre- and post-petition interest at the non-default rate in the form of additional Senior Priority Notes, on a quarterly basis, (D) the payment of the reasonable and documented fees and out-of-pocket expenses of the Senior Priority Notes Trustee (including without limitation, the pre-petition and post-petition fees and expenses of Foley & Lardner LLP, as counsel to the Senior Priority Notes Trustee, and a single firm as local counsel), and the payment of the reasonable and documented fees of the Ad Hoc Noteholder Group (including without limitation, the prepetition and post-petition fees and expenses of (i) Paul Hastings, LLP and Stroock & Stroock & Lavan LLP, as counsel to the Ad Hoc Noteholder Group, and (ii) Evercore Group, L.L.C., as financial advisor to the Ad Hoc Noteholder Group, in accordance with the terms of that certain fee letter effective as to Evercore Group, L.L.C. as of November 3, 2021), (iii) Young Conaway Stargatt & Taylor, LLP, as local counsel to the Ad Hoc Noteholder Group, (iv) Sinclair Group and (v) with the Borrower's consent (not to be unreasonably withheld), such other attorneys, financial advisors or professionals retained by the Ad Hoc Noteholder Group (collectively clauses (i) through (v), the "**Lender Advisors**"); (E) financial reporting, including the weekly delivery of a rolling 13 week cash flow budget, variance reporting, supporting information requested by the Ad Hoc Noteholder Group and/or their advisors, and such other financial reporting acceptable to the Ad Hoc Noteholder Group; and (F) consent rights over the "first day" orders, which shall be reasonably acceptable to the Ad Hoc Noteholder Group;

(ii)     The Prepetition Junior Note Secured Parties shall be entitled to receive, subject in all cases to the Carve-Out and Permitted Prior Liens, the following as adequate protection: (A) to the extent of any diminution in value of the Prepetition Junior Priority Notes Liens in Prepetition Notes Collateral, validly perfected replacement liens on any security interests

in all DIP Collateral (the "**Junior Priority Notes Adequate Protection Liens**"), which replacement liens shall have the priority set forth on **Annex II** attached hereto, as applicable; (B) to the extent of any diminution in value of the Prepetition Junior Priority Notes Liens in Prepetition Notes Collateral, a superpriority administrative expense claim as contemplated by section 507(b) of the Bankruptcy Code against each of the Debtors, on a joint and several basis, which claim shall have priority over all other claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 506(c), 507(a), 507(b), 546(c), 546(d), 726(b), 1113 and 1114 of the Bankruptcy Code or otherwise (other than the Carve-Out) (the "**Junior Priority Notes Adequate Protection Claims**"), which claims shall be subject to the priorities set forth on **Annex II** attached hereto, as applicable; (C) payment of accrued but unpaid pre- and post-petition interest at the non-default rate in the form of additional Junior Priority Notes, on a quarterly basis; (D) the payment of the reasonable and documented fees and out-of-pocket expenses of the Junior Priority Notes Trustee (including without limitation, the pre-petition and post-petition fees and expenses of Foley & Lardner LLP, as counsel to the Junior Priority Notes Trustee, and a single firm as local counsel) and the Lender Advisors; (E) financial reporting, including the weekly delivery of a rolling thirteen week cash flow budget, variance reporting, and such other information provided to the Prepetition Senior Notes Secured Parties as adequate protection; and (F) consent rights over the "first day" orders, which shall be reasonably acceptable to the Ad Hoc Noteholder Group; and

(iii)     The Prepetition ABL Secured Parties shall be entitled to receive, subject in all cases to the Carve-Out and Permitted Prior Liens and only until all obligations under the Prepetition ABL Facility are indefeasibly repaid and/or deemed repaid in full under the ABL DIP Facility (as applicable), the following as adequate protection: (A) to the extent of any diminution in value of the Prepetition ABL Liens in Prepetition ABL Collateral, validly perfected replacement liens on and security interests in all DIP Collateral (the "**ABL Adequate Protection Liens**"), which replacement liens shall have the priority set forth on **Annex II** attached hereto, as applicable; (B) to the extent of any diminution in value of the Prepetition ABL Liens in Prepetition ABL Collateral, a superpriority administrative expense claim as contemplated by section 507(b) of the Bankruptcy Code against each of the Debtors, on a joint and several basis, which claim shall have priority over all other claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 506(c), 507(a), 507(b), 546(c), 546(d), 726(b), 1113 and 1114 of the Bankruptcy Code or otherwise (other than the Carve-Out) (the "**ABL Adequate Protection Claims**"), which claims shall be subject to the priorities set forth on **Annex II** attached hereto, as applicable; (C) payment of accrued but unpaid interest at the

| | |
|---|---|
| | non-default rate, as the same becomes due and payable under the ABL Credit Agreement, (D) the payment of all reasonable and documented fees and out-of-pocket expenses of the ABL Representative (including without limitation, the prepetition and post-petition fees and expenses of (i) Haynes and Boone, LLP, as counsel to the ABL Representative, (ii) Carl Marks Advisors, as financial advisor to the ABL Representative, and (iii) one local counsel (collectively, the "**ABL Advisors**"); (E) financial reporting, including the weekly delivery of a rolling 13 week cash flow budget, variance reporting, supporting information reasonably requested by the ABL Representative and/or their advisors, and such other financial reporting reasonably acceptable to the ABL Representative; and (F) consent rights over the "first day" cash management order, which shall be reasonably acceptable to the ABL Representative. |
| **Carve-Out** | The liens on and security interests in the DIP Collateral (as defined below), the adequate protection liens, and all super-priority administrative expense claims granted under the DIP Orders, shall be subject and subordinate to the Carve Out. |
| | For purposes hereof, "**Carve Out**" means an amount equal to the sum of (i) all fees required to be paid to the clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the applicable statutory rate; (ii) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) to the extent allowed at any time, whether allowed before or after delivery of the Carve-Out Trigger Notice (as defined below) and whether by interim order, procedural order or otherwise, all accrued and unpaid fees and expenses ("**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to sections 327, 328 or 363 of the Bankruptcy Code (the "**Debtor Professionals**") and any statutory committee appointed in the Chapter 11 Cases (an "**Official Committee**"), if appointed in the Chapter 11 Cases, pursuant to sections 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**"), in each case, incurred through the date of delivery of a Carve-Out Trigger Notice, and in the case of any Committee Professionals, subject to the Approved Budget (as defined below), plus (iv) Allowed Professional Fees of Debtor Professionals and any Committee Professionals incurred after the date of delivery of the Carve Out Trigger Notice, in an aggregate amount not to exceed $3.0 million (the "**Post-Carve-Out Trigger Notice Cap**"), with the Debtor Professionals and any Committee Professionals sharing on a *pro rata* basis to the extent Allowed Professional Fees of Debtor Professionals and any Committee Professionals exceed the Post-Carve-Out Trigger Notice Cap. For purposes of the foregoing, the "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the Term DIP Agent (at the direction of the Required DIP Lenders) to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Official Committee (if any), which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined below) and acceleration of the Term DIP Obligations under the Term Loan DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked; *provided that* nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement, or compensation described in clauses (i), (ii), (iii) or |

| | |
|---|---|
| | (iv) above on any grounds. |
| **Type and Amount of the Term Loan DIP Facility** | Senior secured super-priority debtor-in-possession delayed-draw term loan credit facility (the "**Term Loan DIP Facility**", and the loans outstanding thereunder, the "**Term DIP Loans**"), comprised of the following: |
| | (a)  aggregate principal amount of commitments of (A) up to $85 million (the "**New Money Commitments**"), pursuant to which the Term DIP Lenders shall provide new money term loans ("**New Money Loans**") as follows: (i) a principal amount of $32.0 million shall be drawn in one borrowing upon the Closing Date (as defined below) following the entry of the Interim DIP Order, (ii) a principal amount of $25.0 million shall be drawn in one borrowing upon the entry of the Final DIP Order and (iii) a principal amount of $28.0 million shall be available in a third draw (which shall be made in single borrowing subject to the proviso below) on or after June 30, 2022; provided, that (A) as a condition to such third draw, the Borrower shall provide a written certification to the Term DIP Agent that, as of the date of the third borrowing notice, (1) Liquidity (as defined below) of the Loan Parties is less than $75 million in the aggregate, and (2) the Borrower reasonably estimates that Liquidity of the Loan Parties shall be less than $50 million in the aggregate within the two (2) week period following the date of such borrowing notice (assuming no borrowing shall otherwise be made during such two week period), and (B) such amount available to be borrowed (but not the commitments) pursuant to the third draw shall be reduced (to an amount not less than zero), on a dollar for dollar basis, by the amount of that certain Proof of Loss Amount (as defined below) and any other proof of loss approved by the applicable insurers (and signed by the Borrower or the applicable Loan Party) during the period after the effective date of the RSA and prior to the date of such third borrowing notice, as certified by the Borrower (the "**Specified POL**"; and the proceeds thereof, the "**Specified POL Proceeds**") (provided that if, in connection with such third borrowing notice, the Borrower certifies in good faith there has been no payment of such Specified POL Proceeds prior to such date, the availability relating to that portion shall be reinstated (a "**Third Draw Reinstatement**") and may be drawn at such time, it being further agreed to the extent such Specified POL Proceeds are received after such third draw (subject to satisfaction of the conditions precedent set forth above), such Specified POL Proceeds shall be promptly applied to prepay draws under the Term Loan DIP Facility), in each case, which amounts shall be funded by each Term DIP Lender in accordance with its New Money Commitment at such time, and (B) the New-Money Cash Out Commitments (as defined below); and |
| | (b)  a roll up facility (the "**Roll Up Loans**") pursuant to which (a) upon entry of the Interim DIP Order, the Prepetition Senior Priority 2022 Bridge Notes (consisting of $52.5 million of principal, $5.1 million of the Redemption Premium (as defined in the Senior Priority Notes Indenture) and $1.7 million of accrued but unpaid interest, in respect of the Prepetition Senior Priority 2022 Bridge Notes), will be deemed "rolled up" and converted into the Term Loan DIP Facility, on a cashless dollar for dollar basis, and (b) upon entry of the Final DIP Order, the balance of the obligations arising under the Senior Priority Notes (including all remaining principal (including the balance of the Redemption Premium) and accrued but unpaid interest |

|  | through the date thereof) shall be deemed "rolled up" and converted into the Term Loan DIP Facility (the "**Final Roll Up**"), and in each case, shall automatically be deemed to be substituted and exchanged for Term DIP Loans for all purposes hereunder; <u>provided</u>, that holders of the Prepetition Senior Priority Notes that certify in writing that they are unable to effectuate a "roll-up" of their Senior Priority Notes due to limitations with respect to holding term loans in the governing documents or internal policies of such entities shall be repaid in cash from the proceeds of additional new money term loans (the "**New Money Cash Out Term Loans**") funded by the Ad Hoc Noteholder Group on a *pro rata* basis in a principal amount not to exceed $22 million (it being understood that no commitment payment or Exit Payment shall be payable in respect of such New Money Cash Out Term Loans) (the "**New-Money Cash Out Commitment**").[1] |
|  | New Money Commitments that are temporarily unavailable shall be terminated on the date of the third draw. |
|  | Notwithstanding the foregoing, in the event the Specified POL Proceeds are received by the Borrower following the Petition Date but prior to the entry of the Final DIP Order, the New Money Commitments with respect to the second draw shall be reduced on a dollar-for-dollar basis in an amount equal to the excess of the Specified POL Proceeds so received <u>over</u> the aggregate principal amount of the New Money Commitments in respect of the third draw. |
|  | "**Liquidity**" means, as of any date of determination, the sum of (x) unrestricted cash and cash equivalents of the Loan Parties, plus (y) undrawn commitments permitted and available to be drawn, if any, under any ABL DIP Facility as of such date. |
| **Use of Proceeds** | Solely in accordance with and subject to the credit agreement governing the terms of the Term Loan DIP Facility (the "**Term DIP Credit Agreement**", and together with all security and collateral agreements related thereto, the "**Term DIP Documents**"), the proceeds of the Term Loan DIP Facility may be used only (i) to roll-up all amounts outstanding under the Senior Priority Notes, (ii) make adequate protection payments as required in the Term DIP Documents and the DIP Orders, (iii) pay the administrative costs of the Chapter 11 Cases and (iv) for general corporate purposes, in each case, in accordance with and subject to the Term DIP Documents and the DIP Orders (including the Approved Budget (as defined below), subject to permitted variances). |
| **Closing Date** | The date of the satisfaction (or waiver) of each of the conditions precedent to the initial funding of the Term Loan DIP Facility after entry of the Interim DIP Order (the "**Closing Date**"). |
| **Maturity** | The Term Loan DIP Facility will mature on the earliest to occur of: |
|  | (i)    nine (9) months after the Petition Date, subject to an extension of up to three (3) months upon mutual agreement of the Borrower and the |

---

[1]    Amounts set forth in clause (a) assume a June 1, 2022 filing date; in the event this date changes, such amounts shall be updated to reflect amounts outstanding as of such date, based upon the same methodology used to derive the amounts in this clause (a).

|  | Required DIP Lenders; provided, that the Borrower shall pay to the DIP Lenders an extension payment in an amount equal to 1.00% of the aggregate principal amount of the drawn Term DIP Loans, any New-Money Cash Out Commitment and unused New Money Commitment outstanding as of such date of extension; |
|  | (ii)  11:59 p.m. New York City Time on the date that is three (3) calendar days after the Petition Date (or if such third day is not a business day, the first succeeding business day thereafter) if the Interim DIP Order, in form and substance acceptable in all respects to the Required DIP Lenders, has not been entered by the Bankruptcy Court prior to such date and time; |
|  | (iii)  11:59 p.m. New York City Time on the date that is thirty-five (35) calendar days after the Petition Date (or if such thirty-fifth day is not a business day, the first succeeding business day thereafter), if the Final DIP Order, in form and substance acceptable in all respects to the Required DIP Lenders, has not been entered by the Bankruptcy Court prior to such date and time; |
|  | (iv)  the effective date of a chapter 11 plan of any Loan Party, which has been confirmed by an order entered by the Bankruptcy Court in any of the Chapter 11 Cases (such date, the "**Effective Date**"); |
|  | (v)  dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases into a case under Chapter 7 of the Bankruptcy Code; |
|  | (vi)  the acceleration of the Term DIP Loans and the termination of the commitments under the Term Loan DIP Facility; and |
|  | (vii)  the closing of a sale of all or substantially all assets or equity of the Loan Parties (other than to another Loan Party). |
| **Amortization** | None. |
| **Payments and Interest Rates** | As set forth on **Annex I** attached hereto. |
| **Mandatory Prepayments** | Mandatory prepayments of the Term DIP Loans shall be required in an amount equal to (a) (i) 100% of Specified POL Proceeds received after the date of the third borrowing in respect of which the Borrower elected the Third Draw Reinstatement and (ii) without duplication of clause (i), 100% of net cash proceeds of insurance and condemnation (subject to the Existing ABL/Notes Intercreditor Agreement or the DIP Intercreditor Agreement), other than the Specified POL Proceeds that reduced the availability with respect to which the Borrower did not elect the Third Draw Reinstatement, (b) 100% of net cash proceeds from the issuance of post-petition indebtedness not permitted by the DIP Credit Agreement, (c) 100% of net cash proceeds from the issuance of any equity of the Borrower or Holdings, and (d) 100% of the net cash proceeds of any sale of assets of any of the Loan Parties or their subsidiaries (other than asset sales in the ordinary course of business), (subject to the Existing ABL/Notes Intercreditor Agreement or the DIP Intercreditor Agreement) in each case, subject to the Documentation Principles (as defined below) and subject to the |

| | |
|---|---|
| | Exit Payment (as defined below). |
| **Voluntary Prepayments** | Permitted, in whole or in part, together with the Exit Payment, subject to limitations as to minimum amounts of prepayments (and customary SOFR breakage). |
| **Collateral and Priority** | Subject to the Carve-Out, as security for the prompt payment and performance of all amounts due under the Term Loan DIP Facility, including, without limitation, all principal, interest, premiums, payments, fees, costs, expenses, indemnities or other amounts (collectively, the "**Term DIP Obligations**"), effective as of the Petition Date, the Term DIP Agent, for the benefit of itself and the Term DIP Lenders, shall be granted automatically and properly perfected liens and security interests ("**Term DIP Liens**") in all assets and properties of each of the Loan Parties and their bankruptcy estates, whether tangible or intangible, real, personal or mixed, wherever located, whether now owned or consigned by or to, or leased from or to, or hereafter acquired by, or arising in favor of the Loan Parties (including under any trade names, styles or derivations thereof), whether prior to or after the Petition Date, including, without limitation, all of the Loan Parties' rights, title and interests in (1) all Prepetition Notes Collateral, including all ABL Facility Priority Collateral and Notes Priority Collateral, (2) all money, cash and cash equivalents; (3) all funds in any deposit accounts, securities accounts, commodities accounts or other accounts (together with and all money, cash and cash equivalents, instruments and other property deposited therein or credited thereto from time to time); (4) all accounts and other receivables (including those generated by intercompany transactions); (5) all contracts and contract rights; (6) all instruments, documents and chattel paper; (7) all securities (whether or not marketable); (8) all goods, as-extracted collateral, furniture, machinery, equipment, inventory and fixtures; (9) all real property interests; (10) all interests in leaseholds, (11) all franchise rights; (12) all patents, tradenames, trademarks (other than intent-to-use trademarks), copyrights, licenses and all other intellectual property; (13) all general intangibles, tax or other refunds, or insurance proceeds; (14) all equity interests, capital stock, limited liability company interests, partnership interests and financial assets; (15) all investment property; (16) all supporting obligations; (17) all letters of credit and letter of credit rights; (18) all commercial tort claims; (19) upon entry of the Final DIP Order, all claims and causes of action arising under Chapter 5 of the Bankruptcy Code ("**Avoidance Actions**") and the proceeds or or property recovered, whether by judgment, settlement or otherwise, from Avoidance Actions ("**Avoidance Action Proceeds**"); (20) all books and records (including, without limitation, customers lists, credit files, computer programs, printouts and other computer materials and records); (21) to the extent not covered by the foregoing, all other goods, assets or properties of the Loan Parties, whether tangible, intangible, real, personal or mixed; and (22) all products, offspring, profits, and proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, including any and all proceeds of any insurance (including any business interruption and property insurance), indemnity, warranty or guaranty payable to such Loan Party from time to time with respect to any of the foregoing (collectively, the "**DIP Collateral**"); *provided,* that DIP Collateral shall exclude Excluded Property but shall include any and all proceeds and products of Excluded Property, unless such proceeds and products otherwise |

separately constitute Excluded Property.

"**Excluded Property**" has the meaning set forth in the Security Agreement (as defined in Senior Priority Notes Indenture), without giving effect to clauses (iv)(y), (v), (vi), (vii) and (x) of the definition of "Excludable Property" as defined therein, to the extent any term or condition, or any consent, approval or other authorization requirement is not excused, overridden or rendered ineffective by operation of the Uniform Commercial Code, the Bankruptcy Code, the Bankruptcy Court, the DIP Orders or applicable non-bankruptcy law or principles of equity.

The Term DIP Liens shall have the following priorities (subject in all cases to the Carve Out):

i. *First Liens on Unencumbered Property*. Pursuant to Section 364(c)(2) of the Bankruptcy Code, the Term DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected first priority liens and security interests in all DIP Collateral that is not subject to valid, perfected and non-avoidable liens or security interests in existence as of the Petition Date (or perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code), including, upon entry of the Final DIP Order, Avoidance Actions and Avoidance Action Proceeds (collectively, "**Unencumbered Property**"), which DIP Term Liens in Unencumbered Property shall be *pari passu* with any ABL DIP Liens.

ii. *Priming DIP Liens and Liens Junior to Certain Other Liens*. The Term DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected in all DIP Collateral (other than as described in clause (i) above), which Term DIP Liens (a) shall be, pursuant to Section 364(c)(3) of the Bankruptcy Code, subject and subordinate only to the (1) Carve Out, (2) Permitted Prior Liens, (3) solely with respect to ABL Facility Priority Collateral (as defined in the Existing ABL/Notes Intercreditor Agreement or the DIP Intercreditor Agreement, as applicable) and DIP Collateral of a type that would otherwise constitute ABL Facility Priority Collateral, the ABL DIP Liens, as applicable (to the extent an ABL DIP Facility asserts a first priority lien on such ABL Facility Priority Collateral), the Prepetition ABL Liens (until refinanced in full under an ABL DIP Facility), and the ABL Adequate Protection Liens (until refinanced in full under ABL DIP Facility), and (4) solely with respect to the assets of Holdings (the "**TPC Holdings Assets**"), the ABL DIP Liens (to the extent an ABL DIP Facility asserts a first priority lien on such assets) or the Prepetition ABL Liens (until refinanced in full under an ABL DIP Facility), (b) pursuant to Section 364(d)(1) of the Bankruptcy Code, shall be senior to any and all other liens and security interests in DIP Collateral, including, without limitation, all liens and security interests in the Notes Priority Collateral (as defined in the Existing ABL/Notes Intercreditor Agreement or the DIP Intercreditor Agreement, as applicable) or any DIP Collateral that would otherwise constitute Notes Priority Collateral (including, without limitation, any ABL DIP Liens, as applicable, in Notes Priority Collateral or any Senior Priority Notes

|  | Adequate Protection Liens or Junior Priority Notes Adequate Protection Liens in Notes Priority Collateral), and (c) shall otherwise be subject to the priorities set forth in **Annex II** attached hereto. |
|---|---|
|  | iii.   *Liens Senior to Other Liens*. Except to the extent expressly permitted hereunder, subject to the Carve Out, the Term DIP Liens and the Term DIP Superpriority Claims (as defined below) (i) shall not be made subject to or *pari passu* with (A) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any successor cases, including any lien or security interest granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors, (B) any lien or security interest that is avoided or preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise, (C) any intercompany or affiliate claim, lien or security interest of the Debtors or their affiliates, or (D) any other lien, security interest or claim arising under section 363 or 364 of the Bankruptcy Code granted on or after the date hereof. |
| **Guarantees** | Each Loan Guarantor shall unconditionally guarantee, on a joint and several basis, all Term DIP Obligations arising under or in connection with the Term Loan DIP Facility. |
| **Term DIP Superpriority Claims** | Subject to the Carve-Out, the Term DIP Obligations shall be allowed super-priority administrative expense claims under Section 364(c) of the Bankruptcy Code against each of the Debtors, on a joint and several basis, which claims shall have priority over all other claims against the Debtors, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kind specified in or so ordered pursuant to Sections 105, 326, 328, 330, 331, 365, 503(a), 506(c), 507(a), 507(b), 546(c), 546(d), 726(b), 1113 and 1114 of the Bankruptcy Code or otherwise, with recourse against all DIP Collateral (the "**Term DIP Superpriority Claims**"), which Term DIP Superpriority Claims shall be subject to the priorities set forth in **Annex II** attached hereto. |
| **Milestones** | The Loan Parties shall achieve the Milestones (as defined in the RSA), which Milestones shall be incorporated into the Term DIP Credit Agreement. |
| **Documentation** | The Term Loan DIP Facility (including the terms and conditions applicable thereto) will be documented pursuant to and evidenced by (a) a credit agreement, negotiated in good faith, in form and substance acceptable to the Borrower and the Required DIP Lenders, which shall (i) reflect the terms set forth herein, (ii) reflect the terms of the Interim DIP Order or the Final DIP Order, as applicable, (iii) have usual and customary provisions for debtor-in-possession financings of this kind and provisions that are necessary to effectuate the financing contemplated hereby and (iv) be mutually agreed among the Borrower and the Required DIP Lenders, (b) the Interim DIP Order, (c) the Final DIP Order, and (d) as applicable, the related security agreements, collateral agreements, pledge agreements, control agreements, guarantees, mortgages and other legal documentation or instruments as are, in each case, usual and customary for debtor-in-possession financings of this type and/or reasonably necessary to effectuate the financing contemplated hereby, as determined by the Loan Parties |

| | and the Required DIP Lenders (this paragraph, the "**Documentation Principles**". |
|---|---|
| **Representations and Warranties** | The Term DIP Documents will contain usual and customary representations and warranties, subject to the Documentation Principles. |
| **Cash Flow Reporting; Variance Reporting; Variance Testing** | Not later than 5:00 p.m. New York City time on each Friday following the Petition Date (the "**Updated Budget Deadline**"), the Loan Parties shall deliver to the DIP Lenders and the DIP Term Agent and the Lender Advisors a supplement to the Initial DIP Budget (as defined below) (each such supplement, an "**Updated Budget**"), covering the 13-week period that commences with Friday of the calendar week immediately preceding such Updated Budget Deadline, consistent with the form and level of detail set forth in the Initial DIP Budget and including a forecasted unrestricted cash balance as well as a line-item report setting forth the estimated fees and expenses to be incurred by each professional advisor on a weekly basis; provided, that the Updated Budget to be delivered on the third week immediately following the week in which the Petition Date occurs (*i.e.*, June 24, 2022, assuming a Petition Date of June 1, 2022), and the Updated Budget to be delivered on every fourth Updated Budget Deadline thereafter (each, a "**Specified Budget**"), shall be, in each case, subject to the approval of the Required DIP Lenders (which approval may be provided by the Lender Advisors on behalf of the Required DIP Lenders and will be deemed to be given unless an objection by the Required DIP Lenders or either of the Lender Advisors has been delivered to the Borrower by no later than 5:00 pm. New York City time on the Wednesday following the applicable Updated Budget Deadline for such Specified Budget (which objection may be provided via email)). Upon (and subject to) the approval, or deemed approval, of any such Specified Budget by the Required DIP Lenders in their reasonable discretion (which may be provided by the Lender Advisors), such Specified Budget shall constitute the "Approved Budget"; provided, that in the event such Specified Budget is not so approved (or deemed approved) by the Required DIP Lenders, the prior Approved Budget shall remain in effect. |
| | Not later than 5:00 p.m. New York City time every Friday (commencing with Friday of the week immediately following the week in which the Petition Date occurs) (each such Friday, a "**Variance Report Deadline**"), the Loan Parties shall deliver to the DIP Lenders and the DIP Term Agent and the Lender Advisors a variance report (each, a "**Variance Report**"), in form and substance consistent in all material respects with the form delivered to such persons prior to the Petition Date pursuant to the Forbearance Agreement, showing the difference between total actual operating receipts and total budgeted operating receipts as set forth in the Approved Budget, as the case may be (the "**Receipts Variance**"), total actual operating disbursements and total budgeted operating disbursements as set forth in the Approved Budget, as the case may be (the "**Disbursements Variance**") and total actual professional fees and expenses and total budgeted professional fees and expenses as set forth in the Approved Budget, as the case may be (the "**Professional Fee Variance**"), in each case, for the Applicable Period (as defined below), together with a reasonably detailed explanation of such Receipts Variance, Disbursements Variance and Professional Fee Variance. |
| | Commencing with the second Variance Report, the Loan Parties shall not permit |

the Receipts Variance or the Disbursements Variance with respect to any Applicable Period (as defined below) to exceed the Permitted Variance (as defined below) (other than in the case of total actual operating receipts exceeding total budgeted operating receipts or total actual operating disbursements being less than total budgeted operating disbursements).

"**Applicable Period**" means, (w) with respect to the first Variance Report, the one week period ending on the Friday of the week immediately preceding the first Variance Report Deadline, (x) with respect to the second Variance Report, the two-week period ending on the Friday of the week immediately preceding the second Variance Report Deadline, (y) with respect to the third Variance Report, the three-week period ending on the Friday of the week immediately preceding the third Variance Report Deadline, and (z) with respect to the fourth Variance Report, and each Variance Report thereafter, the four-week period ending on the Friday of the week immediately preceding the applicable Variance Report Deadline.

"**Permitted Variance**" means (x) with respect to the second Variance Report, 30% and (y) with respect to the third Variance Report, and each Variance Report thereafter, 20%.

| | |
|---|---|
| **Affirmative and Negative Covenants** | The Term DIP Documents will contain usual and customary affirmative and negative covenants, subject to the Documentation Principles; *provided, that*, without limitation, the Term DIP Documents shall require: |

(i)      in the event the ABL DIP Facility (as applicable) shall not have been entered into prior to the Closing Date, the ABL DIP Documents shall be acceptable to the Required DIP Lenders;

(ii)     the three Business Days' advance delivery of all material pleadings, motions and other material documents filed with the Bankruptcy Court on behalf of the Debtors in the Chapter 11 Cases to the Lender Advisors, unless not reasonably practicable under the circumstances (in which case, as soon as reasonably practicable prior to filing);

(iii)    weekly update meetings and/or calls with the Debtors' senior management and advisors, the Lender Advisors and the Term DIP Lenders, which update calls may cover the Debtors' financial performance, the latest Approved Budget, the Debtors' variance reports, and the other documentation provided pursuant to the reporting covenant described above;

(iv)     compliance with the Milestones;

(v)      delivery of monthly financial statements, including an income statement for such month, balance sheet as of the end of such month and a cash flow statement for such month;

(vi)     delivery of a rolling budget-to-actual variance report of professional fees consistent in all material respects with the form provided pursuant to the Forbearance Agreement (as defined below); and

(vii)    certain covenants materially consistent with those set forth in Section 6(b) in the Forbearance Agreement, dated as of February 3, 2022 (as amended, the "**Forbearance Agreement**") among the Borrower, certain

| | Senior Priority Noteholders and the other parties party thereto. |
|---|---|
| **Conditions Precedent to Closing and the Initial Borrowing** | The Closing Date under the Term Loan DIP Facility, and the initial borrowing thereunder, shall be subject to customary conditions to closing for facilities of this type, including, without limitation, the following: |

(i)     no later than three (3) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order, and the Interim DIP Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the prior written consent of the Required DIP Lenders;

(ii)     the preparation, authorization and execution of the Term DIP Documents with respect to the Term Loan DIP Facility, in form and substance consistent with this DIP Term Sheet and otherwise acceptable to the Loan Parties, the Term DIP Lenders and the Term DIP Agent;

(iii)     the delivery of a 13-week cash flow projection (the "**Initial DIP Budget**") in form and substance acceptable to the DIP Lenders, reflecting (i) the Debtors' and their Subsidiaries' anticipated cash receipts and disbursements for each calendar week during the period from the week in which the Petition Date occurs through and including the end of the thirteenth calendar week thereafter, (ii) the anticipated sum of weekly unused availability under the Term Loan DIP Facility and any ABL DIP Facility, plus unrestricted cash on hand, (iii) anticipated weekly outstanding principal balance of amounts outstanding under the Term Loan DIP Facility and any ABL DIP Facility, and (iv) a professional fee accrual budget with respect to the anticipated fees and expenses to be incurred by professionals retained by the Debtors, any Official Committee (as defined below) appointed in the Chapter 11 Cases, and other professionals during the thirteen week period;

(iv)     the Term DIP Agent shall have been named as an additional insured with respect to, liability policies (other than worker's compensation policies and public liability policies) and the Term DIP Agent shall be named as loss payee with respect to the property and business interruption insurance (other than public property policies) maintained by the Loan Parties;

(v)     the delivery of customary legal opinions in form and substance reasonably acceptable to the Required DIP Lenders;

(vi)     the delivery of (i) a secretary's (or other officer's) certificate of the Borrower and each of the other Loan Parties, dated as of the Closing Date and in such form as is customary for the jurisdiction in which the relevant Loan Party is organized, with appropriate insertions and attachments; and (ii) a customary closing officer's certificate of the Borrower;

(vii)     either (x) the preparation, authorization and execution of the ABL DIP Documents with respect to the ABL DIP Facility, in form and substance acceptable to the Loan Parties, the Required DIP Lenders and the Term DIP Agent, the ABL DIP Facility shall be in full force and effect and

<table>
<tr><td></td><td colspan="2">there shall not be a default or event of default thereunder; or (y) the Prepetition ABL Secured Parties shall have agreed to permit the use of cash collateral, and adequate protection, pursuant to the Interim Order on terms and conditions set forth herein and otherwise acceptable to the Required DIP Lenders;</td></tr>
<tr><td></td><td>(viii)</td><td>all premiums, payments, fees, costs and expenses (including, without limitation, the fees and expenses of the Lender Advisors and all other counsel, financial advisors and other professionals of the Term DIP Lenders and Term DIP Agent (whether incurred before or after the Petition Date) to the extent earned, due and owing, and including estimated fees and expenses through the Closing Date) shall have been paid;</td></tr>
<tr><td></td><td>(ix)</td><td>the DIP Lenders shall have received from the Borrower and each of the Loan Parties, at least three Business Days prior to the Closing Date, (i) documentation and other information requested by any DIP Lender a reasonable period prior to the required delivery date that is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act and (ii) if the Borrower qualifies as a "legal entity customer" under the beneficial ownership regulations, the DIP Lenders shall have received from the Borrower, at least one Business Day prior to the Closing Date, a beneficial ownership certification in relation to the Borrower;</td></tr>
<tr><td></td><td>(x)</td><td>the Term DIP Agent shall have a fully perfected lien on the DIP Collateral to the extent required by the Term DIP Documents and the Interim DIP Order, having the priorities set forth in the Interim DIP Order;</td></tr>
<tr><td></td><td>(xi)</td><td>each Uniform Commercial Code financing statement and each intellectual property security agreement required by the Term DIP Documents to be filed in order to create in favor of the Term DIP Agent a perfected lien on the DIP Collateral having the priorities set forth in the Orders shall have been filed;</td></tr>
<tr><td></td><td>(xii)</td><td>the Term DIP Agent shall have received the certificates, if any, representing the certificated shares of pledged securities held by a Loan Party pledged pursuant to the Term DIP Documents; and</td></tr>
<tr><td></td><td>(xiii)</td><td>the Closing Date shall have occurred on or before the date that is three calendar days after the date of entry of the Interim DIP Order.</td></tr>
<tr><td><strong>Conditions to Each Borrowing</strong></td><td colspan="2">In addition to the conditions precedent noted above, each borrowing under the Term Loan DIP Facility shall be subject to further customary conditions to closing for facilities of this type, including, without limitation:</td></tr>
<tr><td></td><td>(i)</td><td>solely in the case of any borrowing after the Closing Date, no later than thirty-five (35) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order;</td></tr>
<tr><td></td><td>(ii)</td><td>each of the representations and warranties made by any Loan Party in or pursuant to the Term DIP Documents shall be true and correct in all material respects (and in all respects if any such representation or</td></tr>
</table>

|  | warranty is already qualified by materiality or material adverse effect), in each case on and as of such date as if made on and as of such date except to the extent that such representations and warranties relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (and in all respects if any such representation or warranty is already qualified by materiality or material adverse effect) as of such earlier date; |
|---|---|
|  | (iii) there shall be no Default or Event of Default under the DIP Credit Agreement; |
|  | (iv) since the date of the RSA, there shall have been no event, development or circumstance that has had, or would reasonably be expected to have, a material adverse effect; |
|  | (v) each of the RSA and, after the effectiveness thereof following Bankruptcy Court approval, the RO Backstop Agreement and the Exit Notes Backstop Agreement (each as defined in the RSA) shall be in full force and effect, and no breach, default or event of default shall have occurred and be continuing thereunder; |
|  | (vi) all first day motions filed by the Loan Parties on the Petition Date and related orders entered by the Bankruptcy Court in the Chapter 11 Cases (including any motions related to cash management or any critical vendor or supplier motions) shall be in form and substance reasonably satisfactory to the Required DIP Lenders; |
|  | (vii) the Term DIP Agent shall have valid, binding, enforceable, non-avoidable, and automatically and fully and properly perfected liens on, and security interests in, the DIP Collateral, in each case, having the priorities set forth in the Orders and subject only to the payment in full in cash of any amounts due under the Carve-Out; and |
|  | (viii) the Term DIP Agent shall have received a signed borrowing request from the Borrower. |
| **Events of Default** | The Term DIP Documents will contain usual and customary events of default, subject to the Documentation Principles (including grace periods and materiality qualifiers), including, without limitation (the "**Events of Default**"): |
|  | (i) the Debtors' failure to pay principal, or interest and other amounts (other than professional fees) when due under the Term DIP Documents or the DIP Orders; |
|  | (ii) the Debtors' failure to pay professional fees when due under the Term DIP Documents or DIP Orders, subject to a five (5) calendar day grace period; |
|  | (iii) any representation or warranty made by the Debtors is proven untrue or misleading in any material respect (unless qualified by materiality or by reference to material adverse effect); |
|  | (iv) the Debtors' failure to comply with any financial reporting or financial covenants under the Term DIP Documents or the DIP Orders; |
|  | (v) the Debtors' failure to comply with any other affirmative or negative |

covenants contained in the Term DIP Documents, subject to customary grace periods for certain affirmative covenants;

(vi)    cross default to other indebtedness or agreements in excess of $5 million, which shall include the ABL Credit Agreement and any ABL DIP Credit Agreement (in each case, whether amounts thereunder are drawn or not), it being understood that the foregoing shall be subject to customary exclusions, including to the extent rights and remedies are subject to the automatic stay or a forbearance agreement, reasonably acceptable to the Required DIP Lenders, pursuant to which holders have agreed to forbear from exercising rights and remedies, which is in full force and effect;

(vii)    the Closing Date shall not have occurred within three (3) calendar days of the Petition Date;

(viii)    the RSA or, after effectiveness thereof following Bankruptcy Court approval, the RO Backstop Agreement or the Exit Notes Backstop Agreement (each as defined in the RSA) shall have been terminated;

(ix)    the Final DIP Order (i) at any time ceases to be in full force and effect, (ii) shall be vacated, reversed, stayed, modified or amended without the prior written consent of the Required DIP Lenders, or (iii) shall not have been entered by the Bankruptcy Court within thirty-five (35) calendar days after the Petition Date;

(x)    the Loan Parties' failure to satisfy any of the Milestones;

(xi)    dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases to a Chapter 7 case (or the filing of any pleading by a Debtor seeking, consenting to or otherwise supporting such action);

(xii)    appointment of a Chapter 11 trustee, a responsible officer or an examiner (other than a fee examiner) with enlarged powers (beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business of any Debtor in the Bankruptcy Case (or the filing of any pleading by a Debtor seeking, consenting to or otherwise supporting such action);

(xiii)    subject to the Carve-Out, and except as expressly permitted herein, the Bankruptcy Court's granting of any super-priority claim or lien on the DIP Collateral that is *pari passu* with or senior to the super-priority claims or liens of the Term DIP Lenders in the Chapter 11 Cases (or the filing of any pleading by a Debtor seeking, consenting to or otherwise supporting such action);

(xiv)    the Debtors' "exclusive period" under Section 1121 of the Bankruptcy Code for the filing and/or solicitation of a chapter 11 plan is terminated or modified for any reason;

(xv)    other than payments authorized by the Bankruptcy Court and which are set forth in the Approved Budget (a) in respect of accrued payroll and related expenses as of the commencement of the Chapter 11 Cases, (b) in respect of adequate protection payments set forth in the DIP Orders and consented to by the Required DIP Lenders, and (c) in respect of certain critical vendors and other creditors, in each case to the extent

authorized by one or more "first day" or other orders satisfactory to the Required DIP Lenders, any Debtor shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition indebtedness or payables (including without limitation, reclamation claims);

(xvi)     the Bankruptcy Court shall enter one or more orders granting relief from the automatic stay to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on assets of any Debtor that have an aggregate value in excess of $5 million without the prior written consent of the Required DIP Lenders;

(xvii)    any Debtor shall seek to obtain Bankruptcy Court approval for (or the Bankruptcy Court shall enter an order approving) additional financing *pari passu* or senior to the Term DIP Liens or the Term DIP Superpriority Claims (other than the Carve-Out or as expressly permitted under the Term DIP Documents) without the prior written consent of the Required DIP Lenders;

(xviii)   (A) the Debtors engage in or publicly support any challenge to the validity, security, perfection, priority, extent or enforceability of the Term DIP Documents, the Term DIP Liens, the Term DIP Obligations, the prepetition credit documents, the Prepetition Notes Liens or the Prepetition Notes Secured Obligations, including without limitation seeking to equitably subordinate or avoid such liens or claims, (B) the Debtors engage in any investigation or assert any claims or causes of action (or directly or indirectly support assertion of the same) against any of the DIP Secured Parties or the Prepetition Notes Secured Parties; *provided*, that, subject to the DIP Orders, responding, as and to the extent required, to an investigation initiated and conducted by an Official Committee shall not constitute an Event of Default;

(xix)     the entry of a judgment or order by the Bankruptcy Court (i) sustaining any defense, objection or challenge to the validity, security, perfection, priority, extent or enforceability of the Term DIP Documents, the Term DIP Liens, the DIP Obligations, the prepetition credit documents, the Prepetition Notes Liens or the Prepetition Notes Secured Obligations, (ii) avoiding, subordinating, recharacterizing, or otherwise impairing any of the Term DIP Obligations, Term DIP Superpriority Claims, Term DIP Liens, the Prepetition Notes Secured Obligations or the Prepetition Notes Liens;

(xx)      the entry of any order in any of the Chapter 11 Cases surcharging any of the DIP Collateral with respect to the DIP Secured Parties, whether under Section 506(c) of the Bankruptcy Code or otherwise;

(xxi)     the entry of any order in any of the Chapter 11 Cases surcharging any of the Prepetition Notes Collateral with respect to the Prepetition Notes Secured Parties, whether under Section 506(c) of the Bankruptcy Code or otherwise;

(xxii)    the entry of an order in any of the Chapter 11 Cases that is materially adverse to the Term DIP Agent or the Term DIP Lenders in their capacities as such or their rights, remedies and protections under the

Term Loan DIP Facility or the Term DIP Documents;

(xxiii)  any Debtor shall consummate or seek to obtain Bankruptcy Court approval of any sale or other disposition of all or a portion of the DIP Collateral pursuant to Section 363 of the Bankruptcy Code (other than in ordinary course of business that is contemplated by the Approved Budget and expressly permitted in the Term DIP Credit Agreement) without the advance written consent of the Required DIP Lenders, whether as a part of or outside of a plan of reorganization or liquidation, or any Loan Party proposes, supports or fails to contest in good faith the entry of such an order;

(xxiv)  the confirmation of a plan of reorganization or liquidation that does not provide for treatment of the DIP Term Obligations and the Prepetition Notes Obligations acceptable to the Required DIP Lenders, or any Debtor proposes or supports, or fails to contest in good faith, the entry of such a plan of reorganization or liquidation, unless such plan contemplates indefeasibly paying the DIP Obligations and the Prepetition Notes Secured Obligations in full in cash on the effective date of such plan;

(xxv)  if (i) the Existing Noteholder Intercreditor Agreement shall for any reason, except to the extent permitted by the terms thereof, cease to be in full force and effect and valid, binding and enforceable in accordance with its terms against the Borrower, any party thereto or any holder of the liens subordinated thereby, or shall be repudiated by any Loan Party, or be amended, modified or supplemented to cause the liens securing the obligations of the Junior Priority Notes Trustee to be senior or *pari passu* in priority to the liens securing the obligations under the Senior Priority Notes Trustee, (ii) the Borrower takes any action inconsistent with the terms of the Existing Noteholder Intercreditor Agreement (other than in connection with the Plan), or (iii) any order of any court of competent jurisdiction is granted which is materially inconsistent with the terms of the Existing Noteholder Intercreditor Agreement and would reasonably be expected to be adverse to the interests of the Senior Priority Noteholders;

(xxvi)  the reversal or modification of the Roll-Up Loans provided for hereunder by the Bankruptcy Court without the consent of the Required DIP Lenders;

(xxvii)  the failure of any Debtor to comply with the terms of the applicable DIP Order;

(xxviii)  any Debtor shall (i) contest the validity or enforceability of the DIP Orders or any Term DIP Document or deny that it has further liability thereunder, or (ii) contest the validity or perfection of the liens and security interests securing the Term DIP Loans;

(xxix)  the consensual use of prepetition cash collateral is terminated, or the entry of an order by the Bankruptcy Court terminating or modifying the use of cash collateral, in each case, without the prior written consent of the Required DIP Lenders;

(xxx)    the occurrence of customary "ERISA" related events;

(xxxi)    any Term DIP Document shall cease to be in full force or effect (other than pursuant to the terms hereof or thereof) or any grantor thereunder or any other Debtor shall deny or disaffirm in writing any Loan Party's obligations under any of the Term DIP Documents;

(xxxii)    the entry of one or more monetary judgments or decrees of a court of competent jurisdiction against any Debtor involving a liability of $5 million or more in the aggregate for all such judgments and decrees for the Debtors and any such judgments or decrees shall not have been satisfied, vacated, discharged or stayed or bonded pending appeal within thirty (30) days after the entry thereof, in each case, without the prior written consent of the Required DIP Lenders;

(xxxiii) any Loan Party being enjoined, restrained or in any way prevented by order of a court of competent jurisdiction from continuing or conducting all or any material part of its business or affairs;

(xxxiv) since the Closing Date, the occurrence of a material adverse change (to be defined in the Term DIP Credit Agreement); or

(xxxv)    the occurrence of a change of control (to be defined in the Term DIP Agreement).

Upon the occurrence and during the continuation of an Event of Default, subject to the DIP Intercreditor Agreement or Existing ABL/Notes Intercreditor Agreement (as applicable), without further order from or application to the Bankruptcy Court, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the Term DIP Agent, acting at the request of the Required DIP Lenders, to (A) deliver to the Borrower a notice declaring the occurrence of an Event of Default, (B) declare the termination, reduction, or restriction of the commitments under the Term Loan DIP Facility, (C) declare the Term DIP Loans then outstanding to be due and payable, (D) declare the termination, reduction or restriction on the ability of the Debtors to use any Cash Collateral, (E) terminate the Term Loan DIP Facility, (F) charge the default rate of interest under the Term Loan DIP Facility, (G) freeze all monies in any deposit accounts of the Debtors, (H) exercise any and all rights of setoff, (I) exercise any right or remedy with respect to the DIP Collateral or the Term DIP Liens, or (J) take any other action or exercise any other right or remedy permitted under the Term DIP Documents, the DIP Orders or applicable law; *provided, however*, that in the case of the enforcement of rights against the DIP Collateral pursuant to clauses (H), (I) and (J) above, (i) the Term DIP Agent, acting at the request of the Required DIP Lenders, shall provide counsel to the Debtors, counsel to the Official Committee and the Office of the United States Trustee with three (3) Business Days' prior written notice (such period, the "**Remedies Notice Period**"), and (ii) during the Remedies Notice Period, the Debtors and/or any Official Committee shall be permitted to request an emergency hearing before the Bankruptcy Court (which request must be made prior to the conclusion of the Remedies Notice Period and shall seek consideration of such request on an expedited basis) solely to determine whether an Event of Default has occurred; *provided, further*, that in any such hearing following such notice, the only issue that may be raised by any

| | |
|---|---|
| | party in opposition to the actions proposed or available to be taken by the Term DIP Agent shall be whether, in fact, an Event of Default has occurred and is continuing; *provided, further*, that during the Remedies Notice Period and any Remedies Notice Period, the Debtors are permitted to use Cash Collateral solely to fund expenses critically necessary to preserve the value of the Debtors' businesses, as determined by the Required DIP Lenders. |
| **Stipulations, Waivers, Releases and Protections** | 1. The Debtors shall stipulate to the extent, validity, security, enforceability, priority and perfection of the Prepetition Notes Liens and the Prepetition Notes Secured Obligations, and that all cash of the Debtors constitutes "cash collateral" of the Prepetition Notes Secured Parties for purposes of section 363 of the Bankruptcy Code ("**Cash Collateral**") (subject to a challenge period for the Official Committee acceptable to the Required DIP Lenders). |
| | 2. The Debtors shall waive any right to surcharge the DIP Collateral with respect to the DIP Secured Parties and the Prepetition Notes Collateral with respect to the Prepetition Notes Secured Parties for the period prior to entry of the Final DIP Order, and upon entry of the Final DIP Order, the Debtors shall waive any right to surcharge the Prepetition Notes Collateral with respect to the Prepetition Notes Secured Parties for the period from and after entry of the Final DIP Order. |
| | 3. The Debtors shall waive the equitable doctrine of "marshalling" against the DIP Collateral with respect to the DIP Secured Parties, and, subject to entry of the Final DIP Order, the Prepetition Notes Collateral with respect to the Prepetition Notes Secured Parties. |
| | 4. The Prepetition Notes Secured Parties shall be entitled to the benefit of section 552(b) of the Bankruptcy Code, and, upon entry of the Final DIP Order, the Debtors shall waive the "equities of the case exception" under section 552(b) of the Bankruptcy Code with respect to the Prepetition Notes Secured Parties. |
| | 5. The Debtors shall waive and forever release and discharge any and all claims and causes of action against each of the DIP Secured Parties and the Prepetition Notes Secured Parties (and their respective related parties and representatives) as of the date of the applicable DIP Order. |
| | 6. No Cash Collateral, proceeds of the Term Loan DIP Facility, or any cash or other amounts may be used to (a) investigate, challenge, object to or contest the extent, validity, enforceability, security, perfection or priority of any of the Term DIP Liens, Prepetition Notes Liens, Term DIP Obligations or Prepetition Notes Secured Obligations, (b) investigate or initiate any claim or cause of action against any of the DIP Secured Parties or Prepetition Notes Secured Parties, (c) object to or seek to prevent, hinder or delay or take any action to adversely affect the rights or remedies of the Term DIP Secured Parties or the Prepetition Notes Secured Parties, (d) seek to approve superpriority claims or grant liens or security interests (other than those expressly permitted under the Term DIP Documents and the DIP Orders) that are senior to or *pari passu* with the Term DIP Liens, Term DIP Superpriority Claims, the adequate protection liens or claims granted hereunder, or the Prepetition Notes Liens; *provided, however*, no more than |

|  | $50,000 of the Carve-Out in the aggregate may be used by an Official Committee to investigate (but not object to or commence an action or proceeding with respect to) the Prepetition ABL Secured Obligations, the Prepetition Notes Secured Obligations, the Prepetition ABL Liens and the Prepetition Notes Liens. |
|  | 7. The Term DIP Secured Parties shall have the unqualified right to credit bid all DIP Obligations and, upon entry of the Final DIP Order, subject to section 363(k) of the Bankruptcy Code, the Prepetition Secured Parties shall have the unqualified right to credit bid all Prepetition Secured Obligations, in each case, subject to the DIP Intercreditor Agreement, the Existing ABL/Notes Intercreditor Agreement or the Existing Notes Intercreditor Agreement, as applicable. |
|  | 8. The DIP Secured Parties and the Prepetition Secured Parties shall be entitled to good faith protection under Section 364(e) of the Bankruptcy Code. |
| **Expenses and Indemnification** | The DIP Credit Agreement shall provide for the payment of all costs and expenses of the Term DIP Agent and the Term DIP Lenders, including, without limitation, the payment of all reasonable and documented fees and expenses of the Lender Advisors. <br><br> The DIP Credit Agreement shall also provide for customary indemnification by each of the Loan Parties, on a joint and several basis, of each of the Term DIP Secured Parties (together with their related parties and representatives). |
| **Assignments** | The DIP Credit Agreement shall contain assignment provisions that are usual and customary for financings of this type and as determined in accordance with the Documentation Principles, and shall also require that each assignee or participant shall become a party to the RSA prior to or concurrently with acquiring any Term DIP Loans. <br><br> Each assignment or participation of Term DIP Loans shall be subject to a right of first refusal for the benefit of the initial Term DIP Lenders providing New Money Commitments. |
| **Amendments** | Usual and customary for facilities of this type requiring the consent of the Required DIP Lenders, except for amendments customarily requiring approval by affected Term DIP Lenders under the Term Loan DIP Facility. <br><br> "**Required DIP Lenders**" shall mean Term DIP Lenders holding greater than 50% of the aggregate amount of New Money Commitments (as defined in **Annex I** attached hereto), any New-Money Cash Out Commitment and Term DIP Loans. |
| **Governing Law** | This DIP Term Sheet and the Term DIP Documents will be governed by the laws of the State of New York (except as otherwise set forth therein). The Bankruptcy Court shall maintain exclusive jurisdiction with respect to the interpretation and enforcement of the Term DIP Documents and the exercise of the remedies by the DIP Secured Parties and preservation of the value of the DIP Collateral. |

| | |
|---|---|
| **Counsel to the Term DIP Lenders** | Paul Hastings LLP. |

Interest and Certain Payments

| | |
|---|---|
| Interest Rate: | The Term DIP Loans shall bear interest at a rate per annum equal to the Adjusted SOFR Rate (subject to a floor of 1.0%) + 10.0%. |
| Interest Payment Dates: | Interest shall be payable in cash in arrears, with respect to any Adjusted SOFR rate borrowings, on the last day of the interest period in effect for such Adjusted SOFR rate borrowing (which shall be no longer than one month) and, with respect to any base rate borrowing, on the last business day of each month, upon any prepayment due to acceleration and at final maturity. |
| Commitment Payment: | A non-refundable commitment payment equal to 4.50% of an amount equal to (x) the aggregate principal amount of the New Money Commitment of each DIP Lender <u>minus</u> (y) the Proof of Loss Amount (such excess amount of aggregate principal of New Money Commitments, the "<u>Paid-for New Money Commitments</u>"), which shall be payable in cash in full on the Closing Date. Such commitment payment shall be netted from the proceeds of the Closing Date draw. |

Notwithstanding the foregoing,

(x)  if the second draw upon entry of the Final DIP Order occurs, the Borrower shall pay a non-refundable commitment payment equal to 4.50% of the aggregate principal amount of New Money Commitments drawn on the date of such second borrowing (together with the New Money Commitments drawn on the first borrowing) in excess of the Paid-for New Money Commitments, which shall be payable in cash in full on the date of such second draw. Such commitment payment shall be netted from the proceeds of the second draw; and

(y)  if the Third Draw Reinstatement occurs, the Borrower shall pay a non-refundable commitment payment equal to 4.50% of the aggregate amount of New Money Commitments drawn in connection with such Third Draw Reinstatement, which shall be payable in cash in full on the date of such third draw. Such commitment payment shall be netted from the proceeds of the third draw.

"**Proof of Loss Amount**" means an amount equal to $41,947,500, which, pursuant to the Partial Proof of Loss to TPC Group, Inc., dated May 26, 2022 is expected to be provided to the Borrower.

| | |
|---|---|
| Non-Use Payment: | A payment equal to 5.0% per annum on the undrawn New Money Commitments (including any commitments that are temporarily unavailable as a result of the approval of the Specified POL) under the Term Loan DIP Facility, which shall be paid monthly. |
| Exit Payment: | Upon (x) any repayment (including, without limitation, any mandatory prepayment, any voluntary prepayment and any payment upon maturity or otherwise) of the Term DIP Loans or (y) termination of the New Money |

Commitments on the date of the third draw (it being understood that if the Borrower shall have exercised the Third Draw Reinstatement the Exit Payment in respect of the New Money Commitments drawn as DIP Term Loans shall be payable upon repayment of such DIP Term Loans), voluntary reduction or termination of the New Money Commitments by the Borrower or the maturity of the Term Loan DIP Facility, the Borrower shall pay an amount equal to 2.25% of the aggregate amount of (x) the New Money Loans of each DIP Lender subject to such repayment and (y) any New Money Commitments so terminated on the date of the third draw, that were voluntarily reduced or terminated by the Borrower or that were in existence on the maturity date (the "**Exit Payment**"); provided, that no Exit Payment shall be payable on the amount of any undrawn New Money Commitments up to the Proof of Loss Amount (it being understood any such New Money Commitments that are drawn as DIP Term Loans shall be subject to the Exit Payment as set forth above).

|  |  |
|---|---|
| Default Rate: | During the continuance of event of default, principal, overdue interest, overdue premium and fees and other overdue amounts shall bear interest at 2.00% per annum above the rate otherwise applicable to such obligations. |
| Rate and Payment Basis: | All per annum rates shall be calculated on the basis of a year of 360 days. All amounts payable under this DIP Term Sheet will be made in Dollars. |

<div align="center">*     *     *     *</div>

**Annex II**

| Priority | DIP Collateral (other than TPC Holdings Assets) that constitutes ABL Facility Priority Collateral or that would otherwise constitute ABL Facility Priority Collateral | DIP Collateral (other than TPC Holdings Assets) that constitutes Notes Priority Collateral or that would otherwise constitute Notes Priority Collateral | TPC Holdings Assets | Claims |
|---|---|---|---|---|
| *First* | Carve Out and Permitted Liens | Carve Out and Permitted Liens | Carve Out | Carve Out |
| *Second* | ABL DIP Liens | Term DIP Liens | ABL DIP Liens | Term DIP Superpriority Claims and ABL DIP Superiority Claims on a *pari passu* basis |
| *Third* | ABL Adequate Protection Liens (until the Prepetition ABL Secured Obligations are refinanced in full under an ABL DIP Facility) | Senior Priority Notes Adequate Protection Liens (until the Prepetition Senior Priority Notes Secured Obligations are rolled up in full under the DIP Term Loan Facility) | ABL Adequate Protection Liens (until the Prepetition ABL Secured Obligations are refinanced in full under an ABL DIP Facility) | Senior Priority Notes Adequate Protection Claims (until the Prepetition Senior Priority Notes Secured Obligations are rolled up in full under the Term Loan DIP Facility) and ABL Adequate Protection Claims (until the Prepetition ABL Secured Obligations are refinanced in full under an ABL DIP Facility) on a *pari passu* basis |
| *Fourth* | Prepetition ABL Liens (until the Prepetition ABL Secured Obligations are refinanced in full under an ABL DIP | Prepetition Senior Priority Notes Liens (until the Prepetition Senior Priority Notes Secured Obligations | Prepetition ABL Liens (until the Prepetition ABL Secured Obligations are | Junior Priority Notes Adequate Protection Claims |

| | | | |
|---|---|---|---|
| | Facility) | are rolled up in full under the DIP Term Loan Facility) | refinanced in full under an ABL DIP Facility) | |
| *Fifth* | Term DIP Liens | Junior Priority Notes Adequate Protection Liens | Term DIP Liens | |
| *Sixth* | Senior Priority Notes Adequate Protection Liens (until the Prepetition Senior Priority Note Secured Obligations are rolled up in full under the DIP Term Loan Facility) | Prepetition Junior Priority Notes Liens | Senior Priority Notes Adequate Protection Liens (until the Prepetition Senior Priority Notes Secured Obligations are rolled up in full under the Term Loan DIP Facility) | |
| *Seventh* | Prepetition Senior Priority Notes Liens (until the Prepetition Senior Priority Note Secured Obligations are rolled up in full under the DIP Term Loan Facility) | ABL DIP Liens | Junior Priority Notes Adequate Protection Liens | |
| *Eighth* | Junior Priority Notes Adequate Protection Liens | ABL Adequate Protection Liens (until the Prepetition ABL Secured Obligations are refinanced in full under an ABL DIP Facility) | | |
| *Ninth* | Prepetition Junior Priority Notes Liens | Prepetition ABL Liens (until the Prepetition ABL Secured Obligations are refinanced in full under an ABL DIP Facility) | | |

## Exhibit C

### Form of Joinder Agreement

This Joinder Agreement to the Restructuring Support Agreement, dated as of May 31, 2022, (as amended, supplemented, or otherwise modified from time to time, the "**Agreement**"), by and among TPC Group Inc. and its affiliates signatory thereto (collectively, the "**TPC Parties**") and the Supporting Noteholders, is executed and delivered by _____ (the "**Joining Party**") as of _____. Each capitalized term used but not otherwise defined in this Joinder Agreement has the meaning assigned to such term in the Agreement.

1. **Agreement to Be Bound**.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as <u>Annex I</u> (as the same has been or may hereafter be amended, restated, or otherwise modified from time to time in accordance with the provisions of the Agreement).  The Joining Party shall hereafter be deemed to be a Supporting Noteholder and a Party for all purposes under the Agreement and with respect to any and all Notes and other Claims held by such Joining Party.

2. **Representations and Warranties**.  With respect to the aggregate principal amount of the Notes and other Claims set forth below its name on the signature page hereto, the Joining Party hereby makes to each other Party the representations and warranties of a Supporting Noteholder, as applicable, as set forth in <u>Section 11</u> of the Agreement.

3. **Governing Law**.  This Joinder Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to any conflicts-of-laws principles that would require the application of the law of any other jurisdiction.

*[Signature page follows.]*

**SUPPORTING NOTEHOLDER**

[Supporting Noteholder name to be inserted]

[Supporting Noteholder sig block and notice address to be inserted]

| | |
|---|---|
| Principal amount of Priming Notes: | $_____ |
| Principal amount of 10.5% Notes: | $_____ |
| Principal amount of DIP Claims: | $_____ |
| Type and face amount of other Claims: | $_____ |

Acknowledged:

[TPC SIG BLOCK(S) TO BE INSERTED]

**<u>Annex I to Joinder Agreement</u>**

**Restructuring Support Agreement**

[To be attached.]

## EXHIBIT C

## Organizational Chart



[1] Unless ownership % is specified, all entity relationships are 100% wholly owned

## **EXHIBIT D**

**Financial Projections**

**TPC Group**
Financial Projections

# FINANCIAL PROJECTIONS

The Company developed financial projections (the "Financial Projections") to support the feasibility of the Debtors' Joint Plan of Reorganization Pursuant to a Chapter 11 of the Bankruptcy Code (the "Plan").[1] The Financial Projections are reflective of the "Company", which is comprised of the Debtors.  Substantially all of the Debtors' operating assets are owned by TPC Group, LLC.

**THE FINANCIAL PROJECTIONS ARE BASED UPON A NUMBER OF SIGNIFICANT ASSUMPTIONS.   ACTUAL OPERATING RESULTS AND VALUES MAY VARY SIGNIFICANTLY FROM THESE FINANCIAL PROJECTIONS.**

*Overview of Financial Projections*

As a condition to Confirmation, the Bankruptcy Code requires, among other things, the Bankruptcy Court to find that Confirmation is not likely to be followed by either a liquidation or the need to further reorganize the Company.  In connection with developing the Plan, and for purposes of determining whether the Plan satisfies the Bankruptcy Code's feasibility standards, the Company's management ("Management") has, through the development of the Financial Projections, analyzed the Reorganized Company's ability to meet its obligations under the Plan and to maintain sufficient liquidity and capital resources to conduct its business.  The Financial Projections will also assist each holder of a Claim or an Interest entitled to vote on the Plan in determining whether to vote to accept or reject the Plan.  The Company prepared the Financial Projections in good faith, based upon estimates and assumptions made by Management.  The estimates and assumptions in the Financial Projections, while considered reasonable by Management, may not be realized, and are inherently subject to uncertainties and contingencies. They are also based on factors such as industry performance, general business, economic, competitive, regulatory, market and financial conditions, all of which are inherently difficult to predict and generally beyond the Company's control.  Because future events and circumstances may well differ from those assumed and unanticipated events or circumstances may occur, the Company expects that the actual and projected results will differ, and the actual results may be materially greater or materially less than those contained in the Financial Projections.  No representations can be made as to the accuracy of the Financial Projections or the Company's ability to achieve the projected results.  Therefore, the Financial Projections may not be relied upon as a guarantee or as any other form of assurance as to the actual results that will occur.  The inclusion of the Financial Projections herein should not be regarded as an indication that the Company considered or considers the Financial Projections to reliably predict future performance. The Financial Projections are subjective in many respects, and thus are susceptible to multiple interpretations and periodic revisions based on actual experience and future developments.  The Company does not intend to update or otherwise revise the Financial Projections to reflect the occurrence of future events, even in the event that assumptions underlying the Financial

---

[1] Capitalized terms used herein, but not defined have the meanings ascribed to such terms in the Plan.

Projections are not borne out.  The Financial Projections should be read in conjunction with the assumptions and qualifications set forth herein.

In general, as illustrated by the Financial Projections, the Company believes it should have sufficient liquidity to pay and service its debt obligations, and to operate its businesses.  The Company believes that Confirmation and Consummation are not likely to be followed by the liquidation or further reorganization of the Company.  Accordingly, the Company believes that the Plan satisfies the feasibility requirement of Section 1129(a)(11) of the Bankruptcy Code.

**THE COMPANY DID NOT PREPARE THE FINANCIAL PROJECTIONS WITH A VIEW TOWARDS COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS.  THE COMPANY'S INDEPENDENT AUDITOR HAS NEITHER COMPILED NOR EXAMINED THE ACCOMPANYING PROSPECTIVE FINANCIAL INFORMATION TO DETERMINE THE REASONABLENESS THEREFORE AND, ACCORDINGLY, HAS NOT EXPRESSED AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO. THE COMPANY DOES NOT, AS A MATTER OF COURSE, PUBLISH FINANCIAL PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION, RESULT OF OPERATIONS, OR CASH FLOW.**

**ACCORDINGLY, NEITHER THE COMPANY NOR THE REORGANIZED COMPANY INTEND TO, AND EACH DISCLAIMS ANY OBLIGATION TO: (A) FURNISH UPDATED FINANCIAL PROJECTIONS TO HOLDERS OF CLAIMS OR EQUITY INTERESTS PRIOR TO THE EFFECTIVE DATE OR TO ANY OTHER PARTY AFTER THE EFFECTIVE DATE; (B) INCLUDE ANY SUCH UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SECURITIES AND EXCHANGE COMMISSION; OR (C) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE.**

The Company prepared the Financial Projections based on, among other things, the anticipated future financial condition and results of operations of the Company using the business plan.  Management developed and refined the business plan and prepared consolidated Financial Projections of the Company December 2022 through December 2027 (fiscal year 2027) (the "Projection Period").

The Financial Projections assume that the Plan will be consummated in accordance with its terms and that all transactions contemplated by the Plan will be consummated by November 30, 2022 (the "Effective Date").  Any significant delay in the Effective Date may have a significant negative impact on the operations and financial performance of the Company including, but not limited to, an increased risk or inability to meet sales forecasts and the incurrence of higher reorganization expenses.  Although the Financial Projections represent the Company's best estimate and good faith judgment (for which the Company believes it has a reasonable basis), of the results of future operations, financial position, and cash flows of the Company, they are only estimates and actual results may vary considerably from such Financial Projections. Consequently, the inclusion of the Financial Projection herein should not be regarded as a

representation by the Company, the Company's advisors, or any other person that the projected results of operations, financial position, and cash flows of the Company will be achieved.

The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement and in the Plan in their entirety as well as the notes and assumptions set forth below.

The Company does not intend to update or otherwise revise the Financial Projections to reflect circumstances that may occur after their preparation, or to reflect the occurrence of unanticipated events, even in the event that any or all of the underlying assumptions are shown to be in error.

Additional information relating to the principal assumptions used in preparing the Financial Projections are set forth below.

### *General Assumptions and Methodology*

The Financial Projections consist of the following unaudited pro forma financial statements: projected consolidated statement of operations, projected balance sheet and projected statements of cash flows for each year in the Projection period. The Financial Projections are based on the business plan for the Projection Period.

The Financial Projections have been prepared using accounting policies that are materially consistent with those applied in the Company's historical financial statements. The Financial Projections do not reflect the formal implementation of reorganization accounting pursuant to FASB Accounting Standards Codification Topic 852, Reorganizations ("ASC 852"). The Financial Projections: a) are based upon current and projected market conditions in which the Company operates; b) are forecasted by the Company's primary sales channels; c) assume emergence from Chapter 11 on the Effective Date under terms substantially similar to those set forth in the Plan; and d) reflect capital expenditures related to normal course maintenance and other investments necessary to run the business during the Projection Period. Assumptions have not been made to depreciation and amortization to reflect "fresh start" accounting.

### *Income Statement Assumptions*

<u>Revenue</u>: The Company has three primary revenue-generating segments: (i) crude C4 processing, (ii) isobutylene derivates, and (iii) fuels.

The Company's revenue is expected to reduce slightly from fiscal year 2022 to 2023, grow from fiscal year 2023 to 2024, decrease in 2025, then rise back to 2024 levels by 2027. Revenue variation is largely due to forecasted volume and commodity changes.

<u>Cost of Goods Sold and Gross Margin</u>: Cost of Goods Sold primarily includes raw material, inbound and outbound freight, utilities related to the production of inventory, supply chain costs related to the procurement and warehousing, and other miscellaneous costs associated with the production of finished goods.

G&A Expenses:  Operating expenses include payroll, salaries and benefits, equipment and facility maintenance costs, telecom and software costs, selling expenses, supplies, professional fees, environmental compliance costs, insurance, and other corporate administrative costs not allocated to cost of sales.

Other Income / Expense:  Other Income / Expense consists of certain other expenses and income that occur during the projection period.

Income Tax Expense:  The projections assume that the Debtors will be a tax payer throughout the forecast, based on the assumption that the current NOLs and other tax attributes will not remain after the emergence date.  This assumption is subject to change based on additional tax related work and could have a material impact on the financial projections.

**Balance Sheet Assumptions**

The Company's projected balance sheet was developed based upon the Company's financial projections and have been adjusted for the impact of the exit transaction.

The transaction balance sheet reflects the satisfaction per the Plan of the: i) DIP Term Loan, ii) DIP ABL Facility, iii) 10.875 Senior Secured Notes iv) 10.5% Senior Secured Notes and v) General Unsecured Claims.  For the periods following the Effective Date, the projected balance sheet reflects a capital structure comprised of the i) ABL Facility and ii) Exit Notes.  The projected balance sheet is forecasted at TPC Group LLC, and therefore does not reflect the anticipated PIK notes that will sit at a holding company.  Shareholders' equity at emergence is calculated based on the Plan value of $1,125 million less the Exit Notes.

The transaction balance sheet does not reflect the impact of "fresh start" accounting, which could result in a material change to the projected values of assets and liabilities.

**Cash Flow Statement Assumptions**

The Company's projected statements of cash flow and liquidity were developed based on the evaluation of Chapter 11 exit costs followed by the cash needed to support operating, investing, and financing activities during the Projection Period.  Specific items impacting the cash flow statement projections include:

EBITDA Adjustments:  Comprised of certain cash adjustments made to EBITDA.

Changes in Working Capital:  Changes in working capital is attributable primarily to changes in accounts receivable, inventory, and accounts payable.  Working capital is projected using historical DSO, DIO and DPO levels.

Interest Expense:  Consists of interest related to the post-confirmation capital structure, specifically the Exit Notes.  Interest on the Exit Notes is assumed to be 9.0% but is subject to change based on market factors and negotiations.  Cash Interest is projected using the capital structure contemplated in the Company's Restructuring Support Agreement, including postemergence and projected levels of borrowing.  The projected cash interest expense is presented on a 'cash' basis and is not intended to reflect interest expense in accordance with GAAP, the

reflection of which may vary materially from the amounts presented herein.  No Debt Amortization is assumed.

<u>Other Operating Items</u>:    Other Operating Items consists primarily of adjustments to EBITDA for accrual versus cash items.  Non-cash items included in EBITDA include insurance premium amortization, property tax accruals, sales / use tax accruals, AIP accruals, pension expense, and PNO incident charges.  Cash items that are not included in EBITDA include deferred costs associated with turnaround projects, catalysts costs, insurance premiums, property tax payments, sales / use tax payments, AIP payments, 401k payments, PNO incident costs and expenses arising after the Effective Date related to regulatory compliance and related costs and expenses and estimated assumed VCP payments, and interest payments.

<u>Capital Expenditure</u>:  Consists of capital expenditure necessary to maintain operations, as well as capital expenditure related to the growth in the business.

**CONSOLIDATED FINANCIAL PROJECTIONS**

| Income Statement<br>*($ in Millions)* | LRP<br>Dec-22 | LRP<br>2023 | LRP<br>2024 | LRP<br>2025 | LRP<br>2026 | LRP<br>2027 |
|---|---|---|---|---|---|---|
| **Revenue** | $147 | $1,835 | $2,078 | $1,988 | $2,146 | $2,085 |
| Cost of Sales | (113) | (1,366) | (1,527) | (1,453) | (1,551) | (1,505) |
| **Gross Profit Contribution** | $34 | $470 | $551 | $535 | $594 | $580 |
| **Operating Profit** | $14 | $220 | $299 | $285 | $337 | $318 |
| G&A expenses | ($3) | ($38) | ($39) | ($40) | ($41) | ($42) |
| Depreciation and amortization | (6) | (80) | (97) | (97) | (97) | (95) |
| Interest expense, net | (3) | (33) | (33) | (35) | (35) | (37) |
| Other income / expense, net | 6 | 24 | 16 | 3 | - | - |
| **Income (loss) before taxes** | $7 | $93 | $146 | $116 | $164 | $143 |
| Income tax expense | (2) | (20) | (31) | (24) | (34) | (30) |
| **Net income (loss)** | $6 | $74 | $115 | $92 | $129 | $113 |
| Interest expense, net | $3 | $33 | $33 | $35 | $35 | $37 |
| Income tax expense | 2 | 20 | 31 | 24 | 34 | 30 |
| Depreciation & amortization | 6 | 80 | 97 | 97 | 97 | 95 |
| **EBITDA** | $17 | $207 | $276 | $247 | $296 | $276 |
| EBITDA Adjustments | (5) | (22) | (17) | (3) | - | - |
| **Adjusted EBITDA** | $11 | $185 | $259 | $244 | $296 | $276 |

**CONSOLIDATED FINANCIAL PROJECTIONS**

| Balance Sheet<br>($ in Millions) | LRP<br>Dec-22 | LRP<br>2023 | LRP<br>2024 | LRP<br>2025 | LRP<br>2026 | LRP<br>2027 |
|---|---|---|---|---|---|---|
| **Current Assets:** | | | | | | |
| Cash and cash equivalents | $60 | $1 | $59 | $117 | $246 | $333 |
| Trade accounts receivable | 142 | 154 | 170 | 163 | 176 | 171 |
| Inventories | 98 | 95 | 105 | 100 | 107 | 104 |
| Other current assets | 65 | 86 | 87 | 86 | 85 | 84 |
| **Total Current Assets** | **$366** | **$337** | **$421** | **$467** | **$614** | **$692** |
| **Non-Current Assets:** | | | | | | |
| Property, plant and equipment, net | $786 | $875 | $935 | $961 | $983 | $1,006 |
| Intangible assets, net | 130 | 130 | 130 | 130 | 130 | 130 |
| Operating Leases - Right of Use Assets | 143 | 143 | 143 | 143 | 143 | 143 |
| Other assets, net | 83 | 97 | 79 | 84 | 60 | 64 |
| **Total Assets** | **$1,508** | **$1,583** | **$1,709** | **$1,785** | **$1,931** | **$2,036** |
| | | | | | | |
| **Liabilities & Stockholders' Equity** | | | | | | |
| **Current Liabilities:** | | | | | | |
| Accounts payable | $126 | $133 | $143 | $134 | $142 | $139 |
| Accrued liabilities | 85 | 59 | 50 | 50 | 50 | 50 |
| Operating Lease Liabilities - Current | 25 | 25 | 25 | 25 | 25 | 25 |
| Current debt - insurance financing | 14 | 14 | 15 | 14 | 13 | 12 |
| **Total Current Liabilities** | **$250** | **$232** | **$233** | **$224** | **$230** | **$226** |
| **Non-Current Liabilities:** | | | | | | |
| ABL Facility | - | - | - | - | - | - |
| Exit Notes | 350 | 350 | 350 | 350 | 350 | 350 |
| **Long-Term Debt** | **$350** | **$350** | **$350** | **$350** | **$350** | **$350** |
| Operating Lease Liabilities - Non Current | 126 | 126 | 126 | 126 | 126 | 126 |
| Deferred income taxes | 2 | 21 | 31 | 24 | 34 | 30 |
| **Total Liabilities** | **$728** | **$729** | **$739** | **$724** | **$740** | **$732** |
| | | | | | | |
| Equity (excluding current year RE) | $775 | $781 | $854 | $970 | $1,061 | $1,191 |
| Current year retained earnings | 6 | 74 | 115 | 92 | 129 | 113 |
| **Shareholders' Equity** | **$781** | **$854** | **$970** | **$1,061** | **$1,191** | **$1,304** |
| | | | | | | |
| **Total Liabilities & Stockholders' Equity** | **$1,508** | **$1,583** | **$1,709** | **$1,785** | **$1,931** | **$2,036** |

**CONSOLIDATED FINANCIAL PROJECTIONS**

| Cash Flow<br>*($ in Millions)* | LRP<br>Dec-22 | LRP<br>2023 | LRP<br>2024 | LRP<br>2025 | LRP<br>2026 | LRP<br>2027 |
|---|---|---|---|---|---|---|
| **Adjusted EBITDA - underlying** | $11 | $185 | $259 | $244 | $296 | $276 |
| Cash Taxes | - | - | ($21) | ($31) | ($24) | ($34) |
| Interest payments | (1) | (33) | (33) | (35) | (35) | (37) |
| Changes in Working Capital | (18) | (5) | (13) | 6 | (12) | 5 |
| Other Operating Cash Flow Items | 29 | (67) | (19) | (46) | (21) | (46) |
| **Operating Cash Flow** | $22 | $79 | $172 | $140 | $204 | $163 |
| Captial Expenditures | ($8) | ($138) | ($115) | ($81) | ($75) | ($76) |
| **Free cash flow** | $13 | ($59) | $57 | $59 | $130 | $88 |
| Financing Activities: | ($3) | $1 | $0 | ($1) | ($1) | ($1) |
| **Net Cash Flow** | $10 | ($59) | $58 | $58 | $129 | $87 |
| | | | | | | |
| *Memo:* | | | | | | |
| Beginning Cash | $50 | $60 | $1 | $59 | $117 | $246 |
| Net Cash Flow | 10 | (59) | 58 | 58 | 129 | 87 |
| Ending Cash | $60 | $1 | $59 | $117 | $246 | $333 |

# **EXHIBIT E**

**Valuation Analysis**

## REORGANIZED DEBTORS VALUATION ANALYSIS

THE VALUATION INFORMATION CONTAINED HEREIN IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN. THIS VALUATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION AS REQUIRED BY SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS OR INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS.

At the Debtors' request, Moelis & Company LLC ("Moelis") performed a valuation analysis of the Reorganized Debtors.

Based upon and subject to the review and analysis described herein, and subject to the assumptions, limitations and qualifications described herein, Moelis' view, as of August 29, 2022, was that the estimated total distributable value of the Reorganized Debtors, as of an assumed Effective Date for purposes of Moelis' valuation analysis of November 30, 2022 (the "Assumed Effective Date"), is between $708 million and $1,306 million. The total distributable value consists of the estimated going concern enterprise value of the Reorganized Debtors, and the present value of the potential realization of the Debtors' remaining insurance claims under its property damage and business interruption policies. The total distributable value does not account for the impact of any incremental costs that may arise from (i) ongoing proceedings with regulatory, environmental and safety agencies and (ii) ongoing Department of Justice investigations resulting from the PNO Incident.  In performing its valuation analysis, Moelis did not allocate value on a debtor-by-debtor basis.

Moelis' views are necessarily based on economic, monetary, market, and other conditions as in effect on, and the information made available to Moelis as of, the date of its analysis. It should be understood that, although subsequent developments may affect Moelis' views, Moelis does not have any obligation to update, revise, or reaffirm its estimate.

Moelis' analysis is based, at the Debtors' direction, on a number of assumptions, including, among other assumptions, that (i) the Debtors will be reorganized in accordance with the Plan which will be effective on the Assumed Effective Date, (ii) the Reorganized Debtors will achieve the results set forth in the Debtors' management's Financial Projections (as defined in this Disclosure Statement and attached as Exhibit [•] to this Disclosure Statement) for December 2022 through fiscal year 2027 (the "Projection Period") provided to Moelis by the Debtors, (iii) the Reorganized Debtors' capitalization and available cash will be as set forth in the Plan and this Disclosure Statement, and (iv) the Reorganized Debtors will be able to obtain all future financings, on the terms and at the times, necessary to achieve the results set forth in the Financial Projections. Moelis makes no representation as to the achievability or reasonableness of such assumptions. In addition, Moelis assumed that there will be no material change in economic, monetary, market, and other conditions as in effect on, and the information made available to Moelis, as of the Assumed Effective Date.

Moelis assumed, at the Debtors' direction, that the Financial Projections prepared by the Debtors' management were reasonably prepared on a basis reflecting the best currently available estimates and judgments of the Debtors' management as to the future financial and operating performance of the Reorganized Debtors. The future results of the Reorganized Debtors are dependent upon various factors, many of which are beyond the control or knowledge of the Debtors, and consequently are inherently difficult to project. The Reorganized Debtors' actual future results may differ materially (positively or negatively) from the Financial Projections and, as a result, the actual distributable value of the Reorganized Debtors may be materially higher or lower than the estimated range

herein. Among other things, failure to consummate the Plan in a timely manner may have a materially negative impact on the distributable value of the Reorganized Debtors.

The estimated distributable value in this section represents a hypothetical distributable value of the Reorganized Debtors as the continuing operators of the business and assets of the Debtors, after giving effect to the Plan, based on consideration of certain valuation methodologies as described below. The estimated distributable value in this section does not purport to constitute an appraisal or necessarily reflect the actual market value that might be realized through a sale or liquidation of the Reorganized Debtors, their securities or their assets, which may be materially higher or lower than the estimated distributable value range herein. The actual value of an operating business such as the Reorganized Debtors' business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in various factors affecting the financial condition and prospects of such a business.

In conducting its analysis, Moelis, among other things: (i) reviewed certain publicly available business and financial information relating to the Reorganized Debtors that Moelis deemed relevant; (ii) reviewed certain internal information relating to the business, earnings, cash flow, assets, liabilities, and prospects of the Reorganized Debtors, including the Financial Projections, furnished to Moelis by the Debtors; (iii) conducted discussions with members of senior management and other representatives of the Debtors concerning the matters described in clauses (i) and (ii) of this paragraph, as well as their views concerning the Debtors' business prospects before giving effect to the Plan, and the Reorganized Debtors' business and prospects after giving effect to the Plan; (iv) reviewed publicly available financial and stock market data for certain other companies in lines of business that Moelis deemed relevant; (v) reviewed publicly available financial data for certain transactions that Moelis deemed relevant; (vi) reviewed the Plan dated June 16, 2022 [D.I. 216]; (vii) discussed the potential realizable value of the Debtors' insurance policies under its property damage and business interruption policies with senior management and other representatives of the Debtors and (viii) conducted such other financial studies and analyses and took into account such other information as Moelis deemed appropriate. In connection with its review, Moelis did not assume any responsibility for independent verification of any of the information supplied to, discussed with, or reviewed by Moelis and, with the consent of the Debtors, relied on such information being complete and accurate in all material respects. In addition, at the direction of the Debtors, Moelis did not make any independent evaluation or appraisal of any of the assets or liabilities (contingent, insurance related, derivative, off-balance- sheet, tax-related or otherwise) of the Reorganized Debtors, nor was Moelis furnished with any such evaluation or appraisal. Moelis also assumed, with the Debtors' consent, that the final form of the Plan does not differ in any respect material to its analysis from the Plan dated June 16, 2022.

The estimated distributable value in this section does not constitute a recommendation to any Holder of a Claim or Interest entitled to vote on the Plan as to how such Holder of a Claim or Interest should vote or otherwise act with respect to the Plan. Moelis has not been asked to and does not express any view as to what the trading value of the Reorganized Debtors' securities would be when issued pursuant to the Plan or the prices at which they may trade in the future. The estimated distributable value set forth herein does not constitute an opinion as to fairness from a financial point of view to any Holder of a Claim or Interest of the consideration to be received by such Holder of a Claim or Interest under the Plan or of the terms and provisions of the Plan.

**Valuation Methodologies**

In preparing its valuation, Moelis performed a variety of financial analyses and considered a variety of factors. The following is a brief summary of the material financial analyses performed by Moelis, which consisted of (a) a discounted cash flow analysis, (b) a selected transactions analysis, and (c) a selected publicly traded companies analysis. This summary does not purport to be a complete description of the analyses performed and factors considered by Moelis. The preparation of a valuation analysis is a complex analytical process involving various judgmental determinations as to the most appropriate and relevant methods of financial analysis and the application of those methods to particular facts and circumstances, and such analyses and judgments are not readily susceptible to summary description. As such, Moelis' valuation analysis must be considered as a whole. Reliance on only one of the methodologies used, or portions of the analysis performed, could create a misleading or incomplete conclusion as to enterprise value.

A. ***Discounted Cash Flow Analysis.*** The discounted cash flow ("DCF") analysis is an enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business plus a present value of the estimated terminal value of that asset or business. Moelis' DCF analysis used the Financial Projections' estimated debt-free, after-tax free cash flows through December 31, 2027. These cash flows were then discounted at a range of estimated weighted average costs of capital ("Discount Rate") for the Reorganized Debtors. The Discount Rate reflects the estimated blended rate of return that would be expected by debt and equity investors to invest in the Reorganized Debtors' business based on its target capital structure. The enterprise value was determined by calculating the present value of the Reorganized Debtors' unlevered after-tax free cash flows based on the Financial Projections plus an estimate for the value of the Reorganized Debtors beyond the Projection Period known as the terminal value. In determining the estimated terminal value of the Reorganized Debtors, Moelis utilized the perpetuity growth rate method which estimates a range of values for the Reorganized Debtors at the end of the Projection Period based on applying a range of growth rates to final year unlevered free cash flow. In estimating a range of perpetuity growth rates for its DCF analysis, Moelis took into account the limited incremental processing capacity of the Reorganized Debtors' facilities, the highly contractual nature of the Reorganized Debtors' business, and long-term secular declines in key end-uses for certain of the products of the Reorganized Debtors.

To determine the Discount Rate, Moelis used the estimated cost of equity and the estimated after-tax cost of debt for the Reorganized Debtors, assuming a targeted, long-term, debt-to-total capitalization ratio (based on debt-to-capitalization ratios of the selected publicly traded companies and the proposed capital structure contemplated by the Plan initially and after giving effect to the projected financial performance of the Reorganized Debtors during the Projection Period). Moelis calculated the cost of equity based on (i) the capital asset pricing model, which assumes that the expected equity return is a function of the risk-free rate, equity risk premium, and the correlation of the stock performance of the selected publicly traded companies to the return on the broader market, and (ii) an adjustment related to the estimated equity market capitalization of the Reorganized Debtors, which reflects the historical equity risk premium of small, medium, and large equity market capitalization companies. Moelis utilized management assumptions in determining a go-forward blended tax rate. Moelis calculated the cost of debt utilizing its judgment and based on the size, industry, and end-uses for the Reorganized Debtors and on corporate credit spreads in the current market environment.

B. ***Selected Transactions Analysis.*** The selected transactions analysis is based on the implied enterprise values of companies and assets involved in publicly disclosed merger and acquisition transactions for which the targets had operating and financial characteristics comparable in certain respects to the Reorganized Debtors. Under this methodology, a multiple is derived using the enterprise value of each such target, calculated as the consideration paid and the net debt assumed in the selected precedent transaction relative to a financial metric, in this case earnings before interest, taxes, depreciation, and amortization ("EBITDA"). Such multiples were then applied to the Reorganized Debtors' EBITDA projected for fiscal year 2022 to imply an enterprise value for the Reorganized Debtors. Given that the Reorganized Debtors' results for the last twelve month period for which financial results have been publicly announced ("LTM") included a number of material add-backs resulting from various operational issues faced in prior years, Moelis did not believe that LTM EBITDA

reflects a meaningful valuation of the Reorganized Debtors and did not use LTM EBITDA in its selected transactions analysis. Moelis analyzed various merger and acquisition transactions that have occurred in the diversified chemicals sector since 2012.

Other factors not directly related to a company's business operations can affect a valuation in a transaction, including, among others factors, the following: (a) circumstances surrounding a merger transaction may introduce diffusive quantitative results into the analysis (e.g., a buyer may pay an additional premium for reasons that are not solely related to competitive bidding); (b) the market environment is not identical for transactions occurring at different periods of time; (c) circumstances pertaining to the financial position of the company may have an impact on the resulting purchase price (e.g., a company in financial distress may receive a lower price due to perceived weakness in its bargaining leverage); and (d) the ongoing tax environment at the time of the transaction.

Although the selected precedent transactions were used for comparison purposes, no company included in the selected precedent transaction analysis is either identical or directly comparable to the business of the Reorganized Debtors. Accordingly, Moelis' comparison of selected precedent transactions to the business of the Reorganized Debtors and analysis of the results of such comparisons was not purely mathematical, but instead involved considerations and judgments concerning differences in operating and financial characteristics and other factors that could affect the relative values implied by the selected precedent transactions analysis and the Reorganized Debtors. The selection of appropriate transactions for this analysis is a matter of judgment and subject to limitations due to sample size and the public availability of meaningful market-based information.

C. **Selected Publicly Traded Companies Analysis.** The selected publicly traded companies analysis is based on the enterprise values of selected publicly traded diversified chemicals companies that have operating and financial characteristics comparable in certain respects to the Reorganized Debtors. For example, such characteristics may include similar size and scale of operations, end-user exposure, product mix, operating margins, growth rates, and geographical exposure. Under this methodology, certain financial multiples that measure financial performance and value are calculated for each selected company and then applied to the Reorganized Debtors' financials to imply an enterprise value for the Reorganized Debtors. Moelis used, among other measures, enterprise value (defined as market value of equity, plus book value of debt and book value of preferred stock and minority interests, less cash, subject to adjustments for other items where appropriate) for each selected company as a multiple of such company's publicly available consensus projected EBITDA for fiscal year 2022 and 2023.

Although the selected companies were used for comparison purposes, no selected publicly traded company is either identical or directly comparable to the business of the Reorganized Debtors. Accordingly, Moelis' comparison of selected publicly traded companies to the business of the Reorganized Debtors and analysis of the results of such comparisons was not purely mathematical, but instead involved considerations and judgments concerning differences in operating and financial characteristics and other factors that could affect the relative values of the selected publicly traded companies and the Reorganized Debtors. The selection of appropriate companies for this analysis is a matter of judgment and subject to limitations due to sample size and the public availability of meaningful market-based information.

**Reorganized Debtors - Valuation Considerations**

The estimated distributable value in this section is not necessarily indicative of actual value, which may be significantly higher or lower than the ranges set forth herein. Accordingly, none of the Debtors, Moelis or any other person assumes responsibility for the accuracy of such estimated enterprise value. Depending on the actual financial results of the Debtors or changes in the economy and the financial markets, the enterprise value of the Reorganized Debtors as of the Assumed Effective Date may differ from the estimated enterprise value set forth herein as of an Assumed Effective Date of November 30, 2022. In addition, the market prices, to the extent there is a market, of Reorganized Debtors' securities will depend upon, among other things, prevailing interest rates, conditions in the economy and the financial markets, the investment decisions of prepetition creditors receiving such securities under

the Plan (some of whom may prefer to liquidate their investment rather than hold it on a long-term basis), and other factors that generally influence the prices of securities.

**<u>EXHIBIT F</u>**

**Liquidation Analysis**

## Liquidation Analysis

### I. Best Interests Test

Under the "best interests" of creditors test set forth in section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a chapter 11 plan unless each holder of a claim or interest either (i) accepts the plan, or (ii) receives or retains under the plan property of a value, as of the effective date, that is not less than the value such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on the effective date. See 11 U.S.C. § 1129(a)(7). Accordingly, to demonstrate that the Plan satisfies the "best interests" of creditors test, the Debtors have prepared the following hypothetical liquidation analysis (the "Liquidation Analysis") based upon certain assumptions discussed in the Disclosure Statement and in the accompanying notes to the Liquidation Analysis (the "Notes"). Capitalized terms not defined in the Notes shall have the meanings ascribed to them in the Plan and the Disclosure Statement, as applicable.

The Liquidation Analysis estimates potential cash distributions to holders of Allowed Claims in a hypothetical chapter 7 liquidation of the Debtors' assets (the "Assets"). Asset values discussed in the Liquidation Analysis may differ materially from values referred to in the Plan and Disclosure Statement.

The Debtors prepared the Liquidation Analysis with the assistance of their financial and legal advisors. The Debtors believe that their creditors would receive at least as much, and likely significantly more, under the Plan than they would receive in a chapter 7 liquidation of the Assets for the following reasons, among others: (i) the likely discounts that would be realized on the value of the Assets in a chapter 7 liquidation, (ii) the incremental claims that would be triggered in a chapter 7 bankruptcy, (iii) the fees payable to a chapter 7 trustee and newly appointed estate professionals, and (iv) the distributions to holders of Allowed General Unsecured Claims and the waiver of distributions on account of the Allowed 10.5% Notes Deficiency Claims in the event that Class 4 votes to accept the Plan, which would not be available in a chapter 7 liquidation.

### II. Approach and Purpose of the Liquidation Analysis

The Liquidation Analysis was run under two hypothetical scenarios: a Chapter 7 Liquidation of Assets ("Asset Liquidation") and a Chapter 7 Going-Concern Sale ("Going-Concern Sale"). Under the Asset Liquidation Scenario, following a conversion to chapter 7 on November 30, 2022 (the "Conversion Date"), the Debtors would liquidate their Assets (in parts) over a six-month time period. The Asset Liquidation Scenario serves as the "Low Case" value for the Liquidation Analysis. Under the Going-Concern Sale Scenario, following the Conversion Date, the Debtors would engage in a sale process in which they would seek a buyer of the entire business during a three-month time period. This scenario assumes that the Debtors produce break-even cash flow for those months. The Going-Concern Sale Scenario serves as

the "High Case" value for the Liquidation Analysis. See the Chapter 7 Liquidation of Assets and Chapter 7 Going-Concern Sale sections below for a further description of assumptions.

The determination of the costs of, and proceeds from, the Asset Liquidation and Going-Concern Sale scenarios in a chapter 7 case is an uncertain process involving significant estimates and assumptions that, although considered reasonable by the Debtors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management and their advisors. The Liquidation Analysis is also based on the Debtors' best judgment of how numerous decisions in the liquidation process would be resolved. Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 asset liquidation or going-concern sale, and unanticipated events and circumstances could materially affect the ultimate results of both scenarios. In addition, the Debtors' management cannot judge with any degree of certainty the recovery that may result from asset sales or the going-concern sale of the Debtors' business in a chapter 7 liquidation. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable good faith estimate of the proceeds that would be generated if the Debtors were liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended, and should not be used, for any other purpose.

All of the limitations and risk factors set forth in the Disclosure Statement are applicable to this Liquidation Analysis and are incorporated by reference herein. In particular, the underlying financial information in the Liquidation Analysis was not compiled or examined by any independent accountants in accordance with the standards promulgated by the American Institute of Certified Public Accountants. No independent appraisals were conducted in preparing the Liquidation Analysis. NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATIONS OR WARRANTIES THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY.

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based upon the Debtors' latest financial projections and review of liabilities in the Debtors' books and records. The Liquidation Analysis includes estimates for claims that could be asserted and allowed in a chapter 7 liquidation, including equipment recovery and disposal, wind down costs, trustee and professional fees required to facilitate disposition of certain assets in a value maximizing manner. The Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied upon for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims under the Plan. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM BY THE DEBTORS. THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THE LIQUIDATION ANALYSIS. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSIS SET FORTH HEREIN.

### III. Global Notes (Asset Liquidation and Going-Concern Sale)

**1. Dependence on Assumptions**

The Liquidation Analysis depends on a number of estimates and assumptions. Although developed and considered reasonable by the management and the advisors of the Debtors, the assumptions are inherently subject to significant economic, business, regulatory and competitive uncertainties and contingencies beyond the control of the Debtors or their management. The Liquidation Analysis is also based on the Debtors' best judgment of how numerous decisions in the liquidation process would be resolved. Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation and actual results would vary materially and adversely from those contained herein.

**2. Dependence on Forecasted Financials**

This Liquidation Analysis contains numerous estimates regarding the forecasted financials that are still under review and it remains subject to further legal and accounting analysis.

**3. Conversion to Chapter 7**

The Liquidation Analysis assumes conversion of the Debtors' Chapter 11 Cases to chapter 7 liquidation cases on November 30, 2022 (the "Conversion Date"). On the Conversion Date, it is assumed that the Bankruptcy Court would appoint one chapter 7 trustee (the "Trustee") to oversee the liquidation of the Estates. Should multiple Trustees be appointed to administer the Estates, lower recoveries and higher administrative costs could result and distributions to Creditors could be delayed.

**4. Claim Estimates**

In preparing this Liquidation Analysis, the Debtors have preliminarily estimated an amount of claims based upon a review of the Debtors' estimated balance sheet. DIP Claims were estimated based on the expected DIP outstanding as of the Conversion Date. Additional claims were estimated to include certain chapter 7 administrative obligations incurred after the Conversion Date. The estimate of all allowed claims in this Liquidation Analysis is based on the book value of those claims. The estimate of the amount of claims set forth in this Liquidation Analysis should not be relied upon for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of claims under the Plan. The actual amount of claims could be materially different from the amount of claims estimated in the Liquidation Analysis.

**5. General Unsecured Claims**

General Unsecured Claims arising in a hypothetical chapter 7 liquidation may include, among other things: (a) prepetition trade claims; (b) prepetition rejection damages claims; and (c) numerous other types of prepetition liabilities. General Unsecured Claims do not

include any Administrative Expense Claims, Fee Claims, Priority Tax Claims, Other Priority Claims, DIP Claims, or Other Secured Claims.

## Chapter 7 Liquidation of Assets (Low Case)

### IV.  Summary Notes to Chapter 7 Liquidation of Assets

#### 1.  Chapter 7 Liquidation of Assets Process

The liquidation of the Debtors' Assets is assumed to be completed over a six-month period. During the first three months, the Debtors would complete a going-out-of-business sale for all remaining inventory, furniture, fixtures, equipment, pipeline assets, land, and real estate. The last three-month period the Debtors would also be working on administrative activities, such as final creditor distributions needed to complete the wind down of the Estate.

### V.  Specific Notes to the Chapter 7 Liquidation of Assets Proceeds

#### 1.  Cash

The liquidation proceeds of Cash for all Debtor entities holding Cash are assumed to be 100% of estimated ending Cash at the Conversion Date.

#### 2.  Restricted Cash

Restricted Cash is attributable to the utility deposit and is assumed 100% recoverable.

#### 3.  Trade Accounts Receivable

Trade Accounts Receivable includes amounts invoiced to customers on account of products sold or services completed.  The Asset Liquidation Scenario uses blended borrowing base advance rates to determine recoveries beyond the ABL.

#### 4.  Inventory

Inventory includes both raw materials, work-in-process inventory, and finished goods.  The Asset Liquidation Scenario uses blended borrowing base advance rates to determine recoveries beyond the ABL.

#### 5.  Prepaids & Other Current Assets

Consists primarily of maintenance, repair and operations and various supplies stored in the Company's warehouses, along with prepaid deposits, and affiliated company accounts receivable. The Asset Liquidation Scenario assumes a 50% recovery on MRO and supplies, 49% on prepaid deposits, and no recovery on all other categories.

#### 6.  Property, Plant & Equipment & Intangible Assets

Includes Company owned land, plant, tank farms, pipelines, buildings, furniture, technology, vehicles, and insurance recoveries.

4

**7. Other Assets**

Primarily includes prepaid expenses that are amortized over a period of time and some inventory assets.

VI.    **Specific Notes to Chapter 7 Liquidation of Assets Administrative Claims**

**1. Chapter 7 Trustee Fees**

Pursuant to sections 326 and 330 of the Bankruptcy Code, the Bankruptcy Court may allow reasonable compensation for the Trustee's services, not to exceed 25% on the first $5,000 or less, 10% on any amount in excess of $5,000 but not in excess of $50,000, 5% on any amount in excess of $50,000 but not in excess of $1.0 million, and reasonable compensation not to exceed 3% of such moneys in excess of $1.0 million, upon all moneys disbursed or turned over by the Trustee to parties-in-interest. For purposes of this Liquidation Analysis, these fees are assumed to be 3% of liquidation proceeds realized, excluding Cash.

**2. Professional Fees**

Pursuant to section 726 of the Bankruptcy Code, the allowed administrative expenses incurred by the Trustee, including expenses affiliated with selling the Debtors' Assets and winding down operations, would be entitled to payment in full prior to any distribution to Administrative Claims and Other Priority Claims. This Liquidation Analysis assumes that professional fees would total $5.9 million over the course of the six-month wind down, which is based on expected fees and expenses of legal, financial, and other professionals as well as the complexity of the Debtors' liquidation and wind-down. The chapter 7 Liquidation Analysis assumes that Debtor professionals are involved throughout the six-month liquidation with lender professionals only needing to be involved for three months.

**3. Payroll & Benefits**

For purposes of the Asset Liquidation Scenario, it is assumed that some employees of the Company are needed to assist in the wind down of Assets. Payroll & Benefits includes employees in accounting and finance, administration, HR / Payroll and Operations / IT. Payroll & Benefits is assumed to total $2.8 million over the course of the six-month wind down.

**4. Non Payroll Overhead**

For the purposes of the Asset Liquidation Scenario, it is assumed that some Non-Payroll Overhead costs must be maintained to efficiently wind down the Company. Non-Payroll Overhead costs include rent on the corporate headquarters and minimal utilities for four months, software licenses, insurance premiums, accounting and tax services, third-party service providers (including, but not limited to, security for all buildings) for six months, and data storage / record retention for twelve months.

**5. Other Wind-Down Expenses**

For the purposes of the Asset Liquidation Scenario, it is assumed that there are other wind-down expenses that arise and are necessary to complete the wind down. Other Wind-Down Expenses are estimated to be 2% of liquidation proceeds realized, excluding Cash.


## VII.   Chapter 7 Liquidation of Assets Distribution of Proceeds

**1. ABL DIP Claims**
   a. Total ABL DIP Claims as of the Conversion Date are estimated to be $108.5M.
**2. Term Loan DIP Claims**
   a. Total Term Loan DIP Claims as of the Conversion Date are estimated to be $279.2M.
**3. 10.5% Notes Claims**
   a. Total 10.5% Notes Claims are estimated to be $1,086M.
**4. General Unsecured Claim Recovery**
   a. General Unsecured Claims assumed to consist of General Unsecured Claims excluding the 10.5% Notes Deficiency Claims (estimated to be $546M) plus the 10.5% Notes Deficiency Claims (estimated to be the difference between the total 10.5% Notes Claims ($1,086M) and the value available to the 10.5% Notes Secured Claims ($110M)). No value is estimated to be available for Allowed General Unsecured Claims.
**5. TPC Holdings, Inc. Recovery**
   a. TPC Holdings, Inc. has certain Investments – Affiliate assets that reflect the recording of parent company income / loss in the subsidiaries. As no value is available from the subsidiaries after all secured and unsecured claims, there is no value assumed to be available at TPC Holdings, Inc. TPC Holdings, Inc. has no other assets on its own.


## Going-Concern Sale Liquidation Analysis (High Case)

## VIII.   Summary Notes to the Chapter 7 Going-Concern Sale

**1. Chapter 7 Going-Concern Sale Liquidation Process**

The sale process for the Debtors' business is assumed to take three months. The going-concern sale liquidation analysis assumes that the Debtor would be able to operate at cash flow neutral through the sale process. Operating the business through the sale process would allow the Debtors to ensure a buyer that machinery, equipment, and pipelines are operative (the Debtors believe that discontinuing operations could do irreparable harm to various assets) and would allow for a smoother transition of the business to the buyer.

## IX.    Specific Notes to the Going-Concern Sale Proceeds

### 1.    Proceeds from Going Concern Sale and Insurance

Estimated proceeds from the sale of the going concern business and collections on insurance proceeds.

### 2.    Excess Cash

Available Cash for all Debtor entities holding cash is assumed to be 100% of estimated ending Cash at the Conversion Date.

### 3.    Net Operating Cash Flow

This analysis assumes that the Company produces break-even cash flow for the three months following the Conversion Date.

### 4.    Wind-Down Professional Fees

Pursuant to section 726 of the Bankruptcy Code, the allowed administrative expenses incurred by the Trustee, including expenses affiliated with selling the Debtors' assets and winding down operations, would be entitled to payment in full prior to any distribution to Administrative Claims and Other Priority Claims. This Going-Concern Scenario assumes that professional fees would total $7.6 million over the course of the three-month sale period, which is based on an investment banker success fee of 1% of sale proceeds and three months of legal support totaling $850k per month.

### 5.    Trustee Fees

Pursuant to sections 326 and 330 of the Bankruptcy Code, the Bankruptcy Court may allow reasonable compensation for the Trustee's services, not to exceed 25% on the first $5,000 or less, 10% on any amount in excess of $5,000 but not in excess of $50,000, 5% on any amount in excess of $50,000 but not in excess of $1.0 million, and reasonable compensation not to exceed 3% of such moneys in excess of $1.0 million, upon all moneys disbursed or turned over by the Trustee to parties-in-interest. For purposes of this Liquidation Analysis, these fees are assumed to be 3% of liquidation proceeds realized, excluding Cash.

## X.    Chapter 7 Going-Concern Sale Distribution of Proceeds

### 1.    ABL DIP Claims
   a.    Total ABL DIP Claims as of the Conversion Date are estimated to be $108.5M.
### 2.    Term Loan DIP Claims
   a.    Total Term Loan DIP Claims as of the Conversion Date are estimated to be $279.2M.
### 3.    10.5% Notes Claims
   a.    Total 10.5% Notes Claims are estimated to be $1,086M.

4. **General Unsecured Claim Recovery**

    a. General Unsecured Claims assumed to consist of General Unsecured Claims excluding the 10.5% Deficiency Claims (estimated to be $546M) plus the 10.5% Notes Deficiency Claims (estimated to be the difference between the total 10.5% Notes Claims ($1,086 million) and the value available to the 10.5% Notes Secured Claims ($338 million)). No value is estimated to be available for Allowed General Unsecured Claims.

5. **TPC Holdings, Inc. Recovery**

    a. TPC Holdings, Inc. has certain Investments – Affiliate assets that reflect the recording of parent company income / loss in the subsidiaries. As no value is available from the subsidiaries after all secured and unsecured claims, there is no value assumed to be available at TPC Holdings, Inc. TPC Holdings, Inc. has no other assets on its own.

**Illustrative Chapter 7 Asset Liquidation**

| $ in Thousands | Actual/ Book/ Estimated Value | Value $ | Value % |
|---|---|---|---|
| **Total Proceeds from TPC Group Inc.** | | | |
| **Current Assets** | | | |
| Cash | $ 65,245 | $ 65,245 | 100% |
| Restricted Cash | 1,500 | 1,500 | 100% |
| Trade Accounts Receivables | 144,542 | 79,412 | 55% |
| Inventory | 99,549 | 48,526 | 49% |
| Prepaids & Other Current Assets | 41,660 | 15,610 | 37% |
| **Total Current Assets** | $ 352,495 | $ 210,293 | 60% |
| **Long-Term Assets** | | | |
| Property, Plant & Equipment & Intangible Assets | $ 775,767 | $ 340,717 | 44% |
| Other Assets | 83,547 | 5,080 | 6% |
| **Total Long Term Assets** | $ 859,315 | $ 345,797 | 40% |
| **Total Proceeds Available for Distribution** | $ 1,211,809 | $ 556,090 | 46% |

| Liquidation Expenses | | $ | % of Proceeds |
|---|---|---|---|
| Chapter 7 Trustee Fees | | $ 14,725 | 3% |
| Professional Fees | | 5,900 | 1% |
| Payroll & Benefits | | 2,772 | 0% |
| Non Payroll Overhead | | 24,744 | 4% |
| Other Wind-Down Expenses | | 9,817 | 2% |
| **Total Liquidation Expenses** | | $ 57,958 | 10% |
| **Net Proceeds Available for Distribution** | | $ 498,132 | |

**Hypothetical Claims Recovery**

| Secured Debt Recovery | | Recovery | % |
|---|---|---|---|
| ABL | $ 108,476 | $ 108,476 | 100% |
| DIP Facility | 279,192 | 279,192 | 100% |
| 10.5% Senior Secured Notes | 1,086,321 | 110,464 | 10% |
| **Est. Recovery of Secured Debt** | $ 1,473,990 | $ 498,132 | 34% |

| Unsecured Claim Recovery | | | |
|---|---|---|---|
| General Unsecured Excluding Deficiency Claim | $ 546,100 | | |
| 10.5% Senior Secured Notes Deficiency Claim | 975,858 | | |
| **Total General Unsecured Claim** | $ 1,521,957 | $ - | 0% |

| TPC Holdings, Inc. Recovery | | | |
|---|---|---|---|
| Investments – Affiliates | $ 463,308 | $ - | 0% |

**Illustrative Chapter 7 Going-Concern Sale**

| $ in Thousands | Value | Value | |
|---|---|---|---|
| | | $ | % |
| **Proceeds from Going Concern Sale and Insurance** | | $ 680,122 | |
| | | | |
| **Adjustments:** | | | |
| Excess Cash | | $ 66,745 | |
| Net Operating Cash Flow | | - | |
| Wind-Down Professional Fees | | (7,589) | |
| Trustee Fees | | (13,114) | |
| **Total Adjustments** | | $ 46,042 | |
| | | | |
| **Net Proceeds Available for Distribution** | | $ 726,164 | |
| | | | |
| **Hypothetical Claims Recovery** | | | |
| **Secured Debt Recovery** | | Recovery | % |
| ABL | $ 108,476 | $ 108,476 | 100% |
| DIP Facility | 279,192 | 279,192 | 100% |
| 10.5% Senior Secured Notes | 1,086,321 | 338,496 | 31% |
| **Est. Recovery of Secured Debt** | $ 1,473,990 | $ 726,164 | 49% |
| | | | |
| **Unsecured Claim Recovery** | | | |
| General Unsecured Excluding Deficiency Claim | $ 546,100 | | |
| 10.5% Senior Secured Notes Deficiency Claim | 747,825 | | |
| **Total General Unsecured Claim** | $ 1,293,925 | $ - | 0% |
| | | | |
| **TPC Holdings, Inc. Recovery** | | | |
| Investments – Affiliates | $ 463,308 | $ - | 0% |

10

## EXHIBIT G

**Release Provisions**

## RELEASE PROVISIONS, EXCULPATION, AND RELATED INJUNCTIONS

**10.6** **Plan Injunction.**

**Except as otherwise provided in the Plan or in the Confirmation Order, from and after the Effective Date, all Persons who have held, hold, or may hold Claims or Interests, and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, are, with respect to any such Claim or Interest, permanently enjoined after the entry of the Confirmation Order from: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a Debtor, a Reorganized Debtor, or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against a Debtor, a Reorganized Debtor, or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (ii) or any property of any such transferee or successor; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor, a Reorganized Debtor, or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this subsection (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; *provided*, that nothing contained in the Plan shall preclude such Persons who have held, hold, or may hold Claims against, or Interests in, a Debtor, a Reorganized Debtor, or an Estate from exercising their rights and remedies, or obtaining benefits, pursuant to and consistent with the terms of the Plan.**

By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including the injunctions set forth in Section 10.6 of the Plan.

**10.7** **Releases.**

(a) Releases by the Debtors. **As of the Effective Date, except for the rights and remedies that remain in effect from and after the Effective Date to enforce the Plan and the obligations set forth in the Definitive Documents, including the documents in the Plan Supplement, except as provided for in the Schedule of Retained Claims and Causes of Actions, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by the Debtors, the Reorganized Debtors, and the Estates, in each case on behalf of themselves and their**

respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all claims and Causes of Action (including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirements or otherwise that the Debtors, the Reorganized Debtors, the Estates, or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Restructuring, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the ABL DIP Facility, the Term Loan DIP Facility, the Exit ABL Facility, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Plan, the Solicitation Materials, the Restructuring Support Agreement, the Definitive Documents (including the documents in the Plan Supplement) or related agreements, instruments, or other documents relating thereto, the solicitation of votes with respect to the Plan, and any contract, instrument, agreement or other document entered into in connection with any of the foregoing, or any preference, fraudulent transfer or other avoidance action related to the Debtors arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or Causes of Action arising out of or related to any act or omission of a Released Party that constitutes intentional fraud or willful misconduct as determined by a Final Order.  For the avoidance of doubt, claims and Causes of Action retained in the Plan Supplement are not released and expressly preserved.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any Claim or obligation arising under the Plan. [32]

---

"*Released Parties*" means, collectively, (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Supporting Noteholders, (iv) SK Second Reserve, L.P., a Delaware limited partnership; (v) the agents and lenders under the Exit ABL Facility, (vi) the holders of the Exit Notes and Holdco Notes and any agents or trustees thereunder, (vii) the agents and lenders under the ABL DIP Facility, (viii) the agents and lenders under the Term Loan DIP Facility, (ix) the Backstop Parties, (x) the Supporting Sponsors, (xi) the agents and lenders under the Prepetition ABL Credit Agreement, (xii) the indenture trustees and collateral trustees in respect of the Priming Notes and the 10.5% Notes; and (xiii) with respect to each of the foregoing Persons (i)–(xii), each of their affiliates, predecessors, successors, assigns, subsidiaries, current and former officers and directors, principals, equity

Entry of the Confirmation Order by the Bankruptcy Court shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases in <u>Section 10.7(a)</u> of the Plan (the "<u>Debtor Releases</u>"), which includes, by reference, each of the related provisions and definitions under the Plan, and, furthermore, shall constitute the Bankruptcy Court's finding that the Debtor Releases are:  (i) in exchange for the good and valuable consideration provided by the Released Parties, (ii) a good faith settlement and compromise of the claims and Causes of Action released by the Debtors, the Reorganized Debtors and the Estates, (iii) in the best interests of the Debtors, the Estates and all Holders of Claims and Interests, (iv) fair, equitable and reasonable, (v) given and made after due notice and opportunity for hearing, and (vi) a bar to any of the Debtors, the Reorganized Debtors or the Estates asserting any claim or Cause of Action released pursuant to the Debtor Releases.

(b) <u>Releases by the Holders of Claims and Interests</u>.  As of the Effective Date, except for the rights and remedies that remain in effect from and after the Effective Date to enforce the Plan and the obligations contemplated by the Definitive Documents (including the documents in the Plan Supplement) or as otherwise provided in any order of the Bankruptcy Court, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Releasing Parties, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort, or otherwise by statute, violations of federal or state securities laws or otherwise, that such holders or their estates, affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, or their Estates, the Chapter 11 Cases, the Restructuring, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party, the restructuring of any Claims or Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Plan, the Solicitation Materials, the Restructuring Support Agreement, the Definitive Documents

---

holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, employees of affiliates who worked on matters related to the Debtors or the Chapter 11 Cases and other professionals, affiliated investment funds or investment vehicles, managed accounts or funds, and such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such; provided, that in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation; provided, further, that NALCO Co, LLC, Ingenero, Inc., and Suez WTS USA, Inc. shall not be Released Parties.

(including the documents in the Plan Supplement) or related agreements, instruments, or other documents, relating thereto, or the solicitation of votes with respect to the Plan, and any contract, instrument, agreement or other document entered into in connection with any of the foregoing, or any preference, fraudulent transfer or other avoidance action related to the Debtors arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, in all cases based upon any act or omission, transaction, agreement, event, or other occurrences taking place on or before the Effective Date, other than claims or Causes of Action arising out of or related to any act or omission of a Released Party that constitutes intentional fraud or willful misconduct as determined by a Final Order. [33]

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases in <u>Section 10.7(b)</u> of the Plan (the "<u>Third Party Release</u>"), which includes, by reference, each of the related provisions and definitions under the Plan, and, furthermore, shall constitute the Bankruptcy Court's finding that the Third Party Release is (i) consensual, (ii) essential to the confirmation of the Plan, (iii) given in exchange for the good and valuable consideration provided by the Released Parties, (iv) a good faith settlement and compromise of the claims and Causes of Action released by the Third Party Release, (v) in the best interests of the Debtors and their Estates, (vi) fair, equitable and reasonable, (vii) given and made after due notice and opportunity for hearing, and (viii) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third Party Release.

**10.8**   <u>Exculpation</u>.[34]

To the fullest extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party will be released and exculpated from, any claim or Cause

---

[33]   "*Releasing Parties*" means, collectively, and in each case in its capacity as such: (a) the holders of all Claims that vote to or are deemed to accept the Plan, (b) the holders of all Claims whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan, (c) the holders of all Claims or Interests that vote, or are deemed, to reject the Plan but do not opt out of granting the releases set forth herein, (d) the holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth herein but did not opt out, and (e) the Released Parties other than the Debtors (provided, that with respect to Released Parties identified in clause (xiii) of the definition thereof, each such Person constitutes a Releasing Party under this clause (e) solely with respect to claims that such Person could have properly asserted on behalf of a Person identified in clauses (i) through (xii) of the definition of Released Parties).

[34]   "*Exculpated Parties*" means, collectively, (i) the Debtors, (ii) the Reorganized Debtors, (iii) any statutory committee appointed in the Chapter 11 Cases, (iv) the Supporting Noteholders, (v) the Backstop Parties, (vi) the agents and lenders under the Exit ABL Facility, (vii) the agents and lenders under the Prepetition ABL Credit Agreement, (viii) the Supporting Sponsors, (ix) the agents and lenders under the DIP Facilities (x) the holders of the Exit Notes and HoldCo Notes and any agents or trustees thereunder and (xi) with respect to each of the foregoing Persons in clauses (i) through (x), such Persons' predecessors, successors, assigns, subsidiaries, affiliates, current and former officers and directors, principals, equity holders, members, partners, managers,

of Action in connection with or arising out of the administration of the Chapter 11 Cases; the negotiation and pursuit of the ABL DIP Facility, the Priming Notes DIP Roll-Up, the Term Loan DIP Facility, the Exit ABL Facility, the Exit Notes, Holdco Notes, the Debt Rights Offering, the Equity Rights Offering, the Backstop Agreements, the Management Incentive Plan, the Disclosure Statement, the Restructuring Support Agreement, the Restructuring, and the Plan, the Solicitation Materials and any other Definitive Documents (including the documents in the Plan Supplement), or the solicitation of votes for, or confirmation of, the Plan; the funding of the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; the issuance of securities under or in connection with the Plan; the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors; or the transactions in furtherance of any of the foregoing; other than claims or Causes of Action arising out of or related to any act or omission of an Exculpated Party that constitutes intentional fraud or willful misconduct as determined by a Final Order, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of securities pursuant to the Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of securities thereunder.  The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

**10.8**    **Injunction Related to Releases and Exculpation.**

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or entity, whether directly, derivatively, or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released or exculpated pursuant to the Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in the Plan or the Confirmation Order.

---

employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, affiliated investment funds or investment vehicles, managed accounts or funds, and such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such.

# **EXHIBIT H**

**Letter from Official Committee of Unsecured Creditors**

## OFFICIAL COMMITTEE OF UNSECURED CREDITORS
## OF TPC GROUP INC., *ET AL.*

### Case No. 22-10493
### Judge Craig T. Goldblatt, U.S. Bankruptcy Court for the District of Delaware

c/o Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036

[·], 2022

**To:    Holders of Class 4 General Unsecured Claims of TPC Group Inc. and its affiliated
debtors and debtors in possession**

Akin Gump Strauss Hauer & Feld LLP is counsel to the Official Committee of Unsecured
Creditors (the "Committee") in the above-referenced chapter 11 cases of TPC Group Inc. and certain
of its affiliates (collectively, the "Debtors") in the United States Bankruptcy Court for the District of
Delaware.  The Committee retained Dundon Advisers LLC as its financial advisor and Cole Schotz
P.C. as its Delaware counsel.   The Committee was appointed by the United States Trustee, a
representative of the United States Department of Justice, to represent the interests of all of the Debtors'
unsecured creditors as a whole.  We write to advise you of the Committee's position regarding the
Debtors' proposed plan of reorganization -- the *Joint Chapter 11 Plan of Reorganization of TPC
Group, Inc. and Its Debtor Affiliates* [Docket No. •] (the "Plan").  The Plan is described in, and attached
as an exhibit to, the *Disclosure Statement for Joint Chapter 11 Plan of Reorganization of TPC Group,
Inc. and Its Debtor Affiliates* [Docket No. •] (the "Disclosure Statement") included with the materials
you are receiving.[1]  Although the Bankruptcy Court has approved the Disclosure Statement, it has not
passed judgment on whether the Plan on which you are being asked to vote will be approved.

> *** *The Committee urges holders of General Unsecured Claims to vote to __REJECT__ the Plan and
> to __OPT OUT__ of the releases for the reasons set forth below, among others.* ***

> *Importantly, if the Plan is approved and you do not check the box provided on your ballot to
> "opt-out" of the releases proposed for the benefit of various non-Debtor parties, including the
> Debtors' equity sponsors, officers and directors, you will be bound by the releases.  Accordingly, the
> Committee recommends that you elect to __OPT OUT__ of such releases by checking the applicable box
> on your ballot.*

> *** **TO OPT OUT OF THE RELEASES, YOU MUST CHECK THE "OPT OUT" BOX ON
> YOUR BALLOT AND RETURN YOUR BALLOT BEFORE [•], 2022.** ***
>
> **IF THE PLAN IS APPROVED, YOU WILL BE BOUND BY THE RELEASES IF YOU:**
>
> o   **DO NOT TAKE ANY ACTION;**
>
> o   **FAIL TO CHECK THE "OPT OUT" BOX AND SUBMIT A TIMELY BALLOT; __OR__**
>
> o   **VOTE TO ACCEPT THE PLAN (EVEN IF YOU CHECK THE "OPT OUT" BOX).**

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Disclosure
Statement or the Plan, as applicable.

The Committee believes that the Plan, as currently proposed, is not in the best interests of unsecured creditors and does not satisfy the requirements to be approved by the Bankruptcy Court. However, despite the Committee's beliefs, it is possible that the Bankruptcy Court will nevertheless confirm the Plan. ***To be clear, the Committee strongly believes that the Plan does not provide unsecured creditors with the recoveries to which they are legally entitled and should <u>NOT</u> be confirmed***.

## I.     <u>Overview of the Plan</u>

The Debtors entered bankruptcy with a restructuring support agreement, negotiated by and for the benefit of certain of their prepetition secured creditors and equity sponsors (the "<u>Supporting Sponsors</u>"), which outlined the terms of the Plan. Representatives of unsecured creditors as a class were not involved in negotiations concerning the terms of the restructuring support agreement or the Plan.

The Plan's treatment of Class 4 General Unsecured Claims depends on whether Class 4 votes to accept or reject the Plan. If Class 4 votes to accept the Plan and the Plan is confirmed, unsecured creditors in Class 4 will receive their pro rata share of interests in a trust that will receive $5 million in cash from the Debtors' estates (plus an additional $5 million at some date in the future if the Debtors meet certain business performance goals in 2024). If Class 4 votes to reject the Plan and the Plan is confirmed, unsecured creditors will receive no recovery.

In contrast, the Plan provides significantly better recoveries for the Debtors' secured creditors, including holders of the Debtors' 10.5% Notes, based on such creditors' purported liens and security interests in the Debtors' assets. The Plan also provides the Supporting Sponsors and other non-Debtor third parties with broad releases of all potential claims and causes of action related to the Debtors that may be asserted against them by you and other creditors and the Debtors, even though the Committee believes that the Supporting Sponsors are not providing any or fair consideration in exchange for such releases. The Plan's treatment and projected recoveries for unsecured creditors, 10.5% Noteholders and the Supporting Sponsors are summarized below.

| Class | Projected Amount of Claims | Treatment |
|---|---|---|
| Class 3 – 10.5% Notes Secured Claims | $479.2 million | • $350 million in cash plus all unrestricted cash held by the Debtors on the Effective Date in excess of $50 million<br>• 100% of the New Common Shares (prior to dilution)<br>• The right to purchase debt and/or equity in the Reorganized Debtors at a discount<br>• $80 million of Takeback HoldCo Notes |
| Class 4 – General Unsecured Claims (including 10.5% Notes Deficiency Claim) | $170-$921 million (excluding 10.5% Notes Deficiency Claims of $607.2 million) | • If Class 4 votes to accept the Plan: 100% of GUC Trust Interests (which shall entitle the holders thereof to their Pro Rata share of (i) Cash in the aggregate amount of $5 million plus (ii) the right to receive an additional $5 million in Cash in the event that the Reorganized Debtors' 2024 Adjusted EBITDA exceeds $250 million)[2]<br>• If Class 4 votes to reject the Plan: no recovery |

---

[2] If Class 4 votes to accept the Plan, distributions on account of the 10.5% Notes Deficiency Claim will be waived.

| Supporting Sponsors (Class 7 – Existing Holding Interests; Class 8 – Other Holdings Interests) | $0 | • Releases of all potential claims and causes of action related to the Debtors that may be asserted by the Debtors or creditors against the Supporting Sponsors (despite the absence of any consideration provided by the Supporting Sponsors for such releases)<br>• Shares cancelled without distribution |
|---|---|---|

## II.     The Committee Believes the Plan Does Not Provide Unsecured Creditors with Fair Recoveries and Should Not Be Confirmed

As the fiduciary for all unsecured creditors taken together, the Committee has been performing diligence necessary to assess the Plan and maximize recoveries for unsecured creditors, including analyzing the value of the Debtors' enterprise and conducting an investigation into potential sources of value for unsecured creditors. Although the Committee's efforts remain ongoing as of the date of this letter, the Committee believes the Plan does not provide unsecured creditors with a fair recovery because, among other things: (1) the Plan does not take into account legal infirmities in the claims and liens of certain of the Debtors' prepetition secured creditors, including the 10.5% Noteholders; (2) the Debtors' total enterprise value is higher than assumed under the Plan; (3) the Plan impermissibly releases the Supporting Sponsors and other non-Debtor parties from all potential claims and causes of actions against them held by the *Debtors*—the proceeds of which would be available to pay unsecured creditors' claims—even though such parties are not paying any consideration to the Debtors for such releases; and (4) the Plan impermissibly releases the Supporting Sponsors and other non-Debtor parties from all claims and causes of action that *you* and all other creditors may have against them that relate to the Debtors (unless you submit a timely ballot electing to "opt out" of such releases) even though such parties are not paying any consideration for such releases. Each of these issues is discussed in further detail below.

### (1)     Infirmities in Secured Creditors' Purported Claims and Liens

As part of its investigation, the Committee has analyzed the validity of the purported claims and liens of the Debtors' secured creditors. Based on its investigation and analysis, the Committee believes that liens that were purportedly granted for the benefit of the Debtors' pre-bankruptcy secured creditors on valuable assets of the Debtors' estates—including but not limited to hundreds of millions of dollars of insurance proceeds related to the November 27, 2019 explosions at the Debtors' plant in Port Neches, Texas (the "Port Neches Explosions"), certain pipeline assets in Texas and Louisiana and a significant leasehold interest in Westlake, Louisiana—were not perfected as of the date of the bankruptcy filing and, therefore, should be available to fund unsecured creditor recoveries. Further, the Committee believes that the February 2022 guaranty by TPC Holdings, Inc. ("Holdings") of the 10.5% Noteholders' claims should be avoided as a constructively fraudulent transfer. The Plan does not take into account any of these infirmities and assumes that none of these assets are available for distribution to unsecured creditors.

On August 31, 2022, the Committee filed a motion (the "Standing Motion") requesting that the Bankruptcy Court grant it standing to file an adversary complaint (the "Complaint") to pursue these and other claims on behalf of the Debtors' estates and recover the value of such claims for the benefit

of unsecured creditors.[3]  If the Committee is granted standing, it will pursue claims in the following categories:

- **Avoidance of purported liens on up to $390 million of insurance proceeds**.  The Committee believes that certain of the Debtors' prepetition secured creditors, including the 10.5% Noteholders, do not have perfected liens on insurance proceeds related to the Port Neches Explosions due to, among other things, the trustee and collateral agent for the 10.5% Notes' release of its interest as a lender loss payee in such insurance proceeds in January 2020.  The Committee seeks a determination that certain purported liens and security interests in such insurance proceeds were not validly perfected and therefore should be avoided and recovered for the benefit of unsecured creditors.

- **Avoidance of purported liens on pipelines worth approximately $92 million**.  The Committee believes the Debtors' secured creditors do not have perfected liens on the Debtors' pipelines in Galveston, Orange and Brazoria Counties in Texas and Calcasieu Parish in Louisiana because there is no evidence of any lien filings on these assets.  Accordingly, the Committee seeks a determination that there are no valid liens or security interests in these pipelines.

- **Avoidance of purported liens on $60-$80 million leasehold interest**.  The Committee believes the Debtors' secured creditors do not have perfected liens on the Debtors' leasehold interest in a terminal facility in Lake Charles, Louisiana because no leasehold mortgage has been filed on that leasehold interest.  Accordingly, the Committee seeks a determination that there are no valid liens or security interests in this leasehold interest.

- **Disallowance of $5.1 million prepayment premium**.  The Committee believes that the $5.1 million prepayment premium allegedly due in respect of the Senior Priority Bridge Notes issued in March 2022 should be disallowed as an unenforceable liquidated damages provision or an unreasonable fee under Bankruptcy Code section 506(b) because all parties knew that the bankruptcy filing was imminent at the time the notes were issued and that the notes would never reach maturity.  Accordingly, the Committee seeks a determination that the prepayment premium claim should be disallowed.

- **Avoidance of Holdings' guaranty of the 10.5% Notes**.  The Committee has asserted a claim to avoid Holdings' guaranty of the 10.5% Notes in February 2022 as a constructive fraudulent transfer.  Holdings did not guaranty the 10.5% Notes when they were issued in 2019, was insolvent or rendered insolvent as a result of providing such guaranty and did not receive reasonably equivalent value in connection with the provision of such guaranty.  Thus, the Committee seeks to avoid the guaranty as a constructively fraudulent transfer.

The Committee does not believe the Plan can be confirmed if the Committee is granted standing and prevails on all or some of these claims because, among other things, the recoveries under the Plan are predicated on the validity of the liens purportedly securing the 10.5% Notes.  If these liens are avoided or the above assets are determined to be unencumbered, the Plan will need to be revised to allow the value of such assets to be distributed to unsecured creditors.  In addition, recoveries for the 10.5% Noteholders under the Plan include, among other things, 100% of the equity in the Reorganized Debtors (prior to dilution) and 100% of the rights to participate in proposed offerings to

---

[3] Redacted versions of the Standing Motion and Complaint may be accessed at: [•].

purchase debt and equity in the Reorganized Debtors.[4] If the Holdings' guaranty is avoided, however, the 10.5% Noteholders will not have claims against Holdings, the votes on the Plan by the 10.5% Noteholders will be disregarded and the Plan will not be able to be confirmed if Class 4 rejects the Plan.

### (2) Enterprise Value

The Committee believes the Plan is premised on an artificially low valuation of the Debtors' enterprise. Although the Committee is still working to form an independent view of the Debtors' enterprise value, information received to date supports a strong inference that the Debtors are worth considerably more than the Plan's assumed total enterprise value of $1.125 billion. Among other probable omissions and underestimations, the Debtors' valuation undervalues hundreds of millions of dollars of coverage remaining under the Debtors' insurance policies related to the Port Neches Explosions. The Committee believes that an appropriate valuation could result in unsecured creditors being entitled to receive greater recoveries than proposed under the Plan.

### (3) Releases of Debtors' Claims

The Committee believes the Debtors possess potentially valuable causes of action against certain third parties affiliated with the Debtors (such as their officers, directors and the Supporting Sponsors) and non-affiliated third parties. The Plan proposes to provide many of these third parties, including the Supporting Sponsors (collectively, the "Released Parties") with broad releases of all potential claims and causes of action the Debtors may have against them for what appears to be no consideration in return. These releases are very valuable for the Released Parties and they should only receive such releases in exchange for providing fair value to the Debtors' estates, which can then be passed on to the Debtors' creditors such as you.

As part of its investigation, the Committee has been analyzing the potential claims that the Debtors may have against the Released Parties. Based on the preliminary results of its investigation, the Committee believes the Debtors may have potentially valuable claims against certain Released Parties that should be pursued or otherwise monetized for the benefit of their estates. Among other things, the Committee's investigation has determined that the review conducted by the Debtors' Special Committee was largely limited to the Released Parties' conduct in connection with the Port Neches Explosions, and the approval of related party transactions and director and officer reimbursements, and was generally limited to materials made available to the Special Committee. The Committee believes that the Special Committee's review was insufficient and, among other things, did not address issues related to the Released Parties' roles in addressing claims against the Debtors' prepetition lenders or other third parties, such as whether the Released Parties improperly failed to preserve certain claims against the lenders based on the timing of the bankruptcy filings. In addition, the Debtors may have other causes of action outside the scope of the Special Committee's investigation (or that such investigation did not sufficiently analyze) that would otherwise be released under the

---

[4] Although the original version of the Plan [Docket No. 216] contemplated that this equity would be issued by Reorganized Holdings, the Plan was amended such that it is no longer clear which of the Reorganized Debtors will be issuing this equity. *See* Plan, Art. I.1 ("***New Common Shares*** means shares of common stock or other common equity interests of Reorganized Holdings or such other entity as identified in the Restructuring Transaction Memorandum, which may be Reorganized TPC Group Inc.").

Plan. Such claims against the Released Parties must be further investigated in order to determine the scope of the Released Parties' knowledge and actions so that any viable claims can be properly pursued.

Any value that can be recovered on account of these potential estate causes of action could increase recoveries for unsecured creditors. The Plan, however, grants those releases for *no* value. If the Released Parties do not provide fair consideration for such releases, the releases should be removed from the Plan and the Debtors' causes of action against such parties should be preserved for the Debtors' estates and/or creditors to pursue.

### (4)    Releases of Creditors' Claims

In addition to releasing the *Debtors'* claims against the Released Parties, the Plan grants sweeping releases of all claims or causes of action that *you and other creditors* may have against the Released Parties that relate in any way to the Debtors, unless you ***"opt out"*** of such releases on your ballot. The claims that would be released include but are not limited to the significant direct claims asserted against the Supporting Sponsors by victims of the Port Neches Explosions, including claims asserted in the multi-district litigation in the District Court of Orange County, Texas, 128th Judicial District, *In re: TPC Group Litigation*, Cause No. A2020-0236-MD.

The Committee believes that these releases are improper even though you have the ability to "opt out" of having these releases imposed on you. This is because the Plan is designed to incentivize unsecured creditors to vote to accept the Plan by conditioning their right to receive a recovery from the Debtors on Class 4's acceptance of the Plan.[5] If *you* or any other creditor vote to accept the Plan, however, you cannot opt out of the releases and will be deemed to consent to them.

These releases are very valuable for the Released Parties and they should not receive such releases without providing fair value in exchange for such releases that can be passed on to creditors such as you. The Plan, however, grants those releases for *no* value. The Committee believes that the releases must be removed from the Plan unless the Released Parties pay fair value in exchange for them. ***Because the Plan may be approved, however, the Committee recommends that you <u>OPT OUT</u> of the releases by checking the applicable box on your ballot.***

---

**\*\*\* TO OPT OUT OF THE RELEASES, YOU MUST CHECK THE "OPT OUT" BOX ON YOUR BALLOT AND RETURN YOUR BALLOT BEFORE [•], 2022. \*\*\***

**IF THE PLAN IS APPROVED, YOU WILL BE BOUND BY THE RELEASES IF YOU:**
- **DO NOT TAKE ANY ACTION;**
- **FAIL TO CHECK THE "OPT OUT" BOX AND SUBMIT A TIMELY BALLOT; <u>OR</u>**
- **VOTE TO ACCEPT THE PLAN (EVEN IF YOU CHECK THE "OPT OUT" BOX).**

---

## III.    <u>Conclusion</u>

For the foregoing reasons, among others, the Committee believes that the Plan is not in the best interests of unsecured creditors, does not provide the recoveries to unsecured creditors to which they are legally entitled and does not satisfy the legal requirements to be approved by the Bankruptcy Court.

---

[5] For Class 4 to accept the Plan (i) more than half of unsecured creditors who submit votes (by number) must vote to accept the Plan and (ii) more than 2/3 of unsecured creditors who submit votes (by claim amount) must vote to accept the Plan.

***Therefore, the Committee urges holders of Class 4 General Unsecured Claims to vote to <u>REJECT</u> the Plan and to <u>OPT OUT</u> of the releases.***

The foregoing description is not intended as a substitute for the Disclosure Statement. You should read the Disclosure Statement and the Plan in their entirety, and then make your own independent decision as to whether the Plan is acceptable.

The Debtors have provided you with a Ballot with which to vote to accept or reject the Plan as well as opt-out of the releases provided under the Plan. In order to have your vote counted, you must complete and return the Ballot in accordance with the procedures set forth therein and in the accompanying Disclosure Statement Order. **PLEASE READ THE DIRECTIONS ON THE BALLOT CAREFULLY AND COMPLETE YOUR BALLOT IN ITS ENTIRETY BEFORE RETURNING IT TO THE DEBTORS' SOLICITATION AGENT**.

<div align="center">

**THE DEADLINE TO VOTE ON THE PLAN AND<br>TO OPT OUT OF THE RELEASES IS [·], 2022.**

</div>

Should you have any questions about this letter, the Plan, the Disclosure Statement or the solicitation procedures, we would be pleased to discuss them with you at your convenience. Please direct any such questions to Philip C. Dublin (212-872-8083; pdublin@akingump.com), Naomi Moss (212-872-1044; nmoss@akingump.com), Edan Lisovicz (212-872-8105; elisovicz@akingump.com) or TPCCreditorInfo@akingump.com.

Very truly yours,

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF TPC GROUP INC., *ET AL.*