## EXHIBIT 2

**Redline**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| TPC GROUP INC., *et al.*, | Case No. 22-10493 (CTG) |
| Debtors. [1] | (Jointly Administered) |

## DISCLOSURE STATEMENT FOR SECOND AMENDED JOINT CHAPTER 11 PLAN OF TPC GROUP INC. AND ITS DEBTOR AFFILIATES

**BAKER BOTTS L.L.P.**
James R. Prince (admitted *pro hac vice*)
Kevin Chiu (admitted *pro hac vice*)
2001 Ross Avenue, Suite 900
Dallas, Texas 75201-2980
Telephone:    (214) 953-6500
Facsimile:    (214) 953-6503
Email: jim.prince@bakerbotts.com
        kevin.chiu@bakerbotts.com

BAKER BOTTS L.L.P.
Scott R. Bowling (admitted *pro hac vice*)
30 Rockefeller Plaza
New York, New York 10112
Telephone:    (212) 408-2500
Facsimile:    (212) 259-2501
Email: scott.bowling@bakerbotts.com

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Robert J. Dehney (No. 3578)
Curtis S. Miller (No. 4583)
Daniel B. Butz (No. 4227)
Matthew O. Talmo (No. 6333)
Brian Loughnane (No. 6853)
1201 N. Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email:    rdehney@morrisnichols.com
          cmiller@ morrisnichols.com
          dbutz@ morrisnichols.com
          mtalmo@ morrisnichols.com
          bloughnane@ morrisnichols.com

*Attorneys for Debtors
and Debtors in Possession*

---

[1]    The Debtors in these chapter 11 cases (the "**Chapter 11 Cases**"), along with the last four digits of each Debtor's federal tax identification number, are: TPC Group Inc. (3618); TPC Holdings, Inc. (7380); TPC Group LLC (8313); Texas Butylene Chemical Corporation (7440); Texas Olefins Domestic International Sales Corporation (4241); TPC Phoenix Fuels LLC (9133); Port Neches Fuels, LLC (1641); and TP Capital Corp. (6248).  Each Debtor's corporate headquarters and mailing address is 500 Dallas St., Suite 2000, Houston, Texas 77002.

BAKER BOTTS L.L.P.
David R. Eastlake (admitted *pro hac vice*)
Lauren N. Randle (admitted *pro hac vice*)
910 Louisiana Street
Houston, Texas 77002
Telephone:     (713) 229-1234
Facsimile:     (713) 229-1522
Email: david.eastlake@bakerbotts.com
lauren.randle@bakerbotts.com

Dated: September ~~2022~~22, 2022
Wilmington, Delaware

### IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

**THE DEADLINE TO VOTE ON THE PLAN IS OCTOBER 28, 2022, AT 4:00 P.M. (PREVAILING EASTERN TIME), UNLESS EXTENDED BY THE DEBTORS.**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT (OR A MASTER BALLOT CAST ON YOUR BEHALF, AS APPLICABLE) MUST BE ACTUALLY RECEIVED BY KROLL RESTRUCTURING ADMINISTRATION BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.**

**THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS ENTITLED TO VOTE FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE *SECOND AMENDED JOINT CHAPTER 11 PLAN OF TPC GROUP INC. AND ITS DEBTOR AFFILIATES*. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN (DEFINED BELOW), EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN <u>ARTICLE IX</u> HEREIN.**

---

**THE PLAN IS SUPPORTED BY (I) THE DEBTORS, (II) HOLDERS OF APPROXIMATELY 100 PERCENT OF TERM LOAN DIP CLAIMS AND 96.3 PERCENT OF CLASS 3 10.5% NOTES SECURED CLAIMS AND (III) HOLDERS OF APPROXIMATELY 99 PERCENT OF EXISTING HOLDINGS INTERESTS. THE DEBTORS BELIEVE THAT THE PLAN IS FAIR AND EQUITABLE, MAXIMIZES THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDES THE HIGHEST RECOVERIES TO STAKEHOLDERS. THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR ALL PARTIES IN THESE CHAPTER 11 CASES.**

**<u>THE DEBTORS URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO VOTE TO ACCEPT THE PLAN</u>.**

---

**ARTICLE X OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND SECTION 10.7 OF THE PLAN CONTAINS A THIRD-PARTY RELEASE BY HOLDERS OF CLAIMS AND INTERESTS. THUS,**

**YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MAY BE AFFECTED THEREUNDER. FOR MORE INFORMATION ABOUT THE THIRD-PARTY RELEASE BY HOLDERS OF CLAIMS AND INTERESTS, PLEASE REFER TO ARTICLE III.B.8 OF THIS DISCLOSURE STATEMENT.**

THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST ENTITLED TO VOTE TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR

**WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AND INTERESTS AFTER THE EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR INTERESTS OR OBJECTIONS TO CLAIMS OR INTERESTS.**

**THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.**

**INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT.**

**THE DEBTORS HAVE NOT AUTHORIZED ANY PERSON OR ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN, OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.**

**IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.**

**THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE X OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).**

**YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT EACH IN THEIR ENTIRETY, INCLUDING <u>ARTICLE IX</u> HEREIN,**

ENTITLED "<u>RISK FACTORS</u>," BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN.  THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.  EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING VOTES FOR THE ACCEPTANCES AND CONFIRMATION OF THE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE.  IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN, THE RELEVANT PROVISIONS OF THE PLAN WILL GOVERN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "<u>SEC</u>") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.

UPON CONFIRMATION OF THE PLAN, CERTAIN OF THE SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT WILL BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, 15 U.S.C. §§ 77A–77AA, TOGETHER WITH THE RULES AND REGULATIONS PROMULGATED THEREUNDER (THE "SECURITIES ACT"), OR SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN LAWS, IN RELIANCE ON THE EXEMPTION SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE.  OTHER SECURITIES DESCRIBED IN THE DISCLOSURE STATEMENT MAY BE ISSUED PURSUANT TO OTHER APPLICABLE EXEMPTIONS UNDER THE FEDERAL SECURITIES LAWS.  TO THE EXTENT EXEMPTIONS FROM REGISTRATION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR APPLICABLE FEDERAL SECURITIES LAW DO NOT APPLY, THE SECURITIES MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO A VALID EXEMPTION OR UPON REGISTRATION UNDER THE SECURITIES ACT.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS.  THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS.    FORWARD-LOOKING STATEMENTS MAY INCLUDE STATEMENTS ABOUT THE DEBTORS':

- BUSINESS STRATEGIES;

- OPERATING AND GROWTH INITIATIVES AND OPPORTUNITIES, INCLUDING PROPOSED CAPITAL PROJECTS;

- EXISTING AND EXPECTED COMPETITION AND COMPETITIVE POSITION;

- MARKET OUTLOOK AND TRENDS IN THE DEBTORS' INDUSTRY;

- EXPECTED FINANCIAL CONDITION;

- FUTURE CASH FLOWS, INCLUDING INSURANCE PROCEEDS;

- LIQUIDITY NEEDS, FINANCING SOURCES AND AVAILABILITY;

- EXPECTED RESULTS OF OPERATIONS;

- FUTURE CAPITAL AND OTHER EXPENDITURES;

- AVAILABILITY AND PRICE OF RAW MATERIALS AND INVENTORIES;

- THE BUSINESS CYCLICALITY OF THE PETROCHEMICALS INDUSTRY;

- EFFECTS OF SEASONALITY;

- PLANS AND OBJECTIVES OF MANAGEMENT OR THE SUPPORTING SPONSORS;

- **FUTURE COMPLIANCE WITH ORDERS AND AGREEMENTS WITH REGULATORY AGENCIES;**

- **ENVIRONMENTAL MATTERS;**

- **THE IMPACT OF THE COVID-19 PANDEMIC ON THE GLOBAL ECONOMY;**

- **DIRECT OR INDIRECT EFFECTS ON OUR BUSINESS RESULTING FROM ACTUAL OR THREATENED TERRORIST INCIDENTS OR ACTS OF WAR, INCLUDING THE ONGOING RUSSIAN INVASION OF UKRAINE, ITS ASSOCIATED IMPACTS ON GLOBAL COMMODITY MARKETS AND THE RESULTING POLITICAL AND ECONOMIC SANCTIONS ON RUSSIA;**

- **POTENTIAL OUTCOMES OF LEGAL, ENVIRONMENTAL OR REGULATORY PROCEEDINGS AND THEIR EXPECTED EFFECTS ON THE DEBTORS' RESULTS OF OPERATIONS;**

- **POTENTIAL OUTCOMES OF GEOPOLITICAL CHANGES AND THEIR RESULTING EFFECTS ON GLOBAL MARKETS AND THE EFFECTS ON THE DEBTORS' OPERATIONS;**

- **EXPECTATIONS, STRATEGIES AND PLANS FOR INDIVIDUAL ASSETS AND PRODUCTS (INCLUDING THE ABILITY TO MAINTAIN PLANT UTILIZATION RATES), BUSINESS SEGMENTS AND THE DEBTORS AS A WHOLE;**

- **ANTICIPATED RESTRUCTURING, DIVESTITURE AND CONSOLIDATION ACTIVITIES;**

- **COST REDUCTION AND CONTROL EFFORTS AND TARGETS;**

- **COMPLIANCE AND OTHER COSTS AND POTENTIAL DISRUPTION OR INTERRUPTION OF PRODUCTION OR OPERATION DUE TO ACCIDENT, FIRES, EXPLOSIONS, INTERRUPTIONS IN SOURCES OF RAW MATERIALS, CYBER SECURITY INCIDENTS, TERRORISM, POLITICAL UNREST, NATURAL DISASTERS OR OTHER UNFORESEEN EVENTS; AND**

- **ANY OTHER STATEMENTS REGARDING FUTURE GROWTH, FUTURE CASH NEEDS, FUTURE OPERATIONS, BUSINESS PLANS AND FUTURE FINANCIAL RESULTS.**

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE DEBTORS' OR REORGANIZED DEBTORS' FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE DEBTORS' OR REORGANIZED DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE**

**FOLLOWING: THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED; THE DEBTORS' ABILITY TO REDUCE THEIR OVERALL FINANCIAL LEVERAGE; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESSES DURING THE CHAPTER 11 CASES; CUSTOMER AND SUPPLIER RESPONSES TO THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; INTEREST RATE FLUCTUATIONS; PRICE INCREASES; EXPOSURE TO LITIGATION; A DECLINE IN THE DEBTORS' MARKET SHARE DUE TO COMPETITION OR PRICE PRESSURE BY CUSTOMERS; THE DEBTORS' ABILITY TO IMPLEMENT COST REDUCTION INITIATIVES IN A TIMELY MANNER; THE DEBTORS' ABILITY TO DIVEST EXISTING ASSETS OR BUSINESSES; FINANCIAL CONDITIONS OF THE DEBTORS' CUSTOMERS; ADVERSE TAX CHANGES; LIMITED ACCESS TO CAPITAL RESOURCES; CHANGES IN LAWS AND REGULATIONS; NATURAL DISASTERS; GEOPOLITICAL INSTABILITY; AND THE EFFECTS OF GOVERNMENTAL REGULATION ON THE DEBTORS' BUSINESSES.**

# TABLE OF CONTENTS

Page

I.    **INTRODUCTION** ............................................................................................ **1**

    A.    Overview of Restructuring ................................................................ 1
    B.    Inquiries ........................................................................................... 3

II.    **SUMMARY OF PLAN TREATMENT** ......................................................... **5**

    A.    Summary and Description of Classes and Treatment ....................... 5
    B.    Illustrative Recoveries for Allowed Class 4 General Unsecured Claims ... 11

III.    **THE DEBTORS' RESTRUCTURING SUPPORT AGREEMENT AND PLAN** ... **13**

    A.    The Restructuring Support Agreement .............................................. 13
    B.    The Terms of the Plan ....................................................................... 14

IV.    **OVERVIEW OF THE COMPANY AND ITS BUSINESSES** ..................... **23**

    A.    The Company's Businesses ................................................................ 23
    B.    Equity Ownership .............................................................................. ~~27~~28
    C.    Corporate Organization and Prepetition Indebtedness ..................... 28

V.    **EVENTS LEADING TO THE COMMENCEMENT OF THESE CHAPTER 11 CASES** ... **34**

    A.    Current Market Conditions and Business Conditions ....................... 34
    B.    The Dock Incident and the HNO Technical Center Fire ................... 34
    C.    The Port Neches Incident; Company Response and Related Subsequent Events ... 35
    D.    Other Events Leading to Commencement of Chapter 11 Cases ....... 41
    E.    The Company's Prepetition Restructuring Efforts ............................ 42
    F.    Restructuring Support Agreement, Proposed DIP Financing, and Exit Financing. ... 48

VI.    **MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES** ... **52**

    A.    Expected Timetable of the Chapter 11 Cases ................................... 52
    B.    First Day Relief ................................................................................. 52
    C.    Other Procedural and Administrative Motions ................................. 53
    D.    Assumption of Contracts ................................................................... 53
    E.    The Debtors' DIP Financing .............................................................. 54
    F.    Appointment of Creditors' Committee .............................................. 56
    G.    Schedules and Statements ................................................................. 56
    H.    Establishment of a Claims Bar Date ................................................. 57
    I.    Adversary Proceeding ....................................................................... 57
    J.    Backstop Motion ............................................................................... 58
    K.    Litigation Matters ............................................................................. 59

| | L. | Putative PNO Class Claimants' Omnibus Motion for Class Proofs of Claim and Certification of Classes | 59 |
| | M. | Creditors' Committee Standing Motion | 60 |
| | N. | Rejection of Lion Elastomers Storage and Handling Agreement and Adversary Proceeding | 60 |
| **VII.** | **TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL LAW** | | **61** |
| | A. | New Common Shares, HoldCo Notes and Exit Notes | 61 |
| | B. | Equity Backstop Agreement, Debt Backstop Agreement and Exit Notes Backstop Agreement | 62 |
| | C. | Equity Backstop Commitment Securities; Debt Backstop Commitment Securities; Equity Direct Allocation Securities; Debt Direct Allocation Securities; Equity Put Option Securities; Debt Put Option Securities; and Backstop Exit Notes | 63 |
| | D. | Certain Securities Law Matters | 63 |
| **VIII.** | **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** | | **68** |
| | A. | Introduction | 68 |
| | B. | Certain U.S. Federal Income Tax Consequences to the Debtors and Reorganized Debtors | 70 |
| | C. | Certain U.S. Federal Income Tax Consequences to the U.S. Holders of 10.5% Secured Notes Claims and General Unsecured Claims | 75 |
| | D. | Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of 10.5% Secured Notes Claims | 85 |
| | E. | FATCA | 89 |
| | F. | Information Reporting and Backup Withholding | 89 |
| | G. | Transaction Reporting by Holders of Claims | 89 |
| **IX.** | **RISK FACTORS** | | **91** |
| | A. | Certain Bankruptcy Law Considerations | 91 |
| | B. | Risks Related to Recoveries under the Plan | 96 |
| | C. | Risk Factors Relating to Ownership of New Common Shares and HoldCo Notes | 97 |
| | D. | Risks Related to the Debtors' and the Reorganized Debtors' Businesses | 99 |
| **X.** | **SOLICITATION AND VOTING PROCEDURES** | | **117** |
| | A. | Voting Record Date | 117 |
| | B. | Voting Deadline | 117 |
| | C. | Voting on the Plan | 118 |
| | D. | Holders of Claims and Interests Entitled to Vote on the Plan | 118 |
| **XI.** | **CONFIRMATION OF THE PLAN** | | **120** |
| | A. | Requirements for Confirmation of the Plan | 120 |
| | B. | Objections to Confirmation | 120 |
| | C. | Requirements for Confirmation of the Plan | 122 |

**XII.**   **ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE**
       **PLAN.**.................................................................................................................**127**

       A.     Alternative Plan of Reorganization...........................................................127
       B.     Sale under Section 363 of the Bankruptcy Code.......................................127
       C.     Liquidation Under Chapter 7 of Bankruptcy Code...................................127

**XIII.**  **RECOMMENDATION.**...................................................................................**128**

**EXHIBITS**

EXHIBIT A    Joint Chapter 11 Plan

EXHIBIT B    Restructuring Support Agreement

EXHIBIT C    Organizational Chart

EXHIBIT D    Financial Projections

EXHIBIT E    Valuation Analysis

EXHIBIT F    Liquidation Analysis

EXHIBIT G    Release Provisions, Exculpation, and Related Injunctions

EXHIBIT H    Letter from Official Committee of Unsecured Creditors

## I.    **INTRODUCTION**

TPC Group Inc. and its debtor affiliates TPC Holdings, Inc. ("**Holdings**"), TPC Group LLC ("**TPC**"), Texas Butylene Chemical Corporation, Texas Olefins Domestic International Sales Corporation, TPC Phoenix Fuels LLC, Port Neches Fuels, LLC, and TP Capital Corp., as debtors and debtors in possession (each, a "**Debtor**," and collectively, the "**Debtors**," and collectively with their non-Debtor subsidiaries, the "**Company**"), submit this disclosure statement (as may be amended from time to time, this "**Disclosure Statement**") in connection with the solicitation of votes on the *Second Amended Joint Chapter 11 Plan of TPC Group Inc. and its Debtor Affiliates* [D.I. 793], dated September 20, 2022 filed contemporaneously herewith and attached hereto as **Exhibit A** (the "**Plan**").[2]  Although proposed jointly for administrative purposes in these Chapter 11 Cases, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding claims against and interests in each Debtor pursuant to the Bankruptcy Code.

The purpose of this Disclosure Statement is to provide information of a kind, and in sufficient detail, to enable creditors of the Debtors that are entitled to vote on the Plan to make an informed decision on whether to vote to accept or reject the Plan.  This Disclosure Statement contains summaries of the Plan, certain statutory provisions, and events contemplated in the chapter 11 cases that commenced (the "**Chapter 11 Cases**") on June 1, 2022 (the "**Petition Date**"), as well as certain documents related to the Plan.

### A.    **Overview of Restructuring**

The Plan is the result of extensive, good-faith negotiations overseen by the Debtors' independent Special Committee (as defined below) and approved by the Debtors' board of directors, among the Debtors and a number of their key economic stakeholders, including the ABL DIP Lender, the Supporting Noteholders, and the Supporting Sponsors.  The ABL DIP Lender has agreed to provide the Exit ABL Facility on the terms set forth in the Exit ABL Credit Agreement, a copy of which will be filed in the Chapter 11 Cases as part of the Plan Supplement.  The Supporting Noteholders (who collectively hold, in the aggregate, approximately 100% of the Term Loan DIP Claims and 96.3% of the Class 3 10.5% Notes Secured Claims)[3] and the Supporting Sponsors (who collectively hold, in the aggregate, approximately 99% of the Class 8 Existing Holdings Interests) support confirmation of the Plan. [4]  The Supporting Noteholders' and Supporting Sponsors' agreement to support confirmation of the Plan is set forth in, and subject to the terms of, the Restructuring Support Agreement, attached as **Exhibit B** hereto.

---

[2]    Capitalized terms used in the Disclosure Statement but not defined herein have the meanings ascribed to such terms in the Plan.  To the extent any inconsistencies exist between the Disclosure Statement and the Plan, the Plan will govern.

[3]    Subject to execution of an applicable joinder to the RSA and other definitive documentation.

[4]    The holders of the Term Loan DIP Claims also hold approximately 90% of the Priming Notes which were rolled up (and are pending final cancelation or cash-out) pursuant to the Term Loan DIP.

As described in more detail below, the Plan substantially deleverages the Debtors' balance sheet and establishes sufficient liquidity to operate the Debtors' business and execute on a business plan that will provide for a sustainable and successful enterprise going forward. The key components of the Plan are as follows:

- Treatment of the **ABL DIP Claims** consisting of, at the Debtors' option (with the consent of the Required Supporting Noteholders), either (i) on a dollar-for-dollar basis, conversion of such ABL DIP Claims into loans and letter of credit participations under the Exit ABL Facility or (ii) payment in full in Cash from proceeds of the Exit ABL Facility;

- Payment in full in Cash of the **Term Loan DIP Claims**;

- Treatment of **10.5% Notes Secured Claims** consisting of the following:

  (a).  Cash in the amount of $350 million, plus all unrestricted Cash held by the Debtors on the Effective Date in excess of $50 million, with such excess cash to be reduced by (i) any amounts drawn and letters of credit issued (whether or not drawn) under the Exit ABL Facility, and (ii) any reserves and other cash distribution requirements expressly provided under the Plan;

  (b).  100% of the New Common Shares, subject to dilution by the Equity Rights Offering Securities, the Equity Direct Allocation Securities, the Equity Put Option Securities, the Debt Put Option Securities (together with the Equity Put Option Securities, the "**Put Option Premium Securities**"), and the Management Incentive Plan;

  (c).  100% of the Equity Subscription Rights (without oversubscription rights) to participate in a $165 million new money equity rights offering to purchase New Common Shares, which is backstopped by certain Supporting Noteholders;

  (d).  100% of the Debt Subscription Rights (without oversubscription rights) to participate in an $82.5 million debt rights offering to purchase HoldCo Notes, which is backstopped by certain Supporting Noteholders; and

  (e).  $80 million in principal amount of the HoldCo Notes (the "**Takeback HoldCo Notes**");

- Treatment of **General Unsecured Claims** in the form of:[5]

---

[5]  Class 4 consists of all General Unsecured Claims against the Debtors and does not structurally differentiate Class 4 General Unsecured Claims by Debtor. Because Holdings is expected to have no distributable value that would require a greater recovery on account of Allowed Class 4 Claims than that set forth in the Plan, the Plan consolidates Class 4 General Unsecured Claims of all the Debtors into one estate for purposes of distribution only. As such, the holder of an Allowed Class 4 General Unsecured Claim in any Debtor will only be entitled to receive its Pro Rata Share of the GUC Trust Interests, which in turn will entitle such holder to receive only its Pro Rata share of the GUC Trust Assets.

(a).     ***in the event that Class 4 votes to <u>accept</u> the Plan***:  100% of the GUC Trust Interests (which shall entitle the holders thereof to their Pro Rata share of (i) Cash in the aggregate amount of $5 million <u>plus</u> (ii) the right to receive an additional $5 million in Cash in the event that the Reorganized Debtors' 2024 Adjusted EBITDA exceeds $250 million); *provided*, that distributions on account of Allowed 10.5% Notes Deficiency Claims will be waived; or

(b).     ***in the event that Class 4 votes to <u>reject</u> the Plan***: no recovery and all General Unsecured Claims will be discharged without further notice to, approval of or action by any Person or Entity;

- Cancellation of all **Existing Holdings Interests**;

- Exit financing consisting of:

  i.     the Exit ABL Facility, with a maximum committed amount of $200 million, subject to a borrowing base;

  ii.    the Exit Notes in the principal amount of $350 million, which will be fully backstopped by certain Supporting Noteholders; and

  iii.   the new money HoldCo Notes in the aggregate principal amount of $150 million, which will be fully backstopped certain Supporting Noteholders; and

- $202.5 million in new capital, consisting of $135.0 million of Equity Direct Allocation Securities purchased pursuant the Equity Direct Allocation and $67.5 million of Debt Direct Allocation Securities purchased pursuant to the Debt Direct Allocation.

Entry into the Restructuring Support Agreement and the formulation of the Plan are significant achievements for the Debtors.  The level of consensus for this comprehensive reorganization reflects the efforts undertaken by the Debtors, the Supporting Noteholders, and the Supporting Sponsors, as well as such parties' belief in the Debtors' prospects as a reorganized enterprise.

The Debtors and the other parties to the Restructuring Support Agreement believe that the Plan is in the best interests of all stakeholders because it maximizes the value of the Debtors' estates for the benefit of all parties in interest in the Chapter 11 Cases.  Given the Debtors' core strengths, including their experienced management team and strategic business plan going forward, the Debtors are confident that they can implement the Plan's balance sheet restructuring to ensure the Debtors' long-term viability and success.  For these reasons, the Debtors strongly recommend that Holders of Claims entitled to vote accept the Plan.

**B.      Inquiries**

If you have any questions about the packet of materials you have received, please contact Kroll Restructuring Administration, the Debtors' voting agent (the "**Voting Agent**"), via one of the following methods:

*By regular mail, hand delivery, or overnight mail at*:
TPC Ballot Processing
c/o Kroll Restructuring Administration,
850 3rd Avenue, Suite 412,
Brooklyn, NY 11232

*By electronic mail at*:
TPCGroupinfo@ra.kroll.com
*By telephone at*:
(844) 596-2260 (toll free for U.S. and Canada)
(646) 214-8808 (International toll)

Copies of this Disclosure Statement, which includes the Plan and the Plan Supplement (when filed), are also available on the Voting Agent's website, https://cases.ra.kroll.com/TPCGroup/. PLEASE DO NOT DIRECT INQUIRIES TO THE BANKRUPTCY COURT.

## II.    **SUMMARY OF PLAN TREATMENT**

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are: (i) Impaired and Unimpaired under the Plan; (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; and (iii) presumed to accept or reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified.  The classification of Claims and Interests set forth herein shall apply separately to each Debtor.

### A.    **Summary and Description of Classes and Treatment**

The table below provides a summary of the classification, treatment and estimated recoveries of Allowed Claims and Interests under the Plan. This information is provided in summary form for illustrative purposes only, is subject to material change based on contingencies related to, among other things, the Claim reconciliation process, and is qualified in its entirety by reference to the full text of the Plan.  Any estimates of Allowed Claims or Interests in this Disclosure Statement may vary from the final amounts Allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan. The projected recoveries set forth in the table below are estimates only and therefore are subject to change, including based upon changes in the amount of Claims that are Allowed (as defined in the Plan) as well as other factors related to the Debtors' business operations and general economic conditions.  For a more detailed summary of the terms and provisions of the Plan, *see* Article III.B below.

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Projected Amount of Allowed Claims and Interests and Projected Recovery Under the Plan |
|---|---|---|---|
| 1 (Other Secured Claims) | Except to the extent that a holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the Debtors or the Reorganized Debtors, but with the consent of the Required Supporting Noteholders, each holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Other Secured Claim either: <br><br> (i)   payment in full in Cash; or <br><br> (ii)  such other treatment rendering such Other Secured Claim Unimpaired; <br><br> in each case, on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter. | Unimpaired <br><br> (Not entitled to vote because presumed to accept) | Projected Amount of Allowed Claims: N/A <br><br> Projected Recovery Under the Plan: N/A |

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Projected Amount of Allowed Claims and Interests and Projected Recovery Under the Plan |
|---|---|---|---|
| 2 (Other Priority Claims) | Except to the extent that a holder of an Allowed Other Priority Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Priority Claim, at the option of the Debtors or the Reorganized Debtors, but with the consent of the Required Supporting Noteholders, each holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Other Secured Claim either:<br><br>(i)    payment in full in Cash; or<br><br>(ii)   such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code,<br><br>in each case, on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, in each case, or as soon as reasonably practicable thereafter. | Unimpaired<br><br>(Not entitled to vote because presumed to accept) | Projected Amount of Allowed Claims: N/A<br><br>Projected Recovery Under the Plan: N/A |

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Projected Amount of Allowed Claims and Interests and Projected Recovery Under the Plan |
|---|---|---|---|
| 3 (10.5% Notes Secured Claims)[6] | As of the Effective Date, the 10.5% Notes Secured Claims shall be deemed Allowed in the aggregate amount of $479.2 million.[7]<br><br>Except to the extent that a holder of an Allowed 10.5% Notes Secured Claim agrees to less favorable treatment, on the Effective Date, each holder of an Allowed 10.5% Notes Secured Claim shall receive, in full and final satisfaction of such 10.5% Notes Secured Claim, its Pro Rata share of the following:<br><br>(i)   Cash in the amount of $350 million, plus all unrestricted Cash held by the Debtors on the Effective Date in excess of $50 million, with such excess cash to be reduced by (i) any amounts drawn and letters of credit issued | Impaired<br><br>(Entitled to vote) | Projected Amount Allowed of Claims:<br><br>$479.2 million<br><br>Projected Recovery Under the Plan:<br><br>100% |

---

[6]    The 10.5% Notes Secured Claims amount of $479.2 million consists of the principal amount of the 10.5% Notes plus accrued and unpaid prepetition interest plus the applicable premium payable pursuant to the 10.5% Notes Indenture less the amount of the 10.5% Notes Deficiency Claim.  Such amount constitutes a 44.1% recovery on account of the aggregate 10.5% Notes Claims.

[7]    The Allowed 10.5% Notes Secured Claim amount of $479.2 million is based on the midpoint total distributable value per the valuation analysis, attached as Exhibit E hereto, and includes an estimated cash payment of $365 million (based on estimated pre-emergence cash of approximately $65 million).   In performing its valuation analysis of the Reorganized Debtors, Moelis performed an enterprise valuation and as such, did not conduct a valuation of the collateral securing the 10.5% Notes.

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Projected Amount of Allowed Claims and Interests and Projected Recovery Under the Plan |
|---|---|---|---|
|  | (whether or not drawn) under the Exit ABL Facility, and (ii) any reserves and other cash distribution requirements expressly provided under the Plan;<br><br>(ii)  100% of the New Common Shares, subject to dilution by the Equity Rights Offering Securities, the Equity Direct Allocation Securities, the Equity Put Option Securities, the Debt Put Option Securities and the Management Incentive Plan;<br><br>(iii) the Takeback HoldCo Notes;<br><br>(iv) 100% of the Debt Subscription Rights; and<br><br>(v)  100% of the Equity Subscription Rights. |  |  |

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Projected Amount of Allowed Claims and Interests and Projected Recovery Under the Plan |
|---|---|---|---|
| 4 (General Unsecured Claims (including 10.5% Notes Deficiency Claim))[8] | On the Effective Date, the 10.5% Notes Deficiency Claims shall be deemed Allowed in the aggregate amount of $607.2 million. [9] | Impaired (Entitled to vote) | Projected Amount of Allowed Claims: $180 million - $946 million (excluding 10.5% Notes Deficiency Claims of $607.2 million) *See* Section IV.C.4 for information Projected Recovery Under the Plan: 0.00% - 5.00% |

---

[8]    For the avoidance of doubt, all holders of Allowed Class 4 General Unsecured Claims, including holders of 10.5% Notes Deficiency Claims, are entitled to vote on the Plan. Holders of Class 3 10.5% Notes Secured Claims that also hold 10.5% Notes Deficiency Claims must vote both such Claims in the same manner, and such Holders will receive only one ballot on account of both such Claims.

[9]    The Plan represents a compromise with respect to the 10.5% Notes that provides for a secured and unsecured portion of the 10.5% Note Claims, with the unsecured portion based on the Plan value being classified as a General Unsecured Claim in the amount of the full Claim less the remaining Plan value. However, the 10.5% Notes were issued by Debtor TPC Group Inc. and guaranteed by each of the other Debtors, and the holders of the 10.5% Notes have asserted a Claim for the full amount of the principal, make-whole and accrued prepetition interest on such notes at Debtor TPC Group Inc. and each of the other Debtors, and that no payment or allocable value from any of those entities on account of the 10.5% Notes results in the reduction of such claims so long as the 10.5% Notes are not paid in full, including postpetition interest and other fees, costs and charges payable under the indenture in the event that the 10.5% Notes are determined to be oversecured or the Debtors liable for such Claim are determined to be solvent. Accordingly, in the event that the Plan is not confirmed and the compromise with the 10.5% Notes is not approved, the holders of the 10.5% Notes will assert claims in the minimum amount of $1.098 billion against every Debtor entity.

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Projected Amount of Allowed Claims and Interests and Projected Recovery Under the Plan |
|---|---|---|---|
| | Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, each holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Allowed General Unsecured Claim:<br><br>(i) *In the event that Class 4 votes to <u>accept</u> the Plan:* On the Effective Date, its Pro Rata share of the GUC Trust Interests (which, for the avoidance of doubt, shall entitle such holder to receive its Pro Rata share of the GUC Trust Assets in accordance with the GUC Trust Agreement); *provided,* that distributions on account of Allowed 10.5% Notes Deficiency Claims will be waived; or<br><br>(ii) *In the event that Class 4 votes to <u>reject</u> the Plan:* On the Effective Date, all General Unsecured Claims will be discharged without further notice to, approval of or action by any Person or Entity, and the holders of General Unsecured Claims shall not receive any distribution or retain any property on account of such General Unsecured Claims. | | *See* Section II.B for more information |
| 5 (Intercompany Claims) | Allowed Intercompany Claims shall, at the option of the applicable Debtor(s) or Reorganized Debtor(s), as applicable, and the Required Supporting Noteholders, be (i) reinstated, (ii) adjusted, or (iii) discharged (or otherwise eliminated) and receive no distribution under the Plan. | Unimpaired<br><br>(Not entitled to vote because presumed to accept) | Projected Amount of Allowed Claims: N/A<br><br>Projected Recovery Under the Plan: N/A |

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Projected Amount of Allowed Claims and Interests and Projected Recovery Under the Plan |
|---|---|---|---|
| 6 (Subordinated Claims) | All Subordinated Claims, if any, shall discharged, cancelled, released, and extinguished as of the Effective Date and will be of no further force or effect, and holders of Subordinated Claims will not receive any distribution on account of such Subordinated Claims. | Impaired (Not entitled to vote because deemed to reject) | Projected Amount of Allowed Claims: $0 Projected Recovery Under the Plan: 0% |
| 7 (Existing Holdings Interests) | All Existing Holdings Interests shall be cancelled, released, and extinguished and shall be of no further force or effect as of the Effective Date, whether surrendered for cancellation or otherwise. No holder of Existing Holdings Interests shall receive any distribution under the Plan on account of such Existing Holdings Interests. | Impaired (Not entitled to vote because deemed to reject) | Projected Amount of Allowed Claims: $0 Projected Recovery Under the Plan: 0% |
| 8 (Other Holdings Interests) | All Other Holdings Interests shall be cancelled, released, and extinguished and will be of no further force or effect as of the Effective Date, whether surrendered for cancellation or otherwise. No holder of Other Holdings Interests will receive any distribution under the Plan on account of such Other Holdings Interests. | Impaired (Not entitled to vote because deemed to reject) | Projected Amount of Allowed Claims: $0 Projected Recovery Under the Plan: 0% |
| 9 (Intercompany Interests) | Intercompany Interests are Unimpaired. On the Effective Date, all Intercompany Interests shall, at the option of the applicable Debtor(s) or Reorganized Debtor(s), as applicable, and the Required Supporting Noteholders, be (i) adjusted, (ii) reinstated or (iii) discharged (or otherwise eliminated) and receive no distribution under the Plan. | Unimpaired (Not entitled to vote because presumed to accept) | Projected Amount of Allowed Claims: N/A Projected Recovery Under the Plan: N/A |

## B.    Illustrative Recoveries for Allowed Class 4 General Unsecured Claims

Under the Plan, in the event that Class 4 votes to accept the Plan, holders of Allowed Class 4 Claims shall be entitled to their Pro Rata share of 100% of the GUC Trust Interests which shall entitle such holders to receive their Pro Rata share of the GUC Trust Assets in accordance with the GUC Trust Agreement; *provided*, that distributions on account of the Allowed 10.5% Notes Deficiency Claims will be waived.  The GUC Trust Assets consist of (i) Cash in the aggregate amount of $5 million plus (ii) the right to receive an additional $5 million in Cash in the event that the Reorganized Debtors' 2024 Adjusted EBITDA exceeds $250 million).

As further discussed below in Section IV.C.4, substantially all of the claims in Class 4, other than Allowed 10.5% Notes Deficiency Claims are contingent, disputed, and/or unliquidated.  As such, the Debtors are unable to estimate with certainty the recovery amount for Allowed Class 4 Claims under the Plan.  The following illustrative chart sets forth a sensitivity analysis of the Debtors' estimated range of recoveries based on the low and high range of Allowed Class 4 Claims (including the waiver of distributions on account of the Allowed 10.5% Notes Deficiency Claims) as discussed in Section IV.C.4 and the potential range of Pro Rata recoveries on account of the GUC Trust Interests under the Plan, and assumes $1 million in GUC Trust Expenses to administer the GUC Trust, which are paid from the GUC Trust Interests prior to any distribution to Allowed Class 4 Claims.

| (in $millions) | Illustrative Range of Allowed General Unsecured Claim Amounts | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| GUC Trust Assets for Distribution[10] | $200 | $300 | $400 | $500 | $600 | $700 | $800 | $900 |
| $0 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| $5 million | 2.00% | 1.33% | 1.00% | 0.80% | 0.67% | 0.57% | 0.50% | 0.44% |
| $10 million | 4.50% | 3.00% | 2.25% | 1.80% | 1.50% | 1.29% | 1.13% | 1.00% |

---

[10]    This table is provided for illustration and summary purposes only.  The Debtors do not admit to the validity, priority and/or allowance of any claim or, lien or interest in property and reserve rights in relation to such issues related to Class 4 General Unsecured Claims.  Many of these estimated claim amounts incorporate litigation claims which are in their preliminary stages and can only be estimated by using broad ranges.  As such, these amounts could vary significantly. The resolution and/or estimation of these claims for distribution purposes could have a material effect on the estimated recoveries.

### III.    THE DEBTORS' RESTRUCTURING SUPPORT AGREEMENT AND PLAN

#### A.    The Restructuring Support Agreement

The Debtors engaged with their stakeholders to secure the terms of a value-maximizing and consensual reorganization. Specifically, the Debtors, the members of the Ad Hoc Noteholder Group, and the Supporting Sponsors negotiated and formulated a restructuring support agreement (the "**Restructuring Support Agreement**" or "**RSA**") that would provide the Debtors with additional liquidity and exit funding, maximize recoveries to all of the Debtors' creditors, and allow the Debtors to quickly emerge from chapter 11 on a consensual basis. Furthermore, in parallel with its negotiation of the RSA with the Ad Hoc Noteholder Group and Supporting Sponsors, the Company has been engaged in negotiations with a group of law firms representing holders of PNO Claims (as defined below) (such holders, "**PNO Claimants**"), referred to herein as the "**PNO Claims Steering Committee**," which collectively represent a supermajority of PNO Claimants in the pending civil litigation arising from the PNO Incident (as defined below), and certain other stakeholders regarding a potential settlement that would consensually address the PNO Claims and obtain the PNO Claimants' support of the Plan, but these negotiations have not yet been successful. The Debtors also engaged in similar prepetition negotiations with Bayside Capital, Inc. ("**Bayside**") and Cerberus Capital Management, L.P., ("**Cerberus**"), holders of less than 10% of the outstanding principal amount of 10.5% Notes.

Following the Debtors' negotiation efforts, on May 9, 2022, with the support of the Special Committee (as defined below) and the Board (as defined below), the Company, the members of the Ad Hoc Noteholder Group, and the Supporting Sponsors entered into an initial restructuring support agreement with respect to a transaction that would be implemented, subject to the Company's obtaining a debtor-in-possession ABL facility either from its existing bank group or from a new ABL lending source. Over the following weeks, the Company successfully negotiated a postpetititon senior secured superpriority priming asset-based revolving loan facility with Eclipse Business Capital ("**Eclipse**"; such facility, the "**ABL DIP Facility**"), together with obtaining a commitment from Eclipse to provide an exit ABL facility at the conclusion of these chapter 11 cases. Thereafter, on May 31, 2022, the Company, the members of the Ad Hoc Noteholder Group, and the Supporting Sponsors entered into a superseding Restructuring Support Agreement, which is attached hereto as **Exhibit B**.

The restructuring transactions contemplated by the Restructuring Support Agreement provide for, among other things: (i) a restructuring pursuant to a chapter 11 plan funded by a $300 million equity rights offering, a $150 million debt rights offering for paid-in-kind holding company notes, a $350 million issuance of secured exit notes—all backstopped by certain members of the Ad Hoc Noteholder Group, subject to the terms and conditions set forth in the Restructuring Support Agreement and the Backstop Agreements—and an $80 million issuance of paid-in-kind holding company notes; (ii) the elimination of the vast majority of the Company's funded debt and other claims from the Company's balance sheet; and (iii) the financing of the Company's chapter 11 cases through a debtor-in-possession loan facility provided by certain members of the Ad Hoc Noteholder Group and the ABL DIP Facility. The Restructuring Support Agreement also contemplates a plan of reorganization that provides a distribution to holders of general unsecured claims, which would not otherwise be entitled to

receive or retain value under a plan in these chapter 11 cases, consisting of $5 million in cash plus $5 million in future cash subject to the Company's achieving projected 2024 Adjusted EBITDA in excess of $250 million (excluding any insurance proceeds that may be received by the Company), assuming the class of general unsecured claims votes to accept the Plan.

### B.    The Terms of the Plan

The Plan contemplates the following key terms, among others described herein and therein:

### 1.    Issuance and Distribution of New Common Shares

On the Effective Date, all Existing Holdings Interests shall be cancelled and the applicable Reorganized Debtor shall be authorized to issue or cause to be issued and shall issue the New Common Shares for distribution in accordance with the terms of the Plan and the Plan Supplement without the need for any further board, shareholder or other corporate action. All of the New Common Shares, issuable under the Plan, when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable. The applicable New Corporate Governance Documents shall provide for sufficient authorized New Common Shares to effectuate the issuance of New Common Shares contemplated by and in connection with the Plan, including the Equity Direct Allocation Securities, the Equity Rights Offering Securities, the Equity Put Option Securities, the Debt Put Option Securities, the New Common Shares issuable under the Management Incentive Plan and the New Common Shares received by holders of Allowed 10.5% Secured Notes Claims pursuant to Section 5.8 of the Plan. The applicable Reorganized Debtor shall issue or reserve for issuance a sufficient number of shares of New Common Shares to effectuate all such issuances.

Each holder of New Common Shares shall, at the option of the Debtors, with the consent of the Required Supporting Noteholders, and as set forth in the Confirmation Order, be deemed, without further notice or action, to have agreed to be bound by the New Corporate Governance Documents, as the same may be amended from time to time following the Effective Date in accordance with their terms. The New Corporate Governance Documents shall be binding on all Entities receiving New Common Shares (and their respective successors and assigns), whether received pursuant to the Plan or otherwise and regardless of whether such Entity executes or delivers a signature page to the Shareholder Agreement or any other New Corporate Governance Document. Notwithstanding the foregoing, the Debtors or the Reorganized Debtors, as applicable, may condition the distribution of any New Common Shares issued pursuant to the Plan upon the recipient thereof duly executing and delivering to the Debtors or the Reorganized Debtors, as applicable, counter-signatures to the Shareholder Agreement.

### 2.    Issuance and Distribution of HoldCo Notes and Exit Notes

On the Effective Date, the applicable Reorganized Debtors shall be authorized to execute, deliver, and enter into the HoldCo Notes Indenture, the HoldCo Notes, the Exit ABL Credit Agreement, the Exit Notes Indenture and the Exit Notes, including any documents required in connection with the creation or perfection of Liens in connection therewith without further (i) notice to or order or other approval of the Bankruptcy Court, (ii) act or omission under applicable

law, regulation, order, or rule, (iii) vote, consent, authorization, or approval of any Person, or (iv) action by the holders of Claims or Interests. The HoldCo Notes Indenture, the HoldCo Notes, the Exit ABL Credit Agreement, the Exit Notes Indenture and the Exit Notes shall constitute legal, valid, binding and authorized joint and several obligations of the applicable Reorganized Debtors, enforceable in accordance with its terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, the Plan or the Confirmation Order. The financial accommodations to be extended pursuant to the HoldCo Notes Indenture, the HoldCo Notes, the Exit ABL Credit Agreement, the Exit Notes Indenture and the Exit Notes are reasonable and are being extended, and shall be deemed to have been extended, in good faith and for legitimate business purposes.

On the Effective Date, (a) all Liens and security interests granted pursuant to or in connection with the Exit ABL Credit Agreement and the Exit Notes Indenture shall be deemed granted by the Reorganized Debtors, and (b) all Liens and security interests granted pursuant to, or in connection with, the Exit ABL Credit Agreement and the Exit Notes Indenture shall (i) be valid, binding, perfected, enforceable Liens and security interests in the property described in the Exit ABL Credit Agreement and the Exit Notes Indenture (and, in each case, any ancillary documents thereto), with the priorities established in respect thereof under applicable non-bankruptcy law and the applicable intercreditor agreements, and (ii) not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under any applicable law, the Plan, or the Confirmation Order.

The Reorganized Debtors and the Persons granted Liens and security interests under the Exit ABL Credit Agreement and the Exit Notes Indenture are authorized under the Plan to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order without the need for any filings or recordings) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### 3.    The Equity Rights Offering

The Plan provides that following approval by the Bankruptcy Court of the Equity Rights Offering Procedures, the Equity Rights Offering Amount will be raised pursuant to the Equity Rights Offering. The Equity Rights Offering Amount is $165 million and shall be fully backstopped by the Equity Backstop Parties pursuant to the terms and conditions in the Equity Backstop Agreement. The Debtors and the Reorganized Debtors, as applicable, shall distribute (or cause to be distributed, directly or indirectly), the Equity Subscription Rights for the Equity Rights Offering to holders of 10.5% Notes Secured Claims (the "**Rights Offering Participants**") as set forth in the Plan, the Plan Supplement and the Equity Rights Offering Documents. Subject to the terms and conditions set forth in the Equity Rights Offering Procedures, the Equity Rights Offering shall be open to all Equity Rights Offering Participants, and the purchase price per share of the Equity Rights Offering Securities shall be $13.00. The Equity Rights Offering Securities issued upon exercise of the Equity Subscription Rights

pursuant to the terms of the Equity Backstop Agreement and the Rights Offering Procedures will dilute the distribution of New Common Shares received by holders of Allowed 10.5% Secured Notes Claims pursuant to Section 4.3 of the Plan.

Subject to the terms and conditions set forth in the Equity Backstop Agreement, if, after following the procedures set forth in the Equity Rights Offering Procedures, there remains any unsubscribed Equity Rights Offering Securities, the Reorganized Debtors will have an option to sell to the Equity Backstop Parties, and, upon exercise of such option, the Equity Backstop Parties shall each, severally and not jointly, be required to purchase, their respective allocation of the unsubscribed Equity Rights Offering Securities.  As consideration for certain of the commitments of the Equity Commitment Parties under the Equity Backstop Agreement, the applicable Equity Commitment Parties shall receive the Equity Put Option Premium, which shall be deemed fully earned as of the date of execution of the Equity Backstop Agreement.

On the Effective Date, all actions contemplated by the Plan and the Plan Supplement shall be deemed authorized and approved in all respects, including (i) the distribution of the New Common Shares (including New Common Shares representing the Equity Put Option Premium and Debt Put Option Premium) and (ii) the entry into the Shareholder Agreement by Reorganized Holdings and the holders of New Common Shares.  Certain of the Debtors and Reorganized Debtors, as applicable, shall issue the Equity Rights Offering Securities pursuant to the Plan, the Plan Supplement, the Equity Rights Offering Documents.  The Equity Rights Offering will be conducted in reliance upon one or more exemptions from registration under the Securities Act, which will include the exemption provided in section 1145 of the Bankruptcy Code to the fullest extent available and, to the extent such exemption is not available, the exemption from registration set forth in Section 4(a)(2) of the Securities Act or another available exemption from registration under the Securities Act.

On the Effective Date, the rights and obligations of Holdings under the Equity Backstop Agreement shall vest in the Reorganized Debtors.  Notwithstanding anything to the contrary in the Plan, (a) Holdings' obligations under the Equity Backstop Agreement shall remain unaffected and shall survive following the Effective Date in accordance with the terms thereof, (b) any such obligations shall not be discharged under the Plan, and (c) none of the Reorganized Debtors shall terminate any such obligations.

### 4.    The Debt Rights Offering

The Plan provides that following approval by the Bankruptcy Court of the Debt Rights Offering Procedures, the Debt Rights Offering Amount will be raised pursuant to the Debt Rights Offering.  The Debt Rights Offering Amount is $82.5 million and shall be fully backstopped by the Debt Backstop Parties pursuant to the terms and conditions in the Debt Backstop Agreement.  The Debtors and Reorganized Debtors, as applicable, shall distribute (or cause to be distributed, directly or indirectly), the Debt Subscription Rights for the Debt Rights Offering to the Debt Rights Offering Participants as set forth in the Plan and the Debt Rights Offering Documents.  Subject to the terms and conditions set forth in the Debt Rights Offering Procedures, the Debt Rights Offering shall be open to all Debt Rights Offering Participants.

Subject to the terms, conditions, and limitations set forth in the Debt Backstop Agreement, if, after following the procedures set forth in the Debt Rights Offering Procedures, there remains any unsubscribed Debt Rights Offering Securities, the Reorganized Debtors will have an option to sell to the Debt Backstop Parties, and, upon exercise of such option, the Debt Backstop Parties shall each, severally and not jointly, be required to purchase, their respective allocation of the unsubscribed Debt Rights Offering Securities, in accordance with, and subject to, the terms and conditions of the Debt Backstop Agreement. As consideration for certain of the commitments of the Debt Commitment Parties under the Debt Backstop Agreement, the applicable Debt Commitment Parties shall receive the Debt Put Option Premium, which shall be deemed fully earned as of the date of execution of the Debt Backstop Agreement.

On the Effective Date, the Debtors and the Reorganized Debtors, as applicable, subject to the terms of the Plan and the Plan Supplement, shall issue (i) the Debt Rights Offering Securities pursuant to the Debt Rights Offering and the Debt Backstop Agreement and (ii) New Common Shares representing the Debt Put Option Premium to the applicable Debt Commitment Parties. On the Effective Date, the rights and obligations of Holdings under the Debt Backstop Agreement shall vest in the Reorganized Debtors. Notwithstanding anything to the contrary in the Plan or the Confirmation Order, (a) Holdings' obligations under the Debt Backstop Agreement shall remain unaffected and shall survive following the Effective Date in accordance with the terms thereof, (b) any such obligations shall not be discharged under the Plan, and (c) none of the Reorganized Debtors shall terminate any such obligations.

The Debt Rights Offering will be conducted in reliance upon one or more exemptions from registration under the Securities Act, which will include the exemption provided in section 1145 of the Bankruptcy Code and/or the exemption from registration set forth in Section 4(a)(2) of the Securities Act or another available exemption from registration under the Securities Act.

## 5.    Equity Direct Allocation

On the Effective Date, the Equity Direct Allocation Parties shall purchase, and the applicable Reorganized Debtor shall be authorized to issue to such parties, the Equity Direct Allocation Securities for the Equity Direct Allocation Amount.  All such Equity Direct Allocation Shares shall be duly authorized, validly issued, fully paid, and non-assessable.  The issuance of Equity Direct Allocation Shares to the Direct Allocation Parties shall be subject to the terms of the Plan, the Plan Supplement and the Equity Backstop Agreement.

## 6.    Debt Direct Allocation

On the Effective Date, the Debt Direct Allocation Parties shall purchase, and the applicable Reorganized Debtor shall be authorized to issue to such parties, the Debt Direct Allocation Securities for the Debt Direct Allocation Amount.  The issuance of the Debt Direct Allocation Securities to the Debt Direct Allocation Parties shall be subject to the terms of the Plan, the Plan Supplement and the Debt Backstop Agreement.

### 7.        The Exit ABL Credit Facility and Exit Notes

The Exit ABL Credit Facility:

On the Effective Date, the Reorganized Debtors shall enter into the Exit ABL Credit Agreement and the Exit Notes Indenture including any documents required in connection with the creation or perfection of Liens in connection therewith.  The Confirmation Order shall include approval of the Exit ABL Credit Agreement and the Exit Notes Indenture all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Reorganized Debtors in connection therewith, authorization of the Reorganized Debtors to enter into, execute, and perform under the Exit ABL Credit Agreement and the Exit Notes Indenture and all related documents and agreements to the extent a party thereto, and authorization for the Reorganized Debtors to create or perfect the Liens in connection therewith.

The Exit ABL Credit Agreement and the Exit Notes Indenture shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms.  The financial accommodations to be extended pursuant to Exit ABL Credit Agreement and the Exit Notes Indenture are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to any Claims, Causes of Action, avoidance, reduction, recharacterization, subordination (whether contractual or otherwise), cross claim, disallowance, impairment, objection, or challenges under any applicable law or regulation by any Person for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent transfers, obligations, or conveyances, or other voidable transfers or obligations under the Bankruptcy Code or any other applicable non-bankruptcy law.

The lenders and noteholders under the Exit ABL Credit Agreement and the Exit Notes Indenture shall have valid, binding, and enforceable Liens on property identified as "Collateral" therein.  To the extent granted, the guarantees, mortgages, pledges, Liens and other security interests granted pursuant to either the Exit Facility Documents are granted in good faith as an inducement to the lenders and noteholders under either the Exit ABL Credit Agreement and the Exit Notes Indenture to extend credit thereunder and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, recharacterization, or subordination (whether contractual or otherwise) for any purposes whatsoever, and the priorities of any such Liens and security interests shall be as set forth in the relevant Exit Facility Documents.  The Reorganized Debtors and the persons and entities granted such Liens are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order, and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens to third parties.

The Exit Notes:

The Company shall use commercially reasonable efforts to issue $350 million in aggregate principal amount of Exit Notes in a private placement not subject to registration under the Securities Act, pursuant to an Exit Notes Indenture on terms and conditions set forth herein and acceptable to the Debtors and the Required Supporting Noteholders.  The Exit Notes will be secured by a second priority security interest in and lien on the Reorganized Debtors' cash, accounts receivable, and inventory and a first priority security interest in and lien on substantially

all of the Reorganized Debtors' other assets; *provided*, that the indenture governing the Exit Notes shall permit without condition the disposition of all property damage and business interruption insurance policies giving rise to claims by the Company for the November 2019 incident at ~~its~~the PNO ~~facility~~Facility (as defined below), and any proceeds thereof. The proceeds of the Exit Notes shall be used to fund the cash distribution to holders of the 10.5% Notes Secured Claims, as set forth below.

The terms and conditions of the Exit Notes and the Exit Notes Indenture will be set forth in the Plan Supplement. There will be no registration rights associated with the Exit Notes.

If the Company is unable to place some or all of the Exit Notes in the market, the Debtors are expected to have the right to cause the Exit Notes Backstop Parties, on a several (but not joint) basis, to purchase any such Exit Notes that are not placed in the market (the "**Exit Notes Backstop**") on terms and subject to conditions set forth in the Plan Supplement.

### 8.    Releases

The Plan contains releases of claims and causes of actions (as described more fully in Section 10.7 of the Plan), including mutual releases of claims and causes of action between the Debtors, the Reorganized Debtors and the Estates on the one hand, and: (i) the Supporting Noteholders, (ii) SK Second Reserve, L.P., a Delaware limited partnership;[11] (iii) the agents and lenders under the Exit ABL Facility, (iv) the holders of the Exit Notes and Holdco Notes and any agents or trustees thereunder, (v) the agents and lenders under the ABL DIP Facility, (vi) the agents and lenders under the Term Loan DIP Facility, (vii) the Backstop Parties, (viii) the Supporting Sponsors, (ix) the agents and lenders under the Prepetition ABL Credit Agreement, (x) the indenture trustees and collateral trustees in respect of the Priming Notes and the 10.5% Notes; and (xi) with respect to each of the foregoing Persons in clauses (i) through (x), each of their affiliates, predecessors, successors, assigns, subsidiaries, current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, employees of affiliates who worked on matters related to the Debtors or the Chapter 11 Cases and other professionals, affiliated investment funds or investment vehicles, managed accounts or funds, and such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such. None of the foregoing Entities, in each case, shall receive a release under the Plan if it: (a) elects to opt out of the releases contained in the Plan; or (b) timely files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation.

The Plan also contains releases of claims and causes of action, if any, held by the Debtors or their Estates against the Supporting Sponsors and the Debtors' directors and officers. The Debtors have evaluated the existence, colorability, and potential value of any such claims or causes of action against any of the Supporting Sponsors and the Debtors' directors and officers. Specifically, the Board (as defined below) established the Special Committee (as defined below),

---

[11]    SK Second Reserve, L.P. is a party to the Restructuring Support Agreement and has agreed to be bound by its obligations thereunder, including to grant the releases set forth in Section 10.7(b) of the Plan. SK Second Reserve, L.P. is a named defendant in the prepetition litigation arising from the PNO Incident that has no involvement with the Debtors and is unrelated to the Debtors and the PNO Incident.

which directed an independent investigation into potential claims and causes of action of the Company or that would become property of the Company's bankruptcy estate in a chapter 11 case against related parties and insiders, including the Supporting Sponsors and the Debtors' directors and officers.  The Special Committee (as defined below) identified no colorable claims other than one non-material potential preference claim for a $389,581.19 payment to a former officer of the Company in connection with such former officer's severance agreement.  The Special Committee (as defined below) determined that, even if valid, the Potential Preference Claim may be subject to valid defenses and that, in light of the amount at issue, the Potential Preference Claim was of *de minimis* net value to the Company.  For more information on the Independent Investigation *see* Article III.E.4 below.

Under the Plan, Holders of Claims and Interests that either (i) vote to accept or are deemed to accept the Plan, (ii) are in voting Classes who abstain from voting on the Plan, or (iii) vote to reject or are deemed to reject the Plan, and do not opt out of the release provisions contained in Article X of the Plan, will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, from any and all Claims and Causes of action whatsoever (including any derivative claims, asserted or assertable on behalf of the debtors, the Reorganized Debtors, or their Estates), the Debtors and the Released Parties.

**As set forth in the ballot sent to Holders entitled to vote on the Plan, a Holder of a Claim is deemed to provide the release contained in Article 10.7(b) of the Plan (including releases of the Supporting Sponsors, Ad Hoc Noteholder Group, ABL DIP Lender, Term Loan DIP Lender, and PNO Claims asserted in the MDL if they (i) vote to accept the Plan, (ii) do not submit a ballot to accept or reject the Plan, or (iii) vote to reject the Plan and do not opt out of or object to the release provisions in the Plan.**

The Debtors believe that the releases, exculpations, and injunctions set forth in the Plan are appropriate because, among other things: (i) the releases, exculpations, and injunctions are specific; (ii) the releases provide closure with respect to prepetition claims and causes of action, which the Debtors determined is a valuable component of the overall restructuring under the circumstances and is integral to the Plan; (iii) the releases are a necessary part of the Plan; (iv) each of the Released Parties and Exculpated Parties has afforded value to the Debtors and aided in the reorganization process, which facilitated the Debtors' ability to propose and pursue confirmation of a value-maximizing restructuring and (v) and the other Supporting Sponsor-related matters described in Section V.F.1.  Moreover, based on the conclusion of the Special Committee's Independent Investigation (both as defined below), there are no colorable claims or causes of action to be preserved against related parties and insiders.  The releases, exculpations, and injunctions have the support of the vast majority of the Debtors' secured creditors by principal amount.  The Debtors believe that each of the Released Parties and Exculpated Parties has played an integral role in formulating or enabling the Plan and has expended significant time and resources analyzing and negotiating the issues presented by the Debtors' prepetition capital structure.  The Debtors will be prepared to meet their burden to establish the basis for the releases, exculpations, and injunctions for each Released Party and Exculpated Party as part of Confirmation of the Plan.

### 9.    Insurance Policies

Notwithstanding anything in the Plan to the contrary, all of the Debtors' insurance policies, in effect or purchased as of the Petition Date, and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan.

On the Effective Date, pursuant to section 365(a) of the Bankruptcy Code, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto, including all D&O Liability Insurance Policies (including tail coverage liability insurance). All members, managers, directors, and officers of the Company who served in such capacity at any time prior to the Effective Date and all other individuals covered by D&O Liability Insurance Policies will be entitled to the full benefits of each such policy for the full term of such policy, regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Effective Date.

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of all such insurance policies, including the D&O Liability Insurance Policies. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of any Debtor existing as of the Confirmation Date with respect to any Insurance Policy; and prior payments for premiums or other charges made prior to the Petition Date under or with respect to any Insurance Policy shall be indefeasible. Moreover, as of the Effective Date, all payments of premiums or other charges made by the Debtors on or after the Petition Date under or with respect to any insurance policy shall be deemed to have been authorized, approved, and ratified in all respects without any requirement of further action by the Bankruptcy Court. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of insurance policies, including the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim or Claim for Cure Costs need be Filed, and shall survive the Effective Date.

All members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Effective Date and all other individuals covered by such insurance policies will be entitled to the full benefits of each such policy for the full term of such policy, regardless of whether such members, managers directors, officers, or other individuals remain in such positions after the Effective Date.

### 10.    Proceeds from Insurance Recovery Efforts

Under the Plan, all proceeds of property damage/business interruption insurance arising from the PNO Incident constitute collateral securing the 10.5% Notes. If such insurance proceeds are received by the Debtors prior to the Effective Date, they will be distributed as excess cash to holders of Class 3 10.5% Notes Secured Claims pursuant to Section 4.3 of the Plan; otherwise, such proceeds will be retained as an asset of the Reorganized Debtors. No portion of such insurance proceeds will be distributed to holders of unsecured claims.

### 11.    Qualified Defined Benefit Plan

TPC Group LLC sponsors a defined benefit pension plan covered by Title IV of the Employee Retirement Security Act of 1974, as amended ("**ERISA**"), 29 U.S.C. §§ 1301-1461 (2018).

On the Effective Date, the Reorganized Debtors will assume and continue to maintain the TPC Group LLC Cash Balance Plan for Represented Employees (the "**Pension Plan**") in accordance with the terms of the Pension Plan (as such terms may be amended from time to time) and applicable non-bankruptcy law (and the Reorganized Debtors reserve all of their rights thereunder), and as may be required under ERISA or the Tax Code (as defined below) will pay any aggregate unpaid minimum funding contributions, with interest, for the Pension Plan.

After the Effective Date, the Reorganized Debtors will (i) satisfy the minimum funding requirements under 26 U.S.C. §§ 412 and 430 and 29 U.S.C. §§ 1082 and 1083 for the Pension Plan, (ii) pay all required Pension Benefit Guaranty Corporation ("**PBGC**") premiums in accordance with 29 U.S.C. §§ 1306 and 1307 for the Pension Plan, and (iii) administer the Pension Plan in accordance with the applicable provisions of ERISA and the Tax Code, and the Reorganized Debtors reserve all of their rights with respect to all such obligations.

## IV.    OVERVIEW OF THE COMPANY AND ITS BUSINESSES

The Company, headquartered in Houston, Texas, is a leading producer of value-added products derived from petrochemical raw materials such as C4 hydrocarbons, and provider of critical infrastructure and logistics services along the U.S. Gulf Coast.  With an operating history of 75 years, the Company has a manufacturing facility in the industrial corridor adjacent to the Houston Ship Channel and operates product terminals in Port Neches, Texas and Lake Charles, Louisiana.  The Company is, among other things, the largest crude C4 processor by installed capacity in North America, and its customer and supplier relationships average more than 20 years old.

### A.    The Company's Businesses

The Company operates as a value-added processor and marketer through the Debtors and their non-Debtor affiliates, linking raw material providers with its diverse customer base of chemical, refinery and fuels consumers.  Its products are sold to producers in a wide range of performance, specialty and intermediate markets, including synthetic rubber, fuels, lubricant additives, plastics and surfactants.  In North America, the Company is the leader across its major product lines, which include:

- Butadiene: largest producer by production capacity;

- Butene-1: largest producer by production capacity;

- Methyl Tertiary Butyl Ether ("**MTBE**"): second largest producer by production capacity;

- Isobutylene: third largest producer by production capacity; and

- Highly Reactive Polyisobutylene ("**HR-PIB**"): largest producer by production capacity.

The principal operating and reporting segments are C4 Processing and Performance Products.

In the C4 Processing segment, the Company processes the crude C4 stream from ethylene crackers into the following higher-value components:

- Butadiene: primarily used to produce synthetic rubber that is mainly used in tires and other automotive products;

- Butene-1: primarily used in the manufacture of plastic resins and synthetic alcohols; and

- Raffinates: primarily used in the manufacturing of alkylate, a high-octane gasoline blending component.

The Performance Products segment operates through two business units, Fuels and Isobutylene Derivatives, to produce the following higher-value derivative products:

- MTBE: primarily used as a gasoline blending stock;

- Conventional Poly-Isobutylenes ("**PIB**") and HR-PIB: primarily used in the production of fuel and lubricant additives, caulks, adhesives, sealants and packaging;

- Diisobutylene ("**DIB**"): primarily used in the manufacture of surfactants, plasticizers and resins; and

- High Purity Iso-Butylene ("**HPIB**"): primarily used in the production of synthetic rubber, lubricant additives, surfactants and coatings.[12]

The Company owns and operates (a) the HNO Facility; (b) approximately 230 miles of feedstock and product pipelines, including nine active pipelines spanning 113 miles along the Gulf Coast of Texas and Louisiana; and (c) certain shipping and maritime logistics assets such as storage and terminal assets in Houston and Port Neches, Texas and Lake Charles, Louisiana and two contract terminals used to support tank truck movements of PIB products to industrial customers of PIB. The Company also owns and formerly operated the PNO Facility until the PNO Facility was shut down following the PNO Incident, after which the PNO Facility was repurposed to function solely as a storage and shipping terminal. Both the HNO Facility and PNO Facility are serviced by rail, tank truck, barge and ocean-going vessel.

- HNO Facility: The HNO Facility is the Company's principal operating facility. It is built on a 257-acre parcel of land approximately one mile from the Houston Ship Channel and can process crude C4, PIB, DIB, HPIB and MTBE. The HNO Facility has an annual production capacity of 920 million pounds of butadiene; 300 million pounds of butene-1; 740 million pounds of raffinates; 120 million pounds of HR-PIB; 79 million pounds of DIB and 330 million pounds of PIB. It can also process 700 million pounds of purchased isobutylene annually and has a total MTBE production capacity of 1.4 billion pounds. The HNO Facility is also highly flexible with respect to the quality grades of C4 feedstocks that it can process. The facility is covered by an extensive logistics network which includes service by rail, tank truck, barge and ocean-going vessel. Its 20 million pounds of butadiene storage capability is one of the largest on the U.S. Gulf Coast.

---

[12] From time to time, the Company may reduce production at or idle a facility or a particular unit at a facility for an extended period of time or discontinue a product line because of an oversupply of a particular product and/or a lack of demand for that particular product, or high feedstock prices that make production uneconomical. In 2017, the Company significantly decreased production of HPIB at its Houston facility for the reasons described above and is currently not producing any HPIB. The Company expects to continue production when demand and market economics improve.

Figure 1: Aerial Photograph of HNO Facility



- PNO Facility: Prior to the PNO Incident, the PNO Terminal in Port Neches, Texas also housed the PNO Facility, which operated as the Company's second C4 processing facility. On November 27, 2019, two explosions occurred at the TPC plant in Port Neches (the "**PNO Facility**") at approximately 1:00 a.m. and 11:45 a.m. (prevailing central time) (the "**PNO Incident**"). [13] The explosions and subsequent fires resulted in the complete shutdown of all processing at the PNO Facility and production remains shut as of this date. Following the PNO Incident, the PNO Facility was repurposed into a storage, shipping, and logistics terminal.

- Gulf Coast Storage Logistics: Texas Butylene Chemical Corporation, a wholly owned subsidiary of TPC Group LLC, owns storage and terminal assets in Lake Charles, Louisiana (the "**LCO Terminal**"). TPC Group LLC owns storage and terminal assets in Port Neches, Texas (the "**PNO Terminal**"), and a network of product and feedstock pipelines throughout the Gulf Coast region.

*LCO Terminal*

The LCO Terminal comprises two barge docks, two butadiene storage spheres and the ability to pump product via pipeline directly to the Company's customers. Texas Butylene Chemical Corporation leases the land on which the LCO Terminal is built through October 31, 2024, with an automatic ten-year extension

---

[13]   A document titled "Factual Update" dated October 29, 2020 and issued by the U.S. Chemical Safety and Hazard Investigation Board states, among other things, that explosions occurred on November 27, 2019 at 12:56 a.m., 2:40 a.m., and 1:48 p.m. (Central Time). The document is available online at https://www.csb.gov/assets/1/17/tpc_factual_update_10-29-2020.pdf?16614. A member of the Creditors' Committee asserts that four of the fifty instances of the term "PNO Incident" in this Disclosure Statement should read "PNO Explosions and Fire." To maintain consistency of usage throughout this Disclosure Statement and across the other documents that the Debtors have filed in these Chapter 11 Cases, and to avoid confusion, the Debtors use the term "PNO Incident" throughout this Disclosure Statement.

and a purchase option at the end of the extension period. The ground lease covers 3.830 acres in Lake Charles, Louisiana.  Texas Butylene Chemical Corporation is not a defendant in any litigation arising from the PNO Incident.  However, Texas Butylene Chemical Corporation is a guarantor of the 10.5% Notes, and has pledged machinery, equipment and all other personal property as collateral for such 10.5% Notes. In addition, TPC Group LLC has pledged its equity ownership in Texas Butylene Chemical Corporation as collateral securing the 10.5% Notes.

Figure 2: Aerial Photograph of Terminal and Logistics Assets at LCO Terminal



Figure 3: Alternate View of Terminal and Logistics Assets at LCO Terminal



*PNO Terminal*

The PNO Terminal, located on a 216-acre site in Jefferson County, Texas, is owned by the Company (except for the PNO Terminal dock and associated pipelines and wastewater treatment facilities, which are co- owned with industrial neighbors). It provides access to many butadiene customers, suppliers and refineries via barge, ship, rail, truck and an approximate sixty-mile pipeline network. The PNO Terminal also has twenty-two active storage tanks, consisting of six butadiene tanks, nine raffinates tanks, and seven crude C4 tanks. In addition, the PNO Terminal has a load dock facility, consisting of both a vessel and barge dock, and significant rail assets, including four rail racks, twelve rail unloading spots, and ninety railcar storage spots.



Figure 4: Aerial Photograph of Select Storage Assets at PNO Terminal



In addition to its other logistics assets, the Company owns a proprietary pipeline for shipment of B-1 to Dow's Texas City plant. It also leases storage capacity and has terminal capabilities for PIB in Hammond, Indiana, which allows the Company to service northern U.S. customers. Raffinate customers are served through a network of Company-owned and third-party pipelines, including a salt-dome storage facility in Pierce Junction, Texas, which the Company leases.

The Company has a broad client base of chemical producers and refiners, primarily in the United States, who use the Company's products as raw materials primarily for production of tires, nylons, fuel and lubricant additives, gasoline, gasoline blend stocks and plastics. For the years ended December 31, 2021, 2020 and 2019, sales to non-U.S. customers accounted for 4.2%, 5.6% and 9.2%, respectively, of the Company's total revenue.

Finally, the Company employs approximately 470 individuals across its manufacturing facility, production terminals and corporate headquarters. Fifty-one (51) of the Employees are represented by five different unions, each with a collective bargaining agreement: the United Steelworkers, the International Brotherhood of Electrical Workers, the Boilermakers Union, the Pipefitters Union, and the Carpenters Union. The Debtors currently intend to assume such collective bargaining agreements and are not aware of any cure obligations or claims being

asserted on account of such collective bargaining agreements.  On April 30, 2020, the Company terminated the employment of over sixty employees as part of a reduction in force initiative following the PNO Incident.

### B. Equity Ownership

Holdings is a privately-owned company that has, since December 20, 2012 (the "**2012 Acquisition**"), been indirectly, majority-owned by FR Sawgrass, L.P., SK Sawgrass, L.P., and certain affiliates of both entities, with certain current and former employees and members of the Company's senior leadership team indirectly holding approximately 1% of the Company's equity interests.

### C. Corporate Organization and Prepetition Indebtedness

Holdings, the parent company of TPC Group Inc. and the other Debtors, is a Delaware corporation and an unsecured guarantor of the 10.875% Senior Secured Notes and, in connection with the Debtors' entry into the February 2022 forbearance agreement, became an unsecured guarantor of the 10.5% Notes in February 2022.  Each of the Debtors is a direct or indirect wholly owned subsidiary of Holdings.  The Debtors' corporate organization is depicted on the chart attached hereto as **Exhibit C**.

The Debtors' capital structure is summarized by the following table and described in more detail below:

| CAPITAL STRUCTURE | | | | |
|---|---|---|---|---|
| **Secured Debt** *($ in millions)* | **Principal Amount** | **Accrued Interest** | **Applicable Premium** | **Total Claim Amount** |
| Secured ABL Facility | $108.5 | - | - | $108.5 |
| 10.875% Priming Secured Notes | $205.5 | $12.4 | $19.9 | $237.8 |
| 10.50% Senior Secured Notes | $930 | $83.1 | $73.2 | $1,086.3 |
| **Total Debt** | $1,241 | $95.5 | $93.1 | **$1,432.6** |

#### 1. Funded Indebtedness

#### (i) 10.875% Senior Secured Notes due July 2024 – Priming Notes

The Debtors are obligors under that certain *Indenture*, dated as of February 2, 2021, by and among TPC Group Inc., as issuer, the other Debtors, as guarantors, and U.S. Bank National Association ("**U.S. Bank**"), as trustee and collateral agent, for the issuance of $153 million in aggregate principal amount of 10.875% senior secured notes due 2024 (such notes, the "**Original Priming Notes**"; such indenture, as amended, modified, and supplemented, the "**Priming Notes Indenture**").  A portion of the net proceeds of the Original Priming Notes was used to repay and terminate a secured $70 million term loan that the Company borrowed from entities managed by or affiliated with Apollo Global Management, LLC, which term loan otherwise would have matured in August 2021.

(ii)    **10.875% Senior Secured Notes due July 2024 – Additional Priming Notes**

Each of the Debtors is party to a *Forbearance Agreement* (the "**Forbearance Agreement**") dated February 3, 2022, with an ad hoc group of holders of the Company's 10.50% Notes (described below) and the Company's 10.875% Priming Notes.  The Ad Hoc Noteholder Group holds approximately 96.3% of the Company's 10.5% Notes.

Under the Forbearance Agreement, the Ad Hoc Noteholder Group agreed, among other things, to forbear from exercising rights and remedies arising from the Company's election to forego $53 million of interest payments due February 1, 2022, on the Company's secured notes.  The Ad Hoc Noteholder Group also agreed to provide the Company with approximately $51.5 million of additional liquidity in the form of a commitment to purchase additional 10.875% senior secured priming notes due 2024 (the "**Bridge Priming Notes**," and together with the Original Priming Notes, the "**Priming Notes**").[13][14]  The Company issued the Bridge Priming Notes in two tranches: approximately $25 million on March 2, 2022 and approximately $26.5 million on March 11, 2022.  As of the Petition Date, approximately $205.5 million[14][15] in aggregate principal amount of Priming Notes were outstanding, in addition to accrued and unpaid interest, premiums, fees, and other charges.

The Debtors' obligations under the Priming Notes Indenture are secured by a first-priority security interest in and lien on the Notes Priority Collateral (including, among other things, real property, fixtures, and equipment) and a second-priority security interest in and lien on the ABL Priority Collateral, pursuant to, among other security documents, mortgages and a *Pledge and Security Agreement*, dated as of February 2, 2021, by and among TPC Group Inc., each of the other Debtors party to the Priming Notes Indenture, and U.S. Bank.

(iii)    **10.5% Senior Secured Notes due August 2024**

The Debtors are obligors under that certain *Indenture*, dated as of August 2, 2019, by and among TPC Group Inc., as issuer, the other Debtors, as guarantors, and U.S. Bank, as trustee and collateral agent, for the issuance of $930 million in aggregate principal amount of the 10.5% Notes (such indenture, as amended, modified, and supplemented, the "**10.5% Notes Indenture**").

---

[13][14]    In connection with the issuance of the Priming Notes, the Debtors entered into that certain Letter Agreement Providing for an Offer to Purchase Certain Existing Notes of TPC Group Inc. upon the terms and conditions set forth herein (the "**Side Letter**").  The Side Letter required the Debtors to offer to repurchase, under certain circumstances, 10.5% Notes held by the parties specified therein.  As of the Petition Date, the Debtors had not been required to make, and had not made, such an offer, and the enforceability of the Side Letter was stayed by the automatic stay.  Certain of the counterparties to the Side Letter have filed proofs of claim asserting claims arising under the Side Letter, but if the Plan is confirmed, the Debtors' obligations under the Side Letter would be discharged, and the Debtors do not currently anticipate being required to make any distributions on account of such Claims in these chapter 11 cases.

[14][15]    The total of approximately $205.5 million includes a 2% paid-in-kind fee on the issuance of the Bridge Priming Notes.

The Debtors' obligations under the 10.5% Notes Indenture are secured by a first-priority security interest in and lien on the Notes Priority Collateral (including, among other things, real property, fixtures, and equipment) and a second-priority security interest in and lien on the ABL Priority Collateral, pursuant to, among other security documents, mortgages and a *Pledge and Security Agreement*, dated as of August 2, 2019, by and among TPC Group Inc., each of the other Debtors party to the 10.5% Notes Indenture, and U.S. Bank.  As of the Petition Date, approximately $930 million in aggregate principal amount of 10.5% Notes were outstanding, in addition to accrued and unpaid interest, premiums, fees, and other charges.

### 2.    Debtor Credit Facilities

### (i)    ABL Revolving Credit Facility

As of the Petition Date, the Company maintained an asset-based revolving loan facility (the "**ABL Facility**") with Bank of America, N.A., as administrative agent and collateral agent for the lenders thereunder (in such capacity, the "**ABL Agent**"), pursuant to that certain *Amended and Restated Credit Agreement*, dated as of August 2, 2019 (as amended, modified, or otherwise supplemented from time to time, the "**ABL Credit Agreement**").  TPC Group Inc. is the borrower under the ABL Credit Agreement, and the other Debtors are guarantors thereunder.  The ABL Facility has a maximum committed amount of $200 million, consisting of a $192.5 million revolving loan tranche (less outstanding letters of credit) and a $7.5 million "first-in-last-out" loan tranche.  Availability under the ABL Facility is subject to a borrowing base.  The Debtors had borrowings under the ABL Facility of approximately $105.5 million as of the Petition Date, plus any accrued and unpaid prepetition interest, fees, and other charges.

The Debtors' obligations under the ABL Facility and guarantees are secured by a first-priority security interests in and lien on the assets more fully described in that certain *Amended and Restated Pledge and Security Agreement*, dated as of August 2, 2019 (such assets, the "**ABL Priority Collateral**").  The ABL Priority Collateral includes the Debtors' accounts receivable, inventory, general intangibles, intellectual property, deposit and investment accounts, and investment property, and a second-priority security interest in and lien on substantially all of the Debtors' other assets (such other assets, the "**Notes Priority Collateral**") other than real property.

### 3.    Intercreditor Agreements.

The rights of the agent and lenders under the ABL Credit Agreement (the "**ABL Secured Parties**"), the trustee, collateral agent, and holders of Priming Notes under the Priming Notes Indenture (the "**Priming Notes Secured Parties**"), and the trustee, collateral agent, and holders of notes under the 10.5% Notes Indenture (the "**10.5% Notes Secured Parties**," and together with the ABL Secured Parties and Priming Notes Secured Parties, the "**Prepetition Secured Parties**") with respect to collateral and the proceeds thereof are governed by two prepetition intercreditor agreements:

a.    The rights as between the ABL Secured Parties, on the one hand, and the Priming Notes Secured Parties and 10.5% Notes Secured Parties, on the

other hand, are governed by that certain *Intercreditor Agreement*, dated as of August 2, 2019 (as amended, modified, supplemented, or joined, the "**ABL Intercreditor Agreement**").   With respect to ABL Priority Collateral, the rights of the Priming Notes Secured Parties and the 10.5% Notes Secured Parties are subordinate to the rights of the ABL Secured Parties; and with respect to Notes Priority Collateral, the rights of the ABL Secured Parties are subordinate to the rights of the Priming Notes Secured Parties and the 10.5% Notes Secured Parties.

b.       The rights as between the Priming Notes Secured Parties and the 10.5% Notes Secured Parties are governed by that certain *Intercreditor Agreement*, dated as of February 2, 2021 (as amended, modified, or supplemented, the "**Notes Intercreditor Agreement**," and together with the ABL Intercreditor Agreement, the "**Intercreditor Agreements**"). With respect to common collateral under the Priming Notes Indenture and the 10.5% Notes Indenture, the rights of the 10.5% Secured Parties are subordinate to the rights of the Priming Notes Secured Parties.

The Intercreditor Agreements govern, among other things, the priority of distribution of collateral and proceeds thereof among the Prepetition Secured Parties.  A table summarizing some the controlling bankruptcy-specific provisions in the ABL Intercreditor Agreement is set forth below:

| Key Provisions of ABL Intercreditor Agreement[1516] |
|---|
| **Noteholders' Ability to Object to DIP Financing or Provision of Adequate Protection or Request Adequate Protection** | If the ABL Representative or the other ABL Secured Parties desire to consent to or not object to the use of ABL Facility Priority Collateral constituting cash collateral or provide or permit a third-party to provide ABL DIP Financing secured by all or a portion of the ABL Facility Priority Collateral, the noteholders agree to consent and not object to the use of such cash collateral or to the ABL DIP Financing on the grounds of failure to provide for adequate protection or any other grounds, except the Junior Representative may request adequate protection of its interest in the Junior Collateral in the form of an additional or replacement Lien thereon provided that (i) an adequate protection Lien shall also have been granted in favor of the Senior Secured Parties in respect of such Collateral and (ii) the Lien in favor of the Junior Secured Parties on such Collateral shall be subordinated to the Liens thereon securing and providing adequate protection for the Senior Obligations in accordance with the Lien Priority set forth in the Agreement. *ABL Intercreditor Agreement*, §§5.2(a), 5.4. |

---

[1516]  This summary is qualified in its entirety by reference to the applicable provisions of the ABL Intercreditor Agreement.  To the extent anything in this table is inconsistent with the ABL Intercreditor Agreement, the terms of the ABL Intercreditor Agreement shall control.  All capitalized terms listed in this table shall have the meanings ascribed to such terms in the ABL Intercreditor Agreement.

| Key Provisions of ABL Intercreditor Agreement[1516] | |
|---|---|
| **Noteholders' Ability to Seek Relief from the Stay** | Each Notes Representative agrees, on behalf of itself and the applicable Notes Secured Parties, that none of them will seek or support any other Person in seeking relief from the automatic stay or from any other stay in any Insolvency Proceeding or take any action in derogation thereof, in each case in respect of any ABL Facility Priority Collateral, without the prior written consent of the ABL Representative. *ABL Intercreditor Agreement*, §5.3. |

### 4.    General Unsecured Creditors

The Debtors have general unsecured liabilities, which can be grouped into three main categories: (i) PNO Claims asserted by individuals and/or homeowners (including subrogation claims filed by insurance carriers), (ii) PNO Claims asserted by industrial claimants (including subrogation claims filed by insurance carriers), and (iii) other general unsecured claims that include, among other things, contract rejection claims, impaired trade claims and the 10.5% Notes Deficiency Claims.  As of the Petition Date, approximately 7,800 litigation claims have been asserted against one or more of the Debtors arising from the PNO Incident (the "**PNO Claims**").

The table below reflects a range of estimates of Class 4 General Unsecured Claims based upon, among other things, the proofs of claim submitted.  As set forth in the table below, the Debtors' range of estimates of Class 4 General Unsecured Claims that may receive a distribution under the Plan does not include the 10.5% Notes Deficiency Claims.  This information is provided in summary form for illustrative purposes only and is subject to material change based on contingencies related to, among other things, the Claim reconciliation and allowance process.  Further, the Debtors do not admit the validity and amount of any Claim and reserve all rights to object to any Claim, as appropriate.  Further, the Debtors contend that claims for future damages should be discounted to present value as of the Petition Date.  The estimates below do not reflect any such discounting to present value.  The estimates may and likely will vary from the final amounts allowed by the Bankruptcy Court.  The high end of the range for PNO Claims reflects amounts asserted in proofs of claim or, if filed in unliquidated amounts, such amounts were obtained by statements made by counsel to the PNO Claims Steering Committee in open court at the First Day Hearing.  The low end of the range reflects the Debtors' experience resolving and paying over 5,000 PNO Claims under the Voluntary Settlement Program (as defined below) prior to the Petition Date.[1617]

---

[1617]  This table does not include estimates for Claims on account of additional contract rejections that are either pending or anticipated by the Debtors.  The table also does not include any Claims asserted by governmental units.

| General Unsecured Claims (in $ million) | Low | High |
|---|---|---|
| 10.5% Notes Deficiency Claims | $ 607 | $ 607 |
| PNO Claims (Subrogation & Individual) | | |
|     Subrogation Claims | 20 | 20 |
|     Individual Property Damage Claims [17][18] | 72 | 250 |
|     Individual Personal Injury [18][19] | 60 | 250 |
| PNO Claims (Industrial) | | |
|     Indorama | Undetermined | 107 |
|     Lion | Undetermined | 52 |
|     Air Liquide | Undetermined | 9 |
| Contract Rejection Claims | | |
|     Direct Energy | 8 | 8 |
|     Lion | 0 | 12 |
|     Air Liquide | 10 | 210 |
|     Voluntary Settlement Program [19][20] | 0 | 13 |
| Trade Claims | 10 | 15 |
| **Total Class 4 General Unsecured Claims** | **$787** | **$1,553** |
|     Less: 10.5% Notes Deficiency Claims | (607) | (607) |
| **Total Class 4 General Unsecured Claims (with waiver of 10.5% Notes Deficiency Claim)** | **$180** | **$946** |

---

[17][18]  The low end estimate assumes 3,000 claimants with an average amount per claim of $24,000.

[18][19]  The low end estimate assumes 6,000 claimants with an average amount per claim of $10,000.

[19][20]  As set forth herein, the Debtors currently intend to reject the settlement agreements entered into in connection with the Voluntary Settlement Program prior to the Petition Date, provided that determinations regarding assumption and rejection of executory contracts and unexpired leases will be set forth in the Plan Supplement and governed by Section VIII of the Plan.

## V.    **EVENTS LEADING TO THE COMMENCEMENT OF THESE CHAPTER 11 CASES**

### A.    **Current Market Conditions and Business Conditions**

The primary drivers of the Company's businesses are general economic and industrial growth.  The Company's results are impacted by the effects of economic upturns or downturns on its customers and suppliers, and its ability to achieve on-stream time and production targets within operating units.  The Company's results are also dependent on its costs to produce, sell and deliver its products.  The Company's customers generally use its products in their own production processes; therefore, if its customers curtail production of their products, the Company's results could be materially affected.  In particular, feedstock costs and product prices are susceptible to volatility in pricing and availability of crude oil, natural gas, natural gas liquids such as isobutane and oil-related products such as unleaded regular gasoline.  Prices for these products tend to be volatile as well as cyclical, as a result of global and local economic factors, worldwide political events, weather patterns and the economics of oil and natural gas exploration and production, among other things.

In the past several years, the Debtors' businesses, results of operations and liquidity have been negatively impacted by several adverse Company-specific events, including damages to its facilities such as the Dock Incident, the HNO Technical Center Fire and the PNO Incident described below.  General economic conditions and regional disruptions have also combined to exacerbate these negative impacts, including the 2020 oil and gas market crash, the COVID-19 pandemic, and Winter Storm Uri (and lingering effects on equipment, including requiring a shutdown of parts of the HNO Facility for portions of September through November 2021 to repair boilers that supply steam to various part of the HNO Facility).  Finally, most recently, liquidity impacts by trade credit contraction as a result of the Company's financial difficulties have also negatively impacted the Company's operations.

### B.    **The Dock Incident and the HNO Technical Center Fire**

#### 1.    **Dock Incident**

On June 13, 2018, an ocean-going bulk carrier navigating in the Port of Houston Ship Channel veered off course and struck a barge stationed at the Debtors' primary Houston facility dock (the "**Dock Incident**").  The incident caused substantial damage to both the barge and the dock facilities.  There were no significant injuries and there was no environmental impact from the incident.

The damaged dock was returned to full barge and ship service in August 2018 after temporary repairs of approximately $5 million which, excluding a $0.25 million deductible, were reimbursed from insurance proceeds in September 2018.  The insurance proceeds were accounted for as an offset to the actual dock repair costs.  The total amount of the insurance deductible and uninsured logistics and legal expenses recognized in the Debtors' reported 2018 earnings was $1.5 million and the margin on estimated lost sales volume was approximately $6.0 million.  The revenue and cost of sales related to the lost sales volume for the C4 Processing segment were estimated to be $4 million and $2 million, respectively, and for the Performance Products segment were estimated to be $13 million and $9 million, respectively.

The Debtors are close to finalizing agreements with the Houston Port Authority and their insurance carriers around the rebuild of the dock and expect to commence the project in 2023.

### 2.    HNO Technical Center Fire

Early on the morning of January 9, 2021, the TPC Houston operations team responded to a fire alarm in the Technical Center (the "**HNO Technical Center**").  The HNO Technical Center, located on the southwest side of the facility, which contains quality control and research and development activities, had a fire in the mechanical room.  TPC's Emergency Response Team responded to the incident with assistance from the Houston Fire Department.  The Company coordinated with local officials and emergency responders to quickly resolve the issue.  There were no injuries to TPC employees and no offsite or environmental impacts as a result of the event; however, one emergency responder sustained an ankle injury while responding to the event.  As a result of the fire, there was considerable damage to the facility and the housed equipment.  Fortunately, over 75% of the equipment was salvageable, but, in the absence of a functioning laboratory the Company had to secure short-term outsourcing solutions for its quality control testing needs.  Since late February 2021, however, the Company has replaced the majority of the outsourced testing with in-house testing in a combination of TPC and rental facilities, thereby substantially reducing the incremental costs.  In view of the Company's recent operational challenges and their impact on liquidity, the Company has decided to defer rebuilding the HNO Technical Center for the time being and cover its analytical and R&D needs through leased facilities.

### C.    The Port Neches Incident; Company Response and Related Subsequent Events

### 1.    The PNO Incident

On November 27, 2019, two explosions occurred at the PNO Facility at approximately 1:00 a.m. and 11:45 a.m. (prevailing central time).  The explosions and subsequent fires resulted in the complete shutdown of all production at the PNO Facility.  Production remains shut down to this day.  The PNO Incident directly resulted in the loss of approximately half of the Company's historical crude C4 processing capacity.  Following the PNO Incident, the PNO Facility was repurposed into a storage terminal.  The Company terminated the employment of over sixty employees as part of a reduction in force initiative following the PNO Incident.  The Company also incurred significant expenses related to legal and regulatory compliance, health and safety efforts, and restoration of storage and terminal capabilities at the facility.

### 2.    Company's Response to the PNO Incident

In the aftermath of the PNO Incident, the Company worked through a unified command of federal, state, and local government entities (the "**Unified Command**") to secure the site and minimize the impact to the environment while preserving the safety of emergency responders and the community.  Among other things, the Company worked with the Unified Command to develop a response plan to the PNO Incident, to ensure compliance with any investigations and other regulatory matters and to perform critical water, air and other pollution tests for the incident site and surrounding area.  On January 30, 2020, the Unified Command was dissolved

and command of the PNO Incident site was relinquished to the Company, which continued to maintain and monitor operations at the site of the PNO Incident.

### 3.    Federal and State Agency Investigation and Related Matters

Following the PNO Incident, multiple federal, state, and local government agencies initiated full-scale investigations of the PNO Incident.  The Company has fully cooperated, and continues to do so, with each agency's respective investigations, assessments, and requests for information.

In December 2019, the Occupational Safety and Health Administration (OSHA) initiated its inspection of the PNO Incident.  OSHA completed its inspection and issued citations on May 26, 2020, including ten serious citations and three willful citations with total proposed penalties of approximately $0.5 million.  The Company has appealed these citations.  The Company strongly disagrees with the characterization of some of the alleged violations as "willful." Mandatory settlement conferences took place August 5-6, and 19-20, 2021.  The citations were not resolved, and OSHA filed its complaint on September 9, 2021.  The Company appealed certain of the OSHA citations and it is anticipated that a trial will take place in Q4 2022.

The Texas Attorney General has filed two state-court lawsuits in the District Courts of Travis County Texas against the Company. One lawsuit is for alleged violations of the Texas Clean Air Act and the Texas Water Code pertaining to the PNO Incident. This lawsuit also includes claims arising from previously investigated emission events that occurred at the PNO Facility from January 2018 through September 2019. Although these events had been the subject of administrative settlements with TCEQ, the agency withdrew those settlements in the wake of the PNO Incident. The second state-court lawsuit concerns the Company's Houston facility, and seeks injunctive relief, civil penalties, attorney's fees, and court costs for alleged violations of the Texas Clean Air Act, the Federal Clean Air Act, the Texas Water Code, and rules and permits issued thereunder. TPC, the OAG, and TCEQ continue to work together to insure that TPC rectifies current issues at the Houston facility.

The U.S. Chemical Safety and Hazard Board ("**CSB**"), United States Environmental Protection Agency ("**EPA**") and the United States Department of Justice ("**DOJ**") are separately investigating the Company as a result of the PNO Incident.  The EPA has served two separate information requests under Section 114 of the federal Clean Air Act to the Company.  These requests seek information about the incident as well as the Company's Risk Management compliance program at both the PNO Facility and HNO Facility.  Such requests are typically the first step in EPA enforcement.  In addition, a grand jury investigation has issued two subpoenas to the Company in relation to the PNO Incident.

The Company responded to the EPA's information requests and the parties are currently in ongoing discussions regarding potential civil liability.  The Company's response to the first grand jury subpoena is complete.  The response to the second subpoena is ongoing.

On August 23, 2022, the EPA and the Company entered into an Administrative Order on Consent ("AOC") related to the HNO Facility.  Under the AOC, the Company has agreed to specific timeframes to take corrective action related to fixed equipment (vessels and piping), rotating equipment (pumps and compressors), instrumentation and safety systems, water on

pumps, pressure gauges, idle or out-of-service equipment, dead legs, maintenance, and housekeeping at the HNO Facility.

The Company anticipates that there likely will be additional enforcement matters, claims for cost recovery, and/or claims for natural resource damages from these and other similar agencies.

TCEQ and EPA have requested that the following language be added to the Plan or Confirmation Order.

> "*Notwithstanding anything contained in the Plan, Plan Documents, or the Confirmation Order to the contrary, nothing in the Plan, the Plan Documents, or the Confirmation Order shall discharge, exculpate, release, impair, enjoin, or otherwise preclude: (a) any liability to any Governmental Unit that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (b) any liability to any Governmental Unit arising after the Confirmation Date; (c) any liability to a Governmental Unit under police or regulatory law to which any entity is subject as the owner or operator of property after the Plan Effective Date; (d) any criminal liability; or (e) any liability to any Governmental Unit of any non-debtor. Nothing in the Plan, Plan Documents, or Confirmation Order shall impair any setoff or recoupment rights of any Governmental Unit. Nor shall anything in the Plan, Plan Documents, or the Confirmation Order: (a) enjoin or otherwise bar any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability or obligation described in preceding sentence or (b) divest any court, commission, or tribunal of jurisdiction from resolving any matters relating to the liabilities and/or claims set forth in this section.*"

Without such language, TCEQ and EPA are likely to object to the Plan as unconfirmable under 11 USC 1129.  TCEQ's and EPA's rights to object to the Plan are fully preserved, including without limitation with respect to any non-debtor release and regardless of whether TCEQ or EPA choose to vote for or against the Plan.

### 4.        PNO Settlements and Litigation

Promptly following the PNO Incident, the Company established a claims center to deal with and expedite community claims regarding evacuation expenses, damages to property and debris removal.  Since that time, nearly 19,000 evacuation claims have been processed and paid to affected residents and over 5,700 property claims have been resolved under the Company's voluntary settlement program (the "**Voluntary Settlement Program**").  As of the Petition Date, the Company has paid settlements in the aggregate amount of approximately $134.6 million on account of PNO Claims and the Debtors have approximately $13.9 million in aggregate unpaid property damage settlement amounts that are owed under the terms of the settlement agreements. The Debtors currently intend to reject such settlement agreements, provided that determinations regarding assumption and rejection of executory contracts and unexpired leases will be set forth in the Plan Supplement and governed by Section VIII of the Plan.    Separate from the aforementioned $13.9 million in PNO Claims with signed settlement agreements, there are approximately $12.9 million in PNO Claims that had begun being processed in the Voluntary Settlement Program, but did not have a have an executed settlement agreement as of the Petition

Date.  Such PNO Claims without executed settlement agreements would be treated accordingly as Class 4 General Unsecured Claims.

In addition to the outstanding property claims, over 7,000 plaintiffs have filed petitions related to the PNO Incident are pending in Texas state court.  The plaintiffs in those actions assert a variety of claims against certain of the Debtors, certain of the Supporting Sponsors, and certain other entities, such as Nalco Co., LLC, an industrial air and water solutions company, Suez WTS USA, Inc., an industrial air and water solutions company, and Ingenero, Inc., an engineering services provider.  The causes of action include negligence, gross negligence, nuisance, and trespass.  The claims against TPC Holdings, Inc. and the Supporting Sponsors are identical, while the claims against TPC Group LLC/TPC Group Inc. and the Supporting Sponsors have substantial overlap.  To date, although some discovery has taken place, no claim has proceeded to trial.  Given the voluminous nature of the claims at issue, the Company moved the State of Texas' Multi-District Litigation Panel (the "**MDL Panel**") to transfer civil cases to a single court for pretrial purposes to limit inconsistent rulings and excessive and duplicative discovery.   The MDL Panel granted the Company's motion to transfer, designating the Honorable Judge Courtney Arkeen of the 128th Judicial District Court of Orange County (the "**MDL Court**") as the pretrial judge assigned to the cases.  The actions emerging from the PNO Incident were assigned to Multidistrict Litigation under Case Number A-2020-0236-MDL (the "**MDL**").  Over 7,800 individual plaintiffs have claims pending in the MDL and approximately 322 individual plaintiffs have cases pending in Jefferson County and Harris County, Texas which have not yet been dismissed or abated.  Additionally, more than 820 properties are the subject of litigation as a result of subrogation claims filed by insurance companies.

Since the MDL was empaneled, a number of dismissal arguments have been raised by certain of the Supporting Sponsors defendants. Specifically, some of the Supporting Sponsors defendants moved to the dismiss the claims against them for failure to state a claim.  The MDL Court denied that motion, and certain Supporting Sponsors defendants sought relief by mandamus petition on that motion.  The intermediate court of appeals rejected that petition, and the Supporting Sponsors defendants have sought mandamus relief from the Texas Supreme Court.  On September 2, 2022, the Texas Supreme Court asked the parties to provide full merits briefing on the motion to dismiss.  Some of the Supporting Sponsors defendants also challenged the exercise of personal jurisdiction over them, and the MDL Court denied those motions.  The relevant Supporting Sponsors defendants have appealed that determination, and their appeal is currently pending in the Texas Court of Appeals for the Ninth District.   The plaintiffs' responsive briefing in that appeal is due on September 23, 2022; submission of a reply brief and oral argument will follow.

On June 1, 2022, the Company and related entities filed the Chapter 11 Cases, jointly administered under Case No. 22-10493 (CTG).  TPC then filed a suggestion of bankruptcy with the various Texas courts, which resulted in a stay of the litigation that remains ongoing.  Since the stay went into effect, the Support Sponsors have filed letter briefs in the MDL Court requesting the court to clarify that all proceedings (including discovery and further amendments of pleadings) impacting the Debtors or property of the Debtors' estate are currently stayed by virtue of the automatic stay.  The Supporting Sponsors have also argued that the Texas Rules of Civil Procedure do not permit the Debtor defendants to be severed out of the MDL, and explained that it would be more efficient and practical for the court to stay the entire MDL until

the Debtors' bankruptcy proceedings have concluded.  At a status conference on September 12, 2022, the MDL Trial Court agreed with the Defendants that the MDL proceedings were to remain stayed because of the Debtors' bankruptcy proceedings and because of the on-going appellate and mandamus proceedings pursued by the Supporting Sponsors.

Since the time of the filing of these Chapter 11 Cases, no other material developments have occurred in the MDL.

### 5.        Insurance Recovery Efforts

Following the PNO Incident, the Company has engaged in a process to recover proceeds available under its applicable insurance policies, including $850 million in coverage under its property damage and business interruption insurance policies, $100 million in coverage under its liability insurance policies, $25 million in coverage under its environmental/pollution insurance policies and $35 million in coverage under its marine cargo/inventory policies.

The following table reflects the status of the Company's insurance recovery efforts as of the Petition Date:

**PNO Insurance Receipts & Remaining Coverage as of September 1, 2022**
**(Contract Claims Only; Excludes Fees, Costs, Interest, Penalties and Expenses)**

| KEY POLICY | POLICY LIMIT | RECEIVED TO DATE | PENDING AMOUNTS | EST. REMAINING COVERAGE |
|---|---|---|---|---|
| PROPERTY DAMAGE & BUSINESS INTERRUPTION | $850.0 million | $419.8 million[2021] | $39.94[2122] million | $430.2 million[2223] |
| LIABILITY – CLAIMS | $100.0 million | $100.0 million | -- | -- |
| LIABILITY – DEFENSE | -- | $35.2 million | -- | -- |
| POLLUTION POLICY | $25.0 million | $25.0 million | -- | -- |
| INVENTORY POLICY | $35.0 million[2324] | $2.5 million | $2.0 million | -- |
| **TOTAL** | **$1,010 million** | **$582.5 million** | **$41.94 million** | **$430.2 million[2425]** |

[2021] Includes $1.7 million direct payment to Pall Water. Pall Water is a leading water treatment company that was an additional insured under a TPC's Property policy which made a claim directly against TPC's insurers related to the PNO Incident. Pall Water and TPC's insurers eventually negotiated a settlement which included the $1.7 million direct payment.

[2122] As of the filing of this Disclosure Statement, the Debtors have only collected $7.059 million of insurance proceeds on account of POL 11 and 11a. The Company, its insurance carriers and DIP and collateral agents have negotiated a stipulation for the release of the remaining balance of $39.940 million on account of POL 11 and 11a.

[2223] Upon the Company's collection in full of the pending amounts reflected in the table, the estimated remaining coverage under the Company's property damage and business interruption policy will be $390.3 million and total estimated remaining coverage will be $392.3 million. Such amounts have not been collected and the Debtors' entitlement to such amounts is disputed by the Debtors' insurance carriers. The Debtors are unable to predict the outcome or timing of any negotiations, litigation, or potential resolution of disputes between the Debtors and their insurance carriers. As such, the certainty and timing of the Debtors' receipt of such insurance proceeds under these policies are highly unpredictable as well.

[2324] Policy limit for inventory at PNO Facility

[2425] The receipt by the Company of any amounts listed in the "Estimated Remaining Coverage" column of the table above is contingent on additional payment commitments from its Carriers; however, it is unclear whether and when any additional amounts will be paid to the Debtors pursuant to these insurance policies.

**D.      Other Events Leading to Commencement of Chapter 11 Cases**

Over the past two years, the Debtors' business and liquidity has been impacted by several adverse events in addition to the PNO Incident.  These include the 2020 oil and gas market crash, the COVID-19 pandemic, Winter Storm Uri (and lingering effects on equipment), a shutdown of parts of the HNO Facility (for portions of September through November 2021) to repair boilers that supply steam to various part of the HNO Facility, and, most recently, the liquidity impact of trade credit contraction.  These are described in turn below.

**1.      COVID-19 and Commodity Price Volatility**

On March 11, 2020, the World Health Organization declared the ongoing coronavirus (COVID-19) outbreak a pandemic and recommended containment and mitigation measures worldwide.  The pandemic resulted in widespread adverse impacts on the global economy, on the petrochemical, transportation and energy industries as a whole, on world-wide factory output, and on the Company's customers, suppliers, and other parties with whom the Debtors have business relations.  The pandemic and related travel and operational restrictions, as well as business closures and curtailed consumer activity, resulted in a reduction in global demand for intermediate and specialty chemicals and petroleum byproducts, volatility in the market prices for crude oil, condensate, natural gas, and NGLs, and a significant reduction in the market price of crude oil during the first and second quarter of 2020.  Because of the demand destruction, reduced commodity prices, and an uncertain timeline for full recovery, many oil and natural gas producers, including the Company's customers and suppliers, curtailed their drilling and production activity and reduced or slowed down their plans for future drilling and production activity.

Like many other companies, the Company experienced significant disruptions throughout the pandemic and its impacts on the global economy spread, including materially reduced demand across many of the Company's flagship product lines.  For example, world-wide reductions in automotive production and tire manufacturing operations due to the pandemic resulted in historically low prices for, and a precipitous decline in the demand for and consumption of, butadiene, a key component in the manufacture of tires and the largest commodity supplied by the Company.  Likewise, the Company's MTBE business—a product primarily used in gasoline blending—reached a low point on volume and margins in 2020, as the Company's primary demand regions underwent a significant reduction in gasoline demand.  Similarly, the Company's PIB business segment reached a low point in 2020, due to the pandemic's historic impacts on miles driven and the attendant reduction in lubricant and fuel additive demand.

While the effects of COVID-19 on the Company's operating results have begun to dissipate and demand across most business segments (with exception of the fuels business) has begun to rise to pre-COVID-19 levels, the pandemic had an enormous negative impact on the Company's financials.  The Company's total revenue across 2020 decreased by nearly 50% from 2019 and over 50% from 2018 and 2017.  Like most businesses, the Company remains cautious due to the still evolving conditions of the pandemic and ongoing supply-chain delays and disruptions caused by the pandemic.

### 2.      Winter Storm Uri and Other Operational Issues

In February 2021, Winter Storm Uri swept across Texas and the southern United States, bringing in its wake extreme low temperatures of an unprecedented duration and causing millions of Americans to lose power to their homes.

The Company faced significant financial impacts from Winter Storm Uri due to extended disruptions at the Company's facilities in Texas and Louisiana, fluctuations and volatility in demand caused by disruptions to customers and suppliers, and lasting damage to critical equipment at the HNO Facility. Following Winter Storm Uri, the Company experienced repeated outages with the HNO Facility's boilers that are critical to the fuels and butadiene business segments, ultimately resulting in a complete stoppage of all butadiene and fuels production for almost two months while the Company implemented necessary repairs and curative work to restore steam production.

Steam production was fully restored by November 2021, but the adverse financial impacts of the boiler-related outages and costs were material and further negatively impacted operating results and worsened the Company's already tight liquidity.

### 3.      Trade Credit

In the months leading up to the filing, the Company has faced liquidity pressure resulting from adequate assurance demands and the lowering of credit limits by its suppliers and other trade counterparties.   The Company's vendor communications plans, supported by the Company's issuance of the Bridge Priming Notes resulting in approximately $51.5 million of additional liquidity, have mitigated the impact on the Company, but were unable to offset it. Among other things, suppliers' credit insurers refused to insure the Company's credit risk. Certain vendors demanded adequate assurance, requiring cash in advance or deposits.   Others reduced credit limits, shortened due dates, refused to enter new contracts without credit support, or refused to ship or release goods without payment or other credit support.  The Debtors believe that their proposed DIP financing arrangements and requested first-day relief are appropriately designed to help stabilize their business and better position the Debtors' management team to procure goods and services in the ordinary course and on appropriate terms.

### E.      The Company's Prepetition Restructuring Efforts

In addition to continuing its ongoing negotiations with insurers to obtain further PNO Incident-related insurance proceeds—with which the Company has had some degree of success—the Company has explored certain transactions and other strategic and operational initiatives in a multi-year effort to avoid the need to commence these cases.  Unfortunately, no strategy or combination of strategies adequately addressed the Company's balance sheet and liquidity needs.

### 1.      Transactions and Other Strategic Alternatives

First, in Q2 2020, the Company signed a new MTBE offtake contract with one of the world's largest independent fuels and commodity trading firms.  Although this contract is market based (and thus subject to greater pricing volatility than the Company's prior offtake contracts), it provides the Company with a consistent outlet for 100% of its MTBE production through the end of 2023.

Second, the Company has attempted to find new sales outlets for products.  For example, in response to dwindling raffinates sales coupled with inventory build-up throughout 2021, the Company made sustained efforts to find new outlets for raffinates sales, ultimately reducing its overstocked raffinates inventory by the end of Q3 2021.  Likewise, in reaction to increased isobutane and methanol pricing skewing the Company's MTBE margins throughout 2020–2021, the Company capitalized on its operational and logistical flexibility by moving feedstock normally used for MTBE production into the Company's raffinates business to benefit from the stronger demand and margins in alkylate.

Third, in response to the loss of crude C4 processing capacity caused by the PNO Incident, the Company has actively been pursuing opportunities with third-party processors within the industry.  In Q1 2021, the Company signed a long-term contract with a third-party for crude C4 processing and began sending crude C4 to this processor through enhancements made to the PNO terminal following the PNO Incident.  The Company has, in turn, begun receiving butadiene and raffinates back from this third-party processor.  As this agreement grows in volume over time, the Debtors anticipate being able to bring butadiene volumes available for sale back to the levels from prior to the PNO Incident; however, profits are shared with the third-party processor.

Fourth, the Company has responded to market pressures by focusing on products that have remained consistently in demand.  For example, throughout 2020, the Company took sustained efforts to optimize its hydrotreating and raffinate train operations to maximize the production of B-1, a product for which demand has been solid since the start of the COVID-19 pandemic and remained strong in 2021 and 2022.  These strategic catalytic and operational changes are expected to increase B-1 production capabilities by approximately 10–15% by the end of the year.

Finally, from late 2020 and throughout 2021, the Company has proactively pursued multiple strategies to address its liquidity and capital structure, while maintaining safe and reliable operations and meeting the needs of its customers.  As described above, in February 2021, the Company issued the Priming Notes to provide enhanced liquidity, extend its runway to realize on its sizeable insurance asset, and to refinance and extend a secured term loan that was maturing in August 2021.  In addition, throughout the majority of 2021, the Company and its advisors endeavored to market and to sell or lease strategic pipeline, terminal, boiler, and other assets located across the Gulf Coast, with the ultimate goals of bridging liquidity gaps, extending the Company's liquidity runway to pursue its insurance recoveries, and deleveraging its balance sheet.  The Debtors first marketed a package of separable logistics assets, including pipeline, terminal storage tanks, and other assets, but unfortunately, there was insufficient interest at acceptable values.  The Debtors then made efforts to sell the pipelines, but the assets proved to have limited marketable value as the Debtors received no committed offers.

The Debtors intend for these Chapter 11 Cases to have no impact on the Company's operations.  It is critical that the Company demonstrate its ability to continue to perform its obligations under its customer and supplier agreements, notwithstanding the filing.  Thus, key to the Company's prepetition negotiations with its creditors was ensuring that it could obtain the

necessary prepetition liquidity to enable it to continue operating and that it had the necessary support of its creditors to provide for a consensual, non-disruptive restructuring.

### 2. Engagement with Financial Stakeholders and Formation of Special Committee

The board of directors of TPC Holdings Inc. (the "**Board**") has met regularly and thoroughly evaluated an array of strategic alternatives, including potential financings, asset sales or leases, and out-of-court and in-court restructuring transactions, receiving presentations and analysis on such alternatives from the Company's management team and the Company Advisors. For example, in May 2020, the Company engaged Moelis & Company LLC ("**Moelis**") to assist the Company in evaluating an array of strategic alternatives, including potential financings, asset sales or leases, and out-of-court restructuring transactions. Baker Botts L.L.P. ("**Baker Botts**") has also provided legal services to the Company, focusing primarily on assisting the Company with environmental, permitting and other regulatory matters. Following the PNO Incident, Baker Botts was engaged as the Company's lead counsel in responding to regulatory and compliance matters, as well as claims arising from the PNO Incident and insurance recovery efforts. After the retention of Moelis, the Company expanded Baker Botts' role to include corporate and restructuring advice to support the Company's evaluation of strategic alternatives and targeted strategies seeking a global resolution of contingent litigation claims arising from the PNO Incident. Starting in late 2020 and continuing through 2021, the Company and Baker Botts engaged with the MDL plaintiff leadership firms to provide diligence and responses. However, the Company was ultimately unable to secure a source of funds sufficient to effectuate a global settlement of the PNO Claims and other events in 2021, for example, Winter Storm Uri, materially and negatively impacted the Company's liquidity and overall financial condition.

In November 2021, it became increasingly clear that the Company would require significant additional liquidity and a deleveraging transaction to preserve and maximize the value of the Company's business and to optimize the Company's capital structure for long-term success. The Company expanded Baker Botts and Moelis's roles to include an evaluation of a potential comprehensive restructuring through Chapter 11. The Company also retained FTI Consulting as financial advisor.

In December 2021, the Board established a special committee of independent, disinterested directors, comprised of Paul Aronzon and Carol Flaton (the "**Special Committee**"). Ms. Flaton and Mr. Aronzon were appointed to the Board and Special Committee based on, among other things, their extensive restructuring and (respectively) financial and legal experience, as well as their reputations and proven track records for guiding distressed companies through transactions. The Board delegated to the Special Committee the authority to, among other things, direct the Company's negotiations with stakeholders and make recommendations to the Board regarding the implementation of one or more potential transactions or strategies, as well as to conduct an independent investigation of claims, if any, against related parties. Since its formation, the Special Committee has met both formally and informally and communicated with the Company Advisors and the Company's management team multiple times each week and has provided substantial, thoughtful, and invaluable guidance to the Company, the Board, and the Company Advisors. The Special Committee also retained Weil, Gotshal & Manges LLP ("**Weil**") to advise on its independent investigation (as discussed in section E.4 below).

Beginning in late November and early December 2021, the Company began discussions in earnest with an ad hoc group of beneficial holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, a supermajority of both the Priming Notes and the 10.5% Notes (the "**Ad Hoc Noteholder Group**") regarding a potential deleveraging transaction. As of the Petition Date, the Ad Hoc Noteholder Group held in the aggregate approximately 88% of the Priming Notes and approximately 78% of the 10.5% Notes and is represented by Paul Hastings LLP ("**Paul Hastings**") and Evercore Group L.L.C. ("**Evercore**").[26] The Company also began regular discussions with ABL Agent. In January 2022, the Company commenced a marketing process for a potential debtor-in-possession financing, the scope of which included a broad range of capital providers, including commercial banks, investment firms that specialize in debtor-in-possession financing and distressed investments, and certain holders of 10.5% Notes that are not members of the Ad Hoc Noteholder Group. In furtherance of its stakeholder discussions, and to facilitate the Company's marketing for financing sources, the Company established a confidential virtual data room to facilitate the sharing of due diligence materials not only to its economic stakeholders' advisors but also to potential financing sources outside of the Company's existing capital structure. The Company and the Company Advisors held numerous due diligence meetings in furtherance of such process.[27]

### 3. Forbearance and Bridge Financing.

As the Company's process progressed, it became clear that a deal would not be reached prior to February 1, 2022, when approximately $53 million of cash interest on the Company's Priming Notes and 10.5% Notes would come due (the "**February Interest Payment**"). With the support of the Ad Hoc Noteholder Group, the Company determined to utilize its grace period under the Priming Notes and 10.5% Notes with respect to the February Interest Payment. The PNO Claims Steering Committee also informally expressed its support for such determination. For the benefit of the Company's ongoing relationships and negotiations with its suppliers and customers, and to obtain incremental bridge liquidity, the Company negotiated and, on February 3, 2022, entered into a forbearance agreement with the Ad Hoc Noteholder Group (the "**Forbearance Agreement**"). Under the Forbearance Agreement, the Ad Hoc Noteholder Group agreed, among other things, to cause U.S. Bank to forbear from exercising rights and remedies arising from the Company's failure timely to pay the February Interest Payment. The Ad Hoc Noteholder Group also agreed to supplement the Original Priming Notes Indenture and the 10.5% Notes Indenture to enable the Company to issue the Bridge Priming Notes, and to provide

---

[26] As of the date hereof, the members of the Ad Hoc Noteholder Group hold, in the aggregate, approximately 96.3% of the 10.5% Notes and 100% of the Term Loan DIP Claims. Pursuant to the Final DIP Order, approximately 90% of the Priming Notes were rolled up into the Term Loan DIP Claims and are pending final cancelation or cash-out, which amount represents the amount of Priming Notes held by the Ad Hoc Noteholder Group as of the date of the roll-up.

[27] During this time period, the Company's negotiations with Carriers were somewhat productive, as on December 9, 2021, the Company received a $75 million partial proof of loss from its property insurers, providing a much needed, albeit temporary, liquidity bridge. Another $35 million partial proof of loss was approved and paid in April 2022. On May 26, 2022, another partial proof of loss for $41.947 million was approved and a check of $3.1 million representing the first payment has been issued to the Company as of June 10, 2022.

the Company with approximately $51.5 million of additional liquidity in the form of a commitment to purchase the Bridge Priming Notes. The Forbearance Agreement and Bridge Priming Notes enabled the Company to continue its restructuring discussions with its various stakeholders outside of a chapter 11 case, thereby, among other things, increasing the likelihood that the Company would be able to implement a transaction through more structured and orderly chapter 11 cases. This sent a strong signal to the market that the Company's economic stakeholders were supportive of the Company and committed to facilitating its restructuring in an orderly and efficient manner. The liquidity created by the Bridge Priming Notes was critical for the Company to manage and stabilize its key trade and supplier relationships and to complete a previously scheduled turnaround of the Company's butane dehydrogenation unit. To permit the Forbearance Agreement, the Company and the ABL Agent entered into a related amendment to the ABL Credit Agreement. The Forbearance Agreement was amended several times to facilitate continued out-of-court discussions and, most recently, to direct U.S. Bank to forbear from exercising rights or remedies with respect to the Company's nonpayment of interest on the Priming Notes and 10.5% Notes due May 1, 2022. The ABL Agent consented to such extensions.

### 4. Independent Investigation

In December 2021, the Board delegated to the Special Committee the full power and authority of the Board to (i) direct the investigation and assessment of any actual and potential claims against affiliates and insiders of the Company or any of its subsidiaries that would be considered "property of the estate" if any or all such entities were to commence chapter 11 cases and whether any such actual and potential claims have value to any such entity, its creditors and/or its estate (the "**Independent Investigation**"); (ii) make all determinations and assessments regarding the disposition of any such actual and potential claims; and (iii) take or direct the Company to take any other necessary or appropriate actions in furtherance of the foregoing. In connection with carrying out its duties, the Special Committee retained Weil to assist in the Independent Investigation. The Independent Investigation took place over the course of approximately five months. Transactions falling within the scope of the Independent Investigation were diligenced and the following considerations were evaluated with respect to certain prepetition transactions and events: (i) the Board's corporate governance practices and oversight of the business; (ii) the Company's internal controls and reporting systems with respect to potential safety concerns; (iii) any potential breaches of fiduciary and implied duties or mismanagement; (iv) any potential claims that could implicate a piercing of the corporate veil or alter ego theory of recovery; and (v) any potential fraudulent or preferential avoidance claims relating to transfers of property or incurrence of obligations by the Company to certain related parties and insiders.

The Independent Investigation focused on analyzing the following prepetition transactions and events: (1) the November 2019 Port Neches incident; (2) entry into sales agreements between TPC and SI Group, Inc. ("**SI**"), an affiliate of SK Capital Partners, LP, which provides for the sale of certain products from TPC to SI, as amended; (3) 2021 master services agreement between TPC and TNT Crane & Rigging, Inc. ("**TNT**"), an affiliate of First Reserve Management, L.P. ("**First Reserve**"), pursuant to which TNT provides TPC with cranes, operators, and related services, as amended; (4) the master services agreement between TPC and USA DeBusk LLC ("**DeBusk**"), an affiliate of First Reserve, pursuant to which

DeBusk provides TPC with dehydro catalyst removal and refiling, among other services, as amended; (5) three separation and release agreements entered into between certain individuals and TPCI or TPC; and (6) TPC's reimbursement of travel, lodging, and other necessary business expenses incurred by the Company's D&Os in connection with their services paid pursuant to the Amended and Restated Limited Liability Company Agreement of Sawgrass Holdings GP LLC, dated December 20, 2012 and/or the Travel and Entertainment Policy  (collectively, the "**Transactions**").

The Independent Investigation involved an extensive factual and legal analysis, in which Weil conferred with and reported to the Special Committee throughout the investigation. Potential claims and causes of action arising under Delaware, Texas and federal laws relating to the Transactions were analyzed, including: (1) actual fraudulent transfer, (2) constructive fraudulent transfer, (3) preference avoidance, (4) breach of fiduciary duty, (5) breach of good faith and fair dealing, (6) negligence, (7) gross negligence, and (8) piercing the corporate veil.  In connection with the Independent Investigation, Weil collected and reviewed more than 6,000 documents and conducted interviews with six individuals (including one by proxy through counsel), including certain employees within in-line management and senior management, certain Board members, and representatives from each of the Sponsors.

Based on the Independent Investigation, the Special Committee determined that there were no colorable claims belonging to the Company, other than one potential preference and/or fraudulent transfer avoidance claim for a $389,581.19 severance payment to a former officer of the Company (the "**Identified Preference Claim**") that, even if valid, could be subject to potential defenses and, when expected litigation costs were taken into account, the Identified Preference Claim could had a negative net value to the Company.  Further, based on the Independent Investigation, the Special Committee found, among other things, that: (i) the Board did not deny or delay safety or turnaround-related budget requests; and (ii) applicable statutes of limitations would bar the Company's pursuit of certain potential claims.  The Special Committee also found no evidence that, during all relevant times, (i) the Company failed to maintain corporate formalities, (ii) the Sponsors controlled the Company, or (iii) there was any misconduct that would support a claim for breach of fiduciary duties by the Board or piercing the Company's corporate veil to hold the Sponsors or other affiliates responsible for the claims of the Company's creditors.

Based on the Independent Investigation, the Special Committee concluded, and therefore recommended to the Board, that it would be appropriate for the Company to provide, in the context of a chapter 11 restructuring transaction, releases for officers, directors, and the Sponsors if such transaction were otherwise the best transaction available to the Company and were in the best interests of the Company and its stakeholders.

### 5.      Settlement Efforts with PNO Claims Steering Committee

Starting in late 2020, the Debtors began engaging with the PNO Claims Steering Committee to negotiate a global settlement of PNO Claims.  The PNO Claims Steering Committee retained counsel and a financial advisor to assist in those negotiations.  In the course of these discussions, pursuant to confidentiality agreements, the Debtors have been providing confidential information regarding the Debtors, their operations, and their financial condition to

the PNO Claims Steering Committee throughout 2021 and 2022. This has included, among other things, liquidity forecasts, the Debtors' long-range business plan, and a management presentation regarding the Debtors' business plan. The above-described negotiations were ultimately unsuccessful and failed to address the Company's deleveraging needs. Instead, a comprehensive restructuring of the Company's balance sheet was necessary, ultimately leading to the commencement of these Chapter 11 Cases.

F.     **Restructuring Support Agreement, Proposed DIP Financing, and Exit Financing.**

1.     **Restructuring Support Agreement and Plan.**

On May 9, 2022, with the support of the Special Committee and the Board, the Company, the members of the Ad Hoc Noteholder Group, and the Supporting Sponsors entered into an initial restructuring support agreement with respect to a transaction that would be implemented, subject to the Company's obtaining a debtor-in-possession ABL facility either from its existing bank group or from a new ABL lending source. Over the following weeks, the Company successfully negotiated the ABL DIP Facility and obtained a commitment from Eclipse to provide an exit ABL facility at the conclusion of these chapter 11 cases. In connection therewith, on May 31, 2022, the Company, the Ad Hoc Noteholder Group, and the Supporting Sponsors entered into a superseding Restructuring Support Agreement. The Restructuring Support Agreement provides for, among other things:

- *Agreed Use of Cash Collateral and ABL Refinancing*—use of encumbered cash, in accordance with the approved budget, for the duration of these cases. Together with the cash management order and proceeds of the DIP Facilities, the cash collateral order will allow the Company access to sufficient cash on hand to carry it through emergence. To date, the Debtors refinanced the Prepetition ABL Facility and have been using cash collateral as agreed.

- *Committed DIP Financing*—Financing of the Company's chapter 11 cases through a $323 million debtor-in-possession Term DIP Loan Facility provided by certain members of the Ad Hoc Noteholder Group. In addition, the Restructuring Support Agreement provides for the refinancing of the Company's existing ABL facility into a $200 million ABL DIP Facility, subject to a borrowing base, provided by Eclipse. The refinancing of the Company's existing ABL facility under an interim order was necessary so that the Company would have a functioning ABL facility to fund working capital at the beginning of and throughout these cases. To date, the Debtors have drawn $57 million under the Term DIP Facility and have been performing under the ABL DIP Facility as agreed.

- *Committed New Capital*— A $300 million equity rights offering, a $150 million debt rights offering for paid-in-kind holding company notes, a $350 million issuance of secured exit notes—all backstopped by certain members of the Ad Hoc Noteholder Group, subject to the terms and conditions set forth in the Restructuring Support Agreement and the Backstop Agreements—and an $80

49

million issuance of paid-in-kind holding company notes.[2728]   The new money provided by the capital infusion and the exit facilities will fund distributions under the Plan and provide the Company with liquidity to operate and invest in its business which should facilitate a prompt exit from chapter 11 with a less leveraged balance sheet.   To date, these capital commitments have been memorialized in the Equity Backstop Agreement and the Debt Backstop Agreement, which were filed at Docket No. 491 and remain subject to Court approval.

- *Runway*—The comprehensive financing package—including the agreed final cash collateral order, the DIP Facilities, the Exit ABL Facility, the Exit Notes and the terms of the applicable Backstop Agreement—together with the support of the Supporting Noteholders under the Restructuring Support Agreement, provides ample runway and should minimize the execution risk of the Debtors' restructuring.[2829]

- *Flexibility*—The Debtors' obligations under the Restructuring Support Agreement are entirely qualified by their fiduciary obligations to the estates.

- ***Tax Attribute Preservation/Additional Supporting Sponsor Agreements***— As of the Petition Date, the Tax Group (as defined below) had approximately $337 million of estimated net operating loss carryforwards, $291 million of estimated business interest expense carryforwards under section 163(j) of the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), and $3 million of estimated research credit carryforwards.   Future use of available tax attributes could result in substantial tax savings.   On May 31, 2022, the Supporting Sponsors agreed, subject to the terms of the RSA, to refrain from taking a worthless stock deduction under section 165 of the Tax Code for any tax year ending prior to the Effective Date, and from transferring any equity, if doing so could result in an "ownership change" of Holdings under section 382 of the Tax Code.   If the Supporting Sponsors had caused an ownership change by taking such actions, the Tax Group's ability to use such tax attributes could be subject to additional severe limitations.   On June 2, 2022, the Bankruptcy Court entered an order establishing notification procedures and approving restrictions on certain transfers of equity interests in the Debtors, certain worthless stock deduction claims, and other procedures and relief relating to trading in claims against the

---

[2728]   The Equity Rights Offering Securities and the Equity Direct Allocation Securities will be issued at a discount of 35% to plan equity value of $545 million (for the avoidance of doubt, plan equity value has been calculated by subtracting (x) the $350 million of Exit Notes and the $230 million of HoldCo Notes from (y) the plan value of $1.125 billion).   As consideration for the substantial financial commitments being made by the applicable Commitment Parties, the Debtors are providing the Equity Put Option Premium under the Equity Backstop Agreement and the Debt Put Option Premium under the Debt Backstop Agreement of $36 million and $18 million, respectively.

[2829]   Professional fees are being paid by the Debtors' estates pursuant to the Final DIP Order.   The Debtors have not assumed the RSA and are not paying any amounts pursuant to the RSA.

Debtors (the "**NOL Order**"). In accordance with their obligations under the RSA, the Supporting Sponsors consented to entry of the NOL Order, which, among other things, affirmatively enjoins them from taking a worthless stock deduction under section 165 of the Tax Code with respect to the beneficial ownership of Existing Holdings Interests for any tax year ending before the Effective Date, and from transferring any equity interests, in contravention of the NOL Order, in each case, in order to prevent an ownership change under section 382 of the Tax Code prior to the Effective Date.

The Restructuring Support Agreement, particularly the $350 million Exit Notes and $450 million combination of Direct Allocation Securities and the Rights Offerings contemplated thereby, plus the Debtors' cash on hand, are expected to ensure an efficient and prompt reorganization.  The following illustrative chart shows the range of reorganized equity that will be owned by the Commitment Parties under the Plan and rights offerings.



| | Pre-Money | Post-Money | |
| --- | --- | --- | --- |
| | % | % | Amount |
| 10.5% Secured Noteholders | 100.0% | 0.1% | $0 |
| Rights Offering - Pro Rata | - | 56.6% | $254 |
| Rights Offering - Direct Allocation | - | 38.3% | $208 |
| Rights Offering - Backstop | - | 15.2% | $83 |
| Plan Equity Value for Rights Offering | 100.0% | 100.0% | $545 |

The restructuring contemplated therein is intended to minimize any potential adverse effects to the Debtors' business, customers, suppliers, vendors, and employees because of the restructuring, and to allow the Company to expediently emerge from bankruptcy with the entirety of its workforce intact and with a capital structure to allow the Company to be more competitive and positioned for long-term success.  The Debtors fully anticipate these Chapter 11 Cases to be a narrow, de-levering of their balance sheet, with no material impact on their customers, employees or operations.

2.      **DIP Financing.**

To fund the Debtors' operations through the administration of these Chapter 11 Cases, the existing ABL Lenders and certain other third party lenders (collectively, the "**DIP Facility Lenders**"), have agreed to provide a $523 million (the "**Total DIP Commitment**") debtor-in-possession facility comprising of: (i) the ABL DIP Facility, a secured asset-based revolving credit facility in a maximum committed amount of up to $200 million (the "**ABL DIP Loan Facility**"), and (ii) a postpetition senior secured superiority priming term loan facility (as approved by the DIP Orders) in an aggregate amount of $323 million (the "**Term DIP Loan Facility**," and together with the ABL DIP Loan Facility, the "**DIP Facilities**"), in accordance with the terms and conditions of the ABL DIP Credit Agreement and the Term Loan DIP Credit Agreement, respectively.   Under the Term Loan DIP Credit Agreement, the DIP Facility Lenders will (A) provide up to $85 million in new money term loans to fund working capital, general corporate purposes, the expenses of administering the Chapter 11 Cases and (B) permit a roll-up of the Prepetition Senior Priority 2022 Bridge Notes in the amount of approximately $237

million, $59.3 million (consisting of approximately $52.5 million of principal amount outstanding, $5.1 million in respect of the Redemption Premium (as defined in the Priming Notes Indenture) and $1.7 million of accrued but unpaid interest, in respect of the Prepetition Senior Priority 2022) of which will be rolled-up and converted into the Term Loan DIP Facility upon entry of the Interim DIP Order, and the remaining balance of which will be rolled-up and converted into the Term Loan DIP Facility upon entry of the Final DIP Order, in each case, including all principal and accrued but unpaid interest through the date thereof, on a cashless dollar-for-dollar basis.

The ABL DIP Loan Facility and Term DIP Loan Facility have a split lien collateral structure like what existed before the filing.  The ABL DIP Loan Facility will have a first lien on ABL Priority Collateral and a second lien on all other collateral, and the Term DIP Loan Facility will have a second lien on ABL Priority Collateral and a first lien on all other collateral.  The Term DIP Loan Facility will prime the existing 10.5% Notes with the consent of the Ad Hoc Noteholder Group and the notes collateral agent, but not any other liens that are otherwise valid, unavoidable, and senior to the liens securing the Priming Notes and the 10.5% Notes as of the Petition Date.

The Debtors have agreed to pay certain fees in connection with the extension of credit under the DIP Facilities (collectively, the "**DIP Fees**"), which fees are included in the budget pertaining to the DIP Facility.  The DIP Fees include a commitment fee of 4.50% (based on the aggregate amount of New Money Commitment of each lender), an exit fee equal to 2.25% of the aggregate principal amount of any amount repaid or prepaid or that remains outstanding upon maturity of the Term DIP, and a non-use fee equal to 5.0% of the undrawn New Money Commitments under the Term Loan DIP Facility.

The DIP Facility allows the Debtors to pay suppliers and other participants in the Debtors' supply chain in the ordinary course to ensure the continuing and uninterrupted flow of inputs to the Debtors' businesses.

### 3. Exit Facility.

The Restructuring Support Agreement provides for the Reorganized Debtors' entry into a senior secured revolving credit facility and issuance of exit notes which will be issued to fund the Debtors' operations upon emergence from these Chapter 11 Cases.  Specifically, the Restructuring Support Agreement provides that, on the Effective Date, the Reorganized Debtors will enter into the Exit ABL Facility and will conduct a marketing process to issue an aggregate principal amount of $350 million Exit Notes which will be secured by a second priority security interest in and lien on the Reorganized Debtors' cash, accounts receivable, and inventory and a first priority security interest in and lien on substantially all of the Reorganized Debtors' other assets.  If the Reorganized Debtors are unable to place some or all of the Exit Notes in the market, the Reorganized Debtors shall have the right to cause the Exit Notes Backstop Parties, on a several (but not joint) basis, to purchase any such Exit Notes that are not placed in the market on terms and subject to conditions set forth in the Plan Supplement.

The Debtors believe the Exit ABL Facility and the Exit Notes will allow them to operate with stability, and successfully fund a go-forward business plan that fully harnesses the benefits of the Plan.

## VI.    MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

### A.    Expected Timetable of the Chapter 11 Cases

As described therein, the Restructuring Support Agreement (as it may be amended) contains certain milestones for the Debtors to secure Confirmation of a chapter 11 plan and emerge from chapter 11.   Specifically, the Restructuring Support Agreement contemplates, among other things, (i) that an Interim DIP Order will be entered by the Bankruptcy Court within 3 calendar days after the Petition Date, (ii) that the Debtors will file initial versions of the Plan, the Disclosure Statement and a motion to approve the Disclosure Statement within 14 calendar days after the Petition Date, which motion seeks entry of an order granting relief within 5 business days after filing the motion, (iii) that a Final DIP Order will be entered by the Bankruptcy Court within 35 calendar days after the Petition Date, (iv) entry of a final order approving the Disclosure Statement within 75 calendar days after the Petition Date and Confirmation of the Plan within 120 days after the Petition Date and (v) substantial consummation of the Plan by September 29, 2022 (subject to extension under certain circumstances).   Thus, to ensure that the Debtors and their stakeholders will benefit from the Restructuring Support Agreement, the Debtors intend to move at a steady—but reasonable, prudent, and statutorily compliant—pace.   The Disclosure Statement Order scheduled certain dates and deadlines in connection with the approval of this Disclosure Statement and Confirmation of the Plan.   Should the Debtors' projected timelines prove accurate, the Debtors could emerge from chapter 11 within approximately 135 calendar days after the Petition Date. **No assurances can be made, however, that the Bankruptcy Court will enter various orders on the timetable anticipated by the Debtors.**

### B.    First Day Relief

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "**Petitions**"), the Debtors filed several motions (collectively, the "**First Day Motions**") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases.   A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of Robert A. Del Genio in Support of Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 27] (the "**First Day Declaration**").   At a hearing on June 2, 2022, the Bankruptcy Court granted substantially all of the relief initially requested in the First Day Motions, including: authority to continue to pay employee wages and benefits; authority to pay certain taxes and assessments; authority to continue prepetition insurance coverage and renew or enter into new insurance policies; authority to provide adequate assurance for future utility services; notification and hearing procedures for certain transfers of and declarations of worthlessness with respect to stock of Holdings; authority to pay, in the ordinary course of business, certain prepetition claims held by suppliers, critical vendors, shippers, warehouseman, and other lien claimants; and authority to maintain the Company's existing cash management system.

The First Day Motions, the First Day Declaration, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at https://cases.ra.kroll.com/TPCGroup/.

### C.    Other Procedural and Administrative Motions

The Debtors filed several procedural and administrative motions subsequent to the Petition Date to facilitate the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

- OCP Motion.  On June 8, 2022, the Debtors filed the *Debtors' Motion for an Order Authorizing the Debtors to Employ and Compensate Professionals Utilized in the Ordinary Course of Business* [Docket No. 178] (the "**OCP Motion**").  The OCP Motion sought to establish procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course of their businesses

### D.    Assumption of Contracts

The Debtors have filed several motions to assume commercial agreements, as amended by postpetition amendments, to date, including the following:

- Debtors' Motion for Entry of an Order (I) Approving the Debtors Assumption of Commercial Contracts with **Dow**, as Amended, and (II) Granting Related Relief (filed June 1, 2022)

- Motion to Approve Debtors' Motion for Entry of an Order (I) Approving the Debtors Assumption of a Commercial Supply Contract with **Formosa**, as Amended, and (II) Granting Related Relief (filed June 13, 2022)

- Debtors' Motion for Entry of an Order (I) Approving the Debtors Assumption of Commercial Supply Contracts with **CPChem**, as Amended, and (II) Granting Related Relief (filed June 23, 2022)

- Debtors' Motion for Entry of an Order (I) Approving the Debtors Assumption of a Sales Contract with **Trafigura Trading, LLC** and (II) Granting Related Relief (filed June 27, 2022)

- Debtors' Motion for Entry of an Order (I) Approving the Debtors' Assumption of a Commercial Supply Contract with **Sasol**, as Amended, and (II) Granting Related Relief (filed July 1, 2022)

- Debtors' Motion for Entry of an Order (I) Approving the Debtors' Assumption of Commercial Contracts with **Nova**, as Amended, and (II) Granting Related Relief (filed July 1, 2022)

- Debtors' Motion for Entry of an Order (I) Approving the Debtors Assumption of a Commercial Supply Contract with **Shintech**, as Amended, and (II) Granting Related Relief (filed July 11, 2022)

- Debtors' Motion for Entry of an Order (I) Approving the Debtors Assumption of a Commercial Supply Contract with **LACC**, as Amended, and (II) Granting Related Relief (filed July 15, 2022);

- Debtors' Motion for Entry of an Order (I) Approving the Debtors' Assumption of a Commercial Agreement with **Pasadena Performance Products**, (II) Approving the Debtors' Use of Estate Property to Pay for Pipeline Connection Costs of Behalf of Non-Debtor Subsidiaries to Realize the Value of Debtors' Commercial Agreement with Pasadena Performance Products, And (II) Granting Related Relief (filed August 5, 2022); and

- Debtors' Motion for Entry of an Order (I) Approving the Debtors Assumption of a Commercial Supply Contract with **Linde**, as Amended, (II) Approving the Debtors' Entry into a Post-Petition Commercial Contract with Linde, and (III) Granting Related Relief (filed September 9, 2022).

The Company has negotiated amendments to approximately 85-88% of its Crude C4 agreements and the Debtors have filed motions to assume each of these agreements, as amended. Each of these motions can be found at: https://cases.ra.kroll.com/tpcgroup/Home-DocketInfo. The Court has entered orders approving each of these motions except for the Pasadena Performance Productions motion, which is still pending.

Regarding Debtors' pending motion to assume its commercial agreement with Pasadena Performance Products ("**PPP**"), a wholly owned subsidiary of Next Wave Energy Partners, LP, in addition to seeking an order approving assumption its contract to sell raffinate to PPP, Debtors seek Court approval of certain capital expenditures necessary to build infrastructure to facilitate the transportation of the raffinate product from TPC's facilities to PPP's facilities.  A portion of these expenditures are made on behalf of TPC Pipeline Holding Company LLC ("TPC Pipeline Holding"), and its subsidiary, TPC Pipeline Company LLC ("**TPC Pipeline**" and together with TPC Pipeline Holding, the "**Pipeline Companies**"), which are wholly-owned non-Debtor subsidiaries of TPC Group LLC.[29][30]  As of June 2022, TPC has incurred approximately $3 million in costs to ready the pipeline segments owned by TPC Pipeline for connection to PPP's plant facility and related infrastructure assets owned by PPP. TPC estimates that it must spend an additional approximately $700,000 to $800,000 to complete the pipeline segment connections on behalf of TPC Pipeline to realize the value of the commercial agreement sought to be assumed. The Court has entered an order authorizing expenditures on behalf of the Pipeline Companies to support and facilitate the commercial agreement up to a total of $4,000,000.

---

[29][30]  Since filing each of their Schedules, the Debtors received an invoice from CT Corporation for registered agent services in respect of a dormant subsidiary of TPC Group, LLC named TPC IAHC LLC, a Texas limited liability company, which is an entity that was formed but never capitalized with assets.  It also has no liabilities.  The dormant subsidiary was slated for dissolution in 2020, but the Debtors have learned that the dissolution was not in fact fully effectuated as intended prior to the Petition Date.

E.     **The Debtors' DIP Financing**

On June 1, 2022, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 36] (the "**DIP Motion**"), together with the *Declaration of Zul Jamal in Support of Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 65], and the *Declaration of Robert A. Del Genio in Support [of] Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 66]. By the DIP Motion, the Debtors sought approval of: (i) a secured asset-based revolving credit facility in a maximum committed amount of up to $200 million, and (ii) a priming secured term loan facility in an aggregate amount of $323 million, in accordance with the terms and conditions of the ABL DIP Credit Agreement and the Term Loan DIP Credit Agreement, respectively. Under the Term Loan DIP Credit Agreement, the Term Loan DIP Lenders committed to (A) provide $85 million in new money term loans to fund working capital, general corporate purposes, the expenses of administering the Chapter 11 Cases and (B) roll up Prepetition Senior Priority Notes claims in the amount of approximately up to $237 million, $59 million of which was rolled-up and converted into the Term Loan DIP Facility upon entry of the Interim DIP Order, and the balance of which was deemed rolled-up and converted into the Term Loan DIP Facility upon entry of the Final DIP Order, in each case, including all principal and accrued but unpaid interest through the date thereof, on a cashless dollar-for-dollar basis (and subject to an exception for holders of Prepetition Senior Priority Notes unable to roll-up into the Term Loan DIP Facility, who are expected to be cashed out by way of a drawing of new DIP term loans made by other lenders under the Term Loan DIP Facility). The $85 million in new money term loan commitments include (i) $32 million of new money commitments for the first borrowing, (ii) $25 million of new money commitments for the second borrowing, and (iii) $28 million of new money commitments for the third borrowing. As of the date hereof, the first and second borrowings have occurred. The new money term loans require prepayment upon receipt by the Debtors of any insurance proceeds arising or related to the PNO Incident, subject to the Debtors' ability to terminate the new money term loan commitments in respect of the third borrowing in an amount equal to an equivalent amount of insurance proceeds received. So, for example, the Debtors currently have $57 million in principal amount of term loans outstanding under the Term Loan DIP Credit Agreement. To the extent the Debtors receive the approximately $47 million of insurance proceeds under proof of loss 11 and 11a, the Debtors anticipate they will first terminate $28 million of undrawn new money commitments (third borrowing) and then repay approximately $19 million of the outstanding amount under the Term Loan DIP Credit Agreement, leaving approximately $38 million outstanding. If the third borrowing occurs, any insurance proceeds that are received after the third borrowing would first be used to repay the

outstanding amounts under the third borrowing and then remaining proceeds would be used to repay the second borrowing. For the avoidance of doubt, all proceeds of property damage/business interruption insurance arising from the PNO Incident constitute collateral securing the 10.5% Notes. If such insurance proceeds are received by the Debtors prior to the Effective Date, they will be distributed as excess cash to holders of Class 3 10.5% Notes Secured Claims pursuant to Section 4.3 of the Plan; otherwise, such proceeds will be retained as an asset of the Reorganized Debtors. No portion of such insurance proceeds will be distributed to holders of unsecured claims. The Debtors believe the DIP Facility will help ensure the Debtors have sufficient liquidity to enable them to proceed with the process of confirming the Plan, administer their Estates in an efficient manner, and ultimately achieve a successful reorganization.

On June 3, 2022, the Bankruptcy Court entered the *Interim Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (B) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* (ECF No. 147) (the "**Interim DIP Order**") granting the DIP Motion on an interim basis.

The DIP Motion was considered on a final basis at a hearing that took place on June 29, 2022. Following the hearing, the Bankruptcy Court approved the DIP Facilities and overruled all objections filed or otherwise raised at the hearing. On August 2, 2022, the Bankruptcy Court entered the *Final Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 566) (the "Final DIP Order").

### F.    **Appointment of Creditors' Committee**

On June 14, 2022, the U.S. Trustee filed the *Notice of Appointment of Unsecured Creditors Committee* [Docket No. 207], notifying parties in interest that the U.S. Trustee appointed the Creditors' Committee in the Chapter 11 Cases. The Creditors' Committee is currently composed of the following members: (a) Chevron Phillips Chemical Company LP, (b) Sasol Chemicals North America LLC, (c) Farmers Insurance, (d) Amber Harms, (e) Emily Teasley, (f) Suzanne Williamson and (g) Chris Johnson.

On July 22, 2022, following the assumption of their contracts and payment of their prepetition claims, Chevron Phillips Chemical Company LP and Sasol Chemicals North America LLC resigned from the Committee. The Committee currently comprises the following members: (i) Amber Harms; (ii) Chris Johnson; (iii) Emily Teasley; (iv) Farmers Insurance; and (v) Suzanne Williamson.

### G.    **Schedules and Statements**

On June 30, 2022, the Debtors originally filed their Schedules and Statements of Assets and Liabilities for each of the filed Debtors, detailing known claims against the Debtors. Further, as of the date hereof, over 36,000 proofs of Claim had been filed against the Debtors asserting in the aggregate approximately $11.3 billion, which aggregate includes claims filed by

the indenture trustees. The Debtors continue to review, analyze, and reconcile potential objections to the filed Claims.

### H.    Establishment of a Claims Bar Date

On June 30, 2022, the Bankruptcy Court entered an order approving (i) August 5, 2022, as the deadline for all creditors or other parties in interest to file proofs of Claim (the "**Bar Date**"); and (ii) On November 30, 2022, 2022 as the deadline for all Governmental Entities to file a proof of Claim [Docket No.345].

The Debtors provided notice of the Bar Date, and published notice of the Bar Date (i) once in the *Houston Chronicle, La Voz de Houston, Lake Charles American Press* and *New York Times National Edition* and (ii) three times in *The Port Arthur News, Beaumont Enterprises, Beaumont Examiner* and *Orange Leader*. Any party that is required, but that fails, to file a proof of claim in accordance with the procedures set forth in the Bar Date Motion and order shall be forever barred, estopped, and enjoined from asserting such claim against the Debtors, and the Debtors and their property shall be forever discharged from any indebtedness or liability with respect to or arising from such claim. Such party will be prohibited from voting to accept or reject the Plan or any chapter 11 plan filed in these Chapter 11 Cases, participating in any distribution in the Chapter 11 Cases on account of such claim, or receiving further notices regarding such claim.

### I.    Adversary Proceeding

On June 2, 2022, Bayside Capital, Inc. ("**Bayside**") and Cerberus Capital Management, L.P., ("**Cerberus**") commenced an adversary proceeding for declaratory judgment in the Chapter 11 Cases, captioned *Bayside Capital, Inc. and Cerberus Capital Management, L.P. v. TPC Group Inc.*, Adv. Proc. No. 22-50372 (the "**Notes Adversary Proceeding**"). Through the Notes Adversary Proceeding, Bayside and Cerberus allege that the Debtors' issuance of the 10.875% Priming Notes, the 10.875% Priming Notes Indenture, the Supplemental Indenture, and the 2021 Intercreditor Agreement violate the 10.5% Notes Indenture's provisions and that the consents obtained by TPC to the issuance of the Supplemental Indenture and 2021 Intercreditor Agreement were deficient. [Adv. Dkt. Nos. 1, 3]. Bayside and Cerberus have requested a declaration from the Bankruptcy Court ordering that the 10.875% Priming Notes, the 10.875% Priming Notes Indenture, the Supplemental Indenture, and the 2021 Intercreditor Agreement are of no further force or effect with respect to the application of and priority of collateral to the 10.5% Notes and that the consents obtained with respect to such instruments are invalid. On June 2, 2022, Bayside and Cerberus filed a motion for summary judgment on their claims [Adv. Dkt No. 4].

On June 9, 2022, the Debtors filed a counterclaim for declaratory judgment (the "**Notes Counterclaim**") in the Notes Adversary Proceeding against Bayside and Cerberus [Adv. Dkt. No. 15], alleging that Bayside and Cerberus' commencement of the Notes Adversary Proceeding is invalid because it violates the 10.5% Notes Indenture. Specifically, the Debtors allege that the Notes Adversary Proceeding violates Section 6.06(a), a "no-action" clause that places restrictions on when noteholders to the 10.5% Notes can seek remedies related to the 10.5% Notes, 10.5% Notes Indenture, or related documents, because Bayside and Cerberus had not

satisfied its requirements, including establishing that 25% of the aggregate principal amount of the outstanding 10.5% Notes support the Notes Adversary Proceeding or providing proper notice. [Adv. Dkt. No. 15]. Simultaneous with the filing of the Notes Counterclaim, the Debtors filed a motion for summary judgment seeking a declaration from the Bankruptcy Court that the Notes Adversary Proceeding violated the terms of the 10.5% Notes Indenture and that the Notes Adversary Proceeding be dismissed as improper under the 10.5% Notes Indenture [Adv. Dkt. Nos. 16, 17]. Simultaneous with filing of the Notes Counterclaim and summary judgment motion, the Debtors also filed a motion to dismiss the Notes Adversary Proceeding. [Adv. Dkt. Nos. 18, 19].

On June 10, 2022, the Ad Hoc Noteholder Group filed an emergency motion to intervene in the Notes Adversary Proceeding (the "**Intervention**").  [Adv. Dkt. No. 28].  Through the intervention, the Ad Hoc Noteholder Group seeks an order from the bankruptcy court authorizing the Ad Hoc Noteholder Group to intervene in the Notes Adversary Proceeding as a defendant to preserve and protect the interests of its members in the Notes Adversary Proceeding and to have the rights and obligations of a party to the Notes Adversary Proceeding, as if it had been initially named as a defendant.

The Debtors' response to the Notes Adversary Proceeding motion for summary judgment is due on June 17, 2022, with any reply brief in support due June 24, 2022.  Bayside and Cerberus' response to the Notes Counterclaim is June 22, 2022, with any reply brief in support due June 28, 2022.  The hearing on the cross-motions for summary judgment on the Notes Adversary Proceeding and Notes Counterclaim took place on June 29, 2022.

On July 8, 2022, the Bankruptcy Court issued entered judgment denying Bayside and Cerberus' summary judgment motion.  That same day, Bayside and Cerberus filed an emergency motion to stay the Bankruptcy Court's order denying relief, pending appeal.  On July 11, 2022, the Bankruptcy Court denied the emergency motion for stay of order pending appeal. On July 12, 2022, Bayside and Cerberus filed an appeal of the Bankruptcy Court's order to the District Court of Delaware and moved for an emergency motion to stay the Bankruptcy Court's order pending appeal. On July 26, 2022, the District Court issued an order denying Bayside and Cerberus's emergency motion for stay.  On August 5, 2022, the Debtors and Bayside and Cerberus entered into an agreed stipulation dismissing Bayside and Cerberus's appeal with prejudice.

**J.    Backstop Motion**

On July 22, 2022, the Debtors filed the *Motion of Debtors for Order (I) Authorizing Entry Into Backstop Agreements, (II) Approving Obligations Thereunder, (III) Approving Rights Offering Procedures and Related Forms, (IV) Authorizing Debtors to Conduct the Rights Offering Transactions, and (V) Granting Related Relief* [Docket No. 491] (the "**Backstop Motion**").  By way of the Backstop Motion, the Debtors are requesting authorization to enter into the Backstop Agreements, the Bankruptcy Court's approval of (i) the Commitment Obligations (as defined therein) in the Backstop Agreements and (ii) the Rights Offering Procedures, and authorization to conduct the Rights Offering Transactions (as defined therein).

On August 9, 2022, the U.S. Trustee filed an objection to the Backstop Motion [Docket No. 606].   On August 10, 2022, Bayside and Cerberus, the Creditors' Committee, and

Mockingbird Credit Opportunities Company LLC ("**Mockingbird**") each filed their objections to the Backstop Motion [Docket Nos. 616, 620, and 624].

On September 13, 2022, the Debtors announced at a status conference that the Ad Hoc Noteholder Group, Cerberus and Bayside and Mockingbird had reached an agreement in principle to resolve their objections to the Backstop Motion and were working to document such agreement.

### K.    Litigation Matters

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims. These matters primarily consist of claims for personal injury or exposure to certain chemical products or feedstocks, and to environmental matters. To the extent that Debtors are party to any such lawsuits, the Debtors defend such actions vigorously. Moreover, many of the personal injury or product exposure lawsuits to which the Debtors are party to are covered by the Debtors' insurance, subject to certain self-insured retention amounts.

The Debtors' complex contractual arrangements with their customers and suppliers have, from time to time, caused the Debtors to be involved in disputes with their customers and suppliers regarding the interpretation of these contracts. This includes litigation related to complex, index-based pricing formulas applicable to such contracts. These disputes, which are common to the industry and occur in the ordinary course of the Debtors' business, seldom result in actual formal litigation. To the contrary, they are typically resolved in the context of the broader commercial relationship that the Debtors maintain with the customer or supplier in question.

In addition to prepetition litigation related to the PNO Incident (described in greater detail in Section V.C.4, herein), the Texas Attorney General brought suit against TPC in February 2022 in state court in Austin alleging violations by the Debtors of the Texas Clean Air Act and the Texas Water Code, pertaining to certain emissions events in 2020 and 2021 at the HNO Facility.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. The Debtors reserve their right to remove such litigation under Bankruptcy Rule 9027. In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

### L.    Putative PNO Class Claimants' Omnibus Motion for Class Proofs of Claim and Certification of Classes

On August 30, 2022, the PNO Claimants filed the *Port Neches Plant Explosion Class Claimants' Omnibus Motion for (I) Approval and Ratification of Filing of Class Proofs of Claim and (II) Certification of Classes* [Docket No. 687] (the "**Class Claimants' Omnibus Motion**")

seeking, among other things, the Bankruptcy Court's (i) approval and ratification of the filing of class proofs of claim by the proposed class representatives and (ii) certification of the classes, approval of the class representatives and approval of counsel representing the class.

The objection deadline for the Class Claimants' Omnibus Motion has been extended for the Debtors to September 29, 2022 at 4:00 p.m. (prevailing eastern time) by agreement among the parties. The Debtors anticipate filing responsive pleadings opposing the Class Claimants' Omnibus Motion, which is scheduled to be heard at the Debtors' omnibus hearing on October 13, 2022 at 11:00 a.m. (prevailing eastern time).

### M.    Creditors' Committee Standing Motion

On August 31, 2022, the Creditors' Committee filed the *Motion of the Official Committee of Unsecured Creditors of TPC Group Inc., et al., for Entry of an Order Granting (I) Leave, Standing, and Authority to Commence and Prosecute Certain Claims on Behalf of the Debtors' Estates and (II) Exclusive Settlement Authority in Respect of Such Claims* [Docket No. 704] (the "**Standing Motion")**, including the proposed complaint attached thereto, to, among other things, (i) challenge the validity and enforceability of liens and security interests on the Debtors' insurance proceeds arising from the PNO Incident, purportedly unencumbered pipeline assets located in Galveston, Orange and Brazoria Counties in Texas and Calcasieu Parish in Louisiana, and a leasehold interest at the Lake Charles Terminal, (ii) seek avoidance of any unperfected liens with respect to the aforementioned assets, (iii) seek declaratory relief that certain make-whole provisions are unenforceable, and (iv) seek a finding that the New Holdings Guaranty (as defined therein) is avoidable as a constructive fraudulent transfer. In the Standing Motion, the Creditors' Committee has asserted that noteholders' liens in the insurance proceeds are not properly perfected. The Creditors' Committee believes that if its arguments are correct, the Plan will not be confirmable. Moreover, the Creditors' Committee also believes that if its challenge to the validity and enforceability of the noteholders' liens is successful, the Plan will not be confirmable.

The Debtors, the Ad Hoc Noteholder Group and U.S. Bank dispute the Committee's allegations, and the Debtors anticipate filing responsive pleadings opposing the Standing Motion. Other than segments of pipeline assets in Galveston, Orange and Brazoria Counties in Texas and Calcasieu Parish in Louisiana and equity in the Pipeline Companies, the Debtors believe that all assets are encumbered. A hearing on the Standing Motion has been scheduled for October 13, 2022 at 11:00 a.m. (prevailing eastern time).

### N.    Rejection of Lion Elastomers Storage and Handling Agreement and Adversary Proceeding

On September 7, 2022, the Debtors filed *Debtors' Motion for Entry of an Order Approving Rejection of Butadiene Storage and Handling Agreement with Lion Elastomers* [Docket No. 734] (the "**Lion Rejection Motion**"). By way of the Lion Rejection Motion, the Debtors request approval of their rejection of that certain Butadiene Storage and Handling Agreement between TPC, as successor-in-interest under the contract to Texaco Chemical Company, and Lion Elastomers, LLC ("**Lion**"), as successor-in-interest under the contract to Ameripol Synpol Company, dated December 17, 1992 (the "**Storage Agreement**").

On September 7, 2022, TPC also filed its *Complaint for Declaratory Judgment* [Adv. Docket No. 1], seeking a declaration that the Storage Agreement does not contain any covenants that run with the land. Then, on September 16, 2022, TPC filed its *First Amended Complaint for Declaratory Judgment* [Adv. Docket No. 4] seeking (1) a declaration that the Storage Agreement does not contain any covenants that run with the land, and (2) a declaration that any and all purported conveyances of or interests in real property pursuant to the Butadiene Storage and Handling Agreement are avoidable by TPC pursuant to section 544(a)(3) of the Bankruptcy Code and may be recovered by TPC pursuant to section 550(a) for the benefit of the Debtors' estates. On September 16, 2022, TPC filed its *Plaintiff's Motion for Summary Judgment* and *Brief in Support of Plaintiffs' Motion for Summary Judgment*, seeking judgment in its favor on both counts. [Adv. Docket Nos. 5 and 6.]

## VII.    TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL LAW

### A.    New Common Shares, HoldCo Notes and Exit Notes

As discussed herein, the Plan provides for the Debtors and the Reorganized Debtors, as applicable, subject to the terms of the Plan Supplement, to distribute: (1) New Common Shares and HoldCo Notes to Holders of 10.5% Notes Secured Claims on account of their respective Claims and/or in connection with the Equity Rights Offering and Debt Rights Offering; (2) New Common Shares under the Management Incentive Plan; (3) New Common Shares consisting of unsubscribed Equity Rights Offering Securities issued to the Equity Backstop Parties or their Affiliates pursuant to the Equity Backstop Agreement (the "**Equity Backstop Commitment Securities**"); (4) New Common Shares consisting of Equity Put Option Securities issued to the Equity Commitment Parties or their Affiliates pursuant to the Equity Backstop Agreement; (5) New Common Shares consisting of Equity Direct Allocation Securities issued to the Equity Direct Allocation Parties or their Affiliates pursuant to the Equity Backstop Agreement; (6) New Common Shares consisting of Debt Put Option Securities issued to the Debt Commitment Parties or their Affiliates pursuant to the Debt Backstop Agreement; (6)  HoldCo Notes consisting of Unsubscribed Debt Rights Offering Securities issued to the Debt Backstop Parties or their Affiliates pursuant to the Debt Backstop Agreement (the "**Debt Backstop Commitment Securities**"); and (7) HoldCo Notes consisting of Debt Direct Allocation Securities issued to the Debt Direct Allocation Parties or their Affiliates pursuant to the Debt Backstop Agreement.

The Plan also provides for the Debtors and the Reorganized Debtors, as applicable, to issue Exit Notes in a private placement not subject to registration under the Securities Act, and/or unsubscribed Exit Notes issued to the Exit Notes Commitment Parties pursuant to the Exit Notes Backstop Agreement (the "**Exit Notes Backstop Issue**") and, in each case, pursuant to the Exit Notes Indenture.

The Debtors believe that the New Common Shares, HoldCo Notes, and Exit Notes will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and any applicable state securities law (a "**Blue Sky Law**"). The Debtors further believe that the offer, issuance and distribution of the New Common Shares, HoldCo Notes, and the Exit Notes pursuant to the Plan is, and subsequent transfers of shares of the New Common Shares, HoldCo Notes or the Exit Notes by the holders thereof that are not "underwriters" (as defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code) will be, exempt from federal

and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code, and any applicable state Blue Sky Law in each case, to the extent set forth below.

**RECIPIENTS OF NEW COMMON SHARES, HOLDCO NOTES OR EXIT NOTES ARE URGED TO CONSULT WITH THEIR OWN LEGAL ADVISORS AS TO THE AVAILABILITY OF ANY EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE BLUE SKY LAW.**

### B.    Equity Backstop Agreement, Debt Backstop Agreement and Exit Notes Backstop Agreement

The applicable Commitment Parties and the Debtors have entered into (i) the Equity Backstop Agreement with respect to the Equity Rights Offering and (ii) the Debt Backstop Agreement with respect to the Debt Rights Offering, pursuant to which the Equity Backstop Parties and the Debt Backstop Parties, as applicable, severally and not jointly, will undertake to backstop the Equity Rights Offering and Debt Rights Offering, respectively, which Equity Rights Offering and Debt Rights Offering shall be conducted in accordance with the Plan, the Equity Rights Offering Documents and the Debt Rights Offering Documents, as applicable.

Under the Equity Backstop Agreement (i) the Equity Backstop Parties, severally and not jointly, will purchase the Equity Backstop Commitment Securities and (ii) the Equity Direct Allocation Parties will purchase the Equity Direct Allocation Securities for the aggregate Equity Direct Allocation Amount.  As consideration for certain of the commitments of the Equity Commitment Parties under the Equity Backstop Agreement, the applicable Equity Commitment Parties shall receive the Equity Put Option Premium, paid in Equity Put Option Securities, which shall be deemed fully earned as of the date of execution of the Equity Backstop Agreement.

Under the Debt Backstop Agreement, (i) the Debt Backstop Parties, severally and not jointly, will purchase the Debt Backstop Commitment Securities and (ii) the Debt Direct Allocation Parties will purchase the Debt Direct Allocation Securities for the aggregate Debt Direct Allocation Amount.  As consideration for certain of the commitments of the Debt Commitment Parties under the Debt Backstop Agreement, the applicable Debt Commitment Parties shall receive the Debt Put Option Premium, paid in Debt Put Option Securities, which shall be deemed fully earned as of the date of execution of the Debt Backstop Agreement.

In addition, the Exit Note Commitment Parties and the Company, on behalf of itself and each of the other Debtors, are expected to enter into an Exit Notes Backstop Agreement (the "**Exit Notes Backstop Agreement**"), pursuant to which the Exit Notes Backstop Parties, severally and not jointly, will backstop the private placement of Exit Notes to be conducted in accordance with the Plan.  Under the Exit Notes Backstop Agreement, if the Company is unable to place some or all of the Exit Notes in the market, the Debtors are expected to have the right to cause the Exit Notes Commitment Parties, severally but not jointly, to purchase any Exit Notes that are not placed in the market on terms and subject to conditions set forth in the Plan.

The Equity Commitment Parties, the Debt Commitment Parties and the Exit Notes Commitment Parties, as applicable, are sophisticated financial institutions that are familiar with

the Debtors' operations and the petrochemicals industry and the entry into the Equity Backstop Agreement, the Debt Backstop Agreement and the Exit Notes Backstop Agreement by each of the Equity Commitment Parties, the Debt Commitment Parties and the Exit Notes Commitment Parties, as applicable was (or will be) the result of extensive negotiations among the Debtors and the Equity Commitment Parties, the Debt Commitment Parties and the Exit Notes Commitment Parties, as applicable, in the months prior to the Petition Date and thereafter.

C.    **Equity Backstop Commitment Securities; Debt Backstop Commitment Securities; Equity Direct Allocation Securities; Debt Direct Allocation Securities; Equity Put Option Securities; Debt Put Option Securities; and Backstop Exit Notes**

Issuance of the Equity Backstop Commitment Securities, the Debt Backstop Commitment Securities, the Equity Direct Allocation Securities, the Debt Direct Allocation Securities, the Equity Put Option Securities, the Debt Put Option Securities and the Backstop Exit Notes will be in reliance upon the exemption from registration under the Securities Act provided by Section 4(a)(2) thereof.  Such issuances will not be exempt under section 1145 of the Bankruptcy Code because those securities are not being issued in exchange for an existing Claim against the Debtors.

D.    **Certain Securities Law Matters**

1.    **Section 1145 of the Bankruptcy Code**

Issuance of Securities:

Section 1145(a)(1) of the Bankruptcy Code exempts the offer or sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws if three principal requirements are satisfied: (a) the securities must be issued "under a plan" of reorganization by the debtor or its successor under a plan or by an affiliate participating in a joint plan of reorganization with the debtor; (b) the recipients of the securities must hold a claim against, an interest in, or a claim for administrative expenses in the case concerning the debtor; and (c) the securities must be issued in exchange for the recipient's claim against or interest in the debtor, or "principally" in such exchange and "partly" for cash or property.  In reliance upon these exemptions, as well as Section 4(a)(2) under the Securities Act, the Debtors believe that the offer, issuance and distribution under the Plan of the New Common Shares to Holders of the 10.5% Notes Secured Claims pursuant to the Plan (such securities, the "**1145 Securities**" and such Holders, the "**1145 Security Holders**"), following the filing of the Chapter 11 Cases may be made without registration under the Securities Act or any applicable state securities laws. To the extent that the offer, issuance and distribution of the New Common Shares to the 1145 Security Holders following the filing of the Chapter 11 Cases is covered by section 1145 of the Bankruptcy Code, subject to compliance with the New Organizational Documents, such 1145 Securities may be resold without registration under the Securities Act or other federal securities laws, unless such Holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in section 1145(b)(1) of the Bankruptcy Code. In addition, such 1145 Securities are governed by section 1145 of the Bankruptcy Code generally and may be able to be resold without registration under applicable state securities laws pursuant to various exemptions

64

provided by the applicable states; however, the availability of such exemptions cannot be known unless applicable individual state securities laws are examined.

Subsequent Transfers:

The 1145 Securities may be freely transferred by most recipients following the initial issuance under the Plan, subject to any restrictions in the New Corporate Governance Documents, and all resales and subsequent transfers of the 1145 Securities are exempt from registration under the Securities Act and state securities laws, unless the Holder is an "underwriter" with respect to such securities. Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of 1145 Securities by entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, Holders of 1145 Securities who are deemed to be "underwriters" may be entitled to resell their 1145 Securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such Person if the required holding period has been met and, under certain

circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met.  If the issuer is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, adequate current public information as specified under Rule 144 is available if certain company information is made publicly available, as specified in Section (c)(2) of Rule 144.  The Reorganized Debtors will not be subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act.  Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the 1145 Securities, would depend upon various facts and circumstances applicable to that Person.  Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the 1145 Securities and, in turn, whether any Person may freely resell the 1145 Securities.

## 2.    Section 4(a)(2) under the Securities Act

Issuance of Securities:

Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving a public offering are exempt from registration under the Securities Act.  Rule 506 of Regulation D is a nonexclusive safe harbor from registration promulgated by the SEC under section 4(a)(2) of the Securities Act.

Any New Common Shares (including the Equity Put Option Securities and Debt Put Option Securities), HoldCo Notes or Exit Notes distributed pursuant to Section 4(a)(2) under the Securities Act (collectively the "**4(a)(2) Securities**") will be offered, issued and distributed without registration under the Securities Act and applicable state securities laws and in reliance upon the exemption set forth therein.  Such issuances will not be exempt under section 1145 of the Bankruptcy Code because those securities are not being issued in exchange for an existing Claim against the Debtors.

Subsequent Transfers:

The 4(a)(2) Securities will be considered "restricted securities" as defined by Rule 144 of the Securities Act and may not be resold under the Securities Act and applicable state securities laws absent an effective registration statement, or pursuant to an applicable exemption from registration, under the Securities Act and pursuant to applicable state securities laws.  Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such person after a specified holding period if current information regarding the issuer is publicly available and certain other conditions are met, and, if such seller is an affiliate of the issuer (or was an affiliate during the three months preceding the sale), if volume limitations, manner of sale requirements and certain other conditions are met.  The Debtors express no view as to whether any person may freely resell the 4(a)(2) Securities.

A non-affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act and who has not been an affiliate of the issuer during the 90 days preceding such sale may resell restricted securities after a one-year holding period whether or not current public information regarding the issuer is available and without compliance with the volume, manner of sale, and notice requirements described below.

An affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act may resell restricted securities after the one-year holding period if at the time of the sale certain current public information regarding the issuer is available.  An affiliate must also comply with the volume, manner of sale, and notice requirements of Rule 144.  First, the rule limits the number of restricted securities (plus any unrestricted securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of 1% of the outstanding securities of the same class being sold, or, if the class is listed on a stock exchange, the average weekly reported volume of trading in such securities during the four weeks preceding the filing of a notice of proposed sale on Form 144 or if no notice is required, the date of receipt of the order to execute the transaction by the broker or the date of execution of the transaction directly with a market maker. (In the case of debt securities, the amount of debt securities sold for the account of an affiliate in any three-month period may not exceed the greater of the limitation set forth in the preceding sentence or 10% of the principal amount of the applicable tranche of debt securities.) Second, the manner of sale requirement provides that the restricted securities must be sold in a broker's transaction, directly with a market maker or in a riskless principal transaction (as defined in Rule 144).  Third, if the amount of securities sold under Rule 144 in any three month period exceeds 5,000 shares or other units or has an aggregate sale price greater than $50,000, an affiliate must file or cause to be filed with the SEC three copies of a notice of proposed sale on Form 144 and provide a copy to any exchange on which the securities are traded.

The Debtors believe that the Rule 144 exemption will not be available with respect to any 4(a)(2) Securities (whether held by non-affiliates or affiliates) until at least one year after the Effective Date.  Accordingly, unless transferred pursuant to an effective registration statement or another available exemption from the registration requirements of the Securities Act, non-affiliate Holders of 4(a)(2) Securities will be required to hold their 4(a)(2) Securities for at least one year and, thereafter, to sell them only in accordance with the applicable requirements of Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws. It is currently contemplated that the Reorganized Debtors will not be subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act.

Each certificate representing, or issued in exchange for or upon the transfer, sale or assignment of, any 4(a)(2) Security shall, upon issuance, be stamped or otherwise imprinted with a restrictive legend substantially consistent with the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

In addition to the foregoing restrictions, the applicable 4(a)(2) Securities will also be subject to any applicable transfer restrictions contained in the New Corporate Governance Documents.

Reorganized Holdings will reserve the right to require certification or other evidence of compliance with Rule 144 or another available exemption as a condition to the removal of such legend or to any resale of 4(a)(2) Securities or to stop the transfer of 4(a)(2) Securities is such transfer is not in compliance with Rule 144 or another available exemption.

**THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. WE MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE SECURITIES OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT.**

**ANY PERSON WHO RECEIVES SECURITIES UNDER THE PLAN IS URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE FEDERAL OR STATE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, WE ENCOURAGE EACH RECIPIENT OF SECURITIES AND PARTY IN INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS.**

**BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A SECURITY IS EXEMPT FROM THE REGISTRATION REQUIREMENTS UNDER THE FEDERAL OR STATE SECURITIES LAWS OR WHETHER A PARTICULAR RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER, WE MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE SECURITIES ISSUED UNDER THE PLAN.**

### 3.    The Management Incentive Plan

The Confirmation Order shall authorize the Reorganized Holdings Board to adopt and enter into a market-based Management Incentive Plan reserving up to 7.0% of the New Common Shares, with amounts, structure, awards and terms of the Management Incentive Plan to be determined by the New Board. The issuance of New Common Shares, if any, under the Management Incentive Plan would dilute all of the New Common Shares as applicable, issued pursuant to the Plan. The New Common Shares, including New Common Shares issued under the Management Incentive Plan, may be subject to dilution in connection with the conversion of any other options, warrants, convertible securities, or other securities that may be issued post-emergence.

# VIII.   CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

## A.   Introduction

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors, and certain Holders of Claims entitled to vote on the Plan, and it does not address the U.S. federal income tax consequences to Holders of Claims not entitled to vote on the Plan or to any Debtor that ceases to be a member of the Tax Group as a result of the Restructuring Transactions.  This summary is based on the Tax Code, the U.S. Treasury Regulations promulgated thereunder ("**Treasury Regulations**"), judicial decisions, revenue rulings and revenue procedures of the Internal Revenue Service (the "**IRS**"), and other published administrative rules and pronouncements of the IRS, all as in effect on the date hereof (collectively, "**Applicable Tax Law**").  Changes in the Applicable Tax Law or new interpretations of the Applicable Tax Law may have retroactive effect and could significantly affect the U.S. federal income tax consequences described herein.  The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority, or any legal opinion of counsel, with respect to the tax consequences discussed herein.  The discussion below is not binding upon the IRS or the courts, and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address state, local or non-U.S. tax consequences, or any U.S. federal tax consequences (such as consequences under the federal estate tax, the federal gift tax, or the "Medicare" tax on certain net investment income) other than U.S. federal income tax consequences, of the Plan (including such consequences with respect to the Debtors or the Reorganized Debtors).  This summary also does not purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances, nor does it discuss the U.S. federal income tax consequences to certain types of Holders that may be subject to special tax rules (such as persons who are related to the Debtors within the meaning of the Tax Code; persons liable for the alternative minimum tax or base erosion and anti-avoidance tax; U.S. Holders (as defined below) whose functional currency is not the U.S. dollar; U.S. expatriates; broker-dealers; banks; mutual funds; insurance companies; financial institutions; small business investment companies; regulated investment companies; tax-exempt organizations; controlled foreign corporations; passive foreign investment companies; partnerships or other pass-through entities for U.S. federal income tax purposes (and beneficial owners of such entities); persons who will hold Claims, New Common Shares, Takeback HoldCo Notes, Equity Subscription Rights, Debt Subscription Rights, Debt Rights Offering Securities or GUC Trust Interests as part of a straddle, hedge, conversion transaction, or other integrated investment; Holders of Claims with respect to damages on account of personal injury or sickness, punitive damages, or attorneys' fees; persons using a mark-to-market method of accounting; persons who are required to recognize income or gain no later than such income or gain is required to be reported on an applicable financial statement under section 451(b) of the Tax Code; Holders who have previously taken or will take a bad debt deduction (or otherwise take an ordinary loss) with respect to a Claim or the liability giving rise to a Claim; Holders of Existing Holdings Interests; Holders of Disputed Claims; former citizens and residents of the United States; Non-U.S. Holders (as defined below) of General Unsecured Claims; and persons

who are themselves in bankruptcy). This summary also does not address the U.S. federal income tax consequences to Holders of Claims other than 10.5% Secured Notes Claims or General Unsecured Claims. Furthermore, this summary does not address the U.S. federal income tax consequences of the Backstop Agreements and Restructuring Support Agreement (or to the parties thereto in respect of such agreements), or the Exit Notes or the Exit ABL Facility (or loans thereunder) or to the holders thereof, or any aspects thereof or of the DIP Facilities (including any adequate protection provisions).

This summary assumes that a Holder of a Claim, New Common Shares, Takeback HoldCo Notes, Equity Subscription Rights, Debt Subscription Rights, Debt Rights Offering Securities or a GUC Trust Interest holds only Claims in a single Class and holds such Claim, New Common Shares, Takeback HoldCo Notes, Equity Subscription Rights, Debt Subscription Rights, Debt Rights Offering Securities or GUC Trust Interest only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the Claims to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code, and that the Contingent Rights (as defined below) will not be treated in whole or in part as debt or a security for U.S. federal income tax purposes. In addition, this summary assumes that the receipt by a Holder of an Equity Subscription Right or Debt Subscription Right in exchange for a Claim will be treated as the receipt of an option pursuant to a step that is separately identifiable from any subsequent exercise or lapse of such Equity Subscription Right or Debt Subscription Right and that any exercise of an Equity Subscription Right or Debt Subscription Right will be respected as a transaction separate from the other Restructuring Transactions. However, such treatment is not free from doubt. If the IRS were to take a contrary position, and such position were upheld, the U.S. federal income tax consequences to a Holder of the receipt and exercise or lapse of an Equity Subscription Right or Debt Subscription Right (including the amount of gain or loss on such receipt) could be different than as described below. Holders should consult their tax advisors regarding the possibility and consequences of any such alternative treatment.

Furthermore, this summary assumes that the 10.5% Secured Notes are not contingent payment debt instruments and that the terms of the Takeback HoldCo Notes and the Debt Rights Offering Securities (collectively, the "**New Notes**") will not include contingent terms that would cause such New Notes to be subject to special rules governing certain contingent payment debt instruments. If the 10.5% Secured Notes Claims or the New Notes were treated as contingent payment debt instruments, the tax consequences related to the holders of 10.5% Secured Notes Claims and to the receipt and holding of the New Notes could vary significantly from that described below. If the 10.5% Secured Notes or the New Notes were so treated, among other things, holders of 10.5% Secured Notes Claims might be required to characterize any gain or loss upon the exchange pursuant to the Plan in a different manner than as described below, and holders of the New Notes might be required to accrue income at a different rate than described below, and any gain recognized on the sale or other disposition of a New Note would generally be treated as ordinary interest income rather than capital gain. Holders should consult their tax advisors regarding the possible application of the contingent payment debt instrument rules to the New Notes.

For purposes of this discussion, a "**U.S. Holder**" is a beneficial Holder of a Claim or New Common Shares, Takeback HoldCo Notes, Equity Subscription Rights, Debt Subscription Rights, Debt Rights Offering Securities or a GUC Trust Interest acquired pursuant to the Plan that in each case, for U.S. federal income tax purposes, is:  (1) an individual citizen or resident of the United States; (2) a corporation (or other entity treated as a corporation) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the Tax Code) have authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.  For purposes of this discussion, a "**Non-U.S. Holder**" is any beneficial Holder of a Claim or New Common Shares, Takeback HoldCo Notes, Equity Subscription Rights, Debt Subscription Rights, Debt Rights Offering Securities or a GUC Trust Interest acquired pursuant to the Plan that, in each case, is an individual, corporation, estate or trust and is not a U.S. Holder.

If a partnership (or other entity or arrangement treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, New Common Shares, Takeback HoldCo Notes, Equity Subscription Rights, Debt Subscription Rights, Debt Rights Offering Securities or a GUC Trust Interest, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the entity.  Partners (or other beneficial owners) of partnerships (or other entities treated as partnerships or other pass-through entities for U.S. federal income tax purposes) that are Holders of a Claim, New Common Shares, Takeback HoldCo Notes, Equity Subscription Rights, Debt Subscription Rights, Debt Rights Offering Securities or a GUC Trust Interest are urged to consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS INTENDED FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM, NEW COMMON SHARES, TAKEBACK HOLDCO NOTES, EQUITY SUBSCRIPTION RIGHTS, DEBT SUBSCRIPTION RIGHTS, DEBT RIGHTS OFFERING SECURITIES OR A GUC TRUST INTEREST.  ALL HOLDERS OF A CLAIM, NEW COMMON SHARES, TAKEBACK HOLDCO NOTES, EQUITY SUBSCRIPTION RIGHTS, DEBT SUBSCRIPTION RIGHTS, DEBT RIGHTS OFFERING SECURITIES OR A GUC TRUST INTEREST ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN BASED ON THEIR PARTICULAR CIRCUMSTANCES.**

**B.    Certain U.S. Federal Income Tax Consequences to the Debtors and Reorganized Debtors**

     **1.    Effects of Restructuring on the Debtors**

     (i)    **Cancellation of Debt and Reduction of Tax Attributes**

For U.S. federal income tax purposes, Holdings is the common parent of an affiliated group of companies that files a single consolidated U.S. federal income tax return (the "**Tax Group**"), of which the other Debtors are members or are disregarded entities, directly or indirectly, wholly owned by a member of the Tax Group.  In general, absent an exception, the Tax Group will realize and recognize cancellation of indebtedness income ("**COD Income**") upon satisfaction of their outstanding indebtedness for total consideration less than the amount of such indebtedness.  In particular, the amount of COD Income realized by the Tax Group with respect to the satisfaction of the 10.5% Secured Notes Claims is expected to be the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of Cash, (ii) the issue price (or, depending on the particular manner in which the distributions are structured, as will be set forth in the Restructuring Transactions Memorandum, and treated for U.S. federal income tax purposes (the "**Transaction Structure**"), fair market value) of the Takeback HoldCo Notes (as discussed under Section C below), and (iii) the fair market value of the New Common Shares and other consideration (including Equity Subscription Rights and Debt Subscription Rights), in each case, given in satisfaction of such indebtedness at the time of the exchange.  In certain circumstances, the Tax Group also may realize and recognize COD Income upon a modification of a debt instrument if the modification is a "significant modification" for U.S. federal income tax purposes.

Under section 108 of the Tax Code, the Tax Group will not, however, be required to include any amount of COD Income in gross income if the Debtors are under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, the Tax Group must reduce certain tax attributes by the amount of COD Income that they excluded from gross income pursuant to section 108 of the Tax Code.  Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined.  In general, tax attributes will be reduced in the following order: (a) U.S. federal income tax net operating losses ("**NOLs**") and NOL carryforwards; (b) U.S. federal income tax general business credit carryovers; (c) U.S. federal income tax capital loss carryovers; (d) U.S. federal income tax basis in assets (but not below the amount of liabilities to which the Reorganized Debtors will remain subject immediately after the discharge); (e) U.S. federal income tax passive activity loss and credit carryovers; and (f) foreign tax credit carryovers for U.S. federal income tax purposes.  Alternatively, the Tax Group may elect first to reduce the basis of their depreciable assets pursuant to section 108(b)(5) of the Tax Code.  In the absence of contrary guidance, business interest expense carryforwards under section 163(j) of the Tax Code ("**163(j) Deductions**") should not be subject to reduction under these rules.  Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

In connection with the Restructuring Transactions, the Tax Group expects to realize COD Income; however, the exact amount of any COD Income that will be realized by the Tax Group

will not be determinable until the consummation of the Plan. In addition, depending on the Transaction Structure, it is possible that the Tax Group could be treated as recognizing (in addition to COD Income) gain with respect to the extinguishment of the 10.5% Secured Notes Claims or the Takeback HoldCo Notes and/or Debt Subscription Rights distributed pursuant to the Plan. Regardless of the Transaction Structure, however, the Debtors expect that the amount of such COD Income (and gain, if applicable) will reduce some of their Tax Attributes (as defined below) pursuant to section 108 of the Tax Code. Depending on the amount of COD Income, some or all of the Debtors' tax basis in their assets may be reduced by COD Income that is not absorbed by the reduction of their Tax Attributes.

In the event that a Debtor ceases to be a member of the Tax Group as a result of the Restructuring Transactions, the Tax Attributes (as defined below) generally would be reallocated among members of the group.

(ii)      **Limitation on NOLs, 163(j) Deductions, and Other Tax Attributes**

As of the Petition Date, the Debtors estimate that the Tax Group had approximately $337 million of NOL carryforwards, $291 million of 163(j) Deductions and $3 million of research credit carryforwards (collectively, the "**Tax Attributes**"). The Debtors may generate additional tax attributes prior to the Effective Date. Any NOLs remaining upon implementation of the Plan may be able to offset future taxable income for up to 20 years in the case of NOLs arising before 2018 and indefinitely for NOLs arising in taxable years starting in 2018, thereby reducing the Debtors' future aggregate tax obligations. For taxable years beginning after 2020, NOLs arising in taxable years beginning before 2018 generally may offset 100% of taxable income in a given year, and NOLs arising in taxable years beginning after 2017 generally may be used to offset 80% of taxable income in a given year.    As discussed above, however, the Tax Attributes (other than the 163(j) Deductions) are expected to be reduced (or possibly eliminated) upon implementation of the Plan. Moreover, the Tax Attributes are subject to audit and possible challenge by the IRS. Accordingly, the amount of the Tax Attributes ultimately may vary from the amounts set forth above.

After giving effect to the reduction in Tax Attributes pursuant to excluded COD Income described above, the Reorganized Debtors' ability to use any Tax Attributes remaining after the Effective Date also are expected to be subject to certain limitations under sections 382 and 383 of the Tax Code. Under sections 382 and 383 of the Tax Code, if a corporation undergoes an "ownership change," the amounts of any remaining NOL carryforwards, tax credit carryforwards, 163(j) Deductions, and possibly certain other attributes (potentially including losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change) of the corporation allocable to periods on or prior to the date of the ownership change (collectively, "**Pre-Change Losses**") that may be utilized to offset future taxable income generally are subject to an annual limitation. For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will

be deemed to be zero unless it is greater than the lesser of (a) $10 million, or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

The rules of section 382 of the Tax Code are complicated, but as a general matter, the Debtors anticipate that the issuance of New Common Shares pursuant to the Plan will result in an "ownership change" of the Debtors for these purposes, and that the Reorganized Debtors' use of any Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the Tax Code applies.

### (a)      General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments), and (ii) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the ownership change occurs, currently 2.54 percent for September 2022).  The annual limitation may be increased to the extent that the Reorganized Debtors have a net unrealized built-in gain at the time of the ownership change and recognize certain built-in gains in their assets during the five-year period following the ownership change or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65.  In general, a corporation's (or consolidated group's) net unrealized built-in gain will be deemed to be zero unless it is greater than the lesser of (a) $10 million, or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.  Should a corporation be in a net unrealized built-in gain position at the time of an ownership change, proposed Treasury Regulations issued on September 10, 2019, and on January 14, 2020, under section 382(h) of the Tax Code (the "**Proposed Regulations**") would, if finalized in their present form, change the currently existing rules and limit the potential increases to the annual limitation amount for certain built-in gains existing at the time of an ownership change (unless the transition relief provisions of the Proposed Regulations are applicable), thereby possibly reducing the ability to utilize tax attributes. Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits.  Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.  As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

### (b)      Special Bankruptcy Exceptions

Special rules may apply in the case of a corporation that experiences an "ownership change" as a result of a bankruptcy proceeding.  An exception to the foregoing annual limitation rules generally applies under section 382(l)(5) of the Tax Code when the shareholder and so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their shares or claims, at least 50 percent of the vote and value of the stock of the debtor corporation (or a controlling corporation if also in chapter 11) as reorganized pursuant to a confirmed chapter 11 plan (the "**382(l)(5) Exception**").  If the 382(l)(5) Exception applies, a debtor's Pre-Change Losses would not be limited on an annual basis, but NOL carryforwards and 163(j) Deductions would be reduced by the amount of any interest deductions allowable in respect of debt

converted into stock pursuant to the chapter 11 plan of reorganization during the three taxable years preceding the effective date of the plan of reorganization and during the part of the taxable year prior to and including the effective date of the plan of reorganization. If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses thereafter would be effectively eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor corporation does not qualify for it or the debtor corporation otherwise elects not to utilize the 382(l)(5) Exception), another exception will generally apply under section 382(l)(6) of the Tax Code (the "**382(l)(6) Exception**"). Under the 382(l)(6) Exception, the annual limitation generally should be calculated by reference to the lesser of (i) the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or (ii) the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change, although there is some uncertainty as to how to apply this rule in the context of a consolidated group. The 382(l)(6) Exception differs from the 382(l)(5) Exception in that, under the 382(l)(6) Exception, a debtor corporation is not required to reduce its NOL carryforwards and 163(j) Deductions by the amount of certain interest deductions as described above, and a debtor corporation may undergo a subsequent change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses. The limitation resulting from such subsequent change of ownership would be determined under the regular rules for ownership changes.

The Debtors have not determined whether the 382(l)(5) Exception will be available or, if it is available, whether the Reorganized Debtors will elect out of its application. The Plan is not premised on the application of such exception.

## 2.    Treatment of the GUC Trust and GUC Trust Claims Reserve

Pursuant to the Plan, the GUC Trust will be established on behalf of and for the benefit of the Holders of the Allowed General Unsecured Claims. While the treatment of the GUC Trust for U.S. federal income tax purposes is not entirely clear, the GUC Trust (other than assets set aside in escrow to fund the GUC Trust Claims Reserve) is intended to be treated as a liquidating trust within the meaning of Treasury Regulations section 301.7701-4(d), which is not a separate taxable entity, but rather is treated for U.S. federal income tax purposes as a "grantor trust" (*i.e.*, a pass-through entity). *See* Section C.2. below for a discussion of the U.S. federal income tax consequences of the GUC Trust to Holders of Allowed General Unsecured Claims.

The Debtors intend to treat the transfer of assets by the Debtors to the GUC Trust (other than the assets contributed to the GUC Trust Claims Reserve) as (1) a transfer to the Holders of Allowed General Unsecured Claims receiving GUC Trust Interests of their proportionate interests in the GUC Trust's assets in full satisfaction of such Holder's Allowed General Unsecured Claim, followed by (2) the transfer by such Holders to the GUC Trust of such assets in exchange for their beneficial interests in the GUC Trust.

The GUC Trustee will file tax returns for the GUC Trust treating the GUC Trust as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations. The GUC Trust also

will annually send to each holder of GUC Trust Interests a separate statement regarding the receipts and expenditures of the GUC Trust as relevant for U.S. federal income tax purposes.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the GUC Trustee of a private letter ruling if the GUC Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the GUC Trustee), allocations of GUC Trust taxable income or loss shall be allocated by reference to the manner in which any economic gain or loss would be borne immediately after a hypothetical liquidating distribution of the remaining GUC Trust Assets. The tax book value of the GUC Trust Assets for purpose of this paragraph shall equal their fair market value on the date the GUC Trust Assets are transferred to the GUC Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including an adverse determination by the IRS upon audit if not contested by the GUC Trustee), the GUC Trustee intends to (A) timely elect to treat any GUC Trust Claims Reserve as a "disputed ownership fund" governed by Treasury Regulations section 1.468B-9 (which is generally subject to U.S. federal income taxes annually on a separate entity basis, including potentially with respect to payments pursuant to the Contingent Rights allocated to the GUC Trust Claims Reserve), and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. Any entity-level taxes incurred by the GUC Trust Claims Reserve are expected to be paid out of the GUC Trust Assets. All distributions from such GUC Trust Claims Reserve assets (which distributions will be net of the expenses, including taxes, relating to the retention or actual or deemed disposition of such assets) will be treated as received by Holders in respect of their General Unsecured Claims as if distributed directly by the Debtors on their Allowed Claims.

All parties (including the GUC Trustee, the Debtors, and the GUC Trust Beneficiaries) are intended to report for U.S. federal, state and local income tax purposes consistently with the foregoing.

If the treatment of the GUC Trust (including the GUC Trust Claims Reserve) as described above is not respected for U.S. federal income tax purposes, it is possible that the GUC Trust would be subject to U.S. federal income taxation at the entity level. The remainder of this discussion assumes that the treatment described above is respected.

### C.    Certain U.S. Federal Income Tax Consequences to the U.S. Holders of 10.5% Secured Notes Claims and General Unsecured Claims

The following discussion of U.S. federal income tax consequences applies only to U.S. Holders of 10.5% Secured Notes Claims and General Unsecured Claims and assumes that the Debtors will undertake the Restructuring Transactions contemplated by the Plan (including the Plan Supplement). Holders of Claims are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

1.    **U.S. Federal Income Tax Consequences to U.S. Holders of 10.5%**
(i)    **Exchange of 10.5% Secured Notes Claim for Cash, New Common Shares, Takeback HoldCo Notes, Equity Subscription Rights and Debt Subscription Rights**

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of 10.5% Secured Notes Claims, each Holder thereof will receive (i) Cash in an amount equal to its Pro Rata share of $350 million *plus* all unrestricted Cash held by the Debtors on the Effective Date in excess of $50 million (subject to applicable adjustments), (ii) New Common Shares, (iii) Takeback HoldCo Notes, (iii) Equity Subscription Rights and (iv) Debt Subscription Rights.

While not free from doubt, and subject to the Transaction Structure, the Company currently intends for the distributions under the Plan to U.S. Holders in satisfaction of their 10.5% Secured Notes Claims to be treated as a fully taxable exchange to such U.S. Holders for U.S. federal income tax purposes, and the remainder of this discussion assumes such treatment. However, it is possible that the 10.5% Secured Notes Claims could be treated as having been contributed to the Reorganized Debtors pursuant to a generally nontaxable transaction (including, for instance, in a transaction to which section 351(a) of the Tax Code applies) in which the U.S. Holders would recognize gain only to the extent of the non-equity consideration received by them, and would not be entitled to claim any losses.  U.S. Holders are urged to consult their own tax advisors regarding the tax treatment of such exchange.

Other than with respect to any amounts received that are attributable to accrued interest (as described below), a U.S. Holder should recognize gain or loss on satisfaction of its 10.5% Secured Notes Claim in an amount equal to the difference, if any, between (a) the sum of (1) Cash, (2) the fair market value of the New Common Shares, Equity Subscription Rights and Debt Subscription Rights and (3) the issue price (or, depending on the Transaction Structure, fair market value)  of the Takeback HoldCo Notes, in each case received in satisfaction of such 10.5% Secured Notes Claim, and (b) the U.S. Holder's adjusted tax basis in its 10.5% Secured Notes Claim.  The character of such gain as capital gain or ordinary income will be determined by a number of factors including the tax status of the U.S. Holder and the rules regarding "market discount" (as discussed below) and accrued interest.  If recognized gain or loss is capital in nature, it generally would be long-term capital gain or loss if the U.S. Holder held its Claim for more than one year at the time of the exchange.  The holding period for the New Common Shares, Equity Subscription Rights, Debt Subscription Rights and Takeback HoldCo Notes received should begin on the day following the Effective Date.  The U.S. Holder generally should obtain a tax basis in the non-Cash consideration received equal to the fair market value of such property (or, depending on the Transaction Structure, issue price in the case of the Takeback HoldCo Notes).

In the event that, as a result of the ultimate Transaction Structure or a contrary position taken by the IRS, the exchange is generally a nontaxable transaction as described above, a U.S. Holder (1) should not recognize any loss on the satisfaction of its 10.5% Secured Notes Claim, (2) should recognize gain on the satisfaction of its 10.5% Secured Notes Claim to the extent of the Cash and the fair market value of the Equity Subscription Rights, Debt Subscription Rights and the Takeback HoldCo Notes received, (3) should have a tax basis in its New Common Shares equal to the adjusted tax basis in its 10.5% Secured Notes Claim exchanged decreased by

the sum of the Cash and the fair market value of the Equity Subscription Rights, Debt Subscription Rights and Takeback HoldCo Notes received, and increased by the amount of gain recognized in the exchange, and (4) should have a holding period for the New Common Shares that includes its holding period for the 10.5% Secured Notes Claim exchanged. The holding period for the Equity Subscription Rights, Debt Subscription Rights and Takeback HoldCo Notes received should begin on the day following the Effective Date, and such property generally should have a tax basis equal to the fair market value of the property.

(ii)     **The New Notes**

The discussion below is a general discussion of certain U.S. federal income tax consequences currently expected with respect to the holding and disposition of the New Notes. It is currently expected that the New Notes and the Debt Direct Allocation Securities will generally all be issued (to persons other than a bond house, broker, or similar person or organization acting in the capacity of an underwriter, placement agent, or wholesaler) within a period of thirteen days beginning on the Effective Date or otherwise be treated under applicable Treasury Regulations as part of the same issue, and, as a result, such New Notes and the Debt Direct Allocation Securities will have the same "issue price" (as described below) for U.S. federal income tax purposes. To the extent any New Notes or the Debt Direct Allocation Securities are not issued within a period of thirteen days beginning on the Effective Date and certain other conditions are not satisfied, then such New Notes and Debt Direct Allocation Securities may have a different issue price and may not all be fungible for U.S. federal income tax purposes with the New Notes and Debt Direct Allocation Securities issued as of the Effective Date. The discussion below is limited to New Notes (and, where explicitly indicated, Debt Direct Allocation Securities) issued (to persons other than a bond house, broker, or similar person or organization acting in the capacity of an underwriter, placement agent, or wholesaler) within a period of thirteen days beginning on the Effective Date.

*Issue Price*

The Debtors anticipate that a substantial amount of the New Notes and/or Debt Direct Allocation Securities will be issued (or deemed issued) for Cash (other than to bond houses, brokers, or similar persons or organizations acting in the capacity of underwriters, placement agents, or wholesalers) for purposes of the determination of issue price under applicable Treasury Regulations and therefore that the issue price of the New Notes and Debt Direct Allocation Securities would be the first price (including any applicable deemed payments) at which a substantial amount of the New Notes and/or Debt Direct Allocation Securities is sold (or deemed sold) for Cash (other than to bond houses, brokers, or similar persons or organizations acting in the capacity of underwriters, placement agents, or wholesalers).

*Original Issue Discount*

The New Notes will be treated as issued with original issue discount ("**OID**") for U.S. federal income tax purposes if the "stated redemption price at maturity" of the New Notes exceeds their "issue price" (*see* "*—Issue Price*" above) by an amount equal to or more than a statutorily defined de minimis amount (generally, 0.0025 multiplied by the product of the stated redemption price at maturity and the number of complete years to maturity). The "stated

redemption price at maturity" of the New Notes is the total of all payments to be made under the New Notes other than "qualified stated interest" (generally, interest that is unconditionally payable in Cash or in property (other than debt instruments of the issuer), or that will be constructively received under certain specified rules, at least annually at a single fixed rate). Interest on the New Notes is payable in-kind by additional debt instruments bearing the same interest rate and maturity date as the original New Notes. Paid-in-kind interest is not considered a payment on the original debt instrument for these purposes and is instead aggregated with the original debt instrument. Therefore, the New Notes are currently expected to be issued with OID.

U.S. Holders are required to include OID in ordinary income on an annual basis under a constant yield accrual method regardless of such U.S. Holder's regular method of accounting for U.S. federal income tax purposes, subject to reduction in the case of any premium, as discussed below. A U.S. Holder must include in income in each taxable year the sum of the daily portions of OID for each day on which it held a New Note during the taxable year. To determine the daily portions of OID, the amount of OID allocable to an accrual period is determined, and a ratable portion of such OID is allocated to each day in the accrual period. An accrual period may be of any length and the length of the accrual periods may vary over the life of the New Notes, provided that no accrual period may be longer than one year and each scheduled payment of interest or principal on the New Notes must occur on either the first day or last day of an accrual period. The amount of OID allocable to an accrual period will equal (A) the product of (i) the New Notes' adjusted issue price at the beginning of the accrual period and (ii) the New Notes' yield to maturity (adjusted to reflect the length of the accrual period), less (B) any qualified stated interest allocable to the accrual period. It is not currently expected that there will be any qualified stated interest on the New Notes.

A New Note's adjusted issue price at any time generally will be its original issue price, increased by the amount of OID on such New Note accrued for each prior accrual period and decreased by the amount of payments on such New Note other than payments of qualified stated interest. A New Note's yield to maturity is the discount rate that, when used in computing the present value of all principal and interest payments to be made on the New Note, produces an amount equal to the New Note's original issue price.

*Market Discount*

A Takeback HoldCo Note received by a U.S. Holder in exchange for a 10.5% Secured Notes Claim or a Debt Rights Offering Security received by a U.S. Holder upon exercise of a Debt Subscription Right generally is expected to be considered to have been acquired with market discount if the issue price of such New Note exceeds the U.S. Holder's initial tax basis in the New Note immediately after its acquisition by the U.S. Holder by at least a statutory *de minimis* amount (generally equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity). Market discount will be considered to accrue ratably during the period from the date of the U.S. Holder's acquisition of the New Note to the maturity date of the New Note, unless the U.S. Holder has made an election to accrue market discount on a constant yield basis.

U.S. Holders should consult their tax advisors regarding the applicability and impact of market discount for U.S. federal income tax purposes.

*Amortizable Bond Premium and Acquisition Premium*

If a U.S. Holder's initial tax basis in a New Note exceeds such New Note's stated redemption price at maturity, the New Note will be treated as acquired by such U.S. Holder with amortizable bond premium.  In such case, the U.S. Holder will not be required to accrue any OID on such New Note.  Generally, a U.S. Holder may elect to amortize such bond premium (or, if it results in a smaller premium, an amount computed with reference to the amount payable on an earlier call date) as an offset to Cash interest income in respect of a New Note, using a constant yield method as prescribed under the applicable Treasury Regulations, over the remaining term of the New Note.  A U.S. Holder that elects or has elected to amortize bond premium must reduce its basis in a New Note by the amount of premium used to offset Cash interest.  However, it is not currently expected that the New Notes will pay Cash interest until maturity.  An election to amortize bond premium, once made, applies to all debt instruments held or subsequently acquired by the U.S. Holder on or after the first day of the first taxable year to which the election applied and may not be revoked without the consent of the IRS.

If a U.S. Holder's initial tax basis in a New Note exceeds the issue price of such New Note but is less than such New Note's stated redemption price at maturity ("**acquisition premium**"), the U.S. Holder may reduce the OID accrual on such New Note by a portion of such acquisition premium.

U.S. Holders should consult their tax advisors regarding the availability and impact of amortizable bond premium and acquisition premium for U.S. federal income tax purposes.

*Sale, Retirement or Other Taxable Disposition*

A U.S. Holder of a New Note will recognize gain or loss upon the sale, redemption, retirement or other taxable disposition of the New Note equal to the difference between the amount realized upon the disposition (less a portion allocable to any accrued interest that has not yet been included in income by the U.S. Holder, which generally will be taxable as ordinary income) and the U.S. Holder's adjusted tax basis in the New Note.  In general, a U.S. Holder's adjusted tax basis in a New HoldCo Note will be its initial tax basis in the New Note, increased by any accrued OID previously included in the U.S. Holder's income with respect to the New Note and by market discount (discussed above), if any, previously included in the U.S. Holder's income with respect to the New Note (pursuant to an election to include market discount in income currently as it accrues), and reduced (but not below zero) by any amortizable bond premium with respect to the New Note that an electing U.S. Holder has previously amortized.  Any gain or loss on the sale, redemption, retirement or other taxable disposition of the New Note generally will be capital gain or loss, and will be long-term capital gain or loss if the U.S. Holder has held the New Note for more than one year as of the date of disposition, except that any such gain will be treated as ordinary income to the extent of any accrued market discount carried over from the 10.5% Secured Notes and any market discount accrued on the 10.5% Secured Notes. The deductibility of capital losses is subject to limitations.

(iii)    **Equity Subscription Rights**

A U.S. Holder that exercises Equity Subscription Rights received pursuant to the Plan should be treated as receiving, in exchange for the value at issuance of such Equity Subscription Rights and the amount of Cash funded by the U.S. Holder to exercise such Equity Subscription Rights, the Equity Rights Offering Securities.  Such a transaction should generally be treated as the exercise of an option under general tax principles, and accordingly such U.S. Holder should not recognize income, gain, or loss for U.S. federal income tax purposes upon such exercise.  A U.S. Holder's aggregate tax basis in the Equity Rights Offering Securities should equal the sum of (1) the amount of Cash paid by the U.S. Holder to exercise its Equity Subscription Rights and (2) such U.S. Holder's tax basis in the Equity Subscription Rights immediately before exercise, determined as set forth above.  While not free from doubt, a U.S. Holder's holding period for the Equity Rights Offering Securities received should begin on the day following the exercise.   U.S. Holders should consult their tax advisors regarding the tax consequences of exercising Equity Subscription Rights, including the appropriate holding period for the Equity Rights Offering Securities and alternative characterizations of the exercise of the Equity Subscription Rights.

A U.S. Holder that elects not to exercise its Equity Subscription Rights may be entitled to claim a capital loss equal to the amount of tax basis allocated to the Equity Subscription Rights. The deductibility of capital losses is subject to certain limitations.

(iv)    **Debt Subscription Rights**

A U.S. Holder that exercises Debt Subscription Rights received pursuant to the Plan should be treated as purchasing, in exchange for the value at issuance of such Debt Subscription Rights and the amount of Cash funded by the U.S. Holder to exercise such Debt Subscription Rights, the Debt Rights Offering Securities.  Such a purchase should generally be treated as the exercise of an option under general tax principles, and accordingly such U.S. Holder should not recognize income, gain, or loss for U.S. federal income tax purposes upon such exercise.  A U.S. Holder's aggregate tax basis in the Debt Rights Offering Securities should equal the sum of (1) the amount of Cash paid by the U.S. Holder to exercise its Debt Subscription Rights and (2) such U.S. Holder's tax basis in the Debt Subscription Rights immediately before exercise, determined as set forth above.  While not free from doubt, a U.S. Holder's holding period for the Debt Rights Offering Securities received should begin on the day following the exercise.  U.S. Holders should consult their tax advisors regarding the tax consequences of exercising Debt Subscription Rights, including the appropriate holding period for the Debt Rights Offering Securities and alternative characterizations of the exercise of the Debt Subscription Rights.

A U.S. Holder that elects not to exercise its Debt Subscription Rights may be entitled to claim a capital loss equal to the amount of tax basis allocated to the Debt Subscription Rights. The deductibility of capital losses is subject to certain limitations.

(v)    **New Common Shares**

*Distributions on New Common Shares*

Any distributions made on the New Common Shares will constitute dividends for U.S. federal income tax purposes to the extent of applicable current or accumulated earnings and profits as determined under U.S. federal income tax principles.  To the extent that a U.S. Holder

receives distributions on the New Common Shares that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares of the New Common Shares (but not below zero). Any such distributions in excess of the U.S. Holder's basis generally will be treated as capital gain. Any such dividend may be eligible for the dividends-received deduction if the U.S. Holder is an otherwise qualifying corporate U.S. Holder and certain conditions are met. Dividends received by non-corporate U.S. Holders may be subject to U.S. federal income tax at lower rates than other types of ordinary income if certain conditions are met. U.S. Holders should consult their own tax advisors regarding their qualification for the dividends-received deduction and the lower rates on dividends.

*Sale, Redemption, or Repurchase of New Common Shares*

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the New Common Shares. Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder held the New Common Shares for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations.

## 2.    U.S. Federal Income Tax Consequences to U.S. Holders of General Unsecured Claims

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of General Unsecured Claims, in the event the Holders of such claims vote to accept the Plan, each Holder thereof will receive a GUC Trust Interest, which shall entitle each holder of an Allowed Unsecured Claim to receive its Pro Rata share of the GUC Trust Assets after the GUC Trust Expenses have been paid in full or otherwise reserved. As described above, the GUC Trust is intended to be treated as a liquidating trust within the meaning of Treasury Regulations section 301.7701-4(d). Therefore, each U.S. Holder of a General Unsecured Claim should be treated for U.S. federal income tax purposes as receiving pursuant to the Plan (i) its Pro Rata share of $5.0 million in Cash (such Holder's "**Closing Amount**") and (ii) its Pro Rata share of an additional $5.0 million in Cash, payable within a to-be-specified period of time after, and in the event that, the Reorganized Debtors' 2024 Adjusted EBITDA exceeds $250 million (any contingent right to payment under clause (i) or (ii) after the initial distribution of Cash, the "**Contingent Right**"). In addition, U.S. Holders of the GUC Trust Interests will be treated as owning an applicable portion of the GUC Trust Assets for U.S. federal income tax purposes and generally will be allocated any items of income, gain, loss or deduction attributable to such portion (other than to the extent allocable to Disputed General Unsecured Claims). In the event the Holders of General Unsecured Claims vote to reject the Plan, each General Unsecured Claim will be extinguished and entitled to no recovery.

The U.S. federal income tax obligations of a holder with respect to its GUC Trust Interests are not dependent on the GUC Trust distributing any Cash or other proceeds. Thus, a holder may incur a U.S. federal income tax liability with respect to its allocable share of GUC Trust income even if the GUC Trust does not make a concurrent distribution to the holder. In general, other than in respect of Cash retained on account of Disputed General Unsecured Claims

and distributions resulting from undeliverable distributions (the subsequent distribution of which still relates to a holder's Allowed Claim), a distribution of Cash by the GUC Trust will not be separately taxable to a holder of GUC Trust interests since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the Cash was earned or received by the GUC Trust).

Taxable income or loss allocated to a holder of GUC Trust Interests (other than with respect to the initial contribution of the GUC Trust Assets, distributions from the GUC Trust Claims Reserve, distributions resulting from undeliverable distributions, and any payments pursuant to the Contingent Right, the tax treatment of which is described in more detail below) generally will be treated as income or loss with respect to such holder's undivided interest in the underlying assets of the trust, and not as income or loss with respect to its prior Allowed Claim. The character of any income and the character and ability to use any loss will depend on the particular situation of the holder.

If the Holders of the General Unsecured Claims vote to reject the Plan, then, generally, a U.S. Holder may be entitled to claim a loss or deduction to the extent of its adjusted basis in the General Unsecured Claim. Such loss may be subject to limitation, and U.S. Holders of General Unsecured Claims are urged to consult their own tax advisors regarding the consequences to them in the event that the General Unsecured Claims are extinguished and receive no recovery. The remainder of this discussion assumes that the Holders of the General Unsecured Claims vote to accept the Plan.

The receipt of the Closing Amount and the Contingent Right by a U.S. Holder of a General Unsecured Claim pursuant to the Plan generally will be a taxable transaction for U.S. federal income tax purposes, except that such payments under the Plan to a U.S. Holder with respect to damages on account of personal physical injuries or physical sickness generally will not be includable in such U.S. Holder's gross income pursuant to section 104 of the Tax Code, and certain other exceptions may apply depending on the particular circumstances of the U.S. Holder and the nature of the General Unsecured Claim. The amount of gain or loss a U.S. Holder recognizes, and the timing and potential character of a portion of such gain or loss, depends on the U.S. federal income tax treatment of the Contingent Right, which is subject to uncertainty, and whether a U.S. Holder is eligible to report any gain under the installment sale rules. The availability of installment sale treatment with respect to any gain on the exchange of a General Unsecured Claim is also uncertain and may depend on the nature of the particular General Unsecured Claim.

In addition, in the event of the subsequent disallowance of any Disputed General Unsecured Claim, it is possible that a Holder of a previously Allowed General Unsecured Claim may receive additional distributions in respect of its Claim. Distributions from the GUC Trust Claims Reserve should generally be treated for U.S. federal income tax purposes as additional payments in satisfaction of applicable Allowed General Unsecured Claims, except that a portion of such distributions may be treated as interest income under the imputed interest provisions of the Tax Code. Accordingly, it is possible that the recognition of any loss realized by a Holder with respect to an Allowed General Unsecured Claim may be deferred until all General Unsecured Claims are allowed or disallowed. Alternatively, it is possible that a Holder will have additional gain in respect of any additional distributions received in respect of its Allowed

General Unsecured Claim.  Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of any subsequent distributions of Cash originally retained by the GUC Trust on account of Disputed General Unsecured Claims.  See also Section B.2 above ("—Treatment of the GUC Trust and GUC Trust Claims Reserve").

Installment sale treatment with respect to the satisfaction of a General Unsecured Gain would generally result in the recognition of gain to a U.S. Holder as amounts (including the Closing Amount) are paid.  Special rules apply to installment sales in which the total amount to be realized is contingent and some of these rules may, in certain circumstances, provide for disadvantageous recovery of a Holder's basis.  A portion of amounts paid after one year generally will be treated as imputed interested, and additional interest charges could apply in certain circumstances.  If installment sale treatment were available to a U.S. Holder, such treatment would apply unless such U.S. Holder affirmatively elected out of such treatment.  The discussion below assumes that installment sale treatment is not applicable or a U.S. Holder affirmatively elects for installment sale treatment not to apply.

The receipt of the Contingent Right may be treated as a "closed transaction" (as described below) if the fair market value of the Contingent Right is reasonably ascertainable or as an "open transaction" (as described below) if the fair market value of the Contingent Right cannot be reasonably ascertained.  It is possible that a trading value of an applicable Claim would be considered along with other factors in determining whether the value of the Contingent Right is reasonably ascertainable.  Additionally, Treasury Regulations state that only in "rare and extraordinary" cases would the value of contingent payment obligations not be reasonably ascertainable.  Because the Plan requires the GUC Trustee to determine the fair market value of the portion of the GUC Trust Assets that is treated for U.S. federal income tax purposes as having been transferred to each GUC Trust Beneficiary (and that all applicable parties utilize such fair market value for all U.S. federal income tax purposes), while not free from doubt, it is expected that the receipt of the Contingent Right will be treated as a closed transaction.

Each U.S. Holder should consult its tax advisor regarding the availability and application of the installment sale method, the ability to elect out of the installment method, whether the exchange of a General Unsecured Claim for the Closing Amount and the Contingent Right should be treated as an "open transaction" or "closed transaction," and the consequences of each such treatment.

*Treatment as Closed Transaction*

If the receipt of the Contingent Right is treated as part of a closed transaction for U.S. federal income tax purposes, other than with respect to any amounts received that are attributable to accrued interest (as described below), such U.S. Holder generally would recognize gain or loss from the satisfaction of a General Unsecured Claim in an amount equal to the difference between (1) the sum of the fair market value of the Contingent Right and the Closing Amount received for such General Unsecured Claim and (2) the U.S. Holder's basis in the General Unsecured Claim.  A U.S. Holder's initial tax basis in the Contingent Right received pursuant to the Plan would equal the fair market value of such Contingent Right as determined for U.S. federal income tax purposes.  The character of such gain as capital gain or ordinary income will be determined by a number of factors including the tax status of the U.S. Holder and the rules

regarding "market discount" (as discussed below) and accrued interest. If recognized gain or loss is capital in nature, it generally would be long-term capital gain or loss if the U.S. Holder held its Claim for more than one year at the time of the disposition. The deductibility of capital losses is subject to certain limitations.

The amount, timing and character of any gain, income or loss with respect to payments of cash pursuant to the Contingent Right following the Effective Date would be uncertain. For example, amounts received in respect of the Contingent Right could be treated in whole or in part as payments with respect to a sale or exchange of a capital asset or as giving rise to ordinary income. In addition, it is unclear how a U.S. Holder would recover its adjusted tax basis with respect to the Contingent Right. It is also possible that, were a payment to be treated as being with respect to the sale of a capital asset, a portion of such payment would constitute imputed interest (as described below under "—*Treatment as Open Transaction*").

*Treatment as Open Transaction*

If the receipt of a Contingent Right is treated as an "open transaction" for U.S. federal income tax purposes, the Contingent Right would not result in additional gain to a U.S. Holder at the time the Contingent Right is received pursuant to the Plan, and the U.S. Holder would have no tax basis in the Contingent Right. Consequently, upon receipt of the Closing Amount and the Contingent Right in satisfaction of a General Unsecured Claim, other than with respect to any amounts received that are attributable to accrued interest (as described below), a U.S. Holder would generally recognize gain, but not loss, in an amount equal to the excess (if any) of (a) the Closing Amount for such General Unsecured Claim over (b) the U.S. Holder's adjusted tax basis in the General Unsecured Claim.

The U.S. Holder would then take payments pursuant to the Contingent Right into account when made or deemed made in accordance with the U.S. Holder's regular method of accounting for U.S. federal income tax purposes. A portion of any payments made more than one year after the Effective Date should be treated as interest income (as discussed below) and the balance, in general, as additional consideration for the disposition of the General Unsecured Claim.

Payments of cash pursuant to the Contingent Right that are not treated as imputed interest will generally result in gain to the U.S. Holder if, and to the extent, such amounts (plus the Closing Amount for such General Unsecured Claim) exceed the U.S. Holder's adjusted tax basis in the General Unsecured Claim. A U.S. Holder may recognize loss if the amounts received with respect to a General Unsecured Claim (including the Closing Amount) do not in the aggregate equal or exceed the U.S. Holder's adjusted basis in the General Unsecured Claim, although the U.S. Holder generally will not be able to recognize such loss until the resolution of all contingencies with respect to the Contingent Right or possibly until such U.S. Holder's abandonment of the Contingent Right.

The character of such gain as capital gain or ordinary income will be determined by a number of factors including the tax status of the U.S. Holder and the rules regarding "market discount" (as discussed below) and accrued interest. If recognized gain or loss is capital in nature, it generally would be long-term capital gain or loss if the U.S. Holder held its Claim for more than one year at the time of the disposition. The deductibility of capital losses is subject to certain limitations.

The portion of any payment made with respect to a Contingent Right treated as imputed interest generally will be determined at the time such payment is made and should equal the excess of (1) the amount of the Contingent Right over (2) the present value of such amount as of the Effective Date, calculated using the applicable federal rate as the discount rate. The applicable federal rate is published monthly by the IRS. Such imputed interest is taxable as ordinary interest income.

### 3.    Accrued Interest

A portion of the consideration received by U.S. Holders of Claims may be attributable to accrued interest on such Claims. Such amount should be taxable to that U.S. Holder as ordinary interest income if such accrued interest has not been previously included in the U.S. Holder's gross income for U.S. federal income tax purposes. Conversely, U.S. Holders of Claims may be able to recognize a deductible loss to the extent that any accrued interest on the Claims was previously included in the U.S. Holder's gross income but is not paid. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued but unpaid interest is unclear. Under Section 6.13 of the Plan, the aggregate consideration to be distributed to U.S. Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to interest that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than first to the principal amount of Allowed Claims as provided in the Plan. Holders of Claims are urged to consult their respective tax advisors regarding the proper allocation of the consideration received by them under the Plan between principal and accrued interest.

### 4.    Market Discount

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of an Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest," or (b) in the case of a debt instrument issued with OID, its revised issue price (which is the sum of the issue price of the debt instrument and all OID includible in the income of holders with respect such debt instrument prior to the U.S. Holder's acquisition of the debt instrument), in each case, by at least a *de minimis* amount (generally equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of an Allowed Claim (as described above) that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

**D.    Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of 10.5% Secured Notes Claims**

The following discussion of U.S. federal income tax consequences applies only to Non-U.S. Holders of 10.5% Secured Notes Claims and assumes that the Debtors will undertake the Restructuring Transactions contemplated by the Plan (including the Plan Supplement). The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S. income and other tax consequences of the consummation of the Plan to such Non-U.S. Holder and the ownership and disposition of Takeback HoldCo Notes, Equity Subscription Rights, Debt Subscription Rights, the New Common Shares and Debt Rights Offering Securities, as applicable.

**1.    Gain Recognition**

Subject to the discussion under Section F below regarding backup withholding, any gain realized by a Non-U.S. Holder on the exchange of its 10.5% Secured Notes Claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or, if applicable, a lower treaty rate) on the gain recognized, which may be offset by certain U.S. source capital losses. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder. In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or, if applicable, a lower treaty rate) of its effectively connected earnings and profits (that, if required by an applicable income tax treaty, are attributable to a permanent establishment within the United States) for the taxable year, subject to certain adjustments.

**2.    Interest.**

Subject to the discussions below under Section E regarding FATCA and under Section F regarding backup withholding, payments made to a Non-U.S. Holder under the Plan that are attributable to accrued interest with respect to a 10.5% Secured Notes Claim or OID accruals on the Takeback HoldCo Notes and the Debt Rights Offering Securities generally will not be subject to U.S. federal income or withholding tax, provided that (a) such Non-U.S. Holder is not

a bank, (b) such Non-U.S. Holder does not actually or constructively own 10 percent or more of the total combined voting power of all classes of the stock of any of the Debtors, (c) such Non-U.S. Holder is not a "controlled foreign corporation" with respect to which an applicable Debtor is a "related person," each within the meaning of the Tax Code, (d) such payment is not effectively connected with the conduct by such Non-U.S. Holder of a U.S. trade or business (or, if required by an applicable income tax treaty, is not attributable to a permanent establishment within the United States), and (e) the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E, as applicable) establishing that the Non-U.S. Holder is not a U.S. person.  If the interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (and, if required by an applicable income tax treaty, is attributable to a permanent establishment within the United States), (x) the payment of such interest generally will not be subject to U.S. federal withholding tax as long as the Non-U.S. Holder provides a properly completed and executed IRS Form W-8ECI (or successor form) to the withholding agent, but (y) the Non-U.S. Holder generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes also may be subject to a branch profits tax equal to 30 percent (or, if applicable, a lower treaty rate) of its effectively connected earnings and profits (that, if required by an applicable income tax treaty, are attributable to a permanent establishment within the United States) for the taxable year, subject to certain adjustments.

A Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to the payment of interest generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or, if applicable, a lower treaty rate) on such payment.  For purposes of providing a properly completed and executed IRS Form W-8BEN or W-8BEN-E, as applicable, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

### 3.  Exercise of Equity Subscription Rights or Debt Subscription Rights

A Non-U.S. Holder will generally not be subject to U.S. federal income tax upon the exercise of an Equity Subscription Right or Debt Subscription Right.

### 4.  Distributions on New Common Shares

Any distributions made with respect to New Common Shares that constitute dividends for U.S. federal income tax purposes (*see* Section C above for a discussion of when distributions will result in dividends, a reduction in the Non-U.S. Holder's tax basis in the New Common Shares or gain from the sale or exchange of New Common Shares for U.S. federal income tax purposes) that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or, if an income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal withholding tax at a rate of 30 percent (or, if applicable, a lower treaty rate).  In addition, the applicable withholding agent may generally withhold on the entire distribution (including any portion that is not treated as a dividend), in which case a Non-U.S. Holder generally would be entitled to a refund from the IRS by timely filing an appropriate claim for a refund, to the extent

the withholding exceeds such Non-U.S. Holder's tax liability with respect to the distribution.  A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E, as applicable (or an applicable successor form), upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to New Common Shares held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and, if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes also may be subject to a branch profits tax equal to 30 percent (or, if applicable, a lower treaty rate) of its effectively connected earnings and profits (that, if required by an applicable income tax treaty, are attributable to a permanent establishment within the United States) for the taxable year, subject to certain adjustments.

5.    **Sale, Redemption, or Repurchase of Takeback HoldCo Notes, Equity Subscription Rights, Debt Subscription Rights, New Notes or New Common Shares**

Subject to the discussions below under Section E regarding FATCA and under Section F regarding backup withholding, a Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of New Notes, Equity Subscription, Debt Subscription Rights, or New Common Shares unless:  (1) such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition and certain other conditions are met; (2) such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or (3) in the case of New Common Shares (and, potentially, the Equity Subscription Rights), Reorganized Holdings is or has been during a specified testing period a "U.S. real property holding corporation" ("**USRPHC**") for U.S. federal income tax purposes.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or, if applicable, a lower treaty rate) on the gain recognized, which may be offset by certain U.S. source capital losses.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes also may be subject to a branch profits tax equal to 30 percent (or, if applicable, a lower treaty rate) of its effectively connected earnings and profits (that, if required by an applicable income tax treaty, are attributable to a permanent establishment within the United States) for the taxable year, subject to certain adjustments.

If the third exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax on any gain recognized on the disposition of all or a portion of its New Common Shares (and, potentially, the Equity Subscription Rights) under the Foreign Investment in Real Property Tax Act ("**FIRPTA**").  Taxable gain from the disposition of an interest in a

USRPHC (generally equal to the difference between the amount realized and such Non-U.S. Holder's adjusted tax basis in such interest) will constitute effectively connected income. Further, the buyer of the New Common Shares (and, potentially, the Subscription Rights) may be required to withhold a tax equal to 15 percent of the amount realized on the sale.  The amount of any such withholding would be allowed as a credit against the Non-U.S. Holder's federal income tax liability and may entitle the Non-U.S. Holder to a refund, provided that the Non-U.S. Holder properly and timely files a tax return with the IRS.  In general, the FIRPTA provisions will not apply to the New Common Shares if (a) the Non-U.S. Holder does not directly or indirectly own more than 5 percent of the value of the New Common Shares during a specified testing period, and (b) the New Common Shares are regularly traded on an established securities market.

The Debtors do not believe that Holdings is a USRPHC and do not currently anticipate that Reorganized Holdings will become a USRPHC.  However, there can be no assurance that Reorganized Holdings will not become a USRPHC in the future.

### E.     FATCA

Sections 1471 through 1474 of the Tax Code and the Treasury Regulations and administrative guidance issued thereunder (referred to as "**FATCA**") generally impose a 30% withholding tax on certain "withholdable payments" to certain foreign entities, unless such foreign entities satisfy specific information reporting or other compliance provisions or an exemption applies.  For this purpose, "withholdable payments" generally include U.S.-source payments of fixed or determinable, annual or periodical income (generally including dividends, if any, on shares of New Common Shares and interest (including any OID) paid in respect of debt instruments issued by the Debtors).  FATCA withholding tax will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax.

Prior to the issuance of proposed Treasury Regulations, withholding under FATCA would have also applied to payments of gross proceeds from the sale or other disposition of property of a type which can produce U.S. source interest or dividends on or after January 1, 2019.  However, the proposed Treasury Regulations generally eliminate FATCA withholding on payments of gross proceeds.  Taxpayers generally may rely on these proposed Treasury Regulations until final Treasury Regulations are issued.

**BOTH U.S. HOLDERS AND NON-U.S. HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS REGARDING THE POSSIBLE IMPACT OF THESE RULES ON SUCH HOLDERS' EXCHANGE OF ANY OF ITS CLAIMS PURSUANT TO THE PLAN OR ON THE OWNERSHIP OF TAKEBACK HOLDCO NOTES, EQUITY SUBSCRIPTION RIGHTS, DEBT SUBSCRIPTION RIGHTS, DEBT RIGHTS OFFERING SECURITIES, NEW COMMON SHARES OR CONTINGENT RIGHTS.**

### F.     Information Reporting and Backup Withholding

In general, information reporting requirements may apply to distributions or payments made (or deemed made) to a Holder of a Claim under the Plan or for or with respect to, or with respect to OID accruals (as applicable) on, Takeback HoldCo Notes, Equity Subscription Rights, Debt Subscription Rights, Debt Rights Offering Securities, New Common Shares or a Contingent Right.  Copies of these information returns may also be made available to the tax

authorities in a country in which a Non-U.S. Holder resides under the provisions of an applicable income tax treaty. Additionally, under the backup withholding rules, such payments or distributions may be subject to backup withholding unless, in the case of a U.S. Holder, such U.S. Holder provides a properly completed and executed IRS Form W-9 and, in the case of a Non-U.S. Holder, such Non-U.S. Holder provides a properly completed and executed applicable IRS Form W-8 (or otherwise establishes eligibility for an exemption). The current backup withholding rate is 24 percent. Backup withholding is not an additional tax. The amount of any backup withholding will generally be allowed as a credit against the Holder's U.S. federal income tax liability and may entitle the Holder to a refund, provided that the Holder timely furnishes the required information to the IRS.

### G.    Transaction Reporting by Holders of Claims

The Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, for example, "reportable transactions," which include certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds, and certain transactions in which gain or loss is not recognized in whole or in part. Each Holder is urged to consult its tax advisors regarding these Treasury Regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure by the Holder to the IRS.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM, NEW COMMON SHARE, TAKEBACK HOLDCO NOTE, EQUITY SUBSCRIPTION RIGHT, DEBT SUBSCRIPTION RIGHT, DEBT RIGHTS OFFERING SECURITY, OR GUC TRUST INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS, NEW COMMON SHARES, TAKEBACK HOLDCO NOTES, EQUITY SUBSCRIPTION RIGHTS, DEBT SUBSCRIPTION RIGHTS, DEBT RIGHTS OFFERING SECURITIES, AND GUC TRUST INTERESTS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM UNDER THE PLAN AND WITH RESPECT TO NEW COMMON SHARES, TAKEBACK HOLDCO NOTES, EQUITY SUBSCRIPTION RIGHTS, DEBT SUBSCRIPTION RIGHTS, DEBT RIGHTS OFFERING SECURITIES AND GUC TRUST INTERESTS, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL AND NON-U.S. INCOME OR OTHER TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## IX.    RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

**THE DEBTORS HAVE PROVIDED THE FOLLOWING RISK FACTOR DESCRIPTIONS TO SATISFY THE DISCLOSURE REQUIREMENTS OF SECTION 1125 OF THE BANKRUPTCY CODE.    DISCLOSURE AND DISCUSSION OF ADDITIONAL RISK FACTORS RELATED TO THE DEBTORS' BUSINESS MAY BE FOUND ON THE INVESTOR PORTAL OF THE DEBTORS' WEBSITE.**

### A.    Certain Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims or Allowed Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

### 1.    Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2.    The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent.  If such conditions precedent are not met or not waived, the Effective Date will not take place.

### 3.    The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction.  There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the

Holders of Allowed Claims or Interests as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

### 4.    The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim or Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Allowed Claims and Interests against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan and the Restructuring Support Agreement, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan.  Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 5.    Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the

Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased professional expenses.

### 6.       Continued Risk upon Confirmation

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for oil and natural gas (and thus demand for the services the Debtors provide), and increasing expenses.  *See* Article IX.D of this Disclosure Statement, entitled "Risks Related to the Debtors' and the Reorganized Debtors' Businesses." Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed.  As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization as reflected in the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan.  The Debtors will have retained the exclusive right to propose the Plan upon filing their Petitions.  If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve Confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases.  Adequate funds may not be available when needed or may not be available on favorable terms.

### 7.       The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, when commodities prices are volatile, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

8.      **The Debtors May Object to the Amount or Classification of a Claim or Interest**

Except as otherwise provided in the Plan, and subject to the terms of the Restructuring Support Agreement, the Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim or Interest where such Claim or Interest is subject to an objection.  Any Holder of a Claim or Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.  Further, parties in interest may object to the amount or classification of any Claim or Interest under the Plan in accordance with the Bankruptcy Code.

9.      **Risk of Non-Occurrence of the Effective Date**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

10.      **Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan**

The distributions available to Holders of Allowed Claims or Existing Interests under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims or Existing Interests to be subordinated to other Allowed Claims or Existing Interests.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims and Interests may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims and Interests may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time the number or amount of Claims and Interests that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims and Interests under the Plan.

11.      **Releases, Injunctions, and Exculpations Provisions May Not Be Approved**

Article X of the Plan provides for certain releases (including third-party releases), injunctions, and exculpation of claims and causes of action that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable, all as set forth more fully in the Plan.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties is necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts and have agreed to make further contributions, including by agreeing to massive reductions in the amounts of their Claims against the Debtors' estates and facilitating a critical source of post-emergence liquidity by backstopping the Rights Offering and the Exit Notes and committing to the Direct Allocation, but only if they receive the full benefit of the Plan's release and exculpation provisions. The Plan's release and exculpation provisions are an inextricable component of the Restructuring Support Agreement and Plan and the significant deleveraging and financial benefits that they embody.

### 12.    The Backstop Agreements May Not Be Approved

The Debtors and Commitment Parties have entered into the Equity Backstop Agreement and Debt Backstop Agreement in order to backstop the Equity Rights Offering and Debt Rights Offering that will be conducted in accordance with the Plan and have moved for Bankruptcy Court approval of such agreements by way of the Backstop Motion. While certain parties, including the Creditors' Committee, have objected to the approval of the Debtors' motion to approve the Backstop Agreements, the Debtors and the Ad Hoc Noteholder Group have continued to work diligently with the objecting parties and as a result, the Ad Hoc Noteholder Group, Bayside and Cerberus, and Mockingbird have reached an agreement in principle to resolve their objections, subject to definitive documentation. Accordingly, the Debtors are moving forward with a hearing on the Backstop Motion, which is scheduled for September 29, 2022 at 3:00 p.m. (prevailing eastern time).

While the Debtors believe that the Backstop Agreements are reasonable and necessary to effectuate the Restructuring Transactions, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Should the Bankruptcy Court deny the Debtors' Backstop Motion and approval of the Backstop Agreements, the decision may cause a default under the RSA or the Term DIP Facility. Additionally, should the objecting parties prevail, the Bankruptcy Court's decision not to approve the Backstop Agreement may render the Debtors unable to prove that the Plan is feasible or confirmable and the Bankruptcy Court may deny confirmation of the Plan.

### 13.    Ad Hoc Noteholder Group Reservation of Rights

The 10.5% Notes were issued by Debtor TPC Group Inc. and guaranteed by each of the other Debtors, and the holders of the 10.5% Notes have asserted a Claim for the full amount of the principal, make-whole and accrued prepetition interest on such notes against Debtor TPC Group Inc. and each of the other Debtors. In the event that the Plan is not confirmed, Holdings and each of the other Debtors may be liable for the full amount of at least approximately $1.098 billion of 10.5% Notes Claims pursuant to the 10.5% Notes Indenture and Holdings' guarantee of the 10.5% Notes.

### B.    Risks Related to Recoveries under the Plan

#### 1.    The Reorganized Debtors May Not Be Able to Achieve Their Projected Financial Results

The Reorganized Debtors may not be able to achieve their projected financial results. The financial projections set forth in this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular (the "**Financial Projections**").  The Financial Projections are attached hereto as **Exhibit D**.  While the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized.  If the Debtors do not achieve their projected financial results, the value of the New Common Shares may be negatively affected and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date. Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

#### 2.    The New Common Shares Are Subject to Dilution

The New Common Shares distributed on the Effective Date under the Plan, the Equity Rights Offering and the Backstop Agreements, as applicable, will be subject to dilution by any securities that may be issued post-emergence, including in connection with the Management Incentive Plan and any other future issuance of Securities (subject to the terms of the New Corporate Governance Documents).

#### 3.    Certain Tax Implications of the Plan

Holders of Allowed Claims and Interests should carefully review Article VIII of this Disclosure Statement, entitled "Certain U.S. Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan, the Plan Supplement and the Chapter 11 Cases and the ownership of any property received pursuant thereto (including the fact that the Takeback HoldCo Notes, Debt Rights Offering Securities and Debt Direct Allocation Securities are expected to be issued with more than a *de minimis* amount of OID for U.S. federal income tax purposes) may adversely affect the Reorganized Debtors and Holders of Claims and Interests entitled to vote on the Plan.

#### 4.    The Debtors May Not Be Able to Accurately Report Their Financial Results

The Debtors have established internal controls over financial reporting.  However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud.  Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements.  If the Debtors fail to maintain the adequacy of their

internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required for the Debtors' financial reporting under the terms of the agreements governing the Debtors' indebtedness.  Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition.  Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

### C.    Risk Factors Relating to Ownership of New Common Shares and HoldCo Notes

#### 1.    Market for Securities

There is currently no market for the New Common Shares or the HoldCo Notes, and there can be no assurance as to the development or liquidity of any market for any such securities.

Except as my be set forth in the New Corporate Governance Documents, the Reorganized Debtors are under no obligation to list the New Common Shares or the HoldCo Notes on any national securities exchange.  Therefore, there can be no assurance that any of the foregoing securities will be tradable or liquid at any time after the Effective Date.  If a trading market does not develop or is not maintained, holders of the foregoing securities may experience difficulty in reselling such securities or may be unable to sell them at all.  Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in the Disclosure Statement depending upon many factors including prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for the Reorganized Debtors.  Accordingly, holders of these securities may bear certain risks associated with holding securities for an indefinite period of time

#### 2.    The Valuation of New Common Shares Not Intended to Represent Trading Value of New Common Shares

The valuation of the Reorganized Debtors is not intended to represent the trading value of New Common Shares in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict.  Actual market prices of such securities at issuance will depend upon, among other things: (a) prevailing interest rates; (b) conditions in the financial markets; (c) the anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis; and (d) other factors that generally influence the prices of securities.  The actual market price of the New Common Shares is likely to be volatile.  Many factors, including factors unrelated to the Reorganized Debtors' actual operating performance and other factors not possible to predict, could cause the market price of the New Common Shares to rise and fall.  Accordingly, the value, stated herein and in the Plan, of the securities to be issued does not necessarily reflect, and should not be construed as reflecting, values that will be attained for the New Common Shares in the public or private markets.

3.      **The New Common Shares Being Issued Pursuant to the Equity Rights Offering and the Equity Direct Allocation Are Being Issued at a Significant Discount**

Pursuant to the Equity Rights Offering and the Equity Direct Allocations, the Debtors are issuing New Common Shares that in the aggregate will constitute approximately 99.9% of the New Common Shares, at a price of $13.00 per share.  This purchase price reflects a 35% discount to the plan equity value of Reorganized Holdings.  Persons that do not purchase New Common Shares (other than the Equity Direct Allocation Securities) through the Equity Rights Offering will not receive the value associated with this discount.

4.      **The New Common Shares Issued Pursuant to the Equity Rights Offering and the Backstop Agreements, as Applicable, Will Be Restricted Securities**

The New Common Shares issued pursuant to the Equity Rights Offering, the Equity Backstop Agreement and the Debt Backstop Agreement (including the Equity Put Option Securities and Debt Put Option Securities) will be issued in reliance on Section 4(a)(2) of the Securities Act of 1933.  Because these securities will not have been registered under the Securities Act or applicable state securities laws, and will not benefit from the exemption from registration afforded by section 1145 of the Bankruptcy Code, the New Common Shares issuable in the Equity Rights Offering and pursuant to the Equity Backstop Agreement and the Debt Backstop Agreement will be subject to trading restrictions under applicable federal and, possibly state, securities laws.

5.      **HoldCo Notes Issued Pursuant to the Debt Rights Offering and the Debt Backstop Agreement Will Be Restricted Securities**

The HoldCo Notes issued pursuant to the Debt Rights Offering and the Debt Backstop Agreement will be issued only to Qualified Institutional Buyers or non-U.S. Persons in reliance on Section 4(a)(2) of the Securities Act of 1933.  Because these securities will not have been registered under the Securities Act or applicable state securities laws, the HoldCo Notes issuable in the Debt Rights Offering and pursuant to the Debt Backstop Agreement will be subject to trading and resale restrictions under Rule 144 and applicable federal and state securities laws

6.      **Holders of 10.5% Secured Notes Claims Must Tender Such Notes as Part of the Equity Rights Offering and the Debt Rights Offering**

All Holders of 10.5% Secured Notes Claims are required to tender their notes to the subscription agent to the extent they are subscribing for New Common Shares and/or Holdco Notes in the Equity Rights Offering and/or the Debt Rights Offering.  As explained in the Rights Offering Procedures, once the notes are tendered, they may not be withdrawn, unless the Equity Rights Offering and/or the Debt Rights Offering are terminated or, in limited circumstances, the Holders are permitted to revoke the exercise of their subscription rights as set forth in the Rights Offering Procedures.  While it is currently contemplated that the Effective Date (at which time the Equity Rights Offering and the Debt Rights Offering will be consummated) will occur within a short time following the end of the subscription period for the Equity Rights Offering and the

Debt Rights Offering, there can be no assurance that this will be the case. Accordingly, tendering holders of notes may not have access to their notes, and may not be able to transfer or trade their notes, for a considerable period of time during which the Plan will not have been consummated.

### D.    Risks Related to the Debtors' and the Reorganized Debtors' Businesses

#### 1.    The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control, including, without limitation, the continued impact of the COVID-19 pandemic. The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest on their indebtedness, including, without limitation, potential borrowings under the Exit Facility, upon emergence.

#### 2.    The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

### 3. Certain Significant Holders of Shares of New Common Shares May Have Substantial Influence Over the Reorganized Debtors Following the Effective Date

Assuming that the Effective Date occurs, holders of Claims who receive distributions representing a substantial percentage of the outstanding shares of the New Common Shares may be in a position to influence matters requiring approval by the holders of shares of New Common Shares, including, among other things, the election of directors and the approval of a change of control of the Reorganized Debtors. The holders may have interests that differ from those of the other holders of shares of New Common Shares and may vote in a manner adverse to the interests of other holders of shares of New Common Shares. This concentration of ownership may facilitate or may delay, prevent, or deter a change of control of the Reorganized Debtors and consequently impact the value of the shares of New Common Shares. A holder of a significant number of shares of New Common Shares may, on its own account, pursue acquisition opportunities that may be complementary to the Reorganized Debtors' business, and as a result, such acquisition opportunities may be unavailable to the Reorganized Debtors. Such actions by holders of significant number of shares of New Common Shares may have a material adverse impact on the Reorganized Debtors' business, financial condition, and operating results.

### 4. Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization. A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses. In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

5.      **Financial Results May Be Volatile and May Not Reflect Historical Trends**

The Financial Projections attached hereto as **Exhibit D** are based on assumptions that are an integral part of the projections, including Confirmation and Consummation of the Plan in accordance with its terms, the anticipated future performance of the Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors and some or all of which may not materialize.

In addition, unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Debtors' operations.  These variations may be material and may adversely affect the value of the New Common Shares and the ability of the Debtors to make payments with respect to their indebtedness.  Because the actual results achieved may vary from projected results, perhaps significantly, the Financial Projections should not be relied upon as a guarantee or other assurance of the actual results that will occur.

Further, during the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as restructuring activities and expenses, contract terminations and rejections, and/or claims assessments significantly impact the Debtors' consolidated financial statements.  As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization.  The Debtors also may be required to adopt "fresh start" accounting in accordance with Accounting Standards Codification 852 ("**Reorganizations**") in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets.  The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.  The Financial Projections contained in **Exhibit D** hereto do not currently reflect the impact of fresh start accounting, which may have a material impact on the Financial Projections.

Lastly, the business plan was developed by the Debtors with the assistance of their advisors.  There can be no assurances that the Debtors' business plan will not change, perhaps materially, as a result of decisions that the board of directors may make after fully evaluating the strategic direction of the Debtors and their business plan.  Any deviations from the Debtors' existing business plan would necessarily cause a change in financial results.

6.      **The Debtors' Operations Depend on a Limited Number of Key Facilities, and The Loss or Shutdown of Operations at One or More of These Facilities Would Have a Material Adverse Impact**

Until the PNO Facility was shut down following an explosion on November 27, 2019, the Debtors operated two significant processing facilities, which are located in Houston, Texas, and Port Neches, Texas.  Following the PNO Incident, the PNO Facility was repurposed to function solely as a storage and shipping terminal.  The loss or shutdown of operations over an extended

period of time at the Debtors' remaining processing facility would have a material adverse effect on its financial condition, results of operations and cash flows. The Debtors' operations, and those of its customers and suppliers, are subject to the usual hazards associated with chemical manufacturing and the related storage and transportation of feedstocks, products and wastes, including explosions, fires, inclement or extreme weather, natural disasters (including hurricanes and flooding), mechanical failure, pipeline leaks and ruptures, unscheduled downtime, transportation interruptions (including due to third party actions or events such as those resulting from the Dock Incident and the chemical fire at the Intercontinental Terminals Company terminal in 2019), chemical spills, discharges or releases of toxic or hazardous substances or gases and other environmental risks. These hazards can cause personal injury and loss of life, severe damage to or destruction of property and equipment and environmental damage, and may result in suspension of the Debtors' operations and the imposition of civil or criminal penalties.

### 7.    The Debtors' Substantial Liquidity Needs May Impact Revenue

The Debtors operate in a capital-intensive industry. The Debtors' principal sources of liquidity historically have been cash flow from operations, borrowings under various bank-funded facilities, issuances of bonds, and issuances of securities. If the Debtors' cash flow from operations remains depressed or decreases as a result of lower commodity prices, decreased E&P sector capital expenditures, or otherwise, the Debtors may not have the ability to expend the capital necessary to improve or maintain their current operations, resulting in decreased revenues over time.

In addition to the cash requirements necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with preparing for and administering the Chapter 11 Cases and expect to continue to incur significant professional fees and costs through the conclusion of the Chapter 11 Cases. The Debtors cannot guarantee that cash on hand and cash flow from operations will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things: (a) their ability to comply with the terms and conditions of any cash collateral order entered by the Bankruptcy Court in connection with the Chapter 11 Cases; (b) their ability to maintain adequate cash on hand; (c) their ability to generate cash flow from operations; (d) their ability to develop, confirm, and consummate a chapter 11 plan or other alternative restructuring transaction; and (e) the cost, duration, and outcome of the Chapter 11 Cases. The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control. In the event that cash on hand and cash flow from operations are not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing. The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms. The Debtors' access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all. The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

8.      **The Debtors May Not Have Access to Capital in Future Due to Changes in General Economic Conditions or the Reduction in Value of Their Assets**

The Debtors may need new or additional financing in the future to conduct its operations, expand its business, make acquisitions or refinance existing indebtedness.  Longer term volatility and disruptions in the capital and credit markets as a result of uncertainty, changing or increased regulation of financial institutions, reduced alternatives or failure of significant financial institutions could adversely affect access to the liquidity needed for the Debtors in the longer term.  Such disruptions could require the Debtors to take measures to conserve cash until the markets stabilize or until alternative credit arrangements or other funding for its business needs can be arranged.  Inflation and other disruptions in the capital and credit markets could result in higher interest rates on debt securities and increased costs under credit facilities.  Any further disruptions could increase the Debtors' interest expense and capital costs and could adversely affect its results of operations and financial condition, including the Debtors' ability to grow its business through acquisitions.

Because the Exit ABL Facility is asset-based, the availability under the facility will decrease if the value of the Debtors' trade accounts receivable or inventories decrease.  Any sustained weakness in general economic conditions and/or financial markets in the United States or globally could adversely affect the Debtors ability to raise capital on favorable terms or at all.

Finally, in periods of low demand or decreased feedstock supply, the negative effect on the Debtors financial condition may cause the feedstock suppliers with whom the Debtors do business to require shorter payment terms or require letters of credit to secure payment. Complying with shorter payment terms or providing letters of credit would reduce the Debtors cash and/or the availability under the Exit ABL Facility.  Either of these outcomes would impact the Debtors liquidity, and could cause the Debtors to decrease its feedstock purchases or other expenditures, or otherwise negatively affect its financial condition and results of operations.

9.      **Cyclicality, Seasonality and Changes in the Petrochemicals Industry May Result in Reduced Volumes or Operating Margins**

The petrochemicals industry is cyclical and has historically experienced periodic downturns.  Profitability is highly sensitive to supply and demand cycles and product prices, among other factors.  The cycles are generally characterized by periods of strong demand, leading to high operating rates and margins, followed by periods of oversupply relative to demand, primarily resulting from significant capacity additions or decreases in demand, leading to reduced operating rates and lower margins.  Any significant downturn in or developments affecting demand for the end uses for the Debtors' products or in general economic conditions could result in a material reduction in demand and margins for the Debtors' products and could harm the Debtors' business.  The Debtors are unable to predict with certainty supply and demand balances, industry conditions, regulations, product standards and other factors that may affect industry operating margins and demand in the future.  In addition, because the Debtors compete in limited segments of the petrochemicals industry and have less diversified operations than most of the Debtors' competitors, a downturn in one or more of those specific segments may affect the Debtors more severely than the Debtors competitors who compete more broadly in the industry as a whole.

The Debtors may reduce production at or idle a facility or a particular unit at a facility for an extended period of time or discontinue a product line because of an oversupply of a particular product and/or a lack of demand for that particular product, or high feedstock prices that make production uneconomical.  In 2017, the Debtors significantly decreased production of HPIB at the Houston facility for the reasons described above.  Temporary idling or shutdowns sometimes last for several quarters or, in certain cases, longer, and cause the Debtor to incur costs, including the expenses of maintaining and restarting these facilities.  Factors such as increases in feedstock costs or lower demand in the future may cause the Debtor to further reduce capacity, idle facilities or discontinue product lines.

Lastly, the pricing under the Debtors' supply contracts and sales contracts is usually tied to a commodity price index, such as indices based on the price of unleaded regular gasoline, butane, isobutane or methanol, or to the price at which we sell the finished product.  The price for unleaded regular gasoline, typically used in pricing for butene-1 and raffinates, and the market price of MTBE varies seasonally as a result of increased demand during the spring and summer months of the year and decreased demand during the fall and winter months of the year.  As a result, the Debtors generally have increased volumes and margins for these products during the spring and summer and decreased volumes and margins during the fall and winter.

### 10.  Commodity Prices Are Volatile, and Sustained Volatility in the Petrochemicals Industry Could Materially Adversely Affect the Debtors' Businesses, Results of Operations, and Financial Condition

The Debtors' revenues, profitability and the value of the Debtors' assets depend on the prices of raw material feedstocks and demand for its finished products.  In particular, feedstock costs and customer demand are susceptible to volatility in pricing and availability of crude oil, natural gas and oil-related products such as unleaded regular gasoline.  Prices for these products tend to be volatile as well as cyclical, as a result of particular product market dynamics, the chemical nature of these products (and their ability to be stored economically), global and local economic factors, worldwide political events, weather patterns and the economics of oil and natural gas exploration and production, among other factors.  In addition, the Debtor's ability to process raw material feedstock is driven by the composition of feedstock delivered to it by producers.  Raw material feedstock composition is in turn influenced by the economics of producing lighter feedstocks like NGLs or heavier feedstocks like naphtha.  When light feedstocks are inexpensive relative to heavier feedstock, ethylene crackers conduct primarily light cracking, a practice in which producers process light feedstocks instead of heavy feedstocks, which results in lower volumes of crude C4 available in the market and occasionally the Debtors' inability to meet 100% of its contractual sales commitments.

The cost of raw material feedstock is usually determined by application of index-based formulas contained in many of the Debtors' raw material supply contracts.  Through these index-based formulas, raw material costs are linked to commodity market indices (such as the published contract price for butadiene and indices based on the price of unleaded regular gasoline, butane, isobutane or methanol) or to the selling price of the related finished product.  The selling prices for the Debtors' finished products are also typically determined from index-based formulas contained in many of its sales contracts and, in most cases, the indices used to determine finished product selling prices are the same indices used to determine the cost of the corresponding raw material feedstock.

The linkage between the costs of raw material feedstocks and the selling prices of the Debtors' finished products to the same indices mitigates, to varying degrees, the Debtors exposure to volatility in average material margin per pound (which the Debtor defines as the difference between average revenue per pound and average raw material cost per pound).  But, despite the fact that these index-based pricing formulas provide relative stability in average material margin per pound over time, the material margin percentage (which the Debtor defines as the difference between average revenue per pound and average raw material cost per pound as a percentage of average revenue per pound) tends to decline during periods in which selling prices and raw material costs trend upward and tends to increase during periods when selling prices and raw material costs trend downward due to various factors, including those listed below.

- The Debtors may purchase raw material feedstocks in one period based on market indices for that period, and then sell the related finished products in a later period based on market indices for the later period.  Changes in selling prices of finished products, based on changes in the underlying market indices between the period the raw material feedstocks are purchased and the related finished products are sold, lessens the effect of the matching indices and causes variation in the Debtors' average material margin per pound.  For example, the Debtor may purchase crude C4 at pricing based on the January butadiene index but sell the finished butadiene at pricing based on the February butadiene index.  If the butadiene index for January and February are the same, the Debtor would expect to realize substantially the same unit margins regardless of the absolute value of the index.  However, if the index increases between January and February, the Debtor would realize a temporary margin expansion until pricing stabilizes; and conversely, if the index decreases, the Debtor would realize a temporary margin contraction.  The magnitude of the effect on the average material margin per pound and the material margin percentage depends on the magnitude of the change in the underlying indices between the period the raw material is purchased and the period the finished product is sold and the quantity of inventory impacted by the change.

- Although most of the Debtors supply and sales contracts contain index-based formulas, varying proportions of raw material purchases and finished product sales are done on a spot basis or otherwise negotiated terms.  In addition, while many of the index-based formulas in the Debtors contracts are simply based on a percentage of the relevant index, others apply adjustment factors to the market indices that do not fluctuate with changes in the underlying index.  Although non-fluctuating adjustment factors would not impact the material margin per pound, they can impact the material margin percentage.  During periods when market indices are high, the use of non-fluctuating adjustment factors tends to reduce the material margin percentage; and conversely, during periods when market indices are low the non-fluctuating adjustment factors tend to increase the material margin percentage.

- Under some of the Debtors' raw material purchase contracts the cost of the raw materials are based on a percentage of the relevant market index and under some of our sales contracts the selling price of the related finished product is based on a higher percentage of the same market index.  As a result, the average material margin

per pound tends to increase during periods in which the market indices are trending upward and tends to decrease during periods in which the market indices are trending downward, although the material margin percentage tends to be relatively constant.

- Finished product selling price formulas under some of the Debtors sales contracts, primarily in the Performance Products segment, are based on commodity indices not for the period in which the sale occurs but for either a prior or subsequent period. The effect on profit margins of these selling price formulas is diminished during times of relatively stable market indices, but can have a substantial effect on both the average material margin per pound and the material margin percentage during times of rapidly increasing or decreasing market indices.

Because the Debtors' contractual arrangements do not insulate them from all changes in commodity prices, volatile petrochemicals and unleaded gasoline markets can materially and adversely affect its material margin percentage and results of operations.   Further, since producers are reluctant to increase production activities in a high-volatility commodities pricing environment, the pricing and availability of feedstocks and demand for the Debtors' products is affected as much by oil and natural gas price expectations as actual pricing.   Other factors that affect the overall levels of feedstock production and customer demand include:

- the supply of and demand for oil and gas and market expectations for such supply and demand;

- actions of the Organization of Petroleum Exporting Countries and other oil producing countries to control prices or change production levels;

- increased supply of oil and gas resulting from onshore hydraulic fracturing activity and shale development;

- general economic conditions, both worldwide and in particular regions;

- governmental regulation;

- the price and availability of alternative fuels;

- weather conditions, including the impact of hurricanes and other weather-related phenomena;

- advances in exploration, development and production technology;

- the policies of various governments regarding exploration and development of their oil and gas reserves; and

- the worldwide political environment, including uncertainty or instability resulting from an escalation or additional outbreak of armed hostilities or other crises in the Middle East, Ukraine, Russia or other geographic areas, or global threats of terrorism targeting oil and gas installations.

Crude oil prices have fluctuated significantly over the past few years, often with drastic moves in relatively short periods of time. While the Debtors saw an increase in both the demand for and price of crude oil throughout 2021, and a significant increase in price in the first half of 2022, it is not without continued uncertainty. Current global geopolitical and economic instability, particularly as it relates to the ongoing Russian invasion of Ukraine, continues to contribute to future uncertainty, and potential volatility, in financial and commodity markets. One example of such global economic forces impacting crude oil prices was the stalemate among Organization of Petroleum Exporting Countries ("**OPEC**") members and co-operating non-OPEC resource holders (the "**OPEC+ alliance**"), which ultimately ended in mid-2021 and was resolved when the OPEC+ alliance agreed to phase out the COVID-19 production cuts from August 2021 to December 2022. The Debtors expect that the OPEC+ alliance decision will cause the crude oil market to remain relatively tight in the near and medium-term, as this increased production will likely align with the higher global demand. The ongoing Russian invasion of Ukraine and resulting sanctions imposed on Russia, Russian companies and non-Russian companies controlled by Russia (or sanctioned Russian companies) by the European Union, the United States and other countries have further tightened the crude oil market and elevated commodity prices. Although such sanctions do not directly impact the Debtors' business or their customers, the effects of these measures may indirectly affect their business by affecting the price of crude oil, natural gas, natural gas liquids such as isobutane and oil-related products such as unleaded regular gasoline. Additionally, in order to address high oil prices, in March 2022 President Biden announced a plan to release 1 million barrels of oil a day for a period of 6 months from the U.S. Strategic Petroleum Reserve. The release from the U.S. Strategic Petroleum Reserve was available in the market beginning in May 2022. While the scope of impact on commodity prices is somewhat unclear, the continued release could have a downward effect.

Global demand for refined products and chemicals could impact the Debtors' operations and refined products, as well as crude pipelines that feed U.S. manufacturing demand. Likewise, changes in the global market for crude oil could affect their operations and require expansion capital expenditures. Demand for crude oil, natural gas, natural gas liquids such as isobutane and oil-related products may decline in the areas the Debtors serve as a result of decreased production by their customers, depressed commodity prices, decreased third-party investment in the industry, increased competition and other adverse economic factors. Other global events, such as the lingering impacts of the COVID-19 pandemic, could also affect the exploration, production and refining industries generally, which, indirectly, may affect their business.

In short, the Debtors face exposure to oil and natural gas price swings despite mitigation provided, to varying degrees, by the linkage between the costs of raw material feedstocks and the selling prices of finished products. The Debtors expect such volatility to continue in the future, especially given current economic and geopolitical conditions, and to affect availability and cost of raw material feedstock and demand for the Debtors' final products.

### 11. Failure to Obtain Suitable Quantities and Mix of Feedstock Could Materially Adversely Affect the Debtors' Performance and Cash Flows

The Debtors' operation is subject to risks associated with fluctuations in feedstock supply in both the C4 Processing and the Performance Products segments. Most of the Debtors' contracts with its crude C4 suppliers obligate the Debtor to purchase a percentage of the output from a given facility, as opposed to a fixed volume. The contracts contain volume estimates, but the actual amount purchased varies based on what is actually produced by the supplier. Additionally, for supply contracts that specify a fixed volume of feedstocks, as is the case for some agreements in the Performance Products segment, the suppliers are not always able to meet the fixed volume.

The amounts of feedstock produced by the Debtors' suppliers are not tied to the amounts needed to support the Debtors' customers. If customer demand drops without a corresponding drop in supplier production, inventories may dramatically increase and result in significantly increased exposure to commodity price volatility. Similarly, if supplier production decreases without a corresponding drop in customer demand, inventories may dramatically decrease, forcing the Debtor to allocate its own production and putting the Debtor at risk of default under its customer contracts. Moreover, to the extent that the Debtors are unable to obtain additional feedstock from suppliers or other sources, the Debtors' ability to grow the business could be constrained.

Even if the Debtor can obtain raw material feedstock at cost effective prices, the quantity and type of such feedstock may not be sufficient to meet the Debtors' production needs. Composition of the raw material feedstock varies greatly by production source. A disproportionate mixture of one sub-component over another in raw material feedstock can directly affect the types and quantities of products the Debtors can produce. While the Debtor contractually obligates most of its suppliers to certain minimum amounts of carbon compounds in the raw material feedstocks, there is typically an allowed margin of variability. This creates uncertainty as to whether the Debtor will have enough of a particular sub-component to meet its production needs. Finally, there is no guarantee that new sources of raw material feedstocks will have the same sub-component makeup as existing sources.

The Debtor anticipates that the relatively high cost of crude oil compared to the cost of natural gas in recent years may continue, especially in light of the abundance of shale natural gas being discovered and developed in the United States, and will drive continuation of light cracking.

### 12. Failure to Adequately Protect the Debtors' Intellectual Property Rights or Critical Data and Technology Systems Could Materially Adversely Affect the Debtors' Operations

The Debtors' success and ability to compete depends, in part, on proprietary processes for which the Debtors own or have sought to patent or registered intellectual property rights, including key patents related to HR-PIB and the catalyst mechanism for the polymerization of PIB and DIB that give certain products differentiated features. However, not all of the Debtors'

intellectual property can be protected by registration, and while a presumption of validity exits with respect to patents issued to the Debtors, such patents may be challenged, invalidated, circumvented or rendered unenforceable.  It is possible for others to copy, or otherwise obtain and use similar technology without authorization of the Debtors.  Proceedings to enforce the Debtors' intellectual property rights may be costly and the Debtors may not prevail.  Furthermore, as patents expire, the products and processes described and claimed under those patents become generally available for use by competitors.  In addition, patent rights may not prevent the Debtors competitors from developing, using or selling products that are similar or functionally equivalent to its products and processes.  Any unauthorized use or misuse of the Debtors' intellectual property or disclosure of its proprietary information could have a material adverse effect on the Debtors' business, financial condition and results of operations.

In addition, data security and privacy breaches, including due to human error, breach of Debtors' systems through hacking or cyber-attack, leaks or other events, could damage the Debtors' reputation, cause interruptions in their operations, require significant amounts of the Debtors' time and resources to handle, expose the Debtors to a risk of loss or litigation and possible financial liability, subject them to investigations, adverse publicity, regulatory penalties and enforcement action, and could also cause clients and potential clients to lose confidence and trust in the security of the Debtors' transactions, which would have a negative effect on the demand for the Debtors' services and products, all of which may materially affect their results of operations, financial condition and cash flows. Breaches of security could require the Debtors to make further financial investment in technical controls.

While the Debtors have taken reasonable steps to mitigate these risks by implementing network security and internal control measures, there can be no assurance that a system failure or data security breach will not be occur.  Further any insurance coverage maintained by the Debtors to cover such losses may be subject to specific policy terms and conditions (including deductibles, coverage restrictions and monetary coverage caps) or may be unavailable or insufficient to cover all of the Debtors' losses.

## 13. The Debtors' Operations Are Subject to Complex and Extensive Environmental, Health and Safety Regulations That Could Increase the Debtors' Legal Compliance Costs and Reduce the Debtors' Ability to Operate Successfully

The Debtors' operations are subject to extensive international, federal, state and local laws, regulations, rules and ordinances relating to pollution and protection of the environment, including those relating to the generation, handling, transportation, treatment, storage, disposal and cleanup of hazardous substances and wastes, the discharges of waste water, the emission of air pollutants or contaminants and chemical safety regulation and product stewardship.  Statutes and regulations in these jurisdictions also subject the Debtors to various permitting, certification and reporting requirements, and inspections regarding safety, training and general regulatory compliance.  For example, the Debtors' production facilities require a number of environmental permits and authorizations that are subject to renewal, modification and, in certain circumstances, revocation.  Actual or alleged violations of these regulations or permit requirements or the discovery of releases of hazardous substances at or from the Debtors' facilities could result in restrictions or prohibitions on, or require the Debtors to modify, its plant

operations and product distribution/sales strategy.  The Debtors may also incur significant remedial expenditures, substantial civil or criminal sanctions, as well as, under some environmental laws, the assessment of strict liability and/or joint and several liability, all of which could result in reduced revenue and profitability.

In addition, many of the Debtors' products and operations are subject to the chemical control laws of the jurisdictions in which they are located, including the regulation of chemical substances and inventories under the Toxic Substances Control Act ("**TSCA**") and the Emergency Planning and Community Right-to-Know Act ("**EPCRA**") that impose notification, reporting, record-keeping and testing requirements, and restrictions relating to chemical substances and/or mixtures as well as certain reporting on the storage, use and releases of hazardous chemicals to federal, state, and local governments; the federal Resource Conservation and Recovery Act ("**RCRA**") and comparable state laws that impose requirements for the generation, handling, transportation, treatment, storage, disposal and cleanup of waste from the Debtors' facilities; the federal Comprehensive Environmental Response, Compensation, and Liability Act ("**CERCLA**") also known as "Superfund," and comparable state laws that regulate the cleanup of hazardous substances that may have been released at properties currently or previously owned or operated by the Debtors or locations to which the Debtors have sent waste for disposal; the federal Clean Water Act ("**CWA**") and analogous state laws and regulations that impose detailed permit requirements and strict controls on discharges of wastewater from the Debtors facilities; the federal Clean Air Act ("**CAA**") and comparable state laws and regulations that impose obligations related to air emissions, including federal and state laws and regulations that recently took effect or are currently under development to address greenhouse gas ("**GHG**") emissions and which provide for continuous reporting obligations; and the United States Department of Homeland Security's Marine Transportation Security Act ("**MTSA**") which establishes standards for security at marine-based chemical facilities, among others.

New laws and regulations may also be enacted or adopted by various U.S and foreign regulatory agencies which may impact the Debtors' operations.  For example, in the U.S., the EPA finalized revisions to its Risk Management Program in January 2017.  The revisions included new requirements for certain facilities to perform hazard analyses, third-party auditing, incident investigations and root cause analyses, emergency response exercises, and to publicly share chemical and process information.  The EPA's Risk Management Program rule was challenged in court and subsequently the EPA published a reconsideration rule on November 20, 2019 that rescinded several of the 2017 revisions to the Risk Management Program rule.  The reconsideration rule was also challenged and that litigation is held in abeyance while the EPA reviews the 2019 reconsideration rule in response to an executive order issued by the Biden Administration.  Separately, the U.S. Occupational Safety and Health Administration had announced in 2013 that it was considering changes to its Process Safety Management standards that parallel EPA's Risk Management Program, but no rule changes have been issued.  In June and July 2021, the EPA and OSHA held public listening sessions to solicit comments on the Risk Management Program rule and Process Safety Management standards.  In addition, TSCA reform legislation was enacted in June 2016, and the EPA has begun the process of issuing new chemical control regulations.  EPA issued several final rules in 2017 and 2018 under the revised TSCA related to existing chemicals, including the following: (i) a rule to establish EPA's process and criteria for identifying chemicals for risk evaluation; (ii) a rule to establish EPA's process for evaluating high priority chemicals and their uses to determine whether or not they

present an unreasonable risk to health or the environment; and (iii) a rule to require industry reporting of chemicals manufactured or processed in the U.S. over the past 10 years. In April 2020, EPA finalized revisions to its Chemical Data Reporting rule under TSCA, which changes reporting requirements. The EPA has also released its framework for approving new chemicals and new uses of existing chemicals. Under the framework, a new chemical or use presents an unreasonable risk if it exceeds set standards. Such a finding could result in either the issuance of rules restricting the use of the chemical being evaluated or in the need for additional testing.

Furthermore, societal demands for increasing levels of product safety and environmental protection could result in increased pressure for more stringent regulatory control with respect to the petrochemical industry. These concerns could influence public perceptions regarding the Debtors' products and operations, the viability of certain products, the Debtors' reputation, the cost to comply with regulations, and the ability to attract and retain employees.

The Debtors cannot predict the full impact of, or the compliance costs associated with, the application of new and proposed environmental laws and regulations on the Debtors' businesses or any future regulatory and societal developments which might affect the handling, manufacture, or use of the Debtors' products or the handling, use, emission, disposal and/or cleanup of other materials or hazardous and non-hazardous waste. Because the operation of any chemical manufacturing plant entails risk of adverse environmental events, including exposure to chemical products and by-products and contamination associated with accidental spills, discharges or other releases of hazardous substances, the Debtors can provide no assurance that material costs or liabilities will not be incurred to remediate any such damage and the Debtors cannot predict with certainty the extent of any future liabilities and costs that may be imposed by governmental agencies or asserted by third parties under environmental, health and safety laws and regulations. Accordingly, the application of these laws and regulations to the Debtors' businesses may cause the Debtors' to incur significant unanticipated losses, costs or liabilities, which could have a material adverse effect on the Debtors' businesses, financial condition and results of operations.

### 14. The Debtors Are Subject to Other Legal Risks

The Debtors are also subject to laws and regulations which relate to other aspects of the Debtors' businesses, including anti-bribery and anti-corruption laws, other illegal or unethical acts, import and export controls, sanctions against business dealings with certain countries and third parties, the payment of taxes, employment and labor relations, antitrust and fair competition, data privacy protections, securities regulation, and other regulatory requirements affecting trade and investment. The application of these laws and regulations to the Debtors' businesses is often unclear and may sometimes conflict. In addition, these laws are complex and often change with time as international relations and confrontations between and among nations evolve. Compliance with these laws and regulations may involve significant costs or require changes in the Debtors' business practices that could result in reduced revenue and profitability. Non-compliance could result in significant fines, damages, and other criminal sanctions against the Debtors, their officers or their employees, in addition to prohibitions and heightened regulatory requirements with respect to the conduct of the Debtors' businesses, which could damage their reputation. Certain violations of law could also result in suspension or debarment from government contracts.

Although the Debtors implement policies and procedures designed to ensure compliance with these laws, there can be no assurance that all of their employees, contractors, agents, and business partners will not take action in violation with their internal policies. Any such violation of the law or even internal policies could have a material adverse effect on the Debtors' businesses, financial condition and results of operations.

The issue of, and increasing political and social attention on, climate change has resulted in both existing and pending national, regional, and local legislation and regulatory measures, such as mandates for renewable energy and emissions reductions, targeted at limiting or reducing emissions of greenhouse gases. Changes in these laws or regulations may result in delays or restrictions in permitting and the development of projects, may result in increased costs and may impair the Debtors' ability to move forward with their construction, completions, waste handling, storage, transport, and remediation activities, any of which could have an adverse effect on the Debtors' financial results.

In addition, the upcoming Congressional elections in the United States and policies implemented by the current and former Presidential administration have resulted in significant changes in legislation, regulation, implementation of government policy. The 2022 midterm elections may significantly alter the current regulatory framework and impact the Debtors' business and the petrochemicals industry. The Debtors continually monitor these developments so they can respond to the changing regulatory environment impacting their business.

Lastly, the Debtors are, and may in future be, subject to other legal and regulatory actions and claims arising out of the ordinary conduct of their business including product liability claims brought against the Debtors customers. Results of these proceedings cannot be predicted with certainty. Irrespective of their merits, these proceedings may be both lengthy and disruptive to the Debtors operations and may cause significant expenditure and diversion of management attention. In particular, many of the Debtors products provide critical performance attributes to its customers' products that are in turn sold to consumers. These consumers could potentially bring product liability suits in which the Debtors could be named as a defendants or which could cause the Debtors' customers to seek a contribution from the Debtors. A successful claim or series of claims against the Debtors could have a material adverse effect on the Debtors financial condition, results of operations and cash flows.

### 15.    The Debtors' Industry Is Highly Competitive, with Intense Price Competition

The petrochemicals industry is, generally, highly competitive. Due to the commodity nature of many of the Debtors' products, competition is based primarily on price and, to a lesser extent, the Debtors' professional reputation, client relationships, technology, reliability, product quality, product deliverability and product performance. The Debtor is generally not able to protect its industry position by product differentiation. In addition, competition for feedstocks among processors can have significant effects on the Debtors' input costs. If the Debtors' input costs are higher than those of its competitors due to supply-side competition or other factors, the Debtor may have difficulty recovering those higher costs from customers due to the commodity nature of its products.

Many of the Debtors' competitors are larger and have greater financial resources than the Debtor, including some of the world's largest chemical companies and major integrated petroleum companies. Some of these competitors have their own raw materials resources. In addition, a significant portion of the Debtors' operations are based on widely available technology. Therefore, barriers to entry, apart from capital availability, may be low in the commodity product section of the Debtors' business. The entrance of new competitors may reduce the Debtors' ability to maintain profit margins in circumstances where capacity utilization in the industry is diminishing. Certain petroleum-rich countries have also become more significant participants in the petrochemicals industry and may expand their petrochemicals operations significantly in the future. Any significant increases in competition from existing or new industry participants could have a material adverse effect on the Debtors' financial condition, results of operations and cash flows.

16.    **Concentration Risk in the Debtors' Customer and Supplier Base Could Materially and Adversely Affect the Debtors' Profitability and Cash Flows**

A small number of the Debtors' customers account for a significant percentage of its total revenues. For the years ended December 31, 2021, 2020 and 2019, the Debtor's top five customers accounted for an aggregate of 51.0%, 47.2% and 43.3%, respectively, of the Debtors' total revenue. Sales to the Debtor's largest customer accounted for 17% and 15% of its revenue for the years ended December 31, 2021 and 2020, respectively. Three customers accounted for 38% and 30% of the Debtors outstanding accounts receivables balances as of December 31, 2021 and 2020, respectively. In addition, a small number of feedstock suppliers account for a significant percentage of the Debtors' feedstock purchases. For the years ended December 31, 2021, 2020 and 2019, the Debtors' top five suppliers accounted for an aggregate of 62.5%, 65.6%, and 48.3%, respectively, of the Debtors' feedstock purchases. Customers and suppliers are also increasingly pursuing arrangements with processors that can meet a larger portion of their needs and production streams on a more global basis.

A loss of one or more of the Debtors' key customers or suppliers, which may occur for a variety of reasons, including as a result of a merger, consolidation or bankruptcy, would have a material adverse impact on the Debtors' financial condition, results of operations and cash flows.

17.    **The Debtors' Operations Involve a Degree of Inherent Risk That May Not Be Covered by the Debtors' Insurance and May Increase the Debtors' Operating Costs**

The manufacturing and marketing of petrochemical and related products inherently involves a degree of risk. Hazards such as chemical spills, pipeline leaks and ruptures, storage tank leaks, discharges or releases of toxic or hazardous substances or gases, mechanical failures, facility fires, pandemic outbreaks, harsh weather and marine conditions and other hazards incident to the manufacturing, processing, handling, transportation and storage of dangerous chemicals are inherent in the Debtors' businesses and that of its customers and suppliers. These hazards could result in personal injury, loss of life, severe damage to property and equipment, suspension or reduction of operations, environmental contamination and monetary penalties. On November 27, 2019, an explosion occurred at a butadiene processing unit at the PNO Facility.

The explosion and subsequent fires resulted in the complete shutdown of all processing at the PNO Facility and production remains shut as of this date. The PNO Incident directly resulted in the loss of approximately half of the Company's historical crude C4 processing capacity. The Company also incurred significant expenses related to legal and regulatory compliance, health and safety efforts, and restoring storage and terminal capabilities at the facility.

In addition to risks inherent in the day-to-day handling of petrochemical products, the Debtors' revenue, profitability and margins could be materially affected by asset damage. On June 13, 2018, an ocean-going bulk carrier navigating in the Port of Houston Ship Channel veered off course and struck a barge stationed at the Debtors' primary Houston facility dock. The incident caused substantial damage to both the barge and the dock facilities. On January 9, 2021, the HNO Technical Center which contains quality control and research and development equipment had a fire in the mechanical room. As a result of the fire, there was considerable damage to the facility and the housed equipment.

The Debtors attempt to protect themselves against financial losses and damage by carrying insurance, including general liability, workers' compensation, business interruption and property and casualty insurance which they believe are in accordance with customary industry practice. However, the Debtors do not carry insurance against all types of losses and even where losses or liability for damages is covered by insurance, the Debtors may incur deductibles, claims may be subject to maximum coverage limits, and recoveries may be denied, delayed or subject to prolonged litigation. Further, the Debtors' loss history with its insurers in connection with claims relating to events such as the PNO Incident, the Dock Incident and the HNO Technical Center Fire may limit the scope of insurance or coverage available to the Company on economic terms. The Debtors cannot assure you that their existing coverage will be sufficient to protect against losses, that they will be able to maintain their existing coverage in the future or that the premiums will not increase substantially. Certain insurance coverages may also become unavailable or available only for reduced amounts of coverage. For example, following the Debtor's petition for reorganization under Chapter 11, certain insurance providers have notified the Company that they will discontinue coverage or provide coverage at significantly higher costs. The loss of the Debtors' liability insurance coverage, inadequate coverage or substantial increases in premiums could have a material adverse effect on their businesses, financial condition and results of operations.

### 18.    The Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases

In the future, the Reorganized Debtors may become parties to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims or Interests under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

### 19. The Loss of Key Personnel or Labor Disputes Could Adversely Affect the Debtors' Operations

The Debtors' operations are dependent on a relatively small group of key management personnel, mechanics and other highly-trained personnel. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. Because the market for these experienced and highly-trained employees is competitive, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management and operating personnel could adversely affect the Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale could adversely affect the Debtors' businesses and the results of operations. The Debtors do not maintain "key person" life insurance on any of its key employees.

In addition, approximately fifty-one employees at the Debtors' PNO Facility are covered by collective bargaining agreements. The Debtors consider current labor relations with the applicable unions to be generally satisfactory, but there can be no assurance that the Debtors will not experience work stoppages in the future as a result of labor disagreements. A prolonged labor disturbance at one or more of the Debtors' facilities could have a material adverse effect on its operations, financial condition and results of operations.

### 20. Certain Holders of New Common Shares May Be Restricted in Their Ability to Transfer or Sell Their Securities

To the extent that shares of the New Common Shares issued under the Plan are covered by section 1145(a)(1) of the Bankruptcy Code, such securities may be resold by the Holders thereof without registration under the Securities Act unless the Holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities. Resales by Holders of Claims who receive New Common Shares pursuant to the Plan that are deemed to be "underwriters" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law. Such Holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.

The New Common Shares will not initially be registered under the Securities Act or any state securities laws, and the Debtors make no representation regarding the right of any Holder of New Common Shares to freely resell such securities (including, as applicable, shares or notes issuable upon exercise of the Subscription Rights) (as applicable). *See* Article VII to this Disclosure Statement, entitled "Transfer Restrictions And Consequences Under Federal Law."

### 21. Restricted Securities Issued Under the Plan May Not Be Resold or Otherwise Transferred Unless They Are Registered Under the Securities Act or an Exemption from Registration Applies

To the extent that securities issued pursuant to the Plan are not covered by section 1145(a)(1) of the Bankruptcy Code, such securities shall be issued pursuant to section 4(a)(2) under the Securities Act and will be deemed "restricted securities" that may not be sold, exchanged, assigned or otherwise transferred unless they are registered, or an exemption from registration applies, under the Securities Act. Holders of such restricted securities may not be

entitled to have their restricted securities registered and will be required to agree not to resell them except in accordance with an available exemption from registration under the Securities Act.  Under Rule 144, the public resale of restricted securities is permitted if certain conditions are met, and these conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer, as defined in Rule 144.  A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities after a six-month holding period unless certain current public information regarding the issuer is not available at the time of sale, in which case the non-affiliate may resell after a one-year holding period.  An affiliate may resell restricted securities after the applicable holding period but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale and notice requirements of Rule 144.

Holders of New Common Shares who are deemed to be "underwriters" under Section 1145(b) of the Bankruptcy Code will also be subject to restrictions under the Securities Act on their ability to resell those securities.  Resale restrictions are discussed in more detail in Article VII to this Disclosure Statement, entitled "Transfer Restrictions And Consequences Under Federal Law."

    **22.**    **Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations**

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from, among other things, substantially all debts arising prior to confirmation.  With few exceptions, all Claims against the Debtors that arise prior to the Petition Date or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization.  Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations.

## X.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a ballot or ballots to be used for voting on the Plan, is being distributed to the Holders of Claims and Interests in those Classes that are entitled to vote to accept or reject the Plan.  The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order.

***The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement in formulating a decision to vote to accept or reject the Plan.***

### A.    Voting Record Date

**The Voting Record Date is September 22, 2022**.  The Voting Record Date is the date on which it will be determined which Holders of Claims and Interests in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims and Interests have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim or Interest.

### B.    Voting Deadline

All Eligible Holders have been sent a Ballot together with the Disclosure Statement. Such holders should read the Ballot carefully and follow the instructions contained therein. Please use only the Ballot that accompanies the Disclosure Statement to cast your vote.

The Debtors have engaged Kroll Restructuring Administration as their Solicitation Agent to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan.  **FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE SOLICITATION AGENT AT THE ADDRESS SET FORTH BELOW ON OR BEFORE THE VOTING DEADLINE OF 4:00 P.M. (PREVAILING EASTERN TIME) ON OCTOBER 28, 2022, UNLESS EXTENDED BY THE DEBTORS.**

IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE SOLICITATION AGENT AT THE NUMBER SET FORTH BELOW TO RECEIVE A REPLACEMENT BALLOT. ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE A VOTE FOR ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.

IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE SOLICITATION AGENT AT:

*By regular mail, hand delivery, or overnight mail at*:
TPC Ballot Processing
c/o Kroll Restructuring Administration,
850 3rd Avenue, Suite 412,
Brooklyn, NY 11232

*By electronic mail at*:

TPCGroupinfo@ra.kroll.com
*By telephone at*:
(844) 596-2260 (toll free for U.S. and Canada)
(646) 214-8808 (International toll)

Additional copies of the Disclosure Statement are available upon request made to the Solicitation Agent, at the telephone numbers of e-mail address set forth immediately above.

### C.    Voting on the Plan

The Debtors are providing copies of the Disclosure Statement (including all exhibits and appendices), related materials, and a Ballot (collectively, a "**Solicitation Package**") to record holders in the Voting Classes.

Eligible Holders in the Voting Classes should provide all of the information requested by the Ballot, and should (a) complete and return all Ballots received in the enclosed, self-addressed, postage-paid envelope provided with each such Ballot to the Solicitation Agent, or (b) submit a Ballot electronically via the E-Ballot voting platform on the Solicitation Agent's website by visiting https://cases.ra.kroll.com/TPCGroup/, clicking on the "Submit E-Ballot" navigation panel, and following the instructions set forth on the website.

HOLDERS ARE STRONGLY ENCOURAGED TO SUBMIT THEIR BALLOTS VIA THE E-BALLOT PLATFORM.

### D.    Holders of Claims and Interests Entitled to Vote on the Plan

Under the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on a plan.  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless: (1) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof; or (2) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and interests do not actually vote on the plan.  If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan by a class of: (1) Claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Claims that cast ballots for acceptance or rejection of the

Plan; and (2) Interests as acceptance by interest holders in that class that hold at least two-thirds (2/3) in amount of the Interests that cast ballots for acceptance or rejection of the Plan.

The Claims and Interests in the following classes are impaired under the Plan and entitled to vote to accept or reject the Plan:

Class 3 – 10.5% Notes Secured Claims

Class 4  – General Unsecured Claims (including holders of 10.5% Notes Deficiency Claims)

An Eligible Holder should vote on the Plan by completing a Ballot in accordance with the instructions therein and as set forth above.  All Ballots must be signed by the Eligible Holder, or any person who has obtained a properly completed Ballot proxy from the Eligible Holder by the Record Date.

The Ballots provided to Eligible Holders will reflect the principal amount of such Eligible Holder's Claim; however, when tabulating votes, the Solicitation Agent may adjust the amount of such Eligible Holder's Claim by multiplying the principal amount by a factor that reflects all amounts accrued between the Record Date and the Petition Date including interest.

Under the Bankruptcy Code, for purposes of determining whether the requisite votes for acceptance have been received, only Eligible Holders who actually vote will be counted.  The failure of a holder to deliver a duly executed Ballot to the Voting Agent will be deemed to constitute an abstention by such holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan.

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE SOLICITATION AGENT AT (844) 596-2260 (toll-free for U.S. and Canada) or (646) 214-8808 (International toll).  ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL <u>NOT</u> BE COUNTED.**

## XI.    CONFIRMATION OF THE PLAN

### A.    Requirements for Confirmation of the Plan

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties.  Notice of the Confirmation Hearing will be provided to all known creditors and equity holders or their representatives.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing, at any subsequent continued Confirmation Hearing, or pursuant to a notice filed on the docket for the Chapter 11 Cases

### B.    Objections to Confirmation

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Rules, must set forth the name of the objector, the nature and amount of the Claims held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, with a copy to the chambers of the United States Bankruptcy Judge appointed to the Chapter 11 Cases, together with proof of service thereof, and served upon the following parties, including such other parties as the Bankruptcy Court may order:

a) **Debtors at**

TPC Group Inc.
One Allen Center
500 Dallas Street, Suite 2000
Houston, Texas 77002
Attention: Marilyn Moore Basso, SVP and General Counsel
(marilyn.moorebasso@tpcgrp.com)

b) **Counsel to Debtors at**

Baker Botts L.L.P.
30 Rockefeller Plaza
New York, New York 10112
Attention:  Scott R. Bowling (scott.bowling@bakerbotts.com)

- and -

Baker Botts L.L.P.
2001 Ross Avenue, Suite 900
Dallas, Texas 75201-2980
Attention:  James R. Prince (jim.prince@bakerbotts.com)
                    Kevin Chiu (kevin.chiu@bakerbotts.com)

- and -

Baker Botts L.L.P.
910 Louisiana Street
Houston, Texas 77002
Attention:  David R. Eastlake (david.eastlake@bakerbotts.com)
            Lauren N. Randle (lauren.randle@bakerbotts.com)

- and -

Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Attention:  Robert J. Dehney (rdehney@morrisnichols.com)
            Curtis S. Miller (cmiller@ morrisnichols.com)
            Daniel B. Butz (dbutz@ morrisnichols.com)
            Matthew O. Talmo (mtalmo@ morrisnichols.com
            Brian Loughnane (bloughnane@ morrisnichols.com)


**c)  Counsel to the Ad Hoc Noteholder Group**

Paul Hasting LLP
200 Park Avenue
New York, New York 10166
Attention:  Kristopher M. Hansen, Esq. (krishansen@paulhastings.com)
            Kenneth Pasquale, Esq. (kenpasquale@paulhastings.com)
            Erez E. Gilad, Esq. (erezgilad@paulhastings.com)
            Jonathan D. Canfield, Esq. (joncanfield@paulhastings.com)
            Gabriel E. Sasson, Esq. (gabesasson@paulhastings.com)

- and -

Young Conaway Stargatt & Taylor, LLP
1000 North King Street
Wilmington, Delaware 19801
Attention:  Matthew Lunn (mlunn@ycst.com)
            Robert Poppitti (rpoppitti@ycst.com)


**d)  Counsel to the Creditors' Committee**

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
Bank of America Tower
New York, New York 10036-6745

Attention:  Philip C. Dublin (pdublin@akingump.com)
                Naomi Moss (nmoss@akingump.com)

- and -

Akin Gump Strauss Hauer & Feld LLP
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Attention:  Marty L. Brimmage, Jr. (mbrimmage@akingump.com)
                Lacy M. Lawrence (llawrence@akingump.com)

- and -

Cole Schotz P.C.500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Attention:  Justin R. Alberto (jalberto@coleschotz.com)
                Patrick J. Reilley (preilley@coleschotz.com)
                Andrew J. Moore (aroth-moore@coleschotz.com)

**e) Office of the U.S. Trustee**

Office of the U.S. Trustee for the District of Delaware
844 King Street
Suite 2207, Lock Box 35
Wilmington, Delaware   19801
Attention:  Linda, Richenderfer (linda.richenderfer@usdoj.gov)
                Rosa Sierra-Fox (rosa.sierra-fox@usdoj.gov)

## C.  Requirements for Confirmation of the Plan

The Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation are that the Plan is (1) accepted by all impaired Classes of Claims and Interests entitled to vote or, if rejected or deemed rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (2) in the "best interests" of the holders of Claims and Interests impaired under the Plan; and (3) feasible.  The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

### 1.  Acceptance of Plan

(a).  Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[3031]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a Class of Claims will have voted to accept the Plan only if (i) two-thirds in amount and (ii) a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Pursuant to Section 3.7 of the Plan, if a Class contains Claims eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims in such Class shall be deemed to have accepted the Plan.

(b).    <u>Confirmation Without Acceptance by All Impaired Classes</u>

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; provided, that the plan has been accepted by at least one impaired class determined without including any acceptance of the plan by an insider holding a claim in that class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is Impaired under, and has not accepted, the plan.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan. A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or interests receives more than it legally is entitled to receive for its claims or interests. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured; claims versus interests) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to the dissenting class, the test sets different standards that must be satisfied for the Plan to be confirmed, depending on the type of claims or interests in such class. The following sets forth the "fair and equitable" test that must be satisfied as to each type of class for a plan to be confirmed if such class rejects the Plan:

---

[3031]    A class of claims or equity interests is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan:  (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

- **Secured Creditors**. Each holder of an impaired secured claim either (a) retains its liens on the property, to the extent of the allowed amount of its secured claim, and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such secured claim, (b) has the right to credit bid the amount of its claim if its property is sold and retains its lien on the proceeds of the sale, or (c) receives the "indubitable equivalent" of its allowed secured claim.

- **Unsecured Creditors**. Either (a) each holder of an impaired unsecured claim receives or retains under the plan, property of a value, as of the effective date of the plan, equal to the amount of its allowed claim or (b) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

- **Interests**. Either (a) each equity interest holder will receive or retain under the plan property of a value equal to the greater of (i) the fixed liquidation preference or redemption price, if any, of such equity interest and (ii) the value of the equity interest or (b) the holders of interests that are junior to the interests of the dissenting class will not receive or retain any property under the plan.

The Debtors believe the Plan satisfies the "fair and equitable" requirement with respect to any rejecting Class.

IF ALL OTHER CONFIRMATION REQUIREMENTS ARE SATISFIED AT THE CONFIRMATION HEARING, THE DEBTORS WILL ASK THE BANKRUPTCY COURT TO RULE THAT THE PLAN MAY BE CONFIRMED ON THE GROUNDS THAT THE SECTION 1129(b) REQUIREMENTS HAVE BEEN SATISFIED

### 1.    Best Interests of Creditors/Liquidation Analysis

As noted above, with respect to each impaired class of claims and equity interests, confirmation of a plan requires that each such holder either: (a) accept the plan; or (b) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such holder would receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code. This requirement is referred to as the "best interests test."

This test requires a bankruptcy court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtors believe that under the Plan all holders of impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code. The Debtors' belief is based primarily on: (a) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds

available for distribution to holders of impaired Claims and Interests; and (b) the Liquidation Analysis attached hereto as **Exhibit F** (the "**Liquidation Analysis**") prepared by the Debtors with the assistance of the Debtors' advisors.

The Debtors believe that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors. The Liquidation Analysis provided in **Exhibit F** is solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein. There can be no assurance as to values that would actually be realized in a chapter 7 liquidation, nor can there be any assurance that a bankruptcy court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

## 2.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared the consolidated financial projections for the Reorganized Debtors (collectively with the reserve information, development of schedules, and financial information, the "**Financial Projections**") for December 2022 through December 2027 (the "**Projection Period**"). The Financial Projections, and the assumptions on which they are based, are annexed hereto as **Exhibit D**. Based upon such Financial Projections, the Debtors believe they will have sufficient resources to make all payments required pursuant to the Plan and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their advisors, have analyzed their ability to meet their respective obligations under the Plan. The Debtors do not, as a matter of course, publish their business plans or strategies, projections or anticipated financial position. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or Financial Projections to parties in interest after the Confirmation Date, or otherwise make such information public, unless required to do so by a regulatory body. In connection with the planning and development of the Plan, the Financial Projections were prepared by the Debtors, with the assistance of their professionals, to present the anticipated impact of the Plan. The Financial Projections assume that the Plan will be implemented in accordance with its stated terms. The Financial Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, oil and natural gas prices, expectations regarding future commodity prices, competition in the petrochemicals industry, demand for the Debtors' products, changes in the political environment of the countries in which the Debtors and its suppliers and customers operate, regulatory changes, and a variety of other factors. Consequently, the estimates and assumptions underlying the Financial Projections are inherently uncertain and are subject to material business, economic, and other uncertainties. Therefore, such Financial Projections, estimates, and assumptions are not necessarily indicative of current

values or future performance, which may be significantly less or more favorable than set forth herein. Creditors and other interested parties should review Article IX of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code. The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement and the Plan in their entirety.

The Debtors submit that if the Debtors "cram down" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank or the best available under the circumstances. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100% of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan

## XII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN.

The Debtors have evaluated several alternatives to the Plan.  After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan.  If the Plan is not confirmed and consummated, the alternatives to the Plan are: (A) the preparation and presentation of an alternative reorganization; (B) a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code; or (C) a liquidation under chapter 7 of the Bankruptcy Code.

### A.    Alternative Plan of Reorganization

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan.  Such a plan might involve either: (a) a reorganization and continuation of the Debtors' businesses or (b) an orderly liquidation of their assets.  The Debtors, however, believe that the Plan, as described herein, enables their creditors to realize the most value under the circumstances.

### B.    Sale under Section 363 of the Bankruptcy Code

If the Plan is not confirmed, the Debtors could seek from the Bankruptcy Court, after notice and hearing, authorization to sell their assets under section 363 of the Bankruptcy Code.  In liquidations under section 363, the Debtors' assets could be sold over a more extended period of time than in a liquidation under chapter 7.  Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs.  Upon analysis and consideration of this alternative, the Debtors do not believe a sale of its assets under section 363 of the Bankruptcy Code would yield a higher recovery for the holders of Claims under the Plan.

### C.    Liquidation Under Chapter 7 of Bankruptcy Code

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code.  The effect that a chapter 7 liquidation would have on the recovery of holders of Allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as **Exhibit F.**

The Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of, among other things, the delay resulting from the conversion of the Chapter 11 Cases, the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals who would be required to become familiar with the many legal and factual issues in the Chapter 11 Cases, and the loss in value attributable to an expeditious liquidation of the Debtors' assets as required by chapter 7.

## XIII.    RECOMMENDATION.

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario.  Accordingly, the Debtors recommend that Holders of Claims and Interests entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

*[Remainder of page intentionally left blank.]*

Dated:  September 2022, 2022

TPC GROUP INC.
on behalf of itself and all other Debtors


/s/ Bart de Jong
Bart de Jong
Chief Financial Officer
TPC Group Inc.

## EXHIBIT A

**Joint Chapter 11 Plan**

## EXHIBIT B

**Restructuring Support Agreement**



**EXHIBIT C**

**Organizational Chart**

¹ Unless ownership % is specified, all entity relationships are 100% wholly owned

**<u>EXHIBIT D</u>**

**Financial Projections**

## **EXHIBIT E**

**Valuation Analysis**

**EXHIBIT F**

**Liquidation Analysis**

## **EXHIBIT G**

**Release Provisions**

**RELEASE PROVISIONS, EXCULPATION, AND RELATED INJUNCTIONS**

**10.6    Plan Injunction.**

Except as otherwise provided in the Plan or in the Confirmation Order, from and after the Effective Date, all Persons who have held, hold, or may hold Claims or Interests, and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, are, with respect to any such Claim or Interest, permanently enjoined after the entry of the Confirmation Order from:   (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a Debtor, a Reorganized Debtor, or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against a Debtor, a Reorganized Debtor, or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (ii) or any property of any such transferee or successor; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor, a Reorganized Debtor, or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this subsection (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; *provided*, that nothing contained in the Plan shall preclude such Persons who have held, hold, or may hold Claims against, or Interests in, a Debtor, a Reorganized Debtor, or an Estate from exercising their rights and remedies, or obtaining benefits, pursuant to and consistent with the terms of the Plan.

By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including the injunctions set forth in Section 10.6 of the Plan.

**10.7    Releases.**

(a) Releases by the Debtors.  **As of the Effective Date, except for the rights and remedies that remain in effect from and after the Effective Date to enforce the Plan and the obligations set forth in the Definitive Documents, including the documents in the Plan Supplement, except as provided for in the Schedule of Retained Claims and Causes of Actions, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged,**

by the Debtors, the Reorganized Debtors, and the Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all ~~Claims~~claims and Causes of Action (including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirements or otherwise that the Debtors, the Reorganized Debtors, the Estates, or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Restructuring, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the ABL DIP Facility, the Term Loan DIP Facility, the Exit ABL Facility, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Plan, the Solicitation Materials, the Restructuring Support Agreement, the Definitive Documents (including the documents in the Plan Supplement) or related agreements, instruments, or other documents relating thereto, the solicitation of votes with respect to the Plan, and any contract, instrument, agreement or other document entered into in connection with any of the foregoing, or any preference, fraudulent transfer or other avoidance action related to the Debtors arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than ~~Claims~~claims or Causes of Action arising out of or related to any act or omission of a Released Party that constitutes intentional fraud or willful misconduct as determined by a Final Order.   For the avoidance of doubt, ~~Claims~~claims and Causes of Action retained in the Plan Supplement are not released and expressly preserved.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any Claim or obligation arising under the Plan. ~~31~~32

---

"*Released Parties*" means, collectively, (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Supporting Noteholders, (iv) SK Second Reserve, L.P., a Delaware limited partnership; (v) the agents and lenders under the Exit ABL Facility, (vi) the holders of the Exit Notes and Holdco Notes and any agents or trustees thereunder, (vii) the agents and lenders under the ABL DIP Facility, (viii) the agents and lenders under the

Entry of the Confirmation Order by the Bankruptcy Court shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases in Section 10.7(a) of the Plan (the "Debtor Releases"), which includes, by reference, each of the related provisions and definitions under the Plan, and, furthermore, shall constitute the Bankruptcy Court's finding that the Debtor Releases are:  (i) in exchange for the good and valuable consideration provided by the Released Parties, (ii) a good faith settlement and compromise of the ~~Claims~~claims and Causes of Action released by the Debtors, the Reorganized Debtors and the Estates, (iii) in the best interests of the Debtors, the Estates and all Holders of Claims and Interests, (iv) fair, equitable and reasonable, (v) given and made after due notice and opportunity for hearing, and (vi) a bar to any of the Debtors, the Reorganized Debtors or the Estates asserting any claim or ~~cause~~Cause of ~~action~~Action released pursuant to the Debtor ~~Release~~Releases.

(b) **Releases by the Holders of Claims and Interests.**  As of the Effective Date, except for the rights and remedies that remain in effect from and after the Effective Date to enforce the Plan and the obligations contemplated by the Definitive Documents (including the documents in the Plan Supplement) or as otherwise provided in any order of the Bankruptcy Court, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Releasing Parties, from any and all ~~Claims~~claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort, or otherwise by statute, violations of federal or state securities laws or otherwise, that such holders or their estates, affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, or their Estates, the Chapter 11 Cases, the Restructuring, the

---

Term Loan DIP Facility, (ix) the Backstop Parties, (x) the Supporting Sponsors, (xi) the agents and lenders under the Prepetition ABL Credit Agreement, (xii) the indenture trustees and collateral trustees in respect of the Priming Notes and the 10.5% Notes; and (xiii) with respect to each of the foregoing Persons (i)–(xii), each of their affiliates, predecessors, successors, assigns, subsidiaries, current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, employees of affiliates who worked on matters related to the Debtors or the Chapter 11 Cases and other professionals, affiliated investment funds or investment vehicles, managed accounts or funds, and such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such; provided, that in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation; provided, further, that NALCO Co, LLC, Ingenero, Inc., and Suez WTS USA, Inc. shall not be Released Parties.

purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party, the restructuring of any Claims or Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Plan, the Solicitation Materials, the Restructuring Support Agreement, the Definitive Documents (including the documents in the Plan Supplement) or related agreements, instruments, or other documents, relating thereto, or the solicitation of votes with respect to the Plan, and any contract, instrument, agreement or other document entered into in connection with any of the foregoing, or any preference, fraudulent transfer or other avoidance action related to the Debtors arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, in all cases based upon any act or omission, transaction, agreement, event, or other occurrences taking place on or before the Effective Date, other than ~~Claims~~claims or Causes of Action arising out of or related to any act or omission of a Released Party that constitutes intentional fraud or willful misconduct as determined by a Final Order. [~~32~~33]

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases in <u>Section 10.7(b)</u> of the Plan (the "<u>Third Party Release</u>"), which includes, by reference, each of the related provisions and definitions under the Plan, and, furthermore, shall constitute the Bankruptcy Court's finding that the Third Party Release is (i) consensual, (ii) essential to the confirmation of the Plan, (iii) given in exchange for the good and valuable consideration provided by the Released Parties, (iv) a good faith settlement and compromise of the ~~Claims~~claims and Causes of Action released by the Third Party Release, (v) in the best interests of the Debtors and their ~~estates~~Estates, (vi) fair, equitable and reasonable, (vii) given and made after due notice and opportunity for hearing, and (viii) a bar to any of the Releasing Parties asserting any ~~Claim~~claim or Cause of Action released pursuant to the Third Party Release. ~~(c) Release of Liens. Except as otherwise specifically provided in the Plan or in any contract, instrument, release, or other agreement or~~

---

[~~32~~33]    "*Releasing Parties*" means, collectively, and in each case in its capacity as such: (a) the holders of all Claims that vote to or are deemed to accept the Plan, (b) the holders of all Claims whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan, (c) the holders of all Claims or Interests that vote, or are deemed, to reject the Plan but do not opt out of granting the releases set forth herein, (d) the holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth herein but did not opt out, and (e) the Released Parties other than the Debtors (provided, that with respect to Released Parties identified in clause (xiii) of the definition thereof, each such Person constitutes a Releasing Party under this clause (e) solely with respect to claims that such Person could have properly asserted on behalf of a Person identified in clauses (i) through (xii) of the definition of Released Parties).

~~document contemplated under or executed in connection with the Plan, including the Exit Facility Documents, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or filing being required to be made by the Debtors.~~

**10.8    Exculpation.** ~~33~~34

To the fullest extent permitted by applicable law, no ~~exculpated party~~**Exculpated Party** will have or incur, and each Exculpated Party will be released and exculpated from, any ~~Claim~~**claim** or ~~cause~~**Cause** of ~~action~~**Action** in connection with or arising out of the administration of the Chapter 11 Cases; the negotiation and pursuit of the ABL DIP Facility, the Priming Notes DIP Roll-Up, the Term Loan DIP Facility, the Exit ABL Facility, the Exit Notes, Holdco Notes, the Debt Rights Offering, the Equity Rights Offering, the Backstop Agreements, the Management Incentive Plan, the Disclosure Statement, the Restructuring Support Agreement, the Restructuring, and the Plan, the Solicitation Materials and any other Definitive Documents (including the documents in the Plan Supplement), or the solicitation of votes for, or confirmation of, the Plan; the funding of the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; the issuance of securities under or in connection with the Plan; the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors; or the transactions in furtherance of any of the foregoing; other than ~~Claims~~**claims** or Causes of Action arising out of or related to any act or omission of an Exculpated Party that constitutes intentional fraud or willful misconduct as determined by a ~~final order~~**Final Order**, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of securities pursuant to the Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law,

---

~~33~~34    "*Exculpated Parties*" means, collectively, (i) the Debtors, (ii) the Reorganized Debtors, (iii) any statutory committee appointed in the Chapter 11 Cases, (iv) the Supporting Noteholders, (v) the Backstop Parties, (vi) the agents and lenders under the Exit ABL Facility, (vii) the agents and lenders under the Prepetition ABL Credit Agreement, (viii) the Supporting Sponsors, (ix) the agents and lenders under the DIP Facilities (x) the holders of the Exit Notes and HoldCo Notes and any agents or trustees thereunder and (xi) with respect to each of the foregoing Persons in clauses (i) through (x), such Persons' predecessors, successors, assigns, subsidiaries, affiliates, current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, affiliated investment funds or investment vehicles, managed accounts or funds, and such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such.

**rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of securities thereunder. The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.**

**10.8    Injunction Related to Releases and Exculpation.**

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or entity, whether directly, derivatively, or otherwise, of any ~~Claims~~claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released or exculpated pursuant to the Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in the Plan or the Confirmation Order.

## **EXHIBIT H**

**Letter from Official Committee of Unsecured Creditors**

Document comparison by Workshare Compare on Thursday, September 22, 2022 6:43:38 AM

| Input: | |
|---|---|
| Document 1 ID | iManage://BBDMS.IMANAGE.WORK/Active/100134436/30 |
| Description | #100134436v30<Active> - TPC Group - Disclosure Statement |
| Document 2 ID | iManage://BBDMS.IMANAGE.WORK/Active/100134436/33 |
| Description | #100134436v33<Active> - TPC Group - Disclosure Statement |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 71 |
| Deletions | 66 |
| Moved from | 0 |
| Moved to | 0 |
| Style changes | 0 |
| Format changes | 0 |

| Total changes | 137 |
|---|---|