## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| TPC GROUP INC*., et al.,* | Case No. 22-10493 (CTG) |
| Debtors. | (Jointly Administered) |
|  | **Related Docket No. 1334** |

### MEMORANDUM OPINION

The reorganized debtors own and operate a petrochemical business.[1]    In November 2019, two of the debtors' plants, located in Port Neches, Texas, exploded, causing property damage and personal injury to nearby residents.  Various of the residents brought prepetition lawsuits against the debtors and several third parties, including the debtors' equity sponsors, in state court in Texas.[2]

The debtors' confirmed plan of reorganization embodied a global settlement. Under that settlement, $30 million was set aside to pay the claims of general unsecured creditors, including those of the tort plaintiffs.  The debtors released any causes of action their estates may have had against the Supporting Sponsors.  That

---

[1] TPC Group Inc. and its debtor affiliates were the debtors in the above-captioned bankruptcy case and are now (following the effectiveness of the confirmed plan of reorganization) referred to as the "reorganized debtors."

[2] That case is currently pending in the Multi District Litigation Court and can be found at *In re TPC Group Litigation*, Cause No. A2020-0236-MDL (Tex. 128th Dist. Ct. – Orange, Apr. 27, 2021).  For purposes of this memorandum, the case is referred to as the "MDL litigation," and the plaintiffs as the "tort plaintiffs."  The equity sponsor defendants are: (1) SK Second Reserve, LP f/k/a SK Capital Partners, LP; (2) SK Sawgrass, LP; (3) First Reserve Corporation, LLC; (4) FR Sawgrass, LP; (5) First Reserve Management, LP; (6) FR XII Alpha AIV, LP; (7) FR XII-A Alpha AIV LP; (8) Sawgrass Merger Sub, Inc.; (9) Sawgrass Holdings, LP; and (10) Sawgrass Holdings GP LLC.  These defendants are referred to as the "Supporting Sponsors."

release is backed by an injunction against the assertion of such a released cause of action. While the tort plaintiffs granted consensual third-party releases to some non-debtor parties, whatever direct claims the tort plaintiffs may have against the Supporting Sponsors are *not* subject to that release. The tort plaintiffs remain free to pursue them.

The dispute now before the Court presents the question whether the claims the tort plaintiffs intend to pursue against the Supporting Sponsors are claims that belonged to the debtors' estates (and therefore are released and enjoined), or are claims that belong to the plaintiffs themselves, such that they may be pursued in the MDL litigation. At the time of confirmation, the tort plaintiffs and the Supporting Sponsors identified that issue as one over which they disagreed. The plan expressly provides that this Court would resolve it after confirmation.

The dispute between the parties is, in substantial part, a dispute about how to characterize the complaint the plaintiffs seek to pursue in state court. The plaintiffs contend that the complaint asserts a claim for negligent undertaking that seeks to hold the Supporting Sponsors liable only for their own "independent" tortious conduct. The Supporting Sponsors dispute that characterization, contending that the complaint is fundamentally one for veil piercing in which the court is being asked to disregard the corporate separateness between the debtors and the Supporting Sponsors and hold the Supporting Sponsors liable for the debtors' tortious conduct. The Supporting Sponsors contend that veil-piercing actions are estate causes of

action, and that the claim the plaintiffs seek to pursue is therefore barred by the plan injunction.

In fairness, the complaint – both the Fifth Amended version (which is currently operative) and the proposed Sixth Amended version (which plaintiffs propose to file, and which removes the debtors as defendants, among other revisions) – contains elements of both.[3]  For the reasons described below, the Court concludes that in the context of this case, any claim to pierce the corporate veil would be an estate cause of action that has been settled and released.  On the other hand, a claim that alleges that the Supporting Sponsors had sufficient substantive involvement in the operation of the debtors' business that they undertook responsibility for managing the safety function and were negligent in the manner in which they carried it out is a direct claim against the Supporting Sponsors that is not affected by the debtors' settlement or the plan injunction.

The challenge presented by the current motion is that while the tort plaintiffs argue that, in substance, their proposed Sixth Amended Complaint asserts only claims that are for negligent undertaking, the complaint nevertheless asserts that the "corporate separateness should be disregarded."[4]  Indeed, it appears that the plaintiffs have endeavored, in the complaint, to say as much as they could about efforts to "hide behind the corporate veil" while retaining the ability to maintain that

---

[3] The formal title of the pleadings are the Fifth and Sixth "Amended Master Consolidated Petition and Jury Demand With Certificates of Merit and curriculum Vitae of Mr. Edwards, P.E."  These pleadings are referred to as the "complaints."

[4] Sixth Amended Complaint, D.I. 1363-2 ¶ 55.

the action is not *really* a claim for veil piercing that would be barred by this Court's injunction.

In the Court's view, however, the Sixth Amended Complaint crosses the line. While the complaint does assert claims for negligent undertaking that may proceed without running afoul of the plan injunction, fairly read, Count VIII of the Sixth Amended Complaint is simply a claim for ordinary veil piercing. Other counts fall somewhere in between, leaving it unclear whether the alleged liability of the Supporting Sponsors is based on their independent tortious conduct as opposed to a form of vicarious liability as the debtors' alter ego.

To comply with the plan injunction, this ambiguity must be removed. Count VIII must be dropped and the various assertions about veil piercing and hiding behind the corporate shield must be stripped out. The only claims plaintiffs may assert against the Supporting Sponsors are those that are based on their own allegedly tortious conduct. Plaintiffs are accordingly directed to submit to this Court a revised complaint that complies with the plan injunction as set forth herein. The Supporting Sponsors may, within ten days of such a filing, submit a letter brief identifying any portion of the complaint that they contend fails to comply with the terms of this ruling. The Court will thereupon determine whether the proposed complaint comports with the terms of the plan injunction.

The Court emphasizes that its role is simply to police the enforcement of the injunction reflected in the confirmed plan of reorganization (which the tort plaintiffs themselves supported). Neither this ruling nor any subsequent determination that a

further revised complaint may (or may not) be filed purports to venture any opinion about whether the remaining claims for negligent undertaking or otherwise are valid or invalid under Texas law.  Those merits issues are left entirely, as they must be, to the Texas state court.[5]

### Factual and Procedural Background

### 1.    The MDL litigation

For purposes of the motion before this Court, the relevant pleading is the proposed Sixth Amended Complaint, which the plaintiffs contend has been amended so that the debtors are dropped as defendants and the terms of the plan injunction are otherwise respected.

Eight of the counts in that complaint assert claims against one or more of the Supporting Sponsors.  Count II for negligence per se; Count III for negligence, gross negligence, and intentional trespass; Count IV for negligence and/or gross negligence; Count V for nuisance; Count VI for negligence, misrepresentations, and fraud; Count VII for gross negligence; Count VIII for what purports to be "direct liability"; and Count XI for negligent misrepresentation and failure to warn.

For purposes of the motion now before the Court, these counts fall broadly into three categories.  *First,* Counts VI and VII include (although among other things) claims that expressly assert that certain Supporting Sponsors are liable on a theory of negligent undertaking.

---

[5] This Memorandum Opinion sets out the Court's findings of fact and conclusions of law under Fed. R. Civ. P. 52, as made applicable to this contested matter under Fed. R. Bankr. P. 9014(c).

*Second*, Count VIII, despite being labeled "Direct Liability of the Owners and Sawgrass Holdings GP LLC," is in substance a claim for veil piercing. While the count does make reference to defendants' alleged "independent torts" and their "liability for their own wrongdoing," this count nowhere sets forth what those alleged torts are. Instead, the count emphasizes that the "distinct corporate identity" of the defendants should not shield them from liability. Defendants should not be permitted, as Count VIII asserts, to "rely upon the [separate] existence of [distinct legal entities] … to escape the imposition of … obligations … for which they should be held liable."[6] As far as this Court can discern, this count asserts no claim for a specific independent tort. To the extent it might add anything to the other claims in the complaint, the only thing that it can be adding is a claim that the Supporting Sponsors should be held vicariously liable for the debtors' alleged tortious conduct.

*Third*, the remaining counts do not specify which conduct gives rise to the claims. These Counts therefore presumably rely on a footnote in the complaint asserting that:

> Upon information and belief, one or more [Supporting Sponsors] participated and/or otherwise directed or were associated with the acts and/or omissions of TPC described herein. Accordingly, all the allegations against TPC herein are pled against the [Supporting Sponsors]. Stated differently, [the Supporting Sponsors] would be liable for Plaintiffs' damages separate and apart from the conduct of TPC, as they were a proximate cause of the explosions and releases and there can be more than one proximate cause of the same.[7]

---

[6] D.I. 1363-2 ¶¶ 131-139.

[7] *Id.* at 41 n.57.

### 2.    Relevant plan provisions

When the debtors filed for bankruptcy, the tort plaintiffs sought an order from this Court clarifying that the automatic stay did not bar proceedings in the MDL litigation from continuing against the non-debtor Supporting Sponsors.[8]    The Supporting Sponsors opposed this motion, arguing that the automatic stay prohibits parties from exercising control over property of the estate under 11 U.S.C. § 362(a)(3).[9]  According to the Supporting Sponsors, the tort plaintiffs' claims against them necessarily rested on a theory of alter-ego liability, a claim that could have been brought by the debtors and therefore belonged to the estate.[10]

Before that motion was brought to the Court for a hearing, however, the parties reached the settlement that was later embodied in the plan of reorganization.  The parties thus agreed to adjourn the tort plaintiffs' motion.  Section 10.7(a) of the debtors' plan provides for releases by the debtors of all claims and causes of action against the "Released Parties," which include the Supporting Sponsors, "that the Debtors, the Reorganized Debtors, the Estates, or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other person. . ."[11]  These "debtor releases" ensure that any claims held against the Released Parties that could have been brought by the debtors are released by the plan.

---

[8] D.I. 848.

[9] D.I. 957 at 22-23.

[10] *Id*. at 24.

[11] D.I. 1150-2 § 10.7(a).

Section 10.7(b) grants consensual third-party releases in favor of the Released Parties. By virtue of the settlement agreement discussed above, the MDL Plaintiffs agreed to grant these third-party releases to all parties except the Supporting Sponsors. That compromise is reflected in § 5.25 of the plan.[12]

Section 10.9(a) of the plan enjoins parties from prosecuting claims released by the plan. Section 10.9(b) provides that "the Bankruptcy Court will determine whether claims and Causes of Action that are the subject of the Motion for Clarification are property of the Estates. Any claims or Causes of Action determined not to be property of the Estates and for which the tort plaintiffs have not granted the releases set forth in 10.7(b) hereof are not enjoined by Section 10.9(a) hereof."[13]

Taken together, these provisions impose two requirements for the tort plaintiffs to prosecute their claims. *First*, the tort plaintiffs must not have granted a third-party release that would bar them from pursuing their claims. Under § 5.25 of the plan, the tort plaintiffs specifically opted out of granting such releases to the Supporting Sponsors. *Second*, the claims that the tort plaintiffs wish to bring must belong to them, rather than being estate causes of action. If the claims belong to the estate, then they are released under § 10.7(a) of the plan and the assertion of such claims is enjoined under § 10.9(a). The central question, then, is whether the tort plaintiffs' claims are property of the estate. By their current motion, the Supporting Sponsors ask this Court to determine that they are.

---

[12] *Id.* § 5.25.

[13] *Id.*

## Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1334(b). As a case within the district court's bankruptcy jurisdiction, it has been referred to this Court under 28 U.S.C. §157(a) and the district court's standing order of reference.[14]  The Supporting Sponsors' motion asks this Court to interpret the injunction contained in the plan of reorganization and this Court's confirmation order.  Because this Court plainly has jurisdiction to enforce its own orders,[15] this is a core matter under § 157(b).

## Analysis

The basic principle at issue in this dispute is simple to articulate but deceptively tricky to apply.  The notion is that the debtor is free, subject to court approval, to settle *its own* claims against the Supporting Sponsors.  But in doing so, it cannot (in the absence of a plan that grants a third-party release, which is inapplicable here) extinguish *anyone else's* right to assert its own claim against the Supporting Sponsors.  It is of course well settled that a "judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings."[16]  By the same token, a settlement of a claim binds only the parties to that settlement and does not prejudice a third party's right to bring its own lawsuit.

---

[14] Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated Feb. 29, 2012.

[15] *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009); *In re Essar Steel Minnesota LLC*, 47 F.4th 193, 200-202 (3d Cir. 2022).

[16] *Martin v. Wilks*, 490 U.S. 755, 762 (1989).

Deciding whether a veil-piercing claim is an estate cause of action under § 541 of the Bankruptcy Code (that a debtor-in-possession or trustee in bankruptcy can settle and resolve on behalf of the estate) or a claim belonging to an individual creditor (that cannot be settled without that creditor's agreement) can be complex. In the Third Circuit, the basic analytic framework for addressing this issue is set forth in *In re Emoral, Inc.*[17]  Applying the *Emoral* framework to the three categories of claims set forth in the MDL complaint, the Court concludes, for the reasons described below, that: (1) a claim for negligent undertaking is not a veil-piercing claim but is instead a direct claim held by the plaintiff against the party who is alleged to have undertaken a responsibility; (2) in circumstances like those presented in this case, under Third Circuit law any claim for veil piercing would be an estate cause of action; (3) the various other claims asserted may go forward to the extent they adequately allege direct conduct by the Supporting Sponsors and do not rely on theories of vicarious liability.  As noted above, the adequacy of the allegations as a matter of state law is not presented to this Court but is instead reserved for the MDL court.

## I.    Under *Emoral*, a claim for veil piercing is property of the estate.

Section 541 of the Bankruptcy Code gives the trustee in bankruptcy exclusive authority to assert or resolve a cause of action that belonged to the debtor before the bankruptcy.  *Caplin v. Midland Grace Trust Company*[18] explains the converse point

---

[17] 740 F.3d 875 (3d Cir. 2014).

[18] 406 U.S. 416 (1972).

– the trustee in bankruptcy lacks standing to assert a claim that is *not* an estate cause of action.  There, the Supreme Court held that a bankruptcy trustee could not sue an indenture trustee under a bond indenture (for bonds issued by the debtor) on a claim that alleged that the indenture trustee had breached its duties to the bondholders. That claim, the Supreme Court held, belongs to the bondholders, not the bankruptcy trustee.[19]

When a claim against a third party does belong to the debtor before the bankruptcy, however, only the trustee, not the creditors, may assert it.  In the Third Circuit, the test for determining whether a claim is property of the estate was set out in *In re Emoral, Inc.*[20]  *Emoral* involved a claim for successor liability.  Plaintiffs held claims against Emoral arising out of exposure to the chemical diacetyl.  Before its bankruptcy filing, Emoral sold substantially all of its assets to Aaroma.  In Emoral's bankruptcy case, the trustee asserted a fraudulent conveyance claim against Aaroma, which the parties settled.  As part of the settlement, however, the trustee granted Aaroma a global release from all causes of action held by the Emoral estate.  The question before the court was whether that settlement barred the diacetyl claimants from suing Aaroma on the ground that it was Emoral's successor, and thus liable under state law of "successor liability" for Emoral's allegedly tortious conduct.

The Third Circuit held that the settlement between Emoral and Aaroma *did* bar the plaintiffs' claims against Aaroma asserting successor liability.    After

---

[19] *See also* Douglas G. Baird, *The Elements of Bankruptcy* 111-112 (7th ed. 2022).

[20] 740 F.3d 875 (3d Cir. 2014) ("*Emoral*").

observing that, under § 541 of the Bankruptcy Code, the bankruptcy estate includes all "legal or equitable interest of the debtor in property as of the commencement of the case," the court explained that the test for deciding whether a cause of action is property of the estate asks whether (1) "the claim existed at the commencement of the filing and the debtor could have asserted the claim on his own behalf under state law," and (2) the claim is "a general one, with no particularized injury arising from it."[21]   If both of those requirements are met, the claim is the estate's cause of action. If either is not, the claim is property of the individual claimant.

The court further elaborated on the second prong, explaining that the features of a "general" (as opposed to a "particularized") claim are that (1) "the facts giving rise to the cause of action were … common to all creditors," and (2) if there were a successful recovery on the cause of action, it would "benefit the creditors . . . generally."[22]

Caselaw applying the *Emoral* standard has been less than uniform.  In *In re Caribbean Petroleum Corp.*, a debtor that had been forced into bankruptcy by a catastrophic explosion of 21 fuel storage tanks released, under a confirmed plan of reorganization, all claims that the debtor might have had against its officers and directors.[23] Various tort plaintiffs asserted claims arising out of the explosion against former directors for "both alter ego liability and liability for wrongful actions which

---

[21] *Emoral*, 740 F. 3d at 879 (*citing Bd. of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 169 (3d Cir. 2002)).  *See also In re Maxus Energy Corp.*, 571 B.R. 650, 658 (Bankr. D. Del. 2017).

[22] *Emoral*, 740 F. 3d at 878, 881.

[23] *In re Caribbean Petroleum Corp.*, 512 B.R. 774 (Bankr. D. Del. 2014).

[the former directors] committed themselves."[24]  The court rejected the directors' argument that, under *Emoral*, the alter ego claims were estate causes of action.  The court noted the difference between the successor liability claim at issue in *Emoral* and the veil-piercing claim in *Caribbean Petroleum* and placed particular emphasis on the fact that each of the victims of the explosion in *Caribbean Petroleum* suffered its own specific injury.  On that basis, the court concluded that the actions before it "are not claims which could have been brought by any creditor" but instead are for "personal, not generalized" claims.

A few years later, however, the Court in *Maxus* addressed a very similar question and came to the opposite conclusion.[25]  In *Maxus*, a creditor (a state environmental agency) sought to bring a veil-piercing action against the debtor's former owners, alleging that they were responsible for claims that ran, in the first instance, against the debtor.  *Maxus* held that, under *Emoral*, the right to pursue the debtor's parent was a claim held by the debtor and therefore could not (in view of the automatic stay) be pursued by the creditor directly.[26]

Finding that, under Delaware law, a subsidiary may sue its own parent corporation to pierce the corporate veil, the *Maxus* court held that (under the first prong of *Emoral*) the claim was one that the debtor could have brought.[27]  Turning to the second prong, the question whether the claim was "specific" or "generalized," the

---

[24] *Id.* at 778.

[25] *In re Maxus*, 571 B.R. 650 (Bankr. D. Del. 2017).

[26] *Id.* at 658-659.

[27] *Id.*

*Maxus* court, unlike *Caribbean Petroleum*, read *Emoral* to focus "not on the underlying harm, itself, but on the theory of liability put forth by the party bringing such claims."[28]

This Court is persuaded by the *Maxus* analysis. *First*, the Court agrees with the analysis in *Maxus* that a veil-piercing claim is one the debtor could have brought. To be sure, there is at least a sense in which the notion that a subsidiary would sue its parent corporation on the theory that the parent controlled and dominated the subsidiary is inherently counterfactual. If the subsidiary were in fact so thoroughly dominated by the parent, it seems unlikely that it would sue.[29] That said, while the *Maxus* court noted that no Delaware court has expressly addressed the question, this Court is aware of no decision that has disputed Judge Sontchi's conclusion that "under Delaware law, a wholly-owned corporate subsidiary can, in fact, pierce its own corporate veil and hold liable a third-party non-debtor."[30] This Court will accordingly adhere to that precedent.

---

[28] *Id.* at 660.

[29] *See In re Bldgs. by Jamie, Inc.*, 230 B.R. 36, 42-43 (Bankr. D.N.J. 1998) ("defendants who so completely dominate the corporation as to constitute its alter ego are not likely to institute an action to determine their own liability for corporate debts"); Baird, *Elements of Bankruptcy* 113 ("If the affairs of the corporation and the shareholders are so intermingled that the shareholders lose the ability to insist they are not liable for the corporation's debt, it is hard to see how the corporation would enjoy the right to sue them. The essence of the veil-piercing cause of action is that the two have become indistinguishable. It is hard to do this and at the same time argue that one is able to sue the other.")

[30] *Maxus*, 571 B.R. at 658. *See also Phar-Mor, Inc. v. Coopers & Lybrand*, 22 F.3d 1228, 1240 n.20 (3d Cir. 1994) ("Because piercing the corporate veil or alter ego causes of action are based upon preventing inequity or unfairness, it is not incompatible with the purposes of the doctrines to allow a debtor corporation to pursue a claim based upon such a theory.") *See also Harrison v. Soroof Int'l, Inc.*, 320 F. Supp. 3d 602, 615 (D. Del. 2018) ("no Delaware state court has ever definitively stated that, under Delaware law, a corporation may pierce its own corporate veil.")

*Second*, with respect to *Emoral*'s second prong, *Maxus* must be correct that the question of whether the claim is specific or general cannot turn on whether each plaintiff suffered its own particularized injury. While the court in *Caribbean Petroleum* and the tort claimants here emphasize that each claimant suffered its own unique injury,[31] that cannot itself be sufficient. Rather, the question is whether the basis for holding the third party liable is unique to a particular creditor or applies equally to all creditors.

The Seventh Circuit explained the same point in *Koch Refining v. Farmers Union Cent. Exchange, Inc.,* where it emphasized that a specific claim will typically be one that depends on "the personal dealings between [the debtor] and such creditors."[32] For example, if the basis for piercing the corporate veil is that the debtor and its parent held themselves out as a single entity *to a particular creditor*, that creditor may have a basis for recovering on its claim against the parent that is not available to creditors as a whole. But if the basis for asserting the claim against the parent is, for example, the failure to comply with corporate formalities, such a claim would be a general one.[33] While it is true that the decision in *Caribbean Petroleum*

---

[31] *See* D.I. 1363 at 10 (arguing that the claims are individual because they seek to recover for "damages to the homes in the neighborhood, which the Debtors did not own, or for the personal injuries that the individuals who lived near and/or worked in the plan suffered").

[32] *Koch Refining*, 831 F.2d 1339, 1349 (7th Cir. 1987).

[33] Courts engage a similar analysis in determining whether a claim by a shareholder seeking to assert a claim against a company's officers or directors is an individual claim or a "derivative" one – meaning that the claim is held by the corporation and can thus only proceed on a derivative basis. *See, e.g., In re Gaylord Container Corp. Shareholders Litig.*, 747 A.2d 71, 75 (Del. Ch. 1999) ("Special injury has been defined as an injury that is suffered by the plaintiff either 'directly' or 'independently' of the corporation.")

15

appeared to focus on the creditors' distinct injuries, this Court agrees with Judge Sontchi's decision in *Maxus* that the proper focus is not on individual injury but on whether the conduct that gives rise to the alleged liability was directed at a particular creditor.[34]

In the context of this case, it is thus clear that any claim that seeks to hold the Supporting Sponsors liable on an alter ego or veil-piercing theory must be a general claim. The complaint makes no suggestion that there were any "personal dealings" between any of the tort plaintiffs and the Supporting Sponsors. Rather, the claimants are alleged to be involuntary creditors who assert damages arising out of an explosion at the debtors' facility. No claim for veil piercing that they may assert has anything to do with any of the claimants' direct interactions with any of the Supporting Sponsors. Rather, to the extent there is a basis for these plaintiffs to pierce the defendants' corporate veil, such a theory would also be available to any other creditor. Accordingly, any veil piercing claim is an estate cause of action that has been resolved under the debtors' confirmed plan and whose assertion is barred by the plan injunction.

The tort plaintiffs' only real response in this regard is to say that they are not really bringing a claim for veil piercing. Rather, the allegations merely "drive home the point that the Supporting Sponsors cannot hide behind the corporate form of TPC

---

[34] The *Emoral* court's reliance on *Foodtown, see Emoral*, 740 F. 3d at 879, further supports this reading. In *Foodtown*, the Third Circuit held that a claim for withdrawal liability under ERISA was owed to a pension fund, not the company itself, and was therefore an individual rather than an estate claim upon the bankruptcy filing by the company. *See Foodtown*, 296 F.3d at 170.

… to insulate themselves from their own tortious conduct."[35]  At other points, the tort plaintiffs suggest that the basis for their claim of veil piercing is that the Supporting Sponsors engaged in other tortious activity that injured them, and that as a matter of equity a wrongdoer must not be permitted to escape liability for its wrongful conduct.  The problem with the effort to dismiss these allegations as mere rhetorical flourish, however, is that the plan and confirmation order expressly enjoin the tort plaintiffs from straying across the line and asserting an estate cause of action.  And to the extent the claimants contend that the veil piercing actions are just another way of restating their claims arising out of direct tortious conduct, they are wholly redundant.  In view of the plan injunction, the Court concludes that the tort plaintiffs may not proceed with any action in the MDL litigation that asserts any claim for piercing the corporate veil.  Because this Court can discern no purpose for any allegation regarding alter ego or the corporate veil other than to suggest such a claim, the Court concludes that all such allegations must be removed from the Complaint before it can be filed in the MDL litigation.

## II.    A claim for negligent undertaking is a direct cause of action.

Unlike a claim for veil piercing, under *Emoral*, any claim that the tort plaintiffs may assert for negligent undertaking would be a direct claim that belongs to the tort plaintiffs, not the debtors, and therefore is outside the scope of the plan injunction.

Broadly speaking, the basic premise of the law of negligent undertaking is that someone who undertakes to another to protect the safety of a third person must do so

---

[35] D.I. 1363 at 9.

reasonably.  Liability is imposed on one who undertakes to provide such services and fails to take reasonable care if that failure results in harm to the third persons whose safety was at issue.[36]

In the procedural posture of this dispute, the role of this Court is not to opine either on Texas law or on the adequacy of the allegations of the complaint.  Rather, it is simply to address the question whether such a cause of action, if it is recognized by Texas law and if it is adequately pled, would violate the plan injunction.  Applying *Emoral*, this Court concludes that such a claim would not violate the plan injunction.  The reason for that conclusion is that the duty is owed, under the law of negligent undertaking, not only to the party to whom the undertaking is made but also to the third persons whose safety is at issue.  While an action by the party to whom the undertaking is made would be property of that party, an action by the third party is equally the third party's lawsuit.  Such a claim would not be the debtor's cause of action under the first prong of *Emoral*.

As this Court understands the Supporting Sponsors' position, they offer essentially three reasons why the tort plaintiffs' claim for negligent undertaking should be viewed as an estate cause of action.  None is persuasive.

**A.    Factual overlap between a claim for negligent undertaking and one for veil piercing does not convert the negligent undertaking claim into an estate cause of action.**

The Supporting Sponsors argue that the tort plaintiffs' claim for negligent undertaking is actually a veil-piercing claim in disguise.  And it is true that there is

---

[36] *Restatement (Second) of Torts* § 324A.

factual overlap between the claims. The gravamen of the claim for negligent undertaking is that the Supporting Sponsors played such an active role in directing the day-to-day affairs of the debtor that they themselves were effectively making the decisions regarding the company's safety function. Those same factual allegations – that the Supporting Sponsors effectively directed the debtor's day-to-day operations – are also the basis of their veil-piercing claim (which, as described above, is actually an estate cause of action).

That factual overlap, however, does not convert the claim for negligent undertaking into a claim for veil piercing. (On the flip side, nor does the overlap – as the tort claimants contend – mean that a claim for veil piercing can go forward on the ground that it is *really* a claim for negligent undertaking.) For purposes of determining whether the claim for negligent undertaking is an estate cause of action, the fact that it happens to be direct and indirect holders of the debtors' equity that are alleged to have made the undertaking is entirely beside the point. A claim for negligent undertaking, after all, can be asserted against a contractor or even a stranger to the company. There would be no suggestion that such a claim against a contractor or a stranger was actually a veil-piercing action that is property of the estate. The fact that in this case it *happened* to be direct and indirect holders of the debtors' equity that are alleged to have undertaken to control the debtors' safety function does not convert what is otherwise a direct cause of action into one that is held by the estate.

**B.    The fact that the debtors may have had a claim against the Supporting Sponsors does not preclude a direct claim by the tort plaintiffs.**

The Supporting Sponsors argue that because the debtors would have been the parties to which any undertaking was made, any claim for having performed that undertaking negligently would be the debtors' claim to assert.  But that assertion is incorrect as a matter of tort law.  To be sure, it may well be the case that the party to which an undertaking is made can sue the party who makes the undertaking if the undertaking is performed negligently.  If the maker of explosives hires a contractor specializing in industrial safety to ensure that the manufacturing process is safe, and that contractor performs negligently, resulting in an explosion that destroys the plant and surrounding homes, it is likely the case that the explosives company can assert a claim against the contractor sounding in ordinary negligence.  And to the extent the homeowners recover against the explosives company for the resulting damage to their homes, those damages may well be within the scope of what the explosives company may recover against the contractor.

The point of the tort of negligent undertaking, however, is to give the homeowners a direct claim against contractor for the damages they suffered.  Under the principle of single satisfaction, those homeowners presumably could not recover the same damages from *both* the explosives company and the safety contractor for a single harm.  But the fact that the explosives company might have a claim against the contractor does not exclude the possible claim that the homeowners may have against the contractor.

That principle responds to the Supporting Sponsors' argument. The Supporting Sponsors may be right that the debtors would have had a claim against them for whatever acts gave rise to a claim for negligent undertaking. And to the extent the debtors had such a claim, there is no question that it fell within the global settlement reflected in the plan of reorganization and has now been resolved. The resolution of *that* claim, however, does not operate to preclude whatever direct claim that tort plaintiffs may hold against the Supporting Sponsors.

### C.  The fact that the Supporting Sponsors' liability may in some sense "derive" from their relationship with the debtors is insufficient to make the claim an estate cause of action.

Finally, the Supporting Sponsors argue that because any negligent undertaking claim against them would necessarily derive from their relationship with the debtors, any claim against them is (by definition) a "derivative" lawsuit rather than a direct one.

The problem with this argument is that the term "derivative" has multiple meanings – at least two of which have very different legal significance.[37] The different import of these distinct meanings of the term is the source of some amount of confusion.

*First*, the term "derivative" is used as a matter of corporate law to describe a claim that is held by a corporation rather than directly by its shareholders, such that any effort by the shareholders to pursue that lawsuit must be on behalf of the

---

[37] As has been said about the word "jurisdiction," derivative "is a word of many, too many, meanings." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 90 (1998) (citation omitted).

corporation, rather than by the shareholders in their individual capacities. As described above, that use of the term "derivative" involves an analysis that is essentially the same as the one under *Emoral* – asking whether the claim is best understood as being the property of the corporation or the property of the plaintiff who filed the lawsuit.[38]

But the term also has another meaning in the bankruptcy context of third-party releases. Under § 524(g) of the Bankruptcy Code, the provision that expressly permits third-party releases in certain circumstances, those releases are limited to claims that arise "by reason of" four particular relationships between the debtor and the third party, such as the third party's ownership of, or involvement in, the management of the debtor or the third party's provision of insurance to the debtor.[39]

The Third Circuit held in *Combustion Engineering* that § 524(g)'s limitation of the third-party release to claims that arise by reason of one of those four relationships means that a third party's "independent, non-derivative" liability cannot be the subject of a third-party release.[40] That means, for example, that a third-party release protecting an insurance company that is granted in a debtor's bankruptcy must be limited to protecting the insurer from liability that arises out of the insurance policies it issued to the debtor. The injunction cannot protect the insurer from, say, an antitrust claim that has nothing to do with the debtor.[41]

---

[38] *See supra*, n.33.

[39] *See* 11 U.S.C. § 524(g)(4)(A)(ii)(I)-(IV).

[40] *In re Combustion Engineering*, 391 F.3d 190, 233 (3d Cir. 2004).

[41] *See also In re W.R. Grace & Co.*, 900 F.3d 126, 135-138 (3d Cir. 2018) (addressing the permissible scope of a § 524(g) injunction); *In re Boy Scouts of America and Delaware BSA,*

This use of the term "derivative" has some overlap with the corporate law usage. For example, a claim that arises "by reason of [a] third party's ownership of a financial interest in the debtor,"[42] may be precisely the kind of veil-piercing action that would be treated as "derivative" under *Emoral* or corporate law. But that does not mean that every claim that is derivative as that term is used in the law of third-party releases would be a "derivative" claim as a matter of corporate law. As this case demonstrates, even without a third-party release, a debtor may resolve and extinguish its own causes of action, which is what it means for a claim to be "derivative" under corporate law. If the term "derivative" as used in the law of third-party releases covered only those claims, there would be nothing exceptional or extraordinary about such relief. As used in the context of third-party releases, "derivative" necessarily has a broader meaning.

The Supporting Sponsors' argument that the claims at issue here are "derivative" of the debtors reflects this same confusion. The Supporting Sponsors may be correct that the claims all arise by virtue of their relationship with the debtors – whether that be the ownership of a financial interest or alleged involvement in the debtors' management. In that sense, had the Supporting Sponsors received a third-party release, it may be true that the claims asserted here would all be sufficiently tied to the debtors that a third-party release that covered these claims would satisfy

---

*LLC*, 642 B.R. 504, 599-602 (Bankr. D. Del. 2022) (finding that the abuse claims asserted against the Boy Scouts' local councils and chartered organizations were derivative of claims against the Boy Scouts).

[42] 11 U.S.C. § 524(g)(4)(A)(ii)(I).

the standard as the Third Circuit has articulated it.[43]  But that does not and cannot mean that the claim fits within the narrower definition of "derivative" as it is used in *Emoral* and corporate law, such that the claim is property of the debtors rather than of the claimants.

### III.    Other claims that depend on allegations of direct action or inaction by the Supporting Sponsors, and do not rely on claims of veil piercing or alter ego, are not barred by the plan injunction.

In addition to their claims for negligent undertaking, the tort plaintiffs also assert a variety of other tort claims, which contain a hodgepodge of allegations – some involving direct conduct by the Supporting Sponsors and others that appear to rely on theories of vicarious liability.

It is clear that the tort plaintiffs are able to identify those factual allegations that assert direct conduct by the Supporting Sponsors.  Their brief in opposition to the Supporting Sponsors' motion contains nine bullet points in which they point to allegations in their complaint that do not rely on veil piercing or vicarious liability at all.[44]  The problem with the Sixth Amended Complaint is that it is not limited to these kinds of allegations, but (as described above) it also includes allegations regarding the Supporting Sponsors' efforts to shield themselves from liability by hiding behind the shield of corporate separateness.  To comply with the plan injunction, the plaintiffs must submit to this Court a complaint that relies *only* on such direct

---

[43] Had the plan in this case provided for such a release over the objection of the tort claimants, it would of course have been required to satisfy the rigorous requirements set forth in *In re Continental Airlines*, 203 F.3d 203 (3d Cir. 2000), which limits such relief to truly exceptional cases where such extraordinary relief is necessary to facilitate the debtor's reorganization.

[44] D.I. 1363 at 18-20.

allegations of tortious conduct. Once the complaint is revised so that it complies with the plan injunction, the MDL court may then determine whether the allegations are sufficient to state a claim under state law.

## Conclusion

For the foregoing reasons, the motion is granted in part and denied in part. Plaintiffs are accordingly directed to submit to this Court a revised complaint that complies with the plan injunction as set forth herein. The filing may be made by attaching the proposed complaint to a letter brief submitted in accordance with the Court's Chambers' Procedures otherwise applicable to discovery and scheduling matters. The Supporting Sponsors may, within ten days of such a filing, make a submission (also by way of a letter brief as provided in this Court's Chambers Procedures) identifying any portion of the complaint that they contend fails to comply with the terms of this ruling. The Court will thereupon determine whether the proposed complaint comports with the terms of the plan injunction.

Dated: February 22, 2023

_____

CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE